IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
WACO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>SHERMAN LAMONT FIELDS | NO. _____<br><br>CRIMINAL CASE NO.<br>W-01-CR-164 |

## MOTION FOR A NEW TRIAL AND TO VACATE, SET ASIDE AND CORRECT CONVICTION AND DEATH SENTENCE, AND FOR RELIEF FROM JUDGMENT, MADE PURSUANT TO 28 U.S.C. § 2255 OR, IN THE ALTERNATIVE, PURSUANT TO 28 U.S.C. § 2241 OR RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

### *** THIS IS A CAPITAL CASE ***

USActive 14872039.1

## I.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 2255.

## II.    PRELIMINARY STATEMENT

**IN THIS MOTION, MR. FIELDS SETS FORTH CLAIMS DIRECTED AT BOTH HIS CONVICTIONS AND DEATH SENTENCE.**

Mr. Fields (Inmate No. 15651-180), is currently confined at the United States Penitentiary at Terre Haute, Indiana.  He challenges his convictions and sentences, including his death sentence, imposed by the Honorable Walter S. Smith, Jr., District Court Judge for the Western District of Texas at Waco.  Mr. Fields pled "not guilty" and was convicted after a jury trial.  He was represented, for a portion of his trial, by Scott Peterson and Robert Swanton.  His case was affirmed on appeal and on January 14, 2008, the United States Supreme Court denied his petition for a *writ of certiorari*.  He now files this timely motion pursuant to 28 U.S.C. § 2255.  This is Fields' first application for post-conviction relief.

Mr. Fields was permitted to represent himself at a capital trial after an exceedingly brief competency evaluation.  He was sentenced to death after a penalty phase where the only testimony relating to his mental condition was that he was intelligent and *able* to adapt to rules, even if his history demonstrated prior failures to abide by those rules.  In fact, Mr. Fields suffers from chronic and profound mental disabilities.  Those mental disabilities rendered him incompetent to waive counsel and are crucial to an understanding of his life history and an accurate evaluation of his moral culpability.  While Mr. Fields is not seriously cognitively impaired, he is mentally ill.

If trial counsel had discovered and presented evidence of the length and severity of Mr. Fields' mental dysfunction, it would have been clear that he should not have been

permitted to waive counsel.   Likewise, if trial counsel had discovered and presented this evidence to Fields' jury in penalty phase, at least one juror would not have returned a death sentence.  The trial team's failure was not the result of a strategic decision.  It was, instead, the result of a failure to investigate.

After Mr. Fields was permitted to waive counsel, his right of self-representation was interfered with in significant ways.    During jury selection, trial counsel failed to exercise a peremptory challenge requested by Mr. Fields—a decision that was Fields' to make.  During trial, Mr. Fields was not permitted to participate in bench conferences where material issues regarding the course and conduct of the trial were discussed and decided.  Outside of Court, he was kept in a cell that was constantly light and noisy, with no bed nor shower, he was forced to sleep on a mattress on the floor between the cell door and toilet.  In court, he was required to wear a stun belt which, given his history of trauma and resulting anxiety disorder, made it virtually impossible to concentrate and defend himself.  The stun belt also violated his rights during the penalty phase where his heightened fear of being shocked substantially interfered with his right to consult counsel.

In sum, neither this Court nor Mr. Fields' jurors heard facts which, if investigated and presented, would have completely altered both the course and outcome of this case. Moreover, significant structural errors prevented Mr. Fields from receiving a fair trial.

This Court previously appointed undersigned counsel after finding that Fields was indigent and that "appointment of counsel is required by 18 U.S.C. § 3599 (a)(2)."

### III.    FACTS

#### A.    Procedural History

On May 13, 2003, an eight-count indictment was filed in the United States District Court for the Western District of Texas, charging Fields with, among other charges, escape and murder.  The indictment also contained a "Notice of Special Findings" alleging facts to support submission of the statutory intent factors and aggravating factors to the trial jury if the case proceeded as a death penalty prosecution.

On May 23, 2003, the Government gave notice it would seek the death penalty.

Trial started in January 2004.  On January 30, 2004, the jury convicted Fields on all counts.  From February 2-5, 2004, the same jury heard testimony and argument in the penalty phase.  *See* RE 38.  On February 5, the jury retired to deliberate.  On February 6, 2004, the jury sentenced Fields to death.[1]

The trial court entered judgment on April 7, 2004.

Fields filed a notice of appeal the next day.  Fields' conviction and death sentence were affirmed by the Fifth Circuit Court of Appeals on March 29, 2007. *United States v. Fields*, 483 F.3d 313, 323 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1065 (2008).  Fields petitioned the United States Supreme Court, which denied review on January 14, 2008.  This petition timely follows.

#### B.    Facts

At the commencement of trial and after unsuccessfully attempting to obtain new counsel, Mr. Fields told the Court he wanted to represent himself. [2]  In addressing the Court,

---

[1]    The jury's special findings were that the Government had proved beyond a reasonable doubt that Fields committed the murder during commission of another offense, *i.e.*, escape that he has a prior conviction for violent felony involving firearm.  The jury did **not** find that Fields "committed the offense after substantial planning and premeditation to cause the death of the victim."

[2]    Mr. Fields will include citations to the record in his March 1, 2009, pleading.

Fields stated that he found the actions of court appointed counsel "suspicious and I think they are working with the prosecutor instead of for me."  Fields further believed there were "several sure fired ways to prove that several other witnesses are lying," but that counsel either did not want to utilize such a strategy or (in Fields' view) were unable to do so.

After Fields persisted in his request for self-representation, the Court engaged in a colloquy with Fields during which the Court asked Fields if he knew what he was charged with and the possible consequences, including the death penalty, which could follow conviction. Fields answered that he understood and reiterated his belief that his attorneys were working with the prosecutor.  After the prosecutor indicated "concern" regarding Fields' ability to represent himself based on trial counsel's previous declaration that mitigating circumstances existed relating to Fields' mental health, the Prosecutor suggested to send "a shrink in."

As a result, the Court directed that Dr. Stephen Mark conduct an evaluation of Mr. Fields.  Shortly thereafter, Dr. Mark appeared in court and, framing the inquiry as, "can he make the decision to represent himself and be competent," answered: "yes."

Prior to permitting Fields to waive his right to counsel, the Court spoke with Fields one additional time.  During that inquiry, Fields noted that he was "not sure I can do this," but noted again his distrust and disagreement with current counsel.  Trial counsel did not object either to the scope of the hearing or the Court's decision to permit Fields to waive his right to counsel.

Dr. Mark's competency evaluation was exceedingly brief.  Dr. Mark did not review background information and met with Mr. Fields for only approximately 30 minutes. Most importantly, no one, including defense counsel, provided Dr. Mark with information regarding Mr. Fields' prior mental health history.

Mr. Fields suffers from severe symptoms of mental dysfunction including: paranoia, grandiosity, impulsivity, irritability, and the inability to switch sets. Thus, Fields' desire to waive counsel and represent himself was the direct product of his mental illness. But for his mental illness he would not have sought to waive this right.

Prior to his request to waive counsel, Mr. Fields requested that the Court appoint him new counsel citing a conflict of interest between himself and appointed counsel and stating his belief that counsel was conspiring with the prosecutors against him. The Court denied Mr. Fields' request for new counsel. Mr. Fields then invoked his right to self-representation. After Fields invoked his right to self-representation and before the conclusion of *voir dire*, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel. The Court admonished Mr. Peterson and Mr. Swanton that their role was advisory only and that Mr. Fields was to address the Court and the witnesses on his own. The Court did, however, authorize standby counsel to argue motions and take up other matters outside the presence of the jury but only if the record was "absolutely clear" that Fields chose to have counsel do so and that counsel was doing so in a manner Fields approved of. Just before trial, the Court ruled that Fields could not participate in any bench conferences that occurred in the presence of the jury. The Court encouraged Fields to authorize standby counsel to speak for him on whatever matter needed to be discussed and allow his standby counsel to report back on the matters that took place if his participation in a bench conference would require the jury to be excused. Fields never authorized standby counsel's participation in this way and wanted to participate in these conferences on his own behalf.

While Mr. Fields represented himself, the Court held several bench conferences and at least two chambers conferences. Several of the bench conferences occurred in front of the jury. Fields was not permitted to participate in any of these bench or chambers conferences. At each conference, critical trial decisions were made by the trial judge, prosecutors and standby

counsel in Mr. Fields' absence and without his input or consent. When bench conferences took place, Fields' standby counsel either would not or could not consult Fields before approaching the Court. Accordingly, standby counsel did not know what positions Fields wanted them to take or how Fields wanted them to present those positions to the Court concerning any of the issues discussed at bench or chambers conferences. After decisions were made by standby counsel, the prosecutor and the Court at bench or chambers conferences, standby counsel would simply report those decisions to Fields without further discussion.

During *voir dire*, Mr. Fields had already exercised his right of self-representation, and Mr. Peterson and Mr. Swanton were to serve as standby counsel only. Although Mr. Fields agreed to consult with standby counsel during the jury selection process, Mr. Fields did not authorize standby counsel to exercise peremptory challenges in a manner that was contrary to his instructions to them about how he wished to exercise those challenges. Nevertheless, standby counsel did not follow Mr. Fields' instructions to exercise peremptory challenges against particular jurors.

Mr. Fields' ability to represent himself was severely impaired by the conditions of his pre-trial confinement which forced him to conduct his own defense in an extremely sleep deprived state. Prior to and during trial, Mr. Fields was confined in a jail cell where the lights were never dimmed, and where it was constantly noisy. Mr. Fields' sleep cycle and biorhythm were disrupted as a result. These disruptions promoted psychological deterioration and behavioral disruptions in Mr. Fields.

