IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
WACO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>SHERMAN LAMONT FIELDS | NO. _____<br><br>CRIMINAL CASE NO.<br>W-01-CR-164; 09-CV-9-WSS |

## MOTION FOR A NEW TRIAL AND TO VACATE, SET ASIDE AND CORRECT CONVICTION AND DEATH SENTENCE, AND FOR RELIEF FROM JUDGMENT, MADE PURSUANT TO 28 U.S.C. § 2255 OR, IN THE ALTERNATIVE, PURSUANT TO 28 U.S.C. § 2241 OR RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

### *** THIS IS A CAPITAL CASE ***

## I.   JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 2255.

## II.   PRELIMINARY STATEMENT

## IN THIS MOTION, MR. FIELDS SETS FORTH CLAIMS DIRECTED AT BOTH HIS CONVICTIONS AND DEATH SENTENCE.

### A.   Identifying Information

Mr. Fields (Inmate No. 15651-180), is currently confined at the United States Penitentiary at Terre Haute, Indiana.  He challenges his convictions and sentences, including his death sentence, imposed by the Honorable Walter S. Smith, Jr., District Court Judge for the Western District of Texas at Waco.  Mr. Fields pled "not guilty" and was convicted after a jury trial.  He was represented, for a portion of his trial, by Scott Peterson and Robert Swanton.  His case was affirmed on appeal and on January 14, 2008, the United States Supreme Court denied his petition for a *writ of certiorari*.  He now files this timely motion pursuant to 28 U.S.C. § 2255, as per this Court's unobjected to order extending the time to file to this date.  This is Fields' first application for post-conviction relief.[1]

This Court previously appointed undersigned counsel after finding that Fields was indigent and that "appointment of counsel is required by 18 U.S.C. § 3599 (a)(2)."  This Court also approved of attorneys from Cadwalader, Wickersham & Taft, LLP assisting undersigned counsel and appearing, on a *pro bono* basis, on Mr. Fields' behalf.

---

[1] Although Mr. Fields field an initial Motion For Relief Under 28 U.S.C. §§ 2241 and 2255, on January 14, 2009, He expressly asserted his rights under, and relied fully upon, the Court's December 4, 2008 Order Granting equitable tolling and authorizing Mr. Fields to file a fully developed version of his Motion For Relief on or before March 1, 2009.  Accordingly, Mr. Fields timely files the present motion.

**B.**    **Summary of Facts and Argument**

Neither Mr. Fields' conviction nor his death sentence was the product of a constitutionally reliable proceeding.  Mr. Fields was permitted to represent himself at a capital trial after an exceedingly brief and woefully inadequate competency evaluation.  He was sentenced to death after a penalty phase that followed a deficient mitigation investigation and where the only testimony relating to his mental condition was that he was "intelligent."

In fact, Mr. Fields is chronically and profoundly mentally disabled.  Mr. Fields' mental disabilities rendered him incompetent to waive counsel and are crucial to an understanding of his life history and an accurate assessment of his moral culpability.  While Mr. Fields is not seriously cognitively impaired, he is seriously mentally ill.  Mr. Fields' intelligence, while an undeniable strength, does not diminish the pervasive influence of mental disease on his life and his actions.  However, this crucial fact which was apparent from a basic review of Mr. Fields' own social and medical history as well as that of his immediate family, was not discovered by trial counsel and was neither presented to the Court nor to Mr. Fields' jury.

Discovery of Mr. Fields' mental condition would have altered the course of the entire trial.  If trial counsel had discovered and presented evidence of the length and severity of Mr. Fields' mental dysfunction either to the evaluating psychiatrist or the Court, it would have been clear that he should not have been permitted to waive counsel.  Competent counsel would then have been able to defend against the charges and to have secured a not guilty verdict.  Likewise, if trial counsel had discovered and presented this and other powerful, readily available evidence of trauma, impairment, and mental illness to Fields' jurors in penalty phase – jurors who, at one point, declared themselves unable to reach a unanimous verdict despite the paucity

of mitigating evidence – they would not have returned a death sentence. The trial team's failure was not the result of a strategic decision. It was, instead, the result of a failure to investigate.

Appointed counsel's investigative failures, combined with Fields' mental condition gave rise to an attorney-client relationship marred by disagreement and distrust. Mr. Fields' decision to waive counsel was largely the result of a delusional belief that counsel was working with the prosecution and the belief that he had the "power" to compel witnesses to tell the truth. After he was convicted, Mr. Fields reenlisted counsel confirming, in some measure, that paranoia and grandiosity spurred his original decision to proceed *pro se*.

Although Fields contends he would not have been permitted to waive counsel had the extent of his mental illness been investigated and confronted, because he was permitted to act as his own attorney he was constitutionally entitled to the unfettered exercise of that fundamental right. However, after Mr. Fields was permitted to waive counsel, his exercise of the right of self-representation was interfered with in significant ways. During jury selection, trial counsel failed to exercise one of Fields' peremptory challenges – a decision that was Fields' to make. During trial, Mr. Fields was not permitted to participate in bench or chambers conferences where material issues regarding the course and conduct of the trial were discussed and decided without his presence or consent.

In court, he was required to wear a stun belt which, given his history of trauma and resulting anxiety disorder, his fear of shock – accidental or otherwise – made it virtually impossible to concentrate and defend himself. Outside of court, he was kept in a cell that was constantly lit and noisy and was forced to attempt to sleep on a mattress on the floor between the cell door and toilet. In addition to these poor conditions and the unremitting sleep deprivation, Mr. Fields was denied access to the basic tools required to prepare his defense – legal materials

and a pencil. In addition, requiring Mr. Fields to wear the stun belt during the penalty phase substantially interfered with his right to consult counsel.

The defense presentation during the penalty stage of trial was abbreviated, largely superficial, and failed to meaningfully rebut the prosecution testimony that Mr. Fields' life history demonstrated his current and future dangerousness. In fact, that history should have served as the starting point for a discussion of Mr. Fields' mental dysfunction. Mr. Fields' life history is inseparable from his mental health history. Unfortunately, the defense mitigation investigation stopped far short of what is required of competent capital counsel. If Fields' jury had heard testimony describing the nature and depth of his mental dysfunction, it is overwhelmingly clear that his jury would have returned a life sentence.

In sum, neither the Court nor the jury heard facts which, if investigated and presented, would have completely altered both the course and outcome of this case.

### III.    FACTS

#### A.    Procedural History

On May 13, 2003, an eight-count indictment was filed in the United States District Court for the Western District of Texas, charging Fields with, among other charges, escape and murder. The indictment also contained a "Notice of Special Findings" alleging facts to support submission of the statutory intent factors and aggravating factors to the trial jury if the case proceeded as a death penalty prosecution.

On May 23, 2003, the Government gave notice it would seek the death penalty.

Trial started in January 2004. On January 30, 2004, the jury convicted Fields on all counts. From February 2-5, 2004, the same jury heard testimony and argument in the penalty phase. *See* RE 38. On February 5, the jury retired to deliberate. On February 6, 2004, the jury

was told to keep deliberating after evincing an inability to agree on punishment. It sentenced Fields to death shortly thereafter.[2]

The trial court entered judgment on April 7, 2004.

Fields filed a notice of appeal the next day. Fields' conviction and death sentence were affirmed by the Fifth Circuit Court of Appeals on March 29, 2007, with Benavides, J., dissenting. *United States v. Fields*, 483 F.3d 313, 323 (5th Cir. 2007), *cert. denied*, 128 S. Ct. 1065 (2008). Fields petitioned the United States Supreme Court, which denied review on January 14, 2008. This Court granted Mr. Fields' un-objected to motion for equitable tolling until March 1, 2009. This petition timely follows.

### B.    Facts

This section contains an overview of the relevant facts. Additional facts, where helpful to the understanding of a claim, are included in the discussion of that individual claim. For example, the facts supporting Mr. Fields' claim of actual innocence, which are voluminous, are contained in that separate section.[3]

### 1.    Waiver of Counsel

At the commencement of trial and after unsuccessfully attempting to obtain new counsel, Mr. Fields told the Court he wanted to represent himself. Fields had made and withdrawn several similar requests over the two year investigation – all based on counsel's inadequate defense investigation and his fear that counsel was conspiring against him. However,

---

[2] The jury's special findings on the statutory aggravating factors were that the Government had proved beyond a reasonable doubt that Fields committed the murder during commission of another offense, *i.e.*, escape, and that he has a prior conviction for violent felony involving firearm. The jury did *not* find that Fields "committed the offense after substantial planning and premeditation to cause the death of the victim."

[3] Facts will be further developed at a presentation at a hearing as well as through post-filing discovery and attainment of sufficient investigative and expert resources.

this renewed request was different.  Just four days before – and for the first time – counsel informed Fields that Mr. Peterson was a McLennan County district attorney involved in a 1987 prosecution of Fields.  Fields was twelve at the time of that prosecution.  Although counsel did not perceive this to be a conflict, they requested Fields sign a formal waiver.  This surprise announcement bolstered Fields' longstanding delusional belief about counsel and he refused to sign.  Rather, at the start of trial, he renewed his request for new counsel.

In addressing the Court, Fields stated that he found the actions of court appointed counsel "suspicious and I think they are working with the prosecutor instead of for me."  Fields further believed there were "several sure fired [*sic*] ways to prove that several other witnesses are lying," but that counsel would not challenge their credibility.

After Fields persisted in his request for self-representation, the Court engaged in a colloquy with him during which the Court asked Fields if he knew what he was charged with and the possible consequences, including the death penalty, which could follow if he were convicted. Fields answered that he understood and reiterated his belief that his attorneys were working with the prosecutor.  After the prosecutor indicated "concern" regarding Fields' ability to represent himself based on trial counsel's previous declaration that mitigating circumstances existed relating to Fields' mental health, the Prosecutor suggested sending "a shrink in."

As a result, the Court directed that Dr. Stephen Mark conduct an evaluation of Mr. Fields.  Shortly thereafter, Dr. Mark appeared in court and, framing the inquiry as, "can he make the decision to represent himself and be competent," answered: "yes."  Dr. Mark's entire testimony lasted one minute and covers less than two pages of the transcript.  Trial Transcript ("TT") at 61-62.[4]

---

[4] Citations to the transcript of the trial proceedings are represent at TT at (page number).

Prior to permitting Fields to waive his right to counsel, the Court spoke with Fields one additional time. During that inquiry, Fields noted that he was "not sure I can do this," but expressed again his distrust of and disagreement with current counsel. The Court gave him no other options, and trial counsel objected neither to the scope of the hearing nor the Court's decision to permit the impaired Fields to waive his right to counsel.

Dr. Mark's competency evaluation was both brief and uninformed, as his own signed statement reveals. *See Affidavit of Dr. Stephen Mark.* Trial counsel provided the expert with *none* of the readily available background information on Mr. Fields' mental health impairments, including prior psychological evaluations which diagnose Mr. Fields as suffering from post-traumatic stress disorder and a serious mood disorder. *Id.* ("I was not provided and consequently did not review any documents related to Mr. Fields' prior term of incarceration or any prior mental health diagnoses."). As a result, Dr. Mark's entire assessment of Fields' ability to knowingly and intelligently waive counsel and represent himself at the trial for his life lasted 30 minutes. *Id.*

In fact, Mr. Fields' exposure to extreme and repeated trauma has produced pronounced symptoms of post-traumatic stress disorder. He also suffers from bipolar disorder. Additionally, his social, medical history and the symptoms of mental dysfunction demonstrated throughout his life all support the conclusion that he is afflicted with neuropsychological impairments. "Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses. Mr. Fields is intensely paranoid and grandiose. His decision to waive counsel was the result of these mental illness symptoms. Put another way, but for Mr. Fields' mental illness, he would likely not have sought to waive counsel." *See Declaration of Dr. George Woods.*

When he sought to waive counsel, Mr. Fields believed his counsel was working for the prosecution. Trial counsel, Mr. Swanton, adds that Mr. Fields believed that if Fields asked the questions, the "witnesses would be *forced* to tell the truth." *See Affidavit of Robert Swanton,* p. 2, ¶ 16. These are classic examples of delusional beliefs. However, without a psychiatric assessment informed by historical documentation, they were understandably not seen as such.

Mr. Fields was not competent to waive the right to counsel. This conclusion would have been apparent to the Court if a competent mental health investigation had been conducted and the results of that investigation presented.

**2.    The Court and Counsel Interfered with Mr. Fields' Right of Self-Representation**

Nevertheless, this Court approved Mr. Fields' waiver of the right to counsel. Thus, he was constitutionally guaranteed unfettered control over the trial decision-making process. However, there were numerous incidents at trial where Mr. Fields' right to self-representation was significantly impaired.

After Fields invoked his right to self-representation and before the conclusion of *voir dire*, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel. The Court admonished Mr. Peterson and Mr. Swanton that their role was advisory only and that Mr. Fields was to address the Court and the witnesses on his own. The Court did, however, authorize standby counsel to argue motions and take up other matters outside the presence of the jury but only if the record was "absolutely clear" that Fields chose to have counsel do so and that counsel was doing so in a manner Fields approved of.

The Court did not allow Fields to be present at bench conferences when the jury was seated. To avoid having to excuse the jury to allow Fields to participate in bench

conferences, the Court "hope[d]" Fields would authorize standby counsel to speak for him on whatever matter needed to be discussed and allow his standby counsel to report back on the matters that took place if his participation in a bench conference would require the jury to be excused. TT at 1166. Fields never authorized standby counsel's participation in this way and wanted to participate in these conferences on his own behalf.

While Mr. Fields represented himself, the Court held several bench conferences and at least two chambers conferences. Several of the bench conferences occurred in front of the jury. Fields was not permitted to participate in any of these bench or chambers conferences. For each, the jury watched standby counsel and the prosecution approach the bench, leaving Fields seated at the defense table. At each conference, critical trial decisions were made by the trial judge, prosecutors and standby counsel in Mr. Fields' absence and without his input or consent. When bench conferences took place, Fields' standby counsel either would not or could not consult Fields before approaching the Court. Accordingly, standby counsel did not know what positions Fields wanted them to take or how Fields wanted them to present those positions to the Court concerning any of the issues discussed at bench or chambers conferences. While purportedly representing himself, Fields was excluded from all meaningful participation in these trial proceedings.

Moreover, during *voir dire*, Mr. Fields had already exercised his right of self-representation, and Mr. Peterson and Mr. Swanton were to serve as standby counsel only. Although Mr. Fields agreed to consult with standby counsel during the jury selection process, Mr. Fields did not authorize standby counsel to exercise peremptory challenges in a manner that was contrary to his instructions to them about how he wished to exercise those challenges. Nevertheless, standby counsel did not follow Mr. Fields' instructions to exercise peremptory challenges against particular jurors.

USActive 15580100.1                                      -10-

### 3.      Conditions of Pre-Trial Confinement

Mr. Fields' ability to represent himself was severely impaired by the pre-trial confinement conditions which forced him to conduct his own defense in an extremely sleep deprived and otherwise compromised state.  Prior to and during trial, Mr. Fields was confined in a jail cell where the lights were never dimmed, and where it was constantly noisy.  Mr. Fields' sleep cycle and biorhythm were disrupted as a result.  These disruptions promoted Mr. Fields' psychological deterioration and caused his behavioral disruptions.

Fields was kept in a holdover cell in the booking department of McLennan County Jail.  Unlike a typical cell, this small cell was equipped only with a steel bench and a toilet – the cell had no bed, no shower, and no mechanism for shutting out the constant light and noise of the booking area.  Fields was forced to sleep on a mattress placed on the floor of the cell, in what little space existed between the door and the toilet.  As a result, Mr. Fields got virtually no sleep.  This was the case for several weeks prior to and during trial.

During this period of time, Mr. Fields, a *pro se* defendant with no formal legal education, attempted to prepare for his first trial – a federal capital case where his life was at stake.  He had no access to any legal materials while in his cell.  Although he had a pad of paper, he was not allowed to keep a pencil in the cell to write with.

As a result of sleep deprivation and the problematic conditions of confinement, during his conduct of the trial, Fields could not concentrate, had trouble with his memory, and would become irritable.  In addition, these conditions of confinement exacerbated his mental health impairments, causing additional negative consequences including marked distress, anxiety, feelings of lethargy, mood disorders, irritability, ruminations and intrusive thoughts, paranoia, and other symptoms.

### 4.     Use of a Stun Belt

In addition to having to endure these conditions of confinement, the security measures employed in the courtroom during trial also interfered with Fields' ability to represent himself. When Mr. Fields entered the courtroom, he was forced to wear a stun belt. This was so even though the deputy U.S. Marshal in charge of the office described Fields "as a model prisoner here at the courthouse." TT at 52-53. However, based in part on the Marshals' impression of Fields' behavior while kept in the holdover cell, he was required to wear the stun belt. The Court held no inquiry into whether this restraint was necessary other then to solicit the marshal's opinion. Counsel, who still represented Fields, did not object.

Fields was required to wear the stun belt both during the time that he was *pro se* and when he was represented by counsel. The use of a stun belt served as a constant source of concern and fear, making it difficult to impossible for him to concentrate and altering his normal demeanor. Fields' attempts to prevent activation of the stun belt at all costs left him appearing cold and unemotional in the eyes of the jurors.

Mr. Fields' concern regarding the stun belt was well-founded. A stun belt uses an intense electric shock as a means of physical and psychological control over the person wearing the device. The belt is placed over a defendant's waist, and prongs that are connected to two nine-volt batteries are attached to the defendant's left kidney area. The belt is designed to deliver a 45,000 to 50,000 volt shock for approximately eight seconds when activated by a remote control. Once a person activates the device, he cannot stop the shock manually; the shock lasts for the entire eight seconds. The force of the shock knocks most wearers to the ground. The victim shakes uncontrollably and can remain incapacitated for up to 15 minutes. It is not unusual for the wearer to self-urinate or defecate.

The manufacturers of stun belts themselves note the strong psychological effect of the device on the wearer. For example, at trials the defendant will be watching whoever has the monitor. According to one manufacturer, one of the great advantages of the stun belt is its capacity to "humiliate the wearer." The stun belt's intended use, therefore, is to control the mind of the defendant. In this case, it worked.

Prior to being forced to wear the stun belt, the marshals explained and demonstrated its use to Mr. Fields. Consistent with the literature, they told him that the device, if activated, would administer a painful and disabling shock. The marshals told Fields that the device was activated by pushing a button. They told Fields that the marshal would activate the device if they "perceived" any security risk – if Fields refused to remain seated or if he appeared upset or angry. Then, they demonstrated the device by placing it on the ground and activating it. The stun belt crackled, setting off sparks.

Mr. Fields did not trust the marshals. He exhibits the hypervigilance that years of trauma tend to produce, and he is intensely paranoid. He was afraid that a marshal might activate the device for any plausible reason. As a result, Fields remained seated and appeared to be as unemotional as possible. However, Fields could not get the constant threat of an intentional or accidental activation out of his mind. This made it difficult and, at times, impossible for Fields to concentrate. As a result, he simply gave up on some cross-examinations.

The trial court did not consider any less restrictive alternatives to the stun belt. Although the Court heard from the marshals, the Court did not take any testimony on the psychological effects of a stun belt on defendants, in general, or Fields, in particular. Having

failed to investigate their client's history of trauma and mental illness, trial counsel failed to present any evidence to the trial Court regarding the effect of the device on Mr. Fields.[5]

### 5.    Testimony at Trial

At trial, the Government alleged that Fields, possessive and jealous of his sometime-girlfriend Suncerey Coleman, escaped from federal custody, convinced Coleman to come away with him, drove her to a rural area outside Waco, and shot her to death there.  Fields tried to present the defense that he had been framed for the murder by the real killers, Fields' jealous girlfriend Shalaykea Scroggins and one of their acquaintances, Edward "Trey Boy" Outley.  Fields attempted, without success, to attack the Government's witnesses as testifying inconsistently, implausibly, and in return for benefits from the Government.  Fields also attempted to point out the absence of any physical evidence connecting him to the crime.

The Government relied on incarcerated witnesses to support its theory that Fields, while in jail, believed Coleman was seeing other men and wanted to control her.  The prosecutors called these prisoners to testify they had heard Fields say that he was upset that Coleman was seeing other men, that he had told Coleman and others that he would kill her, and that he made a range of confessions to her murder.

Fields, generally without success, tried to put forward evidence that Trey Boy and Scroggins were lying about their involvement in Coleman's murder because they were the actual killers.  Fields sought to show that Scroggins was obsessed with him, that, as a woman spurned,

---

[5]    During penalty phase, Fields was reluctant to discuss with defense counsel many of the matters that concerned him the most for fear that his show of emotion would provide a basis to "push the button."  Several jurors have noted that Fields lack of emotion at trial was a significant factor in their decision to impose a death sentence.

she hated Coleman, and that she had become incensed at seeing Coleman and Fields together the day of Coleman's disappearance.

He also presented evidence that Coleman, unlike Scroggins, had visited him often while he was in jail. In addition, Tanesha Hilliard testified that she had never known Fields to be violent or threatening toward Coleman and that Fields did not seem upset when he was with Coleman at Hillcrest hospital.

In addition, Fields attempted, again without success, to impeach the jail inmate witnesses by, among other things, questioning them about prior inconsistent statements, their ability to talk to one another about his case, the implausibility of his making such damning admissions to them, and the benefits they had or hoped to secure from the Government in exchange for their testimony. These inmate witnesses' statements were generally implausible, inconsistent with the factual evidence, and often inconsistent with their own prior statements. Moreover, most of these inmates had strong motive to lie, given that they were rewarded for their testimony with reduced sentences. The uneducated, impaired and sleep-deprived Fields, however, was not able to establish as much before the jury.

### 6. Penalty Phase Testimony

The Government's case at punishment focused primarily on establishing Fields' future risk of acts of violence. It presented witnesses who testified about Fields' bad behavior at the McLennan County Jail; about police reports relating to other serious violent offenses; and about records that had been prepared in conjunction with his juvenile adjudication, probation, and incarcerations. The Government then presented Richard Coons, M.D., a psychiatrist who testified that Fields would be a danger in the future.

While counsel unsuccessfully sought to exclude and later to diminish Dr. Coons' testimony by arguing that it was not premised on a scientifically accepted methodology for risk

prediction, they were not prepared to impeach this prosecution testimony. Counsel failed to consult with an expert utilizing the methodology endorsed by his cross-examination. Thus, Dr. Coons testified that Fields' "line of work" is violent crime. "He just simply hasn't accepted the rules and regulations of society." TT 2351. Their failure to investigate and present evidence of their client's traumatic background and psychological dysfunction allowed Dr. Coons to further opine that his history *supports* the conclusion that Fields has no conscience or is sociopathic. Due to their failures to prepare, defense counsel's cross-examination of Dr. Coons was largely unsuccessful. Although Dr. Coons admitted the possibility that Mr. Fields might not act violently in the future, he ultimately opined that if Fields got a life sentence and had nothing to lose, he would "go back" to his old ways – which Dr. Coons contended were violent.

Mr. Fields' well-documented symptoms of severe, progressive mood disorder; paranoid ideation; impulsivity; psychotic thinking; suicidal attempts; and agitation were *never presented to his jury*. There is no mention in the trial proceedings of Mr. Field's long history of mental illness. Among the mitigating factors that defense counsel asked the jurors to consider on the Special Findings Form utilized in penalty phase deliberations was the statutory factor stating that "[t]he Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge." Not a single juror found that this factor existed. Another proposed mitigating factor stated simply, "The Defendant can be controlled in a prison setting." Again, not a single juror found that this factor existed. These findings are hardly surprising in view of the lack of expert evidence at trial to explain Mr. Fields' history mental disorders that can, in fact, be effectively managed with treatment.

Mr. Fields was born into a family with a history of mental illness. The absence of any intervention led to a chaotic, violent, and traumatic home environment. Each of these factors

– trauma, mental disorder, and environmental chaos and deprivation – helped to shape the uniquely cultural presentation of Mr. Fields' bipolar disorder, a presentation Dr. Day, a mental health professional who evaluated Mr. Fields when he was a young boy, aptly described as "atypical." It is not an overstatement to say that Mr. Fields' mental dysfunction is the singular fact necessary to an understanding of his life and the crimes of which he has been convicted.

At the time of his trial, and at the time of the crime of conviction, Mr. Fields met the DSM-IV-TR criteria for PTSD as well as bipolar disorder. His PTSD symptoms – the result of multiple traumatic stressors – include numbing of affect, hyperreactivity, emotional withdrawal, agitation, impaired sleeping, hypervigilance, and exaggerated startle response. These symptoms exacerbate his bipolar symptoms. Mr. Field's bipolar symptoms include impaired sleep, paranoid ideation, agitated depression, impaired judgment, mood swings, irritability, and hypersexuality  – all of which have been well documented over an extended period.

Additionally, the trial team failed to investigate and present evidence regarding the federal prison system's ability to control Fields' behavior as well as present his true and negligible escape risk from a high security facility where he would have been having been serving a life sentence. A competent investigation would have revealed that Fields' likelihood of serious prison violence during a life without possibility of parole sentence in BOP was well below "more likely than not." It would have additionally revealed that, should Mr. Fields have been determined by BOP to present a disproportionate risk of violence in prison, he could be held under super-maximum security conditions until determined to no longer be a disproportionate risk. Just as importantly, it would have revealed that the *ad hoc* risk analysis performed by Dr. Coons was subject to grave errors. *See e.g., Declaration of Dr. Mark Cunningham.*

The primary theme of the prosecution witnesses was even "in a highly structured system like a prison the defendant cannot be controlled. He is incapable of being controlled." TT 2065. However, there was a wealth of uninvestigated evidence readily available to conclusively rebut this claim. To begin, the Bureau of Prisons (BOP) has significant security and confinement capability in its super-maximum facility, ADX Florence. The capability largely negates (*i.e.*, renders extraordinarily improbable) Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape. However, even if not assigned to ADX Florence, Mr. Fields could easily be controlled within the federal prison system, if he presented a risk of committing violent acts.

There was much testimony at sentencing regarding the specter that Mr. Fields would again escape from custody, was motivated to escape from custody, announced that he was going to escape from custody, requested assistance from staff in escaping from custody, and damaged a vent in his cell in an apparent attempt to escape from custody. There was also testimony from corrections staff that there is no "escape-proof" facility. TT at 2310, 2312. Once again, the majority of this information could have been rebutted effectively with readily available information. The frequency of escapes from U.S. Penitentiaries is extraordinary low. There is no correspondence between the architecture, security capabilities, and security procedures of a U.S. Penitentiary and the McLennan County Jail. Further, the architecture and security procedures of a U.S. Penitentiary are such that it is unlikely that the co-opting of a single correctional officer would enable an escape.

Furthermore, trial counsel were grossly remiss for failing to counter the Government's evidence of the risk of future violence. The methodology and correctional data associated with reliable violence risk assessments (*i.e.*, future dangerousness) at capital

sentencing represents a highly specialized knowledge base that has not typically been mastered by forensic mental health professionals.

For one, counsel could have presented their own scientific evidence on the actual risk of Mr. Fields' committing acts of future violence in prison. For example, two actuarial scales were available in February 2004 for forecasting the risk of assault in prison that could have been applied to Mr. Fields. The first is based on a study of the prison misconduct of approximately 6,000 convicted murderers, projecting their likelihood of serious prison violence during a 40-year prison term. Application of this scale to Mr. Fields yields a 40-year risk of a 14.5% likelihood of serious prison violence. This is modestly below the risk rate of 16.4% of the sample as a whole. Most of this risk is for assault of another inmate. Life-time risk of an aggravated assault on a correctional officer is projected at 1%. Further, and as discussed previously, even that low probability can be reduced by the application of correctional interventions including more secure confinement.

In addition, as discussed in more detail in the claims corresponding to these facts, the methodology and associated testimony of Dr. Coons demonstrated virtually all of the fundamental errors in violence risk assessment at capital sentencing that have been identified in the peer-reviewed literature. Contrary to Dr. Coons' methodology of illusionary correlations, reviews sponsored by the *U.S. Department of Justice* have concluded: past community violence is *not* strongly or consistently associated with prison violence; current offense, prior convictions, and escape history are only weakly associated with prison misconduct; and the severity of offense is not a good predictor of prison adjustment. Not surprising, reliance on such a fundamentally flawed predictive methodology results in predictions that have an extraordinarily high error rate.

Trial counsel failed not only to challenge the Government's case for death, but also woefully neglected their duty to present an affirmative case for sparing Sherman Fields' life. Although Mr. Fields' life story is undeniably nightmarish, trial counsel's mitigation selection was, at best, lacking in depth, and in some respects, affirmatively damaging to Mr. Fields' case for life.  Rather than present a robust and compelling narrative of Mr. Fields' life history, detailing the variety of risk factors and chronic stressors that influenced the trajectory of his development from childhood onwards, counsel presented only a handful of witnesses and presented the jurors with a thin and superficial presentation of isolated events in Mr. Fields' life. Moreover, counsel failed to provide the jurors with any framework that would allow them to give full mitigating effect to the factual evidence regarding the trauma Mr. Fields experienced throughout his life.

Counsel presented only eight penalty phase witnesses.  Three of the witnesses were correctional officers who had only come to know Mr. Fields in the year prior to his trial while incarcerated that the Federal Medical Center at Fort Worth.  Although ostensibly called for the purpose of showing that Mr. Fields would not be a "future danger" in prison, all three officers readily admitted ignorance of Mr. Fields' extensive prior history of incarceration in the juvenile system, the Texas Department of Corrections, and at the McLennan County Jail. Indeed, one of the witness, Senior Officer Specialist Greg Watts, even testified that he had advised Mr. Fields to behave in prison so as to help his chances in his upcoming capital trial. Such testimony not only undermined the rest of the mitigation presentation, it also suggested that to the extent that Mr. Fields had recently exhibited good conduct in prison, it was just an act to manipulate the jury.

Counsel also called two step-uncles, Ed and Vincent Green, who had lived with Mr. Fields for about a year prior to their father's death at the hands of a drunk driver.  Although

Mr. Fields was a witness to that fatal accident, and was profoundly affected by the loss, counsel's examination of these witnesses only explored the event in the most superficial of terms. The jurors only heard that Mr. Fields was sad and grieved over his grandfather's death, which is obviously a typical response over the loss of a loved one, but learned nothing of the way in which the then-sixteen-year-old Mr. Fields was profoundly affected by witnessing his grandfather being run down by a drunken driver and how this event led to the onset of complex traumatic symptoms. Indeed, in the decade and a half before his trial, Mr. Fields had over twenty different friends who had died of violent deaths – so many that by the time he was in adolescence, mental health professionals were already making the diagnosis of post-traumatic stress disorder (PTSD). The jury, however, never learned of this fact because trial counsel failed to investigate Mr. Fields' mental health history and present evidence that he suffered from PTSD.

Counsel also examined Ed and Vincent Green regarding Mr. Fields' upbringing in certain housing projects in Waco. Although eliciting general statements to the effect that the projects were in a bad neighborhood, counsel failed to present to the jury an adequate and compelling picture about *why* the projects were considered such a dangerous place to live. The jury only heard generalities about the presence of drugs and gangs, but was not provided detailed testimony about the omnipresent threat of violent death to which Mr. Fields was exposed on a daily basis growing up in the projects. Nor did the jury learn about the manner in which Mr. Fields' chronic exposure to these stressors affected him during formative years of his development and worsened his mental condition and PTSD symptoms.

Counsel also called Mr. Fields' mother, Alice Fields Swinnie, as a witness. As with Ed and Vincent Green, counsel elicited only vague generalities from her on the stand regarding violence in the home and the community in which Mr. Fields lived. For example, Ms.

Swinnie testified that one of her live-in boyfriends was "very mean and he used to beat me and he used to beat my kids," (TT. at 2458), and that in the projects "[e]verything happens. They shoots (sic) and deal dope and a lot of other things." TT at 2460. Such testimony was succinct and conclusory and failed to convey any of the details necessary for the jurors to genuinely comprehend the extraordinary stress and trauma that Mr. Fields experienced growing up.

Similarly, counsel presented the testimony of Jane Bye (formerly Jane McHan), their retained social worker. Although Bye outlined some of the significant events in Mr. Fields' background, such as the death of his grandfather, her testimony provided no further details regarding the signs and symptoms of behavioral change in Mr. Fields after such events. Nor did her testimony offer a framework for understanding the trauma characterizing Mr. Fields' life and how repeated exposure to such trauma affects adolescent development and how it affected Mr. Fields.

Counsel also called Jack Randall Price, Ph.D., a clinical and forensic psychologist who testified that Mr. Fields had an IQ of 113 and could adjust well in a structured environment such as prison. During the course of the Government's cross-examination, however, Dr. Price was all but converted into a powerful prosecution witness. The Government invited him to opine at length about the diagnosis of antisocial personality disorder – including the fact that persons with such a diagnosis lack any remorse over hurting others, are not amenable to treatment, and are commonly referred to as sociopaths – before having Dr. Price confirm that Mr. Fields had received this very diagnosis while incarcerated as a juvenile. This was the last "defense witness" whose testimony the jury heard before deliberating whether to sentence Mr. Fields to death.

Trial counsel's deficient mitigation presentation was not the product of tactical consideration or strategic judgment. Rather, counsel simply failed to carry out its basic investigatory duties in preparation for trial. For example, counsel failed to perform such basic

mitigation investigation tasks as obtaining all relevant social history records of Mr. Fields and his family members. Such records identified dozens of available witnesses – including teachers, social service caseworkers, and medical and mental health professionals – who had encountered Mr. Fields throughout the course of his life and who could have provided the jury with crucial details about the influences that shaped Mr. Fields in his developmental years. Moreover, despite the fact that Mr. Fields had a large extended family, counsel failed to interview all but a handful of these witnesses. In so doing, counsel unreasonably missed a crucial opportunity to investigate such issues as the impoverished, violent conditions in which Mr. Fields was raised, risk factors to which he was exposed, patterns of dysfunction that governed family dynamics, and potentially hereditary mental illness in several generations of his family.

Moreover, the trial team failed to conduct a competent investigation into Mr. Fields' own chronic history of serious mental illness. Although the trial team consulted with an expert regarding Mr. Fields' intelligence, this inquiry was too narrow and failed to account for the fact that a high IQ score does not indicate the absence of mental disease. Indeed, mental illness and deficits in neuropsychological function can coexist with average or even high intellectual functioning. Similarly, the trial team's investigation failed to explore the adequacy of institutional responses to Fields' childhood trauma, mental illness, and failed to determine that their client's problems were never accurately identified or properly addressed. Understanding these mental conditions was vital to understanding and explaining Mr. Fields' behavior, including his history of criminal and other "bad acts."

Counsel's lack of investigation into Mr. Fields' mental condition does not reflect reasonable professional judgment, as there were numerous "red flags" that should have alerted counsel to the fact that a complete mental health investigation was necessary. For example, Mr. Fields' readily available institutional records reflected that Mr. Fields had previously

received psychiatric treatment while incarcerated and had been diagnosed with major depression with psychotic features, pervasive mood disorder, atypical bipolar, and posttraumatic stress syndrome. As a result of counsel's failure to pursue an investigation into Mr. Fields' mental health, the jury that sentenced Mr. Fields to death never heard any of this evidence of his lifelong and chronic history of mental health problems, including the fact that he had suffered from Bipolar Disorder and Post-Traumatic Stress Disorder since he was a child.

Yet even with this paltry mitigation presentation, and even without knowing of Mr. Fields' substantial history of mental illness, the death-qualified jury nevertheless stopped after six hours of deliberation and asked the trial court what sentence would be imposed if it could not unanimously agree on a sentence. The trial court responded that in that event, it (the court) would impose a sentence, which could not be the death penalty. The jury almost immediately issued a second note confirming that it could not unanimously agree on a sentence. Over Mr. Fields' objection, the trial court ordered the jurors to keep deliberating. They returned with a death verdict shortly thereafter.

## CLAIMS FOR RELIEF

### IV.    CLAIMS RELATED TO FIELDS' INCOMPETENCY TO WAIVE COUNSEL AND PROCEED *PRO SE*

CLAIM 1:    MR. FIELDS WAS INCOMPETENT TO WAIVE HIS RIGHT TO COUNSEL. PERMITTING MR. FIELDS TO REPRESENT HIMSELF VIOLATED THE CONSTITUTIONAL GUARANTEES OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 2:    MR. FIELDS WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN THE TRIAL COURT CONDUCTED AN INADEQUATE HEARING IN RESPONSE TO MR. FIELDS' COMPETENCY TO WAIVE COUNSEL AND REPRESENT HIMSELF, VIOLATING THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION.

CLAIM 3:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS EIGHTH AMENDMENT RIGHT TO A

RELIABLE SENTENCING VERDICT WHEN COUNSEL FAILED TO CONDUCT A COMPETENT INVESTIGATION PRIOR TO OR IN RESPONSE TO MR. FIELDS' REQUEST TO WAIVE COUNSEL, FAILED TO DEMAND A BROADER INQUIRY BY THE COURT IN RESPONSE TO FIELDS' MOTION, AND FAILED TO OBJECT TO MR. FIELDS' COMPETENCY TO WAIVE HIS RIGHT TO COUNSEL.

A.    **Facts**

Prior to the start of trial, Mr. Fields sought to replace or waive counsel – undeniably the single most important event of the trial. In response, the Government agreed that the facts presented a sufficient question concerning Fields' competence and appropriately requested a hearing. The Government suggested that Mr. Fields should be examined by a psychiatrist to determine whether he possessed the requisite mental competency to proceed *pro se*:

> MR. SNYDER:   [] [I]t might be good to have Dr. Mark or someone like that that the Court trusts to sit down with the defendant and make sure he is not suffering from any mental disease or defect or have any organic background in like damage to the head or something that would affect his ability to make a rational, intelligent decision. . . . I'm concerned with that type of thing in the record with us taking this serious step that an appellate court looking over your shoulder might have said, "You should have stopped and made sure the guy was on all fours."

TT 24-6. While the Court agreed that competency hearing should be held and that the hearing should include expert testimony, the Court then indicated:

> THE COURT: Well, it's 2:20 on a Friday afternoon. When are we going to do that before 9:30 Monday morning and how are we going to do it before 9:30 Monday morning? I guess it's possible you can find somebody to do it.

*Id.*   Pursuant to this colloquy and at the Court's direction, Dr. Stephen Mark interviewed Mr. Fields the following Monday morning, testifying later that morning.

Dr. Mark, the psychiatrist appointed by the court to determine competence, has now noted that he personally met with Mr. Fields, but only for about 30 minutes and without the

aid of any documents and only limited background information. *See Affidavit of Dr. Mark.* Counsel had a number of documents in their possession which diagnosed Mr. Fields' with serious mental illness. *See Affidavit of Jane Bye* ¶12. Those documents were not provided to Dr. Mark. As a result, Dr. Mark had no medical records, no social security records, no medication records, nor any family history to inform his understanding of Mr. Fields' past or present mental disorders and mental state. This evidence demonstrates that Dr. Mark's conclusion concerning Mr. Fields' purported competence was the result of an extremely limited and uninformed evaluation.

However, even these records available at the time of trial did not reveal the true scope of Mr. Fields' mental dysfunction. Thus, the competency evaluation also suffered because counsel failed to conduct a thorough and competent investigation into Mr. Fields' mental health background and current mental condition (*see also* Claim 22 and supporting facts and argument), and did not even furnish the evaluating psychiatrist with any of the information counsel actually discovered in order to aid the psychiatrist in his determination of Mr. Fields' competency to waive counsel and represent himself. Given the stakes, as even the Government has suggested, there was certainly a corresponding need for a thorough evaluation of Mr. Fields' longstanding mental dysfunction and impairments. Instead, the opposite happened.

Yet, following Dr. Mark's cursory examination, the Court conducted a one-minute hearing into the competency of Mr. Fields to proceed *pro se*. TT. at 60-61. Trial counsel did not put on any witnesses. In fact, Dr. Mark was the only witness to testify. *Id.* Trial counsel did not even cross-examine Dr. Mark. *Id.* The Court did not conduct any sort of questioning into Dr. Mark's conclusion or basis thereof. In fact, the only question asked of Dr. Mark was, to paraphrase the Court, "do you have an opinion?" Following, in its entirety, is the transcript of

the hearing that allowed Mr. Fields, a mentally impaired defendant, to proceed *pro se* in a trial

for his life:

> THE COURT: Dr. Mark, I fully realize it's not possible at all for you to submit any kind of written report considering whatever visit you had with Sherman Fields, but if you would, just tell me on the record what happened, if he talked to you, what your opinion is. What I'm interested in is simply this: He informed me Friday that he wants to represent himself, and before I can allow him to do that – which he has a right to do – I have to satisfy myself that he's making a voluntary and intelligent decision. Not necessarily that it's the smart decision or the best decision, but that he's doing it voluntarily and intelligently. If you could help me in that regard at all.
>
> DR. MARK: Yes. I was able to visit with Mr. Fields this morning. He asked that at least one of his current attorneys be present. Mr. Swanton was present. Mr. Fields cooperated with the interview. I went through a standard interview for competency and current mental status. He has had some history of depression in the past and maybe some now with his current situation, but it does not interfere with the competency. He is not psychotic. He is not organic. He appeared able to think through questions and not distract. He appeared able to make decisions adequately for himself. In terms of the specific question can he make the decision to represent himself and be competent, the answer is yes. He is competent to do so.
>
> THE COURT: Dr. Mark, I think that's all I can do. Thank you very much. You know where to send your bill.
>
> DR. MARK: Okay. Thanks.

TT. at 60-61.

It is now clear that all of the numerous critical facts pertaining to Fields' mental

condition were either ignored or overlooked.

Mr. Fields suffers from chronic, serious, severe mental disabilities. He has severe

mood swings, grandiosity, extreme paranoid ideation, and impaired judgment. His request to

waive counsel was the direct product of these disabilities. *See Declaration of Dr. George*

*Woods.*   These disorders also critically diminish Fields' capacity to concentrate, strategize, communicate, formulate questions and conceive and articulate theories of his case.   These disorders prevented Fields from absorbing, comprehending and testing the Government's evidence.  None of this evidence was discovered or presented to this Court.

Mr. Fields' history of criminal behavior and mental illness, and related incarcerations and institutionalizations, began when he was but a child.  A wealth of information helpful to determining Mr. Fields' competency existed.  None of it was presented to the Court.

In addition to the fact none of this information was discovered or presented at the competency hearing, trial counsel did not conduct a competent investigation into Mr. Fields' mental condition.  *See Declaration of Russell Stetler.*  Consequently, the trial team did not discover facts which were highly relevant to the decision to permit Fields to waive his right to counsel, and they also failed to demand a broader scope to the competency hearing, and failed to object to Fields' request to waive counsel.

### B. <u>**Argument**</u>

A criminal defendant may not be tried unless he is competent.  *Godinez v. Moran*, 509 U.S. 389, 396 (1993).   The conviction or sentencing of a defendant who is legally incompetent at the time of the proceedings violates due process.  *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  While movant recognizes that in our federal courts, "the right of self-representation has been protected by statute since the beginnings of our Nation," (*Faretta v. California*, 422 U.S. 806, 813 (1975)), the Constitution only guarantees a defendant who "knowingly and voluntarily" waives the right to counsel the right to proceed *pro se* at his trial. *Faretta v. California,* 422 U.S. 806 (1975).

A high standard exists for a defendant who seeks to waive counsel.  The two cases that set forth the Constitution's "mental competence" standard, *Dusky v. United States*, 362 U.S.

402 (1960) (*per curiam*), and *Drope v. Missouri*, 420 U.S. 162 (1975), specify that the Constitution does not permit trial of an individual who lacks "mental competency." *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present *ability to consult with his lawyer* with a reasonable degree of rational understanding." 362 U.S. at 402 (emphasis added; internal quotation marks omitted). *Drope* repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel, and to assist in preparing his defense* may not be subjected to a trial." 420 U.S. at 171 (emphasis added). As a result, the Constitution permits a court to limit a defendant's self-representation right by insisting upon representation by counsel at trial – where a defendant is incompetent to waive the right to counsel. *Indiana v. Edwards*, 128 S. Ct. 2379, 2387-88 (2008). The competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself, although *Edwards* also permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so.

### 1.    Procedural Due Process Demands an Adequate Inquiry

In other words, the substantive requirement that an incompetent defendant not be tried gives rise to a corresponding procedural due process right. *Drope, supra; Griffin v. Lockhart,* 935 F.3d 926, 929 (8th Cir. 1991). The issue in a substantive competency claim focuses on whether the defendant was in fact incompetent to waive counsel. The issue in a procedural due process claim is whether the court conducted an adequate hearing to determine competency. *Id.* Mr. Fields was denied both substantive and procedural due process.

In addition, a competency hearing is a critical event in a criminal prosecution to which the Sixth Amendment right to counsel applies. *See United States v. Purnett,* 910 F.2d 51, 55 (2d Cir.1990). Thus, counsel was constitutionally obligated to investigate and present relevant evidence on the issue of Mr. Fields' competence. *See e.g., Galowski v. Berge,* 78 F.3d 1176 (7th Cir.1996), *cert. denied,* 519 U.S. 878 (1996) (granting claim of ineffective assistance of counsel for failing to request a competency hearing); *McLaughlin v. Royster,* 346 F.Supp. 297 (E.D.Va.1972) (granting claim of ineffective assistance of counsel in failing to investigate client's mental state and to insist on a competency hearing).

Once doubt as to the defendant's mental capacity is raised, due process requires a "meaningful" and adequate hearing into the defendant's competency. *Drope*, 420 U.S. at 172; *Pate*, 383 U.S. at 386. In the Fifth Circuit, the test for meaningfulness is whether the "quantity and quality of available evidence is adequate to arrive at an assessment that could be labeled as more than mere speculation." *Martin v. Estelle*, 583 F.2d 1373, 1375 (5th Cir. 1978) (in the context of retrospective hearing); *see also Wolfe v. Weisner*, 488 F.3d 234, 238 (4th Cir. 2007) (hearing must be "adequate to protect" the defendant's due process rights).

Here, the Government raised sufficient doubt into the capacity of Mr. Fields to represent himself by asking for a psychiatric examination. However, the Court's one-minute hearing into the matter, relying on the similarly brief, perfunctory and inadequate psychiatric examination of Dr. Mark conducted immediately prior, was not meaningful and was certainly not full, fair and adequate.

Competency evaluations, even in non-capital cases, commonly involve reviewing relevant background information, including both medical records and court records; interviewing the defendant, using a number of structured approaches to questioning; and, sometimes, employing "assessment instruments" and conducting further interviews, such as with the

defendant's attorney.  Mossman, *et al., AAPL Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial,* 35 J. Amer. Acad. Psychiatry & L. No. 4 Suppl. (2007).  Evaluations involve reviewing relevant background information, including both medical records and court records; interviewing the defendant, using a number of structured approaches to questioning; and, sometimes, employing "assessment instruments" and conducting further interviews, such as with the defendant's attorney.  *AAPL Guideline* at S31-S43.  A psychiatric diagnosis is a standard part of the process and is "highly relevant."  *Id.* at S32.  "The goal is to learn whether and how mental symptoms impair competence-related abilities," bearing in mind that "[t]he relevance of even severe symptoms to the question of competence varies from case to case."  *AAPL Guideline* at S31-S43.

Such assessments attempt "to discern a defendant's capacity to make relevant decisions in a self-interested manner, or to uncover delusional thoughts or other symptoms of mental disorder that impair the capacity to *evaluate rationally* the choice that one may face."  N. Poythress, R. Bonnie, J. Monahan, R. Otto, S. Hoge, Adjudicative Competence:  The MacArthur Studies (2002) at 67 (emphasis added).  *See also id.* at 136 (goal of evaluation process is to uncover "faulty reasoning secondary to irrational (delusional) beliefs").

### 2.    Dr. Mark's Evaluation was Far From Adequate

As an initial matter, the brevity of Dr. Mark's interview prevented him from conducting a meaningful and thorough examination into the psychological wellbeing of Mr. Fields' competence.  When it comes to shifting and complex mental illnesses such as those afflicting Mr. Fields, the Supreme Court of California stated,

> More than three or four hours are necessary to assemble a picture of a man.  A person sometimes refuses for the first several interviews to reveal his delusional thinking, or other evidence of mental disease.

*People v. Bassett*, 69 Cal. 2d 122, 142 (Cal. 1968). Courts have repeatedly found psychiatric examinations as cursory as Dr. Mark's "simply too short" for the purposes of formulating a diagnosis as to mental disorder or competency. *See e.g., Ford v. Wainwright*, 477 U.S. 399, 415 n.3 (U.S. 1986) (single interview); *Boutte v. Mudd Separators, Inc*., 236 So.2d 906 (3rd Cir. 1970) (one hour examination); *Bush v. McCollum*, 344 F.2d 672, 673 (5th Cir. 1965) (40 minute examination); *United States v. Walker*, 537 F.2d 1192, 1195 (4th Cir. 1976) (30 minute examination); *United States v. Hamilton*, 107 F. 3d 499, 503 (7th Cir. 1997) (20 minute examination); *United States v. Taylor*, 437 F.2d 371, 378 (4th Cir. 1971) (10 minute examination); *United States v. Lebron*, 76 F.3d 29 (1st Cir. 1996) (five minute examination).

Further, Dr. Mark did not consider evidence of Mr. Fields' prior medical diagnoses of mental disorders, psychiatric evaluations, incarcerations and record of an abuse-filled, traumatic life, rendering his opinion "speculative" and unreliable. *See e.g., United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986); *Hernandez v. Ylst*, 930 F.2d 714 (9th Cir. 1991); *Taylor*, *supra,* 437 F. 2d at 378. Also missing from Dr. Mark's interview with Mr. Fields were the standard battery of psychiatric tests calibrated to detect mental illness. For these additional reasons, the examination was inadequate and unreliable. *See Hays*, 663 F. 2d at 1012-13 and n. 12-14; (examination inadequate due to, *inter alia*, unfocused questions and absence of psychological tests); *Bush v. McCollum*, 231 F.Supp. 560, 563 (D.C.Tex. 1964) (examination "limited to simple questions without the use of any kind of psychological tests" was "cursory" and inadequate to provide mental competence determination); *United States v. Mellor*, 2009 U.S. Dist LEXIS 749 (N.D. Iowa January 6, 2009).

### 3.    The Scope of Inquiry at the Hearing Was Likewise Inadequate

Also fatally, the hearing failed to consider all material facts to the potential competency of Mr. Fields. In this regard, the United States Supreme Court has held that for

capital competency hearings, the factfinder must have before it all possible relevant information about the individual defendant whose fate it must determine. *See Ford v. Wainwright* 477 U.S. 399 (1986) (competency to be executed).

Compared to Dr. Mark's inadequate evaluation, this Court's hearing was even more perfunctory. Indeed, the full evidence as to the competency of Mr. Fields offered at the competency hearing was Dr. Mark's untested conclusion, based on a cursory interview. Psychiatric opinions require particularly close examination because they are "at best a hazardous guess however conscientious." *Ford*, supra, 477 U.S. at 415. Cross-examination, even by the Court, contributes to the search for truth by exposing the foundation of the expert's opinion, any history of error, any personal bias, and the degree of certainty as to the conclusions. By failing to allow or make its own inquiry into any of these areas, the Court accepted a finding of competence without any knowledge whatsoever as to whether Dr. Mark examined the full psychiatric, personal and institutional history of Mr. Fields (he did not), whether Dr. Mark asked questions particularly designed to probe an individual's competence to play the heightened role of self-advocate (he did not), or Dr. Mark's history of error or the degree of certainty to his conclusions (since retracted).

Consequently, without such inquiry, either by trial counsel,[6] or by the Court, the Court's finding is inherently unreliable. *See Ford*, 447 U.S. at 415 ("Without some questioning of the experts concerning their technical conclusion, a factfinder simply cannot be expected to evaluate the various opinions.").

---

[6] *See Ford*, 477 U.S. at 414 ("[Without adversarial examination] the factfinder loses the substantial benefit of potentially probative information. The result is a much greater likelihood of an erroneous decision.")

Further, the sufficiency of the Court's inquiry is not salvaged even if the boundaries of "the competency hearing" are redrawn to include the prior colloquy with trial counsel. For one thing, as recognized by the Supreme Court, "the existence of even a severe psychiatric defect is not always apparent to laymen." *Pate,* 383 U.S. at 386. For this, among other reasons, trial counsel "are wholly unqualified to judge the competency of their clients." *Hull v. Freeman,* 932 F. 2d 159 (3rd Cir. 1991), *overruled on other grounds as stated in Caswell v. Ryan*, 953 F.2d 853, 859 (3d Cir. 1992). For another matter, where, as here, the client wishes to be found competent, counsel is in a hard, if not impossible, place. With regard to this difficulty:

> "When the trial court seeks the opinion of a defendant's counsel regarding his or her client's competency, counsel is placed in a difficult, if not untenable situation. If counsel privately has doubts about competency, but his or her client does not wish to contest competency, how does he or she respond to the court, and what argument should he or she offer on the issue? Counsel certainly cannot be a witness against his or her own client."

*State v. Johnson*, 551 N.W. 2d. 742, 776 (Neb.App. 1996).

Consequently, even if their comments were considered part of the competency inquiry, trial counsel's uninformed and non-expert lay opinions fail to make the competency hearing adequate or reliable.

### 4.    Mr. Fields was Prejudiced

If an adequate competency evaluation and hearing had taken place, informed by the requisite background information, the outcome of the hearing would have been different because Mr. Fields did not have the ability to think rationally about alternative courses of action (whether to represent himself or have counsel represent him) and to express a voluntary choice on that question. Mr. Fields was incompetent to waive his right to counsel because he

delusionally believed that counsel was working with the prosecution. That delusion was the product of his mental illness, which impaired his ability to make a reasoned and rational choice.

Likewise, if counsel had performed competently, the outcome of the hearing would have been different. If counsel had conducted a competent investigation or had provided Dr. Mark with the fruits of that investigation, it would have been clear that "Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses." *See Declaration of Dr. George Woods,* p. 2.

Mr. Fields is intensely paranoid and grandiose. His decision to waive counsel was the result of these mental illness symptoms. Put another way, but for Mr. Fields' mental illness, he would likely not have sought to waive counsel. "Mr. Fields' paranoid fear of his attorneys was consistent with his belief that they were not just not working for him, but were actively working with the prosecutors to convict him." *Id.* at 12.

Mr. Fields' "paranoid ideation and impaired judgment, coupled with the rumination and hyperreactivity of his PTSD (and exacerbated by his conditions of confinement)," fueled his decision to waive counsel, rather than just poor decision-making. *Declaration of Dr. George Woods supra.* This is not atypical. Commentators report that "clinical judgments of incompetency have been closely associated with particular symptoms – most prominently symptoms of thought disorder, *delusional beliefs, paranoia*, disorientation, and hallucinations." Melton at 144 (emphasis added).

However, even assuming that Mr. Fields was competent to waive his right to counsel, he was not competent to proceed *pro se*.

### 5.    Mr. Fields was Incompetent to Represent Himself

To safeguard the fairness of trial proceedings and the dignity and autonomy of the accused, the Supreme Court in *Edwards* recognized that the minimal competency standard to

stand trial, set forth in *Dusky*, is inadequate to determine competency for self representation, and declared that evaluation of a "defendant who would choose to forgo counsel at trial . . . calls for a different standard." *Edwards*, 128 S. Ct. at 2386. The Court defined a category of "borderline-competent" defendants that possess the "minimal constitutional requirement that measures a defendant's ability to stand trial" of *Dusky* but fall short of a "*higher standard* that measures mental fitness for another legal purpose." *Edwards*, 128 S. Ct. at 2385 (emphasis added). The Court recognized that self-representation without the assistance of counsel requires a different and greater capacity than merely to stand trial. *Id*. at 2386 ("Within each domain of adjudicative competence (competence to assist counsel; decisional competence) the data indicates that understanding, reasoning, and appreciation [of the charges against the defendant] are separable and somewhat independent aspects of functional legal ability.") (internal citations omitted); *Id*. at 2387. For this reason, the Supreme Court stated, "given the different capacities needed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient" (*Id*. at 2387), and quoted the American Psychiatric Association concerning how a defendant could meet *Dusky* yet fall short of the capacity to proceed *pro se*:

> Disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the s*ignificantly expanded role required for self-representation even if he can play the lesser role of represented defendant.*

*Id*. at 2387 (emphasis added) (internal citations omitted).

Moreover, the Supreme Court recognized that application of a single, inadequate mental competence standard to the borderline-competent defendant undermines the core precepts of the right to self-representation: the dignity and autonomy of the criminal defendant. *Id.; Faretta*, 422 U.S. at 834 (The defendant's self-representation "choice must be honored out of

that *respect for the individual* which is the lifeblood of the law.") (emphasis added) (internal citations omitted).   Use of a single mental competence standard allows the incapacitated to hurdle the low barrier of *Dusky* only to find themselves faced with obstacles entirely beyond their diminished abilities.   *See Massey*, 348 U.S. at 108 ("No trial can be fair that leaves the defense to a man who is . . . unaided by counsel, and who by reason of his mental condition, stands helpless and alone before the court."); *see also Edwards*, 128 S. Ct. at 2387 (quoting a psychiatrist observing the performance of a *pro se* defendant who passed the *Dusky* test, "[H]ow in the world can our legal system allow an insane man to defend himself?").   Respect for the individual is invariably diminished by the borderline-competent defendant's self-representation. *Id.*   Presented before the prosecution, court and jury without the requisite mental capabilities to carry out the duties of advocacy, the incompetent defendant is subjected to a "humiliating" one-sided trial that amounts more to "spectacle" than fair proceeding.   *Id.*   The loss of power over the proceeding and outcome resulting from the diminished abilities of the borderline-competent defendant's self representation impairs the "core of the *Faretta* right," the constitutional requirement that a defendant retain "actual control over the case he chooses to present to the jury."   *See Wiggins* at 178.   Consequently, the borderline-competent defendant's self-advocacy "undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." *Id.*   Such representation is incompatible with the concept of a just proceeding, undermines public confidence in the outcome, and cannot satisfy the mandate that "proceedings must not only be fair, they must 'appear fair to all who observe them.'"   *See Wheat v. United States,* 486 U.S. 153, 160 (1988).

For all of these reasons, the Supreme Court concluded that the competence necessary to make a knowing and intelligent waiver of counsel is different from the competence to conduct a defense.   *Edwards*, 128 S.Ct. at 2386.   While the Court declined to define a new

standard for mental competence for self representation, it decisively announced that the minimal *Dusky* mental competence standard used to determine fitness to stand trial is not sufficient to determine mental competency for the greater role of the self represented defendant.  Id.[7]

Resolving years of erroneous interpretation, the *Edwards* Court clarified that its decision in *Godinez* did not address, much less set forth, the mental competence standard to self representation.  *Id.* at 2385.  In *Godinez*, the Supreme Court held that the mental competency standard to plead guilty or waive the right to counsel is not constitutionally required to be higher than the standard used to determine if a defendant is competent to stand trial as set forth in *Dusky* and *Drope.  Godinez*, 509 U.S. at 398.[8]  The *Godinez* Court explained that the guilty plea "is no more complicated than the sum total of decisions that a [represented] defendant may be called upon to make during the course of a trial." *Id.*  Therefore, "there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights."  *Id*. at 399.  Many courts, including the Fifth Circuit, erroneously interpreted *Godinez* as to require the application of a single mental

---

[7] The Supreme Court clearly stated this principle in Massey v. Moore, 348 U.S. 105, 108 (1954) ("One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel.") and  many courts have followed the concept post-Edwards. E.g.,  Bies v. Bagley, 535 F.3d 520, 533 (6th Cir. Aug. 5, 2008) ("[T]he law contains many similar, yet distinct, inquiries for competence – competence to stand trial, competence to waive jury trial rights, competence to represent oneself") (citing Edwards); Guerrero, 2008 WL 3457015, at *2 (Tex. App. San Antonio Aug. 13, 2008) ("The [Edwards] Court expressly recognized that there is a mental competency limitation on the right to self-representation, and that competence to represent oneself during trial proceedings involves a higher standard than that required for competence to stand trial."); Chadwick v. State of Texas, 2009 WL 151316, at *3 ("The United States Supreme Court recently rejected the argument that if a defendant is mentally competent to stand trial, he is necessarily competent to represent himself as well."); Collier v. McDonough, 2008 WL 4936501, at *1 (N.D.Fla. Nov. 17, 2008) ("The standards for competence to represent oneself and to go to trial at all are of course different."); Bills v. Clark, 2008 WL 4291325, at *5 (E.D. Cal 2008) ("The Edwards Court ... made a distinction between the level of competency required for a defendant to proceed with the assistance of counsel and to proceed *pro se*"); Thompson v. Covenant Transport, Inc., 2008 WL 289351, at *5 ("[Edwards] dealt with the sixth amendment implications of a criminal defendant who was competent to assist counsel in his own defense, but not competent to act as his own counsel."); State of New Jersey v. McNeil, 2009 WL 88507, at *6 (N.J.Super.A.D. Jan. 14, 2009) ("[F]or federal constitutional purposes, a defendant may be competent to stand trial but not to represent himself.").

[8] However, the Court in Godinez provided that, if they so chose, "States are free to adopt competency standards that are more elaborate than the Dusky formulation."  509 U.S at 2688.

competence standard to govern determinations as to competence to stand trial, waive counsel, and proceed *pro se*.

However, in *Edwards*, the Supreme Court distinguished the *Godinez* mental competence standard as to only be applicable to defendants seeking to waive counsel and enter a guilty plea.  128 S.Ct. at 2385.  Specifically, *Edwards* clarified that the *Godinez* defendant *did* not seek to represent himself but rather "sought only to change his pleas to guilty," and, accordingly, "his ability to conduct a defense at trial was expressly not an issue."  *Id*.  On this point, the Court had stated in *Godinez* that the issue before it was only "the competence to waive the right" and not "the competence [of the defendant] to represent himself."  *Godinez*, 509 U.S. at 399.  Accordingly, the Court in *Edwards* made clear that the holding in *Godinez* is limited to the waiver of counsel and entry of a guilty plea and has no bearing on the mental competence standard to be used for the right to self representation.  *Edwards*, 128 S. Ct. at 2385.

It is now clear – and was provable at the time of trial – that Mr. Fields suffers from severe mental disorders including juvenile-onset bipolar disorder and post-traumatic stress syndrome.  These mental disorders critically diminished his capacity to communicate, absorb and comprehend the Government's evidence, formulate questions and conceive and articulate affirmative theories of the case.  Moreover, his mental illnesses were exacerbated by the mentally debilitating method of courtroom restraint and style of incarceration.

Therefore, even assuming he met the minimal *Dusky* formulation of mental competence to stand trial (a point that Fields in no way concedes), Mr. Fields in no way was able "to carry out the basic tasks needed to present his own defense without the help of counsel," *Edwards*, 128 S. Ct. at 2386, and, accordingly was incompetent to conduct his own trial proceedings.  Moreover, as set forth above, compelled use of a stun belt and the extreme pretrial confinement conditions contributed to the psychological impairment of Mr. Fields.

For all of these reasons, Mr. Fields was incapable of formulating basic trial strategy, effective communication, sustained concentration, focusing on relevant facts or material discrepancies.  In a trial based primarily on the dubious and self-interested testimony of an ex-girlfriend and various jailhouse informants, without any physical evidence tying Fields to the crime, the proceeding was spectacularly one-sided as Fields proved almost entirely incapable of formulating admissible or even relevant questions.  Indeed, Mr. Fields' deficit in this arena was so profound that Court ordered a mock cross-examination of a key government witness outside the presence of the jury.  Consequently, the Government's case, witnesses and evidence essentially underwent no significant adversarial testing, obviating any vestige of fairness, much less the appearance of fairness demanded by *Edwards*.

For example, Mr. Fields was unable to cross-examine his witnesses at all meaningfully.  "There are few subjects, perhaps, upon which [the Supreme] Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."  *Miller v. Illinois*, 476 U.S. 530, 540, (1986).[9]  Without adequate cross-examination, "the accuracy of the truth-determining process" is fatally undermined by eliminating the "basis for evaluating the truth of the [testimony]," *Dutton v. Evans*, 400 U.S. 74, 89 (1970) (internal quotation marks omitted).  Rigorous questioning of hostile witnesses "sheds light on witness perception, memory and narration" and "can expose inconsistencies, incompleteness, and inaccuracies in his testimony."  *See Perry v. Leeke*, 488 U.S. 272, (1989).

---

[9] *See also Pointer v. Texas*, 380 U.S. 400, 405 (1965) ("[C]ross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."); *Craig*, 497 U.S. at 846 ("rigorous adversarial testing ... is the norm of Anglo-American criminal proceedings").

Therefore, Mr. Fields' trial proceeding created the very spectacle and offense to his constitutionally protected rights to dignity, autonomy and a fair proceeding that the Court in *Edwards* specifically sought to prevent. As a result, with an incapacitated self-advocate incapable of formulating questions or noticing discrepancies material to his defense, the integrity and fairness of Mr. Fields' capital proceedings were fatally compromised. *See Faretta*, 422 U.S. at 839 (Burger, C.J., dissenting) ("[T]he integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel.").[10] As the Seventh Circuit stated, "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *United States ex rel. Williams v. Twomey*, 510, F. 2d 634, 640 (7th Cir. 1975). At the very least, Mr. Fields' trial could not meet the *Edwards* mandate that proceedings "appear fair to all who observe them." *Edwards*, 128 S.Ct. at 2386.

Comparison to the *Edwards* defendant is illustrative of Mr. Fields' lack of competence to proceed *pro se.* Like the *Edwards* defendant, Mr. Fields has a rational and factual understanding of the proceedings, or the minimal capacity to stand trial. Like the *Edwards* defendant, Mr. Fields' mental defects may not have been apparent to laymen. In this regard, the *Edwards* defendant made coherent arguments in the courtroom and, in periods of lucidity, was described by psychiatrists as "free of psychosis, depression, mania and confusion," "alert," "able to think clearly," "coherent," and "psychiatrically normal." However, like the *Edwards* defendant, Mr. Fields suffers from serious mental disorders that critically impair psychological functions and abilities necessary to conduct trial proceedings. Like the *Edwards* defendant, Mr.

---

[10] *See also U.S. v. Cronic*, 466 U.S. 648, 659 (1984) ("[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."

Fields made arguments that were often irrelevant and unintelligible.  Accordingly, Mr. Fields'

claim to be a borderline-competent defendant is at least as strong as the defendant in *Edwards.*

Further, several recent post-*Edwards* decisions found borderline-competent

defendants, with evidence similar to or lesser than that supporting the incapacity of Mr. Fields, to

be incompetent to proceed *pro se* or remanded for hearing specifically into that question.

In *Chadwick v. State*, the defendant was convicted of assaulting a public servant

and attempting to take a weapon away from a peace officer.  2009 WL 151316, at *1 (Tex.App.

January 23, 2009).  On appeal, among other things, the defendant argued the trial court erred

when it denied his request to proceed *pro se*.  *Id*. at *2. Under *Edwards*, the Texas Court of

Appeals affirmed his convictions, finding the defendant to be a borderline-competent defendant

capable of standing trial yet incapable of proceeding *pro se*.  *Id*. at *3-4.  In this regard, the court

distinguished the standard to be used to proceed *pro se* from that to stand trial:

> While the test for competence to stand trial asks whether a
> defendant has sufficient present ability to "consult" with his lawyer
> and "assist" in preparing a defense, the test for competence to
> proceed *pro se* is whether a defendant has the ability to present his
> own defense without the assistance of counsel.

*Id.* at *3.  The Texas Court of Appeals held that the trial court had sufficient evidence to support

a finding that the defendant was incompetent to represent himself because, among other things,

he interrupted his attorney, jumped from one topic to another, and made arguments that were

conclusory, incoherent and/or irrelevant.  *Id*. at *3-4.

In *North Carolina v. Lane*, the defendant was convicted of, among other crimes,

first degree murder, first degree rape, and indecent liberties with a child.  669 S.E.2d 321 (N.C.

Dec. 12, 2008).  The defendant was sentenced to death.  He was examined by a battery of mental

health experts who, while disagreeing as to his competence to stand trial, all confirmed that he

was functionally illiterate and suffered from a number of mental disorders which affected his

decision making process.  *See* Defendant-Appellant's Brief of the State in *North Carolina v. Lane*, No. 606A05, 2008 WL 2008 WL 3462011, at *22-23 (Oct. 14, 2008)  Like Mr. Fields, the defendant suffered from depression, anxiety disorder and possibly post traumatic stress disorder. *Id.* at *32-33.  Like Mr. Fields, prior to trial, the defendant was confined to a cell where he was watched constantly with the lights on at all times.  Id at *24.  The trial court held a competency hearing and found the defendant competent to stand trial.  *Id*. at *36.  After the defendant moved to represent himself, the court conducted another competency hearing and found the defendant competent to do so because he was competent to stand trial.  *Id*. at *23-25.  The defendant appealed his conviction on the grounds that the trial court used the wrong mental competence standard to find him competent to proceed *pro se*.  *Lane*, 669 S.E.2d at 322.  In light of *Edwards*, the Supreme Court of North Carolina remanded the case to the trial court to determine (i) during his self representation, did the defendant fall into the "borderline-competent" defendant category as set forth by *Edwards*, and (ii) whether the court, based on a realistic account of the defendant's mental capacities, would have precluded self-representation and appointed counsel. *Lane*, 669 S.E.2d at 322.

In *Major v. Commonwealth of Kentucky*, the defendant was convicted of murder. The trial court ordered a competency hearing into the defendant's competency to stand trial and to put on a defense *pro se*.  2009 WL 215409, at *10 (Ky. January 22, 2009).  A psychiatrist testified that the defendant possessed average intellectual functioning, with a 110 IQ, and "appeared to have a good memory."  *Id*.  The defendant was learned in legal professional knowledge and could "describe specific statutes and rules of law, knew what evidence should not be admitted, knew about the jury process, and all functional aspects of his defense."  *Id*.  The psychiatrist found that the defendant "had no difficulty staying on task, no problem being decisive, and no problem focusing."  *Id*.  However, a stroke had damaged the right side of the

defendant's brain, and while the cognitive functions were left untouched, certain aspects of expressive thinking were impaired. *Id*. In addition, the defendant suffered from cognitive dysfunction, processing information more slowly than an average person. *Id*. Based on this evidence, the trial court found the defendant competent to stand trial, but found that his competency to act as his representative at trial was limited. *Id*. Accordingly, the court permitted the defendant to conduct direct examinations but prohibited the defendant from conducting other trial functions as they required the quick analysis of and response to new information. *Id*. The Supreme Court of Kentucky affirmed this hybrid-representation, finding that precluding the borderline-competent defendant from fully dismissing his counsel safeguarded against his demonstrated mental limitations and preserved his right to a fair trial. *Id*. at *15.

In any event, an actually-incompetent defendant, under either the *Drope-Dusky* or *Edwards* standard, is entitled to a new trial. *Drope,* 420 U.S. at 183. Fields was actually incompetent to waive his right to counsel and to represent himself. In addition, Fields is entitled to a new trial based on the failure to conduct an adequate hearing into his competence. *See United States v. Giron-Reyes,* 234 F.3d 78, 83 (1st Cir. 2000). Finally, Fields is entitled to a new trial because if counsel had performed competently, there was reasonable cause to believe Mr. Fields was suffering from a mental disease which rendered him incompetent to waive counsel. *See generally Strickland v. Washington,* 466 U.S. 668, 687 (1984). *See also Galowski v. Berge,* 78 F.3d 1176, 1181 (7th Cir.1996), *cert. denied,* 519 U.S. 878 (1996) ("A habeas petitioner must first present substantial facts to support allegations that he was not competent to stand trial [before a retrospective competency hearing is required.] Substantial facts are facts sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningful participate and cooperate with counsel during the trial.").

**C.**     **Conclusion**

At trial, the Government correctly moved that Fields be evaluated by a psychiatrist and that a hearing take place prior to deciding whether Mr. Fields should be permitted to waive counsel.  However, the nature and scope of the inquiry – both by the evaluating expert and by the Court – was unconstitutionally insufficient.  Most importantly, the outcome of the hearing was incorrect.  Mr. Fields' decision to waive counsel was not the product of a free and deliberate choice, just as Mr. Fields did not freely choose his mental disabilities. Mr. Fields was not competent to represent himself.

Mr. Fields is entitled to either a new competency hearing or a new trial.

**V.     CLAIMS RELATED TO TRIAL CONDUCT**

CLAIM 4:     AFTER THE TRIAL COURT APPROVED MR. FIELDS' REQUEST TO WAIVE COUNSEL AND REPRESENT HIMSELF, MR. FIELDS' RIGHT TO SELF-REPRESENTATION WAS NEVERTHELESS VIOLATED IN SEVERAL MATERIAL RESPECTS DENYING HIM FIFTH, SIXTH, AND EIGHTH AMENDMENT GUARANTEES.

CLAIM 5:     MR. FIELDS' RIGHTS UNDER THE FIFTH,  SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED WHEN HE WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

CLAIM 6:     MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO BE PRESENT AT TRIAL WERE  VIOLATED WHEN HE WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

**A.**     **Facts**

Once Mr. Fields was permitted to waive counsel, no matter how erroneous a ruling, he was constitutionally entitled to complete control over the conduct of his defense. Nevertheless, Mr. Fields was unconstitutionally excluded from all bench and chambers conferences while he was representing himself *pro se*.  At the outset of trial Fields requested that

the Court appoint him new counsel citing a conflict of interest between himself and appointed counsel and stating his belief that counsel was conspiring with the prosecutors against him. TT at 13:15-14:5, 22:4-6. The Court denied Fields' request for new counsel. TT at 14:22-23. Fields then invoked his right to self-representation. TT at 21:19-23. After Fields invoked his right to self-representation but before the conclusion of *voir dire*, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel. TT at 69:12-70:8. The Court admonished Mr. Peterson and Mr. Swanton that their role was simply advisory. *Id.* Although standby counsel could advise on legal matters and answer legal questions, the Court made clear they were not to "represent him through him." TT at 69:20-70:2. The Court explicitly forbade a hybrid representation situation where Fields "represents himself to the extent he wants to and yet relies on lawyers to represent him to the extent he wants to." TT at 639:22-24. Rather, the Court stated that it was important "that the appearance before the jury is that Mr. Fields is representing himself" and required that Fields "make any statements made to the Court and question any witnesses." TT at 70:3-8. The Court did, however, authorize standby counsel to argue motions and take up other matters outside the presence of the jury but only if the record was "absolutely clear" that Fields chose to have counsel do so and that counsel was doing so in a manner Fields approved of. TT at 644:13-22.

Just before trial began, the Court ruled that Fields could not participate in any bench conferences that occurred in the presence of the jury. TT at 1166:2-18. The Court encouraged Fields to authorize standby counsel to speak for him on whatever matter needed to be discussed and allow his standby counsel to report back on the matters that took place if his participation in a bench conference would require the jury to be excused. TT at 1166. Fields never authorized standby counsel's participation in this way.

The Court held nine bench conferences in the jury's presence and one outside of the jury's presence during the six days of guilt phase testimony. These bench conferences dealt with critical trial issues including sequestration of witnesses (TT at 1552:10-1553:15), objections to the prosecutor's (TT at 1560:20-1561:15, 1583:11-1585:17, 1614:6-25, 1615:12-1616:11) and defendant's (TT at 1648:21-1649:12, 1850:21-1852:2) line of questioning, admissibility of testimony (TT at 1583:11-1585:17), witness availability and whether Fields intended to testify (TT at 1913:11-1916:15), courtroom decorum (TT at 1653:3-10) and prejudicial remarks by the prosecutor (TT at 1615:12-1616:11, 1855:3-1856:7). The Court also held at least two chambers conferences to discuss trial decisions such as limiting Fields' ability to move around the courtroom to present witnesses with exhibits (TT at 1164:20-1166:22) and how to address the perception of "hybrid representation" to the jury and determine the proper role standby counsel was to play in advising Fields (TT at 1636:11-14). There is some suggestion in the record of a third chambers conference (TT at 1106:19-21), although because all chambers conferences were held off the record, it is unclear exactly how many chambers conferences actually occurred. Fields was not permitted to participate in any of these bench or chambers conferences.

When bench conferences took place, Fields' standby counsel either would not or could not consult Fields before approaching the Court. Accordingly, standby counsel did not know what position Fields wanted them to take or how Fields wanted them to present that position to the Court concerning any of the issues discussed at bench or chambers conferences. After decisions were made by standby counsel, the prosecutors, and the Court at bench or chambers conferences, standby counsel would simply report those decisions to Fields without further discussion.

Other than bench and chambers conferences, Fields conducted every aspect of his defense during the guilt phase of trial. He made opening (TT at 1194:10-1203:5) and closing

(TT at 2005:1-2029:20) arguments to the jury.  He cross-examined all government witness and examined all witness in his defense.  He participated in the *voir dire* of jurors and made motions to the Court outside of the jury's presence.  TT at 36:17-20, 67:25-68:14, 484:3-9, 528:10-529:4, 637:24-638:21, 719:7-18, 1108:4-19, 1148:6-1152:9, 1970:23-1971:2.

B.       **The Role Of Standby Counsel**

The Sixth Amendment grants a defendant the right to personally conduct his own defense.  *Faretta v. California*, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense"); *McKaskle v. Wiggins*, 465 U.S. 168, 179 (1984).  Although the court may appoint standby counsel to "to aid the accused if and when the accused requests help," *Faretta*, 422 U.S. at 834 n.46, the Sixth Amendment imposes two significant limitations on the extent of standby counsel's participation:

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury.  This is the core of the *Faretta* right.  If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.
>
> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.  The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy.

*McKaskle*, 465 U.S. at 178 (emphasis in original).

Where, like here, "standby counsel is appointed only to advise, the initial invocation of the right of self-representation is generally sufficient to establish that any participation by standby counsel other than for . . . routine matters . . . is 'over the defendant's

objection.'"  *Frantz v. Hazey*, 533 F.3d 724, 744 (9th Cir. 2008) (*quoting McKaskle* 465 U.S. at 178); *United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir.) (a defendant's assertion of "the right [to self-representation] at the outset of trial proceedings constituted an express and unambiguous request that 'standby counsel be silenced.'  This, per *McKaskle's* analysis, must be given effect as a reassertion of the general right to *pro se* representation as to further proceedings . . .."), *cert. denied*, 471 U.S. 1107 (1985).  Here, from the very outset of trial, the Court appointed Mr. Fields' standby counsel only to advise:

> MR. PETERSON:  Your Honor, Mr. Swanton and I will then be appointed as standby counsel or can we be excused?
>
> THE COURT:  Absolutely you're appointed as standby counsel. The question becomes what the jury is told about that situation. Standby counsel to me it seems by definition includes counsel who are standing by in case the defendant elects to be represented by attorneys at a later stage of the trial, and I intend to tell them that.  I intend to tell them that unless and until that happens.  Then **your role is to advise Mr. Fields on any legal matters he questions you about, that you are in essence his legal reference material since he's not a lawyer and doesn't have a library there at his disposal at counsel table.  On the other hand, that it's not your job to represent him through him, that you're allowed to sit there at the counsel table so you're readily available to answer any questions he has.**  Obviously anything he says to you or you to him is completely confidential.  So no one is going to know to what extent those normal procedures are being followed, but what **I think is important is that the appearance before the jury is that Mr. Fields is representing himself.  He will have to make any statements made to the Court.  He will have to question any witnesses that are made.**

TT at 69:12-70:8 (emphasis added).  Accordingly, absent Mr. Fields' express consent to any individual instance of standby counsel's participation at trial, as a matter of law, standby counsel's participation is over Fields' objection and in violation of his right to self-representation.  Indeed, *McKaskle* does not place a burden on *pro se* defendants to object to every unwanted act of standby counsel.  *Frantz*, 533 F.3d at 744.  "To the contrary, *McKaskle*

limits standby counsel's '*unsolicited* participation' during critical proceedings."   *Id.* (*citing McKaskle*, 465 U.S. at 177) (emphasis in original).  Here, it is especially appropriate to presume that all of standby counsel's participation was unsolicited absent express consent from Fields given that Fields made it abundantly clear he believed standby counsel were operating under a conflict of interest and conspiring with the prosecutors against him.  TT at 13:15-14:5, 22:4-6, 1683:20-1684:1, 1684:14-18.   Violations of Mr. Fields' Sixth Amendment right to self-representation are structural, and therefore *per se* prejudicial:

> Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless.

*McKaskle,* 465 U.S. at 177 n.8; *Myers v. Johnson*, 76 F.3d 1330, 1337 (5th Cir. 1996).

> **C.    Mr. Fields' Sixth Amendment Right To Self-Representation Was Violated Because The Court Prevented Him From Participating In Any Bench Or Chambers Conferences, Requiring Standby Counsel To Participate Instead**

During the guilt phase of trial, the Court held nine bench conferences in the jury's presence and one outside of the jury's presence.  At each, critical trial issues were discussed including sequestration of witnesses (TT at 1552:10-1553:15), objections to the prosecutor's (TT at 1560:20-1561:15, 1583:11-1585:17, 1614:6-25, 1615:12-1616:11) and defendant's (TT at 1648:21-1649:12, 1850:21-1852:2) line of questioning, admissibility of testimony (TT at 1583:11-1585:17), witness availability and whether Fields intended to testify (TT at 1913:11-1916:15), courtroom decorum (TT at 1653:3-10) and prejudicial remarks by the prosecutor (TT at 1615:12-1616:11, 1855:3-1856:7).  Although Fields wanted to participate, he was excluded from every one of these conferences by Court decree.  TT at 1166:2-18.  When called to bench conferences, standby counsel would not or could not consult Fields before approaching and therefore did not know how Fields wanted various issues handled.   As such, these vital trial matters were

discussed and decided in private by the trial judge, prosecutors and standby counsel without Fields' input or consent.  Moreover, during the six days of guilt phase testimony the jury watched the prosecutors and standby counsel approach the bench, leaving Fields behind at counsel's table, at least nine times.  This alone is sufficient "to destroy the jury's perception that the defendant is representing himself." *McKaskle*, 465 U.S. at 178.  Significantly, most of these conferences took place during the testimony of the two most critical witnesses to Fields' defense – Shalaykea Scroggins (five conferences) and Edward "Trey Boy" Outley (two conferences) – the individuals that Fields contends are the actual killers.

None of the bench conferences were limited to minor issues such as "overcoming routine procedural or evidentiary obstacles" or "help[ing] to ensure the defendant's compliance with basic rules of courtroom protocol and procedure" permitted under *McKaskle*.  *McKaskle*, 465 U.S. at 183.  Rather, each involved "significant tactical decisions" or "control [of] the questioning of witnesses" in which standby counsel spoke instead of Fields, and without his consent – precisely the type of interference with the right to self-representation the United States Supreme Court held impermissible in *McKaskle*.  *Id.* at 178.

When faced with similar issues concerning whether a defendant's right to self-representation has been violated by exclusion from bench conferences, courts have routinely granted relief.  *See United States v. McDermott*, 64 F.3d 1448, 1454 (10th Cir. 1995), *cert. denied*, 516 U.S. 1121 (1996); *Oses v. Massachusetts*, 961 F.2d 985, 986-87 (1st Cir.), *cert. denied*, 506 U.S. 954 (1992); *Snowden v. Delaware*, 672 A.2d 1017, 1022 (Del. 1996); *New York v. Rosen*, 613 N.E.2d 946, 949-50 (N.Y. 1993); *Lefevre v. Cain*, C.A. No. 05-6288, 2008 WL 5146537, at \*\*12-19 (E.D. La. Dec. 8, 2008).  Each of these cases are factually analogous to Fields' case and, therefore, the same result is required here.

For instance, like Fields, the *pro se* defendant in *McDermott*, was excluded from participating in bench conferences involving various matters such as discussing minor procedural issues, defendant's motion for a judgment of acquittal, defendant's motion for mistrial, objections to "the admission of [a government witness's] death threat testimony, multiple government objections to the substance and manner of [*pro se* defendant's] cross-examination," the admissibility of hearsay testimony, objections to admission of photographic evidence and other testimony.  64 F.3d at 1452.  Remanding the case for a new trial, the Tenth Circuit held that standby counsel's participation in the bench conferences in lieu of the defendant's participation allowed standby counsel to "make or substantially interfere with any significant tactical decisions . . . or . . . speak instead of the defendant on any matter of importance . . . ."  *Id.* at 1453 (*quoting McKaskle*, 465 U.S. at 178) (emphasis omitted).

Similarly, in *Oses*, the First Circuit affirmed a District Court's grant of a new trial where, *inter alia*, the *pro se* defendant was denied participation at bench or lobby conferences that "covered such important issues as the number of witnesses that the defendant intended to call, a motion for mistrial following a prosecutor's improper comment, and the admission of evidence."  961 F.2d at 986.

The Ninth Circuit recently reversed a *pro se* defendant's conviction and remanded the case for an evidentiary hearing to determine if his *Faretta* right had been violated because the defendant was excluded from a chambers conference discussing questions from the jury during deliberations.  *Frantz*, 533 F.3d at 744.

As recently as December 2008 a district court in this Circuit came to the same conclusion in a case with facts almost identical to those presented here.  On motion for *habeas corpus* pursuant to 28 U.S.C § 2254, the United States District Court fort the Eastern District of Louisiana granted a *pro se* defendant a new trial where, like here, standby counsel's participation

in two bench conferences interfered with defendants right to self-representation. *Lefevre*, 2008 WL 5146537, at *17 ("The court finds that [standby counsel's] participation in the pertinent two bench conferences effectively allowed him to speak instead of Mr. Lefevre on matters of importance").

Like Fields, Lefevre was not allowed to leave counsel table because of court-ordered restraints. *Id.* at *16. Like Fields, Lefevre was denied his right to participate in two bench conferences dealing with the nature of witness testimony. *Id.* at **9-11. Like Fields, Lefevre did not consent to standby counsel's participation in bench conferences nor did he explicitly object to standby counsel's participation. The court rejected the State's argument that that Lefevre "consented to his exclusion from the bench conferences" because he "'offered no objection to [standby counsel] representing him at the bench conferences'" and that standby counsel's "'participation [in] the final two bench conferences occurred after [Lefevre] expressed his willingness for counsel to assume a "bigger role" in his defense.'" *Id.* at *15 (citations omitted). In so doing, the court stated:

> The State's argument in this regard is without merit for the following reasons.
>
> First, in a situation such as this, where Lefevre's request to proceed without counsel was granted and he exercised his *Faretta* rights by making opening and closing arguments to the jury, cross-examining the government's witnesses, putting on his own defense by examining a witness, and arguing a motion outside the presence of the jury, it is not presumed that Lefevre, in the absence of an objection, waived his *Faretta* rights with respect to a particular matter, such as participating in bench conferences. *See McDermott,* 64 F.3d at 1453 (where defendant made his own opening and closing arguments to jury, conducted his own cross-examination of government witnesses, planned and pursued his own defense through a witness, argued motions outside the jury's presence and, with procedural help from standby counsel and the court, handled the admission of defense exhibits, defendant's

exclusion from bench conferences was deemed involuntary).  As the *Frantz* court explained:

> "[Standby counsel's] solo participation in the chambers conference was not constitutional simply because the record contains no objection by Frantz.  The parties do not dispute that the trial court found Frantz competent to represent himself.  Nor do they dispute that, despite the appointment of advisory counsel, the trial began with the understanding that Frantz alone was directing his representation at the trial.  Under such circumstances, *McKaskle* makes clear that – absent some basis for concluding that Frantz consented to representation by [standby counsel] as to the particular matter – Frantz's *Faretta* right remained intact.  *McKaskle* does not place the burden on *pro se* defendants to regulate each of their standby attorneys' actions. To the contrary, *McKaskle* limits standby counsel's '*unsolicited* participation' during critical proceedings.  [465 U.S. at 177 (emphasis added)].  When standby counsel is appointed only to advise, the initial invocation of the right of self-representation is generally sufficient to establish that any participation by standby counsel other than for the routine matters mentioned in *McKaskle* is 'over the defendant's objection.'  [*Id.* at 178]."

*Id.* at **15-16 (*quoting Frantz*, 533 F.3d at 744).

Exclusion from important bench or chambers conferences is a structural error violating the Sixth Amendment regardless of whether standby counsel actually reflects a *pro se* defendant's wishes when dealing privately with the Court.  *See Frantz*, 533 F.3d at 740 ("We first hold that, even if [standby counsel] accurately portrayed [*pro se* defendant's] wishes, unconsented-to exclusion from the conference would so substantially reduce [*pro se* defendant's] ability to shape and communicate his own defense as to violate his *Faretta* rights").  Exclusion of a *pro se* defendant from these conferences is a structural error regardless of whether the Court encouraged communications between a *pro se* defendant and standby counsel and regardless of whether any prejudiced resulted:

> [*Pro se* defendant] does not allege that he would have done anything differently than [standby counsel] did at sidebar, or that any prejudice resulted, or that there was any failure of communication between him and [standby counsel] about the

content or strategy of sidebar discussions or motions. The court even encouraged such communication. [*Pro se* defendant's] objection is based on principle, not specific content or result.

\*     \*     \*

[S]tandby counsel may not, over the defendant's objection, "make or substantially interfere with any significant tactical decisions . . . or . . . speak instead of the defendant on any matter of importance . . . ." [*McKaskle*, 465 U.S. at 178]. That occurred here.

\*     \*     \*

[W]e cannot say that [*pro se* defendant's] exclusion, over his objection, from thirty bench conferences during a six-day trial was an insignificant incursion on his *Faretta* right. **Accordingly, we must grant a new trial. We do so reluctantly because the district court was overall a model of patience and accommodation where [*pro se* defendant's] self-representation was concerned, and by due process standards the trial was fair, and any error relative to most other principles would be harmless. But harmless error analysis does not apply to the Sixth Amendment right in question**.

*McDermott*, 64 F.3d at 1453-54 (emphasis added).

Here, like the defendants in the cases discussed above, Fields was excluded from both bench and chambers conferences involving vital trial issues such as the scope of questioning, impeachment and admissibility of key witness testimony, the role of standby counsel, improper prejudicial remarks by the prosecutors, and the availability and sequestration of witnesses and whether Fields intended to exercise his right to testify.

### 1.     Chambers Conferences

Fields was excluded from all chambers conferences while he represented himself. The record indicates that at least two such conferences took place where important trial decisions were made – without Fields' consultation or consent – pertaining to limiting Fields' ability to move around the courtroom to present witnesses with exhibits  (TT at 1164:20-1166:22) and the role of standby counsel (TT at 1636:11-14).  There is some suggestion in the record of a third

chambers conference (TT at 1106:19-21), although because all chambers conferences were held off the record, it is unclear exactly how many chambers conferences actually occurred. What is clear, though, is regardless of how many chambers conferences occurred, Fields was not present at a single one of them which effectively allowed standby counsel to make significant tactical decisions in his absence and in violation of his right to self-representation. Accordingly, like the *pro se* defendant in *Frantz*, Fields' *Faretta* right was violated by exclusion from these critical moments of trial. *Frantz*, 533 F.3d at 741 (exclusion of *pro se* defendant from a single chambers conference involving "two issues with undoubted tactical importance").

### 2. Bench Conferences

Fields was excluded from all bench conferences held in the presence of the jury. All of these conferences pertained to significant trial matters requiring important tactical decisions to be made in Fields' absence. For instance, one such conference resulted in a limitation on Fields' ability to cross-examine a critical witness, Edward "Trey Boy" Outley – one of the two people Fields' contends are the real killers. In an attempt to impeach Outley's credibility by exposing a strong motive to give false testimony, Fields asked; "And, Mr. Outley, isn't that the reason you in this courtroom testifying today to avoid a murder case?" TT at 1850:19-20. Before the witness could answer, the prosecution requested a bench conference. At that conference, Mr. Swanton spoke instead of Fields on perhaps one of the most important tactical issues in Fields' defense – impeaching the testimony of one of the actual killers:

> (On-the-record bench conference, to wit:
>
> MR. SNYDER: This – I challenge the good faith of this cross-examination. It's being done in bad faith. At no time has anyone from the government suggested to Edward Lee Outley that he could be charged with murder, homicide or that the related offenses related to the death in Suncerey Coleman. For him to say otherwise, I challenge the good faith. I don't believe there's anything in the defense file. They have had open file discovery.

They've talked to almost all of our witnesses. This is simply very improper for him to start saying, you're going to get murder. What he's talking about, Your Honor, is grouping firearms under – as you know, under the guidelines. He ain't talking about murder. And he's mixing apples and oranges and of course this guy ain't smart enough to understand grouping of firearms.

MR. SWANTON: Except it sounds to me, Judge, like what he was just saying is he paid attention to jailhouse lawyers and they were telling him that he could get charged with murder. So he may have been operating under that assumption.

MR. SNYDER: No. No. He said specifically the government threatened to charge you with murder. That's what he said.

THE COURT: That's what he said.

MR. SWANTON: That's what the witness said.

MR. SNYDER: No. That's what Fields said.

THE COURT: No. That's what Fields said.

MR. SWANTON: I think he responded affirmatively to that, Your Honor.

THE COURT: That doesn't matter. The question's improper in any event. Tell him he can't say that again.

(End of bench conference)

TT at 1850:23-1852:2. Mr. Swanton did not confer with Fields about his desired response to this issue before the bench conference. As a result, Mr. Swanton impermissibly spoke instead of Fields regarding "government objections to the substance and manner of [*pro se* defendant's] cross-examination" of a key government witness. *McDermott*, 64 F.3d at 1452; *McKaskle*, 465 U.S. at 178.

Shortly thereafter, and in response to one of the prosecution's many improper speaking objections, Mr. Peterson spoke for Fields on the important matter of curtailing the prosecution's unfairly prejudicial statements in front of the jury:

(On-the-record bench conference, to wit:

MR. PETERSON:  Your Honor, as advisory counsel, we're not able to make objections, but as officers of the Court, we're seeing an unfair prejudice to our client taking place right now with Mr. Snyder making repeated speaking objections and making side-bar statements and asking improper questions during direct examination and we ask the Court to use its advisory capacity to control this.  We know that under normal circumstances it's up to defense counsel to –

THE COURT:  My advisory capacity?

MR. PETERSON:  Yes, sir.

THE COURT:  I don't know what you're talking about, Mr. Peterson.

MR. PETERSON:  Well, Your Honor, you know that it's improper for an officer of the Court, a lawyer, to knowingly ask improper questions and to knowingly make side-bar statements, to knowingly make long speaking –

THE COURT:  You made it clear that that last so-called objection was improper, Mr. Peterson.  The rest of what you're talking about is – I don't know what you're talking about. You can't go back and say he asked improper questions as a general statement. Mr. Snyder, don't do that again.

MR. SNYDER:  Yes, Your Honor.

MR. PETERSON:  I just felt we had to get something on the record.

(End of bench conference)

TT at 1855:6-1856:7.  Here, as in *Oses*, standby counsel improperly spoke instead of Fields in the important matter of the "prosecutor's improper comment[s]."  961 F.2d at 986 (holding, *inter alia*, that the trial court's "unwillingness to curb the prosecutor's rhetorical excess contributed to violate petitioner's right to represent himself").[11]

---

[11]Mr. Snyder later confirmed during closing argument that the Government intentionally used improper objections and side-bar comments to taunt Fields and influence the jury: "You remember when Shaleaykea was on the stand and I started then using objections? Remember that?  And I know I did it to the point where some of you were probably wondering, what is this guy doing?  Why is he doing this?  To show one thing to you and have one thing come out, to let you see, and if you looked, you saw it.  He can't stand not to be in control.  The second he's not in

Standby counsel also spoke instead of Fields on several important matters that controlled the questioning of another critical witness, Shalaykea Scroggins. The first such conference dealt with the prosecutor's attempt to elicit testimony covered by Fields' motion pursuant to Federal Rule of Evidence 404(b). TT at 1583:11-1585:17. Specifically, the prosecutor intended to elicit testimony that Fields threatened to kill Scroggins. TT at 1583:18-1584:6. *See McDermott*, 64 F.3d at 1452 (excluding *pro se* defendant from a bench conference relating to admissibility of government witness's testimony regarding defendant's death threat against her violates Sixth Amendment). Prior to asking the question, the prosecutor requested a bench conference. TT at 1583:11-13. Mr. Peterson spoke for Fields. During the conference, Mr. Peterson informed the Court that Fields requested an "opportunity to make an argument outside the presence of the jury" in relation to a Rule 404(b) objection to this testimony. TT at 1584:14-15. Ultimately, this conference ended without the Court ruling on the Rule 404(b) issue because Mr. Peterson and Mr. Snyder agreed that the prosecution would continue questioning the witness and avoid the issue until re-direct:

> THE COURT: Do you think you'll be questioning her until it's time to take a recess?
>
> MR. SNYDER: Yeah. I think between us and the cross-examination when we get to the recess and then I can – with the defense permission, then I could – if the Court rules it's admissible, I can bring it up on a wide redirect.
>
> THE COURT: Okay. Then I won't entertain an objection if that's outside the record with a promise.

---

control, even in something as technical as the ability to follow the Federal Rules of Evidence, he can't take it. He can't stand it. " TT at 2032:16-24.

TT at 1584:25-1585:7.  Mr. Peterson did not know how Mr. Fields wanted to address this issues when he spoke at that conference.  Significantly, both Mr. Snyder and Mr. Peterson confirmed that standby counsel were participating without Fields' consent:

> MR. SNYDER:  Do you think that there would be a problem with that, gentlemen, although I know you cannot speak for your attorney (sic)?
>
> MR. PETERSON:  We can't speak for him, but I would like an opportunity to talk to him about what went on up here before you continue with your direction.
>
> MR. SNYDER:  Just let me know.
>
> (End of bench conference)

TT at 1585:10-16.  Standby counsel's admission that he was not able to speak for Fields highlights the need for Fields' actual, meaningful participation at all bench conferences.

Fields was eventually provided an opportunity to speak for himself, outside of the presence of the jury, on the issue of the Rule 404(b) testimony.  TT at 1166:2-22 at 1636:9-1639:3.  The colloquy between the Court and Fields evidences the fact that standby counsel's participation in trial interfered with Fields' right to self-representation.  Indeed, the Court acknowledged that standby counsel's conduct was in violation of the second *McKaskle* limitation – that counsel's actions "should not be allowed to destroy the jury's perception that the defendant is representing himself" (465 U.S. at 178) – by stating "[t]he perception of hybrid representation in this case is completely getting out of hand."  TT at 1636:11-12.  Yet, when addressing Fields' objection to Scroggins testimony outside the presence of the jury, the Court still requested Fields' standby counsel – not Fields –  address that issue as well as the issue of hybrid representation:

> THE COURT:  Be seated, everyone. You can go ahead and step down, Ms. Scroggins. **The perception of hybrid representation in this case is completely getting out of hand.  So, counsel,**

**you're going to need to come back to chambers so we can talk about that one more time.** Mr. Fields, I've got to say to you if any human being with the intelligence that I know you have hasn't decided by this point that they're making a terribly serious mistake by trying to represent themselves, then it's just incomprehensible to me. So I urge you to reconsider one last time while you still have an opportunity to do so.

MR. FIELDS: Your Honor –

THE COURT: We have a legal matter we need to take up?

MR. SNYDER: Yes, Your Honor.

THE COURT: What did you want to say, Mr. Fields?

MR. FIELDS: I was just going to say I'm pretty sure that. I can prove that this witness did what I say she did, but I'm not sure how I'm supposed to structure my questions.

THE COURT: That's why I'm suggesting to you, Mr. Fields, that you let your lawyers do it because they know how to do that. You don't know how to do it and you're not going to learn how to do it in time to do yourself any good whatsoever. And if you want to be stubborn, that is your prerogative and your right, but I want to make it clear on the record that from my experience, you are making a terrible, terrible mistake. Mr. Snyder, what matter do we need to take up?

MR. SNYDER: Yes, Your Honor – is – I approached the bench in an attempt to elicit and I stopped when I – that – when they were talking about how they had went out – Mr. Fields and her had went out to Downsville and stopped along the road. He said, "I got to do something," waited a minute and then said, "No. It can wait." I would – the statement that he later told her was is that he was going to kill her out there first. I believe this is admissible. Number one, it proves premeditation because it was in the same area that he murdered Suncerey Coleman. Second of all, it shows bias –

THE COURT: What was the time frame?

MR. SNYDER: This would have occurred at approximately 10:00 to 10:30. Suncerey Coleman would have been out there approximately – would have been sometime after 11:30. If he drove straight out there, it would have been around midnight, within a couple of hours. But, second of all, is – he has suggested – well, not suggested. He's stated outright is – is that she has a

hatred and the hatred is based upon the fact of this jealousy between him and Suncerey Coleman which also tends to – intentionally gives him a motive to murder her, allegedly. However, I would point out – is – this would show her bias, interest and motive.  The reason she hates him is because she realizes he was serious when he said he was going to kill her, and that's the fastest way to stop love that I know of.

**THE COURT:  All right.  Then can one of you counsel express the objection that Mr. Fields would like to be made?**

**MR. FIELDS:  Your Honor?**

THE COURT:  Yes, Mr. Fields.

MR. FIELDS:  The witness have already stated, well, she claimed that I said – I said I was going to kill her.  So if he bring her back and repeat that, that will be repetitive, wouldn't it?

THE COURT:  I don't recall hearing her say that, Mr. Fields.

MR. FIELDS:  She said it, Your Honor.

THE COURT:  Not in response to the question Mr. Snyder wanted to ask her.  And in the context of the question Mr. Snyder wanted to ask her, she blurted that out.  The objection would be overruled and you may do that on redirect.  We'll take our recess.

MR. FIELDS:  All right, Your Honor.

TT at 1636:9-1639:3  (emphasis added).  Despite the fact that the Court asked standby counsel for a response, Fields quickly responded before counsel could – clearly indicating that he wished to represent himself on the issue and not rely on standby counsel.

Fields' standby counsel also spoke for him on important matters concerning the scope of Scroggins' questioning at four more bench conferences.  For instance, Mr. Peterson spoke for Fields with regard to cross-examination questions concerning where Scroggins worked which Fields asked in an attempt to impeach the witness's credibility:

MR. SNYDER:  Your Honor, I'm going to object to the form of the question.  This is getting opened up where people lives. I mean, what people do for a living – is – I think this could be objectionable line.

THE COURT:  Sustain the objection.

MR. FIELDS:  Your Honor –

THE COURT:  Approach, counsel.

(On-the-record bench conference, to wit:

THE COURT:  Is he about to open something up?

MR. SNYDER:  Yes.  The problem of it is once he starts going into where her work, it's only fair to start asking where he worked and he answered – is – he didn't.  He robbed people for a living.

THE COURT:  I don't think that's true, Mr. Snyder.

MR. SNYDER:  Okay.  I just wanted to –

MR. PETERSON:  It's just background.

THE COURT:  I don't know what the relevance is.

MR. PETERSON:  Well, he said that there's something in a written statement about having a conversation with him in a place that she worked and he wants to show through her testimony that she never worked there, that he –

THE COURT:  He can ask her if she ever worked there.

MR. PETERSON:  That's what he's doing his own way.

THE COURT:  Okay.

(End of bench conference)

TT at 1614:1-25.  Here, yet again, standby counsel impermissibly spoke instead of Fields regarding "government objections to the substance and manner of [*pro se* defendant's] cross-examination" of a key Government witness.  *McDermott*, 64 F.3d at 1452; *McKaskle*, 465 U.S. at 178.  That the Court ultimately allowed Mr. Fields to continue his line of cross-examination does not alleviate the structural error of Peterson impermissibly speaking for Fields.  *McDermott*, 64 F.3d at 1453 (granting relief and stating "[*Pro se* defendant] does not allege that he would

have done anything differently than [standby counsel] did at sidebar, or that any prejudice resulted . . . . [*Pro se* defendant's] objection is based on principle, not specific content or result").

Shortly thereafter, Mr. Swanton spoke for Fields at another bench conference concerning the same line of impeachment questions.  At this conference, standby counsel again also spoke for Fields on the important matter of curtailing the prosecution's unfairly prejudicial statements in front of the jury:

> MR. SWANTON:  I understand what Mr. Snyder's concern is, but every time he stands up and says, "This is going somewhere we don't want to go," it intimates to the jury –
>
> THE COURT:  Well, that's not what we agreed we were going to do, Mr. Snyder.
>
> MR. SNYDER:  Okay.
>
> THE COURT:  Object to the form of the question, you understand?
>
> MR. SNYDER:  All right.
>
> (End of bench conference)

TT at 1616:2-11.  Again, as in *Oses*, standby counsel improperly spoke instead of Fields in the important matter of attempting to curb the "prosecutor's improper comment[s]."  961 F.2d at 986 (holding, *inter alia*, that the trial court's "unwillingness to curb the prosecutor's rhetorical excess contributed to violate petitioner's right to represent himself").[12]

Mr. Swanton also spoke for Fields concerning the Prosecutor's objection to Fields' line of questions to Scroggins as hearsay (TT at 1648:23-1649:10) and Mr. Fields' use of the court room microphone in presenting his case  (TT at 1653:3-10).  *See McDermott,* 64 F.3d at

---

[12] Mr. Snyder later confirmed he intentionally used improper objections and side-bar comments to taunt Fields and influence the jury.  *See supra* n.11; TT at 1914:15-19.

1452 (excluding *pro se* defendant from a bench conference relating to admissibility of hearsay testimony violates Sixth Amendment).

Mr. Peterson spoke for Fields at a bench conference concerning the unavailability of several defense witnesses, many of whom were not present despite the Court's issuance of bench warrants (TT at 1913:11-1916:15) and the issue of sequestering adverse witnesses (TT at 1552:10-1553:15). *See Oses*, 961 F.2d at 986 (granting relief where *pro se* defendant was excluded from bench conferences that "covered such important issues as the number of witnesses that the defendant intended to call"). During this same conference, there was an exceedingly brief, but unquestionably important discussion where Peterson spoke for Fields on the issue of whether Fields would testify on his own behalf:

> THE COURT:  [] Is he going to testify?  Is he going to testify?
>
> MR. PETERSON:  He hasn't indicated that he was going to.  No, sir.
>
> THE COURT:  I assume that he's not because he's here.

TT at 1914:15-19.  As such, Peterson impermissibly spoke "*instead* of the defendant on [a] matter of importance" concerning Fields' right to testify.  *McKaskle*, 465 U.S. at 178 (emphasis in original); *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987) (the right to testify secured by the Fifth, Sixth and Fourteenth Amendments).

Standby counsel also represented Fields, although said nothing, in a bench conference concerning Fields' objection to the prosecutor's attempt to elicit hearsay testimony. TT at 1560:23-1561:15.  *See McDermott*, 64 F.3d at 1452 (excluding *pro se* defendant from a bench conference relating to admissibility of hearsay testimony violates Sixth Amendment).  At these, as with all the bench conferences at guilt phase of trial, standby counsel would not or could not discuss with Fields how he wanted these issues handled.  Accordingly, standby

counsel's opinions effectively controlled the outcome of these conferences, substantially interfering with significant tactical decisions in violation of Fields' Sixth Amendment right. *McKaskle*, 465 U.S. at 178 ("If standby counsel's participation . . . effectively allows counsel to make or substantially interfere with any significant tactical decisions . . . or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded") (emphasis in original).

Here, the Sixth Amendment violation is even more egregious because the Court's decision to prohibit Fields' participation in bench conferences was made unilaterally, without adequate discussion or justification. The Court offered no reason for prohibiting Fields from participation at these conferences. The Court made no inquiry into whether Fields would be disruptive or dangerous at bench conferences. The Court made no attempt to conceive, much less adopt, any less drastic alternative to a ban on Fields' participation in these critical points in his trial. Rather, the entirety of the discussion on the issue of participation in bench conferences was contained in the Court's decree that Fields could not participate in any conference in front of the jury:

> THE COURT: One other thing, I'm reminded by the lady who's most concerned about this, is bench conferences. **Any of the bench conferences in which Mr. Fields has to be involved will have to be done outside the presence of the jury and I will certainly insist that to the extent possible that be done before the jury comes in in [the morning or in the afternoon or after a recess or after the jury's left in any of those instances.** And if there must be a bench conference that would interfere and require me to excuse the jury, I would certainly hope that Mr. Fields would authorize his attorneys to speak for him in whatever manner – whatever matter needs to be discussed, and after we have the bench conference, the attorneys could go back and report to him what just took place and come back again if that was not satisfactory, if additional matters needed to be talked about or additional arguments made. I don't know if that will work or not, but it would be something that I hope we could do. Any other things?
>
> MR. PETERSON: No.

MR. FIELDS:  Nothing else, Your Honor.

MR. GLOFF:  Nothing from the government, Your Honor.

TT at 1166:2-22 (emphasis added).  Indeed, it appears that the Court's ruling was based, at least in part, on the unspecified concerns of a "lady" who is presumably a member of the Court's staff. *Id.* (" One other thing, I'm reminded by the lady who's most concerned about this, is bench conferences.").

Despite the apparently deferential language used by the Court, it was abundantly clear to Fields that his presence at bench conferences would not be permitted in front of the jury. Presumably, it was also clear to standby counsel that the issue was not debatable given that neither Mr. Swanton nor Mr. Peterson objected to the Court's order despite being acutely aware of *McKaskle's* limitations on standby counsel:

> MR. PETERSON:  Your Honor, just one more thing.  In looking at the *McKaskle v. Wiggins*, a Supreme Court decision, it appears that the Supreme Court is saying that standby counsel or advisory counsel can come to the Court with motions and argue things outside the presence of the jury, and if Mr. Fields says, "Look. Would you just do that," do we have the Court's permission to do that?
>
> THE COURT:  Sure, as long as the record is **absolutely clear** that it's his choice that you do that and that you're doing it in a manner that he approves of.
>
> MR. PETERSON:  Yes, sir.
>
> THE COURT:  That's beneficial to everybody concerned, I think. And the *McKaskle* case, we all need to remember, is a case where the Supreme Court was determining whether or not certain action was violated of somebody's constitutional rights.  They weren't necessarily preparing a road map for how this should happen, I don't believe.
>
> MR. PETERSON:  Yes, sir.

TT at 644-645 (emphasis added).  Significantly, Fields never made it "absolutely clear" that standby counsel could speak for him at bench conferences.  Just the opposite, he made it

"absolutely clear" that he did not want Mr. Peterson and Mr. Swanton representing him because he did not trust them and believed them to be conspiring with the prosecution against him. *See, e.g,* TT at 13, 22. Given Field's unequivocal rejection of standby counsel (TT at 13, 22) combined with the Court's unequivocal instructions that standby counsel's "role is to advise Mr. Fields on any legal matters he questions you about" (TT at 69-70), as a matter of law, "any participation by standby counsel other than for . . . routine matters . . . is 'over the defendant's objections.'" *Frantz*, 533 F.3d at 744 (citation omitted).

The Court's decision to exclude Fields from bench conferences severely impacted the course of his trial. Fields was denied the opportunity to speak for himself in his own defense. He was also denied his right to be perceived as representing himself in the eyes of the jury – the Court's comment concerning the improper perception of hybrid representation confirms as much. *See* TT at 1636:11("The perception of hybrid representation in this case is completely getting out of hand"). Worse still, critical moments of his defense were left in the control of standby counsel that Fields explicitly rejected and did not trust. Because Fields was not permitted to address the Court on his own, and because important matters were discussed in his absence and without his consultation or consent, the conduct of his trial did not ensure that "disagreements between counsel and the *pro se* defendant [were] resolved in the defendant's favor whenever the matter [was] one that would normally be left to the discretion of counsel." *McKaskle*, 465 U.S. at 179. As such, Fields' Sixth Amendment right to self-representation was violated and his case must be remanded for a new trial.

CLAIM 7:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE HIS EXCLUSION FROM BENCH AND CHAMBERS CONFERENCES IN VIOLATION OF HIS RIGHT TO SELF-REPRESENTATION  AS AN ISSUE ON APPEAL.

On direct appeal, Mr. Fields' appellate counsel, Robert Owen, raised a due process claim concerning the Court's management of standby counsel.  However, appellate counsel failed to raise a Sixth Amendment right to self-representation claim based on Fields' improper exclusion from bench and chambers conferences.[13]  Indeed, the Fifth Circuit confirmed this by commenting on the conspicuous absence of such a claim on direct appeal:  "Significantly, Fields does *not* claim that standby counsel's participation at trial intruded upon his Sixth Amendment right to self-representation."  *United States v. Fields*, 483 F.3d 313, 361 (5th Cir. 2007) (emphasis in original), *cert. denied*, 128 S. Ct. 1065 (2008).  To the extent this claim was clear on the record, counsel's failure to do so is inexcusable.

Appellate counsel had no reason to avoid raising this meritorious record-based claim.  At the very least, Fields' exclusion from bench conferences, if not chambers conferences, was clear from the record.  TT at 1166.  Additionally, it was clear from the record that Fields did not want Mr. Peterson and Mr. Swanton representing him because he did not trust them and believed them to be conspiring with the prosecution against him.  *See, e.g,* TT at 13, 22.  It was also clear from the record that standby counsel's "role [was] to advise Mr. Fields on any legal matters he questions you about" (TT at 69-70) but not to act as hybrid counsel where Fields "represents himself to the extent he wants to and yet relies on lawyers to represent him to the extent he wants to."  TT at 639.  And, Fields' direct appeal was field in 2004 – well after the case law establishing the claim.  *See, e.g.*, *Faretta v. California*, 422 U.S. 806, 819 (1975); *McKaskle*

---

[13] Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claims 4, 5, and 6 above.

*v. Wiggins*, 465 U.S. 168, 179 (1984); *United States v. McDermott*, 64 F.3d 1448, (10th Cir. 1995), *cert. denied*, 516 U.S. 1121 (1996); *Oses v. Massachusetts*, 961 F.2d 985, (1st Cir.), *cert. denied*, 506 U.S. 954 (1992); *United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir.)(1985).

Appellate counsel's ineffective representation is extremely and undeniably prejudicial to Fields. Denial of the right to self-representation was structural error, requiring a new trial regardless of whether "by due process standards the trial was fair, and any error relative to most other principles would be harmless." *McDermott*, 64 F.3d at 1453-54 (emphasis added). Accordingly, had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). Given the structural nature of these claims, but for appellate counsel's failure to raise them on direct appeal, the Fifth Circuit would likely have granted Fields a new trial.

CLAIM 8:    STANDBY COUNSEL'S FAILURE TO EXERCISE A PEREMPTORY CHALLENGE AGAINST A JUROR MR. FIELDS SOUGHT TO STRIKE VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 9:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO A FAIR AND IMPARTIAL JURY AND FIFTH AND EIGHTH AMENDMENT RIGHTS TO DUE PROCESS WERE VIOLATED WHEN ONE OF HIS PEREMPTORY CHALLENGES WAS NOT EXERCISED.

At the outset of trial Fields requested that the Court appoint him new counsel, citing a conflict of interest between himself and appointed counsel and stating his belief that counsel was conspiring with the prosecutors against him. TT at 13, 22. The Court denied Fields' request for new counsel. TT at 14:22-23. Fields then invoked his right to self-representation. TT at 21:19-23. After Fields invoked his right to self-representation but before

the conclusion of *voir dire*, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel. TT at 69-70. The Court admonished Mr. Peterson and Mr. Swanton that their role was simply advisory. *Id.* Although standby counsel could advise on legal matters and answer legal questions, the Court made clear they were not to "represent him through him." TT at 69-70. The Court expressly disapproved of a hybrid representation situation where Fields "represents himself to the extent he wants to and yet relies on lawyers to represent him to the extent he wants to." TT at 639. Rather, the Court stated that it was important "that the appearance before the jury is that Mr. Fields is representing himself" and required that Fields "make any statements made to the Court and question any witnesses." *Id.* The Court did, however, authorize standby counsel to argue motions and take up other matters outside the presence of the jury but only if the record was "absolutely clear" that Fields chose to have counsel do so and that counsel was doing so in a manner Fields approved of. TT at 644-645.

Fields authorized Mr. Peterson to speak on his behalf in connection with his challenge to the Government's juror selection under *Batson v. Kentucky*, 476 U.S. 79 (1986) (TT at 1152) but he did not authorize Mr. Peterson to determine how to use his preemptory challenges to potential jurors. To the contrary, Fields wanted to control the jury selection process after *voir dire*. To assist with the decision making process in exercising preemptory challenges, Fields and standby counsel developed a scoring system to track their perception of each potential juror. Both Mr. Peterson and Mr. Swanton offered their opinions on who they believed Fields should strike. Sometimes those opinions were contrary to Fields' opinion. Fields was willing to listen to standby counsel's views, but he did not want them to control the ultimate decision making process. Standby counsel, however, took control of the decision making process, assuring Fields that their decisions were based on their professional experience.

In at least one case, standby counsel specifically rejected Fields' request to strike a particular juror, Jimmy D. Ansay.  Mr. Fields felt that Mr. Ansay was the single worst potential juror – he did not like his *voir dire* answers.  More importantly to Fields, he did not like the way Ansay stared at him during jury selection.  Accordingly, Fields gave Ansay the worst possible score.  Consequently, Fields directed counsel to exercise a peremptory challenge against Ansay.  Counsel disagreed with Fields about Ansay, apparently viewing him as a bad, but weak juror.  Despite Fields' desire to exercise a peremptory challenge against Ansay, counsel overrode Fields' decision, forcing him to exercise challenges against jurors counsel thought were worse.  Thus, Mr. Ansay was seated as one of the jurors who voted to convict and sentence Mr. Fields to death.

Other than bench and chambers conferences, Fields conducted every other aspect of his defense during the guilt phase of trial.  He made opening (TT at 1194:10-1203:5) and closing (TT at 2005:1-2029:20) arguments to the jury.  He cross examined all government witness and examined all witness in his defense.  He participated in the *voir dire* of jurors and made motions to the court outside of the jury's presence.  TT at 36:17-20, 67:25-68:14, 484:3-9, 528:10-529:4, 637:24-638:21, 719:7-18, 1108:4-19, 1148:6-1152:9, 1970:23-1971:2..

### A.    The Role Of Standby Counsel

The Sixth Amendment grants a defendant the right to personally conduct his own defense.  *Faretta v. California*, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense"); *McKaskle v. Wiggins*, 465 U.S. 168, 179 (1984).  Although the court may appoint standby counsel to "to aid the accused if and when the accused requests help," *Faretta*, 422 U.S. at 834 n.46, the Sixth Amendment imposes two significant limitations on the extent of standby counsel's participation:

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.
>
> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy.

*McKaskle*, 465 U.S. at 178 (emphasis in original).

Where, like here, "standby counsel is appointed only to advise, the initial invocation of the right of self-representation is generally sufficient to establish that any participation by standby counsel other than for . . . routine matters . . . is 'over the defendant's objection.'" *Frantz v. Hazey*, 533 F.3d 724, 744 (9th Cir. 2008) (*quoting McKaskle*, 465 U.S. at 178); *United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir.) (a defendant's assertion of "the right [to self-representation] at the outset of trial proceedings constituted an express and unambiguous request that 'standby counsel be silenced.' This, per *McKaskle's* analysis, must be given effect as a reassertion of the general right to *pro se* representation as to further proceedings . . ."), *cert. denied*, 471 U.S. 1107 (1985). From the very outset of trial, the Court appointed Mr. Fields' standby counsel only to advise:

> MR. PETERSON: Your Honor, Mr. Swanton and I will then be appointed as standby counsel or can we be excused?
>
> THE COURT: Absolutely you're appointed as standby counsel. The question becomes what the jury is told about that situation. Standby counsel to me it seems by definition includes counsel who are standing by in case the defendant elects to be represented by attorneys at a later stage of the trial, and I intend to tell them that. I intend to tell them that unless and until that happens. Then **your role is to advise Mr. Fields on any legal matters he questions**

**you about, that you are in essence his legal reference material since he's not a lawyer and doesn't have a library there at his disposal at counsel table.  On the other hand, that it's not your job to represent him through him, that you're allowed to sit there at the counsel table so you're readily available to answer any questions he has.**  Obviously anything he says to you or you to him is completely confidential.  So no one is going to know to what extent those normal procedures are being followed, but what **I think is important is that the appearance before the jury is that Mr. Fields is representing himself.  He will have to make any statements made to the Court.  He will have to question any witnesses that are made.**

TT at 69-70 (emphasis added).  Accordingly, absent Mr. Fields' express consent to any individual instance of standby counsel's participation at trial, standby counsel's participation is over the defendants' objection and in violation of his right to self-representation.  *McKaskle* does not place a burden on *pro se* defendants to object to every unwanted act of standby counsel.  *Frantz*, 533 F.3d at 744.  "To the contrary, *McKaskle* limits standby counsel's '*unsolicited* participation' during critical proceedings."  *Id.* (*citing McKaskle*, 465 U.S. at 177) (emphasis in original).  Here, it is especially appropriate to presume that all of standby counsel's participation was unsolicited absent express consent from Fields given that Fields made it abundantly clear he believed standby counsel were operating under a conflict of interest and conspiring with the prosecutors against him.  TT at 13, 22.

Violations of Mr. Fields' Sixth Amendment right to self-representation are structural, and therefore *per se* prejudicial:

> Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis.  The right is either respected or denied; its deprivation cannot be harmless.

*McKaskle*, 465 U.S. at 177 n.8; *Myers v. Johnson*, 76 F.3d 1330, 1337 (5th Cir. 1996).

**B.      Mr. Fields' Sixth Amendment Right To Self-Representation Was Violated Because Standby Counsel Substantially Interfered With And Made Significant Tactical Decisions Regarding Jury Selection**

Without doubt, decisions concerning whether and how to use preemptory challenges during jury selection are some of the most significant tactical decisions made at any criminal trial.  Indeed, use of preemptory challenges is one of the most important rights afforded federal criminal defendants:

> Although "[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges," *Stilson v. United States*, [250 U.S. 583, 586 (1919)], nonetheless the challenge is "one of the most important of the rights secured to the accused," *Pointer v. United States,* [151 U.S. 396, 408 (1894)].

*Knox v. Collins*, 928 F.2d 657, 660 (5th Cir. 1991), *cert. denied*, 510 U.S. 1061 (1994).  The right to free exercise of preemptory challenges represents such a significant tactical decision that the Supreme Court and the Fifth Circuit firmly hold that "'[a] defendant does enjoy a federal constitutional right to a trial before a fair and impartial jury, with the concomitant right to peremptorily challenge a limited number of prospective jurors in the selection proceedings.'"  *Id.* at 661 (citations omitted).  In certain contexts, "denial or impairment of the right to exercise peremptory challenges is reversible without a showing of prejudice."  *Id.* (*citing Swain v. Alabama*, 380 U.S. 202, 219 (1965)).

The incredible significance of the preemptory challenge as a tactical trial tool is further evidenced by its broad scope of acceptable use:  "[t]he peremptory challenge generally '**permits rejection [of potential jurors] for a real or imagined partiality** that is less easily designated or demonstrable [than a challenge for cause].'"  *Id.* (*quoting Swain*, 380 U.S. at 220) (emphasis added).   Accordingly, it is beyond legitimate dispute that standby counsel's unsolicited interference with or control of a *pro se* defendant's tactical decisions concerning use

of preemptory challenges violates the very "core of the *Faretta* right" – the *pro se* defendant's entitlement "to preserve actual control over the case he chooses to present to the jury." *McKaskle*, 465 U.S. at 178.  Here, Fields' standby counsel controlled the decisions on use of preemptory challenges against Fields' wishes.

Standby counsel exceeded the bounds of both the Court's instructions and *McKaskle's* limitations in the course of selecting Fields' jurors.  Although the Court clearly described standby counsel's role as advisory (TT at 69-70), Mr. Peterson did not simply advise Fields as to which potential jurors he believed should be challenged and which should serve. Instead, standby counsel forced Fields to exercise preemptory challenges in a manner contrary to his explicit instructions.

Here, the structural error is twofold.  First, as explained above, Mr. Peterson's unauthorized substitution of his opinion for Fields' in connection with the decision to strike juror Ansay is a structural violation of Fields' *Ferretta* right, requiring new trial.  Second, Peterson's actions allowed for Ansay's installation onto the jury, effectively denying Fields' right to exercise a preemptory challenge and resulting in a trial before an unlawful adjudicator.  In short, Fields had a right to trial without Mr. Ansay on the jury and had Fields' right to exercise his preemptory challenges been respected, Ansay would not have been seated.   Peterson's interference with that right renders Fields' jury defective and unlawfully constituted.

Denial of the right to have a criminal trial adjudicated by a lawfully empanelled jury is a structural error that cannot be subjected to a harmless error analysis.  *See Gomez v. United States*, 490 U.S. 858, 876 (1989).  Errors affecting the composition of the jury require automatic reversal of the verdict and a new trial.  *See, e.g., Gray v. Mississippi*, 481 U.S 648, 666-68 (1987) (improper exclusion of juror with scruples regarding the death penalty from capital case); *Batson*, 476 U.S. at 100 (unlawful exclusion of juror based on race); *Vasquez v.*

*Hillery,* 474 U.S. 254, 263-64 (1986) (unlawful exclusion of grand jurors based on race); *Irvin v. Dowd*, 366 U.S. 717, 726, 728 (1961) (pretrial publicity called jury's impartiality into question).

It is impossible to conduct a harmless error analysis to issues involving the wrongful seating of a juror because "there is no way to determine what jury would have been selected under a [lawful] selection system, or how that jury would have decided the case." *Peters v. Keff*, 407 U.S. 493, 504 (1972). Harmless error review is impossible because courts cannot possibly know who the replacement juror would have been, much less speculate about how that juror would have viewed the evidence and participated in deliberations. *See, e.g., McIlwain v. United States*, 464 U.S. 972, 975-76 (1983) (Marshall, J., dissenting from denial of certiorari) ("Given the delicate dynamics of jury deliberations, it is simply impossible to know the effects [one] juror had on her fellow jurors"); *United States v. Annigoni*, 96 F.3d 1132, 1150 (9th Cir. 1996) (*en banc*) (Kozinski, J., dissenting) ("[T]he error is not amenable to normal harmless error analysis, as we can never figure out what would have happened if one member of the jury had been struck and replaced by some other, unknown, person"); Roger J. Traynor, *The Riddle of the Harmless Error* 64-66 (1970) (a defendant who has been wrongly denied a peremptory challenge cannot possibly show prejudice "and should not be called upon to do the impossible at the appellate stage"). Thus, Mr. Ansay's installation on Fields' jury despite Fields' efforts to exercise a preemptory strike against him, constitutes structural error requiring an automatic reversal of the verdict and a new trial.

CLAIM 10:    MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF TRIAL WERE VIOLATED BY HIS EXCLUSION FROM A CHAMBERS CONFERENCE HELD TO DISCUSS THE COURT'S RESPONSE TO THE JURY'S NOTE INDICATING THAT THEY  WERE UNABLE TO REACH A UNANIMOUS VERDICT ON SENTENCING WHERE MR. FIELDS SPECIFICALLY REQUESTED TO ATTEND THAT OFF-THE-RECORD CONFERENCE.

A.    **Facts**

Although it is not clear from the trial record, Mr. Fields was improperly excluded from an off-the-record chambers conference held to decided how to treat the jury's note indicating they were deadlocked on whether Fields should be sentenced to death.  Unlike the guilt phase of trial, counsel represented Mr. Fields during the penalty phase.  Although it is also not clear from the trial record, Fields wanted to be present at this chambers conference.  However, counsel participated without Fields.

At about 3:35 p.m. on Thursday, February 5, 2004, the jury began deliberating sentencing verdict.  TT at 2543.  A little more then an hour later, at around 4:55 p.m. the jury asked to recess until 9 a.m. the next morning, Friday February 6, 2003. At 1:45 p.m. in the afternoon of their second day of penalty phase deliberation, after deliberating for approximately six hours, the jury sent the Court a note asking:

> If we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the Court have for punishment?

T.T. at 2546-2547.  At 2:07 p.m., the Court responded:

> Ladies and Gentleman:  You are instructed on page 16 of the Punishment Phase Charge of the Court as follows:  "If you are unable to unanimously agree on either punishment option, the Court will impose punishment which cannot be a sentence of death."  Beyond that, I am unable to answer your question.

TT at 2547.  **Eighteen minutes** later, at 2:25 p.m., the jury told the Court:  "**We cannot come to a unanimous agreement.**"  TT at 2547 (emphasis added).

Initially, the Court asserted its opinion that the jury was deadlocked and there was

no appropriate response to the note:

> It would be my initial position that **there's absolutely nothing the Court should or could do at this point except accept that statement** and I don't even think it would be appropriate to ask the jury as a whole if any of them disagree with the foreman's statement to the Court."

TT at 2547 (emphasis added).  The government disagreed, however, resulting in a an off-the-

record chambers conference:

> MR. SNYDER:  I think it's too early for them to throw the towel in.
>
> THE COURT:  I'm sorry?
>
> MR. SNYDER:  They've only been working six hours, Judge. That isn't that long.
>
> THE COURT:  Well, let's confer in chambers a moment, counsel.
>
> LAW CLERK:  All rise.
>
> (A break was taken from 2:36 to 2:56)

TT at 2548.

After a twenty minute chambers conference, the Court changed its opinion, and

determined to issue a short response: "Ladies and gentlemen, please continue your

deliberations."  TT at 2548.  When the Court returned to the record, defense Counsel objected,

arguing that following the prior two notes, and considering the time the jury has already

deliberated, that such a response would be tantamount to telling the jury to come to a death

verdict:

> MR. SWANTON:  Sometime ago, 45 minutes maybe ago that indicated to the Court that they were questioning if they can't reach a unanimous verdict what happens, and the Court instructed them essentially as they were already instructed in the charge that if that's the case, that you would impose the sentence but it could

> not be death. They've now informed the Court after receiving that notification from the Court that they cannot reach a unanimous verdict. In essence, it is our position that by reaching that verdict they in fact have reached a decision and are properly following the Court's instructions as have previously been given to them. It is our concern that should the Court ask this jury to continue to deliberate, what the Court is essentially doing is, number one, commenting on the weight of the evidence and essentially telling the jury that – when this jury knows because they've been told through the process of voir dire that there are two possible verdicts or two possible results in this case, a life sentence without the possibility of release or death, that if you send them back and say keep deliberating, it is, in essence, telling them – you know, swaying them to reach the verdict of death and commenting on the evidence and commenting on what you're asking them to do.

TT at 2548. Mr. Swanton also countered the Government's concern as to the length of deliberations noting that: "[the jury's] been out approximately the same amount of time as they were in guilt/innocence minus maybe a couple of hours and we would object to the Court giving that charge." *Id.*

On behalf of the Government, Mr. Snyder argued that the Court had the authority to issue the note and that jury had not been deliberating long enough: "Your Honor – is – when I first got involved in trials – is – I was told by an old lawyer, rule of thumb was is deliberations should usually last a day for every week of trial. We haven't even gone through one day." TT at 2250. At 3:01 p.m., the Court overruled the defense objection, sent the note to the jury and recessed:

> THE COURT: All right. The defendant's objections will be overruled and the note will be submitted to the jury. We'll stand in recess.
>
> LAW CLERK: All rise.
>
> (A break was taken from 3:01 to 4:08)

TT at 2551. **A mere forty-five minutes later**, at 3:46 p.m., the jury came back with an unanimous verdict for death. Although Fields requested to be present and participate in

chambers conference that decided this critical matter in his trial – the decision to accept the jury's determination that a unanimous decision could not be reached – he was prevented from participating with his attorneys at that chambers conference.  Because the conference was off-the-record, Fields does not know what took place during the conference.  Whatever occurred resulted in the Court reversing its initial position that the jury was deadlocked – a reversal of opinion that, for Fields, literally meant the difference between life and death.

**B.  Mr. Fields' Constitutional Right To Be Present At All Stages Of The Trial Was Violated By His Exclusion From The Chambers Conference**

It is well-established that a defendant has a Fifth and Sixth Amendment right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings."  *Faretta v. California*, 422 U.S. 806, 819-20 n.15 (1975) (*citing Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934)).  Due process requires the presence of the defendant "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge."  *Snyder*, 291 U.S. at 105-06.

Despite this well-established right, Fields' explicit request to participate in perhaps the most critical moment of his trial – a chambers conference concerning whether or not the jury was deadlocked on application of the death sentence – was denied.  It is beyond legitimate dispute that whatever transpired during this chambers conference was significant.  Indeed, it caused the Court to turn 180 degrees away from its initial position that "there's absolutely nothing the Court should or could do at this point except accept that statement" that the jury "cannot come to a unanimous agreement."  TT at 2547.  A mere twenty minutes after the Court concluded it could do absolutely nothing but accept the jury's verdict, it returned to the record indicating that it would simply tell the jury to keep deliberating, without any cautionary language designed to protect the rights of any holdout jurors.

There can be no doubt that Fields' absence from this discussion "frustrate[d] the fairness of the proceedings" and denied him the opportunity to defend himself. *Faretta*, 422 U.S. at 820 n.15. It was fundamentally unfair to exclude Fields, especially since had there been no conference, Mr. Fields would not have been sentenced to death. Had there been no conference, the Court could not impose a death sentence because the jury had not unanimously voted for death. Certainly Fields should have been afforded the opportunity to weigh in on this decision. This is especially so considering the on-record argument – that the jurors should deliberate until the end of the day based on the length of the trial (which presumably influenced the off-the-record chambers argument) – was not a legal argument. This argument was proved be false at 3:46 p.m. – a mere forty-five minutes after the jurors received the note and more than an hour earlier than they retired the day before. Fields' exclusion from the conference, therefore, resulted in a direct violation of his constitutional right to be present at this critical stage of trial. *Snyder*, 291 U.S. at 105-06.

CLAIM 11:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT TO HIS EXCLUSION FROM A CHAMBERS CONFERENCE HELD TO DISCUSS THE COURT'S RESPONSE TO THE JURY'S NOTE INDICATING THAT THEY WERE UNABLE TO REACH A UNANIMOUS VERDICT ON SENTENCING WHERE MR. FIELDS SPECIFICALLY REQUESTED TO ATTEND THAT OFF-THE-RECORD CONFERENCE.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in the claims directly preceding this one. In order to establish ineffective assistance of counsel, a habeas petitioner, or in this case a § 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must first show that counsel's performance was deficient, and then

demonstrate that the deficiency prejudiced the defense. *Id*. at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

As demonstrated in preceding claims, Mr. Fields was denied his well-established right to be present at one of the most critical moments of his trial – a chambers conference held to determine whether or not the jury was deadlocked on the application of the death sentence. It is well-established that a defendant has a Fifth and Sixth Amendment right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819-20 n.15 (1975) (*citing Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934)). Counsel ineffectively failed to object to his exclusion. Their failure to do was unreasonable, particularly in light of the critical nature of the proceeding, and there is simply no evidence in the extant record that establishes that counsel's deficient performance in this regard was the product of a tactical consideration.

CLAIM 12:    MR. FIELDS' FIFTH AMENDMENT RIGHT TO DUE PROCESS; HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL; AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE VERDICT AND SENTENCE WERE VIOLATED WHEN THE COURT REQUIRED HIM TO PROVIDE THE PROSECUTION WITH A DETAILED PREVIEW OF HIS TRIAL STRATEGY ON CROSS-EXAMINATION OF A CRITICAL GOVERNMENT WITNESS WITHOUT REQUIRING RECIPROCAL DISCLOSURE OF THE PROSECUTION'S TRIAL STRATEGY.

A.    **Facts**

The Court violated Mr. Fields' due process and Eighth Amendment rights by requiring him to provide discovery material to the Prosecution without reciprocation by the Government. During the cross-examination of key Government witness, Shalaykea Scroggins, the Court ordered Fields to provide unreasonable and unreciprocated discovery to the Government. On Tuesday, January 27, 2004, the Government called Scroggins to offer testimony against Mr. Fields. TT at 1576:20-1611:2. Scroggins was perhaps the most critical witness to Fields' defense because she is one of two individuals that Fields contends are the

actual killers.   According to Mr. Fields, his entire defense rested on the cross-examination of Ms. Scroggins:

> Your Honor, this is my point.  That young lady up there, that's the government's star witness.   This woman is saying that things happened that couldn't have possibly happened, and I'm trying to prove this, but I can't because they won't even let me answer my question.  That's what I'm saying.  This is where my life – my life is right there.  **This is what's going to – either going to – this is how I'm either going to live or die because of her.**

TT at 1683:7-16.  Ms. Scroggins was also key Government witness who claimed that Mr. Fields confessed his guilt to her.  TT at 1599:15-17.

After the Government's direct examination, Mr. Fields attempted to cross-examine Ms. Scroggins to demonstrate that she was lying about her involvement in Coleman's murder to hide the fact that she was the actual killer.  *Id.*  Fields sought to show that Scroggins was obsessed with him, that she hated Coleman out of jealousy over him, and that she had become incensed at seeing Coleman and Fields together the day of Coleman's disappearance. TT at 1356, 15:1618-20, 1650-51.  Mr. Fields' attempts were frustrated by, among other things, his lack of legal training.  Moreover, in response to many of Fields' questions, the prosecution raised repeated objections.[14]   After numerous successively sustained objections to the form and nature of Mr. Fields' cross-examination questions (TT at 1611:3-1665:17), the Court interrupted Mr. Fields:

> THE COURT:  Do you have any other questions of this witness, Mr. Fields?
>
> MR. FIELDS:  Yes.  I have a bunch of more questions, Your Honor.

---

[14] The prosecutor, Mr. Snyder, later admitted during his closing argument that these repeated objections were part of an intentional litigation strategy designed to elicit a specific reaction from Fields to be later highlighted to the jury. *See supra* n. 11; TT at 2032.

> THE COURT: Well, let's see if you can find one that's admissible. Otherwise, we're going to cut short the cross-examination and go on to something else. Finish up with this witness.

TT at 1652:19-1653:1. Mr. Fields continued with his questions only to be confronted by an onslaught of additional objections. The Court then suspended Mr. Fields' cross-examination and allowed the government to return to their direct examination of the witness:

> THE COURT: Sustain the objection. That's merely argument, Mr. Fields. We're going to do something different at this point and conclude the cross-examination for this point in time. We'll come back to it and we'll have the government complete its direct examination of this witness.

TT at 1665:12-17. Without offering any explanation to the jury, the Court allowed Mr. Snyder to conduct a redirect examination of Scroggins until the end of the day.

After the conclusion of the day's proceedings – outside the presence of the jury but with Ms. Scroggins remaining on the witness stand – the Court ordered Mr. Fields to do a "dry run" of his planned cross-examination of Scroggins by reading his list of proposed questions. The Court invited the Government to object to each question asked of the witness:

> What we're going to do is, Mr. Fields, you have a list of all the questions you want to ask this witness and you indicated you have a lot more. So we're going to go ahead and go through that list. You read each question you want to. We'll stay here till midnight if we need to. If the government feels the need to object, the government will object. If I sustain the objection, then, Mr. Fields, you put an "X" by that question. If the government doesn't object or I overrule it, you put a checkmark by it and then in the morning when the jury's here, you can go into the matters with the checkmarks on them."

TT 1669:9-19. Questions that were ruled permissible could be revisited with the witness for a second time the next day while the jury was present.

During this hearing, Mr. Fields read his questions revealing numerous defense theories, impeachment strategies and other tactical considerations including the witness's drug

use (TT at 1697:25-1699:12); the existence of exculpatory trace and DNA evidence (TT at 1673:20-25, 1675:1-24, 1689:18-1690:16); impeaching Ms. Scroggins' credibility regarding the alleged confession (TT at 1700:9-19); and inconsistencies between Ms. Scroggins' testimony and her prior sworn statements to the grand jury testimony (TT 1694:1-1697:23, 1712:1-1715-3). By virtue of this hearing, each of these topics were disclosed to the government in advance of Mr. Fields' cross-examination of the witness in front of the jury. TT at 1723:17-1730:6. This provided the Government a unique opportunity to frame their topics of re-direct exam, as well as plan likely objections to line of questioning a day before the jury even hears the cross-examination for the first time. Moreover, it allowed Ms. Scroggins – perhaps the most important witness to both the prosecution and defense – the opportunity to shape her testimony in anticipation of cross-examination questions to be presented to her before the jury.

Throughout the hearing, Mr. Fields expressed his objection to (and confusion about) the purpose of and proper procedure for this advance presentation of his cross-examination questions and witness testimony:

> MR. FIELDS:  Your Honor, I'm missing the point, Your Honor.
>
> THE COURT:  I know that.
>
> MR. FIELDS:  You telling me – first you tell me to ask the questions and just put a check by them if you don't sustain when they object and put an "X" by them and that's what I was doing and now are you telling me to just let it go or what? What are you telling me?
>
> THE COURT:  Go ahead and make your attempt to represent yourself, Mr. Fields.
>
> MR. FIELDS:  Your Honor, are you trying to persuade me to my standby counsel to represent me?
>
> THE COURT:  I've given up trying to persuade you to do anything, Mr. Fields.

TT at 1676:22-1677:6.

> MR. FIELDS: Okay. So if I ask these questions and then I have to strike the ones that they object to, then I come back tomorrow and ask the question that they didn't object to, it ain't going to make no sense because it ain't in no order.
>
> THE COURT: Well, that's up to you to make sense out of it and to try to understand what you can ask and what you can't ask, and you'll have all night to try to figure that out. You mark what's not admissible and what is and maybe you'll be able to figure it out, Mr. Fields.

TT at 1682:5-13. Mr. Fields' standby counsel also expressed confusion as to how the cross-examination preview hearing would facilitate the flow of the following day's cross-examination:

> MR. SWANTON: I know that you've asked Mr. Fields to checkmark and X mark questions that he has. I know now that he's asking questions that aren't on his piece of paper and I'm not sure how we're going to be able to determine and how he's going to be able to remember which questions are proper and which ones aren't.
>
> THE COURT: I guess we'll have to rely on his memory. I don't know, either.

TT at 1716:7-14.

Based, in part, on the substantial confusion created by this unorthodox hearing and the impossibility of properly recording the Court's evidentiary rulings in any meaningful way, Fields abandoned certain lines of questioning. For instance, outside the jury's presence, Fields questioned Scroggins attempting to elicit testimony on topics such as inconsistencies in her prior grand jury testimony (TT at 1693:20-1695:23), the existence of exculpatory trace and DNA evidence in the getaway car (TT at 1673:20-25, 1675:1-15) and on the victim's body (TT at 1675:23-24, 1690:13-16). Although the Court sustained objections as to the form of the question rather than the topic of questioning (TT at 1672:25-1673:4), Fields abandoned the actual substance of such topics and did not repeat them in front of the jury.

Similarly, based in part on a concern that Scroggins' answers may have been influenced by this preview questioning, Fields abandoned other lines of questioning when before the jury. Outside the jury's presence, Fields elicited court-approved, admissible impeachment testimony concerning inconsistencies in Scroggins' accounts of his alleged confession (TT at 1700:9-19), inconsistencies in Scroggins' past statements of Fields' whereabouts (TT at 1701:10-1703:4), and Scroggins' admitted drug use (TT at 1698:11-1699:2). Because Fields was confused about whether he was still permitted to ask those questions (TT at 1676:22-1677:6, 1682:5-13, 1716:7-14), and because of the clear motivation for the witness to alter her answers, he did not repeated them in front of the jury.

**B.     The Disclosure Of Cross-Examination Questions And Testimony Without Reciprocation Violates The Fifth Amendments' Due Process Clause and his <u>Eight Amendment Right to a Reliable Verdict and Sentence.</u>**

Compelling Fields to preview his theory of the case and elicit testimonial evidence from a key witness outside the presence of the jury is tantamount to providing discovery to the Government. Testimony elicited under oath, but outside the presence of a fact-finder can be nothing more than discovery material. Accordingly, this highly unorthodox hearing essentially elicited deposition testimony from Ms. Scroggins. As such, Mr. Fields' due process rights were violated because the Court did not require reciprocal disclosure of the prosecution's examination questions, or Scroggins' answers, thereby unconstitutionally tipping "the balance of forces between the accused and his accuser." *Wardius v. Oregon*, 412 U.S. 470, 474 (1973). The United States Supreme Court has ruled, in an analogous situation, that requiring a criminal defendant to divulge the details of his own case while subjecting him to surprise concerning the Government's refutation of the evidence he disclosed was fundamentally unfair. *Id.* at 472. The U.S. Supreme Court held that such a situation conferred an unfair advantage to

the Government, undermining the adversarial system and creating the "substantial possibility" of a due process violation by allowing the district court's error to infected the verdict. *Id.* at 479.

Certainly the Court's requiring that Fields expose his defense theories, strategy, and confrontation tactics to the prosecution and its star witness – the defendant's chief accuser – raises a "substantial possibility" of an infected verdict. *Id.* The Court's order subjected the details of Field's trial tactics to advance scrutiny by the Prosecution. Worse still, the Government's objections created the severe risk of coaching their key witness's testimony. Both scenarios undermine the integrity of the adversary system's "primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made." *United States v. Nobles*, 422 U.S. 225, 230 (1975).

Allowing a witness to hear a preview of cross-examination questions in advance of testimony before the jury renders that testimony unreliable. It is beyond legitimate dispute that providing Scroggins with a preview of cross-examination outside the presence of the jury created the danger that her testimony was artificially influenced when she eventually appeared before the jury. As such, her testimony was less reliable to the jury's fact-finding although the jury had no basis to evaluate the reliability of Scroggins' testimony because the jury never witnessed her initial cross-examination, nor were they informed about Scroggins' "practice run." Accordingly, the jury was denied the opportunity to "make an informed judgment as to the weight to place on [Scroggins'] testimony which provided a 'crucial link in the proof . . . of petitioner's act.'" *Davis v. Alaska*, 415 U.S. 308, 317 (1974) (citation omitted). To prevent this very danger of artificially influencing witness testimony, the Court invoked the rule at the very start of trial that no potential witness could be present in the court room to hear questions asked of others:

> THE COURT: Be seated, everyone. Before the jury comes in, I need to make something clear on the record. The rule has been invoked in this case and I am aware that some concern has been expressed that there may be potential witnesses who are sitting in the courtroom listening to testimony and thus disqualifying themselves from later being called to testify. I want to make sure it's clear that each party is responsible for his own witnesses or its own witnesses. That's not the Court's responsibility.

TT at 1552. If witnesses may not hear the questioning of others prior to testifying before the jury, allowing a key witness to preview her own cross-examination prior to her testimony before the jury is even more egregious and is completely irreconcilable with the sprit of this rule.

Moreover, the Court's *ad hoc* appraisal of Fields' cross-examination questions was especially egregious in light of the nature of the compelled disclosure. Mr. Fields' attempts to justify the purpose of his questions in response to various objections lead to the revelation of strategic details, thoughts and impressions concerning his trial strategy. In other words, Mr. Fields was compelled to reveal information covered by the attorney work product doctrine. It is well-settled that the work product doctrine applies in criminal litigation and that it protects against the disclosure of an attorney's efforts and mental processes during trial. *Nobles*, 422 U.S. at 237-38. That Fields is not an attorney does not weaken the protections afforded his mental processes. *See In re Grand Jury Subpeona*, 220 F.R.D. 130, 141 (D. Mass. 2004) (noting work product protections apply to material prepared by "a party, her attorney, or her representative prepares in anticipation of litigation"). There can be little doubt that the planned order, delivery, and presentation of Fields' cross-examination questions fall under the work-product doctrine, a "protected area in which the lawyer can prepare his case free from adversarial scrutiny." *In re Special Sept. 1978 Grand Jury (II)*, 640 F.2d 49, 62 (7th Cir. 1980).

Disclosure of Fields' work product to the prosecution was not necessary. For example, the Court could have reviewed the cross-examination questions *in camera* to determine

their admissibility.  The Court could have excused the witness and the prosecution – like it had earlier in the proceedings – and discussed these privileged matters with Mr. Fields outside of the presence of his adversaries.  *See* TT at 1683-84 (Excusing the Government to discuss potentially privileged issues regarding a conflict of interest between Fields and appointed counsel).  Whatever the Court's alternative options, upon compelling the disclosure of Fields' trial tactics to his adversary, the Court had a duty to order reciprocal disclosure from the Government.  *See Wardius*, 412 U.S. at 475-76.  The Court's failure to do so violated Mr. Fields' constitutional rights under the Fifth Amendment requiring new trial.

CLAIM 13:     MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE ON DIRECT APPEAL FIFTH AMENDMENT RIGHT TO DUE PROCESS, SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, AND EIGHTH AMENDMENT RIGHT TO A RELIABLE VERDICT AND SENTENCE CLAIMS BASED ON THE COURT'S REQUIREMENT THAT HE PROVIDE THE PROSECUTION WITH A DETAILED PREVIEW OF HIS TRIAL STRATEGY ON CROSS-EXAMINATION OF A CRITICAL GOVERNMENT WITNESS WITHOUT REQUIRING RECIPROCAL DISCLOSURE OF THE PROSECUTION'S TRIAL STRATEGY.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in the claims above.  Appellate counsel ineffectively failed to identify and litigate on direct appeal these above-described record-based claims regarding the Court's unconstitutional requirement that Fields provide unreciprocated discovery of a key witness to the government.  This is so despite the fact that objections to this unorthodox procedure were raised by both Fields (TT at 1676-1677 ("Your Honor, I am missing the point, Your Honor") and standby counsel (TT at 1716 "I know now that he's asking questions that aren't on his piece of paper and I'm not sure how we're going to be able to determine and how he's going to be able to remember which questions are proper and which ones aren't").  To the extent this claim was clear on the record, counsel's failure to raise them on direct appeal is inexcusable.  Appellate

counsel had no reason to avoid raising these meritorious record-based claims. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

Appellate counsel's ineffective representation is extremely and undeniably prejudicial to Fields. The above-described errors rendered the testimony of a key Government witness wholly unreliable yet prevented the jury from considering the circumstances behind the unreliability of that testimony – undermining the adversary system's "primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made." *United States v. Nobles*, 422 U.S. 225, 230 (1975). Fields' guilty verdict and death sentence are, therefore, also undermined because it is likely the jury's verdicts were effected from theses constitutional errors. Accordingly, a new trial is warranted and but for appellate counsel's failure to raise these claims on direct appeal, the Fifth Circuit would likely have granted Fields a new trial.

CLAIM 14:    MR. FIELDS' FIFTH, AND SIXTH AMENDMENT RIGHT TO TESTIFY, AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE ALL VIOLATED WHEN THE COURT FAILED TO INQUIRE AS TO WHETHER THE *PRO SE* DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS RIGHT TO TESTIFY.

A.      **Facts**

Mr. Fields did not knowingly and voluntarily waive his right to testify. To the contrary, Fields did not testify because standby counsel erroneously advised that testifying would require him to take the stand and formally examine himself – by asking himself questions and then answering those questions – in front of the jury. Standby counsel advised Fields that testifying in such a way would be awkward and confusing to the jury. Accordingly, Fields did

not testify only because he did not wish to present his testimony in this awkward question and answer format.  Standby counsel did not inform Fields that he could request to testify in narrative format.  Standby counsel did not inform Fields he could request the Court to allow standby counsel to read questions Fields prepared while Fields answered those questions from the witness stand.  Standby counsel did not inform Fields that the Court had discretion to allow any alternative forms of testimony.[15]  Fields had no reason to doubt standby counsel's advice as the Court informed Fields several times that standby counsel was his only access to legal resources and references.  *See, e.g.,* TT at 22:25-24:3.  The Court also advised standby counsel that their role was to advise Mr. Fields and to act "in essence as his legal reference material . . . ."  TT at 69:20-24.

The Court never asked Mr. Fields whether he wanted to testify, inquired as to whether Mr. Fields was aware of his right to testify, or determined whether Mr. Fields voluntarily decided not to testify.  Rather, the Court briefly asked standby counsel whether Fields would testify, but never addressed Fields directly:

> THE COURT:  [] Is he going to testify?  Is he going to testify?
>
> MR. PETERSON:  He hasn't indicated that he was going to.  No, sir.
>
> THE COURT:  I assume that he's not because he's here.

TT at 1914:13-19.  The Court never addressed the right to testify with Fields, who was proceeding *pro se*, despite the fact that Fields' desire to testify should have been clear to the Court.  Twenty times, over four days of trial, the Court struck Fields' witness examination

---

[15] Rule 611(a) of the Federal Rules of Evidence "provides district judges with authority to allow testimony in narrative form rather than as answers to specific questions . . . [and] the narrative may well be the preferable form in some respects."  *United States v. Pless*, 982 F.2d 1118, 1123 (7th Cir. 1992) (citations omitted).  This is exactly the type of legal reference that standby counsel was supposed to provide Mr. Fields.

questions on the grounds that he was "testifying, not asking questions."  *E.g.,* TT at 1334:9-11, 1358:13-15, 1360:2-4, 1360:9-10, 1371:20-23, 1546:12-14, 1575:9-12, 1624:15-18, 1626:14-17, 1641:1-3, 1652:1-4, 1676:3-8, 1747:8-10, 1752:8-11, 1779:22-24, 1781:9-12, 1782:1-3, 1796:8-11, 1899:11-13, 1926:2-4.  Moreover, the Court explicitly acknowledged that several of Fields' questions were an expression of his desire to testify:  "That's your attempt to try to testify without actually taking the stand and be under oath."  TT at 1676:4-5.  Had the Court discussed the right to testify with Fields, it would have been clear that Fields wanted to take the stand because he believed his testimony was critical to his defense but standby counsel advised that it was impossible to present that testimony in a way that was not awkward and confusing.

**B.      Mr. Fields Did Not Knowingly And Voluntarily Waive His Constitutional Right To Testify And The Court Erred In Failing To Inquire As To Mr. Fields' Decision Not To Testify**

Fields did not make "a knowing, voluntary and intelligent waiver of a personal right of fundamental importance such as the right to testify."  *Jordan v. Hargett*, 34 F.3d 310, 314 (5th Cir. 1994).  The right to testify on one's own behalf is secured by the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and is a necessary corollary to the Fifth Amendment's guarantee against self-incrimination.  *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987).  Only the accused may waive his constitutional right to testify, and such a waiver is valid only if it is knowing and voluntary.  *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002), *cert. denied*, 541 U.S. 1031 (2004).

Here, because Fields was proceeding *pro se* and clearly notified the Court of his desire to express his innocence, the Court should have directly addressed Fields to determine whether he was aware of his right to testify.  A direct colloquy between the Court and a *pro se* defendant concerning the right to testify is a practice the Fifth Circuit described as "a model of appropriate judicial concern for the constitutional rights of a criminal defendant."  *Hollenbeck v.*

*Estelle*, 672 F.2d 451, 452 (5th Cir.), *cert. denied*, 459 U.S. 1019 (1982).  Because Mr. Fields represented himself, the Court had "an affirmative duty" to inform Fields of his constitutional right to testify in his own defense.  *Morales v. Maryland*, 600 A.2d 851, 854 (Md. 1992).  Acting *pro se*, Mr. Fields cannot be presumed to know of his constitutional right to testify, and thus cannot be found to have knowingly and voluntarily waived it.  *Id.*  Instead, the Court was duty-bound to "clearly explain" Fields' right to offer his own testimony and "to clearly make a record of the explanation."  *Winkelman v. Indiana*, 498 N.E.2d 99, 101 (Ind. Ct. App. 1986); *United States v. Boyd*, 586 A.2d 670, 677 (D.C. Cir. 1991) ("Once the trial judge became aware that Boyd was asserting that she had wanted to testify, the judge had a duty to determine whether she had made a knowing and intentional waiver.").

Here, the Court relied only on an exceedingly brief discussion with Fields' standby counsel – without Fields present – to determine whether Fields intended to testify.  TT at 1914:13-19.  The Court never addressed – with standby counsel or Fields – whether Fields was aware of his right to testify.  The Court's failure to directly discuss with Mr. Fields his constitutional right to testify was contrary to the Fifth Circuit's express mandate to avoid uncertainty regarding the waiver of such an important right:

> uncertainty in this area could be avoided if counsel would obtain a signed statement from the defendant **or if trial courts would conduct a colloquy and obtain outside of the jury's hearing, a statement on the record from the non-testifying defendant that he is aware of his right to testify and has chosen voluntarily to waive that right**.

*Jordan*, 34 F.3d at 314-15 (emphasis added).  The Fifth Circuit's mandate is designed to prevent precisely the type of situation where, as here, a *pro se* defendant is uncertain about his right to testify, wanting to testify but erroneously believing that it is procedurally impossible to do so in a way that was not awkward and confusing to the jury.

The Court's reliance on standby counsel to assert Fields' rights is especially troublesome given the repeated disagreements (and asserted conflicts of interest) between Fields and standby counsel regarding defense strategies. TT at 13:9-14:5, 21:22-22:6, 1680:1-17. The Court was unquestionably aware of these conflicts:

> THE COURT: What's your conflict of interest, Mr. Fields?
>
> MR. FIELDS:   The conflict of interest is it's my attorneys objective to try to fight to get me a life sentence. I'm not trying to get no life sentence when I'm innocent, man. I want a not guilty.

TT at 1684:14-18. Additionally, Fields made his desire to testify apparent through his conduct. The Court acknowledged as much by striking twenty of Fields' examination questions as improper attempts to testify. *See, e.g.,* TT at 1676:4-5 ("That's your attempt to try to testify without actually taking the stand and be under oath"); *see also* TT at 1334:9-11, 1358:13-15, 1360:2-4, 1360:9-10, 1371:20-23, 1546:12-14, 1575:9-12, 1624:15-18, 1626:14-17, 1641:1-3, 1652:1-4, 1676:3-8, 1747:8-10, 1752:8-11, 1779:22-24, 1781:9-12, 1782:1-3, 1796:8-11, 1899:11-13, 1926:2-4. Regardless, the Court never advised Fields of his right to testify or ascertained whether his waiver of that right was voluntary.

The Court's awareness of Fields' conflicts with standby counsel, his apparent desire to testify, and his desire to assert his innocence are exactly the type of circumstances where, even on behalf of a defendant represented by counsel, "judicial interjection through a direct colloquy with the defendant may be required to ensure that the defendant's right to testify is protected." *United States v. Pennycooke*, 65 F.3d 9, 12 & n.2 (3d Cir. 1995) (requiring such circumstances for defendants represented by counsel, yet reserving decision on whether trial courts have affirmative, independent duty to grant *pro se* defendants an on the record colloquy). These circumstances, in addition to Mr. Fields' self-representation, required the Court to ensure that Fields' waiver of his right to testify was knowing and voluntary.

The prejudice to Fields from the Court's failure to ensure a knowing and voluntary waiver of the right to testify is clear:  Fields never took the stand as a witness on his own behalf.  Accordingly, the jury never heard Fields' testimony or his version of the events – testimony that would have contradicted nearly every one of the Government's witnesses and supported his innocence defense.  The jury, therefore, could not consider that testimony in their deliberations.  This prejudice would be manifest even if Fields was actually able to introduce his version of events through the various questions to witnesses that the Court characterized as attempts to testify – which he was not.  Regardless, witness questions cannot substitute for an opportunity to present his sworn testimony to the jury as a witness in his own defense:

> The testimony of a criminal defendant at his own trial is unique and inherently significant . . . .  When the defendant testifies, the jury is given an opportunity to observe his demeanor and to judge his credibility firsthand.  As the United States Supreme Court noted in *Rock v. Arkansas*, [483 U.S. 44, 52 (1987)], "the most important witness for the defense in many criminal cases is the defendant himself."  Further, **in a case such as this where the question was not whether a crime was committed, but whether the defendant was the person who committed the crime, his testimony takes on even greater importance.  Indeed, '[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance."**
> *United States v. Walker*, 772 F.2d 1172, 1179 (5th Cir. 1985).

*Nichols v. Butler*, 953 F.2d 1550, 1553-54 (11th Cir. 1992) (emphasis added).  Because the nature of the defendant's right to testify is of supreme importance, "the trial judge's failure to hold a hearing to determine whether [the defendant] had waived her right to testify cannot be deemed harmless error."    *Boyd v. United States*, 586 A.2d 670, 677-78 (D.C. 1991).[16]

---

[16] Although certain claims based on the denial of the right to testify based on defense counsel error are subject to harmless error review (*see Wright v. Estelle*, 549 F.2d 971, 974 (5th Cir. 1977), *cert. denied*, 439 U.S. 1004 (1978)), in claims based on a trial court's interference with a defendant's right to testify, such as in not questioning a *pro se* defendant *sua sponte* about whether he voluntarily waived his right to testify, courts have implied that violation of

Accordingly, Mr. Fields was denied his right to testify in violation of the Fifth, Sixth and Eighth Amendments, requiring a new trial.

## VI.    CLAIMS RELATED TO GUILT PHASE EVIDENCE

CLAIM 15:    MR. FIELDS' CONVICTION AND DEATH SENTENCE VIOLATE THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HE IS INNOCENT OF THE MURDER OF SUNCEREY COLEMAN AND HIS CONVICTION RESTS ON FALSE TESTIMONY.

### A.    Facts

Mr. Fields is actually innocent of the murder of Suncerey Coleman. He did not kill her, did not attempt to kill her, and was in no way culpably involved in the events that resulted in her death.

Appreciating the potential merit of this claim requires the Court to closely examine the many contradictions and inconsistencies in the testimony presented by the Government, upon which Mr. Fields' conviction presently rests. Many of those flaws were not effectively presented to the trial jury due to Mr. Fields' understandable deficiencies in representing himself in court. Such scrutiny powerfully demonstrates the fragility of the case against Mr. Fields. The case against Mr. Fields was the proverbial house of cards—a case based on unreliable informant testimony, which when closely examined reveals numerous underlying untruths.

The following is not an exhaustive recitation of the holes in the Government's case, or the misconduct of Government agents that contributed to the presentation of unreliable evidence to the jury, but instead is a representative sampling that highlights the weakness of key

such a duty by the trial court may constitute a structural defect. *See Mullins*, 315 F.3d at 452 ("We distinguish between interference with that right by defense counsel, and interference by the court or prosecutor"); *Sayre v. Anderson*, 238 F.3d 631, 634 & n.2 (5th Cir. 2001) (finding that because petitioner only challenged his counsel's actions and did not contend that the trial court or prosecutor interfered with his right to testify, "we need not elaborate further on this point").

parts of the case against Mr. Fields and demonstrates the importance of subjecting to the most exacting scrutiny the procedures that led to his conviction and death sentence. In addition, further investigation and comprehensive development of the facts in this 2255 proceeding – including, *e.g.*, forensic testing of evidence where possible – will further substantiate Mr. Fields' claim of actual innocence.

The basic facts of the allegations against Mr. Fields are simple. It is alleged that he drove the victim to a remote location where he shot her. It is then alleged that Mr. Fields made his guilt known —apparently to anyone who would listen, even apparently shouting out his guilt to fellow prisoners in a manner that would have easily been heard by numerous jail personnel. The simple fact that no unbiased witness was produced by the Government only begins to show Fields' innocence.

### 1. The Forensic Evidence Establishes Fields' Innocence

However, the starting point for this claim is the fact that no physical evidence whatsoever links Mr. Fields to the crime. Forensic examination and testing of the red Grand Am that Mr. Fields is known to have been driving on the night of Ms. Coleman's disappearance produced no inculpatory evidence whatsoever. That night, Mr. Fields was wearing pants which had been cut off to make shorts. The area where Ms. Coleman's body was found had huge thorns that would have gouged anyone so dressed who encountered them. According to Government witnesses Scroggins and Outley, they and Mr. Fields were together in the Grand Am before Outley dropped off Scroggins and Mr. Fields at the New Road Inn. Scroggins falsely claimed that after Outley left, she noticed that Mr. Fields had blood on his clothes and shoes. Had Mr. Fields killed Ms. Coleman, both their blood would have been found in the red Grand Am. Mr. Fields did not change cars on the night of the crime. The floor mats were still in the Grand Am when it was processed for evidence, and the Grand Am was not painstakingly cleaned

("detailed") before it was recovered by the authorities. Even if the vehicle had been "detailed," blood evidence would still have been discernible. No blood was found in the car. Mr. Fields was uninjured.

Scroggins and Outley drove a gold Jaguar automobile on the night of the murder. Suspiciously, this Jaguar was never forensically examined or tested because Scroggins and Outley conspired to hide it by telling investigators that it was blue rather than gold. Payne, the Jaguar's owner, testified at trial that the Jaguar was gold and had already told investigators the same thing just three months earlier. Nevertheless, the Government attempted to persuade the jury that Outley and Scroggins had been in a blue Jaguar. Upon information and belief, the Government had reason to know this claim was false. Investigators first confronted Outley with the name "Payne" when they arrested him on November 13. Outley eventually told them, falsely, that Payne was the owner of a *blue* Jaguar, in an attempt to avoid having the gold Jaguar found. That blue Jaguar in fact had been wrecked and totaled in 1998 and no longer even existed in 2001.

Law enforcement initially believed that Ms. Coleman had been murdered with a .22, and worked to link Mr. Fields to that weapon. Buccal swabs and a blood samples were obtained from Mr. Fields the night he was arrested. The detective who took the swabs falsely claimed to have found Mr. Fields' blood on the .22. When Mr. Fields was arrested, he had no sign of any injury that should have left his blood on that weapon.

### 2.    The False Testimony of the Scroggins and Outley

However, the most critical false testimony was that of Ms. Scroggins and Mr. Outley. Government witness Shalaykea "Lakie" Scroggins was romantically obsessed with Mr. Fields at one time. Scroggins was frustrated and angry at having lost Mr. Fields to Ms. Coleman. She vowed not to let it happen again, even if that meant killing rivals for his

affection.  The day before the murder, Mr. Fields and Ms. Coleman took action together to have the phone company turn off a phone that Scroggins had gotten in Mr. Fields' name, because Scroggins had called Ms. Coleman and threatened her.

Scroggins gave two different alibis for her whereabouts on the night of the murder after Mr. Fields dropped her off – once claiming that she went to the store while Outley looked for Mr. Fields, and once claiming that she went to her sister's house and went to sleep, while Outley went to his apartment with her other sister, Alberta Hampton.  Both stories were false. Scroggins told at least three different and irreconcilable stories about what Mr. Fields purportedly told her about the crime.  Scroggins first alleged that Mr. Fields called her and told her the details of the murder.  Scroggins later claimed she met Mr. Fields in a car he was driving, and he made inculpatory statements in response to her question about Ms. Coleman.  Still later, Scroggins claimed that Mr. Fields had confessed to her in her apartment around November 8. None of these stories was true.

Scroggins falsely claimed to have known that Ms. Coleman was missing on November 7 because it was on the newsstand; the news of Ms. Coleman's disappearance had not been published at that time.  Scroggins falsely claimed that Mr. Fields possessed a small silver .32 pistol that belonged to her sister Alberta Hampton; Hampton told the grand jury she'd never seen such a weapon.  Scroggins falsely alleged that Mr. Fields called her at 8:00 p.m. on November 15 and told her the details of the murder; her phone records reflect no such call. Scroggins was then induced to change her testimony to assert, falsely, that the call was made to her sister's house.  The Government compounded the harm from this testimony by offering misleading arguments to the jury about the significance of phone records.

Post-conviction counsel has been attempting to locate and interview Ms. Scroggins, so far to no avail.

The claims of prosecution witness Edward "Trey Boy" Outley, like those of Scroggins, are marked by gaps, inconsistencies, contradictions, and outright lies. Outley falsely alleged that Christian "Chae" Walker left him a .32 gun to take to Mr. Fields; Walker said Outley wanted the gun for his own protection. Outley falsely claimed he gave that gun to Scroggins' sister Alberta Hampton; she denied ever seeing it. Outley gave multiple, false, inconsistent accounts of his own activities on the night of November 6. Outley falsely claimed both that *Mr. Fields called him* and admitted the murder, and that *he called Mr. Fields* and asked him, prompting a confession. Outley falsely asserted that the Government had made him no promises; Outley was granted full immunity for his testimony.

Outley wrote a letter to Mr. Fields' attorney Peterson, saying that he (Outley) had not given Mr. Fields a gun and that someone wanted Outley or Scroggins to say they were with Mr. Fields when Ms. Coleman was killed. Outley's subsequent testimony at trial that Mr. Fields had wanted him to write that letter, and that Outley did so because he feared being tagged as a "snitch" at USP Beaumont, was false. Outley told William Young that he (Outley) was present when Ms. Coleman was murdered. Outley wanted a romantic relationship with Scroggins and wanted Fields out of the way. Outley included Scroggins in every deal he attempted to make with the government. Both Outley and Scroggins have violent tempers.

Mr. Outley recently told counsel that he testified for two reasons. First, he stated that he had been given complete immunity from any charge. *See Affidavit of Edward Outley III.* If so, the Government's actual grant of immunity exceeds what was disclosed to Fields. Next, Outley later told counsel that he believed he would be prosecuted for murder if he did not allege that someone else committed the crime. Outley ultimately chose his own self-interest over the truth.

Mr. Fields had never been violent or threatening toward Ms. Coleman and did not become angry or irate when he came into contact with her. He did not threaten to kill her, attempt to control her, or express jealousy about her relationships with other men. Ms. Coleman, unlike Scroggins, visited Mr. Fields often when he was in jail. Before Ms. Coleman was known to have died, Tanesha Hilliard told the local paper that Mr. Fields had not appeared angry when he came to the hospital.

### 3.    Jail-house Informants Gave False Testimony

At trial, the Government presented the testimony of numerous jail inmates who claimed to have obtained information about Mr. Fields' case while incarcerated with him. Upon information and belief, these inmate witnesses were promised benefits in return for their testimony against Mr. Fields, and these promises induced the witnesses to make materially false accusations against Mr. Fields. Because these witness were not telling the truth, many of the witnesses made inconsistent statements regarding important points of fact, both prior to and during Mr. Fields' trial. Some of the inconsistent pretrial statements were provided to the defense prior to trial, but others were not. The Government improperly failed to disclose all information regarding its witnesses that it was required by law to make available to the defense.

Many of the Government's inmate witnesses also communicated with one another prior to and concerning their testimony against Mr. Fields. The Government was, or should have been, aware that these witnesses were providing false testimony. These witnesses included, but were not limited to, the following:

Inmate witness Jerry Reed falsely *alleged* that Mr. Fields had confessed to him while in segregation at a federal facility in Fort Worth that he was responsible for the murder but planned to blame Scroggins and Outley. Reed had been in custody with "Shae" Walker at/after

the time Walker was corresponding with Scroggins; upon information and belief, Scroggins fed Walker the version Walker then passed along to Reed.

Three times prior to trial – on December 5 and 6, 2001, and in February 2002 before the grand jury – Christian "Chae" (also "Shay" or "Shae") Walker avowed that Mr. Fields never claimed to have killed Ms. Coleman, though he (Walker) thought that Mr. Fields might have done something to her. Between making those statements and January 2004, Walker corresponded with Scroggins. In that correspondence, upon information and belief, Scroggins suggested how Walker could testify against Mr. Fields in a manner that would help himself. In January 2004, Walker changed his story and falsely testified, reciting a story similar to Scroggins', that Mr. Fields had confessed to him. Walker falsely claimed that he didn't tell the truth at first because he didn't want to put his family in jeopardy. At trial, Walker denied having talked to Outley "about this case;" yet, he admitted to the grand jury that Outley had told him that he (Outley) had given a .32 gun to Mr. Fields.

Walker also falsely claimed at trial that he had been driving over a bridge in a red Chevy Cavalier with Mr. Fields and Alvin "Bird" Fields when "Bird" allegedly threw a .32 gun into the river – a claim absent from any of Walker's prior statements. The bridge in question is a location Outley knew well, as it was a route he regularly traveled to his mother's residence. Walker and Outley were in contact when Walker came up with this story about disposing of the .32 at that location. Upon information and belief, Outley suggested this false story to Walker. Counsel has interviewed Alvin "Bird" Walker who flatly denies Walker's version of events. "Bird" will testify at an evidentiary hearing that Walker's testimony was mistaken at best, perjury at worst.

Friends Dominique Tubbs and Christopher Quigley, jailed in the same drug case, shared a small cell with Mr. Fields. Both falsely claimed to have heard Mr. Fields threaten to

kill Suncerey Coleman while talking to her on the phone. Prior to trial, Quigley falsely swore that Mr. Fields had told him that he (Fields) intended to kill Ms. Coleman. Quigley later changed his story, falsely insisting instead that he had overheard Mr. Fields making threats against Ms. Coleman while talking to her on the telephone. Quigley and Tubbs disagreed about how frequently Mr. Fields and Ms. Coleman supposedly fought on the phone and whether Mr. Fields had threatened Ms. Coleman in conversations with them. Tubbs falsely claimed he didn't know Ms. Coleman had been killed until he read it in the newspaper; that article was published December 12, 2001. Quigley stated that a police officer told him *and* Tubbs about the murder sometime between November 6 and 24. Neither Tubbs nor Quigley could provide useful information when they were interviewed twice by different sets of U.S. Marshals on November 7. Upon information and belief, Tubbs and Quigley only obtained the information they would later use in testifying falsely against Mr. Fields via coaching by Detective Steve January and/or other agents of the prosecution after November 7.

Inmate Homero DeLeon, wrote a letter on February 12, 2003, falsely claiming that Mr. Fields had told him that since he (DeLeon) was not on the Government's witness list, Mr. Fields would confess to him. At that time there was no witness list; the list was produced in January 2004. DeLeon's letter contains errors of fact which resulted from his having gotten false information about Mr. Fields from other inmates. By November 2003, DeLeon had been transferred to the same prison where "Chae" Welker was confined. DeLeon made false statements to Government agents who interviewed him there, including claiming to have been Mr. Fields' cellmate and to have passed Mr. Fields cigarettes by and through co-defendant Benny Garrett. DeLeon also falsely alleged that Mr. Fields had confessed to him across the hallway; in that facility, there were always at least three officers and ten to twenty other inmates present in that area, and any such communication between DeLeon and Mr. Fields would have

been observed or overheard by other witnesses.   No such witnesses exist because no such communication took place.

At trial, DeLeon changed his story substantially.   He falsely alleged that Mr. Fields had told him that Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, and Andrea Sykes had gone to the grand jury to testify against him, when in fact all five of those individuals had gone to the grand jury to provide information against co-defendant Garrett.   Upon information and belief, DeLeon was coached by Government agents and/or attorneys prior to testifying against Mr. Fields.   Upon further information and belief, much of DeLeon's story originated with "Chae" Walker.   Casey Leon Forge, incarcerated with Walker and DeLeon, obtained from Walker some of the same (false) details included in DeLeon's account.

### 4.    Other False Accusations

Other Government witnesses also testified falsely, and the Government was, or should have been, aware that their testimony was false.   For example, Tammy Edwards falsely accused Mr. Fields of having taken her car at gunpoint.   Although she said in the initial police report that she thought she had previously seen her assailant on television, she later swore in a civil deposition that she had recognized the carjacker as Mr. Fields all along, because his picture had been on fliers all around the hospital.   Ms. Edwards' testimony also shifted regarding whether the carjacker had shot at her.   Although Ms. Edwards purportedly "identified" Mr. Fields as the carjacker from a photo array on November 27, 2001, twelve days earlier police had *twice* shown her a single photograph of Mr. Fields.   In her initial report, Ms. Edwards claimed that she screamed and yelled throughout the carjacking and that it took place during shift change at the busy hospital where she worked.   At trial, however, she claimed she had been choked so hard by the carjacker that she couldn't cry out, and no witness from the hospital could corroborate her carjacking story.   Ms. Edwards had a financial motive to accuse Mr. Fields; she

hoped to attend college with the damages she hoped to win from Civigenics.  At one time, Ms. Edwards was married to Darryl Edwards, who had pleaded guilty to capital murder to avoid the death penalty.  Mr. Fields had no friends or other relatives living close to Hillcrest Hospital, a middle and upper-class neighborhood, and never "staked out" that location.

Ex-U.S. Marshal McNamara falsely testified that when Mr. Fields was arrested, Mr. Fields told him that he had a .22 and where to find it.  Another officer reported that at the scene, Mr. Fields was asked only his name, address, and birth date.  During trial, standby counsel advised Mr. Fields not to question McNamara, but to wait until the Government called Hubert Steadman – in whose home Mr. Fields was arrested, who claimed to have told the Marshals that Mr. Fields had the .22, and who actually located the gun – but the Government never called Steadman.

As noted, this is not yet a comprehensive accounting of the facts in support of Mr. Fields' claim of actual innocence, but demonstrates the severe shortcomings in the Government's case for his guilt.

## B.  **Argument**

The Fifth Amendment's guarantee of due process and the Eighth Amendment's prohibition on cruel and unusual punishments are both violated by the incarceration or execution of a prisoner, like Mr. Fields, who can make a persuasive post-trial demonstration that he is actually innocent of the crime for which he was convicted and sentenced.  *See*, *e.g*., *Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J., joined by Kennedy, J., concurring); *id.* at 429 (White, J., concurring); *id.* at 430 (Blackmun, J., joined by Stevens and Souter, JJ., dissenting); *House v. Bell*, 547 U.S. 518, 554-55 (2006); *United States v. Nobles*, 422 U.S. 225, 230 (1975) ("The dual aim of our criminal justice system is 'that guilt shall not escape or innocence suffer'"); *see also Herrera*, 506 U.S. at 398 ("[T]he central purpose of any system of criminal

justice is to convict the guilty and free the innocent"). Moreover, a conviction based on false testimony, whether or not the Government actually knew or should have known the testimony was false, violates due process. *See*, *e.g.*, *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (knowing presentation of false testimony violates due process); *Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957) (due process violated where prosecutor's examination of witness created "false impression" of material fact).

The Fifth Circuit has not yet embraced the view, adumbrated in *Herrera*, that the Constitution prohibits convicting or executing an actually innocent person. *See, e.g.*, *Moore v. Quarterman*, 534 F.3d 454, 465 n.19 (5th Cir. 2008) (no federal habeas relief based on a claim of actual innocence). However, at least two Fifth Circuit panels have acknowledged that the Supreme Court's decision in *House* suggests that a "stand-alone" claim of actual innocence, supported by strong evidence, could require federal habeas relief. *See Reed v. Quarterman*, 504 F.3d 465, 476 (5th Cir. 2007), *rev'd and remanded*, No. 05-70046, 2009 WL 58903 (5th Cir. Jan. 12, 2009); *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 2099 (2007). In light of the many other federal courts that have reached that same conclusion,[17] and given the overriding importance of correcting a fundamentally unjust incarceration, Mr. Fields respectfully submits that the Court should entertain his claim and grant relief, and to that end asks that the Court empower him to develop the relevant facts fully. At a minimum,

---

[17]    *See*, *e.g.*, *Osborne v. District Att'y's Office for Third Jud. Dist.*, 521 F.3d 1118, 1130-31 (9th Cir.) (Ninth Circuit has "assumed that freestanding innocence claims are possible," although they require a prisoner asserting such a claim to "affirmatively prove" innocence), *cert. granted*, 129 S. Ct. 488 (2008); *House v. Bell*, 311 F.3d 767, 768 (6th Cir. 2002), *cert. denied*, 539 U.S. 937 (2003); *Milone v. Camp*, 22 F.3d 693, 699-700 (7th Cir. 1994) ("The Supreme Court appears to be willing to hold that it is unconstitutional to execute a 'legally and factually innocent person' . . . while at the same time suggesting that [such a claimant's] evidentiary burden . . . would necessarily be extraordinarily high") (citations omitted), *cert. denied*, 513 U.S. 1076 (1995); *Ex parte Elizondo*, 947 S.W.2d 202, 204 (Tex. Crim. App. 1996) (*Herrera* makes it "clear" that either incarcerating or executing an innocent person would violate due process).

such proceedings are necessary to enable meaningful review of Mr. Fields' actual innocence claim at the Court of Appeals or in the Supreme Court.

CLAIM 16:    ON INFORMATION AND BELIEF, MR. FIELDS' FIFTH, FOURTEENTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE GOVERNMENT PRESENTED EVIDENCE AND TESTIMONY THAT IT KNEW OR SHOULD HAVE KNOWN TO BE FALSE.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claims above.  The prosecution's case against Fields relied almost exclusively on the testimony of individuals with motives to lie and manipulate their testimony in any manner necessary to protect their self-interests.  Many received a direct benefit from the Government in exchange for such testimony, providing a powerful motive to lie.  Moreover, much of the testimony against Fields was unsubstantiated, inconsistent with the facts alleged, inconsistent with the testimony of other witnesses, and often inconsistent with the prior statements of the witnesses themselves.  As such, most of this testimony is unreliable.

To the extent the Government knew, or should have known, that any of this testimony was unreliable, yet still presented, solicited or failed to correct it, Mr. Fields is entitled to a new trial.  It is well established that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Curran v. Delaware*, 259 F.2d 707 (3d Cir. 1958)).  The Supreme Court has held that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. at 269 (citing *Alcorta v. Texas*, 355 U.S. 28 (1957)).  Indeed, when the prosecution knowingly presents even partially false evidence, such conduct corrupts the "truth seeking function of the trial process." *United States v. Vozzella*, 124 F.3d 389, 392-93 (2d Cir. 1997) (citing *Agurs*, 427 U.S.

at 104). At the very least, given all the unreliable and conflicting testimony presented at trial, Mr. Fields is entitled to an "evidentiary hearing for the express purpose of clarifying the conflicting evidence and the making of all relevant fact-findings." *See Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994) (where the record did not reflect whether a witness had a deal with the government and that witness, among others, were the only sources of evidence linking the defendant to the crime the court ordered a remand).

CLAIM 17:    MR. FIELDS WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS DUE TO COUNSELS' FAILURE TO CONDUCT A COMPETENT INVESTIGATION INTO THE FACTS OF THE CHARGED HOMICIDE.

A.    **Facts**

For more than two-years before trial, Fields was represented by appointed counsel, Mr. Peterson and Mr. Swanton. During that time, counsel failed to conduct a reasonable investigation into Fields' case. Counsel failed to make any formal discovery demands on the Government, instead relying only on "open file" discovery. TT at 29. Counsel also failed to interview key witnesses including: (i) a potential eyewitness; (ii) a witness who the Government identified as having potentially exculpatory information; (iii) many witnesses from the Government's witness list who eventually testified against Fields at trial, and; (iv) many witnesses that Fields identified as potentially beneficial to his defense. In fact, it appears that counsel interviewed only four of the fifty-nine witnesses who eventually testified on behalf of the Government – fewer then 7% of the Government's witnesses.

For example, the Government's witness list identified 120 potential witness against Fields. Based on a record review, it appears counsel interviewed only eight. There is no record of counsel conducting any investigation at all for thirty-one of these 120 witnesses. One of these thirty-one, Mike McNamara, actually testified at trial.

For seventy-three of the 120 potential government witnesses, counsel merely conducted a document review without any record of an interview. Fifty-four of these witness testified at trial, including: Steve Salazar, Kevin Lamar Burton, Dominique Tubbs, Christopher F. Quigley, Chris Casson, Parnell McNamara, Doug Kunze, Katherine Long, Jill Urban, Silvia Reyes, James Blair, Steve January, Robert Fuller, Michael Alston, Benjamin Rush, Alvin Eugene Brown, Tammy Edwards, Tanesha Hilliard, Tiemika Simmons, Roger Dale Thomison, Ben Burch, Stephen Smith, Morris "Bubba" Colyer, Roy Davis, Misty Smallwood, John Allen Mercer, Lela McMillon, Babe Torres, Jerry Keith Reed, Homero Deleon, Jacqueline Harris, Tim Counce, Steve Graeter, Andrew Degnan, Debra Lynn Kilgo, Bobbie Shelton, Lynn Shaw, Julie Evans, Jimmy Stone, Amrad R. Patel, A.P. Merrillat, Thomas Warren, Joe Hunter, Josalyn Rawlins, Richard Coons, Chris Eubank, Michael Hutchinson, Amber Aguirre, Stephen Johnson, Thomas Giebe, Jerry Slaughter, Raymond William Bell, Jr., Daniel L. Tichenor, and David Sweeney.

For the remaining eight potential government witnesses, there are records indicating some attempt to make contact but no actual interview.

Accordingly, despite a defense investigation lasting nearly two years, counsel's records indicate interviews with only four of the fifty-nine witnesses who eventually testified against Fields at trial: Shalaykea Scroggins, Nathan Andre Lloyd, April Fields, and Robert Campos. Moreover, Fields identified over seventy additional potential witnesses who did not appear on the Governments witness list. It appears counsel failed to interview all but eighteen.

Most significantly, counsel's files indicate that they failed to interview witnesses that were absolutely critical to Fields' defense. For instance, counsel did not interview Renee "Na-Na" Alberta Hampton, who Fields contends was an eyewitness to the crime. Ms. Hampton was the only potential eyewitness who did not testify at trial and who was not otherwise facing

prosecution.   Instead, counsel merely reviewed records of Ms. Hampton's statements to law enforcement.   Had counsel interviewed Ms. Hampton, she could have provided powerful testimony contradicting the Ms. Scroggins and Mr. Outley and supporting Fields' defense that Scroggins was the actual killer.   Although counsel's records indicate that Ms. Hampton refused to speak to the defense investigator, Don Youngblood, counsel should have – but did not – subpoena Ms. Hampton.   Moreover, counsel did not interview Edward Outley III, who Fields asserted was an accomplice to the actual killer, Shalaykea Scroggins.   Similarly, counsel did not interview Debra Alexander, a witness that the Government identified as one who could corroborate Fields' defense that Scroggins was the actual killer.   Had counsel interviewed Ms. Alexander, she could have provided powerful support to Fields' defense.

These investigative failures, in addition to communication problems between counsel and client and the effects of Fields' mental illness, sponsored a steadily deteriorating attorney-client relationship.   Based in part on these deficiencies, Fields made several motions for substitute counsel or to proceed *pro se* almost from the beginning of the attorney-client relationship.   For example, Fields moved for permission to represent himself on September 25, 2002, stating that he had "an intense fear of going to trial with court appointed counsel." *See* Exh. M at FIELDS 004219 ¶ 2.   On March 4, 2003, Fields again moved to proceed *pro se* citing a conflict of interest with appointed counsel and explaining that counsel was denying him access to discovery material that could disprove the Government's case. *See* Exh. N at FIELDS 004220 at ¶¶3-4.   On April 30, 2003, Fields withdrew his motion to proceed *pro se*. *See* Exh. O at FIELDS 004222.   On August 12, 2003, Fields wrote a letter to the Court, indicating that as of that date he had "come to the realization that the attorney client relationship between me and my two court appointed attorneys, Scott Peterson and Rob Swanton is'nt [sic] working and that our interests is'nt [sic] the same." *See* Exh. P at FIELDS 000229.   In that letter, Fields asked the

Court to reconsider his motion to appear *pro se*. *Id*. at FIELDS 000230. On September 2, 2003, over a year after Fields' first request to remove appointed counsel, the Court held a hearing on Fields' renewed motion. During that hearing, Fields withdrew his motion stating:

> I just want to say at the time that I compose that I was frustrated – you know what I'm saying – and I'm not too enthusiastic about my legal team, but I realize that to try to change lawyers or represent myself at this point would be a grave misstate. So I'm just going to stick with them and try to do the best that I can.

*See* Exh. Q at FIELDS 009873. At this hearing, the Court warned Fields that "if he decides to complain about his attorneys in the future it would not delay or continue his trial date." *Id.* at 009872-73. On or about December 19, 2003, three weeks before trial, counsel met with Fields where, yet again, counsel and client disagreed on trial strategy. Accordingly, Fields filed another motion arguing that he cannot place his life in the hands of attorneys that are not looking out for his best interest. *See* Exh. R at FIELDS 022808.

Just about two weeks later, and only four days before trial began, counsel meet with Fields again. At this meeting counsel informed Fields – for the first time during a tumultuous two-year relationship – that in 1987 Mr. Peterson was a McLennan County district attorney and was involved in a delinquency action against Fields when he was twelve. Despite the fact that counsel claims his prior representation did not present a conflict of interests, counsel requested that Fields sign a conflict waiver. Fields refused to sign and, on the first day of trial, January 9, 2004 filed a motion to proceed *pro se*, citing a conflict of interest. That same day, the Court held a hearing on the motion.

During the hearing, Swanton explained that the apparent conflict was only discovered "[f]airly recently." TT at 9. Swanton also suggested that Peterson be called to testify as to the nature of the apparent conflict. TT at 10. Although the Court agreed that there "would probably be some benefit" to Peterson's testimony on the issue, Peterson was never called to

testify.  TT at 10.  The Court did address Fields, asking why he wanted to replace his counsel.

Fields confirmed, among other issues, that counsel's investigation was inadequate:

> appointed counsel now, their actions are suspicious and I think they're working with the prosecutor instead of working for me and **I've asked on several different occasions for documented evidence to no avail.  Also there are sure fired ways to prove that several other witnesses are lying and my attorneys refuse to pursue it.**  They prepared a strategy to lessen the impact in an attempt to try to get me a life sentence when I repeatedly profess my innocence.  My view is that when you're innocent, life is no better than death.  I've tried to work with my attorneys.  I've even tried to compromise, but I can't take no more of their being unfair and completely unreasonable.  I like my attorneys both of them, but they put me in a no win situation.  Their strategy guarantees me the death penalty.  And if I have to go to court with them, I might as well do it myself.

TT at 13-14.  Ultimately, the Court advised Fields that the matter had progress too far to stop at this point, and denied Fields' request for replacement counsel, causing Fields to proceed *pro se.*

## B.    Appointed Counsel's Ineffective Defense Investigation Undermined the Proper Functioning of Fields' Trial

The right to effective counsel "is critical to the ability of the adversarial system to produce just results."  *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  Counsel is constitutionally ineffective when their "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Id*. at 686.  An ineffective assistance claim has two components:  A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."  *Id.* at 687-88.

Fields' counsel fell well below an objective standard of reasonableness by failing to interview several witnesses critical to the defense – Rene Hampton, a potential eyewitness,

Edward Outley, who Fields contends was an accomplice to the crime, and Debra Alexander, who the Government indicated had information placing Scroggins at the scene of the crime. These failures are inexcusable for two reasons. First, counsel had a duty to contact all critical witness and "ascertain whether their testimony would aid the defense." *Bryant v. Scott* 28 F.3d 1411, 1415 (5th Cir. 1994) (citation omitted), *cert. denied sub nom.*, 522 U.S. 1128 (1998); *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003) (in context of failure to interview eyewitness "counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary.") (emphasis in original; citation omitted). Controlling Fifth Circuit precedent demonstrates that the "failure to interview eyewitnesses to a crime may strongly support a claim of ineffective assistance of counsel." *Bryant*, 28 F.3d at 1415 (*citing Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982) (failure to investigate crucial witness may constitute inadequate performance), *cert. denied*, 461 U.S. 910 (1983)); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[T]his circuit has recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case").

Second, failure to interview critical witnesses – such as the eyewitnesses, codefendants and alibi witnesses – cannot be excused as "strategic decision." The Fifth Circuit "squarely rejected" this very argument:

> [I]n *Bryant*, we squarely rejected the argument made by the State here – that a failure to interview witnesses is excusable as "a strategic decision" if the witnesses would not have been credible. Acknowledging that a lack of credibility might support a strategic decision not to call a witness to testify at trial, we explained that a witness's character flaws cannot support a failure to investigate. Without so much as contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness."

*Anderson*, 338 F.3d at 392 (5th Cir. 2003) (emphasis in original; citations omitted).  Indeed, the Fifth Circuit has established that "[i]n a claim grounded in failure to interview, the 'quality' and potential persuasiveness of the eyewitness is largely immaterial; indeed, *if* trial counsel had interviewed [the witness], [s]he might well have proven to be the 'cornerstone' of the defense." *Id.* at 393 (emphasis in original).  Interviewing potentially critical witnesses is so important that counsel must do so whenever their existence is discovered, even if that was "on the first day of trial."  *Bryant*, 28 F.3d at 1417.  Here, it appears that counsel was aware of three potentially critical defense witnesses for more then a year before trial yet failed to interview any of them. As in *Nealy* where that court found a "'factual vacuum' [that] cannot withstand sixth amendment scrutiny," counsel here "'did not choose, strategically or otherwise, to pursue one line of defense over another.  Instead, he simply abdicated his responsibility to advocate his client's cause.'" 764 F.2d at 1178 (citation omitted).

Like the counsel found deficient in *Bryant* and *Anderson*, Fields' counsel conducted a constitutionally ineffective defense investigation by failing to interview a potential eyewitnesses and the person Fields contends was the real killer's accomplice and a person whose testimony could have placed Scroggins at the scene of the crime.  Like the counsel found deficient in *Bryant* and *Anderson*, Fields' counsel knew of their clients desire to mount an innocence defense and knew that the testimony of these individuals would be critical to that defense.  Like the counsel found deficient in *Bryant* and *Anderson*, Fields' counsel knew these facts well before trial, yet still failed to conduct any meaningful investigation.  Accordingly, like the counsel found deficient in *Bryant* and *Anderson*, there is no justifiable excuse for  Fields' counsel's deficient performance.

Moreover, Fields' counsel fell well below an objective standard of reasonableness by relying exclusively on document review and "open file" discovery of the State's investigative

work. *Bryant*, 28 F.3d at 1418 (investigation deficient where counsel "restricted his pretrial investigation to discussions with [defendant], review of the indictment against [defendant], and examination of the prosecutor's file"); *Anderson*, 338 F.3d at 392 (investigation deficient where counsel relied "exclusively on the investigative work of the State and based his own pretrial 'investigation' on assumptions divined from a review of the State's files"); *Crandell v. Bunnell*, 144 F3d. 1213, 1217-1218 (9th Cir. 1998) (attorney's "incompetency, however, lay in his failure to seek formal discovery, to investigate the crime, to interview witnesses and to develop a working relationship with" the client), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000). Here, counsel's records indicate that their investigation into seventy-three of the 120 witnesses on the Government's witness list limited to document review.[18] Fifty-four of these witness actually testified **against** Fields.

In sum, it appears counsel only interviewed four of the fifty-nine witnesses who testified on behalf of the Government at trial, or seven percent. As such, they failed to adequately investigate ninety-three percent of the witness who provided testimony against Fields – such an investigation falls well below an objective standard of reasonableness.

These investigative failures are inexcusable and prejudicial considering the extraordinary gravity of the a capital case in contrast to the weakness of the Governments' proof. Here, "there was no physical evidence connecting [Fields] with the crime" and testimony of the two witness Fields alleges are the actual killers, in addition to seven jailhouse snitch witnesses "was the cornerstone of the state's case in chief." *Bryant*, 28 F.3d at 1418. Accordingly, just like the defendant in *Bryant*, "information relevant to [Fields'] defense might have been obtained through better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have

---

[18]    For another thirty-one there is no record of any investigation at all.

made some effort to investigate the eyewitnesses' testimony." *Id.* (*citing Kemp v. Leggett,* 635 F.2d 453, 454 (5th Cir. 1981) (*habeas* relief granted where counsel failed to interview single eyewitness or character witnesses); *Gaines v. Hopper,* 575 F.2d 1147, 1149 (5th Cir. 1978) (affirming *habeas* relief where counsel failed to interview eyewitnesses)); *see also Anderson*, 338 F.3d at 393-94 (where no physical evidence linked defendant to the crime, and the state's case was based on eyewitness testimony the court held "[i]n light of this relatively 'weak' case, there is a reasonable probability that 'but for' trial counsel's failure to interview and call [critical witnesses] to testify, the result of the proceeding would have been different"); *Nealy*, 764 F.2d at 1179-80 (finding prejudice from ineffective assistance of counsel given that the verdict was "only weakly supported" by evidence other than the confessed murderer's testimony, and that "[s]uch a verdict 'is more likely to have been affected by errors than one with overwhelming record support'") (citations omitted).

Counsel's failure to adequately investigate prejudiced Fields in several ways. Because of counsel's failures, Ms. Hampton was not available to testify during Fields' trial. Accordingly, Fields was not afforded the opportunity to call her in an attempt to discredit the testimony of Scroggins and Outley. Similarly, Ms. Alexander was also not available at trial, and therefore Fields was deprived the opportunity to present the jury with her testimony linking Scroggins to the crime. Thus, counsel's failures "undermined the proper functioning of the adversarial process [such] that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *United States v. Cronic*, 466 U.S. 648, 659 (1984) (courts are required "to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial").

Moreover, counsel's investigative failures prejudiced Fields by depriving him of his right to counsel at critical stages of trial. Because of these failures Fields was "forced to

choose between incompetent counsel or no counsel at all." *Crandell*, 144 F.3d at 1215. When a defendant has "appeared *pro se* pretrial and told the judge that appointed counsel was inadequate" for failing to investigate, the court should inquire and, if it finds counsel overly relied on the state's investigation and document review, and failed to develop a working relationship with the client, the court should appoint new counsel. *Id*. at 1217-18. The trial court in Mr. Fields' case did not adequately inquire into the quality of counsel's investigation, despite the fact that counsel admitted to failing to seek formal discovery and that counsel's investigation was likely to seem inadequate to the client:

> [I]f I may enlighten the Court on one other issue, the government has bent over backwards in this case to provide us with discovery materials from the very git-go. They've provided us with copies of police reports, witness statements and everything, **and I can see how from a client's perspective that would look like defense lawyers are in cahoots with the prosecutors because we're cooperating on this thing to get ready for trial and we've tried to explain that to our client that just because we haven't pursued motions for discovery and that sort of thing**, it's because we're getting more than we're entitled to.

TT at 28-29. Had the Court inquired into the nature of counsel's investigation, it would have learned that counsel failed to interview key witnesses and relied too heavily on the Government's investigative files, and of discovery failures that fueled Fields' distrust of counsel. As such, Fields was prejudiced by the "[a]ctual or constructive denial of the assistance of counsel altogether [which] is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." *Perry v. Leeke*, 488 U.S. 272, 280 (1989) (*quoting Strickland*, 466 U.S. at 692). But for counsel's failures, there is a reasonable probability that the outcome of trial would have been different.

CLAIM 18:     THE GOVERNMENT FAILED TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Edward Outley (Trey Boy) was a critical witness at trial. Described at trial as Fields' best friend, he nevertheless testified that Fields confessed to killing Ms. Coleman. TT at 1238; 1825-26

During his cross-examination, Mr. Fields asked Mr. Outley whether the Government had made him any promises. Outley responded: "No. The government hasn't made me any promises." TT at 1847. This statement was false and the Government knew it was false. In a letter date January 2, 2004, addressed to Outley's attorney, Stan Sweiger, Outley's attorney, was told that the Government would guarantee Outley derivative use immunity for any crimes he testified about, except "for perjury or otherwise making a false statement." *See Letter to Sweiger* attached to *Affidavit of Outley.* Nevertheless, the Government let the answer stand without correction.

However, apparently the Government's actual grant of immunity was even broader than described in that letter. Outley now states, under the same penalty of perjury, that the Government "gave me complete immunity for any charges. Thus, because I could not be prosecuted for any crimes, I had to testify." *See Affidavit of Edward Outley III.* The Government did not reveal this broader grant of immunity to Mr. Fields or his counsel.

This was not the only failure by the Government to provide Fields with exculpatory evidence. Homero DeLeon, a jail-house informant with a history of exchanging testimony for a reduction in prison time, states that he wrote out ten to eleven pages of notes that purportedly reflect various conversations with Fields about the escape and homicide. *See Affidavit of Rick Ojeda* at ¶¶8-16. DeLeon states that he did not keep a copy of these notes and could not have remembered details of his trial testimony without them, but instead sent them to

the AUSA assigned to this case. *Affidavit of Rick Ojeda* at ¶16. Those notes were not provided to Fields or his counsel. DeLeon states that the notes reflected Fields' statements that Fields escaped by crawling through a vent and that he then "carjacked" an "old lady" so that he could get to the hospital. *Affidavit of Rick Ojeda* at ¶13. These facts are inconsistent with both DeLeon's testimony at trial, as well as all of the other testimony. For example, although Fields escaped, he did so by walking out of a fire-escape door, not by crawling through a vent.

These "missing" ten or eleven pages of notes would have provided powerful impeachment of DeLeon. However, the value of the notes extends further than DeLeon's credibility. In addition to proving that DeLeon was testifying untruthfully, the notes provide proof of Fields theory of the case: that the Government's case was built on the testimony of false testimony that had been rewarded by the Government. In other words, these notes provided the necessary thread that could unravel the case against Fields.

## A.     The Government's Failure To Disclose Material Exculpatory Evidence Violated Mr. Fields' Fifth, Eighth And Fourteen Amendment Rights

Outley's grant of immunity and Deleon's notes are material, exculpatory and favorable evidence which could have been used to impeach both their testimony. Moreover, this information could have been used to support Mr. Fields' theory of the case and would have altered the outcome of trial. Despite reasonable due diligence by Mr. Fields, the existence of Outley's broad immunity grant and Deleon's notes remained unknown and were not independently discovered at the time of trial. Although those notes were in possession of the Government, they were never provided to Mr. Fields or his counsel in violation of the Fifth and Eighth Amendments. *See, e.g., Brady v. Maryland*, 373 U.S. 83 (1963); *Strickler v. Greene*, 527 U.S. 263 (1999); *Banks v. Dretke*, 540 U.S. 668 (2004). Given that Fields' counsel has not been

able to access the Government's files, and will seek to do so through discovery, there is reason to believe that additional material exculpatory material may not yet be discovered.

The due process clause of the Fifth Amendment to the United States Constitution states that no person may be "deprived of life, liberty or property, without due process of law . . . ." U.S. Const. amend. V.  The United States Supreme Court has long held that the right to due process requires a federal prosecutor to disclose favorable evidence that is material to either guilt or sentencing.  *See e.g. Brady*, 373 U.S. at 87; *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995); *Banks*, 540 U.S. at 345; *accord Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir.), *cert. denied*, 549 U.S. 943 (2006); *Dickson v. Quarterman*, 453 F.3d 643, 646-67 (5th Cir. 2006); *United States v. Sipe*, 388 F.3d 471, 477 (5th Cir. 2004); *Hudson v. Whitley*, 979 F.2d 1058, 1061 n.6 (5th Cir. 1992).

A prosecutor's duty to disclose exculpatory evidence is especially important in a capital case, as is this Court's duty to review claims of non-disclosure.  *Kyles*, 514 U.S. at 422 (in assessing a *Brady* claim the court acknowledged that its "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case'") (citation omitted).

The Fifth Circuit has held that to state a *Brady* claim, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable, (3) the evidence was material to either guilt or punishment, and (4) discovery of the allegedly favorable evidence was not the result of a lack of due diligence.  *See Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 2974 (2007); *Rector v. Johnson*, 120 F.3d 551, 558

(5th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998).[19]   The due process requirements of the *Brady* doctrine apply to evidence that can be utilized to impeach the prosecutor's theory or witnesses.  *Bagley*, 473 U.S. at 676 (*Brady's* disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); *Giglio*, 405 U.S. at 154 ("[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady's*] general rule") (*quoting Napue*, 360 U.S. at 269).

The *Brady* obligations of the prosecution do not end with the jury's verdict.  The duty to disclose is ongoing through all stages of the appellate and post-conviction process. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("the duty to disclose is ongoing").  Under Brady and its progeny, the Government has a duty to provide exculpatory or favorable evidence regardless of whether the defense made a specific request for the item in question.  *See Banks*, 540 U.S. at 695-96 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed . . . .  A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process.  'Ordinarily we presume that public officials have properly discharged their official duties'").  Indeed, defense counsel is entitled to rely on the presumption that prosecutors will fairly "'discharge[] their

---

[19] The Fifth Circuit's formulation of the fourth element of a Brady claim may conflict with Supreme Court precedent holding that a criminal defendant is entitled to rely on representations made by a prosecutor that all exculpatory information has been disclosed.  *See Banks*, 540 U.S. at 695 ("[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed").

official duties,'"  *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995) (citation omitted), and

that the prosecutor shall act as the "representative not of an ordinary party to a controversy, but

of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, in

a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Berger v.*

*United States*, 295 U.S. 78, 88 (1935).

The failure to disclose all material evidence favorable to an accused violates due

process whether or not the prosecutor acted in good faith.  *Brady*, 373 U.S. at 87.  Indeed:

> [t]he duty of a prosecutor, as the representative of the sovereign in
> a criminal case, is "not that it shall win a case, but that justice shall
> be done" . . . ."Unless, indeed, the adversary system of prosecution
> is to descend to a gladiatorial level unmitigated by any
> prosecutorial obligation for the sake of truth, the government
> simply cannot avoid responsibility for knowing when" disclosure
> is required . . . .  Accordingly, a prosecutor faithfully discharges
> his duty where he fully understands his obligations under *Brady,*
> not where, as here, he fails to "consciously th[ink] about it one way
> or the other."

*Dickson*, 462 F.3d at 479.  Because "the preservation of our civil liberties depends upon the

faithful and ethical exercise of power by [prosecutors] who bear the mantle of public trust . . .

[w]here . . . the actions of [prosecutors] are contrary to these aspirational principles, whether for

improper or guileless reason, courtroom victories are pyrrhic and such conduct 'should attract no

courtroom approbation.'"  *Id.* at 480.  A new trial or sentencing based upon withheld exculpatory

evidence is required when *Brady* evidence is "material."  *Kyles*, 514 U.S. at 432-33.

Here, Outley's broad and undisclosed grant of immunity is unquestionably

material *Brady* evidence.  Key to Fields' deference theory was that Scroggins was the real killer

and Outley an accomplice.  As such, Fields unsuccessfully sought to expose to the jury that

Outley had a strong motive to lie.  To expose this motive, Fields asked Outley directly whether

the Government had given him any promises in return for his testimony and he said no.  TT at

1847.   However, Oultey has indicate that the Government gave him complete immunity and "[t]hus, because [he] could not be prosecuted for any crimes, [he] had to testify." *See Affidavit of Edward Outley III*.  This broad immunity grant provides Outley with a powerful motive to lie and this information was not provided to Fields.  It is beyond legitimate dispute that there is a reasonable probability that had this evidence been disclosed, the trial would have been different in that one of two key Government witnesses would have been effectively impeached.  Indeed, Outley's credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Giglio*, 405 U.S. at 154-55.

Similarly, Deleon's notes are material Brady evidence.  These notes are unquestionably impeachment evidence given that Deleon describes them as having information that is inconsistent with the facts and, potentially inconsistent with his testimony at trial.  Had the Government provided these notes to Fields, they could have been used to impeach Deleon.

The Government's failure to disclose this, and potentially other, Brady material denied Fields of powerful impeachment tools in a case that rested on almost exclusively on the credibility of Government witnesses.  Given the lack of physical evidence, such impeachment evidence is indisputably material and its suppression prejudicial.

CLAIM 19:  THE GOVERNMENT FAILED TO CORRECT A MATERIAL MISSTATEMENT OF FACT BY MR. OUTLEY IN VIOLATION OF MR. FIELDS' FIFTH AMENDMENT GUARANTEE OF DUE PROCESS, SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE VERDICT AND PUNISHMENT DETERMINATION

Edward Lee Outley III, a.k.a. "Trey Boy" was a critical government witness at trial who testified that Mr. Fields confessed to killing Ms. Coleman.  During his cross-examination, Mr. Fields asked Mr. Outley whether the Government had made him any promises.  Outley responded: "No. The government hasn't made me any promises."  RP 1847.  This

statement was false and the Government knew it was false.  In a letter date January 2, 2004, addressed to Outley's attorney, Stan Sweiger, Outley's attorney, was told that the Government would guarantee Outley derivative use immunity for any crimes he testified about, except "for perjury or otherwise making a false statement."  *See* Letter to Sweiger attached as Appendix [].  Nevertheless, the Government let the answer stand without correction.  However, apparently the Government's actual grant of immunity was even broader than described in that letter.  Outley now states, under the same penalty of perjury, that the Government "gave me complete immunity for any charges.  Thus, because I could not be prosecuted for any crimes, I had to testify."  *See Affidavit of Edward Outley III*.  The Government did not reveal this broader grant of immunity to Mr. Fields or his counsel or correct Outley's statement at trial.  *Id*

### A.     The Government's Failure To Correct Outley's Statement Violates Mr. Fields' Fifth And Eighth Amendment Rights

The Government let the answer stand without correction in violation of the Fifth and Eighth Amendments.  *Napue v. Illinois*, 360 U.S. 264 (1959); *Giglio v. United States*, 405 U.S. 150 (1972).  In addition, the Government's actual grant of immunity to Outley was broader than described in a letter written to Outley's counsel that was turned over to Mr. Fields at trial.  In fact, it turns out that Mr. Outley was promised complete immunity on all charges in exchange for his testimony against Fields.

CLAIM 20:     MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN, AFTER FIELDS WAS INDICTED, JAILHOUSE INFORMANTS ACTING AS GOVERNMENT AGENTS QUESTIONED FIELDS IN THE ABSENCE OF COUNSEL AND WHERE THAT INMATE LATER TESTIFIED THAT FIELDS CONFESSED.

No forensic evidence linked Fields to the murder.  Rather, the evidence linking Fields to the crime came almost exclusively from a notoriously unreliable source – jailhouse snitch witnesses.  In all, seven snitch witnesses testified against Fields, most in exchange for

deals from the government.  *See, e.g,* Jerry Reed, TT at 1363-1374 (sentence reduction); Homero Deleon, TT at 1417-1419 (ten month sentence reduction); Steven Salazaar TT at 1488:25-1489:9 (sentence reduction); Christopher Quigley, TT at 1219-1220 (four month sentence reduction); Dominique Trendell Tubbs, TT at 1203-1218 (three month sentence reduction).

At least one these witnesses, Homero Deleon, had a prior informant relationship with the prosecutors.  He cooperated with the government by providing testimony against his former codefendants in a Conspiracy with Intent to Distribute Cocaine charge.  TT at 1419.  In exchange for that testimony, Deleon was rewarded with a reduced sentence of seventy-two months.  TT at 1419-1420.  Mr. Snyder, one of the prosecutors in Fields' case, was also the prosecutor with whom Deleon previously cooperated.  TT at 1425.  In return for Deleon's continued cooperation, this time in connection with testimony regarding Fields, the Government filed a motion for an additional sentence reduction, resulting in Deleon's seventy-two month sentence being further reduced by ten months.  TT at 1420:4-6.

According to Deleon, he and Fields were housed together at the Federal Medical Center (FMC) in Fort Worth.  TT at 1420-21.  Knowing that the government was mounting a case against Fields, and admittedly based on Deleon's prior relationship with the prosecutors, Deleon claims to have approached Fields in an attempt to deliberately elicit self-incriminating information for the purpose of reporting that information back to the government:

> [By Mr. Snyder]
>
> Q:     And, sir, when you were doing this, you were intending this to get as much information as you could from him?
>
> A:     Yeah.  That's right.
>
> Q:     So that you could tell us, correct?

A:    So I can – yeah.

Q:    Because you had already previously cooperated with us?

A:    Yes.

Q:    And you had already previously testified for us?

A:    Yes, sir.

Q:    In fact – is – I was the trial attorney in the case where you testified?

A:    Yes.

TT at 1425.

On the witness stand, Deleon testified in detail about the comments Fields purportedly made. For instance, Deleon testified that Fields told him that he shot the victim "several times in the back of the head" (TT at 1426:2), raped her (TT at 1426), used to run with "Trey Boy and another guy named Chae" (TT at 1427), had another girlfriend named Shlakeya and "[t]hat he was going to try to drag her or one of his home friends into the murder scene, that he wasn't going down by himself" (TT at 1427). Deleon also testified that Fields was angry with several other individuals because they were providing grand jury testimony against him including Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, Andrea Sykes and Steve Salazar. TT at 1423.

Deleon's trial testimony is inconsistent with – and far more detailed then – any of the available documentation created during the government's investigation. For example, November 13, 2003, Gloff and Special Agent Douglass Kunze interviewed Deleon. *Affidavit of Rick Ojeda* Exh. B. Special Agent Kunze's report of that interview does not contain **any** of the details that Deleon testified to at trial. To the contrary, the report reflects a stunning lack of detail: "8. When asked if FIELDS provided more information about killing his girlfriend, DELEON stated that **all he said** was 'I shot the bitch'! FIELDS also told DELEON about a tree

where he killed his girlfriend." *Affidavit of Rick Ojeda* Exh. B (emphasis added).    Unlike Deleon's eventual trial testimony, this report contains absolutely no detail about the purported killing such as the number or location of shots fired.   Unlike Deleon's testimony, the report does not mention the purported rape, "Trey Boy", "Chae", Shlakeya, Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, Andrea Sykes, Steve Salazar or any attempt to "drag" anyone "into the murder scene."   These are significant and conspicuous omissions given that "[i]t is standard investigative procedure to note details like these if they were discussed during a witness interview." *See Affidavit of Rick Ojeda* at ¶15.

Deleon's willingness to testify for the prosecution in exchange for a sentence reduction, however, is completely consistent with the documentary evidence.  On February 12, 2002, Deleon wrote a letter to Mr. Gloff, one of Fields' prosecutors.  *Id.* Exh. A.  In that letter, Deleon claims to have had conversations with Fields, staring around December 12, 2002.  The letter states that Deleon initiated conversation with Fields, by asking him if he committed the murder, in which Fields' answer was "yes".  *Id.*  Although the letter contains no details, Deleon closes his letter by asking to talk to the prosecutors, stating that "I have a lot of detail [sic] information that can help you prosecution of Sherman Fields an Mr. Garrett (guard)."  *Id.*  As a post script, Deleon states "I was the Star Witness in my co-defendants trial, and both of my co-defendants were found guilty.  So, in case you want me to testify against Sherman Fields and Mr. Garrett (guard) I am more than happy to testify . . . Would you please talk to me, or write me and let me know if you want me to be a witness."  *Id.*

Because of these (and other) inconsistencies, Deleon was interviewed by Fields' current counsel and an investigator on December 19, 2008. *Affidavit of Rick Ojeda* at ¶3.  When asked how Deleon came to testify at Fields' trial he related two drastically different versions of events than those presented at trial.  *Id.* at ¶7.   He explained that he approached Fields for

information then immediately related that information to Prosecutor Gloff. *Id.* at ¶9. After this initial contact with the prosecutor, Deleon explained that he subsequently spoke to Fields several times, each time acquiring new information. *Id.* He explained that after each meeting, he wrote the details of the conversation on a piece of yellow legal pad and forwarded it to Gloff. *Id.*

However, when asked a second time to explain the sequence of his contacts with Gloff and Fields, Deleon drastically changed his story. *Id.* at ¶10. Upon the second telling, Deleon explained that he met with Fields several times, elicited information from him, wrote that information down on a yellow legal pad and then, after several meetings, forwarded approximately ten pages of notes to Gloff all at once. Deleon also stated that despite receiving a ten month sentence reduction in exchange for his testimony, he never asked for such a reward and Gloff never offered it. *Id.* at ¶17.

Significantly, in both versions of his story, Deleon sent Gloff several pages of detailed notes concerning his conversations with Fields. *Id.* at ¶14. He stated that without these notes, he would not have been able to remember all of the details of the purported conversations. *Id.* Deleon indicated that these notes contained details such as the caliber of gun used, how and where the shooting occurred, details about a carjacking and the purported rape. *Id.* Details that are conspicuously absent from Agent Kunze's report of their November 13, 2003 meeting. Thus far, Fields' counsel has not been able to locate these notes, but intends to seek discovery concerning this and other issues.

Additionally, when asked about the number of meetings Deleon had with government agents, he reported at least two; the first with Gloff and Kunze in November 2003 and a second with Mr. Snyder shortly before trial in Waco. *Id.* at ¶18. Although it is unclear exactly how many meetings Deleon had with the government, based on Special Agent Kunze's report of the November 2003 meeting with Deleon and Gloff, it is very clear that Deleon's

testimony became far more detailed sometime after that meeting and the time of trial. Significantly, Deleon claims to have had at least one meeting with Mr. Snyder during that time. Thus far, Fields' counsel have not been able to locate any documentation concerning this alleged second meeting. Fields intends to seek discovery on this, and other issues related to Deleon's testimony.

A.   **On Information And Belief, Homero Deleon, And Potentially Several Other Jailhouse Informants Attempted To Deliberately Elicit Self-Incriminating Statements From Fields On The Government's Behalf**

Although additional discovery is required to prove the claim, the facts currently available make out a *prima facia* case that Deleon, if not all of the jailhouse snitches, may have attempted to deliberately elicit self-incriminating information from Fields in violation of his Sixth Amendment rights. Assuming *arguendo* that Deleon's statement that he deliberately spoke to Fields in an attempt to elicit incriminating information after having been in contact with the prosecutors is correct (which Fields does not concede), this would violate Fields' rights.

It is well-established that defendants are entitled to aid of counsel from time of arraignment until beginning of trial. *Massiah v. United States*, 377 U.S. 201, 205 (1964). As such, self-incriminating statements that are "deliberately elicited" from a defendant by federal agents, after indictment "and in the absence of his counsel", are elicited in violation of the Sixth Amendment and cannot "constitutionally be used by the prosecution as evidence against him at his trial." *Id.* at 206-07. This Sixth Amendment protection extends to "indirect and surreptitious interrogations" conducted by undercover informants or any other individuals acting as government agents. *Id.* at 206 (citation omitted). Surreptitious interrogations by government agents are all the more constitutionally repugnant because in such situations, the accused does "'not even know that he [is] under interrogation by a government agent.'" *Id.* (citation omitted).

Agency relationships between the government and jailhouse snitches, like Deleon, have been found in circumstances similar to those presented here. For instance, jailhouse snitches have been found to act as federal agents where they have a prior relationship with the government as an informant, the government was aware that the informant would have access to the accused and would be able to engage him conversations without arousing suspicion, and where the informant would be rewarded upon providing useful information. *United States v. Henry*, 447 U.S. 264, 270 (1980). Similarly, jailhouse snitches are government agents where an informant is "promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant, and . . . acted pursuant to instructions from the State, or otherwise submitted to the State's control." *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999). An informant's agreement with the government may be express or implied and an explicit compensation agreement is not required. *See United States v. Taylor*, 800 F.2d 1012, 1015-16 (10th Cir. 1986), *cert. denied*, 484 U.S. 838 (1987); *see also Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004).

The government has also been determined to have deliberately elicited information from jailhouse snitches based on facts similar to those presented here. Courts have found that the government deliberately elicits information where jailhouse snitches improperly solicit incriminating statements when, acting under prearranged terms with the government, snitches engage in conversation with the accused. *Henry*, 447 U.S. at 270. The government need not intend for the informant to affirmatively bait the accused to violate the Sixth Amendment. *Id.* at 271; *see also Schmitt v. True*, 387 F. Supp. 2d 622, 638-39 (E.D. Va. 2005) (noting that under the Supreme Court's *Massiah* jurisprudence the "historical circumstances" between the government and informant contribute to determination of deliberate elicitation), *aff'd*, 189 Fed. Appx. 251 (4th Cir.), *cert. denied*, 549 U.S. 1028 (2006). Furthermore, "the

identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in Massiah or Henry." *Maine v. Moulton*, 474 U.S. 159, 174 (1985).

The facts surrounding the events leading to Deleon's testimony here create a *prima facia* case of a *Massiah* or *Henry* violation. There is no doubt that Deleon had a prior relationship with the prosecutor, Mr. Snyder confirmed as much as trial. TT at 1425. There is no doubt that Deleon met with the prosecutor on November 13, 2003, Special Agent Kune's report confirms as much. There is no doubt that, at trial, Deleon's testimony contained far more detail – whether true or not – then was contained in the reports of his meeting with the prosecutor on November 13, 2003, Special Agent Kune's report also establishes this. Finally, there is no doubt that Deleon was actually rewarded for his testimony against Fields, Mr. Snyder established that at trial. TT at 1420:4-7. Therefore, assuming *arguendo* that Mr. Deleon's more detailed information was obtained from conversations with Mr. Fields that occurred after Deleon's contact with Government agents (which Mr. Fields does not concede) such information would have been obtained in violation of the Sixth and Eighth Amendment. *See, e.g., Massiah*, 377 U.S. at 205; *Henry*, 447 U.S. at 270-71. These facts warrant additional investigation into whether, when and how Deleon apparently acquired, or attempted to acquire, additional information from Fields **after** his November 2003 meeting with Gloff and Kunze. Fields intends to seek discovery on this and related matters. Fields' efforts to develop this claim to date have been thwarted by the Government's refusal to allow Fields access to the prosecution files.

### VII.    PENALTY PHASE INVESTIGATION CLAIMS

CLAIM 21:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO CONDUCT A COMPETENT PENALTY PHASE INVESTIGATION.

#### A.    The *Strickland* Standard

In order to establish ineffective assistance of counsel, a *habeas* petitioner, or in this case a § 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  A petitioner must first show that counsel's performance was deficient, and then demonstrate that the deficiency prejudiced the defense.  *Id*. at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  In capital cases, an objective standard of reasonableness requires counsel to conduct an adequate investigation for potentially relevant mitigation evidence.  Specifically, it is well-settled that trial counsel have a duty to investigate a client's background, including his social history and mental health.  *See, e.g., Wiggins*, 539 U.S. at 522-23 (*citing Strickland*, 466 U.S. at 690-91).  Moreover, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Wiggins*, 539 U.S. at 527.  In evaluating the reasonableness of counsel's performance, *Strickland* requires consideration of standards such as those in the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines).[20]  *See Wiggins*, 539 U.S. at 524 (citing *Strickland*, 466 U.S. at 688 and *Williams v. Taylor*, 529 U.S. 362, 396 (2000)).

---

[20] The Supreme Court initially relied upon the ABA Guidelines as an appropriate guide for assessing attorney competence in capital cases in *Strickland*, 466 U.S. at 688 (approvingly citing ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function")).  In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins v. Smith*, 539 U.S. 510, 521 (2003), and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), the Supreme Court held that these standards are the appropriate guides for establishing what constitutes reasonably effective assistance under

A *habeas* petitioner meets the second part of the *Strickland* test by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  This standard presumes an objective sentencer:  "The idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency . . . are irrelevant to the prejudice inquiry." *Id*. at 695.  In order to establish *Strickland* prejudice, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id*. at 693.  This is because counsel's deficient performance raises serious questions concerning whether the petitioner received the fundamentally fair trial guaranteed by the Constitution.  As the Court explained in *Strickland*:

> An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower.  The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

---

the Sixth Amendment.  As the Court recognized in *Rompilla*, the 1989 and 2003 versions of the Guidelines "applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases." 545 U.S. at 387 n.7; *see also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("Although the instant case was tried before the 1989 ABA edition of the standards was published, the standards merely represent a codification of longstanding, commonsense principles of representation understood by diligent, competent counsel in death penalty cases.  The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*. They are the same type of longstanding norms referred to in *Strickland* in 1984 as 'guided' by American Bar Association standards and the like"), *cert. denied*, 543 U.S. 925 (2004); *Hudson v. Quarterman*, 273 Fed. Appx. 331, 336 (5th Cir. 2008) ("We have recognized that, under the *ABA Guidelines*, counsel should present 'all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence'") (*quoting Smith v. Quarterman*, 471 F.3d 565, 570 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 2256 (2007)), *cert. denied*, 129 S.Ct. 621 (2008).

*Id*. at 694.   Put simply, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id*.   In *Wiggins*, the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance."   *Id.* at 536.

> **B.      Trial Counsel's Mitigation Investigation Was Deficient And Fell Below The Prevailing Norms At The Time Of Mr. Fields' Trial.**

In *Wiggins*, the Supreme Court affirmed that under *Strickland*, counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'"   539 U.S. at 522 (*quoting Williams*, 529 U.S. at 396).   The Supreme Court recognized that Mr. Wiggins' counsel's failure to investigate their client's background violated the ABA's provision that investigation into mitigating evidence "'should comprise efforts to discover *all reasonably available* mitigating evidence.'"   *Id*. at 524 (emphasis in original) (*quoting* ABA Guideline 11.4.1(c)).   The Supreme Court concluded that Wiggins' trial counsel's performance was deficient because counsel failed to pursue avenues of mitigation investigation that were warranted based on leads that became evident to counsel during their initial investigation.   *Id*. at 525; *see also id*. at 519 ("[T]he scope of [counsel's] investigation was also unreasonable in light of what counsel" had discovered from their limited investigation.   Trial counsel "knew at least some details of Wiggins' childhood").

The mitigation evidence presented at Mr. Fields' trial was substantially incomplete.   Although counsel presented some evidence about Mr. Fields' background during the penalty phase proceedings, counsel did not make "efforts to discover all reasonably available mitigating evidence."   *Id.* at 524.   Consequently, critical mitigation evidence which was readily available at the time of trial was never presented to the jury which sentenced Mr. Fields to death.

The failure to present this evidence was not the result of any strategic or tactical considerations by counsel, but rather was the result of counsel's failure to conduct an adequate investigation into Mr. Field's social history and mental health.  As numerous courts have recognized, omissions which are the product of a lack of investigation cannot be considered strategic or tactical decisions precisely because such "decisions" are not informed by any investigation which supports the omission.  *See id.* at 521 (the deference owed to purported "tactical judgments" to limit the scope of investigation into potential mitigating evidence turns on "the adequacy of the investigations supporting those judgments"; "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation"); *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (*per curiam*) (rejecting claim that trial counsel's failure to adduce mitigating evidence of petitioner's was a "tactical decision" because "[i]t is axiomatic, particularly since *Wiggins*, that such a decision cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose"); *Eldridge v. Atkins*, 665 F.2d 228, 237 n.5 (8th Cir. 1981) ("counsel's 'strategy' not to use [certain witnesses] was not so much trial strategy as it was an accommodation to his own inadequate trial preparation . . . .  Although it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack of preparation which went a long way in inducing him to make it"), *cert. denied*, 456 U.S. 910 (1982).

Here, trial counsel's mitigation investigation was deficient and fell below the prevailing norms regarding the investigation and presentation of the penalty phase of capital cases at the time of Mr. Fields' trial in 2004.  These investigative deficiencies include counsel's failure to obtain all the relevant multigenerational social history records of Mr. Fields' family members and caretakers; failure to interview any of the numerous historical witnesses who

created records pertaining to Mr. Fields that were obtained; failure to interview anyone but a few members of Mr. Fields' immediate family and a few correctional officers; failure to investigate and document Mr. Fields' extraordinary exposure to trauma; failure to investigate Mr. Fields' mental illness and the multigenerational history of mental illness in Mr. Fields' family; failure to investigate potential brain damage and dysfunction, secondary to trauma and anoxia following suicide attempts; and failure to investigate Mr. Fields' history of incarceration and its impact on his current and future functioning. The result was that the jury that sentenced Mr. Fields to death was presented with only a small portion of the mitigating evidence that could have been presented, and was left to consider whether Mr. Fields should be executed based solely on the testimony of a handful of defense witnesses whose testimony was brief, poorly prepared, and superficially presented.

> **1. Counsel unreasonably failed to obtain all the relevant multigenerational social history records of Mr. Fields' family members and caretakers.**

One of the most critical aspects of a mitigation investigation is the gathering of social history records pertaining to the defendant. As the Supreme Court noted in *Williams*, such records typically contain a wealth of information regarding the defendant's background which are often in and of themselves mitigating in nature, and/or offer up investigative leads for further mitigation information. 529 U.S. at 395-96; *see also* ABA Guideline 10.7 and related commentary at 83 ("Records – from courts, government agencies, the military, employers, etc. – can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections") (citations omitted). Moreover, such records are crucial to the mitigation investigation because "they can reveal what the client and his family are reluctant to disclose because of shame and embarrassment, and what they simply can't disclose because they were too young or too

impaired to record the events in memory. They are more credible to fact-finders because they have no inherent bias." *Declaration of Russell Stetler* ¶ 49.

The duty to obtain all relevant social history records is not limited to those of the defendant, but must also encompass the defendant's family members and caretakers. As the ABA Guidelines explain:

> Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children. A multi-generational investigation [extending as far as possible vertically and horizontally] frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.

ABA Guideline 10.7 and related commentary at 83 (citations omitted);[21] *see also Declaration of Russell Stetler* ¶ 49 ("Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next").

Although trial counsel interviewed Mr. Fields' mother, Alice Fields Swinnie, as part of their investigation into Mr. Fields' background, there were clear "red flags" that should have alerted counsel to the fact that Ms. Swinnie could not be relied upon to provide a complete and accurate account of Mr. Fields' life history. By her own admission, she has an impaired memory and receives disability payments for mental retardation after being shot in the head. *Declaration of Russell Stetler* ¶ 30. Clearly, these facts should have concerned counsel and

---

[21]As the Guidelines further explain, such records include, but are not limited to: (1) school records; (2) social service and welfare records; (3) juvenile dependency or family court records; (4) medical records; (5) military records; (6) employment records; (7) criminal and correctional records; (8) family birth, marriage, and death records; (9) alcohol and drug abuse assessment or treatment records; (10) INS records. *See* ABA Guideline 10.7 and related commentary at 84. Moreover, the Guidelines direct that such records should be obtained not only with respect to the client, but also with respect to the client's "siblings and parents, and other family members[.]" Id. (citations omitted).

prompted them to seek out records to independently corroborate the information Ms. Swinnie provided to them, rather than simply take her at her word, as they did.

For example, Ms. Swinnie claimed to the defense team that she experienced "a full term, uncomplicated pregnancy" with Mr. Fields. *Declaration of Russell Stetler* ¶ 30. Yet, counsel also knew that at the age when Ms. Swinnie gave birth to her first child, at age thirteen, she was using marijuana, and that this was only two years prior to when she gave birth to Mr. Fields. Such information should have prompted counsel to obtain all records relating to Mr. Fields' birth at Hilcrest Medical Center in Waco, including any records that would establish whether Ms. Swinnie was receiving prenatal care prior to his birth. Moreover, given Ms. Swinnie's young age at the time of Mr. Fields' birth, counsel also should have obtained all medical records from Mr. Fields' childhood to verify whether he regularly received appropriate pediatric care and, if so, whether these records corroborated Ms. Swinnie's claim that Mr. Fields had always been in good health as a child and that he had met developmental milestones at appropriate intervals. *Id.* Similarly, counsel should have obtained all records related to a two-week hospitalization that Mr. Fields underwent at the age of five after sustaining eye trauma. This hospitalization is mentioned in Mr. Fields' readily available Texas Youth Commission records, and should have prompted counsel to further investigate the traumatic incident, and all records surrounding it.

Additionally, counsel were aware that when Mr. Fields was about eleven years old, Ms. Swinnie spent fifty days in jail – and another five years on probation – for shooting her live-in boyfriend, William Bradford after catching him with another woman (her cousin, Ivory Monroe). Considering that this incident and Ms. Swinnie's absence from the home took place during a critical developmental period in Mr. Fields' adolescence, counsel should have sought out all records relating to the incident – and specifically, Ms. Swinnie's probation records, which

would have offered the independent observations of the probation officer of the household and how the family was adjusting during the period of Ms. Swinnie's term of probation.

Similarly, counsel should have obtained all the records relating to another shooting incident involving Ms. Swinnie, this time in which she was the victim after being shot in the head by her then-husband, Melvin Swinnie. Counsel could have, and should have, obtained all of Ms. Swinnie's medical records documenting her injuries. Moreover, the knowledge of this shooting incident should also have prompted counsel to obtain all records relating to Melvin's criminal history. This is especially so given that Melvin Swinnie was the head of the household and a father figure to Mr. Fields during much of his teenage years, so any competent social history investigation of Mr. Fields should have necessarily encompassed an investigation into the role models that had an influence on him in his formative years – particularly any role models with demonstrated violent and criminal behavior.

The above represent just some of the examples of specific records documenting critical events in the life of Mr. Fields and his family that counsel could have, and should have, obtained. There were numerous "red flags" of which counsel was aware that should have prompted such an effort to obtain the multigenerational social history records of the Fields family, yet counsel failed to undertake that effort. The failure to do was unreasonable, particularly in light of the critical nature of the incidents at issue in these records, and there is simply no evidence in the extant record that establishes that counsel's deficient performance in this regard was the product of a tactical consideration.

2. **Counsel unreasonably failed to interview historical witnesses.**

The gathering of social history records is important for a variety reasons. One, already noted above, is because such records are typically considered more credible to fact-finders because they are contemporaneous accounts prepared by persons unconnected to the

incidents documented in the records.  As such, the accounts contained in the record are treated as particularly credible; not only are the authors of the records lacking in any inherent bias, but the fact that the records were created at the time of the incidents themselves makes them less vulnerable to the criticism of some lay witness testimony (that the passage of time has degraded the witness's memory of the event) and expert testimony (that the expert only formed the opinion after the individual became a defendant in a capital case).  Obtaining such records, therefore, is important for an equally powerful reason: to identify the unbiased witnesses who created these records and who encountered the defendant years before he was ever charged in a capital case.

As is apparent from the nature of the records themselves, the kinds of witnesses at issue here include teachers, social service caseworkers, and medical and mental health professionals – in other words, individuals with unique access and insight into the influence that shaped the defendant's life in his developmental years.  One of the benefits of identifying and interviewing such witnesses is that they occupy an outsider's perspective, and therefore lack the motivation to conceal or cover up embarrassing or painful information about the family dynamics that the family members themselves would.  Moreover, as persons who have an opportunity to observe the family dynamics without themselves being a part of it, such witnesses are often able to provide critical and unbiased information about the dysfunctional environment in which the defendant grew up.

Trial counsel had records that identified numerous such historical witnesses, but they made no effort to locate or interview them.  These witnesses include, but are not limited to:

- Jo Ann Peek, Mr. Fields' second grade teacher at Provident Heights Elementary;

- Lucia Hatten, Mr. Fields' third grade teacher at Provident Heights Elementary;

- Margie Morgan, Mr. Fields' fourth grade teacher at Provident Heights Elementary;

- Billie Phillips, Mr. Fields' fifth grade teacher at Crestview Elementary; and,

- Mrs. Coleman and Mr Dupree, Mr. Fields' teachers at University Middle School.

Teachers could also have been sought at the other schools Mr. Fields attended, such as Lake Air Jr. High, Waco High, and the Alternative School. Numerous potential witnesses were also identified from the many juvenile facilities where Mr. Fields was housed, including, but not limited to:

- Dr. W. Kenneth Day;

- psychologist Joe Lee Fred Moreno, M.Ed.;

- Thomas C. Tan, M.D.;

- Cheryl E. Heidelberger, M.D.;

- R. V. Seller;

- Nhan T. Nguyen, M.D.;

- Nurse B. Gaines (TYC);

- Counselors Nellie O. Spencer and Joe T. Childs; and

- Parole Department Primary Service Worker Lenard Holmes.

The Juvenile Court and Texas Youth Commission files identified numerous other potential witnesses, including, but not limited to:

- Field Probation Officer Kenneth W. Mays, Jr.;

- Field Probation Officer David Salazar;

- Field Probation Officer Mr. McMillan;

- Field Probation Officer James Marlin;

- Field Supervisor Bobby Everett;

- Assistant Director Robert Campos;

- Texas Youth Commission Caseworker Mary Taggart;

- Texas Youth Commission Caseworker Jean Ann Lee;

- Texas Youth Commission Caseworker Irvin Yarbough;

- Clinical Social Worker III (Child/Adolescent Psychiatric Services) Joanne F. Olsen;

- DePaul Psychiatric Center staff, including Dr. William Holts, Elizabeth Douglas, Mr. Davidson, and head ICU nurse Marilyn Slaughter; and

- Three witnesses to two of Mr. Fields' suicide attempts by hanging: Mrs. Martha Wallace, Mrs. Kuehl, and Mr. Stevens.

This is not a situation where counsel contacted the witnesses and decided not to utilize them for some strategic reason. Although identifiable to trial counsel from readily available records, counsel simply failed to locate or interview any of these witnesses. Considering that these potential witnesses came in contact with Mr. Fields during critical developmental periods of his life as both a young child and adolescent, counsel's failure to interview these witnesses is unreasonable. These are witnesses who would have been familiar with Mr. Fields' mental and physical health, his family background, his school attendance, his behavior leading up to and while in juvenile detention or supervision. In other words, these are witnesses who hold textbook mitigation information. *See Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008). Indeed, there is no evidence in the extant record that suggests that counsel's deficient performance in this regard was attributable to anything other than a failure to carry out their basic investigatory duties in preparation for the penalty phase proceedings.

**3.    Counsel unreasonably failed to interview available family-member mitigation witnesses.**

In conducting a thorough an adequate social history investigation, counsel must interview those witnesses who have known the defendant longest and most intimately: the family

members.   Such interviews are necessary not only to discover information directly about the defendant, but also to investigate such issues as the conditions in which the defendant was raised, risk factors to which the defendant was exposed, patterns of dysfunction that governed family dynamics, and potential heritable mental disorders in the family lineage.  Additionally, the life of a capital defendant is often marked by intra-familial abuse, physical and sexual assault, multigenerational substance abuse and mental illness – dark and shameful secrets that individuals are understandably reluctant to discuss.  For this reason, initial interviews with such witnesses often yield incomplete or superficial information, as these witnesses are typically defensive and wary of disclosing personal or sensitive information to a stranger.  Such barriers can only be broken by establishing a rapport and trust with the witnesses – a process that requires many hours and multiple visits with the witnesses.  Yet despite the fact that Mr. Fields came from a large extended family, most of whom live right in Waco, counsel failed to speak with anyone but a few family members – and those interviews were limited and superficial.

Mr. Fields' mother, Alice Fields Swinnie, had five sons by four different men. Counsel identified only two of the fathers by name:  Mr. Fields' father, the late Sherman Mims,[22] and William Bradford, the father of Jimmy and Shaffer.  The fathers of Charles and Jeffrey Fields were not identified.  None of these men were interviewed, although each may have provided some insight into Mr. Fields' mother's lifestyle, romantic relationships, child rearing, mental state, use of substances, among other issues relevant to Mr. Fields' mitigation case. .

At least two of the mother's most violent boyfriends were readily available.  She advised counsel that William Bradford resided in Waterloo, Iowa, where his address and phone

---

[22] Mims was reportedly in his forties and married to someone else at the time he impregnated Sherman's teenage mother.  According to Texas Youth Commission records, he died in 1985.

number are listed in directory assistance. Melvin Swinnie, whose inmate number is TDCJ #00662634, has been incarcerated for two decades, will remain in prison until 2023, and his prison location was readily available at the time of trial. Despite that the whereabouts of these witness was easily discoverable, counsel never made any attempts to locate or interview them as part of the mitigation investigation. Such an omission is particularly troubling given that both Mr. Bradford and Mr. Swinnie essentially occupied a parental role with respect to Mr. Fields, and were male role models for him during his formative years as a child and adolescent. Moreover, considering that both men were involved in violent and traumatic shooting incidents with Mr. Fields' mother, it is unreasonable that counsel failed to investigate and interview these witnesses.

There was no effort whatsoever to investigate Mr. Fields' paternal lineage, or even to verify the mother's report that he had died in Marlin, Texas. With respect to Mr. Fields' maternal lineage, Mr. Fields' mother was one of ten children, two of whom were reportedly deceased by the time of trial. Five (Dorothy Randle, Shirley Fields, Annie Leaks, Hattie Love and George Gaines) lived in Waco, one (Bessie Jackson) in Chicago, and one (Arthur Fields) in Pampa, Texas. Mr. Fields' maternal grandparents never married. In fact, his late maternal grandfather, Shelby Mitchell, was married to someone else. He and his wife had at least three children.

Of all these witnesses, it appears that counsel only interviewed two family members: Vincent and Ed Green, who were Shelby Mitchell's sons, and step-uncles (but age peers) of Mr. Fields. Counsel's interviews with Vincent and Ed Green were superficial, and there was no attempt to interview the numerous readily available family members, even though a few were encountered in a group setting. As noted earlier, only in-depth one-on-one interviews could have provided a textured explanation and vivid account of the violent, chaotic world in

which Mr. Fields grew up.  Here, however, counsel abandoned the mitigation investigation after superficial interviews with a very narrow set of witnesses.  Moreover, counsel made no inquiry into potential heritable mental disorders on either side of the family.

Additionally, counsel made no attempts to interview neighbors or classmates of Mr. Fields, even though counsel knew numerous home addresses and all the schools Mr. Fields attended.  Similarly, counsel failed to interview professionals, caseworkers, or police officers who had dealt with Mr. Fields and his family.  Counsel's deficiencies in this regard, as with the historical witnesses discussed earlier, are simply unreasonable and cannot be ascribed to any tactical considerations.

**4.      Counsel unreasonably failed to investigate and document trauma in Mr. Fields' life history.**

Mr. Fields was exposed to a variety of trauma throughout the course of his life, and particularly during significant developmental periods of his childhood and adolescence.  Some of the incidents of trauma involved severe, acute exposures, such as witnessing his grandfather being run down by a drunken driver, but chronic traumatic exposure pervaded his life.  Neither the jurors who sentenced him to death nor the mental health staff who encountered him in correctional settings were ever provided with a complete and full history of these exposures to trauma.  Although counsel had numerous leads they could have pursued, they failed to follow them or to seek expert guidance in understanding the impact of trauma on Mr. Fields' mental and emotional functioning.

Mr. Fields grew up in a toxic environment of extreme violence and brutality.  His mother's boyfriends regularly beat her and her sons, including Mr. Fields.  As documented in Texas Youth Commission records, Mr., Fields sustained multiple scars on his body as a result of these beatings, including on thighs, arms, shoulders, and the back of his legs.  When Mr. Fields

was about eleven years old, his mother, Ms. Swinnie, shot one of her boyfriends after catching him with another woman – her cousin.  A few years later, Ms. Swinnie herself was shot in the head by her then-husband.  Mr. Fields also witnessed the fatal accident in which his maternal grandfather was run over by a drunk driver.  Additionally, in the six months prior to his fifteenth birthday, two of his friends were killed, and a third committed suicide.  Counsel failed to obtain any relevant records, such as death certificates, coroner's reports, or media accounts, of *any* of these deaths, even when presented with names and dates of death: Roy Cleveland, died January 11, 1989; Roderick Cummings, died March 3, 1989; and John Walker, died June 22, 1989.

In addition, Mr. Fields provided counsel with the names of some *twenty friends* who had died violent deaths in the decade and a half prior to trial:  Gerald Wayne, Anthony Curtis, Roderick Cummings, Terrel Collins, John Walker, Donnell Swinnie, Albert Donnell Sims, Robert Lee Evans, Wesley Sterling (another cousin), Lee McKinney, Doug Harbert, Kim Leaks,  Roderick Scott, Guan Scott, Marcus Thornton, Yoshima Calhoun, Michael Campbell, Oliver Dixon, Eric Rembert, Lionel Stewart, and someone known on the street only as "Spud."

As anyone who has ever lost a loved one knows, the loss of a loved one can be quite a devastating and traumatic experience, the impact of which can be felt for years following the death itself.  Here, Mr. Fields experienced such loss with such cruel frequency that it is almost difficult to contemplate it.  Yet despite this fact, counsel did not investigate any of these deaths, either to assess the impact of the individual losses on Mr. Fields or to explain the context of community violence in the social environment of his developmental years.  That is, Mr. Fields did not simply grow up in a "tough neighborhood" – he grew up in what amounted to a war zone, where casualties were a frequent occurrence, and the risk of being indiscriminately targeted and killed was constant.

Similarly, counsel made no attempts to interview family, friends, and other contemporaries to document the effects of the traumatic losses on Mr. Fields' functioning and behavior. Nor was there any attempt to retain a mental health expert specializing in trauma, even though social worker Jane Bye had specifically advised counsel that Mr. Fields should be evaluated for depression and post-traumatic stress disorder. *Affidavit of Jane Bye.* Counsel's deficiencies in all these regards was unreasonable, and there is no evidence in the extant record to support the claims that counsel's failure to adequately investigate and document Mr. Fields extraordinary exposure to trauma was the product of a strategic decision.

**5.      Counsel unreasonably failed to investigate Mr. Fields' mental illness and the multigenerational history of mental illness in Mr. Fields' family.**

As the Supreme Court has made abundantly clear, mental health investigations are a necessary part of a constitutionally adequate mitigation investigation. *See Rompilla*, 545 U.S. at 390-93 (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (evidence of "impaired intellectual functioning is inherently mitigating"). Yet despite numerous "red flags" that an investigation was warranted into Mr. Fields' mental health, trial counsel unreasonably failed to carry out that investigation.

For example, numerous readily available records indicated that had previously been treated for mental health issues. *Declaration of Russell Stetler* ¶ 35. Not only had Mr. Fields been receiving disability benefits for unspecified "mental problems," *id.*, but numerous mental health professionals had evaluated Mr. Fields since he was a teenager and had diagnosed him with major depression with psychotic features, pervasive mood disorder, atypical bipolar disorder, and posttraumatic stress syndrome. Inexplicably, counsel never interviewed any of the psychiatrists that had previously treated Mr. Fields. Nor did counsel ever retain any expert for

the purpose of exploring evidence relating to the broad array of documented mental disabilities, either for purposes of developing mitigation evidence for the penalty phase proceedings, or to explore the potential implications of Mr. Fields with respect to any competency determinations.

Additionally, as mental illness typically has a hereditary component, any competently conducted mental health investigation must necessarily be multi-generational and inquire into the mental health of not only the defendant, but also the defendant's family.  As noted previously, however, counsel never undertook any investigation with respect to Mr. Fields' biological father or paternal lineage, despite knowing where he lived and died and the name of his employer, Johnson Roofing – a company that is still in business in 2009.  At the very least, employment records and interviews with co-workers should have been pursued as a means of investigating any genetic predispositions or vulnerabilities in the paternal lineage.

With respect to the maternal lineage, there were numerous "red flags" which should have alerted counsel to the need for a robust mental health investigation, but it simply was not pursued.  For example, Alice Fields Swinnie had told counsel that several members of her family had "problems with being crazy," including her sisters, Shirley Fields and Hattie Love; her brother, George Gaines; and George's twenty-year-old son, George Anthony.  Counsel was also informed by Ms. Swinnie that Mr. Fields' half-brother, Jeffrey, was on SSI "for mental health reasons."  Despite this information, counsel did not conduct any interviews with these family members to determine what "problems" they have and whether they have been diagnosed and treated.  Similarly, counsel learned that Mr. Fields' grandmother abused alcohol, but made no effort to obtain documentary evidence or even to interview her about it.  Additionally, Ms. Swinnie reported that she had prescriptions for numerous medications, including Xanax, which is ordinarily prescribed for anxiety disorders and panic attacks, "for several years" for "nerves," as well as a muscle relaxer, Soma, and Hydrocodone for pain.  Counsel, however, neither attempted

to obtain Ms. Swinnie's medical and mental health records, nor investigate her medications, dosage, and treatment.

Notably, even social worker Jane Bye had advised trial counsel that there may be a genetic component to Mr. Fields' mental health issues. *Affidavit of Jane Bye* ¶11.  Nor was there any attempt to retain a mental health expert specializing in trauma, even though social worker Jane Bye had specifically advised counsel that Mr. Fields should be evaluated for depression and post-traumatic stress disorder. *Id.* at ¶10-13.  Yet despite this prompting, and the numerous other aforementioned indicators that a multigenerational investigation into the mental health history of the Fields family was warranted, counsel simply failed to undertake this crucial investigatory step in preparation for Mr. Fields' capital trial.  As a result, the jurors that sentenced Mr. Fields to death heard only a few facts relating to Mr. Fields' mental condition, such as his suicide attempts and his sadness at the loss of friends, but they were not provided with the kind of complete picture that would have allowed them to understand that Mr. Fields was not someone who had simply gone through some "hard times," but actually suffered from a documented history of mental illness.

### 6.    Counsel unreasonably failed to investigate potential brain damage and dysfunction.

There were a number of "red flags" that should have alerted trial counsel to the need for an investigation into Mr. Fields' potential brain damage and dysfunction given what counsel knew and reasonably could have discovered in preparation for Mr. Fields' capital trial.  Indeed, Jane Bye, the social worker who assisted counsel, specifically advised counsel regarding the need for Mr. Fields to undergo a neuropsychological evaluation. *Affidavit of Jane Bye.*  As Ms. Bye noted in her remarks to counsel, and as had been widely reported by the media at the time of Mr. Fields' trial, chronic exposure to violence and trauma has documented

neurobiological effects on the brain, and a growing body of research specifically indicated that such exposure can negatively impair or affect children's brain development. *Declaration of Russell Stetler* ¶ 36. In light of Mr. Fields' extraordinary exposure to trauma growing up, as recounted above, counsel should have pursued a neuropsychological evaluation for their client.

Additionally, readily available records should have alerted counsel to the risk of brain injury to which Mr. Fields was exposed as a result of his prior suicide attempts involving hanging. On one such occasion, Mr. Fields was found with a pulse, but no spontaneous respiration. These facts indicate that Mr. Fields was at risk from anoxic brain injury – that is, injury caused as the result of a lack of oxygen flowing to the brain, since brain cells will start to die within a few minutes if they are deprived of oxygen. Moreover, Mr. Fields' Texas Youth Commission records documented a butterfly-shaped pigmented area over his nose, which is consistent with lupus erythematosus, a condition that can cause vasculitis in the brain – that is, an inflammation of the blood vessels in the brain, which can adversely affect neurological processes and functions.

In light of all these potential indicators of brain damage and dysfunction, counsel should have pursued a thorough neurological assessment of Mr. Fields. Counsel, however, only had Mr. Fields evaluated by psychologist for the narrow purpose of determining his I.Q. Such testing, though, was not a substitute for a proper neuropsychological assessment. Indeed, there is a critical distinction between intellectual functioning, measured by I.Q. scores, and neuropsychological integrity, which implicate the executive functions of the brain.[23] An I.Q. score in the average or above-average range does not preclude the possibility of

---

[23] "Executive functions" refers to a collection of brain processes, most commonly linked to the frontal cortex, which are responsible for planning, decision-making, cognitive flexibility, abstract thinking, rule acquisition, initiating appropriate actions, problem solving, and selecting relevant sensory information.

neuropsychological problems, as deficits in executive functioning, for example, can coexist with average or even high intellectual functioning. However, because counsel never retained an expert to conduct a neuropsychological assessment, these issues were never explored, and consequently, potential evidence regarding brain damage and dysfunction was never investigated and developed.

       7.      **Counsel unreasonably failed to interview readily available witnesses about Mr. Fields' history of incarceration.**

As was obvious to trial counsel at the outset of Mr. Fields' capital prosecution, one of the key arguments that the government would pursue in the penalty phase proceedings was that Mr. Fields' "future dangerousness" justified a sentence of death. Given that by the time of trial, Mr. Fields had spent over a third of his life behind bars, it was clearly incumbent on counsel to conduct a thorough investigation regarding Mr. Fields' history of incarceration, as evidence of Mr. Fields' prior conduct and adjustment to prison life would be probative on this issue. Yet despite this seemingly obvious line of investigation, counsel inexplicably failed to interview *anyone* who had contact with Mr. Fields in the juvenile facilities where he was placed, or during his eight years in the Texas Department of Criminal Justice, or in the early months of his incarceration for the capital offense. Instead, counsel only interviewed a few correctional officers who had only known Mr. Fields for about year prior to his capital trial, while he was incarcerated at the Federal Medical Center in Fort Worth. While these witnesses could testify that Mr. Fields was not currently causing any problems as an inmate in what amounted to solitary confinement in the special housing unit, these witnesses knew little or nothing of his prior incarcerations or problems as an inmate.

Counsel simply failed to interview anyone who was familiar with Mr. Fields' time in his juvenile placements or in the Texas prison system. Such an investigation was necessary to

understand the context of Mr. Fields' behaviors during his prior periods of incarceration, the quality of any care he received when he was having mental and emotional problems, and the effectiveness of the institutions in achieving correctional objectives. Counsel's failure to interview witnesses regarding Mr. Fields' prior incarcerations was unreasonable, as it left counsel unprepared to adequately rebut the anticipated evidence in aggravation at the penalty phase regarding Mr. Fields' alleged future dangerousness. As the Supreme Court has made clear, defense counsel has a duty to make all reasonable efforts to anticipate, investigate and rebut the details of the aggravating evidence that the prosecution will likely emphasize in capital sentencing proceedings. *See Rompilla*, 545 U.S. at 385-90 (counsel held ineffective for failing to investigate petitioner's prior convictions where counsel knew that prosecution intended to seek death penalty by proving petitioner had significant history of felony convictions indicating the use or threat of violence).

### C.    **Trial Counsel's Deficient Performance Prejudiced Mr. Fields.**

The deficiencies in trial counsel's pre-trial mitigation investigation resulted in a penalty phase presentation that only superficially touched on the extraordinary trauma to which Mr. Fields had been exposed throughout his life, and failed to convey the profound impact that these experiences had on shaping Mr. Fields during the formative years of his life and beyond. Moreover, trial counsel failed to present *any* evidence of Mr. Fields' extensive mental health problems, despite numerous "red flags" that mental illness was a multi-generational issue in the Fields family. Additionally, despite being on notice that one of the central arguments that the Government would make as to why Mr. Fields should be sentenced to death was because he would be a "future danger," counsel failed to adequately investigate and prepare for this anticipated aggravating factor with readily available rebuttal evidence. None of these deficiencies are attributable to tactical considerations or strategic judgments on the part of

counsel, but rather directly flowed from counsel's unreasonable failure "to discover *all reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (emphasis added).

Trial counsel's mitigation presentation consisted of only eight witnesses. Three of those witnesses were correctional officers (Jack Jaaks, Fred Waggoner and Greg Watts) who had only known Mr. Fields for the year leading up to his trial, and had almost no knowledge of Mr. Fields' extensive prior history of incarceration. Although the ostensible purpose of putting on these witnesses was to demonstrate that Mr. Fields had adjusted well in prison, the credibility of these witnesses was easily challenged by the government in cross-examination given that: (1) none of these witnesses knew much about Mr. Fields' extensive prior history of incarceration; and (2) to the extent that the Government cross-examined these witnesses about Mr. Field's alleged misconduct during his prior incarceration, none of these witnesses knew enough about those alleged incidents to provide a mitigating context for those incidents.

For example, counsel called Correctional Counselor Jack Jaaks to ostensibly testify about Mr. Fields' conduct at the Federal Medical Center ("FMC") at Forth Worth while awaiting trial. The direct examination consisted of less than 20 questions, more than half of which concerned preliminary background questions about the witness's name and the nature of his employment. TT at 2375-2378. Mr. Jaaks' testimony about Mr. Fields' behavior was perfunctory, simply stating that Mr. Fields had had "problems" when he first came to the facility, but that afterwards he "hadn't been a problem." TT at 2377-2378. On cross-examination, Jaaks admitted that: (1) he knew nothing about Mr. Field's prior prison record within the Texas Department of Corrections, the Texas Youth Commission, or the McLennan County Jail (TT at 2378); (2) that Mr. Fields was found with a shank when he first came to the facility (TT at 2378-2379); and (3) that he was "not sure" whether Mr. Fields had threatened an officer at the facility (TT at 2379). Trial counsel did not conduct any re-direct examination of Jaaks to address these

points raised in cross-examination, but merely let them stand.  The unmistakable impression left for the jury was not only that Jaaks was someone who was simply too unfamiliar with Mr. Fields to offer any reliable information as to whether he would be a future danger, but that even in Jaak's limited time of knowing Mr. Fields, he confirmed that Mr. Fields engaged in alleged conduct – as recent as in the year leading up to the trial – that posed a danger to the staff and inmates at the FMC.

Counsel next called Correctional Officer Fred Waggoner.  Again, counsel asked fewer than 20 questions, roughly half of which were devoted to background information about Waggoner's employment and training, and merely established that Mr. Fields had caused "no problems" while being held in solitary confinement in the Secure Housing Unit of the FMC.  TT at 2380-2382.  As with Jaaks, Waggoner admitted on cross-examination that he had no knowledge of Mr. Fields' prior history of incarceration.  TT at 2382.  Similarly, he testified that Mr. Fields had been had been found with a "homemade knife."  TT at 2383.  Once again, counsel did not follow up with any re-direct examination.

The third correctional officer called was Senior Officer Specialist Greg Watts, to whom counsel posed about 20 questions directly related to his knowledge of Mr. Fields.  TT at 2383-2386.  As with Waggoner and Jaaks, Watts' testimony about Mr. Fields' was superficial at best, consisting of brief testimony that Mr. Fields had been respectful to him and had not caused any problems for him.  TT at 2385.  On cross-examination, the government re-emphasized a point that Watts had made in his direct examination: that Watts had advised Mr. Fields to behave while in custody at the FMC so that his disciplinary issues could not be brought into evidence and used against him at his upcoming capital trial.  TT at 2385, 2388.  In other words, the jury was essentially led to believe that any good behavior that Mr. Fields exhibited at the FMC was not due to a genuine commitment by Mr. Fields to adjust to prison and treat those around him

with respect, but rather, was an act of manipulation to fool the jury into believing he was a safer individual than he "really" was. Moreover, counsel made no attempt to correct the misimpression made by Watt's testimony in this regard, and, as with the other correctional officers, did not conduct any re-direct examination. In one fell swoop, then, Watts' testimony completely undermined any possible benefit counsel had hoped to derive from putting Waggoner and Jaaks on the witness stand to testify about Mr. Fields' good behavior at the FMC leading up to the trial.

Counsel called three family members to the stand: two of Mr. Fields' step-uncles (Vincent Green and Ed Green) and Mr. Fields' mother, Alice Fields Swinnie. With respect to Vincent Green, his testimony was relatively brief. He testified that Mr. Fields had come to live with him and his father, Shelby Mitchell, for about a year when Mr. Fields was 11 years old. TT at 2434-2435. Mr. Fields stopped living with them after Mitchell died, and Vincent did not see much of him again after that. TT at 2438. Although the death of Shelby Mitchell was a life changing event for Mr. Fields, made all the more profound by the fact that Mr. Fields actually witnessed his grandfather being run over by the drunk driver that ultimately killed him, none of this was conveyed by Vincent's testimony, and counsel failed to draw out any details about the event and its impact on Mr. Fields. Rather, Vincent simply testified that Mr. Fields was "hurt real bad" by the loss of Mr. Mitchell, and that he "[couldn't] really say" whether Mr. Fields showed any behavioral differences after Mr. Mitchell's death. TT at 2437. With respect to Mr. Fields' subsequent move to a housing project in Waco, Vincent offered that it was thought of as an "unsafe place" because of the presence of gangs and drugs" (TT at 2438), but such a general statement was inadequate to express how genuinely traumatic it was to grow up in a place where shootings and violent deaths were a common occurrence. Vincent's blanket description of the projects as being in a "bad neighborhood" (TT at 2439), simply lacked the

detail and context necessary to adequately convey the palpable danger that Mr. Fields faced every day he lived there, and the effect that this extreme stress had on his development and psyche.

Similar to Vincent, Ed Green testified that Mr. Fields was "hurt" by Shelby Mitchell's death, and that he "grieved" over the loss (TT at 2446), but counsel failed to elicit anything more about the profound impact that Mitchell's traumatic killing at the hands of a drunk driver had on Mr. Fields. Moreover, Ed also described the projects to which Mr. Fields subsequently moved as being in a "rough neighborhood" (TT at 2448), but counsel did not inquire into the reasons that Ed thought of it as a rough neighborhood or ask any questions to elicit details about specific incidences or occurrences that could vividly illustrate for a jury that was likely unfamiliar with these projects just what it was like to live there on a daily basis. Thus, the jury was given only a superficial understanding of the environment in which Mr. Fields was raised, and absolutely no framework for conceptualizing how both the trauma of his grandfather's death and his subsequent move to a violent housing project affected him during the critical adolescent years of his development.

Alice Fields Swinnie was also called to testify. At the outset of her direct examination, she confirmed that she receives disability benefits for mental retardation after being shot in the head, and that as a result of that injury, she has "trouble remembering things." TT at 2457. In other words, whether or not the jury was prepared to believe that Ms. Fields was a truthful witness, the jury had reason to believe that, on account of her disability, her capacity to accurately recall and relate events may have been so diminished as to make her accounts of past events unreliable. Although Ms. Swinnie testified about the verbal and physical abuse she received from live-in boyfriend, William Bradford, her descriptions were brief and conclusory; for example, she stated that Bradford was "very mean and he used to beat me and he used to beat

my kids." TT. at 2458. Similarly, Ms. Swinnie's testimony about the projects in which Mr. Fields grew up was succinct and vague in its description of why it was a bad environment. She stated that "it's just so bad over there. Everything happens. They shoots and deal dope and a lot of other things." TT at 2460. Such testimony simply failed to convey any of the details necessary to genuinely comprehend the extraordinary stress and trauma that she and her family experienced living in what was essentially a war zone.[24]

Ms. Swinnie was the only witness that counsel called to the stand that had knowledge of the extended family. Yet despite this fact, counsel did not elicit from her any testimony about mental illness present in other family members, or about multigenerational patterns of dysfunction, such as alcohol and substance abuse. Indeed, even with respect to Mr. Fields' life history, Ms. Swinnie's testimony was rather superficial and general, and omitted mention of significant periods of Mr. Fields' life, such as the periods of time in which he was previously incarcerated. Simply put, Ms. Swinnie's testimony failed to provide the kind of comprehensive details necessary to give the jury a robust understanding of the life history of the man whose very existence they were called upon to decide.

Trial counsel also called Adrian Dow, the mother of Mr. Fields' daughter, whose testimony was relatively brief. She testified that their daughter, Octavia, was born while Mr. Fields was in prison, and that while incarcerated, Mr. Fields had corresponded with his daughter by letter and by phone, and was a positive influence on her life. TT at 2454-2455. Dow was not asked any questions about Mr. Fields' life history or background, nor did she provide any such information.

---

[24] Mr. Fields is prepared to present more evidence and expert testimony concerning life in the projects and its impact on Fields at an evidentiary hearing.

Trial counsel also called two other witnesses: Jane Bye (formerly Jane McHan), a social worker, and Jack Randall Price, Ph.D., a clinical and forensic psychologist. Bye testified that this was the first capital case on which she had ever worked. TT at 2389. Although she provided a narrative outline of some of the significant events in Mr. Fields' background, such as the death of Mr. Fields' grandfather, her testimony was just that – an outline, but nothing more. For example, with respect to the death of Mr. Fields' grandfather, Bye testified that that this was a "huge turning point" for Mr. Fields (TT at 2401), but such testimony was merely conclusory. The jury was told that Mr. Fields "cried and cried" at the funeral and became "distraught" (TT at 2402), but such behavior is typical of a grieving family member, and failed to convey precisely how traumatic Mr. Mitchell's death was for the sixteen-year old Mr. Fields. Bye's testimony did not provide any further details regarding the signs and symptoms of behavioral change in Mr. Fields, nor did her testimony offer a framework for understanding trauma and how repeated exposure to such trauma affects adolescent development. Similarly, with respect to Mr. Fields' upbringing, Bye asserted that these years of Mr. Fields' childhood were "chaotic" and that he grew up being exposed to domestic violence (TT at 2407), but Bye was unable, and did not, explain for the jury how the various risk factors present in his life influenced the trajectory of his development, nor how Mr. Fields' life lacked the sort of protective buffers – such as a positive and present male father figure, or a supportive and encouraging teacher or athletic coach – that allow other persons growing up in the projects to chart a different path. Absent such a framework, the jury would have no way of putting the dry facts of Mr. Fields' life into context and give full mitigating effect to the overall picture with which they were presented.

Dr. Price was called to the stand to testify regarding an intelligence test that he had administered to Mr. Fields, as well as Mr. Fields' prospects for leading a productive life in the structured environment of prison. Dr. Price testified that Mr. Fields had an IQ of 113 and

was intelligent enough to complete college level classes in a structured environment. TT at 2475-2476. No doubt, such testimony implied to a lay jury that Mr. Fields suffered from no mental health problems, despite the fact that high IQ scores can co-exist with neuropsychological deficits as well as mental illness. Counsel, however, never investigated Mr. Fields' mental health, and therefore never presented such information about Mr. Fields to the jury.

Although counsel's failure to provide the jury with a complete picture of Mr. Fields' mental health problems was prejudicial in and of itself, the prejudice to Mr. Fields was compounded by the manner in which the government was able to effectively use Dr. Price as a witness *against* Mr. Fields during cross-examination. Specifically, the government was able to elicit through Dr. Price that Mr. Fields demonstrated poor performance during his eight years of incarceration within the Texas Department of corrections, and stated that positive change in prison required a "voluntary effort" which Mr. Fields impliedly lacked. TT at 2481-2482. More devastatingly, the government invited Dr. Price to opine at length about the diagnosis of antisocial personality disorder, before having him confirm on the stand that psychiatrists at the Texas Youth Commission had diagnosed Mr. Fields with that disorder. TT at 2482-2483. Among the remarks that Dr. Price made about the disorder, which the jury would have understood to apply to Mr. Fields, were that the disorder was not amenable to therapy or psychological intervention (TT 2482); that the disorder is characterized by being excessively "self-centered" and a"lack of feeling for others and the lack of feeling bad if they hurt anybody else" (TT at 2482-2483); and that the previously accepted term for this disorder was "sociopath." TT at 2482-2483. Dr. Price also confirmed that psychiatrists at TYC had stated that Mr. Fields was person who lacked remorse. TT at 2483. In short, the government was able to use Dr. Price as a powerful witness to advance its argument that Mr. Fields deserved to die. And because

counsel simply failed to ever investigate Mr. Fields' mental health, they literally were unable to rebut the government's argument that Mr. Fields was a sociopath.

Counsel's thin and superficial presentation of Mr. Fields' life history, as well as their inability to rebut the government's case in aggravation or effectively address damaging points made by the government in cross-examination, was not the result of a planned strategy. Rather, the manner in which the penalty phase case unfolded was a direct product of counsel's lack of pre-trial investigation and preparation.  As noted earlier, there were dozens of witnesses who had encountered Mr. Fields throughout his life which trial counsel could have contacted and interviewed – not simply family members, but teachers, special education staff, juvenile caseworkers, and mental health professionals were readily identifiable and available at the time of Mr. Fields' trial.  Counsel simply failed to do so, and this omission prejudiced Mr. Fields'. What could have been a very robust and comprehensive mitigation presentation, covering not only the chronology of Mr. Fields' life, but also that of his family members, from both "insiders" who lived through the Fields family dynamics, as well as unbiased "outsiders" who were able to observe and contemporaneously record the events of Mr. Fields' life during crucial developmental years, was not presented because counsel performed ineffectively failed to make efforts to discover all reasonably available mitigating evidence.  *See*, *e.g., Outten v. Kearney*, 464 F.3d 401, 421 (3d Cir. 2006) (reversing death sentence and finding counsel ineffective for failing to put on additional evidence of childhood abuse, despite the fact that such evidence was presented at trial, because the trial presentation likely failed to give the jury a comprehensive understanding of the abuse given the discrepancy in depth and detail between the trial evidence and the habeas evidence); *Collier v. Turpin*, 177 F.3d 1184, 1201, 1204 (11th Cir. 1999) (although defense attorneys presented ten witnesses at penalty phase, lawyers' ineffective investigation and presentation resulted in "hollow shell" of mitigation); *Lewis*, 355 F.3d at 369

(overturning district court's denial of habeas relief where district court held that habeas evidence of childhood evidence was merely cumulative to trial presentation); *Williams v. Allen*, 542 F.3d 1326(11th Cir. 2008).

Moreover, counsel entirely failed to pursue any investigation into Mr. Fields' mental health, and consequently, failed to present any evidence of Mr. Fields' significant mental impairments. This failure was unreasonable in light of the numerous "red flags" indicating the need for such an inquiry, including the fact that Mr. Fields had previously received psychiatric treatment while incarcerated and had been diagnosed with major depression with psychotic features, pervasive mood disorder, atypical bipolar, and posttraumatic stress syndrome. Moreover, Mr. Fields had at one point received disability payments for unspecified "mental problems," Alice Fields Swinnie informed counsel that numerous members of the Fields family had "problems with being crazy," and even the social worker assisting counsel, Jane Bye, recommended that counsel pursue a mental health investigation.

Had counsel pursued the obviously necessary mental health investigation of their client, they would have discovered that he suffered from mental impairments that were directly relevant to statutory mitigating factors for purposes of the penalty phase proceedings. As the attached declaration from Dr. George Woods, MD, explains:

> Mr. Fields suffers from significant mental dysfunction. Mr. Fields' exposure to extreme and repeated trauma has produced pronounced symptoms of post-traumatic stress disorder. He also suffers from bipolar disorder. Finally, his social, medical history and the symptoms of mental dysfunction demonstrated throughout his life all support the conclusion that he is afflicted with neuropsychological impairments. Mr. Fields' mental condition is highly relevant to understanding his prior crimes, his behavior in custody, as well as to an assessment of his culpability for the current crime and the statutory mitigating factors of impaired capacity, regardless of whether the capacity was so impaired as to constitute a defense to the charge (18 U.S.C.A. § 3592(a)(1)) and

severe mental or emotional disturbance (18 U.S.C.A. § 3592(a)(6)).

*Declaration of Dr. George Woods* ¶¶ at 1-2.

Additionally, had counsel pursued a mental health investigation, it would have provided counsel with the necessary framework to properly present Mr. Fields' social history and allow the jurors to give full mitigating effect to the factual evidence regarding the trauma that Mr. Fields experienced throughout his life. Rather than being presented with a series of seemingly isolated and discrete instances of "hard times" in Mr. Fields' life, a qualified expert, such as Dr. Woods, could have explained to the jury the manner in which repeated exposure to trauma during the formative years of his development shaped Mr. Fields' brain and behavior. Such mental health evidence has consistently been recognized as being powerful mitigating evidence which trial counsel is constitutionally required to investigate. *Wiggins*, 539 U.S. at 534-35 (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Rompilla,* 545 U.S. at 390-93 (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Jermyn v. Horn*, 266 F.3d 257, 310-11 (3d Cir. 2001) (reversing death sentence due to counsel's failure to provide jury with more detailed incidents of childhood trauma and mental illness); *Harries v. Bell*, 417 F.3d 632, 638-39 (6th Cir. 2005) (counsel ineffective for failing to adequately investigate and present evidence of defendant's mental illness and organic brain dysfunction); *Simmons v. Luebbers*, 299 F.3d 929, 935-38 (8th Cir. 2002) (counsel was ineffective in "fail[ing] to present any meaningful mitigating evidence" despite availability of mental health evidence), *cert. denied sub nom.*, 538 U.S. 923 (2003); *Hill v. Lockhart*, 28 F.3d 832, 845-47 (8th Cir. 1994) (although receiving information that petitioner was previously hospitalized, counsel was ineffective for failing to make any effort to obtain medical records, which would have shown that petitioner had long history of mental problems),

*cert. denied sub nom.*, 513 U.S. 1102 (1995); *Brownlee v. Haley*, 306 F.3d 1043, 1067 (11th Cir. 2003) (ineffective assistance found where counsel failed to "investigate, obtain, or present" mitigating evidence, despite availability of mitigating evidence of petitioner's mental health problems).

As the Supreme Court's recent decisions in *Wiggins*, *Williams* and *Rompilla* demonstrate, in order to be able to establish a claim that trial counsel were ineffective for failing to adequately investigate and develop readily available mitigation and mental health evidence, a capital petitioner must be given the opportunity to present the newly discovered mitigation and mental health evidence in order to establish *Strickland* prejudice, because such prejudice cannot be established in a vacuum. Rather, the court must compare the mitigation evidence presented at trial with the mitigation evidence developed as part of the habeas investigation. Indeed, in each of the aforementioned cases, the petitioner was allowed to develop mitigation and mental health evidence at a post-conviction evidentiary hearing, and the Supreme Court conducted its *Strickland* prejudice analysis by comparing the mitigation case that trial counsel presented with the mitigation case that trial counsel *could have* presented, based on the evidence presented by habeas counsel at the post-conviction hearing. *See, e.g., Rompilla*, 545 U.S. at 391-93 (comparing the evidence that was presented at the original sentencing hearing with the mitigation evidence and testimony presented at a post-conviction hearing to conclude that the undiscovered mitigation evidence "might well have influenced the jury's appraisal of [the defendant's] culpability" and led to a different sentencing decision); *Wiggins*, 539 U.S. at 535-38 (comparing the evidence adduced at trial with the evidence presented at the *habeas* proceeding regarding the petitioner's "excruciating life history" in finding that trial counsel's failure to investigate and present such evidence resulted in *Strickland* prejudice); *Williams*, 529 U.S. at 397-98 (*Strickland*

prejudice determination must take into account mitigation evidence adduced in post-conviction proceedings).

Similarly, in order for Mr. Fields to have a fair and just determination of his *Strickland* claims, he must be given the opportunity to present the evidence that demonstrates that he was prejudiced by counsel's deficient performance. Mr. Fields therefore respectfully requests an evidentiary hearing on this claim at which he can present evidence that would allow this Court to properly make a *Strickland* prejudice determination by comparing the evidence that was presented at trial with the readily available evidence that *could have been* presented but for counsel's unreasonable and deficient mitigation investigation.

CLAIM 22:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR DETERMINATION OF PUNISHMENT BASED ON COUNSEL'S FAILURE TO COMPETENTLY PREPARE FOR AND CROSS EXAMINE THE GOVERNMENT-EXPERT, DR. COONS

CLAIM 23:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS BASED ON COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY BOTH TO ESTABLISH THE RELATIVELY SMALL RISK THAT FIELDS WOULD ENGAGE IN FUTURE ACTS OF VIOLENCE AND TO CHALLENGE THE GOVERNMENT'S ASSERTION THAT FIELDS WOULD BE A FUTURE DANGER IF NOT EXECUTED.

CLAIM 24:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF THE ABILITY OF THE FEDERAL PRISON SYSTEM TO CONTROL FIELDS' BEHAVIOR.

CLAIM 25:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF FIELDS' INCREDIBLY MINIMAL RISK OF ESCAPE FROM A FEDERAL PRISON.

A.    **Mr. Fields' Sixth and Eighth Amendment Rights Were Violated When His Lawyers Were Ineffective In Failing to Rebut the Government's Case for "Future Dangerousness" and in Failing to Present Affirmative Evidence Concerning this Non-Statutory Aggravator**

The Supreme Court "established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). An ineffective assistance of counsel claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.* at 687; *Wiggins*, 539 U.S. at 521. As explained below, Mr. Fields' lawyers failed to prepare to rebut, even with the most readily available information, the Government's case in support of the non-statutory aggravator informally known as "future dangerousness." In addition, counsel failed to present its own expert discrediting the Government's "future dangerousness" expert and presenting an affirmative case that Mr. Fields would not pose a threat of violence or escape if sentenced to life without the possibility of parole. As also described below, the failures of Mr. Fields' lawyers prejudiced the outcome of his capital sentencing.

The jury unanimously found the non-statutory aggravating factor that Mr. Fields was "likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others…." *See Special Verdict Forms attached as Appendix S.* Pursuant to the Government's argument, the jury found "future dangerousness." The jury's finding was based on a misleading presentation by the Government's pertinent witness, Dr. Richard Coons. Fields' counsel failed to introduce readily available evidence to counter Dr. Coons' risk assessment and to demonstrate that, in fact, Fields presented a very low risk of future danger. Counsel also failed to hire a defense expert who could have countered Dr. Coons' testimony and pointed out flaws—obvious to experts but not to lay persons such as the

jurors-- in his approach and conclusion that Mr. Fields was likely to commit future acts of violence and pose a threat to the lives and safety of others.

The declaration of Dr. Mark Cunningham demonstrates the flaws in Dr. Coons' methods and conclusions concerning Mr. Fields' purported future dangerousness.  In addition, as the declarations both of Dr. Cunningham and of former BOP Warden Mark Bezy, filed in another federal capital habeas case[25], demonstrate that at the time of Mr. Fields' trial, the BOP was in a position to virtually negate the risk of violence or escape of prisoners with a far more aggravated history than Mr. Fields'.  Mr. Fields' lawyers' failure to prepare their own expert to challenge or rebut Dr. Coons' scientifically unsound, and at times false, testimony, and their failure to discover even publicly available information about the capacity of the Bureau of Prisons to house even highly dangerous convicts in secure facilities that significantly diminished any risk of escape or violence fell below reasonable standards of performance for defense counsel in a capital case.[26]  As described below, Mr. Fields was prejudiced as a result.

**B.      Counsel Failed to Discover or Present Numerous Sources of Impeachment of the Government's "Future Dangerousness" Expert**

Had Mr. Swanton adequately prepared for Coons' testimony, he would have uncovered numerous readily available sources of impeachment.  Mr. Swanton also failed to hire an expert who could have testified that Coons' methods were discredited and unethical and that Mr. Fields in fact presented a relatively low risk of future acts of violence or other danger in a

---

[25]  Mr. Bezy's affidavit was filed in *United States v. Darry Johnson*, No. 02 C 6998 (N.D. Illinois, Eastern Division) and is attached as an appendix.

[26] In evaluating reasonableness, *Strickland* requires consideration of standards such as those in the ABA Guidelines. *See*, *e.g.*, *Wiggins*, 539 U.S. at 524.  As described more fully herein, the ABA Guidelines established as of the time of Mr. Fields' trial that standard practice in a capital case included, *inter alia*:  rebutting evidence of future dangerousness; hiring defense experts to rebut any of the prosecution's evidence in aggravation,  challenging any prosecution evidence that might be improper, inaccurate, or misleading.  As described, Mr. Fields' lawyers failed in these respects and others.

prison setting. Mr. Fields was prejudiced as a result of trial counsel's failure and to do so violated Mr. Fields' Sixth Amendment right to effective assistance.

During the penalty phase of Fields' trial, the Government called Dr. Richard Coons to testify as an expert on the issue of future dangerousness. Based on no more than a review of documents and a hypothetical set of facts, both provided by the Government, Coons ultimately opined that "it is significantly more likely than not that [Fields] will be of a danger to other people" in prison. TT at 2352-53. Coons never met – let alone medically evaluated – Mr. Fields prior to taking the stand. Moreover, the methodology underlying Coons' opinion has been thoroughly discredited and rejected as both unscientific and unethical by the American Psychiatric Association's (APA), an organization of which Coons is a member. However defense counsel, Mr. Swanton, did not adequately research these issues, and therefore the jury was not presented with information that would have impeached Coons' testimony. Although Swanton conducted *voir dire* of the witness in an attempt to exclude his testimony, because he had not adequately prepared to do so, his attempt to prevent admission of Dr. Coons' testimony failed. Mr. Swanton also cross-examined Dr. Coons in front of the jury. Again, due to his lack of adequate preparation Swanton was unable to competently impeach Dr. Coons' assumptions, methodology or conclusions.

Swanton effectively admits that he failed to adequately prepare for Coons' cross-examination. According to Swanton, he did not put much effort into preparing to cross Coons because "I was familiar with his approach to predicting future dangerousness. Thus, I did not research or review prior transcripts of Dr. Coons' testimony." *See Affidavit of Swanton*. at ¶ 12. In addition to relying on his prior dealings with Coons, Swanton purportedly prepared by reading "a lot" of Coons' prior transcripts. TT at 2316:6-8. Yet, as demonstrated below, counsel failed to impeach Coons based on discrepancies between his prior testimony and his testimony at

Fields' trial.  Counsel also neglected to confront Coons with the numerous studies, analyses, reports and statements contravening his assumptions, methodology and conclusions, with which he should have been familiar both from preparation for Fields' trial and his asserted familiarity with Coons' past testimony.

In all instances described below, counsel's failures fell below objective standards of reasonable representation.  *See* ABA Guideline 10.11 and related commentary

**1.    Counsel's Failure to Discover and Present the Fact that the American Psychiatric Association Rejected Coons' Methodology Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Because of inadequate preparation, Swanton failed to demonstrate that Coons' methodology has been rejected by the APA.  For example, during *voir dire*, Coons testified that he was unaware of the APA's position that future dangerousness cannot "be predicted with any sort of regularity or scientific regularity."  TT at 2318-19.  Similarly, during cross-examination before the jury, counsel asked only whether Coons knew that the APA found predicting future dangerousness "a very, very sketchy thing" and Coons replied that he was "not sure."  TT at 2356:12-19.  Swanton did not explore the issue further.  Had Swanton adequately prepared, he could have impeached Coons' denial of awareness that the APA rejected the validity of the very type of testimony he provided.  Coons is a member of the APA.  TT at 2319:6-8.  As such, Coons should have been aware of the APA's position that "[c]onsiderable evidence has been accumulated now to show that long-term prediction by psychiatrists of future violence is an extremely inaccurate process" and there is "good reason for psychiatrists to shun" opinions made without personal examination, and that experts must "fully acknowledge the limitations" of such opinions.  *See* Am. Psychiatric Assoc., *Psychiatry in the Sentencing Phase: A Report of the Task*

*Force on the Role of Psychiatry in the Sentencing Process* 14-15 (1984); *see also, Barefoot v. Estelle*, 463 U.S. 880 (1983); Amicus Br. of APA 7-10 (arguing that psychiatric predictions of future dangerousness are unreliable and should not be admissible). Because Swanton did not adequately prepare, this powerful impeachment information was never presented to the Court or the jury.

Mr. Fields' lawyers' failure to present evidence rebutting the Government's case for future dangerousness or its own expert on the issue fell below objective standards of reasonable representation in a capital case. *See* ABA Guideline 10.11 The Defense Case Concerning Penalty. ABA Guideline 10.11 (A) states, "As set out in Guideline 10.7(A), counsel at every stage of the case have a *continuing duty to investigate issues bearing upon penalty and to seek information that* supports mitigation *or rebuts the prosecution's case in aggravation…*" (Emphasis added). In addition, Guideline 10.11 (D)  states that, "Counsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present to the sentencing or reviewing body or individual, means by which the mitigation presentation might be strengthened, and *the strategy for meeting the prosecution's case in aggravation*." (Emphasis added). Similarly, Guideline 10.11 (I) establishes counsel's duty to "carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible." The Commentary to Guideline 10.11 elaborates on the critical importance of presenting evidence about "future dangerousness" in particular: "Studies show that 'future dangerousness is on the minds of most capital jurors, and is thus "at issue" in virtually all capital trials,' whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration. Accordingly, counsel should make every effort to present information on this subject." The Commentary goes on to

say, "Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut… Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that fails, rebut the evidence or offer mitigating evidence that will blunt its impact…"   Finally, the Commentary states, "If they have not done so previously in building their affirmative case for a penalty less than death, counsel should also consider putting on evidence describing the conditions under which the client would serve a life sentence *to rebut aggravating evidence of future dangerousness*." (Emphasis added)   Mr. Fields' lawyers failed in all these respects.   Their performance in this regard "fell below an objective standard of reasonableness."  *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688 (internal quotation marks omitted).

Mr. Fields' lawyers' failure to confront Dr. Coons, the Government's expert witness on future dangerousness, with readily available impeachment prejudiced the outcome of his capital trial, *see Strickland*, 466 U.S. at 687:  The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Forms.*   As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death.  Had counsel demonstrated by impeaching Dr. Coons that his methods were spurious, and rejected by professional organizations of which he was a member, there is a reasonable probability that at least one juror would have voted against a finding of future dangerousness, and that non-statutory mitigator would not have weighed in favor of Mr. Fields' death sentence and at least one juror would have voted that Mr. Fields should instead have been sentenced to life without the possibility of parole.

**2.      Counsel's Failure to Discover and Present Readily Available Rules of Professional Ethics that Prohibited Coons' Methodology and Testimony Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Had Swanton adequately prepared, the jury would have been informed that the APA's Principles of Medical Ethics as well as the American Academy of Psychiatry and the Law (AAPL) Ethics Guidelines – both of which directly govern Coons – specifically prohibit Coons' methodology.

The APA Principals of Medical Ethics prohibit Coons from offering professional opinions about a person without conducting an in-person examination. *See, e.g*, Am. Psychiatric Assoc., *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry* (APA Ethics Committee 2006) (1976)(Section 4.5 proscribes "offering speculation as fact."). The APA's Medical Ethics rules declare it "unethical for a psychiatrist to offer a professional opinion *unless he or she has conducted an examination* and has been granted proper authorization for such a statement" with regard to an individual in the "light of public attention." Id. at Section 7.3(emphasis added).  The APA ethical rules also provide that a "psychiatrist may permit his or her certification to be used for the involuntary treatment of any person **only** *following his or her personal examination of that person*."  *Id*. at Section 7.4(emphasis added). As the APA made clear in an amicus brief regarding predictions of future dangerousness that: "[e]ven if psychiatrists under some circumstances are allowed to render an expert medical opinion on the question of future dangerousness, . . *. they should never be permitted to do so unless they have conducted a psychiatric examination of the defendant*." *Barefoot v. Estelle*, 463 U.S. 880 (1983), Amicus Br. of APA 9 (emphasis added).  Because Swanton did not adequately prepare, neither the Court nor the jury was informed that Coons' opinion and methodology violated the APA's Principles of Medical Ethics, even though the APA was on record in a capital

case decided twenty years before Mr. Fields' trial specifically disavowing the very method Dr. Coons used to determine that Mr. Fields purportedly presented a risk of future danger.  Mr. Fields' counsel's failure to discover and present the APA's amicus brief in *Barefoot*, a publicly available document with direct bearing on Mr. Fields' case, fell below objective standards of practice in the defense of capital cases.

Similarly, the AAPL prohibits Coons' methodology – offering medical opinions without in-person examination – as unethical.  The AAPL Ethics Guidelines state that "objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without a personal examination" and that where no personal examination is made, the psychiatrist must "make earnest efforts to ... note any resulting limitations to their opinions." *AAPL Ethics Guidelines*, Art. 4, official comment ¶ 3 (May 2005 ed.).  Coons is also an AAPL member. *See State v. Allen*, No. 3020682, vol. 19, Trial Tr. 198:8-19 (Tex. Dist. 299, Travis Cty. Mar. 18, 2004).

Because of Swanton's failure to prepare, he did not question whether Coons could justify his opinion – which was formed without a medical examination – under these ethical requirements or professional standards.  Although the Government prompted Coons to testify that his opinion regarding Fields' probability of future dangerousness was not made with one hundred percent certainty, (TT at 2352:20-2353:2, 2361:7-12), Coons did not otherwise qualify his opinion as required by professional ethics.  Defense counsel did not attempt to highlight the inconsistency between Coons' opinion and the requirements of professional ethics nor did Swanton attempt to draw out any limitations on Coons' opinion.  Similarly, although Coons admitted his opinion was subjective (TT at 2354:10-16), because of a lack of preparation, Swanton failed to demonstrate that such subjectivity renders a psychiatric opinion both unethical and unreliable.  Had Swanton adequately prepared, he could have demonstrated to the Court and

jury that Coons' methodology was merely "uninformed armchair speculation masquerading as science." *Cunningham Decl.* ¶ 66-67.

Again, counsel's failure to discover and present these publicly available standards to impeach the Government's expert on a crucial non-statutory aggravating factor fell below objective standards of practice for the defense of a capital case. *See* ABA Guidelines 10.11 (A); (D); and (I) and related commentary. Mr. Fields was prejudiced as a result. Mr. Fields' lawyers' failure to confront Dr. Coons with this readily available impeachment prejudiced the outcome of his capital trial: The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Form.* As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death. Had counsel demonstrated by impeaching Dr. Coons that his methods were spurious, and contrary to the ethical standards governing his professional practice, there is a reasonable probability that at least one juror would have voted against a finding of future dangerousness, and that non-statutory mitigator would not have weighed in favor of Mr. Fields' death sentence and at least one juror would have voted that Mr. Fields should instead be sentenced to life without the possibility of parole. As a result of this deficient performance and resultant prejudice, Mr. Fields' Sixth Amendment right to the effective assistance of counsel was violated. *See Strickland*, 466 U.S. at 687.

> **3.    Counsel's Failure to Discover and Present Scientific Studies That Squarely Refuted Coons' Conclusions, Including Some By the Department of Justice, Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Swanton's lack of preparation prevented the jury from hearing about numerous professional studies directly undermining Coons' testimony and methodology. Questioning

about these scientific studies was extremely limited.  Swanton attempted to challenge the scientific validity of Coons' approach, but his lack of preparation and failure to file a *Daubert* motion, rendered such attempts impotent.  The Court did grant Mr. Swanton's oral motion to challenge Coons' testimony under *Daubert*.  During *voir dire* during the brief, oral *Daubert* challenge, Swanton attempted to impeach Coons by asking whether Coons was generally aware scholarly research in the field, and only brought to his attention *a single* study impugning the prediction of future dangerousness.  TT at 2319:19-2321:8.  However, as this Court recognized, counsel failed to file a *Daubert* motion, and therefore, neither counsel nor Coons had any meaningful opportunity to prepare for during cross-examination in front of the jury, and as a result, the Court declined to ask Coons to answer questions pertaining to particular studies that were critical of the method he purported to use to assess Fields' future dangerousness.  TT at 2332-33.  Thus, Swanton failed to cross Coons on the existence of **any** studies rejecting the very substance of his testimony.  Had Swanton adequately prepared, the "erroneous nature of Dr. Coons' methodology could have been more specifically refuted had the jury been informed of the data that are inconsistent with his methodology and their application to Mr. Fields." *Cunningham Decl.* ¶¶ 64-84.  Moreover, the jury heard nothing that would have alerted it to the fact that Coons' approach to evaluating future dangerousness was unorthodox at best, and would have been in fact, discredited by numerous professionals in the field.

Mr. Fields' counsel's failure to discover and present evidence that Dr. Coons' approach to evaluating future dangerousness had by that time been discredited by numerous scientific studies fell below the objective standard of performance in the defense of capital cases. *See* ABA Guidelines 10.11 (A), (D), (I), and (L) and related commentary.  "Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this

evidence can be excluded, rebutted or undercut…"] Mr. Fields was prejudiced as a result of counsel's failures, and his Sixth and Eighth Amendment rights were violated. *See Strickland*, 466 U.S. at 687.

At the time of trial, numerous scientific studies existed that unequivocally rejected the notion that future dangerousness risk prediction can be assessed without empirical evaluation. For example, studies showed that risk predication of future dangerousness is inherently inaccurate:

> To date, the accuracy of these predictions [of dangerousness] have not been good. In order to increase the accuracy of these predictions, it is essential that they be based on results of empirical research. . . . Given the complex, often non-linear interplay of mental, biological and behavior subsystems within the individual and an environment, operating in a probabilistic, sometimes very uncertain and unpredictable way, it is unrealistic to hope for accurate prediction of individual functioning across environmental contexts of differing character or over the life span."

Sheilagh Hodgins, *Studying the Etiology of Crime and Violence Among Persons with Major Mental Disorders: Challenges in the Definition and the Measurement of Interactions, in Developmental Science and the Holistic Approach* 317-18 (2000) (quotations and citation omitted)). Studies also demonstrated that any attempt to predict such risk without use of empirical evidence and actuarial data – as opposed to Coons' rank speculation – are unreliable:

> Clinicians relying on traditional techniques are poor at accurately estimating the future behavior of others – particularly low base-rate behaviors. Actuarial methods have been identified repeatedly as superior to clinical methods in predicting most human behavior, including the probability of violence

Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 Crim. Just. & Behav. 20, 28 (1999). Studies

also existed demonstrating that not only were Coons' methods unreliable, but his failure to explain the limitations of his opinions was professionally irresponsible:

> Despite 25 years of research, social scientists have barely scratched the surface of risk assessment as a predictive tool . . . . Responsible health care professionals have a duty to be aware of their ability and limitations.

Randy K. Otto, *On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature*, 18 L. & Psychol. Rev. 43, 67-68 (1994). Because Swanton failed to properly prepare, the Court and jury remained unaware of the fact that Coons' opinion has been roundly rejected by the scientific community.

Counsel's lack of preparation also prevented him from demonstrating that Coons' methods were scientifically unsound. Although Coons testified that his methods were not "peer review[ed]" or subject to "error rate analysis," counsel failed to highlight the importance of these facts to either the Court or the jury. TT at 2330:25-2331:4, 2356:1-11. Numerous studies confirm that opinions given without peer review and error rate analysis are scientifically worthless with regard to prediction of future dangerousness:

> [w]hen a man informs someone that he knows the exact truth about anything, that person is warranted in inferring that he is an inexact man. Every careful measurement in science is always given with the probable rate of error.

See *Cunningham Decl.* ¶ 14, 110(e); *e.g.,* Edmund H. Mantell, *A Modest Proposal to Dress the Emperor: Psychiatric and Psychological Opinion in the Courts*, 4 Widener J. Pub. L. 53, 64-65 (1994). Because of Swanton's failure to prepare, this fact was not presented at trial.

Neither the Court nor jury was presented with studies that expose a fundamental flaw in Coons' opinion – that future dangerousness cannot be reliably predicted without a history of violence in prison. Coons testified "that past behavior is the best predictor of the future behavior," (TT at 2319:25-2320:1) and that he relied on Fields' "long history" of violence

outside of prison life. TT at 2358:7-2359:25.  However, United States Department of Justice studies have refuted this very assertion concluding that behavior outside of an institutional setting is a poor predictor for future violence within an institutional setting.  See Cunningham Decl. ¶¶ 66-67; *e.g.,* J. Alexander & J. Austin, *Handbook for Evaluating Objective Prison Classification Systems* (National Council on Crime and Delinquency 1992) (sponsored by U.S. Department of Justice); J. Stephan, *Prison Rule Violators: Bureau of Justice Statistics Special Report* (U.S. Department of Justice 1989).  Several scientific studies confirm this result and demonstrate that future dangerousness cannot be responsibly predicted where no such history of violence in prison exists*.  See, e.g.,* Melvin G. Goldzband, *Dangerousness: A Mutating Concept Passes Through the Literature*, 26 J. Am. Acad. Psychiatry & Law 649, 651 (1998) ("dangerousness cannot be diagnosed without a history of previous dangerous behavior" (quotations omitted)).  These studies completely undermine Coons' position, given that Coons himself admits there was no record whatsoever of Fields injuring anyone in prison.  TT at 2357:25-2358:6.  However, because of counsel's lack of preparation, these studies were not used to impeach Coons.

Counsel's failure to discover and present these publicly available studies—several of which were sponsored by the Government's own legal department—to impeach the credibility of the Government's expert on future dangerousness, a crucial non-statutory aggravating factor in Mr. Fields' case, fell below objective standards of practice in the defense of capital cases.  *See* ABA Guidelines, *supra.*  Mr. Fields was prejudiced as a result:  The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future.  *See Special Verdict Form.*  As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death.  Had counsel demonstrated by impeaching Dr. Coons that his methods had been discredited by numerous scientific studies, including some by the Department

of Justice, the entity prosecuting Mr. Fields, there is a reasonable probability that at least one juror would have voted against a finding of future dangerousness, and that non-statutory mitigator would not have weighed in favor of Mr. Fields' death sentence and at least one juror would have voted that Mr. Fields should instead be sentenced to life without the possibility of parole.   As a result, Mr. Fields' Sixth and Eighth Amendment rights were violated.   *See Strickland*, 466 U.S. at 687.

**4.     Counsel's Failure to Present Evidence that Coons' Prior Inconsistent Testimony Impeaches His Credibility   Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Although Swanton claimed to have researched Coons' prior testimony (TT at 2316:6-8), he failed to effectively use any of Coons' prior inconsistent statements to impeach his testimony.

For instance, Coons testified that he reached his "conclusion about Mr. Fields' dangerousness before talking to him," (TT at 2354:4-5) which falsely implies to the jury that Coons did interview Fields at a later time, although Coons admitted in *voir dire* that no interview took place. TT at 2331:22-2332:2.   Yet Counsel failed to point out to the jury by adequately cross-examining Coons that this testimony was misleading, at best.   In prior testimony, Coons declared that "ordinarily in my practice I would do an evaluation before I would undertake to treat someone*."   State v. McDuff*, No. 643820, Trial Tr. 116:5-24 (Tex. Dist. 184, Harris Cty. 1993).   But in the Fields case, Coons admitted he employed no formal study or observations in forming his opinion.   TT at 2328:11-18, 2331:22-2332:2.   Because of their lack of preparation, Mr. Fields' counsel were unaware of Coons' prior testimony and therefore never asked what effect Coons' failure to conduct a clinical examination in this case, though it had purportedly

been his usual practice in other cases, had on the validity of his opinion that Mr. Fields presented a risk of future danger.  Nor did counsel inquire why Coons departed from his ordinary practice of reliance on evaluation or observation with respect to Fields, or whether Coons felt that his complete departure from his normal procedure weakened his opinion in this case.

Coons also testified that he was not aware of the number of studies that cast doubt on the reliability of future dangerousness predictions but that he had "read a lot of things about future dangerousness."  TT at 2320:9-15.  Yet Coons previously testified that specific studies impugning predictions of future dangerousness "are well known to all of us*." United States v. Vialva*, No. W-99-CR-070(1) & (2), Trial Tr., vol. 15, 3159:16-20 (W.D. Tex. June 19, 2000).  This testimony impeaches both Coons' credibility and the scientific validity of his methodology As a result of inadequate preparation, Swanton did not attempt to impeach Coons' feigned unawareness of the scientific community's rejection of his methodology through introduction of this prior testimony.   Such a failure fell below objective standards of practice in the defense of a capital case. *See* ABA Guidelines, *supra.*

Similarly, when Swanton tried to establish that the risk of Fields' future dangerousness is low because prisons have effective methods for controlling the potential violence of prisoners – Coons disagreed.  TT at 2357:7-24.  Before the jury, Coons denied that future violence could be attenuated through removal from the general population.  TT at 2357:7-24.  However, in previous testimony, Coons admitted just the opposite – that prisons are capable of effectively controlling inmate violence through segregation from the general population. *See United States v. Webster*, No. 4:94-CR-121-Y, Trial Tr., vol. 26, 187:6-188:3 (N.D. Tex. June 18, 1996).  Because of counsel's inadequate preparation, these prior inconsistent statements were never presented to the jury.   Counsel's failure to impeach Coons as to this critical issue, which went directly to whether Mr. Fields could be confined securely if given a sentence less than

death, fell below objective standards of practice in the defense of a capital case.  *See* ABA Guidelines, *supra.*

Similarly, counsel's attempt to impeach Coons' testimony that Fields would present a danger if given a life sentence was thwarted by his lack of preparation.  Swanton asked Coons whether he was aware of studies showing that prisoners serving life sentences are less likely to commit violence, but Coons evaded the question by stating that that older prisoners are less violent.  TT at 2360:1-16.  Counsel's failure to prepare prevented him from impeaching the credibility of Coons' evasive response through use of prior testimony on this subject.  In that regard, Fields was twenty-eight at the time of trial; in prior testimony Coons opined that "by the late twenties there is some dwindling of propensity" to commit criminal acts of violence.  *State v. Jeffrey*, No. 991361, Trial Tr., vol. 20, 183:7-18 (Tex. Dist. 147, Travis Cty. Mar. 12, 2001).  Accordingly, Coons' response to Swanton's question was not only evasive, but inconsistent with his prior sworn testimony.  Simply put, Fields was already at an age where Coons has testified that any propensity for violence would have "dwindle[ed]".  Id.  Counsel was unable to adequately cross Coons on this point due to lack of preparation.  Moreover, counsel could have impeached Coons' opinion about the correlation of younger age with institutional violence *via* peer-reviewed studies to the contrary. *See Cunningham Decl.* ¶¶ 77-81; 102, 103 ("There was no expert testimony, however, that age is one of the most powerful predictive factors for prison misconduct violence, with inmates having progressively lower rates of misconduct . . . and assaultive misconduct . . . as they age."); *e.g.,* T.J. Flanagan, *Time Served and Institutional Misconduct: Patterns of Involvement in Disciplinary Infractions Among Long-Term and Short-Term Inmates*, 8 J. Crim. Just. 357-367 (1980).  Yet again, the failure to prepare prevented this from happening.

In sum, defense counsel's failure to adequately prepare allowed Coons present scientifically and ethically unsupportable testimony to the jury while carrying the weight and authority of an "expert." Counsel's ineffectiveness prevented any meaningful rebuttal, although any reasonable preparation would have afforded counsel numerous items impeaching nearly every element of Coons' testimony. Such failure to prepare, discover, and present readily available, in many cases publicly available, information to rebut the Government's future dangerousness expert fell below an objective standard of practice in the defense of a capital case. *See* ABA Guidelines*, supra* ("Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut… Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that fails, rebut the evidence or offer mitigating evidence that will blunt its impact…") Mr. Fields' lawyers' failure to confront Dr. Coons with this readily available impeachment prejudiced the outcome of his capital trial: The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Form.* As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death. Had counsel demonstrated by impeaching Dr. Coons that his methods were spurious, and contrary to the ethical standards governing his professional practice, there is a reasonable probability that at least one juror would have voted against a finding of future dangerousness, and that non-statutory mitigator would not have weighed in favor of Mr. Fields' death sentence and at least one juror would have voted that Mr. Fields should instead have been sentenced to life without the possibility of parole.

**5.**    **Counsel's Failure to Discover and Present Readily Available Information About BOP's Ability to House Prisoners, Including Mr. Fields, Under Strict Conditions of Confinement That Practically Negated Any Risk of Future Violence or Escape Fell Below Objective Standards of Practice In the Defense of a Capital Case and Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

As Dr. Mark Cunningham states in his declaration, "[I]n February 2004 the Bureau of Prisons (BOP) had significant security and confinement capability in its super-maximum facility, ADX Florence, that largely negates (i.e., renders extraordinarily improbable) Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape." *Cunningham Declaration,* p. 7.  Dr. Cunningham further declares that "Testimony regarding the confinement capability at ADX Florence would have directly contradicted the Government's representation . . . that it was impotent to securely manage an offender such as Mr. Fields." *Id.* at 8.  In addition, the attached declaration of former BOP Warden Mark Bezy confirms that it was well known by the time of Mr. Fields' 2004 trial that the BOP was equipped to confine prisoners in facilities that practically negated the risk of escape or serious violence against other prisoners or BOP staff.  Specifically, counsel's failure to prepare, discover, and present readily available information about BOP's capacity to house prisoners securely indefinitely allowed Dr. Coons to testify without rebuttal that when "he [presumably referring to Mr. Fields] gets violent they'll lock him up more securely for a period of time and then put him back in a more general population after he cools down, and then when he does it again, they'll probably lock him up more securely" but "[g]enerally speaking, it's an after the fact issue because . . . if somebody's just irritable or something, they don't generally lock them up, but after they've stuck somebody or cut somebody or beat them up or injured a guard or whatever, then they would isolate them for a while."  TT 2357.

This testimony suggested that there was no condition of confinement that could permanently or meaningfully prevent Mr. Fields from prison violence.    Yet, as Dr.

Cunningham's declaration establishes, statistics show that "ADX was securely confining inmates with prison assault and escape histories. . . . This is important as it reflects the potential for an offender to be referred to ADX *prior* to perpetrating serious violence in BOP.  ADX is designed to control the worst inmates in BOP."  *Id.*at 10 (emphasis in original).  In fact, "[t]hrough 2004, there had been no homicides at ADX and no escapes, and "[t]hough assaults do occur, they are infrequent—particularly in light of the prison misconduct history of the inmates at ADX. Weapons assaults are particularly infrequent." *Id.* at 12

In addition, Mr. Bezy, who was at one time the warden at USP Terre Haute, (*see Bezy* at 1) where Mr. Fields is now housed, and a number of other maximum-security BOP prisons, has declared under penalty of perjury that as of 1998, which was well before Mr. Fields' 2004 trial, BOP had the capacity to house prisoners *indefinitely* at USP Marion, for example, "under highly secure and restrictive conditions of confinement, including . . . restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort. While the hope of the BOP was that inmates sent to the general population at USP Marion would monitor their behavior and return to a mainstream maximum security facility after two or three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum" ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  *Id.* at 2.  Bezy has further declared that "USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and *to reduce or eliminate the inmate's risk of violence or future dangerousness*."  *Id.* at 2-

3(emphasis added)   Bezy has further described in detail the capacity of the Super-Max at Florence to "hold the most dangerous inmates under extremely strict conditions of confinement . . . *for as long as necessary* to deal with the security or future danger concern raised by a particular inmate."  *Id.* at 5 (emphasis added); *see id.* at 8]  He has gone on to describe special cells at Florence that BOP uses to house prisoners who "are deemed to be exceptionally dangerous [or] due to concerns about security and/or . . . future dangerousness as set forth by the sentencing court."  *Id.* at 5.  (emphasis added)]  Bezy's declaration describes BOP's successfully housing convicted spies, bombers, terrorists, and members of murderous organized prison gangs under these strict conditions of confinement.  *Id.* at 3-6 (emphasis added)]  Dr. Cunningham's declaration also provides appendixes with graphic examples of the architecture and staffing that virtually insure that prisoners with much more aggravated criminal histories than Mr. Fields' are unable to escape or commit violent acts against other prisoners or BOP staff.  *See* Appendix to Cunningham, which will be filed separately.

Yet, counsel's lack of preparation and failure to identify or present even publicly available information about BOP's capacity for secure confinement or to hire an expert who could have rebutted Coons' misleading testimony about a prison's ability to practically negate the risk of future dangerousness, left the jury with no counterpoint to Coons' false testimony that prisons lack effective methods for controlling prisoners' potential violence.  As a result, the jury unanimously found the non-statutory aggravating factor that Mr. Fields was likely to pose a risk of danger in the future. *See Special Verdict Forms.*  Mr.  Fields' lawyers' failure to discover or present this evidence fell below objective standards of practice in the defense of a capital case. *See* ABA Guidelines 10.11 (A); (D); (F)(2) and (3)(establishing that in deciding which witnesses to call and evidence to prepare in the penalty phase, counsel should consider "Expert and lay witnesses along with supporting documentation  . . . that may explain or lessen the client's

culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor" as well as "Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served.") *Id.*  As Dr. Cunningham's declaration demonstrates, there was convincing evidence that Mr. Fields could have been housed securely in a prison setting.

Mr. Fields was prejudiced by counsel's failure to investigate this readily available information about the BOP's ability to house Mr. Fields in a secure environment that would have practically eliminated any risk of his escaping or committing acts of violence while in prison.  As Mark Cunningham has declared, if he would have been called to testify at Mr. Fields' trial, he would have testified "that should Mr. Fields have been determined by BOP to be a disproportionate risk of violence in prison, he could be held under super-maximum security conditions until determined to no longer be a disproportionate risk."  *Cunningham,* p. 36. Defense counsel's failure to present this readily available information through an expert on future dangerousness fell below an objective standard of reasonableness and allowed the jury to conclude unanimously that Mr. Fields was likely to commit acts of danger from prison.  *See* ABA Guidelines 10.11 (A); (D); (F)(2) and (3) and related commentary ("If they have not done so previously in building their affirmative case for a penalty less than death, counsel should also consider putting on evidence describing the conditions under which the client would serve a life sentence to rebut aggravating evidence of future dangerousness.")

Mr. Fields was prejudiced by his counsel's failures because there is a reasonable probability that had the jury heard such testimony, at least one juror would not have found the "future dangerousness" aggravator, and that at least one juror would have struck a different

balance in weighing the evidence in aggravation against the mitigation and would have voted to sentence Mr. Fields to life without the possibility of parole. Counsel's failures violated Mr. Fields' Sixth and Eighth Amendment rights. *See Strickland*, 466 U.S. at 687.

**6.     Counsel's Failure to Retain a Defense Expert Concerning Future Dangerousness Fell Below an Objective Standard of Practice in the Defense of a Capital Case and Prejudiced the Outcome of Mr. Fields' Sentencing.**

Dr. Cunningham's declaration sums up the importance of expert testimony in this critical area: "Avoidance of fundamental errors in violence risk assessment at Mr. Fields' capital sentencing required the testimony of an expert to inform the jury of scientifically-sound methodology and empirical data, and to rebut the faulty methodology and erroneous opinions offered by Dr. Coons." *Cunningham* at 37. Had such testimony and data been presented to Mr. Fields' jury in "a clear, organized, logical fashion that would neither confuse nor mislead the jury[,]" there is a reasonable probability that at least one juror would have concluded that BOP had the capacity to house Mr. Fields in a maximum security facility that would have rendered it nearly impossible for him to escape or harm others. Such a finding by even one juror would have eliminated the finding of the non-statutory "future dangerousness" aggravator which in turn would have resulted in a reasonable probability that at least one juror would have concluded that the balance of mitigating factors and aggravating factors weighed in favor of a life without parole sentence.

Yet defense counsel failed to retain an expert who could have presented testimony rebutting nearly all of the Government's case for "future dangerousness." An expert could have testified to the following, none of which was presented at Mr. Fields' trial:

- The use of the term "future dangerousness" was an improper conflation of the language of the actual non-statutory aggravator; thus both the

Government's expert and its argument asked the jury to consider an improper factor in adjudging whether Mr. Fields should be sentenced to death. (*see Cunningham* at 19-21 for transcript quotes).   The phrase "future dangerousness" has the effect of misleading sentencers into believing that they are supposed to be judging whether the defendant "exhibits an enduring *state*  of dangerousness," rather than "an assessment of the probability of *acts* of a particular severity."  This is a distinction that "cannot be over-emphasized in providing for the application of scientific methodology and findings."   An expert could have explained that evaluating an individual's purported "dangerousness" as contrasted with "[g]roup statistical data regarding the incidence and correlates of violence," is "a social judgment that is overly broad, independent of contextual factors, and not subject to reliable measurement."  *Id.* at 21;

- As described previously, in general, the methodology Coons used in evaluating Fields' purported dangerousness was spurious, unethical, and had been discredited by numerous scientific studies, including some by the United States Department of Justice.  *Id.* at 21-22;

- Dr. Coons' reliance on "the incident offense" as a predictor of Mr. Fields' purported future dangerousness was improper.  Expert testimony available from "numerous other federal capital  cases" had described important data on this question.  A defense expert in Mr. Fields' case could have described the studies, presented in Mark Cunningham's  declaration at paragraphs 69-73 that explain why this consideration is improper to an evaluation of whether a prisoner is likely to engage in criminal acts of

violence that would constitute a continuing threat to society, which was the proper inquiry in this case.

- "Dr. Coons' assertion that personality characteristics and lack of conscience are synonymous with serious violence in all contexts, including prison," while it appeals to common sense, is not supported by any data;

- Dr. Coons' testimony that because Fields would have "nothing to lose" if sentenced to life without parole, he'd be at increased risk of prison violence was "fundamentally in error."

- Dr. Coons' testimony that there is "huge amount of violence" in prison that is never reported "is entirely speculative," and "in regard to comparative data there is little plausible reason to expect that unreported violence among the capital LWOP inmates would be more frequent than among the serious offenders with whom they share high-security confinement."

- As discussed previously, "Dr. Coons did not acknowledge how longer-term super-maximum conditions of confinement such as were available at ADX Florence could be applied preemptively to Mr. Fields." Dr. Coons also failed to account for the negative impact the conditions under which Mr. Fields had been confined at the McLennan County Jail had influenced his negative behavior there. *Cunningham* at ¶ 85-96.

- "The methodology and associated testimony of Dr. Coons demonstrated virtually all of the fundamental errors in violence risk assessment at capital sentencing that have been identified in the peer-reviewed

literature," including inadequate reliance on base rates; failure to consider context; susceptibility to illusory correlation; failure to define severity of violence; faulty implications of Antisocial Personality Disorder and Psychopathy; ignoring the effects of aging; misuse of patterns of behavior; neglect of preventive measures.  "Not surprising, reliance on such a fundamentally flawed predictive methodology results in predictions that have an extraordinarily high error rate."  Data rebutting Dr. Coons' own representation of his predictive accuracy made a defense expert's rebuttal all the more important in this case.  ¶ 97-100;

- Dr. Coons and David Sweeney of the Federal Medical Center in Forth Worth improperly mixed the prisoner's age and his incarceration tenure as factors bearing on "future dangerousness."  Yet, there was no expert testimony "that age is one of the most powerful predictive factors for prison misconduct and violence, with inmates having progressively lower rates of misconduct . . .  and assaultive misconduct . . . as they age." ¶ 101-03 (internal citations omitted);

- Prisoners like Mr. Fields who have attained a GED or high school diploma "have *half* the prevalence rates of prison assault as inmates not having this level of educational attainment."  ¶ 104;

- Actuarial models have proven more reliable than clinical judgment in making risk assessments, and there were "two actuarial scales available in February 2004 for forecasting the risk of assault in prison that could have been applied to Mr. Fields."  Application of one of these scales to Mr. Fields "yields a 40-year risk of a 14.5% likelihood of serious prison

violence," which is "modestly below the risk rate of 16.4% of the sample as a whole. Most of this risk is for assault of another inmate. Life-time risk of an aggravated assault on a correctional officer is projected at 1%." These rates are far lower than the "more likely than not" asserted by Dr. Coons. ¶ 105-06;

- "[T]he single most important piece of data in making an accurate violence risk assessment," is knowledge of the base rate of violence in the representative group. An expert could have demonstrated to Mr. Fields' jury by applying the base rate of violence among offenders similar to Mr. Fields that offenders similar to Mr. Fields presented "a low and not disproportionate risk of serious violence in prison." ¶ 107;

- Mr. Fields' pattern of behavior while confined "while creating a management problem, did not progress to serious assaults or significant injury of other persons within the prison. To the extent that this pattern is unrelated to the aggravating effects of his conditions of confinement in the McLennan County Jail, it is simply predictive of continuing management problems—not serious violence." ¶ 108;

Dr. Mark Cunningham has declared that he could have testified to the above had he been called at Mr. Fields' capital sentencing in 2004 and that he could have testified that Mr. Fields' likelihood of serious prison violence during a life without possibility of parole sentence in BOP "was well below 'more likely than not,'" and that even if Mr. fields had been determined by BOP to be a disproportionate risk of violence in prison, "he could be help under super-maximum security conditions until determined to no longer be a disproportionate risk." *Id.* at ¶ 109. Yet, Mr. Fields' counsel failed to retain or present to the jury any expert testimony

rebutting the Government's unscientific and misleading case for a finding of future dangerousness. This failure fell below an objective standard of practice in the defense of a capital case. *See* ABA Guidelines 10.11 (establishing that in deciding which witnesses to call and evidence to prepare in the penalty phase, counsel should consider "Expert and lay witnesses along with supporting documentation . . . that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor" as well as "Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served.")

Mr. Fields was prejudiced by his attorneys' failure to present a defense expert to rebut the Government's evidence of future dangerousness. The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Forms.* As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death. Unanimity was required both for a finding of "future dangerousness" and for a death sentence. Had counsel presented expert testimony rebutting Dr. Coons' methods and conclusions and presenting an affirmative case why Mr. Fields was not at high risk for committing serious acts of violence in prison, there is a reasonable probability that at least one juror would have voted against a finding of future dangerousness, and that non-statutory mitigator would not have weighed in favor of Mr. Fields' death sentence and at least one juror would have voted that Mr. Fields should instead have been sentenced to life without the possibility of parole.

"In the absence of such testimony, leaving before the jury only the unrebutted testimony of Dr. Coons, the risk analysis performed by Mr. Fields' capital sentencing jury was

subject to grave errors." *Cunningham* at ¶ 110. Mr. Fields' Sixth and Eighth Amendment rights were violated. *See Strickland*, 466 U.S. at 687.

Even if the Government had not called Dr. Coons, it was deficient performance for counsel not to consult with an expert on this topic. Evidence of a lack of dangerousness in prison has consistently been characterized as mitigating. *Skipper v. South Carolina,* 476 U.S. 1 (1986). Just as pre-crime background and character and post-crime rehabilitation may extenuate the gravity of the crime, the prospect of a likelihood of non-violent or even good behavior in prison can count as a circumstance tending to make the defendant less deserving of the death penalty. *Id.* at 4-5.

Counsel's failure to investigate can hardly be characterized as tactical. *See United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made.").

Fields was prejudiced by trial counsel's failure, which this Court should measure cumulatively. *See Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (prejudice determined by comparing the totality of the available mitigation evidence with the evidence actually adduced at trial and then reweighing it against the evidence in aggravation).

CLAIM 26:    THE GOVERNMENT COMMITTED PROSECUTORIAL MISCONDUCT BY MISREPRESENTING THE CONDITIONS OF FIELDS' CONFINEMENT UPON CONVICTION AND POTENTIAL FOR FUTURE DANGEROUSNESS IN VIOLATION THE OF THE FIFTH AND EIGHTH AMENDMENT CONSTITUTIONAL GUARANTEES.

A.    **Facts**

A core element of the Government's penalty phase presentation to the jury was the assertion that no prison facility was capable of controlling Fields and, therefore, he would be a danger in the future unless executed. In arguing the point, the Government focused heavily on

Fields' prior behavior and escape from McLennan County Jail (2120:18-2128:23, 2135:9-15, 2154:9-2156:2) and Fields' various "escapes" from ultra-low security juvenile facilities (TT 2064:20-21, 2077:2-11, 2077:24-2078:3, 2078:12-14, 2085:15-2086:16).[27]   Among others, the Government examined Jimmy Stone, a deputy sheriff with the McLennan County Sheriff's Department.  Mr. Stone admitted that he had "never been in a federal prison" (TT at 2313:7-8) and, therefore, could not compare the level of security provided by federal facilities to the security measures provided by McLennan County jail.  TT at 2313:7-8.  Nevertheless, the Government elicited Mr. Stone's opinion that there are no "escape-proof" prisons (TT at 2310:12-14, 2312:4-5) and that there are no prisons where an inmate could be prevented from causing "injury to another inmate or to a correctional officer."  TT at 2310:15-18; *Declaration of Dr. Mark   Cunningham* ¶¶ 50-61.   Based on this testimony the Government argued that execution is the only way prevent the risk of future escape and murder:

> Mr. Swanton said to you, he reiterated what the Judge said, the only way he's going to get out is in a pine box, unless of course he escapes.  Unless of course, there's another Benny Garrett.  When you're thinking about whether or not Sherman Fields is a future danger, think about the pattern of conduct.  **Think about –I mean, isn't the very essence of future danger, isn't the very definition of future danger that you escape from jail and kill someone.**  Isn't that what happened.  That's what happened in this case.

TT 2541: 10-19; *Declaration of Dr. Mark  Cunningham* ¶¶ 50-61.

Based in part on the lack of adequate rebuttal, the Government's tactic worked – the jury unanimously found that Mr. Fields was "likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others . . . and . . .

---

[27] These juvenile facilities were unsecured.  Accordingly, what was characterized as a pattern of "escapes" at trial was, in reality, no more then a pattern of a child walking off an unsecured property without permission.  TT at 2090: 3-10; *Affidavit of Dr. Mark Cunningham* ¶ 55.

is an escape risk . . . ." *See* Special Verdict Forms – Count Three; TT at 2063:12-23. However, the Government knew – but never disclosed – that executing Mr. Fields was by no means the only adequate method of preventing his limited risk of future dangerousness.[28]

While the Government focused on Fields' past behavior in county jail and unsecured juvenile facilities, it never informed the jury that, as a "matter of regulation certainty," Fields would be incarcerated in a high security level federal prison. *Declaration of Dr. Mark Cunningham* ¶¶ 51. The Government never disclosed that the Federal Bureau of Prisons (BOP) had "significant security and confinement capabilit[ies]" including, if need be, placement in the super-maximum security facility ADX Florence. *Id.* at ¶¶ 16-18. "[I]n February 2004 the Bureau of Prisons (BOP) had significant security and confinement capability in its super-maximum facility, ADX Florence, that largely negates (*i.e.*, renders extraordinarily improbable) Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape." *Id.* at ¶ 17.

ADX Florence was designed exclusively to control prisoners with histories of prison violence or escape behavior. *Id.* at ¶ 23. The capabilities to control prisoners in ADX Florence include:

- Single cells with both barred and steel doors.

- Cell windows facing inner recreation area.

- Poured reinforced concrete fixtures.

- Twenty-three-hour a day lockdown.

- Prisoner meals in cell.

---

[28] As described in Claim 22, had Fields' counsel conducted an adequate penalty phase investigation and consulted appropriate experts, the jury would have learned that Fields poses little to no actual risk of future dangerousness.

- Prisoner movement accompanied by double escort with baton, while the prisoner is cuffed behind the back with his feet shackled.

- Limited communication with the outside.  Prisoners are only allowed one or two, fifteen minute, monitored phone calls per month.

- No contact visits – all prisoner visits are monitored.

- All prisoner mail subjected to x-ray, opening and review by staff.

*Id.* at Appendix B7.  Because of the extraordinary control capabilities of ADX Florence, even though the facility houses the worst and most uncontrollable prisoners in the country, there were only 14 minor assaults on staff members and 3 attempted or threatened assaults between December, 1994 and June, 2001.  *Id.* at ¶ 41.  ADX Florence is located in the remote foothills of the Rocky Mountains, 80 miles southwest of Colorado Springs.  *Id.* at ¶ 22.  Its ultra-secure parameter is surrounded by reinforced gun towers and a two fences with stacked coils razor wire between them.  *Id.* at *¶* 24.  The facility was designed not only to prevent prisoner escape, but also to prevent the possibility of terrorists or criminal organizations from breaking in.  *Id.* at ¶ 24.  The design is overwhelmingly effective – there has never been an escape from ADX Florence.  *Id.*  Simply put, the ability to control even the most dangerous criminals at ADX Florence is vastly superior to that of McLennan County jail.  *Id.* at ¶ 52.  The Prosecution knew this fact.

However, given Fields' low risk of future violence, he would almost certainly have been placed in High security in U.S. Penitentiary, as opposed to ADX Florence, had he been given a life sentence:

> A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived.  [Security Designation and Custody Classification Manual (5100.07, p. 40]

*Id.* at ¶ 51.  U.S. Penitentiaries are:

> high-security prisons in BOP, characterized by double-perimeter fencing with razor wire, perimeter detection devices, gun-towers,

> concentric layers of security, controlled inmate movement, and
> intensive staffing.    The architecture, staffing, and security
> procedures assume that all inmates at this level of security are
> motivated to escape and would attempt to do so if given the
> opportunity.

*Id.* at ¶ 52.

The Affidavit of former BOP Warden Mark Bezy, filed in another federal capital habeas case,[29] demonstrates that, at the time of Mr. Fields' trial, the BOP was in a position to virtually negate the risk of violence or escape of prisoners with a far more aggravated history than Mr. Fields'.   Mr. Bezy, who was at one time the warden at USP Terre Haute, where Mr. Fields is now housed, and a number of other maximum-security BOP prisons (*Affidavit of Mark Bezy* at ¶ 2), has declared under penalty of perjury that as of 1998, the BOP had the capacity to house prisoners *indefinitely* at USP Marion:

> under highly secure and restrictive conditions of confinement,
> including . . . restrictions on telephone communications, all of
> which were recorded and monitored, and restrictions on visitation,
> including no contact visits of any sort.  While the hope of the BOP
> was that inmates sent to the general population at USP Marion
> would monitor their behavior and return to a mainstream
> maximum security facility after two or three years, there were
> many inmates who were housed at USP Marion for many years,
> including some who were housed at USP Marion for years and
> then transferred directly to the Administrative Maximum ("Super-
> Max" or "ADX") facility in Florence, Colorado when that facility
> opened.

*Id.* at ¶ 6.  Bezy further declared that USP Marion had units within where:

> the most dangerous and/or high security risk inmates were housed
> under even more strict conditions of confinement than those
> imposed on USP Marion's general population.  These even more
> strict conditions of confinement were imposed for as long as the
> BOP and/or the Warden deemed necessary to ensure security and
> to reduce or eliminate the inmate's risk of violence or future
> dangerousness.

---

[29]Mr. Bezy's affidavit was filed in *United States v. Johnson*, No. 02 C 6998 (N.D. Ill. E. Div.).

*Affidavit of Mark Bezy* at ¶ 7.  Given these highly advanced security capabilities, the BOP successfully houses convicted spies, bombers, terrorists, members of murderous organized gangs and foreign dictators – inmates who are indisputably more dangerous than Fields.  *Id.* at ¶ 8.  Again, the security capabilities of U.S. Penitentiaries are vastly superior to those of McLennan County jail, and the Prosecution knew it.  *Id.*

> **B.     The Government Violated Mr. Fields' Right to Due Process and Fair Sentencing in Failing to Correct Inaccurate Testimony About Mr. Fields' Post-Conviction Confinement and Committed Prosecutorial Misconduct in Citing Inaccurate Testimony in Closing Argument.**

A prosecutor's use of false evidence, or allowance of false evidence to go uncorrected violates due process.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  Here, the Prosecution's reliance on inaccurate testimony concerning the likely and available conditions of Mr. Fields' post-conviction confinement violated the prosecution's "special duty not to mislead." *United States v. Universita*, 298 F.2d 365, 367 (2d Cir.), *cert. denied*, 370 U.S. 950 (1962).  The Government misrepresented the BOP's capability to confine and control Fields.  *See Declaration of Dr. Mark  Cunningham* ¶¶50-57; TT at 2541:10-19.  The Prosecution's failure to correct the record with regard to evidence that "would tend to . . . reduce the penalty help[ed] shape a trial that bears heavily on the defendant.  That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963).

*Brady's* "affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20[th]-century strictures against misrepresentation." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995).  It is well-established that the governments' interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *United States v. Corona*, 551 F.2d 1386, 1391 (5th Cir. 1978) (quoting *Berger*,

295 U.S. at 88); *United States v. Goff*, 847 F.2d 149, 164 (5th Cir. 1988) (same); *Dickson v. Quarterman*, 462 F.3d 470, 479 (5th Cir. 2006) (same).  Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88; *Corona*, 551 F.2d at 1391; *Dickson*, 462 F.3d at 479.

As part of this duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury.  Because of the prosecutor's prominent courtroom role as representative of the Government – and the mantle of respect and authority this creates in the eyes of the jury – jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none."   *Berger*, 295 U.S. at 88; *Goff*, 185 F.3d 307 at 163 ("[i]n considering the impact of what is said the court also must be concerned with the great potential for jury persuasion which arises because the prosecutor's personal status and his role as a spokesman for the government tend to give what he says the ring of authenticity"); *United States v. Gallardo-Trapero*, 185 F.3d 307, 319-20 (5th Cir. 1999) ("[t]he power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says") (citing *Goff*, 185 F.3d at 163).  As numerous courts have stated:

> [t]he prosecutor's job isn't just to win, but to win fairly, staying well within the rules. . . .  It is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true.  But it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt, particularly when it refuses to acknowledge the error afterwards to either the trial court or this court and instead offers far-fetched explanations of its actions.

*U.S. v. Blueford*, 312 F.3d 962, 968-969 (9th Cir. 2002) (internal quotations and citations omitted); *see also*, *United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993) ("[i]t is

improper to imply reliance on a fact that the prosecutor knows to be untrue"); *United States v. Valentine*, 820 F.2d 565, 566 (2d Cir. 1987) (finding prejudicial misconduct where "the prosecutor misrepresented, at least implicitly, the substance of the testimony of several grand jury witnesses").

The United States Supreme Court has subjected closing arguments in capital cases to a greater degree of scrutiny. *Caldwell v. Mississippi*, 472 U.S. 320 (1985). These principles are particularly important in the penalty phase of a capital case where the Eighth Amendment's requirements of heightened "reliability in the determination that death is the appropriate punishment," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), and that the sentencing process "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury, *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), together with the "highly subjective" nature of the sentencing decision, *Caldwell*, at 340-41 n.7 (1985), require that special scrutiny be given to prosecutorial argument. As the Third Circuit has explained:

> The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system . . . Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices. [Berger's requirement that the prosecutor refrain from improper argument] applies with particular force to the prosecuting attorney in the penalty phase of a capital case.

*Lesko v. Lehman*, 925 F.2d 1527, 1541 (3d Cir. 1991); *see also Olson v. Shillinger*, 861 F.2d 612, 626 n. 12 (10th Cir. 1988) ("the minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death," justify even closer scrutiny for error at the sentencing phase . . .).

Here, because the Government "knew or should have known" that prison security provided by Civigenics, Inc. is wholly dissimilar from that provided by the federal Bureau of

Prisons (*Declaration of Dr. Mark Cunningham* ¶¶ 50-57; TT at 2541:10-19), the argument concerning Fields' potential to escape was misleading at best and violated due process. *Kyles*, 514 U.S. at 433. The prosecution sought to provide the jury with the false impression that a post-conviction escape from a high-security U.S. Penitentiary was just as likely as an escape from McLennan County Jail. Creating such an impression constitutes prosecutorial misconduct because "it is decidedly improper for the government to propound inferences it knows to be false, or has very strong reason to doubt." *Blueford*, 312 F.3d at 968.

Here, the Government elicited testimony concerning the mere possibility – rather than the actual likelihood – of Fields' escape or potential for uncontrollable violence in prison. TT at 2310:12-22. They elicited this testimony from a witness that had no basis to form an opinion on the BOP's capability to control prisoners having never even stepped foot in a federal prison. TT at 2313:4-8. The Government never distinguished for the jury the differences in security capabilities between a county jail and a federal prison, thereby creating a false impression of Fields' future dangerousness and ability to be controlled. Worse still, the Government incorporated this false impression into their closing argument – describing Fields' past escape as the "very essence of future danger" (TT at 2541:16) – while disregarding facts about high-security incarceration. The Government did so in an attempt to make this argument "'a highly significant factor reasonably likely to have affected the judgment of the jury.'" *United States v. Mack*, 695 F.2d 820, 822-23 (5th Cir. 1983) (citation omitted). Given the jury's findings on future dangerousness and escape risk, it is beyond dispute that had the Government corrected the record as to the likely conditions of Fields' confinement, there is a "'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434. Their failure to do so is prosecutorial misconduct and "warrants reversal of the judgment of conviction and a new trial." *United States v. Valentine*, 820 F.2d 565, 570-71 (2d Cir. 1987) ("because of the prosecutor's 'consistent

pattern' argument, at best questionable and perhaps outrightly disingenuous, our confidence in the jury verdict is severely shaken").

CLAIM 27:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO RESPOND TO THE PROSECUTION'S MISLEADING EVIDENCE AND ARGUMENTS CONCERNING HIS RISK OF FUTURE DANGEROUSNESS.

CLAIM 28:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT TO THE PROSECUTION'S MISLEADING EVIDENCE AND ARGUMENTS CONCERNING HIS RISK OF FUTURE DANGEROUSNESS AND PRESENT WITH READILY AVAILABLE EVIDENCE CONTRADICTING THE PROSECUTION.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in the claim above. In order to establish ineffective assistance of counsel, a habeas petitioner, or in this case a § 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must first show that counsel's performance was deficient, and then demonstrate that the deficiency prejudiced the defense. *Id*. at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In capital cases, an objective standard of reasonableness requires counsel to conduct an adequate investigation for potentially relevant mitigation evidence.

As demonstrated above, there was an abundance of readily available evidence that could have been used to refute the Government's argument concerning Fields' risk of escape and prison violence while housed in a high security U.S. Penitentiary. Counsel ineffectively failed to gather such evidence, let alone object to the mischaracterization of the Government's presentation. Their failure to do was unreasonable, particularly in light of the critical nature of the proceeding, and there is simply no evidence in the extant record that establishes that counsel's deficient performance in this regard was the product of a tactical consideration.

Moreover, given that Mr. Fields' future dangerousness was the central issue in penalty phase, the prejudice is unmistakable. Mr. Fields is entitled to a new trial.

CLAIM 29:    MR. FIELDS' RIGHT TO A JURY TRIAL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE COURT INSTRUCTED JURORS TO REACH A UNANIMOUS PENALTY PHASE VERDICT AFTER THEY DECLARED THAT THEY WERE NOT UNANIMOUS AND WHERE THAT INSTRUCTION HAD A COERCIVE EFFECT.

Jurors have indicated to counsel that they interpreted the Court's instructions during their penalty phase deliberations as requiring a unanimous verdict. About five hours after sentencing deliberations began, the jury sent a note asking "[i]f we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the court have for punishment?" The court responded: "[y]ou are instructed on page 16 of the Punishment Phase Charge of the Court as follows: 'If you are unable to unanimously agree on either punishment option, the Court will impose punishment, which cannot be a sentence of death.' Beyond that, I am unable to answer your question." Approximately eighteen minutes later the jury sent a note stating that "[w]e cannot come to a unanimous agreement." The court responded with the supplemental instruction "[p]lease continue your deliberations." Less then one hour later the jury returned a unanimous sentence of death.

Jurors indicate that the Court's instruction to "continue your deliberations was coercive for at least one "hold out" juror. Some of the jurors interpreted the instruction as requiring a unanimous verdict and, as a result, the "hold out" juror changed her vote from "life" to "death." The juror did not consider switching her vote until the jurors read the "continue your deliberations" instruction.

A Court can provide additional instructions when a jury is deadlocked. *Allen v. United States,* 164 U.S. 492, 501 (1896). However, a so-called *Allen* charge must comply with two requirements: "'(1) the semantic deviation from approved "*Allen*" charges cannot be so

prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved "*Allen*" charge must not be coercive.'" *United States v. Lindell,* 881 F.2d 1313, 1321 (5th Cir.1989) (citations omitted).

Here, there is affirmative evidence that the supplemental instruction actually was coercive. A juror changed her vote from death to life solely as a result of the Court's instruction. Thus, Fields is entitled to a new trial.

## VIII.   CLAIMS RELATED TO COURTROOM SECURITY AND CONDITIONS OF PRE-TRIAL CONFINEMENT AND THE RIGHT OF SELF-REPRESENTATION

CLAIM 30:    MR. FIELDS' FIFTH AMENDMENT RIGHT TO DUE PROCESS; HIS SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION AND A FAIR TRIAL; AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE ALL DENIED WHEN HE WAS FORCED TO WEAR A STUN BELT DURING TRIAL; WHERE THE STUN BELT SIGNIFICANTLY AFFECTED HIS ABILITY TO CONDUCT HIS OWN DEFENSE, AS WELL AS HIS DEMEANOR IN COURT; AND WHERE THE TRIAL COURT FAILED TO CONSIDER LESS RESTRICTIVE ALTERNATIVES.

CLAIM 31:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO COUNSEL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE TRIAL COURT FAILED TO WARN HIM OF THE DISADVANTAGES OF BEING FORCED TO WEAR A STUN BELT AT THE TIME THE COURT ENGAGED IN A COLLOQUY WITH FIELDS ABOUT HIS REQUEST TO PROCEED *PRO SE*.

CLAIM 32:    MR. FIELDS' RIGHT TO BE PRESENT AT TRIAL AND WAS VIOLATED BY REQUIRING THAT HE WEAR A STUN BELT DURING THE ENTIRE TRIAL, VIOLATING THE GUARANTEES OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

CLAIM 33:    MR. FIELDS' RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN TRIAL COUNSEL FAILED TO DEMAND A HEARING AND PRESENT EVIDENCE IN RESPONSE TO THE DIRECTIVE THAT FIELDS WEAR A STUN BELT DURING TRIAL, DEPRIVING HIM OF RIGHTS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 34:    DEPRIVING HIM OF RIGHTS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS, MR. FIELDS' RIGHT TO COUNSEL (DURING PENALTY PHASE) WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE DEVICE INTERFERED WITH HIS ABILITY TO CONSULT WITH COUNSEL.

CLAIM 35:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE SENTENCING DETERMINATION WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE STUN BELT NEGATIVELY AFFECTED FIELDS' DEMEANOR IN COURT.

CLAIM 36:    MR. FIELDS' RIGHT TO SELF-REPRESENTATION WAS VIOLATED BY HIS CONDITIONS OF CONFINEMENT, INCLUDING BEING HOUSED IN A CELL WHERE THE LIGHTS WERE NEVER TURNED OFF OR DIMMED, WHERE THE NOISE SUBSTANTIALLY INTERFERED WITH FIELDS' ABILITY TO SLEEP, AND WHERE HE WAS DEPRIVED OF THE TOOLS WITH WHICH TO PREPARE FOR THE NEXT DAY'S EXAMINATIONS. THESE CONDITIONS SIGNIFICANTLY IMPAIRED FIELDS' ABILITY TO CONDUCT HIS OWN DEFENSE AND VIOLATED HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.

### A.    Facts

Mr. Fields' ability to conduct his defense (when he represented himself at trial) and his ability to consult with counsel (when he was represented by counsel during penalty phase) was severely impaired as a result of being required to wear a stun belt.  Even assuming this Court correctly concluded that some security measure was appropriate based on Mr. Fields' past behavior outside of the courtroom and notwithstanding the total lack of any inappropriate behavior in court, this Court failed to conduct a hearing to determine how the stun belt might affect Mr. Fields, failed to warn Mr. Fields about how the stun belt might interfere with his ability to represent himself, and failed to consider less restrictive security measures.  Despite the fact that counsel still represented Fields when the Court decided to require Fields to wear the stun belt, counsel was ineffective based on their failure to investigate and present evidence of Mr. Fields' psychological makeup which would have demonstrated the debilitating effects resulting from requiring Mr. Fields' to wear a stun belt.  In addition, Fields' demeanor in court was negatively affected by virtue of the increased security measures, which likely prejudiced Mr. Fields' jury when deliberating about whether to impose a death sentence.

Mr. Fields' right to self-representation was further impaired as a result of the severe sleep deprivation – the product of the inhuman pretrial conditions of confinement.

**B.**     **Argument**

The Supreme Court has recognized that the use of physical restraints is an "inherently prejudicial practice" which raises a number of constitutional concerns. *Holbrook v. Flynn,* 475 U.S. 560, 568 (1986). The use of physical restraints, such as a stun belt, during trial and the sentencing phase implicates a defendant's Fifth and Fourteenth Amendment rights to due process. *Deck v. Missouri*, 544 U.S. 622, 628-29 (2005). Even a restraint that is less severe than a stun belt, like shackles, can interfere with the accused's Sixth Amendment "ability to communicate" with his lawyer. *Illinois v. Allen*, 397 U.S. 337, 343-4 (1970). When the sentencing phase involves the possibility of a death sentence, the use of a stun belt also implicates the Eighth Amendment guarantee against cruel and unusual punishment. Thus, whenever a court is considering restraints of any kind, it must impose only the least restrictive security measure. *Id.*

Forcing Mr. Fields to wear a stun belt was the most restrictive security measure possible – not the least.

A stun belt is an electronic device that is secured around a prisoner's waist. When activated, intentionally or otherwise, the belt delivers a "50,000-volt, three or four milliampere shock lasting eight seconds." *Hawkins v. Comparet-Cassani,* 251 F.3d 1230, 1241 (9th Cir. 2001). The shock administered "causes incapacitation in the first few seconds and severe pain during the entire period," may also cause "immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal." *Hawkins,* 251 F.3d at 1234 and *People v. Mar,* 28 Cal.4th 1201, 1214, 52 P.3d 95 (2002) (internal citation and quotation marks omitted)). The wearer generally is knocked to the ground by the shock and convulses uncontrollably. *Mar,* 28 Cal.4th at 1215. Activation of a shock belt can cause muscular weakness for approximately thirty to forty-five minutes as well as

heartbeat irregularities or seizures. *Mar,* 28 Cal.4th at 1214. "Accidental activations are not unknown." *United States v. Durham,* 219 F.Supp.2d 1234, 1239 (N.D.Fla.2002); *aff'd* 287 F.3d 1297 (11th Cir. 2002) (reporting a survey that showed 11 out of 45 total activations, or 24.4%, were accidental).

Mr. Fields was prejudiced in several ways as a result of being forced to wear the stun belt during trial. To begin, Mr. Fields did not knowingly and voluntarily make the decision to represent himself because, when he waived his right to counsel, the Court failed to warn Fields that wearing a stun belt might interfere with his ability to represent himself. Prior to Mr. Fields' decision to waive counsel, Dan Phillips, a deputy at the Marshall's Service, explained why the marshals sought to require Fields to wear the stun belt. (T.T. at 52-57). However, when the Court was informing Fields of the "dangers" of self-representation, the Court did not mention the adverse affects associated with wearing a stun belt. (T.T. at 63-67).

In *Abdullah v. Groose*, 44 F.3d 692 (8th Cir. 1995), the court held the defendant did not knowingly and voluntarily make the decision to represent himself because the trial court failed to warn the defendant of the negative effects that wearing shackles had on his ability to represent himself. *Id.* at 695. Abdullah argued that his Sixth Amendment right to self-representation was violated because he was forced to wear leg shackles during the trial. The Magistrate Judge recommended granting his relief because "[t]he combination of shackles and self-representation is particularly prejudicial, and without specific warnings once the decision to shackle petitioner was made, it cannot be said that petitioner made the choice of self-representation knowingly and intelligently." *Id.* at 694. The Eighth Circuit agreed and held that "the state trial court did not fulfill its duty to assure that Abdullah was 'aware of the dangers and disadvantage of self-representation' as required by *Faretta. Id.*; *see also Faretta*, 422 U.S. 835. The Eighth Circuit also held Abdullah's Sixth Amendment right to self-representation was

violated because "*Faretta* requires that the defendant seeking to represent himself should be informed by the trial judge of the particular complexities and difficulties that the shackling causes." *See also Oviuk v. State*, 180 P.3d 388 (Ak. 2008) (holding that "when a defendant who is to be shackled at trial indicates that he wishes to waive his right to counsel and exercise his right of self-representation, it is incumbent on the trial judge to explain the added difficulties and potential prejudices that the shackling will pose before the judge accepts the defendant's wavier of the right to counsel").

Next, Mr. Fields' fear of the stun belt interfered with several of his important trial rights. Many courts have recognized the psychological impact that a stun belt has on a defendant. In fact, stun belt manufacturers tout the psychological "supremacy" of the device. However, while the threat of intense, debilitating pain may make it an effective security device, it also serves to interfere with several critical trial rights. For example, in *Durham*, 287 F.3d 1297 (11th Cir. 2002), the court stated:

> A stun belt seemingly poses a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles. The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial-including those movements necessary for effective communication with counsel.

*Id.*

The Eleventh Circuit also held that a stun belt has a negative impact on a defendant's Sixth Amendment and due process rights to be present at trial and to participate fully in his defense:

> Wearing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt. A defendant is likely to concentrate on

>doing everything he can to prevent the belt from being activated, and is thus less likely to participate fully in his defense at trial. We have noted that the presence of shackles may 'significantly affect the trial strategy [the defendant] chooses to follow.' A stun belt is far more likely to have an impact on a defendant's trial strategy than are shackles, as a belt may interfere with the defendant's ability to direct his own defense."

*Id.* at 1306.

In *Durham*, the court held that defendant's right to be present at trial and to participate in his own defense was affected by the stun belt, and thus, reversal was required because the prosecution did not prove that the error was harmless. *Id.* at 1309.[30] *See also People v. Mar*, 28 Cal.4th 1201 (Cal. 2002) (holding that trial court erred in compelling defendant to wear a stun belt).

Similarly in *Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir. 2003), the Ninth Circuit held that the trial court erroneously required the defendant to wear a stun belt, and remanded the case to decide whether the defendant was prejudiced in being forced to wear such a device. The court recognized the fear and anxiety that wearing a stun belt can have on a defendant:

>This "increase in anxiety" may impact a defendant's demeanor on the stand; this demeanor, in turn, impacts a jury's perception of the defendant, thus risking material impairment of and prejudicial affect on the defendant's 'privilege of becoming a competent witness and testifying in his own behalf.

*Id.* at 901 (citations omitted).

All of these constitutional concerns were fully realized in this case. Requiring Mr. Fields to wear a stun belt during trial interfered with his ability to represent himself. Certainly, Mr. Fields is not claiming that he was rendered continuously and completely unable to

---

[30] The Eleventh Circuit also held that the "decision to use a stun belt must be subjected to at least the same 'close judicial scrutiny' required for the imposition of other physical restraints." *Id*. Thus, a court must make the following findings of fact: (1) criteria for triggering the stun belt; (2) possibility of accidental discharge; (3) whether an essential governmental interest is served by making the defendant wear the stun belt; (4) whether less restrictive means of restraint are available; and (5) the court must place its rationale on the record. Id. at 1306-07.

think by virtue of having to wear the stun belt.  However, whenever Fields encountered difficulty in cross-examination (which happened frequently), the stun belt made it difficult to impossible for him to concentrate and think through the issue.  In addition, the extreme sleep deprivation that Mr. Fields had to endure as a result of his conditions of confinement only served to acerbate the problem.  As a result, there are a number of examinations where Fields simply gave up – where he would not have done so but for the security conditions.  In short, Mr. Fields' ability to represent himself was burdened and prejudiced by the use of the stun belt.

During penalty phase, when Mr. Fields was represented by counsel, Mr. Fields was reluctant to discuss matters with counsel for fear of being electrocuted.  For example, Mr. Fields most wanted to speak to his attorneys about matters of trial strategy during breaks.  However, that was also when the marshals sought to take Fields back to the holding cell.  As a result, Mr. Fields would often simply not try to speak with counsel for fear that his efforts would be misinterpreted as a refusal to follow orders, resulting in activation of the device.  There were several instances where Fields decided not to consult with counsel as a result of the stun belt.

It is important to note that unjustified interference with the right to counsel constitutes a structural error.  *See generally United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) ("We have little trouble concluding that the erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error"'") (citations omitted).  Thus, this type of prejudice alone justifies reversal.

However, the prejudice to Mr. Fields does not end there.  Requiring Mr. Fields to wear a stun belt made him appear to be cold and emotionless, the strategy he reasonably adopted in order to lessen the chance of being shocked.  However, while an effective strategy to avoid getting shocked, it was also a strategy that negatively colored jurors' views of Fields in making

their penalty determination, as at least one juror has indicated to counsel.  Thus, the use of the stun belt likely contributed to Mr. Fields' death sentence.

Mr. Fields' reaction to the stun belt – his intense fear of being shocked, his distrust of the marshals, and his altered demeanor – was influenced by years of trauma.  In short, Mr. Fields' psychological condition, especially his paranoia, heightened the legally recognized problems generally associated with the device.  *See Declaration of Dr. George Woods,* p. 3 ("Even unrestrained, Mr. Fields is highly anxious and paranoid.  These symptoms would be dramatically increased by requiring him to wear a stun belt controlled by a marshal.").  All of this information was available at the time of trial and could have been presented by counsel when the Court was considering whether to permit use of the device.

Trial counsel deficiently failed to present relevant evidence when this Court considered and approved the use of the stun belt.  *Strickland v. Washington,* 466 U.S. 668, 692-94 (1984).  Counsel's failure was directly reflective of their corresponding failure to conduct a competent investigation into the negative psychological effects of forcing Mr. Fields, a man whose extreme trauma has understandably invested him with distrust, paranoia, and fear, to wear a device easily activated based on one misperceived move.  *See generally Wiggins v. Smith,* 539 U.S. 510, 534-35 (2003).

Finally, to the extent the Court found justification for some heightened courtroom security, it failed to consider less restrictive alternatives to the stun belt – alternatives that could have provided the necessary security without psychologically disabling Field's ability to represent himself.  For example, a leg brace could have served the same security purpose without any of the corresponding negative psychological effects.

As a result, Fields is entitled to an evidentiary hearing on these claims. Because he was prejudiced in several ways by the unnecessary use of the stun belt, he is entitled to a new trial.

CLAIM 37:    MR. FIELDS' FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY INCREASED SECURITY MEASURES AT TRIAL WHICH WERE APPARENT TO JURORS, INCLUDING THE VISIBLE OUTLINE OF THE STUN BELT, THE PRESENCE OF ADDITIONAL SECURITY PERSONNEL WHO WERE SEATED CLOSE TO FIELDS AND WHO, ON OCCASION INTERACTED WITH HIM WHILE JURORS WERE PRESENT IN THE COURTROOM, AND BY INCREASED SECURITY MEASURES EMPLOYED AFTER THE GUILTY VERDICT.

CLAIM 38:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS EIGHTH AMENDMENT PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN, GIVEN THAT THE STUN BELT AND OTHER SECURITY MEASURES WERE APPARENT TO JURORS, COUNSEL FAILED TO EXPLAIN TO JURORS HOW THESE MEASURES NEGATIVELY ALTERED FIELDS' DEMEANOR.

CLAIM 39:    MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE UNITED STATES MARSHALS INCREASED SECURITY AFTER JURORS RETURNED A GUILTY VERDICT, THEREBY IMPLYING THAT FIELDS WAS DANGEROUS AND WHERE THE COURT TOLD JURORS (OUTSIDE THE PRESENCE OF THE PARTIES) TO COMMUNICATE ANY ALLEGED THREATS TO THE COURT.

CLAIM 40:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN, AFTER CONVICTION, THE MARSHALS INFORMED JURORS THAT THEY WOULD ESCORT JURORS TO THEIR VEHICLES DURING PENALTY PHASE.

CLAIM 41:    MR. FIELDS' RIGHT TO BE PRESENT AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE COURT TOLD JURORS TO REPORT ANY THREATS TO THE COURT WHEN NEITHER FIELDS NOR COUNSEL WERE GIVEN NOTICE, AN OPPORTUNITY TO OBJECT, OR THE RIGHT TO BE PRESENT.

### A.    Facts

The last set of related claims focused on the psychological impact of the stun belt on Mr. Fields – his ability to represent himself, to consult with counsel, and the resulting flat demeanor produced by the psychological threat of activation. This set of claims focuses on the

prejudice from jurors either seeing or hearing about all heightened security measures. Additionally, if jurors were able to see the stun belt, then counsel incompetently failed to explain to jurors that Mr. Fields' apparent lack of emotion was the byproduct being forced to wear stun belt and was not his true reaction to the testimony at trial and in the penalty phase.[31]

Although the stun belt was fitted under Fields' clothes, the outline was visible. Thus, it is likely that some jurors knew that the Court had imposed a heightened security measure in this case. In addition, other visible security measures served to call jurors' attention to the fact that the Court felt Fields' deserved increased security. For example, even though he was fitted with a stun belt during trial (which should have resulted in Fields' being able to move in courtroom), Mr. Fields was directed to remain seated at all times. Security personnel were seated behind him, including the marshal who controlled the stun belt. Often times, when court broke for a recess, at least one marshal would approach Fields, while jurors were exiting the courtroom. While the prosecutors were also directed to remain seated during trial, the prosecutors were permitted to approach the bench. Fields, who represented himself, was not. Thus, stand-by counsel, rather than Fields would approach the bench for side-bar conferences.

After the jury convicted and, without notice to Fields or his counsel, the marshals apparently told jurors that they would now be escorted to their vehicles. There were no incidents, either in or outside of court, justifying this increased security. This increased security arrangement continued for the remainder of the trial. In addition, at least one juror has reported

---

[31] Mr. Fields, paranoid that a marshal would activate the stun belt, sought to remain "emotionless" at trial. At least one juror has told counsel that Mr. Fields' lack of emotion at trial was a factor in the decision to impose a death sentence. Given that Fields' lack of emotion was an artifact of a visible security device, competent counsel should have explained that fact to jurors, so that jurors would not view Fields' demeanor in court as reflective of his true emotions. If counsel had done so, there is a reasonable likelihood of a life verdict.

that the Court, in chambers, advised jurors that they should report any threats to the Court, although it is not presently clear when that warning was issued.

**B.    <u>Argument</u>**

The Due Process clause of the Fifth Amendment to the Constitution forbid the use of visible increased security measures, like shackles, during trial, unless that use is "justified by an essential state interest" – such as the interest in courtroom security-specific to the defendant on trial. *Deck*, 544 U.S. at 628; *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986).

"The appearance of the offender during the penalty phase in [restraints] . . . inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community – often a statutory aggravator and nearly always a relevant factor in jury decisionmaking, even where the State does not specifically argue the point." *Deck*, 544 U.S. at 633. "It also almost inevitably affects adversely the jury's perception of the character of the defendant." *Id.* "And it thereby inevitably undermines the jury's ability to weigh accurately all relevant considerations – considerations that are often unquantifiable and elusive – when it determines whether a defendant deserves death. In these ways, the use of [restraints] can be a 'thumb [on] death's side of the scale.'" *Id.*

While customary security measures do not implicate due process, visible increased security measures may lead jurors to believe that a defendant is dangerous and thereby reverse the presumption of innocence and interfere with the integrity of the jury's deliberations. *Holbrook,* 474 U.S. at 570-72. The essential question is whether the security employed was routine or otherwise. *United States v. Balsam,* 203 F.3d 72, 82 (1st Cir. 2000).

Here, despite the use of stun belt, the marshals were unusually attentive to Mr. Fields in the presence of jurors. Thus, it is exceedingly likely that jurors noticed the increased security. This Court should resolve this issue by conducting an evidentiary hearing.

In addition to the heightened security in the courtroom, at least one juror told post-conviction counsel that marshals had contact with jurors after the guilty verdict when jurors were told that security would be increased.[32]  Such contact, directly relating to an issue of fact in the penalty phase, constitutes improper communications with jurors in violation of the Sixth Amendment.  In *Remmer v. United States*, 347 U.S. 227, 229 (1954), the Supreme Court held that any unapproved private communication, contact, or tampering with a juror during a criminal trial is presumptively prejudicial.  *See also Mattox v. United States*, 146 U.S. 140, 149-50 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.  Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated.  Hence, the separation of the jury in such a way as to expose them to tampering may be reason for a new trial, variously held as absolute; or *prima facie*, and subject to rebuttal by the prosecution; or contingent on proof indicating that a tampering really took place. Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear.") (internal citation removed).

The fact that marshals are a routine fixture in a federal courthouse only serves to increase the presumptive prejudice to Fields.  The Supreme Court held in *Parker v. Gladden,* 385 U.S. 363, 363-64 (1966), that the defendant's Sixth Amendment rights were violated where the bailiff told a juror the defendant was a "wicked fellow."  In rejecting the State's argument that no

---

[32] Additionally, one juror indicated that the Court directed jurors to report any threats to the Court, although the juror was unclear when the communication occurred – during or after trial.  Mr. Fields was not present when these communications took place.  Communications by the Court with jurors, especially about a matter that is in issue at trial, constitutes a denial of the right to be present.  *Rushen v. Spain*, 464 U.S. 114, 118 (1983).  Mr. Fields seeks a hearing on this claim, as well.

harm resulted from these comments because ten jurors testified that they did not hear the statements (and Oregon law permits a guilty verdict with ten votes), the Supreme Court stated "(t)his overlooks the fact that the official character of the bailiff-as an officer of the court as well as the State-beyond question carries great weight with a jury which he had been shepherding for eight days and nights." *Id.* at 365. *See also United States v. O'Brien,* 972 F.2d 12, 13-15 (1st Cir.1992) (upholding a guilty verdict but applying the *Mattox* presumption where a police officer who was a potential prosecution witness, but who did not testify, spoke with three jurors during a recess about matters unrelated to the case); *United States v. Williams,* 822 F.2d 1174, 1188 (D.C.Cir.1987) (upholding a guilty verdict but stating that the *Mattox* presumption is "operable even if the communication at issue consisted only of 'banter' not clearly directed at influencing the jury's verdict"), *superseded on other grounds by rule as stated in United States v. Caballero,* 936 F.2d 1292, 1298-99 (D.C.Cir.1991); *United States v. Betner,* 489 F.2d 116, 117-19 (5th Cir.1974) (ordering a new trial under *Mattox* because the prosecutor conversed with the jury panel during a recess and the trial court failed to conduct an adequate hearing).

The *Mattox* rule applies when an unauthorized communication with a juror crosses a "low threshold" to create the potential for prejudice. A communication is possibly prejudicial, rather than *de minimis,* if it raises a "risk" of influencing the verdict. Prejudice is presumed under these circumstances. *See United States v. Dutkel,* 192 F.3d 893, 899 (9th Cir.1999) ("Because jury tampering cuts to the heart of the Sixth Amendment's promise of a fair trial, we treat jury tampering cases very differently from other cases of jury misconduct. Once tampering is established, we presume prejudice and put a heavy burden on the government to rebut the presumption.").

Given that Mr. Fields' future dangerousness was the central issue in penalty phase, the prejudice is unmistakable. Mr. Fields is entitled to a new trial.

**IX.    CLAIMS RELATED TO THE DISPROPORTIONALITY OF FIELDS' DEATH SENTENCE**

CLAIM 42:    THE FEDERAL DEATH PENALTY STATUTE IS UNCONSTITUTIONAL AND VIOLATES THE EIGHTH AMENDMENT BECAUSE IT FAILS TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW THE EIGHTH AMENDMENT.

The gravity, severity, and irreversibility of the federal death penalty make it unlike all other forms of punishment.  Given this uniqueness, it cannot be imposed unless sentencing procedures exist that prevent the risk of it being inflicted in an arbitrary and capricious manner.  *See*, *e.g.*, *Furman v. Georgia*, 408 U.S. 238, 239-40 (1972); *Gregg v. Georgia*, 428 U.S. 153, 188 (1976).  Accordingly, the death penalty is unconstitutionally applied where, for example, a sentencing statute places unfettered discretion in the hands of juries because arbitrary and often discriminatory capital sentences can result.  *Furman*, 408 U.S. at 310 (Stewart, J., concurring) (finding that the Eighth Amendment "cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed").  Due to its lack of sentencing procedures designed to prevent arbitrary and capricious application of the sentence, death sentences imposed with procedures such as those discussed in *Furman* violate the Eight Amendment's constitutional prohibition against cruel and unusual punishment.  *Id.* at 239-40 (*per curium*).

A time-tested and court-approved means of avoiding such arbitrary and capricious results is the incorporation of a proportionality review to statutory sentencing procedures.  *Zant v. Stephens*, 462 U.S. 862, 890 (1983).  A **meaningful** proportionality review includes a review of the universe of cases in which juries imposed either death or life and a comparison of those cases to the case of the particular defendant to be sentenced.  Additionally, a **meaningful** proportionality review must require inquiry into whether similar cases exist in which the government did not even seek death in the first place.  *See*, *e.g.*, *Walker v. Georgia*, 129 S. Ct. 453, 456 (2008) (Stevens, J.) (denial of *writ of certiorari*:  "Cases in both of these categories are

eminently relevant to the question whether a death sentence in a given case is proportionate to the offense"). "[F]ailure to acknowledge these or any other cases outside the limited universe of cases in which the defendant was sentenced to death creates an unacceptable risk that it will overlook a sentence infected by impermissible considerations." *Id.*

The Federal Death Penalty Act ("FDPA") does not provide for comparative proportionality review. 18 U.S.C. § 3593. While that alone does not render the FDPA unconstitutional *per se*, *see Pulley v. Harris*, 465 U.S. 37, 45-46, 50-51 (1984), the FDPA still suffers from significant constitutional infirmities because that the sentencing procedure provides no meaningful mechanism to prevent arbitrary and capricious sentences, such as proportionality review. *See*, *e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) ("[W]here the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required"). As a result, the FDPA is unconstitutional.

<u>CLAIM 43</u>:     MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE A CLAIM THAT THE FEDERAL DEATH PENALTY STATUTE IS UNCONSTITUTIONAL BECAUSE IT FAILS TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW AS AN ISSUE ON DIRECT APPEAL.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claim 42 above. Appellate counsel ineffectively failed to identify and litigate on direct appeal these above-described claims regarding the unconstitutionality of the federal death penalty statute. To the extent this claim was clear on the record, counsel's failure to raise them on direct appeal is inexcusable. Appellate counsel had no reason to avoid raising these meritorious claims. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above.

*Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

CLAIM 44:   IF   THIS   COURT   CONCLUDES   THAT   COMPARATIVE PROPORTIONALITY REVIEW IS CONSTITUTIONALLY MANDATED AND CAN BE REQUIRED WITHOUT DOING VIOLENCE TO THE STATUTE, MR. FIELDS' DEATH SENTENCE MUST BE OVERTURNED AS DISPROPORTIONATE AND IN VIOLATION OF THE EIGHTH AMENDMENT.

Mr. Fields' case is a significant departure from the typical case in which the federal death penalty would be appropriate.  As such, his death sentence is disproportionate to all other federal death sentences and is, therefore, arbitrary and capricious in violation of the Eighth Amendment.  Indeed, Mr. Fields' case plainly demonstrates that the federal death penalty statute is unconstitutional due to its lack of procedures to control the sentencer's discretion.  A comparison of cases proves the point.

Mr. Fields was convicted and sentenced to death for the single-victim murder of his ex-girlfriend during his escape from a federal detention facility.  In addition, the jury found no evidence of substantial planning or premeditation.  Even a cursory review of federal capital prosecutions resulting in a sentence less than death shows that less severe punishments are typically given for much more severe crimes.  For example, one defendant received a life sentence for the premeditated kidnapping and killing a government witness in a drug conspiracy prosecution by beating the victim with a hammer.  *United States v. Holley*, 96-cr-208 (N.D. Ala.).  Another received a life sentence for his role as a co-conspirator in the September 11, 2001 attacks on the World Trade Center and Pentagon.  *United States v. Moussaoui*, 01-cr-455 (E.D. Va.) (attacks resulted in the death of over 3,000 people).  Many other federal defendants have received life sentences for crimes far more aggravated than for which Fields was convicted.  *See*, *e.g.*, *United States v. Street*, 04-cr-298 (W.D. Mo.) (defendant beat, stabbed, and shot victim in the back of the head); *United States v. Jordan*, 04-cr-58 (E.D. Va.) (victim burned to death);

*United States v. Matthews*, 00-cr-269 (N.D.N.Y.) (victim tortured and beaten to death); *United States v. Pitera*, 90-cr-424 (E.D.N.Y.) (some victims tortured and dismembered). Likewise, federal defendants have received life sentences for multiple murders. *See*, *e.g*., *United States v. Henderson*, 06-cv-39 (S.D. Ohio) (murder of a government witness and the witness' boyfriend); *United States v. Galan*, 06-cr-730 (N.D. Ohio) (drug-related murders of two brothers); *United States v. Hans*, 05-cr-1227 (D.S.C.) (arson resulting in six deaths); *United States v. McTier*, 05-cr-401 (E.D.N.Y.) (three murders by a member of a drug gang); *United States v. McGriff*, 04-cr-966 (E.D.N.Y.) (double-murder); *United States v. Gooch*, 04-cr-128 (D.D.C.) (defendant charged with five murders); *U.S. v. Barnes*, 04-cr-186 (S.D.N.Y.) (two drug-related murders); *United States v. Mayhew*, 03-cr-165 (S.D. Ohio) (defendant murdered his ex-wife, ex-wife's boyfriend; defendant also murdered his own daughter, with whom he had an incestuous relationship).

Based on a review of the comparable universe of death eligible crimes, Mr. Fields' death sentence is disproportionate. On this basis alone, Mr. Fields' sentence violates the Eighth Amendment and must be overturned.

CLAIM 45: MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE A CLAIM THAT THAT COMPARATIVE PROPORTIONALITY REVIEW IS CONSTITUTIONALLY MANDATED AND CAN BE REQUIRED WITHOUT DOING VIOLENCE TO THE STATUTE AND THAT MR. FIELDS' DEATH SENTENCE MUST BE OVERTURNED AS DISPROPORTIONATE UNDER SUCH A REVIEW.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claims 42-44 above. Appellate counsel ineffectively failed to identify and litigate on direct appeal these above-described claims regarding Fields' death sentence being comparatively disproportional to other death eligible crimes. To the extent this claim was clear on the record, counsel's failure to raise them on direct appeal is inexcusable. Appellate counsel had no reason to avoid raising these meritorious claim. Had counsel included these claims on

direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

Appellate counsel's ineffective representation is extremely and undeniably prejudicial to Fields. The above-described errors rendered the application of the death penalty to Mr. Fields unconstitutional. Accordingly, the validity of Fields' death sentence is undermined by these constitutional errors. As such, a new trial and sentencing proceeding are warranted and but for appellate counsel's failure to raise these claims on direct appeal, the Fifth Circuit would likely have granted Fields a new trial and sentencing proceeding.

## X.     OTHER CLAIMS

CLAIM 46:     THE CUMULATIVE ERRORS IN THIS CASE CONSTITUTE A VIOLATION OF MR. FIELDS' RIGHTS TO DUE PROCESS, TO A FAIR TRIAL, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

The combination of errors extant in this case deprived Mr. Fields of due process and provide him with a separate claim for relief. *Kyles v. Whitley*, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only conducts piecemeal analysis of each item of suppressed evidence). The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 289-90, 302-03 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). The cumulative effect of

multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Id.* at 290 n.3; *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) ("combined prejudice of the multiple errors committed in this case deprived Alcala of a fundamentally fair trial and constitutes a separate and independent basis for granting his petition"); *Cargle v. Mullin*, 317 F.3d 1196, 1206-07, 1208, 1221, 1223 (10th Cir. 2003) (*habeas corpus* relief is granted with regard to both capital conviction and sentence based on cumulative effect of ineffective assistance of counsel and prosecutorial misconduct: "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless' . . . Consistent with the unqualified reference to **all errors**, our cases reflect application of cumulative-error review to legally diverse claims such as those here . . . [Petitioner's] cumulative-error claim raises the possibility of guilt-phase error having a continuing, cognizable effect on the penalty phase. This commonsense notion that sentencing proceedings may be affected by errors in the preceding guilt phase is not novel") (emphasis in original; citations omitted).

CLAIM 47:    ISSUES RAISED ON DIRECT APPEAL.

Mr. Fields again alleges and preserves for this motion all errors raised on direct appeal.

CLAIM 48:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL WAS INEFFECTIVE IN MULTIPLE RESPECTS.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in Claims 1 through 46. To the extent that appellate counsel could have raised these claims based on the extant record on direct appeal, appellate counsel was ineffective for failing to raise these claims. Had counsel included these claims on direct appeal, there is a

reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); Smith v. Robbins, 528 U.S. 259 (2000).

CLAIM 49:    MR. FIELDS IS ENTITLED TO AN EVIDENTIARY HEARING.

Mr. Fields has alleged many facts that the Government is likely to contest. Should the Government contest any material facts, Mr. Fields is entitled to a hearing in order to prove those facts. 28 U.S.C. § 2255. Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255. Although the potential scope of such a hearing cannot be assessed until the Government files a responsive pleading, in order to prevent any claim of waiver, Mr. Fields now requests that he be afforded a hearing on any disputed facts which, if proven individually or in combination with other facts, will entitle him to relief.

## XI.    **REQUEST FOR RELIEF**

Based upon all of the above allegations and the entire record of this prosecution, Mr. Fields respectfully requests that the Court provide the following relief:

1.    That the Court permit discovery as will be requested in Mr. Fields' to-be-filed Motions for Discovery;

2.    That, if requested,  Mr. Fields be permitted to amend this motion;

3.    That the Court conduct an evidentiary hearing addressing all material and disputed issues of fact;

4.      That the Court permit oral argument as appropriate and required;

5.      That the Court establish a briefing schedule and permit Fields to submit a memorandum of law in support of his claims;

6.      That at the conclusion of the proceedings that the Court vacate Mr. Fields' conviction and sentence and order that appropriate retrial and/or new sentencing hearing be conducted.

7.      And, any other relief to which Mr. Fields may be entitled.

DATED this 1st day of March, 2009.

Respectfully Submitted:

/s/ Jeffrey E. Ellis

Jeffrey E. Ellis
Law Offices of Ellis,
Holmes & Witchley, PLLC
705 Second Ave., Ste 401
Seattle, WA 98104
206/262-0300 (ph)
206/262-0335 (fax)
ellis_jeff@hotmail.com

Peter J. Isajiw
*Pro Hac Vice* Admission Pending
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
Phone:  212-504-6000
Fax:  212-504-6666
Peter.Isajiw@cwt.com

USActive 15580100.1                         -225-

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey E. Ellis, hereby certify that on March 1, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record in the above-entitled case:

**Gregory S. Gloff**
Assistant United States Attorney
800 Franklin
Suite 280
Waco, TX 76701
Email: Greg.Gloff@usdoj.gov


/s/ Jeffrey E. Ellis

Jeffrey E. Ellis
Attorney at Law