

**G**

**WW** GEORGE  W.  WOODS, JR., M.D.

A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

1-866-646-0509
E-mail:gwoods@georgewoodsmd.com
Oakland Seattle Atlanta San Antonio

## DECLARATION OF GEORGE W. WOODS, JR., M.D.

I, George W. Woods, Jr., declare as follows:

At the request of counsel representing Sherman Fields under 28 U.S.C. § 2255, I have performed a neuropsychiatric examination of Mr. Fields, a 34-year-old African American male, currently incarcerated on Federal Death Row, Terre Haute, Indiana.  In order to complete this examination, I have interviewed Mr. Fields at the Terre Haute Federal Correctional Facility.  After being briefed by counsel, I reviewed extensive documentary evidence, including transcripts of Mr. Fields' trial and medical records from a variety of institutions, including the McLennan County Juvenile Court and Probation Department, the Texas Youth Commission, the Heart of Texas Region Mental Health Mental Retardation Center, the University of Texas Medical Branch Hospital in Galveston, and the McLennan County Jail**.**

I have been asked to opine on the following questions:

1.    Does Mr. Fields suffer from a mental disease and/or defect which has been defined as constitutionally relevant to a decision whether to impose a death sentence?

2.    If Fields suffers from a mental disease or defect, was he competent to waive his right to counsel?

3.    If Mr. Fields suffers from a mental disease or defect, would his mental disease or defect affect the general anxiety created by being forced to wear a stun belt?

In response, I offer the following opinions (set forth in greater detail later in this report), which I hold to a reasonable degree of certainty:

1.    Mr. Fields suffers from significant mental dysfunction.  Mr. Fields' exposure to extreme and repeated trauma has produced pronounced symptoms of post-traumatic stress disorder.  He also suffers from bipolar disorder.  Finally, his social, medical history and the symptoms of mental dysfunction demonstrated throughout his life all support the conclusion that he is afflicted with

neuropsychological impairments.  Mr. Fields' mental condition is highly relevant to understanding his prior crimes, his behavior in custody, as well as to an assessment of his culpability for the current crime and the statutory mitigating factors of impaired capacity, regardless of whether the capacity was so impaired as to constitute a defense to the charge (18 U.S.C.A. § 3592(a)(1)) and severe mental or emotional disturbance (18 U.S.C.A. § 3592(a)(6)).

2.    Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses.  Mr. Fields is intensely paranoid and grandiose.  His decision to waive counsel was the result of these mental illness symptoms.  Put another way, but for Mr. Fields' mental illness, he would likely not have sought to waive counsel.  His competency to waive counsel and represent himself in a capital case should have been carefully assessed through a thorough evaluation of his longstanding mental dysfunction and impairments.

3.    Even unrestrained, Mr. Fields is both highly anxious and paranoid.  These symptoms would be dramatically increased by requiring him to wear a stun belt controlled by a marshal.

QUALIFICATIONS

I am a licensed physician specializing in neuropsychiatry.  I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 701 McGill Park Avenue NE, Atlanta, Georgia, 30312; 1511 M Sycamore Avenue # 258, Hercules, California, 94547; and 139 Harmon Drive, San Antonio, Texas, 78209.

I am Secretary General-Elect of the International Academy of Law and Mental Health. I am a Fellow of the American Psychiatric Association, California Psychiatric Association, and the Northern California Psychiatric Association.  I am a member of the American Neuropsychiatric Association, and the American Psychological Association.

I am a member of the American Academy of Psychiatry and the Law.  I am on the Scientific and Executive Committees of the International Academy of Law and Mental Health.  I am a past member of the Advisory Board of  The Health Law Institute of the College of Law, DePaul University.  Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

I teach Clinical Aspects of Forensic Psychiatry to third and fourth year residents at Morehouse School of Medicine, Department of Psychiatry.  I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento.

2

I was on the faculty of the University of Washington, Bothell campus, where I have taught a course on Mental Illness and the Law.  From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California, Medical Center.

I received my Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah.  I received my medical degree from the University of Utah Medical Center in 1977.  I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year.   I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982.  I received my board certification in psychiatry in 1992.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm.

The neuropsychiatric assessment is data driven.  The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline.  (*See* the web page of the American Neuropsychiatric Association, at www.anpaonline.org.)   The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities.  This medical training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders and dysmorphology (the study of structural abnormalities often related to developmental disorders).

