## Affidavit of Robert Swanton, Esq.


I, Robert Swanton, state as follows:

*Introduction*

1.     I am over 18 and competent to make this affidavit.

2.     I am an attorney admitted to practice law in the State of Texas.

3.     I was one of two attorneys appointed to represent Mr. Fields in his capital trial in the United States District Court for the Western District of Texas (Waco).  My co-counsel was Scott Peterson.

4.     I have been an attorney since 1984.  I have been practicing criminal defense law now for the past 20 years.  This was my third capital trial in which the death penalty was sought.  I have represented approximately six other individuals in non death capital cases.

*Penalty Phase Investigation*

5.     In addition to Mr. Peterson and myself, our defense team included an investigator (Don Youngblood), a mitigation specialist (Jane Bye *nee* McHan), and a psychiatrist (Dr. Randall Price).

6.     I was the attorney who primarily worked with Dr. Price.

7.     I asked Dr. Price to assess Mr. Fields' intelligence and to offer defense strategy opinions regarding Mr. Fields after his interviews with Mr. Fields.  I also asked Dr. Price to assess the relationship between Mr. Fields' intelligence and his ability to adapt to prison, if Fields were sentenced to life.  I also discussed the issues of future dangerousness with Dr. Price and Mr. Fields' history of problems while he was incarcerated.

8.     I did not ask Dr. Price to conduct an actuarial assessment of Mr. Fields' future dangerousness.

9.     I did not ask Dr. Price to conduct any specific neuropsychological testing on Mr. Fields though I knew Dr. Price had experience in the field of neuropsychology and would have relied on his opinion if he felt any such testing was warranted after his interviews with Mr. Fields.


10.     Further, I did not consult with any other experts on any of these issues.

11. After Dr. Price formulated his opinion that Mr. Fields had above average intelligence and the ability to adapt to a prison environment, we decided to call Dr. Price as a witness at trial.

12. Prior to trial, the Government indicated that it would call Dr. Richard Coons as a witness. I had previously tried cases involving Dr. Coons, so I was familiar with his approach to predicting future dangerousness. Thus, I did not conduct any additional research or review prior transcripts of Dr. Coons' testimony.

13. During trial, Dr. Coons opined that Mr. Fields would likely pose a future danger, if sentenced to life in prison. Dr. Coons based his opinion of dangerousness, in part, on Fields' prior criminal behavior, his prior misconduct in detention settings, and the previous diagnoses of Mr. Fields concluding he suffers from an anti-social personality disorder.

14. During my cross-examination of Dr. Coons, I attacked Dr. Coons' methodology, rather than the "facts" underlying his opinion.

*Mr. Field's Decision to Represent Himself*

15. Neither Mr. Peterson nor I wanted Mr. Fields to represent himself. We both repeatedly told Mr. Fields not to waive his right to counsel.

16. Nevertheless, Mr. Fields was adamant, believing that, if he asked the questions, the witnesses would be forced to tell the truth—a dynamic that he felt would not exist if the witnesses' were examined by counsel.

*Security Measures During Trial*

17. I was aware that Mr. Fields was forced to wear a stun belt during the entire trial. I do not believe I was present when the U.S. Marshals explained the use of the stun belt to Mr. Fields.

18. I was aware of the security personnel in the courtroom during trial.

19. I was not aware of any incidents that took place during trial which would have merited any increased security measures.

20. I was unaware of any changes in security measures during the course of the trial.

21. If there were any changes or additional security measures considered or taken during trial (especially if those measures involved jurors), I would have wanted notice and an opportunity to be heard before any such measure was implemented.

I declare under the penalty of perjury of the laws of the State of Texas that the above is true and correct.

Robert T. Swanton, Jr., Affiant

SUBSCRIBED AND SWORN TO BEFORE ME on the 13th day of January, 2009, to certify which witness my hand and official seal.

KIMBERLY F. LONGNECKER
Notary Public, State of Texas
My Commission Expires
December 28, 2011

Notary Public, State of Texas

## DECLARATION OF DR. J. RANDALL PRICE

I, Dr. Randall Price, state:

1. I am a clinical and forensic psychologist and neuropsychologist. I have been licensed as a psychologist in the State of Texas since 1983. I am also licensed in the State of Oklahoma. I have bachelors and masters degrees, as well as a Ph.D. from the University of North Texas. I also completed a post doctoral internship at the Baylor Institute for Rehabilitation and a post-doctoral fellowship at the University of Kentucky. I am board certified in forensic psychology by the American Board of Professional Psychology and in neuropsychology by the American Board of Professional Neuropsychology. I have consulted in more than 200 capital murder cases during the past 20 years with both the defense and prosecution.

2. During August of 2003, I was contacted by Robert Swanton to evaluate and possibly testify in the matter of United States v. Sherman Fields, who was charged with capital murder in United States District Court for the Western District of Texas. On September 8, 2003, I received a court order appointing me on the case to assist Robert Swanton in his defense of Sherman Fields.

3. Prior to meeting with Mr. Fields, I reviewed relevant legal and medical documents including a social history completed by Jane McCann. I did not retain those records and have no specific memory of what records were provided to me.

4. Mr. Fields was initially reluctant to be evaluated, and on my first attempt to evaluate him, he refused to be seen. Eventually, he consented and participated in the evaluation. I evaluated him on December 29, 2003 and January 6, 2004 at the Federal Bureau of Prisons in Fort Worth, Texas.

