IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
WACO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>SHERMAN LAMONT FIELDS | NO. _____<br><br>CRIMINAL CASE NO.<br>W-01-CR-164; 09-CV-9-WSS |

**FIRST AMENDED MOTION FOR A NEW TRIAL AND TO VACATE, SET ASIDE AND CORRECT CONVICTION AND DEATH SENTENCE, AND FOR RELIEF FROM JUDGMENT, MADE PURSUANT TO 28 U.S.C. § 2255 OR, RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

**\*\*\* THIS IS A CAPITAL CASE \*\*\***

## I.    JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 2255.

## II.    PRELIMINARY STATEMENT

## IN THIS MOTION, MR. FIELDS SETS FORTH CLAIMS DIRECTED AT BOTH HIS CONVICTIONS AND DEATH SENTENCE.

### A.    Identifying Information

Mr. Fields (Inmate No. 15651-180), is currently confined at the United States Penitentiary at Terre Haute, Indiana. He challenges his convictions and sentences, including his death sentence, imposed by the Honorable Walter S. Smith, Jr., District Court Judge for the Western District of Texas at Waco. Mr. Fields pled "not guilty" and was convicted after a jury trial. He was represented, for a portion of his trial, by Scott Peterson and Robert Swanton. His case was affirmed on appeal and on January 14, 2008, the United States Supreme Court denied his petition for a *writ of certiorari*. Mr. Fields timely filed a motion pursuant to 28 U.S.C. § 2255, as per this Court's unobjected to order extending the time, on March 1, 2009. On March 3, 2009, the Court ordered the Government to respond within sixty days, on or before May 2, 2009. Since then, the Government filed several requests for extensions of time to respond. Ultimately, the Court ordered the Government to file a response on March 22, 2010, which it did. Accordingly, Mr. Fields now files this present, first amended motion pursuant to Federal Rule of Civil Procedure 15(a)(1)(B). This is Fields' first application for post-conviction relief.[1]

---

[1] Although Mr. Fields filed an initial Motion For Relief Under 28 U.S.C. §§ 2241 and 2255, on January 14, 2009, he expressly asserted his rights under, and relied fully upon, the Court's December 4, 2008 Order Granting equitable tolling and authorizing Mr. Fields to file a fully developed version of his Motion For Relief on or before March 1, 2009. Mr. Fields timely filed his first motion on March 1, 2009.

This Court previously appointed undersigned counsel after finding that Fields was indigent and that "appointment of counsel is required by 18 U.S.C. § 3599 (a)(2)." This Court also approved of attorneys from Cadwalader, Wickersham & Taft, LLP assisting undersigned counsel and appearing, on a *pro bono* basis, on Mr. Fields' behalf.

**B.      Summary Of Facts And Argument**

Neither Mr. Fields' conviction nor his death sentence was the product of a constitutionally reliable proceeding. Mr. Fields was permitted to represent himself at a capital trial after an exceedingly brief and woefully inadequate competency evaluation. He was sentenced to death after a penalty phase that followed a deficient mitigation investigation and where the only testimony relating to his mental condition was that he was "intelligent."

In fact, Mr. Fields is chronically and profoundly mentally disabled. Mr. Fields' mental disabilities rendered him incompetent to waive counsel and are crucial to an understanding of his life history and an accurate assessment of his moral culpability. While Mr. Fields is not seriously cognitively impaired, he is seriously mentally ill. Mr. Fields' intelligence, while an undeniable strength, does not diminish the pervasive influence of mental disease on his life and his actions. However, this crucial fact which was apparent from a basic review of Mr. Fields' own social and medical history as well as that of his immediate family, was not discovered by trial counsel and was neither presented to the Court nor to Mr. Fields' jury.

Discovery of Mr. Fields' mental condition would have altered the course of the entire trial. If trial counsel had discovered and presented evidence of the length and severity of Mr. Fields' mental dysfunction either to the evaluating psychiatrist or the Court, it would have been clear that he should not have been permitted to waive counsel. Competent counsel would then have been able to defend against the charges and to have secured a not guilty verdict.

Likewise, if trial counsel had discovered and presented this and other powerful, readily available evidence of trauma, impairment, and mental illness to Fields' jurors in penalty phase – jurors who, at one point, declared themselves unable to reach a unanimous verdict despite the paucity of mitigating evidence – they would not have returned a death sentence. The trial team's failure was not the result of a strategic decision. It was, instead, the result of a failure to investigate.

Appointed counsel's investigative failures, combined with Fields' mental condition gave rise to an attorney-client relationship marred by disagreement and distrust. Mr. Fields' decision to waive counsel was largely the result of a delusional belief that counsel was working with the prosecution and the belief that he had the "power" to compel witnesses to tell the truth. After he was convicted, Mr. Fields reenlisted counsel confirming, in some measure, that paranoia and grandiosity spurred his original decision to proceed *pro se*.

Although Fields contends he would not have been permitted to waive counsel had the extent of his mental illness been investigated and confronted, because he was permitted to act as his own attorney he was constitutionally entitled to the unfettered exercise of that fundamental right. However, after Mr. Fields was permitted to waive counsel, his exercise of the right of self-representation was interfered with in significant ways. During jury selection, trial counsel failed to exercise one of Fields' peremptory challenges – a decision that was Fields' to make. During trial, Mr. Fields was not permitted to participate in bench or chambers conferences where material issues regarding the course and conduct of the trial were discussed and decided without his presence or consent.

In court, he was required to wear a stun belt which, given his history of trauma and resulting anxiety disorder, his fear of shock – accidental or otherwise – made it virtually impossible to concentrate and defend himself. Outside of court, he was kept in a cell that was constantly lit and noisy and was forced to attempt to sleep on a mattress on the floor between the

cell door and toilet. In addition to these poor conditions and the unremitting sleep deprivation, Mr. Fields was denied access to the basic tools required to prepare his defense – legal materials and a pencil. In addition, requiring Mr. Fields to wear the stun belt during the penalty phase substantially interfered with his right to consult counsel.

The defense presentation during the penalty stage of trial was abbreviated, largely superficial, and failed to meaningfully rebut the prosecution testimony that Mr. Fields' life history demonstrated his current and future dangerousness. In fact, that history should have served as the starting point for a discussion of Mr. Fields' mental dysfunction. Mr. Fields' life history is inseparable from his mental health history. Unfortunately, the defense mitigation investigation stopped far short of what is required of competent capital counsel. If Fields' jury had heard testimony describing the nature and depth of his mental dysfunction, it is overwhelmingly clear that his jury would have returned a life sentence.

In sum, neither the Court nor the jury heard facts which, if investigated and presented, would have completely altered both the course and outcome of this case.

### III.    FACTS

#### A.    Procedural History

On May 13, 2003, an eight-count indictment was filed in the United States District Court for the Western District of Texas, charging Fields with, among other charges, escape and murder. The indictment also contained a "Notice of Special Findings" alleging facts to support submission of the statutory intent factors and aggravating factors to the trial jury if the case proceeded as a death penalty prosecution.

On May 23, 2003, the Government gave notice it would seek the death penalty.

Trial started in January 2004.  On January 30, 2004, the jury convicted Fields on all counts.  From February 2-5, 2004, the same jury heard testimony and argument in the penalty phase.  *See* RE 38.  On February 5, the jury retired to deliberate.  On February 6, 2004, the jury was told to keep deliberating after evincing an inability to agree on punishment.  It sentenced Fields to death shortly thereafter.[2]

The trial court entered judgment on April 7, 2004.

Fields filed a notice of appeal the next day.  Fields' conviction and death sentence were affirmed by the Fifth Circuit Court of Appeals on March 29, 2007, with Benavides, J., dissenting. *United States v. Fields*, 483 F.3d 313, 323 (5th Cir. 2007), *cert. denied*, 552 U.S. 1144 (2008).  Fields petitioned the United States Supreme Court, which denied review on January 14, 2008.  This Court granted Mr. Fields' unobjected-to motion for equitable tolling until March 1, 2009.  On March 3, 2009, the Court ordered the Government to respond within sixty days, on or before May 2, 2009.  Since then, the Government filed several requests for extensions of time to respond.  Ultimately, the Court ordered the Government to file a response on March 22, 2010, which it did.  Accordingly, Mr. Fields now files this present, first amended motion pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

---

[2] The jury's special findings on the statutory aggravating factors were that the Government had proved beyond a reasonable doubt that Fields committed the murder during commission of another offense, *i.e.*, escape, and that he has a prior conviction for a violent felony involving a firearm.  The jury did *not* find that Fields "committed the offense after substantial planning and premeditation to cause the death of the victim."

B.    <u>**Facts**</u>

This section contains an overview of the relevant facts.  The facts relevant to Mr. Fields' claim that trial counsel failed to investigate and present compelling mitigation and mental health evidence are discussed immediately below.  Additional facts, where helpful to the understanding of a claim, are included in the discussion of that individual claim.  For example, the facts supporting Mr. Fields' claim of actual innocence, which are voluminous, are contained in that separate section.[3]

### 1.    Mr. Fields' Social History

Sherman Fields' was born into a family who had struggled against adverse conditions for generation after generation.  They endured years of economic hardship, settling in an area near Waco so undesirable that the neighboring municipalities refused to annex it.  They suffered through decades of racial violence, witnessing firsthand the brutal repression of African Americans in central Texas in the early twentieth century.  Mr. Fields' family struggled to overcome genetic obstacles as well and an astounding number of his family suffered serious mental health problems leading to hallucinations, paranoia, and strange beliefs and behavior.  The family members who survived these crippling hardships were not unaffected.  By July 14, 1974, when Sherman Fields was born, his family's history was indelibly and overwhelmingly characterized by chaos, violence, neglect, abuse, abject poverty and serious substance abuse.

Alice Swinnie *nee* Fields gave birth to her second son, Sherman, at the age of 15 by a 46-year old man that she met at a local café.  Sherman's father had his own family and never lived with or cared for Sherman.  By the time of Sherman's birth, his mother had suffered horribly at the hands of men.  She was molested by the husband of a family member as a young girl and

---

[3] Facts will be further developed at a presentation at a hearing as well as through post-filing discovery and attainment of sufficient investigative and expert resources.

then raped at age 11 by another man. She had her first child, Charles, at age 13. Ms. Swinnie's relationships with abusive men continued throughout Sherman's childhood and Sherman and his siblings became easy targets for their mother's partners' violence and abuse.

Sherman's mother had her longest relationship with a man named William Bradford, the father of two of his younger brothers. Mr. Bradford was a severe alcoholic who would beat the children for little or no reason. Sherman was beaten with whatever Mr. Bradford could find; switches, belts, extension cords, or just his fists alone. At times the beatings were so severe that Sherman had visible welts on his body and he had difficulty sitting down. Mr. Bradford often spared his biological children from the worst of his abuse and singled out Sherman, and to a lesser extent Charles, for the brunt of his violence.

The children also frequently witnessed Bradford beating their mother, resulting in black eyes and bruises. Sherman and his brothers were ashamed that they could do nothing to help their mother and felt sad and helpless, trapped by Mr. Bradford's arbitrary and unpredictable violence. Ms. Swinnie tolerated more than ten years of such violence against herself and her children. But, when she learned that Bradford was cheating on her, she shot both Bradford and his mistress.

Unfortunately, Ms. Swinnie's ability to select stable parental figures for her children did not improve. Although Mr. Fields described his next step-father as the "best male figure my mother was ever with," the man, Melvin Swinnie, was extremely troubled. He suffered from severe mental illness, talking "crazy" and having auditory hallucinations. Mr. Swinnie also abused substances and was addicted to heroin and crack cocaine. Mr. Swinnie did nothing to conceal his drug use from his family and even sold drugs to Sherman's younger brother and his siblings. Mr. Swinnie was admitted for psychiatric treatment on several occasions and ultimately attempted to kill Sherman's mother by shooting her in the head.

The poverty and deprivation of Mr. Fields' family's living conditions is difficult to adequately describe. For the first 7 or 8 years of Sherman's life, the family lived in an area of McLennan County known as "No Man's Land," a small region that no municipality would annex. As a result, the neighborhood—consisting of approximately 700-800 residents, predominately African American—had no sewage system, no municipal police protection, no fire protection, no routine garbage disposal and only a small portion of the houses had running water. Many residents drank untreated water drawn from wells polluted with fecal waste. The area was like a large bowl, surrounded by developed areas of Waco and Bellmead, and after heavy rains, water would pool in the area, festering with mosquitoes, pollutants and fecal material from overflowing septic tanks and animal pens. Children had to wade through the contaminated water to get to school. No municipal pest control existed and the area was infested with rats and other vermin.

The Fields family often had meager rations of food and would frequently be hungry. The family collected discarded food for sustenance and the children recall having to search through their food to remove infesting insects like weevils.

In addition to being exposed to multiple incidents of intra-family trauma, Sherman's juvenile years were marked by the deaths of many of his friends and relatives. As the attached diagram shows (Exh. 117), many of Mr. Fields friends and relatives died violently.

As he grew older, Sherman sometimes sought refuge at his grandfather, Shelby Mitchell's, rural home. Sherman and his brothers occasionally lived there voluntarily and were also placed there during juvenile court placements. Although Mr. Mitchell's house seemed an idyllic respite from the stress of city life, the reality was much different.

Mr. Mitchell was born just outside of Waco in 1909 and had lived through a period of central Texas history that some scholars believe to have encompassed the worst post-Civil War

racial violence.  In 1916, a crowd estimated at 15,000 people, dragged a young black man, Jesse Washington, from the Waco courthouse and lynched him.  The accounts of the violence, which were graphic and widespread, told how the crowd mutilated Mr. Washington's body and fingers and other parts were kept as souvenirs.  Washington was burned on the square and his charred body subsequently dragged around for all to see.  This horrific event permanently defined the world view of seven-year-old Shelby Mitchell.  In 1922, when Shelby was just 13, another young black man, Jesse Thomas, was accused of murder and rape and burned in front of thousands of onlookers.

The trauma of these events, which understandably angered and frightened the African American community in the Waco area, was aggravated for Shelby Mitchell by his own experiences with racial violence.  Klansmen attacked his family's house when he was a child, beat his daddy with a whip, and raped his mama in front of everyone.

The trauma Mr. Mitchell suffered because of these events was never erased.  Although he and Sherman loved each other, Mr. Mitchell was unable to provide necessary supervision and set proper limits for his grandchildren.  Mr. Mitchell relied heavily on alcohol, beginning with coffee and gin in the morning, and would drink until he passed out in the evening, leaving Sherman and his brothers unsupervised.  The boys had easy access to alcohol and firearms.  Sherman's older brother, Charles, remembers bringing girls to the house by age ten or eleven and firing guns by age twelve.

Mr. Mitchell also instilled in his grandchildren the values he drew from his traumatizing life experience:  the importance of isolated, self-reliance.  Mr. Mitchell frequently recounted stories of the KKK attack on his family and local lynchings and imparted as the moral that the boys should always carry firearms and should never trust anyone outside of the family.

Unfortunately, this racial, social, and environmental isolation did little other than contribute to the children's genetic predisposition to serious mental illness.

In 1990, as 15-year-old Sherman and his brothers watched their grandfather mow his lawn, a drunk driver veered off the road, striking and critically injuring Mr. Mitchell.  He died in the hospital days later.  Flawed and damaged though he was, Mr. Mitchell had been a consistent adult presence and influence on young Sherman who then suffered both the grief of losing his grandfather and the trauma of witnessing his death.

As Sherman grew older, signs of a developing mental illness began to emerge.  He faced long odds in his struggle against mental illness because of his genetic predisposition and the environment in which he was raised.  Although some children with a predisposition to mental illness may never develop symptoms of the disease because they are protected by buffers such as strong family support, frequent and thorough medical attention, and proper nutrition, Sherman Fields' life history contains no evidence of such "protective factors."  On the contrary, his life circumstances were tailor-made to encourage the manifestation of his illness.

Mr. Fields' family tree is replete with an astounding amount of documented mental illness and/or mental retardation.  His mother, Alice Swinnie, qualified for Social Security benefits after a diagnosis of mental retardation and appears to have had lifelong impairments. She has suffered from depression, panic attacks and "bad nerves" and attempted suicide by swallowing pills.  Mr. Fields' biological father, Sherman Mims, also known as Buddy, was an alcoholic and hypersexual, chasing young women, even until his last years.  Mr. Mims was described by family alternately as quiet and as seeming to "feel invincible", signs of possible Bipolar Disorder.

Mr. Fields' now-deceased half-uncle Shelley Leon Fields was reportedly mentally impaired and, according to police reports, kept a slip of paper in his wallet with his address on it

because he wandered from home and could not find his way back.  Waco police reportedly returned him to his home on several occasions when he was found wandering the streets in confusion.  Shelley Fields was described as "crazy" by family and was paranoid, believing that people were trying to kill him.  As discussed in more detail, *infra*, this is only a partial list.

Sherman's generation did not escape the legacy of their ancestors.  His younger half-brother Jimmy, born two years after Sherman, has borderline intellectual functioning or mild mental retardation and has been diagnosed at various times with organic delusional disorder and psychosis not otherwise specified (NOS).  He has been prescribed psychotropic and anti-depressants in response to visual and auditory hallucinations.  Another of Sherman's younger half-brothers, Jeffrey, born 4 years after Sherman, has also suffered from severe psychiatric problems.  He has experienced depression and had suicidal ideations.  According to records from the Texas Department of Criminal Justice, he exhibited paranoia, had visual hallucinations, graphic nightmares and heard command voices.    Given this genetic history, it is not surprising that, as Sherman Fields reached adolescence, signs of mental illness began to emerge.

Sherman's older brother noticed how he changed as they became teenagers.  Sherman would "zone out" in a peculiar way, even when someone was talking to him, and his sleep pattern was disrupted.  His brother, Charles, recalls getting up to use the restroom in the middle of the night and seeing Sherman watching TV.

By age fourteen, Sherman had become suicidal.  While incarcerated in the McLennan County Juvenile Detention in January 1989, he and a friend attempted to hang themselves with bedsheets.  The friend succeeded in killing himself.  Sherman survived but had injuries requiring hospitalization for several days.  Upon his return to the juvenile detention center, he again tried to kill himself.  He was moved to a Texas Youth Commission facility and almost immediately upon arrival, Sherman tried yet again to commit suicide.

In February of 1989, Dr. Day, a TYC psychiatrist, diagnosed fourteen-year-old Sherman with Posttraumatic Stress Disorder.   Dr. Day's notes described flattened affect and nightmares consistent with the numbing of emotions and intrusive dreams diagnostic of PTSD.   He recommended ongoing treatment for Sherman and withheld medications he feared might impede the natural and necessary grieving process.  Dr. Day also recognized that Sherman suffered from a severe mood disorder and diagnosed him with atypical Bipolar Disorder.  Recommendations were made for treatment and, when Sherman was not too paranoid to accept treatment, medical records appear to document that he responded positively to medications.  From 1991 until his incarceration in TDCJ, Sherman Fields was on SSI, receiving benefits due to his mental disabilities.

As an adult, Mr. Fields' mental illness was again documented by state authorities. During his pretrial incarceration, for example, he was prescribed an antidepressant, Remeron, but did not take it as ordered.  He began to file numerous grievances illustrating a deteriorating thought process.  Mr. Fields alleged numerous violations of his rights, from mundane assertions that staff were reading his legal material to more fanciful accusations that the prison staff had formed a cabal to kill him while he slept.  On several occasions, Mr. Fields complained that staff were trying to poison him by "putting an unknown substance" into his food.  He also believed that some staff were purposefully hiding behind desks and computer equipment so they could surreptitiously observe him in a homosexual manner.  Less than five months later, Mr. Fields fired his attorneys and represented himself at his capital murder trial.

### 2.    Waiver of Counsel

At the commencement of trial and after unsuccessfully attempting to obtain new counsel, Mr. Fields told the Court he wanted to represent himself.   Fields had made and withdrawn several similar requests over the two year investigation – all based on counsel's

inadequate defense investigation and his fear that counsel was conspiring against him. However, this renewed request was different. Just four days before – and for the first time – counsel informed Fields that Mr. Peterson was a McLennan County district attorney involved in a 1987 prosecution of Fields. Fields was twelve at the time of that prosecution. Although counsel did not perceive this to be a conflict, they requested Fields sign a formal waiver. This surprise announcement bolstered Fields' longstanding delusional belief about counsel and he refused to sign. Rather, at the start of trial, he renewed his request for new counsel.

In addressing the Court, Fields stated that he found the actions of court appointed counsel "suspicious and I think they are working with the prosecutor instead of for me." Trial Transcript ("TT") at 13.[4] Fields further believed there were "several sure fired [*sic*] ways to prove that several other witnesses are lying," but that counsel would not challenge their credibility. *Id.*

After Fields persisted in his request for self-representation, the Court engaged in a colloquy with him during which the Court asked Fields if he knew what he was charged with and the possible consequences, including the death penalty, which could follow if he were convicted. Fields answered that he understood and reiterated his belief that his attorneys were working with the prosecutor. After the prosecutor indicated "concern" regarding Fields' ability to represent himself based on trial counsel's previous declaration that mitigating circumstances existed relating to Fields' mental health, the prosecutor suggested sending "a shrink in." TT at 25.

As a result, the Court directed that Dr. Stephen Mark conduct an evaluation of Mr. Fields. Shortly thereafter, Dr. Mark appeared in court and, framing the inquiry as, "can he

---

[4] Citations to the transcript of the trial proceedings are in the form TT at (page number).

make the decision to represent himself and be competent," answered: "yes."  Dr. Mark's entire testimony lasted one minute and covers less than two pages of the transcript.  TT at 61-62.

Prior to permitting Fields to waive his right to counsel, the Court spoke with Fields one additional time.  During that inquiry, Fields noted that he was "not sure I can do this," but expressed again his distrust of and disagreement with current counsel.  The Court gave him no other options, and trial counsel objected neither to the scope of the hearing nor the Court's decision to permit the impaired Fields to waive his right to counsel.

Dr. Mark's competency evaluation was both brief and uninformed, as his own signed statement reveals.  *See Affidavit of Dr. Stephen Mark.*  Trial counsel provided the expert with *none* of the readily available background information on Mr. Fields' mental health impairments, including prior psychological evaluations which diagnose Mr. Fields as suffering from Post-Traumatic Stress Disorder and a serious mood disorder.  *Id.* ("I was not provided and consequently did not review any documents related to Mr. Fields' prior term of incarceration or any prior mental health diagnoses").  As a result, Dr. Mark's entire assessment of Fields' ability to knowingly and intelligently waive counsel and represent himself at the trial for his life was almost exclusively based on a conversation with Mr. Fields that lasted 30 minutes.  *Id.* Significantly, Dr. Mark's evaluation was based on the standard to determine whether Mr. Fields was competent to stand trial and did not evaluate or answer the critical question:  was Mr. Fields competent to ably carry out the basis tasks necessary to present his own defense without the assistance of counsel?  The Supreme Court made clear in *Indiana v. Edwards*, 128 S. Ct. 2379, 2387-88 (2008), that the standard for determining competency to waive counsel is different – and more stringent – than the competency standard to stand trial or plead guilty.  Dr. Mark did not apply this standard.

Mr. Fields was not competent to waive counsel, nor was he competent to represent himself.

In fact, Mr. Fields' exposure to extreme and repeated trauma has produced pronounced symptoms of Post-Traumatic Stress Disorder. He also suffers from Bipolar Disorder. Additionally, his social, medical history and the symptoms of mental dysfunction demonstrated throughout his life all support the conclusion that he is afflicted with neuropsychological impairments. As Dr. George Woods explains:

> Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses. Mr. Fields is severely and chronically paranoid and grandiose. He was both paranoid and grandiose at the time of my examination. His decision to waive counsel was the result of the co-morbid, or co-occurring symptoms of his mental illnesses. The specific symptoms of grandiosity, paranoia, perseveration, and impulsivity compromised his ability to effectively weigh and deliberate whether to waive counsel. These same symptoms rendered him incapable of representing himself in a capital trial lasting weeks. Emotional modulation, the ability to respond specifically and accurately to emotional stimuli, was impaired as well, also diminishing his ability to effectively determine whether to waive counsel and represent himself. His competency to waive counsel and represent himself in a capital case should have been carefully assessed through a thorough evaluation of his longstanding mental dysfunction and impairments.

*See Declaration of Dr. George Woods* ¶ 5; *see also* ¶¶ 108, 110.

When he sought to waive counsel, Mr. Fields believed his counsel was working for the prosecution. Trial counsel, Mr. Swanton, adds that Mr. Fields believed that if Fields asked the questions, the "witnesses would be *forced* to tell the truth." *See Affidavit of Robert Swanton, Esq.* ¶ 16. These are classic examples of delusional beliefs. However, without a psychiatric assessment informed by historical documentation, they were understandably not seen as such.

Mr. Fields' desire to waive counsel was not just a bad choice. It was "the direct product of his mental illness." *Declaration of Dr. George Woods* ¶ 5. In addition, Fields certainly was not competent "to carry out the basic tasks necessary to present his own defense without the assistance of counsel." *See id.* ¶ 110. This conclusion would have been apparent to the Court if a competent mental health investigation had been conducted and the results of that investigation presented.

### 3. The Court and Counsel Interfered with Mr. Fields' Right of Self-Representation

Nevertheless, this Court approved Mr. Fields' waiver of the right to counsel. Thus, he was constitutionally guaranteed unfettered control over the trial decision-making process. However, there were numerous incidents at trial where Mr. Fields' right to self-representation was significantly impaired.

After Fields invoked his right to self-representation and before the conclusion of *voir dire*, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel. The Court admonished Mr. Peterson and Mr. Swanton that their role was advisory only and that Mr. Fields was to address the Court and the witnesses on his own. The Court did, however, authorize standby counsel to argue motions and take up other matters outside the presence of the jury but only if the record was "absolutely clear" that Fields chose to have counsel do so and that counsel was doing so in a manner Fields approved of. TT at 644.

The Court did not allow Fields to be present at bench conferences when the jury was seated. To avoid having to excuse the jury to allow Fields to participate in bench conferences, the Court "hope[d]" Fields would authorize standby counsel to speak for him on whatever matter needed to be discussed and allow his standby counsel to report back on the matters that took place if his participation in a bench conference would require the jury to be

-16-

excused.  TT at 1166.  Fields never authorized standby counsel's participation in this way and wanted to participate in these conferences on his own behalf.

While Mr. Fields represented himself, the Court held several bench conferences and at least two chambers conferences.  Several of the bench conferences occurred in front of the jury.  Fields was not permitted to participate in any of these bench or chambers conferences.  For each, the jury watched standby counsel and the prosecution approach the bench, leaving Fields seated at the defense table.  At each conference, critical trial decisions were made by the trial judge, prosecutors and standby counsel in Mr. Fields' absence and without his input or consent.  When bench conferences took place, Fields' standby counsel either would not or could not consult Fields before approaching the Court.  Accordingly, standby counsel did not know what positions Fields wanted them to take or how Fields wanted them to present those positions to the Court concerning any of the issues discussed at bench or chambers conferences.  While purportedly representing himself, Fields was excluded from all meaningful participation in these trial proceedings.

Moreover, during *voir dire*, Mr. Fields had already exercised his right of self-representation, and Mr. Peterson and Mr. Swanton were to serve as standby counsel only.  Although Mr. Fields agreed to consult with standby counsel during the jury selection process, Mr. Fields did not authorize standby counsel to exercise peremptory challenges in a manner that was contrary to his instructions to them about how he wished to exercise those challenges.  Nevertheless, standby counsel did not follow Mr. Fields' instructions to exercise peremptory challenges against particular jurors.

### 4.    Conditions of Pre-Trial Confinement

Mr. Fields' ability to represent himself was severely impaired by the pre-trial confinement conditions which forced him to conduct his own defense in an extremely sleep

deprived and otherwise compromised state.  Prior to and during trial, Mr. Fields was confined in a jail cell where the lights were never dimmed, and where it was constantly noisy.  Mr. Fields' sleep cycle and biorhythm were disrupted as a result.  These disruptions promoted Mr. Fields' psychological deterioration and caused his behavioral disruptions.

Fields was kept in a holdover cell in the booking department of McLennan County Jail.  Unlike a typical cell, this small cell was equipped only with a steel bench and a toilet – the cell had no bed, no shower, and no mechanism for shutting out the constant light and noise of the booking area.  Fields was forced to sleep on a mattress placed on the floor of the cell, in what little space existed between the door and the toilet.  As a result, Mr. Fields got virtually no sleep.  This was the case for several weeks prior to and during trial.

During this period of time, Mr. Fields, a *pro se* defendant with no formal legal education, attempted to prepare for his first trial – a federal capital case where his life was at stake.  He had no access to any legal materials while in his cell.  Although he had a pad of paper, he was not allowed to keep a pencil in the cell to write with.

As a result of sleep deprivation and the problematic conditions of confinement, during his conduct of the trial, Fields could not concentrate, had trouble with his memory, and would become irritable.  In addition, these conditions of confinement exacerbated his mental health impairments, causing additional negative consequences including marked distress, anxiety, feelings of lethargy, mood disorders, irritability, ruminations and intrusive thoughts, paranoia, and other symptoms.

### 5.   Use of a Stun Belt

In addition to having to endure these conditions of confinement, the security measures employed in the courtroom during trial also interfered with Fields' ability to represent himself.  When Mr. Fields entered the courtroom, he was forced to wear a stun belt.  This was so

even though the deputy U.S. Marshal in charge of the office described Fields "as a model prisoner here at the courthouse." TT at 52-53. However, based in part on the Marshals' impression of Fields' behavior while kept in the holdover cell, he was required to wear the stun belt. The Court held no inquiry into whether this restraint was necessary other then to solicit the marshal's opinion. Counsel, who still represented Fields at the time, did not object.

Mr. Fields was required to wear the stun belt both during the time that he was *pro se* and when he was represented by counsel. The use of a stun belt served as a constant source of concern and fear, making it nearly impossible for him to concentrate and altering his normal demeanor. Mr. Fields' concerted to prevent activation of the stun belt at all costs left him appearing cold and unemotional in the eyes of the jurors.

Mr. Fields' concern regarding the stun belt was well-founded. A stun belt uses an intense electric shock as a means of physical and psychological control over the person wearing the device. The belt is placed over a defendant's waist, and prongs that are connected to two nine-volt batteries are attached to the defendant's left kidney area. The belt is designed to deliver a 45,000 to 50,000 volt shock for approximately eight seconds when activated by a remote control. Once a person activates the device, he cannot stop the shock manually; the shock lasts for the entire eight seconds. The force of the shock knocks most wearers to the ground. The victim shakes uncontrollably and can remain incapacitated for up to 15 minutes. It is not unusual for the wearer to self-urinate or defecate.

The manufacturers of stun belts themselves note the strong psychological effect of the device on the wearer. For example, at trials the defendant will be watching whoever has the monitor. According to one manufacturer, one of the great advantages of the stun belt is its capacity to "humiliate the wearer." The stun belt's intended use, therefore, is to control the mind of the defendant. In this case, it worked.

-19-

Prior to being forced to wear the stun belt, the marshals explained and demonstrated its use to Mr. Fields.  Consistent with the literature, they told him that the device, if activated, would administer a painful and disabling shock.  The marshals told Fields that the device was activated by pushing a button.  They told Fields that the marshal would activate the device if they "perceived" any security risk – if Fields refused to remain seated or if he appeared upset or angry.  Then, they demonstrated the device by placing it on the ground and activating it.  The stun belt crackled, setting off sparks.

Mr. Fields did not trust the marshals.  He exhibits the hypervigilance that years of trauma tend to produce, and he is intensely paranoid.  He was afraid that a marshal might activate the device for any plausible reason.  As a result, Fields remained seated and appeared to be as unemotional as possible.  However, Fields could not get the constant threat of an intentional or accidental activation out of his mind.  This made it difficult and, at times, impossible for Fields to concentrate.  As a result, he simply gave up on some cross-examinations.

The trial court did not consider any less restrictive alternatives to the stun belt.  Although the Court heard from the marshals, the Court did not take any testimony on the psychological effects of a stun belt on defendants, in general, or Fields, in particular.  Having failed to investigate their client's history of trauma and mental illness, trial counsel failed to present any evidence to the trial Court regarding the effect of the device on Mr. Fields.[5]

### 6.    Testimony at Trial

At trial, the Government alleged that Fields, possessive and jealous of his sometime-girlfriend Suncerey Coleman, escaped from federal custody, convinced Coleman to

---

[5] During penalty phase, Fields was particularly reluctant to show any emotion, fearing that it would provide a basis for the marshals to "push the button."  Several jurors have noted that Fields' lack of emotion at trial was a significant factor in their decision to impose a death sentence.

come away with him, drove her to a rural area outside Waco, and shot her to death there.  Fields tried to present the defense that he had been framed for the murder by the real killers, Fields' jealous girlfriend Shalaykea Scroggins and one of their acquaintances, Edward "Trey Boy" Outley.  Fields attempted, without success, to attack the Government's witnesses as testifying inconsistently, implausibly, and in return for benefits from the Government.  Fields also attempted to point out the absence of any physical evidence connecting him to the crime.

The Government relied on incarcerated witnesses to support its theory that Fields, while in jail, believed Coleman was seeing other men and wanted to control her.  The prosecutors called these prisoners to testify they had heard Fields say that he was upset that Coleman was seeing other men, that he had told Coleman and others that he would kill her, and that he made a range of confessions to her murder.

Fields, generally without success, tried to put forward evidence that Trey Boy and Scroggins were lying about their involvement in Coleman's murder because they were the actual killers.  Fields sought to show that Scroggins was obsessed with him, that, as a woman spurned, she hated Coleman, and that she had become incensed at seeing Coleman and Fields together the day of Coleman's disappearance.

He also presented evidence that Coleman, unlike Scroggins, had visited him often while he was in jail.  In addition, Tanesha Hilliard testified that she had never known Fields to be violent or threatening toward Coleman and that Fields did not seem upset when he was with Coleman at Hillcrest Hospital.

In addition, Fields attempted, again without success, to impeach the jail inmate witnesses by, among other things, questioning them about prior inconsistent statements, their ability to talk to one another about his case, the implausibility of his making such damning admissions to them, and the benefits they had or hoped to secure from the Government in

exchange for their testimony.  These inmate witnesses' statements were generally implausible, inconsistent with the factual evidence, and often inconsistent with their own prior statements. Moreover, most of these inmates had strong motives to lie, given that they were rewarded for their testimony with reduced sentences.  The uneducated, impaired and sleep-deprived Fields, however, was not able to establish as much before the jury.

### 7.    Penalty Phase Proceedings

The jury that sentenced Mr. Fields to death knew almost nothing of the life they were asked to take, but were required to make that decision with only an incomplete—and largely inaccurate—understanding of Mr. Fields and his "diverse human frailties".  Had they jury been presented with a true picture of Sherman Fields, there is a reasonable probability that he would not have received a sentence of death.

The Government's case at punishment focused primarily on establishing Mr. Fields' prior bad acts and his purported future risk of acts of violence.  It presented witnesses who testified about his disciplinary record in the McLennan County Jail; about police reports relating to other serious violent offenses; and about records that had been prepared in conjunction with his juvenile adjudication, probation, and incarcerations.  The Government then presented Richard Coons, M.D., a psychiatrist who opined that Fields presented a certain danger in the future.

Despite readily available evidence demonstrating that Mr. Fields' suffered from mental illness, trial counsel failed to competently challenge Dr. Coons and ultimately allowed him to inform the jury Mr. Fields simply refused to accept societal norms and that his "line of work" was violent crime.  The trial team's failure to investigate and present evidence of their client's traumatic background and psychological dysfunction permitted Dr. Coons to convince the jury that evidence—which should have been properly seen as symptoms of Mr. Fields' mental illness—supported Dr. Coon's assertion that Mr. Fields was a sociopath without a conscience.

Mr. Fields' well-documented symptoms of severe, progressive mood disorder; paranoid ideation; impulsivity; psychotic thinking; suicidal attempts; and agitation were *never presented to his jury*. At the time of his trial, and at the time of the crime of conviction, Mr. Fields met the DSM-IV-TR criteria for PTSD as well as Bipolar Disorder. His PTSD symptoms – the result of multiple traumatic stressors – include numbing of affect, hyperreactivity, emotional withdrawal, agitation, impaired sleeping, hypervigilance, and exaggerated startle response. These symptoms exacerbate his Bipolar symptoms, such as impaired sleep, paranoid ideation, agitated depression, impaired judgment, mood swings, irritability, and hypersexuality – all of which have been well documented over an extended period.

Despite the crucial importance of this evidence, there is no mention in the trial proceedings of Mr. Fields' long history of mental illness. Among the mitigating factors that defense counsel asked the jurors to consider on the Special Findings Form utilized in penalty phase deliberations was the statutory factor stating that "[t]he Defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge." Not a single juror found that this factor existed. Another proposed mitigating factor stated simply, "The Defendant can be controlled in a prison setting." Again, not a single juror found that this factor existed. These findings are hardly surprising in view of the lack of expert evidence at trial to explain Mr. Fields' history mental disorders that can, in fact, be effectively managed with treatment.

Additionally, the trial team failed to investigate and present evidence regarding the federal prison system's ability to control Mr. Fields' behavior or to present his true and negligible escape risk from a high security facility where he would have been having been serving a life sentence. A competent investigation would have revealed that Mr. Fields'

likelihood of serious prison violence during a life without possibility of parole sentence in BOP was well below "more likely than not." It would have additionally revealed that, should Mr. Fields have been determined by BOP to present a disproportionate risk of violence in prison, he could be held under super-maximum security conditions until determined to no longer be a disproportionate risk. Just as importantly, it would have revealed that the *ad hoc* risk analysis performed by Dr. Coons was subject to grave errors. *See e.g., Declaration of Dr. Stephen Mark Cunningham.*

A primary theme of the prosecution witnesses was even "in a highly structured system like a prison the defendant cannot be controlled. He is incapable of being controlled." TT 2065. However, there was a wealth of uninvestigated evidence readily available to conclusively rebut this claim. To begin, the Bureau of Prisons (BOP) has significant security and confinement capability in its super-maximum facility, ADX Florence. The capability largely negates (*i.e.*, renders extraordinarily improbable) Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape. However, even if not assigned to ADX Florence, Mr. Fields could easily be controlled within the federal prison system, if he presented a risk of committing violent acts.

The government offered testimony at sentencing regarding the specter that Mr. Fields would again escape from custody, including evidence suggesting that he was motivated to escape from custody, that he had announced that he was going to escape from custody, that he had requested assistance from staff in escaping from custody, and that he had damaged a vent in his cell in an apparent attempt to escape from custody. There was also testimony from corrections staff that there is no "escape-proof" facility. TT at 2310, 2312. Once again, the majority of this information could have been rebutted effectively with readily available information. The frequency of escapes from U.S. Penitentiaries is extraordinary low. There is no correspondence

between the architecture, security capabilities, and security procedures of a U.S. Penitentiary and the McLennan County Jail. Further, the architecture and security procedures of a U.S. Penitentiary are such that it is unlikely that the co-opting of a single correctional officer would enable an escape.

Furthermore, trial counsel fell below a reasonable standard of competence by failing to counter the Government's evidence of the risk of future violence. The methodology and correctional data associated with reliable violence risk assessments (*i.e.*, future dangerousness) at capital sentencing represents a highly specialized knowledge base that has not typically been mastered by forensic mental health professionals.

For one, counsel could have presented their own scientific evidence on the actual risk of Mr. Fields' committing acts of future violence in prison. For example, two actuarial scales were available in February 2004 for forecasting the risk of assault in prison that could have been applied to Mr. Fields. The first is based on a study of the prison misconduct of approximately 6,000 convicted murderers, projecting their likelihood of serious prison violence during a 40-year prison term. Application of this scale to Mr. Fields yields a 40-year risk of a 14.5% likelihood of serious prison violence. This is modestly below the risk rate of 16.4% of the sample as a whole. Most of this risk is for assault of another inmate. Life-time risk of an aggravated assault on a correctional officer is projected at 1%. Further, and as discussed previously, even that low probability can be reduced by the application of correctional interventions including more secure confinement.

In addition, as discussed in more detail in the claims corresponding to these facts, the methodology and associated testimony of Dr. Coons demonstrated virtually all of the fundamental errors in violence risk assessment at capital sentencing that have been identified in the peer-reviewed literature. Contrary to Dr. Coons' methodology of illusionary correlations,

reviews sponsored by the U.S. Department of Justice have concluded: past community violence is *not* strongly or consistently associated with prison violence; current offense, prior convictions, and escape history are only weakly associated with prison misconduct; and the severity of offense is not a good predictor of prison adjustment.  Not surprising, reliance on such a fundamentally flawed predictive methodology results in predictions that have an extraordinarily high error rate.

Rather than present a robust and compelling narrative of Mr. Fields' life history, detailing the variety of risk factors and chronic stressors that influenced the trajectory of his development from childhood onwards, counsel presented only a handful of witnesses and presented the jurors with a thin and superficial presentation of isolated events in Mr. Fields' life.  Counsel presented only eight penalty phase witnesses.  Three of the witnesses were correctional officers who had only come to know Mr. Fields in the year prior to his trial while incarcerated that the Federal Medical Center at Fort Worth.  Although ostensibly called for the purpose of showing that Mr. Fields would not be a "future danger" in prison, all three officers readily admitted ignorance of Mr. Fields' extensive prior history of incarceration in the juvenile system, the Texas Department of Corrections, and at the McLennan County Jail.  Indeed, one of the witness, Senior Officer Specialist Greg Watts, even testified that he had advised Mr. Fields to behave in prison so as to help his chances in his upcoming capital trial.  Such testimony not only undermined the rest of the mitigation presentation, it also suggested that to the extent that Mr. Fields had recently exhibited good conduct in prison, it was just an act to manipulate the jury.

Counsel also called two step-uncles, Ed Green, and his brother Vincent who had lived with Mr. Fields prior to their father's death at the hands of a drunk driver.  Although Sherman was a witness to that fatal accident, and was profoundly affected by the loss, counsel's examination of these witnesses only explored the event in the most superficial of terms.  The

jurors only heard that Mr. Fields was sad and grieved over his grandfather's death, which is obviously a typical response over the loss of a loved one, but learned nothing of the way in which the then-sixteen-year-old Mr. Fields was profoundly affected by witnessing his grandfather being run down by a drunken driver and how this event led to the onset of complex traumatic symptoms. Indeed, in the decade and a half before his trial, Mr. Fields had over twenty different friends who had died of violent deaths – so many that by the time he was in adolescence, mental health professionals were already making the diagnosis of post-traumatic stress disorder (PTSD). The jury, however, never learned of this fact because trial counsel failed to investigate Mr. Fields' mental health history and present evidence that he suffered from PTSD.

Counsel also examined Ed and Vincent Green regarding Mr. Fields' upbringing in certain housing projects in Waco. Although eliciting general statements to the effect that the projects were in a bad neighborhood, counsel failed to present to the jury an adequate and compelling picture about *why* the projects were considered such a dangerous place to live. The jury only heard generalities about the presence of drugs and gangs, but was not provided detailed testimony about the omnipresent threat of violent death to which Mr. Fields was exposed on a daily basis growing up in the projects. Nor did the jury learn about the manner in which Mr. Fields' chronic exposure to these stressors affected him during formative years of his development and worsened his mental condition and PTSD symptoms.

Counsel also called Mr. Fields' mother, Alice Fields Swinnie, as a witness. As with Ed and Vincent Green, counsel elicited only vague generalities from her on the stand regarding violence in the home and the community in which Mr. Fields lived. For example, Ms. Swinnie testified that one of her live-in boyfriends was "very mean and he used to beat me and he used to beat my kids," (TT. at 2458), and that in the projects "[e]verything happens. They

shoots (sic) and deal dope and a lot of other things." TT at 2460. Such testimony was succinct and conclusory and failed to convey any of the details necessary for the jurors to genuinely comprehend the extraordinary stress and trauma that Mr. Fields experienced growing up.

Similarly, counsel presented the testimony of Jane Bye (formerly Jane McHan), their retained social worker. Although Bye outlined some of the significant events in Mr. Fields' background, such as the death of his grandfather, her testimony provided no further details regarding the signs and symptoms of behavioral change in Mr. Fields after such events. Nor did her testimony offer a framework for understanding the trauma characterizing Mr. Fields' life and how repeated exposure to such trauma affects adolescent development and how it affected Mr. Fields.

Counsel also called Jack Randall Price, Ph.D., a clinical and forensic psychologist who testified that Mr. Fields had an IQ of 113 and could adjust well in a structured environment such as prison. During the course of the Government's cross-examination, however, Dr. Price was all but converted into a powerful prosecution witness. The Government invited him to opine at length about the diagnosis of antisocial personality disorder – including the fact that persons with such a diagnosis lack any remorse over hurting others, are not amenable to treatment, and are commonly referred to as sociopaths – before having Dr. Price confirm that Mr. Fields had received this very diagnosis while incarcerated as a juvenile. This was the last "defense witness" whose testimony the jury heard before deliberating whether to sentence Mr. Fields to death.

Trial counsel's deficient mitigation presentation was not the product of tactical consideration or strategic judgment. Rather, counsel simply failed to carry out its basic investigatory duties in preparation for trial. For example, counsel failed to perform such basic mitigation investigation tasks as obtaining all relevant social history records of Mr. Fields and his family members. Such records identified dozens of available witnesses who had encountered

Mr. Fields throughout the course of his life and who could have provided the jury with crucial details about the influences that shaped Mr. Fields in his developmental years. Moreover, despite the fact that Mr. Fields had a large extended family, counsel failed to interview all but a handful of these witnesses. In so doing, counsel unreasonably missed a crucial opportunity to investigate such issues as the impoverished, violent conditions in which Mr. Fields was raised, risk factors to which he was exposed, patterns of dysfunction that governed family dynamics, and a multigenerational history of serious mental illness in several generations of his family.

Moreover, the trial team failed to conduct a competent investigation into Mr. Fields' own chronic history of serious mental illness. Although the trial team consulted with an expert regarding Mr. Fields' intelligence, this inquiry was too narrow and failed to account for the fact that a high IQ score does not indicate the absence of mental disease. Indeed, mental illness and deficits in neuropsychological function can coexist with average or even high intellectual functioning. Similarly, the trial team's investigation failed to explore the adequacy of institutional responses to Fields' childhood trauma, mental illness, and failed to determine that their client's problems were never accurately identified or properly addressed. Understanding these mental conditions was vital to understanding and explaining Mr. Fields' behavior, including his history of criminal and other "bad acts."

Counsel's lack of investigation into Mr. Fields' mental condition does not reflect reasonable professional judgment, as there were numerous "red flags" that should have alerted counsel to the fact that a complete mental health investigation was necessary. For example, Mr. Fields' readily available institutional records reflected that Mr. Fields had previously received psychiatric treatment while incarcerated and had been diagnosed with major depression with psychotic features, pervasive mood disorder, atypical bipolar, and posttraumatic stress syndrome. As a result of counsel's failure to pursue an investigation into Mr. Fields' mental

health, the jury that sentenced Mr. Fields to death never heard any of this evidence of his lifelong and chronic history of mental health problems, including the fact that he had suffered from Bipolar Disorder and Post-Traumatic Stress Disorder since he was a child.

Jane Bye, the trial mitigation investigator, recently reviewed a portion of the evidence submitted with this petition and confirmed that this was exactly the type of evidence she sought to uncover.  Ms. Bye confirmed that there was no tactical reason that trial counsel failed to fully investigated and discover this information.

Yet even with this paltry mitigation presentation, and even without knowing of Mr. Fields' substantial history of mental illness, the death-qualified jury nevertheless stopped after six hours of deliberation and asked the trial Court what sentence would be imposed if it could not unanimously agree on a sentence.  The trial Court responded that in that event, it (the court) would impose a sentence, which could not be the death penalty.  The jury almost immediately issued a second note confirming that it could not unanimously agree on a sentence. Over Mr. Fields' objection, the trial court ordered the jurors to keep deliberating.  Only after this Court indicated through its instructions that it would not accept a non-unanimous verdict did the jury return with a death verdict.

## CLAIMS FOR RELIEF

**IV.    CLAIMS RELATED TO FIELDS' INCOMPETENCY TO WAIVE COUNSEL AND PROCEED *PRO SE***

CLAIM 1:    MR. FIELDS WAS INCOMPETENT TO WAIVE HIS RIGHT TO COUNSEL. PERMITTING MR. FIELDS TO REPRESENT HIMSELF VIOLATED THE CONSTITUTIONAL GUARANTEES OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 2:    MR. FIELDS WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN THE TRIAL COURT CONDUCTED AN INADEQUATE HEARING IN RESPONSE TO MR. FIELDS' COMPETENCY TO WAIVE COUNSEL AND REPRESENT HIMSELF,

VIOLATING THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION.

CLAIM 3:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE SENTENCING VERDICT WHEN COUNSEL FAILED TO CONDUCT A COMPETENT INVESTIGATION PRIOR TO OR IN RESPONSE TO MR. FIELDS' REQUEST TO WAIVE COUNSEL, FAILED TO DEMAND A BROADER INQUIRY BY THE COURT IN RESPONSE TO FIELDS' MOTION, AND FAILED TO OBJECT TO MR. FIELDS' COMPETENCY TO WAIVE HIS RIGHT TO COUNSEL.

### A.    Facts

Prior to the start of trial, Mr. Fields sought to replace or waive counsel – undeniably the single most important event of the trial. In response, the Government agreed that the facts presented a sufficient question concerning Fields' competence and appropriately requested a hearing. The Government suggested that Mr. Fields should be examined by a psychiatrist to determine whether he possessed the requisite mental competency to proceed *pro se*:

> MR. SNYDER:   [] [I]t might be good to have Dr. Mark or someone like that that the Court trusts to sit down with the defendant and make sure he is not suffering from any mental disease or defect or have any organic background in like damage to the head or something that would affect his ability to make a rational, intelligent decision . . . I'm concerned with that type of thing in the record with us taking this serious step that an appellate court looking over your shoulder might have said, "You should have stopped and made sure the guy was on all fours."

TT at 24-26. While the Court agreed that a competency hearing should be held and that the hearing should include expert testimony, the Court then indicated:

> THE COURT:  Well, it's 2:20 on a Friday afternoon. When are we going to do that before 9:30 Monday morning and how are we going to do it before 9:30 Monday morning? I guess it's possible you can find somebody to do it.

*Id.* Pursuant to this colloquy and at the Court's direction, Dr. Stephen Mark interviewed Mr. Fields the following Monday morning, testifying later that morning.

-31-

Dr. Mark, the psychiatrist appointed by the court to determine competence, has now noted that he personally met with Mr. Fields, but only for about 30 minutes and without the aid of any documents and only limited background information. *See Affidavit of Dr. Mark.* Counsel had a number of documents in their possession which diagnosed Mr. Fields with serious mental illness. *See Affidavit of Jane Bye* ¶ 12. Those documents were not provided to Dr. Mark. As a result, Dr. Mark had no medical records, no social security records, no medication records, nor any family history to inform his understanding of Mr. Fields' past or present mental disorders and mental state. This evidence demonstrates that Dr. Mark's conclusion concerning Mr. Fields' purported competence was based on incomplete information and the result of an extremely limited and uninformed evaluation.

However, even these records available at the time of trial did not reveal the true scope of Mr. Fields' mental dysfunction. Thus, the competency evaluation also suffered because counsel failed to conduct a thorough and competent investigation into Mr. Fields' mental health background and current mental condition (*see also* Claim 22 and supporting facts and argument), and did not even furnish the evaluating psychiatrist with any of the information counsel actually discovered in order to aid the psychiatrist in his determination of Mr. Fields' competency to waive counsel and represent himself. Given the stakes, as even the Government has suggested, there was certainly a corresponding need for a thorough evaluation of Mr. Fields' longstanding mental dysfunction and impairments. Instead, the opposite happened.

Yet, following Dr. Mark's cursory examination, the Court conducted a one-minute hearing into the competency of Mr. Fields to proceed *pro se*. TT at 60-61. Trial counsel did not put on any witnesses. In fact, Dr. Mark was the only witness to testify. *Id.* Trial counsel did not even cross-examine Dr. Mark. *Id.* The Court did not conduct any sort of questioning into Dr. Mark's conclusion or basis thereof. In fact, the only question asked of Dr. Mark was, to

paraphrase the Court, "do you have an opinion?"  Following, in its entirety, is the transcript of

the hearing that allowed Mr. Fields, a mentally impaired defendant, to proceed *pro se* in a trial

for his life:

> THE COURT:  Dr. Mark, I fully realize it's not possible at all for you to submit any kind of written report considering whatever visit you had with Sherman Fields, but if you would, just tell me on the record what happened, if he talked to you, what your opinion is. What I'm interested in is simply this:  He informed me Friday that he wants to represent himself, and before I can allow him to do that – which he has a right to do – I have to satisfy myself that he's making a voluntary and intelligent decision.  Not necessarily that it's the smart decision or the best decision, but that he's doing it voluntarily and intelligently.  If you could help me in that regard at all.
>
> DR. MARK:  Yes.  I was able to visit with Mr. Fields this morning.  He asked that at least one of his current attorneys be present. Mr. Swanton was present. Mr. Fields cooperated with the interview.  I went through a standard interview for competency and current mental status.  He has had some history of depression in the past and maybe some now with his current situation, but it does not interfere with the competency.  He is not psychotic.  He is not organic.  He appeared able to think through questions and not distract.  He appeared able to make decisions adequately for himself. In terms of the specific question can he make the decision to represent himself and be competent, the answer is yes.  He is competent to do so.
>
> THE COURT:  Dr. Mark, I think that's all I can do.  Thank you very much.  You know where to send your bill.
>
> DR. MARK: Okay.  Thanks.

TT at 60-61.

It is now clear that all of the numerous critical facts pertaining to Fields' mental

condition were either ignored or overlooked.

Mr. Fields suffers from chronic, serious, severe mental disabilities.  He has severe

mood swings, grandiosity, extreme paranoid ideation, and impaired judgment.  His request to

waive counsel was the direct product of these disabilities. *See Declaration of Dr. George Woods.* These disorders also critically diminish Fields' capacity to concentrate, strategize, communicate, formulate questions and conceive and articulate theories of his case. These disorders prevented Fields from absorbing, comprehending and testing the Government's evidence. None of this evidence was discovered or presented to this Court.

Mr. Fields' history of criminal behavior and mental illness, and related incarcerations and institutionalizations, began when he was but a child. A wealth of information helpful to determining Mr. Fields' competency existed. None of it was presented to the Court.

In addition to the fact that none of this information was discovered or presented at the competency hearing, trial counsel did not conduct a competent investigation into Mr. Fields' mental condition. *See Declaration of Russell Stetler.* Consequently, the trial team did not discover facts which were highly relevant to the decision to permit Fields to waive his right to counsel, and they also failed to demand a broader scope to the competency hearing, and failed to object to Fields' request to waive counsel.

## B.    Argument

A criminal defendant may not be tried unless he is competent. *Godinez v. Moran*, 509 U.S. 389, 396 (1993). The conviction or sentencing of a defendant who is legally incompetent at the time of the proceedings violates due process. *Pate v. Robinson*, 383 U.S. 375, 378 (1966). While movant recognizes that in our federal courts, "the right of self-representation has been protected by statute since the beginnings of our Nation," (*Faretta v. California*, 422 U.S. 806, 813 (1975)), the Constitution only guarantees a defendant who "knowingly and intelligently" waives the right to counsel the right to proceed *pro se* at his trial. *Id.* at 835.

A high standard exists for a defendant who seeks to waive counsel. The two cases that set forth the Constitution's "mental competence" standard, *Dusky v. United States*, 362 U.S.

402 (1960) (*per curiam*), and *Drope v. Missouri*, 420 U.S. 162 (1975), specify that the Constitution does not permit trial of an individual who lacks "mental competency." *Dusky* defines the competency standard as including both (1) "whether" the defendant has "a rational as well as factual understanding of the proceedings against him" and (2) whether the defendant "has sufficient present *ability to consult with his lawyer* with a reasonable degree of rational understanding." 362 U.S. at 402 (emphasis added; internal quotation marks omitted).  *Drope* repeats that standard, stating that it "has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel, and to assist in preparing his defense* may not be subjected to a trial."  420 U.S. at 171 (emphasis added).  As a result, the Constitution permits a court to limit a defendant's self-representation right by insisting upon representation by counsel at trial where a defendant is incompetent to waive the right to counsel. *Indiana v. Edwards*, 128 S. Ct. 2379, 2387-88 (2008).  The competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right,* not the competence to represent himself, although *Edwards* also permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so.

### 1.    Procedural Due Process Demands an Adequate Inquiry

The substantive requirement that an incompetent defendant not be tried gives rise to a corresponding procedural due process right.  *Drope,* 420 U.S. at 172; *Griffin v. Lockhart,* 935 F.2d 926, 929 (8th Cir. 1991).  The issue in a substantive competency claim focuses on whether the defendant was in fact incompetent to waive counsel.  The issue in a procedural due process claim is whether the court conducted an adequate hearing to determine competency. *Griffin*, 935 F.2d at 929.  Mr. Fields was denied both substantive and procedural due process.

-35-

In addition, a competency hearing is a critical event in a criminal prosecution to which the Sixth Amendment right to counsel applies. *See United States v. Purnett,* 910 F.2d 51, 55 (2d Cir. 1990). Thus, counsel was constitutionally obligated to investigate and present relevant evidence on the issue of Mr. Fields' competence. *See generally Galowski v. Berge,* 78 F.3d 1176 (7th Cir. 1996) (granting claim of ineffective assistance of counsel for failing to request a competency hearing); *McLaughlin v. Royster,* 346 F. Supp. 297 (E.D. Va. 1972) (granting claim of ineffective assistance of counsel in failing to investigate client's mental state and to insist on a competency hearing).

Once doubt as to the defendant's mental capacity is raised, due process requires a "meaningful" and adequate hearing into the defendant's competency. *Drope*, 420 U.S. at 172; *Pate*, 383 U.S. at 386. In the Fifth Circuit, the test for meaningfulness is whether the "quantity and quality of available evidence is adequate to arrive at an assessment that could be labeled as more than mere speculation." *Martin v. Estelle*, 583 F.2d 1373, 1375 (5th Cir. 1978) (in the context of retrospective hearing); *see also Wolfe v. Weisner*, 488 F.3d 234, 238 (4th Cir. 2007) (hearing must be "adequate to protect" the defendant's due process rights).

Here, the Government raised sufficient doubt into the capacity of Mr. Fields to represent himself by asking for a psychiatric examination. However, the Court's one-minute hearing into the matter, relying on the similarly brief, perfunctory and inadequate psychiatric examination of Dr. Mark conducted immediately prior, was not meaningful and was certainly not full, fair and adequate.

Competency evaluations, even in non-capital cases, commonly involve reviewing relevant background information, including both medical records and court records; interviewing the defendant, using a number of structured approaches to questioning; and, sometimes, employing "assessment instruments" and conducting further interviews, such as with the

defendant's attorney.  Mossman, *et al., AAPL Practice Guideline for the Forensic Psychiatric Evaluation of Competence to Stand Trial,* 35 J. Amer. Acad. Psychiatry & L. No. 4 Suppl. (2007).   A psychiatric diagnosis is a standard part of the process and is "highly relevant."  *Id.* at S32.   "The goal is to learn whether and how mental symptoms impair competence-related abilities," bearing in mind that "[t]he relevance of even severe symptoms to the question of competence varies from case to case."  *Id.* at S31-S43.

Such assessments attempt "to discern a defendant's capacity to make relevant decisions in a self-interested manner, or to uncover delusional thoughts or other symptoms of mental disorder that impair the capacity to *evaluate rationally* the choice that one may face." N. Poythress, *et al., Adjudicative Competence:   The MacArthur Studies* 67 (2002) (emphasis added); *see also id.* at 136 (goal of evaluation process is to uncover "faulty reasoning secondary to irrational (delusional) beliefs").

### 2.    Dr. Mark's Evaluation Was Far From Adequate

As an initial matter, the brevity of Dr. Mark's interview prevented him from conducting a meaningful and thorough examination into either the psychological wellbeing or competence of Mr. Fields.  When it comes to shifting and complex mental illnesses such as those afflicting Mr. Fields, the Supreme Court of California stated,

> More than three or four hours are necessary to assemble a picture of a man.  A person sometimes refuses for the first several interviews to reveal his delusional thinking, or other evidence of mental disease.

*People v. Bassett*, 443 P.2d 777, 790 (Cal. 1968).  Courts have repeatedly found psychiatric examinations as cursory as Dr. Mark's "simply too short" for the purposes of formulating a diagnosis as to mental disorder or competency.  *See*, *e.g.*, *Ford v. Wainwright*, 477 U.S. 399, 415 n.3 (1986) (single interview); *Boutte v. Mudd Separators, Inc.*, 236 So. 2d 906, 911 (La. Ct. App.

1970) (one hour examination); *McCollum v. Bush,* 344 F.2d 672, 673 (5th Cir. 1965) (40 minute examination); *United States v. Walker*, 537 F.2d 1192, 1195 (4th Cir. 1976) (30 minute examination); *United States v. Hamilton*, 107 F.3d 499, 503 (7th Cir. 1997) (20 minute examination); *United States v. Taylor*, 437 F.2d 371, 378 (4th Cir. 1971) (10 minute examination).

Further, Dr. Mark did not consider evidence of Mr. Fields' prior medical diagnoses of mental disorders, psychiatric evaluations, incarcerations and record of an abuse-filled, traumatic life, or Fields' multigenerational family history of mental illness,  rendering his opinion "speculative" and unreliable.  *See*, *e.g.*, *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986); *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991); *Taylor*, 437 F.2d at 378.  Also missing from Dr. Mark's interview with Mr. Fields were the standard battery of psychiatric tests calibrated to detect mental illness.  For these additional reasons, the examination was inadequate and unreliable.  *See Hays v. Murphy*, 663 F.2d 1004, 1012-13 & nn.12-14 (10th Cir. 1981); (examination inadequate due to, *inter alia*, unfocused questions and absence of psychological tests); *Bush v. McCollum*, 231 F. Supp. 560, 563 (N.D. Tex. 1964) (examination "limited to simple questions without the use of any kind of psychological tests" was "cursory" and inadequate to provide mental competence determination), *aff'd*, 344 F.2d 672 (5th Cir. 1965); *United States v. Mellor*, No. CR08-0049,  2009 WL 35341, at **2-3 (N.D. Iowa Jan. 6, 2009).

### 3.    The Scope of Inquiry at the Hearing Was Likewise Inadequate

Also fatally, the hearing failed to consider all material facts to the potential competency of Mr. Fields.  In this regard, the United States Supreme Court has held that for capital competency hearings, the factfinder must have before it all possible relevant information about the individual defendant whose fate it must determine. *See Ford v. Wainwright*  477 U.S. 399, 414 (1986) (competency to be executed).

Compared to Dr. Mark's inadequate evaluation, this Court's hearing was even more perfunctory. Indeed, the full evidence as to the competency of Mr. Fields offered at the competency hearing was Dr. Mark's untested conclusion, based on a cursory interview. Psychiatric opinions require particularly close examination because they are "'at best a hazardous guess however conscientious.'" *Ford*, 477 U.S. at 415 (citation omitted). Cross-examination, even by the Court, contributes to the search for truth by exposing the foundation of the expert's opinion, any history of error, any personal bias, and the degree of certainty as to the conclusions. By failing to allow or make its own inquiry into any of these areas, the Court accepted a finding of competence without any knowledge whatsoever as to whether Dr. Mark examined the full psychiatric, personal and institutional history of Mr. Fields (he did not), whether Dr. Mark asked questions particularly designed to probe an individual's competence to play the heightened role of self-advocate (he did not), or Dr. Mark's history of error or the degree of certainty to his conclusions (since retracted).

Consequently, without such inquiry, either by trial counsel,[6] or by the Court, the Court's finding is inherently unreliable. *See Ford*, 447 U.S. at 415 ("Without some questioning of the experts concerning their technical conclusion, a factfinder simply cannot be expected to evaluate the various opinions").

Further, the sufficiency of the Court's inquiry is not salvaged even if the boundaries of "the competency hearing" are redrawn to include the prior colloquy with trial counsel. For one thing, as recognized by the Supreme Court, "the existence of even a severe psychiatric defect is not always apparent to laymen." *Pate,* 383 U.S. at 386. For this, among

---

[6] *See Ford*, 477 U.S. at 414 ("[Without adversarial examination] the factfinder loses the substantial benefit of potentially probative information. The result is a much greater likelihood of an erroneous decision").

other reasons, trial counsel "are wholly unqualified to judge the competency of their clients." *Hull v. Freeman,* 932 F.2d 159, 168 (3d Cir. 1991). For another matter, where, as here, the client wishes to be found competent, counsel is in a hard, if not impossible, situation. With regard to this difficulty:

> When the trial court seeks the opinion of a defendant's counsel regarding his or her client's competency, counsel is placed in a difficult, if not untenable situation. If counsel privately has doubts about competency, but his or her client does not wish to contest competency, how does he or she respond to the court, and what argument should he or she offer on the issue? Counsel certainly cannot be a witness against his or her own client.

*Nebraska v. Johnson*, 551 N.W.2d. 742, 776 (Neb. Ct. App. 1996).

Consequently, even if their comments were considered part of the competency inquiry, trial counsel's uninformed and non-expert lay opinions fail to make the competency hearing adequate or reliable.

### 4.      Mr. Fields was Prejudiced

If an adequate competency evaluation and hearing had taken place, informed by the requisite background information, the outcome of the hearing would have been different because Mr. Fields did not have the ability to think rationally about alternative courses of action (whether to represent himself or have counsel represent him) and to express a voluntary choice on that question. Mr. Fields was incompetent to waive his right to counsel because he delusionally believed that counsel was working with the prosecution. That delusion was the product of his mental illness, which impaired his ability to make a reasoned and rational choice.

Mr. Fields need not show that the deprivation of counsel harmed him. The Supreme Court has recognized that some constitutional rights are "so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman v. California*, 386 U.S. 18, 23

(1967). These errors include the right to counsel. *Id.* at 23 n.8; *see Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) ("[L]awyers in criminal courts are necessities, not luxuries"). Allowing a severely mentally ill man to represent himself is akin to having no counsel at all or to having unconscious counsel. Under these circumstances, prejudice is presumed without inquiring into the actual conduct of the trial. *See United States v. Cronic*, 466 U.S. 648, 658-60 (1984); *Burdine v. Johnson*, 262 F.3d 336, 348-49 (5th Cir. 2001).

Although no showing of actual prejudice is required, Mr. Fields nevertheless can demonstrate a reasonable probability that a competent, thorough evaluation would have resulted in a finding that he was not competent to waive counsel and represent himself at his capital trial. If counsel had performed competently, the outcome of the hearing would have been different. If counsel had conducted a competent investigation or had provided Dr. Mark with the fruits of that investigation, it would have been clear that "Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses." *See Declaration of Dr. George Woods* ¶ 5.

Mr. Fields is intensely paranoid and grandiose. His decision to waive counsel was the result of these mental illness symptoms. Put another way, but for Mr. Fields' mental illness, he would likely not have sought to waive counsel. "Mr. Fields' paranoid fear of his attorneys was consistent with his belief that they were not failing to work for him, but were actively consipiring with the prosecutors to convict him." *Declaration of Dr. George Woods* ¶ 107.

Mr. Fields' "paranoid ideation and impaired judgment, coupled with the rumination and hyperreactivity of his PTSD (and exacerbated by his conditions of confinement) fueled his decision to waive counsel which was the direct product of his co-morbid psychiatric illness compounding and creating poor decision-making." *Declaration of Dr. George Woods* ¶ 108. This is not atypical. Commentators report that "clinical judgments of incompetency have

-41-

been closely associated with particular symptoms – most prominently symptoms of thought

disorder, *delusional beliefs, paranoia*, disorientation, and hallucinations." G. Melton, , *et al.,*

*Psychological Evaluation for the Courts: A Handbook for Mental Health Professionals &*

*Lawyers* 144 (3d ed. 2007) (emphasis added).

The documents readily available at the time of trial demonstrate that Mr. Fields

had been hospitalized at Waco's DePaul psychiatric hospital as a child and diagnosed with Post-

Traumatic Stress Disorder by the time he was 14 years old. *See* Exh. 7. Additionally, Dr.

Kenneth Day, who treated Mr. Fields as a child in the Texas Youth Commission Child Care

System indicated that a diagnosis of Atypical Bipolar Disease was "suggested by family history."

*See* Exh. 7. None of these documents were provided to Dr. Mark.

Additionally, documents readily available at the time of trial demonstrated that

Mr. Fields displayed the signs and symptoms of a combination of Post-Traumatic Stress Disorder

and Atypical Bipolar Disorder in precisely the ways Dr. Woods describes – a history of paranoid

ideation, scanning behavior, impaired judgment, delusional thinking, hypersexuality, irritability,

grandiosity, impulsivity impaired sleep and impaired cognitive functioning. *See Declaration of*

*Dr. George Woods* ¶¶ 95, 100. For instance, several of the prison disciplinary records and

Inmate Grievance forms within trial counsel's files indicate a long history of these symptoms.

> a.    **Signs of Paranoid Ideation and Delusional Thinking**

Several Inmate Grievance forms filed by Mr. Fields clearly evidence paranoid

ideation and delusional thinking:

- On April 25, 2003, Mr. Fields filed an Inmate Grievance form indicating the paranoid and delusional belief that the guards were attempting to kill him: "Since my return to the McLennan County Jail in 4/24/03 I've been subject to harassment and threats as well as the aforementioned physical abuse and I fear for my life." *See* Ex. 73.

- On April 25, 2003, Mr. Fields filed an Inmate Grievance form indicating his belief that officers had stolen his legal materials: "On the date of 4/25/03 at the booking desk area, I Sherman L. Fields #0071651 observed officer R. Martin reading my legal material and showing it to other person(s) while in the process of searching for contraband. When my legal material was finally brought to me I was missing a stack of handwritten notes and comments that I had compose in reference to the Governments evidence against me that was/are intended for my lawyers and private investigator." *See* Exh. 72 at 001072.

- On June 23, 2003, Mr. Fields filed an Inmate Grievance form indicating a paranoid belief that the guards were trying to kill him: "The staff here are plotting to murder me. When I go to sleep they try to sneak in this cell and kill me. I fear for my life." *See* Exh. 74.

- On June 23, 2003, Mr. Fields filed an Inmate Grievance form indicating a paranoid belief that the guards were trying to poison him: "On the date of 6-25-03 at or about 4:30 A.M. Officer Eubanks did try to poison me by putting an unknown substance in my food." *See* Exh. 75.

- On June 25, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional belief that he was not a U.S. citizen: "I am not a United States citizen, I was born in another country and I request access to my country's consulate." *See* Exh. 76.

- On June 30, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were members of the Ku Klux Klan plotting to murder him: "The time is 7:40 P.M. on the date of 11-27-01 and Officer Burch and nine other officers is standing in front of my cell having a Klan meeting and talking about killing me. I'm scared to death that they are gonna come in here and kill me." *See* Exh. 82.

- On July 2, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were going to murder him: "At or about 12:10 A.M. Officer Eubanks stopped at the cell door and made the statement 'I wouldn't poison your ass but I will shoot you.' This not the first time this officer have threatened my life and yes I am scared that he'll carry out his threats." *See* Exh. 77.

- On July 6, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were trying to poison him: "On the date of 7-5-03 at or about 4:00 P.M. Officer Stratil brought a food tray to my cell that had something silver in the cake and some black stuff in my juice. There's a group of officer here at this jail that's conspiring to murder me and they've tried at least three times thus far by poisoning my food but I always know who it is and I catch it before I consume the food." *See* Exh. 78.

- On July 8, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were going to murder him: "Corporal Jimmy Herrington and Sergeant Edward Stone is leading a cabal in a conspiracy to murder me and I tell you right now I'm real real scared.  I sleep with one eye open and I'm afraid to eat my food when certain officers bring it to me."  *See* Exh. 79.

### b.    Signs of Paranoid and Delusional Thinking and Hypersexuality

Numerous prison records indicate behavior consistent with delusional thinking and hypersexuality:

- On July 14, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional belief that the guards were sexually harassing him: "Corporal Tommy Vandyke is sexually harassing me.  Everytime he work up here I catch him peeking at me with lewd eyes from behind computers, desks or whatever is available at the time.  I am not gay and I will not indulges in homosexual activity.  I'm afraid he will try to attack me.  I need some immediate assistance."  *See* Exh. 80.

- On July 24, 2003, Mr. Fields again filed an Inmate Grievance form indicating the delusional belief that the guards were sexually harassing him: "On the date of 7-24-03, at or about 6:30 A.M. Corporal Burch was standing at the copy machine staring at me.  I asked him was he gay.  He asked me what did I say and walked over to my door.  I repeated the question.  He asked me what did I think?  I said, 'Yea, I think your gay.'  He said 'I guess I'm supposed to ask you to see your dick.  You can show it to me if you want to.'  I said 'Get way from my door, I'm not gay!'  Corporal Burch walked away smiling.  This man keeps sexually harassing me and I don't like it.  This is not the first time an I'm fed up."  *See* Exh. 81.

Again, consistent with hypersexuality, many of Mr. Fields' disciplinary reports "were for masturbation, consistent with Mr. Fields' sexual history when not incarcerated . . . the same bipolar symptom of hypersexuality is present in an isolated setting."  *See Declaration of Dr. George Woods*  ¶ 106.  For example:

- December 4, 2001:  "Inmate was masturbating" (Exh. 105 at 001015)**;**

- February 2, 2002:  "[M]asturbated in front of me when told to stop" (Exh. 105 at 001014);

- February 26, 2002:  "Inmate was standing at his door, in full view, masturbating, and grinning at this officer."  (Exh. 106);

- March 17, 2002:  "[I]nmate Fields was fond [sic] masturbating"  (Exh. 107);

- March 24, 2002:  "Inmate Fields, Sherman was standing at cell door masturbating."  (Exh. 108 at 001025.)  On this same day, Mr. Fields was written up for this offence two other times:  "Inmate standing in middle of cell masturbating."  (Exh. 108 at 001024);  "Inmate was standing in middle of cell masturbating as this officer did 15 min watch."  (Exh. 109);

- April 9, 2002:  "[T]he subject stood in front of this window and masturbated while laughing."  (Exh. 110);

- May 12, 2002:  "Inmate Fields was masturbating."  (Exh. 111);

- July 25, 2002:  "While inmate across from Fields was speaking with this officer, Fields was standing on his bunk looking at this officer masturbating."  (Exh. 112; *see also* Exh. 113 at 001049).

### c. Signs of Irritability, Impaired Judgment and Impaired Impulse Control

Similarly, several prison disciplinary records indicated symptoms of irritability, impaired judgment and impaired impulse control:

- On February 12, 2003, Mr. Fields was disciplined for spitting on a guard. Consistent with the symptoms of impulse control, Fields remarked about the incident "I'm not denying that I did it, Because I did it.  I was mad the way they did me.  I reacted without thinking."  *See* Exh. 114.

- On April 3, 2003, Mr. Fields was disciplined for an incident clearly evidencing irritability, impaired judgment and poor impulse control by throwing liquid on a guard and stating "I told you I was going to get your bitch-ass" and "I feel better now." *See* Exh. 11 at 001069.

- On May 19, 2002, Mr. Fields was disciplined for an act of impaired impulse control when he "threw urine on [an] officer during chow." *See* Exh. 115.

- On September 6, 2002, Mr. Fields was disciplined for "throwing juice on Officer." *See* Exh. 113 at 001050.

This behavior is completely consistent with impaired impulse control.

### d.    Signs of Paranoia – Refusal to Take Medication

Additionally, consistent with his paranoid ideation, Mr. Fields was written up several times for refusing to take anti-depression medication provided by the prison staff:

- On April 1, 2003, Mr. Fields was disciplined for refusing to take the anti-depressant Remeron:  "During this search approximately 34 discarded medicine tablets were found in a folder containing inmate Field's [sic] mail.  The pills appeared to be discolored as if they were placed in the mouth then spat out.  It was determined by medical staff that the medication was 30 milligram tablets of "Remeron" which is an anti-depressant.  One pill is issued to the inmate daily."  *See* Exh. 10.

- On April 13, 2003, Mr. Fields was again disciplined for refusing to take the anti-depressant Remeron: "During a shake-down of inmate Field's [sic] cell, six(6) orange pills were discovered inside of an empty deodorant bottle which had been altered so that the bottle could be opened and items placed inside.  P.A. Marrero confirmed the pills were Remeron, an anti-depressant."  *See* Exh. 72 at 001071.

Each of these records is relevant, and essential to a complete and proper mental health diagnosis and each support the diagnosis of Dr. Woods, indicating that Mr. Fields was not competent to waive counsel and represent himself at trial.  *See Declaration of Dr. George Woods* ¶ 5 ("[Mr. Fields'] competency . . . should have been carefully assessed through a thorough evaluation of his longstanding mental dysfunction and impairments").  Absent accurate and comprehensive life history data, a forensic expert in a capital case is precluded from rendering a complete and reliable opinion.  *See* Richard G. Dudley, Jr. & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 984 (2008) ("Until the life history investigation is complete, the mental health expert can render only a preliminary diagnosis or a differential diagnosis based on the incomplete information available to him. When life history information is incomplete, the mental health expert must request further life history investigation to gather the information necessary to reach a credible and firm diagnosis"); *see also* Douglas Liebert & David Foster, *The Mental*

*Health Evaluation in Capital Cases: Standards of Practice,* 15:4 Am. J. Forensic Psychiatry 43 (1994) (noting the necessity of collecting of an accurate medical, developmental, psychological and social history, gathered from multiple sources).

The great wealth of records in Mr. Fields' case was readily available to trial counsel. In fact, a few were actually in trial counsel's files. However, not a single one of these records was shown to Dr. Mark to assist him in his diagnosis: "I was not provided and consequently did not review any documents related to Mr. Fields' prior terms of incarceration or prior mental health diagnoses." *Affidavit of Dr. Stephen Mark* ¶ 4.

### e. Multigenerational History of Mental Illness

Moreover, there were numerous records available at the time of trial indicating a long multigenerational history of mental illness in Mr. Fields' family. As discussed, *supra*, it was incumbent upon counsel to discover this evidence and present it to the forensic expert to ensure a proper mental health diagnoses. Had trial counsel performed an adequate investigation into this issue, they would have found a long history of documented mental illness reaching back to at least four generations. This genetic history could have provided Dr. Mark with documentation demonstrating that Mr. Fields' illnesses were genetically transmitted and underscored the high probability of these illnesses would become manifest. *See Declaration of Dr. George Woods* ¶ 50. This genetic pool included:

- **Leana Powell Fields**, Mr. Fields' maternal great-great grandmother, who was committed to Texas's State Lunatic Asylum. *See* Exh. 98.

- **Jessie Mae Fields**, Mr. Fields' maternal grandmother, who has a history of depression, and "bad nerves." She has been prescribed psychotropic medications, including Cymbalta for depression. Additionally, she has a history of engaging in inappropriate behavior, such as bringing her grandchildren with her to look through garbage cans for food and soda cans and using the bathroom in buckets in the living room in front of

family members. *See Declaration of Shaffer Fields* ¶ 16; Declaration of Vince Green ¶¶ 14-15; *Declaration of Dr. George Woods* ¶ 49.

- **Shelby Mitchell**, Mr. Fields' maternal grandfather, who likely suffered from Post-Traumatic Stress Disorder. He would often tell his grandsons that "if y'all had seen some of the things I seen as a child, y'all would drink too." As a young boy, the KKK came to Mr. Mitchell's house (sometime in the 1920s), dragged his father outside and flogged him and then raped his mother. Mr. Mitchell would tell this story to the kids about every other night. Mr. Mitchell also would frequently talk about the lynching of Jesse Washington. He would say things like the tornado in 1953 that hit Waco was a punishment from God for the murder of Jesse Washington. It is also reported that he believed that his dead wife would visit him and he would have conversations with her. *See Declaration of Charles Fields* ¶¶ 47, 57-59, 80, 83; *see also* Exh. 93 (article regarding hanging of Jesse Washington).

- **Alice Mae "Sarah" Fields Swinnie**, Mr. Fields' mother, who suffers from borderline intellectual functioning; mental retardation/brain trauma; depression or "bad nerves." She has been prescribed psychotropic medications, including Alprazolam. She has been hospitalized for "mental health" problems, and has been diagnosed with mental retardation as of 1993. In April of 2005, Dr. Stephen Mark, diagnosed her with a "generalized anxiety disorder" and "panic disorder." At one point, Alice attempted suicide by swallowing several pills; she described the experience as "a cry for help." *See* Exh. 22; Exh. 17; Exh. 57; Exh. 43; *Declaration of Alice Swinnie* ¶¶ 41-43.

- **Shaffer Allen Fields**, Mr. Fields' maternal half-brother, who has a history of depression and "bad nerves." *See Declaration of Shaffer Field*s ¶ 26.

- **Jeffery Ladale Fields**, Mr. Fields' maternal half-brother, who has a history of mental illness and has been prescribed psychotropic medications, including Nortriptyline, Haldol and Trazodone. He has been treated for his mental illness and has been diagnosed with "mild mental retardation" and treated for ongoing schizophrenia and depression. Clinic notes also indicate that he complained of "hearing voices" and threatened suicide. *See* Exh. 37; Exhs. 58-61.

- **Jimmy Lewis Fields** Mr. Fields' maternal half-brother, who has a history of borderline intellectual functioning, depression and suicidal thoughts. He has been prescribed Thioridazin and Mellaril, as well as anti-depressants. He reports being diagnosed as "mentally insane" and seeing "little green dudes." His records reflect that he hears voices and suffers from "tormenting, intrusive thoughts." He has spent time in a psychiatric hospital because of his mental health issues, but the records have been

destroyed.  *See Declaration of Jimmy Fields* ¶¶ 26-29; Exh. 29; Exh. 32; Exh. 33; Exh. 36; Exh. 39; Exh. 40.

- **Shelley Leon Fields ("Leon")**, Mr. Fields' maternal half-uncle, who was described by a number of sources as "crazy."  He suffered from mental illness, had borderline intellectual functioning, and was prescribed psychotropic medications.  He was known to be paranoid and under the delusion that people were trying to kill him.  Sources describe him as being mentally handicapped and unable to bathe himself or remember his own birthday or where he lived.  *See Declaration of Alice Swinnie* ¶ 49; *Declaration of Jimmy Fields* ¶ 17; *Declaration of Charles Fields* ¶¶ 83-84; *Declaration of Annie Lucille Leaks* ¶ 15; Exh. 41.

- **Shirley Mae Fields Bouye**, Mr. Fields' maternal half-aunt, who has been diagnosed as paranoid schizophrenic.  She has been hospitalized at least twice for her mental illness.  A petition for an order to administer psychoactive medication was filed because she is incapable of making decisions regarding her medications.  Moreover, she has been hospitalized for calling 911 regularly and threatening her neighbors, during which stay she was described as "catatonic," refusing to speak, eat or take her medications.  *See* Exh. 6; Exh. 24; Exh. 25; Exh. 44.

- **Acie Louis Bouye**, Mr. Fields' first cousin and Ms. Bouye's son, who has spent time in a psychiatric hospital and was diagnosed with undifferentiated schizophrenic disorder and personality disorder, after being arrested on burglary charges.  Dr. Mark found him incompetent to stand trial on those charges because he was "hallucinating," "talking to people not present" and because he "appeared frightened as if he was being threatened."  *See* Exh. 15; Exh. 16; *Declaration of Shaffer Fields* ¶ 30.

- **George "Joe" Horde (Harvey) Gaines**, Mr. Fields' maternal half-uncle, who has been described as "crazy" and "slow," with problems counting and reading.  He has been treated at a psychiatric facility in connection with his problems, although the records of his treatment have since been destroyed.  *See Declaration of Charles Fields* ¶¶ 84-85; Exh. 65.

- **Otis Leaks**, Mr. Fields' first cousin, who has been diagnosed with undifferentiated schizophrenia, chronic paranoid schizophrenia and Post-Traumatic Stress Disorder.  He suffers from audio-visual hallucinations, including hearing voices telling him to "watch out" and seeing "demons."  His medical records describe him as suicidal, and suffering from terror, confusion and depression.  *See* Exhs. 45-51.

- **Jerry Leaks**, Mr. Fields' first cousin, who has been diagnosed as schizophrenic, "severely psychotic, fearful, with catatonia and mutism."  He suffers from visual and auditory hallucinations and has been

-49-

hospitalized due to his schizophrenia and "catatonic state." He has been prescribed psychotropic medications, such as Thorazine and Risperdal. *See* Exhs. 52-56.

- **Hattie Love**, Mr. Fields' maternal half-aunt, who has been diagnosed with depression with psychosis. She has been prescribed, at different times, Zoloft, Trazodone and Prozac. She is also significantly intellectually impaired. She attended special education classes as a child and can barely read or count. *See* Exh. 23; Exhs. 26-27; *Declaration of Alice Swinnie* ¶ 48.

- **Patricia Diane Robinson**, Mr. Fields' half-aunt, spent time at a psychiatric treatment center, although the records of her treatment have since been destroyed. *See* Exh. 66.

- **Alton Robinson, Jr.**, Mr. Fields' first cousin and Ms. Robinson's son, who has a record of "major depressive disorder, single episode, severe with psychotic features." Mr. Robinson currently receives "mental health treatment;" during such treatment he "report[ed] symptoms of depression – *e.g.*, depressed mood; loss of appetite; low energy; poor concentration; frequent crying spells, & irritability." He has also sought mental health treatment for "hearing voices." Robinson has experienced "non-specific auditory voices," visual hallucinations and his insight and judgment have been classified as "impaired." He has been prescribed Prozac. *See* Exhs. 62-64.

Simply put, the prevalence of mental illness, borderline intellectual functioning and mental retardation in Mr. Fields' genetic pool is astounding. Mr. Fields' family tree, submitted as Exhibit 117 dramatically illustrates this point. Although all of this documentation was readily available to trial counsel, none of it was collected or provided to Dr. Mark. These documents are highly relevant to an adequate competency determination and Mr. Fields was unquestionably prejudiced by Dr. Mark's inability to consider them.

### f.    Extensive History of Trauma

Similarly, trial counsel failed to provide Dr. Mark with any documentation indicating Mr. Fields' extensive history of trauma, which supports Dr. Woods' diagnosis of Post-Traumatic Stress Disorder and lack of competency to waive counsel and represent himself *pro se*. As Dr. Woods explained "Mr. Fields' life was influenced by both community and family

violence, trauma, absence of nurturing and modeling, lack of appropriate coping mechanisms, and mental illness.  By his teens, Mr. Fields suffered extreme physical and emotional trauma, due to the abuse he suffered at the hands of his caretakers in addition to experiencing his mother shoot his stepfather and his stepfather's mistress and his subsequent stepfather shoot his mother in the head.  Moreover, Mr. Fields experienced racial violence both directly and as a result of secondary trauma, suffered the deaths of numerous friends and family, and attempted suicide on multiple occasions."  *Declaration of Dr. George Woods* ¶ 104.

The prevalence and extent of extreme violence, death and associated trauma in Mr. Fields' life is both devastating and well documented.  For instance, when Mr. Fields was 16, he witnessed his grandfather's death.  Mr. Mitchell, who was 85 at the time, was "struck by a car while he was mowing his yard."  *See* Exh. 70 at 000261.  The drunk driver "veered off the road and struck Mitchell" at 2:30 p.m. and "[s]everal of Mitchell's relatives witnessed the incident" including Fields.  *See* Exh. 70 at 00260.  Moreover, Fields' "mother shot William Bradford (the father of two of her sons) and [Ivory Monroe] the woman Mr. Bradford was seeing" when Fields was just 11 years old.  Mr. Fields' mother was shot in the head herself by Melvin Swinnie, a man Mr. Fields described "as the 'best male figure my mother was ever with.'"  *See Declaration of Dr. George Woods* ¶ 59; Exh. 42 at 009429.  Mr. Fields was 19 at the time.  Melvin and Alice had been arguing over Alice's leaving Melvin and Melvin reportedly had threatened Alice in the past, telling her that "if he couldn't have [her] then no one else could either."  *See* Statement of Alice Swinnie to Waco Police (April 27, 1993).  According to April Fields, Mr. Fields' wife who witnessed the event, Melvin "kept pointing the gun at [April, April's daughter, and Alice] and pulling the trigger but the gun wouldn't fire."  *See* Statement of April Fields to Waco Police (April 27, 1993).  April Fields also told Waco police that Melvin told her and Alice earlier in the

day that he shot at Charles Franklin.  *See* Statement of April Fields to Waco Police (April 27, 1993).

By the time Mr. Fields was nineteen years old, at least twelve of his close friends, family and loved ones died tragically.  By the time he was 27, that number rose to at least nineteen.  For example:

- On September 17, 1986, Roderick Scott, 16, a friend of Fields', died when "he was shot in the chest in the 200 block of Clifton Street."  Scott "was shot once with a small caliber gun" and was found lying next to a car.  "Scott and several other youths were sitting in chairs in the 200 block of Clifton" when the shooter "approached Scott and asked Scott if he wanted to fight."  The shooter then "pulled a small caliber pistol and shot Scott once in the side."  Scott died at a local hospital.  *See* Exh. 96 (*Waco Tribune Herald* (Sept. 19, 1986)).

  Sherman Fields was 12 years old at the time of Scott's death.

- On January 12, 1989, Roy Cleveland, 16, one of Fields' two best friends, hanged himself in his cell at the McLennan County Juvenile Detention Center.  "An employee of the juvenile detention center found Cleveland hanging from a bed sheet looped through a steel plate covering a window in his room."  Cleveland was taken to the hospital and died on January 12, 1989 in the ICU due to oxygen deprivation to his brain.  *See* Exh. 67 (*Waco Tribune Herald* (no date)); *see also* Exh. 97 (Roy Cleveland Funeral Program (Jan. 21, 1989)).  McLennan County Justice of the Peace stated that there was "some indication that [Cleveland] may have been trying a ploy to go to the hospital . . . He may have thought he could escape from the hospital."  *See* Exh. 67 at 000253.  Minutes before Cleveland was found, **Sherman Fields** attempted to hang himself in the cell next door: "workers found [a] 14 year old boy hanging through the steel plate covering the window in his room.  The boy was taken down and suffered no injuries."  *See* Exh. 67 at 000254.

  Sherman Fields was 14 years old at the time of Cleveland's death.

- On March 11, 1989, Roderick Cummings, 16, the second of Fields' two best friends, was "killed during a gun battle at the Sherman Manor Apartments."  One Waco police officer described Cummings as "an innocent bystander" during a drug dealing turf war over who was controlling the area.  When police arrived at the scene, Cummings was already dead.  Another witness stated that Cummings "wasn't the one [the shooters] wanted.  The one they wanted got away."  Another bystander

was also caught in the gunfire but was not harmed. *See* Exh. 94 (*Waco Tribune Herald* (Mar. 11, 1989)).

Sherman Fields was 14 years old at the time of Cummings's death.

- On June 22, 1989, John Walker, 15, a friend of Fields' was killed by "a single .22 caliber gunshot wound to the upper chest." A Waco police officer on patrol stated that he "saw the passenger and [Walker] having some sort of altercation, and [Walker] fell to the ground." The officer gave chase to the suspects, who fled in a vehicle and arrested a 15-year-old and 16-year-old in connection with the shooting. *See* Exh. 71 (*Waco Tribune Herald* (June 23, 1989); Exh. 13 (Medical Examiner's Report (Nov. 10, 2009).

Sherman Fields was 14 years old at the time of Walker's death.

- On July 15, 1990, Donnell Dewayne Swinnie, 16, a friend of Fields', was shot to death by a Fort Hood soldier after getting into an argument with the 25-year-old soldier earlier in the day. Waco police found Swinnie "laying face down in the 1200 block of North Ninth Street shortly after 11:30 Saturday night." McLennan County Justice of the Peace stated that the "bullet apparently struck major arteries at the top of Swinnie's heart." *See* Exh. 83 (*Waco Tribune Herald* (July 21, 1990); *see also* Exh. 21 (Medical Examiner's Report (Jul. 15, 1990)). Police found what they believed to be "the murder weapon – a .380 caliber automatic handgun – in a trash bag in the 1200 block of North Ninth Street." *See* Exh. 83.

Swinnie died two days before Sherman Fields' 16th birthday.

- On February 9, 1992, Albert Donnell Sims, 20, a friend of Fields', "was shot several times with a .25-caliber semi-automatic handgun after an argument erupted between his cousin and another man." *See* Exh. 91 (*Waco Tribune Herald* (Feb. 10, 1992)). Sims was taken to a local hospital where he later died from his injuries. Sims was shot in the right shoulder, right forearm, back of the right arm, left leg, back, lower abdomen and pelvis. *See* Exh. 18 (Medical Examiner's Report (Feb. 11, 1992)).

Sherman Fields was 17 years old at the time of Sims's death.

- On August 14, 1992, Terryll Collins, 18, a friend of Fields', died from a gunshot wound to the head suffered during his arrest. Waco police allegedly came to Collins's residence to arrest him and gave chase when Collins fled the house with a gun. One officer found Collins hiding in a nearby shed, dragged him out, and "Collins began struggling to get away." "The officer said that during the struggle he heard a gunshot. The two of them fell to the ground. Collins landed on his stomach with the officer on

top of him." The officer "found a gun under [Collins] and threw it a safe distance away . . . As the officer tried to put cuffs on [Collins], he noticed Collins was not responding. He then realized Collins had been shot." "Collins, who had a gunshot wound just above the left eye, was taken to Hillcrest Baptist Medical Center where he later died." The arresting officer did not pull his service revolver during the incident. Questions remained as to why the arresting officer "didn't wait for backup before confronting Collins in the shed and if he said anything to [Collins] at the point of arrest." The Waco Police Department placed the arresting officer on administrative leave pending the outcome of its investigation into Collins's shooting death. Information from the investigation was said to probably go to a grand jury for review. Although officers at the scene saw Collins with a gun, police were "reviewing a tape of police radio transmissions to determine if officers broadcast the fact that Collins had a gun." *See* Exh. 85 (*Waco Tribune Herald* (Aug. 15, 1992)).

Sherman Fields was 18 years old at the time of Collins's death.

- On November 19, 1992, Michael Campbell, 29, a friend of Fields', was found shot to death, "slumped over behind the wheel" of a car. Campbell was pronounced dead at the scene, having been shot multiple times. *See* Exh. 86 (*Waco Tribune Herald* (Nov. 20, 1992)). The Medical Examiner's report stated that Campbell "sustained a number of gunshot wounds" to the abdomen, back, arm, leg and face, and was found "seated in the driver's seat and slumped to the left into the passenger seat." *See* Exh. 19 (Medical Examiner's Report (Nov. 19, 1992) at 003101.

Sherman Fields was 18 years old at the time of Campbell's death.

- On November 3, 1993, Kimberly Leaks, 16, Fields' cousin, was found by Waco police "suffering from a stab wound to the upper chest" and was pronounced dead at a local hospital less than an hour later. Police took a 15-year-old girl into custody who stabbed Leaks in the chest with a knife after the two girls got into a argument. *See* Exh. 84 (*Waco Tribune Herald* (Nov. 4, 1993)). This stabbing occurred in the Fields family home.

Sherman Fields was 19 years old at the time of Leaks' death.

- On December 10, 1993, Guan Scott, 21, a friend of Fields', "was shot in the head with a handgun in the parking lot of Dottie's Bar." Scott was taken to a local hospital where he later died from his injuries. *See* Exh. 95 (*Waco Tribune Herald* (Dec. 6, 1993)).

Sherman Fields was 19 years old at the time of Scott's death.

- On April 26, 1994, Lee Walley McKinney, 16, a friend of Fields' was found dead with apparent head trauma "lying on the ground near some

trash" on a gravel road.  *See* Exh. 90 (*Waco Tribune Herald* (Apr. 27, 1994)).  Police suspected foul play in McKinney's death, which was later confirmed by the Medical Examiner who reported that McKinney died from a gunshot wound to the head.  *See* Exh. 20 (Medical Examiner's Report (Apr. 27, 1994)).  "Detectives believe McKinney was injured somewhere else and that his body was dumped at the site." *See* Exh. 90.

Sherman Fields was 19 years old at the time of McKinney's death.

- On October 17, 1994, Marcus Thornton, 24, a friend of Fields, was shot in the torso by a security guard in an apartment complex after reportedly exchanging fire with the guard staff.  "Thornton reportedly fired upon security officers shortly after 10:30 pm Monday night at The Villages Apartments . . . During the gunfire, Thornton was struck once in the torso by a shot from one of the guards."  "Neither of the security guards was injured during the exchange of gunfire."  Thornton was taken to a local hospital where he later died from his injuries.  At the time of the shooting, security guards were enforcing a 10:00 pm curfew and approached a 15-year-old boy whom they noticed was armed with .45-caliber semi-automatic weapon.  "While the guards were apparently looking at the teenager, Thornton, who was standing several feet away, reportedly began shooting at the security officers." *See* Exh. 87 (*Waco  Tribune Herald* (Oct. 19, 1994)).

  Sherman Fields was 20 years old at time of Thornton's death.

- On November 18, 1994, Doug Harbert, 21, a friend of Fields' was shot in the head and killed by a bar owner when Harbert and another 16-year-old allegedly attempted to rob the owner's bar.  After opening the cash register, the owner "grabbed a handgun that he kept nearby and shot . . . Harbert in the head, killing him."  The 16-year-old fled the scene after Harbert was shot and was later arrested.  Harbert was scheduled to complete his probation in December 1995 and had completed two required boot camps. *See* Exh. 89 (*Waco Tribune Herald* (Nov. 19, 1994)).

  Sherman Fields was 20 years old at the time of Harbert's death.

- On March 19, 1995, Robert Lee Evans, 21, a friend of Fields', was riding as a passenger in a vehicle when Kevin Buhl walked up to the side of the car and opened fire, shooting Evans in the head and killing him.  Buhl continued to fire into the vehicle, killing a 16-year-old passenger as well and injuring an 18-year-old passenger.  "Buhl was in the park and reportedly walked up to the vehicle as it passed by . . . After shooting Evans in the head, Buhl then fired several shots into the car . . . Buhl then ran from the scene."  Evans had been shot in the back about 6 months earlier in an unrelated incident.  Police stated that, while they didn't have a specific motive for the shootings, there had been some ongoing dispute

between Buhl and Evans.  After the shootings, officers guarded the vehicle in which Evans was killed, with "its back window shattered and interior bloodstained."  *See* Exh. 88 (*Waco Tribune Herald* (Mar. 21, 1995)).

Sherman Fields was 20 years old at the time of Evans's death.

- On October 27, 1998, "Lionel Stewart, 26, of Waco died Sunday at a Dallas hospital."  *See* Exh. 69 (*Waco Tribune Herald* (Oct. 27, 1998)). Stewart was another of Fields' friends.

    Sherman Fields was 24 years old at the time of Stewart's death.

- On November 2, 1998, Yoshima Calhoun, 22, a friend of Fields', died after suffering "two gunshot wounds to the leg."  Calhoun "bled to death from those injuries."  A 20-year-old victim was also shot in the head during the same incident and was in critical condition at a local hospital. "Police said Calhoun and the other victim had gone to a North 31st Street residence to give someone a ride.  [The shooter] reportedly was visiting a nearby residence when an argument started outside of the homes that escalated into gunfire on the sidewalk."  *See* Exh. 92(*Waco Tribune Herald* (Nov. 4, 1998)).

    Sherman Fields was 24 years old at the time of Calhoun's death.

- On April 29, 2002, Tiron Wesley Sterling, 22, a friend of Fields', was found by Waco police shot to death.  Sterling's brother was also shot numerous times in the same incident and was in the ICU.  *See* Exh. 68 (*Waco Tribune Herald* (Apr. 30, 2002)). The Medical Examiner's Report indicates that Sterling was shot in the head and neck while walking down the street.  *See* Exh. 14 (Medical Examiner's Report (Apr. 30, 2002)).

    Sherman Fields was 27 years old at the time of Sterling's death.

This long history of trauma spans Mr. Fields' entire adolescent life, as visually depicted in Exhibit 117 (Fields: A Witness to Extreme Violence).  Although this history of trauma was well documented and available at the time of trial, none of those documents were provided to Dr. Mark.  *Affidavit of Dr. Stephen Mark* ¶ 4 ("I was not provided and consequently did not review any documents related to Mr. Fields' prior terms of incarceration or prior mental health diagnoses").

Had trial counsel conducted a competent investigation into Fields' mental health history, (or provided Dr. Mark with the documentation collected from their limited investigation into this subject), this historical manifestation of Bipolar and PTSD symptoms described above would have been clear. Consequently, it would have been clear that Mr. Fields was not competent to waive counsel. As explained by Dr. Woods:

> Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses. Mr. Fields is severely and chronically paranoid and grandiose. He was both paranoid and grandiose at the time of my examination. His decision to waive counsel was the result of the co-morbid, or co-occurring symptoms of his mental illnesses. The specific symptoms of grandiosity, paranoia, perseveration, and impulsivity compromised his ability to effectively weigh and deliberate whether to waive counsel.

*Declaration of Dr. George Woods* ¶ 5; *see also id.* ¶ 108 ("Mr. Fields was not, in my opinion, competent to waive counsel and/or represent himself").

However, even assuming that Mr. Fields was competent to waive his right to counsel – which he was not – he was not competent to proceed *pro se*.

### 5.    Mr. Fields was Incompetent to Represent Himself

The Supreme Court made clear in *Edwards*, discussed *supra*, that the standard for determining competency to waive counsel is different – and more stringent – than the competency standard to stand trial or plead guilty. Mr. Fields' competency evaluation applied only the standard to determine whether he was competent to stand trial and thus failed to ask or answer the critical question: was Mr. Fields competent to ably carry out the basic tasks necessary to present his own defense without the assistance of counsel. Because no such examination occurred, this Court should grant Mr. Fields' motion for relief pursuant to § 2255. *See Westbrook v. Arizona* 384 U.S. 150, 150 (1966) ("Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the

issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense").

To safeguard the fairness of trial proceedings and the dignity and autonomy of the accused, the Supreme Court in *Edwards* recognized that the minimal competency standard to stand trial, set forth in *Dusky*, is inadequate to determine competency for self representation, and declared that evaluation of a "defendant who would choose to forgo counsel at trial . . . calls for a different standard." *Edwards*, 128 S. Ct. at 2386. The Court defined a category of "borderline-competent" defendants that possess the "minimal constitutional requirement that measures a defendant's ability to stand trial" of *Dusky* but fall short of a "*higher standard* that measures mental fitness for another legal purpose." *Id.* at 2385 (emphasis added). The Court recognized that self-representation without the assistance of counsel requires a different and greater capacity than merely to stand trial. *Id*. at 2386 ("Within each domain of adjudicative competence (competence to assist counsel; decisional competence) the data indicates that understanding, reasoning, and appreciation [of the charges against the defendant] are separable and somewhat independent aspects of functional legal ability") (citations omitted); *see also id.* at 2387. For this reason, the Supreme Court stated, "given the different capacities needed to trial without counsel, there is little reason to believe that *Dusky* alone is sufficient." (*id*. at 2387), and quoted the American Psychiatric Association concerning how a defendant could meet *Dusky* yet fall short of the capacity to proceed *pro se*:

> Disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the s*ignificantly expanded role required for self-representation even if he can play the lesser role of represented defendant.*

*Id*. at 2387 (emphasis added; citations omitted).

Moreover, the Supreme Court recognized that application of a single, inadequate mental competence standard to the borderline-competent defendant undermines the core precepts of the right to self-representation:   the dignity and autonomy of the criminal defendant. *Edwards*, 128 S. Ct. at 2387; *Faretta*, 422 U.S. at 834 (The defendant's self-representation "choice must be honored out of that *respect for the individual* which is the lifeblood of the law") (emphasis added; citations omitted).   Use of a single mental competence standard allows the incapacitated to hurdle the low barrier of *Dusky* only to find themselves faced with obstacles entirely beyond their diminished abilities.  *See Massey v. Moore*, 348 U.S. 105, 108 (1954) ("No trial can be fair that leaves the defense to a man who is . . . unaided by counsel, and who by reason of his mental condition, stands helpless and alone before the court"); *see also Edwards*, 128 S. Ct. at 2387 (quoting a psychiatrist observing the performance of a *pro se* defendant who passed the *Dusky* test, "[H]ow in the world can our legal system allow an insane man to defend himself?").   Respect for the individual is invariably diminished by the borderline-competent defendant's self-representation.  *Id.*  Presented before the prosecution, court and jury without the requisite mental capabilities to carry out the duties of advocacy, the incompetent defendant is subjected to a "humiliating" one-sided trial that amounts more to "spectacle" than fair proceeding.   *Id.*   The loss of power over the proceeding and outcome resulting from the diminished abilities of the borderline-competent defendant's self representation impairs the "core of the *Faretta* right," the constitutional requirement that a defendant retain "actual control over the case he chooses to present to the jury."  *See McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984). Consequently, the borderline-competent defendant's self-advocacy "undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial."  *Edwards*, 128 S. Ct. at 2387. Such representation is incompatible with the concept of a just proceeding, undermines public confidence in the outcome, and cannot satisfy the mandate that "proceedings must not only be

fair, they must 'appear fair to all who observe them.'" *Wheat v. United States,* 486 U.S. 153, 160 (1988) (citation omitted).

For all of these reasons, the Supreme Court concluded that the competence necessary to make a knowing and intelligent waiver of counsel is different from the competence to conduct a defense. *Edwards*, 128 S. Ct. at 2386. While the Court declined to define a new standard for mental competence for self representation, it decisively announced that the minimal *Dusky* mental competence standard used to determine fitness to stand trial is not sufficient to determine mental competency for the greater role of the self-represented defendant. *Id.*[7]

Resolving years of erroneous interpretation, the *Edwards* Court clarified that its decision in *Godinez* did not address, much less set forth, the mental competence standard to self representation. *Edwards*, 128 S. Ct. at 2385. In *Godinez*, the Supreme Court held that the mental competency standard to plead guilty or waive the right to counsel is not constitutionally

---

[7] The Supreme Court clearly stated this principle in *Massey*, 348 U.S. at 108 ("One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel") and many courts have followed the concept post-*Edwards*. *See*, *e.g.*, *Bies v. Bagley*, 535 F.3d 520, 533 (6th Cir. 2008) ("[T]he law contains many similar, yet distinct, inquiries for competence – competence to stand trial, competence to waive jury trial rights, competence to represent oneself") (*citing Edwards*, 128 S. Ct. 2379); *Guerrero v. Texas*, 271 S.W.3d 309, 312 (Tex. App. - San Antonio 2008) ("The [Edwards] Court expressly recognized that there is a mental competency limitation on the right to self-representation, and that competence to represent oneself during trial proceedings involves a higher standard than that required for competence to stand trial"), *aff'd in part, rev'd in part*, Nos. PD-1661-08, 1662-08, 2009 WL 4696103 (Tex. Crim. App. Dec. 9, 2009); *Chadwick v. Texas*, 277 S.W.3d 99, 103 (Tex. App. – Austin 2009) ("The United States Supreme Court recently rejected the argument that if a defendant is mentally competent to stand trial, he is necessarily competent to represent himself as well"); *Collier v. McDonough*, No. 5:06cv187-RH/AK, 2008 WL 4936501, at *1 (N.D. Fla. Nov. 17, 2008) ("The standards for competence to represent oneself and to go to trial at all are of course different"); *Bills v. Clark*, No. CIV S-06-2223 MCE GGH P, 2008 WL 4291325, at *5 (E.D. Cal. Sept. 18, 2008) ("The Edwards Court . . . made a distinction between the level of competency required for a defendant to proceed with the assistance of counsel and to proceed *pro se*"); *Thompson v. Covenant Transport, Inc.*, No. 1:07cv275, 2008 WL 2893521, at *5 (W.D.N.C. July 23, 2008) ("[Edwards] dealt with the sixth amendment implications of a criminal defendant who was competent to assist counsel in his own defense, but not competent to act as his own counsel"); *New Jersey v. McNeil*, 963 A.2d 358, 366 (N.J. Super. App. Div. 2009) ("[F]or federal constitutional purposes, a defendant may be competent to stand trial but not to represent himself"); *Missouri v. Baumruk*, 280 S.W.3d 600, 610-11 (Mo. 2009) ("[defendant] may be sufficiently competent to stand trial but not able to elect self-representation voluntarily and intelligently"); *Iowa v. Jason*, 779 N.W.2d 66, 77 (Iowa Ct. App. 2009) ("[defendant's] competency to stand trial does not equate to competency to represent himself at trial in light of his diagnosis of Asperger's Syndrome").

required to be higher than the standard used to determine if a defendant is competent to stand trial as set forth in *Dusky* and *Drope.* 509 U.S. at 398.[8]  The *Godinez* Court explained that the guilty plea "is no more complicated than the sum total of decisions that a [represented] defendant may be called upon to make during the course of a trial." *Id*.  Therefore, "there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." *Id*. at 399.  Many courts, including the Fifth Circuit, erroneously interpreted *Godinez* as to require the application of a single mental competence standard to govern determinations as to competence to stand trial, waive counsel, and proceed *pro se*.

However, in *Edwards*, the Supreme Court distinguished the *Godinez* mental competence standard as to only be applicable to defendants seeking to waive counsel and enter a guilty plea.  128 S. Ct. at 2385.  Specifically, *Edwards* clarified that the *Godinez* defendant *did* not seek to represent himself but rather "sought only to change his pleas to guilty," and, accordingly, "his ability to conduct a defense at trial was expressly not an issue." *Id*.  On this point, the Court had stated in *Godinez* that the issue before it was only "the competence to waive the right" and not "the competence [of the defendant] to represent himself." *Godinez*, 509 U.S. at 399.  Accordingly, the Court in *Edwards* made clear that the holding in *Godinez* is limited to the waiver of counsel and entry of a guilty plea and has no bearing on the mental competence standard to be used for the right to self-representation.  128 S. Ct. at 2385.

Therefore, even if Dr. Mark's limited evaluation was sufficient to determine that Mr. Fields was competent to stand trial – which it was not – his evaluation has no bearing on Mr.

---

[8] However, the Court in *Godinez* provided that, if they so chose, "States are free to adopt competency standards that are more elaborate than the *Dusky* formulation."  509 U.S at 402.

Fields' competence to proceed *pro se* because Dr. Mark was using the pre-*Edward* standard for competence to waive counsel. *See United States v. Ferguson*, 560 F.3d 1060, 1068 (9th Cir. 2009) (noting that psychiatric reports are of "limited value," where such reports only "considered whether Defendant was mentally competent to work with counsel" because "they considered Defendant's mental competency under the pre-*Edwards* standard"). It is now clear – and was provable at the time of trial – that Mr. Fields suffers from severe mental disorders including juvenile-onset Bipolar Disorder and Post-Traumatic Stress Syndrome. These mental disorders critically diminished his capacity to communicate, absorb and comprehend the Government's evidence, formulate questions and conceive and articulate affirmative theories of the case. Moreover, his mental illnesses were exacerbated by the mentally debilitating method of courtroom restraint and style of incarceration.

Therefore, even assuming he met the minimal *Dusky* formulation of mental competence to stand trial (a point that Fields in no way concedes), Mr. Fields in no way was able "to carry out the basic tasks needed to present his own defense without the help of counsel," (*Edwards*, 128 S. Ct. at 2386), and, accordingly was incompetent to conduct his own trial proceedings. Moreover, as set forth above, compelled use of a stun belt and the extreme pretrial confinement conditions contributed to the psychological impairment of Mr. Fields.

For all of these reasons, Mr. Fields was incapable of formulating basic trial strategy, effective communication, sustained concentration, focusing on relevant facts or material discrepancies. The abilities to understand and articulate the exact elements of the crimes charged and sound objections to admission of prosecution evidence (which may be unreliable or irrelevant or prejudicial); to challenge forensic evidence, including expert testimony; to define and then pursue lines of cross-examination that show genuine weaknesses in particular prosecution witnesses' testimony; to see difficulties in the prosecution's evidence and then ask

the right questions of defense witnesses to identify such difficulties and to present contrary evidence; to grasp what is important to highlight, throughout trial and in closing, and then to speak so that the essential points are actually communicated and not lost among other details – these are the abilities that a *pro se* defendant must have that go well beyond those required of a represented defendant.  These are abilities that Mr. Fields, because of his mental illness, totally lacked.  Dr. Woods confirms the point:

> The symptoms of Mr. Fields' mental disease or defect, including paranoid ideation, grandiosity, agitated depression, impaired judgment, irritability, hyperreactivity, withdrawal, and a numbing of affect and emotion, rendered him unable to carry out the basic tasks necessary to present his own defense without the assistance of counsel.  Due to his mental illness, he would not have been able to adequately deal with the complexities of a capital trial such as reviewing discovery and accurately assessing the evidence against him, processing a large amount of complex factual details, accurately assessing the credibility of witnesses, understanding what points, facts or arguments are important to highlight, speaking so that essential points are actually communicated and not lost among other details, and developing and presenting a cohesive defense case.  He certainly could not sustain these complex tasks over a period [of] several consecutive days, let alone weeks.

*Declaration of Dr. George Woods* ¶ 110; *see also id.* ¶ 108 ("Mr. Fields was not, in my opinion, competent to waive counsel and/or represent himself").

In a trial based primarily on the dubious and self-interested testimony of an ex-girlfriend and various jailhouse informants, without any physical evidence tying Fields to the crime, the proceeding was spectacularly one-sided as Fields proved almost entirely incapable of formulating admissible or even relevant questions.  Indeed, Mr. Fields' deficit in this arena was so profound that Court ordered a mock cross-examination of a key Government witness outside the presence of the jury.  Consequently, the Government's case, witnesses and evidence

essentially underwent no significant adversarial testing, obviating any vestige of fairness, much less the appearance of fairness demanded by *Edwards*.

For example, Mr. Fields was unable to cross-examine his witnesses at all meaningfully.  "There are few subjects, perhaps, upon which [the Supreme] Court and other courts have been more nearly unanimous than in the expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Lee v. Illinois*, 476 U.S. 530, 540, (1986).[9] Without adequate cross-examination, "the accuracy of the truth-determining process" is fatally undermined by eliminating the "basis for evaluating the truth of the [testimony]." *Dutton v. Evans*, 400 U.S. 74, 89 (1970) (internal quotation marks omitted).  Rigorous questioning of hostile witnesses "sheds light on witness' perception, memory and narration" and "can expose inconsistencies, incompleteness, and inaccuracies in his testimony." *Perry v. Leeke*, 488 U.S. 272, 283 n.7 (1989) (internal quotation marks omitted).

Therefore, Mr. Fields' trial proceeding created the very spectacle and offense to his constitutionally protected rights to dignity, autonomy and a fair proceeding that the Court in *Edwards* specifically sought to prevent.  As a result, with an incapacitated self-advocate incapable of formulating questions or noticing discrepancies material to his defense, the integrity and fairness of Mr. Fields' capital proceedings were fatally compromised.  *See Faretta*, 422 U.S. at 839 (Burger, C.J., dissenting) ("[T]he integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to

---

[9] *See also Pointer v. Texas*, 380 U.S. 400, 405 (1965) ("[C]ross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal"); *Maryland v. Craig*, 497 U.S. 836, 846 (1990) ("rigorous adversarial testing ... is the norm of Anglo-American criminal proceedings").

waive counsel").[10]  As the Seventh Circuit stated, "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators."  *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir. 1975).  At the very least, Mr. Fields' trial could not meet the *Edwards* mandate that proceedings "appear fair to all who observe them."  *Edwards*, 128 S. Ct. at 2386. [11]

Comparison to the *Edwards* defendant is illustrative of Mr. Fields' lack of competence to proceed *pro se*.  Like the *Edwards* defendant, Mr. Fields appeared to have a rational and factual understanding of the proceedings, or the minimal capacity to stand trial. Like the *Edwards* defendant, Mr. Fields' mental defects may not have been apparent to laymen. In this regard, the *Edwards* defendant made coherent arguments in the courtroom and, in periods of lucidity, was described by psychiatrists as "free of psychosis, depression, mania and confusion," "alert," "able to think clearly," "coherent," and "psychiatrically normal."  However, like the *Edwards* defendant, Mr. Fields suffers from serious mental disorders that critically impair psychological functions and abilities necessary to conduct trial proceedings.  Like the *Edwards* defendant, Mr. Fields made arguments that were often irrelevant and unintelligible. Accordingly, Mr. Fields' claim to be a borderline-competent defendant is at least as strong as the defendant in *Edwards.*

---

[10] *See also Cronic*, 466 U.S. at 659 ("[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable").

[11] The uncertainty and disruption injected into a trial with a severely mentally ill *pro se* defendant are exacerbated in a death penalty case.  Because the defendant in *Edwards* did not face the death penalty, the Supreme Court did not have to grapple with Eighth Amendment concerns.  In Mr. Fields' case, however, Eighth Amendment interests are paramount.  The Eight Amendment demands procedures that heighten the reliability of the verdict in a death penalty prosecution.  *See*, *e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 303-05 (1976) (opinion of Stewart, Powell and Stevens, JJ.).  As a result, a capital defendant's need for the guiding hand of Sixth Amendment counsel is greater.

Further, several recent post-*Edwards* decisions found borderline-competent defendants, with evidence similar to or lesser than that supporting the incapacity of Mr. Fields, to be incompetent to proceed *pro se* or remanded for hearing specifically into that question.

In *Chadwick*, the defendant was convicted of assaulting a public servant and attempting to take a weapon away from a peace officer. 277 S.W.3d at 101. On appeal, among other things, the defendant argued the trial court erred when it denied his request to proceed *pro se*. *Id*. at 102. Under *Edwards*, the Texas Court of Appeals affirmed his convictions, finding the defendant to be a borderline-competent defendant capable of standing trial yet incapable of proceeding *pro se*. *Id*. at 103-05. In this regard, the court distinguished the standard to be used to proceed *pro se* from that to stand trial:

> While the test for competence to stand trial asks whether a defendant has sufficient present ability to "consult" with his lawyer and "assist" in preparing a defense, the test for competence to proceed *pro se* is whether a defendant has the ability to present his own defense without the assistance of counsel.

*Id*. at 103-04. The Texas Court of Appeals held that the trial court had sufficient evidence to support a finding that the defendant was incompetent to represent himself because, among other things, he interrupted his attorney, jumped from one topic to another, and made arguments that were conclusory, incoherent and/or irrelevant. *Id*. at 103-05.

In *North Carolina v. Lane*, 669 S.E.2d 321 (N.C. 2008), the defendant was convicted of, among other crimes, first degree murder, first degree rape, and indecent liberties with a child. The defendant was sentenced to death. *Id*. at 322. He was examined by a battery of mental health experts who, while disagreeing as to his competence to stand trial, all confirmed that he was functionally illiterate and suffered from a number of mental disorders which affected his decision-making process. *See* Defendant-Appellant's Brief in *North Carolina v. Lane*, No. 606A05, 2008 WL 3462011, at **22-23 (July 30, 2008). Like Mr. Fields, the defendant suffered

from depression, anxiety disorder and possibly Post-Traumatic Stress Disorder. *Id.* at \*\*32-33. Like Mr. Fields, prior to trial, the defendant was confined to a cell where he was watched constantly with the lights on at all times. *Id.* at \*24. The trial court held a competency hearing and found the defendant competent to stand trial. *Id.* at \*36. After the defendant moved to represent himself, the court conducted another competency hearing and found the defendant competent to do so because he was competent to stand trial. *Id.* at \*\*23-25. The defendant appealed his conviction on the grounds that the trial court used the wrong mental competence standard to find him competent to proceed *pro se*. *Lane*, 669 S.E.2d at 322. In light of *Edwards*, the Supreme Court of North Carolina remanded the case to the trial court to determine (i) during his self representation, did the defendant fall into the "borderline-competent" defendant category as set forth by *Edwards*, and (ii) whether the court, based on a realistic account of the defendant's mental capacities, would have precluded self-representation and appointed counsel. *Id.*

In *Major v. Kentucky*, 275 S.W.3d 706 (Ky. 2009), the defendant was convicted of murder. The trial court ordered a competency hearing into the defendant's competency to stand trial and to put on a defense *pro se*. *Id.* at 717. A psychiatrist testified that the defendant possessed average intellectual functioning, with a 110 IQ, and "appeared to have a good memory." *Id.* The defendant was learned in legal professional knowledge and could "describe specific statutes and rules of law, knew what evidence should not be admitted, knew about the jury process, and all functional aspects of his defense." *Id.* at 717-18. The psychiatrist found that the defendant "had no difficulty staying on task, no problem being decisive, and no problem focusing." *Id.* at 718. However, a stroke had damaged the right side of the defendant's brain, and while the cognitive functions were left untouched, certain aspects of expressive thinking were impaired. *Id.* at 717. In addition, the defendant suffered from cognitive dysfunction,

processing information more slowly than an average person. *Id*. at 718. Based on this evidence, the trial court found the defendant competent to stand trial, but found that his competency to act as his representative at trial was limited. *Id*. Accordingly, the court permitted the defendant to conduct direct examinations but prohibited the defendant from conducting other trial functions as they required the quick analysis of and response to new information. *Id*. The Supreme Court of Kentucky affirmed this hybrid representation, finding that precluding the borderline-competent defendant from fully dismissing his counsel safeguarded against his demonstrated mental limitations and preserved his right to a fair trial. *Id*. at 722.

In any event, an actually-incompetent defendant, under either the *Drope-Dusky* or *Edwards* standard, is entitled to a new trial. *Drope,* 420 U.S. at 183. Fields was actually incompetent to waive his right to counsel and to represent himself. In addition, Fields is entitled to a new trial based on the failure to conduct an adequate hearing into his competence. *See United States v. Giron-Reyes,* 234 F.3d 78, 83 (1st Cir. 2000). Finally, Fields is entitled to a new trial because if counsel had performed competently, there was reasonable cause to believe Mr. Fields was suffering from a mental disease which rendered him incompetent to waive counsel. *See generally Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see also Galowski,* 78 F.3d at 1181 ("A *habeas* petitioner must first present substantial facts to support allegations that he was not competent to stand trial [before a retrospective competency hearing is required]. Substantial facts are facts sufficient to positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to the mental capacity of the petitioner to meaningfully participate and cooperate with counsel during the trial").

C.    **Conclusion**

At trial, the Government correctly moved that Fields be evaluated by a psychiatrist and that a hearing take place prior to deciding whether Mr. Fields should be

permitted to waive counsel.  However, the nature and scope of the inquiry – both by the evaluating expert and by the Court – was unconstitutionally insufficient.  Most importantly, the outcome of the hearing was incorrect.  Mr. Fields' decision to waive counsel was not the product of a free and deliberate choice, just as Mr. Fields did not freely choose his mental disabilities.  Mr. Fields was not competent to represent himself.

Mr. Fields is entitled to either a new competency hearing or a new trial.

## V.    CLAIMS RELATED TO TRIAL CONDUCT

CLAIM 4:    AFTER THE TRIAL COURT APPROVED MR. FIELDS' REQUEST TO WAIVE COUNSEL AND REPRESENT HIMSELF, MR. FIELDS' RIGHT TO SELF-REPRESENTATION WAS NEVERTHELESS VIOLATED IN SEVERAL MATERIAL RESPECTS DENYING HIM FIFTH, SIXTH, AND EIGHTH AMENDMENT GUARANTEES.

CLAIM 5:    MR. FIELDS' RIGHTS UNDER THE FIFTH,  SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED WHEN HE WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

CLAIM 6:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO BE PRESENT AT TRIAL WERE   VIOLATED WHEN HE WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

### A.    Facts

Once Mr. Fields was permitted to waive counsel, no matter how erroneous a ruling, he was constitutionally entitled to complete control over the conduct of his defense.  Nevertheless, Mr. Fields was unconstitutionally excluded from all bench and chambers conferences while he was representing himself *pro se*.  At the outset of trial, Fields requested that the Court appoint him new counsel citing a conflict of interest between himself and appointed counsel and stating his belief that counsel was conspiring with the prosecutors against him.  TT at 13:15-14:5, 22:4-6.  The Court denied Fields' request for new counsel.  TT at 14:22-23.

Fields then invoked his right to self-representation.  TT at 21:19-23.  After Fields invoked his right to self-representation but before the conclusion of *voir dire*, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel.  TT at 69:12-70:8.  The Court admonished Mr. Peterson and Mr. Swanton that their role was simply advisory.  *Id.*  Although standby counsel could advise on legal matters and answer legal questions, the Court made clear they were not to "represent him through him."  TT at 69:20-70:2.  The Court explicitly forbade a hybrid representation situation where Fields "represents himself to the extent he wants to and yet relies on lawyers to represent him to the extent he wants to."  TT at 639:22-24.  Rather, the Court stated that it was important "that the appearance before the jury is that Mr. Fields is representing himself" and required that Fields "make any statements made to the Court and question any witnesses."  TT at 70:3-8.  The Court did, however, authorize standby counsel to argue motions and take up other matters outside the presence of the jury but only if the record was "absolutely clear" that Fields chose to have counsel do so and that counsel was doing so in a manner Fields approved of.  TT at 644:13-22.

Just before trial began, the Court ruled that Fields could not participate in any bench conferences that occurred in the presence of the jury.  TT at 1166:2-18.  The Court encouraged Fields to authorize standby counsel to speak for him on whatever matter needed to be discussed and allow his standby counsel to report back on the matters that took place if his participation in a bench conference would require the jury to be excused.  TT at 1166.  Fields never authorized standby counsel's participation in this way.

The Court held nine bench conferences in the jury's presence and one outside of the jury's presence during the six days of guilt phase testimony.  These bench conferences dealt with critical trial issues including sequestration of witnesses (TT at 1552:10-1553:15), objections to the prosecutor's (TT at 1560:20-1561:15, 1583:11-1585:17, 1614:6-25, 1615:12-1616:11) and

defendant's (TT at 1648:21-1649:12, 1850:21-1852:2) line of questioning, admissibility of testimony (TT at 1583:11-1585:17), witness availability and whether Fields intended to testify (TT at 1913:11-1916:15), courtroom decorum (TT at 1653:3-10) and prejudicial remarks by the prosecutor (TT at 1615:12-1616:11, 1855:3-1856:7). The Court also held at least two chambers conferences to discuss trial decisions such as limiting Fields' ability to move around the courtroom to present witnesses with exhibits (TT at 1164:20-1166:22) and how to address the perception of "hybrid representation" to the jury and determine the proper role standby counsel was to play in advising Fields (TT at 1636:11-14). There is some suggestion in the record of a third chambers conference (TT at 1106:19-21), although because all chambers conferences were held off the record, it is unclear exactly how many chambers conferences actually occurred. Fields was not permitted to participate in any of these bench or chambers conferences.

When bench conferences took place, Fields' standby counsel either would not or could not consult Fields before approaching the Court. Accordingly, standby counsel did not know what position Fields wanted them to take or how Fields wanted them to present that position to the Court concerning any of the issues discussed at bench or chambers conferences. After decisions were made by standby counsel, the prosecutors, and the Court at bench or chambers conferences, standby counsel would simply report those decisions to Fields without further discussion.

Other than bench and chambers conferences, Fields conducted every aspect of his defense during the guilt phase of trial. He made opening (TT at 1194:10-1203:5) and closing (TT at 2005:1-2029:20) arguments to the jury. He cross-examined all Government witnesses and examined all witnesses in his defense. He participated in the *voir dire* of jurors and made motions to the Court outside of the jury's presence. TT at 36:17-20, 67:25-68:14, 484:3-9, 528:10-529:4, 637:24-638:21, 719:7-18, 1108:4-19, 1148:6-1152:9, 1970:23-1971:2.

### B.    The Role Of Standby Counsel

The Sixth Amendment grants a defendant the right to personally conduct his own defense.  *Faretta v. California*, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense"); *McKaskle v. Wiggins*, 465 U.S. 168, 179 (1984).  Although the court may appoint standby counsel to "to aid the accused if and when the accused requests help," (*Faretta*, 422 U.S. at 834 n.46), the Sixth Amendment imposes two significant limitations on the extent of standby counsel's participation:

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury.  This is the core of the *Faretta* right.  If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.
>
> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.  The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy.

*McKaskle*, 465 U.S. at 178 (emphasis in original).

Where, like here, "standby counsel is appointed only to advise, the initial invocation of the right of self-representation is generally sufficient to establish that any participation by standby counsel other than for . . . routine matters . . . is 'over the defendant's objection.'" *Frantz v. Hazey*, 533 F.3d 724, 744 (9th Cir. 2008) (*quoting McKaskle*, 465 U.S. at 178); *United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir. 1985) (a defendant's assertion of "the right [to self-representation] at the outset of trial proceedings constituted an express and unambiguous request that 'standby counsel be silenced.' This, per *McKaskle's* analysis, must be

given effect as a reassertion of the general right to *pro se* representation as to further proceedings . . ."). Here, from the very outset of trial, the Court appointed Mr. Fields' standby counsel only to advise:

> MR. PETERSON:  Your Honor, Mr. Swanton and I will then be appointed as standby counsel or can we be excused?
>
> THE COURT:  Absolutely you're appointed as standby counsel. The question becomes what the jury is told about that situation. Standby counsel to me it seems by definition includes counsel who are standing by in case the defendant elects to be represented by attorneys at a later stage of the trial, and I intend to tell them that.  I intend to tell them that unless and until that happens.  Then **your role is to advise Mr. Fields on any legal matters he questions you about, that you are in essence his legal reference material since he's not a lawyer and doesn't have a library there at his disposal at counsel table.  On the other hand, that it's not your job to represent him through him, that you're allowed to sit there at the counsel table so you're readily available to answer any questions he has.**  Obviously anything he says to you or you to him is completely confidential.  So no one is going to know to what extent those normal procedures are being followed, but what **I think is important is that the appearance before the jury is that Mr. Fields is representing himself.  He will have to make any statements made to the Court.  He will have to question any witnesses that are made.**

TT at 69:12-70:8 (emphasis added).  Accordingly, absent Mr. Fields' express consent to any individual instance of standby counsel's participation at trial, as a matter of law, standby counsel's participation is over Fields' objection and in violation of his right to self-representation.  Indeed, *McKaskle* does not place a burden on *pro se* defendants to object to every unwanted act of standby counsel.  *Frantz*, 533 F.3d at 744.  "To the contrary, *McKaskle* limits standby counsel's '*unsolicited* participation' during critical proceedings."  *Id.* (*citing McKaskle*, 465 U.S. at 177) (emphasis in original).  Here, it is especially appropriate to presume that all of standby counsel's participation was unsolicited absent express consent from Fields given that Fields made it abundantly clear he believed standby counsel were operating under a

conflict of interest and conspiring with the prosecutors against him.  TT at 13:15-14:5, 22:4-6, 1683:20-1684:1,  1684:14-18.    Violations of Mr. Fields' Sixth Amendment right to self-representation are structural, and therefore *per se* prejudicial:

> Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis. The right is either respected or denied; its deprivation cannot be harmless.

*McKaskle,* 465 U.S. at 177 n.8; *Myers v. Johnson*, 76 F.3d 1330, 1337 (5th Cir. 1996).

> **C.**     **Mr. Fields' Sixth Amendment Right To Self-Representation Was Violated Because The Court Prevented Him From Participating In Any Bench Or Chambers Conferences, Requiring Standby Counsel To Participate Instead**

During the guilt phase of trial, the Court held nine bench conferences in the jury's presence and one outside of the jury's presence.  At each, critical trial issues were discussed including sequestration of witnesses (TT at 1552:10-1553:15), objections to the prosecutor's (TT at 1560:20-1561:15, 1583:11-1585:17, 1614:6-25, 1615:12-1616:11) and defendant's (TT at 1648:21-1649:12, 1850:21-1852:2) line of questioning, admissibility of testimony (TT at 1583:11-1585:17), witness availability and whether Fields intended to testify (TT at 1913:11-1916:15), courtroom decorum (TT at 1653:3-10) and prejudicial remarks by the prosecutor (TT at 1615:12-1616:11, 1855:3-1856:7).  Although Fields wanted to participate, he was excluded from every one of these conferences by Court decree.  TT at 1166:2-18.  When called to bench conferences, standby counsel would not or could not consult Fields before approaching and therefore did not know how Fields wanted various issues handled.  As such, these vital trial matters were discussed and decided in private by the trial judge, prosecutors and standby counsel without Fields' input or consent.  Moreover, during the six days of guilt phase testimony the jury watched the prosecutors and standby counsel approach the bench, leaving Fields behind at counsel's table, at least nine times.  This alone is sufficient "to destroy the jury's perception that

-74-

the defendant is representing himself." *McKaskle*, 465 U.S. at 178.  Significantly, most of these conferences took place during the testimony of the two most critical witnesses to Fields' defense – Shalaykea Scroggins (five conferences) and Edward "Trey Boy" Outley (two conferences) – the individuals that Fields contends are the actual killers.

None of the bench conferences were limited to minor issues such as "overcoming routine procedural or evidentiary obstacles" or "help[ing] to ensure the defendant's compliance with basic rules of courtroom protocol and procedure" permitted under *McKaskle*.  *McKaskle*, 465 U.S. at 183.  Rather, each involved "significant tactical decisions" or "control [of] the questioning of witnesses" in which standby counsel spoke instead of Fields, and without his consent – precisely the type of interference with the right to self-representation the United States Supreme Court held impermissible in *McKaskle*.  *Id.* at 178.

When faced with similar issues concerning whether a defendant's right to self-representation has been violated by exclusion from bench conferences, courts have routinely granted relief.  *See United States v. McDermott*, 64 F.3d 1448, 1454 (10th Cir. 1995); *Oses v. Massachusetts*, 961 F.2d 985, 986-87 (1st Cir. 1992); *Snowden v. Delaware*, 672 A.2d 1017, 1022 (Del. 1996); *New York v. Rosen*, 613 N.E.2d 946, 949-50 (N.Y. 1993).  Each of these cases are factually analogous to Fields' case and, therefore, the same result is required here.

For instance, like Fields, the *pro se* defendant in *McDermott*, was excluded from participating in bench conferences involving various matters such as discussing minor procedural issues, defendant's motion for a judgment of acquittal, defendant's motion for mistrial, objections to "the admission of [a government witness's] death threat testimony, multiple government objections to the substance and manner of [*pro se* defendant's] cross-examination," the admissibility of hearsay testimony, objections to admission of photographic evidence and other testimony.  64 F.3d at 1452.  Remanding the case for a new trial, the Tenth Circuit held

-75-

that standby counsel's participation in the bench conferences in lieu of the defendant's participation allowed standby counsel to "make or substantially interfere with any significant tactical decisions . . . or . . . speak instead of the defendant on any matter of importance . . . ." *Id.* at 1453 (*quoting McKaskle*, 465 U.S. at 178) (emphasis omitted).

Similarly, in *Oses*, the First Circuit affirmed a District Court's grant of a new trial where, *inter alia*, the *pro se* defendant was denied participation at bench or lobby conferences that "covered such important issues as the number of witnesses that the defendant intended to call, a motion for mistrial following a prosecutor's improper comment, and the admission of evidence." 961 F.2d at 986.

The Ninth Circuit recently reversed a *pro se* defendant's conviction and remanded the case for an evidentiary hearing to determine if his *Faretta* right had been violated because the defendant was excluded from a chambers conference discussing questions from the jury during deliberations. *Frantz*, 533 F.3d at 744.

In *Lefevre v. Cain*, 586 F.3d 349 (5th Cir. 2009), the Fifth Circuit addressed a case that presented many of the same issues as those presented here. On appeal from a district court judgment, the Fifth Circuit reversed and denied *pro se* defendant Lefevre's petition for writ of *habeas* corpus. *Id.* at 350-51. During trial, Lefevre was required by the court to wear leg shackles. *Id.* at 351. In order to prevent jurors from observing the shackles, Lefevre conducted his defense from behind the counsel table. *Id.* The shackles also compelled Lefevre to remain seated while his standby counsel participated in three bench conferences. *Id.* Among other claims, Lefevre's § 2254 petition raised the denial of the right to self-representation by his exclusion from bench conferences and the denial of the due process right to be present at all critical stages of trial. *Id.* at 352.

The Fifth Circuit stated that the magistrate judge's conclusion, which was adopted

by the district court, relied on the *Frantz* and *McDermott* cases discussed above.  *Lefevre*, 586

F.3d at 356.  The Fifth Circuit distinguished these cases, stating:

> Both *Frantz* and *McDermott* held that a defendant had not waived
> his right to self-representation despite standby counsel's
> participation in conferences.  As discussed above, the conference
> in *Frantz* occurred during jury deliberations, while the defendant
> was in custody elsewhere.  The court determined the defendant's
> failure to object to his exclusion from the conference was not fatal
> to his claim because "[w]hen standby counsel is appointed only to
> advise, the initial invocation of the right of self-representation is
> generally sufficient to establish that any participation by standby
> counsel other than for routine matters mentioned in *McKaskle* is
> 'over the defendant's objection.'"    The defendant had no
> opportunity to object and may not have had a choice in whether to
> attend.  In *McDermott*, the court determined that the defendant had
> not given up control of his defense as a result of standby counsel's
> participation in sidebar conferences from which the defendant had
> been involuntary excluded.    **However, the defendant's
> involuntary exclusion from conferences was because the court
> had ruled, over the defendant's objection, that the defendant
> would not be permitted to be present at bench conferences.**
>
> Lefevre was in a different position.  While Lefevre objected to his
> shackling and had a right to be tried without visible restraints,
> Lefevre never objected to [his standby counsel's] participation in
> the bench conferences on his behalf, or requested to have the jury
> removed to argue an objection.  **Unlike the trial court in
> *McDermott*, Lefevre's trial court never ruled that Lefevre
> could not participate in the bench conferences.**  Also, unlike the
> defendant in *Frantz*, Lefevre was present in the courtroom during
> the bench conferences and had an opportunity to object to his
> absence from the conferences, either at the time of the conference
> or after the jury was removed from the courtroom.

*Id.* (emphasis added).  There is a crucial distinction between *Lefevre* and this case.  As is further

explained below, the trial court here expressly ruled that Fields could not participate in any

bench conferences that took place in the jury's presence.  Such a ruling was exactly the factor

cited by Fifth Circuit in distinguishing *McDermott* from *Lefevre*.  As such, it is clear that this case is analogous to *McDermott* and distinct from *Lefevre*.

Exclusion from important bench or chambers conferences is a structural error violating the Sixth Amendment regardless of whether standby counsel actually reflects a *pro se* defendant's wishes when dealing privately with the Court.  *See Frantz*, 533 F.3d at 740 ("We first hold that, even if [standby counsel] accurately portrayed [*pro se* defendant's] wishes, unconsented-to exclusion from the conference would so substantially reduce [*pro se* defendant's] ability to shape and communicate his own defense as to violate his *Faretta* rights").  Exclusion of a *pro se* defendant from these conferences is a structural error regardless of whether the Court encouraged communications between a *pro se* defendant and standby counsel and regardless of whether any prejudiced resulted:

> [*Pro se* defendant] does not allege that he would have done anything differently than [standby counsel] did at sidebar, or that any prejudice resulted, or that there was any failure of communication between him and [standby counsel] about the content or strategy of sidebar discussions or motions.  The court even encouraged such communication.  [*Pro se* defendant's] objection is based on principle, not specific content or result.
>
> \*       \*       \*
>
> [S]tandby counsel may not, over the defendant's objection, "make or substantially interfere with any significant tactical decisions . . . or . . . speak instead of the defendant on any matter of importance . . . ."  [*McKaskle*, 465 U.S. at 178].  That occurred here.
>
> \*       \*       \*
>
> [W]e cannot say that [*pro se* defendant's] exclusion, over his objection, from thirty bench conferences during a six-day trial was an insignificant incursion on his *Faretta* right.  **Accordingly, we must grant a new trial.  We do so reluctantly because the district court was overall a model of patience and accommodation where [*pro se* defendant's] self-representation was concerned, and by due process standards the trial was fair,**

> **and any error relative to most other principles would be
> harmless. But harmless error analysis does not apply to the
> Sixth Amendment right in question**.

*McDermott*, 64 F.3d at 1453-54 (emphasis added).

Here, like the defendants in the cases discussed above, Fields was excluded from both bench and chambers conferences involving vital trial issues such as the scope of questioning, impeachment and admissibility of key witness testimony, the role of standby counsel, improper prejudicial remarks by the prosecutors, and the availability and sequestration of witnesses and whether Fields intended to exercise his right to testify. Unlike in *Lefevre*, the court here expressly ruled that Fields could not participate in bench conferences that took place in the jury's presence.

### 1.     Chambers Conferences

Fields was excluded from all chambers conferences while he represented himself. The record indicates that at least two such conferences took place where important trial decisions were made – without Fields' consultation or consent – pertaining to limiting Fields' ability to move around the courtroom to present witnesses with exhibits (TT at 1164:20-1166:22) and the role of standby counsel (TT at 1636:11-14). There is some suggestion in the record of a third chambers conference (TT at 1106:19-21), although because all chambers conferences were held off the record, it is unclear exactly how many chambers conferences actually occurred. What is clear, though, is regardless of how many chambers conferences occurred, Fields was not present at a single one of them, which effectively allowed standby counsel to make significant tactical decisions in his absence and in violation of his right to self-representation. Accordingly, like the *pro se* defendant in *Frantz*, Fields' *Faretta* right was violated by exclusion from these critical moments of trial. 533 F.3d at 741 (exclusion of *pro se* defendant from a single chambers conference involving "two issues with undoubted tactical importance").

### 2.    Bench Conferences

Fields was excluded from all bench conferences held in the presence of the jury. All of these conferences pertained to significant trial matters requiring important tactical decisions to be made in Fields' absence.  For instance, one such conference resulted in a limitation on Fields' ability to cross-examine a critical witness, Edward "Trey Boy" Outley – one of the two people Fields contends are the real killers.   In an attempt to impeach Outley's credibility by exposing a strong motive to give false testimony, Fields asked; "And, Mr. Outley, isn't that the reason you in this courtroom testifying today to avoid a murder case?"  TT at 1850:19-20.  Before the witness could answer, the prosecution requested a bench conference.  At that conference, Mr. Swanton spoke instead of Fields on perhaps one of the most important tactical issues in Fields' defense – impeaching the testimony of one of the actual killers:

> (On-the-record bench conference, to wit:
>
> MR. SNYDER:  This – I challenge the good faith of this cross-examination.  It's being done in bad faith.  At no time has anyone from the Government suggested to Edward Lee Outley that he could be charged with murder, homicide or that the related offenses related to the death in Suncerey Coleman.  For him to say otherwise, I challenge the good faith.  I don't believe there's anything in the defense file.  They have had open file discovery.  They've talked to almost all of our witnesses.  This is simply very improper for him to start saying, you're going to get murder.  What he's talking about, Your Honor, is grouping firearms under – as you know, under the guidelines.  He ain't talking about murder.  And he's mixing apples and oranges and of course this guy ain't smart enough to understand grouping of firearms.
>
> MR. SWANTON:  Except it sounds to me, Judge, like what he was just saying is he paid attention to jailhouse lawyers and they were telling him that he could get charged with murder.  So he may have been operating under that assumption.
>
> MR. SNYDER:  No.  No.  He said specifically the Government threatened to charge you with murder.  That's what he said.
>
> THE COURT:  That's what he said.

MR. SWANTON:  That's what the witness said.

MR. SNYDER:  No.  That's what Fields said.

THE COURT:  No.  That's what Fields said.

MR. SWANTON:  I think he responded affirmatively to that, Your Honor.

THE COURT:  That doesn't matter.  The question's improper in any event.  Tell him he can't say that again.

(End of bench conference)

TT at 1850:23-1852:2.  Mr. Swanton did not confer with Fields about his desired response to this issue before the bench conference.  As a result, Mr. Swanton impermissibly spoke instead of Fields regarding "government objections to the substance and manner of [*pro se* defendant's] cross-examination" of a key government witness.  *McDermott*, 64 F.3d at 1452; *McKaskle*, 465 U.S. at 178.

Shortly thereafter, and in response to one of the prosecution's many improper speaking objections, Mr. Peterson spoke for Fields on the important matter of curtailing the prosecution's unfairly prejudicial statements in front of the jury:

(On-the-record bench conference, to wit:

MR. PETERSON:  Your Honor, as advisory counsel, we're not able to make objections, but as officers of the Court, we're seeing an unfair prejudice to our client taking place right now with Mr. Snyder making repeated speaking objections and making side-bar statements and asking improper questions during direct examination and we ask the Court to use its advisory capacity to control this.  We know that under normal circumstances it's up to defense counsel to –

THE COURT:  My advisory capacity?

MR. PETERSON:  Yes, sir.

THE COURT:  I don't know what you're talking about, Mr. Peterson.

-81-

MR. PETERSON:  Well, Your Honor, you know that it's improper for an officer of the Court, a lawyer, to knowingly ask improper questions and to knowingly make side-bar statements, to knowingly make long speaking –

THE COURT:  You made it clear that that last so-called objection was improper, Mr. Peterson.  The rest of what you're talking about is – I don't know what you're talking about. You can't go back and say he asked improper questions as a general statement. Mr. Snyder, don't do that again.

MR. SNYDER:  Yes, Your Honor.

MR. PETERSON:   I just felt we had to get something on the record.

(End of bench conference)

TT at 1855:6-1856:7.  Here, as in *Oses*, standby counsel improperly spoke instead of Fields in the important matter of the "prosecutor's improper comment[s]."  961 F.2d at 986 (holding, *inter alia*, that the trial court's "unwillingness to curb the prosecutor's rhetorical excess contributed to violate petitioner's right to represent himself").[12]

Standby counsel also spoke instead of Fields on several important matters that controlled the questioning of another critical witness, Shalaykea Scroggins.  The first such conference dealt with the prosecutor's attempt to elicit testimony covered by Fields' motion pursuant to Federal Rule of Evidence 404(b).  TT at 1583:11-1585:17.  Specifically, the prosecutor intended to elicit testimony that Fields threatened to kill Scroggins.  TT at 1583:18-1584:6.  *See McDermott*, 64 F.3d at 1452 (excluding *pro se* defendant from a bench conference relating to admissibility of government witness's testimony regarding defendant's death threat

---

[12] Mr. Snyder later confirmed during closing argument that the Government intentionally used improper objections and side-bar comments to taunt Fields and influence the jury: "You remember when Shaleaykea was on the stand and I started then using objections? Remember that?  And I know I did it to the point where some of you were probably wondering, what is this guy doing?  Why is he doing this?  To show one thing to you and have one thing come out, to let you see, and if you looked, you saw it.  He can't stand not to be in control.  The second he's not in control, even in something as technical as the ability to follow the Federal Rules of Evidence, he can't take it.  He can't stand it. "  TT at 2032:16-24.

-82-

against her violates Sixth Amendment).  Prior to asking the question, the prosecutor requested a

bench conference.  TT at 1583:11-13.  Mr. Peterson spoke for Fields.  During the conference,

Mr. Peterson informed the Court that Fields requested an "opportunity to make an argument

outside the presence of the jury" in relation to a Rule 404(b) objection to this testimony.  TT at

1584:14-15.  Ultimately, this conference ended without the Court ruling on the Rule 404(b) issue

because Mr. Peterson and Mr. Snyder agreed that the prosecution would continue questioning the

witness and avoid the issue until re-direct:

> THE COURT:  Do you think you'll be questioning her until it's time to take a recess?
>
> MR. SNYDER:  Yeah.  I think between us and the cross-examination when we get to the recess and then I can – with the defense permission, then I could – if the Court rules it's admissible, I can bring it up on a wide redirect.
>
> THE COURT:  Okay.  Then I won't entertain an objection if that's outside the record with a promise.

TT at 1584:25-1585:7.  Mr. Peterson did not know how Mr. Fields wanted to address this issues

when he spoke at that conference, nor did Mr. Peterson ask Mr. Fields if he consented to

allowing the Government's proposed procedure.  Significantly, both Mr. Snyder and Mr.

Peterson confirmed that standby counsel were participating without Fields' consent:

> MR. SNYDER:  Do you think that there would be a problem with that, gentlemen, although I know you cannot speak for your attorney (sic)?
>
> MR. PETERSON:  We can't speak for him, but I would like an opportunity to talk to him about what went on up here before you continue with your direction.
>
> MR. SNYDER:  Just let me know.
>
> (End of bench conference)

TT at 1585:10-16.  Standby counsel's admission that he was not able to speak for Fields highlights the need for Fields' actual, meaningful participation at all bench conferences.

Fields was eventually provided an opportunity to speak for himself, outside of the presence of the jury, on the issue of the Rule 404(b) testimony.  TT at 1166:2-22 at 1636:9-1639:3.  The colloquy between the Court and Fields evidences the fact that standby counsel's participation in trial interfered with Fields' right to self-representation.  Indeed, the Court acknowledged that standby counsel's conduct was in violation of the second *McKaskle* limitation – that counsel's actions "should not be allowed to destroy the jury's perception that the defendant is representing himself" (465 U.S. at 178) – by stating "[t]he perception of hybrid representation in this case is completely getting out of hand."  TT at 1636:11-12.  Yet, when addressing Fields' objection to Scroggins' testimony outside the presence of the jury, the Court still requested Fields' standby counsel – not Fields –  address that issue as well as the issue of hybrid representation:

> THE COURT:  Be seated, everyone. You can go ahead and step down, Ms. Scroggins. **The perception of hybrid representation in this case is completely getting out of hand.  So, counsel, you're going to need to come back to chambers so we can talk about that one more time.**  Mr. Fields, I've got to say to you if any human being with the intelligence that I know you have hasn't decided by this point that they're making a terribly serious mistake by trying to represent themselves, then it's just incomprehensible to me.  So I urge you to reconsider one last time while you still have an opportunity to do so.
>
> MR. FIELDS:  Your Honor –
>
> THE COURT:  We have a legal matter we need to take up?
>
> MR. SNYDER:  Yes, Your Honor.
>
> THE COURT:  What did you want to say, Mr. Fields?

MR. FIELDS:  I was just going to say I'm pretty sure that.  I can prove that this witness did what I say she did, but I'm not sure how I'm supposed to structure my questions.

THE COURT:  That's why I'm suggesting to you, Mr. Fields, that you let your lawyers do it because they know how to do that.  You don't know how to do it and you're not going to learn how to do it in time to do yourself any good whatsoever.  And if you want to be stubborn, that is your prerogative and your right, but I want to make it clear on the record that from my experience, you are making a terrible, terrible mistake.  Mr. Snyder, what matter do we need to take up?

MR. SNYDER:  Yes, Your Honor – is – I approached the bench in an attempt to elicit and I stopped when I – that – when they were talking about how they had went out – Mr. Fields and her had went out to Downsville and stopped along the road.  He said, "I got to do something," waited a minute and then said, "No.  It can wait."  I would – the statement that he later told her was is that he was going to kill her out there first.  I believe this is admissible.  Number one, it proves premeditation because it was in the same area that he murdered Suncerey Coleman.  Second of all, it shows bias –

THE COURT:  What was the time frame?

MR. SNYDER:  This would have occurred at approximately 10:00 to 10:30.  Suncerey Coleman would have been out there approximately – would have been sometime after 11:30.  If he drove straight out there, it would have been around midnight, within a couple of hours.  But, second of all, is – he has suggested – well, not suggested.  He's stated outright is – is that she has a hatred and the hatred is based upon the fact of this jealousy between him and Suncerey Coleman which also tends to – intentionally gives him a motive to murder her, allegedly.  However, I would point out – is – this would show her bias, interest and motive.  The reason she hates him is because she realizes he was serious when he said he was going to kill her, and that's the fastest way to stop love that I know of.

**THE COURT:  All right.  Then can one of you counsel express the objection that Mr. Fields would like to be made?**

**MR. FIELDS:  Your Honor?**

THE COURT:  Yes, Mr. Fields.

-85-

> MR. FIELDS:  The witness have already stated, well, she claimed that I said – I said I was going to kill her.  So if he bring her back and repeat that, that will be repetitive, wouldn't it?
>
> THE COURT:  I don't recall hearing her say that, Mr. Fields.
>
> MR. FIELDS:  She said it, Your Honor.
>
> THE COURT:  Not in response to the question Mr. Snyder wanted to ask her.  And in the context of the question Mr. Snyder wanted to ask her, she blurted that out.  The objection would be overruled and you may do that on redirect.  We'll take our recess.
>
> MR. FIELDS:  All right, Your Honor.

TT at 1636:9-1639:3  (emphasis added).  Despite the fact that the Court asked standby counsel for a response, Fields quickly responded before counsel could – clearly indicating that he wished to represent himself on the issue and not rely on standby counsel.

Fields' standby counsel also spoke for him on important matters concerning the scope of Scroggins' questioning at four more bench conferences.  For instance, Mr. Peterson spoke for Fields with regard to cross-examination questions concerning where Scroggins worked which Fields asked in an attempt to impeach the witness's credibility:

> MR. SNYDER:  Your Honor, I'm going to object to the form of the question.  This is getting opened up where people lives. I mean, what people do for a living – is – I think this could be objectionable line.
>
> THE COURT:  Sustain the objection.
>
> MR. FIELDS:  Your Honor –
>
> THE COURT:  Approach, counsel.
>
> (On-the-record bench conference, to wit:
>
> THE COURT:  Is he about to open something up?
>
> MR. SNYDER:  Yes.  The problem of it is once he starts going into where her work, it's only fair to start asking where he worked and he answered – is – he didn't.  He robbed people for a living.

THE COURT:  I don't think that's true, Mr. Snyder.

MR. SNYDER:  Okay.  I just wanted to –

MR. PETERSON:  It's just background.

THE COURT:  I don't know what the relevance is.

MR. PETERSON:  Well, he said that there's something in a written statement about having a conversation with him in a place that she worked and he wants to show through her testimony that she never worked there, that he –

THE COURT:  He can ask her if she ever worked there.

MR. PETERSON:  That's what he's doing his own way.

THE COURT:  Okay.

(End of bench conference)

TT at 1614:1-25.  Here, yet again, standby counsel impermissibly spoke instead of Fields regarding "government objections to the substance and manner of [*pro se* defendant's] cross-examination" of a key Government witness.  *McDermott*, 64 F.3d at 1452; *McKaskle*, 465 U.S. at 178.  That the Court ultimately allowed Mr. Fields to continue his line of cross-examination does not alleviate the structural error of Peterson impermissibly speaking for Fields.  *McDermott*, 64 F.3d at 1453 (granting relief and stating "[*Pro se* defendant] does not allege that he would have done anything differently than [standby counsel] did at sidebar, or that any prejudice resulted . . . [*Pro se* defendant's] objection is based on principle, not specific content or result").

Shortly thereafter, Mr. Swanton spoke for Fields at another bench conference concerning the same line of impeachment questions.  At this conference, standby counsel again also spoke for Fields on the important matter of curtailing the prosecution's unfairly prejudicial statements in front of the jury:

MR. SWANTON:  I understand what Mr. Snyder's concern is, but every time he stands up and says, "This is going somewhere we don't want to go," it intimates to the jury –

THE COURT:  Well, that's not what we agreed we were going to do, Mr. Snyder.

MR. SNYDER:  Okay.

THE COURT:  Object to the form of the question, you understand?

MR. SNYDER:  All right.

(End of bench conference)

TT at 1616:2-11.  Again, as in *Oses*, standby counsel improperly spoke instead of Fields in the important matter of attempting to curb the "prosecutor's improper comment[s]."  961 F.2d at 986 (holding, *inter alia*, that the trial court's "unwillingness to curb the prosecutor's rhetorical excess contributed to violate petitioner's right to represent himself").[13]

Mr. Swanton also spoke for Fields concerning the prosecutor's objection to Fields' line of questions to Scroggins as hearsay (TT at 1648:23-1649:10) and Mr. Fields' use of the court room microphone in presenting his case (TT at 1653:3-10).  *See McDermott,* 64 F.3d at 1452 (excluding *pro se* defendant from a bench conference relating to admissibility of hearsay testimony violates Sixth Amendment).

Mr. Peterson spoke for Fields at a bench conference concerning the unavailability of several defense witnesses, many of whom were not present despite the Court's issuance of bench warrants (TT at 1913:11-1916:15) and the issue of sequestering adverse witnesses (TT at 1552:10-1553:15).  *See Oses*, 961 F.2d at 986 (granting relief where *pro se* defendant was excluded from bench conferences that "covered such important issues as the number of witnesses that the defendant intended to call").  During this same conference, there was an exceedingly

---

[13] Mr. Snyder later confirmed he intentionally used improper objections and side-bar comments to taunt Fields and influence the jury.  *See supra* n.12; TT at 1914:15-19.

brief, but unquestionably important discussion where Peterson spoke for Fields on the issue of whether Fields would testify on his own behalf:

> THE COURT: [] Is he going to testify? Is he going to testify?
>
> MR. PETERSON: He hasn't indicated that he was going to. No, sir.
>
> THE COURT: I assume that he's not because he's here.

TT at 1914:15-19. As such, Peterson impermissibly spoke "*instead* of the defendant on [a] matter of importance" concerning Fields' right to testify. *McKaskle*, 465 U.S. at 178 (emphasis in original); *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987) (the right to testify secured by the Fifth, Sixth and Fourteenth Amendments).

Standby counsel also represented Fields, although said nothing, in a bench conference concerning Fields' objection to the prosecutor's attempt to elicit hearsay testimony. TT at 1560:23-1561:15. *See McDermott*, 64 F.3d at 1452 (excluding *pro se* defendant from a bench conference relating to admissibility of hearsay testimony violates Sixth Amendment). At these, as with all the bench conferences at the guilt phase of trial, standby counsel would not or could not discuss with Fields how he wanted these issues handled. Accordingly, standby counsel's opinions effectively controlled the outcome of these conferences, substantially interfering with significant tactical decisions in violation of Fields' Sixth Amendment right. *McKaskle*, 465 U.S. at 178 ("If standby counsel's participation . . . effectively allows counsel to make or substantially interfere with any significant tactical decisions . . . or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded") (emphasis in original).

Here, the Sixth Amendment violation is even more egregious because the Court's decision to prohibit Fields' participation in bench conferences was made unilaterally, without adequate discussion or justification. The Court offered no reason for prohibiting Fields from

participation at these conferences.  The Court made no inquiry into whether Fields would be disruptive or dangerous at bench conferences.  The Court made no attempt to conceive, much less adopt, any less drastic alternative to a ban on Fields' participation in these critical points in his trial.  Rather, the entirety of the discussion on the issue of participation in bench conferences was contained in the Court's decree that Fields could not participate in any conference in front of the jury:

> THE COURT:  One other thing, I'm reminded by the lady who's most concerned about this, is bench conferences.  **Any of the bench conferences in which Mr. Fields has to be involved will have to be done outside the presence of the jury and I will certainly insist that to the extent possible that be done before the jury comes in in the morning or in the afternoon or after a recess or after the jury's left in any of those instances.**  And if there must be a bench conference that would interfere and require me to excuse the jury, I would certainly hope that Mr. Fields would authorize his attorneys to speak for him in whatever manner – whatever matter needs to be discussed, and after we have the bench conference, the attorneys could go back and report to him what just took place and come back again if that was not satisfactory, if additional matters needed to be talked about or additional arguments made. I don't know if that will work or not, but it would be something that I hope we could do. Any other things?
>
> MR. PETERSON:  No.
>
> MR. FIELDS:  Nothing else, Your Honor.
>
> MR. GLOFF:  Nothing from the government, Your Honor.

TT at 1166:2-22 (emphasis added).  Indeed, it appears that the Court's ruling was based, at least in part, on the unspecified concerns of a "lady" who is presumably a member of the Court's staff. *Id*. ("One other thing, I'm reminded by the lady who's most concerned about this, is bench conferences").

Despite the apparently deferential language used by the Court, it was abundantly clear to Fields that his presence at bench conferences would not be permitted in front of the jury.

Presumably, it was also clear to standby counsel that the issue was not debatable given that

neither Mr. Swanton nor Mr. Peterson objected to the Court's order despite being acutely aware

of *McKaskle's* limitations on standby counsel:

> MR. PETERSON:  Your Honor, just one more thing.  In looking at the *McKaskle v. Wiggins*, a Supreme Court decision, it appears that the Supreme Court is saying that standby counsel or advisory counsel can come to the Court with motions and argue things outside the presence of the jury, and if Mr. Fields says, "Look. Would you just do that," do we have the Court's permission to do that?
>
> THE COURT:  Sure, as long as the record is **absolutely clear** that it's his choice that you do that and that you're doing it in a manner that he approves of.
>
> MR. PETERSON:  Yes, sir.
>
> THE COURT:  That's beneficial to everybody concerned, I think. And the *McKaskle* case, we all need to remember, is a case where the Supreme Court was determining whether or not certain action was violated of somebody's constitutional rights.  They weren't necessarily preparing a road map for how this should happen, I don't believe.
>
> MR. PETERSON:  Yes, sir.

TT at 644-645 (emphasis added).  Significantly, Fields never made it "absolutely clear" that

standby counsel could speak for him at bench conferences.  Just the opposite, he made it

"absolutely clear" that he did not want Mr. Peterson and Mr. Swanton representing him because

he did not trust them and believed them to be conspiring with the prosecution against him.  *See*,

*e.g.*, TT at 13, 22.  Given Fields' unequivocal rejection of standby counsel (TT at 13, 22)

combined with the Court's unequivocal instructions that standby counsel's "role is to advise Mr.

Fields on any legal matters he questions you about" (TT at 69-70), as a matter of law, "any

participation by standby counsel other than for . . . routine matters . . . is 'over the defendant's

objections.'"  *Frantz*, 533 F.3d at 744 (citation omitted).

-91-

The Court's decision to exclude Fields from bench conferences severely impacted the course of his trial.  Fields was denied the opportunity to speak for himself in his own defense.  He was also denied his right to be perceived as representing himself in the eyes of the jury – the Court's comment concerning the improper perception of hybrid representation confirms as much.  *See* TT at 1636:11 ("The perception of hybrid representation in this case is completely getting out of hand").  Worse still, critical moments of his defense were left in the control of standby counsel that Fields explicitly rejected and did not trust.  Because Fields was not permitted to address the Court on his own, and because important matters were discussed in his absence and without his consultation or consent, the conduct of his trial did not ensure that "disagreements between counsel and the *pro se* defendant [were] resolved in the defendant's favor whenever the matter [was] one that would normally be left to the discretion of counsel."  *McKaskle*, 465 U.S. at 179.  As such, Fields' Sixth Amendment right to self-representation was violated and his case must be remanded for a new trial.

CLAIM 7:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE HIS EXCLUSION FROM BENCH AND CHAMBERS CONFERENCES IN VIOLATION OF HIS RIGHT TO SELF-REPRESENTATION AS AN ISSUE ON APPEAL.

On direct appeal, Mr. Fields' appellate counsel, Robert Owen, raised a due process claim concerning the Court's management of standby counsel.  However, appellate counsel failed to raise a Sixth Amendment right to self-representation claim based on Fields' improper exclusion from bench and chambers conferences.[14]  Indeed, the Fifth Circuit confirmed this by commenting on the conspicuous absence of such a claim on direct appeal: "Significantly, Fields does *not* claim that standby counsel's participation at trial intruded upon his Sixth

---

[14] Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claims 4, 5, and 6 above.

Amendment right to self-representation." *United States v. Fields*, 483 F.3d 313, 361 (5th Cir. 2007) (emphasis in original), *cert. denied*, 552 U.S. 1144 (2008). To the extent this claim was clear on the record, counsel's failure to do so is inexcusable.

Appellate counsel had no reason to avoid raising this meritorious record-based claim. At the very least, Fields' exclusion from bench conferences, if not chambers conferences, was clear from the record. TT at 1166. Additionally, it was clear from the record that Fields did not want Mr. Peterson and Mr. Swanton representing him because he did not trust them and believed them to be conspiring with the prosecution against him. *See*, *e.g.*, TT at 13, 22. It was also clear from the record that standby counsel's "role [was] to advise Mr. Fields on any legal matters he questions you about" (TT at 69-70) but not to act as hybrid counsel where Fields "represents himself to the extent he wants to and yet relies on lawyers to represent him to the extent he wants to." TT at 639. And, Fields' direct appeal was filed in 2004 – well after the case law establishing the claim. *See*, *e.g.*, *Faretta v. California*, 422 U.S. 806, 819 (1975); *McKaskle v. Wiggins*, 465 U.S. 168, 179 (1984); *United States v. McDermott*, 64 F.3d 1448, 1451-52 (10th Cir. 1995); *Oses v. Massachusetts*, 961 F.2d 985, 986 (1st Cir. 1992); *United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir. 1985).

Appellate counsel's ineffective representation is extremely and undeniably prejudicial to Fields. Denial of the right to self-representation was structural error, requiring a new trial regardless of whether "by due process standards the trial was fair, and any error relative to most other principles would be harmless." *McDermott*, 64 F.3d at 1453-54 (emphasis added). Accordingly, had appellate counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v.*

*Robbins*, 528 U.S. 259, 285-86 (2000). Given the structural nature of these claims, but for appellate counsel's failure to raise them on direct appeal, the Fifth Circuit would likely have granted Fields a new trial.

CLAIM 8: STANDBY COUNSEL'S FAILURE TO EXERCISE A PEREMPTORY CHALLENGE AGAINST A JUROR MR. FIELDS SOUGHT TO STRIKE VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 9: MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO A FAIR AND IMPARTIAL JURY AND FIFTH AND EIGHTH AMENDMENT RIGHTS TO DUE PROCESS WERE VIOLATED WHEN ONE OF HIS PEREMPTORY CHALLENGES WAS NOT EXERCISED.

At the outset of trial Fields requested that the Court appoint him new counsel, citing a conflict of interest between himself and appointed counsel and stating his belief that counsel was conspiring with the prosecutors against him. TT at 13, 22. The Court denied Fields' request for new counsel. TT at 14:22-23. Fields then invoked his right to self-representation. TT at 21:19-23. After Fields invoked his right to self-representation but before the conclusion of *voir dire*, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel. TT at 69-70. The Court admonished Mr. Peterson and Mr. Swanton that their role was simply advisory. *Id.* Although standby counsel could advise on legal matters and answer legal questions, the Court made clear they were not to "represent him through him." TT at 69-70. The Court expressly disapproved of a hybrid representation situation where Fields "represents himself to the extent he wants to and yet relies on lawyers to represent him to the extent he wants to." TT at 639. Rather, the Court stated that it was important "that the appearance before the jury is that Mr. Fields is representing himself" and required that Fields "make any statements made to the Court and question any witnesses." *Id.* The Court did, however, authorize standby counsel to argue motions and take up other matters outside the presence of the jury but only if

the record was "absolutely clear" that Fields chose to have counsel do so and that counsel was doing so in a manner Fields approved of.  TT at 644-645.

Fields authorized Mr. Peterson to speak on his behalf in connection with his challenge to the Government's juror selection under *Batson v. Kentucky*, 476 U.S. 79 (1986) (TT at 1152) but he did not authorize Mr. Peterson to determine how to use his peremptory challenges to potential jurors.  To the contrary, Fields wanted to control the jury selection process after *voir dire*.  To assist with the decision-making process in exercising peremptory challenges, Fields and standby counsel developed a scoring system to track their perception of each potential juror.  Both Mr. Peterson and Mr. Swanton offered their opinions on who they believed Fields should strike.  Sometimes those opinions were contrary to Fields' opinion. Fields was willing to listen to standby counsel's views, but he did not want them to control the ultimate decision-making process.  Standby counsel, however, took control of the decision-making process, assuring Fields that their decisions were based on their professional experience.

In at least one case, standby counsel specifically rejected Fields' request to strike a particular juror, Jimmy D. Ansay.  Mr. Fields felt that Mr. Ansay was the single worst potential juror – he did not like his *voir dire* answers.  More importantly to Fields, he did not like the way Ansay stared at him during jury selection.  Accordingly, Fields gave Ansay the worst possible score.  Consequently, Fields directed counsel to exercise a peremptory challenge against Ansay. Counsel disagreed with Fields about Ansay, apparently viewing him as a bad, but weak juror. Despite Fields' desire to exercise a peremptory challenge against Ansay, counsel overrode Fields' decision, forcing him to exercise challenges against jurors counsel thought were worse. Thus, Mr. Ansay was seated as one of the jurors who voted to convict and sentence Mr. Fields to death.

Other than bench and chambers conferences, Fields conducted every other aspect of his defense during the guilt phase of trial. He made opening (TT at 1194:10-1203:5) and closing (TT at 2005:1-2029:20) arguments to the jury. He cross examined all government witnesses and examined all witnesses in his defense. He participated in the *voir dire* of jurors and made motions to the court outside of the jury's presence. TT at 36:17-20, 67:25-68:14, 484:3-9, 528:10-529:4, 637:24-638:21, 719:7-18, 1108:4-19, 1148:6-1152:9, 1970:23-1971:2..

## A.    <u>The Role Of Standby Counsel</u>

The Sixth Amendment grants a defendant the right to personally conduct his own defense. *Faretta v. California*, 422 U.S. 806, 819 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense"); *McKaskle v. Wiggins*, 465 U.S. 168, 179 (1984). Although the court may appoint standby counsel to "to aid the accused if and when the accused requests help," (*Faretta*, 422 U.S. at 834 n.46), the Sixth Amendment imposes two significant limitations on the extent of standby counsel's participation:

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury. This is the core of the *Faretta* right. If standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decisions, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.
>
> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself. The defendant's appearance in the status of one conducting his own defense is important in a criminal trial, since the right to appear *pro se* exists to affirm the accused's individual dignity and autonomy.

*McKaskle*, 465 U.S. at 178 (emphasis in original).

Where, like here, "standby counsel is appointed only to advise, the initial invocation of the right of self-representation is generally sufficient to establish that any participation by standby counsel other than for . . . routine matters . . . is 'over the defendant's objection.'" *Frantz v. Hazey*, 533 F.3d 724, 744 (9th Cir. 2008) (*quoting McKaskle*, 465 U.S. at 178); *United States v. Lorick*, 753 F.2d 1295, 1299 (4th Cir. 1985) (a defendant's assertion of "the right [to self-representation] at the outset of trial proceedings constituted an express and unambiguous request that 'standby counsel be silenced.' This, per *McKaskle's* analysis, must be given effect as a reassertion of the general right to *pro se* representation as to further proceedings . . ."). From the very outset of trial, the Court appointed Mr. Fields' standby counsel only to advise:

> MR. PETERSON: Your Honor, Mr. Swanton and I will then be appointed as standby counsel or can we be excused?
>
> THE COURT: Absolutely you're appointed as standby counsel. The question becomes what the jury is told about that situation. Standby counsel to me it seems by definition includes counsel who are standing by in case the defendant elects to be represented by attorneys at a later stage of the trial, and I intend to tell them that. I intend to tell them that unless and until that happens. Then **your role is to advise Mr. Fields on any legal matters he questions you about, that you are in essence his legal reference material since he's not a lawyer and doesn't have a library there at his disposal at counsel table. On the other hand, that it's not your job to represent him through him, that you're allowed to sit there at the counsel table so you're readily available to answer any questions he has.** Obviously anything he says to you or you to him is completely confidential. So no one is going to know to what extent those normal procedures are being followed, but what **I think is important is that the appearance before the jury is that Mr. Fields is representing himself. He will have to make any statements made to the Court. He will have to question any witnesses that are made.**

TT at 69-70 (emphasis added). Accordingly, absent Mr. Fields' express consent to any individual instance of standby counsel's participation at trial, standby counsel's participation is

over the defendants' objection and in violation of his right to self-representation.  *McKaskle* does

not place a burden on *pro se* defendants to object to every unwanted act of standby counsel.

*Frantz*, 533 F.3d at 744.  "To the contrary, *McKaskle* limits standby counsel's '*unsolicited*

participation' during critical proceedings."  *Id.* (*citing McKaskle*, 465 U.S. at 177) (emphasis in

original).  Here, it is especially appropriate to presume that all of standby counsel's participation

was unsolicited absent express consent from Fields given that Fields made it abundantly clear he

believed standby counsel were operating under a conflict of interest and conspiring with the

prosecutors against him.  TT at 13, 22.

Violations of Mr. Fields' Sixth Amendment right to self-representation are

structural, and therefore *per se* prejudicial:

> Since the right of self-representation is a right that when exercised
> usually increases the likelihood of a trial outcome unfavorable to
> the defendant, its denial is not amenable to "harmless error"
> analysis.  The right is either respected or denied; its deprivation
> cannot be harmless.

*McKaskle*, 465 U.S. at 177 n.8; *Myers v. Johnson*, 76 F.3d 1330, 1337 (5th Cir. 1996).

**B.**      **Mr. Fields' Sixth Amendment Right To Self-Representation Was Violated Because Standby Counsel Substantially Interfered With And Made Significant Tactical Decisions Regarding Jury Selection**

Without doubt, decisions concerning whether and how to use peremptory

challenges during jury selection are some of the most significant tactical decisions made at any

criminal trial.  Indeed, use of peremptory challenges is one of the most important rights afforded

federal criminal defendants:

> Although "[t]here is nothing in the Constitution of the United
> States which requires the Congress [or the States] to grant
> peremptory challenges," *Stilson v. United States*, [250 U.S. 583,
> 586 (1919)], nonetheless the challenge is "one of the most
> important of the rights secured to the accused," *Pointer v. United
> States,* [151 U.S. 396, 408 (1894)].

*Knox v. Collins*, 928 F.2d 657, 660 (5th Cir. 1991).  The Supreme Court has stated similarly that "[t]he peremptory challenge is part of our common-law heritage. Its use in felony trials was already venerable in Blackstone's time.  We have long recognized the role of the peremptory challenge in reinforcing a defendant's right to trial by an impartial jury."  *United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000) (citation omitted).  The right to free exercise of peremptory challenges represents such a significant tactical decision that the Supreme Court and the Fifth Circuit firmly hold that "'[a] defendant does enjoy a federal constitutional right to a trial before a fair and impartial jury, with the concomitant right to peremptorily challenge a limited number of prospective jurors in the selection proceedings.'"  *Knox*, 928 F.2d at 661 (citations omitted).

The incredible significance of the peremptory challenge as a tactical trial tool is further evidenced by its broad scope of acceptable use:  "[t]he peremptory challenge generally '**permits rejection [of potential jurors] for a real or imagined partiality** that is less easily designated or demonstrable [than a challenge for cause].'"  *Knox*, 928 F.2d at 661 (*quoting Swain v. Alabama*, 380 U.S. 202, 220 (1965)) (emphasis added).  The Supreme Court has acknowledged that the only "substantive control over a federal criminal defendant's choice of whom to challenge peremptorily" is prescribing a challenge based solely on "the juror's gender, ethnic origin, or race," and has specifically declined to apply further controls to the defendant's choice.  *Martinez-Salazar*, 528 U.S. at 314-15.  Accordingly, it is beyond legitimate dispute that standby counsel's unsolicited interference with or control of a *pro se* defendant's tactical decisions concerning use of peremptory challenges violates the very "core of the *Faretta* right" – the *pro se* defendant's entitlement "to preserve actual control over the case he chooses to present to the jury."  *McKaskle*, 465 U.S. at 178.  Here, Fields' standby counsel controlled the decisions on use of peremptory challenges against Fields' wishes.

Standby counsel exceeded the bounds of both the Court's instructions and *McKaskle's* limitations in the course of selecting Fields' jurors. Although the Court clearly described standby counsel's role as advisory (TT at 69-70), Mr. Peterson did not simply advise Fields as to which potential jurors he believed should be challenged and which should serve. Instead, standby counsel forced Fields to exercise peremptory challenges in a manner contrary to his explicit instructions. Mr. Peterson's unauthorized substitution of his opinion for Fields' in connection with the decision to strike juror Ansay is a structural violation of Fields' *Faretta* right, requiring a new trial.

**C.     Mr. Fields' Sixth and Eighth Amendment Rights To Trial Before a Fair and Impartial Jury and Fifth and Eight Amendment Rights to Due Process Were <u>Violated Because Jimmy D. Ansay Was Wrongly Impaneled In His Jury</u>**

Additionally, Peterson's actions allowed for Ansay's installation onto the jury, effectively denying Fields' right to exercise a peremptory challenge and resulting in a trial before an unlawful adjudicator. In short, Fields had a right to trial without Mr. Ansay on the jury and had Fields' right to exercise his peremptory challenges been respected, Mr. Ansay would not have been seated. Peterson's interference with that right renders Fields' jury defective and unlawfully constituted.

The Fifth Circuit has repeatedly stated that denial of a peremptory challenge is error. *See*, *e.g.*, *United States v. Hall*, 152 F.3d 381, 408 (5th Cir. 1998); *United States v. Broussard*, 987 F.2d 215, 221 (5th Cir. 1993); *see also United States v. Munoz*, 15 F.3d 395, 398 n.1 (5th Cir. 1994). The court's evaluation in *United States v. Webster,* 162 F.3d 308 (5th Cir. 1998), is particularly instructive:

> [The defendant] does not allege that any of the jurors who served was not impartial. We do not face, therefore, a pure constitutional challenge. Rather, we address Webster's statutory right to the free exercise of his peremptory challenges as a means of implementing the constitutional guarantees. "While peremptory challenges, or

the number provided by [Fed. R. Crim. P. 24(b)] may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal." "'The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice.'"

*Id.* at 341-42 (citations and internal quotation marks omitted). *Webster*'s reasoning is completely consistent with the Supreme Court's holding in *Rivera v. Illinois*, 129 S. Ct. 1446 (2009), that a state court's denial of a peremptory challenge is not necessarily a constitutional violation. The Fifth Circuit in *Webster* considered the right to peremptory challenges as statutory, and its holding is thus not implicated by *Rivera*. Based on long standing Fifth Circuit precedent, there can be no question that Fields' inability to strike Mr. Ansay as he desired was error – and such an error requires a new trial.

Denial of the right to have a criminal trial adjudicated by a lawfully impaneled jury is a structural error that cannot be readily subjected to a harmless error analysis. *See Gomez v. United States*, 490 U.S. 858, 876 (1989). Errors affecting the composition of the jury require automatic reversal of the verdict and a new trial. *See*, *e.g.*, *Gray v. Mississippi*, 481 U.S 648, 666-68 (1987) (improper exclusion of juror with scruples regarding the death penalty from capital case); *Batson*, 476 U.S. at 100 (unlawful exclusion of juror based on race); *Vasquez v. Hillery,* 474 U.S. 254, 263-64 (1986) (unlawful exclusion of grand jurors based on race); *Irvin v. Dowd*, 366 U.S. 717, 726, 728 (1961) (pretrial publicity called jury's impartiality into question).

Courts of Appeals have recognized even after the Supreme Court's decision in *Rivera* that erroneous denial of a peremptory challenge could be harmless only if "'it is highly probable that the error did not influence the verdict.'" *United States v. Gonzalez-Melendez*, 594 F.3d 28, 33 (1st Cir. 2010) (*quoting United States v. Pakala*, 568 F.3d 47, 52 (1st Cir. 2009)). Another Circuit has similarly required the court to be able to "'say, with fair assurance, after

-101-

pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Hinton v. United State*s, 979 A.2d 663, 690-91 (D.C. 2009) (*en banc*) (citation omitted) (reversing conviction because of error in jury composition).  But ascertaining a juror's influence on the verdict will generally be exceedingly difficult at best.  As the *Hinton* court concluded, "[w]e cannot know what would have happened – and that is the problem . . . We cannot say with the necessary 'fair assurance' that absent the error, all twelve members of Hinton's jury would have voted to convict him." *Id.* at 692.  The Supreme Court has agreed that such difficulties can raise an error to structural dimensions. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006) (stating that errors may be deemed structural based on "the difficulty of assessing the effect of the error"); *Vasquez*, 474 U.S. at 263 ("[W]hen a petit jury has been selected upon improper criteria . . . we have required reversal of the conviction because the effect of the violation cannot be ascertained") (*citing Davis v. Georgia*, 429 U.S. 122 (1976) (*per curiam*); *Sheppard v. Maxwell*, 384 U.S. 333, 351-52 (1966)).

It is impracticable at best to conduct a harmless error analysis to issues involving the wrongful seating of a juror because "there is no way to determine what jury would have been selected under a [lawful] selection system, or how that jury would have decided the case." *Peters v. Kiff*, 407 U.S. 493, 504 (1972).  Harmless error review is impossible because courts cannot possibly know who the replacement juror would have been, much less speculate about how that juror would have viewed the evidence and participated in deliberations. *See*, *e.g.*, *McIlwain v. United States*, 464 U.S. 972, 975-76 (1983) (Marshall, J., dissenting from denial of certiorari) ("Given the delicate dynamics of jury deliberations, it is simply impossible to know the effects [one] juror had on her fellow jurors"); *United States v. Annigoni*, 96 F.3d 1132, 1150 (9th Cir. 1996) (*en banc*) (Kozinski, J., dissenting) ("[T]he error is not amenable to normal

harmless error analysis, as we can never figure out what would have happened if one member of the jury had been struck and replaced by some other, unknown, person"); Roger J. Traynor, *The Riddle of the Harmless Error* 64-66 (1970) (a defendant who has been wrongly denied a peremptory challenge cannot possibly show prejudice "and should not be called upon to do the impossible at the appellate stage").

Indeed, Fields is not required to demonstrate either harmlessness or prejudice to him. The *Hinton* court spoke directly to the burden of persuasion when a criminal defendant raises a claim that his jury was not properly composed:

> Under this standard, the "burden" is not on the appellant to show that he has suffered prejudice; rather, the issue is whether the record **eliminates** the appellate court's doubt about whether the error influenced the jury's decision . . . If we are to speak, somewhat loosely perhaps, in terms of burdens of persuasion, then we may say that the government bears the "burden of showing the absence of prejudice."

*Hinton*, 979 A.2d at 691 (emphasis added; citations omitted). As the government has not proffered any evidence whatsoever showing the absence of prejudice from the impaneled jury, it cannot have met its burden.

Mr. Ansay's installation on Fields' jury despite Fields' efforts to exercise a preemptory strike against him, was error. As described above, the impracticability of assessing Mr. Ansay's impact on the jury's findings and verdict raise this error to structural dimension, and requires a new trial.

CLAIM 10:    MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF TRIAL WERE VIOLATED BY HIS EXCLUSION FROM A CHAMBERS CONFERENCE HELD TO DISCUSS THE COURT'S RESPONSE TO THE JURY'S NOTE INDICATING THAT THEY  WERE UNABLE TO REACH A UNANIMOUS VERDICT ON SENTENCING WHERE MR. FIELDS SPECIFICALLY REQUESTED TO ATTEND THAT OFF-THE-RECORD CONFERENCE.

A.      Facts

Although it is not clear from the trial record, Mr. Fields was improperly excluded from an off-the-record chambers conference held to decided how to treat the jury's note indicating they were deadlocked on whether Fields should be sentenced to death.  Unlike the guilt phase of trial, counsel represented Mr. Fields during the penalty phase.  Although it is also not clear from the trial record, Fields wanted to be present at this chambers conference.  However, counsel participated without Fields.

At about 3:35 p.m. on Thursday, February 5, 2004, the jury began deliberating sentencing verdict.  TT at 2543.  A little more then an hour later, at around 4:55 p.m. the jury asked to recess until 9 a.m. the next morning, Friday February 6, 2003.  At 1:45 p.m. in the afternoon of their second day of penalty phase deliberation, after deliberating for approximately six hours, the jury sent the Court a note asking:

> If we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the Court have for punishment?

TT at 2546-2547.  At 2:07 p.m., the Court responded:

> Ladies and Gentleman:  You are instructed on page 16 of the Punishment Phase Charge of the Court as follows:  "If you are unable to unanimously agree on either punishment option, the Court will impose punishment which cannot be a sentence of death."  Beyond that, I am unable to answer your question.

TT at 2547.  **Eighteen minutes** later, at 2:25 p.m., the jury told the Court:  "**We cannot come to a unanimous agreement.**"  *Id.* (emphasis added).

Initially, the Court asserted its opinion that the jury was deadlocked and there was no appropriate response to the note:

> It would be my initial position that **there's absolutely nothing the Court should or could do at this point except accept that statement** and I don't even think it would be appropriate to ask the

-104-

> jury as a whole if any of them disagree with the foreman's statement to the Court."

TT at 2547 (emphasis added).  The government disagreed, however, resulting in an off-the-record chambers conference:

> MR. SNYDER:  I think it's too early for them to throw the towel in.
>
> THE COURT:  I'm sorry?
>
> MR. SNYDER:  They've only been working six hours, Judge. That isn't that long.
>
> THE COURT:  Well, let's confer in chambers a moment, counsel.
>
> LAW CLERK:  All rise.
>
> (A break was taken from 2:36 to 2:56)

TT at 2548.

After a twenty minute chambers conference, the Court changed its opinion, and determined to issue a short response: "Ladies and gentlemen, please continue your deliberations."  TT at 2548.  When the Court returned to the record, defense Counsel objected, arguing that following the prior two notes, and considering the time the jury has already deliberated, that such a response would be tantamount to telling the jury to come to a death verdict:

> MR. SWANTON:  Sometime ago, 45 minutes maybe ago that indicated to the Court that they were questioning if they can't reach a unanimous verdict what happens, and the Court instructed them essentially as they were already instructed in the charge that if that's the case, that you would impose the sentence but it could not be death.  They've now informed the Court after receiving that notification from the Court that they cannot reach a unanimous verdict.  In essence, it is our position that by reaching that verdict they in fact have reached a decision and are properly following the Court's instructions as have previously been given to them.  It is our concern that should the Court ask this jury to continue to deliberate, what the Court is essentially doing is, number one, commenting on the weight of the evidence and essentially telling

-105-

> the jury that – when this jury knows because they've been told through the process of voir dire that there are two possible verdicts or two possible results in this case, a life sentence without the possibility of release or death, that if you send them back and say keep deliberating, it is, in essence, telling them – you know, swaying them to reach the verdict of death and commenting on the evidence and commenting on what you're asking them to do.

*Id.* Mr. Swanton also countered the Government's concern as to the length of deliberations noting that:  "[the jury's] been out approximately the same amount of time as they were in guilt/innocence minus maybe a couple of hours and we would object to the Court giving that charge." *Id.*

On behalf of the Government, Mr. Snyder argued that the Court had the authority to issue the note and that jury had not been deliberating long enough: "Your Honor – is – when I first got involved in trials – is – I was told by an old lawyer, rule of thumb was is deliberations should usually last a day for every week of trial. We haven't even gone through one day." TT at 2250. At 3:01 p.m., the Court overruled the defense objection, sent the note to the jury and recessed:

> THE COURT:  All right.  The defendant's objections will be overruled and the note will be submitted to the jury.  We'll stand in recess.
>
> LAW CLERK:  All rise.
>
> (A break was taken from 3:01 to 4:08)

TT at 2551.  **A mere forty-five minutes later**, at 3:46 p.m., the jury came back with an unanimous verdict for death.  Although Fields requested to be present and participate in the chambers conference that decided this critical matter in his trial – the decision to accept the jury's determination that a unanimous decision could not be reached – he was prevented from participating with his attorneys at that chambers conference.  Because the conference was off-the-record, Fields does not know what took place during the conference.  Whatever occurred

resulted in the Court reversing its initial position that the jury was deadlocked – a reversal of opinion that, for Fields, literally meant the difference between life and death.

> **B.    Mr. Fields' Constitutional Right To Be Present At All Stages Of The Trial Was Violated By His Exclusion From The Chambers Conference**

It is well-established that a defendant has a Fifth and Sixth Amendment right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819-20 n.15 (1975) (*citing Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934)).  Due process requires the presence of the defendant "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder*, 291 U.S. at 105-06.

Despite this well-established right, Fields' explicit request to participate in perhaps the most critical moment of his trial – a chambers conference concerning whether or not the jury was deadlocked on application of the death sentence – was denied.  It is beyond legitimate dispute that whatever transpired during this chambers conference was significant.  Indeed, it caused the Court to turn 180 degrees away from its initial position that "there's absolutely nothing the Court should or could do at this point except accept that statement" that the jury "cannot come to a unanimous agreement."  TT at 2547.  A mere twenty minutes after the Court concluded it could do absolutely nothing but accept the jury's verdict, it returned to the record indicating that it would simply tell the jury to keep deliberating, without any cautionary language designed to protect the rights of any holdout jurors.

There can be no doubt that Fields' absence from this discussion "frustrate[d] the fairness of the proceedings" and denied him the opportunity to defend himself.  *Faretta*, 422 U.S. at 820 n.15.  It was fundamentally unfair to exclude Fields, especially since had there been no conference, Mr. Fields would not have been sentenced to death.  Had there been no

conference, the Court could not impose a death sentence because the jury had not unanimously voted for death. Certainly Fields should have been afforded the opportunity to weigh in on this decision. This is especially so considering the on-record argument – that the jurors should deliberate until the end of the day based on the length of the trial (which presumably influenced the off-the-record chambers argument) – was not a legal argument. This argument was proved to be false at 3:46 p.m. – a mere forty-five minutes after the jurors received the note and more than an hour earlier than they retired the day before. Fields' exclusion from the conference, therefore, resulted in a direct violation of his constitutional right to be present at this critical stage of trial. *Snyder*, 291 U.S. at 105-06.

CLAIM 11:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT TO HIS EXCLUSION FROM A CHAMBERS CONFERENCE HELD TO DISCUSS THE COURT'S RESPONSE TO THE JURY'S NOTE INDICATING THAT THEY WERE UNABLE TO REACH A UNANIMOUS VERDICT ON SENTENCING WHERE MR. FIELDS SPECIFICALLY REQUESTED TO ATTEND THAT OFF-THE-RECORD CONFERENCE.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in the claims directly preceding this one. In order to establish ineffective assistance of counsel, a *habeas* petitioner, or in this case a § 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must first show that counsel's performance was deficient, and then demonstrate that the deficiency prejudiced the defense. *Id*. at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

As demonstrated in preceding claims, Mr. Fields was denied his well-established right to be present at one of the most critical moments of his trial – a chambers conference held to determine whether or not the jury was deadlocked on the application of the death sentence. It

is well-established that a defendant has a Fifth and Sixth Amendment right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819-20 n.15 (1975) (*citing Snyder v. Massachusetts*, 291 U.S. 97, 106 (1934)).  Counsel failed to object to his exclusion.  Their failure to do so was unreasonable, particularly in light of the critical nature of the proceeding, and there is simply no evidence in the extant record that establishes that counsel's deficient performance in this regard was the product of a tactical consideration.

CLAIM 12:    MR. FIELDS' FIFTH AMENDMENT RIGHT TO DUE PROCESS; HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL; AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE VERDICT AND SENTENCE WERE VIOLATED WHEN THE COURT REQUIRED HIM TO PROVIDE THE PROSECUTION WITH A DETAILED PREVIEW OF HIS TRIAL STRATEGY ON CROSS-EXAMINATION OF A CRITICAL GOVERNMENT WITNESS WITHOUT REQUIRING RECIPROCAL DISCLOSURE OF THE PROSECUTION'S TRIAL STRATEGY.

> ### A.     Facts

The Court violated Mr. Fields' due process and Eighth Amendment rights by requiring him to provide discovery material to the Prosecution without reciprocation by the Government.  During the cross-examination of a key Government witness, Shalaykea Scroggins, the Court ordered Fields to provide unreasonable and unreciprocated discovery to the Government.   On Tuesday, January 27, 2004, the Government called Scroggins to offer testimony against Mr. Fields.  TT at 1576:20-1611:2.  Scroggins was perhaps the most critical witness to Fields' defense because she is one of two individuals that Fields contends are the actual killers.  As stated by Mr. Fields on the record, his entire defense rested on the cross-examination of Ms. Scroggins:

> Your Honor, this is my point.  That young lady up there, that's the government's star witness.  This woman is saying that things happened that couldn't have possibly happened, and I'm trying to prove this, but I can't because they won't even let me answer my question.  That's what I'm saying.  This is where my life – my life

> is right there. **This is what's going to – either going to – this is how I'm either going to live or die because of her.**

TT at 1683:7-16. Ms. Scroggins was also the key Government witness who claimed that Mr. Fields confessed his guilt to her. TT at 1599:15-17.

After the Government's direct examination, Mr. Fields attempted to cross-examine Ms. Scroggins to demonstrate that she was lying about her involvement in Coleman's murder to hide the fact that she was the actual killer. *Id.* Fields sought to show that Scroggins was obsessed with him, that she hated Coleman out of jealousy over him, and that she had become incensed at seeing Coleman and Fields together the day of Coleman's disappearance. TT at 1356, 15:1618-20, 1650-51. Mr. Fields' attempts were frustrated by, among other things, his lack of legal training. Moreover, in response to many of Fields' questions, the prosecution raised repeated objections.[15] After numerous successively sustained objections to the form and nature of Mr. Fields' cross-examination questions (TT at 1611:3-1665:17), the Court interrupted Mr. Fields:

> THE COURT: Do you have any other questions of this witness, Mr. Fields?
>
> MR. FIELDS: Yes. I have a bunch of more questions, Your Honor.
>
> THE COURT: Well, let's see if you can find one that's admissible. Otherwise, we're going to cut short the cross-examination and go on to something else. Finish up with this witness.

---

[15] The prosecutor, Mr. Snyder, later admitted during his closing argument that these repeated objections were part of an intentional litigation strategy designed to elicit a specific reaction from Fields to be later highlighted to the jury. *See supra* n. 12; TT at 2032.

TT at 1652:19-1653:1.  Mr. Fields continued with his questions only to be confronted by an onslaught of additional objections.  The Court then suspended Mr. Fields' cross-examination and allowed the government to return to their direct examination of the witness:

> THE COURT:  Sustain the objection.  That's merely argument, Mr. Fields.  We're going to do something different at this point and conclude the cross-examination for this point in time.  We'll come back to it and we'll have the government complete its direct examination of this witness.

TT at 1665:12-17.  Without offering any explanation to the jury, the Court allowed Mr. Snyder to conduct a redirect examination of Scroggins until the end of the day.

After the conclusion of the day's proceedings – outside the presence of the jury but with Ms. Scroggins remaining on the witness stand – the Court ordered Mr. Fields to do a "dry run" of his planned cross-examination of Scroggins by reading his list of proposed questions.  The Court invited the Government to object to each question asked of the witness:

> What we're going to do is, Mr. Fields, you have a list of all the questions you want to ask this witness and you indicated you have a lot more.  So we're going to go ahead and go through that list.  You read each question you want to.  We'll stay here till midnight if we need to.  If the government feels the need to object, the government will object.  If I sustain the objection, then, Mr. Fields, you put an "X" by that question.  If the government doesn't object or I overrule it, you put a checkmark by it and then in the morning when the jury's here, you can go into the matters with the checkmarks on them."

TT at 1669:9-19.  Questions that were ruled permissible could be revisited with the witness for a second time the next day while the jury was present.

During this hearing, Mr. Fields read his questions revealing numerous defense theories, impeachment strategies and other tactical considerations including the witness's drug use (TT at 1697:25-1699:12); the existence of exculpatory trace and DNA evidence (TT at 1673:20-25, 1675:1-24, 1689:18-1690:16); impeaching Ms. Scroggins' credibility regarding the

alleged confession (TT at 1700:9-19); and inconsistencies between Ms. Scroggins' testimony and her prior sworn statements to the grand jury testimony (TT at 1694:1-1697:23, 1712:1-1715-3). By virtue of this hearing, each of these topics were disclosed to the government in advance of Mr. Fields' cross-examination of the witness in front of the jury. TT at 1723:17-1730:6. This provided the Government a unique opportunity to frame their topics of re-direct exam, as well as plan likely objections to Mr. Fields' line of questioning a day before the jury would even hear the cross-examination for the first time. Moreover, it allowed Ms. Scroggins – perhaps the most important witness to both the prosecution and defense – the opportunity to shape her testimony in anticipation of cross-examination questions to be presented to her before the jury.

Throughout the hearing, Mr. Fields expressed his objection to (and confusion about) the purpose of and proper procedure for this advance presentation of his cross-examination questions and witness testimony:

> MR. FIELDS: Your Honor, I'm missing the point, Your Honor.
>
> THE COURT: I know that.
>
> MR. FIELDS: You telling me – first you tell me to ask the questions and just put a check by them if you don't sustain when they object and put an "X" by them and that's what I was doing and now are you telling me to just let it go or what? What are you telling me?
>
> THE COURT: Go ahead and make your attempt to represent yourself, Mr. Fields.
>
> MR. FIELDS: Your Honor, are you trying to persuade me to my standby counsel to represent me?
>
> THE COURT: I've given up trying to persuade you to do anything, Mr. Fields.

TT at 1676:22-1677:6.

> MR. FIELDS: Okay. So if I ask these questions and then I have to strike the ones that they object to, then I come back tomorrow and

-112-

> ask the question that they didn't object to, it ain't going to make no sense because it ain't in no order.
>
> THE COURT:  Well, that's up to you to make sense out of it and to try to understand what you can ask and what you can't ask, and you'll have all night to try to figure that out.  You mark what's not admissible and what is and maybe you'll be able to figure it out, Mr. Fields.

TT at 1682:5-13.  Mr. Fields' standby counsel also expressed confusion as to how the cross-examination preview hearing would facilitate the flow of the following day's cross-examination:

> MR. SWANTON:   I know that you've asked Mr. Fields to checkmark and X mark questions that he has.  I know now that he's asking questions that aren't on his piece of paper and I'm not sure how we're going to be able to determine and how he's going to be able to remember which questions are proper and which ones aren't.
>
> THE COURT:  I guess we'll have to rely on his memory.  I don't know, either.

TT at 1716:7-14.

Based, in part, on the substantial confusion created by this unorthodox hearing and the impossibility of properly recording the Court's evidentiary rulings in any meaningful way, Fields abandoned certain lines of questioning.  For instance, outside the jury's presence, Fields questioned Scroggins attempting to elicit testimony on topics such as inconsistencies in her prior grand jury testimony (TT at 1693:20-1695:23), the existence of exculpatory trace and DNA evidence in the getaway car (TT at 1673:20-25, 1675:1-15) and on the victim's body (TT at 1675:23-24, 1690:13-16).  Although the Court sustained objections as to the form of the question rather than the topic of questioning (TT at 1672:25-1673:4), Fields abandoned the actual substance of such topics and did not repeat them in front of the jury.

Similarly, based in part on a concern that Scroggins' answers may have been influenced by this preview questioning, Fields abandoned other lines of questioning when before the jury.  Outside the jury's presence, Fields elicited court-approved, admissible impeachment

-113-

testimony concerning inconsistencies in Scroggins' accounts of his alleged confession (TT at 1700:9-19), inconsistencies in Scroggins' past statements of Fields' whereabouts (TT at 1701:10-1703:4), and Scroggins' admitted drug use (TT at 1698:11-1699:2).   Because Fields was confused about whether he was still permitted to ask those questions (TT at 1676:22-1677:6, 1682:5-13, 1716:7-14), and because of the clear motivation for the witness to alter her answers, he did not repeat them in front of the jury.

> **B.      The Disclosure Of Cross-Examination Questions And Testimony Without Reciprocation Violates The Fifth Amendments' Due Process Clause And His Eighth Amendment Right To A Reliable Verdict And Sentence**

Compelling Fields to preview his theory of the case and elicit testimonial evidence from a key witness outside the presence of the jury is tantamount to providing discovery to the Government.  Testimony elicited under oath, but outside the presence of a fact-finder can be nothing more than discovery material.  Accordingly, this highly unorthodox hearing essentially elicited deposition testimony from Ms. Scroggins.  As such, Mr. Fields' due process rights were violated because the Court did not require reciprocal disclosure of the prosecution's examination questions, or Scroggins' answers, thereby unconstitutionally tipping "the balance of forces between the accused and his accuser." *Wardius v. Oregon*, 412 U.S. 470, 474 (1973).  The United States Supreme Court has ruled, in an analogous situation, that requiring a criminal defendant to divulge the details of his own case while subjecting him to surprise concerning the Government's refutation of the evidence he disclosed was fundamentally unfair. *Id.* at 472.  The U.S. Supreme Court held that such a situation conferred an unfair advantage to the Government, undermining the adversarial system and creating the "substantial possibility" of a due process violation by allowing the district court's error to infect the verdict. *Id.* at 479.

Certainly the Court's requiring that Fields expose his defense theories, strategy, and confrontation tactics to the prosecution and its star witness – the defendant's chief accuser –

raises a "substantial possibility" of an infected verdict. *Wardius*, 412 U.S. at 479. The Court's order subjected the details of Fields' trial tactics to advanced scrutiny by the Prosecution. Worse still, the Government's objections created the severe risk of coaching their key witness's testimony. Both scenarios undermine the integrity of the adversary system's "primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made." *United States v. Nobles*, 422 U.S. 225, 230 (1975).

Allowing a witness to hear a preview of cross-examination questions in advance of testimony before the jury renders that testimony unreliable. It is beyond legitimate dispute that providing Scroggins with a preview of cross-examination outside the presence of the jury created the danger that her testimony was artificially influenced when she eventually appeared before the jury. As such, her testimony was less reliable to the jury's fact-finding although the jury had no basis to evaluate the reliability of Scroggins' testimony because the jury never witnessed her initial cross-examination, nor were they informed about Scroggins' "practice run." Accordingly, the jury was denied the opportunity to "make an informed judgment as to the weight to place on [Scroggins'] testimony which provided a 'crucial link in the proof . . . of petitioner's act.'" *Davis v. Alaska*, 415 U.S. 308, 317 (1974) (citation omitted). To prevent this very danger of artificially influencing witness testimony, the Court invoked the rule at the very start of trial that no potential witness could be present in the courtroom to hear questions asked of others:

> THE COURT: Be seated, everyone. Before the jury comes in, I need to make something clear on the record. The rule has been invoked in this case and I am aware that some concern has been expressed that there may be potential witnesses who are sitting in the courtroom listening to testimony and thus disqualifying themselves from later being called to testify. I want to make sure it's clear that each party is responsible for his own witnesses or its own witnesses. That's not the Court's responsibility.

TT at 1552.  If witnesses may not hear the questioning of others prior to testifying before the jury, allowing a key witness to preview her own cross-examination prior to her testimony before the jury is even more egregious and is completely irreconcilable with the sprit of this rule.

Moreover, the Court's *ad hoc* appraisal of Fields' cross-examination questions was especially egregious in light of the nature of the compelled disclosure.  Mr. Fields' attempts to justify the purpose of his questions in response to various objections lead to the revelation of strategic details, thoughts and impressions concerning his trial strategy.  In other words, Mr. Fields was compelled to reveal information covered by the attorney work product doctrine.  It is well-settled that the work product doctrine applies in criminal litigation and that it protects against the disclosure of an attorney's efforts and mental processes during trial.  *Nobles*, 422 U.S. at 237-38.  That Fields is not an attorney does not weaken the protections afforded his mental processes.  *See In re Grand Jury Subpeona*, 220 F.R.D. 130, 141 (D. Mass. 2004) (noting work product protections apply to material prepared by "a party, her attorney, or her representative prepares in anticipation of litigation").  There can be little doubt that the planned order, delivery, and presentation of Fields' cross-examination questions fall under the work-product doctrine, a "protected area in which the lawyer can prepare his case free from adversarial scrutiny." *In re Special Sept. 1978 Grand Jury (II)*, 640 F.2d 49, 62 (7th Cir. 1980).

Disclosure of Fields' work product to the prosecution was not necessary.  For example, the Court could have reviewed the cross-examination questions *in camera* to determine their admissibility.  The Court could have excused the witness and the prosecution – like it had earlier in the proceedings – and discussed these privileged matters with Mr. Fields outside of the presence of his adversaries.  *See* TT at 1683-84 (Excusing the Government to discuss potentially privileged issues regarding a conflict of interest between Fields and appointed counsel).  Whatever the Court's alternative options, upon compelling the disclosure of Fields' trial tactics

to his adversary, the Court had a duty to order reciprocal disclosure from the Government. *See Wardius*, 412 U.S. at 475-76. The Court's failure to do so violated Mr. Fields' constitutional rights under the Fifth Amendment requiring new trial.

CLAIM 13:     MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE ON DIRECT APPEAL FIFTH AMENDMENT RIGHT TO DUE PROCESS, SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, AND EIGHTH AMENDMENT RIGHT TO A RELIABLE VERDICT AND SENTENCE CLAIMS BASED ON THE COURT'S REQUIREMENT THAT HE PROVIDE THE PROSECUTION WITH A DETAILED PREVIEW OF HIS TRIAL STRATEGY ON CROSS-EXAMINATION OF A CRITICAL GOVERNMENT WITNESS WITHOUT REQUIRING RECIPROCAL DISCLOSURE OF THE PROSECUTION'S TRIAL STRATEGY.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in the claims above. Appellate counsel ineffectively failed to identify and litigate on direct appeal these above-described record-based claims regarding the Court's unconstitutional requirement that Fields provide unreciprocated discovery of a key witness to the government. This is so despite the fact that objections to this unorthodox procedure were raised by both Fields (TT at 1676-1677 ("Your Honor, I am missing the point, Your Honor") and standby counsel (TT at 1716 "I know now that he's asking questions that aren't on his piece of paper and I'm not sure how we're going to be able to determine and how he's going to be able to remember which questions are proper and which ones aren't"). To the extent this claim was clear on the record, counsel's failure to raise them on direct appeal is inexcusable. Appellate counsel had no reason to avoid raising these meritorious record-based claims. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

-117-

Appellate counsel's ineffective representation is extremely and undeniably prejudicial to Fields. The above-described errors rendered the testimony of a key Government witness wholly unreliable yet prevented the jury from considering the circumstances behind the unreliability of that testimony – undermining the adversary system's "primary responsibility for developing relevant facts on which a determination of guilt or innocence can be made." *United States v. Nobles*, 422 U.S. 225, 230 (1975). Fields' guilty verdict and death sentence are, therefore, also undermined because it is likely the jury's verdicts were effected from these constitutional errors. Accordingly, a new trial is warranted and but for appellate counsel's failure to raise these claims on direct appeal, there is a reasonable probability the Fifth Circuit would have granted Fields a new trial.

CLAIM 14:    MR. FIELDS' FIFTH, AND SIXTH AMENDMENT RIGHT TO TESTIFY, AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE ALL VIOLATED WHEN THE COURT FAILED TO INQUIRE AS TO WHETHER THE *PRO SE* DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS RIGHT TO TESTIFY.

### A.    Facts

Mr. Fields did not knowingly and voluntarily waive his right to testify. To the contrary, Fields did not testify because standby counsel erroneously advised that testifying would require him to take the stand and formally examine himself – by asking himself questions and then answering those questions – in front of the jury. Standby counsel advised Fields that testifying in such a way would be awkward and confusing to the jury. Accordingly, Fields did not testify only because he did not wish to present his testimony in this awkward question and answer format. Standby counsel did not inform Fields that he could request to testify in narrative format. Standby counsel did not inform Fields he could request the Court to allow standby counsel to read questions Fields prepared while Fields answered those questions from the witness stand. Standby counsel did not inform Fields that the Court had discretion to allow any

alternative forms of testimony.[16]  Fields had no reason to doubt standby counsel's advice as the Court informed Fields several times that standby counsel was his only access to legal resources and references.  *See*, *e.g.*, TT at 22:25-24:3.  The Court also advised standby counsel that their role was to advise Mr. Fields and to act "in essence as his legal reference material . . . ."  TT at 69:20-24.

The Court never asked Mr. Fields whether he wanted to testify, inquired as to whether Mr. Fields was aware of his right to testify, or determined whether Mr. Fields voluntarily decided not to testify.  Rather, the Court briefly asked standby counsel whether Fields would testify, but never addressed Fields directly:

> THE COURT:  [] Is he going to testify?  Is he going to testify?
>
> MR. PETERSON:  He hasn't indicated that he was going to.  No, sir.
>
> THE COURT:  I assume that he's not because he's here.

TT at 1914:13-19.  The Court never addressed the right to testify with Fields, who was proceeding *pro se*, despite the fact that Fields' desire to testify should have been clear to the Court.  Twenty times, over four days of trial, the Court struck Fields' witness examination questions on the grounds that he was "testifying, not asking questions."  *E.g.,* TT at 1334:9-11, 1358:13-15, 1360:2-4, 1360:9-10, 1371:20-23, 1546:12-14, 1575:9-12, 1624:15-18, 1626:14-17, 1641:1-3, 1652:1-4, 1676:3-8, 1747:8-10, 1752:8-11, 1779:22-24, 1781:9-12, 1782:1-3, 1796:8-11, 1899:11-13, 1926:2-4.  Moreover, the Court explicitly acknowledged that several of Fields' questions were an expression of his desire to testify:  "That's your attempt to try to testify

---

[16] Rule 611(a) of the Federal Rules of Evidence "provides district judges with authority to allow testimony in narrative form rather than as answers to specific questions . . . [and] the narrative may well be the preferable form in some respects."  *United States v. Pless*, 982 F.2d 1118, 1123 (7th Cir. 1992) (citations omitted).  This is exactly the type of legal reference that standby counsel was supposed to provide Mr. Fields.

without actually taking the stand and be under oath." TT at 1676:4-5. Had the Court discussed the right to testify with Fields, it would have been clear that Fields wanted to take the stand because he believed his testimony was critical to his defense but standby counsel advised that it was impossible to present that testimony in a way that was not awkward and confusing.

> **B.      Mr. Fields Did Not Knowingly And Voluntarily Waive His Constitutional Right To Testify And The Court Erred In Failing To Inquire As To Mr. Fields' Decision Not To Testify**

Fields did not make "a knowing, voluntary and intelligent waiver of a personal right of fundamental importance such as the right to testify." *Jordan v. Hargett*, 34 F.3d 310, 314 (5th Cir. 1994). The right to testify on one's own behalf is secured by the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and is a necessary corollary to the Fifth Amendment's guarantee against self-incrimination. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). Only the accused may waive his constitutional right to testify, and such a waiver is valid only if it is knowing and voluntary. *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002).

Here, because Fields was proceeding *pro se* and clearly notified the Court of his desire to express his innocence, the Court should have directly addressed Fields to determine whether he was aware of his right to testify. A direct colloquy between the Court and a *pro se* defendant concerning the right to testify is a practice the Fifth Circuit described as "a model of appropriate judicial concern for the constitutional rights of a criminal defendant." *Hollenbeck v. Estelle*, 672 F.2d 451, 452 (5th Cir. 1982). Because Mr. Fields represented himself, the Court had "an affirmative duty" to inform Fields of his constitutional right to testify in his own defense. *Morales v. Maryland*, 600 A.2d 851, 854 (Md. 1992). Acting *pro se*, Mr. Fields cannot be presumed to know of his constitutional right to testify, and thus cannot be found to have knowingly and voluntarily waived it. *Id.* Instead, the Court was duty-bound to "clearly explain"

Fields' right to offer his own testimony and "to clearly make a record of the explanation." *Winkelman v. Indiana*, 498 N.E.2d 99, 101 (Ind. Ct. App. 1986); *Boyd v. United States*, 586 A.2d 670, 677 (D.C. 1991) ("Once the trial judge became aware that Boyd was asserting that she had wanted to testify, the judge had a duty to determine whether she had made a knowing and intentional waiver").

Here, the Court relied only on an exceedingly brief discussion with Fields' standby counsel – without Fields present – to determine whether Fields intended to testify.  TT at 1914:13-19.  The Court never addressed – with standby counsel or Fields – whether Fields was aware of his right to testify.  The Court's failure to directly discuss with Mr. Fields his constitutional right to testify was contrary to the Fifth Circuit's express mandate to avoid uncertainty regarding the waiver of such an important right:

> uncertainty in this area could be avoided if counsel would obtain a signed statement from the defendant **or if trial courts would conduct a colloquy and obtain outside of the jury's hearing, a statement on the record from the non-testifying defendant that he is aware of his right to testify and has chosen voluntarily to waive that right**.

*Jordan*, 34 F.3d at 314-15 (emphasis added).  The Fifth Circuit's mandate is designed to prevent precisely the type of situation where, as here, a *pro se* defendant is uncertain about his right to testify, wanting to testify but erroneously believing that it is procedurally impossible to do so in a way that was not awkward and confusing to the jury.

The Court's reliance on standby counsel to assert Fields' rights is especially troublesome given the repeated disagreements (and asserted conflicts of interest) between Fields and standby counsel regarding defense strategies.  TT at 13:9-14:5, 21:22-22:6, 1680:1-17.  The Court was unquestionably aware of these conflicts:

THE COURT:  What's your conflict of interest, Mr. Fields?

> MR. FIELDS:     The conflict of interest is it's my attorneys
> objective to try to fight to get me a life sentence.  I'm not trying to
> get no life sentence when I'm innocent, man.  I want a not guilty.

TT at 1684:14-18.  Additionally, Fields made his desire to testify apparent through his conduct. The Court acknowledged as much by striking twenty of Fields' examination questions as improper attempts to testify.  *See*, *e.g.*, TT at 1676:4-5 ("That's your attempt to try to testify without actually taking the stand and be under oath"); *see also* TT at 1334:9-11, 1358:13-15, 1360:2-4, 1360:9-10, 1371:20-23, 1546:12-14, 1575:9-12, 1624:15-18, 1626:14-17, 1641:1-3, 1652:1-4, 1676:3-8, 1747:8-10, 1752:8-11, 1779:22-24, 1781:9-12, 1782:1-3, 1796:8-11, 1899:11-13, 1926:2-4.  Mr. Fields' conduct and statements, even though not made under oath, are sufficient indicators of his intent to testify, thereby requiring further inquiry into whether his waiver of his constitutional right to testify was knowing and voluntary.  *See United States v. Ward*, No. 09-1882, 2010 WL 1171697, at *4 (8th Cir. Mar. 29, 2010) (defendant's repeated assertions that prosecutors tampered with key evidence "signal[ed] that he might insist on testifying to that effect even if counsel advised otherwise").  Regardless, the Court never advised Fields of his right to testify or ascertained whether his waiver of that right was voluntary.

The Court's awareness of Fields' conflicts with standby counsel, his apparent desire to testify, and his desire to assert his innocence are exactly the type of circumstances where, even on behalf of a defendant represented by counsel, "judicial interjection through a direct colloquy with the defendant may be required to ensure that the defendant's right to testify is protected."  *United States v. Pennycooke*, 65 F.3d 9, 12 & n.2 (3d Cir. 1995) (requiring such circumstances for defendants represented by counsel, yet reserving decision on whether trial courts have affirmative, independent duty to grant *pro se* defendants an on-the-record colloquy). These circumstances, in addition to Mr. Fields' self-representation, required the Court to ensure that Fields' waiver of his right to testify was knowing and voluntary.

-122-

The prejudice to Fields from the Court's failure to ensure a knowing and voluntary waiver of the right to testify is clear: Fields never took the stand as a witness on his own behalf. Accordingly, the jury never heard Fields' testimony or his version of the events – testimony that would have contradicted nearly every one of the Government's witnesses and supported his innocence defense. The jury, therefore, could not consider that testimony in their deliberations. This prejudice would be manifest even if Fields was actually able to introduce his version of events through the various questions to witnesses that the Court characterized as attempts to testify – which he was not. Regardless, witness questions cannot substitute for an opportunity to present his sworn testimony to the jury as a witness in his own defense:

> The testimony of a criminal defendant at his own trial is unique and inherently significant . . . When the defendant testifies, the jury is given an opportunity to observe his demeanor and to judge his credibility firsthand. As the United States Supreme Court noted in *Rock v. Arkansas*, [483 U.S. 44, 52 (1987)], "the most important witness for the defense in many criminal cases is the defendant himself." Further, **in a case such as this where the question was not whether a crime was committed, but whether the defendant was the person who committed the crime, his testimony takes on even greater importance. Indeed, "[w]here the very point of a trial is to determine whether an individual was involved in criminal activity, the testimony of the individual himself must be considered of prime importance."** *United States v. Walker*, 772 F.2d 1172, 1179 (5th Cir. 1985).

*Nichols v. Butler*, 953 F.2d 1550, 1553-54 (11th Cir. 1992) (emphasis added). Because the nature of the defendant's right to testify is of supreme importance, "the trial judge's failure to hold a hearing to determine whether [the defendant] had waived her right to testify cannot be deemed harmless error." *Boyd*, 586 A.2d at 677-78.[17] Accordingly, Mr. Fields was denied his right to testify in violation of the Fifth, Sixth and Eighth Amendments, requiring a new trial.

---

[17] Although certain claims based on the denial of the right to testify based on defense counsel error are subject to harmless error review (*Wright v. Estelle*, 549 F.2d 971, 974 (5th Cir. 1977)), in claims based on a trial court's

## VI.     CLAIMS RELATED TO GUILT PHASE EVIDENCE

CLAIM 15:     MR. FIELDS' CONVICTION AND DEATH SENTENCE VIOLATE THE FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HE IS INNOCENT OF THE MURDER OF SUNCEREY COLEMAN AND HIS CONVICTION RESTS ON FALSE TESTIMONY.

### A.     Facts

Mr. Fields is actually innocent of the murder of Suncerey Coleman. He did not kill her, did not attempt to kill her, and was in no way culpably involved in the events that resulted in her death. The witnesses at trial against him engaged in a conspiracy of lies. Mr. Fields has repeatedly and consistently asserted his innocence. In post-conviction, he has repeatedly and consistently sought to examine and test the physical evidence associated with the homicide. The Government has repeatedly and consistently refused Fields' requests.

Appreciating the potential merit of this claim requires the Court to closely examine the many contradictions and inconsistencies in the testimony presented by the Government, upon which Mr. Fields' conviction presently rests. Many of those flaws were not effectively presented to the trial jury due to Mr. Fields' understandable deficiencies in representing himself in court. Such scrutiny powerfully demonstrates the fragility of the case against Mr. Fields. The case against Mr. Fields was the proverbial house of cards—a case based on unreliable informant testimony, which when closely examined reveals numerous underlying untruths.

It is common for forensic evidence to demonstrate the unreliable nature of informant testimony. However, in this case, the Government's agents conducted only a cursory

---

interference with a defendant's right to testify, such as in not questioning a *pro se* defendant *sua sponte* about whether he voluntarily waived his right to testify, courts have implied that violation of such a duty by the trial court may constitute a structural defect. *See Mullins*, 315 F.3d at 452 ("We distinguish between interference with that right by defense counsel, and interference by the court or prosecutor"); *Sayre v. Anderson*, 238 F.3d 631, 634 & n.2 (5th Cir. 2001) (finding that because petitioner only challenged his counsel's actions and did not contend that the trial court or prosecutor interfered with his right to testify, "we need not elaborate further on this point").

-124-

examination of the items seized with the recovery of the victim's body. Fields seeks a closer more comprehensive examination of those seized items, along with an opportunity to test any biological material observed and recovered. He is confident that DNA testing will expose the lies that led to his conviction and death sentence. Because the Government refuses to agree to permit this evidence to be inspected and tested, Fields will seek leave to file a motion compelling the Government to permit him to conduct this investigation.

The following is not an exhaustive recitation of the holes in the Government's case, or the misconduct of Government agents that contributed to the presentation of unreliable evidence to the jury, but instead is a representative sampling that highlights the weakness of key parts of the case against Mr. Fields and demonstrates the importance of subjecting to the most exacting scrutiny the procedures that led to his conviction and death sentence. In addition, further investigation and comprehensive development of the facts in this § 2255 proceeding – including, *e.g.*, forensic testing of evidence where possible – will further substantiate Mr. Fields' claim of actual innocence.

The basic facts of the allegations against Mr. Fields are simple. It is alleged that he drove the victim to a remote location where he shot her. It is then alleged that Mr. Fields made his guilt known – apparently to anyone who would listen, even apparently shouting out his guilt to fellow prisoners in a manner that would have easily been heard by numerous jail personnel. The simple fact that no unbiased witness was produced by the Government only begins to show Fields' innocence.

### 1.    The Forensic Evidence Establishes Fields' Innocence

However, the starting point for this claim is the fact that no physical evidence whatsoever links Mr. Fields to the crime. Forensic examination and testing of the red Grand Am that Mr. Fields is known to have been driving on the night of Ms. Coleman's disappearance

produced no inculpatory evidence whatsoever. That night, Mr. Fields was wearing pants which had been cut off to make shorts. The area where Ms. Coleman's body was found had huge thorns that would have gouged anyone so dressed who encountered them. According to Government witnesses Scroggins and Outley, they and Mr. Fields were together in the Grand Am before Outley dropped off Scroggins and Mr. Fields at the New Road Inn. Scroggins falsely claimed that after Outley left, she noticed that Mr. Fields had blood on his clothes and shoes. Had Mr. Fields killed Ms. Coleman, both their blood would have been found in the red Grand Am. Mr. Fields did not change cars on the night of the crime. The floor mats were still in the Grand Am when it was processed for evidence, and the Grand Am was not painstakingly cleaned ("detailed") before it was recovered by the authorities. Even if the vehicle had been "detailed," blood evidence would still have been discernible. No blood was found in the car. Mr. Fields was uninjured.

Scroggins and Outley drove a gold Jaguar automobile on the night of the murder. Suspiciously, this Jaguar was never forensically examined or tested because Scroggins and Outley conspired to hide it by telling investigators that it was blue rather than gold. Payne, the Jaguar's owner, testified at trial that the Jaguar was gold and had already told investigators the same thing just three months earlier. Nevertheless, the Government attempted to persuade the jury that Outley and Scroggins had been in a blue Jaguar. Upon information and belief, the Government had reason to know this claim was false. Investigators first confronted Outley with the name "Payne" when they arrested him on November 13. Outley eventually told them, falsely, that Payne was the owner of a *blue* Jaguar, in an attempt to avoid having the gold Jaguar found. That blue Jaguar in fact had been wrecked and totaled in 1998 and no longer even existed in 2001.

-126-

Law enforcement initially believed that Ms. Coleman had been murdered with a .22, and worked to link Mr. Fields to that weapon. Buccal swabs and a blood samples were obtained from Mr. Fields the night he was arrested. The detective who took the swabs falsely claimed to have found Mr. Fields' blood on the .22. When Mr. Fields was arrested, he had no sign of any injury that should have left his blood on that weapon.

### 2.    The False Testimony of Scroggins and Outley

However, the most critical false testimony was that of Ms. Scroggins and Mr. Outley. Government witness Shalaykea "Lakie" Scroggins was romantically obsessed with Mr. Fields at one time. Scroggins was frustrated and angry at having lost Mr. Fields to Ms. Coleman. She vowed not to let it happen again, even if that meant killing rivals for his affection. The day before the murder, Mr. Fields and Ms. Coleman took action together to have the phone company turn off a phone that Scroggins had gotten in Mr. Fields' name, because Scroggins had called Ms. Coleman and threatened her.

Scroggins gave two different alibis for her whereabouts on the night of the murder after Mr. Fields dropped her off – once claiming that she went to the store while Outley looked for Mr. Fields, and once claiming that she went to her sister's house and went to sleep, while Outley went to his apartment with her other sister, Alberta Hampton. Both stories were false. Scroggins told at least three different and irreconcilable stories about what Mr. Fields purportedly told her about the crime. Scroggins first alleged that Mr. Fields called her and told her the details of the murder. Scroggins later claimed she met Mr. Fields in a car he was driving, and he made inculpatory statements in response to her question about Ms. Coleman. Still later, Scroggins claimed that Mr. Fields had confessed to her in her apartment around November 8. None of these stories was true.

-127-

Scroggins falsely claimed to have known that Ms. Coleman was missing on November 7 because it was on the newsstand; the news of Ms. Coleman's disappearance had not been published at that time. Scroggins falsely claimed that Mr. Fields possessed a small silver .32 pistol that belonged to her sister Alberta Hampton; Hampton told the grand jury she'd never seen such a weapon. Scroggins falsely alleged that Mr. Fields called her at 8:00 p.m. on November 15 and told her the details of the murder; her phone records reflect no such call. Scroggins was then induced to change her testimony to assert, falsely, that the call was made to her sister's house. The Government compounded the harm from this testimony by offering misleading arguments to the jury about the significance of phone records.

Post-conviction counsel has been attempting to locate and interview Ms. Scroggins, so far to no avail.

The claims of prosecution witness Edward "Trey Boy" Outley, like those of Scroggins, are marked by gaps, inconsistencies, contradictions, and outright lies. Outley falsely alleged that Christian "Chae" Walker left him a .32 gun to take to Mr. Fields; Walker said Outley wanted the gun for his own protection. Outley falsely claimed he gave that gun to Scroggins' sister Alberta Hampton; she denied ever seeing it. Outley gave multiple, false, inconsistent accounts of his own activities on the night of November 6. Outley falsely claimed both that *Mr. Fields called him* and admitted the murder, and that *he called Mr. Fields* and asked him, prompting a confession. Outley falsely asserted that the Government had made him no promises; Outley was granted full immunity for his testimony.

Outley wrote a letter to Mr. Fields' attorney Peterson, saying that he (Outley) had not given Mr. Fields a gun and that someone wanted Outley or Scroggins to say they were with Mr. Fields when Ms. Coleman was killed. Outley's subsequent testimony at trial that Mr. Fields had wanted him to write that letter, and that Outley did so because he feared being tagged as a

-128-

"snitch" at USP Beaumont, was false.  Outley told William Young that he (Outley) was present when Ms. Coleman was murdered.  Outley wanted a romantic relationship with Scroggins and wanted Fields out of the way.  Outley included Scroggins in every deal he attempted to make with the government.  Both Outley and Scroggins have violent tempers.

Mr. Outley recently told counsel that he testified for two reasons.  First, he stated that he had been given complete immunity from any charge.  *See Affidavit of Edward Outley III.* If so, the Government's actual grant of immunity exceeds what was disclosed to Fields.  Next, Outley later told counsel that he believed he would be prosecuted for murder if he did not allege that someone else committed the crime.  Outley ultimately chose his own self-interest over the truth.

Mr. Fields had never been violent or threatening toward Ms. Coleman and did not become angry or irate when he came into contact with her.  He did not threaten to kill her, attempt to control her, or express jealousy about her relationships with other men.  Ms. Coleman, unlike Scroggins, visited Mr. Fields often when he was in jail.  Before Ms. Coleman was known to have died, Tanesha Hilliard told the local paper that Mr. Fields had not appeared angry when he came to the hospital.

### 3.    Jail-house Informants Gave False Testimony

At trial, the Government presented the testimony of numerous jail inmates who claimed to have obtained information about Mr. Fields' case while incarcerated with him.  Upon information and belief, these inmate witnesses were promised benefits in return for their testimony against Mr. Fields, and these promises induced the witnesses to make materially false accusations against Mr. Fields.  Because these witnesses were not telling the truth, many of the witnesses made inconsistent statements regarding important points of fact, both prior to and during Mr. Fields' trial.  Some of the inconsistent pretrial statements were provided to the

defense prior to trial, but others were not.  The Government improperly failed to disclose all information regarding its witnesses that it was required by law to make available to the defense.

Many of the Government's inmate witnesses also communicated with one another prior to and concerning their testimony against Mr. Fields.  The Government was, or should have been, aware that these witnesses were providing false testimony.  These witnesses included, but were not limited to, the following:

Inmate witness Jerry Reed falsely *alleged* that Mr. Fields had confessed to him while in segregation at a federal facility in Fort Worth that he was responsible for the murder but planned to blame Scroggins and Outley.  Reed had been in custody with "Shae" Walker at/after the time Walker was corresponding with Scroggins; upon information and belief, Scroggins fed Walker the version Walker then passed along to Reed.

Three times prior to trial – on December 5 and 6, 2001, and in February 2002 before the grand jury – Christian "Chae" (also "Shay" or "Shae") Walker avowed that Mr. Fields never claimed to have killed Ms. Coleman, though he (Walker) thought that Mr. Fields might have done something to her.  Between making those statements and January 2004, Walker corresponded with Scroggins.  In that correspondence, upon information and belief, Scroggins suggested how Walker could testify against Mr. Fields in a manner that would help himself.  In January 2004, Walker changed his story and falsely testified, reciting a story similar to Scroggins', that Mr. Fields had confessed to him.  Walker falsely claimed that he didn't tell the truth at first because he didn't want to put his family in jeopardy.  At trial, Walker denied having talked to Outley "about this case;" yet, he admitted to the grand jury that Outley had told him that he (Outley) had given a .32 gun to Mr. Fields.

Walker also falsely claimed at trial that he had been driving over a bridge in a red Chevy Cavalier with Mr. Fields and Alvin "Bird" Fields when "Bird" allegedly threw a .32 gun

into the river – a claim absent from any of Walker's prior statements.  The bridge in question is a location Outley knew well, as it was a route he regularly traveled to his mother's residence. Walker and Outley were in contact when Walker came up with this story about disposing of the .32 at that location.  Upon information and belief, Outley suggested this false story to Walker. Counsel has interviewed Alvin "Bird" Walker who flatly denies Walker's version of events. "Bird" will testify at an evidentiary hearing that Walker's testimony was mistaken at best, perjury at worst.

Friends Dominique Tubbs and Christopher Quigley, jailed in the same drug case, shared a small cell with Mr. Fields.  Both falsely claimed to have heard Mr. Fields threaten to kill Suncerey Coleman while talking to her on the phone.  Prior to trial, Quigley falsely swore that Mr. Fields had told him that he (Fields) intended to kill Ms. Coleman.  Quigley later changed his story, falsely insisting instead that he had overheard Mr. Fields making threats against Ms. Coleman while talking to her on the telephone.  Quigley and Tubbs disagreed about how frequently Mr. Fields and Ms. Coleman supposedly fought on the phone and whether Mr. Fields had threatened Ms. Coleman in conversations with them.  Tubbs falsely claimed he didn't know Ms. Coleman had been killed until he read it in the newspaper; that article was published December 12, 2001.  Quigley stated that a police officer told him *and* Tubbs about the murder sometime between November 6 and 24.  Neither Tubbs nor Quigley could provide useful information when they were interviewed twice by different sets of U.S. Marshals on November 7.  Upon information and belief, Tubbs and Quigley only obtained the information they would later use in testifying falsely against Mr. Fields via coaching by Detective Steve January and/or other agents of the prosecution after November 7.

Inmate Homero DeLeon, wrote a letter on February 12, 2003, falsely claiming that Mr. Fields had told him that since he (DeLeon) was not on the Government's witness list,

Mr. Fields would confess to him.  At that time there was no witness list; the list was produced in January 2004.  DeLeon's letter contains errors of fact which resulted from his having gotten false information about Mr. Fields from other inmates.  By November 2003, DeLeon had been transferred to the same prison where "Chae" Walker was confined.  DeLeon made false statements to Government agents who interviewed him there, including claiming to have been Mr. Fields' cellmate and to have passed Mr. Fields cigarettes by and through co-defendant Benny Garrett.  DeLeon also falsely alleged that Mr. Fields had confessed to him across the hallway; in that facility, there were always at least three officers and ten to twenty other inmates present in that area, and any such communication between DeLeon and Mr. Fields would have been observed or overheard by other witnesses.  No such witnesses exist because no such communication took place.

At trial, DeLeon changed his story substantially.  He falsely alleged that Mr. Fields had told him that Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, and Andrea Sykes had gone to the grand jury to testify against him, when in fact all five of those individuals had gone to the grand jury to provide information against co-defendant Garrett.  Upon information and belief, DeLeon was coached by Government agents and/or attorneys prior to testifying against Mr. Fields.  Upon further information and belief, much of DeLeon's story originated with "Chae" Walker.  Casey Leon Forge, incarcerated with Walker and DeLeon, obtained from Walker some of the same (false) details included in DeLeon's account.

### 4.    Other False Accusations

Other Government witnesses also testified falsely, and the Government was, or should have been, aware that their testimony was false.  For example, Tammy Edwards falsely accused Mr. Fields of having taken her car at gunpoint.  Although she said in the initial police report that she thought she had previously seen her assailant on television, she later swore in a

civil deposition that she had recognized the carjacker as Mr. Fields all along, because his picture had been on fliers all around the hospital. Ms. Edwards' testimony also shifted regarding whether the carjacker had shot at her. Although Ms. Edwards purportedly "identified" Mr. Fields as the carjacker from a photo array on November 27, 2001, twelve days earlier police had *twice* shown her a single photograph of Mr. Fields. In her initial report, Ms. Edwards claimed that she screamed and yelled throughout the carjacking and that it took place during shift change at the busy hospital where she worked. At trial, however, she claimed she had been choked so hard by the carjacker that she couldn't cry out, and no witness from the hospital could corroborate her carjacking story. Ms. Edwards had a financial motive to accuse Mr. Fields; she hoped to attend college with the damages she hoped to win from Civigenics. At one time, Ms. Edwards was married to Darryl Edwards, who had pleaded guilty to capital murder to avoid the death penalty. Mr. Fields had no friends or other relatives living close to Hillcrest Hospital, a middle and upper-class neighborhood, and never "staked out" that location.

Ex-U.S. Marshal McNamara falsely testified that when Mr. Fields was arrested, Mr. Fields told him that he had a .22 and where to find it. Another officer reported that at the scene, Mr. Fields was asked only his name, address, and birth date. During trial, standby counsel advised Mr. Fields not to question McNamara, but to wait until the Government called Hubert Steadman – in whose home Mr. Fields was arrested, who claimed to have told the Marshals that Mr. Fields had the .22, and who actually located the gun – but the Government never called Steadman.

As noted, this is not yet a comprehensive accounting of the facts in support of Mr. Fields' claim of actual innocence, but demonstrates the severe shortcomings in the Government's case for his guilt.

-133-

**B.**     **Argument**

The Fifth Amendment's guarantee of due process and the Eighth Amendment's prohibition on cruel and unusual punishments are both violated by the incarceration or execution of a prisoner, like Mr. Fields, who can make a persuasive post-trial demonstration that he is actually innocent of the crime for which he was convicted and sentenced. *See*, *e.g.*, *Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J., joined by Kennedy, J., concurring); *id.* at 429 (White, J., concurring); *id.* at 430 (Blackmun, J., joined by Stevens and Souter, JJ., dissenting); *House v. Bell*, 547 U.S. 518, 554-55 (2006); *United States v. Nobles*, 422 U.S. 225, 230 (1975) ("The dual aim of our criminal justice system is 'that guilt shall not escape or innocence suffer'"); *see also Herrera*, 506 U.S. at 398 ("[T]he central purpose of any system of criminal justice is to convict the guilty and free the innocent"). Moreover, a conviction based on false testimony, whether or not the Government actually knew or should have known the testimony was false, violates due process. *See*, *e.g.*, *Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (knowing presentation of false testimony violates due process); *Alcorta v. Texas*, 355 U.S. 28, 31-32 (1957) (due process violated where prosecutor's examination of witness created "false impression" of material fact).

The Fifth Circuit has not yet embraced the view, adumbrated in *Herrera*, that the Constitution prohibits convicting or executing an actually innocent person. *See*, *e.g.*, *Moore v. Quarterman*, 534 F.3d 454, 465 n.19 (5th Cir. 2008) (no federal *habeas* relief based on a claim of actual innocence). However, at least two Fifth Circuit panels have acknowledged that the Supreme Court's decision in *House* suggests that a "stand-alone" claim of actual innocence, supported by strong evidence, could require federal *habeas* relief. *See Reed v. Quarterman*, 504 F.3d 465, 476 (5th Cir. 2007), *rev'd & remanded*, 555 F.3d 364 (5th Cir. 2009); *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006). Additionally, the Supreme Court has

-134-

recently suggested that a freestanding claim of actual innocence may exist under federal law. Justice Stevens, in a concurring opinion, argued that freestanding claims of actual innocence may qualify as "clearly established federal law, as determined by the Supreme Court," (28 U.S.C. § 2254(d)(1)), because "decisions of this court clearly support the proposition that it 'would be an atrocious violation of our Constitution and the principles upon which it is based' to execute an innocent person." *In re Davis*, 130 S. Ct. 1, 1 (2009) (*citing In re Davis*, 565 F.3d 810, 830 (11th Cir. 2009) (Barkett, J., dissenting); *Teague v. Lane*, 489 U.S. 288, 311-313 (1989) (plurality opinion)). In light of the many other federal courts that have reached that same conclusion,[18] and given the overriding importance of correcting a fundamentally unjust incarceration, Mr. Fields respectfully submits that the Court should entertain his claim and grant relief, and to that end asks that the Court empower him to develop the relevant facts fully. At a minimum, such proceedings are necessary to enable meaningful review of Mr. Fields' actual innocence claim at the Court of Appeals or in the Supreme Court.

The Government's failure to voluntarily permit Mr. Fields to scientifically examine the items seized when the victim's body was recovered can only suggest that the Government seeks to avoid the truth—that it recognizes that the forensic evidence will expose the conspiracy of lies that formed the case against Mr. Fields.

CLAIM 16:   ON INFORMATION AND BELIEF, MR. FIELDS' FIFTH, FOURTEENTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE GOVERNMENT

---

[18] *See*, *e.g.*, *Osborne v. District Att'y's Office for Third Jud. Dist*., 521 F.3d 1118, 1130-31 (9th Cir.) (Ninth Circuit has "assumed that freestanding innocence claims are possible," although they require a prisoner asserting such a claim to "affirmatively prove" innocence), *rev'd & remanded on other grounds*, 129 S. Ct. 2308 (2009); *House*, 311 F.3d atr 768; *Milone v. Camp*, 22 F.3d 693, 699-700 (7th Cir. 1994) ("The Supreme Court appears to be willing to hold that it is unconstitutional to execute a 'legally and factually innocent person' . . . while at the same time suggesting that [such a claimant's] evidentiary burden . . . would necessarily be extraordinarily high") (citations omitted); *Ex parte Elizondo*, 947 S.W.2d 202, 204 (Tex. Crim. App. 1996) (*Herrera* makes it "clear" that either incarcerating or executing an innocent person would violate due process).

PRESENTED EVIDENCE AND TESTIMONY THAT IT KNEW OR SHOULD HAVE KNOWN TO BE FALSE.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claims above. The prosecution's case against Fields relied almost exclusively on the testimony of individuals with motives to lie and manipulate their testimony in any manner necessary to protect their self-interests. Many received a direct benefit from the Government in exchange for such testimony, providing a powerful motive to lie. Moreover, much of the testimony against Fields was unsubstantiated, inconsistent with the facts alleged, inconsistent with the testimony of other witnesses, and often inconsistent with the prior statements of the witnesses themselves. As such, most of this testimony is unreliable.

To the extent the Government knew, or should have known, that any of this testimony was unreliable, yet still presented, solicited or failed to correct it, Mr. Fields is entitled to a new trial. It is well established that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (*citing Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Curran v. Delaware*, 259 F.2d 707 (3d Cir. 1958)). The Supreme Court has held that "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue*, 360 U.S. at 269 (*citing Alcorta v. Texas*, 355 U.S. 28 (1957)). Indeed, when the prosecution knowingly presents even partially false evidence, such conduct corrupts the "truth seeking function of the trial process." *United States v. Vozzella*, 124 F.3d 389, 392-93 (2d Cir. 1997) (*citing United States v. Agurs*, 427 U.S. 97, 104 (1976)). At the very least, given all the unreliable and conflicting testimony presented at trial, Mr. Fields is entitled to an "evidentiary hearing for the express purpose of clarifying the conflicting evidence and the making of all relevant fact-findings." *Blackmon v.*

*Scott*, 22 F.3d 560, 565 (5th Cir. 1994) (where the record did not reflect whether a witness had a deal with the government and that witness, among others, were the only sources of evidence linking the defendant to the crime the court ordered a remand).

CLAIM 17:    MR. FIELDS WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS DUE TO COUNSELS' FAILURE TO CONDUCT A COMPETENT INVESTIGATION INTO THE FACTS OF THE CHARGED HOMICIDE.

A.    **Facts**

For more than two-years before trial, Fields was represented by appointed counsel, Mr. Peterson and Mr. Swanton. During that time, counsel failed to conduct a reasonable investigation into Fields' case. Counsel failed to make any formal discovery demands on the Government, instead relying only on "open file" discovery. TT at 29. Counsel also failed to interview key witnesses including: (i) a potential eyewitness; (ii) a witness who the Government identified as having potentially exculpatory information; (iii) many witnesses from the Government's witness list who eventually testified against Fields at trial, and; (iv) many witnesses that Fields identified as potentially beneficial to his defense. In fact, it appears that counsel interviewed only four of the fifty-nine witnesses who eventually testified on behalf of the Government – fewer then 7% of the Government's witnesses.

For example, the Government's witness list identified 120 potential witness against Fields. Based on a record review, it appears counsel interviewed only eight. There is no record of counsel conducting any investigation at all for thirty-one of these 120 witnesses. One of these thirty-one, Mike McNamara, actually testified at trial.

For seventy-three of the 120 potential government witnesses, counsel merely conducted a document review without any record of an interview. Fifty-four of these witness testified at trial, including: Steve Salazar, Kevin Lamar Burton, Dominique Tubbs, Christopher F. Quigley, Chris Casson, Parnell McNamara, Doug Kunze, Katherine Long, Jill Urban, Silvia

-137-

Reyes, James Blair, Steve January, Robert Fuller, Michael Alston, Benjamin Rush, Alvin Eugene Brown, Tammy Edwards, Tanesha Hilliard, Tiemika Simmons, Roger Dale Thomison, Ben Burch, Stephen Smith, Morris "Bubba" Colyer, Roy Davis, Misty Smallwood, John Allen Mercer, Lela McMillon, Babe Torres, Jerry Keith Reed, Homero Deleon, Jacqueline Harris, Tim Counce, Steve Graeter, Andrew Degnan, Debra Lynn Kilgo, Bobbie Shelton, Lynn Shaw, Julie Evans, Jimmy Stone, Amrad R. Patel, A.P. Merrillat, Thomas Warren, Joe Hunter, Josalyn Rawlins, Richard Coons, Chris Eubank, Michael Hutchinson, Amber Aguirre, Stephen Johnson, Thomas Giebe, Jerry Slaughter, Raymond William Bell, Jr., Daniel L. Tichenor, and David Sweeney.

For the remaining eight potential government witnesses, there are records indicating some attempt to make contact but no actual interview.

Accordingly, despite a defense investigation lasting nearly two years, counsel's records indicate interviews with only four of the fifty-nine witnesses who eventually testified against Fields at trial: Shalaykea Scroggins, Nathan Andre Lloyd, April Fields, and Robert Campos. Moreover, Fields identified over seventy additional potential witnesses who did not appear on the Government's witness list. It appears counsel failed to interview all but eighteen.

Most significantly, counsel's files indicate that they failed to interview witnesses that were absolutely critical to Fields' defense. For instance, counsel did not interview Renee "Na-Na" Alberta Hampton, who Fields contends was an eyewitness to the crime. Ms. Hampton was the only potential eyewitness who did not testify at trial and who was not otherwise facing prosecution. Instead, counsel merely reviewed records of Ms. Hampton's statements to law enforcement. Had counsel interviewed Ms. Hampton, she could have provided powerful testimony contradicting the Ms. Scroggins and Mr. Outley and supporting Fields' defense that Scroggins was the actual killer. Although counsel's records indicate that Ms. Hampton refused

to speak to the defense investigator, Don Youngblood, counsel should have – but did not – subpoena Ms. Hampton. Moreover, counsel did not interview Edward Outley III, who Fields asserted was an accomplice to the actual killer, Shalaykea Scroggins. Similarly, counsel did not interview Debra Alexander, a witness that the Government identified as one who could corroborate Fields' defense that Scroggins was the actual killer. Had counsel interviewed Ms. Alexander, she could have provided powerful support to Fields' defense.

These investigative failures, in addition to communication problems between counsel and client and the effects of Fields' mental illness, sponsored a steadily deteriorating attorney-client relationship. Based in part on these deficiencies, Fields made several motions for substitute counsel or to proceed *pro se* almost from the beginning of the attorney-client relationship. For example, Fields moved for permission to represent himself on September 25, 2002, stating that he had "an intense fear of going to trial with court appointed counsel." *See* Appendix V at FIELDS 004219 ¶ 2. On March 4, 2003, Fields again moved to proceed *pro se* citing a conflict of interest with appointed counsel and explaining that counsel was denying him access to discovery material that could disprove the Government's case. *See* Appendix W at FIELDS 004220 ¶¶ 3-4. On April 30, 2003, Fields withdrew his motion to proceed *pro se*. *See* Appendix X at FIELDS 004222. On August 12, 2003, Fields wrote a letter to the Court, indicating that as of that date he had "come to the realization that the attorney client relationship between me and my two court appointed attorneys, Scott Peterson and Rob Swanton is'nt [sic] working and that our interests is'nt [sic] the same." *See* Appendix Y at FIELDS 000229. In that letter, Fields asked the Court to reconsider his motion to appear *pro se*. *Id*. at FIELDS 000230. On September 2, 2003, over a year after Fields' first request to remove appointed counsel, the Court held a hearing on Fields' renewed motion. During that hearing, Fields withdrew his motion stating:

> I just want to say at the time that I compose that I was frustrated – you know what I'm saying – and I'm not too enthusiastic about my legal team, but I realize that to try to change lawyers or represent myself at this point would be a grave mistake. So I'm just going to stick with them and try to do the best that I can.

*See* Appendix Z at FIELDS 009873. At this hearing, the Court warned Fields that "if he decides to complain about his attorneys in the future it would not delay or continue his trial date." *Id.* at 009872-73. On or about December 19, 2003, three weeks before trial, counsel met with Fields where, yet again, counsel and client disagreed on trial strategy. Accordingly, Fields filed another motion arguing that he cannot place his life in the hands of attorneys that are not looking out for his best interest. *See* Appendix AA at FIELDS 022808.

Just about two weeks later, and only four days before trial began, counsel met with Fields again. At this meeting counsel informed Fields – for the first time during a tumultuous two-year relationship – that in 1987 Mr. Peterson was a McLennan County district attorney and was involved in a delinquency action against Fields when he was twelve. Despite the fact that counsel claims his prior representation did not present a conflict of interests, counsel requested that Fields sign a conflict waiver. Fields refused to sign and, on the first day of trial, January 9, 2004 filed a motion to proceed *pro se*, citing a conflict of interest. That same day, the Court held a hearing on the motion.

During the hearing, Swanton explained that the apparent conflict was only discovered "[f]airly recently." TT at 9. Swanton also suggested that Peterson be called to testify as to the nature of the apparent conflict. TT at 10. Although the Court agreed that there "would probably be some benefit" to Peterson's testimony on the issue, Peterson was never called to testify. *Id.* The Court did address Fields, asking why he wanted to replace his counsel. Fields confirmed, among other issues, that counsel's investigation was inadequate:

-140-

> appointed counsel now, their actions are suspicious and I think they're working with the prosecutor instead of working for me and **I've asked on several different occasions for documented evidence to no avail. Also there are sure fired ways to prove that several other witnesses are lying and my attorneys refuse to pursue it.** They prepared a strategy to lessen the impact in an attempt to try to get me a life sentence when I repeatedly profess my innocence. My view is that when you're innocent, life is no better than death. I've tried to work with my attorneys. I've even tried to compromise, but I can't take no more of their being unfair and completely unreasonable. I like my attorneys both of them, but they put me in a no win situation. Their strategy guarantees me the death penalty. And if I have to go to court with them, I might as well do it myself.

TT at 13-14. Ultimately, the Court advised Fields that the matter had progressed too far to stop at this point, and denied Fields' request for replacement counsel, causing Fields to proceed *pro se*.

### B. Appointed Counsel's Ineffective Defense Investigation Undermined The Proper Functioning Of Fields' Trial

The right to effective counsel "is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Counsel is constitutionally ineffective when their "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* at 687-88.

Fields' counsel fell well below an objective standard of reasonableness by failing to interview several witnesses critical to the defense – Rene Hampton, a potential eyewitness, Edward Outley, who Fields contends was an accomplice to the crime, and Debra Alexander, who the Government indicated had information placing Scroggins at the scene of the crime. These

failures are inexcusable for two reasons.  First, counsel had a duty to contact all critical witness and "ascertain whether their testimony would aid the defense."  *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (citation omitted); *Anderson v. Johnson*, 338 F.3d 382, 391 (5th Cir. 2003) (in context of failure to interview eyewitness "counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary") (emphasis in original; citation omitted).  Controlling Fifth Circuit precedent demonstrates that the "failure to interview eyewitnesses to a crime may strongly support a claim of ineffective assistance of counsel."  *Bryant*, 28 F.3d at 1415 (*citing Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982) (failure to investigate crucial witness may constitute inadequate performance)); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[T]his circuit has recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case"); *Richards v. Quarterman*, 566 F.3d 553, 570-71 (5th Cir. 2009) ("given the fundamental importance of adequate pre-trial investigation," counsel's "failure to interview [witnesses] before the day of the trial" was "constitutionally deficient performance").

Second, failure to interview critical witnesses – such as the eyewitnesses, codefendants and alibi witnesses – cannot be excused as "strategic decision."  The Fifth Circuit "squarely rejected" this very argument:

> [I]n *Bryant*, we squarely rejected the argument made by the State here – that a failure to interview witnesses is excusable as "a strategic decision" if the witnesses would not have been credible. Acknowledging that a lack of credibility might support a strategic decision not to call a witness to testify at trial, we explained that a witness's character flaws cannot support a failure to investigate. Without so much as contacting a witness, much less speaking with him, counsel is "ill-equipped to assess his credibility or persuasiveness as a witness."

-142-

*Anderson*, 338 F.3d at 392 (emphasis in original; citations omitted).  Indeed, the Fifth Circuit has established that "[i]n a claim grounded in failure to interview, the 'quality' and potential persuasiveness of the eyewitness is largely immaterial; indeed, *if* trial counsel had interviewed [the witness], [s]he might well have proven to be the 'cornerstone' of the defense."  *Id.* at 393 (emphasis in original).  Interviewing potentially critical witnesses is so important that counsel must do so whenever their existence is discovered, even if that was "on the first day of trial." *Bryant*, 28 F.3d at 1417.  Here, it appears that counsel was aware of three potentially critical defense witnesses for more then a year before trial yet failed to interview any of them.  As in *Nealy* where that court found a "'factual vacuum' [that] cannot withstand sixth amendment scrutiny," counsel here "'did not choose, strategically or otherwise, to pursue one line of defense over another.  Instead, he simply abdicated his responsibility to advocate his client's cause.'" 764 F.2d at 1178 (citation omitted); *see Porter v. McCollum*, 130 S. Ct. 447, 453 (2009) (in a capital case, counsel's "decision not to investigate did not reflect reasonable professional judgment" and the need to conduct mitigation investigation was "not obviate[d]" even if defendant was "fatalistic or uncooperative") (citation omitted); *Simon v. Epps*, 344 Fed. Appx. 69, 75 (5th Cir. 2009) ("[T]he fact that counsel acquires some information does not necessarily render counsel effective.  Instead, counsel must have sufficient information from which they could make a reasoned strategic decision not to pursue additional evidence of abuse") (emphasis and citation omitted).

Like the counsel found deficient in *Bryant* and *Anderson*, Fields' counsel conducted a constitutionally ineffective defense investigation by failing to interview a potential eyewitnesses and the person Fields contends was the real killer's accomplice and a person whose testimony could have placed Scroggins at the scene of the crime.  Like the counsel found deficient in *Bryant* and *Anderson*, Fields' counsel knew of their clients desire to mount an

-143-

innocence defense and knew that the testimony of these individuals would be critical to that defense.  Like the counsel found deficient in *Bryant* and *Anderson*, Fields' counsel knew these facts well before trial, yet still failed to conduct any meaningful investigation.  Accordingly, like the counsel found deficient in *Bryant* and *Anderson*, there is no justifiable excuse for  Fields' counsel's deficient performance.

Moreover, Fields' counsel fell well below an objective standard of reasonableness by relying exclusively on document review and "open file" discovery of the State's investigative work.  *Bryant*, 28 F.3d at 1418 (investigation deficient where counsel "restricted his pretrial investigation to discussions with [defendant], review of the indictment against [defendant], and examination of the prosecutor's file"); *Anderson*, 338 F.3d at 392 (investigation deficient where counsel relied "exclusively on the investigative work of the State and based his own pretrial 'investigation' on assumptions divined from a review of the State's files"); *Crandell v. Bunnell*, 144 F.3d 1213, 1217-1218 (9th Cir. 1998) (attorney's "incompetency, however, lay in his failure to seek formal discovery, to investigate the crime, to interview witnesses and to develop a working relationship with" the client), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).  Here, counsel's records indicate that their investigation into seventy-three of the 120 witnesses on the Government's witness list limited to document review.[19]  Fifty-four of these witness actually testified **against** Fields.

In sum, it appears counsel only interviewed four of the fifty-nine witnesses who testified on behalf of the Government at trial, or seven percent.  As such, they failed to adequately investigate ninety-three percent of the witness who provided testimony against Fields – such an investigation falls well below an objective standard of reasonableness.

---

[19] For another thirty-one there is no record of any investigation at all.

-144-

These investigative failures are inexcusable and prejudicial considering the extraordinary gravity of a capital case in contrast to the weakness of the Governments' proof. Here, "there was no physical evidence connecting [Fields] with the crime" and testimony of the two witnesses Fields alleges are the actual killers, in addition to seven jailhouse snitch witnesses "was the cornerstone of the state's case in chief." *Bryant*, 28 F.3d at 1418. Accordingly, just like the defendant in *Bryant*, "information relevant to [Fields'] defense might have been obtained through better pretrial investigation of the eyewitnesses, and a reasonable lawyer would have made some effort to investigate the eyewitnesses' testimony." *Id.* (*citing Kemp v. Leggett,* 635 F.2d 453, 454 (5th Cir. 1981) (*habeas* relief granted where counsel failed to interview single eyewitness or character witnesses); *Gaines v. Hopper,* 575 F.2d 1147, 1149 (5th Cir. 1978) (affirming *habeas* relief where counsel failed to interview eyewitnesses)); *see also Anderson*, 338 F.3d at 393-94 (where no physical evidence linked defendant to the crime, and the state's case was based on eyewitness testimony the court held "[i]n light of this relatively 'weak' case, there is a reasonable probability that 'but for' trial counsel's failure to interview and call [critical witnesses] to testify, the result of the proceeding would have been different"); *Nealy*, 764 F.2d at 1179-80 (finding prejudice from ineffective assistance of counsel given that the verdict was "only weakly supported" by evidence other than the confessed murderer's testimony, and that "[s]uch a verdict 'is more likely to have been affected by errors than one with overwhelming record support'") (citations omitted).

Counsel's failure to adequately investigate prejudiced Fields in several ways. Because of counsel's failures, Ms. Hampton was not available to testify during Fields' trial. Accordingly, Fields was not afforded the opportunity to call her in an attempt to discredit the testimony of Scroggins and Outley. Similarly, Ms. Alexander was also not available at trial, and therefore Fields was deprived of the opportunity to present the jury with her testimony linking

-145-

Scroggins to the crime.  Thus, counsel's failures "undermined the proper functioning of the adversarial process [such] that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686; *United States v. Cronic*, 466 U.S. 648, 659 (1984) (courts are required "to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial").

Moreover, counsel's investigative failures prejudiced Fields by depriving him of his right to counsel at critical stages of trial.  Because of these failures Fields was "forced to choose between incompetent counsel or no counsel at all." *Crandell*, 144 F.3d at 1215.  When a defendant has "appeared *pro se* pretrial and told the judge that appointed counsel was inadequate" for failing to investigate, the court should inquire and, if it finds counsel overly relied on the state's investigation and document review, and failed to develop a working relationship with the client, the court should appoint new counsel. *Id.* at 1217-18.  The trial court in Mr. Fields' case did not adequately inquire into the quality of counsel's investigation, despite the fact that counsel admitted to failing to seek formal discovery and that counsel's investigation was likely to seem inadequate to the client:

> [I]f I may enlighten the Court on one other issue, the government has bent over backwards in this case to provide us with discovery materials from the very git-go.  They've provided us with copies of police reports, witness statements and everything, **and I can see how from a client's perspective that would look like defense lawyers are in cahoots with the prosecutors because we're cooperating on this thing to get ready for trial and we've tried to explain that to our client that just because we haven't pursued motions for discovery and that sort of thing**, it's because we're getting more than we're entitled to.

TT at 28-29.  Had the Court inquired into the nature of counsel's investigation, it would have learned that counsel failed to interview key witnesses and relied too heavily on the Government's investigative files, and of discovery failures that fueled Fields' distrust of counsel.  As such,

-146-

Fields was prejudiced by the "[a]ctual or constructive denial of the assistance of counsel altogether [which] is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." *Perry v. Leeke*, 488 U.S. 272, 280 (1989) (*quoting Strickland*, 466 U.S. at 692). But for counsel's failures, there is a reasonable probability that the outcome of trial would have been different.

CLAIM 18:    THE GOVERNMENT FAILED TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

Edward Outley (Trey Boy) was a critical witness at trial. Described at trial as Fields' best friend, he nevertheless testified that Fields confessed to killing Ms. Coleman. TT at 1238, 1825-26

During his cross-examination, Mr. Fields asked Mr. Outley whether the Government had made him any promises. Outley responded: "No. The government hasn't made me any promises." TT at 1847. This statement was false and the Government knew it was false. In a letter date January 2, 2004, addressed to Outley's attorney, Stan Sweiger, Outley's attorney was told that the Government would guarantee Outley derivative use immunity for any crimes he testified about, except "for perjury or otherwise making a false statement." *See Letter to Sweiger* attached to *Affidavit of Edward Outley III*. Nevertheless, the Government let the answer stand without correction.

However, apparently the Government's actual grant of immunity was even broader than described in that letter. Outley now states, under the same penalty of perjury, that the Government "gave me complete immunity for any charges. Thus, because I could not be prosecuted for any crimes, I had to testify." *See Affidavit of Edward Outley III*. The Government did not reveal this broader grant of immunity to Mr. Fields or his counsel.

-147-

This was not the only failure by the Government to provide Fields with exculpatory evidence. Homero DeLeon, a jail-house informant with a history of exchanging testimony for a reduction in prison time, states that he wrote out ten to eleven pages of notes that purportedly reflect various conversations with Fields about the escape and homicide. *See Affidavit of Rick Ojeda* ¶¶ 8-16. DeLeon states that he did not keep a copy of these notes and could not have remembered details of his trial testimony without them, but instead sent them to the AUSA assigned to this case. *Id.* ¶ 16. Those notes were not provided to Fields or his counsel. DeLeon states that the notes reflected Fields' statements that Fields escaped by crawling through a vent and that he then "carjacked" an "old lady" so that he could get to the hospital. *Id.* ¶ 13. These facts are inconsistent with both DeLeon's testimony at trial, as well as all of the other testimony. For example, although Fields escaped, he did so by walking out of a fire-escape door, not by crawling through a vent.

These "missing" ten or eleven pages of notes would have provided powerful impeachment of DeLeon. However, the value of the notes extends further than DeLeon's credibility. In addition to proving that DeLeon was testifying untruthfully, the notes provide proof of Fields theory of the case: that the Government's case was built on the testimony of false testimony that had been rewarded by the Government. In other words, these notes provided the necessary thread that could unravel the case against Fields.

A.    **The Government's Failure To Disclose Material Exculpatory Evidence Violated Mr. Fields' Fifth, Eighth And Fourteenth Amendment Rights**

Outley's grant of immunity and Deleon's notes are material, exculpatory and favorable evidence which could have been used to impeach both their testimony. Moreover, this information could have been used to support Mr. Fields' theory of the case and would have altered the outcome of trial. Despite reasonable due diligence by Mr. Fields, the existence of

Outley's broad immunity grant and Deleon's notes remained unknown and were not independently discovered at the time of trial.  Although those notes were in possession of the Government, they were never provided to Mr. Fields or his counsel in violation of the Fifth and Eighth Amendments.  *See*, *e.g.*, *Brady v. Maryland*, 373 U.S. 83 (1963); *Strickler v. Greene*, 527 U.S. 263 (1999); *Banks v. Dretke*, 540 U.S. 668 (2004).  Given that Fields' *habeas* counsel has not been able to access the Government's files, and will seek to do so through discovery, there is reason to believe that additional material exculpatory material may not yet be discovered.

The due process clause of the Fifth Amendment to the United States Constitution states that no person may be "deprived of life, liberty or property, without due process of law . . . ."  U.S. Const. amend. V.  The United States Supreme Court has long held that the right to due process requires a federal prosecutor to disclose favorable evidence that is material to either guilt or sentencing.  *See*, *e.g.*, *Brady*, 373 U.S. at 87; *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995); *Banks*, 540 U.S. at 345; *accord Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006); *Dickson v. Quarterman*, 453 F.3d 643, 646-67 (5th Cir. 2006); *United States v. Sipe*, 388 F.3d 471, 477 (5th Cir. 2004); *Hudson v. Whitley*, 979 F.2d 1058, 1061 n.6 (5th Cir. 1992).

A prosecutor's duty to disclose exculpatory evidence is especially important in a capital case, as is this Court's duty to review claims of non-disclosure.  *Kyles*, 514 U.S. at 422 (in assessing a *Brady* claim the court acknowledged that its "'duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case'") (citation omitted).

The Fifth Circuit has held that to state a *Brady* claim, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable, (3) the evidence was material to either guilt or punishment, and (4) discovery of the allegedly favorable evidence was not the result of a lack of due diligence.  *See Parr v. Quarterman*, 472 F.3d 245,

254 (5th Cir. 2006); *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997).[20]  The due process requirements of the *Brady* doctrine apply to evidence that can be utilized to impeach the prosecutor's theory or witnesses.  *Bagley*, 473 U.S. at 676 (*Brady's* disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); *Giglio*, 405 U.S. at 154 ("[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady's*] general rule") (*quoting Napue*, 360 U.S. at 269).

The *Brady* obligations of the prosecution do not end with the jury's verdict.  The duty to disclose is ongoing through all stages of the appellate and post-conviction process. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("the duty to disclose is ongoing").  Under Brady and its progeny, the Government has a duty to provide exculpatory or favorable evidence regardless of whether the defense made a specific request for the item in question.  *See Banks*, 540 U.S. at 695-96 ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed . . . A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process.  'Ordinarily we presume that public officials have properly discharged their official duties'").  Indeed, defense counsel is entitled to rely on the presumption that prosecutors will fairly "'discharge[] their

---

[20] The Fifth Circuit's formulation of the fourth element of a Brady claim may conflict with Supreme Court precedent holding that a criminal defendant is entitled to rely on representations made by a prosecutor that all exculpatory information has been disclosed.  *See Banks*, 540 U.S. at 695 ("[o]ur decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed").

official duties,'"  *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995) (citation omitted), and

that the prosecutor shall act as the "representative not of an ordinary party to a controversy, but

of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, in

a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Berger v.*

*United States*, 295 U.S. 78, 88 (1935).

The failure to disclose all material evidence favorable to an accused violates due

process whether or not the prosecutor acted in good faith.  *Brady*, 373 U.S. at 87.  Indeed:

> [t]he duty of a prosecutor, as the representative of the sovereign in
> a criminal case, is "not that it shall win a case, but that justice shall
> be done" . . . Unless, indeed, the adversary system of prosecution
> is to descend to a gladiatorial level unmitigated by any
> prosecutorial obligation for the sake of truth, the government
> simply cannot avoid responsibility for knowing when" disclosure
> is required . . . Accordingly, a prosecutor faithfully discharges his
> duty where he fully understands his obligations under *Brady,* not
> where, as here, he fails to "consciously th[ink] about it one way or
> the other."

*Dickson v. Quarterman*, 462 F.3d 470, 479 (5th Cir. 2006).  Because "the preservation of our

civil liberties depends upon the faithful and ethical exercise of power by [prosecutors] who bear

the mantle of public trust . . . [w]here . . . the actions of [prosecutors] are contrary to these

aspirational principles, whether for improper or guileless reason, courtroom victories are pyrrhic

and such conduct 'should attract no courtroom approbation.'"  *Id.* at 480.  A new trial or

sentencing based upon withheld exculpatory evidence is required when *Brady* evidence is

"material."  *Kyles*, 514 U.S. at 432-33.

Here, Outley's broad and undisclosed grant of immunity is unquestionably

material *Brady* evidence.  Key to Fields' deference theory was that Scroggins was the real killer

and Outley an accomplice.  As such, Fields unsuccessfully sought to expose to the jury that

Outley had a strong motive to lie.  To expose this motive, Fields asked Outley directly whether

-151-

the Government had given him any promises in return for his testimony and he said no. TT at 1847. However, Oultey has indicated that the Government gave him complete immunity and "[t]hus, because [he] could not be prosecuted for any crimes, [he] had to testify." *See Affidavit of Edward Outley III*. This broad immunity grant provides Outley with a powerful motive to lie and this information was not provided to Fields. It is beyond legitimate dispute that there is a reasonable probability that had this evidence been disclosed, the trial would have been different in that one of two key Government witnesses would have been effectively impeached. Indeed, Outley's credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Giglio*, 405 U.S. at 154-55.

Similarly, Deleon's notes are material Brady evidence. These notes are unquestionably impeachment evidence given that Deleon describes them as having information that is inconsistent with the facts and, potentially inconsistent with his testimony at trial. Had the Government provided these notes to Fields, they could have been used to impeach Deleon.

The Government's failure to disclose this, and potentially other, Brady material denied Fields of powerful impeachment tools in a case that rested on almost exclusively on the credibility of Government witnesses. Given the lack of physical evidence, such impeachment evidence is indisputably material and its suppression prejudicial.

CLAIM 19: THE GOVERNMENT FAILED TO CORRECT A MATERIAL MISSTATEMENT OF FACT BY MR. OUTLEY IN VIOLATION OF MR. FIELDS' FIFTH AMENDMENT GUARANTEE OF DUE PROCESS, SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE VERDICT AND PUNISHMENT DETERMINATION

Edward Lee Outley III, a.k.a. "Trey Boy" was a critical government witness at trial who testified that Mr. Fields confessed to killing Ms. Coleman. During his cross-examination, Mr. Fields asked Mr. Outley whether the Government had made him any promises.

Outley responded: "No. The government hasn't made me any promises." RP 1847. This statement was false and the Government knew it was false. In a letter date January 2, 2004, addressed to Outley's attorney, Stan Sweiger, Outley's attorney, was told that the Government would guarantee Outley derivative use immunity for any crimes he testified about, except "for perjury or otherwise making a false statement." *See* Appendix J (Letter to Schweiger attached to *Affidavit of Edward Outley III*). Nevertheless, the Government let the answer stand without correction. However, apparently the Government's actual grant of immunity was even broader than described in that letter. Outley now states, under the same penalty of perjury, that the Government "gave me complete immunity for any charges. Thus, because I could not be prosecuted for any crimes, I had to testify." *See Affidavit of Edward Outley III*. The Government did not reveal this broader grant of immunity to Mr. Fields or his counsel or correct Outley's statement at trial. *Id.*

### A. The Government's Failure To Correct Outley's Statement Violates Mr. Fields' Fifth And Eighth Amendment Rights

The Government let the answer stand without correction in violation of the Fifth and Eighth Amendments. *Napue v. Illinois*, 360 U.S. 264 (1959); *Giglio v. United States*, 405 U.S. 150 (1972). In addition, the Government's actual grant of immunity to Outley was broader than described in a letter written to Outley's counsel that was turned over to Mr. Fields at trial. In fact, it turns out that Mr. Outley was promised complete immunity on all charges in exchange for his testimony against Fields. Moreover, Mr. Outley's denial of the prosecution's grant of immunity was material because he was an "indispensable witness" whose testimony was necessary to support a guilty verdict. *See Douglas v. Workman*, 560 F.3d 1156, 1175 (10th Cir. 2009).

CLAIM 20:    MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN, AFTER FIELDS WAS INDICTED, JAILHOUSE INFORMANTS

ACTING AS GOVERNMENT AGENTS QUESTIONED FIELDS IN THE ABSENCE OF COUNSEL AND WHERE THAT INMATE LATER TESTIFIED THAT FIELDS CONFESSED.

No forensic evidence linked Fields to the murder.  Rather, the evidence linking Fields to the crime came almost exclusively from a notoriously unreliable source – jailhouse snitch witnesses.  In all, seven snitch witnesses testified against Fields, most in exchange for deals from the government.  *See, e.g,* Jerry Reed, TT at 1363-1374 (sentence reduction); Homero Deleon, TT at 1417-1419 (ten month sentence reduction); Steven Salazaar TT at 1488:25-1489:9 (sentence reduction); Christopher Quigley, TT at 1219-1220 (four month sentence reduction); Dominique Trendell Tubbs, TT at 1203-1218 (three month sentence reduction).

At least one of these witnesses, Homero Deleon, had a prior informant relationship with the prosecutors.  He cooperated with the government by providing testimony against his former codefendants in a Conspiracy with Intent to Distribute Cocaine charge.  TT at 1419.  In exchange for that testimony, Deleon was rewarded with a reduced sentence of seventy-two months.  TT at 1419-1420.  Mr. Snyder, one of the prosecutors in Fields' case, was also the prosecutor with whom Deleon previously cooperated.  TT at 1425.  In return for Deleon's continued cooperation, this time in connection with testimony regarding Fields, the Government filed a motion for an additional sentence reduction, resulting in Deleon's seventy-two month sentence being further reduced by ten months.  TT at 1420:4-6.

According to Deleon, he and Fields were housed together at the Federal Medical Center (FMC) in Fort Worth.  TT at 1420-21.  Knowing that the government was mounting a case against Fields, and admittedly based on Deleon's prior relationship with the prosecutors, Deleon claims to have approached Fields in an attempt to deliberately elicit self-incriminating information for the purpose of reporting that information back to the government:

[By Mr. Snyder]

Q:   And, sir, when you were doing this, you were intending this
     to get as much information as you could from him?

A:   Yeah.  That's right.

Q:   So that you could tell us, correct?

A:   So I can – yeah.

Q:   Because you had already previously cooperated with us?

A:   Yes.

Q:   And you had already previously testified for us?

A:   Yes, sir.

Q:   In fact – is – I was the trial attorney in the case where you
     testified?

A:   Yes.

TT at 1425.

On the witness stand, Deleon testified in detail about the comments Fields purportedly made.  For instance, Deleon testified that Fields told him that he shot the victim "several times in the back of the head" (TT at 1426:2), raped her (TT at 1426), used to run with "Trey Boy and another guy named Chae" (TT at 1427), had another girlfriend named Shlakeya and "[t]hat he was going to try to drag her or one of his home friends into the murder scene, that he wasn't going down by himself" (*id.*).  Deleon also testified that Fields was angry with several other individuals because they were providing grand jury testimony against him including Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, Andrea Sykes and Steve Salazar.  TT at 1423.

Deleon's trial testimony is inconsistent with – and far more detailed then – any of the available documentation created during the government's investigation.  For example,

November 13, 2003, Prosecutor Gloff and Special Agent Douglass Kunze interviewed Deleon. *Affidavit of Rick Ojeda* Exh. B.  Special Agent Kunze's report of that interview does not contain **any** of the details that Deleon testified to at trial.  To the contrary, the report reflects a stunning lack of detail:  "8.  When asked if FIELDS provided more information about killing his girlfriend, DELEON stated that **all he said** was 'I shot the bitch'!  FIELDS also told DELEON about a tree where he killed his girlfriend."  *Id.* (emphasis added).  Unlike Deleon's eventual trial testimony, this report contains absolutely no detail about the purported killing such as the number or location of shots fired.  Unlike Deleon's testimony, the report does not mention the purported rape, "Trey Boy", "Chae", Shlakeya, Eric Snell, Jarrell Patterson, Steve Sykes, Colin Alvis Smith, Andrea Sykes, Steve Salazar or any attempt to "drag" anyone "into the murder scene."  These are significant and conspicuous omissions given that "[i]t is standard investigative procedure to note details like these if they were discussed during a witness interview."  *See Affidavit of Rick Ojeda* ¶ 15.

Deleon's willingness to testify for the prosecution in exchange for a sentence reduction, however, is completely consistent with the documentary evidence.  On February 12, 2002, Deleon wrote a letter to Mr. Gloff, one of Fields' prosecutors.  *Affidavit of Rick Ojeda* Exh. A.  In that letter, Deleon claims to have had conversations with Fields, staring around December 12, 2002.  The letter states that Deleon initiated conversation with Fields, by asking him if he committed the murder, in which Fields' answer was "yes".  *Id.*  Although the letter contains no details, Deleon closes his letter by asking to talk to the prosecutors, stating that "I have a lot of detail [sic] information that can help you prosecution of Sherman Fields an Mr. Garrett (guard)."  *Id.*  As a post script, Deleon states "I was the Star Witness in my co-defendants trial, and both of my co-defendants were found guilty.  So, in case you want me to testify against

Sherman Fields and Mr. Garrett (guard) I am more than happy to testify . . . Would you please talk to me, or write me and let me know if you want me to be a witness." *Id.*

Because of these (and other) inconsistencies, Deleon was interviewed by Fields' current counsel and an investigator on December 19, 2008. *Affidavit of Rick Ojeda* ¶ 3. When asked how Deleon came to testify at Fields' trial he related two drastically different versions of events than those presented at trial. *Id.* ¶ 7. He explained that he approached Fields for information then immediately related that information to Prosecutor Gloff. *Id.* ¶ 9. After this initial contact with the prosecutor, Deleon explained that he subsequently spoke to Fields several times, each time acquiring new information. *Id.* He explained that after each meeting, he wrote the details of the conversation on a piece of yellow legal pad and forwarded it to Gloff. *Id.*

However, when asked a second time to explain the sequence of his contacts with Gloff and Fields, Deleon drastically changed his story. *Affidavit of Rick Ojeda* ¶ 10. Upon the second telling, Deleon explained that he met with Fields several times, elicited information from him, wrote that information down on a yellow legal pad and then, after several meetings, forwarded approximately ten pages of notes to Gloff all at once. Deleon also stated that despite receiving a ten month sentence reduction in exchange for his testimony, he never asked for such a reward and Gloff never offered it. *Id.* ¶ 17.

Significantly, in both versions of his story, Deleon sent Gloff several pages of detailed notes concerning his conversations with Fields. *Affidavit of Rick Ojeda* ¶ 14. He stated that without these notes, he would not have been able to remember all of the details of the purported conversations. *Id*. Deleon indicated that these notes contained details such as the caliber of gun used, how and where the shooting occurred, details about a carjacking and the purported rape. *Id.* These details are conspicuously absent from Agent Kunze's report of their

-157-

November 13, 2003 meeting. Thus far, Fields' counsel has not been able to locate these notes, but intends to seek discovery concerning this and other issues.

Additionally, when asked about the number of meetings Deleon had with government agents, he reported at least two; the first with Gloff and Kunze in November 2003 and a second with Mr. Snyder shortly before trial in Waco. *Affidavit of Rick Ojeda* ¶ 18. Although it is unclear exactly how many meetings Deleon had with the government, based on Special Agent Kunze's report of the November 2003 meeting with Deleon and Gloff, it is very clear that Deleon's testimony became far more detailed sometime after that meeting and the time of trial. Significantly, Deleon claims to have had at least one meeting with Mr. Snyder during that time. Thus far, Fields' counsel have not been able to locate any documentation concerning this alleged second meeting. Fields intends to seek discovery on this, and other issues related to Deleon's testimony.

**A.    On Information And Belief, Homero Deleon, And Potentially Several Other Jailhouse Informants Attempted To Deliberately Elicit Self-Incriminating Statements From Fields On The Government's Behalf**

Although additional discovery is required to prove the claim, the facts currently available make out a *prima facia* case that Deleon, if not all of the jailhouse snitches, may have attempted to deliberately elicit self-incriminating information from Fields in violation of his Sixth Amendment rights. Assuming *arguendo* that Deleon's statement that he deliberately spoke to Fields in an attempt to elicit incriminating information after having been in contact with the prosecutors is correct (which Fields does not concede), this would violate Fields' rights.

It is well-established that defendants are entitled to aid of counsel from time of arraignment until beginning of trial. *Massiah v. United States*, 377 U.S. 201, 205 (1964). As such, self-incriminating statements that are "deliberately elicited" from a defendant by federal agents, after indictment "and in the absence of his counsel", are elicited in violation of the Sixth

-158-

Amendment and cannot "constitutionally be used by the prosecution as evidence against him at his trial." *Id.* at 206-07. This Sixth Amendment protection extends to "indirect and surreptitious interrogations" conducted by undercover informants or any other individuals acting as government agents. *Id.* at 206 (citation omitted). Surreptitious interrogations by government agents are all the more constitutionally repugnant because in such situations, the accused does "'not even know that he [is] under interrogation by a government agent.'" *Id.* (citation omitted).

Agency relationships between the government and jailhouse snitches, like Deleon, have been found in circumstances similar to those presented here. For instance, jailhouse snitches have been found to act as federal agents where they have a prior relationship with the government as an informant, the government was aware that the informant would have access to the accused and would be able to engage him in conversations without arousing suspicion, and where the informant would be rewarded upon providing useful information. *United States v. Henry*, 447 U.S. 264, 270 (1980). Similarly, jailhouse snitches are government agents where an informant is "promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant, and . . . acted pursuant to instructions from the State, or otherwise submitted to the State's control." *Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998). An informant's agreement with the government may be express or implied and an explicit compensation agreement is not required. *See United States v. Taylor*, 800 F.2d 1012, 1015-16 (10th Cir. 1986); *see also Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004). Where, like here, a snitch has served previously as a government informant and police interview notes demonstrate inconsistencies concerning the timing of the police-informant relationship, there exists "sufficient circumstantial evidence to find an agency agreement." *Lisker v. Knowles*, 651 F. Supp. 2d 1097, 1114 (C.D. Cal. 2009).

The government has also been determined to have deliberately elicited information from jailhouse snitches based on facts similar to those presented here.  Courts have found that the government deliberately elicits information where jailhouse snitches improperly solicit incriminating statements when, acting under prearranged terms with the government, snitches engage in conversation with the accused.  *Henry*, 447 U.S. at 270.  The government need not intend for the informant to affirmatively bait the accused to violate the Sixth Amendment.  *Id.* at 271; *see also Schmitt v. True*, 387 F. Supp. 2d 622, 638-39 (E.D. Va. 2005) (noting that under the Supreme Court's *Massiah* jurisprudence the "historical circumstances" between the government and informant contribute to determination of deliberate elicitation), *aff'd*, 189 Fed. Appx. 257 (4th Cir. 2006).  Furthermore, "the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in Massiah or Henry."  *Maine v. Moulton*, 474 U.S. 159, 174 (1985).

The facts surrounding the events leading to Deleon's testimony here create a *prima facia* case of a *Massiah* or *Henry* violation.  There is no doubt that Deleon had a prior relationship with the prosecutor, Mr. Snyder confirmed as much as trial.  TT at 1425.  There is no doubt that Deleon met with the prosecutor on November 13, 2003, Special Agent Kune's report confirms as much.  There is no doubt that, at trial, Deleon's testimony contained far more detail – whether true or not – then was contained in the reports of his meeting with the prosecutor on November 13, 2003, Special Agent Kune's report also establishes this.  Finally, there is no doubt that Deleon was actually rewarded for his testimony against Fields, Mr. Snyder established that at trial.  TT at 1420:4-7.  Therefore, assuming *arguendo* that Mr. Deleon's more detailed information was obtained from conversations with Mr. Fields that occurred after Deleon's contact with Government agents (which Mr. Fields does not concede) such information would have been obtained in violation of the Sixth and Eighth Amendment.  *See*, *e.g.*, *Massiah*, 377

U.S. at 205; *Henry*, 447 U.S. at 270-71. These facts warrant additional investigation into whether, when and how Deleon apparently acquired, or attempted to acquire, additional information from Fields **after** his November 2003 meeting with Gloff and Kunze. Fields intends to seek discovery on this and related matters. Fields' efforts to develop this claim to date have been thwarted by the Government's refusal to allow Fields access to the prosecution files.

## VII.    PENALTY PHASE INVESTIGATION CLAIMS

CLAIM 21:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO CONDUCT A COMPETENT PENALTY PHASE INVESTIGATION.

### A.    The *Strickland* Standard

In order to establish ineffective assistance of counsel, a *habeas* petitioner, or in this case a § 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must first show that counsel's performance was deficient, and then demonstrate that the deficiency prejudiced the defense. *Id.* at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003). In capital cases, an objective standard of reasonableness requires counsel to conduct an adequate investigation for potentially relevant mitigation evidence. Specifically, it is well-settled that trial counsel have a duty to investigate a client's background, including his social history and mental health. *See*, *e.g.*, *Wiggins*, 539 U.S. at 522-23 (*citing Strickland*, 466 U.S. at 690-91). Moreover, "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. In evaluating the reasonableness of counsel's performance, *Strickland* requires consideration of standards such as those in the American Bar Association Guidelines for the Appointment and Performance of

Defense Counsel in Death Penalty Cases (ABA Guidelines).[21]  *See Wiggins*, 539 U.S. at 524

(*citing Strickland*, 466 U.S. at 688; *Williams*, 529 U.S. at 396).

A *habeas* petitioner meets the second part of the *Strickland* test by demonstrating

that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Strickland*, 466 U.S. at 694.  This standard presumes

an objective sentencer:  "The idiosyncrasies of the particular decision maker, such as unusual

propensities toward harshness or leniency . . . are irrelevant to the prejudice inquiry." *Id*. at 695.

In order to establish *Strickland* prejudice, "a defendant need not show that counsel's deficient

conduct more likely than not altered the outcome in the case." *Id*. at 693.  This is because

counsel's deficient performance raises serious questions concerning whether the petitioner

received the fundamentally fair trial guaranteed by the Constitution.  As the Court explained in

*Strickland*:

> An ineffective assistance claim asserts the absence of one of the
> crucial assurances that the result of the proceeding is reliable, so
> finality concerns are somewhat weaker and the appropriate
> standard of prejudice should be somewhat lower.  The result of a
> proceeding can be rendered unreliable, and hence the proceeding

---

[21] The Supreme Court initially relied upon the ABA Guidelines as an appropriate guide for assessing attorney competence in capital cases in *Strickland*, 466 U.S. at 688 (approvingly *citing* ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function")).  In *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000), *Wiggins*, 539 U.S. at 521, and *Rompilla v. Beard*, 545 U.S. 374, 387 (2005), the Supreme Court held that these standards are the appropriate guides for establishing what constitutes reasonably effective assistance under the Sixth Amendment.  As the Court recognized in *Rompilla*, the 1989 and 2003 versions of the Guidelines "applied the clear requirements for investigation set forth in the earlier Standards to death penalty cases." 545 U.S. at 387 n.7; *see also Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003) ("Although the instant case was tried before the 1989 ABA edition of the standards was published, the standards merely represent a codification of longstanding, commonsense principles of representation understood by diligent, competent counsel in death penalty cases.  The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*. They are the same type of longstanding norms referred to in *Strickland* in 1984 as 'guided' by American Bar Association standards and the like"); *Hudson v. Quarterman*, 273 Fed. Appx. 331, 336 (5th Cir. 2008) ("We have recognized that, under the *ABA Guidelines*, counsel should present 'all reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence'") (*quoting Smith v. Quarterman*, 471 F.3d 565, 570 (5th Cir. 2006)).

> itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Id*. at 694. Put simply, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. In *Wiggins*, the Court noted that in a death penalty scheme where a non-unanimous jury spares the defendant's life, such as the federal system, confidence in the outcome is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." 539 U.S. at 536.

### B.    Trial Counsel's Mitigation Investigation Was Deficient And Fell Below The Prevailing Norms At The Time Of Mr. Fields' Trial

In *Wiggins*, the Supreme Court affirmed that under *Strickland*, counsel have an "'obligation to conduct a thorough investigation of the defendant's background.'" 539 U.S. at 522 (*quoting Williams*, 529 U.S. at 396). The Supreme Court recognized that Mr. Wiggins' counsel's failure to investigate their client's background violated the ABA's provision that investigation into mitigating evidence "'should comprise efforts to discover *all reasonably available* mitigating evidence.'" *Id*. at 524 (emphasis in original) (*quoting* ABA Guideline 11.4.1(c)). The Supreme Court concluded that Wiggins' trial counsel's performance was deficient because counsel failed to pursue avenues of mitigation investigation that were warranted based on leads that became evident to counsel during their initial investigation. *Id*. at 525; *see also id*. at 519 ("[T]he scope of [counsel's] investigation was also unreasonable in light of what counsel" had discovered from their limited investigation. Trial counsel "knew at least some details of Wiggins' childhood").

Even if defense counsel conducts some mitigation investigation, this does not immediately absolve them from an ineffective assistance claim. Rather, an investigation that reveals further available avenues of investigation that trial counsel then fails to pursue is the essence of constitutionally deficient performance. The Supreme Court has found ineffective

assistance where, "[d]espite these well-defined norms" articulated in the ABA Standards, "counsel abandoned their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. A partial investigation is not good enough. Defense counsel's awareness of *some* aspects of defendant's background "d[oes] not excuse [his counsel] from their duty to make a 'fully informed and deliberate decision' about whether to present a mitigation case" and "[i]n fact . . . *their knowledge triggers an obligation to look further*." *Id*. at 519 (citations omitted). Defense counsel's "possession of '*some* information with respect to petitioner's background . . . [did not put him] in a position to make a tactical choice not to present a mitigation defense.'" *Walbey v. Quarterman*, 309 Fed. Appx. 795, 801 (5th Cir. 2009) (*quoting Wiggins* 539 U.S. at 527) (emphasis in the original). Here, as in *Walbey*, trial counsel relied almost exclusively on Mr. Fields' mother for information about his social history. *Id*. at 802. Mr. Fields' mother, who at the time of Mr. Fields' trial had a documented diagnosis of mental retardation, provided only a narrow view of the true circumstances of Mr. Fields' life. What she did provide counsel were numerous red flags that pointed up the need for them to speak with other family members and witnesses who knew Mr. Fields at various points in his life and could provide a more complete and accurate picture of his the circumstances that bear on a juror's evaluation of his moral culpability. *See also Williams v. Allen*, 542 F.3d 1326, 1340 (11th Cir. 2008) (concluding that trial counsel's investigation should have, at a minimum, included interviewing family members other than the defendant's mother); *see generally Pinholster v. Ayers*, 590 F.3d 651 (9th Cir. 2009) (finding ineffective assistance of counsel when defense counsel relied on mitigation evidence from one self-serving witness and failed to conduct further inquiries), *pet. for cert. filed*, 78 U.S.L.W. 3549 (U.S. Mar. 9, 2010) (No. 09-1088); *Libberton v. Ryan*, 583 F.3d 1147 (9th Cir. 2009) (granting *habeas* relief as to sentencing where defense counsel conducted a

minimal mitigation investigation but failed pursue other readily available leads); *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006) (ordering resentencing where defense counsel only conducted minimal mitigation investigation in preparation for penalty phase); *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005) (finding ineffective assistance where counsel failed to follow up on leads regarding defendant's mental illness and troubled family background garnered from interviews with two family members and institutional records).

The mitigation evidence presented at Mr. Fields' trial was substantially incomplete. Although counsel presented some evidence about Mr. Fields' background during the penalty phase proceedings, counsel did not make "efforts to discover all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 524. Consequently, critical mitigation evidence which was readily available at the time of trial was never presented to the jury which sentenced Mr. Fields to death. The failure to present this evidence was not the result of any strategic or tactical considerations by counsel, but rather was the result of counsel's failure to conduct an adequate investigation into Mr. Fields' cultural, familial, social and mental health history.

As numerous courts have recognized, omissions which are the product of a lack of investigation cannot be considered strategic or tactical decisions precisely because such "decisions" are not informed by any investigation which supports the omission. *See Wiggins*, 539 U.S. at 521 (the deference owed to purported "tactical judgments" to limit the scope of investigation into potential mitigating evidence turns on "the adequacy of the investigations supporting those judgments"; "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation"); *Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (*per curiam*) (rejecting claim that trial counsel's failure to adduce mitigating evidence of petitioner's was a "tactical decision" because "[i]t is axiomatic, particularly since *Wiggins*, that such a decision cannot be

credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose"); *Eldridge v. Atkins*, 665 F.2d 228, 237 n.5 (8th Cir. 1981) ("counsel's 'strategy' not to use [certain witnesses] was not so much trial strategy as it was an accommodation to his own inadequate trial preparation. . . Although it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack of preparation which went a long way in inducing him to make it").

Here, trial counsel's mitigation investigation was deficient and fell below the prevailing norms regarding the investigation and presentation of the penalty phase of capital cases at the time of Mr. Fields' trial in 2004. These investigative deficiencies include counsel's failure to obtain all the relevant multigenerational social history records of Mr. Fields' family members and caretakers; which document a history of abject poverty, childhood neglect, abuse, mental disease, and trauma; failure to interview any of the numerous historical witnesses who created records pertaining to Mr. Fields that were obtained; failure to conduct anything more than cursory interviews of a few members of Mr. Fields' immediate family; failure to investigate and document Mr. Fields' extraordinary exposure to trauma; failure to investigate Mr. Fields' mental illness and the multigenerational history of mental illness in Mr. Fields' family; failure to investigate the cultural history of Mr. Fields' family and the community in which he was raised; failure to investigate Mr. Fields' potential brain damage and dysfunction; and failure to investigate Mr. Fields' history of incarceration, most significantly the link between Mr. Fields' jail and prison "infractions" and his mental illness, as well as the failure of the jail and prison personnel to properly treat his mental disease, and its impact on his current and future functioning. The result was that the jury that sentenced Mr. Fields to death was presented with only a small portion of the mitigating evidence that could have been presented (some of which was incorrect and misleading), and was left to consider whether Mr. Fields should be executed

based solely on the testimony of a handful of defense witnesses whose testimony was brief, poorly prepared, and superficially presented.   Trial counsel's failure to conduct a thorough, and constitutionally adequate investigation was confirmed by Jane Bye, the trial team's mitigation specialist, who, after reviewing the newly discovered evidence, admits:

> There was no tactical reason for me not to have uncovered this information.   To the contrary, this was exactly the type of information that I was attempting to uncover.

*Second Affidavit of Jane Bye* ¶ 6.

In this motion, Mr. Fields sets forth a preview of the mitigation case that could have been presented—if a competent investigation had been presented.  Mr. Fields grew up in abject poverty.   He was the victim of severe neglect during his developmental years.   His caretakers were saddled with numerous deficits (including mental illness, intellectual disabilities, and substance abuse) that profoundly limited their own abilities to nurture and care for him.  He experienced significant trauma, both in and out of the house, with alarming frequency.  He and his siblings were abused by a variety of adults so frequently that it became a way of life.  Over and over again, he saw his friends killed.   All of these experiences exacerbated the serious mental illness he began experiencing early in life and which continues to this day.

Just as importantly, the defense mitigation case attempted to ignore the aggravating evidence assembled by the Government.   If a competent investigation had been conducted, the defense would have been able to turn that aggravation into mitigation.

Below, Mr. Fields begins by discussing the trial team's numerous investigatory failures.  Then, he turns to the evidence that could have been discovered and presented to Mr. Fields' jury – the evidence that likely would have made the difference between death and life.

**1.      Counsel unreasonably failed to obtain all the relevant multigenerational social history records of Mr. Fields' family members and caretakers**

One of the most critical aspects of a mitigation investigation is the gathering of social history records pertaining to the defendant.  As the Supreme Court noted in *Williams*, such records typically contain a wealth of information regarding the defendant's background which are often in and of themselves mitigating in nature, and/or offer up investigative leads for further mitigation information.  529 U.S. at 395-96; *see also* ABA Guideline 10.7 & related commentary at 83 ("Records – from courts, government agencies, the military, employers, etc. – can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections") (citations omitted).  Moreover, such records are crucial to the mitigation investigation because "they can reveal what the client and his family are reluctant to disclose because of shame and embarrassment, and what they simply can't disclose because they were too young or too impaired to record the events in memory.  They are more credible to fact-finders because they have no inherent bias." *Declaration of Russell Stetler* ¶ 49.

The duty to obtain all relevant social history records is not limited to those of the defendant, but must also encompass the defendant's family members and caretakers.  As the ABA Guidelines explain:

> Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children.  A multi-generational investigation [extending as far as possible vertically and horizontally] frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.

ABA Guideline 10.7 & related commentary at 83 (citations omitted);[22] *see also Declaration of Russell Stetler* ¶ 49 ("Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next").

Although trial counsel interviewed Mr. Fields' mother, Alice Fields Swinnie, as part of their investigation into Mr. Fields' background, there were clear "red flags" that should have alerted counsel to the fact that Ms. Swinnie could not be relied upon to provide a complete and accurate account of Mr. Fields' life history. By her own admission, she has an impaired memory and receives disability payments for "mental retardation." *Declaration of Russell Stetler* ¶ 30. Clearly, these facts should have concerned counsel and prompted them to seek out records to independently corroborate the information Ms. Swinnie provided to them, rather than simply take her at her word, as they apparently did.

If trial counsel had conducted the type of investigation that is constitutionally required and described by United States Supreme Court precedent with reference to the ABA Guidelines, they would have discovered numerous records that contain a wealth of mitigating evidence and documenting retardation, brain damage, and mental illness, throughout Mr. Fields' social history. Numerous records available at the time of trial indicate a long multigenerational history of mental illness in Mr. Fields' family. *See supra* pgs 47-50; *see also* Ex 116 (Sherman Fields' Family Tree).

---

[22] As the Guidelines further explain, such records include, but are not limited to: (1) school records; (2) social service and welfare records; (3) juvenile dependency or family court records; (4) medical records; (5) military records; (6) employment records; (7) criminal and correctional records; (8) family birth, marriage, and death records; (9) alcohol and drug abuse assessment or treatment records; (10) INS records. *See* ABA Guideline 10.7 & related commentary at 84. Moreover, the Guidelines direct that such records should be obtained not only with respect to the client, but also with respect to the client's "siblings and parents, and other family members[.]" *Id.* (citations omitted).

The failure to discover these records was unreasonable, particularly in light of the critical nature of the incidents at issue in these records, and there is simply no evidence in the extant record that establishes that counsel's deficient performance in this regard was the product of a tactical consideration.

### 2. Counsel unreasonably failed to interview historical witnesses and collect and review relevant historical documents

The gathering of records that reflect an individual's cultural, community, and social history is important for a variety reasons. These records permit the jury to see the defendant in a more complete and accurate context. Such records are typically considered more credible to fact-finders because they are contemporaneous accounts prepared by persons unconnected to the incidents documented in the records. As such, the accounts contained in the record are treated as particularly credible; not only are the authors of the records lacking in any inherent bias, but the fact that the records were created at the time of the incidents themselves makes them less vulnerable to the criticism of some lay witness testimony (that the passage of time has degraded the witness's memory of the event) and expert testimony (that the expert only formed the opinion after the individual became a defendant in a capital case). Obtaining such records, therefore, is important for an equally powerful reason: to identify the unbiased witnesses who created these records and who encountered the defendant years before he was ever charged in a capital case.

As is apparent from the nature of the records themselves, the kinds of witnesses at issue here include teachers, social service caseworkers, and medical and mental health professionals – in other words, individuals with unique access and insight into the influence that shaped the defendant's life in his developmental years. One of the benefits of identifying and interviewing such witnesses is that they occupy an outsider's perspective, and therefore lack the

motivation to conceal or cover up embarrassing or painful information about the family dynamics that the family members themselves would. Moreover, as persons who have an opportunity to observe the family dynamics without themselves being a part of it, such witnesses are often able to provide critical and unbiased information about the dysfunctional environment in which the defendant grew up.

Mr. Fields' trial team gathered only TYC records that on their face stated that they were incomplete and based on self-reports and interviews with Fields' mother. Almost none of the records trial counsel gathered relating to anyone other than Mr. Fields himself. The TYC records were a starting point, replete with red flags that trial counsel had a duty to pursue. This is not a situation where counsel contacted the witnesses and decided not to utilize them for some strategic reason. Although identifiable to trial counsel from readily available records, counsel simply failed to locate or interview any of these witnesses. Considering that these potential witnesses came in contact with Mr. Fields during critical developmental periods of his life as both a young child and adolescent, counsel's failure to interview these witnesses is unreasonable. These are witnesses who would have been familiar with Mr. Fields' mental and physical health, his family background, his school attendance, his behavior leading up to and while in juvenile detention or supervision. In other words, these are witnesses who hold textbook mitigation information. *See Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008).

Rather than investigate these sources of information, or interview these primary witness, trial counsel instead entirely relied on Mr. Fields' Texas Youth Commission ("TYC") records. Trial counsel's reliance on these records was clearly deficient because those records themselves indicated that they were incomplete and primarily based on unreliable self-reporting from a juvenile Fields and his mentally retarded mother. For instance, these records indicate that a 14 year old Fields self-reported that "[t]here is no family history of any mental illness, to his

knowledge, no suicides in his family, no other serious recent losses.  He has relatives that have had trouble with alcoholism." *See* Exh. 9.  This statement is demonstrably false.  As demonstrated above, and confirmed by Dr. George Woods, there is a rampant history of mental illness in Mr. Fields' family:

> The maternal side of Mr. Fields' family suffered from multi-generational neurological impairments and affective mood disorders, as well as substance abuse and parental neglect. Mr. Fields' mother and extended family were ill-equipped cognitively, emotionally or financially to rear children.  There are indications that the paternal side of the family was also burdened by mental disease and substance abuse.

*Declaration of Dr. George Woods* ¶ 30; *See also supra* pgs 47-50; Exh. 116 (Sherman Fields' Family Tree).

This is not an isolated statement of incomplete information contained in TYC records – Mr. Fields' TYC records are littered with such indications.  For example, a March 8, 1989 report indicates that "[l]ittle information is available regarding Sherman's personal history."  *See* Exh. 3 at  000348.  At that time Fields' evaluators "ha[d] no information about Sherman's natural parents psychiatric history, substance abuse, or other criminal history." *See* Exh. 4 at 000410.  The records included recommendations that "[a] thorough physical, laboratory and psychological assessment" and "[i]f possible more family history from mother" be made, and that "escape an suicidal precautions" continue to be taken because of Fields' reported history. *See* at Exh. 4 at 000411.  A January 20, 1989 TYC report indicates "[w]e do not have access to home evaluations." *See* Exh. 1.  Another report regarding family history, including the presence of mental illness, alcoholism or retardation in parents or siblings, includes "[n]o information", "Father?" and "Sibs?". *See* Exh. 8.  Another report dated March 19, 1989 notes that Fields' "long-standing conduct disorder symptoms" and feelings of "sadness and low self-

-172-

esteem." *See* Exh. 5 at 000428. That report also notes that Fields had been admitted to a psychiatric hospital and that Fields' several "suicide attempts" were "serious" and that "[h]e should be under close scrutiny and observation". *See* Exh. 5 at 000427-428, 000431. A record dated January 1, 1989 notes that despite his history of psychiatric hospitalization, Fields had not received either outpatient or inpatient therapy, and his mother was "[not] willing to participate in treatment" during his placement at TYC because she had "no time". Exh. 2 at 000280-81. Based on these records, and conversations with Alice Swinnie Fields, Mr. Fields' mother, trial counsel was only able to present to the jury a brief, conclusory and superficial and vague description living in a bad environment.

However, had trial counsel performed an adequate pre-trial investigation and collected all relevant historical documents, a more realistic picture of Mr. Fields' home life would have been developed. For instance, the readily available TYC records of Mr. Fields' brother, Jimmy Fields paint a vivid picture of the chaotic, abusive, violent, impoverished, neglectful, and dysfunctional home in which Mr. Fields grew up. These documents depict a bleak picture:

- "10 people living in a 4 bdrm home. Mom is only employed; children do as they please; Mom does not participate in outside involvement but loves her children: She would benefit from parenting classes a great deal . . ." Exh. 28.

- "Mother says she and children were physically and mentally abused by a common law husband. Mother shot common law husband after one beating. Mother also shot the common law husband's girlfriend, prior to this. Neglectful supervision. Abandonment." Exh. 30.

- Under a heading "Characteristics of the family as a whole with whom the child has lived," the following characteristics were characterized as "Very Much or Often:" (1) Chronic Poverty, (2) Chaotic home environment, (3) Discipline skills lacking, (4) Difficult or unacceptable to express emotions, (5) Frequent family moves or school moves. Moreover, Social

isolation and Illiteracy were characterized as "Somewhat/sometimes." Exh. 31 at 007225.

- "Mother is a single parent, who works two jobs, and is unable to satisfactorily supervise them. Family receives housing assistance and moves frequently. Mother received probation for attempted murder x2. Dysfunctional home environment w/ chronic neglectful supervision." Exh. 31 at 007226.

- Mother earns $650 a month as a laundry attendant. An additional $346 per month comes from food stamps. Exh. 31 at 007227.

- "Family appears to be dysfunctional . . . Mother unable to supervise Jimmy and five other siblings (4 boys, 1 girl)." Exh. 34 at 007291.

- "[H]istory of abuse noted." The TYC Recommended participation in "Physical Abuse Survivors Group." Exh. 34 at 007292.

- "Current Problems: Lack of supervision by parent in home. Recommendations: Assess for intervention services for family unit to address parent/child problems and neglect/abuse issues." Exh. 34 at 007293.

- "[Mother] has shown poor parenting and supervision skills. She fails to maintain open communication and provide structure in the home. **The child's basic needs have not been met and they have sought criminal behavior to satisfy their needs**." Exh. 35 at 007313 (emphasis added.)

- Mother's husband was described by Jimmy Fields as follows: "This man is a 'dope fiend'. Jimmy reported that he sells dope to him occasionally." Exh. 38 at 007419.

None of these records were collected by trial counsel. However, the records demonstrate precisely why counsel's reliance on the self-reporting contained in Mr. Fields' TYC records was wholly inappropriate and fell well below the established norms. But for the fact that Mr. Fields' TYC reports did not benefit from a home and family evaluation, this detailed information about the chaotic, abusive, violent, impoverished, neglectful, and dysfunctional home would have been included in Mr. Fields' files. Had trial counsel conducted the type of investigation required under United States Supreme Court precedent and the ABA Guidelines, they would have discovered these numerous records containing a wealth of mitigating evidence. There is no

-174-

evidence in the extant record that suggests that counsel's deficient performance in this regard was attributable to anything other than a failure to carry out their basic investigatory duties in preparation for the penalty phase proceedings.

### 3. Counsel unreasonably failed to interview available family-member mitigation witnesses

In conducting a thorough and adequate social history investigation, counsel must interview those witnesses who have known the defendant longest and most intimately: the family members. Such interviews are necessary not only to discover information directly about the defendant, but also to investigate such issues as the conditions in which the defendant was raised, risk factors to which the defendant was exposed, patterns of dysfunction that governed family dynamics, and potential heritable mental disorders in the family lineage. Additionally, the life of a capital defendant is often marked by intra-familial abuse, physical and sexual assault, multigenerational substance abuse and mental illness – dark and shameful secrets that individuals are understandably reluctant to discuss. For this reason, initial interviews with such witnesses often yield incomplete or superficial information, as these witnesses are typically defensive and wary of disclosing personal or sensitive information to a stranger. Such barriers can only be broken by establishing a rapport and trust with the witnesses – a process that requires many hours and multiple visits with the witnesses. Yet despite the fact that Mr. Fields came from a large extended family, most of whom live right in Waco, counsel failed to speak with anyone but a few family members – and those interviews were limited and superficial.

Mr. Fields' mother, Alice Fields Swinnie, had five sons by four different men. Counsel identified only two of the fathers by name: Mr. Fields' father, the late Sherman Mims,[23]

---

[23] Mims was reportedly in his forties and married to someone else at the time he impregnated Sherman's teenage mother. According to Texas Youth Commission records, he died in 1985.

and William Bradford, the father of Jimmy and Shaffer Fields.  The fathers of Charles and Jeffrey Fields were not identified.  None of these men were interviewed, although each may have provided some insight into Mr. Fields' mother's lifestyle, romantic relationships, child rearing, mental state, use of substances, among other issues relevant to Mr. Fields' mitigation case.

At least two of the mother's most violent boyfriends were readily available.  She advised counsel that William Bradford resided in Waterloo, Iowa, where his address and phone number are listed in directory assistance.  Melvin Swinnie, who had shot Alice Swinnie, has a TDCJ inmate number of #00662634, has been incarcerated for two decades, will remain in prison until 2023, and his prison location was readily available at the time of trial.  Despite that the whereabouts of these witness was easily discoverable, counsel never made any attempts to locate or interview them as part of the mitigation investigation.  Such an omission is particularly troubling given that both Mr. Bradford and Mr. Swinnie essentially occupied a parental role with respect to Mr. Fields, and were male role models for him during his formative years as a child and adolescent.  Moreover, considering that both men were involved in violent and traumatic shooting incidents with Mr. Fields' mother, it is unreasonable that counsel failed to investigate and interview these witnesses.

There was no effort whatsoever to investigate Mr. Fields' paternal lineage, or even to verify the mother's report that Fields' biological father had died in Marlin, Texas.  With respect to Mr. Fields' maternal lineage, Mr. Fields' mother was one of ten children, two of whom were reportedly deceased by the time of trial.  Five (Dorothy Randle, Shirley Fields, Annie Leaks, Hattie Love and George Gaines) lived in Waco, one (Bessie Jackson) in Chicago, and one (Arthur Fields) in Pampa, Texas.  Mr. Fields' maternal grandparents never married.  In fact, his late maternal grandfather, Shelby Mitchell, was married to someone else.  He and his wife had at least three children.

-176-

Of all these witnesses, trial counsel only called two family members (aside from Mr. Fields' mother) as witnesses during the penalty phase of Mr. Fields' trial: Vincent and Ed Green, who were Shelby Mitchell's sons, and half-uncles (but age peers) of Mr. Fields.  Counsel did not even bother to personally interview Vincent and Ed Green prior to putting them on the stand:

> For Sherman's capital trial, I was subpoenaed . . . When I got to the courthouse, I hadn't met with anyone like his lawyers or anything before that.  Sarah asked me because I was an uncle and I was close to Sherman.  I can't remember her name, but a black lady in her early 40s maybe spoke to me before I went on the stand.  I don't think she testified but she worked for the lawyers and we spoke for maybe 15 minutes.  I can't remember what she said to me.  When I got on the stand I had no idea what questions they were going to ask me.

*Declaration of Vincent Green* ¶ 27.  As a result, his testimony was superficial and incomplete.  If counsel had interviewed Vincent Green prior to putting him on the stand, they would have learned that he could have testified to, for example, the abuse suffered by Mr. Fields at the hands of William Bradford and his grandmother, the extreme poverty he endured and the mental illness prevalent on the maternal side of Mr. Fields' family.  *See Declaration of Vincent Green, ¶ 12 (describing that the Fields family sometimes had no food); ¶ 14 (describing Jessie Mae Fields' digging in dumpsters for food for the family); ¶ 16 (describing the Fields home as infested with rats and roaches); ¶ ¶17, 18 (describing Leon and Joe's mental illness, respectively).*  Moreover, there was no attempt to contact the numerous readily available family members, even though a few were encountered in a group setting.  As noted earlier, only in-depth one-on-one interviews could have provided a textured explanation and vivid account of the violent, chaotic world in which Mr. Fields grew up.  For example (and as described in more detail below):

- Charles Fields, Mr. Fields' older brother, who was at the trial, yet "none of [Mr. Fields'] lawyers or social workers talked to [him] about anything,"

"would have testified" to the abuse, and parental neglect endured by Mr. Fields, the racism he was subjected to, the conditions in the community that Mr. Fields grew up in, the abject poverty he and his family lived in and the prevalent mental illness on the maternal side of the family, among other things. *See Declaration of Charles Fields* ¶ 2.

- Jimmy Fields, Mr. Fields' younger brother, who "no one working for [Mr. Fields] came to see before trial," could have testified to parental neglect, the mental illness on the maternal side of the family, the trauma suffered by Mr. Fields, among other things. *See Declaration of Jimmy Fields* ¶ 31.

- Shaffer Fields, Mr. Fields' younger brother, who "would have testified" but was not asked to, could have testified to, among other things, abuse, parental neglect, mental illness on the maternal side of the family, and Mr. Fields' role as a parental figure. *See Declaration of Shaffer Fields* ¶ 35-36.

- Tameika Randle, Mr. Fields' step-sister, who was "never contacted or talked to" by Mr. Fields' attorneys, would have testified to Mr. Fields' role as a parental figure as well as parental neglect and the instability of the home environment. *See Declaration of Tameika Randle* ¶ 16.

- Alton Robinson, Jr., Mr. Fields' cousin, who Mr. Fields' lawyers "never talked to" but "would've testified if they had asked," could have testified to, among other things, the abject poverty Mr. Fields grew up in, the history of mental illness on the maternal side of the family, and the trauma suffered by Mr. Fields. *See Declaration of Alton Robinson, Jr.* ¶ 35.

- "No lawyer or investigator ever spoke to" Lucille Leaks, Mr. Fields' half-aunt, before the trial. She would have testified to, among other things, the mental illness on the maternal side of Mr. Fields' family and the poverty in which Mr. Fields grew up. *See Declaration of Lucille Leaks* ¶ 20.

- Vera LeBlanc, Mr. Fields' half-sister, was "never contacted by anyone representing [Mr. Fields] in his capital case" before March 2010. If asked, she could have provided information about the mental health of the paternal side of Mr. Fields' family. *See Declaration of Vera LeBlanc* ¶ 25.

Here, however, counsel did not even bother to interview any member of Sherman's family aside from his mother and none of this mitigating evidence was uncovered or presented to the jury. Moreover, counsel made no inquiry into potential heritable mental disorders on either side of the family.

Additionally, counsel made no attempts to interview neighbors or classmates of Mr. Fields, even though counsel knew numerous home addresses and all the schools Mr. Fields attended.  Similarly, counsel failed to interview professionals, caseworkers, or police officers who had dealt with Mr. Fields and his family.  Counsel's deficiencies in this regard, as with the historical witnesses discussed earlier, are simply unreasonable and cannot be ascribed to any tactical considerations.

### 4.    Counsel unreasonably failed to investigate and present evidence of the abject poverty of the Fields Family

Mr. Fields grew up in soul-crushing poverty.  His defense team at trial told jurors that he grew up poor and moved to the "projects" after his mother went to prison for shooting his stepfather.  TT at 2370-75, 2393.  Reality was much, much worse.  The ABA Guidelines succinctly state: "Family members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants."  Commentary to Guideline 10.11.  In this case, the trial team did not discover and consequently could not present to Fields' jurors an accurate picture of the harsh and shameful conditions that Fields was forced to endure on a daily basis.  The true extent of Mr. Fields' poverty is described in the ensuing section describing the prejudice resulting from Mr. Fields' trial counsel's deficient performance.

Mr. Fields grew up in abject poverty in a community just outside of the Waco city limits that was fittingly called "No Man's Land," a small region that no municipality would annex.  *See* Ex. 104.  The area was so poor that it was once featured in a national news segment, a copy of which (on DVD) will be filed separately.  The neighborhood had no sewage system, no municipal police protection, no fire protection, no routine garbage disposal and only a small portion of the houses had running water.  Exh. 100; Exh. 101; Exh. 102; Exh. 103 at 011538, 011541.  Many residents drank untreated water drawn from wells polluted with fecal waste.  *See*

Exhs. 100-103.  After heavy rains, the septic tanks would overflow and children would reportedly wade through the contaminated water to get to school.  *See* Exh. 99; Exh. 101 at 011516-17; Exh. 103.  No municipal pest control existed and the area was infested with rats and other vermin.  *See* Exh. 103 at 011541.  Nonresidents came to No Man's Land to dump garbage and dead animals.   *See* Exh. 101 at 011517.  Witnesses were readily available who could have described first-hand this shocking level of deprivation.

In addition this undiscovered historical information about Mr. Fields' childhood community, witnesses were readily available who could have described first-hand this shocking level of deprivation.

Dorothy Randle described the poverty in "No Man's Land":

> When Sarah was living in No Man's Land, that was her hardest time.  She was poor then.  She had Charles and Sherman.  Sarah didn't discuss her money situation with me, but I gave them stuff.  I gave them stuff whether they wanted it or not.  I'd get groceries for them – greens, cabbage, neck bones, skins, all that stuff.

*Declaration of Dorothy Randle* ¶ 10.

The family did not have enough money for food.  For example, Charles Fields states in his declaration:

> I remember that before Brad came to live with us, we were always poor.  We had beans and chicken every day.  We didn't have much money for food.  We kept a lot of Caritas cheese – the processed cheese.  We would chop it up and make grilled-cheese sandwiches.  That's what they call government cheese.  We were eating a lot of beans and chicken.  We got chicken from the store and we'd eat every last bit of it.  I remember being hungry as a kid.  We would be hungry a lot at the end of the month.  We would have a little food, but we had to try to stretch it out.  It was probably the last two weeks of the month that would be like that.  We would get help from Caritas and that and some churches – I can't remember which ones.  Caritas was on S. 8th or 9th or something.  It would be a long line – you had to sit and wait to get something.  In those

last two weeks of the month, we could have two meals and that was it during the day.

*Declaration of Charles Fields* ¶ 12.

Even though they had very little food, the Fields' family had to compete with rats

for what they had:

We used to have big rats and stuff. We had to fight them for our food. They'd jump up on the stove – big rats, about a foot long. I'd be the Lone Ranger and Sherman was Tonto and we'd hunt the rats at night. We had holes all over the house – rat holes everywhere. We were too poor to get rat poison but we had traps and we'd throw them out behind the shack. At Pearl, the rats were out of control. We had rats at some of the other places we lived too.

*Declaration of Charles Fields* ¶ 14. Vincent Green also remembers the lack of food:

When Sarah [Sherman's mother] was staying in the projects in East Waco, I stayed with her. I stayed with her in North Waco too when she was with William Bradford . . . Sometimes they had no food and stuff. I knew they would run out of food because Sarah would come and tell daddy she had no food and ask if she could borrow some money. They would have like pork, or beans or wieners – when I was over there that was all they had.

*Declaration of Vincent Green* ¶ 12.

Alton Robinson's declaration recounts the constant presence of rats:

I would see rats at the house on Pearl every night. They were always there – they stayed there. They were like wood rats. They are like the size of a cat. They would mostly be in the kitchen. I was scared. I hate those rats right to this day. They tried to catch them sometimes with these big traps that just like slam on their tails. I don't know if they got poison. I guess poison is more expensive.

*Declaration of Alton Robinson, Jr.* ¶ 13. Vincent Green's declaration adds:

There were rats and roaches in their houses. The rats would be in the kitchen or running across the living room floor. I'd never seen that at home. Roaches were everywhere. They'd always be out in the kitchen and stuff – always – it wasn't like you'd see one every once in a while. It would bother the kids because their friends

-181-

would come over and it would be embarrassing for them. I had to get used to it. Before I went there, they told me, "Man, you might see some stuff you don't like." They brought a few friends around but rarely.

*Declaration of Vincent Green* ¶ 16.

Because there was not enough money for food, the children often accompanied their grandmother "dumpster diving":

Jessie Mae, Sherman's grandma . . . would go digging in trash cans. She'd find thrown-away donuts and bring them to the house. The kids would eat it. I wouldn't touch it. It was nasty. I thought, "How can y'all eat this?" But they really had no choice. The donuts would be in a box but they were coming out the trashcan. You don't know what other crap is in there. But they had no choice. Jessie always walked around with a shopping cart and would go to the dumpsters in apartment complexes, alleys, the dumpsters and the stores and whatever she could find, she'd go get it.

*Declaration of Vincent Green* ¶ 14.

However, it is probably the account of Shaffer Fields that is most moving, if not shocking:

As we got older,. . . [my grandmother would] go dumpster diving – looking for cans to cash in at the scrap place. She'd make us go with her. We'd have to hide from kids we went to school with. I guess she did it to make money. She'd get all the soda cans and she tried to make us eat stuff out of there too. It was embarrassing. She didn't always have to do that. She made all the family do that – all the young ones . . . We got breakfast and lunch at school, but on the weekends, we would be hungry the rest of the day. Every day we had some kind of beans and cornbread. Sometimes we would get meat too – neck bones and stuff. But sometimes we didn't have food. It would depend. Sometimes it would only be free food, like from Caritas. You'd look at it sometimes and it would be moving. You had to search the cereal for weevils and stuff. The food they gave you was like expired or open and stuff – they gave you anything.

*Declaration of Shaffer Fields* ¶¶ 16-17.

Charles Fields explained the psychological impact of the poverty on Mr. Fields:

> Sherman and I used to get depressed because we had less than other people. There were times the rental center would come and re-possess some of our furniture. It was like that really until we could buy things ourselves. After I dropped out of school, I worked with my grandfather and had money. He made sure we had clothes. We were real poor. The house was raggedy and the stuff we had wasn't too far from being in the dumpster.

*Declaration of Charles Fields* ¶ 15.

A competent investigation should have included consulting with a mental health professional about the psychological consequences of growing up deprived. Dr. Woods' states:

> The co-morbidity of Sherman Fields' own genetically-based potential for developing a mental illness and the traumatic stress manifested by the circumstances of his upbringing, *including the extreme poverty in which his family lived,* his caretakers' substance abuse, and neglect and abuse that he and his siblings suffered in their childhood; created greater and more severe symptomatology than either disorder alone may present.

*Declaration of Dr. George Woods* ¶ 50 (emphasis supplied).

This level of deprivation is one that the vast majority of Americans have never experienced and maybe can't imagine still exists in our Nation. Most importantly, it stands in stark contrast to the defense case that was actually investigated and presented. Mr. Fields' jury knew that growing up, Mr. Fields and his family were poor. What they did not know was how poor and how this poverty negatively shaped his emotional and psychological outlook. Had the jury learned the truth about Mr. Fields' poverty and deprivation, there is a reasonable probability that at least one juror would have voted for a life sentence. Mr. Fields was therefore prejudiced by his trial counsel's failure to investigate this readily available mitigating evidence.

-183-

**5.      Counsel unreasonably failed to investigate and present evidence of the neglect of Mr. Fields family and caretakers**

The trial team's limited investigation failed to uncover the near-constant neglect by Mr. Fields' parents and caretakers that marked his developmental years. As a result of their deficient investigation, the defense at trial presented an inaccurate and misleading account of Mr. Fields' early years.

The trial team failed to uncover Mr. Fields' neglect by his own biological mother and father. Mr. Fields' developmental years were marked with constant transition in a household wrought with neglect by absentee parents lacking the developmental skills and stability to properly raise Mr. Fields and the other children. Members of Mr. Fields' family vividly remember the tragic circumstances under which Mr. Fields and the rest of the children were raised.

Charles Fields recalls that their mother, Alice Swinnie – a young, working mother – was never present in the home and slept when she was at home. *Declaration of Charles Fields*, ¶ 19. Charles Fields added:

> I wished my mom would be home more. I used to feel we barely saw her. She pretty much just worked after she shot Brad and Ivory. It was probably because of her probation fees and stuff that she owed after she shot Brad and Ivory. I was pretty much mad.

*Id.* ¶ 39. Alice Swinnie admitted as much, stating, "I slept a whole lot. I'd go to work, go to sleep, work, come back and go to sleep." *Declaration of Alice Swinnie* ¶ 42. This condition may have been induced by Alice Swinnie's depression. *Id.* ¶ 41. Other family members recall that Mr. Fields' mother would be gone for two or three days straight. *Declaration of Jimmy Fields* ¶ 7.

-184-

Mr. Fields' half-brother, Shaffer Fields, stated that their mother's focus when not at work was not on the family, but on card games and gambling, resulting in further diminished oversight of her children. Shaffer recalled:

> We moved schools a lot because we were moving houses a lot. I have no idea why we moved so much. Maybe my mom couldn't make the rent. She gambled a lot. She was a real live gambling addict. She would be gone for days at a time. She would go to these people's house. Our grandma would watch us when she was gone gambling. Grandma always stayed with us or stayed close by.
>
> I think my mom worked in the day time. Most of the time, she'd be at the card deck. We would see her for an hour and then she would be gone again. It was that way as early back as I can remember. She could stay up for three days straight. There would be 7 or 8 people at the table and there would be people standing around waiting to play . . . Most days she would be gone gambling. It upset me, but I didn't talk to her about it. Almost every evening, Mom was gone.

*Declaration of Shaffer Fields* ¶¶ 11-12. Jimmy Fields further corroborates this account:

> My mom was never really at home. She was working and then when she wasn't working, she was probably at card games. I don't know where she did it – they had a card game group. I told Sherman one time, "Mom raised us the best she knew how, but in other people's eyes she might not have been good. She might not have been a good influence." When I look at life, I see how it could've been a whole lot different. If she'd spent more time with us, it could've been a whole lot different. When I told Sherman that, he told me I shouldn't talk about her like that.

*Declaration of Jimmy Fields* ¶¶ 6-7.

The years of neglect were evident. Jimmy Fields recalled that his mother allowed them to do whatever they wanted including illegal drug use, as long as it was done in the home. *Declaration of Jimmy Fields* ¶ 9. Even when her children were apprehended by authorities, Alice Swinnie neglected to care for them. *See id.* ¶ 25 ("The whole time I was at boot camp, my

mom came to see me twice.  I wasn't far away and she only made it out there two times").  Once Mr. Fields and the children became teenagers they were effectively on their own.  *Id.* ¶ 12.

The trial team also failed to uncover the abhorrent caretaking by Mr. Fields' other family members and "father figures" introduced to the family by Mr. Fields' mother.  Had the trial team performed their duty to investigate, they would have discovered that with Mr. Fields' parents chronically absent, Mr. Fields was predominately raised by several family members and friends who were saddled with cognitive and emotional deficits, and chronic substance abuse addictions resulting in further neglect during Mr. Fields' developmental years.

Since Ms. Swinnie was a young mother, Jessie Mae Fields, Mr. Fields' grandmother, was referred to as  "mama" in the Fields household.  *Declaration of Jimmy Fields* ¶ 7.  However, Jessie Mae failed to provide the proper oversight of the children, often resorting to beating the children.  *Declaration of Vincent Green* ¶ 14.  Jessie Mae Fields also suffered from the same pervasive alcohol abuse that was prevalent in the Fields' household:

> My grandma stayed tipsy.  She was an alcoholic.  She drank Schlitz beers at home.  She'd drink three or four days out of seven.  She usually started on a Thursday and would drink through Sunday.  She would drink beer at home on the weekends and would also go out.  She'd get drunk.  When she was drunk she would get very outspoken – and she speaks her mind even when she isn't drunk.  When she was drunk, she'd speak her mind to whoever got on her nerves. . . .

*Declaration of Charles Fields* ¶ 39.

Shelby Mitchell, Mr. Fields' grandfather, who was presented at trial as a stable influence on Mr. Fields, also failed to provide the support and positive influence that Mr. Fields so desperately needed.  *See Declaration of Shaffer Fields* ¶ 18 ("Our granddad would take care of us too – though I think he was kind of a bad influence"); *see also* Exh. 12.  Unfortunately,

Shelby Mitchell also suffered from substance abuse issues and emotional issues from his own

childhood trauma.  As Charles Fields recalls:

> My granddad [Shelby Mitchell] drank every day – morning to
> night.  He'd have a shot of coffee first thing and the gin is next, or
> a Coors.  He had a lot of friends and they all bought him liquor and
> beer.  He had plenty food and so much beer and liquor round the
> house.

*Declaration of Charles Fields* ¶ 81.  Jimmy Fields confirms:

> He used to work and drink gin all day . . .  He drank gin from the
> time he got up to the time he passed out.  He'd be sitting in the
> kitchen eating in the trailer and fall out on the floor and get
> comfortable until he went to bed.

*Declaration of Jimmy Fields* ¶ 15.  Shelby Mitchell's alcohol abuse also impacted Mr. Fields:

> My dad [Shelby Mitchell] was a heavy drinker all his life.  He
> drank every day – later on in the day.  He drank beer, liquor,
> whatever.  Sometimes Sherman and I would get his drink.

*Declaration of Vincent Green* ¶ 4.

Further, as a result of Shelby Mitchell's own traumatic past he often provided Mr.

Fields and the children with skewed life lessons:

> Our grandfather, Shelby Mitchell, raised us up that it was better to
> get caught with a gun than without.  My grandfather always carried
> a pistol – even to church.  He'd say, "You can shoot a black man
> and get away with it.  Shoot a white man and you'll go to jail."  He
> taught us to believe that no one was better than us.  He told us we
> should always use a gun if someone pulled a gun on us.  He said he
> could always get us out of jail but he couldn't get us out the grave.

*Declaration of Charles Fields* ¶ 44.

Further, the trial team should have discovered and submitted at trial, that Mr.

Fields' mother often brought home other "father figures" who were equally wrought with

substance abuse and violence issues and neglected Mr. Fields and the children.  Family members

recalled that Alice Swinnie's boyfriend William Bradford (known as "Brad") was a "real"

-187-

alcoholic who would drink "breakfast beers" and was "drunk every day." *Declaration of Charles Fields* ¶¶ 11, 20; *Declaration of Jimmy Fields* ¶ 14 ("My dad [William Bradford] used to drink"). Alice Swinnie recalled that William Bradford not only hit her in front of the children, but would hit Mr. Fields and the other children "because they weren't his." *Declaration of Alice Swinnie* ¶¶ 29, 33. Ms. Swinnie did nothing to stop Brad because she thought it was "normal for Brad to just keep whooping them."[24] *Id.* In fact, the children believed that Alice Swinnie made Brad more of a priority then Mr. Fields and the children. *Declaration of Charles Fields'* ¶ 24 ("I felt like my mom put Brad before us").

Family members also recalled that Ms. Swinnie's second husband, Melvin Swinnie, had pervasive substance abuse problems which were witnessed by Mr. Fields and other family members:

> He was not a good catch – he was a dope fiend. His mom told me he was and I didn't know. He took heroin and then moved on to crack. He was supporting his habit through burglarizing. I got his check. If I had known, I wouldn't have married him. Melvin got arrested a few times. He was in jail when we got married. He stayed in there a couple of years – I think on an attempted murder charge because he shot his wife and her cousin. Later, he shot me too.

*Declaration of Alice Swinnie* ¶ 35. Charles Fields also remembers Melvin Swinnie's absence and drug issues:

> Melvin Swinnie, my mother's husband, was in and out. We got a little extra money because Melvin had a crack habit so he gave mom his check for like $20 cash.

*Declaration of Charles Fields* ¶ 20.

---

[24] Indeed, William Bradford's abuse and philandering resulted in Alice Swinnie taking matters into her own hands when she shot Bradford and his mistress Ivory Monroe. This resulted in Alice Swinnie receiving probation and continued time away from home while she worked to pay her probation fees and fines. *Declaration of Charles Fields* ¶ 19.

Shaffer Fields further recalled Melvin's addictions as well as Mr. Fields' direct

involvement:

> I have no idea when my mom met Melvin, but he started coming around on 11[th] Street. I think Melvin was drinking and smoking crack from the beginning. I have no idea why my mom wanted to be with him. When she first met him he wasn't all-the-way strung out.
>
> Sherman was there for some of the time Melvin was with us. I think Sherman and Jimmy used to confront him about him stealing stuff from us but mom wouldn't let them. My mom would defend Melvin. He would steal from us every day – he was crack head. Me and my brothers used to talk about that all the time. We knew he was a crack head before she did. He had crack pipes all around the house. I don't think my mom was naïve. I think as long as it was benefiting her, she didn't care. He probably was stealing shit to give her money to play cards. Back then all she cared about was card games. She still goes, but not as much as she used to.

*Declaration of Shaffer Fields* ¶¶ 32, 33.

### 6.    Counsel unreasonably failed to investigate and present evidence of the extent of abuse experienced by Mr. Fields in his formative years

Mr. Fields' jurors were told that Mr. Fields and his family members experienced

periodic abuse at the hands of William Bradford. This was true. But, the abuse was hardly

limited to Bradford. Once again, an inadequate investigation resulted in a misleadingly

incomplete history. There was no tactical reason for the trial team not to uncover the true extent

of the abuse – by Bradford and others – inflicted and witnessed by Mr. Fields. Indeed, the

defense team obviously understood the mitigating value of this evidence because they presented

what they discovered. However, the trial team's investigation stopped far short of competence,

leaving Fields' jurors with only a faction of the true picture.

Several witnesses were available who could have provided powerful and moving first-hand accounts detailing the abuse; the abusers; the victims of the abuse; and the resulting consequences, both physical and mental, on the young boy who was forced to endure it all.

For example, Charles Fields' declaration describes how he and Sherman were repeatedly and viciously beat by their mother's boyfriend beginning at a very young age;

> When I was a kid, Sherman and I lived with my grandfather off and on because of Brad. Brad used to whoop me and Sherman a lot. He used to beat us and not touch his sons. I was 3 or 4 when Brad came. He was nice at first. He would take us riding, buy us candy. After he got in there, he laid his rules down. I guess once he moved in he thought he could run the house like he wanted to. Brad didn't like me because my grandmother was so protective of me. I got punished quickly. She would always come to my aid.
>
> We tried to do whatever Brad thought was right because otherwise he'd tear us up. Mostly he would pull us into his room and tell us what we supposedly did wrong and whoop us. It was mostly just him around and my mom would be out at work or something. A lot of times when Brad whooped him, Sherman would cry, even though he tried hard not to. Sherman was kind of bull-headed. I think he didn't want to give Brad the satisfaction of knowing he made him cry. I'd try not to cry too. I felt like he'd feel he'd accomplished his mission if he made us cry. If we did cry, he wouldn't stop – didn't make a difference to Brad. But if we could take it and not cry, we felt good because we hadn't given him the satisfaction. Sherman you'd have to whip real good for him to cry, so I knew Brad must have been hitting him hard, especially when that would happen.

*Declaration of Charles Fields* ¶¶ 22-23. The beatings were brutal, prolonged attacks on small, defenseless children:

> Brad would whoop you until he got tired. It was usually 20, 25 licks with our clothes on. We always had whelps. We would be black and bruised. It would hurt for maybe two days. He would get us on our backsides so you could barely sit down. It hurt to sit down.

*Id.* ¶ 26.

The torrent of physical abuse was not limited to Sherman and his brothers, as

Charles further explains:

> The worst fight I remember was when Brad whooped my mom, my grandma and my auntie. Brad and my mom were getting into it and when he hit my mom, my Aunt Hattie chunked an iron at him. Then he hit Hattie in her face with his fist. Then he pushed my grandma off the porch. He slapped them, punched them in the face, arms, wherever. My grandma was old then. When LB Belcher came running over there he ran off. LB was yelling, "Come back here and fight a man! You fight these women, come fight a man!" I think my mom and Hattie were bleeding. I think Hattie had a busted lip and my mom was bleeding from the corner of her eye. **Sherman and I were peeking around the door, seeing everything. We were both crying. Right then we said we were going to get him when we were older.**
>
> **We used to see my mom get so many whoopings that we made a vow not to let that happen again. My mom didn't try to fight back – she'd just ball up on the ground. He kept her with black eyes and swollen lips. He'd still try to punch her when she was on the ground.** Mom had black eyes a lot. It made me feel mad. She'd be going outside with a black eye, a busted lip. Sometimes she would wear sunglasses. **We would see her bleeding and she would bleed a lot. There would be blood on the floor. My mom would be screaming and crying every time.** We felt helpless. Sherman and I would talk about it – we used to always plan to get him when we were like 4, 5, and 6. We said we were going to catch him sleeping. We'd see it all the time and get tired of it – and then you're young and you can't do nothing about it. We would just talk about getting him all the time, "We going to get him!"

*Declaration of Charles Fields* ¶¶ 36-37(emphasis added). The threat of physical violence was

omnipresent. The Fields children were required to always be alert to the possibility of the next

assault:

> **Another reason we were scared of Brad is that he kept a pistol and a shotgun all the time. We thought he'd use it on someone in the family.** The shotgun was in the closet in the bedroom but he always carried the pistol. You would see it in his waistband. The only person we felt could protect us some was my grandma. **The police used to come over there all the time. They'd talk**

> **for a while and then leave – they'd never take Brad.  We felt helpless when the police would leave and Brad was still there.**

*Id.* ¶ 77.

The abuse left scars.  Vincent Green remembers seeing the unmistakable signs of

abuse on Sherman's body:

> **One day at the country, Sherman showed us the whelps on his back where his step-dad whooped him.  There were like six whelps across his back – lashes that were all swollen.  They were like 6 or 7 inches long.  I never got whelps like that.**  Sherman would say he was tired of getting whooped.  He'd say that when he came to visit – he'd come for a break from it.  Maybe four times or more I remember him coming there and talking about whoopings.
>
> The only ones that Brad whooped were Sherman and Charles.  They didn't like it that he singled them out.  Sherman knew it was because they weren't his sons.  **He used to whoop them with belts, extension cords – whatever he could find to whoop them with.**  I think all the whoopings probably made him angry, but when he talked about it, he seemed more sad though than angry.  He never cried and he didn't cuss him out.  He was maybe 8 or so when it started and I think it went on for at least 3 or 4 years after that.  He never stopped whipping them – I think it stopped because my sister shot Brad and he went away.

*Declaration of Vincent Green* ¶¶ 7-8. (emphasis added).  Sherman's step-father was not the only

abuser:

> Grandma was a stand-in mom back then.  We had no choice but to get along.  Back then they didn't care – be good or get whooped.  She used to whoop us with a switch – go get one and if it breaks, get another one.  I just remember getting whooped one time by my mama.  **Our grandma would whoop us every day – every day.**  We'd get whooped for not moving too fast when she said something.  **My grandma was the only one to whoop us with switches.  She was extra mean.**

*Declaration of Shaffer Fields* ¶ 14.

The failure of Fields' mother to leave Brad despite the abuse had a profound effect on Sherman and his siblings:

> I felt like my mom put Brad before us. She knew he was whooping us – even though he was whooping her too so she couldn't do too much. I felt she should've got out of the relationship. She was with him all the way until 1985—ten years. It took a hell of a toll on us. We felt our mom loved him more than us. He was like a drill sergeant to us. He was in the military. Sherman and I hated him – mostly because he put his hands on our mom and auntie and grandma.
>
> I think my grandma's the only one that seen it – no cousins or friends or anything and especially not teachers. We were scared we'd be taken away. Mom said to make sure the teachers didn't see it because she was in love with that man. I never told anyone outside the house but my granddad.

*Declaration of Charles Fields* ¶¶ 24, 26.

In addition, the children observed the physical and mental decline of their mother as a result of the endless brutality.

> You could tell it was wearing my mom down. Her confidence went down. I guess she felt like she was stuck with him. She'd be at home a lot, stopped seeing friends. After Ivory and Brad started messing around, she didn't trust friends anymore.

*Declaration of Charles Fields* ¶ 36.

The psychic pain to a young and helpless child that accompanies witnessing his mother's repeated brutalization and her corresponding emotional downfall is nothing short of staggering. However, Mr. Fields' jurors were not given an opportunity to consider and give mitigating effect to these experiences because they were not discovered and presented at Mr. Fields' trial.

Once again, if the full extent of the abuse had been discovered, it could have been provided to a mental health expert. The various negative, lifelong consequences of child abuse

-193-

were well documented at the time of Mr. Fields' trial.  Dr. Woods summarizes the abuse and its

effects on Mr. Fields:

> Mr. Fields was also exposed to neurocognitive insults during his formative years from the physical abuse that he suffered and his caretakers' frequent domestic disputes that often ended in violence. At various times in Mr. Fields' childhood, there were shootings in and around the household.  Ms. Swinnie's longest relationship during Sherman Fields' childhood was with William Bradford (who fathered two of Mr. Fields' younger brothers).  Mr. Fields was subjected to relentless and vicious beatings at the hands of Mr. Bradford as well as the hands of his maternal grandmother.  He was beaten with switches, belts, extension cords and fists.  Family members report seeing welts on his body and that at times, his injuries would be so painful that it would be difficult for him to sit down.  Mr. Bradford's beatings of Mr. Fields, in particular, were capricious and seemingly unprovoked.

*Declaration of Dr. George Woods* ¶ 57.

However, Dr. Woods' conclusion is equally, if not more, important in order to

assess the mitigating value of the evidence:

> The inconsistency of Mr. Bradford's brutality created the hypervigilance and scanning behavior so characteristic of Mr. Fields' anticipatory anxiety, the anxiety that makes him act before he thinks.  Chronic autonomal arousal creates both anticipatory anxiety and the disconnect from affect found in PTSD.

*Declaration of Dr. George Woods* ¶ 57.

The details make all of the difference.  It was those details that the trial team

failed to discover and consequently failed to present to Mr. Fields' jurors.  While Mr. Fields'

jurors knew that he and other family members, including his mother, had experienced a chaotic

youth (as Dr. Price testified) and generally knew that Mr. Bradford assaulted Sherman,

Sherman's siblings, and Sherman's mother, critical details (found in the declarations quoted

above) were omitted.  Thus, Mr. Fields' jurors heard allegations of abuse, but were deprived of

any information that would have allowed them to place this information in a meaningful contest.

Sherman and his family members were not just hit from time to time – as reprehensible as that is. The abuse he endured produced both temporary physical pain and scars and caused lifelong psychological and emotional injuries.

> **7.      Counsel unreasonably failed to investigate and document trauma in Mr. Fields' life history**

Mr. Fields was exposed to a variety of trauma, including but not limited to the abuse discussed above, throughout the course of his life, and particularly during significant developmental periods of his childhood and adolescence.  Some of the incidents of trauma involved severe, acute exposures; such as witnessing his grandfather being run down by a drunken driver.  However, chronic traumatic exposure pervaded his life.  Neither the jurors who sentenced him to death nor the mental health staff who encountered him in correctional settings were ever provided with a complete and full history of these exposures to trauma.  Although counsel had numerous leads they could have pursued, they failed to follow them or to seek expert guidance in understanding the impact of trauma on Mr. Fields' mental and emotional functioning.

Mr. Fields grew up in a toxic environment polluted by an on-going history of racism, and punctuated by extreme violence and brutality.  Both Mr. Fields and his family (including previous generations) felt the sharp sting of racial prejudice.  This left an indelible mark on his psyche – as it had done with previous generations of his family.  In addition, physical brutality and sudden violence were Fields' constant unwanted companions.  The beatings discussed in the previous section resulted in multiple scars on his body including to his thighs, arms, shoulders, and the back of his legs.  When he wasn't the recipient of beatings, he was the witness to extreme violence – which was often lethal.  When Mr. Fields was about eleven years old, his mother, Ms. Alice Swinnie, shot one of her boyfriends after catching him

with another woman – her cousin.  A few years later, Ms. Swinnie herself was shot in the head by her then-husband.  *See* Exh. 42.

In the course of a few years, an astonishing number of Mr. Fields' friends and family were killed.  By the time Mr. Fields was nineteen years old, at least twelve of his close friends, family and loved ones died tragically.  By the time he was twenty-seven, that number rose to at least nineteen.  Counsel failed to document this history by obtaining any relevant records, such as death certificates, coroner's reports, or media accounts of *any* of these deaths, even when presented with names of the deceased.  As demonstrated above, these records were readily available and should have been obtained and presented to Mr. Fields' jurors.  *See supra* pgs 50-57.

The defense team at trial told jurors that three or four of Fields' friends died violent deaths.  TT at 2401.  However, the actual number of friends and loved ones lost through extreme violence was drastically higher – nineteen by the time of trial.  As demonstrated by Exhibit 117 (Sherman Fields:  A Witness to Extreme Violence), between Mr. Fields' eleventh and twenty-seventh birthdays, no single two-year period elapsed without exposing him to extreme violence resulting in the loss of a close friend or loved one.  Despite this brutally consistent pattern of violence and loss, which was relatively simple to document, trial counsel did nothing but provide the jury with a minimized version of the truth.  As anyone who has ever lost a loved one knows, the loss of a loved one can be quite a devastating and traumatic experience, the impact of which can be felt for years following the death itself.

Here, Mr. Fields experienced such loss with such cruel frequency that it is almost difficult to contemplate it.  Yet despite this fact, counsel did not investigate any of these deaths, either to assess the impact of the individual losses on Mr. Fields or to explain the context of community violence in the social environment of his developmental years.  That is, Mr. Fields

did not simply grow up in a "tough neighborhood" – he grew up in what amounted to a war zone, where casualties were a frequent occurrence, and the risk of being indiscriminately targeted and killed was constant.  However, the jury heard none of these facts.

Similarly, counsel made no attempts to interview family, friends, and other contemporaries to document the effects of the traumatic losses on Mr. Fields' functioning and behavior.  Once again, the overlooked evidence was compelling mitigation, either considered in isolation or in combination with the other undiscovered evidence.  Several readily available individuals could have explained the effects of this chronic and severe violence on Mr. Fields. Several were in the court room during trial, and some actually testified at the penalty phase but were not asked about these incidents.  For instance, Charles Fields, Mr. Fields' older brother, noted Fields' reaction to the death of one of his best friends, Roy Cleveland, who hung himself in a juvenile detention facility:

> I remember when it happened, and I remember seeing changes in Sherman after Roy died – that was his best friend.  Sherman slept a lot after that.  I don't know if he felt like he it was his fault or what.  That was when he started getting worse.  I guess he felt that they let him die.  He was always talking about this big fat guard who worked at the juvenile.  He said he took his time to get Roy down and he could've got him sooner.  He thought it was a deliberate thing.  Me and my mom went to see him at juvenile after they hung themselves.  He was sad and depressed and he said the guard could've got him down.

*Declaration of Charles Fields* ¶ 70.  Although Charles sat through the entire trial, and would have testified if asked, trial counsel never approached him.  *Id.* ¶ 95 ("I was there for all his trial. His lawyers never talked to me").

Shaffer Fields, Mr. Fields' youngest half-brother, was also available and could have given jurors a moving account of Fields' reactions to the death of the second of Mr. Fields' two best friends, Roderick Cummings, when Fields was just sixteen years old:

> Growing up where we did, we seen people get killed and bloodied up – like Roderick, and he was like our cousin. He used to only be with my brother and he always come over our house. I know I seen people killed before I saw him. Roderick just stick in my mind cause he was the first I really knew. I was like 9 or so when that happened. We were coming through the projects and heard the shots and we went over there and seen him – all bloody and the ambulance and everybody crying. Roy and Roderick were the main two people Sherman would be with.

*Declaration of Shaffer Fields* ¶ 29. Like his brother Charles, Shaffer Fields would have testified if asked by counsel. *Id.* ¶ 36 ("The Federal Marshals came to talk to me in jail. I guess they were looking for [Sherman Fields]. I think his lawyers only talked to my mom. If they'd asked me to, I would've testified").

Likewise, Mr. Fields' younger brother, Jimmy Fields, could also attest to the devastating effect the violent loss of close friends had on Mr. Fields. Jimmy Fields paints a vivid and compelling picture of the violence Mr. Fields was exposed to in early life:

> Sherman lost a lot of friends and all of them were like brothers to the family. When Roderick got killed – he was like a big brother to all of us. He used to be over our house all the time. I was over there when Roderick got killed. I heard a gunshot. My mama beat me because I had just walked off that porch. I had just asked him if he'd seen Sherman. He hadn't seen him. He had that blank look – he was in that zone. He had a little kid with him and was pushing him out the way when he got shot. I know now that he looked like that because he probably knew he was getting ready to die. Then I went out to the front and when I came back in, I saw his brother Ricky cradling him and half his head was shot off – for real, all this side was missing. I hadn't even heard gunshots. I heard nothing. Then I seen the cops and heard the sirens.

-198-

*Declaration of Jimmy Fields* ¶ 22; *see also id.* ¶ 23 ("I know Sherman lost a lot of friends. Roy died and Roderick and another guy called Duke . . . That was the first time I had seen my brother cry – tears were running down his face"). This testimony was never presented to the jury because, as Jimmy Fields explains, "[n]o one working for Sherman came to see me before the trial." *Id.* ¶ 31.

Again, Alton Robinson, Mr. Fields' first cousin, could have provided powerful testimony concerning how Mr. Fields' devastation following the death of his best friend Roy Cleveland:

> I remember when Sherman and Roy hung themselves. I don't know how he was coping after Roy died. He used to talk to my brother Timothy a lot – a few of their friends had passed at that time. Timothy and Sherman would talk about what happened with Sherman and Roy. Sherman was sad after it happened. It was probably because he died so young. **If there was a conversation when people talked about people that were dead, Sherman and Timothy always talked about Roy. Sherman said it was like Roy was in there hollering and then all of a sudden he wasn't saying nothing. Then they found him dead.**
>
> Before Roy died, Sherman and him used to be together a lot. They were good friends. If you saw one, you would probably see the other. I can picture them walking to the basketball court together. It might be just them, or Timothy would be with them a lot. They'd joke around together. . . .

*Declaration of Alton Robinson, Jr.* ¶¶ 21-22 (emphasis added). The jury did not hear this account, however, because, despite the fact that Mr. Robinson "would've testified if they asked me to," he explains that "[n]one of Sherman's lawyers came to talk to me." *Id.* ¶ 35.

Trial counsel's failure to investigate trauma in Mr. Fields' life history prevented them from obtaining this powerful testimony from a witness who actually testified. Alice Swinnie, Mr. Fields' mother, could have testified about the devastating effect of losing his two best friends, Roy Cleveland and Roderick Cummings:

> Sherman had a lot of friends getting killed.  He lost more friends than my other kids.  I saw it affect him.  He always cried.  He'd cry in front of me and probably in his room too.  I think Roderick Cummings was his first friend to die.  He got shot at one of the projects – Sherman Manor Apartments.  They were real close.  They used to hang out together.  I remember we were coming down the road and we were following the ambulance. . . .

> I think Roy's death affected Sherman the most.  He just cried a whole lot and they put him in DePaul and he wasn't the same after.  He just didn't seem to be the same person.  It was like he didn't care – didn't care about himself. . . .

*Declaration of Alice Swinnie* ¶¶ 51-52.  Although trial counsel called Ms. Swinnie to testify, because they failed to investigate the vast history of trauma in Mr. Fields' life, they did not know to ask her questions about the effects such devastating personal losses had on her son.

In addition to this unrelenting history of violence, Mr. Fields, his family, and his community felt the constant sharp sting of racism.  The uninvestigated – and consequently unpresented – evidence is documented in the declaration of Charles Fields:

> I think I was really first aware of the racism in Waco when I was at Alternative School when I was in like 9[th] Grade.  I was sent there.  I got into a fight at the school with this Mexican dude, and I went to the principal's office.  The principal said, "That's why we didn't want the school over here by all these niggers cause you all don't know how to act."  Then my mom walked in.  We went to the school board and filed a complaint.  That was in 1985, maybe 1986.  They had me and my mom give a statement . . . The school board found she didn't say it.  The principal kicked me out the school and the Mexican guy got suspended for two weeks.  That was really what made me realize, "Poor black people ain't got no say."  People around that woman knew she was racist.  After that I felt pretty much like racism was everywhere in Waco.  I wasn't expecting the principal to say "niggers" like that.

*Declaration of Charles Fields* ¶ 50.  However, the effects of racism felt by Mr. Fields and his family extended to far more then just marginalization.  Racism was life-threatening:

> There was a lot of kidnapping and abductions and the KKK when we were kids.  The KKK took out one dude and cut off his penis and put it in his mouth.  They threw him in the Brazos.  We had to

-200-

walk that way, from the project in East Waco, across the bridge to the baseball field. The field was where the zoo is now in Cameron Park. Our parents told us, "Stick together because they can't get you all." We were scared to go across the bridge – especially at night. We would be crossing that bridge and have people chunking beer bottles at us. Drunk white boys were going by and they'd hit us with something. They would yell at us and use the N-word. The parents would tell us to all go together. They'd say, "If something happens, then the others will see it."

We knew who the murdered guy's kin was and they said he was fast and they still caught him. They killed him around 1980, maybe as late as 1983. We used to get chased out of Cameron Park a lot. Once we made it to Sherman Manor we were alright because it was a black neighborhood and we knew they wouldn't try and follow us over there. There didn't used to be any housing in front of that project – you had to run up from the river, through all these bamboo stalks and bushes. It was so scary because you had to run up through there in the dark and you wouldn't be able to see if someone was waiting in the bushes to get you. That bridge crosses at Herring.

*Id.* ¶¶ 51-52. Charles Fields explains that these events continue today:

Stuff still happens. About five years ago, two black guys got stabbed on the bridge by white guys. The KKK marched down Valley Mills around 1998 and they had police escorts. My Aunt Bessie moved to Chicago a long time ago and I don't think she would ever come back cause of the racism here. If there are black/white couples, they need to watch out because if it's at night and the white boys think they can get at them, they will.

*Id.* ¶ 55. He further explains the very real and traumatic effects of racism on him and his brother:

I know the racism in Waco affected me. At an early age I knew, by the color of my skin, that black is wrong, white its right. We knew that. Racism was like a part of dealing with life. You just know you got to run from white folks at night time – that's what it was. You had to stop thinking about it and just do it regardless. Sherman didn't really talk about it with me, we just knew if we get caught by one, we will have to fight for our lives. But that's why we always looked out for each other so much. We knew it was unfair but it was just the way it was. They say it's all supposed to be over with but it doesn't feel that way around here.

*Id*. ¶ 56. Shaffer Fields, another of Mr. Fields' brothers, confirms that the pervasive racism in

Waco had a traumatic effect on him growing up:

> I don't like anything about Waco. Here, they won't let black people do nothing – you can't gather in the park anymore. The police came and cleared it out. Yet, when the KKK protest here, the police protect them.

*See Declaration of Shaffer Fields* ¶ 34.

The contemporary experience of racially motivated violence for Mr. Fields and

his siblings only served to reinforce and enhance the traumatic effects of the pervasive historical

racial violence felt by generations of Mr. Fields' family in Waco. Scholars have documented the

extreme racial violence in the Waco area. *See Declaration of Dr. George Woods* ¶¶ 62-70. The

most notorious incident was the 1916 lynching of Jesse Washington, who was dragged from the

courthouse, beaten, mutilated and burned in front of a mob of ten to fifteen thousand people

assembled on the lawn of city hall. Mr. Washington's corpse was subsequently dragged through

the streets and parts of his body were collected as souvenirs. Patricia Bernstein, *The First Waco*

*Horror: The Lynching of Jesse Washington and the Rise of the NAACP* (2006); *Declaration of*

*Dr. George Woods* ¶ 63. According to the Texas State Historical Association's *Handbook of*

*Texas Online*;

> Waco became a center of Ku Klux Klan activity and influence during the 1920s. Lynchings had occurred in Waco in 1905, 1915, and 1916, and on at least one occasion the black victim was publicly burned in the town square; in the 1920s mobs of white citizens hanged or burned other blacks as well. In 1923 more than 2,000 Klansmen paraded through the city, and the organization boycotted businesses of people unsympathetic with its agenda. Many of Waco's business and political leaders at least implicitly supported the Klan during this period, and one member claimed that the Klan "controlled every office in the city of Waco" during the 1920s.

*Handbook of Texas Online*, s.v. "Waco," http://www.tshaonline.org/handbook/online/articles/ WW/hdw1.html (last visited Apr. 7, 2010).

This history of extreme racially motivated violence permeated the childhood of Mr. Fields' grandfather, Shelby Mitchell, shaping his perception of the world, which he, in turn passed onto his grandchildren. Research demonstrates that even family members who had not been born when the traumatic events occurred can develop PTSD-like symptoms secondary to dealing with the traumatic symptoms of family members or loved ones, much like the children of psychotic parents, whom often has soft signs of psychosis. *See Declaration of Dr. George Woods* ¶ 73. For Mr. Mitchell, the traumatic effects of racial violence were felt first-hand. As Charles Fields explains:

> My grandfather used to tell us that he and his brothers were at home and Klansmen came to their house and beat his daddy with a whip and raped his mama right there in the house in front of all of them . . . It probably [] never was reported. Back then, you cleaned up and prayed on it – go to the police and they'd be likely to kill you. That's the score around here.
>
> My granddad told the story about the KKK coming to his house a lot. It seemed like he told it every other night. He tried to always get us to understand that there was a difference in color in the world and that everybody wasn't treated fairly. He would always tell that story exactly the same way. He'd say he was scared, looking out the door. He'd seen all the white people out there wearing sheets and burning crosses. I guess he heard all of them shouting, "Niggers leave!" I don't know why they picked on them. He said they just came up there one night. He said they'd already been getting other people around there – burning crosses and raping people's women and stuff. They lived on a farm and I think he said they just walked in the door.
>
> My granddad used to talk about other racist stuff. He would say people just used to harass him. That thing with the KKK wasn't the only thing that happened. He used to talk about lynchings. He told us about how a mob of white people they dragged a black man downtown – took him out the courthouse and hung him. He said they dragged him down the same path the tornado took. He said

God showed them that what they did to that man was very wrong and that's why he sent that tornado down there to tear up everything.

*Declaration of Charles Fields* ¶¶ 59-61.

Not surprisingly, this traumatic childhood took its toll on Shelby Mitchell:

This traumatic childhood clearly had deleterious effects on Mr. Mitchell.   First, it contributed to his severe alcoholism.   Mr. Mitchell reportedly drank every day, morning to night.  According to Charles Fields, he would have a shot of coffee and then begin drinking gin and beer.   He reportedly drank from the time he awoke until sundown when he would pass out in his room. Charles Fields remembered that he could drink and work all day but as soon as he kicked his shoes off, he would pass out.  Charles Fields also recalled that Mr. Mitchell would become too drunk to drive and Charles remembers driving him around when he was as young as age 12.   Mr. Mitchell told his grandchildren that his drinking calmed his nerves and would tell them "[i]f y'all had seen some of the things I seen as a child, y'all would drink too."

*Declaration of Dr. George Woods* ¶ 69; *see also id.* ¶ 74.  Additionally, he likely suffered from

severe mental illness, believing his dead wife would visit him at night:

A lot of people in our family have mental problems.  You know, my granddad used to always be talking to himself in the back room.  He told us his wife who died, Corine, would always come visit him at night and talk to him.  I didn't believe it – I felt like he was going crazy. . . .

*Declaration of Charles Fields* ¶ 80.

Indeed, Mr. Fields' grandfather was paranoid, and reinforced the isolation race

naturally created in his grandchildren.  As Charles Fields explains:

Even when I was a kid I tied my granddad's drinking to what he'd been through.  I would always ask him why he drank so much and he said it calmed his nerves.  He'd say, "If y'all had seen some of the things I seen as a child, y'all would drink too."  He used to say how lucky we all were cause we didn't have to go through some of the harassment he did – with people kicking in the doors.  I guess that's why he had as many guns as he did – to protect himself.  He had about 16 guns.  Most of them were rifles and shotguns.  He has 7 or 8 pistols – from .38s to .22s.  He kept a whole bunch of 38s –

-204-

> snub-noses, long barrels.  He would say that he liked them cause
> they ain't too powerful, but they enough to stop somebody.  I guess
> he meant they were powerful enough to kill someone.

*Declaration of Charles Fields* ¶ 80.  It is now clear, and was provable at the time of trial, that the lessons Mr. Mitchell taught his grandchildren, including Mr. Fields, contributed to early childhood trauma instead of safeguarding the children from trauma:

> Our grandfather, Shelby Mitchell, raised us up that it was better to
> get caught with a gun than without.  My grandfather always carried
> a pistol – even to church.  He'd say, "You can shoot a black man
> and get away with it.  Shoot a white man and you'll go to jail."  He
> taught us to believe that no one was better than us.  He told us we
> should always use a gun if someone pulled a gun on us.  He said he
> could always get us out of jail but he couldn't get us out the grave.

*Declaration of Charles Fields* ¶ 44.

Trial counsel's failure to conduct a constitutionally adequate investigation resulted in not only the failure to discover numerous pieces of evidence of an overwhelming lifetime of deprivation and trauma, it resulted in the inaccurate portrayal of Shelby Mitchell, Sherman's grandfather, and his influence on Sherman and his siblings.  As demonstrated above, Charles Fields provides a powerful corrective to the information presented to Mr. Fields' jurors of an idyllic time living under the stable stewardship of Mr. Mitchell.  However, Charles was not able to explain the truth to Mr. Fields' jury because, although he was present for the entire trial, Fields' lawyers never talked to him.  *Declaration of Charles Fields* ¶ 95.

Moreover, trial counsel never attempted to retain a mental health expert specializing in trauma, even though social worker Jane Bye had specifically advised counsel that Mr. Fields should be evaluated for depression and Post-Traumatic Stress Disorder.  *Affidavit of Jane Bye*.  Dr. George Woods demonstrates the prejudice to Mr. Fields resulting from this failure:

-205-

> [t]his racial, social, and environmental isolation of Mr. Fields and his family potentiated the multigenerational mental illness. Mr. Fields' decisions, before and during the offense, as well as at the time of trial, were made with the weight of this emotional dysfunction.

*Declaration of Dr. George Woods* ¶ 75.   Counsel's deficiencies in all these regards was unreasonable, and there is no evidence in the extant record to support the claims that counsel's failure to adequately investigate and document Mr. Fields extraordinary exposure to trauma was the product of a strategic decision.  Had Sherman Fields' jury heard all this evidence of the true extent of the trauma that Mr. Fields' lived through, there is a reasonable probability that at least one juror would have voted for life instead of death.  His trial counsel's failure to uncover this wealth of readily available mitigation prejudiced the outcome of his capital sentencing proceeding.

> **8.    Counsel unreasonably failed to investigate Mr. Fields' mental illness and the multigenerational history of mental illness in Mr. Fields' family**

As the Supreme Court has made abundantly clear, mental health investigations are a necessary part of a constitutionally adequate mitigation investigation.  *See Rompilla*, 545 U.S. at 390-93 (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (evidence of "impaired intellectual functioning is inherently mitigating").  Yet despite numerous "red flags" that an investigation was warranted into Mr. Fields' mental health, trial counsel unreasonably failed to carry out that investigation.

As vividly demonstrated by Mr. Fields' family tree, Exhibit 116, and described in detail above (*see supra* at 47-50]), Mr. Fields was genetically predisposed to mental illness, and even a cursory investigation would have alerted trial counsel to that fact.  Indeed, the maternal

side of Mr. Fields' family suffered from "multi-generational neurological impairments and affective mood disorders." *See Declaration of Dr. George Woods* ¶ 30.   Dr. Woods noted:

> The sheer number of close relatives in Mr. Fields' family who suffer from serious mental illness is extraordinary and contributed to a very high probability that he, also, would suffer from mental disease. Mood disorders have an incidence in the United States of approximately 8 percent of the population meaning that, at any one time, 8 percent of persons in the United States suffer from various forms of depression or Bipolar Disorder.  When there is a genetic loading of mood disorders in a family, the incidence increases exponentially.  This genetic loading for mental illness makes the potential for Mr. Fields to suffer from Bipolar Disorder very high. The co-morbidity of Sherman Fields' own genetically-based potential for developing a mental illness and the traumatic stress manifested by the circumstances of his upbringing, including the extreme poverty in which his family lived, his caretakers' substance abuse, and neglect and abuse that he and his siblings suffered in their childhood; created greater and more severe symptomatology than either disorder alone may present.

*Id.* ¶ 50.   Although all of the documentation with regard to Mr. Fields' mental illness and his genetic predisposition to such mental illness was readily available to trial counsel, none of it was collected and none of this information was provided to the jury.

### 9.       Counsel unreasonably failed to investigate potential brain damage and dysfunction

There were a number of "red flags" that should have alerted trial counsel to the need for an investigation into Mr. Fields' potential brain damage and dysfunction given what counsel knew and reasonably could have discovered in preparation for Mr. Fields' capital trial. Indeed, Jane Bye, the social worker who assisted counsel, specifically advised counsel regarding the need for Mr. Fields to undergo a neuropsychological evaluation.  *Affidavit of Jane Bye.*  As Ms. Bye noted in her remarks to counsel, and as had been widely reported by the media at the time of Mr. Fields' trial, chronic exposure to violence and trauma has documented neurobiological effects on the brain, and a growing body of research specifically indicated that

such exposure can negatively impair or affect children's brain development. *Declaration of Russell Stetler* ¶ 36. In light of Mr. Fields' extraordinary exposure to trauma growing up, as recounted above, counsel should have pursued a neuropsychological evaluation for their client. *See supra* 50-58**;** *see also* Exh. 117 (Sherman Fields: A Witness to Extreme Violence).

Additionally, readily available records should have alerted counsel to the risk of brain injury to which Mr. Fields was exposed as a result of his prior suicide attempts involving hanging. On one such occasion, Mr. Fields was found with a pulse, but no spontaneous respiration. These facts indicate that Mr. Fields was at risk from anoxic brain injury – that is, injury caused as the result of a lack of oxygen flowing to the brain, since brain cells will start to die within a few minutes if they are deprived of oxygen. Moreover, Mr. Fields' Texas Youth Commission records documented a butterfly-shaped pigmented area over his nose, which is consistent with lupus erythematosus, a condition that can cause vasculitis in the brain – that is, an inflammation of the blood vessels in the brain, which can adversely affect neurological processes and functions.

In light of all these potential indicators of brain damage and dysfunction, counsel should have pursued a thorough neurological assessment of Mr. Fields. Counsel, however, only had Mr. Fields evaluated by a psychologist for the narrow purpose of determining his I.Q. Such testing, though, was not a substitute for a proper neuropsychological assessment. Indeed, there is a critical distinction between intellectual functioning, measured by I.Q. scores, and neuropsychological integrity, which implicate the executive functions of the brain.[25] An I.Q. score in the average or above-average range does not preclude the possibility of

---

[25] "Executive functions" refers to a collection of brain processes, most commonly linked to the frontal cortex, which are responsible for planning, decision-making, cognitive flexibility, abstract thinking, rule acquisition, initiating appropriate actions, problem solving, and selecting relevant sensory information.

neuropsychological problems, as deficits in executive functioning, for example, can coexist with average or even high intellectual functioning.  However, because counsel never retained an expert to conduct a neuropsychological assessment, these issues were never explored, and consequently, potential evidence regarding brain damage and dysfunction was never investigated and developed.

### 10. Counsel unreasonably failed to obtain all documents and interview readily available witnesses about Mr. Fields' history of incarceration

As was obvious to trial counsel at the outset of Mr. Fields' capital prosecution, one of the key arguments that the government would pursue in the penalty phase proceedings was that Mr. Fields' "future dangerousness" justified a sentence of death.  Given that by the time of trial, Mr. Fields had spent over a third of his life behind bars, it was clearly incumbent on counsel to conduct a thorough investigation regarding Mr. Fields' history of incarceration, as evidence of Mr. Fields' prior conduct and adjustment to prison life would be probative on this issue.  Yet despite this seemingly obvious line of investigation, counsel inexplicably failed to interview *anyone* who had contact with Mr. Fields in the juvenile facilities where he was placed, or during his eight years in the Texas Department of Criminal Justice, or in the early months of his incarceration for the capital offense.  Compounding this failure, counsel failed to obtain and understand how Mr. Fields' incarceration records were compelling proof of his mental illness. Instead, counsel only obtained a few records, reviewed them in a cursory manner without the benefit of an accurate understanding of Mr. Fields' multigenerational family history of mental illness, and interviewed a few correctional officers who had only known Mr. Fields for about a year prior to his capital trial, while he was incarcerated at the Federal Medical Center in Fort Worth.  While these witnesses could testify that Mr. Fields was not currently causing any

problems as an inmate in what amounted to solitary confinement in the special housing unit, these witnesses knew little or nothing of his prior incarcerations or problems as an inmate.

Counsel failed to interview anyone who was familiar with Mr. Fields' time in his juvenile placements or in the Texas prison system. Such an investigation was necessary to understand the context of Mr. Fields' behavior during his prior periods of incarceration, the quality of any care he received when he was having mental and emotional problems, and the effectiveness of the institutions in achieving correctional objectives.

Counsel's failure to thoroughly review records and conduct interviews with witnesses regarding Mr. Fields' prior incarcerations was unreasonable, as it left counsel unprepared to adequately rebut the anticipated evidence in aggravation at the penalty phase regarding Mr. Fields' alleged future dangerousness. As the Supreme Court has made clear, defense counsel has a duty to make all reasonable efforts to anticipate, investigate and rebut the details of the aggravating evidence that the prosecution will likely emphasize in capital sentencing proceedings. *See Rompilla*, 545 U.S. at 385-90 (counsel held ineffective for failing to investigate petitioner's prior convictions where counsel knew that prosecution intended to seek death penalty by proving petitioner had significant history of felony convictions indicating the use or threat of violence).

## C.    Trial Counsel's Deficient Performance Prejudiced Mr. Fields

The deficiencies in trial counsel's pre-trial mitigation investigation resulted in a penalty phase presentation that only superficially touched on selected portions of the extraordinary trauma to which Mr. Fields had been exposed throughout his life, and failed to convey the profound impact that these experiences had on shaping Mr. Fields during the formative years of his life and beyond. Moreover, trial counsel failed to present any evidence of Mr. Fields' extensive mental health problems, despite numerous "red flags" that mental illness

was a multi-generational issue in the Fields family.  Additionally, despite being on notice that one of the central arguments that the Government would make as to why Mr. Fields should be sentenced to death was because he would be a "future danger," counsel failed to adequately investigate and prepare for this anticipated aggravating factor with readily available rebuttal evidence.  None of these deficiencies are attributable to tactical considerations or strategic judgments on the part of counsel, but rather directly flowed from counsel's unreasonable failure "to discover all reasonably available mitigating evidence." *Wiggins*, 539 U.S. at 524 (emphasis added).

Trial counsel's mitigation presentation consisted of only eight witnesses.  Three of those witnesses were correctional officers (Jack Jaaks, Fred Waggoner and Greg Watts) who had only known Mr. Fields for the year leading up to his trial, and had almost no knowledge of Mr. Fields' extensive prior history of incarceration.  Although the ostensible purpose of putting on these witnesses was to demonstrate that Mr. Fields had adjusted well in prison, the credibility of these witnesses was easily challenged by the government in cross-examination given that: (1) none of these witnesses knew much about Mr. Fields' extensive prior history of incarceration; and (2) to the extent that the Government cross-examined these witnesses about Mr. Fields' alleged misconduct during his prior incarceration, none of these witnesses knew enough about those alleged incidents to provide a mitigating context for those incidents.

For example, counsel called Correctional Counselor Jack Jaaks to ostensibly testify about Mr. Fields' conduct at the Federal Medical Center ("FMC") at Forth Worth while awaiting trial.  The direct examination consisted of less than 20 questions, more than half of which concerned preliminary background questions about the witness's name and the nature of his employment.  TT at 2375-2378.  Mr. Jaaks' testimony about Mr. Fields' behavior was perfunctory, simply stating that Mr. Fields had had "problems" when he first came to the facility,

but that afterwards he "hadn't been a problem." TT at 2377-2378. On cross-examination, Jaaks admitted that: (1) he knew nothing about Mr. Fields' prior prison record within the Texas Department of Corrections, the Texas Youth Commission, or the McLennan County Jail (TT at 2378); (2) that Mr. Fields was found with a shank when he first came to the facility (TT at 2378-2379); and (3) that he was "not sure" whether Mr. Fields had threatened an officer at the facility (TT at 2379). Trial counsel did not conduct any re-direct examination of Jaaks to address these points raised in cross-examination, but merely let them stand. The unmistakable impression left for the jury was not only that Jaaks was someone who was simply too unfamiliar with Mr. Fields to offer any reliable information as to whether he would be a future danger, but that even in Jaak's limited time of knowing Mr. Fields, he confirmed that Mr. Fields engaged in alleged conduct – as recent as in the year leading up to the trial – that posed a danger to the staff and inmates at the FMC.

Counsel next called Correctional Officer Fred Waggoner. Again, counsel asked fewer than 20 questions, roughly half of which were devoted to background information about Waggoner's employment and training, and merely established that Mr. Fields had caused "no problems" while being held in solitary confinement in the Secure Housing Unit of the FMC. TT at 2380-2382. As with Jaaks, Waggoner admitted on cross-examination that he had no knowledge of Mr. Fields' prior history of incarceration. TT at 2382. Similarly, he testified that Mr. Fields had been had been found with a "homemade knife." TT at 2383. Once again, counsel did not follow up with any re-direct examination.

The third correctional officer called was Senior Officer Specialist Greg Watts, to whom counsel posed about 20 questions directly related to his knowledge of Mr. Fields. TT at 2383-2386. As with Waggoner and Jaaks, Watts' testimony about Mr. Fields' was superficial at best, consisting of brief testimony that Mr. Fields had been respectful to him and had not caused

any problems for him.  TT at 2385.  On cross-examination, the government re-emphasized a point that Watts had made in his direct examination: that Watts had advised Mr. Fields to behave while in custody at the FMC so that his disciplinary issues could not be brought into evidence and used against him at his upcoming capital trial.  TT at 2385, 2388.  In other words, the jury was essentially led to believe that any good behavior that Mr. Fields exhibited at the FMC was not due to a genuine commitment by Mr. Fields to adjust to prison and treat those around him with respect, but rather, was an act of manipulation to fool the jury into believing he was a safer individual than he "really" was.  Moreover, counsel made no attempt to correct the misimpression made by Watt's testimony in this regard, and, as with the other correctional officers, did not conduct any re-direct examination.  In one fell swoop, then, Watts' testimony completely undermined any possible benefit counsel had hoped to derive from putting Waggoner and Jaaks on the witness stand to testify about Mr. Fields' good behavior at the FMC leading up to the trial.

Counsel called three family members to the stand:  two of Mr. Fields' step-uncles (Vincent Green and Ed Green) and Mr. Fields' mother, Alice Fields Swinnie.  With respect to Vincent Green, his testimony was relatively brief.  He testified that Mr. Fields had come to live with him and his father, Shelby Mitchell, for about a year when Mr. Fields was 11 years old.  TT at 2434-2435.  Mr. Fields stopped living with them after Mitchell died, and Vincent did not see much of him again after that.  TT at 2438.  Although the death of Shelby Mitchell was a life changing event for Mr. Fields, made all the more profound by the fact that Mr. Fields actually witnessed his grandfather being run over by the drunk driver that ultimately killed him, none of this was conveyed by Vincent's testimony, and counsel failed to draw out any details about the event and its impact on Mr. Fields.  Rather, Vincent simply testified that Mr. Fields was "hurt real bad" by the loss of Mr. Mitchell, and that he "[couldn't] really say" whether Mr. Fields

showed any behavioral differences after Mr. Mitchell's death.  TT at 2437.  With respect to Mr. Fields' subsequent move to a housing project in Waco, Vincent offered that it was thought of as an "unsafe place" because of the presence of gangs and drugs" (TT at 2438), but such a general statement was inadequate to express how genuinely traumatic it was to grow up in a place where shootings and violent deaths were a common occurrence.  Vincent's blanket description of the projects as being in a "bad neighborhood" (TT at 2439), simply lacked the detail and context necessary to adequately convey the palpable danger that Mr. Fields faced every day he lived there, and the effect that this extreme stress had on his development and psyche.

Similar to Vincent, Ed Green testified that Mr. Fields was "hurt" by Shelby Mitchell's death, and that he "grieved" over the loss (TT at 2446), but counsel failed to elicit anything more about the profound impact that Mitchell's traumatic killing at the hands of a drunk driver had on Mr. Fields.  Moreover, Ed also described the projects to which Mr. Fields subsequently moved as being in a "rough neighborhood" (TT at 2448), but counsel did not inquire into the reasons that Ed thought of it as a rough neighborhood or ask any questions to elicit details about specific incidences or occurrences that could vividly illustrate for a jury that was likely unfamiliar with these projects just what it was like to live there on a daily basis.  Thus, the jury was given only a superficial understanding of the environment in which Mr. Fields was raised, and absolutely no framework for conceptualizing how both the trauma of his grandfather's death and his subsequent move to a violent housing project affected him during the critical adolescent years of his development.

Alice Fields Swinnie was also called to testify.  At the outset of her direct examination, she confirmed that she receives disability benefits for mental retardation after being shot in the head, and that as a result of that injury, she has "trouble remembering things."  TT at

2457. In other words, whether or not the jury was prepared to believe that Ms. Swinnie was a truthful witness, the jury had reason to believe that, on account of her disability, her capacity to accurately recall and relate events may have been so diminished as to make her accounts of past events unreliable. Although Ms. Swinnie testified about the verbal and physical abuse she received from live-in boyfriend, William Bradford, her descriptions were brief and conclusory. For example, she stated that Bradford was "very mean and he used to beat me and he used to beat my kids." TT at 2458. Similarly, Ms. Swinnie's testimony about the projects in which Mr. Fields grew up was succinct and vague in its description of why it was a bad environment. She stated that "it's just so bad over there. Everything happens. They shoots and deal dope and a lot of other things." TT at 2460. Such testimony simply failed to convey any of the details necessary to genuinely comprehend the extraordinary stress and trauma that she and her family experienced living in what was essentially a war zone.[26]

Ms. Swinnie was the only witness that counsel called to the stand that had knowledge of the extended family. Yet despite this fact, counsel did not elicit from her any testimony about mental illness present in other family members, or about multigenerational patterns of dysfunction, such as alcohol and substance abuse. Indeed, even with respect to Mr. Fields' life history, Ms. Swinnie's testimony was rather superficial and general, and omitted mention of significant periods of Mr. Fields' life, such as the periods of time in which he was previously incarcerated. Simply put, Ms. Swinnie's testimony failed to provide the kind of comprehensive details necessary to give the jury a robust understanding of the life history of the man whose very existence they were called upon to decide.

---

[26] Mr. Fields is prepared to present more evidence and expert testimony concerning life in the projects and its impact on Fields at an evidentiary hearing.

Trial counsel also called Adrian Dow, the mother of Mr. Fields' daughter, whose testimony was relatively brief.  She testified that their daughter, Octavia, was born while Mr. Fields was in prison, and that while incarcerated, Mr. Fields had corresponded with his daughter by letter and by phone, and was a positive influence on her life.  TT at 2454-2455.  Dow was not asked any questions about Mr. Fields' life history or background, nor did she provide any such information.

Trial counsel also called two other witnesses: Jane Bye (formerly Jane McHan), a social worker, and Jack Randall Price, Ph.D., a clinical and forensic psychologist.  Bye testified that this was the first capital case on which she had ever worked.  TT at 2389.  Although she provided a narrative outline of some of the significant events in Mr. Fields' background, such as the death of Mr. Fields' grandfather, her testimony was just that – an outline, but nothing more.  For example, with respect to the death of Mr. Fields' grandfather, Bye testified that that this was a "huge turning point" for Mr. Fields (TT at 2401), but such testimony was merely conclusory.  The jury was told that Mr. Fields "cried and cried" at the funeral and became "distraught" (TT at 2402), but such behavior is typical of a grieving family member, and failed to convey precisely how traumatic Mr. Mitchell's death was for the sixteen-year old Mr. Fields.  Bye's testimony did not provide any further details regarding the signs and symptoms of behavioral change in Mr. Fields, nor did her testimony offer a framework for understanding trauma and how repeated exposure to such trauma affects adolescent development.  Similarly, with respect to Mr. Fields' upbringing, Bye asserted that these years of Mr. Fields' childhood were "chaotic" and that he grew up being exposed to domestic violence (TT at 2407), but Bye was unable, and did not, explain for the jury how the various risk factors present in his life influenced the trajectory of his development, nor how Mr. Fields' life lacked the sort of protective buffers – such as a positive and present male father figure, or a supportive and encouraging teacher or athletic coach – that

allow other persons growing up in the projects to chart a different path. Absent such a framework, the jury would have no way of putting the dry facts of Mr. Fields' life into context and give full mitigating effect to the overall picture with which they were presented.

Dr. Price was called to the stand to testify regarding an intelligence test that he had administered to Mr. Fields, as well as Mr. Fields' prospects for leading a productive life in the structured environment of prison. Dr. Price testified that Mr. Fields had an I.Q. of 113 and was intelligent enough to complete college level classes in a structured environment. TT at 2475-2476. No doubt, such testimony implied to a lay jury that Mr. Fields suffered from no mental health problems, despite the fact that high I.Q. scores can co-exist with neuropsychological deficits as well as mental illness. Counsel, however, never investigated Mr. Fields' mental health, and therefore never presented such information about Mr. Fields to the jury.

Although counsel's failure to provide the jury with a complete picture of Mr. Fields' mental health problems was prejudicial in and of itself, the prejudice to Mr. Fields was compounded by the manner in which the government was able to effectively use Dr. Price as a witness *against* Mr. Fields during cross-examination. Specifically, the government was able to elicit through Dr. Price that Mr. Fields demonstrated poor performance during his eight years of incarceration within the Texas Department of corrections, and stated that positive change in prison required a "voluntary effort" which Mr. Fields impliedly lacked. TT at 2481-2482. More devastatingly, the government invited Dr. Price to opine at length about the diagnosis of antisocial personality disorder, before having him confirm on the stand that psychiatrists at the Texas Youth Commission had diagnosed Mr. Fields with that disorder. TT at 2482-2483. Among the remarks that Dr. Price made about the disorder, which the jury would have understood to apply to Mr. Fields, were that the disorder was not amenable to therapy or

-217-

psychological intervention (TT 2482); that the disorder is characterized by being excessively "self-centered" and a "lack of feeling for others and the lack of feeling bad if they hurt anybody else" (TT at 2482-2483); and that the previously accepted term for this disorder was "sociopath." *Id.* Dr. Price also confirmed that psychiatrists at TYC had stated that Mr. Fields was person who lacked remorse. TT at 2483. In short, the government was able to use Dr. Price as a powerful witness to advance its argument that Mr. Fields deserved to die. And because counsel simply failed to ever investigate Mr. Fields' mental health, they literally were unable to rebut the government's argument that Mr. Fields was a sociopath.

Counsel's thin and superficial presentation of Mr. Fields' life history, as well as their inability to rebut the government's case in aggravation or effectively address damaging points made by the government in cross-examination, was not the result of a planned strategy. Rather, the manner in which the penalty phase case unfolded was a direct product of counsel's lack of pre-trial investigation and preparation. As noted earlier, there were dozens of witnesses who had encountered Mr. Fields throughout his life which trial counsel could have contacted and interviewed – witnesses who could have provided the jury with rich detail about the poverty, malnutrition, physical and emotional abuse, feeling of helplessness and despair, racial oppression, ever-present violence and myriad other obstacles that Mr. Fields faced daily as a child. A wealth of extant documentary evidence, including graduate theses, contemporaneous CBS news reports, medical and psychological records, home studies by juvenile workers and much more, could have provided the jury with a palpable understanding of Mr. Fields' tragic life. Counsel simply failed in their obligations and their crucial omissions prejudiced Mr. Fields'. What could have been a very robust and comprehensive mitigation presentation, covering not only the chronology of Mr. Fields' life, but also that of his family members, from both "insiders" who lived through the Fields family dynamics, as well as unbiased "outsiders" who were able to

observe and contemporaneously record the events of Mr. Fields' life during crucial developmental years, was not presented because counsel ineffectively failed to make efforts to discover all reasonably available mitigating evidence.    *See*, *e.g.*, *Outten*, 464 F.3d at 421 (reversing death sentence and finding counsel ineffective for failing to put on additional evidence of childhood abuse, despite the fact that such evidence was presented at trial, because the trial presentation likely failed to give the jury a comprehensive understanding of the abuse given the discrepancy in depth and detail between the trial evidence and the *habeas* evidence); *Collier v. Turpin*, 177 F.3d 1184, 1201, 1204 (11th Cir. 1999) (although defense attorneys presented ten witnesses at penalty phase, lawyers' ineffective investigation and presentation resulted in "hollow shell" of mitigation); *Lewis*, 355 F.3d at 369 (overturning district court's denial of *habeas* relief where district court held that *habeas* evidence of childhood evidence was merely cumulative to trial presentation); *Allen*, 542 F.3d 1326.

Mr. Fields' jury clearly understood the mitigating import of this evidence.  Even presented with the paltry evidence Mr. Fields' lawyers discovered, the jurors unanimously found that Mr. Fields lived most of his life without a significant father figure, suffered from physical and emotional abuse and neglect during his formative years, is the "product of an impoverished background which impaired and hampered his integration into the social and economic mainstream," and was exposed to the violent deaths of loved ones and friends.  See Special Verdict Form attached as Appendix BB.  Seven jurors additionally found that Mr. Fields "grew up in an atmosphere of violence and fear, which misshaped his perception as to the acceptability or necessity of violent conduct."  *Id*.  These findings demonstrate that Mr. Fields' jurors were willing to give full consideration and effect to this type of mitigating evidence.  Had trial counsel conducted a constitutionally competent investigation and presented the overwhelmingly rich

evidence they could have discovered, there is a reasonable probability that one juror would have voted against imposing a death sentence.

The fact that the jurors sent multiple notes to this Court indicating they were deadlocked also underscores the impact the omitted evidence would have had. After lengthy deliberations, the jury sent this Court a note reading, "If we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the Court have for punishment." TT at 2546-47. The jury subsequently sent this Court another note, succinctly stating, "We cannot come to a unanimous agreement." TT at 2547. The length of the jury's deliberations and the notes regarding deadlock demonstrate *Strickland* prejudice in Mr. Fields' case. *See*, *e.g.*, *Mayfield v. Woodford*, 270 F.3d 915, 932 (9th Cir. 2001) ("In light of the quantity and quality of the mitigating evidence [Petitioner] failed to present at trial, the duration of the jury's deliberations, and the jury's communication to the trial judge, we are not confident that, with the additional evidence presented at the evidentiary hearing, a unanimous jury would still have returned a sentence of death").

Moreover, counsel entirely failed to pursue any investigation into Mr. Fields' mental health, and consequently, failed to present a single scrap of evidence about Mr. Fields' significant mental impairments. This failure was unreasonable in light of the numerous "red flags" indicating the need for such an inquiry, including the fact that Mr. Fields had previously received psychiatric treatment while incarcerated and had been diagnosed with major depression with psychotic features, pervasive mood disorder, atypical bipolar, and posttraumatic stress syndrome. Moreover, Mr. Fields had at one point received disability payments for unspecified "mental problems," Alice Fields Swinnie informed counsel that numerous members of the Fields family had "problems with being crazy," and even the social worker assisting counsel, Jane Bye *nee* McHan, recommended that counsel pursue a mental health investigation. *See Declaration of*

*Jane Bye*. This failure of counsel, in combination with the lack of a single question on the verdict form discussing or mentioning Mr. Fields' mental health issues, deprived the jury of an opportunity to give Mr. Fields' mental illness mitigating effect.

Had counsel pursued the obviously necessary mental health investigation of their client, they would have discovered that he suffered from mental impairments that were directly relevant to statutory mitigating factors for purposes of the penalty phase proceedings. As the attached declaration from Dr. George Woods, explains:

> Mr. Fields suffers from significant mental dysfunction. Mr. Fields' exposure to extreme and repeated trauma has produced pronounced symptoms of complex Post-Traumatic Stress Disorder (PTSD). He also suffers from Bipolar Disorder. Finally, his social, medical history and the symptoms of mental dysfunction demonstrated throughout his life all support the conclusion that he is afflicted with neuropsychological impairments. Mr. Fields' mental condition is highly relevant to understanding his prior crimes, his behavior in custody, as well as to an assessment of his culpability for the current crime and the statutory mitigating factors of impaired capacity, regardless of whether the capacity was so impaired as to constitute a defense to the charge (18 U.S.C.A. § 3592(a)(1)) and severe mental or emotional disturbance (18 U.S.C.A. § 3592(a)(6)).

*Declaration of Dr. George Woods* ¶ 3.

Additionally, had counsel pursued a mental health investigation, the fruits of that investigation would have provided counsel with the necessary framework to properly present Mr. Fields' social history and allow the jurors to give full mitigating effect to the factual evidence regarding the trauma that Mr. Fields experienced throughout his life. Rather than being presented with a series of seemingly isolated and discrete instances of "hard times" in Mr. Fields' life, a qualified expert, such as Dr. Woods, could have explained to the jury the manner in which repeated exposure to trauma during the formative years of his development shaped Mr. Fields' brain and behavior. Such mental health evidence has consistently been recognized as

-221-

being powerful mitigating evidence which trial counsel is constitutionally required to investigate. *Wiggins*, 539 U.S. at 534-35 (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Rompilla,* 545 U.S. at 390-93 (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Jones v. Ryan*, 583 F.3d 626, 636-40 (9th Cir. 2009) (finding ineffective assistance where counsel failed to get expert evaluation of defendant's mental health); *Jermyn v. Horn*, 266 F.3d 257, 310-11 (3d Cir. 2001) (reversing death sentence due to counsel's failure to provide jury with more detailed incidents of childhood trauma and mental illness); *Harries v. Bell*, 417 F.3d 632, 638-39 (6th Cir. 2005) (counsel ineffective for failing to adequately investigate and present evidence of defendant's mental illness and organic brain dysfunction); *Simmons v. Luebbers*, 299 F.3d 929, 935-38 (8th Cir. 2002) (counsel was ineffective in "fail[ing] to present any meaningful mitigating evidence" despite availability of mental health evidence); *Hill v. Lockhart*, 28 F.3d 832, 845-47 (8th Cir. 1994) (although receiving information that petitioner was previously hospitalized, counsel was ineffective for failing to make any effort to obtain medical records, which would have shown that petitioner had long history of mental problems); *Brownlee v. Haley*, 306 F.3d 1043, 1067 (11th Cir. 2003) (ineffective assistance found where counsel failed to "investigate, obtain, or present" mitigating evidence, despite availability of mitigating evidence of petitioner's mental health problems).

A thorough and proper understanding of Mr. Fields' history of mental illness could have contextualized much of Mr. Fields' seemingly aggravating conduct and provided the jury with a means to understanding the effects and hardships imposed by severe mental illness. The prosecution's theme in punishment was based on the theory that Mr. Fields was dangerous, manipulative, and made reasoned choices about his actions. According to the government, he chose which guards to assault and which he would subject to masturbation, (TT at 2540), and he chose to disobey his grandfather and his mother (TT at 2542). The prosecution urged the jury to

discount the impact of Mr. Fields' traumatic childhood: "Just because you're raised in a bad environment and bad things happen to you, you still have to make choices, right or wrong. You still have to do the deeds, right or wrong. Sherman Fields is a grown man. He is not the child from juvenile detention. He is a grown man who made his choices." TT at 2538.

Had trial counsel properly investigated Mr. Fields' background and mental health history, the jury would have seen a much more nuanced and realistic picture of Mr. Fields. Mr. Fields suffers from not one, but two major, debilitating mental illnesses: Bipolar Disorder and Post-Traumatic Stress Disorder (PTSD). These diagnoses are not of recent origin but date back to 1989 when he was evaluated in a juvenile facility. The symptoms of Mr. Fields' Bipolar Disorder and PTSD are synergistic, resulting in a constellation of symptoms including paranoid ideation, grandiosity, hypersexuality, scanning behavior, irritability, agitated depression, impaired judgment, rumination and hyperreactivity. *Declaration of Dr. George Woods* ¶ 100. Bipolar Disorder has a cyclical onset and PTSD can be triggered by external factors as well as internal responses such as stress. Thus, at given times Mr. Fields can be affected by his Bipolar Disorder or his PTSD or an unfortunate combination. Had the jury be informed of this evidence, they could have understood that, rather than being a "grown man" who made "grown choices", TT at 2542, Mr. Fields is a severely damaged individual who is sometimes subjected to compulsions and who makes his choices based on perceptual disorders, paranoid ideations, and grandiosity.

A more complete understanding of Mr. Fields' mental state would have contextualized evidence that the government introduced as aggravation. For example, prosecution witness Officer Chris Eubank told the jury that as he stood in front of Mr. Fields' cell, Mr. Fields threatened to kill his wife and children and told him, "When I get up out of here, I'm going to hunt your fucking bitch ass down and cut your throat." TT at 2155. On cross-

-223-

examination, defense counsel weakly pressed Mr. Eubanks by suggesting the Texas summer heat made for short tempers and, alternatively, that Mr. Fields was just "spouting off."  TT at 2156-57.  Defense counsel then questioned Mr. Eubanks about whether Mr. Fields was angry with him because Mr. Fields believed he was putting something in his food.  *Id*.  Mr. Eubanks denied hearing anything about that and the cross-examination ended with this exchange:

> Q:  Okay.  So you don't know why he was upset then?
>
> A:  Correct.  I do not know.
>
> Q:  He just did it then.  You say you don't have a reason why he might have done that?
>
> A:  No, sir.  I don't have a clue why he done it.
>
> Q:  Okay.  And you seem like a pretty easygoing guy.  You're not there aggravating people, are you?
>
> A:  No, sir.  I'm not.
>
> Q:  Okay.  But Mr. Fields seemed upset at the time, didn't he?
>
> A:  Yes, sir.  He did.
>
> Q:  Okay.  All right.  Thank you.

TT at 2157-58.

Had counsel investigated Mr. Fields' long history of mental illness and consulted with a competent mental health expert, they could have demonstrated to the jury how Mr. Fields' mental health suffered in pretrial detention.  As discussed above, Mr. Fields wrote numerous grievances not complaining merely about the staff "putting something in his food" but rather explaining how the prison staff had formed a cabal, were holding KKK meetings, and were plotting to kill him by sneaking in his cell at night or poisoning his food.  In the weeks before the incident described by Mr. Eubanks, there were signs that Mr. Fields' Bipolar Disorder was manifesting itself.  On June 23, for example, Mr. Fields filed a grievance explaining that he was

in fear for his life because the staff were plotting to murder him.  There is no indication that Mr. Fields was referred to a mental health professional based on the grievance.  Instead, the Sergeant merely replied, "No one is trying to sneak into your cell to do anything to you.  Your complaint is completely unfounded."  *See* Exh. 74.  On June 25, Mr. Fields again filed a grievance expressing concern about the staff plot to murder him, this time specifically naming Chris Eubanks:  "Officer Eubanks did try to poison me by putting an unknown substance in my food." *See* Exh. 75.  The grievance officer again accepted the complaint at face value and rejected it as unfounded "without further proof or evidence."  *See* Exh. 75.  On July 2, the very day of the incident Mr. Eubanks reported, Mr. Fields filed a grievance stating that Mr. Eubanks threatened his life and that he was fearful.  *See* Exh. 77.  The jury never heard this evidence.

Many of Mr. Fields' other disciplinary infractions are indicative of his long-standing mental illness.  It is not surprising, given Mr. Fields' paranoid ideation and belief that he was unsafe in lockup where even the staff was attempting to murder him, that he would possess a shank.  Dr. Woods explained that Bipolar Disorder often affects African Americans differently than Caucasians, frequently psychotic features, paranoid ideation and auditory hallucinations. *Declaration of Dr. George Woods* ¶ 42.  In light of these symptoms, it is hardly surprising that his delusional fear could cause him to possess some means of perceived self-defense.

This paranoid ideation and fear was not confined solely to times when Mr. Fields was incarcerated.  Had mental health evidence been discovered and introduced, the jury could have understood how Mr. Fields' delusions and paranoia, coupled with his grandfather's insistence on isolated self-reliance and the importance of being armed, might have led to his illegal possession of firearms.  With such evidence, there is a reasonable probability the jury would have the prosecution's simplistic insistence that these actions were purely a matter of

rational choice.  TT at 2539 ("[H]e could control himself when he wanted to.  380-caliber handgun found with Sherman Fields.  This was not some act of chance.  He chose to do this.  The 9-millimeter handgun, this was not some random act of chance.  He chose to do this").

Other disciplinary infractions stem from the multiple instances of indecent exposure and masturbation.  At trial, the prosecution estimated at least 20 such infractions, TT at 2256, and it was often mentioned in testimony.  TT at 2122-26, 2233, 2250-51, 2255-56, 2303, 2347, 2349, 2360.  The prosecution even discussed it in closing argument as an example of a "choice" Mr. Fields made.  TT at 2540.  Had counsel investigated and presented the existing evidence of Mr. Fields' Bipolar Disorder, the jury could have better understood this evidence.  Hypersexuality is an extremely common feature of Bipolar Disorder.  In fact, it is so common that a google search reveals many websites for laypersons discussing the problem of hypersexuality with Bipolar Disorder.  *See*, *e.g.*, http://www.identifybipolardisorder.com/ hypersexuality/ (last visited Apr. 11, 2010) ("With bipolar disorder, hypersexuality is marked by an excessive desire for sex and a lack of satisfaction after the act, leading to increased need for gratification . . . This doesn't just affect "liberals" with loose morals, but very conservative individuals as well.  Hypersexuality is a medical problem and affects bipolars irregardless [sic] of one's moral code . . . If your spouse or partner cheats on you while hypomanic, they are responsible for their actions, but keep in mind that this is a strong impulse and requires a lot of self control").

Many other statements presented as aggravation are indicative of Mr. Fields' mental illness and could have been understood in their proper context had trial counsel conducted a complete and thorough investigation.  For example, Mr. Fields' grandiosity is displayed in comments like "the Waco PD was afraid of him and that's why they didn't stop him anywhere else and they waited for him to get to the house."  TT at 2173.

Had counsel properly investigated Mr. Fields' mental illness, counsel could have better cross-examined the prosecution's expert, Dr. Coons, and, perhaps more importantly, prevented their expert, Dr. Price, from giving extremely damaging testimony. Although the prosecution did not use the term Antisocial Personality Disorder during questioning of Dr. Coons, Dr. Coons, based on a hypothetical, informed the jury that Mr. Fields was essentially what is colloquially called a psychopath:

> I look at the personality, the long-term personality and behavior patterns, long-standing rejection of authority, and that goes back to childhood. The pattern of criminal behavior going back to childhood. Escapes from various institutions, attempted escapes. This – his line of work basically is crime. It's not working and being a member of society. It's basically crime when – which usually involves violence in the crime. He just simply hasn't accepted the rules and regulations of society. I look then at the issue of conscience and that – that history basically says this person doesn't evidence conscience. The – we know that he doesn't have a conscience which prevents him from property crimes, taking other people's – threats of violence, violence itself, murder, and no apparent remorse about any of that. It's just a way of life. That's a longstanding pattern.

TT at 2351.

On cross-examination of defense expert, Dr. Price, the prosecution directly questioned him about the possibility of Mr. Fields having Antisocial Personality Disorder (ASPD). After explaining to the jury what ASPD was, Dr. Price admitted that previous psychologists suggested that Mr. Fields had ASPD. He also told the jury that there were very few ways of treating ASPD, that he had seen where previous psychologists believed treatment was useless with Mr. Fields, and that Mr. Fields' own mother had described him as having a "Dr. Jekyll and Mr. Hyde" personality. TT at 2482-84. The testimony of these experts was extremely damaging to Mr. Fields' case and trial counsel's further questioning was ineffectual.

-227-

Had trial counsel properly investigated the history of Mr. Fields' mental illness and learned some of the basic information about Mr. Fields' particular disorders, they could have educated the jury as to why this testimony was inaccurate. The DSM-IV-TR, like its predecessors, explicitly notes that an Antisocial Personality Disorder diagnosis cannot be made "during the course of schizophrenia or a manic episode." In other words, symptoms, or diagnosis, of Bipolar Disorder, an Axis I diagnosis, are a rule out for an Antisocial Personality Disorder diagnosis, an Axis II diagnosis. As Dr. Woods noted:

> Personality disorders . . . are often mistaken for Bipolar Disorder due to the affective instability in each. Yet, personality disorders should not be diagnosed until the Axis I diagnoses, in this case Bipolar Disorder, and PTSD, have been controlled. Often symptoms of Axis I disorders will mimic personality disorders.

*Declaration of Dr. George Woods* ¶ 92.

Had trial counsel investigated and learned about Mr. Fields' Bipolar Disorder and PTSD diagnoses at age 15 and presented that information to Dr. Price, he would have been prepared to educate the jury about the complexities of Mr. Fields' mental illness and why ASPD could not be a proper diagnosis. Likewise, had counsel competently investigated and learned this information, they could have effectively cross-examined the government's expert and highlighted the fallacies underlying his hypothetical.

As the Supreme Court's recent decisions in *Wiggins*, *Williams* and *Rompilla* establish, in evaluating the prejudice component of a claim of ineffective assistance of trial counsel at the penalty phase of a capital trial, the habeas court must compare the mitigating evidence presented in a capital habeas petitioner's trial with the mitigating evidence developed during his habeas proceedings. Such a comparison here warrants the conclusion that Mr. Fields was prejudiced by his trial counsel's deficient performance. *See, e.g., Rompilla*, 545 U.S. at 391-93 (comparing the evidence that was presented at the original sentencing hearing with the

mitigation evidence and testimony presented in post-conviction to conclude that the undiscovered mitigation evidence "might well have influenced the jury's appraisal of [the defendant's] culpability" and led to a different sentencing decision); *Wiggins*, 539 U.S. at 535-38 (comparing the evidence adduced at trial with the evidence presented in *habeas* regarding the petitioner's "excruciating life history" in finding that trial counsel's failure to investigate and present such evidence resulted in *Strickland* prejudice); *Williams*, 529 U.S. at 397-98 (*Strickland* prejudice determination must take into account mitigation evidence adduced in post-conviction proceedings).

CLAIM 22:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR DETERMINATION OF PUNISHMENT BASED ON COUNSEL'S FAILURE TO COMPETENTLY PREPARE FOR AND CROSS EXAMINE THE GOVERNMENT-EXPERT, DR. COONS

CLAIM 23:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS BASED ON COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY BOTH TO ESTABLISH THE RELATIVELY SMALL RISK THAT FIELDS WOULD ENGAGE IN FUTURE ACTS OF VIOLENCE AND TO CHALLENGE THE GOVERNMENT'S ASSERTION THAT FIELDS WOULD BE A FUTURE DANGER IF NOT EXECUTED.

CLAIM 24:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF THE ABILITY OF THE FEDERAL PRISON SYSTEM TO CONTROL FIELDS' BEHAVIOR.

CLAIM 25:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF FIELDS' INCREDIBLY MINIMAL RISK OF ESCAPE FROM A FEDERAL PRISON.

> **A.    Mr. Fields' Sixth and Eighth Amendment Rights Were Violated When His Lawyers Were Ineffective In Failing to Rebut the Government's Case for "Future Dangerousness" and in Failing to Present Affirmative Evidence Concerning this Non-Statutory Aggravator**

The Supreme Court "established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). An

ineffective assistance of counsel claim has two components:   A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.  *Id*. at 687; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  As explained below, Mr. Fields' lawyers failed to prepare to rebut, even with the most readily available information, the Government's case in support of the non-statutory aggravator informally known as "future dangerousness."   In addition, counsel failed to present its own expert discrediting the Government's "future dangerousness" expert and presenting an affirmative case that Mr. Fields would not pose a threat of violence or escape if sentenced to life without the possibility of parole.  As also described below, the failures of Mr. Fields' lawyers prejudiced the outcome of his capital sentencing.

The jury unanimously found the non-statutory aggravating factor that Mr. Fields was "likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others. . . ."  *See* Special Verdict Forms.  Pursuant to the Government's argument, the jury found "future dangerousness."  The jury's finding was based on a misleading presentation by the Government's pertinent witness, Dr. Richard Coons.  Fields' counsel failed to introduce readily available evidence to counter Dr. Coons' risk assessment and to demonstrate that, in fact, Fields presented a very low risk of future danger.  In particular, counsel failed to cross-examine Dr. Coons and effectively counter his extremely prejudicial statements suggesting that Mr. Fields lacked any conscience and was essentially anti-social.[27] Counsel also failed to hire a defense expert who could have countered Dr. Coons' testimony and

---

[27] As noted, *supra*, although Coons never explicitly labeled Mr. Fields with Anti-Social Personality Disorder, his description of Mr. Fields as conscienceless and unable to conform his behavior to the rules of society sounded unmistakably like ASPD, and described in lay terms the most aggravating features of the disorder, if not the formal diagnosis.  TT at 2351.  Moreover, the defense's own expert, Dr. Price, acknowledged that ASPD had been considered by mental health professionals who had encountered Mr. Fields in the past, TT at 2482-2484, so the jury was certainly aware that ASPD might have been a factor in Mr. Fields' background.  Despite a wealth of readily available information pointing to Mr. Fields' actual mental diseases, Bipolar Disorder and PTSD, trial counsel did nothing to counter the impression that Mr. Fields was antisocial, or in common parlance, a "psychopath".

pointed out flaws – obvious to experts but not to lay persons such as the jurors – in his approach and conclusion that Mr. Fields was likely to commit future acts of violence and pose a threat to the lives and safety of others.

The declaration of Dr. Mark Cunningham demonstrates the flaws in Dr. Coons' methods and conclusions concerning Mr. Fields' purported future dangerousness. In addition, as the declarations both of Dr. Cunningham and of former BOP Warden Mark Bezy, filed in another federal capital *habeas* case[28], demonstrate that at the time of Mr. Fields' trial, the BOP was in a position to virtually negate the risk of violence or escape of prisoners with a far more aggravated history than Mr. Fields'. Mr. Fields' lawyers' failure to prepare their own expert to challenge or rebut Dr. Coons' scientifically unsound, and at times false, testimony, and their failure to discover even publicly available information about the capacity of the Bureau of Prisons to house even highly dangerous convicts in secure facilities that significantly diminished any risk of escape or violence fell below reasonable standards of performance for defense counsel in a capital case.[29] As described below, Mr. Fields was prejudiced as a result.

### B.    Counsel Failed to Discover or Present Numerous Sources of Impeachment of the Government's "Future Dangerousness" Expert

Had Mr. Swanton adequately prepared for Coons' testimony, he would have uncovered numerous readily available sources of impeachment. Mr. Swanton also failed to hire an expert who could have testified that Coons' methods were discredited and unethical and that

---

[28] Mr. Bezy's affidavit was filed in *United States v. Johnson*, No. 02 C 6998 (N.D. Ill. E. Div.) and is attached as Appendix D.

[29] In evaluating reasonableness, *Strickland* requires consideration of standards such as those in the ABA Guidelines. *See*, *e.g.*, *Wiggins*, 539 U.S. at 524. As described more fully herein, the ABA Guidelines established as of the time of Mr. Fields' trial that standard practice in a capital case included, *inter alia*: rebutting evidence of future dangerousness; hiring defense experts to rebut any of the prosecution's evidence in aggravation, challenging any prosecution evidence that might be improper, inaccurate, or misleading. As described, Mr. Fields' lawyers failed in these respects and others.

Mr. Fields in fact presented a relatively low risk of future acts of violence or other danger in a prison setting. Mr. Fields was prejudiced as a result of trial counsel's failure to do so, and his Sixth Amendment right to effective assistance of counsel was violated.

During the penalty phase of Fields' trial, the Government called Dr. Richard Coons to testify as an expert on the issue of future dangerousness. Based on no more than a review of documents and a hypothetical set of facts, both provided by the Government, Coons ultimately opined that "it is significantly more likely than not that [Fields] will be of a danger to other people" in prison. TT at 2352-53. Coons never met – let alone medically evaluated – Mr. Fields prior to taking the stand. Moreover, the methodology underlying Coons' opinion has been thoroughly discredited and rejected as both unscientific and unethical by the American Psychiatric Association (APA), an organization of which Coons is a member. However defense counsel, Mr. Swanton, did not adequately research these issues, and therefore the jury was not presented with information that would have impeached Coons' testimony. Although Swanton conducted *voir dire* of the witness in an attempt to exclude his testimony, because he had not adequately prepared to do so, his attempt to prevent admission of Dr. Coons' testimony failed. Mr. Swanton also cross-examined Dr. Coons in front of the jury. Again, due to his lack of adequate preparation Swanton was unable to competently impeach Dr. Coons' assumptions, methodology or conclusions.

Swanton effectively admits that he failed to adequately prepare for Coons' cross-examination. According to Swanton, he did not put much effort into preparing to cross Coons because "I was familiar with his approach to predicting future dangerousness. Thus, I did not research or review prior transcripts of Dr. Coons' testimony." *See Affidavit of Robert Swanton, Esq.* ¶ 12. In addition to relying on his prior dealings with Coons, Swanton purportedly prepared by reading "a lot" of Coons' prior transcripts. TT at 2316:6-8. Yet, as demonstrated below,

-232-

counsel failed to impeach Coons based on discrepancies between his prior testimony and his testimony at Fields' trial. Counsel also neglected to confront Coons with the numerous studies, analyses, reports and statements contravening his assumptions, methodology and conclusions, with which he should have been familiar both from preparation for Fields' trial and his asserted familiarity with Coons' past testimony.

In all instances described below, counsel's failures fell below objective standards of reasonable representation. *See* ABA Guideline 10.11 & related commentary.

> **1.    Counsel's Failure to Discover and Present the Fact that the American Psychiatric Association Rejected Coons' Methodology Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Because of inadequate preparation, Swanton failed to demonstrate that Coons' methodology has been rejected by the APA. For example, during *voir dire*, Coons testified that he was unaware of the APA's position that future dangerousness cannot "be predicted with any sort of regularity or scientific regularity." TT at 2318-19. Similarly, during cross-examination before the jury, counsel asked only whether Coons knew that the APA found predicting future dangerousness "a very, very sketchy thing" and Coons replied that he was "not sure." TT at 2356:12-19. Swanton did not explore the issue further. Had Swanton adequately prepared, he could have impeached Coons' denial of awareness that the APA rejected the validity of the very type of testimony he provided. Coons is a member of the APA. TT at 2319:6-8. As such, Coons should have been aware of the APA's position that "[c]onsiderable evidence has been accumulated now to show that long-term prediction by psychiatrists of future violence is an extremely inaccurate process" and there is "good reason for psychiatrists to shun" opinions made without personal examination, and that experts must "fully acknowledge the limitations" of such opinions. *See* Am. Psychiatric Assoc., *Psychiatry in the Sentencing Phase: A Report of the Task*

*Force on the Role of Psychiatry in the Sentencing Process* 14-15 (1984); *see also Barefoot v. Estelle*, 463 U.S. 880 (1983), Amicus Br. of APA 7-10 (arguing that psychiatric predictions of future dangerousness are unreliable and should not be admissible).  Because Swanton did not adequately prepare, this powerful impeachment information was never presented to the Court or the jury.

Mr. Fields' lawyers' failure to present evidence rebutting the Government's case for future dangerousness or its own expert on the issue fell below objective standards of reasonable representation in a capital case.  *See* ABA Guideline 10.11 (The Defense Case Concerning Penalty).  ABA Guideline 10.11 (A) states, "As set out in Guideline 10.7(A), counsel at every stage of the case have a *continuing duty to investigate issues bearing upon penalty and to seek information that* supports mitigation *or rebuts the prosecution's case in aggravation . . . .*" *Id.* (emphasis added).  In addition, Guideline 10.11 (D) states that, "Counsel at every stage of the case should discuss with the client the content and purpose of the information concerning penalty that they intend to present to the sentencing or reviewing body or individual, means by which the mitigation presentation might be strengthened, and *the strategy for meeting the prosecution's case in aggravation.*" *Id.* (emphasis added).  Similarly, Guideline 10.11 (I) establishes counsel's duty to "carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading or not legally admissible." *Id.*  The Commentary to Guideline 10.11 elaborates on the critical importance of presenting evidence about "future dangerousness" in particular:  "Studies show that 'future dangerousness is on the minds of most capital jurors, and is thus "at issue" in virtually all capital trials,' whether or not it is argued by the prosecution or is a statutorily mandated sentencing consideration.  Accordingly, counsel should make every effort to present information on this subject." ABA Guideline 10.11 & related commentary at 109.  The Commentary goes on to say,

"Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut . . . Where possible, counsel should move to exclude aggravating evidence as inadmissible, and, if that fails, rebut the evidence or offer mitigating evidence that will blunt its impact. . . ." *Id.* at 111. Finally, the Commentary states, "If they have not done so previously in building their affirmative case for a penalty less than death, counsel should also consider putting on evidence describing the conditions under which the client would serve a life sentence *to rebut aggravating evidence of future dangerousness.*" *Id.* at 114 (emphasis added) Mr. Fields' lawyers failed in all these respects. Their performance in this regard "fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521 (*quoting Strickland*, 466 U.S. at 688 (internal quotation marks omitted).

Mr. Fields' lawyers' failure to confront Dr. Coons, the Government's expert witness on future dangerousness, with readily available impeachment prejudiced the outcome of his capital trial, (*see Strickland*, 466 U.S. at 687):  The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Forms.*  As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death.  Had counsel properly impeached Dr. Coons, and introduced readily available evidence that his methodology was rejected by professional organizations of which he was a member, there is a reasonable probability that the outcome of the penalty phase proceeding would have been different.

**2.    Counsel's Failure to Discover and Present Readily Available Rules of Professional Ethics that Prohibited Coons' Methodology and Testimony Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Had Swanton adequately prepared, the jury would have been informed that the APA's Principles of Medical Ethics as well as the American Academy of Psychiatry and the Law (AAPL) Ethics Guidelines – both of which directly govern Coons – specifically prohibit Coons' methodology.

The APA Principles of Medical Ethics prohibit Coons from offering professional opinions about a person without conducting an in-person examination. *See, e.g*, Am. Psychiatric Assoc., *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry* (APA Ethics Comm. 2006) (Section 4.5 proscribes "offering speculation as fact"). The APA's Medical Ethics rules declare it "unethical for a psychiatrist to offer a professional opinion *unless he or she has conducted an examination* and has been granted proper authorization for such a statement" with regard to an individual in the "light of public attention." *Id.* Section 7.3 (emphasis added). The APA ethical rules also provide that a "psychiatrist may permit his or her certification to be used for the involuntary treatment of any person **only** *following his or her personal examination of that person*." *Id*. Section 7.4 (emphasis added). As the APA made clear in an amicus brief regarding predictions of future dangerousness: "[e]ven if psychiatrists under some circumstances are allowed to render an expert medical opinion on the question of future dangerousness . . . *they should never be permitted to do so unless they have conducted a psychiatric examination of the defendant.*" *Barefoot v. Estelle*, 463 U.S. 880 (1983), Amicus Br. of APA 9 (emphasis added). Because Swanton did not adequately prepare, neither the Court nor the jury was informed that Coons' opinion and methodology violated the APA's Principles of Medical Ethics, even though the APA was on record in a capital case decided twenty years

before Mr. Fields' trial specifically disavowing the very method Dr. Coons used to determine that Mr. Fields purportedly presented a risk of future danger. Mr. Fields' counsel's failure to discover and present the APA's amicus brief in *Barefoot*, a publicly available document with direct bearing on Mr. Fields' case, fell below objective standards of practice in the defense of capital cases.

Similarly, the AAPL prohibits Coons' methodology – offering medical opinions without in-person examination – as unethical. The AAPL Ethics Guidelines state that "objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without a personal examination" and that where no personal examination is made, the psychiatrist must "make earnest efforts to . . . note any resulting limitations to their opinions." *AAPL Ethics Guidelines*, Art. 4, official cmt. ¶ 3 (May 2005 ed.). Coons is also an AAPL member. *See State v. Allen*, No. 3020682, vol. 19, Trial Tr. 198:8-19 (Tex. Dist. 299, Travis Cty. Mar. 18, 2004).

Because of Swanton's failure to prepare, he did not question whether Coons could justify his opinion – which was formed without a medical examination – under these ethical requirements or professional standards. Although the Government prompted Coons to testify that his opinion regarding Fields' probability of future dangerousness was not made with one hundred percent certainty, (TT at 2352:20-2353:2, 2361:7-12), Coons did not otherwise qualify his opinion as required by professional ethics. Defense counsel did not attempt to highlight the inconsistency between Coons' opinion and the requirements of professional ethics nor did Swanton attempt to draw out any limitations on Coons' opinion. Similarly, although Coons admitted his opinion was subjective (TT at 2354:10-16), because of a lack of preparation, Swanton failed to demonstrate that such subjectivity renders a psychiatric opinion both unethical and unreliable. Had Swanton adequately prepared, he could have demonstrated to the Court and

-237-

jury that Coons' methodology was merely "uninformed armchair speculation masquerading as science." *Declaration of Dr. Mark Cunningham* ¶¶ 66-67.

Again, counsel's failure to discover and present these publicly available standards to impeach the Government's expert on a crucial non-statutory aggravating factor fell below objective standards of practice for the defense of a capital case. *See* ABA Guidelines 10.11 (A), (D), and (I) and related commentary. Mr. Fields was prejudiced as a result. Mr. Fields' lawyers' failure to confront Dr. Coons with this readily available impeachment prejudiced the outcome of his capital trial: The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Form.* As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death. Had counsel properly impeached Dr. Coons with readily available evidence that his methods were spurious, and contrary to the ethical standards governing his professional practice, there is a reasonable probability that at least one juror would have voted against a finding of future dangerousness, and that the outcome of the proceeding would have been different. As a result of this deficient performance and resultant prejudice, Mr. Fields' Sixth Amendment right to the effective assistance of counsel was violated. *See Strickland*, 466 U.S. at 687.

> **3.   Counsel's Failure to Discover and Present Scientific Studies That Squarely Refuted Coons' Conclusions, Including Some By the Department of Justice, Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Swanton's lack of preparation prevented the jury from hearing about numerous professional studies directly undermining Coons' testimony and methodology. Questioning about these scientific studies was extremely limited. Swanton attempted to challenge the scientific validity of Coons' approach, but his lack of preparation and failure to file a *Daubert* motion, rendered such attempts ineffective. The Court did grant Mr. Swanton's oral motion to

-238-

challenge Coons' testimony under *Daubert*.  During *voir dire* during the brief, oral *Daubert* challenge, Swanton attempted to impeach Coons by asking whether Coons was generally aware of scholarly research in the field, and only brought to his attention *a single* study impugning the prediction of future dangerousness.  TT at 2319:19-2321:8.  However, as this Court recognized, counsel failed to file a *Daubert* motion, and therefore, neither counsel nor Coons had any meaningful opportunity to prepare for cross-examination on this topic in front of the jury, and as a result, the Court declined to ask Coons to answer questions pertaining to particular studies that were critical of the method he purported to use to assess Fields' future dangerousness.  TT at 2332-33.  Thus, Swanton failed to cross Coons on the existence of **any** studies rejecting the very substance of his testimony.  Had Swanton adequately prepared, the "erroneous nature of Dr. Coons' methodology could have been more specifically refuted had the jury been informed of the data that are inconsistent with his methodology and their application to Mr. Fields." *Declaration of Dr. Mark Cunningham* ¶¶ 64-84.  Moreover, the jury heard nothing that would have alerted it to the fact that Coons' approach to evaluating future dangerousness was unorthodox at best, and would have been in fact, discredited by numerous professionals in the field.

Mr. Fields' counsel's failure to discover and present evidence that Dr. Coons' approach to evaluating future dangerousness had by that time been discredited by numerous scientific studies fell below the objective standard of performance in the defense of capital cases. *See* ABA Guidelines 10.11 (A), (D), (I), and (L) & related commentary ("Counsel should use available discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends to introduce, and then thoroughly investigate to determine whether this evidence can be excluded, rebutted or undercut . . .").  Mr. Fields was prejudiced as a result of

counsel's failures, and his Sixth and Eighth Amendment rights were violated.  *See Strickland*, 466 U.S. at 687.

At the time of trial, numerous scientific studies existed that unequivocally rejected the notion that future dangerousness risk prediction can be assessed without empirical evaluation.  For example, studies showed that risk predication of future dangerousness is inherently inaccurate:

> To date, the accuracy of these predictions [of dangerousness] have not been good.  In order to increase the accuracy of these predictions, it is essential that they be based on results of empirical research . . . Given the complex, often non-linear interplay of mental, biological and behavior subsystems within the individual and an environment, operating in a probabilistic, sometimes very uncertain and unpredictable way, it is unrealistic to hope for accurate prediction of individual functioning across environmental contexts of differing character or over the life span."

Sheilagh Hodgins, *Studying the Etiology of Crime and Violence Among Persons with Major Mental Disorders: Challenges in the Definition and the Measurement of Interactions, in Developmental Science and the Holistic Approach* 317-18 (2000) (quotations and citation omitted).  Studies also demonstrated that any attempt to predict such risk without use of empirical evidence and actuarial data – as opposed to Coons' rank speculation – are unreliable:

> Clinicians relying on traditional techniques are poor at accurately estimating the future behavior of others – particularly low base-rate behaviors.  Actuarial methods have been identified repeatedly as superior to clinical methods in predicting most human behavior, including the probability of violence

Mark D. Cunningham & Thomas J. Reidy, *Don't Confuse Me With the Facts: Common Errors in Violence Risk Assessment at Capital Sentencing*, 26 Crim. Just. & Behav. 20, 28 (1999).  Studies also existed demonstrating that not only were Coons' methods unreliable, but his failure to explain the limitations of his opinions was professionally irresponsible:

> Despite 25 years of research, social scientists have barely scratched the surface of risk assessment as a predictive tool . . . Responsible health care professionals have a duty to be aware of their ability and limitations.

Randy K. Otto, *On the Ability of Mental Health Professionals to "Predict Dangerousness": A Commentary on Interpretations of the "Dangerousness" Literature*, 18 L. & Psychol. Rev. 43, 67-68 (1994). Because Swanton failed to properly prepare, the Court and jury remained unaware of the fact that Coons' opinion has been roundly rejected by the scientific community.

Counsel's lack of preparation also prevented him from demonstrating that Coons' methods were scientifically unsound. Although Coons testified that his methods were not "peer review[ed]" or subject to "error rate analysis," counsel failed to highlight the importance of these facts to either the Court or the jury. TT at 2330:25-2331:4, 2356:1-11. Numerous studies confirm that opinions given without peer review and error rate analysis are scientifically worthless with regard to prediction of future dangerousness:

> [w]hen a man informs someone that he knows the exact truth about anything, that person is warranted in inferring that he is an inexact man. Every careful measurement in science is always given with the probable rate of error.

*See Declaration of Dr. Mark Cunningham* ¶¶ 14, 110(e); *see also* Edmund H. Mantell, *A Modest Proposal to Dress the Emperor: Psychiatric and Psychological Opinion in the Courts*, 4 Widener J. Pub. L. 53, 64-65 (1994). Because of Swanton's failure to prepare, this fact was not presented at trial.

Neither the Court nor jury was presented with studies that expose a fundamental flaw in Coons' opinion – that future dangerousness cannot be reliably predicted without a history of violence in prison. Coons testified "that past behavior is the best predictor of the future behavior," (TT at 2319:25-2320:1) and that he relied on Fields' "long history" of violence outside of prison life. TT at 2358:7-2359:25. However, United States Department of Justice

studies have refuted this very assertion concluding that behavior outside of an institutional setting is a poor predictor for future violence within an institutional setting. *See Declaration of Dr. Mark Cunningham* ¶¶ 66-67; *e.g.,* J. Alexander & J. Austin, *Handbook for Evaluating Objective Prison Classification Systems* (National Council on Crime and Delinquency 1992) (sponsored by U.S. Dept. of Justice); J. Stephan, *Prison Rule Violators: Bureau of Justice Statistics Special Report* (U.S. Dept. of Justice 1989). Several scientific studies confirm this result and demonstrate that future dangerousness cannot be responsibly predicted where no such history of violence in prison exists. *See*, *e.g.*, Melvin G. Goldzband, *Dangerousness: A Mutating Concept Passes Through the Literature*, 26 J. Am. Acad. Psychiatry & Law 649, 651 (1998) ("dangerousness cannot be diagnosed without a history of previous dangerous behavior" (citations omitted)). These studies completely undermine Coons' position, given that Coons himself admits there was no record whatsoever of Fields injuring anyone in prison. TT at 2357:25-2358:6. However, because of counsel's lack of preparation, these studies were not used to impeach Coons.

Counsel's failure to discover and present these publicly available studies – several of which were sponsored by the Government's own legal department – to impeach the credibility of the Government's expert on future dangerousness, a crucial non-statutory aggravating factor in Mr. Fields' case, fell below objective standards of practice in the defense of capital cases. *See generally* ABA Guidelines. Mr. Fields was prejudiced as a result: The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Form.* As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death. Had counsel demonstrated by impeaching Dr. Coons that his methods had been discredited by numerous scientific studies, including some by the Department of Justice, the entity prosecuting Mr. Fields, there is a reasonable probability that at least one

juror would have voted against a finding of future dangerousness, and that the outcome of the penalty phase proceeding would have been different.  As a result, Mr. Fields' Sixth and Eighth Amendment rights were violated.  *See Strickland*, 466 U.S. at 687.

> **4.      Counsel's Failure to Present Evidence that Coons' Prior Inconsistent Testimony Impeaches His Credibility Amounted to Deficient Performance that Prejudiced the Outcome of Mr. Fields' Sentencing Proceeding**

Although Swanton claimed to have researched Coons' prior testimony (TT at 2316:6-8), he failed to effectively use any of Coons' prior inconsistent statements to impeach his testimony.

For instance, Coons testified that he reached his "conclusion about Mr. Fields' dangerousness before talking to him," (TT at 2354:4-5) which falsely implies to the jury that Coons did interview Fields at a later time, although Coons admitted in *voir dire* that no interview took place. TT at 2331:22-2332:2.  Yet Counsel failed to point out to the jury by adequately cross-examining Coons that this testimony was misleading, at best.  In prior testimony, Coons declared that "ordinarily in my practice I would do an evaluation before I would undertake to treat someone."  *State v. McDuff*, No. 643820, Trial Tr. 116:5-24 (Tex. Dist. 184, Harris Cty. 1993).  But in the Fields case, Coons admitted he employed no formal study or observations in forming his opinion.  TT at 2328:11-18, 2331:22-2332:2.  Because of their lack of preparation, Mr. Fields' counsel were unaware of Coons' prior testimony and therefore never asked what effect Coons' failure to conduct a clinical examination in this case, though it had purportedly been his usual practice in other cases, had on the validity of his opinion that Mr. Fields presented a risk of future danger.  Nor did counsel inquire why Coons departed from his ordinary practice of reliance on evaluation or observation with respect to Fields, or whether Coons felt that his complete departure from his normal procedure weakened his opinion in this case.

Coons also testified that he was not aware of the number of studies that cast doubt on the reliability of future dangerousness predictions but that he had "read a lot of things about future dangerousness." TT at 2320:9-15. Yet Coons previously testified that specific studies impugning predictions of future dangerousness "are well known to all of us." *United States v. Vialva*, No. W-99-CR-070(1) & (2), Trial Tr., vol. 15, 3159:16-20 (W.D. Tex. June 19, 2000). This testimony impeaches both Coons' credibility and the scientific validity of his methodology As a result of inadequate preparation, Swanton did not attempt to impeach Coons' feigned unawareness of the scientific community's rejection of his methodology through introduction of this prior testimony. Such a failure fell below objective standards of practice in the defense of a capital case. *See generally* ABA Guidelines.

Similarly, when Swanton tried to establish that the risk of Fields' future dangerousness is low because prisons have effective methods for controlling the potential violence of prisoners – Coons disagreed. TT at 2357:7-24. Before the jury, Coons denied that future violence could be attenuated through removal from the general population. TT at 2357:7-24. However, in previous testimony, Coons admitted just the opposite – that prisons are capable of effectively controlling inmate violence through segregation from the general population. *See United States v. Webster*, No. 4:94-CR-121-Y, Trial Tr., vol. 26, 187:6-188:3 (N.D. Tex. June 18, 1996). Because of counsel's inadequate preparation, these prior inconsistent statements were never presented to the jury. Counsel's failure to impeach Coons as to this critical issue, which went directly to whether Mr. Fields could be confined securely if given a sentence less than death, fell below objective standards of practice in the defense of a capital case. *See generally* ABA Guidelines.

Similarly, counsel's attempt to impeach Coons' testimony that Fields would present a danger if given a life sentence was thwarted by his lack of preparation. Swanton asked

-244-

Coons whether he was aware of studies showing that prisoners serving life sentences are less likely to commit violence, but Coons evaded the question by stating that older prisoners are less violent.  TT at 2360:1-16.  Counsel's failure to prepare prevented him from impeaching the credibility of Coons' evasive response through use of prior testimony on this subject.  In that regard, Fields was twenty-eight at the time of trial; in prior testimony Coons opined that "by the late twenties there is some dwindling of propensity" to commit criminal acts of violence.  *State v. Jeffrey*, No. 991361, Trial Tr., vol. 20, 183:7-18 (Tex. Dist. 147, Travis Cty. Mar. 12, 2001).  Accordingly, Coons' response to Swanton's question was not only evasive, but inconsistent with his prior sworn testimony.  Simply put, Fields was already at an age where Coons has testified that any propensity for violence would have "dwindle[d]".  *Id.*  Counsel was unable to effectively cross-examine Coons on this point due to lack of preparation.  Moreover, counsel could have impeached Coons' opinion about the correlation of younger age with institutional violence *via* peer-reviewed studies to the contrary.  *See Declaration of Dr. Mark Cunningham* ¶¶ 77-81, 102, 103 ("There was no expert testimony, however, that age is one of the most powerful predictive factors for prison misconduct violence, with inmates having progressively lower rates of misconduct . . . and assaultive misconduct . . . as they age"); *see also* T.J. Flanagan, *Time Served and Institutional Misconduct: Patterns of Involvement in Disciplinary Infractions Among Long-Term and Short-Term Inmates*, 8 J. Crim. Just. 357-67 (1980).  Yet again, the failure to prepare prevented this from happening.

In sum, defense counsel's failure to adequately prepare allowed Coons to present scientifically and ethically unsupportable testimony to the jury while carrying the weight and authority of an "expert."  Counsel's ineffectiveness prevented any meaningful rebuttal, although any reasonable preparation would have afforded counsel numerous items impeaching nearly every element of Coons' testimony.  Such failure to prepare, discover, and present readily

available, in many cases publicly available, information to rebut the Government's future

dangerousness expert fell below an objective standard of practice in the defense of a capital case.

*See* ABA Guideline 10.11 & related commentary at 111 ("Counsel should use available

discovery mechanisms to ascertain the aggravating and rebuttal evidence the prosecution intends

to introduce, and then thoroughly investigate to determine whether this evidence can be

excluded, rebutted or undercut . . .  Where possible, counsel should move to exclude aggravating

evidence as inadmissible, and, if that fails, rebut the evidence or offer mitigating evidence that

will blunt its impact . . .").  Mr. Fields' lawyers' failure to confront Dr. Coons with this readily

available impeachment prejudiced the outcome of his capital trial:  The jury unanimously found

a likelihood that Mr. Fields presented a risk of danger in the future.  *See Special Verdict Form.*

As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields

should be sentenced to death.  Had counsel demonstrated by impeaching Dr. Coons eith the

aforementioned readily available evidence that his conclusions and methods were spurious, and

contrary to the ethical standards governing his professional practice, there is a reasonable

probability that at least one juror would have voted against a finding of future dangerousness,

and that the outcome of the proceeding would have been different.

>     **5.    Counsel's Failure to Discover and Present Readily Available
>            Information About BOP's Ability to House Prisoners,
>            Including Mr. Fields, Under Strict Conditions of Confinement
>            That Practically Negated Any Risk of Future Violence or
>            Escape Fell Below Objective Standards of Practice In the
>            Defense of a Capital Case and Prejudiced the Outcome of Mr.
>            Fields' Sentencing Proceeding**

As Dr. Mark Cunningham states in his declaration, "[I]n February 2004 the

Bureau of Prisons (BOP) had significant security and confinement capability in its super-

maximum facility, ADX Florence, that largely negates (*i.e.*, renders extraordinarily improbable)

Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape." *Declaration of Dr. Mark Cunningham* ¶ 17. Dr. Cunningham further declares that "Testimony regarding the confinement capability at ADX Florence would have directly contradicted the Government's representation . . . that it was impotent to securely manage an offender such as Mr. Fields." *Id.* In addition, the attached declaration of former BOP Warden Mark Bezy confirms that it was well known by the time of Mr. Fields' 2004 trial that the BOP was equipped to confine prisoners in facilities that practically negated the risk of escape or serious violence against other prisoners or BOP staff. Specifically, counsel's failure to prepare, discover, and present readily available information about BOP's capacity to house prisoners securely indefinitely allowed Dr. Coons to testify without rebuttal that when "he [presumably referring to Mr. Fields] gets violent they'll lock him up more securely for a period of time and then put him back in a more general population after he cools down, and then when he does it again, they'll probably lock him up more securely" but "[g]enerally speaking, it's an after the fact issue because . . . if somebody's just irritable or something, they don't generally lock them up, but after they've stuck somebody or cut somebody or beat them up or injured a guard or whatever, then they would isolate them for a while." TT at 2357.

This testimony suggested that there was no condition of confinement that could permanently or meaningfully prevent Mr. Fields from prison violence. Yet, as Dr. Cunningham's declaration establishes, statistics show that "ADX was securely confining inmates with prison assault and escape histories . . . This is important as it reflects the potential for an offender to be referred to ADX *prior* to perpetrating serious violence in BOP. ADX is designed to control the worst inmates in BOP." *Declaration of Dr. Mark Cunningham* ¶ 23 (emphasis in original). In fact, "[t]hrough 2004, there had been no homicides at ADX and no escapes," and

-247-

"[t]hough assaults do occur, they are infrequent—particularly in light of the prison misconduct history of the inmates at ADX.  Weapons assaults are particularly infrequent."  *Id.* ¶ 35.

In addition, Mr. Bezy, who was at one time the warden at USP Terre Haute, (*see Affidavit of Mark Bezy* ¶ 2) where Mr. Fields is now housed, and a number of other maximum-security BOP prisons, has declared under penalty of perjury that as of 1998, which was well before Mr. Fields' 2004 trial, BOP had the capacity to house prisoners *indefinitely* at USP Marion, for example, "under highly secure and restrictive conditions of confinement, including . . . restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort.  While the hope of the BOP was that inmates sent to the general population at USP Marion would monitor their behavior and return to a mainstream maximum security facility after two or three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum" ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.  *Id.* ¶ 6.  Bezy has further declared that "USP Marion had units within the facility where the most dangerous and/or high security risk inmates were housed under even more strict conditions of confinement than those imposed on USP Marion's general population.  These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and *to reduce or eliminate the inmate's risk of violence or future dangerousness*."  *Id.* ¶ 7 (emphasis added).  Bezy has further described in detail the capacity of the Super-Max at Florence to "hold the most dangerous inmates under extremely strict conditions of confinement . . . *for as long as necessary* to deal with the security or future danger concern raised by a particular inmate."  *Id.* ¶ 11 (emphasis added); *see id.* ¶ 16.  He has gone on to describe special cells at Florence that BOP uses to house prisoners who "are deemed to be

-248-

exceptionally dangerous [or] due to concerns about security and/or . . . future dangerousness as set forth by the sentencing court." *Id.* ¶ 11. (emphasis added). Bezy's affidavit describes BOP's successfully housing convicted spies, bombers, terrorists, and members of murderous organized prison gangs under these strict conditions of confinement. *Id.* ¶¶ 8-13 (emphasis added). Dr. Cunningham's declaration also provides appendixes with graphic examples of the architecture and staffing that virtually insure that prisoners with much more aggravated criminal histories than Mr. Fields' are unable to escape or commit violent acts against other prisoners or BOP staff. *See* Appendix to Cunningham, which will be filed separately.

Yet, counsel's lack of preparation and failure to identify or present even publicly available information about BOP's capacity for secure confinement or to hire an expert who could have rebutted Coons' misleading testimony about a prison's ability to practically negate the risk of future dangerousness, left the jury with no counterpoint to Coons' false testimony that prisons lack effective methods for controlling prisoners' potential violence. As a result, the jury unanimously found the non-statutory aggravating factor that Mr. Fields was likely to pose a risk of danger in the future. *See Special Verdict Forms.* Mr. Fields' lawyers' failure to discover or present this evidence fell below objective standards of practice in the defense of a capital case. *See* ABA Guidelines 10.11 (A), (D), (F)(2), (3) (establishing that in deciding which witnesses to call and evidence to prepare in the penalty phase, counsel should consider "Expert and lay witnesses along with supporting documentation . . . that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor" as well as "Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served"). As Dr.

Cunningham's declaration demonstrates, there was convincing evidence that Mr. Fields could have been housed securely in a prison setting.

Mr. Fields was prejudiced by counsel's failure to investigate this readily available information about the BOP's ability to house Mr. Fields in a secure environment that would have practically eliminated any risk of his escaping or committing acts of violence while in prison.  As Mark Cunningham has declared, if he would have been called to testify at Mr. Fields' trial, he would have testified "that should Mr. Fields have been determined by BOP to be a disproportionate risk of violence in prison, he could be held under super-maximum security conditions until determined to no longer be a disproportionate risk." *Declaration of Dr. Mark Cunningham* ¶ 109.    Defense counsel's failure to present this readily available information through an expert on future dangerousness fell below an objective standard of reasonableness and allowed the jury to conclude unanimously that Mr. Fields was likely to commit acts of danger from prison.  *See* ABA Guidelines 10.11 (A), (D), (F)(2), (3) & related commentary ("If they have not done so previously in building their affirmative case for a penalty less than death, counsel should also consider putting on evidence describing the conditions under which the client would serve a life sentence to rebut aggravating evidence of future dangerousness").

Mr. Fields was prejudiced by his counsel's failures because there is a reasonable probability that had the jury heard such testimony, at least one juror would not have found the "future dangerousness" aggravator, and that at least one juror would have struck a different balance in weighing the evidence in aggravation against the mitigation and would have voted to sentence Mr. Fields to life without the possibility of parole.  Counsel's failures violated Mr. Fields' Sixth and Eighth Amendment rights.  *See Strickland*, 466 U.S. at 687.

**6.      Counsel's Failure to Retain a Defense Expert Concerning Future Dangerousness Fell Below an Objective Standard of Practice in the Defense of a Capital Case and Prejudiced the Outcome of Mr. Fields' Sentencing**

Dr. Cunningham's declaration sums up the importance of expert testimony in this critical area:  "Avoidance of fundamental errors in violence risk assessment at Mr. Fields' capital sentencing required the testimony of an expert to inform the jury of scientifically-sound methodology and empirical data, and to rebut the faulty methodology and erroneous opinions offered by Dr. Coons."  *Declaration of Dr. Mark Cunningham* ¶ 111.  Had such testimony and data been presented to Mr. Fields' jury in "a clear, organized, logical fashion that would neither confuse nor mislead the jury[,]" there is a reasonable probability that at least one juror would have concluded that BOP had the capacity to house Mr. Fields in a maximum security facility that would have rendered it nearly impossible for him to escape or harm others.  Such a finding by even one juror would have eliminated the finding of the non-statutory "future dangerousness" aggravator which in turn would have resulted in a reasonable probability that at least one juror would have concluded that the balance of mitigating factors and aggravating factors weighed in favor of a life without parole sentence.

Yet defense counsel failed to retain an expert who could have presented testimony rebutting nearly all of the Government's case for "future dangerousness."  An expert could have testified to the following, none of which was presented at Mr. Fields' trial:

- The use of the term "future dangerousness" was an improper conflation of the language of the actual non-statutory aggravator; thus both the Government's expert and its argument asked the jury to consider an improper factor in adjudging whether Mr. Fields should be sentenced to death. (*see Declaration of Dr. Mark Cunningham* ¶ 63 for transcript quotes).  The phrase "future dangerousness" has the effect of misleading sentencers into believing that they are supposed to be judging whether the defendant "exhibits an enduring *state* of dangerousness," rather than "an assessment of the probability of *acts* of a particular severity."  *Id.* ¶ 63.  This is a distinction that "cannot be over-emphasized in providing for the

application of scientific methodology and findings." *Id.* An expert could have explained that evaluating an individual's purported "dangerousness" as contrasted with "[g]roup statistical data regarding the incidence and correlates of violence," is "a social judgment that is overly broad, independent of contextual factors, and not subject to reliable measurement." *Id.*;

- As described previously, in general, the methodology Coons used in evaluating Fields' purported dangerousness was spurious, unethical, and had been discredited by numerous scientific studies, including some by the United States Department of Justice. *Declaration of Dr. Mark Cunnigham* ¶¶ 66-67;

- Dr. Coons' reliance on "the incident offense" as a predictor of Mr. Fields' purported future dangerousness was improper. Expert testimony available from "numerous other federal capital cases" had described important data on this question. A defense expert in Mr. Fields' case could have described the studies, presented in Mark Cunningham's declaration (¶¶ 69-73) that explain why this consideration is improper to an evaluation of whether a prisoner is likely to engage in criminal acts of violence that would constitute a continuing threat to society, which was the proper inquiry in this case.

- "Dr. Coons' assertion that personality characteristics and lack of conscience are synonymous with serious violence in all contexts, including prison," while it appeals to common sense, is not supported by any data;

- Dr. Coons' testimony that because Fields would have "nothing to lose" if sentenced to life without parole, he'd be at increased risk of prison violence was "fundamentally in error."

- Dr. Coons' testimony that there is "huge amount of violence" in prison that is never reported "is entirely speculative," and "in regard to comparative data there is little plausible reason to expect that unreported violence among the capital LWOP inmates would be more frequent than among the serious offenders with whom they share high-security confinement."

- As discussed previously, "Dr. Coons did not acknowledge how longer-term super-maximum conditions of confinement such as were available at ADX Florence could be applied preemptively to Mr. Fields." Dr. Coons also failed to account for the negative impact the conditions under which Mr. Fields had been confined at the McLennan County Jail had influenced his negative behavior there. *Declaration of Dr. Mark Cunningham* ¶¶ 85-96.

- "The methodology and associated testimony of Dr. Coons demonstrated virtually all of the fundamental errors in violence risk assessment at capital sentencing that have been identified in the peer-reviewed literature," including inadequate reliance on base rates; failure to consider context; susceptibility to illusory correlation; failure to define severity of violence; faulty implications of Antisocial Personality Disorder and Psychopathy; ignoring the effects of aging; misuse of patterns of behavior; neglect of preventive measures.  "Not surprising, reliance on such a fundamentally flawed predictive methodology results in predictions that have an extraordinarily high error rate."  Data rebutting Dr. Coons' own representation of his predictive accuracy made a defense expert's rebuttal all the more important in this case. *Declaration of Dr. Mark Cunningham* ¶¶ 97-100;

- Dr. Coons and David Sweeney of the Federal Medical Center in Forth Worth improperly mixed the prisoner's age and his incarceration tenure as factors bearing on "future dangerousness."  Yet, there was no expert testimony "that age is one of the most powerful predictive factors for prison misconduct and violence, with inmates having progressively lower rates of misconduct . . .  and assaultive misconduct . . . as they age." *Declaration of Dr. Mark Cunningham* ¶¶ 101-03 (internal citations omitted);

- Prisoners like Mr. Fields who have attained a GED or high school diploma "have *half* the prevalence rates of prison assault as inmates not having this level of educational attainment." *Declaration of Dr. Mark Cunningham* ¶ 104;

- Actuarial models have proven more reliable than clinical judgment in making risk assessments, and there were "two actuarial scales available in February 2004 for forecasting the risk of assault in prison that could have been applied to Mr. Fields."  Application of one of these scales to Mr. Fields "yields a 40-year risk of a 14.5% likelihood of serious prison violence," which is "modestly below the risk rate of 16.4% of the sample as a whole.  Most of this risk is for assault of another inmate.  Life-time risk of an aggravated assault on a correctional officer is projected at 1%."  These rates are far lower than the "more likely than not" asserted by Dr. Coons. *Declaration of Dr. Mark Cunningham* ¶¶ 105-06;

- "[T]he single most important piece of data in making an accurate violence risk assessment," is knowledge of the base rate of violence in the representative group.  An expert could have demonstrated to Mr. Fields' jury by applying the base rate of violence among offenders similar to Mr. Fields that offenders similar to Mr. Fields presented "a low and not disproportionate risk of serious violence in prison." *Declaration of Dr. Mark Cunningham* ¶ 107;

- Mr. Fields' pattern of behavior while confined "while creating a management problem, did not progress to serious assaults or significant injury of other persons within the prison. To the extent that this pattern is unrelated to the aggravating effects of his conditions of confinement in the McLennan County Jail, it is simply predictive of continuing management problems—not serious violence." *Declaration of Dr. Mark Cunningham* ¶ 108.

Dr. Mark Cunningham has declared that he could have testified to the above had he been called at Mr. Fields' capital sentencing in 2004 and that he could have testified that Mr. Fields' likelihood of serious prison violence during a life without possibility of parole sentence in BOP "was well below 'more likely than not,'" and that even if Mr. Fields had been determined by BOP to be a disproportionate risk of violence in prison, "he could be held under super-maximum security conditions until determined to no longer be a disproportionate risk." *Declaration of Dr. Mark Cunningham* ¶ 109. Yet, Mr. Fields' counsel failed to retain or present to the jury any expert testimony rebutting the Government's unscientific and misleading case for a finding of future dangerousness. This failure fell below an objective standard of practice in the defense of a capital case. *See* ABA Guidelines 10.11 (F)(2), (3) (establishing that in deciding which witnesses to call and evidence to prepare in the penalty phase, counsel should consider "Expert and lay witnesses along with supporting documentation . . . that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor" as well as "Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served").

Mr. Fields was prejudiced by his attorneys' failure to present a defense expert to rebut the Government's evidence of future dangerousness. The jury unanimously found a likelihood that Mr. Fields presented a risk of danger in the future. *See Special Verdict Forms.*

As a result, it weighed this non-statutory aggravator in its unanimous conclusion that Mr. Fields should be sentenced to death. Unanimity was required both for a finding of "future dangerousness" and for a death sentence. Had counsel presented expert testimony rebutting Dr. Coons' methods and conclusions and presenting an affirmative case why Mr. Fields was not at high risk for committing serious acts of violence in prison, there is a reasonable probability that at least one juror would have voted against a finding of future dangerousness, and would have struck a different balance in weighing the evidence in aggravation against the mitigation and would have voted to sentence Mr. Fields to life without the possibility of parole.

"In the absence of such testimony, leaving before the jury only the unrebutted testimony of Dr. Coons, the risk analysis performed by Mr. Fields' capital sentencing jury was subject to grave errors." *Declaration of Dr. Mark Cunningham* ¶ 110. Mr. Fields' Sixth and Eighth Amendment rights were violated. *See Strickland*, 466 U.S. at 687.

Even if the Government had not called Dr. Coons, it was deficient performance for counsel not to consult with an expert on this topic. Evidence of a lack of dangerousness in prison has consistently been characterized as mitigating. *Skipper v. South Carolina,* 476 U.S. 1 (1986). Just as pre-crime background and character and post-crime rehabilitation may extenuate the gravity of the crime, the prospect of a likelihood of non-violent or even good behavior in prison can count as a circumstance tending to make the defendant less deserving of the death penalty. *Id.* at 4-5.

Counsel's failure to investigate can hardly be characterized as tactical. *See United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made").

Fields was prejudiced by trial counsel's failure, which this Court should measure cumulatively. *See Williams v. Taylor*, 529 U.S. 362, 395-96 (2000) (prejudice determined by comparing the totality of the available mitigation evidence with the evidence actually adduced at trial and then reweighing it against the evidence in aggravation).

CLAIM 26:    THE GOVERNMENT COMMITTED PROSECUTORIAL MISCONDUCT BY MISREPRESENTING THE CONDITIONS OF FIELDS' CONFINEMENT UPON CONVICTION AND POTENTIAL FOR FUTURE DANGEROUSNESS IN VIOLATION THE OF THE FIFTH AND EIGHTH AMENDMENT CONSTITUTIONAL GUARANTEES.

A.    **Facts**

A core element of the Government's penalty phase presentation to the jury was the assertion that no prison facility was capable of controlling Fields and, therefore, he would be a danger in the future unless executed. In arguing the point, the Government focused heavily on Fields' prior behavior and escape from McLennan County Jail (TT at 2120:18-2128:23, 2135:9-15, 2154:9-2156:2) and Fields' various "escapes" from ultra-low security juvenile facilities (TT at 2064:20-21, 2077:2-11, 2077:24-2078:3, 2078:12-14, 2085:15-2086:16).[30] Among others, the Government examined Jimmy Stone, a deputy sheriff with the McLennan County Sheriff's Department. Mr. Stone admitted that he had "never been in a federal prison" (TT at 2313:7-8) and, therefore, could not compare the level of security provided by federal facilities to the security measures provided by McLennan County jail. TT at 2313:7-8. Nevertheless, the Government elicited Mr. Stone's opinion that there are no "escape-proof" prisons (TT at 2310:12-14, 2312:4-5) and that there are no prisons where an inmate could be prevented from causing "injury to another inmate or to a correctional officer." TT at 2310:15-18; *Declaration of*

---

[30] These juvenile facilities were unsecured. Accordingly, what was characterized as a pattern of "escapes" at trial was, in reality, no more then a pattern of a child walking off an unsecured property without permission. TT at 2090:3-10; *Affidavit of Dr. Mark Cunningham* ¶ 55.

*Dr. Mark Cunningham* ¶¶ 50-61.  Based on this testimony the Government argued that execution is the only way prevent the risk of future escape and murder:

> Mr. Swanton said to you, he reiterated what the Judge said, the only way he's going to get out is in a pine box, unless of course he escapes.  Unless of course, there's another Benny Garrett.  When you're thinking about whether or not Sherman Fields is a future danger, think about the pattern of conduct.  **Think about –I mean, isn't the very essence of future danger, isn't the very definition of future danger that you escape from jail and kill someone.**  Isn't that what happened.  That's what happened in this case.

TT at 2541: 0-19; *Declaration of Dr. Mark Cunningham* ¶¶ 50-61.

Based in part on the lack of adequate rebuttal, the Government's tactic worked – the jury unanimously found that Mr. Fields was "likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others . . . and . . . is an escape risk . . . ."  *See* Special Verdict Forms – Count Three; TT at 2063:12-23.  However, the Government knew – but never disclosed – that executing Mr. Fields was by no means the only adequate method of preventing his limited risk of future dangerousness.[31]

While the Government focused on Fields' past behavior in county jail and unsecured juvenile facilities, it never informed the jury that, as a "matter of regulation certainty," Fields would be incarcerated in a high security level federal prison.  *Declaration of Dr. Mark Cunningham* ¶¶ 51.  The Government never disclosed that the Federal Bureau of Prisons (BOP) had "significant security and confinement capabilit[ies]" including, if need be, placement in the super-maximum security facility ADX Florence.  *Id.* ¶¶ 16-18.  "[I]n February 2004 the Bureau of Prisons (BOP) had significant security and confinement capability in its super-maximum

---

[31] As described in Claim 22, had Fields' counsel conducted an adequate penalty phase investigation and consulted appropriate experts, the jury would have learned that Fields poses little to no actual risk of future dangerousness.

facility, ADX Florence, that largely negates (*i.e.*, renders extraordinarily improbable) Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape." *Id.* ¶ 17.

ADX Florence was designed exclusively to control prisoners with histories of prison violence or escape behavior. *Declaration of Dr. Mark Cunningham* ¶ 23. The capabilities to control prisoners in ADX Florence include:

- Single cells with both barred and steel doors.

- Cell windows facing inner recreation area.

- Poured reinforced concrete fixtures.

- Twenty-three-hour a day lockdown.

- Prisoner meals in cell.

- Prisoner movement accompanied by double escort with baton, while the prisoner is cuffed behind the back with his feet shackled.

- Limited communication with the outside. Prisoners are only allowed one or two, fifteen minute, monitored phone calls per month.

- No contact visits – all prisoner visits are monitored.

- All prisoner mail subjected to x-ray, opening and review by staff.

*Id.* at Appendix B7. Because of the extraordinary control capabilities of ADX Florence, even though the facility houses the worst and most uncontrollable prisoners in the country, there were only 14 minor assaults on staff members and 3 attempted or threatened assaults between December, 1994 and June, 2001. *Declaration of Dr. Mark Cunningham* ¶ 41. ADX Florence is located in the remote foothills of the Rocky Mountains, 80 miles southwest of Colorado Springs. *Id.* ¶ 22. Its ultra-secure parameter is surrounded by reinforced gun towers and a two fences with stacked coils razor wire between them. *Id.* ¶ 24. The facility was designed not only to prevent prisoner escape, but also to prevent the possibility of terrorists or criminal organizations from breaking in. *Id.* ¶ 24. The design is overwhelmingly effective – there has never been an escape

from ADX Florence.  *Id.*  Simply put, the ability to control even the most dangerous criminals at ADX Florence is vastly superior to that of McLennan County jail.  *Id.* ¶ 52.  The Prosecution knew this fact.

However, given Fields' low risk of future violence, he would almost certainly have been placed in High security in U.S. Penitentiary, as opposed to ADX Florence, had he been given a life sentence:

> A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived.  [Security Designation and Custody Classification Manual (5100.07, p. 40]

*Declaration of Dr. Mark Cunningham* ¶ 51.  U.S. Penitentiaries are:

> high-security prisons in BOP, characterized by double-perimeter fencing with razor wire, perimeter detection devices, gun-towers, concentric layers of security, controlled inmate movement, and intensive staffing.   The architecture, staffing, and security procedures assume that all inmates at this level of security are motivated to escape and would attempt to do so if given the opportunity.

*Id.* ¶ 52.

The Affidavit of former BOP Warden Mark Bezy, filed in another federal capital *habeas* case,[32] demonstrates that, at the time of Mr. Fields' trial, the BOP was in a position to virtually negate the risk of violence or escape of prisoners with a far more aggravated history than Mr. Fields'.  Mr. Bezy, who was at one time the warden at USP Terre Haute, where Mr. Fields is now housed, and a number of other maximum-security BOP prisons (*Affidavit of Mark Bezy* ¶ 2), has declared under penalty of perjury that as of 1998, the BOP had the capacity to house prisoners *indefinitely* at USP Marion:

---

[32] Mr. Bezy's affidavit was filed in *United States v. Johnson*, No. 02 C 6998 (N.D. Ill. E. Div.).

> under highly secure and restrictive conditions of confinement, including . . . restrictions on telephone communications, all of which were recorded and monitored, and restrictions on visitation, including no contact visits of any sort. While the hope of the BOP was that inmates sent to the general population at USP Marion would monitor their behavior and return to a mainstream maximum security facility after two or three years, there were many inmates who were housed at USP Marion for many years, including some who were housed at USP Marion for years and then transferred directly to the Administrative Maximum ("Super-Max" or "ADX") facility in Florence, Colorado when that facility opened.

*Id.* ¶ 6. Bezy further declared that USP Marion had units within where:

> the most dangerous and/or high security risk inmates were housed under even more strict conditions of confinement than those imposed on USP Marion's general population. These even more strict conditions of confinement were imposed for as long as the BOP and/or the Warden deemed necessary to ensure security and to reduce or eliminate the inmate's risk of violence or future dangerousness.

*Id.* ¶ 7. Given these highly advanced security capabilities, the BOP successfully houses convicted spies, bombers, terrorists, members of murderous organized gangs and foreign dictators – inmates who are indisputably more dangerous than Fields. *Id.* ¶ 8. Again, the security capabilities of U.S. Penitentiaries are vastly superior to those of McLennan County jail, and the Prosecution knew it. *Id.*

> **B.    The Government Violated Mr. Fields' Right To Due Process And Fair Sentencing In Failing To Correct Inaccurate Testimony About Mr. Fields' Post-Conviction Confinement And Committed Prosecutorial Misconduct In Citing Inaccurate Testimony In Closing Argument**

A prosecutor's use of false evidence, or allowance of false evidence to go uncorrected violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Here, the Prosecution's reliance on inaccurate testimony concerning the likely and available conditions of Mr. Fields' post-conviction confinement violated the prosecution's "special duty not to mislead." *United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962). The Government misrepresented

the BOP's capability to confine and control Fields. *See Declaration of Dr. Mark Cunningham* ¶¶ 50-57; TT at 2541:10-19. The Prosecution's failure to correct the record with regard to evidence that "would tend to . . . reduce the penalty help[ed] shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963).

*Brady's* "affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20[th]-century strictures against misrepresentation." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). It is well-established that the government's interest "in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *United States v. Corona*, 551 F.2d 1386, 1391 (5th Cir. 1978) (*quoting Berger*, 295 U.S. at 88); *United States v. Goff*, 847 F.2d 149, 164 (5th Cir. 1988) (same); *Dickson v. Quarterman*, 462 F.3d 470, 479 (5th Cir. 2006) (same). Thus, while a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88; *Corona*, 551 F.2d at 1391; *Dickson*, 462 F.3d at 479.

As part of this duty to see that justice is done, the prosecutor has a special duty to avoid improper argument to the jury. Because of the prosecutor's prominent courtroom role as representative of the Government – and the mantle of respect and authority this creates in the eyes of the jury – jurors are predisposed to give great deference to the prosecutor's words, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88; *Goff*, 847 F.2d at 163 ("[i]n considering the impact of what is said the court also must be concerned with the great potential for jury persuasion which arises because the prosecutor's personal status and his role as a spokesman for the government tend to give what he says the ring of authenticity"); *United States v. Gallardo-Trapero*, 185 F.3d 307, 319-20 (5th Cir. 1999) ("[t]he power and force of the government tend to

-261-

impart an implicit stamp of believability to what the prosecutor says") (*citing Goff*, 847 F.2d at

163).  As numerous courts have stated:

> [t]he prosecutor's job isn't just to win, but to win fairly, staying well within the rules . . . It is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true.  But it is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt, particularly when it refuses to acknowledge the error afterwards to either the trial court or this court and instead offers far-fetched explanations of its actions.

*United States v. Blueford*, 312 F.3d 962, 968-69 (9th Cir. 2002) (internal quotations and citations

omitted); *see also United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993) ("[i]t is

improper to imply reliance on a fact that the prosecutor knows to be untrue"); *United States v.*

*Valentine*, 820 F.2d 565, 566 (2d Cir. 1987) (finding prejudicial misconduct where "the

prosecutor misrepresented, at least implicitly, the substance of the testimony of several grand

jury witnesses").

The United States Supreme Court has subjected closing arguments in capital cases

to a greater degree of scrutiny.  *Caldwell v. Mississippi*, 472 U.S. 320 (1985).  These principles

are particularly important in the penalty phase of a capital case where the Eighth Amendment's

requirements of heightened "reliability in the determination that death is the appropriate

punishment," *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), and that the sentencing

process "minimize the risk of wholly arbitrary and capricious action" by the sentencing jury,

(*Gregg v. Georgia*, 428 U.S. 153, 189 (1976)), together with the "highly subjective" nature of

the sentencing decision, (*Caldwell*, 472 U.S. at 340-41 n.7), require that special scrutiny be given

to prosecutorial argument. As the Third Circuit has explained:

> The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system . . .  Because of

> the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices. [*Berger*'s requirement that the prosecutor refrain from improper argument] applies with particular force to the prosecuting attorney in the penalty phase of a capital case.

*Lesko v. Lehman*, 925 F.2d 1527, 1541 (3d Cir. 1991); *see also Olson v. Shillinger*, 861 F.2d 612, 626 n. 12 (10th Cir. 1988) ("the minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death," justify even closer scrutiny for error at the sentencing phase).

Here, because the Government "knew or should have known" that prison security provided by Civigenics, Inc. is wholly dissimilar from that provided by the federal Bureau of Prisons, (*Declaration of Dr. Mark Cunningham* ¶¶ 50-57; TT at 2541:10-19), the argument concerning Fields' potential to escape was misleading at best and violated due process. *Kyles*, 514 U.S. at 433. The Prosecution sought to provide the jury with the false impression that a post-conviction escape from a high-security U.S. Penitentiary was just as likely as an escape from McLennan County Jail. Creating such an impression constitutes prosecutorial misconduct because "it is decidedly improper for the government to propound inferences it knows to be false, or has very strong reason to doubt." *Blueford*, 312 F.3d at 968.

Here, the Government elicited testimony concerning the mere possibility – rather than the actual likelihood – of Fields' escape or potential for uncontrollable violence in prison. TT at 2310:12-22. They elicited this testimony from a witness that had no basis to form an opinion on the BOP's capability to control prisoners having never even stepped foot in a federal prison. TT at 2313:4-8. The Government never distinguished for the jury the differences in security capabilities between a county jail and a federal prison, thereby creating a false impression of Fields' future dangerousness and ability to be controlled. Worse still, the

-263-

Government incorporated this false impression into their closing argument – describing Fields' past escape as the "very essence of future danger" (TT at 2541:16) – while disregarding facts about high-security incarceration. The Government did so in an attempt to make this argument "'a highly significant factor reasonably likely to have affected the judgment of the jury.'" *United States v. Mack*, 695 F.2d 820, 822-23 (5th Cir. 1983) (citation omitted). Given the jury's findings on future dangerousness and escape risk, it is beyond dispute that had the Government corrected the record as to the likely conditions of Fields' confinement, there is a "'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434. Their failure to do so is prosecutorial misconduct and "warrants reversal of the judgment of conviction and a new trial." *Valentine*, 820 F.2d at 570-71 ("because of the prosecutor's 'consistent pattern' argument, at best questionable and perhaps outrightly disingenuous, our confidence in the jury verdict is severely shaken").

CLAIM 27:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO RESPOND TO THE PROSECUTION'S MISLEADING EVIDENCE AND ARGUMENTS CONCERNING HIS RISK OF FUTURE DANGEROUSNESS.

CLAIM 28:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT TO THE PROSECUTION'S MISLEADING EVIDENCE AND ARGUMENTS CONCERNING HIS RISK OF FUTURE DANGEROUSNESS AND PRESENT READILY AVAILABLE EVIDENCE CONTRADICTING THE PROSECUTION.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in the claim above. In order to establish ineffective assistance of counsel, a *habeas* petitioner, or in this case a Section 2255 movant, must meet both parts of the Supreme Court's familiar two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner must first show that counsel's performance was deficient, and then demonstrate that the deficiency prejudiced the defense. *Id*. at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 521

(2003). In capital cases, an objective standard of reasonableness requires counsel to conduct an adequate investigation for potentially relevant mitigation evidence.

As demonstrated above, there was an abundance of readily available evidence that could have been used to refute the Government's argument concerning Fields' risk of escape and prison violence while housed in a high security U.S. Penitentiary. Counsel ineffectively failed to gather such evidence, let alone object to the mischaracterization of the Government's presentation. Their failure to do was unreasonable, particularly in light of the critical nature of the proceeding, and there is simply no evidence in the extant record that establishes that counsel's deficient performance in this regard was the product of a tactical consideration. Moreover, given that Mr. Fields' future dangerousness was the central issue in penalty phase, the prejudice is unmistakable. Mr. Fields is entitled to a new trial.

CLAIM 29:   MR. FIELDS' RIGHT TO A JURY TRIAL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE COURT INSTRUCTED JURORS TO REACH A UNANIMOUS PENALTY PHASE VERDICT AFTER THEY DECLARED THAT THEY WERE NOT UNANIMOUS AND WHERE THAT INSTRUCTION HAD A COERCIVE EFFECT.

Jurors have indicated to counsel that they interpreted the Court's instructions during their penalty phase deliberations as requiring a unanimous verdict. About five hours after sentencing deliberations began, the jury sent a note asking "[i]f we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the court have for punishment?" The court responded: "[y]ou are instructed on page 16 of the Punishment Phase Charge of the Court as follows: 'If you are unable to unanimously agree on either punishment option, the Court will impose punishment, which cannot be a sentence of death.' Beyond that, I am unable to answer your question." Approximately eighteen minutes later the jury sent a note stating that "[w]e cannot come to a unanimous agreement." The court

responded with the supplemental instruction "[p]lease continue your deliberations."  Less then one hour later the jury returned a unanimous sentence of death.

Jurors indicate that the Court's instruction to "continue your deliberations was coercive for at least one "hold out" juror.  Some of the jurors interpreted the instruction as requiring a unanimous verdict and, as a result, the "hold out" juror changed her vote from "life" to "death."  The juror did not consider switching her vote until the jurors read the "continue your deliberations" instruction.

A Court can provide additional instructions when a jury is deadlocked.  *Allen v. United States,* 164 U.S. 492, 501 (1896).  However, a so-called *Allen* charge must comply with two requirements: "'(1) the semantic deviation from approved "*Allen*" charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved "*Allen*" charge must not be coercive.'"  *United States v. Lindell,* 881 F.2d 1313, 1321 (5th Cir. 1989) (citations omitted).

Here, there is affirmative evidence that the supplemental instruction actually was coercive.  A juror changed her vote from death to life solely as a result of the Court's instruction.  Thus, Fields is entitled to a new trial.

## VIII.  CLAIMS RELATED TO COURTROOM SECURITY AND CONDITIONS OF PRE-TRIAL CONFINEMENT AND THE RIGHT OF SELF-REPRESENTATION

CLAIM 30:    MR. FIELDS' FIFTH AMENDMENT RIGHT TO DUE PROCESS; HIS SIXTH AMENDMENT RIGHT TO SELF-REPRESENTATION AND A FAIR TRIAL; AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE ALL DENIED WHEN HE WAS FORCED TO WEAR A STUN BELT DURING TRIAL; WHERE THE STUN BELT SIGNIFICANTLY AFFECTED HIS ABILITY TO CONDUCT HIS OWN DEFENSE, AS WELL AS HIS DEMEANOR IN COURT; AND WHERE THE TRIAL COURT FAILED TO CONSIDER LESS RESTRICTIVE ALTERNATIVES.

CLAIM 31:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO COUNSEL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE

VIOLATED WHEN THE TRIAL COURT FAILED TO WARN HIM OF THE DISADVANTAGES OF BEING FORCED TO WEAR A STUN BELT AT THE TIME THE COURT ENGAGED IN A COLLOQUY WITH FIELDS ABOUT HIS REQUEST TO PROCEED *PRO SE*.

CLAIM 32:    MR. FIELDS' RIGHT TO BE PRESENT AT TRIAL WAS VIOLATED BY REQUIRING THAT HE WEAR A STUN BELT DURING THE ENTIRE TRIAL, VIOLATING THE GUARANTEES OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

CLAIM 33:    MR. FIELDS' RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN TRIAL COUNSEL FAILED TO DEMAND A HEARING AND PRESENT EVIDENCE IN RESPONSE TO THE DIRECTIVE THAT FIELDS WEAR A STUN BELT DURING TRIAL, DEPRIVING HIM OF RIGHTS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 34:    DEPRIVING HIM OF RIGHTS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS, MR. FIELDS' RIGHT TO COUNSEL (DURING PENALTY PHASE) WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE DEVICE INTERFERED WITH HIS ABILITY TO CONSULT WITH COUNSEL.

CLAIM 35:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE SENTENCING DETERMINATION WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE STUN BELT NEGATIVELY AFFECTED FIELDS' DEMEANOR IN COURT.

CLAIM 36:    MR. FIELDS' RIGHT TO SELF-REPRESENTATION WAS VIOLATED BY HIS CONDITIONS OF CONFINEMENT, INCLUDING BEING HOUSED IN A CELL WHERE THE LIGHTS WERE NEVER TURNED OFF OR DIMMED, WHERE THE NOISE SUBSTANTIALLY INTERFERED WITH FIELDS' ABILITY TO SLEEP, AND WHERE HE WAS DEPRIVED OF THE TOOLS WITH WHICH TO PREPARE FOR THE NEXT DAY'S EXAMINATIONS. THESE CONDITIONS SIGNIFICANTLY IMPAIRED FIELDS' ABILITY TO CONDUCT HIS OWN DEFENSE AND VIOLATED HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.

### A.    **Facts**

Mr. Fields' ability to conduct his defense (when he represented himself at trial) and his ability to consult with counsel (when he was represented by counsel during penalty phase) was severely impaired as a result of being required to wear a stun belt.  Even assuming this Court correctly concluded that some security measure was appropriate based on Mr. Fields' past behavior outside of the courtroom and notwithstanding the total lack of any inappropriate behavior in court, this Court failed to conduct a hearing to determine how the stun belt might

affect Mr. Fields, failed to warn Mr. Fields about how the stun belt might interfere with his ability to represent himself, and failed to consider less restrictive security measures. Despite the fact that counsel still represented Fields when the Court decided to require Fields to wear the stun belt, counsel was ineffective based on their failure to investigate and present evidence of Mr. Fields' psychological makeup which would have demonstrated the debilitating effects resulting from requiring Mr. Fields' to wear a stun belt. In addition, Fields' demeanor in court was negatively affected by virtue of the increased security measures, which likely prejudiced Mr. Fields' jury when deliberating about whether to impose a death sentence.

Mr. Fields' right to self-representation was further impaired as a result of the severe sleep deprivation – the product of the inhuman pretrial conditions of confinement.

## B.    **Argument**

The Supreme Court has recognized that the use of physical restraints is an "inherently prejudicial practice" which raises a number of constitutional concerns. *Holbrook v. Flynn,* 475 U.S. 560, 568 (1986). The use of physical restraints, such as a stun belt, during trial and the sentencing phase implicates a defendant's Fifth and Fourteenth Amendment rights to due process. *Deck v. Missouri*, 544 U.S. 622, 628-29 (2005). Even a restraint that is less severe than a stun belt, like shackles, can interfere with the accused's Sixth Amendment "ability to communicate" with his lawyer. *Illinois v. Allen*, 397 U.S. 337, 343-44 (1970). When the sentencing phase involves the possibility of a death sentence, the use of a stun belt also implicates the Eighth Amendment guarantee against cruel and unusual punishment. Thus, whenever a court is considering restraints of any kind, it must impose only the least restrictive security measure. *Id.*

Forcing Mr. Fields to wear a stun belt was the most restrictive security measure possible – not the least.

A stun belt is an electronic device that is secured around a prisoner's waist. When activated, intentionally or otherwise, the belt delivers a "50,000-volt, three or four milliampere shock lasting eight seconds." *Hawkins v. Comparet-Cassani,* 251 F.3d 1230, 1241 (9th Cir. 2001). The shock administered "causes incapacitation in the first few seconds and severe pain during the entire period," may also cause "immediate and uncontrolled defecation and urination, and the belt's metal prongs may leave welts on the wearer's skin requiring as long as six months to heal." *Id.* at 1234; *People v. Mar,* 52 P.3d 95, 103 (Cal. 2002) (internal citation and quotation marks omitted)). The wearer generally is knocked to the ground by the shock and convulses uncontrollably. *Mar,* 52 P.3d at 103. Activation of a shock belt can cause muscular weakness for approximately thirty to forty-five minutes as well as heartbeat irregularities or seizures. *Id.* "Accidental activations are not unknown." *Gonzalez v. Pliler*, 341 F.3d 897, 899 (9th Cir. 2003) (*citing United States v. Durham,* 219 F. Supp. 2d 1234, 1239 (N.D. Fla. 2002) (reporting a survey that showed 11 out of 45 total activations, or 24.4%, were accidental).

Mr. Fields was prejudiced in several ways as a result of being forced to wear the stun belt during trial. To begin, Mr. Fields did not knowingly and voluntarily make the decision to represent himself because, when he waived his right to counsel, the Court failed to warn Fields that wearing a stun belt might interfere with his ability to represent himself. Prior to Mr. Fields' decision to waive counsel, Dan Phillips, a deputy at the Marshall's Service, explained why the marshals sought to require Fields to wear the stun belt. TT at 52-57. However, when the Court was informing Fields of the "dangers" of self-representation, the Court did not mention the adverse affects associated with wearing a stun belt. TT at 63-67.

In *Abdullah v. Groose*, 44 F.3d 692 (8th Cir. 1995), the court held the defendant did not knowingly and voluntarily make the decision to represent himself because the trial court failed to warn the defendant of the negative effects that wearing shackles had on his ability to

represent himself.  Abdullah argued that his Sixth Amendment right to self-representation was violated because he was forced to wear leg shackles during the trial.  The Magistrate Judge recommended granting his relief because "[t]he combination of shackles and self-representation is particularly prejudicial, and without specific warnings once the decision to shackle petitioner was made, it cannot be said that petitioner made the choice of self-representation knowingly and intelligently."  *Id.* at 694.  The Eighth Circuit agreed and held that "the state trial court did not fulfill its duty to assure that Abdullah was 'aware of the dangers and disadvantage of self-representation'" as required by *Faretta.  Id.* at 695; *see also Faretta v. California*, 422 U.S. 806, 835 (1975).  The Eighth Circuit also held Abdullah's Sixth Amendment right to self-representation was violated because "*Faretta* requires that the defendant seeking to represent himself should be informed by the trial judge of the particular complexities and difficulties that the shackling causes."  44 F.3d at 695; *see also Oviuk v. Alaska*, 180 P.3d 388, 390-91 (Alaska Ct. App. 2008) (holding that "when a defendant who is to be shackled at trial indicates that he wishes to waive his right to counsel and exercise his right of self-representation, it is incumbent on the trial judge to explain the added difficulties and potential prejudices that the shackling will pose before the judge accepts the defendant's waiver of the right to counsel").

Next, Mr. Fields' fear of the stun belt interfered with several of his important trial rights.  Many courts have recognized the psychological impact that a stun belt has on a defendant.  In fact, stun belt manufacturers tout the psychological "supremacy" of the device.  However, while the threat of intense, debilitating pain may make it an effective security device, it also serves to interfere with several critical trial rights.  For example, in *Durham*, the court stated:

> A stun belt seemingly poses a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles.  The fear of receiving a painful and humiliating shock for any

gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements during trial-including those movements necessary for effective communication with counsel.

287 F.3d at 1305.

The Eleventh Circuit also held that a stun belt has a negative impact on a defendant's Sixth Amendment and due process rights to be present at trial and to participate fully in his defense:

> Wearing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case. It is reasonable to assume that much of a defendant's focus and attention when wearing one of these devices is occupied by anxiety over the possible triggering of the belt. A defendant is likely to concentrate on doing everything he can to prevent the belt from being activated, and is thus less likely to participate fully in his defense at trial. We have noted that the presence of shackles may 'significantly affect the trial strategy [the defendant] chooses to follow.' A stun belt is far more likely to have an impact on a defendant's trial strategy than are shackles, as a belt may interfere with the defendant's ability to direct his own defense."

*Id.* at 1306.

In *Durham*, the court held that defendant's right to be present at trial and to participate in his own defense was affected by the stun belt, and thus, reversal was required because the prosecution did not prove that the error was harmless. *Id.* at 1309;[33] *see also Mar*, 52 P.3d at 113-14 (holding that trial court erred in compelling defendant to wear a stun belt).

Similarly in *Pliler*, the Ninth Circuit held that the trial court erroneously required the defendant to wear a stun belt, and remanded the case to decide whether the defendant was

---

[33] The Eleventh Circuit also held that the "decision to use a stun belt must be subjected to at least the same 'close judicial scrutiny' required for the imposition of other physical restraints." *Id*. Thus, a court must make the following findings of fact: (1) criteria for triggering the stun belt; (2) possibility of accidental discharge; (3) whether an essential governmental interest is served by making the defendant wear the stun belt; (4) whether less restrictive means of restraint are available; and (5) the court must place its rationale on the record. *Id.* at 1306-07.

prejudiced in being forced to wear such a device.  The court recognized the fear and anxiety that wearing a stun belt can have on a defendant:

> This "increase in anxiety" may impact a defendant's demeanor on the stand; this demeanor, in turn, impacts a jury's perception of the defendant, thus risking material impairment of and prejudicial affect on the defendant's 'privilege of becoming a competent witness and testifying in his own behalf.

341 F.3d at 901 (citations omitted).

All of these constitutional concerns were fully realized in this case.  Requiring Mr. Fields to wear a stun belt during trial interfered with his ability to represent himself. Certainly, Mr. Fields is not claiming that he was rendered continuously and completely unable to think by virtue of having to wear the stun belt.  However, whenever Fields encountered difficulty in cross-examination (which happened frequently), the stun belt made it nearly impossible for him to concentrate and think through the issue.  In addition, the extreme sleep deprivation that Mr. Fields had to endure as a result of his conditions of confinement only served to acerbate the problem.  As a result, there are a number of examinations where Fields simply gave up – where he would not have done so but for the security conditions.  In short, Mr. Fields' ability to represent himself was burdened and prejudiced by the use of the stun belt.

During penalty phase, when Mr. Fields was represented by counsel, Mr. Fields was reluctant to discuss matters with counsel for fear of being electrocuted.  For example, Mr. Fields most wanted to speak to his attorneys about matters of trial strategy during breaks. However, that was also when the marshals sought to take Fields back to the holding cell.  As a result, Mr. Fields would often simply not try to speak with counsel for fear that his efforts would be misinterpreted as a refusal to follow orders, resulting in activation of the device.  There were several instances where Fields decided not to consult with counsel as a result of the stun belt.

It is important to note that unjustified interference with the right to counsel constitutes a structural error. *See generally United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) ("We have little trouble concluding that the erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error"'") (citations omitted). Thus, this type of prejudice alone justifies reversal.

However, the prejudice to Mr. Fields does not end there. Requiring Mr. Fields to wear a stun belt made him appear to be cold and emotionless, the strategy he reasonably adopted in order to lessen the chance of being shocked. However, while an effective strategy to avoid getting shocked, it was also a strategy that negatively colored jurors' views of Fields in making their penalty determination, as at least one juror has indicated to counsel. Thus, the use of the stun belt likely contributed to Mr. Fields' death sentence.

Mr. Fields' reaction to the stun belt – his intense fear of being shocked, his distrust of the marshals, and his altered demeanor – was influenced by years of trauma. In short, Mr. Fields' psychological condition, especially his paranoia, heightened the legally recognized problems generally associated with the device. *See Declaration of Dr. George Woods* ¶ 6 ("Even unrestrained, Mr. Fields is highly anxious and paranoid. These symptoms would be dramatically increased by requiring him to wear a stun belt controlled by a marshal"). All of this information was available at the time of trial and could have been presented by counsel when the Court was considering whether to permit use of the device.

Trial counsel deficiently failed to present relevant evidence when this Court considered and approved the use of the stun belt. *Strickland v. Washington,* 466 U.S. 668, 692-94 (1984). Counsel's failure was directly reflective of their corresponding failure to conduct a competent investigation into the negative psychological effects of forcing Mr. Fields, a man

whose extreme trauma has understandably invested him with distrust, paranoia, and fear, to wear a device easily activated based on one misperceived move.  *See generally Wiggins v. Smith,* 539 U.S. 510, 534-35 (2003).  Moreover, trial counsel's failure to request the Court to make a "particularized determination" based on the relevant evidence as to why it was necessary in this specific trial for Fields to wear a stun belt constituted ineffective assistance of counsel.  *See Stephenson v. Levenhagen*, No. 3:07-CV-539-TS, 2009 WL 1886081, at **7-9 (N.D. Ind. July 1, 2009).

Finally, to the extent the Court found justification for some heightened courtroom security, it failed to consider less restrictive alternatives to the stun belt – alternatives that could have provided the necessary security without psychologically disabling Fields' ability to represent himself.  For example, a leg brace could have served the same security purpose without any of the corresponding negative psychological effects.

As a result, Fields is entitled to an evidentiary hearing on these claims.  Because he was prejudiced in several ways by the unnecessary use of the stun belt, he is entitled to a new trial.

CLAIM 37:    MR. FIELDS' FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY INCREASED SECURITY MEASURES AT TRIAL WHICH WERE APPARENT TO JURORS, INCLUDING THE VISIBLE OUTLINE OF THE STUN BELT, THE PRESENCE OF ADDITIONAL SECURITY PERSONNEL WHO WERE SEATED CLOSE TO FIELDS AND WHO, ON OCCASION INTERACTED WITH HIM WHILE JURORS WERE PRESENT IN THE COURTROOM, AND BY INCREASED SECURITY MEASURES EMPLOYED AFTER THE GUILTY VERDICT.

CLAIM 38:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS EIGHTH AMENDMENT PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN, GIVEN THAT THE STUN BELT AND OTHER SECURITY MEASURES WERE APPARENT TO JURORS, COUNSEL FAILED TO EXPLAIN TO JURORS HOW THESE MEASURES NEGATIVELY ALTERED FIELDS' DEMEANOR.

CLAIM 39:    MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE

UNITED STATES MARSHALS INCREASED SECURITY AFTER JURORS RETURNED A GUILTY VERDICT, THEREBY IMPLYING THAT FIELDS WAS DANGEROUS AND WHERE THE COURT TOLD JURORS (OUTSIDE THE PRESENCE OF THE PARTIES) TO COMMUNICATE ANY ALLEGED THREATS TO THE COURT.

CLAIM 40:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN, AFTER CONVICTION, THE MARSHALS INFORMED JURORS THAT THEY WOULD ESCORT JURORS TO THEIR VEHICLES DURING PENALTY PHASE.

CLAIM 41:    MR. FIELDS' RIGHT TO BE PRESENT AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE COURT TOLD JURORS TO REPORT ANY THREATS TO THE COURT WHEN NEITHER FIELDS NOR COUNSEL WERE GIVEN NOTICE, AN OPPORTUNITY TO OBJECT, OR THE RIGHT TO BE PRESENT.

A.    **Facts**

The last set of related claims focused on the psychological impact of the stun belt on Mr. Fields – his ability to represent himself, to consult with counsel, and the resulting flat demeanor produced by the psychological threat of activation. This set of claims focuses on the prejudice from jurors either seeing or hearing about all heightened security measures. Additionally, if jurors were able to see the stun belt, then counsel incompetently failed to explain to jurors that Mr. Fields' apparent lack of emotion was the byproduct being forced to wear stun belt and was not his true reaction to the testimony at trial and in the penalty phase.[34]

Although the stun belt was fitted under Fields' clothes, the outline was visible. Thus, it is likely that some jurors knew that the Court had imposed a heightened security measure in this case. In addition, other visible security measures served to call jurors' attention to the fact that the Court felt Fields' deserved increased security. For example, even though he

---

[34] Mr. Fields, paranoid that a marshal would activate the stun belt, sought to remain "emotionless" at trial. At least one juror has told counsel that Mr. Fields' lack of emotion at trial was a factor in the decision to impose a death sentence. Given that Fields' lack of emotion was an artifact of a visible security device, competent counsel should have explained that fact to jurors, so that jurors would not view Fields' demeanor in court as reflective of his true emotions. If counsel had done so, there is a reasonable likelihood of a life verdict.

was fitted with a stun belt during trial (which should have resulted in Fields' being able to move in the courtroom), Mr. Fields was directed to remain seated at all times. Security personnel were seated behind him, including the marshal who controlled the stun belt. Often times, when court broke for a recess, at least one marshal would approach Fields, while jurors were exiting the courtroom. While the prosecutors were also directed to remain seated during trial, the prosecutors were permitted to approach the bench. Fields, who represented himself, was not. Thus, stand-by counsel, rather than Fields would approach the bench for side-bar conferences.

After the jury returned a guilt verdict, the marshals, without notice to Fields or his counsel, apparently told jurors that they would now be escorted to their vehicles. There were no incidents, either in or outside of court, justifying this increased security. This increased security arrangement continued for the remainder of the trial. In addition, at least one juror has reported that the Court, in chambers, advised jurors that they should report any threats to the Court, although it is not presently clear when that warning was issued.

### B. <u>Argument</u>

The Due Process clause of the Fifth Amendment to the Constitution forbids the use of visible increased security measures, like shackles, during trial, unless that use is "justified by an essential state interest" – such as the interest in courtroom security specific to the defendant on trial. *Deck v. Missouri*, 544 U.S. 622, 628 (2005); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986).

"The appearance of the offender during the penalty phase in [restraints] . . . inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community – often a statutory aggravator and nearly always a relevant factor in jury [decision-making], even where the State does not specifically argue the point." *Deck*, 544 U.S. at 633. "It also almost inevitably affects adversely the jury's perception of the

character of the defendant." *Id.* "And it thereby inevitably undermines the jury's ability to weigh accurately all relevant considerations – considerations that are often unquantifiable and elusive – when it determines whether a defendant deserves death. In these ways, the use of [restraints] can be a 'thumb [on] death's side of the scale.'" *Id.*

While customary security measures do not implicate due process, visible increased security measures may lead jurors to believe that a defendant is dangerous and thereby reverse the presumption of innocence and interfere with the integrity of the jury's deliberations. *Holbrook,* 474 U.S. at 570-72. The essential question is whether the security employed was routine or otherwise. *United States v. Balsam,* 203 F.3d 72, 82 (1st Cir. 2000).

Here, despite the use of a stun belt, the marshals were unusually attentive to Mr. Fields in the presence of jurors. Thus, it is exceedingly likely that jurors noticed the increased security. This Court should resolve this issue by conducting an evidentiary hearing because the extant record is insufficient to conclusively resolve this issue.

In addition to the heightened security in the courtroom, at least one juror told post-conviction counsel that marshals had contact with jurors after the guilty verdict when jurors were told that security would be increased.[35] Such contact, directly relating to an issue of fact in the penalty phase, constitutes improper communications with jurors in violation of the Sixth Amendment. The Supreme Court has held that any unapproved private communication, contact, or tampering with a juror during a criminal trial is presumptively prejudicial. *See Remmer v. United States*, 347 U.S. 227, 229 (1954); *see also Mattox v. United States*, 146 U.S. 140, 149-50

---

[35] Additionally, one juror indicated that the Court directed jurors to report any threats to the Court, although the juror was unclear when the communication occurred – during or after trial. Mr. Fields was not present when these communications took place. Communications by the Court with jurors, especially about a matter that is in issue at trial, constitutes a denial of the right to be present. *Rushen v. Spain*, 464 U.S. 114, 118 (1983). Mr. Fields seeks a hearing on this claim, as well.

(1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.  Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated.  Hence, the separation of the jury in such a way as to expose them to tampering may be reason for a new trial, variously held as absolute; or *prima facie*, and subject to rebuttal by the prosecution; or contingent on proof indicating that a tampering really took place. Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear") (internal citation omitted).

The fact that marshals are a routine fixture in a federal courthouse only serves to increase the presumptive prejudice to Fields.  The Supreme Court has held that a defendant's Sixth Amendment rights were violated where the bailiff told a juror the defendant was a "wicked fellow." *Parker v. Gladden,* 385 U.S. 363, 363-64 (1966).  In rejecting the State's argument that no harm resulted from these comments because ten jurors testified that they did not hear the statements (and Oregon law permits a guilty verdict with ten votes), the Supreme Court stated "(t)his overlooks the fact that the official character of the bailiff-as an officer of the court as well as the State-beyond question carries great weight with a jury which he had been shepherding for eight days and nights." *Id.* at 365; *see also United States v. O'Brien,* 972 F.2d 12, 13-15 (1st Cir. 1992) (upholding a guilty verdict but applying the *Mattox* presumption where a police officer who was a potential prosecution witness, but who did not testify, spoke with three jurors during a recess about matters unrelated to the case); *United States v. Williams,* 822 F.2d 1174, 1188 (D.C. Cir. 1987) (upholding a guilty verdict but stating that the *Mattox* presumption is "operable even if the communication at issue consisted only of 'banter' not clearly directed at influencing the jury's verdict"), *superseded on other grounds by rule as stated in United States v. Caballero,* 936

F.2d 1292, 1298-99 (D.C. Cir. 1991); *United States v. Betner,* 489 F.2d 116, 117-19 (5th Cir. 1974) (ordering a new trial under *Mattox* because the prosecutor conversed with the jury panel during a recess and the trial court failed to conduct an adequate hearing).

The *Mattox* rule applies when an unauthorized communication with a juror crosses a "low threshold" to create the potential for prejudice. A communication is possibly prejudicial, rather than *de minimis,* if it raises a "risk" of influencing the verdict. Prejudice is presumed under these circumstances. *See United States v. Dutkel,* 192 F.3d 893, 899 (9th Cir. 1999) ("Because jury tampering cuts to the heart of the Sixth Amendment's promise of a fair trial, we treat jury tampering cases very differently from other cases of jury misconduct. Once tampering is established, we presume prejudice and put a heavy burden on the government to rebut the presumption").

Given that Mr. Fields' future dangerousness was the central issue in penalty phase, the prejudice is unmistakable. Mr. Fields is entitled to a new trial.

## IX.     CLAIMS RELATED TO THE DISPROPORTIONALITY OF FIELDS' DEATH SENTENCE

CLAIM 42:     THE FEDERAL DEATH PENALTY STATUTE IS UNCONSTITUTIONAL AND VIOLATES THE EIGHTH AMENDMENT BECAUSE IT FAILS TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW THE EIGHTH AMENDMENT.

The gravity, severity, and irreversibility of the federal death penalty make it unlike all other forms of punishment. Given this uniqueness, it cannot be imposed unless sentencing procedures exist that prevent the risk of it being inflicted in an arbitrary and capricious manner. *See*, *e.g.*, *Furman v. Georgia*, 408 U.S. 238, 239-40 (1972); *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). Accordingly, the death penalty is unconstitutionally applied where, for example, a sentencing statute places unfettered discretion in the hands of juries because arbitrary and often discriminatory capital sentences can result. *Furman*, 408 U.S. at 310

(Stewart, J., concurring) (finding that the Eighth Amendment "cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed").  Due to its lack of sentencing procedures designed to prevent arbitrary and capricious application of the sentence, death sentences imposed with procedures such as those discussed in *Furman* violate the Eight Amendment's constitutional prohibition against cruel and unusual punishment.  *Id.* at 239-40 (*per curium*).

A time-tested and court-approved means of avoiding such arbitrary and capricious results is the incorporation of a proportionality review to statutory sentencing procedures.  *Zant v. Stephens*, 462 U.S. 862, 890 (1983).  A **meaningful** proportionality review includes a review of the universe of cases in which juries imposed either death or life and a comparison of those cases to the case of the particular defendant to be sentenced.  Additionally, a **meaningful** proportionality review must require inquiry into whether similar cases exist in which the government did not even seek death in the first place.  *See*, *e.g.*, *Walker v. Georgia*, 129 S. Ct. 453, 456 (2008) (Stevens, J.) (denial of *writ of certiorari*:  "Cases in both of these categories are eminently relevant to the question whether a death sentence in a given case is proportionate to the offense").  "[F]ailure to acknowledge these or any other cases outside the limited universe of cases in which the defendant was sentenced to death creates an unacceptable risk that it will overlook a sentence infected by impermissible considerations."  *Id.*

The Federal Death Penalty Act ("FDPA") does not provide for comparative proportionality review.  18 U.S.C. § 3593.  While that alone does not render the FDPA unconstitutional *per se*, (*Pulley v. Harris*, 465 U.S. 37, 45-46, 50-51 (1984)), the FDPA still suffers from significant constitutional infirmities because the sentencing procedure provides no meaningful mechanism to prevent arbitrary and capricious sentences, such as proportionality review.  *See*, *e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987) ("[W]here the statutory

-280-

procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required"). As a result, the FDPA is unconstitutional.

CLAIM 43:  MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE A CLAIM THAT THE FEDERAL DEATH PENALTY STATUTE IS UNCONSTITUTIONAL BECAUSE IT FAILS TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW AS AN ISSUE ON DIRECT APPEAL.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claim 42 above. Appellate counsel ineffectively failed to identify and litigate on direct appeal these above-described claims regarding the unconstitutionality of the federal death penalty statute. To the extent this claim was clear on the record, counsel's failure to raise them on direct appeal is inexcusable. Appellate counsel had no reason to avoid raising these meritorious claims. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

CLAIM 44:  IF THIS COURT CONCLUDES THAT COMPARATIVE PROPORTIONALITY REVIEW IS CONSTITUTIONALLY MANDATED AND CAN BE REQUIRED WITHOUT DOING VIOLENCE TO THE STATUTE, MR. FIELDS' DEATH SENTENCE MUST BE OVERTURNED AS DISPROPORTIONATE AND IN VIOLATION OF THE EIGHTH AMENDMENT.

Mr. Fields' case is a significant departure from the typical case in which the federal death penalty would be appropriate. As such, his death sentence is disproportionate to all other federal death sentences and is, therefore, arbitrary and capricious in violation of the Eighth Amendment. Indeed, Mr. Fields' case plainly demonstrates that the federal death penalty statute is unconstitutional due to its lack of procedures to control the sentencer's discretion. A comparison of cases proves the point.

Mr. Fields was convicted and sentenced to death for the single-victim murder of his ex-girlfriend during his escape from a federal detention facility. In addition, the jury found no evidence of substantial planning or premeditation. Even a cursory review of federal capital prosecutions resulting in a sentence less than death shows that less severe punishments are typically given for much more severe and heinous crimes. For example, one defendant received a life sentence for the premeditated kidnapping and killing of a government witness in a drug conspiracy prosecution by beating the victim with a hammer. *United States v. Holley*, 96-cr-208 (N.D. Ala.). Another received a life sentence for his role as a co-conspirator in the September 11, 2001 attacks on the World Trade Center and Pentagon. *United States v. Moussaoui*, 01-cr-455 (E.D. Va.) (attacks resulted in the death of over 3,000 people). Many other federal defendants have received life sentences for crimes far more aggravated than for which Fields was convicted. *See*, *e.g.*, *United States v. Street*, 04-cr-298 (W.D. Mo.) (defendant beat, stabbed, and shot victim in the back of the head); *United States v. Jordan*, 04-cr-58 (E.D. Va.) (victim burned to death); *United States v. Matthews*, 00-cr-269 (N.D.N.Y.) (victim tortured and beaten to death); *United States v. Pitera*, 90-cr-424 (E.D.N.Y.) (seven murders, two of which qualified as capital crimes under 21 U.S.C. § 848(e); some victims tortured and dismembered); *United States v. Ingle*, 96-cr-60022 (W.D. Ark.) (robbery and murder of an elderly National Parks employee who was found shot and bound with tape near a hiking path); *United States v. Bobbitt*, 97-cr-129 (E.D. Va.) (fatal shooting of a bank teller during a robbery; a security guard also was shot and blinded, but survived); *United States v. Quinones*, 00-cr-761 (S.D.N.Y.) (murder of a NYPD informant who was allegedly beaten or tortured and body burned post-mortem). Likewise, federal defendants have received life sentences for multiple murders. *See*, *e.g.*, *United States v. Henderson*, 06-cv-39 (S.D. Ohio) (murder of a government witness and the witness' boyfriend; three additional murders alleged in aggravation); *United States v. Galan*, 06-cr-730 (N.D. Ohio)

(drug-related murders of two brothers); *United States v. Hans*, 05-cr-1227 (D.S.C.) (arson resulting in six deaths at a motel); *United States v. McTier*, 05-cr-401 (E.D.N.Y.) (three murders by a member of a drug gang); *United States v. McGriff*, 04-cr-966 (E.D.N.Y.) (double-murder); *United States v. Gooch*, 04-cr-128 (D.D.C.) (defendant charged with five murders); *United States v. Barnes*, 04-cr-186 (S.D.N.Y.) (two drug-related murders); *United States v. Mayhew*, 03-cr-165 (S.D. Ohio) (defendant murdered his ex-wife, ex-wife's boyfriend; defendant also murdered his own daughter, with whom he had an incestuous relationship, and shot a West Virginia state trooper in the chest); *United States v. Gilbert*, 98-cr-30044 (D. Ma.) (killing of four patients at a Veterans Affairs Hospital by intentional injection of epinephrine, a drug that can over-stimulate the heart); *United States v. Dinkins*, 06-cr-309 (D. Md.) (two drug-related gun murders); *United States v. Green*, 06-cr-19 (W.D. Ky.) (murder of an Iraqi family of four and rape murder of their daughter by U.S. soldier).

Equally instructive are comparisons to cases in which the authorization to seek the death penalty was not sought by the U.S. Attorney or a request was rejected by the Attorney General. *See*, *e.g.*, *United States v. Coffin,* 98-cr-002 (W.D. Ky.) (authorization not requested where, defendant crossed state lines to kill his girlfriend, who was the mother of his 17-month old child); *United States v. Mather*, 00-cr-58 (W.D. Okla.) (authorization not requested where defendant murdered stepmother with an axe and a serrated knife); *United States v. Blackthorne*, 00-cr-003 (W.D. Tex.) (authorization not requested where defendant contracted for the murder of his ex-wife; his wife was found slain with her two-year old quadruplets tracking through her blood); *United States v. Bailey*, 97-cr-269 (S.D.N.Y.) (authorization not requested where defendant kidnapped girlfriend of co-conspirator, assaulted her and burned her alive in the trunk of her car); *United States v. Secatero*, 98-cr-546 (D.N.M.) (request for authorization rejected where defendant killed four family members, seriously wounded a fifth, and killed two family

dogs); *United States v. Koblan*, 03-CR-80089 (S.D. Fla.) (request for authorization rejected by Attorney General where defendant allegedly murdered two people in an attempt to eliminate them as government witnesses and stuffed one victim's body in a refrigerator); *United States v. Horton*, 00-cr-105 (D. Md.) (request for authorization rejected by Attorney General where defendant engaged in murder for hire; defendant abducted the victim, strangled and beat her, and then doused the car with gasoline and ignited it).

Based on a review of the comparable universe of death eligible crimes, Mr. Fields' death sentence is disproportionate. On this basis alone, Mr. Fields' sentence violates the Eighth Amendment and must be overturned.

CLAIM 45:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE A CLAIM THAT THAT COMPARATIVE PROPORTIONALITY REVIEW IS CONSTITUTIONALLY MANDATED AND CAN BE REQUIRED WITHOUT DOING VIOLENCE TO THE STATUTE AND THAT MR. FIELDS' DEATH SENTENCE MUST BE OVERTURNED AS DISPROPORTIONATE UNDER SUCH A REVIEW.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in claims 42-44 above. Appellate counsel ineffectively failed to identify and litigate on direct appeal these above-described claims regarding Fields' death sentence being comparatively disproportional to other death eligible crimes. To the extent this claim was clear on the record, counsel's failure to raise them on direct appeal is inexcusable. Appellate counsel had no reason to avoid raising these meritorious claim. Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481-82 (2000); *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).

Appellate counsel's ineffective representation is extremely and undeniably prejudicial to Fields. The above-described errors rendered the application of the death penalty to Mr. Fields unconstitutional. Accordingly, the validity of Fields' death sentence is undermined by these constitutional errors. As such, a new trial and sentencing proceeding are warranted and but for appellate counsel's failure to raise these claims on direct appeal, the Fifth Circuit would likely have granted Fields a new trial and sentencing proceeding.

## X.   OTHER CLAIMS

CLAIM 46:   THE CUMULATIVE ERRORS IN THIS CASE CONSTITUTE A VIOLATION OF MR. FIELDS' RIGHTS TO DUE PROCESS, TO A FAIR TRIAL, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

The combination of errors extant in this case deprived Mr. Fields of due process and provide him with a separate claim for relief. *Kyles v. Whitley*, 514 U.S. 419, 421-22, 440-41 (1995) (in determining whether exculpatory evidence suppressed by state is sufficiently material to violate Due Process Clause, court is required to assess "cumulative" or "net" effect of all suppressed evidence and commits legal error if it only conducts piecemeal analysis of each item of suppressed evidence). The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 289-90, 302-03 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Id.* at 290 n.3; *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) ("combined prejudice of the multiple errors committed in this case deprived Alcala of a fundamentally fair trial and constitutes a separate

and independent basis for granting his petition"); *Cargle v. Mullin*, 317 F.3d 1196, 1206-07, 1208, 1221, 1223 (10th Cir. 2003) (*habeas corpus* relief is granted with regard to both capital conviction and sentence based on cumulative effect of ineffective assistance of counsel and prosecutorial misconduct: "'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless' . . . Consistent with the unqualified reference to **all errors**, our cases reflect application of cumulative-error review to legally diverse claims such as those here . . . [Petitioner's] cumulative-error claim raises the possibility of guilt-phase error having a continuing, cognizable effect on the penalty phase.  This commonsense notion that sentencing proceedings may be affected by errors in the preceding guilt phase is not novel") (emphasis in original; citations omitted).

CLAIM 47:    ISSUES RAISED ON DIRECT APPEAL.

Mr. Fields again alleges and preserves for this motion all errors raised on direct appeal.

CLAIM 48:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL WAS INEFFECTIVE IN MULTIPLE RESPECTS.

Mr. Fields hereby re-alleges and incorporates by reference the facts and arguments alleged in Claims 1 through 46.  To the extent that appellate counsel could have raised these claims based on the extant record on direct appeal, appellate counsel was ineffective for failing to raise these claims.  Had counsel included these claims on direct appeal, there is a reasonable probability that the outcome of the proceeding would have been different because there was extant authority establishing that Mr. Fields' rights were violated, as articulated above. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *Smith v. Robbins*, 528 U.S. 259 (2000).

-286-

CLAIM 49:    MR. FIELDS IS ENTITLED TO AN EVIDENTIARY HEARING.

Mr. Fields has alleged many facts that the Government is likely to contest. Should the Government contest any material facts, Mr. Fields is entitled to a hearing in order to prove those facts.  28 U.S.C. § 2255.  Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  *Id.*  Although the potential scope of such a hearing cannot be assessed until the Government files a responsive pleading, in order to prevent any claim of waiver, Mr. Fields now requests that he be afforded a hearing on any disputed facts which, if proven individually or in combination with other facts, will entitle him to relief.  Mr. Fields reserves the right to more fully brief his entitlement to an evidentiary hearing at the appropriate time.

## XI.    REQUEST FOR RELIEF

Based upon all of the above allegations and the entire record of this prosecution, Mr. Fields respectfully requests that the Court provide the following relief:

1.    That the Court permit discovery as will be requested in Mr. Fields' to-be-filed Motions for Discovery;

2.    That, if requested,  Mr. Fields be permitted to amend this motion;

3.    That the Court conduct an evidentiary hearing on the claims raised in this petition;

4.    That the Court permit oral argument as appropriate and required;

5.    That the Court establish a briefing schedule and permit Fields to submit a memorandum of law in support of his claims;

-287-

6.    That at the conclusion of the proceedings that the Court vacate Mr. Fields' conviction and sentence and order that appropriate retrial and/or new sentencing hearing be conducted.

7.    And, any other relief to which Mr. Fields may be entitled.

DATED this 12th day of April, 2010.

Respectfully Submitted:

/s/ Jeffrey E. Ellis

Jeffrey E. Ellis
Law Offices of Ellis,
Holmes & Witchley, PLLC
705 Second Ave., Ste 401
Seattle, WA 98104
206/262-0300 (ph)
206/262-0335 (fax)
ellis_jeff@hotmail.com

Peter J. Isajiw
*Pro Hac Vice* Admission Pending
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
Phone:  212-504-6000
Fax:  212-504-6666
Peter.Isajiw@cwt.com

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey E. Ellis, hereby certify that on April 12, 2010, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to the following attorneys of record in the above-entitled case:


**Gregory S. Gloff**
Assistant United States Attorney
800 Franklin
Suite 280
Waco, TX 76701
Email: Greg.Gloff@usdoj.gov



/s/ Jeffrey E. Ellis

Jeffrey E. Ellis
Attorney at Law