# DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

*Background and Qualifications*

1. I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, www.capdefnet.org. This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003). In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

2. From1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

3. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project,

a nonprofit law office in San Francisco which coordinated appellate and postconviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.

4. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in postconviction. Most of these conferences were organized and attended by attorneys specializing in capital work.

5. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Wyoming. I have also lectured on numerous occasions under the auspices of the Administrative Offices of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over the past decade, I have lectured at more than a dozen capital defense training programs in Texas (in Dallas, Galveston, Houston, Plano, and San Antonio).

6. I have lectured on mitigation investigation at multiple national training conferences

and at various times in the past two decades, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA). I am co-chair of the planning committee for this seminar in 2009. I also teach regularly at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois, where attorneys with federal death penalty cases routinely bring their cases for brainstorming, training, and consultation.

7. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This four-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine have been cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (Summer 2003), available at www.abanet.org/deathpenalty. At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA LAW REVIEW 1157 (Summer 2003). At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of

3

Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (Spring 2008).

8. I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., and Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press). I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008)

9. As an expert witness, I have provided evidence on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in numerous state and federal jurisdictions, including Alabama, Arizona, Arkansas, California, Georgia, Mississippi, Missouri, New York, Oklahoma, Pennsylvania, Tennessee, Texas, and Wyoming. Over the years, I have been directly involved in hundreds of capital cases in California and New York, including dozens of trials and postconviction hearings. I have also been consulted in various capacities on capital cases in numerous other jurisdictions around the country.

***Standard of Care in Capital Cases***

10. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar I have participated in since 1980, instructors have emphasized the importance of

4

conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases.

11. As early as 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983).

12. Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience. Whenever brain-behavior relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity.

13. Over the past decade, the U.S. Supreme Court has found trial counsel ineffective for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000), *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard*, 545 U.S. 374 (2005). In

*Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins,* trial counsel were found deficient in their performance, even though they had had their client examined by a mental health expert, because they failed to conduct a complete social history investigation. In *Rompilla,* counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts.

14. In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Thus, competent capital counsel retain a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted a decade ago that mitigation specialists "have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." The subcommittee report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done

by a lawyer, rather than an investigator or paralegal." FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference, May 1998, *available at* http://www.uscourts/gov/dpenalty/1COVER.htm.

15. The Revised ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, 2003 Revised ABA Guidelines, *available at* www.abanet.org/deathpenalty) state unequivocally that lead counsel at any stage of capital representation (trial or postconviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (also *available at* www.abanet.org/deathpenalty), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.C.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.D.(7).) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." (1989 Guideline 11.4.1.C.) The 1989 ABA Guidelines were recognized by the U.S. Supreme Court in *Wiggins* as "well-defined norms." (539 U.S. at 524). "The new ABA Guidelines adopted in 2003 simply explain in greater detail

than the 1989 Guidelines the obligations of counsel to investigate mitigating evidence." *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).[1]

16. Without a thorough social history investigation, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J. FORENSIC PSYCHIATRY 43 (1994).

17. The social history investigation should include a thorough collection of objective, reliable documentation about the client and his family, typically including medical, educational, employment, social service, and court records. Such contemporaneous records are intrinsically credible and may document events which the client and other family members were too young to

---

[1]The Supreme Court has consistently used the ABA's standards and guidelines in capital cases to assess the performance of trial counsel who prepared their cases before the relevant ABA publications had been issued. In *Strickland*, the Court cited standards published by the ABA in 1980 when assessing trial counsel's performance in 1976-77. In *Wiggins*, the Court cited the 1989 ABA Guidelines when assessing trial counsel's performance in 1988-89. In *Rompilla*, the Court used multiple ABA publications from 1980, 1989, and 2003, to assess deficiencies in a 1988 trial. Finally, in *Nixon v. Florida*, 543 U.S. 175 (2004), the Court used the 2003 Guidelines to assess performance in 1984-85.

remember, too impaired to understand and record in memory, or too traumatized, ashamed, or biased to articulate. The collection of records and analysis of this documentation involve a slow and time-intensive process. Many government record repositories routinely take months to comply with appropriately authorized requests. Great diligence is required to ensure compliance. Careful review of records often discloses the existence of collateral documentation which, in turn, needs to be pursued.

18. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socio-economic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

19. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the

cyclical nature of the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation,* THE CHAMPION, 43-45 (May 1992).

20. Mitigation investigation is particularly important when the client does not share the attorney's racial, ethnic, or cultural background. Cultural differences can include not only ethnicity and language, but all of the badges of social identity that define an individual's world and belief system, including politics, religion, and sexual orientation.

21. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute, mitigation need not involve a mental disease or defect. Nevertheless, in many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

22. For clients who are psychiatrically disordered or brain damaged, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Of all the diverse frailties of humankind, brain damage is singularly powerful in its ability to explain why individuals from the same family growing up in the same setting turn out differently. It is an objective scientific fact. It does not reflect a bad choice made by the client.

23. Over the years, I have been involved in hundreds of capital cases, including dozens of trials and postconviction hearings. I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in dozens of cases

10

around the country. My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases. *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness). This research provides empirical vindication for the principle enunciated by Justice O'Connor in *Penry v. Lynaugh*, 492 U.S. 302 (1989), "that punishment should be directly related to the personal culpability of the criminal defendant" in capital cases. (*Id.*, at 319.) She continued, "rather than creating a risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a 'reasoned *moral* response to the defendant's background, character, and crime.'" (*Id.*, at 328, quoting *California v. Brown*, 479 U.S. 538, 545 (1987)(O'Connor, J., concurring.))

