**DECLARATION OF GEORGE W. WOODS, JR., M.D.**

I, George W. Woods, M.D., declare as follows:

1.    At the request of counsel representing Sherman Fields under 28 U.S.C. § 2255, I have performed a neuropsychiatric examination of Mr. Fields, a 35-year-old African American male, currently incarcerated on Federal Death Row, Terre Haute, Indiana.  In order to complete this examination, I have interviewed Mr. Fields at the Terre Haute Federal Correctional Facility. I reviewed extensive documentary evidence, including transcripts of Mr. Fields' trial and medical records from a variety of institutions, including the McLennan County Juvenile Court and Probation Department, the Texas Youth Commission, the Heart of Texas Region Mental Health Mental Retardation Center, the University of Texas Medical Branch Hospital in Galveston, and the McLennan County Jail.  A comprehensive list is attached as Appendix A.  These are the types of data customarily relied upon by qualified mental health professionals to perform an accurate and reliable neuropsychiatric assessment.

2.    I have been asked to provide my expert opinion on the following questions:

I.    What are the social, psychological, developmental, familial, cultural, and environmental factors that played a role in shaping Mr. Fields' development and functioning?  How did each of these factors shape Mr. Fields' social and psychological development and functioning?

II.    If Mr. Fields suffers from a mental disease or defect, was he competent to waive counsel and did his mental illness, alone and in combination with other factors such as being forced to wear a stun belt, render him unable to carry out the basic tasks necessary to present his own defense without the assistance of counsel?  I have been informed by counsel that those basic tasks include, but are not limited to, the abilities to: understand and articulate the exact elements of the crimes charged; review evidence found through discovery and evaluate the prosecution's evidence to determine if its unreliable, irrelevant or prejudicial; challenge forensic evidence, including expert testimony; define and then pursue lines of cross-examination that show genuine weaknesses in particular prosecution witnesses' testimony; recognize and comprehend deficiencies in the prosecution's evidence and then ask the proper questions of defense witnesses to identify such deficiencies and to present contrary evidence; understand what points, facts or arguments are important to highlight during opening argument, trial and closing argument; speak so that essential points are actually communicated and not lost among other details.

3.    In response, I offer the following opinions (set forth in greater detail later in this report), which I hold to a reasonable degree of medical certainty:

4.    Mr. Fields suffers from significant mental dysfunction.  Mr. Fields' exposure to extreme and repeated trauma has produced pronounced symptoms of complex Post-Traumatic Stress Disorder (PTSD).  He also suffers from Bipolar Disorder.  Finally, his social, medical history and the symptoms of mental dysfunction demonstrated throughout his life all support the conclusion that he is afflicted with neuropsychological impairments.

Mr. Fields' mental condition is highly relevant to understanding his prior crimes, his behavior in custody, as well as to an assessment of his culpability for the current crime and the statutory mitigating factors of impaired capacity, regardless of whether the capacity was so impaired as to constitute a defense to the charge (18 U.S.C.A. § 3592(a)(1)) and severe mental or emotional disturbance (18 U.S.C.A. § 3592(a)(6)).

5.      Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses.  Mr. Fields is severely and chronically paranoid and grandiose.  He was both paranoid and grandiose at the time of my examination.  His decision to waive counsel was the result of the co-morbid, or co-occurring symptoms of his mental illnesses.  The specific symptoms of grandiosity, paranoia, perseveration, and impulsivity compromised his ability to effectively weigh and deliberate whether to waive counsel.  These same symptoms rendered him incapable of representing himself in a capital trial lasting weeks.  Emotional modulation, the ability to respond specifically and accurately to emotional stimuli, was impaired as well, also diminishing his ability to effectively determine whether to waive counsel and represent himself.  His competency to waive counsel and represent himself in a capital case should have been carefully assessed through a thorough evaluation of his longstanding mental dysfunction and impairments.

6.      Even unrestrained, Mr. Fields is both highly anxious and paranoid.  These symptoms would be dramatically increased by requiring him to wear a stun belt controlled by a marshal.

## QUALIFICATIONS

7.      I am a licensed physician specializing in psychiatry and neuropsychiatry. I currently maintain a private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

8.      I am a Fellow of the American Psychiatric Association, and a member of the California Psychiatric Association and the Northern California Psychiatric Association. I am also a member of the American Neuropsychiatric Association, the American Psychological Association, the American Society of Addiction Medicine and the Black Psychiatrists of America.

9.      I am Secretary General of the International Academy of Law and Mental Health, where I am a member of the Scientific and Executive Committees.  I also serve on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York.

10.     I received my bachelor's degree from Westminster College in Salt Lake City, Utah, in 1969; and was awarded my medical degree from the University of Utah in 1977.  I then completed a rotating medical internship at Alameda County Medical Center (Highland Hospital), in Oakland, California, which included internal medicine, surgery, orthopedic surgery, Emergency Medicine, and Obstetrics/Gynecology.  In 1981, I completed my

psychiatric residency at the Pacific Medical Center in San Francisco, California, where I served as Chief Resident my senior year. During my psychiatric residency, I pursued specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives consisted of extended, three month clerkships, in which I was assigned to the Neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

11.    In 1982, I then participated in a National Institute of Mental Health/American Psychiatric Association Fellowship, during which I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. The focus of my Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology, however, is an extremely valuable approach to the study of psychopharmacology in general. The medical/psychiatric/neurological/pharmacological training and experience I gained during this period proved relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population. Following the completion of my Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In that capacity, I conducted home visits with elderly patients who manifested psychiatric symptoms. Medical examinations and neurological intervention were frequently required.

12.    From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, a long-term psychiatric facility, dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations and the diagnosis of mental retardation. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in areas that may lack community mental health services and or widespread availability of intensive treatment. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

13.    From 1989 to 1994, I served as Clinical Director of the New Beginnings Chemical Dependency Program, an inpatient substance abuse detoxification and rehabilitation center housed at Doctors Hospital in Pinole, California. In 1994, I was appointed as Senior Consulting Addictionologist by Doctors Hospital, and oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units. During my tenure, New Beginnings evolved into program that treated patients with what are called co-occurring disorders, meaning persons who have multiple psychiatric disorders – which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

14. The clinical facilities at Doctors Hospital afforded access to a Single Photon Emission Computerized Tomography (SPECT), which was utilized to determine brain function. My neuroimaging experience also includes the study of Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET). From 1990 through 1995, I also served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital Sleep Disorders Center. The assessment of sleep disorders, the evaluation of disorders in the architecture of sleep, is a seminal component of diagnosing medical illness and psychiatric disorders, and formulating appropriate pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all psychiatric disorders. Impairment of normal sleep patterns is also often a contributing cause of and exacerbated by substance abuse.

15. In 1991, I was retained by Neurocare Corporation, a treatment facility in Concord, California, specializing in head-injury and neurological disorders, to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. The facility was a multidisciplinary environment in which the treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. Treating physicians required an intimate knowledge of brain/behavior relationships in order to avoid misdiagnosis of atypical symptom presentations.

16. In 1992, I received my board certification in psychiatry by the American Board of Psychiatry and Neurology. I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship.

17. In 1998, at the request of Kenyan and Tanzanian Medical Societies, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

18. I am currently an Adjunct Professor on the faculty of Morehouse School of Medicine, Department of Psychiatry, in Atlanta, Georgia, where I teach courses in Clinical Aspects of Forensic Psychiatry to third and fourth year residents. I am also on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento, California.

19. My clinical private practice is based in Oakland, California. I have been qualified and testified as an expert in numerous civil and criminal cases in state and federal courts.

## MENTAL STATUS EXAMINATION

20.     Sherman Fields is a 35-year-old African American male who looks his chronological age. He was oriented to person, place, date and time, as well as circumstances. His movements were rapid. He was wearing prison garb.

21.     Mr. Fields attempted to be attentive, but was easily distractable. He would become perseverative, with real difficulty switching mental tasks. He was cooperative during the interview, and was spontaneous in his response.

22.     Mr. Fields' speech output was normal in volume. His speech was pressured. He did not have prosody. Rather, his vocabulary was used appropriately. His comprehension is grossly intact.

23.     Mr. Fields does not present perceptual disorders. He denies current hallucinations, illusions, and delusions. His thought processes reflected flight of ideas. Mr. Fields' speech exhibited mild circumstantiality, a tendency toward greater detail than may be warranted.

24.     Mr. Fields' thinking was perseverative, meaning he will get stuck with an idea, and he was unable to think of alternatives. His thinking was also ruminative, meaning he would become obsessed with ideas, often paranoid ideation. Rumination and perseveration have a cumulative effect on thinking, creating a "stuck" quality to Ms. Field's thinking. This "stuck" thinking is consistent with the scanning and reliving of symptoms seen in PTSD and the impaired executive functioning found in bipolar disorder.

25.     His thought content was both grandiose and paranoid. There was flight of ideas as well.

26.     Mr. Fields' mood was variable. He was anxious and there were times when he noted that he was depressed. His affect was bright with little variability, inconsistent with the range of mood he expressed. His affect, the physical expression of emotion, was inconsistent with his mood. This disconnect between mood and affect occurs in bipolar disorder, particularly in mixed phases, when depression and mania occur simultaneously. The disconnect also occurs in PTSD, when the relationship between mood response and stimuli strength is impaired, leading to extreme reactions with little provocation or minimal reaction to highly charged situations. He acknowledged a history of depression and suicidal ideation, but denied present homicidal or suicidal ideation.

27.     Insight and judgment were impaired by his paranoid ideation, perseveration, and hyperreactivity, symptoms of his mental illnesses. For example, Mr. Fields was unable to see that just getting rid of his attorneys was not the answer to his paranoid ideation. His paranoid ideation precluded him from effectively weighing such a decision.

28.     Due to the length of Mr. Fields' psychiatric history, he is able to articulate symptoms of his mental illness, and has some insight into his depression and disinhibition.

## BACKGROUND AND DEVELOPMENTAL IMPACT

29.    Mr. Fields was born on July 14, 1974 in Waco, Texas. He was the second child born to Alice Swinnie, *nee* Fields, who was also known as Sarah.  Mr. Fields' mother had just turned 13 years old when she gave birth to Charles, Mr. Fields older brother, and was 15 years old when she had Mr. Fields.  Mr. Fields' father, Sherman Mims, was a 46-year-old man who was married to another woman.  Mr. Mims never lived with Mr. Fields or his mother and did not participate in raising Mr. Fields.

30.    The maternal side of Mr. Fields' family suffered from multi-generational neurological impairments and affective mood disorders, as well as substance abuse and parental neglect.  Mr. Fields' mother and extended family were ill-equipped cognitively, emotionally or financially to rear children. There are indications that the paternal side of the family was also burdened by mental disease and substance abuse.

