# MARK D. CUNNINGHAM, PH.D., ABPP

*Board Certified in Clinical Psychology  -  Board Certified in Forensic Psychology*
*American Board of Professional Psychology*

417 Oak Bend, Suite 260      Lewisville, Texas 75067
972-459-0658   Fax 972-459-0958   mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Idaho #PSY-379, Illinois #071-006010, Indiana #20041376A, Louisiana #794, New Mexico #0768,*
*New York #017111, Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #22351*

### Declaration of Mark D. Cunningham, Ph.D., ABPP

**Re:** *United States v. Sherman Fields*

I, Mark D. Cunningham, Ph.D., ABPP, hereby declare:

1.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in the states of Texas, Arizona, Arkansas, Colorado, Connecticut, Idaho, Illinois, Indiana, Louisiana, New Mexico, New York, Oklahoma, Oregon, South Carolina, and Tennessee. I have provided my current curriculum vitae (Appendix A). I am over age 21. I have personal knowledge of the facts contained in this declaration and am competent to testify about them.

2.      Jeff Ellis, Esq., federal habeas co-counsel for Sherman Fields, has requested that I identify violence risk assessment factors, findings, and conclusions that could have been presented in expert testimony at the capital sentencing trial of Mr. Fields in February 2004.  In addition, he has requested that I outline my opinions regarding the Government-sponsored testimony of Dr. Richard Coons at the penalty phase, including what scientific perspectives could have informed cross-examination and/or expert rebuttal.

3.      Mr. Ellis has requested that I outline special qualifications and experience that I have in providing clinical and forensic psychological evaluations at capital sentencing, as well as in capital post-conviction and federal habeas proceedings.

*Qualifications*

4.      I received a Bachelor's degree in Psychology from Abilene Christian College with high honors in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977.  I completed a one-year internship in Clinical Psychology at the National Naval Medical Center of Bethesda, Maryland.  My doctoral training and clinical psychology internship were accredited by the American Psychological Association. I completed a two-year part-time postdoctoral training program at the Yale University School of Medicine where I was given an award as the outstanding trainee. I served as an active duty clinical psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981, and was decorated for my professional contributions.  I was an assistant

professor of psychology at Hardin-Simmons University in Abilene, Texas from 1981 to 1983. I have maintained a private practice in clinical and forensic psychology with offices in Texas since 1981. My practice is national in scope.

*Special qualifications*

5.      I am board-certified both in clinical psychology and in forensic psychology by the American Board of Professional Psychology (ABPP). Both of these board certifications follow a rigorous series of qualifying barriers culminating in oral examinations. The historic failure rate at the forensic oral examination is 40%. Approximately 280 psychologists in the United States are currently board-certified (ABPP) in forensic psychology and approximately 1200 are board-certified in clinical psychology. I have provided forensic evaluation services in over 450 cases. I have participated in extensive continuing education in the area of forensic psychology.

6.      I have been recognized as a clinical and forensic psychology expert in testifying regarding sentencing determination issues including mitigation and/or violence risk assessment (i.e., "future dangerousness") in both state and federal courts. I first provided a violence risk assessment in a capital case in 1995 and continued to be actively involved in providing these consultations in 2004. To date, I have testified as a clinical and forensic psychology expert regarding sentencing determination issues in approximately 85 state capital cases and approximately 50 federal capital cases. I have testified in substantially more federal capital sentencing proceedings than any other mental health expert in the United States. I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in Arizona, Alabama, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Nevada, Oklahoma, Oregon, Pennsylvania, Puerto Rico, South Carolina, Tennessee, Texas, Virginia, Washington, and West Virginia. I have never failed to qualify as an expert in clinical and/or forensic psychology. I have provided consultations and evaluations regarding capital post-conviction and federal habeas proceedings on many occasions.

7.      I am extensively involved in research and scholarship relevant to capital sentencing issues and death row populations. I have authored or co-authored over 30 scholarly papers during the past nine years, including eight "in press" or published in 2008, four published in 2007, and six published in 2006. These peer-reviewed papers, edited book chapters, and edited case reports address standards and procedures for mental health evaluations at capital sentencing, as well as scholarship and research relevant to violence risk assessment at capital sentencing including literature reviews, empirical studies of prison inmate populations including convicted murderers and convicted capital murderers, and discussion of evidentiary standards and associated scientific support for various violence risk assessment methodologies at capital sentencing. I am first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12-volume *Handbook of Psychology*. My scholarly publications that are

relevant to the violence risk assessment of capital defendants include the following:

Sorensen, J. R., & Cunningham, M. D. (*in press*). Once a killer always a killer? Prison misconduct of former death-sentenced inmates in Arizona. *Journal of Psychiatry and Law*.

Sorensen, J. R. & Cunningham, M. D. (*in press*).  Conviction offense and prison violence: A comparative study of murderers and other offenders. *Crime & Delinquency.*

Kuanliang, A., Sorensen, J. R., & Cunningham, M. D. (2008). Juvenile offenders in an adult prison system: A comparative examination of rates and correlates of misconduct. *Criminal Justice and Behavior, 35*, 1186-1201.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence. *Law and Human Behavior*, *32,* 46-63.

Cunningham, M. D. (2008). Institutional misconduct among capital murderers (pp. 237-253). In M. DeLisi & P. J. Conis (Eds.), *Violent offenders: Theory, research, public policy, and practice.* Boston: Jones & Bartlett Publishers.

Cunningham, M. D. (2007*)* Capital violence risk assessment [case report]. In Mary A. Conroy & D. Murrie, *From risk assessment to risk management: A model for forensic practice*. New York: John Wiley & Sons.

Cunningham, M. D. (2007).  Forensic psychology evaluations at capital sentencing (pp. 211-238). In R. L. Jackson (Ed.), *Learning forensic assessment*. Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Cunningham, M. D. & Sorensen, J. R. (2007). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct. *Law and Human Behavior*, pre-published online 23 March 2007.

Cunningham, M. D. & Sorensen, J. R. (2007). Predictive factors for violent misconduct in close custody. *Prison Journal, 87*, 241-253.

Sorensen, J. R. & Cunningham, M. D. (2007). Operationalizing risk:  The influence of measurement choice on the prevalence and correlates of violence among incarcerated murderers. *Journal of Criminal Justice, 35*, 546-555.

Cunningham, M. D. (2006).  Dangerousness and death: A nexus in search of science and reason. *American Psychologist, 61*, 828-839.

Cunningham, M. (2006). Special issues in capital sentencing. In Conroy, M. A., Lyons, P. M., Jr., & Kwartner, P. P. (Eds.). *Forensic mental health services in Texas* [special issue, electronic version]. *Applied Psychology in Criminal Justice, 2*, 205-236.

Cunningham, M. D. & Sorensen, J. R. (2006).   Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13*, 253-265.

Cunningham, M. D. & Sorensen, J. R. (2006). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior, 33*, 683-705.

Lyon, A. D. & Cunningham, M. D. (2006) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law, 33*, 1-30.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23,* 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12,* 40-49.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15,* 365-376.

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment:  A casebook* (152-171).  New York:  Oxford University Press.

Cunningham, M. D. & Reidy, T .J. (2002).  Violence risk assessment at federal capital sentencing:  Individualization, generalization, relevance, and scientific standards.  *Criminal Justice and Behavior, 29*, 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics,

adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20*, 191-210.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19*, 473-490.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28,* 62-82.

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16,* 333-351.

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences & the Law, 16*, 71-95.

8. My scholarly activities have been favorably recognized by my peers. I am the recipient of the highly prestigious *2006 American Psychological Association Award for Distinguished Contributions to Research in Public Policy*. The American Psychological Association, a professional organization of 160,000 members, confers this award on one psychologist annually who has made distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work. I am the first psychologist working outside of an academic or institutional setting to be honored with this award. I am the recipient of the *2005 Texas Psychological Association Award for Outstanding Contribution to Science*. This is an annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge. My scholarship and professional practice have been recognized by other distinctions as well. In 2006, I was made a *Fellow* of the American Psychological Association, a peer-reviewed distinction reflecting unusual and outstanding contributions to the field of psychology on a national level. I was the recipient of the *2004 National Association of Sentencing Advocates John Augustus Award*. I was decorated with the *Navy Commendation Medal*, an unusual recognition for a junior officer in his first assignment, for my professional contributions while an active duty psychologist with the U.S. Navy.

9.      The American Academy of Forensic Psychology is an association of board certified forensic psychologists (ABPP). Under the auspices and at the request of the Academy I have provided full-day workshops on "The role of the forensic psychologist in death penalty litigation" in Milwaukee, Wisconsin; Austin, Texas; Monterey, California; San Diego, California; Cincinnati, Ohio; and LaJolla, California.  These workshops emphasized research literature, statistics, and conceptualizations relevant to violence risk assessments of capital defendants. I have also provided a full-day workshop for psychologists regarding capital sentencing evaluations under the auspices of the Texas Psychological Association.

10.      I have provided CLE training regarding capital sentencing evaluations of mitigation and violence risk assessment to attorneys and mitigation investigators at regional and national conferences throughout the United States, including Texas.

11.      On motion of defense counsel, I have been given in-depth tours and briefings of Administrative Maximum, Florence, Colorado (i.e., ADX Florence, aka "super-max") on three occasions. I also toured USP Marion when it functioned as a mid-level security facility between other U.S. Penitentiaries and ADX Florence. To explain, U.S. Penitentiaries are high security facilities (as opposed to medium, low, and minimum security facilities in BOP). In 2004, USP Marion functioned at a higher level of security than other U.S. Penitentiaries. I have conducted evaluations of inmates in USP Allenwood and USP Terre Haute, as well as other BOP facilities. I have familiarized myself with Bureau of Prisons program statements, procedures, and extensive statistical data regarding inmate misconduct, including misconduct at USP Marion and ADX Florence.

12.      I was an invited scientific consultant to the Brief of *Amicus Curiae* American Psychological Association in Support of Defendant-Appellant *U.S. v. Sherman Lamont Fields* in the United States Court of Appeals for the Fifth Circuit (2005).

13.      I testified before the Texas State Senate, Criminal Justice Committee, 78th Legislative Session, Austin, 2003; and the 79th Legislative Session, Austin, 2005. This testimony addressed research findings regarding the prison behavior of inmates sentenced to parolable and nonparolable life sentences.