Fields was kept in a holdover cell in the booking department of McLennan County Jail. Unlike a typical cell, this small cell was only equipped with a steel bench and a toilet – the cell had no bed, no shower and no ability to escape the constant light and noise of the booking area. Fields was forced to sleep on a mattress placed on the floor of the cell, in what

little space existed between the door and the toilet.  As a result, Mr. Fields got virtually no sleep.  This was the case for several weeks prior to and during trial.

During this same period of time, Mr. Fields, a *pro se* defendant with no formal legal education, attempted to prepare for his first trial – a federal capital case where his life was at stake.  He had no access to any legal materials while in his cell.  Although he had a pad of paper, he was not allowed to keep a pencil in the cell to write with.

As a result of sleep deprivation, during his conduct of the trial Fields could not concentrate, had trouble with his memory, and would become irritable.  In addition, these conditions of confinement caused additional negative consequences including marked distress, anxiety, feelings of lethargy, mood disorders, irritability, ruminations and intrusive thoughts, paranoia, and other symptoms.

In addition to having to endure these conditions of confinement, the security measures employed in the courtroom during trial also interfered with ability to represent himself.  When Mr. Fields entered the courtroom, he was forced to wear a stun belt.  Fields was required to wear the stun belt both during the time that he was *pro se* and when he was represented by counsel.  The use of a stun belt served as a constant source of concern and fear, making it difficult to impossible for him to concentrate and which altered his normal demeanor in order to lessen the risk (in his mind) of the marshal activating the stun belt, making Fields act cold and unemotional.

Mr. Fields' concern regarding the stun belt was well-founded.  A stun belt uses an intense electric shock as a means of physical and psychological control over the person wearing the device.  The belt is placed over a defendant's waist, and prongs that are connected to two nine-volt batteries are attached to the defendant's left kidney area.  The belt is designed to deliver a 45,000 to 50,000 volt shock for approximately eight seconds when activated by a

remote control.  Once a person activates the device, that person cannot stop the shock manually; the shock lasts for the entire eight seconds.  The force of the shock knocks most wearers to the ground.  The victim shakes uncontrollably and can remain incapacitated for up to 15 minutes.  It is not unusual for the wearer to self-urinate or defecate.

The manufacturers of stun belts themselves note the strong psychological effect of the device on the wearer.  For example, at trials the defendant will be watching whoever has the monitor.  According to one manufacturer, one of the great advantages of the stun belt is its capacity to "humiliate the wearer."  The stun belt's intended use, therefore, is to control the mind of the defendant.  In this case, it worked.

Prior to being forced to wear the stun belt, the marshals explained and demonstrated its use to Mr. Fields.  Consistent with the literature, they told him that the device, if activated, would administer a painful and disabling shock.  The marshals told Fields that the device was activated by pushing a button.  They told Fields that the marshal would activate the device if they perceived any security risk – if Fields refused to remain seated or if he appeared upset or angry.  Then, they demonstrated the device by placing it on the ground and activating it.  The stun belt crackled, setting off sparks.

Mr. Fields did not trust the marshals.  Due to years of trauma, he is intensely paranoid – he does not trust anyone.  Thus, he expected a marshal to activate the device for any plausible reason.  As a result, Fields remained seated and appeared to be as unemotional as possible.  However, Fields could not get the constant threat of an intentional or accidental activation out of his mind.  This made it difficult and, at times, impossible for Fields to concentrate.  As a result, he simply gave up on some cross-examinations.

The trial court did not consider any less restrictive alternatives to the stun belt. Although the Court heard from the marshals, the Court did not take any testimony on the

psychological effects of a stun belt on defendants, in general, or Fields, in particular. Trial counsel failed to present any evidence regarding the effect of the device on Mr. Fields to the trial Court. The reason was trial counsel's failure to conduct an adequate investigation into Mr. Fields' history of mental illness.

At trial, the Government alleged that Fields, possessive and jealous of his sometime-girlfriend Suncerey Coleman, escaped from federal custody, convinced Coleman to come away with him, drove her to a rural area outside Waco, and shot her to death there. Fields presented the defense that he had been framed for the murder by the real killers, Fields' jealous girlfriend Shalaykea Scroggins and one of their acquaintances, Edward "Trey Boy" Outley. Fields attempted, without success, to attack the Government's witnesses as testifying inconsistently, implausibly, and in return for benefits from the Government. Fields also attempted to point out the absence of any physical evidence connecting him to the crime.

The Government presented witnesses to support its theory that Fields, while in jail, became desperate to control Coleman and suspicious that she was seeing other men. The prosecutors called a host of jail inmates to testify they had heard Fields say that he was upset that Coleman was seeing other men, that he had told Coleman and others that he would kill her, and that he made a range of confessions to her murder.

Fields, generally without success, tried to put forward evidence that Trey Boy and Scroggins were lying about their involvement in Coleman's murder because they were the actual killers. Fields sought to show that Scroggins was obsessed with him, that she hated Coleman out of jealousy over him, and that she had become incensed at seeing Coleman and Fields together the day of Coleman's disappearance.

He also presented evidence that Coleman, unlike Scroggins, had visited him often while he was in jail. In addition, Tanesha Hilliard testified that she had never known Fields to be

violent or threatening toward Coleman and that Fields did not seem upset when he was with Coleman at Hillcrest hospital.

In addition, Fields attempted, again without success, to impeach the jail inmate witnesses by, among other things, questioning them about prior inconsistent statements, their ability to talk to each other about his case, the implausibility of his making such damning admissions to them, and the benefits they had or hoped to secure from the Government in exchange for their testimony.

The Government's case at punishment focused primarily on establishing Fields' future dangerousness. It presented witnesses who testified about Fields' bad behavior at the McLennan County Jail; about police reports relating to other serious violent offenses; and about records that had been prepared in conjunction with his juvenile adjudication, probation, and incarceration; his incarceration in the Texas Department of Criminal Justice; the Federal Medical Center; and the McLennan County Jail. The Government then presented Richard Coons, M.D., a psychiatrist who testified that Fields would be a danger in the future.

Fields acceded to representation during the penalty phase of the trial, and, through his attorneys, presented lay evidence describing the events that marked his childhood. Fields and his four other brothers were raised by his single mother. They lived in Waco's housing projects, and there were exposed to drugs, violence, weapons, and alcoholism from his earliest age. From age three to eleven, Fields' mother's boyfriend lived with them, and he was a drunk who beat her and the children regularly. Eventually, Fields' mother shot the boyfriend and went to jail. (Later, his mother would be shot by one of her boyfriends.) From that time on, Fields started having serious behavioral problems, becoming involved in both the juvenile justice and mental health systems.

Fields' grandfather, his primary father figure, was the only person to offer Fields a nurturing environment as a child, and Fields flourished during his time with him. This relationship came to a tragic end when Fields watched his grandfather be run over in front of him by a drunk driver.

At one point, Fields was in juvenile detention, and he and a friend made a suicide pact. Fields nearly succeeded in hanging himself, and was unable to respond when his friend called out to him. Thinking Fields had died the friend proceeded to hang himself. By the time Fields was about 15 years old, several other close friends had been killed.

Finally, Fields presented the testimony of Randy Price, Ph.D., a psychologist who testified to Fields' intelligence and ability to adapt to a structured environment.

The trial team's investigation failed to explore the adequacy of institutional responses to Fields' childhood trauma, mental illness, and failed to determine that their client's problems were never accurately identified or properly addressed. Understanding these mental conditions is vital to understanding and explaining Mr. Fields' behavior, including his history of criminal and other "bad acts." Mr. Fields' misconduct in detention settings is completely consistent with the symptomology associated with bipolar disorder and with an individual who has been exposed to chronic and severe trauma. Additionally, if properly understood and treated, Mr. Fields' behavior could have been previously, and can currently be moderated and positively adjusted in the future.

The trial team failed to conduct a competent investigation into Mr. Fields' chronic history of serious mental dysfunction. Counsel's investigation into Mr. Fields' mental condition does not reflect reasonable professional judgment. Although the trial team consulted with an expert regarding Mr. Fields' cognitive ability, the trial team did not investigate and consequently did not discover this wealth of information about Fields' mental health. Counsel failed to consult

with experts tailored specifically to the needs of the case, but instead relied on an expert who limited his inquiry to Fields' cognitive ability.

Additionally, the trial team failed to investigate and present evidence regarding the federal prison system's ability to control Fields' behavior and his true escape risk. The Bureau of Prisons (BOP) has significant security and confinement capability in its super-maximum facility, ADX Florence. The capability largely negates (*i.e.*, render extraordinarily improbable) Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape. However, even if not assigned to ADX Florence, Mr. Fields could easily be controlled within the federal prison system, if he presented a risk of committing violent acts.

Mr. Fields' true risk of committing acts of future violence can be accurately measured and predicted. Two actuarial scales were available in February 2004 for forecasting the risk of assault in prison that could have been applied to Mr. Fields. The first is based on a study of the prison misconduct of approximately 6,000 convicted murderers, projecting their likelihood of serious prison violence during a 40-year prison term. Application of this scale to Mr. Fields yields a 40-year risk of a 14.5% likelihood of serious prison violence. This is modestly below the risk rate of 16.4% of the sample as a whole. Most of this risk is for assault of another inmate. Life-time risk of an aggravated assault on a correctional officer is projected at 1%. Further, and as discussed previously, even that low probability can be reduced by the application of correctional interventions including more secure confinement.