The American  Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and transcendent of both traditional psychiatric and neurological practice. The approach represents a fundamental departure from the traditional psychiatry and neurology in several ways.  The reciprocal influences of psychology and cerebral dysfunction are appreciated.  Both processes are, of course, brain-related.  However, each has its own unique and significant influence on behavior.  Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis.  Therefore, a more comprehensive assessment of mental status in undertaken.

The training encouraged by the American Neuropsychiatric Association is explicit: Develop clinical expertise regarding the psychiatric care of persons with disorders of brain function to include diagnostic skills, neurologic and mental status examinations, cognitive testing, electrophysiological testing, neuroimaging, differential diagnosis, crisis intervention,

application of time-limited psychotherapy, and referral for rehabilitative therapies. Gain broad knowledge in the field of neuropsychiatry though extensive exposure to the core literature in neuropsychiatry, neuropsychology, and behavioral neurology.  Neuroanatomy and neurochemistry of behavior should be emphasized.  Gain an advanced understanding of psychopharmacology, including neuropsychopharmacology, with special emphasis on anticonvulsants, psychostimulants, and the interactions of psychotropic medications with other medications on the central nervous system.

My early medical training focused on internal medicine as well as psychiatry.  My internship at Alameda county Medical Center (Highland Hospital, Oakland, California) was not in psychiatry.  Rather, I chose to complete a rotating medical internship, which included internal medicine, surgery, Orthopedic surgery, Emergency Medicine, and Obstetrics/Gynecology. During my psychiatric residency at Pacific Presbyterian Hospital, in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California.  I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United States Farmworkers.  After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency.  During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital.  This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units.  Many of these patients had neurological impairments, significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

The focus of my American Psychiatric Association/National Institute of Mental Health Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general.  The elderly present several pharmacologically-related challenges.  First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount.  Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population.  Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly

in the elderly, and must be appropriately diagnosed and treated.

Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency.  In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms.  Neurological intervention and medical examinations were frequently required.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long-term psychiatric facility, dedicated to treating severely ill patients.  Many of these patients came from state hospitals with atypical presentations.  Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment.  Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments.  A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers.  An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations.

During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California.  Kentfield Rehabilitation Hospital is one of the premier rehabilitation facilities in Northern California.  I was responsible for monitoring complex drug regimens with medically ill individuals.  Many psychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics.  Often, these psychiatric drugs are not utilized for their primary psychiatric indication.  For example, anti-psychotics, anti-depressants, and anti-seizure medications may be effective in diabetic limb and phantom pain.

Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common.  Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature.  Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population.  Differentiating substance use from substance abuse was also  necessary for successful clinical intervention. During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California.

Sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions.  Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder.  Disruption of sleep can be found in almost all psychiatric disorders.  Substance abuse is also often related to impairment of normal sleep patterns.  From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center.  Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic.

We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea.  A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often by of diagnostic significance. From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital.  This contract also extended to Brookside Hospital in San Pablo, California.  Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients.  My evaluation of chronically ill patients, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994.  New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients with what are called co-occurring disorders.  Co-occurring disorders defined persons who have multiple psychiatric disorders, which is the norm, rather than unusual.  Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital.  Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.  The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology.  I rounded with nurses, internists, cardiologists, neurologists, and hospital pharmacologists on all patients in the Intensive care Unit.  During this period I was named Outstanding Medical Director of

Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units. I have consulted with neuropsychologists on neuropsychological tests, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not limited to, the Minnesota Multiphasic Personality Inventory (MMPI 1 and 2), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

Doctors Hospital had a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET). I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (THE JOURNAL OF NEUROPSYCHIATRY AND CLINICAL NEUROSCIENCES), and CNS SPECTRUMS; as well as the AMERICAN JOURNAL OF PSYCHIATRY, PSYCHIATRIC ANNALS AND JOURNAL OF CLINICAL PSYCHIATRY. I also subscribe to the PSYCHIATRIC AND NEUROLOGIC CLINICS OF NORTH AMERICA. I subscribe to the NEW ENGLAND JOURNAL OF MEDICINE.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse College of Medicine, Department of Psychiatry, Atlanta, Georgia. At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patients as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time. I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November, 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in mainstream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that,

even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation ins absolutely necessary. I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

CLINICAL FORMULATION

Mr. Fields was born into a genetic pool of mental illness that – with little recognition of the multiple mental disorders involved, and no intervention – led to an chaotic, violent, and traumatic environment.  Each of these factors – trauma, mental disorder, and environmental chaos and deprivation – helped to shape the uniquely cultural presentation of Mr. Fields' bipolar disorder, a presentation Dr. Day aptly described as "atypical."  It is not an overstatement to say that Mr. Fields' mental dysfunction is the singular fact necessary to an understanding of his life and the crimes of which he has been convicted.