5. During the course of my evaluation, I conducted an IQ test and a clinical interview. Mr. Fields' full scale IQ on the Wechsler adult intelligence scale was 113. Mr. Fields verbal IQ score was 107. His non-verbal IQ score was 121. One reason for this disparity is that Mr. Fields score was comparatively lower on the general knowledge part of the test, which was likely due to his poor educational experiences. I did not conduct any additional testing on Mr. Fields. I also did not conduct any neuropsychological testing on Mr. Fields as I did not find any suggestion of congenital or acquired brain damage.

6. While I was not asked and did not evaluate Mr. Fields on the issue of whether he was competent to represent himself, I discussed his ability to represent himself with Mr. Swanton. I opined that while I found no mental disorder that

1

specifically precluded his competency to represent himself, I expressed the opinion that his decision to do so was poor judgment on his part.

7.      During trial, I testified about Mr. Fields' IQ test results. I opined that Mr. Fields has the intellectual ability to further his education in prison. In reaching this opinion, I considered Mr. Fields' IQ score, along with the fact that he completed his GED while incarcerated. I further opined that Mr. Fields' failure to do well in school was partially attributable to his chaotic home life as a youth. During trial, I also opined that, partially as a result of Mr. Fields' intelligence, he had the ability to adapt to a prison environment.

8.      I was not asked to offer an opinion about the risk of Mr. Fields to engage in violence while incarcerated, but I was asked to offer an opinion about Mr. Fields' ability to adapt to a prison environment. Mr. Swanton and I discussed this in detail, and Mr. Swanton decided that to limit the extent of information presented about his risk to engage in violent behavior in prison due to his prior behavior while incarcerated. Consequently, I did not conduct an "actuarial" risk assessment. However, such actuarial risk assessments can be useful in predicting the potential risk of future violence by an offender in prison., and experts, such as Dr. Mark Cunningham, who is experienced in both mitigation analysis and risk assessment might be of assistance in a case such as that of Sherman Fields.

I declare under the penalty of perjury of the laws of the State of Texas that the above is true and correct.

Dated this 8th day of January , 2009.

Dallas Texas
Place

Dr. J. Randall Price

2

## Affidavit of Jane Bye

I, Jane Bye, state as follows:

1.     I am over 18 and am competent to make this affidavit.

2.     I am the mitigation specialist who worked with the trial team on behalf of Sherman Fields.

3.     I have the following training and experience as a mitigation specialist:  I have a Master's degree in Social Work (MSW) from Rutgers University, 1981. At the time of Mr. Fields' trial, I had over 20 years' experience in the social work field, primarily with people with developmental disabilities, health issues, and mental retardation.  I had also worked in juvenile probation early in my career.  I completed mitigation training through a Texas Criminal Defense Lawyers Association conference, through a National Association of Social Workers Texas Chapter seminar in cooperation with the Texas Defender Service, and through self directed reading and study.  Prior to working with Mr. Fields' defense team, I had assisted with three Texas cases, all of which were finalized through plea agreements and did not go to trial.  Mr. Fields' was my first case that actually went to trial.

4.     My duties on this case included investigating Mr. Fields' social and mental health history, consulting with the attorneys, the investigator, and other members of the defense team.   I also met with Mr. Fields on several occasions.

5.     In the course of my work, I learned that Mr. Fields had experienced a great deal of trauma in his life.  Mr. Fields had witnessed a great deal of violence and had lost friends and family members in a violent manner.  He had attempted suicide more than once.  And, just as importantly, Mr. Fields' mental health treatment was limited or non-existent in the various facilities where he was detained.

6.     From my review of Mr. Fields' life history and my contact with Mr. Fields, I noticed he fluctuates between periods of depression, with periods of great activity.  In addition, he often presents as grandiose.

7.     Thus, I thought it was important to learn more about Mr. Fields' psychological makeup.

8.     As we prepared for trial it was my opinion that a complete and thorough understanding of Mr. Fields' mental health was critical.

9.     The attorneys, Robert Swanton and Scott Peterson, retained Dr. Randy Price to focus on Mr. Fields' level of intelligence (IQ) and his ability to adapt to a prison environment.

10.    Although I recognized the value of Dr. Price's opinion, I also felt that Mr. Fields' mental health issues constituted the most compelling mitigation in his case. To the best of my knowledge, additional mental health experts were not retained to address these issues.

11.    For example, I thought it was important to evaluate the influence of Mr. Fields' history of trauma on his life and to determine whether Mr. Fields suffers from any mental illnesses.

12.    I was also aware of several prior evaluations and diagnoses of Mr. Fields which I thought were suspect and which made Mr. Fields look dangerous, which I thought needed to be carefully reviewed. I understood that the Government had copies of these evaluations. Thus, I expected that these evaluations would be introduced at trial.

13.    I feel that I should have advocated to the attorneys for a full mental health evaluation by an additional expert or experts who could have testified to Mr. Fields' experiences and how these affected him.

14.    In addition, I do not recall any conversations about the subject of retaining an expert to conduct an actuarial risk prediction.

15.    I do not recall any conversations about the subject of retaining an expert to conduct neuropsychological testing.

16.    Other than the court appointed psychiatrist, we did not have anyone evaluate Mr. Fields on the issue of whether he was competent to represent himself.

17.    I am not faulting the attorneys because I think they did what they felt was best, but I wish I had been more confident to push them to look at some other options or to get some advice from experienced capital defense attorneys about what else could be done. As it was, I think we did not do everything we could to defend Mr. Fields' life.

I declare under the penalty of perjury that the above is true and correct.

1/11/09 Mariposa, CA
Date and Place

Jane Bye