### *Standard of Care in Capital Mental Health Evaluations*

24. Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses. (*See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts.) Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative

11

lay witnesses whose identity and potential evidence can only be discovered through life-history investigation. However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the factors that shaped the client over the course of his life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities. Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

25. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons). Additional components of a reliable evaluation will include a thorough physical examination (including neurological examination) and appropriate diagnostic testing. The standard mental status examination cannot be relied upon in isolation for reliable clinical assessments any more than the expert can be relied upon in isolation in the courtroom context.

26. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent

12

expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including neuropsychology, psychopharmacology, and the disciplines which study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to elicit, or assess the credibility of, client disclosures; and testifying witnesses, to name but a few. To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs to conduct a thorough social history investigation.

### *Review of the Sherman Lamont Fields Case*

27. I was asked by postconviction counsel for Sherman Fields to address the prevailing professional norms regarding the investigation and preparation of the penalty phase of capital cases at the time of Mr. Fields's trial and to assess trial counsel's investigation and presentation of mitigation evidence in that light.

28. At the request of Mr. Fields's postconviction counsel, I have reviewed the direct appeal opinion, *United States of America v. Sherman Lamont Fields*, 483 F.3d 313 (5th Cir. 2007); the transcripts of the penalty phase of the trial in the United States District Court for the Western District of Texas, Waco Division, February 4-6, 2004 (*hereinafter,* Trial Tr.); the Special Findings Form from the Trial; the Psychosocial History report and Mitigation Themes memo dated November 29, 2003, of the social worker who testified at the trial, Jane McHan, LCSW; and Mr. Fields's records from numerous agencies, including the Waco Independent

School District, the McLennan County Juvenile Court and Probation Department, the Texas Youth Commission, the Heart of Texas Region Mental Health Mental Retardation Center, the University of Texas Medical Branch Hospital in Galveston, the Social Security Administration, the McLennan County Jail Facility, the United States Marshals Service, and the United States Probation Department. I have also been briefed by counsel about the procedural history of the case and other details.

29. Based on the material I have reviewed and the information provided by postconviction counsel, it is my opinion that trial counsel's performance in both the investigation and presentation of mitigation evidence fell below the prevailing professional norms at the time of Mr. Fields's trial in 2004. The investigative deficiencies are in seven broad substantive areas:

(1) failure to obtain all the relevant multigenerational social history records: although counsel obtained some records pertaining to Mr. Fields himself, there was no attempt to gather records pertaining to other family members and caretakers;

(2) failure to interview *any* of the numerous historical witnesses who had created the records that were obtained;

(3) failure to interview anyone but a few members of Mr. Fields's immediate family and a few correctional officers;

(4) failure to investigate and document Mr. Fields's extraordinary exposure to trauma;

(5) failure to investigate Mr. Fields's mental illness and the multigenerational history of mental illness in Mr. Fields's family;

(6) failure to investigate potential brain damage and dysfunction, secondary to trauma and anoxia following suicide attempts; and

14

(7)     failure to investigate Mr. Fields's history of incarceration and its impact on his current and future functioning.

The investigative deficiencies were compounded by counsel's failure to retain appropriate experts to address the areas of trauma, mental illness, brain damage, and incarceration history (especially in relation to future dangerousness). The result was a sentencing phase presentation that was fatally flawed. Although jurors heard testimony from a few jail guards, three family members, a social worker, and a psychologist, the brief testimony of these witnesses was superficial and poorly prepared. It constituted a small fragment of what might have been presented had counsel undertaken the full mitigation investigation that effective capital representation requires.

30. *Failure to obtain multigenerational social history records.*[2] Mr. Fields's mother, by her own account, has memory problems. (Trial Tr. 2457:22-25.) She receives disability payments for mental retardation secondary to being shot in the head. She smoked marijuana at age thirteen (the age when she gave birth to her first child), used alcohol (as did her own mother), and dropped out of high school with only a ninth grade education. (Sherman Lamont Fields, Psychosocial History by Jane McHan, LCSW, dated November 29, 2003; *hereinafter,* "PSH,"at 2-4.) Nonetheless, counsel failed to obtain *any* records that could have provided more trustworthy, accurate, and complete accounts than the mother offered. Even if counsel had no

---

[2]Counsel delegated some of the collection of life-history records in this case to a private investigator, D. P. Youngblood of the Institute of Criminal and Civil Investigations. When institutions informed Mr. Youngblood that records had been destroyed, there was apparently no attempt to identify and interview any staff who might have remembered Mr. Fields (for example, at the Heart of Texas Region Mental Health Mental Retardation Center, which screened Mr. Fields on December 29, 1989, but subsequently destroyed its records, including records of diagnosis).

systematic plan for obtaining documentary records, numerous "red flags" should have prompted efforts to obtain specific records documenting critical events. For example, counsel should have obtained all records relating to Mr. Fields's birth at Hillcrest Medical Center in Waco, including any records that would establish whether his mother had prenatal care – rather than simply accepting her statement that she "experienced a full term, uncomplicated pregnancy with Sherman." (PSH; at 4.) Counsel should have obtained all medical records from Mr. Fields's childhood to investigate whether he received appropriate pediatric care and, if so, whether those records support his mother's claim that he "has always been in good health" and "developmental milestones were met at the appropriate intervals." (*Id.*, 4.) Texas Youth Commission records indicated that Mr. Fields had been hospitalized for two weeks at approximately age five when he sustained some eye trauma. Every effort should have been made to locate those hospital records. Counsel should have obtained the court and police records relating to the incident in which Mr. Fields's mother shot her paramour, William Bradford, after catching him with another woman, her cousin Ivory Monroe. Mr. Fields's mother reported that she spent fifty days in jail and five years on probation during a critical developmental period of Mr. Fields's adolescence. Her probation records would provide an outsider's independent observations on the household. Finally, counsel should have obtained all the records relating to the incident in which Mr. Fields's mother was shot in the head by a subsequent paramour, Melvin Swinnie, as well as the medical records documenting her injuries and the criminal history of Mr. Swinnie, a key criminogenic role model when Mr. Fields was a teenager.