31.    Mr. Fields' developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord and violence, physical abuse, personal loss, trauma and abject poverty.  For example, by the time Mr. Fields was nineteen years old, at least twelve of his close friends, family and loved ones died tragically.  In addition, the Fields family survived the turbulent racial discord that existed in central Texas in the early 20th century and carried with them a residual distrust, anger and a justified sense of marginalization that was amplified by the paranoia of their mental disease or by their cognitive dysfucntion. The impact of environmental factors on the expression of mental disease is well understood in the clinical literature. This is particularly true when mental disorders such as PTSD, an environmentally-derived mental disorder, interacts with the genetic vulnerability of Bipolar Disorder in someone with as affectively-laden a family as Mr. Fields'.  These environmental factors impact Mr. Fields' genetic vulnerability for the development of mental disorders negatively, as well as expose him to increased compromise of his neurocognitive development and functioning.

32.    Significant risk factors for, and the symptomatic presentation of, multiple types of mental disorders and neurologic impairments existed in both the maternal and paternal lines of Mr. Fields' ancestors.  In particular, Mr. Fields has high genetic predisposition for Bipolar Disorder and other affective disorders.  He has multiple multigenerational and first-degree relatives with confirmed diagnoses of mood disorders.  Moreover, many relatives within Mr. Fields' generational history are affected by borderline intelligence and/or mental retardation. Mr. Fields' extensive family history of Bipolar and associated neuropsychiatric disorders is rarely seen in family cohorts, and presents a clinical profile which, consistent with research protocols of the National Institute of Mental Health's collaborative Genetic Linkage Study of Schizophrenia and Bipolar Disorder, identifies his family as likely genetically predisposed to develop the disorders.

33.    Mr. Fields' mother, Alice Swinnie, qualified for Social Security benefits after a diagnosis of mental retardation and appears to have had lifelong impairments.  She has suffered from depression, panic attacks and "bad nerves" and attempted suicide by swallowing pills.  Ms. Swinnie was treated at a Mental Health and Mental Retardation Center but records regarding that admission have been destroyed.  An MRI conducted in 2003

because of persistent headaches discovered multiple infarcts, or blood vessels that have broken and spilled, in her white matter of her brain.  These types of blood vessel breakage leads to problems in the areas of the brain where they occur, often resulting in emotional or behavioral disruption.

34.    Mr. Fields' biological father, Sherman Mims, also known as Buddy, reportedly was an alcoholic and hypersexual, chasing young women, even until his last years.  He reportedly had multiple girlfriends at any given time and had children by a number of women.  Mr. Mims was described alternately as quiet and as seeming to "feel invincible." He reportedly always tried to look good with alligator shoes and nice cars and would sometimes stay awake for days without sleeping.  It's not clear if he would use drugs to stay awake. He worked long hours and spent nights partying, drinking, and chasing women.  According to relatives, Mr. Mims died in 1985 of renal failure.  Some of his children believe that he was suicidal in that he refused proper treatment of advanced kidney disease, opting instead for a home dialysis machine that he didn't use and discarded in the back yard.

35.    Connie Mims, one of Mr. Fields' paternal half-sisters, was described as being unpredictable and having "ups and downs."  One day she expresses love for her grandchildren, the next day she hates them and then she says she loves them again.  She also reportedly can be extremely talkative and will talk until she falls asleep.  Other times she cries inexplicably.  She was described as a "religious fanatic" and during phone conversations Connie informs her family when the world will end.  She also tells family that they are not paying attention the signs that God is giving and thinks of herself as a kind of prophet who has been chosen to save the world.  She also shops obsessively, piling her cart high with dozens and dozens of items, only to decide she does not want them once she reaches the check-out line.  One of Mr. Fields' other half-sisters Vera is reported to suffer from depression.  She has period of time when she has no interest in dressing or showering because she sees no point in any of it.  She also opted to have a hysterectomy at the age of 25 because she did not want to bear children who resembled her father, Buddy Mims.  Although I do not know whether any of these paternal relatives of Mr. Fields has been formally diagnosed with a mental disease, these behaviors are indicative of mood disorders and perhaps Bipolar Disorder.

36.    Mr. Fields' younger half-brother Jimmy, born two years after Sherman, has borderline intellectual functioning or mild mental retardation and has been diagnosed at various times with organic delusional disorder and psychosis not otherwise specified (NOS).  He has been prescribed psychotropic medication and anti-depressants in response to visual and auditory hallucinations.

37.    Another of Mr. Fields' younger half-brothers, Jeffrey, born 4 years after Sherman, has also suffered from severe psychiatric problems.  He has experienced depression and had suicidal ideations.  According to records from the Texas Department of Criminal Justice ("TDCJ"), he exhibited paranoia, had visual hallucinations, graphic nightmares and heard command voices.  TDCJ's treatment plan included administering Haldol, a potent antipsychotic, and Nortryptiline, an antidepressant, in attempts to reduce his cyclical moods. Jeffrey was diagnosed with Schizophrenia or Schizoaffective Disorder.  Persons

with Shizoaffective Disorder, a combination of disorders of thinking as well as disorders of mood like Bipolar Disorder, are often genetically related to persons with Bipolar Disorder.  Jeffery also received disability payments for mental retardation and "mood disorders".

38.    Shaffer, Mr. Fields' youngest half-brother, also has a history of depression and "bad nerves." He has a history of substance abuse, and records indicate a history of suicidal ideation. Persons suffering from mood disorders often self medicate their mood disruption with both inappropriate prescription medications and illicit drugs.

39.    Mr. Fields' now-deceased half-uncle Shelley Leon Fields was reportedly mentally impaired and, according to police reports, kept a slip of paper in his wallet with his address on it because he wandered from home and could not find his way back.  Waco police reportedly returned him to his home on several occasions when he was found wandering the streets in confusion.  Shelley Fields was described as "crazy" by family and reportedly was paranoid, believing that people were trying to kill him.  He, at one time, was prescribed psychotropic medication and received disability payments for mental retardation.

40.    Shirley Mae Fields Bouye, Sherman's half-aunt, suffers from depression, "bad nerves," paranoia and is on psychotropic medication.  She has been diagnosed with Paranoid Schizophrenia and psychosis and has been admitted to the DePaul Center and the Austin State Hospital for her psychiatric problems.  She reportedly has a "high level of paranoid psychosis," has threatened her neighbors, and believes a camera has been installed in her home.  She was determined to be incapable of making decisions concerning her medication and a petition was filed requesting an order to forcibly medicate.

41.    In 2003, shortly before Mr. Fields' trial, Acie Bouye, one of Shirley Mae's sons, was found incompetent to stand trial for burglary.  He was diagnosed with undifferentiated Schizophrenic Disorder and a G6PD deficiency, a genetic deficiency of blood clotting. The clinic notes state that he has a lengthy history of symptoms consistent with Paranoid Schizophrenia, including sleep disturbance, loose associations, auditory hallucinations (sometimes command voices) and physical aggression.  Mr. Bouye was later re-arrested after breaking into a parked car and using it as a restroom.

42.    Otis Leaks, another of Mr. Fields' first cousins, has dealt with a lifetime of psychiatric disorders.  Mr. Leaks reportedly experiences auditory and-visual hallucinations and hears voices telling him to watch out.  He has been seeing "demons" since the age of 9. The early onset of his psychosis reinforces a genetic vulnerability for mental illness.  Mr. Leaks suffers from depression, has suicidal ideation and experiences terror and confusion.  He has been diagnosed with chronic Paranoid Schizophrenia and Post-Traumatic Stress Disorder.  He takes or has taken several psychotropic medications, including Thorazine and Geodon, both antipsychotics.  Mr. Leaks receives Social Security disability payments because of his Paranoid Schizophrenia.  Paranoid Schizophrenia is often misdiagnosed in African Americans with Bipolar Disorder. African Americans present with greater paranoia in mood disorders, and have a greater incidence of psychosis in mood disorders as well.  We also know there can be significant

overlap in the genetics of thought disorders and mood disorders, with both occurring in family pedigree.

43.    Theresa Leggett, Otis Leaks' sister, has struggled with mental illness and has been diagnosed with Bipolar Disorder.

44.    Jerry Leaks, another of Mr. Fields' cousins, has also struggled with a lifetime of mental illness.  In addition to borderline intellectual functioning, he experiences depression and paranoia and has been prescribed psychotropic medications.  He suffers from both visual and auditory hallucinations , paranoia, psychosis, occasional catatonia, a rare symptom in modern Schizophrenia, and insomnia.  He has been involuntarily hospitalized where records describe him as a "man with paranoid schizophrenia, with severe decompensation," after he has missed taking his medications.  Jerry Leaks also receives disability payments, and his disability diagnosis is Schizophrenic, paranoid, and other functional psychotic disorders.

45.    Hattie Love, one of Mr. Fields' half-aunts, has impaired intellectual functioning and "bad nerves."  She was diagnosed with depression with psychosis and has been on various antidepressants, including Prozac, Zoloft, and Trazodone.

46.    Alton Robinson, Jr., another of Mr. Fields' cousins, has documented "major depressive disorder, single episode, severe with psychotic features."  Mr. Robinson experienced a depressed mood, loss of appetite, low energy, poor concentration, frequent crying spells, and irritability.  He has also sought mental health treatment for "hearing voices."  Mr. Robinson reported "non-specific auditory voices" and visual hallucinations, including seeing his dead mother in the dining room.

47.    Patricia Diane Robinson, Mr. Fields' half-aunt, suffered from mental illness and had suicidal ideation and was admitted to the DePaul Center in 1992, where she remained inpatient for approximately a week.   Beginning in 1998, Ms. Robinson began receiving Social Security disability payments for "mood disorders."

48.    Other family members with a history of mental illness and impairments include:  Arthur Fields, Mr. Fields' half-uncle, suffered from depression or "bad nerves"; Mildred Fay Bouye, Mr. Fields' first cousin, reportedly mentally ill; Brian Allen Bouye, Mr. Fields' second cousin, suffers from depression, and has been prescribed psychotropic medication; Lisa Darlene Bouye, Mr. Fields' first cousin, suffers from depression, and paranoia and has been prescribed psychotropic medications, possibly has bipolar disorder; George "Joe" Horde (Harvey) Gaines, Mr. Fields' half-uncle, suffered from mental illness, mental retardation and paranoia, reported to be "crazy" by family members, has difficulty reading and counting and receives Supplemental Security Income ("SSI") for "mental or psychological impairments"; George William Anthony, Mr. Fields' cousin, suffers from mental illness and intellectual impairments; Annie "Lucille" Leaks, Mr. Fields' half-aunt, has intellectual impairments and receives disability income.

49.    The prevalence of major psychiatric disorders can be found in Mr. Fields' maternal family back to at least four generations, reinforcing the belief Mr. Fields suffers from a

genetically-transmitted mood disorder. His maternal great-great-grandmother, Leana Powell Fields, was involuntarily committed to the Austin State Hospital around 1920. Mr. Fields' maternal grandmother, Jessie Mae Fields, who helped raise Sherman, reportedly had a history of depression or "bad nerves" and was prescribed psychotropic medications, including Cymbalta and Amitripyline, both antidepressants. Mr. Fields' maternal grandfather manifested hyperreactivity and numbing of affects, both signs of PTSD, and reportedly had conversations with his deceased wife.