*Importance of specialized qualifications*

14.      Capital sentencing represents a highly specialized arena of forensic mental health practice.  The methodology and correctional data associated with reliable violence risk assessments (i.e., future dangerousness) at capital sentencing represent a highly specialized knowledge base that has not typically been mastered by forensic mental health professionals. Maintaining true expertise with this literature requires extensive, ongoing study of the peer-reviewed literature in this arena, as well as being routinely engaged in these consultations. I am uniquely qualified in this regard, both by being

routinely engaged in providing these assessments and in being the most heavily published mental health expert in the United States regarding risk assessments at capital sentencing. Further, I am well-versed in security interventions that can be brought to bear to reduce the potential for inmate violence. Because risk is always a function of context of confinement, knowledge of security measures is quite important to risk assessments at capital sentencing.

*Records reviewed*

15.     My findings and opinions in this matter are informed by peer-reviewed research and scholarly sources, and data from the federal Bureau of Prisons and other corrections agencies. My findings and opinions are based on review of the following records specific to Mr. Fields:

1.  Sentencing Transcripts
2.  Juvenile Records – 1987-1990
3.  Mitigation Themes
4.  Waco Police Department   11/13/91-9/23/92 & 11/08/01
5.  Arrest Report  4/30/02
6.  Witness Reports 4/30/02
7.  McLennan County Incident/Medical  11/25/01-1/24/04
8.  TDCJ Records  5/29/95 – 12/23/99
9.  Escape Attempt  11/6/01
10. McLennan County Miscellaneous Records  5/3/00
11. US DOJ Investigation 12/06/01
12. Court Documents 4/12/2004

**Findings**

*Capabilities of the federal Bureau of Prisons*

16.     In its opening statement at the penalty phase, the Government summarized its position regarding "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society" as follows:

> In short, the thrust of the government's evidence will be that the defendant cannot be controlled. Even in a highly structured system like a prison the defendant cannot be controlled. He is incapable of being controlled. (page 2065, lines 17-20)

17.     In fact, in February 2004 the Bureau of Prisons (BOP) had significant security and confinement capability in its super-maximum facility, ADX Florence, that largely negates (i.e., renders extraordinarily improbable) Mr. Fields' ability to perpetrate serious violence against anyone or to effect an escape. As described above, my second tour and briefing regarding this facility had been accomplished in January 2004. Testimony regarding the

confinement capability at ADX Florence would have directly contradicted the Government's representation, stated above, that it was impotent to securely manage an offender such as Mr. Fields.

18.    The "mission statement" regarding ADX Florence (P.S. 5100.06; June 7, 1996; Chapter 9, Page 10) is specifically on point regarding the Government's assertion regarding Mr. Fields:

> ADX Florence.  ADX Florence general population units are used for those inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution.

19.    It is acknowledged that Mr. Fields may well have not been assigned to ADX Florence had he been sentenced to life without possibility of release by his capital jury. In the vast majority of cases, capital offenders against whom this nonstatutory aggravating factor has been alleged, if given life sentences by their federal capital juries, are assigned to a U.S. Penitentiary (i.e., high-security facility).  In other words, in most federal capital prosecutions the predictive expectations asserted by the Government at trial are not shared by the corrections professionals in BOP.  An assignment to super-maximum custody for Mr. Fields would only occur if BOP concurred with the assertions of the Government at trial that Mr. Fields was a disproportionate risk of serious violence or escape, who "even in a highly structured system like a prison…cannot be controlled." The essential point here is not whether Mr. Fields would have been designated to ADX Florence, rather that BOP is not incapable, incompetent, or impotent in being able to manage Mr. Fields or inmates with far more malignant histories of prison violence or escape. This is quite contrary to the Government's argument and Dr. Coons' testimony that execution represented the sole mechanism to prevent Mr. Fields from perpetrating serious violence on staff or other inmates, or effecting an escape.

20.    An assertion of correctional incapability or incompetence is fundamental to alleging of this nonstatutory aggravating factor in a capital case where the alternative to execution is a prison sentence of life without possibility of release. This is what differentiates violence risk assessment at capital sentencing from risk evaluations for civil commitment of mentally ill persons, or the application of risk considerations in criminal sentencing, parole determinations, and as justification for the continuing confinement of "sexually violent predators." In all of these other applications of risk assessment, the risk is asserted to be if the person is in the open community and is assumed to be *competently contained* if the individual is in an institutional or prison setting. Only at capital sentencing is the risk asserted to continue unabated even in confinement, that this offender is "incapable of being controlled."

21.    Because an assertion of correctional incapability is fundamental to the nonstatutory aggravating factor, and because this assertion is inconsistent with

---

Cunningham re: *U.S. v Sherman Fields*                                      Page 8

longstanding BOP capability, up to February 2004, I had provided expert testimony regarding BOP confinement options and associated security procedures, including ADX Florence (i.e. "Super-max") - with utilization of photographs, schematics, and drawings of ADX - in federal capital cases including:

**U.S. v Dean Beckford** (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division

**U.S. v Darryl Johnson** (1997), Cause No. 96 CR 379-1 in the U.S. District Court, Northern District of Illinois, Eastern Division.

**U.S. v Anthony Ayeni Jones** (1998), Cause No. CR-WMN-96-0458 in the U.S. District Court for the District of Maryland.

**U.S. v Marvin Holley** (1998), Cause No. CR96-B-0208-NE in the U.S. District Court for the Northern District of Alabama.

**U.S. v Saheem Johnson and Raheem Johnson** (1998), Criminal No. 97-00241-A in the U.S. District Court for the Eastern District of Virginia, Alexandria Division.

**U.S. v Khalfan Khamis Mohamed,** (2001), Criminal No. 98-CR-1023:008 in the U.S. District Court of New York.

**U.S. v Keith Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in the U.S. District Court, Western District of Missouri, Western Division.

**U.S. v Julius Omar Robinson** (2002), Cause No. 4:00-CR-260-Y in the U. S. District Court for the Northern District of Texas, Fort Worth Division.

**U.S. v Carl Haskell** (2002), Cause No. 00-395-01-CR-W-2 in the U.S. District Court, Western District of Missouri, Western Division.

**U.S. v John Bass** (2003), 97-CR-80235 in the U.S. District Court for the Eastern District of Michigan.

**U.S. v Wesley Purkey** (2003), Cause No. 01-308-01-CR-W-1, in the U.S. District Court, Western District of Missouri, Western Division, Missouri.

**U.S. v Gary Sampson** (2003), Cause No. 01-010384-MLW, in the U.S. District Court, District of Massachusetts, Boston, Massachusetts.

**U.S. v Emile Dixon** (2003), Cause No. 01 CR389 (S-2) (RJD), in the Eastern District of New York, New York.

Cunningham re: *U.S. v Sherman Fields* Page 9

22.     Digital demonstrative exhibits (PowerPoint slides) that I was utilizing in my testimony in federal capital cases in 2004 to illustrate the security capabilities that were available at ADX Florence at that time and the effectiveness of these capabilities are attached (Appendix B).

22.     Administrative Maximum or ADX is a super-maximum BOP facility located at Florence, Colorado, about 80 miles southwest of Colorado Springs in the remote foothills of the eastern slope of the Rocky Mountains. It is located on a larger campus of other prison units, but has its own ultra-secure perimeter.  It opened in late 1994 and provides extremely high security capabilities and procedures for inmates who are identified as unable to function in a less restrictive environment without being a threat to others or the orderly operation of the institution. Exhibit B1 is a photograph of ADX Florence from an adjacent hill.

23.     Appendix B2 reflects that the rated capacity of ADX is 490 inmates. The historic census 1995-2004 was approximately 390. The ADX contains nine housing units. The primary "reason for referral" of inmates at ADX in mid-1998 reflects that over half had perpetrated serious violence against inmates or staff. Approximately 9.2% had been referred for escape behavior. These statistics remained broadly consistent in 2006. It should be noted that while these statistics reflect the *primary* reason for referral, the percentage of inmates at ADX who had *histories* of such misconduct in federal prison, however, is far higher.  Thus, by 2006 32.2% of inmates at ADX had committed a murder in prison, 74.1% had committed an assault in prison, and 40% had been involved in an escape.  These data are relevant in demonstrating that ADX was securely confining inmates with prison assault and escape histories. Importantly, 4.1% of inmates at ADX in mid-1998 had been direct commitments from court. By 2006, these direct commitments constituted 6.3% of the ADX inmate population. This is important as it reflects the potential for an offender to be referred to ADX *prior* to perpetrating serious violence in BOP. ADX is designed to control the worst inmates in BOP.

24.     Appendix B3 depicts the large, reinforced gun-towers on the perimeter of ADX. The facility is surrounded by a double fence with stacked coils of razor wire between them. ADX is designed to not only defeat any attempt to escape from the inside, but also defeat any attempt to break into the facility by terrorists or organized criminal organizations. There has never been an escape from ADX.

25.     Appendix B4 depicts the control bubble or picket of a housing unit. The control bubble is at the hub, mid-way between two-story tiers that radiate out from it. The control bubble electrically operates the corridor and cell doors.

26.     Appendix B5 is a schematic of the standard housing unit at ADX. The cells are on one side of the hall, so that inmates are unable to stand at their cell fronts and signal to each other, or to "kite" notes or contraband between cells. There are interior recreation or

programming rooms across from the cells. The cells have windows facing the outdoor recreation area. This outdoor recreation area is closed off with a two-story wall. Thus the inmates never have any view of the exterior perimeter of the facility or the patrol routine.

27.     Appendix B6 is a photograph looking down one of the tiers or corridors. Notice that it is isolated by a "grill" or wall of bars with a remotely-operated sliding door of bars. This is illustrative of the redundant barriers separating the inmate from the free world.

28.     Appendix B7 is a drawing of a typical cell at ADX, including those on the general population units. The standard cell has a vestibule: an outer sliding steel door opens into a vestibule with a grill separating the inmate from access to the outer door. The grill has a sliding door of bars. The cell is constructed from a single pour of rebar-reinforced concrete. Thus the bed, concrete stool, shelf, and desk are poured into the wall and/or floor of the cell. This is designed to defeat attempts to remove them and provides no crevices for the secreting of weapons or other contraband. The cell also includes a stainless steel shower at the rear of the cell, and a one-piece stainless steel toilet, sink, and "bubbler." There is no toilet seat, preventing such a convenience from being ripped off and used as a weapon. Similarly, there is no axle for the toilet paper, rather a cylindrical receptacle in the side of the toilet ensemble.  Inmates on the general population units in 2004 were single-celled approximately 23 hours daily, shackled behind their back before the grill door was opened, double-escorted in the presence of staff, and exercised alone or in small groups.  Mail was x-rayed, opened, and read. There was no contact visitation.