During penalty phase, Fields was reluctant to discuss with defense counsel many of the matters that concerned him the most for fear that his show of emotion would provide a basis to "push the button." Several jurors have noted that Fields lack of emotion at trial was a significant factor in their decision to impose a death sentence.

After deliberating over six hours, the jury asked the trial court what sentence would be imposed if it could not unanimously agree on a sentence.  The trial court responded that in that event, it (the court) would impose a sentence, which could not be the death penalty.  The jury almost immediately issued a second note confirming that it could not unanimously agree on a sentence.  Over Fields' objection, the trial court ordered the jurors to keep deliberating.  They returned with a death verdict shortly thereafter.

## IV.    CLAIMS FOR RELIEF

> **CLAIMS RELATED TO FIELDS' INCOMPETENCY TO WAIVE COUNSEL AND PROCEED *PRO SE***

CLAIM 1:    MR. FIELDS WAS INCOMPETENT TO WAIVE HIS RIGHT TO COUNSEL.  PERMITTING MR. FIELDS TO REPRESENT HIMSELF VIOLATED THE CONSTITUTIONAL GUARANTEES OF SIXTH AND EIGHTH AMENDMENTS.

CLAIM 2:    MR. FIELDS WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN THE TRIAL COURT CONDUCTED AN INADEQUATE HEARING IN RESPONSE TO MR. FIELDS' COMPETENCY TO WAIVE COUNSEL AND REPRESENT HIMSELF.

CLAIM 3:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO CONDUCT A COMPETENT INVESTIGATION PRIOR TO OR IN RESPONSE TO MR. FIELDS' REQUEST TO WAIVE COUNSEL, FAILED TO DEMAND A BROADER INQUIRY BY THE COURT IN RESPONSE TO FIELDS' MOTION, AND FAILED TO OBJECT TO MR. FIELDS' COMPETENCY TO WAIVE HIS RIGHT TO COUNSEL.

Mr. Fields suffers from chronic, serious, severe mental disabilities.  He has severed mood swings, grandiosity, extreme paranoid ideation, and impaired judgment.  His request to waive counsel was the direct product of these disabilities.  None of this evidence was discovered or presented to this Court.

Trial counsel did not conduct a competent investigation into Mr. Fields' mental condition.  One failure of the trial team's investigation was the failure to consult with appropriate

experts.  Consequently, the trial team did not discover facts which were highly relevant to the decision to permit Fields' to waive his right to counsel, failed to demand a broader scope to the competency hearing, and failed to object to Fields' request to waive counsel.

A criminal defendant may not be tried unless he is competent. *Godinez v. Moran*, 509 U.S. 389, 396 (1993).  The conviction or sentencing of a defendant who is legally incompetent at the time of the proceedings violates due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  Likewise, in our federal courts, "the right of self-representation has been protected by statute since the beginnings of our Nation." *Faretta v. California*, 422 U.S. 806, 813 (1975).  A defendant's entitlement is clear: the Sixth Amendment "grants to the accused personally the right to make his defense . . . [t]he right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819-20.

However, a high standard exists for a defendant who seeks to waive counsel.  The two cases that set forth the Constitution's "mental competence" standard, *Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*), and *Drope v. Missouri*, 420 U.S. 162 (1975), specify that the Constitution does not permit trial of an individual who lacks "mental competency." *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding." 362 U.S. at 402 (emphasis added; internal quotation marks omitted).  *Drope* repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."  420 U.S. at 171 (emphasis added).  As a result, the Constitution permits a Court to limit that defendant's self-representation right by insisting upon representation by counsel at

trial—where a defendant is incompetent to waive the right to counsel. *Indiana v. Edwards*, 128 S. Ct. 2379, 2387-88 (2008) ("We consequently conclude that the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so").

---

### CLAIMS RELATED TO TRIAL CONDUCT

CLAIM 4:    AFTER THE TRIAL COURT APPROVED MR. FIELDS' REQUEST TO WAIVE COUNSEL AND REPRESENT HIMSELF, MR. FIELDS SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS VIOLATED IN SEVERAL MATERIAL RESPECTS.

CLAIM 5:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS VIOLATED WHEN FIELDS WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

CLAIM 6:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO BE PRESENT AT TRIAL WAS VIOLATED WHEN FIELDS WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

After this Court permitted Mr. Fields to waive counsel and directed former counsel to act as standby counsel, Fields was excluded from bench conferences where critical decisions regarding the course and conduct of trial were conducted.

Other then bench and chambers conferences, Fields conducted every aspect of his defense during the guilt phase of trial. He made opening and closing arguments to the jury. He cross examined all government witness and examined all witness in his defense. He participated in the *voir dire* of jurors and made motions to the court outside of the jury's presence. Accordingly, Mr. Fields' Sixth Amendment right to self-representation was violated by his exclusion from bench and chambers conferences where critical trial decisions were made in his absence and without his input or consent. *See*, *e.g*., *Faretta*, 422 U.S. at 819-20; *McKaskle v.*

*Wiggins*, 465 U.S. 168, 173-75 (1984); *United States v. McDermott*, 64 F.3d 1448, 1453-54 (10th Cir. 1995), *cert. denied*, 516 U.S. 1121 (1996); *Frantz v. Hazey*, 533 F.3d 724, 743-44 (9th Cir. 2008); *Oses v. Massachusetts*, 961 F.2d 985, 987 (1st Cir.), *cert. denied*, 506 U.S. 954 (1992); *Lefevre v. Cain*, C.A. No. 05-6288, 2008 WL 5146537, at \*15 (E.D. La. Dec. 8, 2008). Violations of the Sixth Amendment right to self-representation are structural, and are therefore *per se* prejudicial, requiring an automatic reversal of Mr. Fields' convictions. *McKaskle*, 465 U.S. at 177 n.8; *Myers v. Johnson*, 76 F.3d 1330, 1337 (5th Cir. 1996).

CLAIM 7:    STANDBY COUNSEL'S FAILURE TO EXERCISE A PEREMPTORY CHALLENGE AGAINST A JUROR MR. FIELDS SOUGHT TO STRIKE VIOLATED THE FIFTH AND SIXTH AMENDMENTS.

Mr. Fields directed standby counsel to excuse a particular juror.  Counsel did not do so.  That juror was seated and was part of the jury that convicted and sentenced Mr. Fields to death.

Standby counsel's failure to exercise peremptory challenges in accordance with Mr. Fields' directives to them violated Mr. Fields' Fifth Amendment right to due process, Sixth Amendment right to a jury trial, and Sixth Amendment right to personally conduct his own defense and to make significant tactical decisions regarding the conduct of that defense. *See*, *e.g.*, 422 U.S. 806, 819 (1975); *McKaskle v. Wiggins*, 465 U.S. 168, 178-79 (1984); *Pointer v. United States*, 151 U.S. 396, 408) (1894) (peremptory challenges are "one of the most important of the rights secured to the accused"); *Swain v. Alabama*, 380 U.S. 202, 219-220 (1965) (in certain contexts, "denial or impairment of the right to exercise peremptory challenges is reversible without a showing of prejudice").  Moreover, the violation of Mr. Fields' Sixth Amendment rights in this regard is structural, and thus *per se* prejudicial, requiring relief from judgment.  McKaskle, 465 U.S. at 177 n. 8.

CLAIM 8:    MR. FIELDS' FIFTH AND SIXTH AMENDMENT RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF TRIAL WERE VIOLATED BY HIS EXCLUSION FROM A CHAMBERS CONFERENCE HELD TO DISCUSS THE COURT'S RESPONSE TO THE JURY'S NOTE INDICATING THAT THEY  WERE UNABLE TO REACH A UNANIMOUS VERDICT ON SENTENCING WHERE MR. FIELDS SPECIFICALLY REQUESTED TO ATTEND THAT OFF-THE-RECORD CONFERENCE.

The jury sent out several notes during their penalty phase deliberations.  In one of those notes the jury asked what sentence would be imposed if it could not come to an unanimous agreement.  In response to that note, the Court indicated that it would impose a sentence that could not be a death sentence.  Immediately following the Court's response, the jury sent out a note indicating that they could not come to an unanimous agreement.  Initially, the Court asserted its opinion that the jury was deadlocked and there was no appropriate response to the note.   The government disagreed resulting in an off-the-record chambers conference, presumably, to discuss an appropriate response.  Although Fields requested to be present and participate in this chambers conference that decided a critical matter in his trial – the decision to accept the jury's determination that a unanimous decision could not be reached – he was prevented from participating with his attorneys at that chambers conference in violation of his Fifth and Sixth Amendment right to be present.  *See*, *e.g*., *Faretta*, 422 U.S. at 815-16; *Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934)(*reversed on other grounds*).  After the off-the-record chambers conference, and over a defense objection, the Court instructed the jury to keep deliberating.  Shortly thereafter, the jury returned a death verdict.

CLAIM 9:      MR. FIELDS' FIFTH AMENDMENT RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE COURT REQUIRED HIM TO PROVIDE THE PROSECUTION WITH A DETAILED PREVIEW OF HIS TRIAL STRATEGY ON CROSS-EXAMINATION OF A CRITICAL GOVERNMENT WITNESS WITHOUT REQUIRING RECIPROCAL DISCLOSURE OF THE PROSECUTION'S TRIAL SRATEGY.