Mr. Fields' mother, Alice Fields, was a chaotic, violent, victimized woman who had children by a number of abusive, violent men. At various times in Mr. Fields' childhood, there were shootings in and around the household.  His mother shot William Bradford (the father of two of her sons) and the woman Mr. Bradford was seeing.  Alice Fields was shot in the head herself by Melvin Swinnie, a man Mr. Fields described to me as the "best male figure my mother was ever with."

Mr. Fields' grandfather, Shelby Mitchell, by all accounts the most stable figure in Mr. Fields' life, was killed by a drunk driver in front of Mr. Fields' home. Family members recall the loss of Mr. Fields' grandfather as the death knell of his spirit, consistent with the onset of complex traumatic symptoms. Yet, Mr. Fields' experienced so many more deaths, by the time he was in adolescence, mental health professionals were making the diagnosis of post traumatic stress disorder (PTSD).

In February 1989, Dr. Day gave Mr. Fields the diagnosis of post traumatic stress disorder after seeing Mr. Fields following a suicide gesture gone terribly wrong. Mr. Fields and his friend, Anthony Curtis, had apparently simulated hanging themselves in a juvenile plan.  Mr. Fields' friend actually killed himself, sending Mr. Fields' down a suicidal spiral for the next several months, consistent with the interplay between his mood disorder and his PTSD, an anxiety disorder.

Dr. Day described the flattened affect, the nightmares Mr. Fields' experienced, consistent with the numbing of emotions and emotional expression found in PTSD. He recommended ongoing treatment for Mr. Fields.  Dr. Day withheld medications he feared might impede Mr. Fields' grieving.

The lack of familial support only made matters worse.  Mr. Fields grew up with no

familial support from his mother, who was herself impaired. His father was completely absent. Mr. Fields recalls meeting him only once, when his father gave him five dollars.  Mr. Fields, and his four siblings were subjected to murderous rages from everyone in the household – particularly, between his mother and a string of violent, emotionally abusive men.

Bessel van der Kolk et al. discuss the impact of trauma in the formative years, and the protective role parents should play:

> Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults.  For example, Pittman(1995) showed that people who developed PTSD secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults.  In addition, interpersonal traumas are likely to have more profound effects than personal ones. . . . Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses.  The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing feeding, comforting, touching, looking, cleaning, resting – in short, by teaching them skills that will gradually help them modulate their own arousal...In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage.  (BESSEL A. VAN DER KOLK, TRAUMATIC STRESS: THE EFFECTS OF OVERWHELMING EXPERIENCE ON MIND, BODY, AND SOCIETY, 184-185 (Guilford Press, 1996)

Mr. Fields continues to exhibit PTSD symptoms.  However, PTSD is not his sole mental illness.

Mr. Fields has suffered from symptoms of bipolar disorder since childhood.  Ample support for this conclusion is found in the multiple diagnoses of mood disorders he received from a succession of treating psychiatrists and psychologists.  Many of his symptoms that were attributed to conduct disorder are also consistent with the presentation of bipolar disorder in children. Bipolar disorder in children and adolescents presents with depression, acting out behavior, emotional isolation, and impaired academic functioning:

> Initial presentation of child or adolescent BD typically involves moodiness, frequent or aggressive oppositional behavior, anger that does not resolve in fifteen minutes, sadness, … inattention, and impulsiveness. When illness begins before or soon after puberty, it is often characterized by a pattern of continuous rapid-cycling, irritable and mixed symptoms that may co-occur with disruptive behaviors, particularly ADHD or CDs (Conduct Disorders), or may have features of these disorders as presenting symptoms. (Faust et al., *Diagnosis and management of childhood bipolar disorder in the primary care setting*, CLINICAL PEDIATRICS, 301, 2006.)

Dr. Day, one of the multiple psychiatrists evaluating Mr. Fields' during his adolescence recognized Mr. Fields' severe mood disorder, and documented his symptoms on several hospitalizations.  He made the diagnosis of atypical bipolar disorder, and recommended mood stabilizers for Mr. Fields.  The "atypical' aspect of Mr. Fields' early presentation was based upon two crucial epidemiological factors, age and ethnicity.