31. *Failure to interview historical witnesses.* One reason for gathering life-history records is to collect reliable information. An equally important reason is to identify unbiased

witnesses who encountered the capital client long before he faced capital prosecution. Witnesses outside the family can often provide insight into the dysfunctional environment in which the client was raised. Teachers, social service caseworkers, and mental health professionals can provide insight into the influences that shaped the client's life in his developmental years. They have credibility with jurors precisely because they are not the client's flesh and blood, but are neutral citizens from the same community as the jurors. Counsel had records that identified numerous such witnesses, but made no effort to locate and interview them. These witnesses included Jo Ann Peek (second grade teacher at Provident Heights Elementary), Lucia Hatten (third grade teacher at the same school), Margie Morgan (fourth grade teacher at Provident), Billie Phillips (fifth grade teacher at Crestview Elementary), and Mrs. Coleman and Mr Dupree (University Middle School) (PSH, at 5, and McLennan County Juvenile Court file, *hereinafter* "Juvenile"). Teachers could also have been sought at Lake Air Jr. High, Waco High, and the Alternative School. Numerous potential witnesses were also identified from the many juvenile facilities where Mr. Fields was housed, including Dr. W. Kenneth Day (PSH, at 8-9. 11-12); psychologist Joe Lee (Sherman Fields Mitigation Themes, Memo from Jane McHan, LCSW, November 29, 2003; *hereinafter,* "SFMT," at 1), Fred Moreno, M.Ed. (PSH, at 9); Thomas C. Tan, M.D., Cheryl E. Heidelberger, M.D., R. V. Sellers, M.D. (PSH, at 10-11), Thomas C. Tan, M.D., and Nhan T. Nguyen, M.D. (Texas Youth Commission file, *hereinafter* "TYC"); nurse B. Gaines (TYC); counselors Nellie O. Spencer and Joe T. Childs (PSH, at 12-13); and Parole Department Primary Service Worker Lenard Holmes (PSH, at 13-15). The Juvenile Court and Texas Youth Commission files identified numerous other potential witnesses, including Field Probation Officers Kenneth W. Mays, Jr., David Salazar, Mr. McMillan, and James Marlin; Field

17

Supervisor Bobby Everett; Assistant Director Robert Campos; Texas Youth Commission caseworkers Mary Taggart, Jean Ann Lee, and Irvin Yarbough; Clinical Social Worker III (Child/Adolescent Psychiatric Services) Joanne F. Olsen; DePaul Psychiatric Center staff, including Dr. William Holts, Elizabeth Douglas, Mr. Davidson, and head ICU nurse Marilyn Slaughter; and three witnesses to two of Mr. Fields's suicide attempts by hanging, Mrs. Martha Wallace, Mrs. Kuehl, and Mr. Stevens.

32. *Failure to interview anyone but a few immediate family.* Mr. Fields came from a large extended family, most of whom lived right in Waco. His mother had five sons by four different men. Counsel identified only two of the fathers by name (Sherman's father, the late Sherman Mims;[3] and William Bradford, the father of Jimmy and Shaffer). The fathers of Charles and Jeffrey Fields were not identified. None of these men were interviewed, although each may have provided some insight into Mr. Fields's promiscuous mother. At least two of the mother's most violent paramours were readily available. She advised counsel that William Bradford lived in Waterloo, Iowa, where his address and phone number are listed in directory assistance. Melvin Swinnie, TDCJ #00662634, has been in prison for two decades, will remain in prison until 2023, and his prison location was readily available at the time of trial. There was no effort whatsoever to investigate Mr. Fields's paternal lineage, or even to verify the mother's report that he had died in Marlin, Texas. Counsel made no inquiry about potential heritable mental disorders on either side of the family. Mr. Fields's mother was one of ten children; two were

---

[3]Mims was reportedly in his forties and married to someone else at the time he impregnated Sherman's teenage mother. According to Texas Youth Commission records, he died in 1985. The Social Security Death Index shows a Sherman Mims, 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, who was born April 18, 1928, and died in January 1985 in Houston at age fifty-six.

reportedly deceased by the time of trial. Five (Dorothy Randle, Shirley Fields, Annie Leaks, Hattie Love and George Gaines) lived in Waco, one (Bessie Jackson) in Chicago, and one (Arthur Fields) in Pampa, Texas. Mr. Fields's maternal grandparents never married. In fact, his late maternal grandfather, Shelby Mitchell, was married to someone else. He and his wife had at least three children; two of his legitimate sons (step-uncles, but age peers of Mr. Fields) were interviewed superficially. There was no attempt to interview the numerous readily available family members, even though a few were encountered in a group setting. Only in-depth one-on-one interviews could have provided a textured explanation and vivid account of the violent, chaotic world in which Mr. Fields grew up. Instead, counsel abandoned the mitigation investigation after superficial interviews with a very narrow set of witnesses. There was no attempt whatsoever to interview neighbors or classmates even though counsel knew numerous home addresses and all the schools Mr. Fields attended. There was no attempt to interview professionals, caseworkers, or police officers who had dealt with Mr. Fields and his family. There was no attempt to interview anyone who knew Mr. Fields during his lengthy years of incarceration.

33. *Failure to interview anyone about incarceration except a few current correctional officers.* By the time of trial, Mr. Fields had spent over a third of his life behind bars. His capital charges arose following an escape from federal custody. It was clear from the outset of the case that the Government would make future dangerousness an explicit focus of their pursuit of a death sentence for Mr. Fields. Inexplicably, counsel failed to interview *anyone* who had contact with Mr. Fields in the juvenile facilities where he was placed or during his eight years in the Texas Department of Criminal Justice or in the early months of his incarceration for the capital

19

offense. Instead, they interviewed a few officers who could attest that Mr. Fields was causing no current problems (mainly in solitary confinement), but who knew little or nothing of his prior incarcerations or problems as an inmate.