50.  The sheer number of close relatives in Mr. Fields' family who suffer from serious mental illness is extraordinary and contributed to a very high probability that he, also, would suffer from mental disease. Mood disorders have an incidence in the United States of approximately 8 percent of the population meaning that, at any one time, 8 percent of persons in the United States suffer from various forms of depression or Bipolar Disorder. When there is a genetic loading of mood disorders in a family, the incidence increases exponentially. This genetic loading for mental illness makes the potential for Mr. Fields to suffer from Bipolar Disorder very high. The co-morbidity of Sherman Fields' own genetically-based potential for developing a mental illness and the traumatic stress manifested by the circumstances of his upbringing, including the extreme poverty in which his family lived, his caretakers' substance abuse, and neglect and abuse that he and his siblings suffered in their childhood; created greater and more severe symptomatology than either disorder alone may present.

51.  *From Neurons to Neighborhoods*, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that are necessary for the developing brain to fully mature. They also determined that chronic stress is detrimental to the normal development of the brain. Shonkoff and Phillips, *From Neurons to Neighborhoods: The Science of Early Childhood Development*, National Academy of Science Press, 2001, page 199.

52.  Parental neglect of the type suffered by Mr. Fields has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest-term and most pernicious effects of all such early traumatic experiences.

> …interpersonal traumas are likely to have more profound effects than personal ones...Particularly early in life, the social context plays a critical role in buffering an individual against stressful situations, and in building the psychological and biological capacities to deal with further stresses. The primary function of parents can be thought of as helping children modulate their arousal by attuned and well-timed provision of playing feeding, comforting, touching, looking, cleaning, resting-in short, by teaching them skills that will gradually help them modulate their own arousal...In children who have been exposed to severe stressors, the quality of the parental bond is probably the single most important determinant of long-term damage. . . . (Bessel Van Der Kolk ,Traumatic Stress: The effects of Overwhelming

> Experience on Mind, Body, and Society; Guilford Press, New York, London, 1996, page 184-185)

53. The brain is only starting to grow, mature, and differentiate at the time of birth. Within the newborn brain there are certain structures, such as the amygdala, which respond to different types of stimulation. The newborn child's interpersonal and environmental experiences determine the rate and quality of development for neurological systems that regulate definition of person and comprehension of one's place in his or her environment. The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. In general, the maturation of the brain appears to proceed from inferior to superior and from posterior to anterior structures (Huttenlocher, 1979; Huttenlocher & de Courten, 1987;Yakovlev & Lecours, 1967), with maturation in superior parietal and frontal cortical regions being most prominent between 7 and 16 years of age (Sowell et al., 1999). Hence, any brain trauma during this period has the potential to disrupt typical neurodevelopmental processes and contribute to long-term negative consequences. Prolonged stress or prolonged exposure to glucocorticoids (i.e., the adrenal steroids secreted during stress) and elevated levels of catecholamines that result from dysregulated stress response systems during this period is likely to affect brain development adversely. Indeed, the stress of child maltreatment has been associated with alterations in the neurobiological systems that are highly involved in brain maturation, cognitive development, and emotional/behavioral regulation (De Bellis, 2005). (Watts-English et al, The Psychobiology of Maltreatment in Childhood, *Journal of Social Issues, Vol. 62, No. 4, 2006, pp. 719)*

54. Emotional development can be seen as the literal acquisition of emotions. Children must develop the capacity to recognize and use emotions appropriately. Children must also become successful in a complex maturation process that entails learning to become emotionally responsive rather than emotionally reactive to internal experiences of emotion. In addition, children must learn to use their emotional repertoire to handle the inherent anxiety and stresses that are universal to the human condition. Emotional maturity can be understood as the acquisition of coping defenses in infancy and childhood. (Sadock and Sadock, Comprehensive Textbook of Psychiatry, Eight Edition, Lippincott, Wilkins, and Williams, 2005, page 3029.)

55. Bessel van der Kolk et al. discuss the impact of trauma in the formative years, and the protective role parents should play:

> Although both adults and children may respond to a traumatic event with generalized hyperarousal, attentional difficulties, problems with stimulus discrimination, inability to self-regulate, and dissociative processes, these problems have very different effects on young children than they do on mature adults. For example, Pittman (1995) showed that people who developed PTSD secondary to child abuse had more profound physiological dysregulation in response to nontraumatic stimuli than people who developed PTSD as adults. (BESSEL A. VAN DER KOLK,

TRAUMATIC STRESS: THE EFFECTS OF OVERWHELMING EXPERIENCE ON MIND, BODY, AND SOCIETY, 184-185 (Guilford Press, 1996)

56.   Mr. Fields' mother, Alice Swinnie, was a chaotic, violent, victimized woman who had children by a number of abusive, violent men.  Ms. Swinnie was molested by her sister's husband as a child and was raped by another man at the age of 11.  Soon after, she began a series of relationships resulting in the births of Charles and Sherman Fields at ages 13 and 15.

57.   Mr. Fields was also exposed to neurocognitive insults during his formative years from the physical abuse that he suffered and his caretakers' frequent domestic disputes that often ended in violence.  At various times in Mr. Fields' childhood, there were shootings in and around the household.  Ms. Swinnie's longest relationship during Sherman Fields' childhood was with William Bradford (who fathered two of Mr. Fields' younger brothers).  Mr. Fields was subjected to relentless and vicious beatings at the hands of Mr. Bradford as well as the hands of his maternal grandmother.  He was beaten with switches, belts, extension cords and fists.  Family members report seeing welts on his body and that at times, his injuries would be so painful that it would be difficult for him to sit down.  Mr. Bradford's beatings of Mr. Fields, in particular, were capricious and seemingly unprovoked.  The inconsistency of Mr. Bradford's brutality created the hypervigilance and scanning behavior so characteristic of Mr. Fields' anticipatory anxiety, the anxiety that makes him act before he thinks.  Chronic autonomal arousal creates both anticipatory anxiety and the disconnect from affect found in PTSD.

58.   Mr. Bradford was described as a severe alcoholic who physically and emotionally abused Ms. Swinnie, her mother, and her children, including Mr. Fields.  Mr. Fields was described as appearing sad after he was beaten and his brother described the children as feeling helpless, a common symptom of PTSD, particularly in children.  Mr. Fields' brothers recount him receiving the brunt of the abuse, in part because he was not Mr. Bradford's biological son.  The children also witnessed Mr. Bradford beat their mother so severely she had black eyes and bruises.  They were embarrassed by her injuries and ashamed that they could do nothing to help her.  Ms. Swinnie's relationship with Mr. Bradford, which was described as taking "a hell of a toll" on the family, lasted ten years, and finally ended when Mr. Fields' mother shot Mr. Bradford and the woman with whom Mr. Bradford was having an affair.

59.   Mr. Fields' mother thereafter married Melvin Swinnie.  Although Mr. Fields only lived with Mr. Swinnie sporadically for a short time, he described Mr. Swinnie as the "best male figure my mother was ever with."  However, Mr. Swinnie and Ms. Fields' relationship was very troubled and Mr. Swinnie suffered from severe mental problems, spending time in the DePaul center and the Austin State Hospital to deal with depression, suicidal and homicidal ideations.  He was described as weird and "talking crazy" and reportedly heard voices.  Mr. Swinnie was described as addicted to heroin and crack cocaine and Mr. Fields' younger brother suggested that Mr. Swinnie was selling drugs to him and his siblings.

60. In the fall of 1992, Mr. Swinnie left the psychiatric hospital after leaving a threatening note and telling a nurse that he was going to kill Ms. Swinnie (*nee* Fields) and then himself. He was intercepted by local police and convinced to seek further medical help. In spring 1993, Mr. Swinnie went to Ms. Swinnie's house and attempted to kill her, shooting at her with a pistol. One bullet grazed Ms. Swinnie's head but she was otherwise unharmed. Mr. Swinnie had shot one of his previous wives as well.

61. Mr. Fields' grandfather, Shelby Mitchell, was perceived by Mr. Fields' mother as a safe haven for her son because he had a stable address, held a steady job and lived in the country away from temptations of the city. As a boy, Mr. Fields looked up to Mr. Mitchell and saw him as a role model in his life. Ms. Fields' perception of her father, however, is not borne out by other accounts of Mr. Mitchell's life.

62. Mr. Mitchell was born in Axtell, Texas just outside of Waco in 1909. During his youth, Mr. Mitchell was severely traumatized by the racial violence that engulfed central and east Texas from the turn of the century until the Second World War, reaching its peak in the 1920s. According to the Texas State Historical Association's *Handbook of Texas Online*;

> Waco became a center of Ku Klux Klan activity and influence during the 1920s. Lynchings had occurred in Waco in 1905, 1915, and 1916, and on at least one occasion the black victim was publicly burned in the town square; in the 1920s mobs of white citizens hanged or burned other blacks as well. In 1923 more than 2,000 Klansmen paraded through the city, and the organization boycotted businesses of people unsympathetic with its agenda. Many of Waco's business and political leaders at least implicitly supported the Klan during this period, and one member claimed that the Klan "controlled every office in the city of Waco" during the 1920s.
>
> *Handbook    of    Texas    Online*,    s.v.    "Waco," http://www.tshaonline.org/handbook/online/articles/WW/hdw1.html    (accessed April 7, 2010).

63. Scholars have documented the extreme racial violence in the Waco area during this period, which was extraordinary, even in the Jim Crow South. The most notorious incident was the 1916 lynching of Jesse Washington, who was dragged from the courthouse, beaten, mutilated and burned in front of a mob of ten to fifteen thousand people assembled on the lawn of city hall. Mr. Washington's corpse was subsequently dragged through the streets and parts of his body were collected as souvenirs. Bernstein, Patricia, *The First Waco Horror: The Lynching of Jesse Washington and the Rise of the NAACP*, Texas A&M University Press, 2006.

64. Unfortunately, the lynching of Mr. Washington was not an isolated event during Mr. Mitchell's childhood in McLennan County. On June 23, 1917, Elijah Hayes, accused of assault, was beaten to death with pieces of cordwood by dozens of men and on May 26, 1922, Jesse Thomas, accused of murder and rape, was shot after capture by a small posse and then burned in front of thousands of onlookers. Carrigan, William D., *The Making of*

*a Lynching Culture*, University of Illinois Press, 2006, Appendix A. The extraordinary racial violence in Waco was infamous and affected the African-American community throughout the state and beyond. A 1923 article in the *Houston Informer*, a black newspaper, suggested Waco was better known as "Barbecueville" and concluded that police could not close a recent criminal case because all the young black men in the area had already been "lynched, burned at the stake, or deported." *Id*. at 198.