29.     Appendix B8 is a cutaway schematic of a typical vestibule cell at ADX. The drawing does not depict the second story corridor. The schematic is informative in reflecting the narrow confines of the cells. The cell photographs that follow were taken with a wide-angle lens that makes the cells appear wider than they actually are.

30.     Appendix B9 is a photograph taken at the cell front and looking toward the back of a typical vestibule cell.

31.     Appendix B10 is a photograph taken from the back of the cell looking toward the cell front. Notice that there is a cutaway in the grill-door. This allows the corrections officer to maintain a hold on the inmate's shackles while the cell door is being opened or closed. This prevents the inmate from being able to spin around on the officer during this transfer.

32.     Appendix B11 is a photograph of an inmate being double-escorted at ADX. One officer is holding onto the shackles (i.e., handcuffs) while the other carries a steel-tipped wooden baton. This baton may be utilized as a blocking instrument or a thrusting instrument (e.g., against an inmate's hands at the cell front, or into the ribs if combative during escort).

33.     Appendix B12 is a photograph of a visitation booth at ADX from the inmate's side. The inmate is separated from the visitor with a thick glass panel that has a very high hammer rating (i.e., resistance to being chipped or penetrated). The visitation occurs over telephone headsets.

34.     Appendix B13 is a photograph of a typical exterior recreation area attached to each housing unit at ADX. The top of the recreation yard is secured with steel girders and metal mesh. This is to defeat any effort to climb out of the recreation area or a helicopter extraction by external resources.

35.     Appendix B14 is a chart reflecting assaults (disaggregated by type/severity), homicides, and escapes at ADX for each year 1996 to 2002. Though assaults do occur, they are infrequent – particularly in light of the prison misconduct histories of the inmates at ADX. Weapons assaults are particularly infrequent.  Through 2004, there had been no homicides at ADX and no escapes.

36.     Appendix B15 describes the "step-down" program at ADX, and how confinement is modified at each stage from the General Population Units to the Pre-Transfer unit. To explain, ADX is not intended to be a permanent placement for many of the inmates who are sent there. Rather, it is hoped that the rehabilitation programming and deterrent experience of ADX will result in their eventually being able to leave ADX for a high-security prison. The minimum stay is three years, assuming the inmate completely cooperates with rehabilitation programming, has no disciplinary infractions whatsoever, and the *reasons have been mitigated* for placement at a particular level in the step-down program.  In other words, advancement through this program is not automatic. At every stage, a review of the security needs of the inmate is made. Note as well that "general population" is a bit of a misnomer, as inmates on the three general population units are single-celled and are confined in their cells approximately 23 hours daily. Most of the inmates at ADX ultimately have tenures at the facility much longer than three years, and some have remained in the facility for a decade.

37.     Appendix B16 is a photograph of the single-front, as opposed to vestibule, cells that characterize the Intermediate, Transitional, and Pre-Transfer Units.

38.     Appendix B17 presents the regulation describing the mission of the "Control Unit." There is one Control Unit in BOP, located within ADX, providing confinement for the worst of the worst. The physical characteristics of the Control Unit are identical with the General Population Units. However, the security procedures are even higher security procedures.

39.     Appendix B18 presents the regulation dictating the factors to be considered in designating an inmate to the Control Unit. If BOP determines that Mr. Fields is, in fact, incapable of being controlled in a highly structured prison, they could designate him to the Control Unit.

40.     Appendix B19 provides an outline of the security procedures applied to inmates on the Control Unit. These procedures varied from those on the General Population Units in 2004 in the shackling of feet as well as hands for any out-of-cell movement, triple escorts for any out-of-cell movement, reduced hours for recreation, and solitary recreation. As reflected in CFR 541.50, the duration of confinement on the Control Unit is until the reasons for designation to the Control Unit have been resolved as determined by BOP.

41.     Appendix B20 summarizes my analysis, from data provided me by BOP, of assaults on staff on the Control Unit from the opening of ADX in December 1994 to June 2001 (approximately 70 inmates at any point in time). These data are directly responsive to whether there exists the phenomenon of an inmate who is "incapable of being controlled" by BOP – the assertion that was made regarding Mr. Shields. These data reflect that there is a level of custody that can effectively incapacitate even the most violence-motivated inmate.  During this 78-month period, inmates requiring the highest security unit in BOP engaged in the following assaultive misconduct:

> *14 minor assaults on staff:*
> - 9 throwing unknown liquid/feces or spitting in face of officer
> - 1 kicking foot forward as leg shackles removed, jerking officer's hand into bars
> - 1 pulling away and then throwing ice tray full of water and carton of milk at officer
> - 1 throwing head back against officer's face
> - 1 attempting to pull away from officer while being escorted, causing cuffs to scrape officer's hand
> - 1 grabbing officer's shirt and pulling him into the bars
>
> *3 attempted/threatened minor assaults on staff:*
> - 2 attempting or threatening to throw liquid
> - 1 attempted head-butt
>
> *10 of the above 17 involved a single inmate*
>  *6 total inmates involved*

42.     All of these incidents were coded as "minor" assaults. Even among the worst of the worst over a 78-month period, there were no serious assaults (i.e., Code 101). There was no violence that would appear to be of such severity so as to constitute "a continuing threat to society," or that would render a preventative intervention of death a proportional response.

43.     Appendix B21 is a schematic reflecting an ADX unit offering an even greater level of security than the Control Unit. Notice that along the left side of this schematic

are four cells and the adjacent indoor recreation rooms, outdoor recreation areas, and visitation booths. This unit allows an inmate to be confined with minimal need to have physical contact with the inmate for purposes of recreation or visitation. Instead, by simply remotely opening the doors on this unit, the staff can direct the inmate to these activities. *Note that though this schematic has been presented in open court on numerous occasions, it should be treated as sensitive in nature and not openly distributed.*

*Ordered violence in the community*

44.     The Government-sponsored testimony that Mr. Fields had threatened Waco law enforcement and McLennan County Jail correctional staff with violence under his direction that would be carried out by others.

> Q.     Then what did he say? Did he say anything else?
>
> A.     Yes, sir. Then he stated that he'd have someone kill my family.
>
> Q.     And that would be your wife and children?
>
> A.     That's correct, sir.
>
>> (direct examination of Detective Robert Fuller, Waco Police Department, page 2155, lines 20-24.)
>
> -----------------------------------------------------------------
>
> A.     Especially to me was what he said, "Bitch, you know, I've got my family working on it. You know, I ain't playing." You know, that's basically what he was talking about.
>
> Q.     So is it fair to say he said he had his family that would also inflict violence on you?
>
> A.     Yes.
>
>> (direct examination of Debra Lynn Kilgo, McLennan County jailer, page 2126, line 24 to Page 2127, line 1)

45.     An analysis of the risk of an inmate ordering violence from prison to be perpetrated in the community is more complex than simply that the inmate made such a threat.  The first factor to consider is whether the inmate, in fact, has a sustained motivation to enact such a threat or is simply "mouthing off." This consideration gains additional salience when it is noted that staff are threatened and otherwise verbally abused by inmates with some frequency in jails and prisons.  In Mr. Fields' case, his

record is replete with extreme threats against staff, but generally void of instances where he has followed through with a serious assault against staff.

46.    A second factor is whether the threatening inmate has a criminal organization under his continuing direction and/or financial resources in the community to effect the threat. I found no evidence in the sentencing transcript of records that Mr. Fields controlled a criminal organization or possessed extensive financial assets to carry out such threats even if he did have sustained assaultive motivation toward corrections staff.

47.    A third factor is whether correctional authorities or law enforcement regarded the threats as sufficiently credible that steps were taken to protect the intended targets. I saw no testimony at trial that apprehension regarding Mr. Fields' ability to enact his threats had resulted in any preventative/protective actions were taken by the staff targeted with these threats or by law enforcement. Similarly, I saw no testimony that Mr. Fields' threats were regarded as sufficiently credible that Special Administrative Measures (SAMs) were applied to Mr. Fields pre-trial to restrict his communication with other persons.

48.    A fourth factor in the analysis relates to the capability of BOP to impose special conditions of confinement. To explain, in some federal capital sentencing proceedings there has been evidence that the defendant had the capability and/or history of ordering violence or criminal activity from prison. Thus, there may be well-founded concerns that the inmate might attempt to use phone privileges, visitation contacts, letters, or inmate communication to continue a criminal enterprise or to direct violence against others. It is important in considering the future likelihood of such directed violence, however, to be aware that there are capabilities within BOP for limiting the contact that an inmate may have with other inmates, the free community, or even their own attorney. Extraordinary limitations on defendant communications with other inmates and community members were ordered in *U.S. v. Luis Felipe* (1998) (head of the Latin Kings) and *U.S. v. Ramsi Yousef* (1998) (World Trade Center bomber). In *Felipe* the office of the U.S. Attorney submitted a brief in support of the authority of the sentencing federal judge, the Department of Justice, and the federal Bureau of Prisons to employ special conditions of confinement. The trial court's authority to order special conditions of confinement in *Felipe* was subsequently upheld by the 2nd Circuit Court of Appeals.

49.    The above analysis supports a conclusion that there was *not* a probability (i.e., more likely than not) that Mr. Fields would successfully order criminal violence in the community from prison. Further, should the Department of Justice or the Bureau of Prisons believe that there was such a probability, special restrictions on his communications could be imposed that would negate any opportunity for Mr. Fields to carry out this agenda.

*Escape*

50.     There was much testimony at sentencing regarding the specter that Mr. Fields would again escape from custody, was motivated to escape from custody, announced that he was going to escape from custody, requested assistance from staff in escaping from custody, and damaged a vent in his cell in an apparent attempt to escape from custody. There was also testimony from corrections staff that there is no "escape-proof" facility (Jimmy Stone, page 2310, 2312). Indeed, in its closing statement, the Government identified the escape-related offense of conviction and its potential recurrence as "the very essence of future danger," arguing:

> Mr. Swanton said to you, he reiterated what the Judge said, the only way he's going to get out is in a pine box, unless of course he escapes. Unless of course, there's another Benny Garrett.  When you're thinking about whether or not Sherman Fields is a future danger, think about the pattern of conduct. Think about –I mean, isn't the very essence of future danger, isn't the very definition of future danger that you escape from jail and kill someone. Isn't that what happened. That's what happened in this case. (Government closing, page 2541, lines 10-19)

51.     Several points are relevant to an analysis of the likelihood that Mr. Fields would escape from the federal Bureau of Prisons if sentenced to life without possibility of release. First, if not designated to ADX, Mr. Fields would be assigned to a U.S. Penitentiary. This is a matter of regulation certainty:

> A male inmate with more than 30 years remaining to serve (including non-parolable LIFE sentences) shall be housed in a High security level institution unless the PSF [Public Safety Factor] has been waived. [*Security Designation and Custody Classification Manual (5100.07, p. 4)*]

52.     U.S. Penitentiaries are high-security prisons in BOP, characterized by double-perimeter fencing with razor wire, perimeter detection devices, gun-towers, concentric layers of security, controlled inmate movement, and intensive staffing. The architecture, staffing, and security procedures assume that all inmates at this level of security are motivated to escape and would attempt to do so if given the opportunity. I have toured USP Marion. I have conducted forensic evaluations in U.S. Penitentiaries and in the McLennan County Jail. There is no correspondence between the architecture, security capabilities, and security procedures of a U.S. Penitentiary and the McLennan County Jail. Further, the architecture and security procedures of a U.S. Penitentiary are such that it is unlikely that the co-opting of a single correctional officer would enable an escape.