Shalaykea Scroggins was a critical government witness at trial who testified that Mr. Fields confessed to killing Ms. Coleman.  Scroggins was also one of the most critical witnesses to Mr. Fields' defense as she is one of two individuals that Fields contends are the actual killers.  Because of the Government's numerous objections to Mr. Fields' cross-examination of Ms. Scroggins, the Court ordered Mr. Fields to stop his cross-examination and allowed the Government to redirect Ms. Scroggins until the end of the day.  After the conclusion of the day's proceedings, outside the presence of the jury but with Ms. Scroggins remaining on the witness stand, the Court ordered Mr. Fields to proceed with his cross-examination and invited the Government to object.  During the ensuing hearing, Mr. Fields cross-examined the witness while the Government objected.  The Court instructed Mr. Fields that those questions that the Court ruled were permissible could be revisited with the witness for a second time, the next day, while the jury was present.  Questions about which the Court sustained objections were not to be asked of the witness the next day.  As such, Mr. Fields was compelled to preview his theory of the case and elicit testimonial evidence from a key witness outside the presence of the jury and in front of the prosecution.  The Court did not require the Government to provide Mr. Fields with any reciprocal disclosure.  According, the Court's order violated Mr. Fields' right to due process. *Wardius v. Oregon*, 412 U.S. 470, 474-76 (1973); *Nobles*, 422 U.S. at 229-31.

**CLAIMS RELATED TO COURTROOM SECURITY AND CONDITIONS OF PRE-TRIAL CONFINEMENT AND THE RIGHT OF SELF-REPRESENTATION**

CLAIM 10: MR. FIELDS' SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION WAS DENIED WHEN HE WAS FORCED TO WEAR A STUN BELT DURING TRIAL; WHERE THE STUN BELT SIGNIFICANTLY AFFECTED HIS ABILITY TO CONDUCT HIS OWN DEFENSE, AS WELL AS HIS DEMEANOR IN COURT; AND WHERE THE TRIAL COURT FAILED TO CONSIDER LESS RESTRICTIVE ALTERNATIVES.

CLAIM 11: MR. FIELDS' SIXTH AMENDMENT RIGHT TO BE PRESENT AT TRIAL WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT DURING THE ENTIRE TRIAL.

CLAIM 12: MR. FIELDS' RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN TRIAL COUNSEL FAILED TO DEMAND A HEARING AND PRESENT EVIDENCE IN RESPONSE TO THE DIRECTIVE THAT FIELDS WEAR A STUN BELT DURING TRIAL.

CLAIM 13: MR. FIELDS' RIGHT TO COUNSEL (DURING PENALTY PHASE) WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE DEVICE INTERFERED WITH HIS ABILITY TO CONSULT WITH COUNSEL.

CLAIM 14: MR. FIELDS' EIGHTH AMENDMENT RIGHT TO A RELIABLE DEATH PENALTY DETERMINATION WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE STUN BELT NEGATIVELY AFFECTED FIELDS' DEMEANOR IN COURT.

CLAIM 15: MR. FIELDS' RIGHT TO SELF-REPRESENTATION WAS VIOLATED BY THE CONDITIONS OF CONFINEMENT, INCLUDING BEING HOUSED IN A CELL WHERE THE LIGHTS WERE NEVER TURNED OFF OR DIMMED AND WHERE THE NOISE SUBSTANTIALLY INTERFERED WITH FIELDS' ABILITY TO SLEEP AND WHICH SIGNIFICANTLY IMPAIRED FIELDS' ABILITY TO CONDUCT HIS OWN DEFENSE.

Mr. Fields' ability to conduct his defense (when he represented himself) and his ability to consult with counsel (during penalty phase) was severely diminished as a result of being required to wear a stun belt, coupled with his severe sleep deprivation. In addition, Fields' demeanor in court was negatively affected by virtue of the increased security measures. Trial counsel failed to investigate and present this evidence to the Court or to the jury.

The use of physical restraints, such as a stun belt, during trial and the sentencing phase implicates a defendant's right to due process. *Deck v. Missouri*, 544 U.S. 622, 628-29 (2005). When the sentencing phase involves the possibility of a death sentence, it also implicates the Eighth Amendment. Even a less severe restraint like shackles can interfere with the accused's "ability to communicate" with his lawyer. *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Unjustified interference with the right to counsel constitutes a structural error. *See generally United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) ("We have little trouble concluding that the erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error"'") (citations omitted). Requiring Fields to wear a stun belt substantially interfered with his ability to represent himself, as well as his ability to consult with counsel in the penalty phase. It negatively affected his demeanor, giving the jury a misimpression of his emotional reaction to the evidence discussed at trial.

Trial counsel deficiently failed to present relevant evidence when this Court considered and approved the use of the stun belt. *Strickland v. Washington,* 466 U.S. 668, 692-94 (1984). Counsel's failure was directly reflective of their corresponding failure to conduct a competent investigation into the negative psychological effects of forcing Mr. Fields, a man whose extreme trauma has understandably invested him with distrust, paranoia, and fear, to wear a device easily activated based on one misperceived move. *Wiggins v. Smith,* 539 U.S. 510, 534-35 (2003). Finally, to the extent the Court found justification for some heightened courtroom security, it failed to consider less restrictive alternatives to the stun belt – alternatives that could have provided the necessary security without psychologically disabling Field's ability to represent himself. As a result, Fields is entitled to a new trial.

CLAIM 16:    MR. FIELDS' FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY INCREASED SECURITY MEASURES AT TRIAL WHICH WERE APPARENT TO JURORS, INCLUDING THE VISIBLE OUTLINE OF THE STUN BELT, THE PRESENCE OF ADDITIONAL SECURITY WHO WERE SEATED CLOSE TO FIELDS AND WHO, ON OCCASION INTERACTED WITH HIM WHILE JURORS WERE PRESENT IN THE COURTROOM, AND BY INCREASED SECURITY MEASURES EMPLOYED AFTER THE GUILTY VERDICT.

CLAIM 17:    MR. FIELDS EIGHTH AMENDMENT RIGHT TO A RELIABLE DEATH SENTENCE WAS VIOLATED WHEN THE UNITED STATES MARSHALS INCREASED SECURITY AFTER JURORS RETURNED A GUILTY VERDICT, THEREBY IMPLYING THAT FIELDS WAS DANGEROUS AND WHERE THE COURT TOLD JURORS (OUTSIDE THE PRESENCE OF THE PARTIES) TO COMMUNICATE ANY ALLEGED THREATS TO THE COURT.

Although the stun belt was fitted under Fields' clothes, the outline was visible.  In addition, other security measures that focused on Mr. Fields served to call jurors' attention to the increased security.  During trial, Mr. Fields was directed to remain seated at all times.  Security personnel were seated behind him, including the marshal who controlled the stun belt.  Often times, when court broke for a recess, at least one marshal would approach Fields, while jurors were exiting the courtroom.  While the prosecutors were also directed to remain seated during trial, the prosecutors were permitted to approach the bench. Fields, who represented himself, was not.  As a result, at least some jurors must have known Fields was fitted with some sort of restraint.

After the jury convicted Fields and, without notice to Fields or his counsel, the marshals told jurors that they would now be escorted to their vehicles.  There were no incidents, either in or outside of court, justifying this increased security.  This increased security arrangement continued for the remainder of the trial.  In addition, a juror indicates that the Court, in chambers, told jurors that they should report any threats to the Court.

The last set of related claims focused on the psychological impact of the stun belt on Mr. Fields – his ability to represent himself and to consult with counsel.  This set of claims

USActive 14872039.1                    -21-

focuses on the prejudice from jurors either seeing or hearing about heightened security measures. The Due Process clauses of the Fifth and Fourteenth Amendments to the Constitution forbid the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is "justified by an essential state interest" – such as the interest in courtroom security-specific to the defendant on trial. *Deck*, 544 U.S. at 628; *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986); *Illinois*, 397 U.S. at 343-44.

"The appearance of the offender during the penalty phase in [restraints] . . . inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community – often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point." *Deck*, 544 U.S. at 633. "It also almost inevitably affects adversely the jury's perception of the character of the defendant." *Id.* "And it thereby inevitably undermines the jury's ability to weigh accurately all relevant considerations – considerations that are often unquantifiable and elusive – when it determines whether a defendant deserves death. In these ways, the use of [restraints] can be a 'thumb [on] death's side of the scale.'" *Id.*

Additional actions described above, apparently taken by both the Court and the Marshals Service, also unfairly called attention to the heightened security in the case and thereby prejudiced Fields by implying his dangerousness. Thus, these actions could have only served to prejudice Fields. He is entitled to a new trial.

**PENALTY PHASE INVESTIGATION CLAIMS:**

CLAIM 18:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN COUNSEL FAILED TO CONDUCT A COMPETENT PENALTY PHASE INVESTIGATION.

CLAIM 19:    MR. FIELDS WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO CONDUCT A COMPETENT INVESTIGATION OF MR. FIELDS' MENTAL CONDITION AND WHERE SUCH AN INVESTIGATION REVEALS A LIFETIME HISTORY OF CHRONIC AND SEVERE MENTAL AND EMOTIONAL DYSFUNCTION.

CLAIM 20:    MR. FIELDS WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY THAT FIELDS SUFFERS FROM THE MULTIPLE NEGATIVE PSYCHOLOGICAL CONSEQUENCES RESULTING FROM YEARS OF TRAUMA.

CLAIM 21:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT AN EXPERT WITNESS TO TESTIFY TO FIELDS RISK OF FUTURE ACTS OF VIOLENCE IN PRISON BASED ON AN ACTUARIAL ASSESSMENT, ESPECIALLY WHERE FIELDS' COUNSEL CRITICIZED THE GOVERNMENT-EXPERT'S FAILURE TO USE SUCH AN INSTRUMENT.