Race is a major factor in the presentation of psychiatric symptoms, particularly in mood disorders. Strakowski and others have discussed the unique presentation African American adolescents manifest when suffering from bipolar disorder, a higher propensity to suffer paranoid ideation, psychotic thinking, and greater perceptual disorders:

> Ethnic differences existed in manic and positive symptom profiles, but not depressive symptoms. Compared with the white cohort, African-American youths were diagnosed more frequently as having psychotic features, and had higher ratings for auditory hallucinations. (Strakowski et al., *Ethnic differences in symptom presentation of youths with bipolar disorder*, 8 BIPOLAR DISORDERS 96 (2006).)

When Dr. Day examined Mr. Fields on March 6, 1989, after Mr. Fields was found with a sheet around his neck, Dr. Day's impressions were that Mr. Fields had a psychotic depression and was suffering from post traumatic stress disorder.  By the time Mr. Fields was discharged, Dr.Day had made the diagnosis of atypical bipolar disorder. By 1989, Mr. Fields had also been seen by the MHMR Center in Waco and placed upon medications, type unknown.

Mr. Fields' bipolar symptoms as a child – paranoid ideation, impulsivity, impaired judgment, acting out behavior, psychotic thinking – are abundantly documented in medical records. Other psychiatrists, including Dr. Sellers and Dr. Heidelberger, thought Mr. Fields may have had, as Dr. Sellers noted, "a pervasive mood disorder."  Even Dr. Tan, who did not find Mr. Fields depressed, believed if Mr. Fields continued to have difficulty, mood-stabilizing medications like Lithium should have been the first choice of medication.  Lithium is primarily prescribed for forms of bipolar disorder.

Recommendations were made for treatment and, when Mr. Fields was not too paranoid to accept treatment, medical records appear to document that Mr. Fields responded positively to medications. By late 1989, Mr. Holmes, the probation officer for Mr. Fields, documented his "suicide problem" but wrote that he was taking medication.  From 1991 until his incarceration, Mr. Fields was on SSI, receiving benefits for his mental disabilities.

Mr. Fields suffered – and continues to suffer, in my professional opinion – from bipolar disorder. The symptoms of his bipolar disorder that manifested as he became older included hypersexuality, poor impulse control, and grandiosity – plus impaired cognitive functioning.

Now, at the time of his trial, and at the time of the crime of conviction, Mr. Fields met the DSM-IV-TR criteria for PTSD as well as bipolar disorder.  His PTSD symptoms – the result of

multiple traumatic stressors – include numbing of affect, hyperreactivity, emotional withdrawal, agitation, impaired sleeping, and exaggerated startle response.  These symptoms are synergistic with his bipolar symptoms.  Mr. Field's bipolar symptoms include impaired sleep, paranoid ideation, agitated depression, impaired judgment, mood swings, irritability, and hypersexuality  – all of which have been well documented over an extended period.

MENTAL STATUS EXAMINATION

Sherman Fields is a 34-year-old African American male who looks his chronological age. He was oriented to person, place, date and time, as well as circumstances.  His movements were rapid.  He was wearing prison garb.

Mr. Fields was attentive, but easily distracted.  He would easily become fixed, with real difficulty switching mental tasks.  He was cooperative during the interview, and was spontaneous in his response.

Mr. Fields' speech output was normal in volume.  He speech was pressured, however, and his words would often fall over each other.  He did not have prosody.  Rather, his vocabulary was good.  His comprehension is grossly intact for nontechnical information.

Mr. Fields does not present perceptual disorders. He denies current hallucinations, illusions, nor delusions.  His thought processes reflected flight of ideas, although he was coherent. Mr. Fields' speech exhibited mild circumstantiality, a tendency toward greater detail than may be warranted.

Mr. Fields' thinking was ruminative, meaning he will get stuck with an idea, and he was unable to think of alternatives. This "stuck" thinking is consistent with the anxiety seen in PTSD. It is also consistent with the impaired executive functioning found in bipolar disorder.

His thought content was both grandiose and paranoid. He was perseverative, repetitive, and rigid in his thinking.