34. *Failure to investigate and document trauma.* Mr. Fields was exposed to trauma in diverse forms over multiple developmental stages of his life. Several of the experiences involved severe, acute exposures; but chronic traumatic exposure pervaded his life. Neither the jurors who sentenced him to death nor the mental health staff who encountered him in correctional settings were ever provided with a history of these exposures. Counsel was provided with numerous leads, but failed to follow them or to seek expert guidance in understanding the impact of trauma on Mr. Fields's mental and emotional functioning. By any measure, Mr. Fields grew up in an atmosphere of extreme violence and brutality. His mother's paramours beat her and her sons, including Mr. Fields. Multiple scars on his body (right thigh, anterior right arm, posterior right shoulder, and back of right leg)are documented in the Texas Youth Commission records. When Mr. Fields was about eleven, his mother shot one of her paramours after catching him with another woman (her cousin). A few years later, another paramour shot Mr. Fields's mother in the head. Mr. Fields also witnessed the fatal accident in which his maternal grandfather was run over by a drunk driver. In the six months prior to his fifteenth birthday, two of his friends were killed, and a third committed suicide. It is hardly surprising that he told his treating psychiatrist at the Texas Youth Commission that summer that he was "going to die young." (PSH, at 12.) A foreshortened sense of future is a classic symptom of trauma syndromes. Counsel failed to obtain records (death certificates, coroner's reports, or media accounts) of *any* of these deaths, even when presented with names and dates of death: Roy Cleveland, died January 11, 1989;

20

Roderick Cummings, died March 3, 1989; and John Walker, died June 22, 1989. (*Id.*) In addition, Mr. Fields provided counsel with the names of some twenty friends who had died violent deaths in the decade and a half prior to trial: Gerald Wayne (perhaps Jerald Wayne Harjo?), Anthony Curtis, Roderick Cummings, Terrel Collins, John Walker, Donnell Swinnie (his cousin), Albert Donnell Sims, Robert Lee Evans, Wesley Sterling (another cousin), Lee McKinney, Doug Harbert, Kim Leaks (another cousin), Roderick Scott, Guan Scott, Marcus Thornton, Yoshima Calhoun, Michael Campbell, Oliver Dixon, Eric Rembert, Lionel Stewart, and someone known on the street only as "Spud." (PSH, at 17-18.) There was no investigation of any of these deaths, either to assess the impact of the individual losses on Mr. Fields or to explain the context of community violence in the social environment of his developmental years – that is, the difference between a "rough neighborhood" and a war zone. As noted by clinical psychologist Kathleen Wayland, Ph.D., ". . . consistent findings from the trauma literature show a dose-response relationship with respect to trauma exposure and PTSD: the risk of PTSD and its debilitating symptoms increases progressively with types of traumas experienced and/or the total number of risk factors to which one is exposed. A competent mitigation investigation must include assessment of all 'Criterion A' trauma exposures, and include careful attention to the number, type, magnitude, circumstances, and dynamics of traumatic exposures for any individual client."[4] There was also no attempt to interview family, friends, and other contemporaries to document the effects of the traumatic losses on Mr. Fields's functioning and behavior. There was no attempt to retain a mental health expert specializing in trauma even though social worker

---

[4]Kathleen Wayland, *The Importance of Recognizing Trauma throughout Capital Mitigation Investigations and Presentations*, 36 HOFSTRA L. REV. 923, 939 (2008) (citation omitted).

Jane McHan had specifically advised counsel: "Evaluation for depression and PTSD seem particularly important . . ." (SFMT, at 3.)

35. *Failure to investigate mental illness in Mr. Fields and his family.* As noted in ¶ 32, *supra*, counsel learned nothing about Mr. Fields's biological father or paternal lineage, despite knowing where he lived and died and the name of the his employer, Johnson Roofing (a company that is still in business in 2009). Employment records and interviews with co-workers would have enabled counsel to investigate any genetic predispositions or vulnerabilities in the paternal lineage. On the maternal side, counsel learned that Mr. Fields's grandmother abused alcohol, but made no effort to obtain documentary evidence or even to interview her about it. Counsel was informed by Mr. Fields's mother that several members of her family had "problems with being crazy," including her sisters, Shirley Fields and Hattie Love; her brother, George Gaines; and George's twenty-year-old son, George Anthony. There was no follow-up to interview these family members or to determine what "problems" they have and whether they have been diagnosed and treated, even though social worker Jane McHan had advised counsel, "There may be a genetic component to Sherman's mental health issues . . ." (SFMT, at 3.) Mr. Fields's mother reported that she had prescriptions for numerous medications, including Xanax (normally prescribed for anxiety disorders and panic attacks) "for several years" for "nerves" (PSH, at 3-4), as well as a muscle relaxer, Soma, and Hydrocodone for pain (*Id.*, at 3). There was no attempt to obtain records or otherwise investigate her medications, dosage, and treatment. Counsel was also informed that Mr. Fields's half-brother, Jeffrey, was on SSI "for mental health reasons" according to their mother. (SFMT; at 3.) Mr. Fields himself received disability benefits for unspecified "mental problems." (*See* Texas Rehabilitation Commission correspondence with

Austin State Hospital on March 4, 1991, regarding disability benefits for "mental problems.") Numerous mental health professionals had evaluated Mr. Fields since he was a teenager, with diagnostic impressions including major depression with psychotic features (PSH, at 9), pervasive mood disorder (PSH, at 10), atypical bipolar (PSH, at 12), and posttraumatic stress syndrome (SFMT, at 2). None of the treating psychiatrists was ever interviewed by the defense team. No expert was retained for the purpose of exploring mitigating evidence relating to the broad array of documented mental disabilities, or their potential implications for competency determinations. The jurors heard only a few facts relating to Mr. Fields's mental condition, such as his suicide attempts and his sadness at the loss of friends, but they were provided no framework for appreciating the depth and seriousness of his longstanding symptoms of disorder.