65.   Although the murder of Mr. Washington received more national attention, the lynching of Jesse Thomas reportedly had a greater effect on the African-American community in the Waco area. Mr. Mitchell was very young, perhaps 13, when Mr. Thomas was murdered and would have been very aware of the circumstances. Mr. Thomas was almost certainly innocent, yet no further investigation or prosecution was apparently conducted even though a man named Sank Johnson was a prime suspect. *Id.* at 200. More than a year later, a black man named Roy Mitchell confessed to the crime and on July 30, 1923 was hanged "under festive conditions before a crowd estimated between seven and ten thousand…" *Id*. According to William Carrigan's research:

> For the black community in Waco, however, the tragedy of the murder of Jesse Thomas went beyond the personal effects on his family and friends. Although undoubtedly race relations were poor in Waco before Thomas's murder, Waco's blacks looked upon the Thomas affair as insufferable, a wound that could not be healed. According to Willie Long Smith, race relations were never the same in Waco after the murder of Thomas. She said, "Everything was downhill after that." Blacks were able to accept many injustices, said Smith, but the murder of the innocent Jesse Thomas combined with the lack of prosecution of Harris [who supposedly led the lynching] was more than they could tolerate. "They were terribly upset," she remembered, but "couldn't do anything about it." As a black minister in Waco recalled, "I have heard some of the layman now who were youngsters then, they say what a horror it [the mob violence] was and maybe what distress it brought to them during those early periods." Kneeland Clemons, born a few months after Thomas's murder, said that "the fire never died" in the hearts of blacks in Waco, but that they kept their resentment until they died.
>
> The murder of Jesse Thomas held a tighter grip on the mind of black Wacoans than did the lynching of 1916. Jesse Washington did not live in or come from Waco. Instead, he was a young black man whose family had only recently moved to Robinson, a rural area outside the city. By contrast, Thomas lived in the city itself, and both blacks and whites in Waco knew him and his family. Furthermore, black Wacoans knew the Harris family. The mob leaders who supposedly led Washington's lynching went home to Robinson, but Harris stayed in Waco and continued to lead his life, an enduring example of Waco's refusal to bring wrong-doers to

> justice. Black Wacoans recognized both Washington and Thomas as members of the same race, but the black community perceived Jesse Thomas as more than a fellow victim of racial oppression. His murder left black Wacoans feeling that their community itself had been personally attacked.

*Id*. at 200-201 (internal citations omitted).

66. The African-American community had no means to express its outrage. A 1916 newspaper article denouncing the Washington lynching written for a local black college newspaper resulted in the author's conviction for libel and a sentence of a year of hard labor. *Id*. Instead the African-American community memorialized its history in oral tradition:

> In the intervening decades, black memories of the lynchings of Washington, Thomas and other victims of mob violence blurred together, eventually becoming one horrible racial catastrophe in the minds of most black Wacoans. The memories became tales as they passed down the story of the lynching to their children and newcomers to the area. The repression of local criticism of lynching meant that blacks were not likely to write down their memories and feelings about lynching. Instead, they passed stories privately, through oral tradition, inside the black community.

*Id*. at 202

67. Mr. Fields' grandfather, Shelby Mitchell, was reportedly severely traumatized by these events, and in keeping with the oral tradition described by historians, Mr. Mitchell repeatedly told his grandchildren how white people used to harass him and recounted stories of the lynchings in the Waco area. Mr. Fields' brother recounted how Mr. Mitchell would tell them about how a mob of white people dragged a black man downtown and took him out the courthouse and hung him. According to Mr. Mitchell, the 1953 Waco tornado was God's retribution for the lynching and the tornado traveled the same path as the mob. Mr. Mitchell believed that "God showed them that what they did to that man was very wrong and that's why he sent that tornado down there to tear up everything."[1]

68. In addition to the lynching stories, Mr. Mitchell routinely recounted a more directly personal racial catastrophe for Mr. Fields and his brothers: He told of a time when he was a boy and Klansmen came to their house, beat his father with a whip, and raped his mother in front of all of them. According to Mr. Fields' brother:

---

[1] This narrative was apparently very common in the Waco African American community and, in his book, William Carrigan traces several versions of the retribution story. Carrigan, William D., *The Making of a Lynching Culture*, University of Illinois Press, 2006, pgs. 202-206.

> It seemed like he told it every other night. He tried to always get us to understand that there was a difference in color in the world and that everybody wasn't treated fairly. He would always tell that story exactly the same way. He'd say he was scared, looking out the door. He'd seen all the white people out there wearing sheets and burning crosses. I guess he heard all of them shouting, "Niggers leave!"… He said they just came up there one night. He said they'd already been getting other people around there – burning crosses and raping people's women and stuff. They lived on a farm and I think he said they just walked in the door.

Declaration of Charles Fields at ¶58.

> It [ ] probably never was reported. Back then, you cleaned up and prayed on it – go to the police and they'd be likely to kill you. That's the score around here.

*Id.* at ¶57.

69. This traumatic childhood clearly had deleterious effects on Mr. Mitchell. First, it contributed to his severe alcoholism. Mr. Mitchell reportedly drank every day, morning to night. According to Charles Fields, he would have a shot of coffee and then begin drinking gin and beer. He reportedly drank from the time he awoke until sundown when he would pass out in his room. Charles Fields remembered that he could drink and work all day but as soon as he kicked his shoes off, he would pass out. Charles Fields also recalled that Mr. Mitchell would become too drunk to drive and Charles remembers driving him around when he was as young as age 12. Mr. Mitchell told his grandchildren that his drinking calmed his nerves and would tell them "[i]f y'all had seen some of the things I seen as a child, y'all would drink too."

70. Mr. Mitchell also reportedly instilled in his grandchildren the importance of isolated, self-reliance. Mr. Mitchell apparently kept about 16 guns. Most of them were rifles and shotguns but he also had .38s and .22s. He taught Mr. Fields and his brothers that it "was better to get caught with a gun than without," and Mr. Mitchell himself reportedly always carried a pistol – even to church. According to Charles Fields, Mitchell would say, "[y]ou can shoot a black man and get away with it. Shoot a white man and you'll go to jail." He taught the children to believe that no one was better than them and instructed them to "always use a gun if someone pulled a gun on us" because "he could always get [them] out of jail but he couldn't get [them] out the grave."

71. As a result of Mr. Mitchell's alcoholism and the trauma he suffered, he was unable to provide necessary supervision and set proper limits for his grandchildren. Mr. Fields and his brothers liked staying with their grandfather because they were isolated and had no boundaries. According to Mr. Fields' brother, they were allowed to bring girls home at age 10, 11 and 12, they had easy access to alcohol and could drive Mr. Mitchell's truck, and they were firing guns by age 12.

72.     Some of Mr. Mitchell's actions, however, confused his grandsons and further complicated issues of race in the area.  Charles Fields remembered how their grandfather acted with the people he worked for in his lawn mowing business.  According to Charles Fields, Mr. Mitchell would sometimes spend all day on a rich client's home and used to "kiss up to them all the time."  Despite his bravado in other aspects of his life, Charles Fields felt that "[i]t was like back in the slave days when he'd get around white people."  Charles Fields recalled that "[i]t made me feel kind of embarrassed to see him like that though because he would throw his weight around with everybody else."  *Declaration of Charles Fields* at ¶61.

73.     Research demonstrates that even family members who had not been born when the trauma events occurred can develop PTSD-like symptoms secondary to dealing with the traumatic symptoms of family members or loved ones, much like the children of psychotic parents, whom often has soft signs of psychosis.  Children of Vietnam veterans with PTSD, for example, exhibit impaired self-esteem, poor reality testing, hyperactivity, aggressive behavior, and have problems coping with their own feelings, especially fear, rage, guilt and mistrust.  *Compassion Fatigue: Coping with Secondary Traumatic Stress Disorder in Those Who Treat the Traumatized*, Charles R. Figley, ed. (New York: Brunner/Mazel, 1995), p. 210; Harkness, Laurie Leydie;  "Transgenerational Transmission of War Related Trauma" in *International Handbook of Traumatic Stress Syndrome*, eds. John P. Wilson and Beverley Raphael (New York: Plenum Press, 1993), p. 36.

74.     Mr. Fields' grandfather also had significant paranoia, and, in spite of working outside of his neighborhood, reinforced the isolation race naturally created.  Mr. Fields and his brothers were taught to trust no one outside the family and to rely only on themselves.  As described further below, they learned from personal experience that law enforcement would not protect them, so they took to heart their grandfather's admonitions to arm themselves and always be on guard.

75.     This racial, social, and environmental isolation of Mr. Fields and his family potentiated the multigenerational mental illness.  Mr. Fields' decisions, before and during the offense, as well as at the time of trial, were made with the weight of this emotional dysfunction.

76.     Mr. Fields' environment during childhood was replete with stressors unmitigated by protective factors.  For approximately the first 7 years of his life, Mr. Fields lived in an area of McLennan County known as "No Man's Land," a small region that neighboring municipalities refused to annex.  As a result, the neighborhood had no sewage system, no municipal police protection, no fire protection, no routine garbage disposal and only a small portion of the houses had running water.  Many residents drank untreated water drawn from wells polluted with fecal waste.  After heavy rains, the septic tanks would overflow and children would reportedly wade through the contaminated water to get to school.  No municipal pest control existed and the area was infested with rats and other vermin.

77.     This environmental assault on the people in the neighborhood was no less meaningful in isolating them from everyday life, understanding, and decisions. The environment was the first barrier to overcome, before other stressors could be dealt with.  Mr. Fields, however, had more than an unsanitary and dangerous physical environment to contend with.

78.     Mr. Fields' mental illness presented very early in his life, consistent with the childhood presentation of many genetic diseases at their most severe, diabetes, for example.

79.     Initial presentation of childhood or adolescent Bipolar Disorder typically involves moodiness, frequent or aggressive oppositional behavior, anger that does not resolve in 15 minutes, sadness and easy crying, inattention, and impulsiveness.  When the illness begins before or soon after puberty, it is often characterized by a pattern of continuous rapid-cycling, irritable or mixed symptoms that may co-occur with disruptive behavior disorders such as ADHD or CDs (conduct disorders), or may have symptoms of these disorders as presenting features. (Faust et al, Diagnosis and management of childhood bipolar disorder in the primary care setting, Primary Pediatrics, November 2006, page 801.)

80.     By latency age Mr. Fields demonstrated many of the prodromal symptoms associated with childhood Bipolar Disorder, including irritability, isolation, sadness, and impaired academic functioning.

81.     Mr. Fields' older brother recognized a change in Mr. Fields in his teens.  Mr. Fields would reportedly "zone out" a lot, even when someone was talking to him.  At age 15 or 16, his sleep pattern had changed, even when he wasn't using drugs.  He reportedly would get up in the night and watch TV.  His brother, Charles, recalled getting up to use the restroom in the middle of the night and seeing Mr. Fields watching TV.

82.     Mr. Fields also apparently began to express little concern about his safety, showing markedly impaired judgment and a certain grandiosity.  Mr. Fields' brother recounted that Mr. Fields' attitude was "If it's my time, it's my time.  God decides when you die and you can't argue with that."

83.     In January 1989, while incarcerated in the McLennan County Juvenile Detention Center, Mr. Fields and another boy, a close friend, attempted to hang themselves with bedsheets, in a bizarre escape attempt.  Mr. Fields was rescued.  Mr. Fields' friend, however, did not survive.  Mr. Fields was kept in the hospital for four days and within one hour of his return to the juvenile facility, he again attempted to hang himself.