53.     The frequency of escapes from U.S. Penitentiaries is extraordinary low. To illustrate, in 2004 there were 13 U.S. Penitentiaries (high security) facilities in BOP, housing approximately 17,000 inmates. To my knowledge, there had not been a secure-

perimeter escape from this level of security since at least the mid-1990s. This reflects an annual incidence of less than 1 per 100,000 inmates.

54.     Though Mr. Fields was able to co-opt Bennie Garrett to facilitate an escape, his belligerence, verbal reactivity and threats, announcements of escape intention, direct solicitations of escape assistance without underlying rapport/relationship, and repugnant behavior toward staff such as open masturbation are broadly inconsistent with effective staff manipulation or maintaining a "low-profile" so that staff scrutiny is lessened. Thus, despite his success in escaping a local jail to perpetrate the capital offense, Mr. Fields does not exhibit a high degree of escape acumen.

55.     Mr. Fields' "escapes" as a juvenile were simply "walk-aways" from facilities without secure perimeters. These are irrelevant to his escape potential from a U.S. Penitentiary.

56.     Contrary to the Government's assertion that prior escape was the "very essence of future danger," literature reviews sponsored by the U.S. Department of Justice had concluded that escape history is only *weakly* associated with prison misconduct (Alexander & Austin, 1992; National Institute of Corrections, 1992).

57.     It can thus not be reasonably asserted that Mr. Fields has some special capabilities that would elevate his risk above the extraordinarily low risk of escape for other U.S. Penitentiary inmates (i.e., 1 per 100,000 annually).

*Probability vs. possibility*

58.     The Government asserted in argument that the nonstatutory aggravating factor be evaluated in terms of a "guarantee":

> What's going to happen if he goes into a highly structured penal institution? Is that a *guarantee* [emphasis added] that he'll behave himself? Ask yourself, is that a *guarantee* that he'll behave himself if he's given a life sentence and he goes into a highly structured penal institution? (Government closing statement, page 2541, lines 5-9)

59.     The Government additionally posed the nonstatutory aggravating factor in terms of whether a prison can be "escape proof":

> Q. Sir, is there such a thing as an escape proof facility?

> A. No, sir.

> (redirect exam of Thomas Giebe, page 2117, lines 8-10)

---

60.     The Government additionally framed the nonstatutory aggravating factor in terms of whether violence occurred in prison:

> Q. Sir, when you were at Leavenworth, were there still assaults on -- from inmate to inmate?
>
> A. Yes, sir.
>
> Q. Were there still assaults from inmate to guard?
>
> A. Yes, sir.
>
> Q. Were there still high escape risks?
>
> A. Yes, sir.
>
> (redirect exam of Thomas Giebe, page 2117, lines 11-17)

61.     Whether expressed in terms of "guarantee," "escape-proof," "were there still assaults?" or "risks," the nonstatutory aggravating factor has been reframed from "probability" to "any possibility." This is a predictable reframe that is recurrently observed in prosecution questioning of witnesses and in arguments at sentencing.  If this aggravating factor is to have any particularizing value in the application of the death penalty, however, then the "*probability* that the defendant would commit acts of criminal violence that would constitute a continuing threat to society" must be construed as something more than a mere *possibility*. There is always a *possibility* that every capital offender, and every criminal defendant for that matter, will perpetrate violence in prison. The defense did not object to this argument.

*Future danger vs. violence risk assessment*

62.      The nonstatutory aggravating factor as described in the Government's opening statement was conceptually consistent with the issue affirmed in *Jurek v Texas* (1976): "Whether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." By comparison, in its *Fields* opening statement at sentencing, the Government stated:

> …likely to commit further criminal acts of violence in the future, which would be a continuing and serious threat to the lives and safety of other, including, not limited to, inmates and correctional officers in an institutional setting…

63.     Subsequently, however, the Government and the defense reframed this question as one of "future danger" or "future dangerousness." [illustrative and not exhaustive, emphasis added with *italics*]

Q.      How would you rate Mr. Fields in terms of *dangerousness* of dealing with him?

A.      Top two percent.

(redirect exam of Thomas Giebe, page 2117, lines 21-23)

-----------------------------------------------------------------

Q:  And how would you rate Sherman Fields in terms of his *dangerousness*?

Mr. SWANTON:  Judge, I would object to that question. This witness is not qualified to rate somebody's *dangerousness*. She hasn't done any studies. There's not any tests that she's performed. It's beyond her area of expertise and I would object on that basis.

(direct exam of Debra Lynn Kilgo, page 2127, lines 12-18)

-----------------------------------------------------------------

Q.      Compared with the – all the inmates that you've dealt with in your career, how would you rate Sherman Fields in terms of his *dangerousness*?

(direct exam of Debra Lynn Kilgo, page 2128, lines13-15)

-----------------------------------------------------------------

Q.      And does this constitute a *danger* to the officers who's having these substances thrown on them?

A.      Yes, sir. The biologic *danger* and not to mention the fact that it -- when something like that happens, it encourages other inmates who might have designs on harming officers or starting riots or problems, it encourages them to go forward with their plans.

(direct exam of A. P. Merrillat, page 2237, lines 3-9)

-----------------------------------------------------------------

MR. SWANTON:      Judge, I'm not exactly sure what the government intends to elicit from Mr. Coons. I have some general idea, but if they intend to get into the

issue of *future dangerousness*, I'd like to take him outside the presence of the jury and do a *Daubert* challenge to that particular kind of information.

THE COURT: How many transcripts of his testimony in that regard have you read?

MR. SWANTON: A lot of them.

THE COURT: And you still think he won't pass the test?

MR. SWANTON: All I know, Judge, is I'm not sure the Fifth Circuit has addressed that issue with respect to *future dangerousness* and I feel like I need to do that. I don't anticipate it would take very long.

THE COURT: How long will it take?

MR. SNYDER: I probably won't have him for more than 15 or 20 minutes, but I am going into the *future dangerousness*. So it's just whenever the Court desires to do it.

(defense initiated conference with the Court, pages 2315, line 25 to 2316, line 17)

------------------------------------------------------------

Q. It is my understanding that at least one of the issues that you've been called to testify about for the government has to do with the potential for Mr. Fields to engage in criminal activity in the future, specifically his *future dangerousness*; is that correct?

A. That's my understanding.

Q. I want to ask you a few questions about that issue. First of all, can you tell me -- it is a fact that the American Psychiatric Association has essentially taken the position that the area of *future dangerousness* is not one that can be predicted with any sort of regularity or scientific regularity; isn't that correct?

A. Not to my knowledge, but it may be.

Q. Do you have any idea about the position that the American Psychiatric Association took in the case of *Barefoot vs. Estelle*?

A. No.

Q.      You have no -- you have no information whatsoever on that?

A.      No. I don't.

Q.      Are you aware of the psychiatric community in general being reluctant to agree that somebody can predict someone's *future dangerousness*?

        (defense voir dire of Dr. Richard Coons, page 2318, lines 3-25)

Q.      And are you aware that that organization has indicated that they have reluctance to certify any sort of reliability in someone's ability to predict *future dangerousness*?

        (defense voir dire of Dr. Richard Coons, page 2319, lines 9-12)


64.     The nonstatutory aggravating factor, though, does not pose whether the defendant exhibits an enduring *state* of dangerousness. Rather, it calls for an assessment of the probability of *acts* of a particular severity. The importance of this distinction cannot be over-emphasized in providing for the application of scientific methodology and findings. Group statistical data regarding the incidence and correlates of violence can be gathered to inform a determination of probability. This methodology is not unique to violence risk assessment. Indeed, the projection of casualty rates by the insurance industry, as well as concepts of therapeutics and prognosis in medicine, relies on systematically collected group data that is then individualized to particular cases. "*Dangerousness*," by contrast, is a social judgment that is overly broad, independent of contextual factors, and not subject to reliable measurement.

65.     The broad nature of "dangerousness" as a social judgment presents a special problem at capital sentencing. All capital offenders are dangerous, as are all violent felons. Stated differently, under what circumstances would a recently convicted rapist, armed robber, kidnapper, murderer, or capital offender not be considered dangerous, as compared to a law-abiding member of the community? The "dangerousness" of these offenders if at large in the community is an important rationale for a lengthy quarantine in prison.  If the question regarding a capital offender is construed as "Is he dangerous?" the answer is always "yes" - and the issue serves no narrowing or particularizing value in the application of the death penalty.

*Methodology utilized by Dr. Coons*

66.     The methodology employed by Dr. Coons in arriving at his opinion regarding Mr. Fields that "there is a probability of future violence" (page 2350, lines 19-20) was unreliable. More specifically, it was either without empirical support or was *contrary* to

the existing data. This methodology, as outlined by Dr. Coons, relied on appraisal of: 1. history of violence; 2. attitude about violence; 3. the incident offense; 4. personality and general behavior patterns; 5. area of conscience; 6. where they will be: in prison or on death row (see page 2344, line 3 to 2345, line 7). Factors 2-5 constituted "illusory correlations." Factor 1 constituted an illusory correlation to the extent that Dr. Coons relied on a history of violence in the community. Factor 6 was not properly considered or applied. Illusory correlations are factors that would appear to be related to (i.e., predictive of) violence in prison, but are not. Stated more plainly, illusory correlations are nothing more than uninformed armchair speculation masquerading as science.

67.     Contrary to Dr. Coons' methodology of illusionary correlations, reviews sponsored by the *U.S. Department of Justice* have concluded: past community violence is *not* strongly or consistently associated with prison violence; current offense, prior convictions, and escape history are only weakly associated with prison misconduct; and the severity of offense is not a good predictor of prison adjustment (see Alexander & Austin, 1992; National Institute of Corrections, 1992; Stephan, 1989).