CLAIM 22:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF THE ABILITY OF THE FEDERAL PRISON SYSTEM TO CONTROL FIELDS' BEHAVIOR.

CLAIM 23:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF FIELDS' INCREDIBLY MINIMAL RISK OF ESCAPE FROM A FEDERAL PRISON.

CLAIM 24:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO CONDUCT AN INVESTIGATION INTO MR. FIELDS' NEUROPSYCHOLOGICAL DEFICITS.

CLAIM 25:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE TO HIS JURY IN PENALTY PHASE OF THE EFFECTS OF THE PRE-TRIAL CONDITIONS OF CONFINEMENT AND THE USE OF A STUN BELT ON MR. FIELDS' ABILITY TO FUNCTION AND DEMEANOR IN COURT.

Mr. Fields' defense penalty phase case consisted of two components: testimony (from lay witnesses and a social worker) detailing Mr. Fields' early life history, and Dr. J. Randall Price, who testified that Fields' intelligence provided him the ability to adapt to life in prison. No defense witness testified as to whether Mr. Fields suffers from a mental disease or defect, nor did any expert witness explain how the vast trauma suffered by Fields psychologically affected him. However, in response to cross-examination, Dr. Price conceded that Fields had previously been diagnosed by detention personnel as anti-social personality disordered, remorseless, and that no effective treatment for such disordered individuals existed.

Having to endure numerous and severe traumatic incidents did not leave Mr. Fields psychologically unscathed. Instead, it left him paranoid, hyper-vigilant, anxious, and, at times, depressed. It also likely caused significant neuropsychological impairments. In addition, Mr. Fields suffers from bipolar disorder. He has severe mood swings, grandiosity, extreme paranoid ideation, disinhibition of thought and action, and impaired judgment. He also suffers from dysexecutive syndrome. These impairments have a synergistic effect. His mental disabilities are profound, notwithstanding his obvious cognitive strengths.

Mr. Fields' entire life history, including his prior crimes and institutional adjustment problems, reflects his mental impairments. You cannot understand one without the other. Recognizing and understanding these psychological and neuropsychological conditions are vital to an understanding of who Mr. Fields is – the frailties integral to understanding his humanity.

Competent capital counsel had a duty to conduct an adequate investigation into a defendant mental condition, which includes consulting with appropriate experts. *Strickland*, 466 U.S. at 692-94; *Wiggins*, 539 U.S. at 534-35. In addition, competent capital counsel has a duty to make reasonable efforts to discover and rebut information that counsel knows the prosecution

will rely on as evidence of aggravation. *Rompilla v. Beard,* 545 U.S. 374, 384-85 (2005). Counsel also failed to conduct a competent investigation that would have scientifically proved that Fields presents a low risk of committing future violent acts and rebutting the Government's claims of future dangerousness. *Skipper v. South Carolina,* 476 U.S. 1, 4-6 (1986).

Counsel's failure to uncover and present voluminous mitigating evidence at sentencing cannot be justified as a tactical decision where counsel has not fulfilled their obligation to conduct a thorough investigation of the defendant's background, which is defined, in part, by the ABA. A defendant is prejudiced by counsel's deficient performance because there is a reasonable probability that at least one juror would have struck a different balance and cast a verdict for life. But for counsels' errors there is a reasonable probability that the results at trial would have been different.

CLAIM 26:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO COMPETENTLY PREPARE FOR AND CROSS EXAMINE THE GOVERNMENT-EXPERT, DR. COONS.

During the penalty phase of Field's trial, the Government called Dr. Richard Coons to testify as an expert on the issue of future dangerousness. Although defense counsel, Mr. Swanton, conducted *voir dire* of the witness in an attempt to exclude his testimony, he had not adequately prepared to do so and, as a result, his attempt to prevent admission of Dr. Coons' testimony failed. Mr. Swanton also cross-examined Dr. Coons in front of the jury. Again, due to his lack of adequate preparation Swanton was unable to competently impeach Dr. Coons' assumptions, methodology or conclusions. Had Mr. Swanton adequately prepared for Coons' testimony, he would have uncovered numerous readily available sources of impeachment Trial counsel's failure to do so violated  Mr. Fields' Sixth Amendment right to effective assistance of

counsel.  *See*, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  But for counsels' errors there is a reasonable probability that the results at trial would have been different.

| CLAIMS RELATED TO GUILT PHASE EVIDENCE |
|---|

CLAIM 27:  MR. FIELDS' CONVICTION AND DEATH SENTENCE VIOLATE THE FIFTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HE IS INNOCENT OF THE MURDER OF SUNCEREY COLEMAN AND HIS CONVICTION RESTS ON FALSE TESTIMONY.

Mr. Fields is actually innocent of the murder of Suncerey Coleman.  He did not kill her, did not attempt to kill her, and was in no way culpably involved in the events that resulted in her death.

Appreciating the potential merit of this claim requires the Court to closely examine the many contradictions and inconsistencies in the testimony presented by the Government, upon which Mr. Fields' conviction presently rests.  Many of those flaws were not effectively presented to the trial jury due to Mr. Fields' understandable deficiencies in representing himself in court.  Such scrutiny powerfully demonstrates the fragility of the case against Mr. Fields.

The following is not an exhaustive recitation of the holes in the Government's case, or the misconduct of Government agents that contributed to the presentation of unreliable evidence to the jury, but instead is a representative sampling that highlights the weakness of key parts of the case against Mr. Fields and demonstrates the importance of subjecting to the most exacting scrutiny the procedures that led to his conviction and death sentence.  In addition, further investigation and comprehensive development of the facts in this 2255 proceeding – including, *e.g.*, forensic testing of evidence where possible – will further substantiate Mr. Fields' claim of actual innocence.

No physical evidence whatsoever links Mr. Fields to the crime. Forensic examination and testing of the red Grand Am that Mr. Fields is known to have been driving on the night of Ms. Coleman's disappearance produced no inculpatory evidence whatsoever. That night, Mr. Fields was wearing pants which had been cut off to make shorts. The area where Ms. Coleman's body was found had huge thorns that would have gouged anyone so dressed who encountered them. According to Government witnesses Scroggins and Outley, they and Mr. Fields were together in the Grand Am before Outley dropped off Scroggins and Mr. Fields at the New Road Inn. Scroggins falsely claimed that after Outley left, she noticed that Mr. Fields had blood on his clothes and shoes. Had Mr. Fields killed Ms. Coleman, both their blood would have been found in the red Grand Am. Mr. Fields did not change cars on the night of the crime. The floor mats were still in the Grand Am when it was processed for evidence, and the Grand Am was not painstakingly cleaned ("detailed") before it was recovered by the authorities. Even if the vehicle had been "detailed," blood evidence would still have been discernible. The Grand Am was not "clean" when recovered on November 14, as it had been rented repeatedly in the interim and its owner (Thomison) had a dirty job when he was working.

Scroggins and Outley drove a gold Jaguar automobile on the night of the murder. This Jaguar was never forensically examined or tested because Scroggins and Outley conspired to hide it by telling investigators that it was blue rather than gold. Payne, the Jaguar's owner, testified at trial that the Jaguar was gold and had already told investigators the same thing just three months earlier. Nevertheless, the Government attempted to persuade the jury that Outley and Scroggins had been in a blue Jaguar. Upon information and belief, the Government had reason to know this claim was false. Investigators first confronted Outley with the name "Payne" when they arrested him on November 13. Outley eventually told them, falsely, that Payne was

the owner of a *blue* Jaguar, in an attempt to avoid having the gold Jaguar found. That blue Jaguar in fact had been wrecked and totaled in 1998 and no longer even existed in 2001.

Key Government witnesses, including jail inmates, made inconsistent statements regarding important points of fact, both prior to and during Mr. Fields' trial. Some of the pretrial inconsistent statements were provided to the defense prior to trial, but others were not. The Government improperly failed to disclose all information regarding its witnesses that it was required by law to make available to the defense. The Government witnesses known or believed to have made materially inconsistent or misleading statements include, but are not limited to, the following.

Friends Dominique Tubbs and Christopher Quigley, jailed in the same drug case, shared a small cell with Mr. Fields. Both falsely claimed to have heard Mr. Fields threaten to kill Suncerey Coleman while talking to her on the phone. Prior to trial, Quigley falsely swore that Mr. Fields had told him that he (Fields) intended to kill Ms. Coleman. Quigley later changed his story, falsely insisting instead that he had overheard Mr. Fields making threats against Ms. Coleman while talking to her on the telephone. Quigley and Tubbs disagreed about how frequently Mr. Fields and Ms. Coleman supposedly fought on the phone and whether Mr. Fields had threatened Ms. Coleman in conversations with them. Tubbs falsely claimed he didn't know Ms. Coleman had been killed until he read it in the newspaper; that article was published December 12, 2001. Quigley stated that a police officer told him *and* Tubbs about the murder sometime between November 6 and 24. Neither Tubbs nor Quigley could provide useful information when they were interviewed twice by different sets of U.S. Marshals on November 7. Upon information and belief, Tubbs and Quigley only obtained the information they would later use in testifying falsely against Mr. Fields via coaching by Detective Steve January and/or other agents of the prosecution after November 7.