Mr. Fields' mood is anxious.  His mood was also depressed.  His affect, however, was bright and had a broad range.  His affect, the physical expression of emotion, was inconsistent with his mood.  This inconsistency is common in bipolar disorder.  He acknowledged a history of depression and suicidal ideation, but denied present homicidal or suicidal ideation.

Insight and judgment were impaired by the symptoms of his mental illnesses. For example, Mr. Fields was unable to see that just getting rid of his attorneys was not the answer to his paranoid ideation.  His paranoid ideation precluded him from effectively weighing such a decision.

Due to Mr. Fields' psychiatric history, he is able to articulate symptoms of his mental

illness, and has some insight into his depression and disinhibition.


DIAGNOSES

I.
A. BIPOLAR DISORDER, CHRONIC
B. POST TRAUMATIC STRESS DISORDER, CHRONIC
C. SUBSTANCE ABUSE, MULTIDRUG, CHRONIC,

II.
DEFERRED

III.
A. STATUS POST GUNSHOT WOUND
B. STATUS POST MULTIPLE SUICIDE ATTEMPTS

IV.
A. LEGAL PROBLEMS
B. MENTAL HEALTH PROBLEMS

V.
GAF-45


FORENSIC FORMULATION

It is my professional opinion, which I hold to a reasonable degree of neuropsychiatric certainty, that Mr. Fields suffers from PTSD and bipolar disorder. In addition, he appears to suffer from neuropsychological deficits (and should be given a complete battery of neuropsychological tests). Mr. Fields' mental impairments are consistently described as the type of human frailties whose consideration is constitutionally indispensable to an individualized death penalty decision. Mr. Fields' mental impairments are also consistently described by courts and commentators as highly mitigating. Finally, understanding Mr. Fields' mental impairments is vital to an assessment of his past and future conduct.

The symptoms of Mr. Field's multiple psychiatric disorders impaired his competency to waive his right to counsel. Mr. Fields' paranoid fear of his attorneys was consistent with his belief that they were not just not working for him, but were actively working with the prosecutors to convict him. The conditions of Mr. Fields' confinement at the McLennan County Jail exacerbated his mental disorders. As I have noted, *supra*, sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all psychiatric disorders. Historically, Mr. Fields had symptoms of sleep impairment associated with both PTSD and bipolar disorder. Placing him in a cell where he

was under twenty-four surveillance and subjected to continuous illumination could only increase his paranoid suspicions and hypervigilance, while further disrupting his sleep cycles and sense of autonomy and adversely affecting his cognition.

I have reviewed the transcripts from the trial. Mr. Fields' well-documented symptoms of severe, progressive mood disorder; paranoid ideation; impulsivity; psychotic thinking; suicidal attempts; and agitation were not presented at his trial.   There is no mention in the trial proceedings of Mr. Field's long history of mental illness.  Among the mitigating factors that defense counsel asked the jurors to consider on the Special Findings Form utilized in penalty phase deliberations was the statutory factor stating that "[t]he Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge."  Not a single juror found that this factor existed.  Another proposed mitigating factor stated simply, "The Defendant can be controlled in a prison setting."  Again, not a single juror found that this factor existed.  These findings are hardly surprising in view of the lack of expert evidence at trial to explain Mr. Fields' history mental disorders that can be effectively managed with treatment.

The cursory competency examinations hours before the trial started were limited, given that Dr. Mark had no medical records, no social security records, no  medication records, nor any family history to inform his  understanding of Mr. Fields' past or present mental disorder and mental state.

Family history would have provided Dr. Mark a necessary foundation for other diagnoses Mr. Fields suffered from, particularly Post Traumatic Stress Disorder.  There are few stressors Mr. Field did not experience.  Individually, these stressors had the potential to create lasting symptoms in Mr. Fields.  Cumulatively, the stressors magnify the mood symptoms from which he also suffered.

As Mr. Fields attempted to represent himself, the trial Court made his legal failings abundantly clear. The Court noted that Mr. Fields had no expertise or training in the law.  Mr. Fields had no idea what to object to and why. He did not know the Federal Rules of Evidence. Mr. Fields did not know what to present to the jury and what not to present.  Additionally, the Court put strict limits on the types of interaction between Mr. Fields and his legal consultants.

Mr. Fields' paranoid ideation and impaired judgment, coupled with the rumination and hyperreactivity of his PTSD (and exacerbated by his conditions of confinement), fueled his decision to waive counsel, rather than just poor decision- making.  Mr. Fields was not, in my opinion, competent to waive counsel.  Dr. Mark's cursory examination at the time of trial suffered from a paucity of essential information about Mr. Fields' mental health history that would have added appropriate and necessary mental health context.