36. *Failure to investigate potential brain damage and dysfunction.* The social worker who assisted counsel, Jane McHan, alerted counsel to the need for neuropsychological evaluation. (SFMT, at 3.) She specifically noted, "Research by Dr. Bruce Perry of Houston and others indicates that children's brain development is impaired or affected by chronic exposure to violence." (*Id.*, at 4.)[5] The neurobiological effects of trauma had also been widely reported in

---

[5]Dr. Perry's publications included, for example, *Neurobiological Sequelae of Childhood Trauma: Post Traumatic Stress Disorders in Children*, in CATECHOLAMINE FUNCTION IN POST TRAUMATIC STRESS DISORDER: EMERGING CONCEPTS 253 (M. Murburg, ed., 1994); VIOLENCE AND CHILDHOOD: HOW PERSISTING FEAR CAN ALTER THE DEVELOPING CHILD'S BRAIN (1999); *The neurodevelopmental impact of violence in childhood* in TEXTBOOK OF CHILD AND ADOLESCENT FORENSIC PSYCHIATRY (D. Schetky & E. Benedek, eds., 2001); and *The neuroarcheology of childhood maltreatment: the neurodevelopmental costs of adverse childhood events*, in THE COST OF CHILD MALTREATMENT: WHO PAYS? WE ALL DO (B. Geffner, ed., 2001).

the media long before Mr. Fields's trial.[6] In addition, Mr. Fields was at risk from anoxic brain injury from his suicide attempts involving hanging, at least one of which required "rescue breathing" (indicating he was found with pulse but no spontaneous respiration). Texas Youth Commission records also documented a butterfly hypo-pigmented area over his nose, the characteristic sign of lupus erythematosus, a condition that can cause vasculitis affecting blood vessels in the vein (with potential neurological effects). Thus, counsel should have investigated potential brain damage through a thorough neuropsychological assessment. Instead, counsel had a psychologist perform IQ testing – without appreciating the critical distinction between intellectual functioning and neuropsychological integrity. Deficits in executive functioning,[7] for example, can coexist with average or even high intellectual functioning. No expert was retained for the purpose of exploring mitigating evidence relating to brain damage or dysfunction, or the potential implications for competency determinations.

37. *Failure to investigate history and impact of incarceration.* As noted in ¶ 33, *supra,* by the time of his capital trial, Mr. Fields had spent over a third of his life and virtually all of his adult life behind bars. Counsel's investigation could hardly ignore this significant segment of Mr. Fields's life, and counsel had a duty to investigate the effects of incarceration on Mr. Fields in his formative years. Counsel failed to interview anyone who knew anything about Mr. Fields in his juvenile placements or the Texas prison system. Counsel failed to investigate the

---

[6]*See,* for example, *The biology of soul murder: Fear can harm a child's brain. Is it reversible?* U.S. NEWS AND WORLD REPORT (November 11, 1996)

[7]Executive functions are those capacities, most commonly linked to the frontal cortex, that guide complex behavior over time through planning, decision-making and impulse control. These capacities regulate judgment, problem solving, and social conduct.

institutions in which Mr. Fields had been placed to understand the context of his behaviors, the quality of the care he received when mental and emotional problems presented, and the effectiveness of the institutions in achieving correctional objectives. Counsel was on notice about specific incidents which the Government was likely to point to as evidence of future dangerousness and noncompliant behavior, so it was important to investigate these incidents thoroughly.

38. In sum, the mitigation investigation in this case produced only rudimentary knowledge from a narrow set of sources. Counsel was not in a position to make informed strategic choices about which witnesses to call in the sentencing phase because so few people had been interviewed, even in Mr. Fields's immediate biological family. Counsel had not consulted with mental health experts in spite of the long history of traumatic exposures discussed in ¶ 34, *supra*. Without expert guidance, neither counsel nor the jury could understand the impact of these exposures on Mr. Fields's social, emotional, and behavioral functioning. Counsel had not consulted with mental health experts in spite of the evidence of multigenerational mental disorders in Mr. Fields's family, his own diagnoses in adolescence, and his documented designation for disability income based on his mental problems, as discussed in ¶ 35, *supra*. Without expert guidance, neither counsel nor the jury could understand that Mr. Fields could respond to medication and treatment. The court, in turn, was denied an informed and reliable assessment of Mr. Fields's competency to represent himself. Counsel had not consulted with mental health experts to assess possible brain damage in spite of all the "red flags" discussed in ¶ 36, *supra*. Without expert guidance, neither counsel nor the jury (nor the court) could understand the distinction between intellectual capacity and other domains of neurological functioning.

Counsel had not consulted with experts on either the effects of incarceration or future dangerousness in the federal prison environment, as noted in ¶ 37, *supra*. Without expert guidance, neither counsel nor the jury could understand how his long institutional history had affected Mr. Fields and what factors would most accurately predict his future functioning in a federal correctional setting. In short, the jury was provided no conceptual framework to interpret the minimal facts that were provided in the sentencing phase, so they had no means to grasp the mitigating significance of what they heard. The testimony was conclusory, rather than detailed and vivid.