84.     Shortly thereafter, he was moved to a placement in the Texas Youth Commission and almost immediately tried to commit suicide again.  He was discovered by staff and revived with rescue breathing.

85.     In February of 1989, Dr. Day, a Texas Youth Commission ("TYC") psychiatrist, diagnosed Mr. Fields with Post-Traumatic Stress Disorder.  Dr. Day's notes described the flattened affect, the nightmares Mr. Fields experienced, each symptom consistent with the numbing of emotions and intrusive dreams diagnostic of PTSD.  He recommended

ongoing treatment for Mr. Fields and withheld medications he feared might impede Mr. Fields' grieving.

86.    Dr. Day also recognized Mr. Fields' severe mood disorder, and documented his symptoms during several hospitalizations.  He made the diagnosis of atypical Bipolar Disorder, and recommended mood stabilizers for Mr. Fields.  The "atypical' aspect of Mr. Fields' early presentation was based upon two crucial epidemiological factors: age and ethnicity.

87.    Ethnicity is a major factor in how symptoms manifest, particularly in mood disorders. Strakowski and others have discussed the specific symptom constellation of African-American adolescents suffering from bipolar disorder, which includes a higher propensity to suffer paranoid ideation, psychotic thinking, and greater perceptual disorders.

88.    Ethnic differences existed in manic and positive symptom profiles, but not depressive symptoms.  Compared with the white cohort, African-American youths were diagnosed more frequently as having psychotic features, and had higher ratings for auditory hallucinations. (Strakowski et al., *Ethnic differences in symptom presentation of youths with bipolar disorder*, 8 BIPOLAR DISORDERS 96 (2006).)

89.    Symptoms of agitated depression rather than melancholic, retarded depression and paranoid psychosis are more likely to appear in both major depressive disorder and bipolar disorder for African Americans.  Psychosis is also found more commonly in the depressive phase of Bipolar Disorder, as are neurovegetative signs like sleep disruption, catatonia, and changes in weight.  Agitated depression and paranoia were apparent in the descriptions of Mr. Fields' mental state leading up to his capital murder trial in 2004.

90.    Dr. Day's initial observation of Mr. Fields on March 6, 1989 led him to note that Mr. Fields had a psychotic depression and was suffering from Post-Traumatic Stress Disorder.  By the time Mr. Fields was discharged, Dr. Day had made the diagnosis of atypical Bipolar Disorder.  By 1989, Mr. Fields had also been seen by the MHMR Center in Waco and placed on medications, type unknown.

91.    Mr. Fields' Bipolar symptoms as a child – paranoid ideation, impulsivity, impaired judgment, acting out behavior, psychotic thinking – are also abundantly documented in medical records.  Other psychiatrists, including Dr. Sellers and Dr. Heidelberger, thought Mr. Fields may have had, as Dr. Sellers noted, "a pervasive mood disorder."  Even Dr. Tan, who did not find Mr. Fields depressed, believed if Mr. Fields continued to have difficulty, mood-stabilizing medications like Lithium should have been the first choice of medication.  Lithium is primarily prescribed for forms of bipolar disorder.

92.    Personality disorders, like borderline personality disorder, are often mistaken for Bipolar Disorder, due to the affective instability in each.  Yet, personality disorders should not be diagnosed until the Axis I diagnoses, in this case Bipolar Disorder and PTSD, have been controlled.  Often, symptoms of Axis I disorders will mimic personality disorders.

> Many of the specific criteria for the Personality Disorders describe
> features (eg., suspiciousness, dependency, or insensitivity) that are

also characteristic of episodes of Axis I mental disorders. A personality disorder should be diagnosed only when the defining characteristics appeared before early adulthood, are typical of the individual's long term functioning, and do not occur exclusively during an episode of an Axis I disorder. It may be particularly difficult (and not particularly useful) to distinguish Personality Disorders that have an early onset and a chronic, relatively stable course. . . .   The clinician must be cautious in diagnosing Personality Disorders during an episode of a Mood Disorder or an Anxiety Disorder because these conditions may have cross-sectional symptom features that mimic personality traits and may make it more difficult to evaluate retrospectively the individual's long term patterns of functions. When personality changes emerge and persist after a individual has been exposed to extreme stress, a diagnosis of Post Traumatic Stress Disorder should be considered.

(Diagnostic and Statistical Manual-IVth Edition, Text Revised (DSM-IV-TR), page 688)

93.    Recommendations were made for treatment and, when Mr. Fields was not too paranoid to accept treatment, medical records appear to document that Mr. Fields responded positively to medications.  By late 1989, Mr. Holmes, the probation officer for Mr. Fields, documented his "suicide problem" but wrote that he was taking medication.  From 1991 until his incarceration in TDCJ, Mr. Fields was on SSI, receiving benefits due to his mental disabilities.

94.    When Mr. Fields was released from TDCJ, relatives recognized signs of Mr. Fields' continued mental health problems.  Mr. Fields reportedly had severe sleep disturbances and would stay up for long periods of time and sleep at odd hours.  He also reported being disturbed by auditory hallucinations.

95.    During Mr. Fields' pretrial incarceration for the capital offense, his mental health continued to decline.  He was apparently prescribed Remeron, an extremely sedating antidepressant, but was medication noncompliant.  On April 1, 2003, staff discovered approximately 34 doses of Remeron hidden in Mr. Fields' cell.  On April 13, 2003, six more doses were discovered.  Mr. Fields filed numerous grievances, the contents of which illustrate a deterioration of his thought processes during this period.  These grievances indicate an ever-increasing paranoia beginning with a belief that staff was reading his legal material and escalating to the paranoid ideation that staff were conspiring to kill him.  On several occasions, Mr. Fields complained that staff were trying to poison him "by putting an unknown substance" in his food.  He also believed that officers were having KKK meetings outside his cell and had formed a cabal to kill him.  Mr. Fields expressed a belief that other prison staff were hiding behind computers and desks so they could watch him in a homosexual manner.  He also asserted that he was not a United States citizen and demanded access to his consular official.  These delusions were culturally consistent, an important factor in determining the authenticity of perceptual disorders.  They reflect the grandiosity and paranoid ideation found in the mania of Bipolar Disorder.  Additionally, Mr. Fields was reportedly placed in a in a cell

-20-

where he was under twenty-four surveillance and subjected to continuous illumination. This could only increase his paranoid suspicions and hypervigilance, while further disrupting his sleep cycles and sense of autonomy and adversely affecting his cognition.

96.    Mr. Fields accumulated a number of disciplinary infractions during this pretrial incarceration.    The vast majority of these violations were for indecent exposure/masturbation.    This hypersexuality, again consistent with bipolar disorder, reflected symptoms that could be observed in jail, and symptoms that were consistent with reported sexual behavior on the streets.  Indicative of Mr. Fields' PTSD was his high level of paranoia.  He was found with a shank, so great was his fear, much of it delusional rather than reality-based.

## Etiology and Onset

97.    The clinical literature consistently points to Bipolar Disorder having significant cognitive deficits as a course of the disorder, even when effectively treated.  Impairments in judgment, effective weighing and deliberating, being able to see the big picture, inhibiting socially inappropriate behaviors, and inability to plan effectively are all neurological functions that are impaired in Bipolar Disorder, mediated by different anatomic locations the frontal lobes. Bipolar disorder, even when the patient is euthymic, meaning with a stable mood, can manifest cognitive impairments.  This is due to structural changes in the brain associated with Bipolar Disorder.  During the first 6 years of life, a normally developing brain first grows an extensive neuronal network of connections, then selectively prunes those networks.  This process of pruning, fosters the development of specific neurological pathways, allowing cognitive skills like focus, mature judgment and more accurate memory retrieval, collectively known as executive functioning.

> Subcortical structures, such as the amygdala, basal ganglia, and thalamus, are mature by puberty, and increased striatal volume in patients with bipolar disorder suggests a failure of pruning in at least a portion of the subcortical portion of the ALN. These findings are buttressed by evidence of abnormal striatal development in bipolar children and adolescents.  Similar abnormal developmental processes may be related to findings of white matter pathology as well.

(Strakowski et al, Brain Network Dysfunction in Bipolar Disorder, CNS Spectrums, *2006;11(4), page 315)*

98.    This failure of normal pruning and neuronal pathway development in Bipolar patients results in a loss of executive functioning.

> The three groups of bipolar patients displayed worse performance than the comparison group, mainly on measures of verbal memory and executive functioning. The manic or hypomanic, depressed, and euthymic patients

performed poorer on new learning as well as on recall than the comparison subjects, even when semantic cues were provided to enhance the recovery of information. These results suggest that verbal learning and memory seem to be impaired in bipolar disorder, independently of cli*nical state, so that pr*oblems in encoding and also probably in the retrieval of verbal information are involved. Furthermore, the acutely ill patients showed statistical differences from the comparison group regarding recognition memory. These results suggest that complex memory processes seem to be impaired in remitted patients.

(MARTÍNEZ-ARÁN, VIETA, REINARES, ET AL., Cognitive Function Across Manic or Hypomanic, Depressed, and Euthymic States in Bipolar Disorder, *(American Journal of Psychiatry 2004; 161:267)*

99.    Mr. Fields' family history, the consistency of mood dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility, all clinically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

## CLINICAL IMPRESSIONS

100.    Now, at the time of his trial, and at the time of the crime of conviction, Mr. Fields met the DSM-IV-TR criteria for Post-Traumatic Stress Disorder, chronic, severe, 309.81 and Bipolar Disorder 296.4x.  His PTSD symptoms – the result of multiple traumatic stressors – include numbing of affect and emotion, irritability, withdrawal, scanning behavior, rumination, hyperreactivity, emotional withdrawal, agitation, impaired sleeping, and exaggerated startle response.  These symptoms are synergistic with his bipolar symptoms.  Mr. Fields' bipolar symptoms include impaired sleep, paranoid ideation, grandiosity, agitated depression, impaired judgment, mood swings, irritability, and hypersexuality – all of which have been well documented over an extended period.

101.    Ample anecdotal and congruent documentary evidence confirm that Mr. Fields' mental disorders and defects predated the date of the commitment offense and his trial and, to some degree, continue today.

## SUMMARY AND CONCLUSIONS

102.    Based upon my clinical observations of Mr. Fields and review of the documents enumerated above, I have formed expert opinions as to the referral questions posed by counsel for Mr. Fields, as follows:

I.      What are the social, psychological, developmental, familial, cultural, and environmental factors that played a role in shaping Mr. Fields' development and functioning?  How did each of these factors shape Mr. Fields' social and psychological development and functioning?

103.    As a result of the social, psychological, developmental, familial, cultural, and environmental factors described above, Mr. Fields' development and functioning have

been severely impaired throughout his life, including the time of the capital offense for which he is incarcerated, the time of his pretrial detention, his pretrial preparation of his defense, and the time of his trial, up through the present.