*History of violence in the community and associated attitude about violence*

67.     The erroneous nature of Dr. Coons' methodology could have been more specifically refuted had the jury been informed of the data that are inconsistent with his methodology and their application to Mr. Fields. For example, if "attitude about violence" were reliably associated with violence in prison, extremely high rates of serious violence in prison would be expected. That is not the case. This can be illustrated with data that Dr. Coons would be expected to be familiar with given his routine appearance in Texas capital cases and his testimony in this case in a federal capital case. Almost half of the 152,602 offenders confined in the Texas Department of Criminal Justice (TDCJ) at the end of 2003 were serving sentences for violent offense convictions (i.e., assault, homicide, kidnapping, robbery, and sexual assault), with one in five of these violent offenders serving time for a homicide conviction (see TDCJ, 2003 Fiscal Year Statistical Report). Notably, over one in three inmates confined in TDCJ in 2003 had served a prior sentence in the Texas prison system. In the federal Bureau of Prisons (BOP), in fiscal year 2003 the distribution of offenders in U.S. Penitentiaries (high security) included robbery (22.1%); homicide, kidnapping aggravated assault (15%); and arms, explosives, and arson (18.3%). Forty percent of the USP population was serving a sentence in excess of 20 years. A substantial proportion of these state and federal offenders had thus committed serious violent offenses and/or had significant histories of criminal misconduct in the community.

68.     Despite this concentration of individuals whose community conduct had been recurrently criminal and violent, the rate of serious violence in correctional settings is low. Serious assaults involved only a small proportion of the TDCJ inmate population in 2003: less than 1 inmate in 3,000 (.00029) seriously assaulted a staff member, and less than one inmate in 100 (.0065) was cited for the serious assault of another inmate (Executive Services, TDCJ, January, 2004). The average annual rate of inmate assault resulting in

major injury in U.S. Penitentiaries 2001-2001 was approximately 0.00245 (i.e., 2.45 per 1,000 inmates). The rate of inmate homicide in TDCJ system-wide was only 0.66 per 100,000 inmates in 2003 (i.e., 1 inmate homicide for 2003 for 152,602 inmates). This rate of homicide in TDCJ is only 6% of the 10.6 per 100,000 rate of homicide among males in the open community of the United States in 2001 (see Pastore & Maguire, 2003). The 0.66 per 100,000 annualized rate of homicide in TDCJ in 2003 is particularly startling in comparison to extrapolated rates of homicide among males in major Texas cities in 2001: Dallas, TX = 37 per 100,000; Houston, TX = 25 per 100,000; San Antonio = 16 per 100,000; much less major cities elsewhere in the United States, e.g., Washington, DC = 77 per 100,000; Chicago = 43 per 100,000 (see Pastore & Maguire, 2003). The rate of inmate homicide in U.S. Penitentiaries during the same time period was much higher than TDCJ, approximately 16 per 100,000 inmates (note however that the USPs represent the upper 10% classification in BOP). Though rate of homicide in BOP is above the 11.2 per 100,000 rate of homicide among males in the open community of the United States, it remains far below the homicide rates among males in a number of major American cities as detailed above. Rates of the inmate homicide of a correctional staff member are extraordinarily low in BOP and other correctional systems, averaging approximately one staff homicide per million inmates nationally each year. The last time a correctional staff member was killed in BOP was in 1997. These data demonstrate the problems with making simplistic assumptions regarding the continuity from community criminality/violence to prison violence. These data are also important for disabusing the jury of erroneous beliefs that serious violence and inmate homicide are rampant in prison.

*The incident offense*

69.     Dr. Coons described his reliance on "the incident offense" as a predictor of violence in prison. This can be examined in terms of whether inmates who have been convicted of murder in the community carry their violent community trajectories with them into prison. Important data on this question were available at the time of Mr. Fields' sentencing phase in 2004 and had repeatedly been described in expert testimony in numerous other federal capital cases.

70.     Sorensen and Pilgrim (2000) retrospectively reviewed the prison disciplinary records of 6,390 convicted murderers admitted to Texas prisons from 1990-1998, utilizing this data to project the expected prevalence rate of violence among these inmates during a 40-year prison term. While comparative data were not reported, these researchers projected that 83.6% of this large sample of murderers would *not* engage in serious institutional violence during four decades in confinement. Most of this projected risk was for assault of another inmate. The 40-year projected likelihood of an aggravated assault of a correctional officer was 1%, and the projected 40-year risk of the homicide of another inmate was .2% (.002). In other words, for most there was not a continuing trajectory of serious violence that crossed the community-to-prison boundary.

71.     A comparative study of Texas capital inmates published in 1989 is of immediate

relevance to this assumption. Marquart, Ekland-Olson, and Sorensen (1989) compared the institutional disciplinary records for assaultive misconduct of four groups: 1. former death row inmates who had been sentenced to death in Texas post-1973, with an *affirmative finding* to Special Issue 2 (i.e., there is a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society"), and then had gained relief from this sentence; 2. capital murderers serving life sentences after their juries answered "no" to Special Issue 2; 3. inmates "system-wide"; and, 4. inmates in a high-security facility. The capital inmates, regardless of how their juries had answered Special Issue 2, had similar disproportionately low rates of assaultive misconduct. In fact, their annualized frequency rate of institutional violence was less than one-fourth that of inmates system-wide, and less than one-seventh that of inmates in the high-security unit.

72.     Marquart and Sorensen's finding that capital offenders in their study were disproportionately *less* likely to be involved in institutional violence is not an isolated one. By February 2004, my colleagues and I had collected and analyzed data on the innovative policy of the Missouri Department of Corrections of mainstreaming death-sentenced inmates in the general prison population of the Potosi Correctional Center. Rather than being segregated under super-maximum conditions on a death row, these death-sentenced inmates were intermingled with and treated identically with life-without-parole (LWOP) and parole-eligible inmates.  An eleven-year retrospective records review revealed that the death-sentenced and LWOP inmates had less than one-fourth the frequency rate of assaultive misconduct as the parole-eligible inmates who they were side-by-side with in the same correctional facility. A subsequent analysis on a substantial subsection ($N = 2,505$) of this sample, also completed in February 2004, found that holding other predictive variables constant, both death-sentenced and LWOP inmates were approximately half as likely to be cited for assaultive misconduct as parole-eligible inmates.

73.     Sorensen and Wrinkle (1996) found similarly low 15-year prevalence rates of violence among convicted murderers, regardless of whether they were death-sentenced, LWOP, or life-with-parole inmates. Though direct comparative data is not available, less than a third of 533 capital offenders commuted under *Furman* nationwide committed a serious disciplinary infraction during the ensuing 15 years in the general prison population, and only 7.4% committed three or more of these institutional offenses (Marquart & Sorensen, 1989). A study involving former death row inmates in Indiana found that only 15.4% of the capital offenders committed assaults resulting in serious injuries during confinements averaging 16 years on and off of death row (Reidy, Cunningham, & Sorensen, 2001).

*Personality, general behavior pattern, and conscience*

74.     Dr. Coons' assertion that personality characteristics and lack of conscience are synonymous with serious violence in all contexts, including prison, appeals to common sense.  This hypothesis seems intuitively logical and it is understandable why it would

find ready acceptance by juries and the courts. It lacks only one element: any data to support it. That personality characteristics and "lack of conscience" are not predictive of serious violence in prison could have been easily demonstrated. Aggregating various studies, it is estimated that 75% of inmates in American prisons meet diagnostic criteria for Antisocial Personality Disorder (APD) (see Cunningham & Reidy, 1998a, 2002). Antisocial Personality Disorder is characterized by pervasive disregard for the rights and feelings of others (i.e., lack of conscience), with features such as repeated illegal acts, irresponsibility, exploitation, dishonesty, impulsivity, risk-taking, lack of remorse, etc. When this high prevalence rate of APD among prison inmates is intersected by the low rate of serious violence in prison illustrated in an earlier section, it becomes obvious why APD and its progeny will fail to predict serious prison violence in that setting. This is a predictive maxim: any characteristic that is present in the majority of subjects in a targeted population will fail to predict a low base rate (i.e., highly infrequent) behavior. Not surprising then, there is no research demonstrating that APD is reliably associated with serious violence in American prisons. Rather than denoting a particularly malignant or violence-prone inmate, an APD diagnosis simply reflects an inmate who is similar in this regard to most others in prison. Of course, the disaggregated traits and characteristics underlying APD or psychopathy, utilized by Dr. Coons and embedded in the Government's hypothetical, would fare no better in predicting prison violence – for the same reason. Impulsivity, lack of remorse, irresponsibility, dishonesty, etc. are nearly ubiquitous among a prison population.

75.     Even psychopathy (see the Psychopathy Checklist – Revised, Hare, 1991), though conceptualized as an extreme end of the APD continuum, has not been demonstrated to reliably identify offenders who engage in serious violence in American prisons (see Cunningham & Reidy, 1998a; 2002; Edens, Petrila, & Buffington-Vollum, 2001).  The few studies that have examined the performance of this scale in an American prison setting have found weak or nonsignificant correlations with institutional aggression.

76.     The Government did inquire of J. Randall Price, Ph.D. regarding APD and its treatment responsiveness. In fact, there is little research regarding the extent to which APD may respond to counseling interventions. In any case, there is substantial "aging out" of APD during the fourth decade of life (i.e., 30s). Large scale representative community samples have found lower prevalence rates of APD among community residents over age 45 as compared to those younger than age 45 (Myers et al., 1984; Regier et al., 1988). Criminal behaviors associated with this disorder may be significantly reduced by aging (American Psychiatric Association, 1994; Harpur & Hare, 1994; Hirschi & Gottfredson, 1989) and context (Quay, 1984). There was no expert testimony describing the effects of age on the personality characteristics associated with APD and their expression in violence and criminality.

*Nothing to lose*

77.     Though not specified in his initial list of factors that he considers in a capital risk

assessment for prison, on cross examination Dr. Coons predicted that Mr. Fields would "quickly revert to his old ways" [behave violently] if he received a life sentence because he had nothing to lose:

> Q:    Are you saying that in your opinion you're 100 percent sure that the only reason he has controlled his behavior in jail in the past four months is simply because he knew he was coming to trial?
>
> A:    No. No. No. No. I mean, there could be minor reasons in there. I think that's likely the major reason. But in terms of him controlling it when he's got a life sentence and he hasn't got anything to lose, I would say he would quickly revert to his old ways.
>
> Q:    You are aware, are you not, Doctor, of the studies which indicate that people who receive life sentences actually act better in prison than those who don't? You know those studies exist, don't you?
>
> A:    Well, there are – there are studies that show that older people, for example, in prisons are less likely to be violent and so forth. So when you're considering the longevity of a life sentence, a good bit of that is on the far end of their life when they are less active and less violent and less whatever.
>
> (cross examination of Dr. Coons, page 2359, line 17 to page 2360, line 10)

78.    The testimony of Dr. Coons was fundamentally in error regarding whether inmates sentenced to life without possibility of release (i.e., life-without-parole, LWOP) have "nothing to lose" and the role of the age of the inmate in this research. This could have been compelling, demonstrated with data available in 2004.