Other Government witnesses also testified falsely, and the Government was, or should have been, aware that their testimony was false. For example, Tammy Edwards falsely accused Mr. Fields of having taken her car at gunpoint. Although she said in the initial police report that she thought she had previously seen her assailant on television, she later swore in a civil deposition that she had recognized the carjacker as Mr. Fields all along, because his picture had been on fliers all around the hospital. Ms. Edwards' testimony also shifted regarding whether the carjacker had shot at her. Although Ms. Edwards purportedly "identified" Mr. Fields as the carjacker from a photo array on November 27, 2001, twelve days earlier police had *twice* shown her a single photograph of Mr. Fields. In her initial report, Ms. Edwards claimed that she screamed and yelled throughout the carjacking and that it took place during shift change at the busy hospital where she worked. At trial, however, she claimed she had been choked so hard by the carjacker that she couldn't cry out, and no witness from the hospital could corroborate her carjacking story. Ms. Edwards had a financial motive to accuse Mr. Fields; she hoped to attend college with the damages she hoped to win from Civigenics. At one time, Ms. Edwards was married to Darryl Edwards, who had pleaded guilty to capital murder to avoid the death penalty. Mr. Fields had no friends or other relatives living close to Hillcrest Hospital, a middle and upper-class neighborhood, and never "staked out" that location.

At trial, the Government presented the testimony of numerous jail inmates who claimed to have obtained information about Mr. Fields' case while incarcerated with him. Upon information and belief, these inmate witnesses were promised benefits in return for their testimony against Mr. Fields, and these promises induced the witnesses to make materially false accusations against Mr. Fields. Many of the Government's inmate witnesses also communicated with one another prior to and concerning their testimony against Mr. Fields. The Government

was, or should have been, aware that these witnesses were providing false testimony. These witnesses included, but were not limited to, the following:

Inmate witness Jerry Reed falsely *alleged* that Mr. Fields had confessed to him while in segregation at a federal facility in Fort Worth that he was responsible for the murder but planned to blame Scroggins and Outley. Reed had been in custody with "Shae" Walker at/after the time Walker was corresponding with Scroggins; upon information and belief, Scroggins fed Walker the version Walker then passed along to Reed.

Three times prior to trial – on December 5 and 6, 2001, and in February 2002 before the grand jury – Christian "Chae" (also "Shay" or "Shae") Walker avowed that Mr. Fields never claimed to have killed Ms. Coleman, though he (Walker) thought that Mr. Fields might have done something to her. Between making those statements and January 2004, Walker corresponded with Scroggins. In that correspondence, upon information and belief, Scroggins suggested how Walker could testify against Mr. Fields in a manner that would help himself. In January 2004, Walker changed his story and falsely testified, reciting a story similar to Scroggins, that Mr. Fields had confessed to him. Walker falsely claimed that he didn't tell the truth at first because he didn't want to put his family in jeopardy. At trial, Walker denied having talked to Outley "about this case;" yet, he admitted to the grand jury that Outley had told him that he (Outley) had given a .32 gun to Mr. Fields.

Walker also falsely claimed at trial that he had been driving over a bridge in a red Chevy Cavalier with Mr. Fields and Alvin "Bird" Fields when "Bird" allegedly threw a .32 gun into the river – a claim absent from any of Walker's prior statements. The bridge in question is a location Outley knew well, as it was a route he regularly traveled to his mother's residence. Walker and Outley were in contact when Walker came up with this story about disposing of the .32 at that location. Upon information and belief, Outley suggested this false story to Walker.

Ex-U.S. Marshal McNamara falsely testified that when Mr. Fields was arrested, Mr. Fields told him that he had a .22 and where to find it. Another officer reported that at the scene, Mr. Fields was asked only his name, address, and birthdate. During trial, standby counsel advised Mr. Fields not to question McNamara, but to wait until the Government called Hubert Steadman – in whose home Mr. Fields was arrested, who claimed to have told the Marshals that Mr. Fields had the .22, and who actually located the gun – but the Government never called Steadman.

Law enforcement initially believed that Ms. Coleman had been murdered with that .22, and worked to link Mr. Fields to that weapon. Buccal swabs and a blood sample were obtained from Mr. Fields the night he was arrested. The detective who took the swabs falsely claimed to have found Mr. Fields' blood on the .22. When Mr. Fields was arrested, he had no sign of any injury that should have left his blood on that weapon.

Inmate Homero DeLeon, wrote a letter on February 12, 2003, falsely claiming that Mr. Fields had told him that since he (DeLeon) was not on the Government's witness list, Mr. Fields would confess to him. At that time there was no witness list; the list was produced in January 2004. DeLeon's letter contains errors of fact which resulted from his having gotten false information about Mr. Fields from other inmates. By November 2003, DeLeon had been transferred to the same prison where "Chae" Welker was confined. DeLeon made false statements to Government agents who interviewed him there, including claiming to have been Mr. Fields' cellmate and to have passed Mr. Fields cigarettes by and through co-defendant Benny Garrett. DeLeon also falsely alleged that Mr. Fields had confessed to him across the hallway; in that facility, there were always at least three officers and ten to twenty other inmates present in that area, and any such communication between DeLeon and Mr. Fields would have

been observed or overheard by other witnesses.  No such witnesses exist because no such communication took place.

At trial, DeLeon changed his story substantially.  He falsely alleged that Mr. Fields had told him that Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, and Andrea Sykes had gone to the grand jury to testify against him, when in fact all five of those individuals had gone to the grand jury to provide information against co-defendant Garrett.  Upon information and belief, DeLeon was coached by Government agents and/or attorneys prior to testifying against Mr. Fields.  Upon further information and belief, much of DeLeon's story originated with "Chae" Walker.  Casey Leon Forge, incarcerated with Walker and DeLeon, obtained from Walker some of the same (false) details included in DeLeon's account.

Government witness Shalaykea "Lakie" Scroggins was romantically obsessed with Mr. Fields at one time.  Scroggins was frustrated and angry at having lost Mr. Fields to Ms. Coleman.  She vowed not to let it happen again, even if that meant killing rivals for his affection. The day before the murder, Mr. Fields and Ms. Coleman took action together to have the phone company turn off a phone that Scroggins had gotten in Mr. Fields' name, because Scroggins had called Ms. Coleman and threatened her.

Scroggins gave two different alibis for her whereabouts on the night of the murder after Mr. Fields dropped her off – once claiming that she went to the store while Outley looked for Mr. Fields, and once claiming that she went to her sister's house and went to sleep, while Outley went to his apartment with her other sister, Alberta Hampton.  Both stories were false. Scroggins told at least three different and irreconcilable stories about what Mr. Fields purportedly told her about the crime.  Scroggins first alleged that Mr. Fields called her and told her the details of the murder.  Scroggins later claimed she met Mr. Fields in a car he was driving, and he made inculpatory statements in response to her question about Ms. Coleman.  Still later,

Scroggins claimed that Mr. Fields had confessed to her in her apartment around November 8. None of these stories was true.

Scroggins falsely claimed to have known that Ms. Coleman was missing on November 7 because it was on the newsstand; the news of Ms. Coleman's disappearance had not been published at that time.  Scroggins falsely claimed that Mr. Fields possessed a small silver .32 pistol that belonged to her sister Alberta Hampton; Hampton told the grand jury she'd never seen such a weapon.  Scroggins falsely alleged that Mr. Fields called her at 8:00 p.m. on November 15 and told her the details of the murder; her phone records reflect no such call. Scroggins was then induced to change her testimony to assert, falsely, that the call was made to her sister's house.  The Government compounded the harm from this testimony by offering misleading arguments to the jury about the significance of phone records.

The claims of prosecution witness Edward "Trey Boy" Outley, like those of Scroggins, are marked by gaps, inconsistencies, contradictions, and outright lies.  Outley falsely alleged that Christian "Chae" Walker left him a .32 gun to take to Mr. Fields; Walker said Outley wanted the gun for his own protection.  Outley falsely claimed he gave that gun to Scroggins' sister Alberta Hampton; she denied ever seeing it.  Outley gave multiple, false, inconsistent accounts of his own activities on the night of November 6.  Outley falsely claimed both that *Mr. Fields called him* and admitted the murder, and that *he called Mr. Fields* and asked him, prompting a confession.  Outley falsely asserted that the Government had made him no promises; Outley was granted full immunity for his testimony.

Outley wrote a letter to Mr. Fields' attorney Peterson, saying that he (Outley) had not given Mr. Fields a gun and that someone wanted Outley or Scroggins to say they were with Mr. Fields when Ms. Coleman was killed.  Outley's subsequent testimony at trial that Mr. Fields had wanted him to write that letter, and that Outley did so because he feared being tagged as a

"snitch" at USP Beaumont, was false. Outley told William Young that he (Outley) was present when Ms. Coleman was murdered. Outley wanted a romantic relationship with Scroggins and wanted Fields out of the way. Outley included Scroggins in every deal he attempted to make with the government. Both Outley and Scroggins have violent tempers.

Mr. Fields had never been violent or threatening toward Ms. Coleman and did not become angry or irate when he came into contact with her. He did not threaten to kill her, attempt to control her, or express jealousy about her relationships with other men. Ms. Coleman, unlike Scroggins, visited Mr. Fields often when he was in jail. Before Ms. Coleman was known to have died, Tanesha Hilliard told the local paper that Mr. Fields had not appeared angry when he came to the hospital.

As noted, this is not yet a comprehensive accounting of the facts in support of Mr. Fields' claim of actual innocence, but demonstrates the severe shortcomings in the Government's case for his guilt.