Neither the Court which determined competency to waive counsel nor the jury which determined sentence were provided the contexts of extreme trauma and violence, mental illness

13

and substance abuse that would have allowed Mr. Fields' behaviors to be understood for what, in many cases they were, symptoms of mental illness. This is particularly true when trying to understand Mr. Fields' developmental years within the context of his mental illness.

The co-morbidity (the symptom combination) of Mr. Fields' bipolar disorder and PTSD must be taken into consideration when attempting to assess Mr. Fields' prior behavior.  One example involves Mr. Fields' prison write-ups in 2001 and 2002.  Many of these write-ups were for masturbation, consistent with Mr. Fields sexual history when not incarcerated. Although Mr. Fields ascribed much of his behavior with women in a negative light, the same bipolar symptom of hypersexuality is present in an isolated setting.  Without a complete social history – including medical records, prior prison records, family medical records, school records, and adolescent treatment records – Mr. Fields' mental illnesses were not able to be considered among the possible causative factors for his behavior.  Similarly, his mental illnesses could not be considered as mitigating factors, since the jury was provided no evidence of his longstanding disorders.

The contextual framework that the jury should have been provided was well described by Mueser et al.:

> OBJECTIVES: Adverse childhood experiences have been found to be associated with poor physical and poor mental health, impaired functioning, and increased substance abuse in the general adult population.  The purpose of this study was to examine the clinical correlates of these experiences among adults with severe mood disorders. METHODS: Adverse childhood experiences (including physical abuse, sexual abuse, parental mental illness, loss of parent, parental separation or divorce, witnessing domestic violence, and placement in foster or kinship care) were assessed retrospectively in a sample of 254 adults with major mood disorders.  The relationships between cumulative exposure to these experiences and psychiatric problems, health, substance use disorders, community functioning, trauma exposure in adulthood, and high-risk behaviors were examined. RESULTS: Increased exposure to childhood adverse experiences was related to high-risk behaviors, diagnosis of a substance use disorder, exposure to trauma in adulthood, psychiatric problems (younger age at first hospitalization, number of suicide attempts, and diagnosis of posttraumatic stress disorder), medical service utilization, and homelessness. CONCLUSIONS: The findings extend research in the general population by suggesting that adverse childhood experiences contribute to worse mental and physical health and functional outcomes among adults with severe mood disorders( Mueser et a.l, *Correlates of adverse childhood experiences among adults with severe mood disorders*. 59(9) PSYCHIATRIC SERVICE1018 (Sept. 2008).)

In summary, Mr. Fields suffers from bipolar disorder and post traumatic stress disorder. He has suffered from the symptom constellation of these two disorders since childhood.  Mr. Fields' life was influenced by violence, absence of nurturing and modeling appropriate coping mechanisms, and mental illness.  Mr. Fields, before most of our grandchildren have attended their high school prom, experienced his mother shoot a man and a woman, and then his mother shot in

14

the head, suffered the deaths of numerous friends and family, and attempted suicide on multiple occasions.

Mr. Fields had been diagnosed with mood disorders as early as adolescence.  He had also been given the diagnosis of Post Traumatic Stress Disorder, based upon a single event, with little known family history that would have substantiated an even greater history of chronic trauma..

Mr. Fields' decision to represent himself reflected  the same disinhibited manner as his escape, when he had absolutely no plan to get further than past the door, no plan to get out of town.  He went right back to the only people – and environment – that he knew.  Although he showed some planning in bribing an obviously available guard, Mr. Garrett, he had no plan after walking out the door.

Mr. Fields  had no strategy to defend himself when he waived counsel. His thinking – based upon paranoia, hyperreactivity, and impaired judgment – was not designed to provide him an attorney.  He was bound to a stun belt under his clothes, creating an anticipatory anxiety to add to his PTSD and bipolar disorder. Mr. Fields was constantly on guard, lest a movement, intonation, or remark end up in him being shocked.

Mr. Fields was paranoid of his attorneys, and, therefore, wanted them gone. He had not thought through  the next step, that he would then have to provide a defense for himself. His manic grandiosity, paranoia, and poor decision making had undermined him again.

I declare, under penalty of perjury, that the foregoing is true and correct.  Executed this 27th day of February 2009.

George Woods, MD