39. Correctional Counselor Jack Jaacks of the Federal Medical Center at Fort Worth was the first sentencing phase witness. He testified that although Mr. Fields had had problems when he first came to the Federal Medical Center, he left at some point and then returned with a better attitude after "he understood that if he gave us respect as officers and bureau staff that he would get respect in return." (Trial Tr. 2377:22-24.) On cross-examination, he testified that he knew nothing about Mr. Fields's prior incarcerations in state prison, juvenile facilities, and county jail. He also confirmed that Mr. Fields had been found with a shank in his cell at FMC, although Mr. Jaccks was not sure whether Mr. Fields had threatened an officer. Correctional Officer Fred Waggoner testified that Mr. Fields had caused no problems while in solitary confinement in the Secure Housing Unit at the FMC. On cross-examination, Mr. Waggoner, too, said that he knew nothing about Mr. Fields's prior incarcerations, but did know he had had a "homemade knife" at the jail. (Trial Tr. 2383:11.) A third officer, Senior Officer Specialist Greg Watts testified that he "didn't have any problems out of" Fields at FMC. (Trial Tr. 2385:17.) He added that he had counseled Mr. Fields about how his behavior in the jail could be used against him in his pending

case: ". . . I let him know that he needed to, you know, kind of adjust to the institution and everything, you know, because if you don't, you know, a lot of stuff come out in court later on, you know, your behavior and stuff like that." (Trial Tr. 2385:21-25.) That point was confirmed – and re-emphasized – on cross-examination: "It was going to all come back on him, you know, on him in court." (Trial Tr. 2388:9-10.)

40. Social worker Jane McHan briefly summarized a few events in Mr. Fields's life. She had worked for almost twenty years with children with disabilities and had testified in court previously, but never "in this capacity in this kind of case." (Trial Tr. 2389:11-16, 2391:14-17.) She identified by name three of Mr. Fields's friends who died violent deaths when he was fifteen and also noted how his grandfather was killed by a drunk driver in front of the children when Mr. Fields was sixteen. (Trial Tr. 2401:1-9, 15-23.) Ms. McHan described these events as traumatic and characterized the death of the grandfather as a "huge turning point" (Trial Tr. 2402:1), but the jurors were provided neither details of the signs and symptoms of behavioral change, nor a framework for understanding trauma. All they knew is that Mr. Fields "cried and cried" at the grandfather's funeral and became "distraught." (Trial Tr. 2402:4-5.) Similarly, Ms. McHan characterized Mr. Fields's childhood as "a very chaotic existence. The family moved quite a few times within Waco." She noted that there were "many people in and out of his life in varying capacities that may not have necessarily been positive for him," as well as violence in the home to which he was regularly exposed. (Trial Tr. 2407:14-25.) The jury was offered no framework for assessing the multiple factors that put Mr. Fields at risk in his developmental years, and the utter absence of protective buffers. Finally, Ms. McHan reported that Mr. Fields "finally got the

message" and has changed his own attitude, behavior, and thinking. (Trial Tr. 2409:14-21.) She concluded that he might help others in prison. (Trial Tr. 2410:9-15.)

41. On cross-examination, the Government elicited from Ms. McHan that records indicated Mr. Fields had yelled at his mother and grandfather, wouldn't listen to them, and kept running off. (Trial Tr. 2415:14-21.) Ms. McHan also acknowledged that various mental health staff had found Mr. Fields "manipulative" (Trial Tr. 2417:7-10) and without "remorse or guilt" (Trial Tr. 2421:16-19). One doctor reasoned that if Mr. Fields were truly suicidal he would simply have killed himself when out in the world. (Trial Tr. 2422:6-8.)

42. Mr. Fields's step-uncle, Vincent Green, testified about how they worked together for Vincent's father (Mr. Fields's grandfather). Mr. Green testified hat he was only a year older than Mr. Fields. He said that Mr. Fields was a "hard worker" at age eleven (Trial Tr. 2434:7-12), but they did not see much of one another after the death of Mr. Green's father (Trial Tr. 2438:1-3). Mr. Green did not visit Mr. Fields in prison, but did pick him up when he was released. (Trial Tr. 2439:13-25.) He said that he and Mr. Fields were "like brothers" (Trial Tr. 2440:9). Rev. Edward Green, Vincent's older step-brother, also testified that Mr. Fields was a "[v]ery hard worker" (Trial Tr. 2447:1-3). After the death of Mr. Green's stepfather (Mr. Fields's grandfather), Mr. Fields moved to a housing project known as the Estella Maxey apartments, which Mr. Green described as "a rough neighborhood. It was the type of neighborhood you had to get in. In other words, as you say, you have to get in where you fit in. So if someone was over there gang banging, jumping on someone, you had to get in or else you'd be singled out and it wasn't a place that you would want to bring you kids up back then." (Trial Tr. 2448:5-15.) He concluded dryly that it would have a "negative impact" on him if Mr. Fields were to be sentenced

28

to death. (Trial Tr. 2450:21-23.) He conceded on cross-examination that some people who were raised in humble circumstances went on to lead respectable good lives in the community and might even be his parishioners. (Trial Tr. 2451:23-25 to 2452:1-4.)

43. Adrian Dow came to court in her Dan's Dairy Queen uniform and testified that Mr. Fields was the father of her eleven-year-old daughter, born while he was in prison. (Trial Tr. 2454:1-2, 12-15.) She testified that Mr. Fields had written her daughter from prison, occasionally talked to her on the phone, and was a positive influence on her life. (Trial Tr. 2455:1-18.) There was no cross-examination.

44. Alice Mae Fields Swinnie testified that she was fifteen years old when she gave birth to Sherman Fields. (Trial Tr. 2457:3-4.) She said she receives SSI benefits because of a disability (mental retardation) resulting from being shot in the head by Melvin Swinnie, but she continued to do "volunteer work." She confirmed that her memory is affected by the disability. (*Id.*, 5-25.) Ms. Swinnie said that when William Bradford lived with her, he "was very mean and he used to beat me and he used to beat my kids." (Trial Tr. 2458:19-22.) Her descriptions were succinct and conclusory: Bradford "stayed drunk a lot" and inflicted physical and verbal abuse. (Trial Tr. 2459:5-15.) Her description of the housing project to which she later moved was equally vague: ". . . it's just so bad over there. Everything happens. They shoots and deal dope and a lot of other things." (Trial Tr. 2460:13-21.) She described herself as working hard to provide for her family, leaving the children unsupervised. (Trial Tr. 2461:1-8.) At some point, Sherman went to live with Ms. Swinnie's father, Shelby Mitchell, and "did a lot better." (*Id.*, 12-19.) At another point, she shot Bradford and his girlfriend, pled guilty to two aggravated assaults, and spent "[e]xactly fifty days" in jail. (Trial Tr. 2463:8-25 and 2464:1-4.) Ms.