104.  Mr. Fields suffers from Bipolar Disorder and Post-Traumatic Stress Disorder.  He has suffered from the symptom constellation of these two disorders since childhood.  Mr. Fields' life was influenced by both community and family violence, trauma, absence of nurturing and modeling, lack of appropriate coping mechanisms, and mental illness.  By his teens, Mr. Fields suffered extreme physical and emotional trauma, due to the abuse he suffered at the hands of his caretakers in addition to experiencing his mother shoot his stepfather and his stepfather's mistress and his subsequent stepfather shoot his mother in the head.  Moreover, Mr. Fields experienced racial violence both directly and as a result of secondary trauma, suffered the deaths of numerous friends and family, and attempted suicide on multiple occasions.

105.  Mr. Fields had been diagnosed with mood disorders as early as adolescence.  He had also been given the diagnosis of Post-Traumatic Stress Disorder, based upon a single event, even without knowledge or consideration of the extensive history of chronic trauma and neglect that is now available.

106.  Mr. Fields' extensive and well-documented history of trauma and mental disorders, including the co-morbidity (the symptom combination) of Mr. Fields' Bipolar Disorder and PTSD, significantly impaired his functioning and prior behavior.  For example, many of Mr. Fields' disciplinary infractions during incarceration were for masturbation, consistent with Mr. Fields' sexual history when not incarcerated. Although Mr. Fields ascribed much of his behavior with women in a negative light, the same bipolar symptom of hypersexuality is present in an isolated setting.

II.  If Mr. Fields suffers from a mental disease or defect, was he competent to waive counsel and did his mental illness, alone and in combination with other factors such as being forced to wear a stun belt, render him unable to carry out the basic tasks necessary to present his own defense without the assistance of counsel?

107.  The symptoms of Mr. Fields' multiple psychiatric disorders impaired his competency to waive his right to counsel.  Mr. Fields' paranoid fear of his attorneys was consistent with his belief that they were not just failing to work for him, but were actively conspiring with the prosecutors to convict him.  The conditions of Mr. Fields' confinement at the McLennan County Jail exacerbated his mental disorders.  As discussed, sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder.  Disruption of sleep can be found in almost all psychiatric disorders.  Historically, Mr. Fields had symptoms of sleep impairment associated with both PTSD and Bipolar Disorder.  He describes both early insomnia, not falling asleep, which is consistent with PTSD; and long periods of not needing sleep, consistent with bipolar disorder.  Placing him in a cell where he was under twenty-four-hour surveillance and subjected to continuous illumination could only increase his paranoid suspicions and hypervigilance, while further disrupting his sleep cycle and sense of autonomy and adversely affecting his cognition.

108.    Mr. Fields' paranoid ideation and impaired judgment, coupled with the rumination and hyperreactivity of his PTSD (and exacerbated by his conditions of confinement), fueled his decision to waive counsel which was the direct product of his co-morbid psychiatric illness compounding and creating poor decision-making.  Mr. Fields was not, in my opinion, competent to waive counsel and/or represent himself.

109.    Mr. Fields lacked a cogent strategy to defend himself when he waived counsel.  His thinking – based upon paranoia, hyperreactivity, and impaired judgment – was not designed to provide him an attorney.  He was bound to a stun belt under his clothes, activating the anticipatory anxiety of his PTSD.  Traumatic stressors have been well documented in the clinical literature as triggers for manic and mixed phases of Bipolar Disorder.  Mr. Fields was constantly on guard, lest a movement, intonation, or remark end up in him being shocked.

110.    The symptoms of Mr. Fields' mental disease or defect, including paranoid ideation, grandiosity, agitated depression, impaired judgment, irritability, hyperreactivity, withdrawal, and a numbing of affect and emotion, rendered him unable to carry out the basic tasks necessary to present his own defense without the assistance of counsel.  Due to his mental illness, he would not have been able to adequately deal with the complexities of a capital trial such as reviewing discovery and accurately assessing the evidence against him, processing a large amount of complex factual details, accurately assessing the credibility of witnesses, understanding what points, facts or arguments are important to highlight, speaking so that essential points are actually communicated and not lost among other details, and developing and presenting a cohesive defense case.  He certainly could not sustain these complex tasks over a period several consecutive days, let a lone weeks.

111.    Mr. Fields was suffering from both acute and chronic symptoms of his Post-Traumatic Stress Disorder and Bipolar Disorder, was paranoid of his attorneys, and, therefore, wanted them gone.  His desire to have them gone was not just paranoia.  It was also a manifestation of his trauma-driven anxiety, his poor affective modulation, and perseveration; all signs of PTSD.  These symptoms, coupled with his manic grandiosity, paranoia, and poor decision making rendered him, in my professional opinion, incompetent to represent himself at his capital trial.

112.    I hold the foregoing opinions to a reasonable degree of medical certainty, and if called as a witness, I would and could testify truthfully to the information set forth above.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and was executed on April 11, 2010.

-25-



_____
George W. Woods, Jr., M.D.

## APPENDIX A

### INDEX OF REVIEWED DOCUMENTARY EVIDENCE

1. Sherman Fields' medical records from FMC Ft. Worth and UTMB Medical Archives
2. Sherman Fields' Mental Health records from Waco MHMR
3. Sherman Fields' education records from Waco ISD
4. Sherman and Alice Fields' SSI Info
5. Acie Bouye Burglary of Habitation, Cause No. 2003-503-C
6. Jeffery Fields Aggravated Robbery, Cause No. 94-295-C
7. Melvin Swinnie Attempted Murder of Alice Swinnie (Fields), Cause No. 93-494-C
8. Alice Swinnie's medical and mental health records
9. Shaffer Allen Fields' education records
10. Paternity test results for Shaffer Fields
11. Certificate of Immunizations for Sherman Fields
12. Alice Swinnie's certificate of completion for Head Start child development course
13. Alice Swinnie's discharged from probation papers for Cause No's 86-799-C & 86-800-C
14. Certificate of Immunizations for Shaffer, Jeffrey, and Jimmy Fields
15. SSI Payment increase for George William Anthony
16. William Bradford's account statement with the V.A. Hospital
17. Letter from McLennan Community College to Alice Swinnie
18. Chenika Fields' juvenile court documents
19. Shaffer Fields social security card and TDCJ identification card
20. Paternity testing by William Bradford for Jimmy, Jeffrey, and Shaffer Fields
21. Nursing Home Week Certificate for Alice Swinnie
22. Certificate of Promotion for Sherman Fields in passing the 6th grade at Carver Middle School
23. Paternity results for Jeffrey Fields
24. Alice Swinnie's certificate of proficiency as a nursing assistant
25. Immunization certificate for Charles Fields
26. Alice Swinnie's GED certificate
27. Award certificate for Jeffrey Fields from Mrs. Busby, for learning spatial words
28. Alice Swinnie's certification of completion for Toddlers in Child Care
29. Shaffer Allen Fields GED documents while incarcerated in TDCJ
30. Shaffer Fields medical records
31. Acie Bouye charge for Criminal Trespass, Cause No. MR2C0503507
32. Jimmy Lewis Fields education records
33. Charles William Fields education records
34. Shirley Mae Fields mental health records
35. Sherman Fields' TDCJ public information display
36. Jimmy Fields' TDCJ public information display
37. Charles Fields' TDCJ public information display
38. Lucille Leaks Disability Records
39. Shirley Fields Family Practice Center
40. Shirley Fields Mental Health DePaul Center
41. Akieriiah Hamilton Family Health Center
42. Charles Fields Lindsey State Jail

43. Hattie Love Family Health Center
44. Shirley Fields TX Dept of Human Services Community Care
45. Annie Leaks Family Practice Center
46. Charles Fields TDCJ Classification
47. April Fields TX Dept. Family and Protective Services
48. Lucille Leaks Disability Claim
49. Shaffer Fields TDCJ Medical Records
50. Jimmy Fields Texas Youth Commission
51. Shaffer Fields Texas Youth Commission
52. Jimmy Fields TDCJ Medical Archives
53. Acie Bouye Misdemeanors 2005-8
54. Jimmy Fields TDCJ OIG Open Records
55. Shaffer Fields Allen Hospital Records Iowa
56. Charles Fields Providence Health Center Records
57. Jessie Mae Fields Waco PD Reports
58. Dorothy Randle Waco PD Reports
59. Patricia Robinson Waco PD Reports
60. Alice Swinnie Waco PD Reports
61. Shelby Mitchell and Family 1910 US Census
62. Shelby Mitchell and Family 1920 US Census
63. Leana and Julia Mongomery 1910 US Census
64. Lee Mongomery 1910 US Census
65. Leana Fields State Lunatic Asylum 1920 US Census
66. Acie Bouye Letter to Judge Ragland and MHMR page 2007
67. Shirley Fields Austin State Hospital Records
68. Cory Tyrone Robinson Possession of Controlled Substance Revoke Probation #97-115-C
69. Curtis Dwayne Fields Aggravated Sexual Assault [Enhanced] #2006-1460-C[2]
70. Curtis Dwayne Fields Failure to Comply Sex Offender #2003-194-C
71. Otis Leaks HOT MHMR Records
72. Acie Bouye DWI Revoke Probation #20060005 CR1
73. Alice Swinnie Hillcrest Baptist Medical Center Records
74. Jimmy Fields Hillcrest Baptist Medical Center Records
75. Charles Fields Hillcrest Baptist Medical Center Records
76. Otis Leaks DePaul Psychiatric Center
77. Jerry Leaks Central Counties MHMR Records
78. Shirley Fields Providence Hospital Records
79. Jerry Leaks DePaul Psychiatric Center Records
80. Tameika Swinnie TDCJ Classification Records
81. Tameika Swinnie TDCJ Medical and Mental Health Records
82. Jeffrey Fields HOT MHMR Records
83. Kiesha Fields Waco ISD Records
84. Clippings from newspapers related to Lincoln Park
85. Geological Baylor Study of No Man's Land
86. Leo Berndt History of No Man's Land Thesis
87. Lib Davis Study of No Man's Land - selected pages
88. Newspaper Clippings in Baylor study of No Man's Land

89. North Waco Poverty Article in Tribune 1984
90. Texas Monthly Article on No Man's Land
91. Sherman Fields juvenile records
92. Sherman Fields' records from the Texas Youth Commission, including mental health documents
93. Sherman Field's disciplinary reports & grievances from various institutional facilities
94. Declaration of Charles Fields
95. Declaration of  Jimmy Fields
96. Declaration of Alice Swinnie
97. Declaration of Shaffer Fields
98. Declaration of Tameika (Swinnie) Randall
99. Declaration of Vincent Green
100.       Declaration of Annie Lucille Leaks
101.       Declaration of Alton Robinson
102.       Declaration of Dorothy Randle
103.       Declaration of Vera LeBlanc

**CURRICULUM VITA**
**George W. Woods, Jr., M.D.**

EDUCATION

1981-1982:    American Psychiatric Association/National Institute of Mental Health Fellowship
Pacific Medical Center
San Francisco, California (Jeanne Spurlock, M.D., Chair)

1981:    Residency- Psychiatric - Pacific Medical Center
San Francisco, California (Allen Enelow, M.D., Chair)

1977-1978:    Internship—Medical/Surgical, Highland Hospital
Oakland, California

1977:    MD, University of Utah
Salt Lake City, Utah

1969:    BA, Westminster College
Salt Lake City, Utah

LICENSES & CERTIFICATIONS

2009:    Secretary General, International Academy of Law and Mental Health

2008:    Certified Mediation Specialist, California State University, Sacramento, California

2004-2005:    Interim License, Zanzibar Revolutionary Government

2004:    Fellow: American Psychiatric Association

1992:    Certified by the American Board of Psychiatry and Neurology

1979:    Licensed Physician in California

CLINICAL EXPERIENCE & CONSULTATION

2010:    Task Force on Mental Retardation and the Death Penalty, American Association for Individuals with Intellectual Disabilities.