79.    Sorensen and Wrinkle (1996) compared 323 LWOP inmates who had been convicted of capital murder and 232 inmates sentenced to life with parole for 2nd degree murder.  A 15-year retrospective review of the disciplinary records of these inmates (1977-1992) found no significant difference in their overall rates of disciplinary infractions or their assaultive rule violations. Whether the life-sentenced inmates had an anticipation of possible parole was not predictive of prison misconduct.

80.    By February 2004, my research colleagues and I had analyzed data comparing 960 LWOP inmates to 1,503 parole-eligible inmates who had been confined at the Potosi Correctional Center, a high-security prison in the Missouri Department of Corrections. An 11-year retrospective review of the disciplinary records (1991-2002) of these inmates revealed that the LWOP inmates were half as likely to have been cited for violent misconduct as were the parole-eligible inmates with whom they were serving time in the same correctional facility. This study disaggregated violent misconduct by level of severity, and *controlled for age* and a number of other factors.

Cunningham re: *U.S. v Sherman Fields*                                                    Page 26

81.     Such an expectation is consistent with the above research, as well as longstanding observations that, *controlling for age*, inmates facing lengthy prison sentences have lower rates of disciplinary misconduct than inmates serving short sentences (Flanagan, 1980). In explaining this finding, Flanagan posited that long-term inmates take a different perspective on doing time. Recognizing that they will be in prison for an extended period, they act to enhance the meager privileges and activities allowed them.

*Unreported violence in prison*

82.     Dr. Coons asserted that regarding unreported violence in prison:

> A.     …and of course in the penitentiary there's a huge amount of violence that's never reported. So it's very difficult to do a study like that.
>
> (cross examination of Dr. Coons, page 2355, lines 19-21)

83.     Dr. Coons' characterization that there is a "huge amount" of violence in prison that is never reported is entirely speculative. It is not possible to characterize the extent of what is not known.

84.     That said, some violence in prison obviously goes unobserved and/or unreported. In considering the impact of this problem on either base rates of prison violence among capital-sentenced inmates, three observations appear relevant. First, the problem of unreported violence should have a negligible impact on rates of inmate-on-staff assault, as staff members would be expected to report instances where they are the victim of a significant assault by an inmate. Additionally, because of the close supervision of inmates in federal high-security prisons, violence of greatest concern such as assaults on inmates resulting in moderate or major injury are unlikely to go unnoticed or unreported. Thus it is likely that rates of threats, fights, minor assaults, and sexual assaults are more likely to reflect significant underestimates. Finally, in regard to comparative data there is little plausible reason to expect that unreported violence among the capital LWOP inmates would be more frequent than among the serious offenders with whom they share high-security confinement.

*Conditions of confinement*

85.     Though Dr. Coons described incorporating the location or conditions of confinement under which an inmate was held in his risk assessment methodology, there was little evidence of this finding practical application in his risk assessment of Mr. Fields. As has been previously discussed, Dr. Coons did not acknowledge how longer-term super-maximum conditions of confinement such as were available at ADX Florence could be applied preemptively to Mr. Fields.

86.    Dr. Coons also failed to acknowledge how the interpretation of Mr. Fields'
misconduct in the McLennan County Jail should be tempered by concerns with the
effects of such confinement in destabilizing an inmate and potentially inducing the
misconduct.

87.    At the McLennan County Jail, Mr. Fields' confinement was not only characterized
by social isolation, no television or radio, but lights that were on 24 hours daily. These
conditions were summarized by defense counsel in addressing the Government's
objection:

> MR. PETERSON: Your Honor, the government has provided us with 40 or 50
> incident reports at the jail and what their argument is going to be, we believe, is
> that Mr. Fields is uncontrollable. They've made that statement numerous times in
> their opening statement and otherwise. It's extremely relevant that Mr. Fields was
> locked up in this cage with a glass window where he had no privacy 24/7 right in
> front of main control out there in the jail for extensive periods of time, nine
> months where he for hours a day seven days a week he had lights on all the time.
> They had somebody watching him like an animal in a zoo and Mr. Giebe has
> testified that certainly being locked up over 60 days would affect an inmate in that
> regard and all I'm trying to do is lay the predicate that this is what the holding cell
> is.

> (page 2114, lines 12-25)

88.    Though these conditions were elicited by the defense from Mr. Giebe, as well as
the highly atypical policy of confining an inmate under these conditions for months, there
was no expert testimony regarding the deleterious psychological effects of such
conditions of confinement or their relationship to behavior disturbance and institutional
misconduct.

89.    *Disruption of sleep cycle:* Several aspects of the protocol directed against Mr.
Fields have the effect of disrupting a normal sleep cycle and associated biorhythm. These
include twenty-four hour illumination, and having a large window facing a staff control
area. These will each be considered in turn.

>   a.  *Twenty-four hour illumination*: The sleep cycle and biorhythm of human
>       beings are significantly influenced by ambient light: preparing the body for
>       sleep as illumination fades in the evening, darkness facilitating falling asleep,
>       darkness facilitating remaining asleep, and gradually increasing illumination
>       facilitating awakening. The latter three impacts occur even through closed
>       eyelids as the retina is still able to gauge light intensity. Continuous
>       illumination promotes insomnia and reduces the restorative effects of the sleep
>       that does occur. Continuous illumination additionally disrupts the body's
>       biorhythm, essential to psychological stability and resilience. Deprivation

Cunningham re: *U.S. v Sherman Fields*                                    Page 28

from external illumination via windows aggravates this disruption of biorhythm. It is for these reasons that deprivation from natural light and continuous illumination are utilized as "enhanced interrogation techniques" in reducing the resistance and promoting the psychological breakdown of persons from whom information is sought. More specifically, disruptions of sleep cycle and biorhythm reduce stress tolerance, increase susceptibility to psychological disorder, undermine concentration and judgment, reduce the efficiency of cognitive processes, and undermine feelings of autonomy. These effects have grave implications regarding a defendant's ability and motivation to assist in his defense.

b. *Noise, light, and activity:* Mr. Fields' sleep cycle and biorhythm were also disrupted by the holding cell of his confinement for many months having a large interior cell window facing a staff control area, with the associated conversation, noise, light, and activity of this staff control area. These disruptions would promote the psychological deterioration and behavioral disruptions as described.

90. *Undermining of autonomy:* Beyond their impact on sleep cycle and biorhythm, the above "security provisions" have recognized effects in promoting psychological breakdown through undermining the fundamental experience of autonomy and body mastery. This is accomplished in part by taking total control of the prisoner's (in this case Mr. Fields') sensory and interpersonal experience to a profoundly greater extent than occurs in typical detention/prison confinement. For example, correctional staff are in total control of the illumination that falls on his eyes, what cognitive stimulation is available to him (e.g., reading materials, writing materials, radio, television, games, puzzles), whether he can see the sky, basic life comforts (e.g., clean uniform, blanket, pillow), whether he has a conversation with another human being and how long this lasts, whether he is able to exercise a modicum of privacy, etc. These are all "choices" or expressions of individuality that other human beings, including inmates, are allowed to retain. Such choices are critically important in maintaining psychological identity, ego strength, resilience, and psychological health.

91. Importantly, even at ADX Florence, inmates are not confined in 24-hour illumination, do not endure a large cell window facing a staff control area, have a slit window to the outside, have a television in the cell, are allowed reading material, and have recreation that affords at least the opportunity to converse with other inmates. Even in the most security-intensive facility in the United States, these provisions for the psychological health of inmates are maintained. Arguably, then, the conditions of confinement under which Mr. Fields was confined in the McLennan County Jail served no legitimate security interest. To the extent that the restrictions or intrusions on personal autonomy have no legitimate security rationale, their usefulness in undermining the psychological equilibrium of the prisoner is *enhanced*. The "thinner" the security rationale, the stronger the demonstration that all control over even the most basic life

aspects is at the whim of those holding the prisoner – without boundary or limits, and none accrues to the prisoner. This "at our whim" demonstration of control is particularly destructive to the experience of individuality, as well as routinely demoralizing, and is obviously conducive to psychological breakdown. Again, this is why such protocols are a standard aspect of "brainwashing" and/or "enhanced interrogation techniques." In Mr. Fields' case, it is difficult to conceive of a rational nexus between potential for his either escaping or ordering violence in the community and confinement conditions of twenty-four hour illumination, constant observation through a large cell window facing a staff control area, or deprivation of adequate stimulation through television, radio, and ample reading material.

92.     *Cognitive, sensory, and interpersonal stimulation*:  The holding-cell conditions under which Mr. Fields was held in the McLennan County Jail represent a marked deprivation of the critically important sensory and cognitive stimulus; stimulus that is essential to maintaining psychological equilibrium and health. An extensive literature details the obvious: conditions of solitary, restricted, stimulus-deprived environments adversely affect the psychological functioning of human beings in significant ways.  The extent of this impact depends on the duration and extent of the deprivations.  The scholarly literature supporting this conclusion includes historical descriptions of adverse reactions to solitary prison confinement, laboratory experiments on sensory deprivation, studies demonstrating the importance of social contact and support,  research on isolated and restricted living environs,  observation of the effects of seclusion with hospitalized psychiatric patients,  studies of torture victims, self-reports of prisoners of war, autobiographical and descriptive accounts,  and direct studies of solitary confinement. Even when the relevant literature is limited to studies regarding the effects of solitary or super-maximum confinement, the findings are consistent and robust regarding the psychologically damaging impact of sustained incarceration under these conditions. As Haney (2003), who has reviewed this issue in some depth, summarized:

> Empirical research on solitary and supermax-like confinement has consistently and unequivocally documented the harmful consequences of living in these kinds of environments.  Despite some methodological limitations that apply to some individual studies, the findings are robust. Evidence of these negative psychological effects comes from personal accounts, descriptive studies, and systematic research on solitary and supermax-type confinement, conducted over a period of four decades, by researchers from several different continents who had diverse backgrounds and a wide range of professional expertise. (page 130)

93.     Adverse psychological responses to such confinement have included subjective experience of marked distress, a sense of impending emotional breakdown, anxiety symptoms, feelings of lethargy, psychosomatic complaints, mood disorders, appetite disturbance, sleep disturbance and nightmares, irritability and rage, aggressive behavior and assaults, withdrawal, ruminations and intrusive thoughts, paranoia, hallucinations, suicidal ideation and self-mutilation, and other symptoms.  There is no credible evidence that conditions of long-term solitary confinement and highly restricted activity are psychologically benign:

> To summarize, there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasted for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects. (Haney 2003, page 132)

94. Apart from acute psychological "pain" and the disorders detailed above, Dr. Haney observed that inmates subjected to solitary and supermax-like conditions for long periods of time exhibit pathological adaptations to this confinement. These include chronic problems with self-control and self-initiation of behavior, a pervasive sense of unreality or sense of self, social withdrawal and social anxiety, and uncontrollable rage and/or ruminations of assaultive retaliation.