The Fifth Amendment's guarantee of due process and the Eighth Amendment's prohibition on cruel and unusual punishments are both violated by the incarceration or execution of a prisoner, like Mr. Fields, who can make a persuasive post-trial demonstration that he is actually innocent of the crime for which he was convicted and sentenced. *See*, *e.g.*, *Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J., joined by Kennedy, J., concurring); *id.* at 429 (White, J., concurring); *id.* at 430 (Blackmun, J., joined by Stevens and Souter, JJ., dissenting); *House v. Bell*, 547 U.S. 518, 554-55 (2006); *United States v. Nobles*, 422 U.S. 225, 230 (1975) ("The dual aim of our criminal justice system is 'that guilt shall not escape or innocence suffer'"); *see also Herrera*, 506 U.S. at 398 ("[T]he central purpose of any system of criminal justice is to convict the guilty and free the innocent"). Moreover, a conviction based on false testimony, whether or not the Government actually knew or should have known the testimony

was false, violates due process. *See*, *e.g*., *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (knowing presentation of false testimony violates due process); *Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957) (due process violated where prosecutor's examination of witness created "false impression" of material fact).

The Fifth Circuit has not yet embraced the view, adumbrated in *Herrera*, that the Constitution prohibits convicting or executing an actually innocent person. *See, e.g.*, *Moore v. Quarterman*, 534 F.3d 454, 465 n.19 (5th Cir. 2008) (no federal habeas relief based on a claim of actual innocence). However, at least two Fifth Circuit panels have acknowledged that the Supreme Court's decision in *House* suggests that a "stand-alone" claim of actual innocence, supported by strong evidence, could require federal habeas relief. *See Reed v. Quarterman*, 504 F.3d 465, 476 (5th Cir. 2007), *rev'd and remanded*, No. 05-70046, 2009 WL 58903 (5th Cir. Jan. 12, 2009); *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 2099 (2007). In light of the many other federal courts that have reached that same conclusion,[3] and given the overriding importance of correcting a fundamentally unjust incarceration, Mr. Fields respectfully submits that the Court should entertain his claim and grant relief, and to that end asks that the Court empower him to develop the relevant facts fully. At a minimum, such proceedings are necessary to enable meaningful review of Mr. Field's actual innocence claim at the Court of Appeals or in the Supreme Court.

---

[3]   *See*, *e.g*., *Osborne v. District Att'y's Office for Third Jud. Dist.*, 521 F.3d 1118, 1130-31 (9th Cir.) (Ninth Circuit has "assumed that freestanding innocence claims are possible," although they require a prisoner asserting such a claim to "affirmatively prove" innocence), *cert. granted*, 129 S. Ct. 488 (2008); *House v. Bell*, 311 F.3d 767, 768 (6th Cir. 2002), *cert. denied*, 539 U.S. 937 (2003); *Milone v. Camp*, 22 F.3d 693, 699-700 (7th Cir. 1994) ("The Supreme Court appears to be willing to hold that it is unconstitutional to execute a 'legally and factually innocent person' . . . while at the same time suggesting that [such a claimant's] evidentiary burden . . . would necessarily be extraordinarily high") (citations omitted), *cert. denied*, 513 U.S. 1076 (1995); *Ex parte Elizondo*, 947 S.W.2d 202, 204 (Tex. Crim. App. 1996) (*Herrera* makes it "clear" that either incarcerating or executing an innocent person would violate due process).

<u>CLAIM 28</u>:   MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO CONDUCT A COMPETENT INVESTIGATION INTO THE FACTS OF THE CHARGED HOMICIDE.

Appointed counsel failed to conduct a reasonable investigation into the facts of the charged murder by, among other things, failing to interview key witnesses including potential eyewitnesses, witnesses that the Government identified as having potentially exculpatory information and witnesses who eventually testified against Mr. Fields at trial.   Moreover, appointed counsel failed to conduct a reasonable investigation into the facts of the charged murder by, among other things, failing to pursue formal discovery form the Government.   Had appointed counsel done so, they would have discovered significant and favorable evidence that could have been used to impeach or disqualify witnesses, support Mr. Fields' theory of the case. But for counsels' errors there is a reasonable probability that the results at trial would have been different.

<u>CLAIM 29</u>:   THE GOVERNMENT FAILED TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

The Government's failure to disclose material exculpatory evidence includes, but is not limited to, evidence related to witness who testified.   For example, Homero Deleon, a government witness who testified against Mr. Fields, took numerous pages of notes documenting issues related to his testimony and provided those notes to the Government.   Those notes are material, exculpatory and favorable evidence which could have been used to impeach Mr. Deleon's testimony, support Mr. Fields' theory of the case and alter the outcome of trial. Despite reasonable due diligence by Mr. Fields, the existence of these notes remained unknown and the notes were not independently discovered at the time of trial.   Although those notes were in possession of the Government, they were never provided to Mr. Fields or his counsel in

violation of the Fifth and Eighth Amendments. *See, e.g. Brady v. Maryland*, 373 U.S. 83 (1963);

*Strickler v. Greene*, 527 U.S. 263 (1999); *Banks v. Dretke*, 540 U.S. 668 (2004).

CLAIM 30:    THE GOVERNMENT FAILED TO CORRECT A MATERIAL MISSTATEMENT OF FACT BY MR. OUTLEY IN VIOLATION OF MR. FIELDS' FIFTH AMENDMENT GUARANTEE OF DUE PROCESS.

Edward Lee Outley III, a.k.a. "Trey Boy" was a critical government witness at trial who testified that Mr. Fields confessed to killing Ms. Coleman. Mr. Outley also testified that the Government had not promised him any benefit or reward in exchange for his testimony. However, this testimony was false, and the Government knew it was false because Mr. Outley was promised immunity in exchange for his testimony. Nevertheless, the Government let the answer stand without correction in violation of the Fifth and Eighth Amendments. *Napue v. Illinois*, 360 U.S. 264 (1959); *Giglio v. United States*, 405 U.S. 150 (1972). In addition, the Government's actual grant of immunity to Outley was broader than described in a letter written to Outley's counsel that was turned over to Mr. Fields at trial. In fact, it turns out that Mr. Outley was promised complete immunity on all charges in exchange for his testimony against Fields.

CLAIM 31:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN, AFTER FIELDS WAS INDICTED, JAILHOUSE INFORMANTS ACTING AS GOVERNMENT AGENTS QUESTIONED FIELDS IN THE ABSENCE OF COUNSEL AND WHERE THAT INMATE LATER TESTIFIED THAT FIELDS CONFESSED.

As outlined in the statement of facts, *supra*, Homero Deleon was a government witness who testified against Mr. Fields. Mr. Deleon had a prior informant relationship with the trial prosecutors in this case and had previously cooperated with the Government by providing testimony in exchange for favorable treatment. Mr. Deleon attempted to elicit information from Mr. Fields while Mr. Fields was in custody and outside of the presence of counsel with the intention of reporting any information back to the Government. The Government knew or had

reason to know that Mr. Deleon had access to Mr. Fields and the ability to initiate contact with him in a manner that would not arouse his suspicions. Mr. Deleon was in contact with Government agents on several occasions prior to trial. Mr. Deleon's trial testimony contained more detailed information – whether true or not – than was contained in the reports of his meeting with government agents. Mr. Deleon was rewarded for his testimony against Fields. Assuming *arguendo* that Mr. Deleon's more detailed information was obtained from conversations with Mr. Fields that occurred after Deleon's contact with Government agents (which Mr. Fields does not concede) such information would have been obtained in violation of the Sixth and Eighth Amendment. *See e.g., Massiah v. U.S.*, 377 U.S. 201, 205, 84 S.Ct. 1199, 1202 (U.S.N.Y. 1964); *United States v. Henry*, 447 U.S. 264 (1980). Mr. Fields intends to seek discovery on this and related issues.

CLAIM 32:   MR. FIELDS' RIGHT TO A JURY TRIAL WAS VIOLATED WHEN THE COURT INSTRUCTED JURORS TO REACH A UNANIMOUS PENALTY PHASE VERDICT AFTER THEY DECLARED THAT THEY WERE NOT UNANIMOUS AND WHERE THAT INSTRUCTION HAD A COERCIVE EFFECT.

About five hours after sentencing deliberations began, the jury sent a note asking "[i]f we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the court have for punishment?" The court responded: "[y]ou are instructed on page 16 of the Punishment Phase Charge of the Court as follows: 'If you are unable to unanimously agree on either punishment option, the Court will impose punishment, which cannot be a sentence of death.' Beyond that, I am unable to answer your question." Approximately eighteen minutes later the jury sent a note stating that "[w]e cannot come to a unanimous agreement." The court responded with the supplemental instruction "[p]lease continue your deliberations." Less then one hour later the jury returned a unanimous sentence of death.

Jurors indicate that the Court's instruction to "continue your deliberations was coercive for at least one "hold out" juror.  At least some of the jurors interpreted the instruction as requiring a unanimous verdict and, as a result, the "hold out" juror changed her vote from "life" to "death."  The juror did not consider switching her vote until the jurors read the "continue your deliberations" instruction.

A Court can provide additional instructions when a jury is deadlocked.  *Allen v. United States,* 164 U.S. 492, 501 (1896).  However, a so-called *Allen* charge must comply with two requirements: "'(1) the semantic deviation from approved "*Allen*" charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved "*Allen*" charge must not be coercive.'"  *United States v. Lindell,* 881 F.2d 1313, 1321 (5th Cir.1989) (citations omitted).

Here, there is affirmative evidence that the supplemental instruction actually was coercive.  A juror changed her vote from death to life solely as a result of the Court's instruction.  Thus, Fields is entitled to a new trial.