29

Swinnie later began a relationship with Melvin Swinnie, who shot her "one night in the head" and received a prison sentence of thirty-five years. (Trial Tr. 2465:22 and 2466:3-5.) Her direct testimony concluded with her reading a poem written by Sherman. (Trial Tr. 2468:17-25 and 2469:1-3.) If he were given the death penalty, she said, "It would affect me a lot. Just like I say, I don't know how it feels, you know, to lose a child, but I'm quite sure that it would hurt a lot." (Trial Tr. 2469:23-25.) The cross-examination disclosed that Ms. Swinnie had received phone calls and a visit from Mr. Fields while he was a fugitive. (Trial Tr. 2470:17-25, 2471:21-23.) She was combative on cross-examination when confronted with records. For example, she denied telling the Texas Youth Commission that Sherman had a "Jekyll and Hyde personality" (Trial Tr. 2472:21-24)..

45. The final defense witness was Jack Randall Price, Ph.D., a clinical and forensic psychologist, who was also a former prison guard. Dr. Price had administered a WAIS-III intelligence test to Mr. Fields and measured his Full Scale IQ at 113. (Trial Tr. 2475:1-2.) Dr. Price opined that Mr. Fields was intelligent enough to complete college level classes in a structured environment. (Trial Tr. 2476:16-19.) He attributed Mr. Fields's poor academic record in school to his "chaotic life, to emotional disturbance and acting out in terms of conduct problems." (*Id.*, 20-25.) Dr. Price concluded that Mr. Fields had the intelligence to further himself and help others if sentenced to life imprisonment. (Trial Tr. 2480:6-14.) The Government's cross-examination was devastatingly effective. Dr. Price conceded that Mr. Fields's past performance during eight years in the Texas Department of Corrections was poor, adding that "it takes a voluntary effort as well as the capacity" for positive change. (Trial Tr. 2481:25 to 2482:1.) He explained the diagnosis of antisocial personality disorder (Trial Tr.

30

2482:9-15), described the disorder as not being amenable to "therapy or psychological intervention" (*Id.*, 20-22), and accepted that the term "sociopath" is an "older term" for the disorder, sometimes used when "the pattern is more deep of their lack of feelings for others and the lack of feeling bad if they hurt anybody else and the more self-centered they are." (Trial Tr. 2482:24-25 to 2483:1-5.) Dr. Price confirmed that psychiatrists at the Texas Youth Commission had diagnosed Mr. Fields with antisocial personality disorder and stated that he lacked remorse. (Trial Tr. 2483:11-17.) On redirect, the defense essentially impeached its own witness by asking Dr. Price to concede that psychiatry and psychology are not exact sciences, and any diagnosis may be unreliable. (Trial Tr. 2486:9-19.) On recross-examination, Dr. Price agreed with the Government that there are "tests and instruments that can increase the reliability" of a diagnosis of sociopathy or antisocial personality disorder, but they were not administered in this case – by him or anyone else. (Trial Tr. 2487:2-6.) The Government called no witnesses in rebuttal, having turned Dr. Price into a powerful final witness for the prosecution.

46. The jurors own findings indicate that facts alone – without a framework to interpret them – are not perceived as mitigating, even though they constitute the basis of the sort of powerful mitigating evidence that has been recognized in cases like *Wiggins* and *Rompilla*. In the trial courts, it is imperative to give jurors the framework that permits them to give full mitigating effect to the factual evidence. According to the Special Findings Sheet, eleven mitigating factors were found either unanimously or by eleven of the twelve jurors, including execution impact on Mr. Fields's family, his lack of a father figure, the physical and emotional abuse and neglect in his childhood, poverty, and exposure to violent deaths of loved ones. Only one juror found that Mr. Fields "has recently responded well to a structured environment and

would likely adapt to prison life if he were sentenced to life imprisonment without the possibility of release." None found that he can be controlled in a prison setting. None found that he had talent, capabilities, or qualities that might be of value to society.

47. Throughout the pretrial period, counsel had numerous "red flags" identifying significant areas requiring further investigation and consultation with appropriate experts, but there is no evidence that this triggering information led to any additional efforts. As noted in ¶¶ 34-36, *supra*, social worker Jane McHan made specific recommendations of evaluations for depression and PTSD, as well as neuropsychological assessment, to no avail. As Justice Souter has noted, writing for the majority of the Supreme Court, counsel "could not have reasonably ignored mitigation evidence or red flags simply because they were unexpected." *Rompilla v. Beard*, 545 U.S. 374, 391 (2005). In *Rompilla*, postconviction experts "found plenty of 'red flags' pointing up the need" for further exploration. *Id.* at 392.

48. By the time of Mr. Fields's case, it was well accepted that counsel in death penalty cases should engage the services of a mitigation specialist. (*See* the 1998 Report of the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, discussed *supra* at ¶14.) The importance of the mitigation specialist is also addressed at length in the Commentary to ABA Guideline 4.1:

> A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings. Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may never have disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the

client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.

Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict. The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effects on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation. (Citations omitted; 31 HOFSTRA L. REV. at 959 (2003)).

Although retained as a mitigation specialist in Mr. Fields's case, social worker Jane McHan was not directed or funded to provide an exhaustive investigation, and her attempts to identify areas requiring expert assistance were ignored.