1

2006-2009: Projects Among African Americans Explore Risks for Schizophrenia (PAARTNERS), Consensus Diagnosis Group, Minority Mental Health Research Group, Department of Psychiatry and Behavioral Sciences, Morehouse School of Medicine, Atlanta, Georgia

1996-present: Individual Private Practice, Oakland, California

2006: National Consortium on Disaster Response for the Poor and Underserved, Developmental Task Force for the Minority Mental Health Professions Foundation, Atlanta, Georgia

2006: Georgia Congressional Representative Cynthia McKinney's Post-Katrina Working Task Force

1998-2004: Consultant-the Board of Directors, Crestwood Behavioral Health Systems, Stockton, California

1996: Individual Private Practice, San Francisco, California

1994-1996: Senior Consulting Addictionologist, New Beginnings Programs, San Ramon and Pinole, California

1988-1996: Individual Private Practice, Pinole, California

1994-1995: Chemical Dependency Consultant, Physicians' Advisory Committee, Alameda Contra Costa Medical Association

1990-1995: Consultant, Insomnia Division of the Sleep Disorders Center, Doctors Hospital, Pinole, California

1992-1994: Qualified Medical Examiner, Industrial Medical Council, State of California

1990-1994: Medical Director, Pain Management Program, Doctors Hospital, Pinole, California

1991-1993: Psychiatric/Pharmacologic Consultant, Triumph Over Pain (TOP Program), Kentfield Rehabilitation Hospital, Kentfield, California

1991-1993: Psychiatric Consultation, NeuroCare Corporation, Concord, California

1989-1994: Clinical Director, New Beginnings Chemical Dependency Program, Doctors Hospital, Pinole, California

1988-1993: Private Practice, Comprehensive Psychiatric Services, Walnut Creek

1983-1990:    Staff Psychiatrist, Crestwood Manor, Vallejo, California

1982-1983:    Medical Director, Westside Geriatric Services of Family Service Agency of San Francisco

1982-1983:    Staff Psychiatrist, Villa Fairmount Psychiatric Facility, San Leandro, California

1981-1982:    Assistant Director of the Inpatient Center, Director of Geriatric Services, Pacific Medical Center, San Francisco, California

1980-1981:    Medical Director, Clinica De La Raza, Blythe, California

1979-1981:    Emergency Room Physician, Medical Emergency Services, Fairmount Hospital, San Leandro, California

### INTERNATIONAL CLINICAL EXPERIENCE & CONSULTATIONS

2006-2008:    Adjunct Professor, Makerere University, Department of Psychiatry, Kampala, Uganda

2006-present:  Human Rights Committee, International Academy of Law and Mental Health, Montreal, Quebec, Canada

2006:    Visiting Staff Psychiatrist, Butabika National Hospital, Kampala, Uganda

2004:    Clinical Consultant, Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania

2004:    Scientific Committee, International Academy of Law and Mental Health

1998-2004:    Technical Advisor, Documentation Committee, Operation Recovery, Kenya Medical Association

1999-2003:    Advisor - the Jomo Kenyatta National Hospital, PTSD Project, Nairobi, Kenya

1998-2003:    Technical Advisor- Recovery Services, Ministry of Health, United Republic of Tanzania

### ADVISORY BOARDS

2006-present:  Executive Committee, International Academy of Law and Mental Health

2004-2007:    Advisory Board, Health Law Institute, DePaul University, College of Law

2004-present:  Advisory Board, Human Dignity and Humiliation Studies, University of Trondheim, Norway

2004-present:  Board of Directors, The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento

2003-present:  International Board of Directors, International Academy of Law and Mental Health

## FACULTY AND PROFFESIONAL APPOINTMENTS

2008:  Secretary, American Psychiatric Association's Africa Action Committee

2003-present:  Adjunct Professor, California State University, Sacramento, Department of Educational Leadership and Public Policy, Sacramento, California

2002-present:  Adjunct Professor, Morehouse College School of Medicine, Atlanta, Georgia

1999-2004:  Affiliate Professor, University of Washington, Bothell Campus, Interdisciplinary Arts and Sciences

1986-2002:  Adjunct Professor, University of Nebraska, Omaha, College of Public Affairs

1996-2000:  Adjunct Professor, University of California, Davis, Department of Psychiatry, Forensic Fellowship

1992:  Summer Faculty, North Central Educational Research Laboratory, Northeastern University

## CLINICAL LECTURES

2009:  Sleep Disorders in Psychiatric Practice: Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia

2008:  Moderator: The Impact of Mental Health Issues on Aging, Particularly as it Relates to Alzheimer, Dementia, and Parkinson Disease, National Medical Association, Atlanta, Georgia

2008:  Aging and Mental Health: What is Wellness and What is Pathology? National Medical Association, Atlanta, Georgia

2007:    The Price of Leadership and the Cost of Success: Urban Leadership Program, Graduate School of Educational Leadership and Public Policy, California State University, Sacramento

2007:    Cognitive Assessment and Curriculum, Department of Educational Policy, Urban Leadership Program, Graduate School of Educational Leadership, California State University, Sacramento

2007:    Complex disorders of trauma and torture: The neurological bases examined through sleep disorders, Padua, Italy

2006:    Clinical Aspects of Forensic Evaluation, Makerere University, Department of Psychiatry, Kampala, Uganda

2006:    Memory, Medications, and Aging, Crockett, California Women's Club

2006:    Cultural Differences: Ethics or Efficacy, Mental Health, Ethics and Social Policy, University of Montreal, Quebec, Canada

2006:    An Update on Memory Function, Grand Rounds, Morehouse School of Medicine, Atlanta, Georgia

2006:    Moderator & Respondent (Representing Morehouse School of Medicine) Consortium for the Poor and Underserved- Cultural Factors, DePaul University School of Law and Health, Health Law Institute

2005:    Constitutional Theory and Medical Rights, Montreal, Quebec, Canada

2005:    Medical Diseases with Psychiatric Manifestations: Morrison and Foerster, LLP

2004:    Diagnosis and Treatment of Malaria-Induced Altered Mental States: Kidongo Chekundo Mental Hospital, Zanzibar, Tanzania

2003:    Law, Mental Health, and Popular Culture: University of San Francisco College of Law

2003:    Accommodating Mental Illness in the Workplace: The 28th International Conference, International Academy of Law and Mental Illness, Sydney, Australia

2002:    Cultural and Psycho-biological Factors In the Assessment and Treatment of Trauma: Don't Believe Everything You Think: Traumatology 1003, The Trauma Recovery Institute, Morgantown, West Virginia

2002:    Trauma, Recovery and Resiliency: University of Washington, Bothell, 2002

2001:    Understanding the Relationship Between Neuroimaging, Neuropsychology, and Behavior: National Medical Association 2001 Annual Convention and Scientific Assembly, Nashville, Tennessee, 2001

2001:    The Thrill is Gone: Keynote Address, African American History Month, Loras College, Dubuque, Iowa

2001:    Disparate Access- Healthcare: University of Washington, Bothell Campus Nursing Program

2000:    Anger Management: West Contra Costa Stroke and Aphasia Support Group, Doctors Hospital, San Pablo, California, 2000

2000:    Race, Culture and Bioethics: American Society for Bioethics Annual Conference, Panel Discussion, Salt Lake City, Utah

2000:    Globalization and Postmodernism: International Congress on Law and Mental Health, Siena, Italy

2000:    Globalization and Neuropsychiatry: Answers that Transcend Culture? International Congress on Law and Mental Health, Sienna, Italy

1998:    Managed Care in the Kenyan Medical Environment: Kenyan Medical Environment: Kenyan Medical Association, Aga Khan Hospital, Nairobi, Kenya

1994:    The Relationship Between Holidays and Mood Disorders: Doctors Hospital Pinole, California

1994:    The Role of the Mental Health Expert as a Liaison Between Chemical Dependency and Pain Management Programs: American Academy of Pain Management, Vancouver, Canada

1994:    Chemical Dependency: Selected Topics: Critical Care Conference, Doctors Hospital, Pinole California

1993:    Detox: The First Step to Recovery: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993:    Substance Use and Substance Induced Organic Mental Disorders: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993:    Dual Diagnosis in the Inpatient Setting- Professional Seminar, Doctors Hospital, Pinole, California

1993:    Depression and Strokes: Brookside Hospital, San Pablo, California

1992:          Drug Interactions in the ICU: Clinical Care Rounds, Doctors Hospital, Pinole, California

1992:          Overview of Sleep Disorders: Grand Rounds, Doctor  Hospital, Pinole, California

1991:          Benzodiazepines: Uses and Abuses: Grand Rounds, Brookside Hospital, San Pablo, California

1990:          Sleep Disorders in Schizophrenia: Quarterly Medical Staff Meeting, East Bay Hospital

1987:          Afro-Centricity in Psychology: Grand Rounds, San Francisco General Hospital, San Francisco, California

1982:          Geriatric Psychiatry-University of Southern California, 1982

## PROFESSIONAL AFFILIATIONS

Northern California Psychiatric Society

American Society of Addition Medicine

American Psychiatric Association

Black Psychiatrists of America

American Neuropsychiatric Association

American Psychological Association

American  Association for Intellectual and Developmental Disabilities

## CLINICAL PROFESSIONAL ACTIVITIES

2007-2009:    Neurocognitive Committee, PAARTNERS

2004-present:  Scientific Committee, International Academy of Law and Mental Health

1993-1996:    Medical Privileges Committee, Doctors Hospital, Pinole, California

1991-1996:    Physicians' Advisory Committee, Doctors Hospital, Pinole, California (Chair, 1994- 1995)

7

1993-1995:    Physicians' Advisory Committee, Alameda Contra Costa Medical Association, Oakland, California

1993-1994:    Board of Directors, Solano Park Hospital, Fairfield, California

1992-1993:    Board of Directors, East Bay Hospital, Richmond, California

1992:    Chief of Staff, East Bay Hospital, Richmond, California

1992:    Chairman, Medical Executive Committee, East Bay Hospital, Richmond, California

1992:    Allied Health Committee, Doctors Hospital, Pinole, California

1992:    Pharmacy & Therapeutics Committee, Doctors Hospital, Pinole, California

1991:    Professional Activities Committee, Easy Bay Hospital, Richmond, California

1990:    Psychiatry Committee, Chairman, East Bay Hospital, Richmond, California

## HONORS

2009:    Secretary General, International Academy of Law and Mental Health

2009:    Co-Chair, International Academy of Law and Mental Health Congress, New York University Law School,

2007:    Co-Chair, International Academy of Law and Mental Health Congress, University of Padua, Padua, Italy.