95. Of particular importance in interpreting the meaning of Mr. Fields' misconduct in the McLennan County Jail, escalating management problems have been observed to be inadvertently triggered by such highly restrictive or "supermax" confinement procedures. Dr. Hans Toch (1981) observed:

> Psychologically, restrictive regimes invite games of cops and robbers. Rules spark efforts to evade them, and regimentation breeds resistance. When prisoner reactions become overtly hostile or assertive, they tend to be countered with more regimentation and added strictures, leading to a climate of trench warfare. When this is a steady diet, officers and prisoners are situationally dehumanized.

96. Such conditions of confinement may also promote disciplinary misconduct as the inmate seeks some interaction with others, even if punitive in nature. Games of "cops and robbers" with staff under such conditions also provide an expression of autonomy, as well as some cognitive stimulation in a context where little else is available. Though not known at trial, Mr. Fields' institutional misconduct largely subsided after arrival in BOP post-trial as he began to be maintained in more humane conditions. Importantly, these more psychologically humane conditions could be offered even while still maintaining extremely high security.

*Common errors in violence risk assessment*

97. The methodology and associated testimony of Dr. Coons demonstrated virtually all of the fundamental errors in violence risk assessment at capital sentencing that have been identified in the peer-reviewed literature (Cunningham & Reidy, 1999). These common errors are listed below, with those utilized by Dr. Coons in *italics*:

1. *Inadequate reliance on base rates.*

2. *Failure to consider context.*

3. *Susceptibility to illusory correlation.*

4. *Failure to define severity of violence.*

5. Over-reliance on clinical interview.

6. Misapplication of psychological testing.

7. *Faulty implications of Antisocial Personality Disorder and Psychopathy.*

8. *Ignoring the effects of aging.*

9. *Misuse of patterns of behavior.*

10. *Neglect of preventive measures.*

98.    Not surprising, reliance on such a fundamentally flawed predictive methodology results in predictions that have an extraordinarily high error rate. The failure of Dr. Coons' risk assessment methodology, which has been common to prosecution-sponsored expert testimony in Texas, was demonstrated by a study sponsored by Texas Defender Services (2004). This study reported on the violent misconduct of 155 inmates in Texas who had been sentenced to death following expert testimony asserting their "future dangerousness" and included inmates who had been executed, inmates remaining on death row, and inmates who had had their sentences reduced and were serving capital life terms. It is notable that most of these inmates had had death row tenures during an era that would have allowed contact with correctional staff and other inmates without shackling, thus providing opportunities for violence. Obviously, such opportunity was characteristic of the experience of inmates who had gained relief from their death sentences and were transferred to the general prison population.

99.    The institutional violence rates of these inmates were not significantly different, regardless of subsample. If the expert assertions of "dangerousness" were intended to reflect a probability of a homicide in prison, the predictions were wrong 100% of the time. None of the 155 capital offenders in question killed again in prison. If the assertions of "future dangerousness" were intended to reflect an assault that required more than first aid treatment, the expert prediction was wrong 95% of the time. Only 8 of 155 inmates perpetrated such assaults. Further discrepant from the expert predictions of "dangerousness," 20% of these capital offenders were *never* cited for a disciplinary infraction in prison. These findings are a stunning rebuke of the methodology and conclusions of experts such as Dr. Coons who purported to assist capital juries in these cases.

100.   The above data on the predictive accuracy of prosecution-sponsored expert testimony asserting "future dangerousness" was particularly important given Dr. Coons' representations of his predictive accuracy:

A. In terms of people that I have made my own estimates of their future danger, I've been doing this for 30 years and I've seen them over and over and over again having made predictions that they're going to keep doing it over and over again and sure enough -- and sure enough I tend to be right --

(page 2326, lines 6-10)

*Age*

101.    Testimony was elicited by the defense from David Sweeney, Federal Medical Center, Fort Worth, to the effect that inmates who had been in a custody longer and are older tend to exhibit less misconduct:

Q.      Have you been able to draw any conclusions as to whether or not the inmates as they get older -- or that is the older inmates are easier to control than the younger inmates?

A.      My personal experience is no and mainly because I was usually wrong. When I first started with the Bureau of Prisons, I worked in drug treatment and I tried to predict, is this person going to come back, is this person going to come back, and I was usually wrong. So I stopped doing that about four years ago.

Q.      Maybe I didn't make my question clear. Within the facility itself --

A.      Uh-huh.

Q. -- you have less incident reports with the people that have been there for awhile, the older inmates?

A. Oh, correct. That's true.

(page 2281, lines 9-23)

102.    Even this testimony, however, mixed age and incarceration tenure as factors. Similarly, Dr. Coons mixed these factors in describing the prison adjustment of inmates serving LWOP sentences.

A. Well, there are -- there are studies that show that older people, for example, in prisons are less likely to be violent and so forth. So when you're considering the longevity of a life sentence, a good bit of that is on the far end of their life when they're less active and less violent and less whatever.

---

Q. That's right. And you're also aware of those studies of which you speak which indicate that as prisoners get older, their behavior starts to slow down and they become less of a problem in the penitentiary, correct?

A. They're like the rest of us in that regard.

(page 2360, lines 5-15)

103. There was no expert testimony, however, that age is one of the most powerful predictive factors for prison misconduct violence, with inmates having progressively lower rates of misconduct (Hirschi & Gottfredson, 1989, Stephan, 1989) and assaultive misconduct (Sorensen & Pilgrim, 2000) as they age. This observation holds even when the inmate committed the offense of conviction at an older age (Flanagan, 1980; Sorensen & Pilgrim, 2000). Thus, holding other factors constant, Mr. Fields' risk of violence as a 28-year-old inmate is markedly less than inmates in their late teens or early twenties, and would be expected to further decline as he ages in prison. Additionally, these widely-accepted age-related findings provide important perspectives regarding Mr. Fields' disciplinary misconduct in the Texas Department of Criminal Justice as he began that prior prison sentence in his late teens and was thus in the highest risk age-category.

*Education*

104. Higher levels of educational achievement have been described as associated with lower levels of prison misconduct and assault (Cao et al, 1997; DeLisi et al., 2004; Grendeau et al., 1997). Harer and Langan (2001), in a large-scale study of inmates in federal prison, reported that inmates who have earned a high school diploma or G.E.D. (the educational attainment of Mr. Fields) have lower rates of violence in prison. My colleagues and I had collected and analyzed data from a multi-year study of violence in a high-security prison, demonstrating that, controlling for other factors, offenders who had attained a high school diploma or G.E.D. demonstrated *half* the prevalence rates of prison assault as inmates not having this level of educational attainment. There was no testimony at Mr. Fields' sentencing trial regarding the effect of age on his risk of serious violence in prison.

*Application of actuarial scales*

105. Actuarial models have proven more reliable than clinical judgment (such as employed by Dr. Coons) in a variety of risk assessment contexts (Dawes, Faust, & Meehl, 1989). Two actuarial scales were available in February 2004 for forecasting the risk of assault in prison that could have been applied to Mr. Fields. The first is based on a study of the prison misconduct of approximately 6,000 convicted murderers, projecting their likelihood of serious prison violence during a 40-year prison term (Sorensen & Pilgrim, 2000). Application of this scale to Mr. Fields yields a 40-year risk of a 14.5% likelihood of serious prison violence. This is modestly below the risk rate of 16.4% of the

sample as a whole. Most of this risk is for assault of another inmate. Life-time risk of an aggravated assault on a correctional officer is projected at 1%. These risk rates are far below the "more likely than not" risk asserted by Dr. Coons:

> A. That's right. That's right. My opinion is that it's significantly more likely than not that he will be of a danger to other people, other inmates and correctional officers and medical personnel and so forth.
>
> (direct examination of Dr. Richard Coons, page 2352, line 24 to 2333, line 2)

106. A second actuarial scale had been constructed, but not yet published by me and my colleagues in early 2004, based on over 3,000 inmates over an 11-year period in a high-security prison. Application of this scale to Mr. Fields results in a mid-level risk (risk level 5 of 8). Of inmates sharing this risk category, 14.9% exhibited assaultive misconduct over a several-year period. Again, this risk projection is far below "more likely than not."

*Application of base rate data*

107. Knowledge of the base rate of violence in the representative group is the single most important piece of data in making an accurate violence risk assessment (Monahan, 1981). The analysis I have provided above has articulated much of the relevant base rate data. A finding that offenders similar to the defendant present a low and not disproportionate risk of serious violence in prison will be reached with high reliability in most capital cases through the application of base rate (i.e., group statistical) and actuarially derived data (Cunningham, in press; Cunningham & Goldstein, 2003; Cunningham & Reidy, 1998b, 1999, 2002; Sorensen & Pilgrim, 2000; Reidy, Cunningham, & Sorensen, 2001). Mr. Fields is not an exception to this conclusion. The specified improbability will vary in relation to the severity of violence being forecasted. Further, and as discussed previously, even that low probability can be reduced by the application of correctional interventions including more secure confinement (for discussion of violence risk assessment testimony at federal capital sentencing in light of *Daubert* see Cunningham & Reidy, 2002).

*Application of a past pattern analysis*

108. As has been described previously, neither having committed a capital murder nor having a history of violence in the community are predictive of serious violence in prison. Rather, a history of serious violence in prison is predictive of serious violence in prison. An analysis of Mr. Fields' pattern of behavior in confinement does not reflect a history of serious assaults against staff or other inmates. Rather, his history points to his engaging in threats, verbal abuse, belligerence, open masturbation, etc. that while creating a management problem, did not progress to serious assaults or significant injury of other persons within the prison. To the extent that this pattern is unrelated to the

---

Case 6:01-cr-00164-WSS    Document 300-3    Filed 03/07/09    Page 36 of 41

aggravating effects of his conditions of confinement in the McLennan County Jail, it is simply predictive of continuing management problems – not serious violence. Similarly, there is no indication that Mr. Fields attempted to act on his threats against correctional officers or their families through the recruitment of others outside of prison.