CLAIM 33:    THE CUMULATIVE ERRORS IN THIS CASE CONSTITUTE A VIOLATION OF MR. FIELDS' RIGHTS TO DUE PROCESS, TO A FAIR TRIAL, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

The combination of errors extant in this case deprived Mr. Fields of due process and provide him with a separate claim for relief.  *Kyles v. Whitley*, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only conducts piecemeal analysis of each item of suppressed evidence).  The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair.  *Chambers v. Mississippi*, 410 U.S. 284, 289-90, 302-03 (1973) (combined

effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial").  The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal.  *Id.* at 290 n.3; *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) ("combined prejudice of the multiple errors committed in this case deprived Alcala of a fundamentally fair trial and constitutes a separate and independent basis for granting his petition"); *Cargle v. Mullin*, 317 F.3d 1196, 1206-07, 1208, 1221, 1223 (10th Cir. 2003) (*habeas corpus* relief is granted with regard to both capital conviction and sentence based on cumulative effect of ineffective assistance of counsel and prosecutorial misconduct: "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless' . . . Consistent with the unqualified reference to **all errors**, our cases reflect application of cumulative-error review to legally diverse claims such as those here . . . [Petitioner's] cumulative-error claim raises the possibility of guilt-phase error having a continuing, cognizable effect on the penalty phase.  This commonsense notion that sentencing proceedings may be affected by errors in the preceding guilt phase is not novel") (emphasis in original; citations omitted).

---

**DISPROPORTIONALITY OF FIELDS' DEATH SENTENCE:**

---

<u>CLAIM 34</u>: THE FEDERAL DEATH PENALTY STATUTE IS UNCONSTITUTIONAL BECAUSE IT FAILS TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW

The gravity, severity, and irreversibility of the federal death penalty make it unlike all other forms of punishment. Given this uniqueness, it cannot be imposed unless sentencing procedures exist that prevent the risk of it being inflicted in an arbitrary and capricious manner. *See*, *e.g.*, *Furman v. Georgia*, 408 U.S. 238, 239-40 (1972); *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). Accordingly, the death penalty is unconstitutionally applied where, for example, a sentencing statute places unfettered discretion in the hands of juries because arbitrary and often discriminatory capital sentences can result. *Furman*, 408 U.S. at 310 (finding that the Eighth Amendment "cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed") (Stewart, J., concurring). Due to its lack of sentencing procedures designed to prevent arbitrary and capricious application of the sentence, death sentences imposed with procedures such as those discussed in *Furman* violate the Eight Amendment's constitutional prohibition against cruel and unusual punishment. *Id.* at 239-40 (*per curium*).

A time-tested and court approved means of avoiding such arbitrary and capricious results is the incorporation of a proportionality review to statutory sentencing procedures. *Zant v. Stephens*, 462 U.S. 862, 890 (1983). A **meaningful** proportionality review includes a review of the universe of cases in which juries imposed either death or life and a comparison of those cases to the case of the particular defendant to be sentenced. Additionally, a **meaningful** proportionality review must require inquiry into whether similar cases exist in which the government did not even seek death in the first place. *See*, *e.g.*, *Walker v. Georgia*, 129 S. Ct. 453, 456 (2008) (denial of *writ of certiorari*) (Stevens, J.) ("Cases in both of these categories are

eminently relevant to the question whether a death sentence in a given case is proportionate to the offense"). "[F]ailure to acknowledge these or any other cases outside the limited universe of cases in which the defendant was sentenced to death creates an unacceptable risk that it will overlook a sentence infected by impermissible considerations." *Id.*

The Federal Death Penalty Act ("FDPA") does not provide for comparative proportionality review. 18 U.S.C. § 3593. While that alone does not render the FDPA unconstitutional *per se*, *see Pulley v. Harris*, 465 U.S. 37, 45-46, 50-51 (1984), the FDPA still suffers from significant constitutional infirmities because that the sentencing procedure provides no meaningful mechanism to prevent arbitrary and capricious sentences, such as proportionality review. *See*, *e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) ("[W]here the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required"). As a result, the FDPA is unconstitutional.

CLAIM 35: IF THIS COURT CONCLUDES THAT COMPARATIVE PROPORTIONALITY REVIEW IS CONSTITUTIONALLY MANDATED AND CAN BE REQUIRED WITHOUT DOING VIOLENCE TO THE STATUTE, MR. FIELDS' DEATH SENTENCE MUST BE OVERTURNED AS DISPROPORTIONATE.

Mr. Fields' case is a significant departure from the typical case in which the federal death penalty would be appropriate. As such, his death sentence is disproportionate to all other federal death sentences and is, therefore, arbitrary and capricious in violation of the Eighth Amendment. Indeed, Mr. Fields' case plainly demonstrates that the federal death penalty statute is unconstitutional due to its lack of procedures to control the sentencer's discretion. A comparison of cases proves the point.

Mr. Fields was convicted and sentenced to death for the single-victim murder of his ex-girlfriend during his escape from a federal detention facility. In addition, the jury found no evidence of substantial planning or premeditation.

Even a cursory review of federal capital prosecutions resulting in a sentence less than death shows that less severe punishments are typically given for much more severe crimes. For example, one defendant received a life sentence for the premeditated kidnapping and killing a government witness in a drug conspiracy prosecution by beating the victim with a hammer. *United States v. Holley*, 96-cr-208 (N.D. Ala.). Another received a life sentence for his role as a co-conspirator in the September 11, 2001 attacks on the World Trade Center and Pentagon. *United States v. Moussaoui*, 01-cr-455 (E.D. Va.) (attacks resulted in the death of over 3,000 people). Many other federal defendants have received life sentences for crimes far more aggravated than for which Fields was convicted. *See*, *e.g*., *United States v. Street*, 04-cr-298 (W.D. Mo.) (defendant beat, stabbed, and shot victim in the back of the head); *United States v. Jordan*, 04-cr-58 (E.D. Va.) (victim burned to death); *United States v. Matthews*, 00-cr-269 (N.D.N.Y.) (victim tortured and beaten to death); *United States v. Pitera*, 90-cr-424 (E.D.N.Y.) (some victims tortured and dismembered). Likewise, federal defendants have received life sentences for multiple murders. *See*, *e.g*., *United States v. Henderson*, 06-cv-39 (S.D. Ohio) (murder of a government witness and the witness' boyfriend); *United States v. Galan*, 06-cr-730 (N.D. Ohio) (drug-related murders of two brothers); *United States v. Hans*, 05-cr-1227 (D.S.C.) (arson resulting in six deaths); *United States v. McTier*, 05-cr-401 (E.D.N.Y.) (three murders by a member of a drug gang); *United States v. McGriff*, 04-cr-966 (E.D.N.Y.) (double-murder); *United States v. Gooch*, 04-cr-128 (D.D.C.) (defendant charged with five murders); *U.S. v. Barnes*, 04-cr-186 (S.D.N.Y.) (two drug-related murders); *United States v. Mayhew*, 03-cr-165 (S.D. Ohio) (defendant murdered his ex-wife, ex-wife's boyfriend; defendant also murdered his own daughter, with whom he had an incestuous relationship).

Based on a review of the comparable universe of death eligible crimes, Mr. Fields' death sentence is disproportionate. On this basis alone, Mr. Fields' sentence violates the Eighth Amendment and must be overturned.

CLAIM 36:    ISSUES RAISED ON DIRECT APPEAL.

Mr. Fields again alleges and preserves for this motion all errors raised on direct appeal.

CLAIM 37:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL WAS INEFFECTIVE IN MULTIPLE RESPECTS.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in Claims 1 through 34. To the extent that appellate counsel could have raised these claims based on the extant record on direct appeal, appellate counsel was ineffective for failing to raise these claims. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); Smith v. Robbins, 528 U.S. 259 (2000).

CLAIM 38:    MR. FIELDS IS ENTITLED TO AN EVIDENTIARY HEARING.

Mr. Fields has alleged many facts that the Government is likely to contest. Should the Government contest any material facts, Mr. Fields is entitled to a hearing in order to prove those facts.  28 U.S.C. §2255.  Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall. . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  28 U.S.C. §2255.  Although the potential scope of such a hearing cannot be assessed until the Government files a responsive pleading, in order to prevent any claim of waiver, Mr. Fields now requests that he be afforded a hearing on any disputed facts which, if proven individually or in combination with other facts, would entitle him to relief.

## V.    **REQUEST FOR RELIEF**

Based upon all of the above allegations and the entire record of this prosecution, Mr. Fields respectfully requests that the Court provide the following relief:

1.    That the Court defer requiring the Government to answer this motion until Mr. Fields files his more fully developed motion on or before the equitably tolled date of March 1, 2009;

2.    That the Court permit discovery as will be requested in Mr. Fields' to-be-filed Motions for Discovery;

3.    That, if requested,  Mr. Fields be permitted to amend this motion;

4.    That the Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

5.    That the Court permit oral argument as appropriate and required;

6.      That at the conclusion of the proceedings that the Court vacate Mr. Fields' conviction and sentence and order that appropriate retrial and/or new sentencing hearing be conducted.

7.      And, any other relief to which Mr. Fields may be entitled.

DATED this 13th day of January, 2009.

Respectfully Submitted:
/s/ Jeffrey E. Ellis
Jeffrey E. Ellis
Law Offices of Ellis,
Holmes & Witchley, PLLC
705 Second Ave., Ste 401
Seattle, WA 98104
206/262-0300 (ph)
206/262-0335 (fax)
ellis_jeff@hotmail.com

## CERTIFICATE OF SERVICE

I, Jeffrey E. Ellis, hereby certify that on January 14, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record in the above-entitled case:

**Gregory S. Gloff**
Assistant United States Attorney
800 Franklin
Suite 280
Waco, TX 76701
Email: Greg.Gloff@usdoj.gov

/s/ Jeffrey E. Ellis
Jeffrey E. Ellis
*Attorney at Law*