49. The Commentary to ABA Guideline 10.7 underscores the importance of obtaining all relevant records:

Counsel should use all appropriate avenues including signed releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes, to obtain all potentially relevant information *pertaining to the client, his or her siblings and parents, and other family members,* including but not limited to:
a.      school records
b.      social service and welfare records
c.      juvenile dependency or family court records
d.      medical records
e.      military records
f.      employment records
g.      criminal and correctional records
h.      family birth, marriage, and death records
i.      alcohol and drug abuse assessment or treatment records
j.      INS records
(31 HOFSTRA L. REV. at 1025, emphasis added).

Reliable, objective records are critical to life-history investigation because they can reveal what the client and his family are reluctant to disclose because of shame and embarrassment, and what they simply can't disclose because they were too young or too impaired to record the events in memory. They are more credible to fact-finders because they have no inherent bias. Contemporaneous records are more credible than witnesses sharing previously undisclosed memories of past events, or experts offering opinions formed only after the client faces capital charges. They also enable the defense team to interview mitigation witnesses more effectively. The authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family. Siblings' records often reveal insights into family dynamics or help to explain the differences between their life trajectories and that of the capital client. Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next. Records from multiple family members also provide a context for understanding key changes in the client's life – for example, when changes in school attendance or behavior reflect the impact of what is occurring in the lives of the parents. Counsel obtained only a small fraction of the relevant records in Mr. Fields's case, and there was no attempt to interview any of the professionals who had created the records.

50. Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 677 (Spring 2008), explain in detail the duties of counsel to obtain the services of competent team members and to supervise and direct their work. (Supp. Guideline 4.1.A and B, 36 HOFSTRA L. REV. at 680.) These Supplementary Guidelines also explain why one skilled member of the capital defense team needs to give patient and undivided

attention to the mitigation investigation. Guidelines 6.1 and 10.3 also stress that everyone of the

team should limit their workloads to enable them to provide high-quality legal representation (36

HOFSTRA L. REV. at 684, 687).

51. The Supplementary Guidelines provide clear guidance about the qualifications

needed to investigate mitigation effectively. Supplementary Guideline 5.1.C elaborates on the

necessary interviewing skills:

> Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance. (36 HOFSTRA L. REV. at 682)

Guideline 5.1.F discusses the necessary skills in record gathering:

> Mitigation specialists must possess the knowledge and skills to obtain all relevant records pertaining to the client and others. They must understand the various methods and mechanisms for requesting records and obtaining the necessary waivers and releases, and the commitment to pursue all means of obtaining records. (36 HOFSTRA L. REV. at 683)

52. The importance of multiple one-on-one interviews is succinctly summarized at

Supplementary Guideline 10.11.C:

> Team members must conduct in-person, face-to-face, one-on-one interviews with the client, the client's family, and other witnesses who are familiar with the client's life, history, or family history or who would support a sentence less than death. Multiple interviews will be necessary to establish trust, elicit sensitive information and conduct a thorough and reliable life-history investigation. Team members must endeavor to establish the rapport with the client and witnesses that will be necessary to provide the client with a defense in accordance with constitutional guarantees relevant to a capital sentencing proceeding. (36 HOFSTRA L. REV. at 689)

53. As noted in ¶32, *supra*, the authors of reports and documents are themselves potential mitigation witnesses, otherwise unknown to the client and his family. They have credibility with jurors because they are not perceived as paid experts ("hired guns") or biased by familial ties. They created the records in the normal course of business, long before the capital offense, as neutral, objective professionals. They are in the best position to explain in detail the significance of the events or conditions that they documented.

54. There are no indications that anyone ever attempted to interview Mr. Fields's school teachers and other Special Education staff, juvenile caseworkers, or mental health professionals who evaluated him during his developmental years. They might also have offered insight into his mother and her common-law husbands, and the extent to which the caregivers cooperated with or hindered Sherman's efforts in the school system. Counsel had numerous school records, but there is no indication that the appropriate follow-up steps were taken to find teachers and other professionals who could have discussed the developmental impact of Mr. Fields's chaotic home environment.

55. Records in themselves are important pieces of an individual's life story, but they are most effective in the development of mitigation evidence when they lead to the professionals who can interpret them in the context in which they were created. That context may reveal institutional failures in some cases, or in other cases how the best efforts of the intervening institutions were thwarted by parental resistance or dysfunction. In Sherman Fields's case, there were voluminous records calling out for investigation, but no follow-up.

56. Defense counsel's hope to rely on one expert witness, unsupported by lay witnesses or historical experts, is a classic example of the witness who "backfires" because jurors view him

36

as a hired gun. (*See* ¶ 24, *supra,* citing Professor Scott Sundby's article about this precise problem -- published seven years prior to the Fields trial.) The jurors who were charged with the responsibility of making a reasoned moral response to the aggravation and mitigation in this case should have had a comprehensive overview of Mr. Fields's developmental years and mental disorders.

57. Supplementary Guideline 10.4.A delineates the responsibility of counsel in preparing mitigation evidence as follows:

> Counsel bears ultimate responsibility for the performance of the defense team and for decisions affecting the client and the case. It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client. It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and documents that enable the defense to develop and implement an effective defense strategy. (36 HOFSTRA L. REV. at 688)

58. It is my conclusion that the capital defense representation provided to Mr. Fields fell far below the prevailing professional norms in the investigation and presentation of mitigation evidence at the time of his trial in 2004. Although the preparation for the penalty phase was spread over a period of several months, trial counsel devoted little time and attention to it. Investigation of mitigation was confined to an extremely narrow set of sources which themselves were replete with "red flags" pointing to the need for further investigation. The witnesses who testified were uniformly ill prepared and effectively impeached by the prosecution using the very records that trial counsel should have used to build a thorough social history. Mr. Fields was entitled to representation by counsel who had the time and expertise to develop the potential mitigating evidence, and the jurors charged with deciding whether he should live or die were entitled to hear a more accurate and complete account of his life.

I declare under penalty of perjury under the laws of the States of California and Texas, and the United States of America, that the foregoing is true and correct and was executed this 25th day of February 2009 in Oakland, California.

RUSSELL STETLER