2007:    Executive Committee, International Academy of Law and Mental Health

1993:    Outstanding Professor Award, Goodrich Program, Department of Public Policy, University of Nebraska at Omaha

1992:    National Medical Enterprises' Outstanding Medical Director of Psychiatric, Rehabilitation and Recovery Hospitals

1992:    Chief of Staff Award for Outstanding Service, East Bay Hospital, Richmond, California

## CLINICAL PUBLICATIONS

Bradford, Fresh, Woods: Not all patients are alike:  Ethnopsychopharmacology of Bipolar Disorder in African Americans. Psychiatric Times, February, 2007.

8

Abueg, Woods, Watson: Disaster Trauma; <u>Cognitive-Behavioral Strategies in Crisis Intervention</u>: Second Edition, Guilford Press, New York and London; p. 73-290, 2000.

## FORENSIC PRACTICE

1981-present:  Psychiatric Consultant (Civil, Criminal and Appellate Judicial Proceedings)

1993-2001:    Consultant- the Victims' Assistance Program, State Board of Control, State of California, Sacramento, California

1983-2000:    Medical Examiner Panel, San Francisco County, Marin County and Contra Costa County Superior Courts

## FORENSIC PROFESSIONAL LECTURES

2009:    Treatment of Mentally Ill Offenders in the United States, Canada, and Japan; Japanese Association of  Forensic Psychiatry, Tokyo, Japan

1998-2007:    In Association With The National Institute of Trial Advocacy Training, Notre Dame University, South Bend, Indiana; Georgia State Law School, Atlanta, Georgia; New York University Law School, New York City, University of North Carolina Law School, Chapel Hill, North Carolina; University of Houston Law School, Houston, Texas; University of Tennessee Law School, Knoxville, Tennessee; Atlanta, Georgia; University of Texas Law School, Austin, Texas; Temple University School of Law, Philadelphia, Pennsylvania

2006:    Aligning Clinical Services with Correctional Treatment, Luzira Prison, Kampala, Uganda

2006:    Decision Tree for Forensic Evaluations, Butabika Hospital, Kampala, Uganda

2006:    Neuropsychiatry and The Courts: The University of Texas Law School, Austin Texas

2002:    Demystifying Emotional Damages Claims: Paul, Hastings, Janofsky & Walker, San Francisco, California

2000:    An Introduction-Multi-Axial Assessment and <u>DSM-IV</u>: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

2000:    Psychiatric Manifestations of Mental Disorders: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

1999:    An Introduction-Multi-Axial Assessment and <u>DSM-IV</u>: First National Seminar on Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999:    Psychiatric Manifestations of Medical Disorders: First National Seminar of Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999:    The Kenya/Tanzania Embassy Bombings: When Forensic Science, Politics, and Cultures Collide: International Academy on Law and Mental Health, Toronto, Quebec, Canada

1999:    Research Collaboration Between East Africa and the United States: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1999:    Trauma/Resiliency In East Africa Workshop: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1998:    Mental Health Litigation and the Workplace: Sponsored by the University of California Davis Health System, Division of Forensic Psychiatry, Department of Psychiatry, and Continuing Medical Education, Napa, California

1998:    Psychological Disabilities: Charting A Course Under the ADA and Other Statutes: Yosemite Labor and Employment Conference, Yosemite, California

1998:    Current Trends in Psychiatry and the Law: Developing a Forensic Neuro-Psychiatric Team: CLE, Federal Public Defenders for the District of Oregon, Portland, Oregon

1997:    The Changing Picture of Habeas Litigation: The National Habeas Training Conference, New Orleans, Louisiana

1997:    Accommodating Mental Illness in the Workplace: Employment Law Briefing, Orange County

1997:    Accommodating Mental Illness in the Workplace: Employment Law Briefing, Palo Alto, California

1997:    Accommodating Mental Illness in the Workplace: Employment Law Briefing, Morrison & Foerster, San Francisco

1997:    Psychiatric Evaluations in the Appellate Process: Emory University, Department of Psychiatry, Forensic Fellowship, Atlanta, Georgia

1997:      So You Wait Until Discovery Is Over to Consult with a Psychiatrist?  Can You Tell Me More About That? Morrison and Foerster Labor Law College, Los Angeles, California

1997:      The Changing Cultural Perspectives in Forensic Psychiatry, San Francisco General Hospital Grand Rounds, San Francisco, California

1996:      Evaluations of an Elementary School Child: Criminal Competency and Criminal Responsibility, Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, Division of Child, Psychiatry and Child Development, Grand Rounds, Palo Alto, California

1996:      Forensic Psychiatry: Cultural Factors in Criminal Behavior, Malingering, and Expert Testimony: The Black Psychiatrists of America Transcultural Conference, Dakar, Senegal, West Africa

1996:      Dangerousness; Evaluation of Risk Assessment: Grand Rounds, Department of Psychiatry, University of California, Davis

1995:      Violence in the Workplace: A Psychiatric Perspective of Its Causes and Remedies: The Combined Claims Conference of Northern California, Sacramento, California

1995:      Experts: New Ways To Assess Competency- Neurology and Psychopharmacology: Santa Clara University Death Penalty College, Santa Clara, California

1995:      Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation:  The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995:      Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995:      The Use of Psychologists In Judicial Proceedings: The California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Monterey, California

1994:      Commonly Seen Mental Disorders in Death Row Populations: The California Appellate Project, Training Session for Legal Fellows and Thurgood Marshall Investigative Interns, San Francisco, California

1994:      Anatomy of a Trial: Mock Trial Participant, The California State Bar Annual Convention, Anaheim, California

1994:        Developing a Forensic Neuropsychiatric Team: The American College of Forensic Psychiatry 12th Annual Symposium in Forensic Psychiatry, Montreal, Quebec, Canada

1994:        Responsibility in Forensic Psychiatry: Department of Criminology Faculty Seminar, University of Nebraska, Omaha

1994:        Attorney/Investigator Workshop: Brain Function: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Long Beach, California

1994:        Appellate and Habeas Attorney/Investigator Workshop: Evaluating Mental Health Issues in Post-Conviction Litigation: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar, Long Beach, California

1993:        Psychological Issues in Police Misconduct: Police Misconduct Litigation, National Lawyers Guild, San Francisco

1993:        Neuropsychiatry, Neuropsychology and Criminal Law: Maricopa County Office of the Public Defender, Seminar on Investigation for Mitigation and Capital Cases, Phoenix, Arizona

1993:        Working With Experts: California Appellate Project, San Francisco, California

1991:        Forensic Psychiatry and Ethnicity-Black District Attorneys Association, National Convention

## PROFESSIONAL FORENSIC PUBLICATIONS

Psychiatry and Criminal Law, <u>Contra Costa Lawyer</u>, Volume II, No. 8, August 1998.

Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The Psychiatrist's Opinion as Scientific, The Expert's Foundation As Sufficient, 1995 (Available from The American College of Forensic Psychiatry and on Audiotape).

Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation, 1995.  (Available from the American College of Forensic Psychiatry and on Audiotape).

Developing a Forensic Neuropsychiatric Team,1994. (Available from the American College of Forensic Psychiatry on Audiotape).

Anatomy of a Trial: 1994 (Available for the California State Bar).

PROFESSIONAL AFFILIATIONS

- International Academy of Law and Mental Health

PROFESSIONAL DEVELOPMENT & CORPORATE SERVICES

2009:       AgeServe  Communications, LLC: Director of Research/Director of Government Programs

2004:       Consultant, Corporate Structure, Tostan, Non Governmental Organization, Theis, Senegal

2004:       Toward Effective Retention Efforts: The use of narratives in understanding the experiences of racially diverse college students., Narrative Matters, Fredericton, New Brunswick, Canada

2003:       In Association with the Council on Education in Management, Charlotte, North Carolina, Accommodating Psychiatric Disabilities: Avoiding the Legal Pitfalls of the ADA, Human Resources Conference, Palm Springs, California

2001-2003:  Consultant, Vulcan Inc., Seattle, Washington

1999:       In Association with Matthew Bender Legal Publishing, New York: Psychiatric Disabilities and California Workplace Requirement, With the Bar Association of San Francisco, San Francisco

1998:       Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Atlanta, Georgia

1998:       Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Los Angeles, California

THE CRITICAL MOMENTS CONSULTING GROUP

2001:       Part I- Responding Creatively to Cultural Diversity through Case Stories and Part II- Strategies and Challenges for Campus-wide Diversity Project: Models of Integrating Critical Moments, Fourteenth, Annual Conference on Race and Ethnicity in American Higher Education, Seattle Washington

2001:       Teaching Complex Case Stories, Faculty Development, Loras College, Dubuque, Iowa

13

2000:        Critical Moments:  Creating a Diversity Leadership Learning Community, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000:        Critical Moments: Practicum on Teaching Diversity Through Case Stories, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000:        Improving Undergraduate Education: Teaching and Learning in the Context of Cultural Differences, The Washington Center for Improving the Quality of Undergraduate Education, Thirteenth Annual Conference, Seattle, Washington

1999:        Critical Moments: Deepening Our Understanding of Cultural Diversity through Critical Analysis, Effective Interviewing, Case Writing, and Case Teaching, The Washington Center, Evergreen State College, Olympia, Washington

1999:        Teaching Complex Issues with Case Studies: A Workshop for Faculty and Graduate Teaching Assistants, University of Nebraska at Lincoln, Teaching and Learning Center and Critical Moments Project

1999:        Critical Moments: Writing the Stories of Diverse Students, Washington Center for Improving the Quality of Undergraduate Education Workshop for College and University Faculty, Administrators, Staff and Students, Evergreen State College, Bothell, Washington

1999:        Critical Moments: A Case Study Approach for Easing the Cultural Isolation for Under-represented College Students, Presented at Transforming Campuses Through Learning Communities, National Learning Communities Conference, Seattle, Washington

1993:        Contextualism and Multi-Cultural Psychology-Graduate Seminar, University of Nebraska, Omaha, Nebraska

1992:        Curriculum and Developmental Stages-North Central Educational Research Lab, Northwestern University

## CRITICAL MOMENTS PUBLICATIONS

Diane Gillespie, Ph.D., Gillies Malnarich, and George Woods, M.D. (2006).  Critical Moments: Using College Students' Border Narratives as Sites for Cultural Dialogue, In M.B. Lee (Ed.), Ethnicity Matters:  Rethinking How Black, Hispanic and Indian Students Prepare for and Succeed in College.  (pp. 99-116).  New York: Peter Land Publishing Group.

14

Diane Gillespie, Ph.D. and George Woods, Jr., M.D. (2000).  Critical Moments: Responding Creatively Cultural Diversity Through Case Stories; Third Edition.


Updated  October 12, 2009