## *Summary*

109.    Had I been called to testify at Mr. Fields' capital sentencing in 2004, I could have testified to the above. I would have testified that his likelihood of serious prison violence during a life without possibility of parole sentence in BOP was well below "more likely than not." I would have additionally testified that should Mr. Fields have been determined by BOP to be a disproportionate risk of violence in prison, he could be held under super-maximum security conditions until determined to no longer be a disproportionate risk.

110.    In the absence of such testimony, leaving before the jury only the unrebutted testimony of Dr. Coons, the risk analysis performed by Mr. Fields' capital sentencing jury was subject to grave errors. This conclusion is based on the following:

a.    Individuals undertaking violence risk assessment are likely to commit a number of fundamental errors unless guided by reliable scientific methodology and data. These errors more often result in an overestimation of violence risk (see Shah, 1978). The jury is unlikely to have knowledge of this methodology and research data unless informed by expert testimony.

b.    A capital jury's familiarity with the heinousness of the capital offense and knowledge of other aggravating factors or acts are likely in many instances to result in a perception of high future violence risk in prison that is not justified by research.

c.    The combination of these factors is likely to result in a capital sentencing jury that is strongly biased toward overestimation of violence risk when scientifically grounded expert testimony is not presented to the jury.

d.    In the absence of expert testimony, a capital jury has no mechanism to understand or incorporate base rate data, appreciate the importance of context, avoid illusory correlation, maintain skepticism of clinical methods, understand the implications of Antisocial Personality Disorder or related characterizations, incorporate the effects of aging, reliably evaluate patterns of behavior, factor in preventive measures, acquire the broad information relevant to violence risk considerations, appreciate the probabilistic nature of their task, or critically evaluate the arguments of the Government or the defense.

Case 6:01-cr-00164-WSS Document 300-3 Filed 03/01/09 Page 37 of 41

e.  The scientific methodology and data relevant to violence risk assessment of capital offenders is based on multiple independent research studies, has been subjected to peer-review, articulates an error rate through the range of probabilities expressed, and is generally accepted in the violence risk assessment scientific community. [Note that this scientifically-sound methodology and data were not utilized by Dr. Coons.]

f.  A capital jury is at best almost certain to be ignorant of rates of prison violence, inmate demographics and criminal histories, and prison confinement options and security procedures.

g.  At worst a capital jury comes to capital sentencing risk assessment holding assumptions regarding "future dangerousness" that are false. Such false assumptions spring from intuitive but erroneous beliefs. It must be emphasized that much of the research data on the violence risk assessment of prison inmates is counter-intuitive.

111.  Avoidance of fundamental errors in violence risk assessment at Mr. Fields' capital sentencing required the testimony of an expert to inform the jury of scientifically-sound methodology and empirical data, and to rebut the faulty methodology and erroneous opinions offered by Dr. Coons. Particularly when accompanied by demonstrative exhibits that assist the jury's understanding and retention, such testimony detailing violence risk assessment methodology and empirical data could have been presented to Mr. Fields' capital sentencing jury in a clear, organized, logical fashion that would neither confuse nor mislead that jury.

EXECUTED UNDER PAINS AND PENALTIES OF PERJURY:

_____        Date: 01/10/09
Mark D. Cunningham, Ph.D., ABPP

# REFERENCES

Alexander, J. & Austin, J. (1992). *Handbook for evaluating objective prison classification systems.* San Francisco: National Council on Crime and Delinquency. Sponsored by U.S. Department of Justice.

American Psychiatric Association (1994). *Diagnostic and statistical manual of mental disorders (4th ed.).* Washington DC: Author.

American Psychological Association (2005). Brief of *amicus curie* in support of defendant-appellant, *U.S. v Sherman Lamont Fields*, in the United States Court of Appeals for the Fifth Circuit.

Barefoot v. Estelle, 463 US 880 (1983).

Cao, L., Zhoa, J., & Van Dine, S. (1997). Prison disciplinary tickets: A test of the deprivation and importation models. *Journal of Criminal Justice, 25*, 103-113.

Cooper, R., & Werner, P. (1990). Predicting violence in newly admitted inmates. *Criminal Justice and Behavior, 17,* 431-477.

Cunningham, M. D. (*in press in 2004*). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), *Forensic evaluations under Texas law: Selected criminal issues*. To be published by the Capacity for Justice.

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

Cunningham, M. D., & Reidy, T. J. (1998a). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16*, 333-351.

Cunningham, M. D. & Reidy, T. J. (1998b). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences & the Law, 16*, 71-95.

Cunningham, M.D., & Reidy, T.J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Cunningham, M. D. & Reidy, T. J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*, 512-537.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Dawes, R. M., Faust, D., & Meehl, P. E. (1989). Clinical versus actuarial judgment. *Science, 243,* 1668-1674.

DeLisi, M., Berg, M. T., & Hochstetler, A. (2004). Gang members, career criminals and prison violence: Further specification of the importation model of inmate behavior. *Criminal Justice Studies, 17*, 369-383.

Edens, J. F., Petrila, J., & Buffington-Vollum, J. K. (2001). Psychopathy and the death penalty: Can the Psychopathy Checklist-Revised identify offenders who represent "a continuing threat to society?" *Journal of Psychiatry and Law, 29*, 433-481.

Estelle v. Smith 451 U.S. 454 (1981).

Flanagan, T. J. (1980). Time served and institutional misconduct: Patterns of involvement in disciplinary infractions among long-term and short-term inmates. *Journal of Criminal Justice, 8,* 357-367.

Furman v. Georgia, 408 U.S. 238 (1972).

Gendreau, P., Goggin, C. E., & Law, M. A. (1997). Predicting prison misconducts. *Criminal Justice and Behavior, 24*, 414-431.

Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement, *Crime & Delinquency, 49*, 130- .

Hare, R. D. (1991). *The Hare Psychopathy Checklist - Revised.* Toronto,: Multi-Health Systems.

Harer, M. D. & Langan, N. P. (2001). Gender differences in predictors of prison violence: Assessing the predictive validity of a risk classification system. *Crime & Delinquency, 47,* 513-536.

Harpur, T. J., & Hare, R. D. (1994). Assessment of psychopathy as a function of age. *Journal of Abnormal Psychology, 103,* 604-809.

Heilbrun, K. (1997). Prediction versus management models relevant to risk assessment: The importance of legal decision-making context. *Law and Human Behavior, 21,* 347-359.

Hirschi, T., & Gottfredson, M. (1989). Age and the explanation of crime. *American Journal of Sociology, 89,* 552-584.

Jurek v. Texas, 428 U.S. 153, 96 S. Ct. 2950 (1976).

Case 6:01-cr-00164-WSS   Document 300-3   Filed 03/01/09   Page 40 of 41

Marquart, J. W., & Sorensen, J. R. (1988).  Institutional and post release behavior of Furman-commuted inmates in Texas. *Criminology, 26,* 677-693.

Marquart, J. W., & Sorensen, J. R. (1989).  A national study of the Furman-commuted inmates: Assessing the threat to society from capital offenders.  *Loyola of Los Angeles Law Review, 23,* 5-28.

Marquart, J. W., Ekland-Olson, S., & Sorensen, J. R. (1989). Gazing Into the crystal ball: Can jurors accurately predict dangerousness in capital cases? *Law & Society Review, 23,* 449-468.

Monahan, J. (1981). *Predicting violent behavior: An assessment of clinical techniques.* Beverly Hills:  Sage.

Myers, J. K., Weissman, M. M., Tischler, G. L., Holzer, C. E. III, Leaf, T. J., Orzashel, H., Anthony, J. C., Boyd, J. H., Burke, J. D., Kramer, M., & Stoltzman, R. (1984). Six-month prevalence of psychiatric disorders in three communities, 1980-1982. *Archives of General Psychiatry, 41,* 959-967.

National Institute of Corrections (1992).  *Jail classification system development: A review of the literature, revised edition.* U.S. Department of Justice. Author.

Pastore, A. L., &Maguire, K. eds. (2003). *Sourcebook of criminal justice statistics* (2002) NCJ 203301 [Online]. Available: http://www.albany.edu/sourcebook/.

Quay, H. (1984). *Managing adult inmates: Classification for housing and program assignments. Adult internal management system (AIMS) classification manual.* College Park, MD: American Correctional Association.

Regier, D. A., Boyd, J. H., Burke, J. D., Rae, D. S., Myers, J. K., Kramer, M., Robins, L. N., George, L. K., Karno, M., & Locke, B. Z. (1988). One month prevalence of mental disorders in the United States. *Archives of General Psychiatry, 45*, 977-986.

Reidy, T. J., Cunningham, M. D., & Sorensen, J. R. (2001). From death to life: Prison behavior of former death row inmates. *Criminal Justice and Behavior, 28*, 67-82.

Shah, S. (1978).  Dangerousness: A paradigm for exploring some issues in law and psychology. *American Psychologist, 33,* 224-238.

Sorensen, J. R. & Pilgrim, R. L. (2000).  An actuarial risk assessment of violence posed by capital murder defendants. *Journal of Criminal Law & Criminology, 90*, 1251-1270.

Sorensen, J. R., & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions among death-sentenced and life-without-parole inmates. *Criminal Justice and Behavior, 23,* 542-552.

Stephan, J. (1989). Prison rule violators. Bureau of Justice Statistics special report. U.S. Department of Justice. NCJ-120344.

Texas Defender Service (2004). *Deadly speculation*: *Misleading Texas capital juries with false predictions of future dangerousness.* Austin: Author.

Texas Department of Criminal Justice (2004) *Fiscal year 2003 statistical report*. Huntsville, TX: Author.

Texas Department of Criminal Justice. (January, 2004). *Emergency Action Center select statistics: December 2003*. Executive Services Department. Huntsville, TX: Author.

Toch, H. (2001). The Future of supermax confinement, *Prison Journal, 81*.

U.S. Department of Justice (2-17-00). Program statement 5100.07: Security designation and custody manual, Chapter 7: Public safety factors and management variables. Federal Bureau of Prisons. Washington, D.C.

U.S. Department of Justice. (Policy statements and statistical data). Federal Bureau of Prisons. Washington, D.C.

U.S. v. Felipe, 148 F.3d 101 (2nd Cir. 1998).

U.S. v. Ramsi Yousef, Southern District of New York, Cause No. 612 93 CRI180 (KTD) (1998).