IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA

vs.

SHERMAN LAMONT FIELDS

NO. _____

CRIMINAL CASE NO.
W-01-CR-164; 09-CV-9-WSS

## SHERMAN LAMONT FIELDS' REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION FOR A NEW TRIAL AND TO VACATE, SET ASIDE AND CORRECT CONVICTION AND DEATH SENTENCE, AND FOR RELIEF FROM JUDGMENT, MADE PURSUANT TO 28 U.S.C. § 2255 OR, RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

### *** THIS IS A CAPITAL CASE ***

Defendant Sherman Lamont Fields ("Mr. Fields"), by counsel, hereby replies to the Government's Response to Petitioner's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (the "Government's Response" or "GR").  Mr. Fields re-asserts all factual and legal allegations contained in his Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, Made Pursuant to 28 U.S.C. § 2255 or, in the Alternative, Pursuant to 28 U.S.C. § 2241 or Rule 33 of the Federal Rules of Criminal Procedure (the "Petition") and in his First Amended  Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, Made Pursuant to 28 U.S.C. § 2255 or, in the Alternative, Pursuant to 28 U.S.C. § 2241 or Rule 33 of the Federal Rules of Criminal Procedure (the "Amended Petition").[1]

## PRELIMINARY STATEMENT

Mr. Fields demonstrated in his Petition that he is entitled to a new trial, or alternatively, discovery and an evidentiary hearing because neither Mr. Fields' conviction nor his death sentence was the product of a constitutionally reliable determination of the facts.  To the contrary, the "building blocks" that formed the "foundation" for Mr. Fields' conviction, as the Government analogized during its penalty phase closing (TT at 2504:8-23), have been shown to be structurally unsound.

The conviction of Mr. Fields, from start to finish, is an example of justice gone horribly awry.  Mr. Fields' trial and conviction are the direct result of a series of fundamental failures of the systems designed to safeguard his constitutional rights and the integrity of the

---

[1]   On April 16, 2010, Mr. Fields filed with this Court his Amended Petition pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).  As a result, Mr. Fields' Amended Petition is now the operative petition setting forth Mr. Fields' claims for relief and his factual support for those claims.  The Government voluntarily chose not to respond to the Amended Petition, and, as a result, this Reply is to the Government's response to the original Petition.  If the Government later seeks and is granted leave to file an untimely response to the Amended Petition, Mr. Fields will, upon motion to this Court, file a reply to that response.

federal criminal trials in the search for truth.  Without Court intervention, these systemic failures will cost Mr. Fields his life and undermine the integrity of the judicial system.

As one example of a systemic failure, although they had two years to do so, Mr. Fields' appointed counsel failed to conduct an adequate or competent investigation into the facts and circumstances surrounding the crimes for which Mr. Fields was accused.  Mr. Fields repeatedly told his counsel he was innocent and that there were witnesses, including an eye-witness, that could corroborate his story and offer exculpatory evidence.  His counsel failed to interview those key witnesses.  Counsel's deficient performance, combined with the fact that Mr. Fields suffers from Atypical Bipolar Disorder and Post-Traumatic Stress Disorder ("PTSD"), led to a relationship so rife with disagreement and distrust that Mr. Fields came to believe his counsel were conspiring with and working for the Government – not him.  Based on this belief, Mr. Fields repeatedly sought (and was repeatedly denied) new counsel.  When Mr. Fields learned just days before trial – and for the first time in more than two years of representation – that one of his appointed attorneys was involved with his prosecution as a youth, it confirmed his conspiracy theory and he felt he had no choice but to make a final motion for new counsel. When the Court denied his motion, Mr. Fields made the fatal decision to waive counsel and represent himself at his capital murder trial, a decision he would not have been permitted to make but for yet another systemic failure of justice.

It is clear now, and would have been clear at the time of trial if an adequate competency evaluation was performed, that Mr. Fields' decision to represent himself at trial was the direct result of his mental illness.  However, despite Mr. Fields' obvious mental infirmities, which the Government recognized when it requested that Mr. Fields be examined by a psychiatrist to determine whether he possessed the requisite mental competency to proceed *pro se*, his competency was never adequately examined.  After an exceedingly brief and uninformed

thirty minute examination by the court-appointed psychiatrist, and a one minute competency hearing, Mr. Fields was permitted to waive counsel and represent himself at trial. The court-appointed psychiatrist has since admitted that as a part of his cursory competency examination, Mr. Fields' counsel did not provide him with, nor did he request or review, any of Mr. Fields' voluminous medical or social history records. *See Declaration of Dr. Stephen Mark* ¶ 4. This is true even though Mr. Fields' counsel had records in its possession diagnosing and demonstrating Mr. Fields' severe metal illness. Moreover, if Mr. Fields' counsel had actually conducted any kind of an investigation into Mr. Fields' mental health background and current mental condition, they would have found a plethora of information demonstrating the signs and symptoms of Atypical Bipolar Disorder and PTSD – including a history of paranoid ideation, scanning behavior, impaired judgment, delusional thinking, hypersexuality, irritability, grandiosity, impulsivity, impaired sleep and impaired cognitive functioning – signs and symptoms that all indicated that Mr. Fields was not competent to waive counsel or represent himself. Indeed, Dr. Woods, the only psychiatrist to conduct an adequate examination of Mr. Fields in connection with his trial, and the only psychiatrist to review the voluminous background documentary evidence relating to Mr. Fields' medical and social background has confirmed that "Mr. Fields was not [] competent to waive counsel and/or represent himself." *Declaration of George Woods*, dated February 27, 2009 (hereinafter "*Woods Declaration I*"), at 2; *Declaration of George Woods*, dated April 11, 2010 (hereinafter "*Woods Declaration II*"), ¶ 108.[2]

The spectacle of a trial that unfolded once Mr. Fields was allowed to represent himself bolsters Dr. Woods' opinion. At trial, as a result of his mental illness, Mr. Fields' ability to communicate, absorb and comprehend the Government's evidence, formulate questions and

---

[2] For the ease of the Court, unless otherwise noted, all references to Appendixes and Exhibits herein are references to documents attached to and filed with the Amended Petition.

conceive and articulate affirmative theories of the case were critically diminished. His abilities were even further diminished by the unjustified and mentally debilitating courtroom security measures, which included, among other things, being required to wear a stun belt, and his style of incarceration, which included being kept in a cell that was constantly lit and noisy, where he was forced to sleep on the floor between the cell door and toilet, and where he was constantly monitored. As a result of mental illness, sleep deprivation, and lack of legal training, Mr. Fields was simply unable to formulate admissible or relevant questions, meaningfully cross-examine witnesses, or formulate the most basic trial strategies effectively.

Accordingly, when the Government put on a case devoid of any physical evidence linking Mr. Fields to the crime he was convicted of, a case based almost exclusively on testimony from sources that the Government knew (or should have known) to be unreliable – jailhouse informants and the two individuals Mr. Fields contends are the actual killers – Mr. Fields was incapable of carrying out the basic tasks needed to effectively cross-examine the witnesses and present his defense. The foundation of the murder case against Mr. Fields was always weak. And, while the forensic evidence Mr. Fields seeks through discovery in this proceeding may definitively prove Mr. Fields' innocence, even without DNA, the Government's case has no credibility in light of the new factual allegations set forth in the Petition.

Once Mr. Fields was permitted to waive counsel, he had a constitutional right to self-representation, yet this right too was violated repeatedly, representing another systemic failure. For example, trial counsel, then acting as standby counsel, did not allow Mr. Fields to exercise one of his peremptory challenges as he saw fit; Mr. Fields was not permitted to participate in bench and chambers conferences, which was a structural violation of Mr. Fields' rights as a *pro se* litigant; and he was subjected to enhanced security measures, including being forced to wear a stun belt, which made it impossible for him to concentrate. As demonstrated in

the Petition, from start to finish, Mr. Fields' trial was rampant with systemic failures to protect Mr. Fields' constitutional rights from violation.

After Mr. Fields was found guilty and decided to allow his counsel to represent him during the mitigation phase of the trial, his rights were further violated. Counsel's mitigation phase investigation was even less thorough and competent than its guilt phase investigation. The Government's case for death rested heavily on an allegation of "future dangerousness" and relied on a misleading and scientifically unsound presentation by the Government's so-called "expert witness," Dr. Coons. Trial counsel failed to rebut Dr. Coons' testimony with the readily available evidence demonstrating that, in fact, Mr. Fields presented a very low risk of future dangerousness. Trial counsel also failed to hire an expert who could have effectively rebutted Dr. Coons' unsound methodology. Indeed, Mr. Fields' trial counsel, Robert Swanton, admits that he did not adequately prepare to either cross-examine Dr. Coons or attempt to disqualify Dr. Coons as an expert. *See Affidavit of Robert Swanton, Esq.*, ¶¶ 12-14.

Further proof of the systemic failure to provide Mr. Fields with effective counsel is evident in the development (or lack thereof) of his mitigation case. Mr. Fields endured a life full of hardship, suffering, and violence that most of us cannot imagine. His caretakers' neglect resulted in a reduced ability to cope. His serious mental illness only made matters worse. However, if given proper structure, Mr. Fields can positively thrive. Dozens of witnesses were available – many of whom were present at trial – who could have provided the jury with rich detail about the unimaginable abject poverty, malnutrition, physical and emotional abuse, helplessness, despair, racial oppression, omnipresent threat of violent death, and the myriad of other obstacles that Mr. Fields faced daily as a child. Many of those witnesses could have also described the selfless acts of caring and kindness that Mr. Fields bestowed on them on a regular basis. Mr. Fields' jurors heard none of this because counsel failed to seek out and present such

testimony.  In fact, after reviewing just a portion of the mitigation evidence developed by habeas counsel, Jane Bye, trial counsel's mitigation specialist, admitted that there was no tactical reason for the trial team not to uncover this information.  *See Second Affidavit of Jane Bye* ¶ 6.  To the contrary, this was the type of information the trial team should have but did not uncover.  *Id.* Such a failure is inexcusable, and constitutionally deficient, particularly given that some of the witnesses who could have provided this vital information were sitting in the courtroom, but never approached by counsel.

Trial counsel's ineffectiveness was also evident during penalty phase closing, when counsel told the jurors:

> We know that Sherman Lamont Fields grew up on the street and he
> lived by his instinct.  We know that he was subject to impulsive
> behavior.  We know that he was the type of person who felt that he
> needed to be in control. . . .

TT at 2514:2-6.  This description of Mr. Fields, uninformed by a competent investigation, is frankly more aggravating than it is mitigating given that it portrays Mr. Fields as an animal guided by impulse and instinct and the need for control.  It was, in fact, a paraphrase of the Government's theme.  As demonstrated in the Petition and herein, a much more humanizing (and accurate) picture existed, but was uninvestigated by the trial team.

In response, the Government does not deny the vast majority of the facts set forth in Mr. Fields' Petition, nor does it offer any affidavits, exhibits or other evidence refuting such evidence.  Instead, relying on inapplicable law and mischaracterized facts, the Government makes a series of bald and conclusory arguments that Mr. Fields' constitutional rights were not violated.  The Government's failure to adequately respond to the facts set forth in Mr. Fields' Petition only underscores the strength of those claims.

While the Eighth Amendment allows the death penalty as an appropriate response to especially egregious crimes, it also strictly regulates the procedures by which death sentences are imposed and reviewed.  *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("Th[e] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"); *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (asserting that the need for reliability in death sentences "'requires a correspondingly greater degree of scrutiny of the capital sentencing determination'") (citation omitted).  Sentencing procedures for capital crimes, far more so than for non-capital crimes, must be created and enforced in a way that ensures that the punishment will not be inflicted in an arbitrary and capricious manner.  Because of the numerous errors described herein, that has not happened here.  Accordingly, Mr. Fields is entitled to discovery, an evidentiary hearing, and ultimately a new trial.

## ARGUMENT

## I.   EACH OF MR. FIELDS' CLAIMS IS PROPERLY BEFORE THIS COURT IN THIS PROCEEDING

On December 3, 2008, this Court granted Mr. Fields' motion for equitable tolling of the statute of limitations, giving him until March 1, 2009 to file his Petition.  The Government acknowledges that this Court granted Mr. Fields equitable tolling, but nonetheless asserts that claims 7, 9, 13, 14, 16, 26-28, 31, 38, 40, 41, 43 and 45 are barred because they were not timely, claiming that the Court's granting of equitable tolling was in error.  The Government is wrong.  The Supreme Court has held that the one year period of limitations found in Section 2244(1)(d) for filing the analogous Section 2254 petition is not a jurisdictional bar and that the limitations period can be equitably tolled under appropriate circumstances.  *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010) ("[W]e hold that [Section] 2244(d) is subject to equitable tolling in appropriate cases"); *see also Davis v. Johnson*, 158 F.3d 806, 807 (5th Cir. 1998) ("We conclude

that the limitations period does not circumscribe federal jurisdiction, and can be equitably tolled in appropriate, albeit extraordinary circumstances"); *Flanagan v. Johnson*, 154 F.3d 196, 200 n.2 (5th Cir. 1998) (recognizing that the limitations periods applicable to Section 2254 petitions and Section 2255 motions are "virtually identical").  Here, this Court granted Mr. Fields equitable tolling based on the delay in granting Mr. Fields' habeas counsel.  This is precisely the type of "extraordinary" circumstance in which equitable tolling is appropriate and the Government does not and cannot cite to a single case to the contrary.  *See Davis*, 158 F.3d at 808 n.2 (assuming without deciding that the district court's failure to notify counsel of his appointment for a certain period of time justified equitably tolling to period of limitations).  In addition, a stated in Mr. Fields' Emergency Motion for Equitable Tolling ("Equitable Tolling Motion"), filed with this Court on November 28, 2008, Mr. Fields' counsel "attempted to contact opposing counsel, Assistant United States Attorney Gloff, regarding this motion.  However, Mr. Gloff has not responded to this inquiry or any other inquiry made by undersigned counsel." Equitable Tolling Motion at 2.  In fact, the Government never responded or opposed Mr. Fields' Equitable Tolling Motion and has therefore waived any opposition.  *See* Western Dist. of Texas Local Rule CV-7(d).  Accordingly, claims 7, 9, 13, 14, 16, 26-28, 31, 38, 40, 41, 43 and 45 are properly before this Court in this proceeding.

## II.     CLAIMS RELATED TO FIELDS' INCOMPETENCY TO WAIVE COUNSEL AND PROCEED *PRO SE*

CLAIM 1:     MR. FIELDS WAS INCOMPETENT TO WAIVE HIS RIGHT TO COUNSEL. PERMITTING MR. FIELDS TO REPRESENT HIMSELF VIOLATED THE CONSTITUTIONAL GUARANTEES OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 2:     MR. FIELDS WAS DENIED HIS RIGHT TO COUNSEL AND DUE PROCESS WHEN THE TRIAL COURT CONDUCTED AN INADEQUATE HEARING IN RESPONSE TO MR. FIELDS' COMPETENCY TO WAIVE COUNSEL AND REPRESENT HIMSELF, VIOLATING THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE U.S. CONSTITUTION.

<u>CLAIM 3</u>:    MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE SENTENCING VERDICT WHEN COUNSEL FAILED TO CONDUCT A COMPETENT INVESTIGATION PRIOR TO OR IN RESPONSE TO MR. FIELDS' REQUEST TO WAIVE COUNSEL, FAILED TO DEMAND A BROADER INQUIRY BY THE COURT IN RESPONSE TO FIELDS' MOTION, AND FAILED TO OBJECT TO MR. FIELDS' COMPETENCY TO WAIVE HIS RIGHT TO COUNSEL.

In his Petition, Mr. Fields established that his constitutional rights under the Fifth, Sixth and Eighth Amendments were violated when he was allowed to stand trial, waive counsel, and proceed *pro se* despite suffering severe and debilitating mental disabilities, including Atypical Bipolar Disorder and PTSD, and that, as such, he is entitled to a new trial or, alternatively, an evidentiary hearing.  *See* Petition at 24-45; Amended Petition at 30-68.  The Government does not even attempt to rebut the evidence set forth in the Petition demonstrating that Mr. Fields suffers from Atypical Bipolar Disorder and PTSD.  *See* GR at 8-15.  Instead, the Government simply asserts, without addressing any of Mr. Fields' new evidence, that the cursory competency examination of Mr. Fields by Dr. Marks, the "less than one page" competency hearing, and the complete failure of his counsel to investigate and present Mr. Fields' mental and social history to Dr. Mark and this Court by appointed counsel were adequate.  The Government is wrong on both the facts and the law.

## A.    Mr. Fields Was Incompetent To Stand Trial, Waive Counsel, And Represent Himself

In his Petition, Mr. Fields established that he is entitled to an evidentiary hearing as to the issue of whether his mental illnesses rendered him unfit to stand trial, waive counsel and proceed with his own defense.  *See* Petition at 24-45; Amended Petition at 30-68.  The Petition demonstrated that, impaired by Atypical Bipolar Disorder and PTSD, Mr. Fields did not meet the basic standards for mental competency because he was incapable of "consult[ing] with his lawyer with a reasonable degree of rational understanding," *Dusky v. United States*, 362 U.S.

402, 402 (1960) (*per curiam*), nor was he able to "assist in preparing his defense," *Drope v. Missouri*, 420 U.S. 162, 171 (1975).  Indeed, Mr. Fields' overwhelming paranoia led to the belief that his lawyers were conspiring with the Government to obtain his conviction, a symptom of the mental disease that led him to waive his right to counsel and seek to represent himself.  *See Woods Declaration I* at 12; *Woods Declaration II* ¶ 111.  At best, Mr. Fields is a "borderline-competent" defendant who should never have been allowed to  "play the significant expanded role required for self-representation" because he manifestly could not "carry out the basic tasks needed to present his own defense," such as the "organization of defense, making motions, arguing points of law, participating in *voir dire*, questioning witnesses, and addressing the court and jury."  *Indiana v. Edwards*, 128 S. Ct. 2379, 2387 (2008); *see also* Petition at 35-44; Amended Petition at 57-68.  Just as importantly, Mr. Fields should not have been allowed to waive counsel without an adequate evaluation, informed by Mr. Fields' mental health history.  And, if Dr. Mark did not think or was unwilling to ask for that information during his evaluation, defense counsel was obliged to present it to him and the Court.

Dr. George Woods, who, unlike Dr. Mark (or Dr. Price), conducted a lengthy interview with Mr. Fields and reviewed voluminous background documentary evidence regarding Mr. Fields' social and medical history, confirmed that "Mr. Fields was not [] competent to waive counsel and/or represent himself."  *Woods Declaration I* at 2; *Woods Declaration II* ¶ 108.

The Government does not and cannot offer any response to the evidence indicating that Mr. Fields was incompetent to stand trial and defend himself.  The Government does not even address the findings of Dr. Woods, much less offer any evidence to refute his conclusions.  Nor does the Government make any attempt to distinguish Mr. Fields' grossly

inadequate trial and conviction from that of the borderline-competent defendant in *Edwards*. Rather, the Government misreads and misapplies the law and mischaracterizes the record.

First, by misreading *Godinez v. Moran*, 509 U.S. 389 (1993), the Government argues that there is no difference in the constitutional standard to waive counsel and that required to proceed *pro se*. GR at 9. As Mr. Fields demonstrated in his Petition, however, *Godinez* does not address or control the standard to proceed *pro se* and, as such, has no bearing on whether Mr. Fields was competent to represent himself at trial. Petition at 38-39; Amended Petition at 60-61. Indeed, *Edwards* clarified that the *Godinez* defendant did not seek to represent himself at trial but rather sought only to plead guilty and therefore "his ability to conduct a defense at trial was *expressly not an issue*." 128 S. Ct. at 2385 (emphasis added). The Court explained, "[i]n *Godinez*, the higher standard sought to measure the defendant's ability to proceed on his own to *enter a guilty plea*; here the higher standard seeks to measure the defendant's ability *to conduct trial proceedings*." *Id.* (emphasis added). The difference is crucial – entering a guilty plea requires no more capability than that to stand trial, whereas conducting trial proceedings requires the enhanced and "different standard" of competence announced by *Edwards,* the competence to "play the significantly expanded role required for self-representation." *Id.* at 2387. Accordingly, in *Godinez* the Court made clear that the issue before it was *only* the defendants' "competence to *waive the right*" and not his "competence to represent himself." 509 U.S. at 399 (emphasis in original).[3] The Government ignores this distinction, and as such, seeks to apply the wrong standard.

---

[3]    The Government also argues that the Court did not overrule *Faretta*. But this is simply irrelevant to the question of Fields' competence. *Faretta* addressed the *quality* of the decision to waive counsel, not the threshold *ability* to do so. Indeed, the Court in *Edwards* stated, "*Faretta* does not answer the question before us both because *it did not consider the problem of mental competency*." 128 S. Ct. at 2384 (emphasis added). Accordingly, the Court's "15-minute interview," where it satisfied itself that Fields' waiver was "knowing and intelligent" under *Faretta*, did not answer the question of Fields' competency. *Godinez*, 509 U.S. at 401 n.12 (explaining that the

Second, relying solely on the dissent, the Government contends that *Edwards* "did not answer the question of whether another constitutional requirement limits a defendant's right to elect self-representation." GR at 9. The Government fails to offer any authority supporting this conclusion and ignores the mass of authority set forth in the Petition that interprets *Edwards* to do just that. *See* Petition at 42-44; Amended Petition at 66-68. For example, in *United States v. Ferguson*, 560 F.3d 1060 (9th Cir.), *cert. denied*, 130 S. Ct. 286 (2009), the Ninth Circuit Court of Appeals found that "[The Supreme Court] held that the question of mental competence for self-representation 'calls for a different standard' than the question of mental competence for assistance of counsel at trial. . . . *The Court therefore recognized 'a mental-illness-related limitation on the* scope *of the self-representation right.*'" *Id.* at 1067 (emphasis added; citation omitted); *see also Chadwick v. Texas*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010) (same).

Third, the Government tautologically argues that Mr. Fields must have been competent to proceed *pro se* because he was allowed to proceed *pro se*. *See* GR at 10. This argument cannot be reconciled with *Edwards,* which the Government does not even attempt to distinguish. In *Edwards* the defendant "filed several intelligible pleadings, such as a motion to dismiss counsel, a motion to dismiss charges under the Indiana speedy trial provision, and a motion seeking a trial transcript." 128 S. Ct. at 2389 (dissenting op.). The *Edwards* defendant also made "coherent" arguments in the courtroom and "correctly answered questions about the meaning of *voir dire* and how it operated, and described the basic framework for admitting videotape evidence to trial." *Id.* (dissenting op.). Nonetheless, the Supreme Court held that the a borderline-competent defendant who, like Mr. Fields, to the layman appeared "free of psychosis, depression, mania, and confusion," "alert," "able to think clearly," "coherent," and

---

purpose of a *Faretta* inquiry is "to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision in uncoerced") (emphasis in original).

"psychiatrically normal" was incapable of self-representation because he, like Mr. Fields, suffered from mental disorders that critically impaired the psychological functions and abilities necessary to conduct trial proceedings. *Id.* (dissenting op.).

Here, there is no better proof of Mr. Fields' incompetence to waive counsel than the trial transcript itself. As a consequence of his multiple mental diseases, aggravated by the traumatic conditions of his confinement and involuntary restraint by a stun belt, Mr. Fields was unable "to carry out the basic tasks needed to present his own defense without the help of counsel." *Id.* at 2386. As discussed in more detail in the Petition, Mr. Fields was unable to formulate admissible or relevant questions, cross-examine witnesses meaningfully or formulate the most basic of trial strategies effectively. *See* Petition at 39-41; Amended Petition at 62-65. Indeed, Mr. Fields' inability to create coherent lines of questioning was so severe as to prompt the Court to order Mr. Fields to conduct a mock cross-examination of a key Government witness (thereby giving the Government and its witness a preview of his theories and "strategies").

Finally, the Government contends that the examination of Mr. Fields by Dr. Price, who did not even testify as to Mr. Fields' competency, provides evidence of his competency. GR at 8. Again, the Government mischaracterizes the facts. Based on a mischaracterization of the Declaration of Dr. Price, the Government claims that Dr. Price "specifically found no mental disorder that precluded Fields' competency to represent himself." GR at 11. However, the Government ignores the portion of that same declaration where Dr. Price states that he "was not asked and did not evaluate Mr. Fields on the issue of whether he was competent to represent himself. . . ." *See Declaration of Dr. J. Randall Price* ¶ 6. Instead, Dr. Price conducted an IQ examination and limited his conclusions and his testimony to the academic potential of Mr. Fields and his prospects in the prison environment. TT at 2473-81; *Declaration of Dr. J. Randall Price* ¶¶ 4, 7. Accordingly, the Government cannot rely on Dr. Price's opinion to

counter Mr. Fields' showing that he was not competent to waive counsel and represent himself. Simply put, the record in this case clearly evidences that the only psychiatrist to conduct a full and adequate examination of Mr. Fields' competency to waive counsel and represent himself was Dr. Woods, who found that he was not competent to do so:

> Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses.  Mr. Fields is severely and chronically paranoid and grandiose.  He was both paranoid and grandiose at the time of my examination.  His decision to waive counsel was the result of the co-morbid, or co-occurring symptoms of his mental illnesses.  The specific symptoms of grandiosity, paranoia, perseveration, and impulsivity compromised his ability to effectively weigh and deliberate whether to waive counsel.

*Woods Declaration II* ¶ 5; *see also id.* ¶ 108 ("Mr. Fields was not, in my opinion, competent to waive counsel and/or represent himself").

### B. The Court's Inquiry Into Mr. Fields' Competence Was Constitutionally Inadequate

Mr. Fields' Petition established that the one-minute competency hearing conducted by the Court, and the cursory 30 minute psychiatric examination performed by Dr. Mark, did not come close to meeting the requirements of due process.  Petition at 35-45; Amended Petition at 57-69.  The Government, in its response, fails to offer any meaningful rebuttal and, as such, essentially concedes that Mr. Fields is, at the very least, entitled to a hearing as to whether his due process rights were violated when he was allowed to waive counsel and proceed *pro se.*

*First*, the Government claims that a constitutionally sufficient competency hearing was unnecessary because no "doubt" had been raised into Mr. Fields' competence.  GR at 11.  The Government itself, however, expressed such doubt when it made the request for a psychiatric examination and hearing into Mr. Fields' competency to waive counsel and proceed *pro se.*  TT at 24-26.  The Government further argues that Dr. Price's examination precluded any

doubt as to Mr. Fields' competence.  However, as set forth above, Dr. Price was not directed to and did not make a finding as to Mr. Fields' competency.  *See Declaration of Dr. J. Randall Price* ¶ 6.  Further, Dr. Price was also not presented with adequate information about Mr. Fields' background and his history of mental dysfunction because trial counsel did not conduct a constitutionally competent investigation.  *See id.* ¶ 3.

> *Second*, the Government argues that "the combination of Fields' normal behavior, Dr. Price's evaluations, Mr. Fields' attorneys' opinions, the court's questioning, and Dr. Mark's evaluation constituted an adequate inquiry of whether Fields was competent to represent himself."  GR at 12-14.  Each of these contentions is fatally flawed.  As discussed above and in the Petition, Mr. Fields' conduct at trial and Dr. Price's evaluations did anything but provide evidence of a man fit to represent himself at his capital trial.  Moreover, Mr. Fields established in his Petition that the opinions of his counsel are those not of experts but rather of uninformed laymen and thus amount to no more than unreliable speculation.  *See* Petition at 34; Amended Petition at 39-40.  In *Bruce v. Estelle*, 536 F.2d 1051 (5th Cir. 1976), the Court cautioned "the existence of even a severe psychiatric defect is not always apparent to laymen."  *Id.* at 1059; *see also Bouchillon v. Collins*, 907 F.2d 589, 593-94 (5th Cir. 1990).  For this and other reasons, including the conflict of interest presented by warring obligations of counsel to the defendant's wishes and his constitutional protections, the court in *Hull v. Freeman*, 932 F.2d 159 (3d Cir. 1991), declared that trial counsel "are wholly unqualified to judge the competency of their clients."  *Id.* at 168.

> With respect to the extraordinarily brief one-minute competency hearing, the Government offers no response to Mr. Fields' demonstration that the Court fatally failed to examine or test the foundation for Dr. Mark's opinions, his history of error, or his degree of certainty.  *See* Petition at 31-32; Amended Petition at 38-39.  Rather, the Government again

attempts to improperly shoehorn the *Faretta* inquiry into the competency hearing.  As discussed *supra* at footnote 3, however, this contention is futile because a *Faretta* inquiry is irrelevant to the question of mental competence.

In addition, the Government offers no rebuttal to Mr. Fields' showing that Dr. Mark's evaluation was inadequate because he did not consider evidence of Mr. Fields' prior diagnosed mental illnesses, history of incarceration, or traumatic social history (*Declaration of Dr. Stephen Mark* ¶ 4), and, crucially, he *did not* examine Mr. Fields' competence for the significantly expanded role necessary to play self-advocate.  Petition at 31-32; Amended Petition at 37-38.  Rather, the Government, without any legal support, asserts that the duration of the thirty minute interview is constitutionally adequate and attempts to distinguish, to no avail, the authorities cited in Mr. Fields' Petition demonstrating the inadequacy of Dr. Mark's evaluation. *See* GR at 12-14.  For example, the Government correctly points out that the Court in *Ford v. Wainwright*, 477 U.S. 399 (1986), held that competency findings based on untested expert opinion are unreliable. *Id.* at 415.  But the Court *also* cautioned that the psychiatric opinion was unlikely to be reliable when based on a single interview, finding that, "[t]he adequacy of the factfinding procedures is further called into question by the cursory nature of the underlying psychiatric examination itself." *Id.* at 415 n.3.

In *McCollum v. Bush*, 344 F.2d 672 (5th Cir. 1965), the Government acknowledges that the Fifth Circuit held a forty minute psychiatric examination to be inadequate to determine competency, *id.* at 672 n.1, but attempts to distinguish *Bush* on the basis that the interview took place over a lunch recess, whereas Mr. Fields' examination took place in the morning.  Whether the exam is over lunch or breakfast is clearly irrelevant to the inadequacy of its duration – the fact is, the exam in *Bush* was 33% *longer* than Dr. Mark's exam here.  The Government's contention that *Bush* is distinguishable because Dr. Price also offered psychiatric

testimony is, again, simply wrong because Dr. Price did not examine Fields' competency to stand trial, waive counsel, or represent himself.  *Declaration of Dr. J. Randall Price* ¶ 6.

The Government's attempt to distinguish *United States v. Walker*, 537 F.2d 1192 (4th Cir. 1976), on the grounds that the defendant was found competent to stand trial also fails. While that court held that the thirty minute psychiatric examination was sufficient to determine the defendant's competency to stand trial, the same examination was found to be inadequate to reach a reliable conclusion into his mental capacity to commit the crime because there was not a focused examination into the latter capacity.  The court observed, "[t]he one question may have little bearing upon the other; many defendants who may not be held criminally responsible for their unlawful acts are clearly competent to stand trial."  *Id.* at 1195.  So, too, here, even if Dr. Mark's examination was sufficient to provide a reliable conclusion as to Mr. Fields' competence to stand trial, it was inadequate to determine his competence to take on the expanded role necessary of the self-advocate.  Indeed, by definition, all borderline-competent or "gray-area" defendants are competent to stand trial – the threshold finding has no bearing on their capacity to represent themselves.  *See Bruce v. Estelle*, 483 F.2d 1031, 1040-42 (5th Cir. 1973) (holding a competency hearing to be "fundamentally unfair" as a result of the wrong mental competence standard used).

C.    **Trial Counsel's Assistance Was Constitutionally Ineffective**

The Sixth Amendment guarantees Mr. Fields, like all other criminal defendants, the right to effective assistance of counsel.  *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  Mr. Fields demonstrated in his Petition that trial counsel's performance was grossly inadequate because they failed to discover or develop crucial facts regarding his mental illnesses despite the presence, in their files, of records documenting his diagnosed mental diseases.  Petition at 34-35; Amended Petition at 40-56.  The Government offers no response to this showing except for a

-17-

cursory argument that "the overall record and performance of counsel" meet the reasonableness standard.  GR at 14-15.  The caselaw within this Circuit and elsewhere is clear: counsel is constitutionally ineffective where, as here, they fail to investigate mental competence when presented with a history of mental illness and social trauma.

Assistance by counsel is inadequate if it "undermined the proper functioning of the adversarial process [to the degree] that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Trial counsel was under a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.  As demonstrated in Mr. Fields' Petition, trial counsel ignored numerous "red flags" that should have triggered a thorough investigation of Mr. Fields' serious mental health problems.  Trial counsel had in their possession the medical, personal, and institutional records that indicated Mr. Fields' prior diagnosed mental disorders and extensive history of personal trauma but failed to explore the possibility that he was incompetent to stand trial, waive counsel, and proceed *pro se*.  Trial counsel failed to develop and present this history to Dr. Mark, Dr. Price or the Court, and failed to even request that Dr. Price make a determination as to Mr. Fields' competency.  *See Declaration of Dr. J. Randall Price* ¶ 6; Petition at 34-35; Amended Petition at 40-56.  Indeed, if counsel had conducted a competent investigation or had provided Dr. Mark with the fruits of that investigation, it would have been clear that "Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses." *Woods Declaration II* ¶ 5.

Mr. Fields is intensely paranoid and grandiose.  His decision to waive counsel was the result of these mental illness symptoms.  Put another way, but for Mr. Fields' mental illness, he would likely not have sought to waive counsel.  "Mr. Fields' paranoid fear of his

attorneys was consistent with his belief that they were not failing to work for him, but were actively conspiring with the prosecutors to convict him." *Woods Declaration II* ¶ 107.

Mr. Fields' "paranoid ideation and impaired judgment, coupled with the rumination and hyperreactivity of his PTSD (and exacerbated by his conditions of confinement) fueled his decision to waive counsel which was the direct product of his co-morbid psychiatric illness compounding and creating poor decision-making." *Woods Declaration II* ¶ 108. This is not atypical. Commentators report that "clinical judgments of incompetency have been closely associated with particular symptoms – most prominently symptoms of thought disorder, *delusional beliefs, paranoia*, disorientation, and hallucinations." Gary B. Melton *et al., Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals & Lawyers* 144 (3d ed. 2007) (emphasis added).

The documents readily available at the time of trial, but not reviewed by counsel, demonstrate that Mr. Fields had been hospitalized at Waco's DePaul psychiatric hospital as a child and diagnosed with PTSD by the time he was 14 years old. *See* Exh. 7. Additionally, Dr. Kenneth Day, who treated Mr. Fields as a child in the Texas Youth Commission Child Care System indicated that a diagnosis of Atypical Bipolar Disease was "suggested by family history." *See* Exh. 7. Despite their availability, counsel provided none of these documents to Dr. Mark. *Affidavit of Dr. Stephen Mark* ¶ 4 ("I was not provided and consequently did not review any documents related to Mr. Fields' prior terms of incarceration or any prior mental health diagnoses").

Additionally, documents readily available at the time of trial, but ignored by counsel, demonstrated that Mr. Fields displayed the signs and symptoms of a combination of PTSD and Atypical Bipolar Disorder in precisely the ways Dr. Woods describes – a history of paranoid ideation, scanning behavior, impaired judgment, delusional thinking, hypersexuality,

irritability, grandiosity, impulsivity impaired sleep and impaired cognitive functioning. *See Woods Declaration II* ¶¶ 95, 100. For instance, several of the prison disciplinary records and Inmate Grievance forms within trial counsel's files indicate a long history of these symptoms.

### 1.    Signs of Paranoid Ideation and Delusional Thinking

Several Inmate Grievance forms filed by Mr. Fields clearly evidence paranoid ideation and delusional thinking:

- On April 25, 2003, Mr. Fields filed an Inmate Grievance form indicating the paranoid and delusional belief that the guards were attempting to kill him: "Since my return to the McLennan County Jail in 4/24/03 I've been subject to harassment and threats as well as the aforementioned physical abuse and I fear for my life." *See* Exh. 73.

- On April 25, 2003, Mr. Fields filed an Inmate Grievance form indicating his belief that officers had stolen his legal materials: "On the date of 4/25/03 at the booking desk area, I Sherman L. Fields #0071651 observed officer R. Martin reading my legal material and showing it to other person(s) while in the process of searching for contraband. When my legal material was finally brought to me I was missing a stack of handwritten notes and comments that I had compose in reference to the Governments evidence against me that was/are intended for my lawyers and private investigator." *See* Exh. 72 at 001072.

- On June 23, 2003, Mr. Fields filed an Inmate Grievance form indicating a paranoid belief that the guards were trying to kill him: "The staff here are plotting to murder me. When I go to sleep they try to sneak in this cell and kill me. I fear for my life." *See* Exh. 74.

- On June 23, 2003, Mr. Fields filed an Inmate Grievance form indicating a paranoid belief that the guards were trying to poison him: "On the date of 6-25-03 at or about 4:30 A.M. Officer Eubanks did try to poison me by putting an unknown substance in my food." *See* Exh. 75.

- On June 25, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional belief that he was not a U.S. citizen: "I am not a United States citizen, I was born in another country and I request access to my country's consulate." *See* Exh. 76.

- On June 30, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were members of the Ku Klux Klan plotting to murder him: "The time is 7:40 P.M. on the date of

11-27-01 and Officer Burch and nine other officers is standing in front of my cell having a Klan meeting and talking about killing me. I'm scared to death that they are gonna come in here and kill me." *See* Exh. 82.

- On July 2, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were going to murder him: "At or about 12:10 A.M. Officer Eubanks stopped at the cell door and made the statement 'I wouldn't poison your ass but I will shoot you.' This not the first time this officer have threatened my life and yes I am scared that he'll carry out his threats." *See* Exh. 77.

- On July 6, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were trying to poison him: "On the date of 7-5-03 at or about 4:00 P.M. Officer Stratil brought a food tray to my cell that had something silver in the cake and some black stuff in my juice. There's a group of officer here at this jail that's conspiring to murder me and they've tried at least three times thus far by poisoning my food but I always know who it is and I catch it before I consume the food." *See* Exh. 78.

- On July 8, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional and paranoid belief that the guards were going to murder him: "Corporal Jimmy Herrington and Sergeant Edward Stone is leading a cabal in a conspiracy to murder me and I tell you right now I'm real real scared. I sleep with one eye open and I'm afraid to eat my food when certain officers bring it to me." *See* Exh. 79.

**2.    Signs of Paranoid and Delusional Thinking and Hypersexuality**

Numerous prison records indicate behavior consistent with delusional thinking and hypersexuality:

- On July 14, 2003, Mr. Fields filed an Inmate Grievance form indicating the delusional belief that the guards were sexually harassing him: "Corporal Tommy Vandyke is sexually harassing me. Everytime he work up here I catch him peeking at me with lewd eyes from behind computers, desks or whatever is available at the time. I am not gay and I <u>will not</u> indulges in homosexual activity. I'm afraid he will try to attack me. I need some immediate assistance." *See* Exh. 80.

- On July 24, 2003, Mr. Fields again filed an Inmate Grievance form indicating the delusional belief that the guards were sexually harassing him: "On the date of 7-24-03, at or about 6:30 A.M. Corporal Burch was standing at the copy machine staring at me. I asked him was he gay. He asked me what did I say and walked over to my door. I repeated the question. He asked me what did I think? I said, 'Yea, I think your gay.'

He said 'I guess I'm supposed to ask you to see your dick. You can show it to me if you want to.' I said 'Get way from my door, I'm not gay!' Corporal Burch walked away smiling. This man keeps sexually harassing me and I don't like it. This is not the first time an I'm fed up." *See* Exh. 81.

Again, consistent with hypersexuality, many of Mr. Fields' disciplinary reports "were for masturbation, consistent with Mr. Fields' sexual history when not incarcerated . . . the same bipolar symptom of hypersexuality is present in an isolated setting." *Woods Declaration II* ¶ 106. For example:

- December 4, 2001: "Inmate was masturbating." *See* Exh. 105 at 001015.

- February 2, 2002: "[M]asturbated in front of me when told to stop." *See* Exh. 105 at 001014.

- February 26, 2002: "Inmate was standing at his door, in full view, masturbating, and grinning at this officer." *See* Exh. 106.

- March 17, 2002: "[I]nmate Fields was fond [sic] masturbating" *See* Exh. 107.

- March 24, 2002: "Inmate Fields, Sherman was standing at cell door masturbating." *See* Exh. 108 at 001025. On this same day, Mr. Fields was written up for this offense two other times: "Inmate standing in middle of cell masturbating." *See* Exh. 108 at 001024. "Inmate was standing in middle of cell masturbating as this officer did 15 min watch." *See* Exh. 109.

- April 9, 2002: "[T]he subject stood in front of this window and masturbated while laughing." *See* Exh. 110.

- May 12, 2002: "Inmate Fields was masturbating." *See* Exh. 111.

- July 25, 2002: "While inmate across from Fields was speaking with this officer, Fields was standing on his bunk looking at this officer masturbating." *See* Exh. 112; *see also* Exh. 113 at 001049.

**3.    Signs of Irritability, Impaired Judgment and Impaired Impulse Control**

Similarly, several prison disciplinary records indicated symptoms of irritability, impaired judgment and impaired impulse control:

- On February 12, 2003, Mr. Fields was disciplined for spitting on a guard. Consistent with the symptoms of impulse control, Fields remarked about the incident "I'm not denying that I did it, Because I did it.  I was mad the way they did me.  I reacted without thinking."  *See* Exh. 114.

- On April 3, 2003, Mr. Fields was disciplined for an incident clearly evidencing irritability, impaired judgment and poor impulse control by throwing liquid on a guard and stating "I told you I was going to get your bitch-ass" and "I feel better now."  *See* Exh. 11 at 001069.

- On May 19, 2002, Mr. Fields was disciplined for an act of impaired impulse control when he "threw urine on [an] officer during chow."  *See* Exh. 115.

- On September 6, 2002, Mr. Fields was disciplined for "throwing juice on Officer."  *See* Exh. 113 at 001050.

This behavior is completely consistent with impaired impulse control.

### 4.      Signs of Paranoia – Refusal to Take Medication

Additionally, consistent with his paranoid ideation, Mr. Fields was written up several times for refusing to take anti-depression medication provided by the prison staff:

- On April 1, 2003, Mr. Fields was disciplined for refusing to take the anti-depressant Remeron:  "During this search approximately 34 discarded medicine tablets were found in a folder containing inmate Field's [sic] mail.  The pills appeared to be discolored as if they were placed in the mouth then spat out.  It was determined by medical staff that the medication was 30 milligram tablets of "Remeron" which is an anti-depressant.  One pill is issued to the inmate daily."  *See* Exh. 10.

- On April 13, 2003, Mr. Fields was again disciplined for refusing to take the anti-depressant Remeron: "During a shake-down of inmate Field's [sic] cell, six(6) orange pills were discovered inside of an empty deodorant bottle which had been altered so that the bottle could be opened and items placed inside.  P.A. Marrero confirmed the pills were Remeron, an anti-depressant."  *See* Exh. 72 at 001071.

Each of these records is relevant, and essential to a complete and proper mental health diagnosis and each support the diagnosis of Dr. Woods, indicating that Mr. Fields was not competent to waive counsel and represent himself at trial.  *See Woods Declaration II* ¶ 5 ("[Mr. Fields'] competency . . . should have been carefully assessed through a thorough evaluation of

his longstanding mental dysfunction and impairments").  Absent accurate and comprehensive life history data, a forensic expert in a capital case is precluded from rendering a complete and reliable opinion.  *See* Richard G. Dudley, Jr. & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 984 (2008) ("Until the life history investigation is complete, the mental health expert can render only a preliminary diagnosis or a differential diagnosis based on the incomplete information available to him. When life history information is incomplete, the mental health expert must request further life history investigation to gather the information necessary to reach a credible and firm diagnosis"); *see also* Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice,* 15:4 Am. J. Forensic Psychiatry 43 (1994) (noting the necessity of collecting of an accurate medical, developmental, psychological and social history, gathered from multiple sources).

The great wealth of records in Mr. Fields' case were readily available to trial counsel.  In fact, a few were actually in trial counsel's files.  However, not a single one of these records was shown to Dr. Mark to assist him in his diagnosis: "I was not provided and consequently did not review any documents related to Mr. Fields' prior terms of incarceration or prior mental health diagnoses."  *Affidavit of Dr. Stephen Mark* ¶ 4.

### 5.   **Multigenerational History of Mental Illness**

Moreover, there were numerous records available at the time of trial, but ignored by counsel, indicating a long multigenerational history of mental illness in Mr. Fields' family.  As discussed, *supra*, it was incumbent upon counsel to discover this evidence and present it to the forensic expert to ensure a proper mental health diagnosis and accurate assessment of Mr. Fields' competence to represent himself. Had trial counsel performed an adequate investigation into this issue, they would have found a long history of documented mental illness reaching back

to at least four generations.    This family history could have provided Dr. Mark with documentation suggesting the strong likelihood that Mr. Fields' symptoms were the marks of genetically transmitted and serious mental illnesses that would have rendered him incompetent to represent himself.  *See Woods Declaration II* ¶ 50.  Mr. Fields' mentally ill family members included:

- **Leana Powell Fields**, Mr. Fields' maternal great-great grandmother, who was committed to Texas's State Lunatic Asylum.  *See* Exh. 98.

- **Jessie Mae Fields**, Mr. Fields' maternal grandmother, who has a history of depression, and "bad nerves."  She has been prescribed psychotropic medications, including Cymbalta for depression.  Additionally, she has a history of engaging in inappropriate behavior, such as bringing her grandchildren with her to look through garbage cans for food and soda cans and using the bathroom in buckets in the living room in front of family members.  *See Declaration of Shaffer Fields* ¶ 16; *Declaration of Vince Green* ¶¶ 14-15; *Woods Declaration II* ¶ 49.

- **Shelby Mitchell**, Mr. Fields' maternal grandfather, who likely suffered from PTSD.  He would often tell his grandsons that "if y'all had seen some of the things I seen as a child, y'all would drink too."  As a young boy, the KKK came to Mr. Mitchell's house (sometime in the 1920s), dragged his father outside and flogged him and then raped his mother. Mr. Mitchell would tell this story to the kids about every other night.  Mr. Mitchell also would frequently talk about the lynching of Jesse Washington.  He would say things like the tornado in 1953 that hit Waco was a punishment from God for the murder of Jesse Washington.  It is also reported that he believed that his dead wife would visit him and he would have conversations with her.  *See Declaration of Charles Fields* ¶¶ 47, 57-59, 80, 83; *see also* Exh. 93 (article regarding hanging of Jesse Washington).

- **Alice Mae "Sarah" Fields Swinnie**, Mr. Fields' mother, who suffers from borderline intellectual functioning; mental retardation/brain trauma; depression or "bad nerves."  She has been prescribed psychotropic medications, including Alprazolam.  She has been hospitalized for "mental health" problems, and has been diagnosed with mental retardation as of 1993.  In April of 2005, Dr. Stephen Mark, diagnosed her with a "generalized anxiety disorder" and "panic disorder."  At one point, Alice attempted suicide by swallowing several pills; she described the experience as "a cry for help."  *See* Exh. 22; Exh. 17; Exh. 57; Exh. 43; *Declaration of Alice Swinnie* ¶¶ 41-43.

- **Shaffer Allen Fields**, Mr. Fields' maternal half-brother, who has a history of depression and "bad nerves." *See Declaration of Shaffer Fields* ¶ 26.

- **Jeffery Ladale Fields**, Mr. Fields' maternal half-brother, who has a history of mental illness and has been prescribed psychotropic medications, including Nortriptyline, Haldol and Trazodone. He has been treated for his mental illness and has been diagnosed with "mild mental retardation" and treated for ongoing schizophrenia and depression. Clinic notes also indicate that he complained of "hearing voices" and threatened suicide. *See* Exh. 37; Exhs. 58-61.

- **Jimmy Lewis Fields** Mr. Fields' maternal half-brother, who has a history of borderline intellectual functioning, depression and suicidal thoughts. He has been prescribed Thioridazin and Mellaril, as well as anti-depressants. He reports being diagnosed as "mentally insane" and seeing "little green dudes." His records reflect that he hears voices and suffers from "tormenting, intrusive thoughts." He has spent time in a psychiatric hospital because of his mental health issues, but the records have been destroyed. *See Declaration of Jimmy Fields* ¶¶ 26-29; Exh. 29; Exh. 32; Exh. 33; Exh. 36; Exh. 39; Exh. 40.

- **Shelley Leon Fields ("Leon")**, Mr. Fields' maternal half-uncle, who was described by a number of sources as "crazy." He suffered from mental illness, had borderline intellectual functioning, and was prescribed psychotropic medications. He was known to be paranoid and under the delusion that people were trying to kill him. Sources describe him as being mentally handicapped and unable to bathe himself or remember his own birthday or where he lived. *See Declaration of Alice Swinnie* ¶ 49; *Declaration of Jimmy Fields* ¶ 17; *Declaration of Charles Fields* ¶¶ 83-84; *Declaration of Annie Lucille Leaks* ¶ 15; Exh. 41.

- **Shirley Mae Fields Bouye**, Mr. Fields' maternal half-aunt, who has been diagnosed as paranoid schizophrenic. She has been hospitalized at least twice for her mental illness. A petition for an order to administer psychoactive medication was filed because she is incapable of making decisions regarding her medications. Moreover, she has been hospitalized for calling 911 regularly and threatening her neighbors, during which stay she was described as "catatonic," refusing to speak, eat or take her medications. *See* Exh. 6; Exh. 24; Exh. 25; Exh. 44.

- **Acie Louis Bouye**, Mr. Fields' first cousin and Ms. Bouye's son, who has spent time in a psychiatric hospital and was diagnosed with undifferentiated schizophrenic disorder and personality disorder, after being arrested on burglary charges. Dr. Mark found him incompetent to stand trial on those charges because he was "hallucinating," "talking to people not present" and because he "appeared frightened as if he was

being threatened."  *See* Exh. 15; Exh. 16; *Declaration of Shaffer Fields* ¶ 30.

- **George "Joe" Horde (Harvey) Gaines**, Mr. Fields' maternal half-uncle, who has been described as "crazy" and "slow," with problems counting and reading.  He has been treated at a psychiatric facility in connection with his problems, although the records of his treatment have since been destroyed.  *See Declaration of Charles Fields* ¶¶ 84-85; Exh. 65.

- **Otis Leaks**, Mr. Fields' first cousin, who has been diagnosed with undifferentiated schizophrenia, chronic paranoid schizophrenia and Post-Traumatic Stress Disorder.  He suffers from audio-visual hallucinations, including hearing voices telling him to "watch out" and seeing "demons."  His medical records describe him as suicidal, and suffering from terror, confusion and depression.  *See* Exhs. 45-51.

- **Jerry Leaks**, Mr. Fields' first cousin, who has been diagnosed as schizophrenic, "severely psychotic, fearful, with catatonia and mutism."  He suffers from visual and auditory hallucinations and has been hospitalized due to his schizophrenia and "catatonic state."  He has been prescribed psychotropic medications, such as Thorazine and Risperdal.  *See* Exhs. 52-56.

- **Hattie Love**, Mr. Fields' maternal half-aunt, who has been diagnosed with depression with psychosis.  She has been prescribed, at different times, Zoloft, Trazodone and Prozac.  She is also significantly intellectually impaired.  She attended special education classes as a child and can barely read or count.  *See* Exh. 23; Exhs. 26-27; *Declaration of Alice Swinnie* ¶ 48.

- **Patricia Diane Robinson**, Mr. Fields' half-aunt, spent time at a psychiatric treatment center, although the records of her treatment have since been destroyed.  *See* Exh. 66.

- **Alton Robinson, Jr.**, Mr. Fields' first cousin and Ms. Robinson's son, who has a record of "major depressive disorder, single episode, severe with psychotic features."  Mr. Robinson currently receives "mental health treatment;" during such treatment he "report[ed] symptoms of depression – *e.g.*, depressed mood; loss of appetite; low energy; poor concentration; frequent crying spells, & irritability."  He has also sought mental health treatment for "hearing voices."  Robinson has experienced "non-specific auditory voices," visual hallucinations and his insight and judgment have been classified as "impaired."  He has been prescribed Prozac.  *See* Exhs. 62-64.

Simply put, the prevalence of mental illness, borderline intellectual functioning and mental retardation in Mr. Fields' genetic pool is astounding. This family history is vividly depicted in Exh. 116 (Sherman Fields' Family Tree). Although all of this documentation was readily available to trial counsel, none of it was collected or provided to Dr. Mark. These documents are highly relevant to an adequate competency determination and Mr. Fields was unquestionably prejudiced by Dr. Mark's inability to consider them.

### 6.   Extensive History of Trauma

Similarly, trial counsel failed to provide Dr. Mark with any documentation indicating Mr. Fields' extensive history of trauma, which supports Dr. Woods' diagnosis of PTSD and lack of competency to waive counsel and represent himself *pro se*. As Dr. Woods explained "Mr. Fields' life was influenced by both community and family violence, trauma, absence of nurturing and modeling, lack of appropriate coping mechanisms, and mental illness. By his teens, Mr. Fields suffered extreme physical and emotional trauma, due to the abuse he suffered at the hands of his caretakers in addition to experiencing his mother shoot his stepfather and his stepfather's mistress and his subsequent stepfather shoot his mother in the head. Moreover, Mr. Fields experienced racial violence both directly and as a result of secondary trauma, suffered the deaths of numerous friends and family, and attempted suicide on multiple occasions." *Woods Declaration II* ¶ 104.

The prevalence and extent of extreme violence, death and associated trauma in Mr. Fields' life is both devastating and well documented. For instance, when Mr. Fields was 16, he witnessed his grandfather's death. Mr. Mitchell, who was 85 at the time, was "struck by a car while he was mowing his yard." *See* Exh. 70 at 000261. The drunk driver "veered off the road and struck Mitchell" at 2:30 p.m. and "[s]everal of Mitchell's relatives witnessed the incident" including Fields. *See* Exh. 70 at 00260. Moreover, Fields' "mother shot William Bradford (the

father of two of her sons) and [Ivory Monroe] the woman Mr. Bradford was seeing" when Fields was just 11 years old.  Mr. Fields' mother was shot in the head herself by Melvin Swinnie, a man Mr. Fields described "as the 'best male figure my mother was ever with.'"  *See Woods Declaration II* ¶ 59; Exh. 42 at 009429.  Mr. Fields was 19 at the time.  Melvin and Alice had been arguing over Alice's leaving Melvin and Melvin reportedly had threatened Alice in the past, telling her that "if he couldn't have [her] then no one else could either."  *See* Exh. 42 at 009429.  According to April Fields, Mr. Fields' wife who witnessed the event, Melvin "kept pointing the gun at [April, April's daughter, and Alice] and pulling the trigger but the gun wouldn't fire."  *See id.*  April Fields also told Waco police that Melvin told her and Alice earlier in the day that he shot at Charles Franklin.  *See id.*

By the time Mr. Fields was nineteen years old, at least twelve of his close friends, family and loved ones died tragically.  By the time he was 27, that number had risen to at least nineteen.  In addition to his having witnessed his grandfather fatally struck by a car, Mr. Fields experienced the loss of the following relatives and close friends, among others:

- On September 17, 1986, Roderick Scott, 16, a friend of Mr. Fields', died when "he was shot in the chest in the 200 block of Clifton Street."  Scott "was shot once with a small caliber gun" and was found lying next to a car.  "Scott and several other youths were sitting in chairs in the 200 block of Clifton" when the shooter "approached Scott and asked Scott if he wanted to fight."  The shooter then "pulled a small caliber pistol and shot Scott once in the side."  Scott died at a local hospital.  *See* Exh. 96 (*Waco Tribune Herald* (Sept. 19, 1986)).

  Sherman Fields was 12 years old at the time of Scott's death.

- On January 12, 1989, Roy Cleveland, 16, one of Mr. Fields' two best friends, hanged himself in his cell at the McLennan County Juvenile Detention Center.  "An employee of the juvenile detention center found Cleveland hanging from a bed sheet looped through a steel plate covering a window in his room."  Cleveland was taken to the hospital and died on January 12, 1989 in the ICU due to oxygen deprivation to his brain.  *See* Exh. 67 (*Waco Tribune Herald* (no date)); *see also* Exh. 97 (Roy

Cleveland Funeral Program (Jan. 21, 1989)). McLennan County Justice of the Peace stated that there was "some indication that [Cleveland] may have been trying a ploy to go to the hospital . . . He may have thought he could escape from the hospital." *See* Exh. 67 at 000253. Minutes before Cleveland was found, **Sherman Fields** attempted to hang himself in the cell next door: "workers found [a] 14 year old boy hanging through the steel plate covering the window in his room. The boy was taken down and suffered no injuries." *See* Exh. 67 at 000254.

Sherman Fields was 14 years old at the time of Cleveland's death.

- On March 11, 1989, Roderick Cummings, 16, the second of Mr. Fields' two best friends, was "killed during a gun battle at the Sherman Manor Apartments." One Waco police officer described Cummings as "an innocent bystander" during a drug dealing turf war over who was controlling the area. When police arrived at the scene, Mr. Cummings was already dead. Another witness stated that Mr. Cummings "wasn't the one [the shooters] wanted. The one they wanted got away." Another bystander was also caught in the gunfire but was not harmed. *See* Exh. 94 (*Waco Tribune Herald* (Mar. 11, 1989)).

Sherman Fields was 14 years old at the time of Cummings's death.

- On June 22, 1989, John Walker, 15, a friend of Fields' was killed by "a single .22 caliber gunshot wound to the upper chest." A Waco police officer on patrol stated that he "saw the passenger and [Walker] having some sort of altercation, and [Walker] fell to the ground." The officer gave chase to the suspects, who fled in a vehicle and arrested a 15-year-old and 16-year-old in connection with the shooting. *See* Exh. 71 (*Waco Tribune Herald* (June 23, 1989); Exh. 13 (Medical Examiner's Report (Nov. 10, 2009)).

Sherman Fields was 14 years old at the time of Walker's death.

- On July 15, 1990, Donnell Dewayne Swinnie, 16, a friend of Mr. Fields', was shot to death by a Fort Hood soldier after getting into an argument with the 25-year-old soldier earlier in the day. Waco police found Swinnie "laying face down in the 1200 block of North Ninth Street shortly after 11:30 Saturday night." McLennan County Justice of the Peace stated that the "bullet apparently struck major arteries at the top of Swinnie's heart." *See* Exh. 83 (*Waco Tribune Herald* (July 21, 1990); *see also* Exh. 21 (Medical Examiner's Report (Jul. 15, 1990)). Police found what they believed to be "the murder weapon – a .380 caliber automatic handgun – in a trash bag in the 1200 block of North Ninth Street." *See* Exh. 83.

Swinnie died two days before Sherman Fields' 16th birthday.

- On February 9, 1992, Albert Donnell Sims, 20, a friend of Mr. Fields', "was shot several times with a .25-caliber semi-automatic handgun after an argument erupted between his cousin and another man." *See* Exh. 91 (*Waco Tribune Herald* (Feb. 10, 1992)). Sims was taken to a local hospital where he later died from his injuries. Sims was shot in the right shoulder, right forearm, back of the right arm, left leg, back, lower abdomen and pelvis. *See* Exh. 18 (Medical Examiner's Report (Feb. 11, 1992)).

Sherman Fields was 17 years old at the time of Sims's death.

- On August 14, 1992, Terryll Collins, 18, a friend of Mr. Fields', died from a gunshot wound to the head suffered during his arrest. Waco police allegedly came to Collins's residence to arrest him and gave chase when Collins fled the house with a gun. One officer found Collins hiding in a nearby shed, dragged him out, and "Collins began struggling to get away." "The officer said that during the struggle he heard a gunshot. The two of them fell to the ground. Collins landed on his stomach with the officer on top of him." The officer "found a gun under [Collins] and threw it a safe distance away . . . As the officer tried to put cuffs on [Collins], he noticed Collins was not responding. He then realized Collins had been shot." "Collins, who had a gunshot wound just above the left eye, was taken to Hillcrest Baptist Medical Center where he later died." The arresting officer did not pull his service revolver during the incident. Questions remained as to why the arresting officer "didn't wait for backup before confronting Collins in the shed and if he said anything to [Collins] at the point of arrest." The Waco Police Department placed the arresting officer on administrative leave pending the outcome of its investigation into Collins's shooting death. Information from the investigation was said to probably go to a grand jury for review. Although officers at the scene saw Collins with a gun, police were "reviewing a tape of police radio transmissions to determine if officers broadcast the fact that Collins had a gun." *See* Exh. 85 (*Waco Tribune Herald* (Aug. 15, 1992)).

Sherman Fields was 18 years old at the time of Collins's death.

- On November 19, 1992, Michael Campbell, 29, a friend of Mr. Fields', was found shot to death, "slumped over behind the wheel" of a car. Campbell was pronounced dead at the scene, having been shot multiple times. *See* Exh. 86 (*Waco Tribune Herald* (Nov. 20, 1992)). The Medical Examiner's report stated that Campbell "sustained a number of gunshot wounds" to the abdomen, back, arm, leg and face, and was found "seated in the driver's seat and slumped to the left into the passenger seat." *See* Exh. 19 (Medical Examiner's Report (Nov. 19, 1992)) at 003101.

Sherman Fields was 18 years old at the time of Campbell's death.

- On November 3, 1993, Kimberly Leaks, 16, Mr. Fields' cousin, was found by Waco police "suffering from a stab wound to the upper chest" and was pronounced dead at a local hospital less than an hour later.  Police took a 15-year-old girl into custody who stabbed Leaks in the chest with a knife after the two girls got into a argument.  *See* Exh. 84 (*Waco Tribune Herald* (Nov. 4, 1993)).  This stabbing occurred in the Fields family home.

  Sherman Fields was 19 years old at the time of Leaks' death.

- On December 10, 1993, Guan Scott, 21, a friend of Mr. Fields', "was shot in the head with a handgun in the parking lot of Dottie's Bar."  Scott was taken to a local hospital where he later died from his injuries.  *See*  Exh. 95 (*Waco Tribune Herald* (Dec. 6, 1993)).

  Sherman Fields was 19 years old at the time of Scott's death.

- On April 26, 1994, Lee Walley McKinney, 16, a friend of Mr. Fields' was found dead with apparent head trauma "lying on the ground near some trash" on a gravel road.  *See* Exh. 90 (*Waco Tribune Herald* (Apr. 27, 1994)).  Police suspected foul play in McKinney's death, which was later confirmed by the Medical Examiner who reported that McKinney died from a gunshot wound to the head.  *See* Exh. 20 (Medical Examiner's Report (Apr. 27, 1994)).  "Detectives believe McKinney was injured somewhere else and that his body was dumped at the site."  *See* Exh. 90.

  Sherman Fields was 19 years old at the time of McKinney's death.

- On October 17, 1994, Marcus Thornton, 24, a friend of Mr. Fields, was shot in the torso by a security guard in an apartment complex after reportedly exchanging fire with the guard staff.  "Thornton reportedly fired upon security officers shortly after 10:30 pm Monday night at The Villages Apartments . . . During the gunfire, Thornton was struck once in the torso by a shot from one of the guards."  "Neither of the security guards was injured during the exchange of gunfire."  Thornton was taken to a local hospital where he later died from his injuries.  At the time of the shooting, security guards were enforcing a 10:00 pm curfew and approached a 15-year-old boy whom they noticed was armed with .45-caliber semi-automatic weapon.  "While the guards were apparently looking at the teenager, Thornton, who was standing several feet away, reportedly began shooting at the security officers."  *See* Exh. 87 (*Waco Tribune Herald* (Oct. 19, 1994)).

  Sherman Fields was 20 years old at time of Thornton's death.

- On November 18, 1994, Doug Harbert, 21, a friend of Mr. Fields' was shot in the head and killed by a bar owner when Harbert and another 16-year-old allegedly attempted to rob the owner's bar.  After opening the

cash register, the owner "grabbed a handgun that he kept nearby and shot . . . Harbert in the head, killing him." The 16-year-old fled the scene after Harbert was shot and was later arrested. Harbert was scheduled to complete his probation in December 1995 and had completed two required boot camps. *See* Exh. 89 (*Waco Tribune Herald* (Nov. 19, 1994)).

Sherman Fields was 20 years old at the time of Harbert's death.

- On March 19, 1995, Robert Lee Evans, 21, a friend of Mr. Fields', was riding as a passenger in a vehicle when Kevin Buhl walked up to the side of the car and opened fire, shooting Evans in the head and killing him. Buhl continued to fire into the vehicle, killing a 16-year-old passenger as well and injuring an 18-year-old passenger. "Buhl was in the park and reportedly walked up to the vehicle as it passed by . . . After shooting Evans in the head, Buhl then fired several shots into the car . . . Buhl then ran from the scene." Evans had been shot in the back about 6 months earlier in an unrelated incident. Police stated that, while they didn't have a specific motive for the shootings, there had been some ongoing dispute between Buhl and Evans. After the shootings, officers guarded the vehicle in which Evans was killed, with "its back window shattered and interior bloodstained." *See* Exh. 88 (*Waco Tribune Herald* (Mar. 21, 1995)).

Sherman Fields was 20 years old at the time of Evans's death.

- On October 27, 1998, "Lionel Stewart, 26, of Waco died Sunday at a Dallas hospital." *See* Exh. 69 (*Waco Tribune Herald* (Oct. 27, 1998)). Stewart was another of Fields' friends.

Sherman Fields was 24 years old at the time of Stewart's death.

- On November 2, 1998, Yoshima Calhoun, 22, a friend of Mr. Fields', died after suffering "two gunshot wounds to the leg." Calhoun "bled to death from those injuries." A 20-year-old victim was also shot in the head during the same incident and was in critical condition at a local hospital. "Police said Calhoun and the other victim had gone to a North 31st Street residence to give someone a ride. [The shooter] reportedly was visiting a nearby residence when an argument started outside of the homes that escalated into gunfire on the sidewalk." *See* Exh. 92 (*Waco Tribune Herald* (Nov. 4, 1998)).

Sherman Fields was 24 years old at the time of Calhoun's death.

- On April 29, 2002, Tiron Wesley Sterling, 22, a friend of Mr. Fields', was found by Waco police shot to death. Sterling's brother was also shot numerous times in the same incident and was in the ICU. *See* Exh. 68 (*Waco Tribune Herald* (Apr. 30, 2002)). The Medical Examiner's Report indicates that Sterling was shot in the head and neck while walking down

the street.  *See* Exh. 14 (Medical Examiner's Report (Apr. 30, 2002)).

Sherman Fields was 27 years old at the time of Sterling's death.

This long history of severe trauma is vividly depicted in Exh. 117 (Fields: A Witness to Extreme Violence).  Although this history of trauma was well documented and available at the time of trial, none of those documents were provided to Dr. Mark.  *Affidavit of Dr. Stephen Mark* ¶ 4 ("I was not provided and consequently did not review any documents related to Mr. Fields' prior terms of incarceration or prior mental health diagnoses").

Had trial counsel conducted a competent investigation into Mr. Fields' mental health history, (or provided Dr. Mark with the documentation collected from their limited investigation into this subject), this historical manifestation of Bipolar and PTSD symptoms described above would have been clear.  Consequently, it would have been clear that Mr. Fields was not competent to waive counsel.  As explained by Dr. Woods:

> Mr. Fields' request to waive his right to counsel was the direct product of his mental illnesses.  Mr. Fields is severely and chronically paranoid and grandiose.  He was both paranoid and grandiose at the time of my examination.  His decision to waive counsel was the result of the co-morbid, or co-occurring symptoms of his mental illnesses.  The specific symptoms of grandiosity, paranoia, perseveration, and impulsivity compromised his ability to effectively weigh and deliberate whether to waive counsel.

*Woods Declaration II* ¶ 5; *see also id.* ¶ 108 ("Mr. Fields was not, in my opinion, competent to waive counsel and/or represent himself").

In *Bouchilllon*, the Fifth Circuit found trial counsel's performance to be constitutionally ineffective due to the failure to investigate.  The facts presented to counsel are extremely similar to those here:  the defendant had a history of mental problems and substance abuse.  His childhood was marked by abuse, neglect and trauma.  In finding the performance

inadequate, the court noted that counsel's failures were not excused by the layman's misperception of competence because:

> One does not need to be a psychiatrist or a seer to know that, if nothing else, such a background [of abuse and neglect] provides a fertile soil in which to develop mental problems and from which some degree of social maladjustment or antisocial behavior might be predicted. Bouchillon's case proves the rule, rather than the exception.

907 F.2d at 590. Here, too, trial counsel's failure to investigate and develop Mr. Fields' incompetence were not reasonable and rendered his trial and conviction constitutionally unreliable and defective. The Government simply cannot rebut the Fifth Circuit's observation that "[i]t must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of a client's history of mental problems." *Id.* at 597. Because counsels' performance does not meet the reasonableness standard, and the Government has not offered a single fact that demonstrates that it did, Mr. Fields is entitled to a new trial, or, alternatively, discovery and an evidentiary hearing as to his competency to waive counsel and represent himself at his capital trial.

## III.   CLAIMS RELATED TO TRIAL CONDUCT

CLAIM 4:   AFTER THE TRIAL COURT APPROVED MR. FIELDS' REQUEST TO WAIVE COUNSEL AND REPRESENT HIMSELF, MR. FIELDS' RIGHT TO SELF-REPRESENTATION WAS NEVERTHELESS VIOLATED IN SEVERAL MATERIAL RESPECTS DENYING HIM FIFTH, SIXTH, AND EIGHTH AMENDMENT GUARANTEES.

CLAIM 5:   MR. FIELDS' RIGHTS UNDER THE FIFTH,  SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED WHEN HE WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

CLAIM 6:   MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO BE PRESENT AT TRIAL WERE  VIOLATED WHEN HE WAS NOT PERMITTED TO PARTICIPATE IN BENCH AND CHAMBERS CONFERENCES AND WHERE TRIAL COUNSEL DID NOT ADEQUATELY CONSULT WITH MR. FIELDS PRIOR TO OR AFTER THOSE CONFERENCES.

As demonstrated above, Mr. Fields never should have been permitted to waive counsel and represent himself at his capital trial.  Once he was allowed to do so, however, the Sixth Amendment guaranteed him the right to personally conduct his own defense.   As demonstrated in the Petition, Mr. Fields' Sixth and Eighth Amendment rights were violated when he was not permitted to participate in bench and chambers conferences and where standby counsel did not adequately consult with Mr. Fields prior to or after those conferences.  *See* Petition at 45-68; Amended Petition at 69-92.  In response, the Government concedes that Mr. Fields was not permitted to participate in bench and chambers conferences and concedes that the legal standard stated in Mr. Fields' Petition is applicable.  *See* GR at 16.  Moreover, with regard to chambers conferences, the Government fails to refute and thereby concedes that the exclusion of Mr. Fields from such conferences violated his right to self-representation.  For this reason alone, Mr. Fields is entitled to a new trial.  With regard to the bench conferences, the Government claims that Mr. Fields acquiesced to standby counsel's participation in such conferences and argues that, in any event, the law does not require such participation.  *See* GR at 17-21.  The Government is wrong on both counts.

A.    **Mr. Fields Did Not Acquiesce To Standby Counsel's Unsolicited Participation In Bench And Chambers Conferences, And Such Participation Was Over His Objection**

The Petition clearly demonstrates that Mr. Fields' standby counsel was appointed only to advise and because Mr. Fields did not expressly consent to any individual instance of standby counsel's participation at trial, as a matter of law, standby counsel's participation was over Mr. Fields' objection and in violation of his right to self-representation.  *See* Petition at 45-68; *see also* Amended Petition at 69-92.  The presumption that standby counsel's participation was unsolicited is strengthened in this case, because Mr. Fields made it abundantly clear he believed standby counsel was operating under a conflict of interest and conspiring with the

prosecutors against him, effectively renewing his objection to the participation of standby counsel.  TT at 13:15-14:5, 22:4-6, 1683:20-1684:1, 1684:14-18.[4]

The Government does not and cannot refute that Mr. Fields never expressly consented to standby counsel's participation in bench or chambers conferences, but instead argues that Mr. Fields acquiesced to standby counsel's participation in bench conferences because he did not object to such participation, relying on *Lefevre v. Cain*, 586 F.3d 349 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 1941 (2010).  GR at 16-17.  The Government's reliance on *Lefevre*, however, is predicated upon a mischaracterization of the facts of both *Lefevre* and the instant case.  In *Lefevre*, the Fifth Circuit ruled that the defendant had waived his right to self-representation because he failed to object to his standby counsel's participation in bench trials on his behalf, and because the court never ruled that he could not participate in bench conferences.  586 F.3d at 356.  Unlike in *Lefevre*, the Court here explicitly ruled that Mr. Fields could not participate in any bench conferences that occurred in the jury's presence.  TT at 1166:2-18.  Moreover, unlike Lefevre, Mr. Fields made his objection to the participation of standby counsel on numerous occasions.  The Government ignores these crucial distinctions.

Moreover, unlike this case, in *Lefevre*, the court never addressed whether Lefevre would be allowed to participate in bench conferences.  In that regard, the court held that by

---

[4]    While Mr. Fields may not have explicitly used the phrase, "I object," while repeatedly asserting his distrust in standby counsel, there can be no doubt that he expressed his objection sufficiently to preserve his claims on appeal.  Indeed, the Fifth Circuit recognizes that no magic words are needed to raise an objection.  *See United States v. Johnson*, 267 F.3d 376, 380 (5th Cir. 2001) (holding that attorney sufficiently expressed his objection to confer with client, despite not using the words "I object," by clearly stating on the record his desire to speak with his client and the court's refusal to allow him to do so); *United States v. Ben-Shimon*, 249 F.3d 98, 103 (2d Cir. 2001) (holding that *pro se* defendant, who did not clearly state his objection and who "tended to wander and rant" when objecting, sufficiently objected to sentencing enhancement).  Here, there can be no reasonable dispute that Mr. Fields objected to the participation of standby counsel at bench and chambers conferences.  Moreover, it is well-settled law that courts treat *pro se* defendants more leniently and, as such, Mr. Fields objections, however stated should be credited.  *See Johnson v. Quarterman*, 479 F.3d 358, 359 (5th Cir. 2007) (holding that *pro se* litigant's briefs were to "afforded liberal construction"); *Ben-Shimon*, 249 F.3d at 103 ("'[P]ro se litigants may in general deserve more lenient treatment than those represented by counsel'") (citation omitted).

failing to object, the defendant acquiesced to standby counsel's participation in bench conferences on his behalf.  586 F.3d at 356-57.  The court stated that "[h]ad Lefevre objected, the court might have accommodated his request to participate in the bench conferences by removing the jury from the courtroom and then allowing Lefevre to argue his objections."  *Id.*  In contrast, the Court here strongly indicated that it was not amenable to excusing the jury in the event of a bench conference, effectively deciding for Mr. Fields that his standby counsel would participate in such conferences:

> THE COURT: And if there must be a bench conference that would interfere and require me to excuse the jury, I would certainly hope that Mr. Fields would authorize his attorneys to speak for him in whatever manner – whatever matter needs to be discussed, and after we have the bench conference, the attorneys could go back and report to him what just took place and come back again if that was not satisfactory, if additional matters needed to be talked about or additional arguments made.  I don't know if that will work or not, but it would be something that I hope we could do.

TT at 1166:9-18.  As the Government states, the Court subsequently asked if there was anything else, to which Mr. Fields replied, "Nothing else, Your Honor."  TT at 1166:19-21.  This response does not constitute tacit approval or acquiescence, as the Government argues.  It was rather an acknowledgment by Mr. Fields that he would be excluded over his objection.  The Court made it known that it was unwilling to excuse the jury in a manner that would allow Mr. Fields to maintain control of his defense by participating in bench conferences, thereby nullifying any subsequent objections Mr. Fields might have made.  The Court's refusal to allow Mr. Fields to participate in these conferences illustrates that standby counsel's participation was unsolicited and that Mr. Fields' absence from these conferences was involuntary.  This exclusion violated his right to self-representation and was *per se* prejudicial.  *See McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).

*Lefevre* is distinguishable in other respects.  Unlike Mr. Fields, the defendant in *Lefevre* was inconsistent and irresolute regarding the level of participation by his standby counsel.  586 F.3d at 355.  For example:

> After the first bench conference, outside of the presence of the jury, the judge asked Lefevre if he wanted to reconsider representing himself.  Lefevre replied that he did not want to give up his right to speak totally, and he inquired whether [his standby counsel] could "play a bigger role."  While Lefevre did not waive his right to self-representation during this conversation, he also did not indicate that he was unhappy with [his standby counsel]'s participation on his behalf, and in fact suggested that he would like [his standby counsel] to play a larger role.

*Id.* at 357.  Mr. Fields, unlike the defendant in *Lefevre*, repeatedly made clear that he believed his standby counsel had a conflict of interest and were actively working against his interests.  TT at 13:15-14:5, 22:4-6, 1683:20-1684:1, 1684:14-18.  Unlike the *Lefevre* defendant, Mr. Fields was steadfast in his opposition to their participation, which interfered with his control of his defense and denied him his right to self-representation.

### B.    Exclusion From Bench And Chambers Conferences Was Sufficient In Isolation To Violate Mr. Fields' Right To Self-Representation

The Government also attempts to distinguish the case law cited in Mr. Fields' Petition holding that exclusion from bench and chambers conferences violates a defendant's rights to self-representation.  GR at 17-18.  First, the Government argues that because the *Oses* court relied on the "three sets of errors" (exclusion from bench conferences, overly restrictive security restraints on the petitioner, and the trial judge's sarcastic commenting and refusal to reign in "the prosecutor's rhetorical excesses") in upholding the district court's grant of a writ of habeas corpus, it has no application here.  GR at 17.  As the Tenth Circuit noted in *McDermott*, however, the exclusion from bench conferences alone is sufficient to violate a defendant's right to self-representation.  *United States v. McDermott*, 64 F.3d 1448, 1452-54 (10th Cir. 1995).

The Government further attempts to distinguish *Oses v. Massachusetts*, 961 F.2d 985 (1st Cir. 1992), by contrasting the number of conferences in *Oses* (seventy bench conferences) with the number of conferences in Mr. Fields' trial (two chambers conferences and ten bench conferences). GR at 17-18. This is a distinction of magnitude, not one of kind, and it is not meaningful in this case. The subject matter of the conferences is what makes Mr. Fields' exclusion from them a constitutional violation. *See McDermott*, 64 F.3d at 1452 (contrasting the "minor procedural issues or matters concerning codefendants" addressed in some of the conferences with issues such as petitioner objections, government objections, and admissibility of testimony). The issues that were discussed in the bench conferences from which Mr. Fields was excluded were not  "minor procedural issues" but rather involved "significant tactical decisions" or "control [of] the questioning of witnesses," issues on which a standby counsel speaking in place of the defendant, and without his consent, constitute a violation of *Faretta* rights. *McKaskle*, 465 U.S. at 178; *see, e.g.*, TT at 1560:20-1561:15, 1583:11-1585:17, 1614:6-25, 1615:12-1616:11 (objections to prosecutor's and defendant's lines of questioning); TT at 1583:11-1583:17 (admissibility of testimony). The exclusion of Mr. Fields from the bench and chambers conferences violated his Sixth Amendment right to self-representation and Mr. Fields is entitled to a new trial.

C.   **The Matters Discussed In The Bench And Chambers Conferences From Which Mr. Fields Was Excluded Were Not Purely Legal Matters**

The Government contends that Mr. Fields' Sixth and Eighth Amendment rights to be present at trial were not violated for two reasons. First, it contends that Mr. Fields acquiesced to his exclusion from bench and chambers conferences. GR at 20. This is just a rehashing of its earlier arguments, and these arguments fail for the same reasons discussed above. Second, the Government argues that the matters discussed at these conferences were purely legal in nature,

and that a defendant does not have the right to be present at conferences addressing purely legal matters.  GR at 21 (*citing United States v. Graves*, 669 F.2d 964, 972 (5th Cir. 1982); *United States v. Sinclair*, 438 F.2d 50, 52 (5th Cir. 1971)).  The Government declares in a conclusory manner, and with no substantive discussion, that "[t]he matters discussed here were purely legal and not in any way prejudiced to the defendant regarding sequestration to admissibility of testimony."  GR at 21.  This is false.

The bench conferences dealt with critical trial issues including sequestration of witnesses (TT at 1552:10-1553:15), objections to the prosecutor's (TT at 1560:20-1561:15, 1583:11-1585:17, 1614:6-25, 1615:12-1616:11) and defendant's (TT at 1648:21-1649:12, 1850:21-1852:2) lines of questioning, admissibility of testimony (TT at 1583:11-1585:17), witness availability and whether Fields intended to testify (TT at 1913:11-1916:15), courtroom decorum (TT at 1653:3-10) and prejudicial remarks by the prosecutor (TT at 1615:12-1616:11, 1855:3-1856:7).  The chambers conferences dealt with trial decisions such as limiting Fields' ability to move around the courtroom to present witnesses with exhibits (TT at 1164:20-1166:22) and how to address the perception of "hybrid representation" to the jury and determine the proper role standby counsel was to play in advising Mr. Fields (TT at 1636:11-14).  These issues cannot be said to be "purely legal" in nature.  Mr. Fields' exclusion from these proceedings was a violation of his Constitutional right to be present at trial and, as such, he is entitled to a new trial.

CLAIM 7:   MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE HIS EXCLUSION FROM BENCH AND CHAMBERS CONFERENCES IN VIOLATION OF HIS RIGHT TO SELF-REPRESENTATION AS AN ISSUE ON APPEAL.

As set forth in the Petition, Mr. Fields' appellate counsel, Robert Owen, inexcusably failed to raise a Sixth Amendment right to self-representation claim based on Mr.

Fields' improper exclusion from bench and chambers conferences.  *See* Petition at 69-70;

Amended Petition at 92-94.  The Government contends that the failure to raise such a claim does

not constitute ineffective assistance of counsel because counsel is not required to "raise meritless

or weak issues."  *See* GR at 22.[5]  As set forth above and in the Petition, however, Mr. Fields self-

representation claims relating to his exclusion from bench and chambers conferences are neither

weak nor meritless.  Indeed, such claims were significant enough that the Fifth Circuit noted

their absence.  *See United States v. Fields*, 483 F.3d 313, 361 (5th Cir. 2007) ("Significantly,

Fields does *not* claim that standby counsel's participation at trial intruded upon his Sixth

Amendment right to self-representation") (emphasis in original), *cert. denied*, 552 U.S. 1144

(2008).

      Appellate counsel's failure to argue Mr. Fields' right to self-representation claim

based on his exclusion from bench and chambers conferences constitutes ineffective assistance

of counsel.  The record clearly demonstrates Mr. Fields' distrust in his appointed standby counsel

and belief that they were in a conspiracy against him, that standby counsel were not to act as

"hybrid counsel," but were appointed to advise Mr. Fields solely on legal matters, should Mr.

Fields request them to do so, and that standby counsel failed to serve in a solely advisory

capacity, but instead, made important tactical decisions without Mr. Fields' consent, in violation

of his Sixth Amendment rights.  *See, e.g.*, TT at 13, 22, 69-70, 639.  Appellate counsel's failure

to raise a claim regarding such a violation was undeniably prejudicial to Mr. Fields.  Denial of

---

[5] *Jones v. Barnes*, 463 U.S. 745 (1983), cited in the Government's response, is inapposite.  The issue in that case was whether counsel was obligated to bring claims as demanded by a defendant.  *See id.* at 751 (holding that a "defendant [does not have] a constitutional right to compel appointed counsel to press nonfrivolous points requested by a client, if counsel, as a matter of professional judgment, decides not to present those points").  Here, there is no evidence, and the Government has not provided any, that Mr. Owen ever considered the claim, and in his professional judgment, determined it was weak or frivolous claim that should not be raised.

the right to self-representation was a structural error, and it is likely that had the argument been

raised, the Fifth Circuit would have granted Mr. Fields a new trial.

CLAIM 8:      STANDBY  COUNSEL'S  FAILURE  TO  EXERCISE  A  PEREMPTORY
CHALLENGE AGAINST A JUROR MR. FIELDS SOUGHT TO STRIKE VIOLATED THE
FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 9:      MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO A FAIR
AND IMPARTIAL JURY AND FIFTH AND EIGHTH AMENDMENT RIGHTS TO DUE
PROCESS WERE VIOLATED WHEN ONE OF HIS PEREMPTORY CHALLENGES WAS
NOT EXERCISED.

Mr. Fields established in his Petition that he is entitled to a new trial because his

Fifth, Sixth and Eighth Amendment rights were violated when standby counsel failed to exercise

a peremptory challenge against a juror Mr. Fields sought to strike and that juror was empanelled

on the jury.  Petition at 70-77; Amended Petition at 94-103.  The Government concedes that such

an error is structural and entitles Mr. Fields to a new trial,[6] but argues that Mr. Fields is not

entitled to a new trial because Mr. Fields authorized standby counsel to conduct his *Batson*

hearing.  GR at 23-25.  The Government does not and cannot set forth any facts, however, that

demonstrate that Mr. Fields authorized standby counsel to make the determination on how to

exercise his peremptory challenges in the first instance.  In fact, Mr. Fields did not authorize

standby counsel to make the determinations on how to exercise his peremptory challenges, and,

the fact that Mr. Fields authorized standby counsel to argue the law at a later *Batson* hearing is

---

[6]     *See, e.g., United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006) (stating that errors may be deemed structural based on "the difficulty of assessing the effect of the error"); *Vasquez v. Hillery,* 474 U.S. 254, 263 (1986) ("[W]hen a petit jury has been selected upon improper criteria . . . we have required reversal of the conviction because the effect of the violation cannot be ascertained"); *Peters v. Kiff*, 407 U.S. 493, 504 (1972) ("[T]here is no way to determine what jury would have been selected under a [lawful] selection system, or how that jury would have decided the case"); *Hinton v. United State*s, 979 A.2d 663, 690-92 (D.C. 2009) (*en banc*) (reversing conviction because of error in jury composition); *United States v. Webster*, 162 F.3d 308, 341-42 (5th Cir. 1998) (addressing defendant's "statutory right to the free exercise of his peremptory challenges as a means of implementing the constitutional guarantees"); *United States v. Hall*, 152 F.3d 381, 408 (5th Cir. 1998) ("'The denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice'") (*quoting United States v. Broussard*, 987 F.2d 215, 221 (5th Cir. 1993)).

simply immaterial.[7]  *See* Petition at 75-76; Amended Petition at 99.  Mr. Fields demonstrated that standby counsel's unauthorized substitution of their opinion for Fields' in connection with the decision to strike a jurors was a structural violation of Mr. Fields' *Faretta* right, requiring a new trial.  *See* Petition at 75-77; Amended Petition at 98-103.  The Government's failure to rebut this fact entitles Mr. Fields to a new trial.

The Government relies on *McKaskle* to argue that consent to standby counsel's action in one circumscribed case gives consent to all related actions.  GR at 23-24.  The Government's reliance is misplaced.  The Government's assertion that "[w]hen a defendant asks standby counsel to handle anything, there is no need to burden the court procedures with a task-oriented waiver analysis" simply cannot be credited.  GR at 24.  By the Government's reasoning, once a defendant has consented to standby counsel performing any task, however circumscribed, he has entirely waived his Sixth Amendment right to self-representation.  This is not the law. *Faretta* and *McKaskle* do not tolerate the wholesale waiver of a core Sixth Amendment right *sub silentio*, regardless of the Government's concern for the "burden" on this court of protecting Mr. Field's rights.  Mindful of *Faretta* and *McKaskle*, this Court authorized standby counsel to argue motions and take up other matters outside the presence of the jury only if the record was

---

[7]  A *Batson* hearing is a circumscribed event applying legal precedent deriving from the *Batson* line of cases to the legality of the Government's challenges to jurors, not a defendant's strategic choice to exercise peremptory challenges.  It is dependent on these challenges having been submitted, and thus separated from the process of *voir dire* and submission of peremptory challenges in the first instance.  Moreover, whereas *voir dire* and the exercise of peremptory challenges are suffused with factual inquiry and strategic concerns, a *Batson* hearing is only the application of legal precedent.  A *Batson* hearing does *not* involve issuing peremptory challenges, which the Government conflates with "strikes," *e.g.*, GR at 23 ("Fields' consent to standby counsel performing his strikes under *Batson v. Kentucky* waives any complaint as to how standby counsel went about issuing those strikes").  In this regard, the Government's argument makes little sense.  Mr. Fields objected to the Government's strikes of African-Americans and made a *Batson* objection.  *Batson* did not prescribe the way to make peremptory strikes, rather, it just set forth a test for determining whether challenged strikes are unconstitutionally race-based.  Accordingly, Mr. Fields' counsel would not and could not have been making "strikes under *Batson*."  It was entirely reasonable – indeed, prudent – for Mr. Fields to allow his standby counsel to represent him for the limited purpose of making the necessary argument of law, while reserving to himself absolute control of the *voir dire* process and issuance of his peremptory challenges, both of which are integral to trial strategy.  *See* Petition at 75-76; Amended Petition at 98-100.

"absolutely clear" that Mr. Fields chose to have counsel do and that counsel was doing so in a manner that Mr. Fields approved of.  TT at 644:13-22.  If Mr. Fields wished to authorize counsel to make his peremptory challenges, then he would have done so explicitly, as *McKaskle* and this Court required.  S*ee Frantz v. Hazey*, 533 F.3d 724, 744 (9th Cir. 2008) (*quoting McKaskle*, 465 U.S. at 178).  Mr. Fields did not.

        The Government also relies on Mr. Fields' signature, which appears on the form submitting peremptory challenges.  GR at 23.  That Mr. Fields "scratched out" standby counsel's names on the form is susceptible of multiple interpretations – including, most obviously, that Mr. Fields was indicating protest against his standby counsel's involvement.  Moreover, the actual names of the veniremen challenged appear to be written in the hand of Mr. Fields' standby counsel, which at the least greatly undermines the Government's position that Mr. Fields' signature indicates he agreed to names that might not even have been written at the time he signed.  In any case, standby counsel's having chosen the names only underscores the fact that Mr. Fields' standby counsel were imposing their control on the jury selection process, against Mr. Fields' wishes and rights.  Any questions relating to the events here can and should be the basis of discovery and testimony at an evidentiary hearing.

        The Government's single-sentence proposition that Mr. Fields' failure to object constitutes a waiver of his claim is simply unfounded.  GR at 25.  Mr. Fields' complaint is that standby counsel unconstitutionally denied him the ability to represent himself.  It is absurd to argue that a defendant who has been unconstitutionally silenced by his standby counsel waives his constitutional claim *because he was silenced*.  Such a Catch-22 would provide no protection against overactive standby counsel to the criminal defendant exercising his Sixth Amendment right to self-representation, and should not be countenanced by this Court.  Moreover, once Mr. Fields invoked his right to self-representation, he is not required to continually renew his

objection to standby counsel's participation.  *See Frantz*, 533 F.3d at 744 (*quoting McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984)); *see also supra* at 36.

The Government fails to raise facts demonstrating that Mr. Fields authorized standby counsel to exercise his peremptory challenges, and accordingly, Mr. Fields' right to self-representation was violated and Mr. Fields is entitled to a new trial, or, at the very least, discovery and an evidentiary hearing.

CLAIM 10: MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHT TO BE PRESENT AT ALL CRITICAL STAGES OF TRIAL WERE VIOLATED BY HIS EXCLUSION FROM A CHAMBERS CONFERENCE HELD TO DISCUSS THE COURT'S RESPONSE TO THE JURY'S NOTE INDICATING THAT THEY  WERE UNABLE TO REACH A UNANIMOUS VERDICT ON SENTENCING WHERE MR. FIELDS SPECIFICALLY REQUESTED TO ATTEND THAT OFF-THE-RECORD CONFERENCE.

In his Petition, Mr. Fields established that a defendant has a Fifth and Sixth Amendment right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings" and that the denial of Mr. Fields' explicit request to participate in perhaps the most critical moment of his trial – a chambers conference concerning whether or not the jury was deadlocked on application of the death sentence – was a violation of those rights. Petition at 78-82; Amended Petition at 103-08.  The Government concedes that Mr. Fields has a right to be present "at any stage of the criminal proceeding that is critical to the outcome if his presence would contribute to the fairness of the proceeding" but argues that his presence would not have affected the outcome of the trial.  GR at 25.  There is no record of what happened in that twenty-minute conference, and the Government, despite being present at that conference, offers no affidavit or other evidence about what happened at that conference.   But it is undeniable that had there been no conference, Mr. Fields would not have been sentenced to death: the Court could not have imposed a death sentence because the jury had not unanimously voted for death.  Indeed, prior to the conference, the Court said exactly that:

It would be my initial position that **there's absolutely nothing the Court should or could do at this point except accept that statement** and I don't even think it would be appropriate to ask the jury as a whole if any of them disagree with the foreman's statement to the Court.

TT at 2547 (emphasis added).  The Government's failure to rebut this fact demonstrates that, at the very least, Mr. Fields is entitled to discovery and an evidentiary hearing with regard to Claim 10.

The Government also argues that Mr. Fields' exclusion was necessary to maintain the order of the courtroom.  *See* GR at 26.  While *Allen* notes that the right to be present may be waived by the defendant by his own disruptive or unruly conduct, the conference at issue occurred while the jury was deliberating, and the record clearly demonstrates that Mr. Fields had not and was not behaving in a manner that was either disruptive or unruly.  Just the opposite, the deputy U.S. Marshal described Mr. Fields "as a model prisoner here at the courthouse."  TT at 52-53.  Significantly, the Government does not contend that he was behaving in such a manner, but instead vaguely suggests that his exclusion was necessary to "maintain the safety of the courtroom" because Mr. Fields had successfully (but not violently) escaped from custody prior to the trial.[8]  *See* TT at 52-53.  The Government does not cite to a single case, however, where a defendant waives his right to be present based on his behavior outside the courtroom.

Equally unavailing is the Government's assertion that the Sixth Amendment right to be present is derived from the Confrontation Clause and because the chambers conference at issue did not involve any witnesses, Mr. Fields' rights were not violated.  *See* GR at 26-27.  The Government does not cite a single case that limits a defendant's Sixth Amendment right to be present at critical stages of his trial to only those instances where witnesses are present.  Indeed,

---

[8]   The Government's assertion is further undermined by the fact that Mr. Fields was forced to wear a stun belt, making any escape attempt impossible.

*Young v. Herring*, 938 F.2d 543 (5th Cir. 1991), cited by the Government, explicitly notes that a defendant's right to due process may be violated "'where the defendant is not actually confronting witnesses or evidence against him.'"   *Id.* at 557 (citation omitted); *see also Cohen v. Senkowski*, 290 F.3d 485, 490-91 (2d Cir. 2002) (finding that a petitioner's constitutional due process right to be present was violated by his exclusion from pre-screening of prospective jurors); *United States v. Hanno*, 21 F.3d 42, 46 (4th Cir. 1994) (finding the trial court's dismemberment of the jury without notice and in the absence of the defendant to be a violation of due process right to be present); *United States v. Panzeca*, 463 F.2d 1216, 1218 (7th Cir. 1972) (holding that a probation revocation hearing held in the defendant's absence violated his due process right to be present).  It is difficult to imagine an instant more pivotal in a capital trial than a conference at which it is decided how the Court will respond to a note concerning the jury's inability to reach a unanimous sentencing verdict – a decision that literally meant the difference between life or death.

Mr. Fields' Petition alleges that Mr. Fields had a right to be present at the conference at which counsel was present and the Court decided how to treat the jury's note concerning its inability to reach a unanimous decision to sentence Mr. Fields to death.  *See* Petition at 78-82; Amended Petition at 103-08.  The Government offers no facts or law rebutting Mr. Fields showing in his Petition, and for this reason, Mr. Fields is entitled to a new trial, or, at the least, discovery and an evidentiary hearing at which evidence may be presented concerning the nature of the discussion and counsel's arguments during the conference from which Mr. Fields was excluded.

CLAIM 11:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT TO HIS EXCLUSION FROM A CHAMBERS CONFERENCE HELD TO DISCUSS THE COURT'S RESPONSE TO THE JURY'S NOTE INDICATING THAT THEY WERE UNABLE TO REACH A UNANIMOUS VERDICT ON SENTENCING

WHERE MR. FIELDS SPECIFICALLY REQUESTED TO ATTEND THAT OFF-THE-RECORD CONFERENCE.

As set forth in the Petition, Mr. Fields' counsels' performance was deficient because they failed to object to Mr. Fields' exclusion from the chambers conference held to determine whether or not the jury was deadlocked on the application of the death sentence and Mr. Fields was prejudiced as a result.  *See* Petition at 82-83; Amended Petition at 108-09.  The Government agrees that the standard ineffective assistance of counsel is governed by *Strickland v. Washington*, 466 U.S. 668 (1984), but contends that counsels' failure to object did not prejudice Mr. Fields because there was no need for Mr. Fields to be present during a "purely legal" discussion.  *See* GR at 27-28.  The Government is wrong.  There is no record of the conference and, tellingly, the Government offers no evidence to support its contention that the discussion that took was "purely legal" nor does the Government attempt to argue that the failure to object was the product of tactical consideration.  Mr. Fields does not know what took place during the conference except that whatever occurred resulted in the Court reversing its initial opinion that the jury was deadlocked – a reversal that, for Mr. Fields, literally meant the difference between life and death.  Given the critical nature of the conference, counsels' failure to object was deficient, unreasonable, and the end result was highly prejudicial to Mr. Fields.  Given the Government's failure to offer any evidence rebutting this claim, Mr. Fields is entitled to a grant of relief, or at the very least, to discovery of what occurred during the chambers conference and an evidentiary hearing at which relevant evidence can be presented.

CLAIM 12:   MR. FIELDS' FIFTH AMENDMENT RIGHT TO DUE PROCESS; HIS SIXTH AMENDMENT RIGHT TO A FAIR TRIAL; AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE VERDICT AND SENTENCE WERE VIOLATED WHEN THE COURT REQUIRED HIM TO PROVIDE THE PROSECUTION WITH A DETAILED PREVIEW OF HIS TRIAL STRATEGY ON CROSS-EXAMINATION OF A CRITICAL GOVERNMENT WITNESS WITHOUT REQUIRING RECIPROCAL DISCLOSURE OF THE PROSECUTION'S TRIAL STRATEGY.

As demonstrated in Mr. Fields' Petition, the Court improperly required Mr. Fields to provide discovery material to the Prosecution without reciprocation in violation of Mr. Fields' Fifth, Sixth, and Eighth Amendment rights.  Petition at 83-91; Amended Petition at 109-17.  The Court's compelled "dry run" of Mr. Fields' cross-examination of a crucial Government witness, Shalaykea Scroggins, was fundamentally unfair and Constitutionally unsound.  *See Wardius v. Oregon*, 412 U.S. 470, 472 (1973).  Providing Ms. Scroggins with a preview of Mr. Fields' cross-examination outside of the present of the jury, without informing the jury that the "dry run" occurred, renders that testimony unreliable.  Indeed, Mr. Fields' Petition demonstrated that because of this "dry run", the jury was denied the opportunity to "make an informed judgment as to the weight to place on [Scroggins'] testimony which provided a 'crucial link in the proof . . . of petitioner's act.'"  *Davis v. Alaska*, 415 U.S. 308, 317 (1974) (citation omitted).  *See* Petition at 83-91; Amended Petition at 109-17.

The Government's response does not dispute, and thus concedes, the central allegation of Mr. Fields' claim:  that the Court compelled the disclosure of Mr. Fields' cross-examination questions of one of the Government's key witnesses in the presence of the Government and the witness without reciprocal discovery. Instead, in opposition, the Government contends that the trial court acted within its discretion in exercising control over the presentation of evidence under the Federal Rules of Evidence, that Mr. Fields' defense strategy and tactics were already apparent and known to the Prosecution, and that Mr. Fields failed to object to the Court's "practice run" thereby waiving his right to challenge this procedure on Habeas Review.  GR at 30-31.  Each of these arguments is without merit.

Contrary to the Government's claim, trial courts do not enjoy unlimited discretion in managing the presentation of evidence under the Federal Rules of Evidence.  Under Rule 611(a), upon which the Government relies, trial courts must exercise "reasonable" control over a

trial and are limited by due process principles.  *See* 28 Charles Alan Wright & Victor James Gold, *Federal Practice & Procedure: Evid*. § 6164 (West 2010) (adverse rulings under Rule 611(a) implicate several constitutional rights such as "the right to present a defense and the right to testify, which are aspects of the right to due process"); *see also Hoover v. Maryland*, 714 F.2d 301, 305 (4th Cir. 1983) ("[t]he trial judge's traditional discretion to control the limits of cross-examination cannot be exercised until "the constitutionally required threshold level of inquiry has been afforded the defendant'") (citation omitted).  A trial court's discretion in controlling the examination of witnesses is also limited to the extent such control is "effective for the ascertainment of truth."   Fed. R. Evid. 611(a).   As established in the Petition, because the unilateral disclosure of Mr. Fields' confrontation of the prosecutions' key witness unfairly tipped "the balance of forces between the accused and his accuser" in violation of Mr. Fields' constitutional due process rights, *see Wardius*, 412 U.S. at 472-74, the Court's preview of Mr. Fields' cross-examination of Ms. Scroggins was not "reasonable" and thus not within the bounds of Federal Rules of Evidence.   Rather then assist in ascertaining the truth, allowing Ms. Scroggins – the person Mr. Fields contends is the actual killer – a preview of Mr. Fields' cross-examination question without the jury present made it easier for Ms. Scroggins to lie to the jury the next day.  Indeed, the Government's admission that Ms. Scroggins was a key witness affirms the importance and magnitude of the court's unorthodox procedure and compelled disclosure of Mr. Fields' cross-examination to the witness and the Government.

The Government makes the conclusory and unsupported argument that it simply does not matter that Mr. Fields' constitutional rights were violated because Mr. Fields' trial strategy was already apparent and known.  GR at 30.  The Government, however, offers no evidence supporting this conclusion, nor does it offer any support from the record.  Moreover,

the Government's claim certainly raises questions of fact requiring an evidentiary hearing to resolve the issue.

Finally, the Government suggests that Mr. Fields has waived Claim 12 because he failed to object to the Court's compelled discovery. GR at 31. This is demonstrably false. Mr. Fields objected to the interruption of his cross-examination of Ms. Scroggins and explicitly complained of the harm that the Court's procedure would cause him during the trial. *See* TT at 1681:2-1682:8, 1683:7-16. Mr. Fields also expressed confusion, multiple times, as to how the Court's practice run would work and how it would affect his ability to cross-examine Ms. Scroggins in the presence of the jury. TT at 1676:22-1677:6, 1682:5-13. Mr. Fields' complaints are clear objections.[9] Moreover, Mr. Fields' standby counsel registered a complaint about the procedure and expressed the position that it was unworkable and impractical, which the Court acknowledged. TT at 1716:7-14. Thus, the Government's assertion that Mr. Fields acquiesced to the Court's compelled disclosure is simply wrong.

Mr. Fields' Petition demonstrated that his constitutional rights were violated when the Court compelled him to give Ms. Scroggins and the Government a preview of his cross-examination. *See* Petition at 83-91; Amended Petition at 109-17. The Government fails to offer any facts rebutting Mr. Fields' claim, and he is therefore entitled to a new trial, or, at the very least, discovery and an evidentiary hearing.

---

[9]    The fact that Mr. Fields may not have used the precise words "I object" does not mean that he failed to express his objection and properly preserve his claims. As set forth *supra* at footnote 4, the Fifth Circuit has recognized that no magic words are needed to raise an objection. This is particularly true given that Mr. Fields is a *pro se* defendant.

<u>CLAIM 13:</u>   MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE ON DIRECT APPEAL FIFTH AMENDMENT RIGHT TO DUE PROCESS, SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, AND EIGHTH AMENDMENT RIGHT TO A RELIABLE VERDICT AND SENTENCE CLAIMS BASED ON THE COURT'S REQUIREMENT THAT HE PROVIDE THE PROSECUTION WITH A DETAILED PREVIEW OF HIS TRIAL STRATEGY ON CROSS-EXAMINATION OF A CRITICAL GOVERNMENT WITNESS WITHOUT REQUIRING RECIPROCAL DISCLOSURE OF THE PROSECUTION'S TRIAL STRATEGY.

As set forth in the Petition, Mr. Fields' appellate counsel ineffectively failed to identify and litigate on direct appeal record-based claims regarding the Court's unconstitutional requirement that Mr. Fields provide unreciprocated discovery of a key witness to the government.  *See* Petition at 91-92; Amended Petition at 117-18.  The Government contends that the failure to raise such a claim does not constitute ineffective assistance of counsel because counsel is not required to "raise meritless or weak issues."  *See* GR at 32.[10]  As set forth above and in the Petition, however, Mr. Fields' claims relating to his compelled disclosure of his cross-examination to "a key witness" and the Government was neither weak nor meritless.  Petition at 83-91; Amended Petition at 109-17.

Appellate counsel's representation was clearly deficient as a result of his failure to appeal the above stated claim.  Mr. Fields was subjected to a one-sided disclosure requirement which fundamentally deprived Mr. Fields of his ability to cross-examine the central witness against him and to meaningfully challenge her credibility.  Ms. Scroggins' role in Mr. Fields' conviction can not be overstated and the negative impact of the court's disclosure procedure on his cross-examination is clear from the record.  *See* GR at 28 (stating that Scroggins was "a key Government witness").  Mr. Fields and his standby counsel timely objected to the disclosure requirement and the issue could not have been preserved more clearly for appeal.  *See* TT at 1676-77, 1716.

---

[10]   *See supra* n.5.

Undoubtedly, the failure of direct appellate counsel to raise the trial court's unconstitutional disclosure procedure caused prejudice to Mr. Fields. As the Petition states (*see* Petition at 91-92; Amended Petition at 117-18), it is inexcusable that appellate counsel failed to assert this claim. But for appellate counsel's clear oversight, there is a "reasonable probability," sufficient to undermine the confidence in the outcome in Mr. Field's appeal, that the Fifth Circuit would have granted a new trial on this issue, particularly in light of the serious violation against Mr. Fields' due process rights. *See* Petition at 83-91; Amended Petition at 109-17.

CLAIM 14:   MR. FIELDS' FIFTH, AND SIXTH AMENDMENT RIGHT TO TESTIFY, AND HIS EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE ALL VIOLATED WHEN THE COURT FAILED TO INQUIRE AS TO WHETHER THE *PRO SE* DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS RIGHT TO TESTIFY.

Mr. Fields demonstrated in his Petition that he did not knowingly and voluntarily waive his constitutional right to testify and the Court erred when it failed to advise Mr. Fields of his right to testify, failed to ask Mr. Fields whether he wanted to testify, failed to ask Mr. Fields whether he was aware of his right to testify, and failed to determine whether Mr. Fields voluntarily waived his right to testify. Indeed, Mr. Fields demonstrated that he wanted to testify, but did not because standby counsel erroneously advised that testifying would require him to take the stand and formally examine himself – by asking himself questions and then answering those questions – in front of the jury. Petition at 92-98; Amended Petition at 118-23. Accordingly, Mr. Fields did not testify only because he did not wish to present his testimony in this awkward question and answer format. Standby counsel did not inform Mr. Fields that he could request to testify in narrative format or that he could request the Court to allow standby counsel to read questions Mr. Fields prepared while Mr. Fields answered those questions from the witness stand. The Government ignores these facts when it baldy declares that "[a]t no point during the trial did Mr. Fields state his express wish to testify and therefore Mr. Fields

knowingly and intelligently waive his right to testify."  GR 35.  Moreover, the Government does not deny and therefore concedes that the Court never asked Mr. Fields whether he was aware of his right to testify and knowingly and voluntary waived that right, but claims that the Court was not required notify Mr. Fields of his right to testify, and therefore there was no error.  The Government is wrong.

The Government cites *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991), *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989), *vacated*, 928 F.2d 1470 (9th Cir. 1991), *United States v. Campione*, 942 F.2d 429, 439 (7th Cir. 1991), *Siciliano v. Vose*, 834 F.2d 29, 30 (1st Cir. 1987), and *United States v. Janoe*, 720 F.2d 1156, 1161 (10th Cir. 1983), in support of the general proposition that there is no affirmative duty for courts to notify a criminal defendant of the right to testify or obtain an on-the-record waiver of that right, *see* GR at 33, but none of these cases involve *pro se* defendants or contradict Mr. Fields' claim that courts take additional steps under certain circumstances to ensure that a defendant's waiver of the constitutional right to testify was knowing and voluntary.  In fact, the stated rationale for not generally requiring an on-the-record colloquy regarding a defendant's waiver is to avoid improperly influencing a defendant's unique relationship with his attorney, *see Campione*, 942 F.2d at 439; *Martinez*, 883 F.2d at 760, which is not implicated in Mr. Fields' case because he was acting as his own counsel and specifically notified the Court of disagreements with his standby counsel regarding his defense.  The Government also states that the Tenth Circuit does not require a colloquy regarding a defendant's right to testify, yet ignores more recent decisions supporting the need for further inquiry when conflicts exist between defendants and counsel.  *See United States v. Dryden*, 141 F.3d 1186 (TABLE), 1998 WL 104724, at *2 (TEXT IN WESTLAW) (10th Cir. 1998) ("triggering circumstances" will require a trial court to inquire into a defendant's decision not to testify), *vacated in part*, 166 F.3d 1222 (10th Cir. 1998); *see*

*also Backus v. Hartley*, No. 07-cv-00135-REB, 2009 WL 1505518, at *13 (D. Colo. May 26, 2009) (conflicts between a defendant and counsel over whether to testify present special circumstances which require an inquiry into a defendant's decision not to take the stand), *appeal dismissed*, 346 Fed. Appx. 336 (10th Cir. 2009) (Summary Order), *cert. denied*, 130 S. Ct. 1087 (2010).

The Government's attempt to distinguish the Fifth Circuit decision *Jordan v. Hargett*, 34 F.3d 310 (5th Cir. 1994), which directly supports Mr. Fields' claim that certain circumstances require trial courts to inquire into whether a defendant knowingly and voluntarily waived his right to testify, is not persuasive. The Government accurately notes that *Jordan* held that a district court must hold an evidentiary hearing before rejecting a magistrate's credibility based fact findings, but the appellate panel's observation that certain circumstances require an on the record colloquy to definitively resolve whether a defendant has knowingly and voluntarily waived his constitutional right to testify is still applicable here. *See* 34 F.3d at 314-15. While the Government quotes *Jordan* for the proposition that a defendant's silence may evidence waiver, it ignores the Fifth Circuit's conclusion "that such silence does not raise an irrebuttable presumption of waiver." *Id.* at 315. Mr. Fields' *pro se* status, along with his clearly expressed disagreements with standby counsel and repeated attempts to express his innocence through his examination of witness, are the types of factors which under *Jordan* would require that a court conduct an inquiry to remove uncertainty over whether a defendant's waiver of constitutional right to testify was knowing and voluntary.

The Government's assertions that Mr. Fields was notified of his right to testify is also not supported by the record. *See* GR at 34-35. First, the Court's discussion to the jury pool during voir dire, which the Government cites in support, concerned, generally, the right of the accused not to incriminate himself and not the right to testify. The Government does not dispute,

and thus concedes, that the Court never asked Mr. Fields whether he was aware of his right to

testify and knowingly and voluntary waived that right.  Additionally, the Government's reference

to an unrelated, collateral proceeding held almost two years prior to the trial to which this

Petition pertains in which Mr. Fields was summarily advised as to rights waived in connection

with acceptance of a guilty plea is irrelevant to this Claim.  *See* GR at 35.  Mr. Fields was not

advised by the Court in the present trial of his right to testify, Mr. Fields wanted to testify and

but for standby counsel's incorrect advice on the format of his testimony, would have.

Accordingly, Mr. Fields did not knowingly and voluntarily waive that right.  For this reason also,

Mr. Fields is entitled to a new trial, or alternatively, discovery and an evidentiary hearing.

## IV.    CLAIMS RELATED TO GUILT PHASE EVIDENCE

CLAIM 15:    MR. FIELDS' CONVICTION AND DEATH SENTENCE VIOLATE THE
FIFTH, SIXTH AND EIGHTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION BECAUSE HE IS INNOCENT OF THE MURDER OF SUNCEREY
COLEMAN AND HIS CONVICTION RESTS ON A CONSPIRACY OF FALSE
TESTIMONY.

Mr. Fields is innocent of the murder of Suncerey Coleman.  He was convicted

after a trial where the Government repeatedly presented false testimony.  As a result, Mr. Fields'

conviction and death sentence are both unconstitutional.  *See* Petition at 98-109; Amended

Petition at 124-35.

A civilized society does not allow the conviction and execution of innocent

people, even if innocence is not established until after a lawful trial.  Nevertheless, the

Government argues that actual innocence is not a constitutional claim.  GR at 36-37.

It is disappointing, but perhaps not surprising in this case, that the Government

believes allowing Mr. Fields to bring a post-trial actual innocence claim is burdensome and will

have a disruptive effect on the need for "finality" in this capital case.  GR at 36-37.  It is

disappointing, but perhaps not surprising, that the Government argues against holding an

evidentiary hearing into this matter, especially given how the Government relied exclusively on suspect informant testimony to obtain a conviction.  However, it would be a fundamental miscarriage of justice to execute an innocent person.  The importance in preventing the execution of an innocent person and preserving the principles of fairness in our criminal justice system substantially outweigh any burden placed on the Government or negative effect on finality of criminal judgments that may result from allowing actual innocence claims.

In *Herrera v. Collins*, 506 U.S. 390 (1993), a majority of the United State Supreme Court justices acknowledged that the Constitution prohibits the execution of an innocent person.  Justice O'Connor's concurring opinion, joined by Justice Kennedy, said that such an execution would be a "constitutionally intolerable event."  *Id.* at 419.   Justice Blackmun's dissent, joined by Justices Stevens and Souter, likewise proclaimed that "[n]othing could be more contrary to contemporary standards of decency . . . or more shocking to the conscience . . . than to execute a person who is actually innocent."  *Id*. at 430 (citations omitted). As Justice Blackmun bluntly and rightly observed, "[t]he execution of a person who can show that he is innocent comes perilously close to simple murder."  *Id*. at 446.[11]

Mr. Fields wholeheartedly agrees.  He adds that the execution of someone who was convicted and sentenced to death based on any testimony that the Government either knew

---

[11]   Recently, in *In re Davis*, 130 S. Ct. 1 (2009), Justice Stevens, in a concurring opinion, argued that freestanding claims of actual innocence exist under federal law, because "decisions of this court clearly support the proposition that it 'would be an atrocious violation of our Constitution and the principles upon which it is based' to execute an innocent person."  *Id.* at 1 (*quoting In re Davis*, 565 F.3d 810, 830 (11th Cir. 2009) (Barkett, J., dissenting); *see also Kennedy v. Louisiana*, 128 S. Ct. 2641, 2650 (2008) (finding that eligibility for capital punishment relates to culpability); *Cabana v. Bullock*, 474 U.S. 376, 386 (1986) (under the Eighth Amendment, "a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death").  Although the Fifth Circuit has not yet embraced the view that the Constitution prohibits convicting or executing an actually innocent person, *Moore v. Quarterman*, 534 F.3d 454, 465 n.19 (5th Cir. 2008), at least two Fifth Circuit panels have acknowledged that the Supreme Court's decision in *House* suggests that a "stand-alone" claim of actual innocence, supported by strong evidence, could require federal *habeas* relief.  *See Reed v. Quarterman*, 504 F.3d 465, 476 (5th Cir. 2007), *rev'd & remanded*, 555 F.3d 364 (5th Cir. 2009); *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006).

was false or was presented with a reckless disregard for the truth comes "perilously close" to a conspiracy to murder.

The Government argues that this Court should reject this claim simply because Mr. Fields had an opportunity to cross-examine the witnesses, putting aside the fact that Mr. Fields was incompetent to represent himself. GR at 37. Mr. Fields vehemently disagrees. If provided discovery and a full and fair evidentiary hearing, Mr. Fields can make a persuasive demonstration that he is actually innocent of the murder of Suncerey Coleman.

Mr. Fields has certainly presented sufficient evidence to merit an evidentiary hearing. Having made his initial showing, Mr. Fields now seeks discovery to further prove his claim. For example, Mr. Fields has filed a motion seeking access to the scientific evidence seized at the crime scene, which is currently pending. Obviously, the recovery of DNA from someone other than Mr. Fields from the body of the victim or her clothing would be highly exculpatory. DNA tests may put this case in an entirely different light. As of this writing, there have been 258 post-conviction DNA exonerations in the United States. Seventeen of the 258 people exonerated through DNA served time on death row. Mr. Fields seeks an opportunity to prove that he is the unfortunate eighteenth person on that list.

Mr. Fields' request to test physical evidence for DNA is particularly appropriate in this case. The forensic evidence presented at trial did not implicate Mr. Fields. In fact, it was largely exculpatory.

The Government underestimates the importance of the lack of blood found in Grand Am that Mr. Fields was driving on the night of Ms. Coleman's disappearance. GR at 37. There is no physical evidence linking Mr. Fields to the murder of Ms. Coleman. *See* Petition at 99-100; Amended Petition at 125-27. There should have been, if the Government's theory was true. In particular, Mr. Fields was uninjured when he was arrested and there was no blood found

in the Grand Am that he was driving on the night of the incident.  Petition at 99-100; Amended Petition at 126-27.  Since Mr. Fields was wearing cut-off shorts and the victim's body was found in an area with huge thorns, Petition at 99; Amended Petition at 126, Mr. Fields would have been gouged by the thorns and therefore visibly injured when he was arrested if he killed Ms. Coleman.  But, absolutely no blood was found in the Grand Am.

The Government failed to secure other physical evidence that held forensic clues regarding this crime.  The Government never seized, nor forensically examined, the gold Jaguar that Ms. Scroggins and Mr. Outley drove on the night of the murder.  *See* Petition at 100; Amended Petition at 126.  Ms. Scroggins and Mr. Outley conspired to hide the Jaguar by telling investigators that the Jaguar was blue.  However, the Government had reason to know the Jaguar was gold.  The Jaguar's owner, Mr. Payne, testified at trial that he told the investigators three months earlier that the car was gold.  *Id.*  If the Government had seized the Jaguar, it would have proved extremely valuable to the investigation.  This is yet one example of the Government's pre-judgment of this case.

Next, it is important to examine the foundation upon which Mr. Fields' conviction and death sentence is based: informant testimony.

As mentioned previously, overturned convictions based on DNA test results have increased public recognition that our criminal justice system often convicts the wrong people.  Criminal informants, or "snitches," play a prominent role in this wrongful conviction phenomenon, just as they did in this case.  According to Northwestern University Law School's Center on Wrongful Convictions, 45.9 percent of documented wrongful capital convictions have been traced to false informant testimony, making informant testimony the leading cause of wrongful convictions in U.S. capital cases.  Rob Warden, Ctr. on Wrongful Convictions, N.W. Univ. Sch. of Law, *The Snitch System: How Snitch Testimony Sent Randy Steidl And Other*

*Innocent Americans To Death Row* 3 (Winter 2004-05).  University of Michigan Law School Professor Samuel Gross's study on exonerations likewise reports that nearly fifty percent of wrongful murder convictions involved perjury by someone such as a "jailhouse snitch or another witness who stood to gain from the false testimony."  Samuel R. Gross *et al.*, *Exonerations in the United States 1989 Through 2003*, 95 J. Crim. L. & Criminology 523, 543-44 (2005); *see also* Alexandra Natapoff, *Beyond Unreliable: How Snitches Contribute to Wrongful Convictions*, 37 Golden Gate U. L. Rev. 107, 108 (2006) ("The usual protections against false evidence, particularly prosecutorial ethics and discovery, may thus be unavailing to protect the system from informant falsehoods precisely because prosecutors themselves have limited means and incentives to ferret out the truth").

Horror stories abound of lying jailhouse and paid informants who frame innocent people in pursuit of cash or lenience for their own crimes.  In recognition of the dangers of informants who lie, capital reform proposals often contain provisions designed to restrain the use of informant testimony.

But informants do not generate wrongful convictions merely because they lie. After all, lying hardly distinguishes informants from other sorts of witnesses.  Rather, it is how and why they lie, and how the government depends on lying informants, that makes snitching a troubling distortion of the truth-seeking process.  Informants lie primarily in exchange for lenience for their own crimes, although sometimes they lie for money.  In order to obtain the benefit of these lies, informants must persuade the government that their lies are true.  Police and prosecutors, in turn, often do not and cannot check these lies because the informant's information may be all the government has.  Additionally, police and prosecutors are heavily invested in using informants to conduct investigations and to make their cases.  As a result, they often lack the objectivity and the information that would permit them to discern when informants are lying.

This gives rise to a disturbing marriage of convenience: both informants and the government benefit from inculpatory information while neither has a strong incentive to challenge it. The fact that the criminal system routinely produces and relies on inherently unreliable information reflects a cavalier attitude toward guilt.

There is much evidence to support the conclusion that the Government's informants lied – and that they conspired with each other to implicate Mr. Fields and win favor for themselves. For example, in his Petition, Mr. Fields presented new evidence regarding the physical layout of the jail cells that makes the claim that Mr. Fields privately confessed by yelling across a wide expanse without anyone else (including jail guards) hearing the supposed confession. *See* Petition at 105-06; Amended Petition at 131-32. The Government simply chooses to ignore this evidence and asks this Court to do the same. *See* GR at 37.

The testimony of crucial Government witnesses, including Ms. Scroggins and Mr. Outley, and many other witnesses, including the jail-house informants, are filled with gaps, inconsistencies, contradictions, and outright lies. *See* Petition at 100-07; Amended Petition at 127-33. Additionally, the inmate witnesses were promised benefits in return for their testimony against Mr. Fields, which induced the witnesses to make materially false accusations and resulted in numerous inconsistent statements. *See* Petition at 103; Amended Petition at 129.

For example, Ms. Scroggins gave two different alibis about her whereabouts on the night of the murder after Mr. Fields dropped her off, three different and irreconcilable stories about what Mr. Fields told her about the crime, claimed to have known Ms. Coleman was missing because it was on the newsstand even though the story was not yet published, and alleged that Mr. Fields called her at her house at a time not indicated on her phone records. Petition at 101; Amended Petition at 127-28. Prior to the murder on November 6, 2001, Ms. Scroggins wrote a letter where she threatened: "I'm killing bitches." In addition, Mr. Outley

testified to the grand jury that Ms. Scoggins called the victim and threatened to kill her shortly before the victim's death.  There was significant evidence of Ms. Scroggins motive to kill the victim.  Ms. Scroggins testimony also made no sense.  For example, Ms. Scroggins claimed that Mr. Fields showed her a gun and told her that one of the bullets was for her.  However, after this alleged incident, and after Ms. Coleman's murder, Ms. Scroggins spent the night with Mr. Fields.

Mr. Outley also gave multiple, false and inconsistent accounts of his own activities on the night of the murder by making claims concerning the .32 caliber gun that conflict with every other version of the event, claims Mr. Fields called him and admitted to murder while also claiming he called Mr. Fields and prompted a confession, and recently claimed he testified at Mr. Fields' trial because was granted full immunity, even though at trial he claimed the Government did not make him any promises, and he was afraid he would be convicted of Ms. Coleman's murder.  Petition at 102; Amended Petition at 128-29.  Mr. Outley told the Grand jury that "Bird" told him that Mr. Fields killed Ms. Coleman.  At trial, Mr. Outley told the jury that Alberta Hampton and Ms. Scroggins told him that Mr. Fields had killed Ms. Coleman.  William Young testified that Mr. Outley stated he was there when Ms. Coleman was murdered.

In contrast, Mr. Outley claimed at trial, that at the time of Ms. Coleman's murder, he was out selling crack cocaine.  TT at 1821.  However, Ms. Scroggins claimed that she and Mr. Outley were out looking for Mr. Fields and then went to Alberta Hampton's house.  Glaring contradictions, such as these, are the hallmarks of lies.  The Government recognized this when, during Mr. Outley's felon in possession trial, Prosecutor Gloff told the jury that Mr. Outley had told so many stories he could not keep them all straight.  However, during Mr. Fields' trial, he offered any and all testimony that implicated Mr. Fields – no matter how much other evidence contradicted it.

Jerry Reed claimed that Mr. Fields met up with Chae Walker on the night of the murder.  However, Mr. Walker testified that he did not see Mr. Fields until "five or six" days after Mr. Fields escaped.  Mr. Reed also testified that Mr. Fields confessed to him, despite the fact that they did not know each other.  The details demonstrate the falsity of Mr. Reed's testimony.  In the unit where Mr. Fields and Mr. Reed were housed, there was a desk sitting in the middle of the hallway between Mr. Fields' cell and he cell where Mr. Reed claimed he was in when Mr. Fields confessed.  At all times there were a minimum of three officers present.  There were at least twenty other inmates present as well in the surrounding cells.  Yet, only Mr. Reed claims to have heard Mr. Fields' confession.

This case is similar in that respect to a state case, *Roberts v. South Carolina,* 602 S.E. 768 (S.C. 2004).  In *Roberts,* an informant testified that the defendant confessed to him while in jail.  At an evidentiary hearing in support of the post-conviction petition, the testimony established that it was impossible for the conversation to have taken place as the informant maintained, in large part because the distance between the cells.  *Id.* at 771.  "It is highly unlikely that respondent confessed to murder across a cellblock from a distance of thirty-five to one hundred feet.  There was evidence at the [evidentiary] hearing that numerous other inmates and guards would have overheard respondent, as it would have been necessary to shout over the television and other noise."  *Id.*  The reviewing court reversed:  "This evidence was particularly important in light of the fact that the case against respondent was far from overwhelming," and depended in large part on "Gleen, a jailhouse snitch."  *Id.*

Mr. Reed's testimony, like the testimony of many of the informant witnesses, is also incredible because Mr. Reed suggested that Mr. Fields confessed to Mr. Reed, yelling a confession across a cellblock to a man he did not even know.  This scenario is an absurdist piece

of fiction.  Nevertheless, the Government sought to validate these lies by having others repeat them.

Homero DeLeon wrote a letter to prosecutors on February 12, 2003, telling them that he could get Mr. Fields to confess, since he was not on the (then non-existent) witness list. Mr. DeLeon promoted himself to the Government as a previously successful informant.  Just like Mr. Reed, Mr. DeLeon claimed that Mr. Fields confessed to him while both were in their cells. However, also just like with Mr. Reed, this would have been impossible without Mr. Fields being overheard by numerous guards and inmates.  *See* Petition at 105-06; Amended Petition at 131-32.

The testimony of the "informant" witnesses also shows a disturbing pattern where the witnesses either were wrong or did not know details at the time they were first interviewed, but at trial had developed knowledge of these details, knowledge which they claim came entirely from Mr. Fields confession prior to their first interview.  For example, Mr. DeLeon first stated that Mr. Fields had only confessed to shooting the victim.  However, at trial, he alleged that Mr. Fields shot the victim several times in the head and then drug her body to the place where she was later discovered.  John Mercer first told investigators that Mr. Fields shot the victim with a .22 or a 9mm gun.  Then, at trial, Mr. Mercer stated he simply overheard Fields confessing to others – as a means to explain the incorrect details.  These are just two of many possible examples.

It is important to note that the Government's informant witnesses were not kept separate from each other – a common step to insure the integrity of witness testimony.  As a result, "snitching" on Mr. Fields was easy.  All one had to do was to contact another "snitch" who already possessed some information about Mr. Fields' case and then contact the Government and repeat that information – alleging that it came from Mr. Fields.  There is no

evidence that the Government ever took any precautionary or investigative steps to evaluate the truthfulness of this testimony.  Instead, the Government appears to have willfully ignored any and all signs that the witnesses had collaborated on their stories, because the stories aided the Government's theory of the case.

What these examples illustrate is the Government's willingness to use informant testimony despite the many and obvious signs that the witnesses were not being truthful.

The inconsistencies and contradictions in the Government witnesses' testimony, along with the benefits they received for testifying, demonstrates that the testimony was unreliable and tainted.  The Government claims that the jury has already weighed the credibility of the witnesses at trial.  GR at 37.  This claim ignores the fact that the jury could not accurately weigh the credibility of the witnesses because the witnesses' inconsistent and contradictory statements, and their individual motives were hidden from the jury.

Indeed, the Government's use of informants was both so wide-spread and so suspect in this case that cross-examination (by Mr. Fields) was not an adequate safeguard.  The Fourth Circuit has recently expressed its deep concern over the use of compensated informant testimony and its reluctance to admit such testimony absent stringent judicial controls.  *United States v. Levenite*, 277 F.3d 454, 460-64 (4th Cir. 2002).  Compensated testimony "create[s] fertile fields from which truth-bending or even perjury could grow, threatening the core of a trial's legitimacy."  *Id.* at 461.  Such testimony "may be approved only rarely and under the highest scrutiny."  *Id.* at 462.  Similarly the Ninth Circuit has called for increased judicial scrutiny of deals between informants and the government, holding that "where the prosecution fails to disclose evidence such as the existence of a leniency deal or promise that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the due process rights of the accused and undermines confidence in the outcome of the trial,"

*Horton v. Mayle*, 408 F.3d 570, 581 (9th Cir. 2005), and calling such lack of disclosure "unscrupulous." *Silva v. Brown*, 416 F.3d 980, 991 (9th Cir. 2005).

"The use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril. This hazard is a matter 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' and thus of which we can take judicial notice." *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993) (citation omitted). "Our judicial history is speckled with cases where informants falsely pointed the finger of guilt at suspects and defendants, creating the risk of sending innocent persons to prison." *Id.* at 334. Another court has noted that "[n]ever has it been more true than it is now that a criminal charged with a serious crime understands that a fast and easy way out of trouble with the law is . . . to cut a deal at someone else's expense and to purchase leniency from the government by offering testimony in return for immunity, or in return for reduced incarceration." *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1123 (9th Cir. 2001). Indeed, long before snitching became a pervasive aspect of the criminal justice system, the Supreme Court recognized that "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility." *On Lee v. United States*, 343 U.S. 747, 757 (1952).

Where the unreliability of a particular type of witness is so well-established, it is appropriate for the court to take protective steps to guarantee the integrity of the process. *Cf. Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 595 (1993) (court to act as "gatekeeper" to ensure reliability of scientific evidence).

Despite the recognized unreliability of compensated informant witnesses, courts have traditionally permitted them to testify on the assumption that cross-examination will

adequately test an informant's truthfulness.  *See, e.g., Hoffa v. United States*, 385 U.S. 293, 311 (1966).  The Government repeats this argument in its response.

The Government, however, has special obligations when it comes to their cooperating informants.  Courts have established that a "'prosecutor who does not appreciate the perils of using rewarded criminals as witnesses risks compromising the truth-seeking mission of our criminal justice system . . . [and courts] expect prosecutors and investigators to take all reasonable measures to safeguard the system against treachery.'"  *Bowie*, 243 F.3d at 1116 (*quoting Bernal-Obeso*, 989 F.3d at 333); *see also Levenite*, 277 F.3d at 460-64.  This obligation stems from two sources: first, the government enlists and controls and rewards its informants and is therefore in a unique position to evaluate their reliability.  The second is that the prosecutor, as the representative of the sovereign, has an ethical obligation to ensure that the defendant is given a fair trial.  *See Bowie*, 243 F.3d at 1116 (*citing Berger v. United States*, 295 U.S. 78, 88 (1935) and its progeny).  Unfortunately, because of the dynamics of this case, the Government was in no position to guarantee the reliability of the cooperators' testimony.

The Ninth Circuit addressed these issues of the court's gate-keeping obligation to insure reliability in *Bowie*, where three co-conspirators were charged with murder and kidnapping.  There was some evidence that two of the three conspired to pin the murder on the third.  The government's failure to fully investigate the possibility of collaborative perjury caused the Court to reverse the conviction.  In its decision, the Court noted that when the government makes a deal with an informant, "each contract for testimony is fraught with the real peril that the proffered testimony will not be truthful, but simply factually contrived to 'get' a target of sufficient interest to induce concessions from the government."  *Bowie*, 243 F.3d at 1124.  The Court concluded that "rewarded criminals also represent a great threat to the mission of the criminal justice system."  *Id.*

At least two courts have ordered reliability hearings whenever incarcerated informants are proposed witnesses. *See Dodd v. Oklahoma*, 993 P.2d 778, 785 n.1 (Okla. Crim. App. 2000) (Strubhar, J., concurring) (approving lower court imposition of "reliability hearing" comparable to *Daubert* hearing); *D'Agostino v. Nevada*, 823 P.2d 283, 285 (Nev. 1992) (holding that before "jailhouse incrimination" testimony is admissible the "trial judge [must] first determine[] that the details of the admissions supply a sufficient indicia of reliability"). The Illinois Governor's Commission on Capital Punishment has likewise recommended reliability hearings whenever incarcerated informants are offered as witnesses.

The law's treatment of expert witnesses further supports the holding of a reliability hearing in this instance. In *Daubert*, the Supreme Court determined the need for a special mechanism to evaluate the reliability of expert witnesses because experts pose thorny problems of cross-examination and persuasion. Experts, for example, rely on specialized information that is not directly available to the jury. 509 U.S. at 592. The court held that the concerns underlying Rule 403 are preeminent because expert witnesses can have such a potent effect on juries:

> "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."

*Id.* at 595 (citation omitted).

Informants pose many of the same special concerns that expert witnesses do. Unlike typical lay witnesses, they are compensated, they have personal interests in the outcome of the case, their testimony is difficult to test on cross-examination, and they are selected and controlled by the propounding party. Like experts, moreover, informant testimony can be powerful and quite misleading.

Fields is confident that further discovery and a full hearing where the reliability of the Government's witnesses is tested will reveal the truth.  The Government's failure to permit Mr. Fields to scientifically examine the items seized when the victim's body was recovered suggests that the Government is avoiding the truth.  The witness testimony, which was filled with inconsistencies, contradictions and lies, helped the Government hide the truth.  As the current facts are tainted with lies and improper motives, further factual developmental will substantiate Mr. Fields' claim of innocence.  Additionally, scientific evidence will expose the lies upon which Mr. Fields was convicted and sentenced.  Most importantly, Mr. Fields is confident it will reveal the truth about Ms. Coleman's murder.

Frankly speaking, this is more than a case of "actual innocence."  As Justice Blackmun alluded to many years ago, it is a case of a conspiracy to murder an innocent man. *See Herrera*, 506 U.S. at 446.

CLAIM 16:   MR. FIELDS' FIFTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE GOVERNMENT PRESENTED EVIDENCE AND TESTIMONY THAT IT KNEW OR SHOULD HAVE KNOWN TO BE FALSE.

As Mr. Fields alleged in his Petition, the Government improperly presented and relied on testimony which it knew to be unreliable, unsubstantiated, and contradictory, in violation of Mr. Fields' due process rights.  Petition at 109-10; Amended Petition at 135-37.  Tellingly, the Government does not refute that it presented (among other things) "jailhouse" informants who gave unreliable and conflicting testimony and who were compensated with reduced sentences, immunity and similar agreements in exchange for their testimony,[12] nor does it refute that a conviction obtained through the use of false testimony violates Mr. Fields' constitutional rights.  Instead the Government argues that the jury's verdict is reliable, and then

---

[12]   Jailhouse informants are notoriously unreliable. *See supra* at 60-69.

blames Mr. Fields for not using facts known only to the Government to impeach such witnesses. GR at 37-38.  Mr. Fields, however, is not required to impeach witnesses with evidence he never had access to due to the Government's failure to disclose such material evidence.  *See United States v. Bagley*, 473 U.S. 667, 676 (1985) (*Brady's* disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence"); *Giglio v. United States*, 405 US. 150, 154 (1972) ("[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [*Brady's*] general rule) (*quoting Napue*, 360 U.S. at 269).

Moreover, the Government argues that Mr. Fields has not presented any new evidence disproving such witnesses.  GR at 38.  That statement is false and ignores the evidence as set forth in Claim 15.  For example, as demonstrated in the Petition, since Mr. Fields' conviction, Mr. Outley signed an affidavit that he had been given full immunity in exchange for his testimony.  *See* Petition at 102; Amended Petition at 129; *Affidavit of Edward Outley III*. This was a fact known to the Government at the time of trial, a fact it did not disclose to Mr. Fields.  The Government's failure to deny or offer any evidence refuting Mr. Fields' Claim 16 simply demonstrates that Mr. Fields is entitled to discovery and an evidentiary hearing for the purpose of clarifying conflicting and unreliable testimony.

CLAIM 17:    MR. FIELDS WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS DUE TO COUNSEL'S FAILURE TO CONDUCT A COMPETENT INVESTIGATION INTO THE FACTS OF THE CHARGED HOMICIDE.

Mr. Fields established in his Petition that appointed counsel's failure to conduct a competent investigation into the facts surrounding the death of Suncerey Coleman amounted to ineffective assistance of counsel and a violation of Mr. Fields' Fifth, Sixth and Eighth

Amendment rights.  Petition at 110-19; Amended Petition at 137-47.  Rather than address the fact that, for more than two years prior to trial, appointed counsel failed to conduct a reasonable investigation into Mr. Fields' case – indeed the Government does not refute the fact Mr. Fields' counsel failed to interview the majority of possible witnesses – the Government characterizes Mr. Fields' counsel prior to the trial as "standby" counsel, and argues that Mr. Fields was not entitled to effective assistance of "hybrid" counsel.  GR at 38-41.  The Government purposefully ignores the fact that for more than two years, until the week before trial, Mr. Fields was represented by counsel, Mr. Peterson and Mr. Swanton.[13]  Until the moment that Mr. Fields was permitted to go *pro se*, his appointed counsel was required to provide and Mr. Fields was entitled to receive effective assistance of counsel.  *See, e.g., Bryant v. Scott*, 28 F3d 1411, 1415 (5th Cir. 1994); *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985).

Accordingly, the Government's claim that it was Mr. Fields' "choice who to interview, who to subpoena, who to call as a witness during trial" (GR at 41), is disingenuous at best.  Mr. Fields repeatedly expressed his dissatisfaction with his counsel's failure to investigate his case and interview witnesses Mr. Fields wanted to interview in connection with his repeated requests for new counsel – these investigative failures contributed to his belief that trial counsel was conspiring against him with the Government.  TT at 13.  Likewise, the Government's purported defense that the "record does not reveal that Fields asked for a continuance to subpoena or interview witnesses" is also disingenuous.  The Government ignores the Court's clear directive that the trial would not be delayed by Mr. Fields' *pro se* status:

---

[13]    Because Mr. Fields' was not *pro se* during the investigation, the case cited by the Government, *United States v. Morrison*, 153 F.3d 34, 55 (2d Cir. 1998), which holds that a claim for ineffective assistance of standby counsel turns on whether counsel was in control of the case, is wholly inapplicable here.  It is also worth noting that the Second Circuit explicitly stated that its holding would not preclude "a claim for ineffective assistance of standby counsel if standby counsel 'held that title in name only and, in fact, acted as the defendant's lawyer throughout the proceedings.'"  *Id.* (citation omitted).

> THE COURT: Well, Mr. Fields, as Mr. Swanton pointed out, he
> and Mr. Peterson have been working on your behalf in this case for
> approximately two years. . . .  If other attorneys were appointed to
> represent you, there would be a lengthy delay, and as I told you the
> last time we were here, that's not going to happen. . . .

TT at 14.

The Government also argues that Mr. Fields' counsel was not required to interview "insignificant" witnesses because to do so would have been futile in the face of "overwhelming evidence" against Mr. Fields (such "overwhelming evidence" was little more than witness testimony from jailhouse informants and the two individuals Mr. Fields contends are the actual killers.)  *See* GR at 39.  But the law does not require counsel to only provide a competent investigation when the Government believes its case is weak.  Rather, as established in Mr. Fields' Petition (*see* Petition at 115; Amended Petition at 142), the law requires counsel to "at a minimum . . . interview potential witnesses and to make an independent investigation of the facts and circumstances of the case."  *Nealy*, 764 F.2d at 1177; *see also Bryant*, 28 F3d at 1415 (counsel has a duty to contact all critical witnesses and "'ascertain whether their testimony would aid the defense'") (citation omitted).  And in fact, counsel here failed to interview highly significant witnesses.  Indeed, the Government does not dispute that Mr. Fields' counsel failed to interview, among others, Renee "Na-Na" Hampton, the *only eye-witness who did not testify and who was not facing prosecution*; Edward Outley III, an alleged accomplice to the alleged actual killer Shalaykea Scroggins; and Debra Alexander, a witness that the Government identified as one who could corroborate Mr. Fields' defense that Ms. Scroggins was the killer.  Accordingly, the Government's claim that Mr. Fields' counsel only failed to interviewed "insignificant" witnesses is meritless.

The Government also disingenuously claims that it is "untrue" that counsel relied on "open-file" discovery, and attaches two "formal discovery motions."  *See* GR at 41 & Exs. 7-

8.  The exhibits attached by the Government are, respectively, *a motion requesting open-file discovery* and a request to the U.S. Attorney for records of priors and other evidence to be used in the punishment phase.   In the latter request, counsel notes that "I know this [open-file discovery] has included punishment evidence as well," and "out of an abundance of caution" merely requests additional records in connection with the punishment phase of the trial.  *Id.*, Ex. 8.  Neither motion sought anything beyond open-file discovery.

The Government has offered no facts rebutting Mr. Fields' claim that his rights under the Fifth, Sixth and Eighth Amendments were denied due to counsels' failure to conduct a competent investigation into the facts of the charged homicide.   Accordingly, Mr. Fields is entitled to a new trial, or alternatively, discovery and an evidentiary hearing to determine the adequacy of trial counsels' investigation.

CLAIM 18:    THE GOVERNMENT FAILED TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

In his Petition, Mr. Fields alleges that the Government failed to disclose powerful impeachment evidence to Mr. Fields concerning two critical witnesses, Mr. Outley and Mr. DeLeon, who testified against Mr. Fields at his trial.  Petition at 120-25; Amended Petition at 147-52  Specifically, the Government failed to reveal to Mr. Fields that it granted Mr. Outley complete immunity for all charges and neglected to correct Mr. Outley when he falsely testified during cross-examination that the Government did not make him any promises.  *See* TT at 1847; *see Affidavit of Edward Outley III*.  With regard to Mr. DeLeon, the Government failed to provide Mr. Fields with the ten to eleven pages of notes containing several details from conversations that Mr. DeLeon allegedly had with Mr. Fields that Mr. DeLeon claims that he wrote and sent to the AUSA assigned to this case.  *See Affidavit of Rick Ojeda* ¶¶ 10-16.  If this

evidence exists, the Government's failure to disclose this information, which Mr. Fields could have used to impeach the witnesses' testimony, violated *Brady v. Maryland*, 373 U.S 83 (1983).

Tellingly, the Government does not deny that it suppressed evidence favorable to Mr. Fields with regard to Mr. Outley or Mr. DeLeon.[14]  Although the Government suggests that it did not violate its *Brady* obligations because it disclosed a letter sent to Mr. Outley's attorney guaranteeing Mr. Outley derivative use immunity for any crimes he testified about and a four page letter from Mr. DeLeon (GR at 42), it does not deny that it granted Mr. Outley broader immunity than that letter reveals.  With regard to Mr. DeLeon, the Government neither denies the existence of Mr. DeLeon's notes nor that it never provided Mr. Fields with such notes.  These tacit admissions alone are sufficient grounds to grant Mr. Fields discovery of the Government's files through an evidentiary hearing.  Moreover, the Government's contention that Mr. Fields "has made no showing" supporting his assertion about Mr. DeLeon's notes exits ignores the sworn testimony of Mr. Fields' investigator indicating that Mr. DeLeon repeatedly explained that they did: "In any event, DeLeon insisted that he sent AUSA Gloff a package of approximately 10 or 11 pages of notes he took of his conversations with Mr. Fields."  *See Affidavit of Rick Ojeda* ¶¶ 12, 14.

Rather than argue that it did not suppress favorable evidence, the Government argues that such evidence is not material to Mr. Fields' guilt or innocence and therefore is not

---

[14]   The Government suggests that it had no responsibility to correct Mr. Outley's false testimony concerning his agreement with the Government because Mr. Fields had a copy of the letter sent to Mr. Outley's attorney.  *See* GR at 42.  The Government is overlooking its responsibility to behave fairly and attempting to shift its obligation to disclose exculpatory evidence onto Mr. Fields.  A prosecutor is the "representative not of an ordinary party to a controversy, but of a sovereignty whose obligation [is] to govern impartially . . . and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  Furthermore, the Government's duty to disclose favorable exculpatory evidence is especially important in a capital case.  *Kyles v. Whitley*, 514 U.S. 419, 422 (1995).  The Government violated its commitment to justice and its *Brady* obligations when it allowed the jury to be misled into believing Mr. Outley was not receiving a benefit for testifying.

covered by *Brady.*  GR at 41, 43.  The Government is wrong because the suppressed evidence could have been used to impeach both Mr. Outley and Mr. DeLeon, both key Government witnesses against Mr. Fields.  As established in the Petition (*see* Petition at 121-24; Amended Petition at 148-51), the Government's duty to disclose under *Brady* applies to any evidence that can be used to impeach the prosecution's witnesses.  *See, e.g., United States v. Bagley*, 473 U.S. 667, 676 (1985); *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999) ("Our cases make clear that *Brady's* disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness").  The Government overlooks the fact that "[t]he jury's estimate of the truthfulness and reliability of a given witness may be well determinative of guilt or innocence."  *Napue v. Illinois*, 360 U.S. 264, 269 (1959).  Here, the jury's estimate of the credibility of each witness was particularly significant because the case was devoid of physical evidence and rested almost exclusively on the testimony of Government witnesses.

Indeed, the Government concedes that the suppressed material could have been used to impeach Mr. Outley when it acknowledges that evidence of Mr. Outley's bias may have demonstrated that Mr. Outley had a motive to lie.  GR at 41-42.  Nevertheless, the Government still contends that it did not violate its *Brady* obligations because evidence of a motive to lie is not direct evidence of lying.  GR at 41-42.  A jury, however, does not need direct evidence of lying to determine that a witness is not credible.  As Mr. Outley's credibility was an important issue in the outcome of this case, the jury was entitled to know of "evidence of any understanding or agreement as to a future prosecution [because it] would be relevant to his credibility."  *Giglio v. United States*, 405 U.S. 150, 155 (1972).  The Government's failure to disclose that it granted complete immunity to Mr. Outley, one of its key witnesses, is a *Brad*y violation because it denied Mr. Fields the opportunity to impeach Mr. Outley, which could have had a significant impact on the jury's decision.

The Government's failure to rebut the showing put forth by Mr. Fields that it suppressed evidence demonstrates that Mr. Fields is entitled to a new trial, or, alternatively, discovery and an evidentiary hearing with regard to Claim 18.

<u>CLAIM 19</u>:   THE   GOVERNMENT   FAILED   TO   CORRECT   A   MATERIAL MISSTATEMENT OF FACT BY MR. OUTLEY IN VIOLATION OF MR. FIELDS' FIFTH AMENDMENT GUARANTEE OF DUE PROCESS, SIXTH AMENDMENT RIGHT TO A FAIR TRIAL, AND EIGHTH AMENDMENT RIGHT TO A RELIABLE VERDICT AND PUNISHMENT DETERMINATION

In his Petition, Mr. Fields established that a critical witness, Mr. Outley, made a material misstatement, namely that the Government had not made him any promises, that the Government failed to correct in violation of Mr. Fields' constitutional rights.  Petition at 125-26; Amended Petition at 152-53; *see also* TT at 1847.  The Government's opposition does not dispute, and thus concedes, that Mr. Outley's testimony was false, that the Government knew Mr. Outley's testimony was false, and that the Government failed to correct that testimony.  GR at 43-44.  The Government claims that Mr. Outley's false statement was not material, and as such it was under no duty to correct.  *Id.*  The Government is wrong.  As demonstrated in the Petition and *supra* at 76, the credibility of key witnesses is material.  *See Douglas v. Workman*, 560 F.3d 1156, 1174-76 (10th Cir. 2009).  Indeed, the Government concedes that evidence relating to Mr. Outley's immunity could be evidence of a motive to lie.  GR at 41-42.  Because Mr. Outley's immunity was reasonably likely to have affected the jury's determination of Mr. Outley's credibility and the verdict, such testimony is material.  The Government's failure to correct Mr. Outley's misstatement violated Mr. Fields' constitutional rights and as such, he is entitled to a new trial, or, at the very least, discovery and an evidentiary hearing.

CLAIM 20:   MR. FIELDS' FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN, AFTER MR. FIELDS WAS INDICTED, JAILHOUSE INFORMANTS ACTING AS GOVERNMENT AGENTS QUESTIONED FIELDS IN THE ABSENCE OF COUNSEL AND WHERE THAT INMATE LATER TESTIFIED THAT MR. FIELDS CONFESSED.

In his Petition, Mr. Fields demonstrated that there is a possibility that Mr. DeLeon, among other jail-house informants, deliberately elicited self-incriminating statements from Mr. Fields and, if this were the case, the use of such statements as evidence against Mr. Fields would violate his Sixth Amendment rights. Petition at 126-33; Amended Petition at 153-61; *see also Massiah v. United States*, 377 U.S. 201, 206 (1964); *United States v. Henry*, 447 U.S. 264, 273-74 (1980). The Petition established that Mr. Deleon had a prior relationship with the Government as an informant, that he forwarded notes and details regarding Mr. Fields' alleged statements to the Government, and in exchange Mr. DeLeon was rewarded with a reduction in his sentence. The Petition also established that based on Mr. DeLeon's own statements, he believed he may have communicated with Mr. Fields with the intention of eliciting information to provide to the Government *after* he sent those notes to the Government. These facts, if true, are sufficient to establish that Mr. Deleon was acting as a Government agent at the time he allegedly elicited the purportedly incriminating statements, in violation of Mr. Fields' Sixth Amendment rights under *Massiah*.

The Government does not deny that Mr. DeLeon previously acted as an informant for the Government and acted as an informant in this case, but insists that Mr. Deleon was not acting on behalf of the Government because the Government did not deliberately recruit Mr. Deleon as an informant. GR at 44-45. As established in the Petition, however, an informant's agreement with the government may be implied and exist in the absence of an explicit compensation agreement. *See United States v. Taylor*, 800 F.2d 1012, 1015-16 (10th Cir. 1986). Mr. Deleon had a preexisting relationship with the Government as an informant which predated

his conversations with Mr. Fields, and received a reduced sentence in exchange for soliciting information from Mr. Fields after offering and submitting to the state's control. *See Creel v. Johnson*, 162 F.3d 385, 393 (5th Cir. 1998). Moreover, the Government concedes that the timing of Mr. DeLeon's alleged actions controls the analysis of whether an agency relationship existed between Mr. DeLeon and the Government. Here, although Mr. Fields denies that these conversations took place, the Government contends they did and relied on such purported conversations at trial, and the Petition demonstrated that according to Mr. DeLeon, he may have been communicating with the Government and Mr. Fields simultaneously by sending the missing notes described in Claim 19. The Government has not denied the existence of these notes or that Mr. DeLeon contacted Mr. Fields after Mr. DeLeon communicated with the Government. The Petition set forth sufficient evidence establishing the very real potential for an agency relationship in violation of the Sixth and Eighth Amendments, *see Lisker v. Knowles*, 651 F. Supp. 2d 1097, 1114 (C.D. Cal. 2009), and the Government has failed to meaningfully rebut that evidence. *See* Petition at 126-33; Amended Petition at 153-61. As such, Mr. Fields is entitled to discovery and a evidentiary hearing.

## V.     PENALTY PHASE INVESTIGATION CLAIMS

CLAIM 21:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO CONDUCT A COMPETENT PENALTY PHASE INVESTIGATION.

In his Petition, Mr. Fields demonstrated that trial counsel's incomplete and ineffective mitigation investigation and presentation to the jury – consisting of only eight inadequately prepared witnesses – fell well below the prevailing norms at the time, directly prejudicing Mr. Fields. Petition at 134-66; Amended Petition at 161-229. Mr. Fields demonstrated that trial counsel ineffectively "abandoned their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set

of sources." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).  As a result, Mr. Fields was prejudiced

because the mitigation evidence provided to Mr. Fields' jury was substantially incomplete,

despite the existence of critical, and readily available, mitigation evidence and witnesses (many

of whom were actually present at trial but never approached by counsel).  Indeed, Jane Bye, trial

counsel's mitigation specialist, admits that the trial team "did not do everything we could to

defend Mr. Fields' life."  *See Affidavit of Jane Bye* ¶ 17.  More significantly, after reviewing just

some of the mitigation evidence collected by habeas counsel and described below, Ms. Bye

admitted that trial counsel failed to conduct a thorough  and constitutionally adequate mitigation

investigation:

> There was no tactical reason for me not to have uncovered this
> information.   To the contrary,  this  was  exactly  the  type  of
> information that I was attempting to uncover.

See *Second Affidavit of Jane Bye* ¶ 6.

In response, the Government simply summarizes the testimony of six of these

eight witnesses and baldly concludes that "[i]t cannot be said that further research should have

been done by counsel and that Fields was prejudiced by counsel's alleged failure."  GR at 47.

The Government argues that because Mr. Fields' counsel touched briefly upon several mitigating

factors during his penalty phase, counsel met their burden under *Strickland*.  The United States

Supreme Court, however, has recently rejected this very argument:

> We certainly have never held that counsel's effort to present *some*
> mitigation evidence should foreclose an inquiry into whether a
> facially deficient mitigation investigation might have prejudiced
> the defendant.   To the contrary, we have consistently explained
> that the *Strickland* inquiry requires precisely the type of probing
> and fact-specific analysis that the state trial court failed to
> undertake below.   In the *Williams* decision, for instance, we
> categorically rejected the type of truncated prejudice inquiry
> undertaken by the state court in this case.  [*Williams v. Taylor*, 529
> U.S. 362, 397-98 (2000)].  And, in *Porter,* we recently explained:

> "To assess the probability of a different outcome under *Strickland*, we consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." [*Porter v. McCollum*, 130 S. Ct. 447, 453-54 (2009)].
>
> That same standard applies – and will necessarily require a court to "speculate" as to the effect of the new evidence-regardless of how much or how little mitigation evidence was presented during the initial penalty phase. Indeed, it is exactly this kind of probing inquiry that Justice [Scalia] now undertakes . . . and that the trial court failed to do. In all circumstances, this is the proper prejudice standard for evaluating a claim of ineffective representation in the context of a penalty phase mitigation investigation.

*Sears v. Upton* , 130 S. Ct. 3259, 3266-67 (2010)(citations omitted).

It is not enough to simply conduct a cursory investigation into potential mitigating factors, as the Government suggests in its response. If that were the case, reviewing courts would never find penalty phase ineffectiveness as long as one "mitigation" witness was interviewed or his testimony presented to the jury. Rather, as the Supreme Court noted in *Wiggins*, counsel has an "'obligation to conduct a thorough investigation of the defendant's background.'" 539 U.S. at 522 (*quoting Williams*, 529 U.S. at 396). Counsel's investigation "'should comprise efforts to discover *all reasonably available* mitigating evidence.'" *Id.* at 524 (emphasis in original) (*quoting* ABA Guideline 11.4.1(c)).

The failure of capital defense attorneys to abide by these standards has, on numerous occasions, led both the Supreme Court and other courts to conclude that the constitutional guarantee of effective assistance of counsel has been breached. Indeed, the Sixth Circuit in *Poindexter v. Mitchell*, 454 F.3d 564 (6th Cir. 2006), catalogued a number of instances in which insufficient investigation by defense counsel necessitated a conclusion that capital defendants did not receive the legal assistance to which they were constitutionally entitled, including:

- *Wiggins*, 539 U.S. at 523-28 (finding ineffective assistance based on counsel's failure to follow leads that would have lead them to discover evidence of severe privation and abuse as a child from his alcoholic mother, and sexual torment and rape in foster care, as well as diminished mental capacities);

- *Williams*, 529 U.S. at 395 (finding counsel's performance deficient where counsel failed to investigate or otherwise prepare for mitigation until a week before trial and failed to 'conduct an investigation that would have uncovered extensive records graphically describing Williams' [sic] nightmarish childhood');

- *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005) (finding that counsel failed to conduct an adequate investigation where counsel limited their investigation to contacting by telephone the petitioner's mother and brother, sent requests for information to some institutions in which the petitioner had been confined, interviewed only four witnesses – the petitioner, his co-defendant, and two state witnesses, and declined to seek the assistance of a mental health expert or to conduct a thorough investigation into the petitioner's history of mental health or family background);

- *Hamblin v. Mitchell*, 354 F.3d 482, 488 (6th Cir. 2003) (adopting the 1989 and 2003 standard for attorneys representing death penalty prisoners in 1982 and holding that counsel's failure to adhere to those guidelines constituted ineffective assistance of counsel; finding that had counsel investigated the case, counsel would have found a large body of mitigating evidence including fact that the petitioner grew up in a poor and unstable environment and likely suffered from a mental disability or disorder);

- *Powell v. Collins*, 332 F.3d 376, 399 (6th Cir. 2003) (holding that trial counsel's failure to construct the defendant's social history through access to background records and interviews with family and friends constituted deficient performance);

- *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (holding that trial counsel were ineffective for failing to investigate and present the petitioner's highly traumatic childhood, two head injuries, psychological history showing a borderline retarded range IQ and mixed personality disorder);

- *Carter v. Bell*, 218 F.3d 581, 597, 599 (6th Cir. 2000) (finding deficient performance because counsel failed to investigate and present at mitigation evidence of the defendant's illegitimacy, family history, limited education, low IQ, mental condition and positive relationships with children);

- *Austin v. Bell*, 126 F.3d 843, 849 (6th Cir. 1997) (holding that counsel's failure to investigate and present mitigation 'because he didn't think it would do any good' rendered death sentence unreliable);

- *Glenn v. Tate*, 71 F.3d 1204, 1208-11 (6th Cir. 1995) (holding that counsel's investigation was deficient some, where the attorneys presented some, but failed to uncover more convincing mitigating evidence, including evidence of the petitioner's mental retardation, his neurological impairment, and his need for attention and susceptibility to the influence of his brother).

*Id.* at 577-78.

As demonstrated by the mountain of readily available but undiscovered mitigation evidence described below, the Government is simply wrong in their assertion that trial counsel should not have done further mitigation research. Trial counsel could have – and as a matter of clearly established law should have – conducted a thorough investigation and collected this evidence. Their failure to do so prevented Mr. Fields' jury from considering this evidence, which severely prejudiced Mr. Fields. Indeed, absent Court intervention, trial counsel's failures may cost Mr. Fields his life.

Additionally, the Government's response suggests that counsel's failure to investigate can only prejudice a defendant if counsel "failed to discover whole areas of a defendants' past that could have been used at mitigation. . . ." GR at 47. Although that is exactly what happened here, the Government's argument mischaracterizes the standard applied by controlling case law. The *Strickland* standard does not assess prejudice on an item-by-item basis. Rather, prejudice is viewed cumulatively. *See, e.g., Williams*, 529 U.S. at 397-98 (noting that when assessing prejudice, a court must consider the evidence cumulatively); *Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (when applying *Strickland*, the court must examine "the cumulative errors of counsel"); *Livingston v. Johnson*, 107 F.3d 297, 308-09 (5th Cir. 1997) (same).

As demonstrated more fully below, Mr. Fields meets even this artificially heightened standard because Mr. Fields' counsel did in fact fail to discover whole areas of Mr. Fields' past.  As just one striking example, trial counsel failed to discover the abject poverty and deprivation of Mr. Fields' family's living conditions as a child.  For the first 7 or 8 years of Mr. Fields' life, the family lived in an area of McLennan County known as "No Man's Land," a small region that no municipality would annex.  As a result, the neighborhood – consisting of approximately 700-800 residents, predominately African-American – had no sewage system, no municipal police protection, no fire protection, no routine garbage disposal and only a small portion of the houses had running water.  Many residents drank untreated water drawn from wells polluted with fecal waste.  The area was like a large bowl, surrounded by developed areas of Waco and Bellmead, and after heavy rains, water would pool in the area, festering with mosquitoes, pollutants and fecal material from overflowing septic tanks and animal pens.  Children had to wade through the contaminated water to get to school.  No municipal pest control existed and the area was infested with rats and other vermin.  The Fields family often had meager rations of food and would frequently be hungry.  The family collected discarded food for sustenance and the children recall having to search through their food to remove infesting insects like weevils.  None of this information was ever presented to Mr. Fields' jury, because counsel unreasonably failed to investigate it.

**A.** **Trial Counsel's Failure to Conduct Adequate Mitigation Investigation Directly Prejudiced Fields**

Despite the Government's bald and conclusory statements to the contrary (*see* GR at 47), trial counsel's deficient pre-trial mitigation investigation prejudiced Mr. Fields.  Trial counsel's ineffective and incomplete efforts resulted in a penalty phase presentation that only superficially touched on selected portions of the extraordinary trauma to which Mr. Fields had

been exposed throughout his life, and failed to convey the profound impact that these experiences had on shaping Mr. Fields during the formative years of his life and beyond. Moreover, trial counsel failed to present any evidence of Mr. Fields' extensive mental health problems, despite numerous "red flags" that mental illness was a multi-generational issue in the Fields family.  Additionally, despite being on notice that one of the central arguments that the Government would make as to why Mr. Fields should be sentenced to death was because he would be a "future danger," counsel failed to adequately investigate and prepare for this anticipated aggravating factor with readily available rebuttal evidence.   None of these deficiencies are attributable to tactical considerations or strategic judgments on the part of counsel, but rather directly flowed from counsel's unreasonable failure "to discover *all reasonably available* mitigating evidence."  *Wiggins*, 539 U.S. at 524 (emphasis in original).

As the Supreme Court's recent decisions in *Wiggins*, *Williams* and *Rompilla* establish, in evaluating the prejudice component of a claim of ineffective assistance of trial counsel at the penalty phase of a capital trial, the habeas court must compare the mitigating evidence presented in a capital habeas petitioner's trial with the mitigating evidence developed during his habeas proceedings.  Such a comparison here warrants the conclusion that Mr. Fields was prejudiced by his trial counsel's deficient performance.  *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 391-93 (2005) (comparing the evidence that was presented at the original sentencing hearing with the mitigation evidence and testimony presented in post-conviction to conclude that the undiscovered mitigation evidence "'"might well have influenced the jury's appraisal" of [the defendant's] culpability'" and led to a different sentencing decision); *Wiggins*, 539 U.S. at 535-38 (comparing the evidence adduced at trial with the evidence presented in *habeas* regarding the petitioner's "excruciating life history" in finding that trial counsel's failure to investigate and present such evidence resulted in *Strickland* prejudice); *Williams*, 529 U.S. at 397-98 (*Strickland*

prejudice determination must take into account mitigation evidence adduced in post-conviction proceedings).

Set forth below is just a preview of the mitigation case that could have been presented if trial counsel performed a competent investigation.  A mitigation case consisting of critical, readily available yet completely unexplored evidence that likely would have made the difference between life and death.

**1.    Counsel Unreasonably Failed to Obtain Relevant Multigenerational Social History Records of Mr. Fields' Family Members and Caretakers**

Mr. Fields' Petition demonstrated that one of the most critical aspects of a mitigation investigation is the gathering of social history records pertaining to the defendant. Petition at 138-41; Amended Petition at 168-70.  As the Supreme Court noted in *Williams*, such records typically contain a wealth of information regarding the defendant's background which are often in and of themselves mitigating in nature, and/or offer up investigative leads for further mitigation information.  529 U.S. at 395-96; *see also* ABA Guideline 10.7 & related commentary at 83 ("Records – from courts, government agencies, the military, employers, etc. – can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections") (citations omitted).  Moreover, such records are crucial to the mitigation investigation because "they can reveal what the client and his family are reluctant to disclose because of shame and embarrassment, and what they simply can't disclose because they were too young or too impaired to record the events in memory.  They are more credible to fact-finders because they have no inherent bias." *Declaration of Russell Stetler* ¶ 49.

The duty to obtain all relevant social history records is not limited to those of the defendant, but must also encompass the defendant's family members and caretakers.  As the ABA Guidelines explain:

> Records should be requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and children.  A multi-generational investigation [extending as far as possible vertically and horizontally] frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment.

ABA Guideline 10.7 & related commentary at 83 (citations omitted);[15] *see also Declaration of Russell Stetler* ¶ 49 ("Multigenerational records show inherited predispositions and vulnerabilities, as well as patterns of behavior that are repeated from one generation to the next").

Although trial counsel interviewed Mr. Fields' mother, Alice Fields Swinnie, as part of their investigation into Mr. Fields' background, there were clear "red flags" that should have alerted counsel to the fact that Ms. Swinnie could not be relied upon to provide a complete and accurate account of Mr. Fields' life history.  By her own admission, she has an impaired memory and receives disability payments for "mental retardation."  *Declaration of Russell Stetler* ¶ 30.  Clearly, these facts should have concerned counsel and prompted them to seek out records to independently corroborate the information Ms. Swinnie provided to them, rather than simply take her at her word, as they apparently did.

---

[15]    As the Guidelines further explain, such records include, but are not limited to: (1) school records; (2) social service and welfare records; (3) juvenile dependency or family court records; (4) medical records; (5) military records; (6) employment records; (7) criminal and correctional records; (8) family birth, marriage, and death records; (9) alcohol and drug abuse assessment or treatment records; (10) INS records.  *See* ABA Guideline 10.7 & related commentary at 84.  Moreover, the Guidelines direct that such records should be obtained not only with respect to the client, but also with respect to the client's "siblings and parents, and other family members[.]"  *Id.* (citations omitted).

If trial counsel had conducted the type of investigation that is constitutionally required and described by United States Supreme Court precedent with reference to the ABA Guidelines, they would have discovered numerous records that contain a wealth of mitigating evidence documenting retardation, brain damage, and mental illness, throughout Mr. Fields' social history. Numerous records available at the time of trial indicate a long multigenerational history of mental illness in Mr. Fields' family. *See supra* at 24-28; *see also* Exh. 116 (Sherman Fields' Family Tree).

The failure to discover these records was unreasonable, particularly in light of the critical nature of the incidents at issue in these records. As trial counsel's mitigation specialist confirms, counsel's deficient performance in this regard was not the product of a tactical consideration. *See Second Affidavit of Jane Bye* ¶ 6. Just the opposite, Ms. Bye admits "this was exactly the type if information that [she] was attempting to uncover." *Id.*

### 2. Counsel Unreasonably Failed to Interview Historical Witnesses and Collect and Review Relevant Historical Documents

Mr. Fields' Petition demonstrates that gathering of records that reflect an individual's cultural, community, and social history is important for a variety reasons. Petition at 141-44; Amended Petition at 170-75. These records permit the jury to see the defendant in a more complete and accurate context. Such records are typically considered more credible to fact-finders because they are contemporaneous accounts prepared by unbiased persons unconnected to the incidents documented in the records. The fact that the records were created at the time of the incidents themselves makes them less vulnerable to the criticism of some lay witness testimony (that the passage of time has degraded the witness's memory of the event) and expert testimony (that the expert only formed the opinion after the individual became a defendant in a capital case). Obtaining such records, therefore, is important for an equally powerful reason:

to identify the unbiased witnesses who created these records and who encountered the defendant years before he was ever charged in a capital case.

As is apparent from the nature of the records themselves, the kinds of witnesses at issue here include teachers, social service caseworkers, and medical and mental health professionals – in other words, individuals with unique access and insight into the influence that shaped the defendant's life in his developmental years.  One of the benefits of identifying and interviewing such witnesses is that they occupy an outsider's perspective, they often knew the defendant years before his capital trial, and therefore lack the motivation to conceal or cover up embarrassing or painful information or to embellish information about the family dynamics that the family members themselves would.  Moreover, as persons who have an opportunity to observe the family dynamics without themselves being a part of it, such witnesses are often able to provide critical and unbiased information about the dysfunctional environment in which the defendant grew up.

Mr. Fields' trial team gathered only Texas Youth Commission ("TYC") records that on their face stated that they were incomplete and based on self-reports and interviews with Mr. Fields' mother.  Almost none of the records trial counsel gathered related to anyone other than Mr. Fields himself.  The TYC records were a starting point, replete with red flags that trial counsel had a duty to pursue.  This is not a situation where counsel contacted the witnesses and decided not to utilize them for some strategic reason.  Although identifiable to trial counsel from readily available records, counsel simply failed to locate or interview any of these witnesses. Considering that these potential witnesses came in contact with Mr. Fields during critical developmental periods of his life as both a young child and adolescent, trial counsel's failure to interview these witnesses is unreasonable.  These are witnesses who would have been familiar with Mr. Fields' mental and physical health, his family background, his school attendance, his

behavior leading up to and while in juvenile detention or supervision.  In other words, these are witnesses who hold textbook mitigation information.  *See Williams v. Allen*, 542 F.3d 1326, 1339-40 (11th Cir. 2008).

Rather than investigate these sources of information, or interview these primary witnesses, trial counsel instead entirely relied on Mr. Fields' TYC records.  Trial counsel's reliance on these records was clearly deficient because those records themselves indicated that they were incomplete and primarily based on unreliable self-reporting from a juvenile Mr. Fields and his mentally retarded mother.  For instance, these records indicate that a 14 year old Mr. Fields self-reported that "[t]here is no family history of any mental illness, to his knowledge, no suicides in his family, no other serious recent losses.  He has relatives that have had trouble with alcoholism."  *See* Exh. 9.  This statement is demonstrably false.  As demonstrated above, and confirmed by Dr. George Woods, there is a rampant history of mental illness in Mr. Fields' family:

> The maternal side of Mr. Fields' family suffered from multi-generational neurological impairments and affective mood disorders, as well as substance abuse and parental neglect. Mr. Fields' mother and extended family were ill-equipped cognitively, emotionally or financially to rear children.  There are indications that the paternal side of the family was also burdened by mental disease and substance abuse.

*Woods Declaration II* ¶ 30; *see also supra* at 24-28; Exh. 116 (Sherman Fields' Family Tree).

This is not an isolated statement of incomplete information contained in TYC records – Mr. Fields' TYC records are littered with such indications.  For example, a March 8, 1989 report indicates that "[l]ittle information is available regarding Sherman's personal history." *See* Exh. 3 at  000348.  At that time Mr. Fields' evaluators "ha[d] no information about Sherman's natural parents psychiatric history, substance abuse, or other criminal history." *See*

Exh. 4 at 000410.  The records included recommendations that "[a] thorough physical, laboratory and psychological assessment" and "[i]f possible more family history from mother" be made, and that "escape and suicidal precautions" continue to be taken because of Mr. Fields' reported history.  *See* at Exh. 4 at 000411.  A January 20, 1989 TYC report indicates "[w]e do not have access to home evaluations."  *See* Exh. 1.  Another report regarding family history, including the presence of mental illness, alcoholism or retardation in parents or siblings, includes "[n]o information", "Father?" and "Sibs?".  *See* Exh. 8.  Another report dated March 19, 1989 notes that Mr. Fields' "long-standing conduct disorder symptoms" and feelings of "sadness and low self-esteem."  *See* Exh. 5 at 000428.  That report also notes that Mr. Fields had been admitted to a psychiatric hospital and that Fields' several "suicide attempts" were "serious" and that "[h]e should be under close scrutiny and observation".  *See* Exh. 5 at 000427-428, 000431.  A record dated January 1, 1989 notes that despite his history of psychiatric hospitalization, Mr. Fields had not received either outpatient or inpatient therapy, and his mother was "[not] willing to participate in treatment" during his placement at TYC because she had "no time".  *See* Exh. 2 at 000280-81.  Based on these records, and conversations with Alice Swinnie Fields, Mr. Fields' mother, trial counsel was only able to present to the jury a brief, conclusory and superficial and vague description living in a bad environment.

However, had trial counsel performed an adequate pre-trial investigation and collected all relevant historical documents, a more realistic picture of Mr. Fields' home life would have been developed.  For instance, the readily available TYC records of Mr. Fields' brother, Jimmy Fields paint a vivid picture of the chaotic, abusive, violent, impoverished, neglectful, and dysfunctional home in which Mr. Fields grew up.  These documents depict a bleak picture:

- "10 people living in a 4 bdrm home.  Mom is only employed; children do as they please; Mom does not participate in outside involvement but loves her children:  She would benefit from parenting classes a great deal. . . ."  *See* Exh. 28.

- "Mother says she and children were physically and mentally abused by a common law husband.  Mother shot common law husband after one beating.  Mother also shot the common law husband's girlfriend, prior to this.  Neglectful supervision.  Abandonment."  *See* Exh. 30.

- Under a heading "Characteristics of the family as a whole with whom the child has lived," the following characteristics were characterized as "Very Much or Often:" (1) Chronic Poverty, (2) Chaotic home environment, (3) Discipline skills lacking, (4) Difficult or unacceptable to express emotions, (5) Frequent family moves or school moves.  Moreover, Social isolation and Illiteracy were characterized as "Somewhat/sometimes."  *See* Exh. 31 at 007225.

- "Mother is a single parent, who works two jobs, and is unable to satisfactorily supervise them.  Family receives housing assistance and moves frequently.  Mother received probation for attempted murder x2.  Dysfunctional home environment w/ chronic neglectful supervision."  *See* Exh. 31 at 007226.

- Mother earns $650 a month as a laundry attendant.  An additional $346 per month comes from food stamps.  *See* Exh. 31 at 007227.

- "Family appears to be dysfunctional . . . Mother unable to supervise Jimmy and five other siblings (4 boys, 1 girl)."  *See* Exh. 34 at 007291.

- "[H]istory of abuse noted."  The TYC  Recommended participation in "Physical Abuse Survivors Group."  *See* Exh. 34 at 007292.

- "Current Problems:  Lack of supervision by parent in home.  Recommendations:  Assess for intervention services for family unit to address parent/child problems and neglect/abuse issues."  *See* Exh. 34 at 007293.

- "[Mother] has shown poor parenting and supervision skills.  She fails to maintain open communication and provide structure in the home.  **The child's basic needs have not been met and they have sought criminal behavior to satisfy their needs**."  *See* Exh. 35 at 007313 (emphasis added.)

- Mother's husband was described by Jimmy Fields as follows:  "This man is a 'dope fiend'.  Jimmy reported that he sells dope to him occasionally."  *See* Exh. 38 at 007419.

None of these records were collected by trial counsel.  However, the records demonstrate precisely why trial counsel's reliance on the self-reporting contained in Mr. Fields' TYC records was wholly inappropriate and fell well below the established norms.  But for the fact that Mr. Fields' TYC reports did not benefit from a home and family evaluation, this detailed information about the chaotic, abusive, violent, impoverished, neglectful, and dysfunctional home would have been included in Mr. Fields' files.  Had trial counsel conducted the type of investigation required under United States Supreme Court precedent and the ABA Guidelines, they would have discovered these numerous records containing a wealth of mitigating evidence.  There is no evidence in the extant record that suggests that trial counsel's deficient performance in this regard was attributable to anything other than a failure to carry out their basic investigatory duties in preparation for the penalty phase proceedings.  As trial counsel's mitigation specialist confirms, trial counsel's deficient performance in this regard was not the product of a tactical consideration.  *See Second Affidavit of Jane Bye* ¶ 6.  Just the opposite, Ms. Bye admits "this was exactly the type if information that [she] was attempting to uncover."  *Id.*

### 3.    Counsel Unreasonably Failed to Interview Available Family-Member Mitigation Witnesses

Mr. Fields' Petition demonstrated that conducting a thorough and adequate social history investigation, requires counsel to interview those witnesses who have known the defendant longest and most intimately: the family members.  Petition at 144-47; Amended Petition at 175-79.  Such interviews are necessary not only to discover information directly about the defendant, but also to investigate such issues as the conditions in which the defendant was raised, risk factors to which the defendant was exposed, patterns of dysfunction that governed family dynamics, and potential heritable mental disorders in the family lineage.  Additionally,

the life of a capital defendant is often marked by intra-familial abuse, physical and sexual assault, multigenerational substance abuse and mental illness – dark and shameful secrets that individuals are understandably reluctant to discuss.  For this reason, initial interviews with such witnesses often yield incomplete or superficial information, as these witnesses are typically defensive and wary of disclosing personal or sensitive information to a stranger.  Such barriers can only be broken by establishing a rapport and trust with the witnesses – a process that requires many hours and multiple visits with the witnesses.  Yet despite the fact that Mr. Fields came from a large extended family, most of whom live right in Waco, trial counsel failed to speak with anyone but a few family members – and those interviews were limited and superficial.

Mr. Fields' mother, Alice Fields Swinnie, had five sons by four different men. Trial counsel identified only two of the fathers by name:  Mr. Fields' father, the late Sherman Mims,[16] and William Bradford, the father of Jimmy and Shaffer Fields.  The fathers of Charles and Jeffrey Fields were not identified.  None of these men were interviewed, although each may have provided some insight into Mr. Fields' mother's lifestyle, romantic relationships, child rearing, mental state, use of substances, among other issues relevant to Mr. Fields' mitigation case.

At least two of the mother's most violent boyfriends were readily available.  She advised counsel that William Bradford resided in Waterloo, Iowa, where his address and phone number are listed in directory assistance.  Melvin Swinnie, who had shot Alice Swinnie, has a TDCJ inmate number of #00662634, has been incarcerated for two decades, will remain in prison until 2023, and his prison location was readily available at the time of trial.  Although the whereabouts of these witnesses was easily discoverable, trial counsel attempted to neither locate

---

[16]    Mims was reportedly in his forties and married to someone else at the time he impregnated Sherman's teenage mother.  According to TYC records, he died in 1985.

nor interview them as part of the mitigation investigation.  Such an omission is particularly troubling given that both Mr. Bradford and Mr. Swinnie essentially occupied a parental role with respect to Mr. Fields, and were male role models for him during his formative years as a child and adolescent.  Moreover, considering that both men were involved in violent and traumatic shooting incidents with Mr. Fields' mother, it is unreasonable that trial counsel failed to investigate and interview these witnesses.

There was no effort whatsoever to investigate Mr. Fields' paternal lineage, or even to verify the mother's report that Mr. Fields' biological father had died in Marlin, Texas. With respect to Mr. Fields' maternal lineage, Mr. Fields' mother was one of ten children, two of whom were reportedly deceased by the time of trial.  Five (Dorothy Randle, Shirley Fields, Annie Leaks, Hattie Love and George Gaines) lived in Waco, one (Bessie Jackson) in Chicago, and one (Arthur Fields) in Pampa, Texas.  Mr. Fields' maternal grandparents never married.  In fact, his late maternal grandfather, Shelby Mitchell, was married to someone else.  He and his wife had at least three children.

Of all these witnesses, trial counsel only called two family members (aside from Mr. Fields' mother) as witnesses during the penalty phase of Mr. Fields' trial: Vincent and Ed Green, who were Shelby Mitchell's sons, and half-uncles (but age peers) of Mr. Fields.  Counsel did not even bother to personally interview Vincent and Ed Green prior to putting them on the stand:

> For Sherman's capital trial, I was subpoenaed . . . When I got to the courthouse, I hadn't met with anyone like his lawyers or anything before that.  Sarah asked me because I was an uncle and I was close to Sherman.  I can't remember her name, but a black lady in her early 40s maybe spoke to me before I went on the stand.  I don't think she testified but she worked for the lawyers and we spoke for maybe 15 minutes.  I can't remember what she

> said to me.  When I got on the stand I had no idea what questions
> they were going to ask me.

*See Declaration of Vincent Green* ¶ 27.  As a result, his testimony was superficial and

incomplete.  If counsel had interviewed Vincent Green prior to putting him on the stand, they

would have learned that he could have testified to, for example, the abuse suffered by Mr. Fields

at the hands of William Bradford and his grandmother, the extreme poverty he endured and the

mental illness prevalent on the maternal side of Mr. Fields' family.  *See id.* ¶ 12 (describing that

the Fields family sometimes had no food); *id.* ¶ 14 (describing Jessie Mae Fields' digging in

dumpsters for food for the family); *id.* ¶ 16 (describing the Fields home as infested with rats and

roaches); *id.* ¶¶ 17, 18 (describing Leon and Joe's mental illness, respectively).  Moreover, there

was no attempt to contact the numerous readily available family members, even though a few

were encountered in a group setting.  As noted earlier, only in-depth one-on-one interviews could

have provided a textured explanation and vivid account of the violent, chaotic world in which

Mr. Fields grew up.  For example (and as described in more detail below):

- Charles Fields, Mr. Fields' older brother, who was at the trial, yet "none of [Mr. Fields'] lawyers or social workers talked to [him] about anything," "would have testified" to the abuse, and parental neglect endured by Mr. Fields, the racism he was subjected to, the conditions in the community that Mr. Fields grew up in, the abject poverty he and his family lived in and the prevalent mental illness on the maternal side of the family, among other things.  *See Declaration of Charles Fields* ¶ 2.

- Jimmy Fields, Mr. Fields' younger brother, who "no one working for [Mr. Fields] came to see before trial," could have testified to parental neglect, the mental illness on the maternal side of the family, the trauma suffered by Mr. Fields, among other things.  *See Declaration of Jimmy Fields* ¶ 31.

- Shaffer Fields, Mr. Fields' younger brother, who "would have testified" but was not asked to, could have testified to, among other things, abuse, parental neglect, mental illness on the maternal side of the family, and Mr. Fields' role as a parental figure.  *See Declaration of Shaffer Fields* ¶ 35-36.

- Tameika Randle, Mr. Fields' step-sister, who was "never contacted or talked to" by Mr. Fields' attorneys, would have testified to Mr. Fields' role as a parental figure as well as parental neglect and the instability of the home environment. *See Declaration of Tameika Randle* ¶ 16.

- Alton Robinson, Jr., Mr. Fields' cousin, who Mr. Fields' lawyers "never talked to" but "would've testified if they had asked," could have testified to, among other things, the abject poverty Mr. Fields grew up in, the history of mental illness on the maternal side of the family, and the trauma suffered by Mr. Fields. *See Declaration of Alton Robinson, Jr.* ¶ 35.

- "No lawyer or investigator ever spoke to" Lucille Leaks, Mr. Fields' half-aunt, before the trial. She would have testified to, among other things, the mental illness on the maternal side of Mr. Fields' family and the poverty in which Mr. Fields grew up. *See Declaration of Lucille Leaks* ¶ 20.

- Vera LeBlanc, Mr. Fields' half-sister, was "never contacted by anyone representing [Mr. Fields] in his capital case" before March 2010. If asked, she could have provided information about the mental health of the paternal side of Mr. Fields' family. *See Declaration of Vera LeBlanc* ¶ 25.

Here, however, trial counsel did not even bother to interview any member of Mr. Fields' family aside from his mother and none of this mitigating evidence was uncovered or presented to the jury. Moreover, trial counsel made no inquiry into potential heritable mental disorders on either side of the family.

Additionally, trial counsel made no attempts to interview neighbors or classmates of Mr. Fields, even though counsel knew numerous home addresses and all the schools Mr. Fields attended. Similarly, counsel failed to interview professionals, caseworkers, or police officers who had dealt with Mr. Fields and his family. Trial counsel's deficiencies in this regard, as with the historical witnesses discussed earlier, are simply unreasonable and cannot be ascribed to any tactical considerations. As trial counsel's mitigation specialist confirms, counsel's deficient performance in this regard was not the product of a tactical consideration. *See Second Affidavit of Jane Bye* ¶ 6. Just the opposite, Ms. Bye admits "this was exactly the type if information that [she] was attempting to uncover." *Id.*

### 4. Counsel Unreasonably Failed to Investigate and Present Evidence of the Abject Poverty of the Fields Family

As set forth in the Petition, Mr. Fields grew up in soul-crushing poverty.  *See* Petition at 147-49; Amended Petition at 179-83.  His defense team at trial told jurors that he grew up poor and moved to the "projects" after his mother went to prison for shooting his stepfather.  TT at 2370-75, 2393.  Reality was much, much worse and represents a "whole area of a defendant's past that could have been used in mitigation" but that was completely unexplored by trial counsel.  *See* GR at 47.  The ABA Guidelines succinctly state: "Family members and friends can provide vivid first-hand accounts of the poverty and abuse that characterize the lives of many capital defendants."  Commentary to Guideline 10.11.  In this case, the trial team did not discover and consequently could not present to Mr. Fields' jurors an accurate picture of the harsh and shameful conditions that Mr. Fields was forced to endure on a daily basis.  The true extent of Mr. Fields' poverty is described in the ensuing section describing the prejudice resulting from Mr. Fields' trial counsel's deficient performance.

Mr. Fields grew up in abject poverty in a community just outside of the Waco city limits that was fittingly called "No Man's Land," a small region that no municipality would annex.  *See* Ex. 104.  The area was so poor that it was once featured in a national news segment, a copy of which (on DVD) will be filed separately.  The neighborhood had no sewage system, no municipal police protection, no fire protection, no routine garbage disposal and only a small portion of the houses had running water. See Exh. 100; Exh. 101; Exh. 102; Exh. 103 at 011538, 011541.  Many residents drank untreated water drawn from wells polluted with fecal waste.  *See* Exhs. 100-103.  After heavy rains, the septic tanks would overflow and children would reportedly wade through the contaminated water to get to school.  *See* Exh. 99; Exh. 101 at 011516-17; Exh. 103.  No municipal pest control existed and the area was infested with rats and

other vermin.  *See* Exh. 103 at 011541.  Nonresidents came to No Man's Land to dump garbage and dead animals.  *See* Exh. 101 at 011517.  Witnesses were readily available who could have described first-hand this shocking level of deprivation.

In addition this undiscovered historical information about Mr. Fields' childhood community, witnesses were readily available who could have described first-hand this shocking level of deprivation.

Dorothy Randle described the poverty in "No Man's Land":

> When Sarah was living in No Man's Land, that was her hardest time.  She was poor then.  She had Charles and Sherman.  Sarah didn't discuss her money situation with me, but I gave them stuff.  I gave them stuff whether they wanted it or not.  I'd get groceries for them – greens, cabbage, neck bones, skins, all that stuff.

*Declaration of Dorothy Randle* ¶ 10.

The family did not have enough money for food.  For example, Charles Fields states in his declaration:

> I remember that before Brad came to live with us, we were always poor.  We had beans and chicken every day.  We didn't have much money for food.  We kept a lot of Caritas cheese – the processed cheese.  We would chop it up and make grilled-cheese sandwiches.  That's what they call government cheese.  We were eating a lot of beans and chicken.  We got chicken from the store and we'd eat every last bit of it.  I remember being hungry as a kid.  We would be hungry a lot at the end of the month.  We would have a little food, but we had to try to stretch it out.  It was probably the last two weeks of the month that would be like that.  We would get help from Caritas and that and some churches – I can't remember which ones.  Caritas was on S. 8th or 9th or something.  It would be a long line – you had to sit and wait to get something.  In those last two weeks of the month, we could have two meals and that was it during the day.

*Declaration of Charles Fields* ¶ 12.

Even though they had very little food, the Fields' family had to compete with rats

for what they had:

> We used to have big rats and stuff. We had to fight them for our
> food. They'd jump up on the stove – big rats, about a foot long.
> I'd be the Lone Ranger and Sherman was Tonto and we'd hunt the
> rats at night. We had holes all over the house – rat holes
> everywhere. We were too poor to get rat poison but we had traps
> and we'd throw them out behind the shack. At Pearl, the rats were
> out of control. We had rats at some of the other places we lived
> too.

*Id.* ¶ 14. Vincent Green also remembers the lack of food:

> When Sarah [Sherman's mother] was staying in the projects in
> East Waco, I stayed with her. I stayed with her in North Waco too
> when she was with William Bradford . . . Sometimes they had no
> food and stuff. I knew they would run out of food because Sarah
> would come and tell daddy she had no food and ask if she could
> borrow some money. They would have like pork, or beans or
> wieners – when I was over there that was all they had.

*Declaration of Vincent Green* ¶ 12.

> Alton Robinson's declaration recounts the constant presence of rats:
>
> I would see rats at the house on Pearl every night. They were
> always there – they stayed there. They were like wood rats. They
> are like the size of a cat. They would mostly be in the kitchen. I
> was scared. I hate those rats right to this day. They tried to catch
> them sometimes with these big traps that just like slam on their
> tails. I don't know if they got poison. I guess poison is more
> expensive.

*Declaration of Alton Robinson, Jr.* ¶ 13. Vincent Green's declaration adds:

> There were rats and roaches in their houses. The rats would be in
> the kitchen or running across the living room floor. I'd never seen
> that at home. Roaches were everywhere. They'd always be out in
> the kitchen and stuff – always – it wasn't like you'd see one every
> once in a while. It would bother the kids because their friends
> would come over and it would be embarrassing for them. I had to
> get used to it. Before I went there, they told me, "Man, you might
> see some stuff you don't like." They brought a few friends around
> but rarely.

*Declaration of Vincent Green* ¶ 16.

Because there was not enough money for food, the children often accompanied

their grandmother "dumpster diving":

> Jessie Mae, Sherman's grandma . . . would go digging in trash cans. She'd find thrown-away donuts and bring them to the house. The kids would eat it. I wouldn't touch it. It was nasty. I thought, "How can y'all eat this?"  But they really had no choice.  The donuts would be in a box but they were coming out the trashcan. You don't know what other crap is in there.  But they had no choice.  Jessie always walked around with a shopping cart and would go to the dumpsters in apartment complexes, alleys, the dumpsters and the stores and whatever she could find, she'd go get it.

*Id.* ¶ 14.

However, it is probably the account of Shaffer Fields that is most moving, if not

shocking:

> As we got older . . . [my grandmother would] go dumpster diving – looking for cans to cash in at the scrap place.  She'd make us go with her.  We'd have to hide from kids we went to school with.  I guess she did it to make money.  She'd get all the soda cans and she tried to make us eat stuff out of there too.  It was embarrassing. She didn't always have to do that.  She made all the family do that – all the young ones . . . We got breakfast and lunch at school, but on the weekends, we would be hungry the rest of the day.  Every day we had some kind of beans and cornbread.  Sometimes we would get meat too – neck bones and stuff.  But sometimes we didn't have food.  It would depend.  Sometimes it would only be free food, like from Caritas.  You'd look at it sometimes and it would be moving.  You had to search the cereal for weevils and stuff.  The food they gave you was like expired or open and stuff – they gave you anything.

*Declaration of Shaffer Fields* ¶¶ 16-17.

Charles Fields explained the psychological impact of the poverty on Mr. Fields:

> Sherman and I used to get depressed because we had less than other people.  There were times the rental center would come and re-possess some of our furniture.  It was like that really until we

> could buy things ourselves.  After I dropped out of school, I
> worked with my grandfather and had money.  He made sure we
> had clothes.  We were real poor.  The house was raggedy and the
> stuff we had wasn't too far from being in the dumpster.

*Declaration of Charles Fields* ¶ 15.

A competent investigation should have included consulting with a mental health professional about the psychological consequences of growing up deprived.  Dr. Woods states:

> The co-morbidity of Sherman Fields' own genetically-based
> potential for developing a mental illness and the traumatic stress
> manifested by the circumstances of his upbringing, *including the
> extreme poverty in which his family lived,* his caretakers' substance
> abuse, and neglect and abuse that he and his siblings suffered in
> their childhood; created greater and more severe symptomatology
> than either disorder alone may present.

*Woods Declaration II* ¶ 50 (emphasis supplied).

This level of deprivation is one that the vast majority of Americans have never experienced and maybe can't imagine still exists in our nation.  Most importantly, it stands in stark contrast to the defense case that was actually investigated and presented.  Mr. Fields' jury knew that growing up, Mr. Fields and his family were poor.  What they did not know was how poor and how this poverty negatively shaped his emotional and psychological outlook.  Had the jury learned the truth about Mr. Fields' poverty and deprivation, there is a reasonable probability that at least one juror would have voted for a life sentence.  Mr. Fields was therefore prejudiced by his trial counsel's failure to investigate this readily available mitigating evidence.

### 5.    Counsel Unreasonably Failed to Investigate and Present Evidence of the Neglect of Mr. Fields Family and Caretakers

The trial team's limited investigation failed to uncover the near-constant neglect by Mr. Fields' parents and caretakers that marked his developmental years.  As a result of their deficient investigation, the defense at trial presented an inaccurate and misleading account of Mr. Fields' early years.

The trial team failed to uncover Mr. Fields' neglect by his own biological mother and father.  Mr. Fields' developmental years were marked with constant transition in a household wrought with neglect by absentee parents lacking the developmental skills and stability to properly raise Mr. Fields and the other children.  Members of Mr. Fields' family vividly remember the tragic circumstances under which Mr. Fields and the rest of the children were raised.

Charles Fields recalls that their mother, Alice Swinnie – a young, working mother – was never present in the home and slept when she was at home.  *Declaration of Charles Fields* ¶ 19.  Charles Fields added:

> I wished my mom would be home more.  I used to feel we barely saw her.  She pretty much just worked after she shot Brad and Ivory.  It was probably because of her probation fees and stuff that she owed after she shot Brad and Ivory.  I was pretty much mad.

*Id.* ¶ 39.  Alice Swinnie admitted as much, stating, "I slept a whole lot.  I'd go to work, go to sleep, work, come back and go to sleep."  *Declaration of Alice Swinnie* ¶ 42.  This condition may have been induced by Alice Swinnie's depression.  *Id.* ¶ 41.  Other family members recall that Mr. Fields' mother would be gone for two or three days straight.  *Declaration of Jimmy Fields* ¶ 7.

Mr. Fields' half-brother, Shaffer Fields, stated that their mother's focus when not at work was not on the family, but on card games and gambling, resulting in further diminished oversight of her children.  Shaffer recalled:

> We moved schools a lot because we were moving houses a lot.  I have no idea why we moved so much. Maybe my mom couldn't make the rent.  She gambled a lot.  She was a real live gambling addict.  She would be gone for days at a time.  She would go to these people's house.  Our grandma would watch us when she was gone gambling.  Grandma always stayed with us or stayed close by.

> I think my mom worked in the day time. Most of the time, she'd be at the card deck. We would see her for an hour and then she would be gone again. It was that way as early back as I can remember. She could stay up for three days straight. There would be 7 or 8 people at the table and there would be people standing around waiting to play . . . Most days she would be gone gambling. It upset me, but I didn't talk to her about it. Almost every evening, Mom was gone.

*Declaration of Shaffer Fields* ¶¶ 11-12. Jimmy Fields further corroborates this account:

> My mom was never really at home. She was working and then when she wasn't working, she was probably at card games. I don't know where she did it – they had a card game group. I told Sherman one time, "Mom raised us the best she knew how, but in other people's eyes she might not have been good. She might not have been a good influence." When I look at life, I see how it could've been a whole lot different. If she'd spent more time with us, it could've been a whole lot different. When I told Sherman that, he told me I shouldn't talk about her like that.

*Declaration of Jimmy Fields* ¶¶ 6-7.

The years of neglect were evident. Jimmy Fields recalled that his mother allowed them to do whatever they wanted including illegal drug use, as long as it was done in the home. *Declaration of Jimmy Fields* ¶ 9. Even when her children were apprehended by authorities, Alice Swinnie neglected to care for them. *See id.* ¶ 25 ("The whole time I was at boot camp, my mom came to see me twice. I wasn't far away and she only made it out there two times"). Once Mr. Fields and the children became teenagers they were effectively on their own. *Id.* ¶ 12.

The trial team also failed to uncover the abhorrent caretaking by Mr. Fields' other family members and "father figures" introduced to the family by Mr. Fields' mother. Had the trial team performed their duty to investigate, they would have discovered that with Mr. Fields' parents chronically absent, Mr. Fields was predominately raised by several family members and friends who were saddled with cognitive and emotional deficits, and chronic substance abuse addictions resulting in further neglect during Mr. Fields' developmental years.

Since Ms. Swinnie was a young mother, Jessie Mae Fields, Mr. Fields'
grandmother, was referred to as  "mama" in the Fields household.  *Declaration of Jimmy Fields*
¶ 7.  However, Jessie Mae failed to provide the proper oversight of the children, often resorting
to beating the children.  *Declaration of Vincent Green* ¶ 14.  Jessie Mae Fields also suffered from
the same pervasive alcohol abuse that was prevalent in the Fields' household:

> My grandma stayed tipsy.  She was an alcoholic.  She drank
> Schlitz beers at home.  She'd drink three or four days out of seven.
> She usually started on a Thursday and would drink through
> Sunday.  She would drink beer at home on the weekends and
> would also go out.  She'd get drunk.  When she was drunk she
> would get very outspoken – and she speaks her mind even when
> she isn't drunk.  When she was drunk, she'd speak her mind to
> whoever got on her nerves. . . .

*Declaration of Charles Fields* ¶ 39.

Shelby Mitchell, Mr. Fields' grandfather, who was presented at trial as a stable
influence on Mr. Fields, also failed to provide the support and positive influence that Mr. Fields
so desperately needed.  *See Declaration of Shaffer Fields* ¶ 18 ("Our granddad would take care
of us too – though I think he was kind of a bad influence"); *see also* Exh. 12.  Unfortunately,
Shelby Mitchell also suffered from substance abuse issues and emotional issues from his own
childhood trauma.  As Charles Fields recalls:

> My granddad [Shelby Mitchell] drank every day – morning to
> night.  He'd have a shot of coffee first thing and the gin is next, or
> a Coors.  He had a lot of friends and they all bought him liquor and
> beer.  He had plenty food and so much beer and liquor round the
> house.

*Declaration of Charles Fields* ¶ 81.  Jimmy Fields confirms:

> He used to work and drink gin all day . . .  He drank gin from the
> time he got up to the time he passed out.  He'd be sitting in the
> kitchen eating in the trailer and fall out on the floor and get
> comfortable until he went to bed.

*Declaration of Jimmy Fields* ¶ 15.  Shelby Mitchell's alcohol abuse also impacted Mr. Fields:

> My dad [Shelby Mitchell] was a heavy drinker all his life.  He drank every day – later on in the day.  He drank beer, liquor, whatever.  Sometimes Sherman and I would get his drink.

*Declaration of Vincent Green* ¶ 4.

Further, as a result of Shelby Mitchell's own traumatic past he often provided Mr. Fields and the children with skewed life lessons:

> Our grandfather, Shelby Mitchell, raised us up that it was better to get caught with a gun than without.  My grandfather always carried a pistol – even to church.  He'd say, "You can shoot a black man and get away with it.  Shoot a white man and you'll go to jail."  He taught us to believe that no one was better than us.  He told us we should always use a gun if someone pulled a gun on us.  He said he could always get us out of jail but he couldn't get us out of the grave.

*Declaration of Charles Fields* ¶ 44.

Further, the trial team should have discovered and submitted at trial, that Mr. Fields' mother often brought home other "father figures" who were equally wrought with substance abuse and violence issues and neglected Mr. Fields and the children.  Family members recalled that Alice Swinnie's boyfriend William Bradford (known as "Brad") was a "real" alcoholic who would drink "breakfast beers" and was "drunk every day."  *Declaration of Charles Fields* ¶¶ 11, 20; *Declaration of Jimmy Fields* ¶ 14 ("My dad [William Bradford] used to drink").  Alice Swinnie recalled that William Bradford not only hit her in front of the children, but would hit Mr. Fields and the other children "because they weren't his."  *Declaration of Alice Swinnie* ¶¶ 29, 33.  Ms. Swinnie did nothing to stop Brad because she thought it was "normal for Brad to just keep whooping them."[17]  *Id.*  In fact, the children believed that Alice Swinnie made

---

[17]    Indeed, William Bradford's abuse and philandering resulted in Alice Swinnie taking matters into her own hands when she shot Bradford and his mistress Ivory Monroe.  This resulted in Alice Swinnie receiving probation and continued time away from home while she worked to pay her probation fees and fines.  *Declaration of Charles Fields* ¶ 19.

Brad more of a priority then Mr. Fields and the children.  *Declaration of Charles Fields*' ¶ 24 ("I felt like my mom put Brad before us").

Family members also recalled that Ms. Swinnie's second husband, Melvin Swinnie, had pervasive substance abuse problems which were witnessed by Mr. Fields and other family members:

> He was not a good catch – he was a dope fiend.  His mom told me he was and I didn't know.  He took heroin and then moved on to crack.  He was supporting his habit through burglarizing.  I got his check.  If I had known, I wouldn't have married him.  Melvin got arrested a few times.  He was in jail when we got married.  He stayed in there a couple of years – I think on an attempted murder charge because he shot his wife and her cousin.  Later, he shot me too.

*Declaration of Alice Swinnie* ¶ 35.  Charles Fields also remembers Melvin Swinnie's absence and drug issues:

> Melvin Swinnie, my mother's husband, was in and out.  We got a little extra money because Melvin had a crack habit so he gave mom his check for like $20 cash.

*Declaration of Charles Fields* ¶ 20.

Shaffer Fields further recalled Melvin's addictions as well as Mr. Fields' direct involvement:

> I have no idea when my mom met Melvin, but he started coming around on 11th Street.  I think Melvin was drinking and smoking crack from the beginning.  I have no idea why my mom wanted to be with him.  When she first met him he wasn't all-the-way strung out.
>
> Sherman was there for some of the time Melvin was with us.  I think Sherman and Jimmy used to confront him about him stealing stuff from us but mom wouldn't let them.  My mom would defend Melvin.  He would steal from us every day – he was crack head.  Me and my brothers used to talk about that all the time.  We knew he was a crack head before she did.  He had crack pipes all around the house.  I don't think my mom was naïve.  I think as long as it

was benefiting her, she didn't care.  He probably was stealing shit
to give her money to play cards.  Back then all she cared about was
card games.  She still goes, but not as much as she used to.

*Declaration of Shaffer Fields* ¶¶ 32, 33.

### 6.     Counsel Unreasonably Failed to Investigate and Present Evidence of the Extent of Abuse Experienced By Mr. Fields in His Formative Years

Mr. Fields' jurors were told that Mr. Fields and his family members experienced periodic abuse at the hands of William Bradford.  This was true.  But, the abuse was hardly limited to Mr. Bradford.  Once again, an inadequate investigation resulted in a misleadingly incomplete history.  There was no tactical reason for the trial team not to uncover the true extent of the abuse – by Mr. Bradford and others – inflicted and witnessed by Mr. Fields.  Indeed, the defense team obviously understood the mitigating value of this evidence because they presented what they discovered.  However, the trial team's investigation stopped far short of competence, leaving Mr. Fields' jurors with only a faction of the true picture.  *See Walbey v. Quarterman*, 309 Fed. Appx. 795, 800 (5th Cir. 2009) ("'[C]ounsel should consider presenting . . . [the defendant's] medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences'") (*quoting Wiggins*, 539 U.S. at 524).

Several witnesses were available who could have provided powerful and moving first-hand accounts detailing the abuse; the abusers; the victims of the abuse; and the resulting consequences, both physical and mental, on the young boy who was forced to endure it all.

For example, Charles Fields' declaration describes how he and Mr. Fields were repeatedly and viciously beat by their mother's boyfriend beginning at a very young age;

When I was a kid, Sherman and I lived with my grandfather off
and on because of Brad.  Brad used to whoop me and Sherman a
lot.  He used to beat us and not touch his sons.  I was 3 or 4 when
Brad came.  He was nice at first.  He would take us riding, buy us

candy.  After he got in there, he laid his rules down.  I guess once he moved in he thought he could run the house like he wanted to.  Brad didn't like me because my grandmother was so protective of me.  I got punished quickly.  She would always come to my aid.

We tried to do whatever Brad thought was right because otherwise he'd tear us up.  Mostly he would pull us into his room and tell us what we supposedly did wrong and whoop us.  It was mostly just him around and my mom would be out at work or something.  A lot of times when Brad whooped him, Sherman would cry, even though he tried hard not to.  Sherman was kind of bull-headed.  I think he didn't want to give Brad the satisfaction of knowing he made him cry.  I'd try not to cry too.  I felt like he'd feel he'd accomplished his mission if he made us cry.  If we did cry, he wouldn't stop – didn't make a difference to Brad.  But if we could take it and not cry, we felt good because we hadn't given him the satisfaction.  Sherman you'd have to whip real good for him to cry, so I knew Brad must have been hitting him hard, especially when that would happen.

*Declaration of Charles Fields* ¶¶ 22-23.  The beatings were brutal, prolonged attacks on small,

defenseless children:

Brad would whoop you until he got tired.  It was usually 20, 25 licks with our clothes on.  We always had whelps.  We would be black and bruised.  It would hurt for maybe two days.  He would get us on our backsides so you could barely sit down.  It hurt to sit down.

*Id.* ¶ 26.

The torrent of physical abuse was not limited to Mr. Fields and his brothers, as

Charles further explains:

The worst fight I remember was when Brad whooped my mom, my grandma and my auntie.  Brad and my mom were getting into it and when he hit my mom, my Aunt Hattie chunked an iron at him.  Then he hit Hattie in her face with his fist.  Then he pushed my grandma off the porch.  He slapped them, punched them in the face, arms, wherever.  My grandma was old then.  When LB Belcher came running over there he ran off.  LB was yelling, "Come back here and fight a man!  You fight these women, come fight a man!"  I think my mom and Hattie were bleeding.  I think Hattie had a busted lip and my mom was bleeding from the corner of her eye.  **Sherman and I were peeking around the door,**

-109-

> seeing everything.  We were both crying.  **Right then we said**
> **we were going to get him when we were older.**
>
> **We used to see my mom get so many whoopings that we made**
> **a vow not to let that happen again.  My mom didn't try to fight**
> **back – she'd just ball up on the ground.  He kept her with**
> **black eyes and swollen lips.  He'd still try to punch her when**
> **she was on the ground.**  Mom had black eyes a lot.  It made me
> feel mad.  She'd be going outside with a black eye, a busted lip.
> Sometimes she would wear sunglasses.  **We would see her**
> **bleeding and she would bleed a lot.  There would be blood on**
> **the floor.  My mom would be screaming and crying every time.**
> We felt helpless.  Sherman and I would talk about it – we used to
> always plan to get him when we were like 4, 5, and 6.  We said we
> were going to catch him sleeping.  We'd see it all the time and get
> tired of it – and then you're young and you can't do nothing about
> it.  We would just talk about getting him all the time, "We going to
> get him!"

*Declaration of Charles Fields* ¶¶ 36-37 (emphasis added).  The threat of physical violence was

omnipresent.  The Fields children were required to always be alert to the possibility of the next

assault:

> **Another reason we were scared of Brad is that he kept a pistol**
> **and a shotgun all the time.  We thought he'd use it on someone**
> **in the family.**  The shotgun was in the closet in the bedroom but
> he always carried the pistol.  You would see it in his waistband.
> The only person we felt could protect us some was my grandma.
> **The police used to come over there all the time.  They'd talk**
> **for a while and then leave – they'd never take Brad.  We felt**
> **helpless when the police would leave and Brad was still there.**

*Id.* ¶ 77 (emphasis added).

The abuse left scars.  Vincent Green remembers seeing the unmistakable signs of

abuse on Mr. Fields' body:

> **One day at the country, Sherman showed us the whelps on his**
> **back where his step-dad whooped him.  There were like six**
> **whelps across his back – lashes that were all swollen.  They**
> **were like 6 or 7 inches long.  I never got whelps like that.**
> Sherman would say he was tired of getting whooped.  He'd say
> that when he came to visit – he'd come for a break from it.  Maybe

four times or more I remember him coming there and talking about whoopings.

The only ones that Brad whooped were Sherman and Charles. They didn't like it that he singled them out. Sherman knew it was because they weren't his sons. **He used to whoop them with belts, extension cords – whatever he could find to whoop them with.** I think all the whoopings probably made him angry, but when he talked about it, he seemed more sad though than angry. He never cried and he didn't cuss him out. He was maybe 8 or so when it started and I think it went on for at least 3 or 4 years after that. He never stopped whipping them – I think it stopped because my sister shot Brad and he went away.

*Declaration of Vincent Green* ¶¶ 7-8 (emphasis added). Mr. Fields' step-father was not the only abuser:

Grandma was a stand-in mom back then. We had no choice but to get along. Back then they didn't care – be good or get whooped. She used to whoop us with a switch – go get one and if it breaks, get another one. I just remember getting whooped one time by my mama. **Our grandma would whoop us every day – every day.** We'd get whooped for not moving too fast when she said something. **My grandma was the only one to whoop us with switches. She was extra mean.**

*Declaration of Shaffer Fields* ¶ 14 (emphasis added).

The failure of Mr. Fields' mother to leave Brad despite the abuse had a profound effect on Mr. Fields and his siblings:

I felt like my mom put Brad before us. She knew he was whooping us – even though he was whooping her too so she couldn't do too much. I felt she should've got out of the relationship. She was with him all the way until 1985–ten years. It took a hell of a toll on us. We felt our mom loved him more than us. He was like a drill sergeant to us. He was in the military. Sherman and I hated him – mostly because he put his hands on our mom and auntie and grandma.

I think my grandma's the only one that seen it – no cousins or friends or anything and especially not teachers. We were scared we'd be taken away. Mom said to make sure the teachers didn't see it because she was in love with that man. I never told anyone outside the house but my granddad.

*Declaration of Charles Fields* ¶¶ 24, 26.

In addition, the children observed the physical and mental decline of their mother as a result of the endless brutality.

> You could tell it was wearing my mom down.  Her confidence went down.  I guess she felt like she was stuck with him.  She'd be at home a lot, stopped seeing friends.  After Ivory and Brad started messing around, she didn't trust friends anymore.

*Id.* ¶ 36.

The psychic pain to a young and helpless child that accompanies witnessing his mother's repeated brutalization and her corresponding emotional downfall is nothing short of staggering.  However, Mr. Fields' jurors were not given an opportunity to consider and give mitigating effect to these experiences because they were not discovered and presented at Mr. Fields' trial.

Once again, if the full extent of the abuse had been discovered, it would not only have been directly relevant to Mr. Fields' jury's assessment of his moral culpability, it could also have been provided to a mental health expert.  The various negative, lifelong consequences of child abuse were well documented at the time of Mr. Fields' trial.  Dr. Woods summarizes the abuse and its effects on Mr. Fields:

> Mr. Fields was also exposed to neurocognitive insults during his formative years from the physical abuse that he suffered and his caretakers' frequent domestic disputes that often ended in violence. At various times in Mr. Fields' childhood, there were shootings in and around the household.  Ms. Swinnie's longest relationship during Sherman Fields' childhood was with William Bradford (who fathered two of Mr. Fields' younger brothers).  Mr. Fields was subjected to relentless and vicious beatings at the hands of Mr. Bradford as well as the hands of his maternal grandmother.  He was beaten with switches, belts, extension cords and fists.  Family members report seeing welts on his body and that at times, his injuries would be so painful that it would be difficult for him to sit

down.  Mr. Bradford's beatings of Mr. Fields, in particular, were capricious and seemingly unprovoked.

*Woods Declaration II* ¶ 57.

However, Dr. Woods' conclusion is equally, if not more, important in order to assess the mitigating value of the evidence:

> The inconsistency of Mr. Bradford's brutality created the hypervigilance and scanning behavior so characteristic of Mr. Fields' anticipatory anxiety, the anxiety that makes him act before he thinks.  Chronic autonomal arousal creates both anticipatory anxiety and the disconnect from affect found in PTSD.

*Woods Declaration II* ¶ 57.

The details make all of the difference.  It was those details that the trial team failed to discover and consequently failed to present to Mr. Fields' jurors.  While Mr. Fields' jurors knew that he and other family members, including his mother, had experienced a chaotic youth (as Dr. Price testified) and generally knew that Mr. Bradford assaulted Sherman, Sherman's siblings, and Sherman's mother, critical details (found in the declarations quoted above) were omitted.  Thus, Mr. Fields' jurors heard allegations of abuse, but were deprived of any information that would have allowed them to place this information in a meaningful context. Sherman and his family members were not just hit from time to time – as reprehensible as that is. The abuse he endured produced both temporary physical pain and scars and caused lifelong psychological and emotional injuries.  *See Walbey*, 309 Fed. Appx. at 801 ("[C]ase law . . . firmly establishes a duty to investigate the background and character of a capital defendant, along with his family and social circumstances and mental health history").

### 7.    Counsel Unreasonably Failed to Investigate and Document Trauma in Mr. Fields' Life History

Mr. Fields was exposed to a variety of trauma, including but not limited to the abuse discussed above, throughout the course of his life, and particularly during significant

developmental periods of his childhood and adolescence.  Some of the incidents of trauma involved severe, acute exposures; such as witnessing his grandfather being run down by a drunken driver.  However, chronic traumatic exposure pervaded his life.  Neither the jurors who sentenced him to death nor the mental health staff who encountered him in correctional settings were ever provided with a complete and full history of these exposures to trauma.  Although counsel had numerous leads they could have pursued, they failed to follow them or to seek expert guidance in understanding the impact of trauma on Mr. Fields' mental and emotional functioning.

Mr. Fields grew up in a toxic environment polluted by an on-going history of racism, and punctuated by extreme violence and brutality.  Both Mr. Fields and his family (including previous generations) felt the enduring humiliation and grave and palpable threat of racial prejudice and the violence it inspired in the community.  This left an indelible mark on his psyche – as it had done with previous generations of his family.  In addition, physical brutality and sudden violence were Fields' constant unwanted companions.  The beatings discussed in the previous section resulted in multiple scars on his body including to his thighs, arms, shoulders, and the back of his legs.  When he wasn't the recipient of beatings, he was the witness to extreme violence – which was often lethal.  When Mr. Fields was about eleven years old, his mother, Ms. Alice Swinnie, shot one of her boyfriends after catching him with another woman – her cousin.  A few years later, Ms. Swinnie herself was shot in the head by her then-husband. *See* Exh. 42.

In the course of a few years, an astonishing number of Mr. Fields' friends and family were killed.  By the time Mr. Fields was nineteen years old, at least twelve of his close friends, family and loved ones died tragically.  By the time he was twenty-seven, that number rose to at least nineteen.  Trial counsel failed to document this history by obtaining any relevant

records, such as death certificates, coroner's reports, or media accounts of *any* of these deaths, even when presented with names of the deceased. As demonstrated above, these records were readily available and should have been obtained and presented to Mr. Fields' jurors. *See supra* at 28-34.

The defense team at trial told jurors that three or four of Fields' friends died violent deaths. TT at 2401. However, the actual number of friends and loved ones lost through extreme violence was drastically higher – nineteen by the time of trial. As demonstrated by Exhibit 117 (Fields: A Witness to Extreme Violence), between Mr. Fields' eleventh and twenty-seventh birthdays, no single two-year period elapsed without exposing him to extreme violence resulting in the loss of a close friend or loved one. Despite this brutally consistent pattern of violence and loss, which was relatively simple to document, trial counsel did nothing but provide the jury with a minimized version of the truth. As anyone who has ever lost a loved one knows, the loss of a loved one can be quite a devastating and traumatic experience, the impact of which can be felt for years following the death itself.

Here, Mr. Fields experienced such loss with such cruel frequency that it is almost difficult to contemplate it. Yet despite this fact, trial counsel did not investigate any of these deaths, either to assess the impact of the individual losses on Mr. Fields or to explain the context of community violence in the social environment of his developmental years. That is, Mr. Fields did not simply grow up in a "tough neighborhood" – he grew up in what amounted to a war zone, where casualties were a frequent occurrence, and the risk of being indiscriminately targeted and killed was constant. However, the jury heard none of these facts.

Similarly, trial counsel made no attempts to interview family, friends, and other contemporaries to document the effects of the traumatic losses on Mr. Fields' functioning and behavior. Once again, the overlooked evidence was compelling mitigation, either considered in

isolation or in combination with the other undiscovered evidence.  Several readily available individuals could have explained the effects of this chronic and severe violence on Mr. Fields. Several were in the courtroom during trial, and some actually testified at the penalty phase but were not asked about these incidents.  For instance, Charles Fields, Mr. Fields' older brother, noted Mr. Fields' reaction to the death of one of his best friends, Roy Cleveland, who hung himself in a juvenile detention facility:

> I remember when it happened, and I remember seeing changes in Sherman after Roy died – that was his best friend.  Sherman slept a lot after that.  I don't know if he felt like he it was his fault or what.  That was when he started getting worse.  I guess he felt that they let him die.  He was always talking about this big fat guard who worked at the juvenile.  He said he took his time to get Roy down and he could've got him sooner.  He thought it was a deliberate thing.  Me and my mom went to see him at juvenile after they hung themselves.  He was sad and depressed and he said the guard could've got him down.

*Declaration of Charles Fields* ¶ 70.  Although Charles sat through the entire trial, and would have testified if asked, trial counsel never approached him.  *Id.* ¶ 95 ("I was there for all his trial. His lawyers never talked to me").

Shaffer Fields, Mr. Fields' youngest half-brother, was also available and could have given jurors a moving account of Mr. Fields' reactions to the death of the second of Mr. Fields' two best friends, Roderick Cummings, when Fields was just sixteen years old:

> Growing up where we did, we seen people get killed and bloodied up – like Roderick, and he was like our cousin.  He used to only be with my brother and he always come over our house.  I know I seen people killed before I saw him.  Roderick just stick in my mind cause he was the first I really knew.  I was like 9 or so when that happened.  We were coming through the projects and heard the shots and we went over there and seen him – all bloody and the ambulance and everybody crying. Roy and Roderick were the main two people Sherman would be with.

*Declaration of Shaffer Fields* ¶ 29.  Like his brother Charles, Shaffer Fields would have testified if asked by counsel.  *Id.* ¶ 36 ("The Federal Marshals came to talk to me in jail.  I guess they were looking for [Sherman Fields].  I think his lawyers only talked to my mom.  If they'd asked me to, I would've testified").

Likewise, Mr. Fields' younger brother, Jimmy Fields, could also attest to the devastating effect the violent loss of close friends had on Mr. Fields.  Jimmy Fields paints a vivid and compelling picture of the violence Mr. Fields was exposed to in early life:

> Sherman lost a lot of friends and all of them were like brothers to the family.  When Roderick got killed – he was like a big brother to all of us.  He used to be over our house all the time.  I was over there when Roderick got killed.  I heard a gunshot.  My mama beat me because I had just walked off that porch.  I had just asked him if he'd seen Sherman.  He hadn't seen him.  He had that blank look – he was in that zone.  He had a little kid with him and was pushing him out the way when he got shot.  I know now that he looked like that because he probably knew he was getting ready to die.  Then I went out to the front and when I came back in, I saw his brother Ricky cradling him and half his head was shot off – for real, all this side was missing.  I hadn't even heard gunshots.  I heard nothing.  Then I seen the cops and heard the sirens.

*Declaration of Jimmy Fields* ¶ 22; *see also id.* ¶ 23 ("I know Sherman lost a lot of friends.  Roy died and Roderick and another guy called Duke . . . That was the first time I had seen my brother cry – tears were running down his face").  This testimony was never presented to the jury because, as Jimmy Fields explains, "[n]o one working for Sherman came to see me before the trial." *Id.* ¶ 31.

Again, Alton Robinson, Mr. Fields' first cousin, could have provided powerful testimony concerning how Mr. Fields' devastation following the death of his best friend Roy Cleveland:

> I remember when Sherman and Roy hung themselves.  I don't know how he was coping after Roy died.  He used to talk to my

brother Timothy a lot – a few of their friends had passed at that time.  Timothy and Sherman would talk about what happened with Sherman and Roy.  Sherman was sad after it happened.  It was probably because he died so young.  **If there was a conversation when people talked about people that were dead, Sherman and Timothy always talked about Roy.  Sherman said it was like Roy was in there hollering and then all of a sudden he wasn't saying nothing.  Then they found him dead.**

Before Roy died, Sherman and him used to be together a lot.  They were good friends.  If you saw one, you would probably see the other.  I can picture them walking to the basketball court together.  It might be just them, or Timothy would be with them a lot.  They'd joke around together. . . .

*Declaration of Alton Robinson, Jr.* ¶¶ 21-22 (emphasis added).  The jury did not hear this account, however, because, despite the fact that Mr. Robinson "would've testified if they asked me to," he explains that "[n]one of Sherman's lawyers came to talk to me."  *Id.* ¶ 35.

Trial counsel's failure to investigate trauma in Mr. Fields' life history prevented them from obtaining this powerful testimony from a witness who actually testified.  Alice Swinnie, Mr. Fields' mother, could have testified about the devastating effect of losing his two best friends, Roy Cleveland and Roderick Cummings:

Sherman had a lot of friends getting killed.  He lost more friends than my other kids.  I saw it affect him.  He always cried.  He'd cry in front of me and probably in his room too.  I think Roderick Cummings was his first friend to die.  He got shot at one of the projects – Sherman Manor Apartments.  They were real close.  They used to hang out together.  I remember we were coming down the road and we were following the ambulance. . . .

I think Roy's death affected Sherman the most.  He just cried a whole lot and they put him in DePaul and he wasn't the same after.  He just didn't seem to be the same person.  It was like he didn't care – didn't care about himself. . . .

*Declaration of Alice Swinnie* ¶¶ 51-52.  Although trial counsel called Ms. Swinnie to testify, because they failed to investigate the vast history of trauma in Mr. Fields' life, they did not know to ask her questions about the effects such devastating personal losses had on her son.

In addition to this unrelenting history of violence, Mr. Fields, his family, and his community felt the constant sharp sting of racism. The uninvestigated – and consequently unpresented – evidence is documented in the declaration of Charles Fields:

> I think I was really first aware of the racism in Waco when I was at Alternative School when I was in like 9th Grade. I was sent there. I got into a fight at the school with this Mexican dude, and I went to the principal's office. The principal said, "That's why we didn't want the school over here by all these niggers cause you all don't know how to act." Then my mom walked in. We went to the school board and filed a complaint. That was in 1985, maybe 1986. They had me and my mom give a statement . . . The school board found she didn't say it. The principal kicked me out the school and the Mexican guy got suspended for two weeks. That was really what made me realize, "Poor black people ain't got no say." People around that woman knew she was racist. After that I felt pretty much like racism was everywhere in Waco. I wasn't expecting the principal to say "niggers" like that.

*Declaration of Charles Fields* ¶ 50. However, the effects of racism felt by Mr. Fields and his family extended to far more then just marginalization. Racism was life-threatening:

> There was a lot of kidnapping and abductions and the KKK when we were kids. The KKK took out one dude and cut off his penis and put it in his mouth. They threw him in the Brazos. We had to walk that way, from the project in East Waco, across the bridge to the baseball field. The field was where the zoo is now in Cameron Park. Our parents told us, "Stick together because they can't get you all." We were scared to go across the bridge – especially at night. We would be crossing that bridge and have people chunking beer bottles at us. Drunk white boys were going by and they'd hit us with something. They would yell at us and use the N-word. The parents would tell us to all go together. They'd say, "If something happens, then the others will see it."
>
> We knew who the murdered guy's kin was and they said he was fast and they still caught him. They killed him around 1980, maybe as late as 1983. We used to get chased out of Cameron Park a lot. Once we made it to Sherman Manor we were alright because it was a black neighborhood and we knew they wouldn't try and follow us over there. There didn't used to be any housing in front of that project – you had to run up from the river, through all these bamboo stalks and bushes. It was so scary because you

-119-

> had to run up through there in the dark and you wouldn't be able to
> see if someone was waiting in the bushes to get you.  That bridge
> crosses at Herring.

*Id.* ¶¶ 51-52.  Charles Fields explains that these events continue today:

> Stuff still happens.  About five years ago, two black guys got
> stabbed on the bridge by white guys.  The KKK marched down
> Valley Mills around 1998 and they had police escorts.  My Aunt
> Bessie moved to Chicago a long time ago and I don't think she
> would ever come back cause of the racism here.  If there are
> black/white couples, they need to watch out because if it's at night
> and the white boys think they can get at them, they will.

*Id.* ¶ 55.  He further explains the very real and traumatic effects of racism on him and his brother:

> I know the racism in Waco affected me.  At an early age I knew,
> by the color of my skin, that black is wrong, white is right.  We
> knew that.  Racism was like a part of dealing with life.  You just
> know you got to run from white folks at night time – that's what it
> was.  You had to stop thinking about it and just do it regardless.
> Sherman didn't really talk about it with me, we just knew if we get
> caught by one, we will have to fight for our lives.  But that's why
> we always looked out for each other so much.  We knew it was
> unfair but it was just the way it was.  They say it's all supposed to
> be over with but it doesn't feel that way around here.

*Id.* ¶ 56.  Shaffer Fields, another of Mr. Fields' brothers, confirms that the pervasive racism in

Waco had a traumatic effect on him growing up:

> I don't like anything about Waco.  Here, they won't let black
> people do nothing – you can't gather in the park anymore.  The
> police came and cleared it out.  Yet, when the KKK protest here,
> the police protect them.

*See Declaration of Shaffer Fields* ¶ 34.

The contemporary experience of racially motivated violence for Mr. Fields and

his siblings only served to reinforce and enhance the traumatic effects of the pervasive historical

racial violence felt by generations of Mr. Fields' family in Waco.  Scholars have documented the

extreme racial violence in the Waco area.  *See Woods Declaration II* ¶¶ 62-70.  The most

notorious incident was the 1916 lynching of Jesse Washington, who was dragged from the

courthouse, beaten, mutilated and burned in front of a mob of ten to fifteen thousand people assembled on the lawn of city hall.  Mr. Washington's corpse was subsequently dragged through the streets and parts of his body were collected as souvenirs.  Patricia Bernstein, *The First Waco Horror: The Lynching of Jesse Washington and the Rise of the NAACP* (2006); *Woods Declaration II* ¶ 63.  According to the Texas State Historical Association's *Handbook of Texas Online*;

> Waco became a center of Ku Klux Klan activity and influence during the 1920s. Lynchings had occurred in Waco in 1905, 1915, and 1916, and on at least one occasion the black victim was publicly burned in the town square; in the 1920s mobs of white citizens hanged or burned other blacks as well.  In 1923 more than 2,000 Klansmen paraded through the city, and the organization boycotted businesses of people unsympathetic with its agenda. Many of Waco's business and political leaders at least implicitly supported the Klan during this period, and one member claimed that the Klan "controlled every office in the city of Waco" during the 1920s.

Roger N. Conger, "Waco, Tex.", *Handbook of Texas Online*, *available at* http://www.tshaonline.org/handbook/online/articles/WW/hdw1.html (last visited Aug. 23, 2010).

This history of extreme racially motivated violence permeated the childhood of Mr. Fields' grandfather, Shelby Mitchell, shaping his perception of the world, which he, in turn passed onto his grandchildren.  Research demonstrates that even family members who had not been born when the traumatic events occurred can develop PTSD-like symptoms secondary to dealing with the traumatic symptoms of family members or loved ones, much like the children of psychotic parents, whom often has soft signs of psychosis.  *See Woods Declaration II* ¶ 73.  For Mr. Mitchell, the traumatic effects of racial violence were felt first-hand.  As Charles Fields explains:

> My grandfather used to tell us that he and his brothers were at home and Klansmen came to their house and beat his daddy with a

whip and raped his mama right there in the house in front of all of them . . . It probably [] never was reported. Back then, you cleaned up and prayed on it – go to the police and they'd be likely to kill you. That's the score around here.

My granddad told the story about the KKK coming to his house a lot. It seemed like he told it every other night. He tried to always get us to understand that there was a difference in color in the world and that everybody wasn't treated fairly. He would always tell that story exactly the same way. He'd say he was scared, looking out the door. He'd seen all the white people out there wearing sheets and burning crosses. I guess he heard all of them shouting, "Niggers leave!" I don't know why they picked on them. He said they just came up there one night. He said they'd already been getting other people around there – burning crosses and raping people's women and stuff. They lived on a farm and I think he said they just walked in the door.

My granddad used to talk about other racist stuff. He would say people just used to harass him. That thing with the KKK wasn't the only thing that happened. He used to talk about lynchings. He told us about how a mob of white people they dragged a black man downtown – took him out the courthouse and hung him. He said they dragged him down the same path the tornado took. He said God showed them that what they did to that man was very wrong and that's why he sent that tornado down there to tear up everything.

*Declaration of Charles Fields* ¶¶ 59-61.

Not surprisingly, this traumatic childhood took its toll on Shelby Mitchell:

This traumatic childhood clearly had deleterious effects on Mr. Mitchell. First, it contributed to his severe alcoholism. Mr. Mitchell reportedly drank every day, morning to night. According to Charles Fields, he would have a shot of coffee and then begin drinking gin and beer. He reportedly drank from the time he awoke until sundown when he would pass out in his room. Charles Fields remembered that he could drink and work all day but as soon as he kicked his shoes off, he would pass out. Charles Fields also recalled that Mr. Mitchell would become too drunk to drive and Charles remembers driving him around when he was as young as age 12. Mr. Mitchell told his grandchildren that his drinking calmed his nerves and would tell them "[i]f y'all had seen some of the things I seen as a child, y'all would drink too."

*Woods Declaration II* ¶ 69; *see also id.* ¶ 74.  Additionally, he likely suffered from severe mental illness, believing his dead wife would visit him at night:

> A lot of people in our family have mental problems.  You know, my granddad used to always be talking to himself in the back room.  He told us his wife who died, Corine, would always come visit him at night and talk to him.  I didn't believe it – I felt like he was going crazy. . . .

*Declaration of Charles Fields* ¶ 80.

Indeed, Mr. Fields' grandfather was paranoid, and reinforced the isolation race naturally created in his grandchildren.  As Charles Fields explains:

> Even when I was a kid I tied my granddad's drinking to what he'd been through.  I would always ask him why he drank so much and he said it calmed his nerves.  He'd say, "If y'all had seen some of the things I seen as a child, y'all would drink too."  He used to say how lucky we all were cause we didn't have to go through some of the harassment he did – with people kicking in the doors.  I guess that's why he had as many guns as he did – to protect himself.  He had about 16 guns.  Most of them were rifles and shotguns.  He has 7 or 8 pistols – from .38s to .22s.  He kept a whole bunch of 38s – snub-noses, long barrels.  He would say that he liked them cause they ain't too powerful, but they enough to stop somebody.  I guess he meant they were powerful enough to kill someone.

*Declaration of Charles Fields* ¶ 80.  It is now clear, and was provable at the time of trial, that the lessons Mr. Mitchell taught his grandchildren, including Mr. Fields, contributed to early childhood trauma instead of safeguarding the children from trauma:

> Our grandfather, Shelby Mitchell, raised us up that it was better to get caught with a gun than without.  My grandfather always carried a pistol – even to church.  He'd say, "You can shoot a black man and get away with it.  Shoot a white man and you'll go to jail."  He taught us to believe that no one was better than us.  He told us we should always use a gun if someone pulled a gun on us.  He said he could always get us out of jail but he couldn't get us out the grave.

*Id.* ¶ 44.

Trial counsel's failure to conduct a constitutionally adequate investigation resulted in not only the failure to discover numerous pieces of evidence of an overwhelming lifetime of deprivation and trauma, it resulted in the inaccurate portrayal of Shelby Mitchell, Sherman's grandfather, and his influence on Sherman and his siblings. As demonstrated above, Charles Fields provides a powerful corrective to the information presented to Mr. Fields' jurors of an idyllic time living under the stable stewardship of Mr. Mitchell. However, Charles was not able to explain the truth to Mr. Fields' jury because, although he was present for the entire trial, Fields' lawyers never talked to him. *Declaration of Charles Fields* ¶ 95.

Moreover, trial counsel never attempted to retain a mental health expert specializing in trauma, even though social worker Jane Bye had specifically advised counsel that Mr. Fields should be evaluated for depression and Post-Traumatic Stress Disorder. *Affidavit of Jane Bye*. Dr. George Woods demonstrates the prejudice to Mr. Fields resulting from this failure:

> [t]his racial, social, and environmental isolation of Mr. Fields and his family potentiated the multigenerational mental illness. Mr. Fields' decisions, before and during the offense, as well as at the time of trial, were made with the weight of this emotional dysfunction.

*Woods Declaration II* ¶ 75. Trial counsel's deficiencies in all these regards was unreasonable, and there is no evidence in the extant record to support the claims that trial counsel's failure to adequately investigate and document Mr. Fields extraordinary exposure to trauma was the product of a strategic decision. Had Mr. Fields' jury heard all this evidence of the true extent of the trauma that Mr. Fields lived through, there is a reasonable probability that at least one juror would have voted for life instead of death. His trial counsel's failure to uncover this wealth of readily available mitigation prejudiced the outcome of his capital sentencing proceeding.

8.  **Counsel unreasonably failed to investigate Mr. Fields' mental illness and the multigenerational history of mental illness in Mr. Fields' family**

As the Supreme Court has made abundantly clear, mental health investigations are a necessary part of a constitutionally adequate mitigation investigation.  *See Rompilla*, 545 U.S. at 390-93 (counsel ineffective for failing to present evidence of petitioner's mental health problems); *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004) (evidence of "impaired intellectual functioning is inherently mitigating").  Yet despite numerous "red flags" that an investigation was warranted into Mr. Fields' mental health, trial counsel unreasonably failed to carry out that investigation.

As vividly demonstrated by Mr. Fields' family tree, Exhibit 116, and described in detail above (*see supra* at 24-28), Mr. Fields was genetically predisposed to mental illness, and even a cursory investigation would have alerted trial counsel to that fact.  Indeed, the maternal side of Mr. Fields' family suffered from "multi-generational neurological impairments and affective mood disorders."  *See Woods Declaration II* ¶ 30.  Dr. Woods noted:

> The sheer number of close relatives in Mr. Fields' family who suffer from serious mental illness is extraordinary and contributed to a very high probability that he, also, would suffer from mental disease. Mood disorders have an incidence in the United States of approximately 8 percent of the population meaning that, at any one time, 8 percent of persons in the United States suffer from various forms of depression or Bipolar Disorder.  When there is a genetic loading of mood disorders in a family, the incidence increases exponentially.  This genetic loading for mental illness makes the potential for Mr. Fields to suffer from Bipolar Disorder very high. The co-morbidity of Sherman Fields' own genetically-based potential for developing a mental illness and the traumatic stress manifested by the circumstances of his upbringing, including the extreme poverty in which his family lived, his caretakers' substance abuse, and neglect and abuse that he and his siblings suffered in their childhood; created greater and more severe symptomatology than either disorder alone may present.

*Id.* ¶ 50.   Although all of the documentation with regard to Mr. Fields' mental illness and his genetic predisposition to such mental illness was readily available to trial counsel, none of it was collected and none of this information was provided to the jury.

Trial counsel's failure to develop this mitigation evidence absolutely prejudiced Mr. Fields.  A thorough and proper understanding of Mr. Fields' history of mental illness could have contextualized much of Mr. Fields' seemingly aggravating conduct and provided the jury with a means to understanding the effects and hardships imposed by severe mental illness.  The prosecution's theme in punishment was based on the theory that Mr. Fields was dangerous, manipulative, and made reasoned choices about his actions.  According to the Government, he chose which guards to assault and which he would subject to masturbation (TT at 2540), and he chose to disobey his grandfather and his mother (TT at 2542).  The prosecution urged the jury to discount the impact of Mr. Fields' traumatic childhood: "Just because you're raised in a bad environment and bad things happen to you, you still have to make choices, right or wrong.  You still have to do the deeds, right or wrong.  Sherman Fields is a grown man.  He is not the child from juvenile detention.  He is a grown man who made his choices."  TT at 2538.

Had trial counsel properly investigated Mr. Fields' background and mental health history, the jury would have seen a much more nuanced and realistic picture of Mr. Fields.  Mr. Fields suffers from not one, but two major, debilitating mental illnesses:  Bipolar Disorder and Post-Traumatic Stress Disorder (PTSD).  These diagnoses are not of recent origin but date back to 1989 when he was evaluated in a juvenile facility.  The symptoms of Mr. Fields' Bipolar Disorder and PTSD are synergistic, resulting in a constellation of symptoms including paranoid ideation, grandiosity, hypersexuality, scanning behavior, irritability, agitated depression, impaired judgment, rumination and hyperreactivity.  *Woods Declaration II* ¶ 100.  Bipolar Disorder has a cyclical onset and PTSD can be triggered by external factors as well as internal

responses such as stress.  Thus, at given times Mr. Fields can be affected by his Bipolar Disorder or his PTSD or an unfortunate combination.  Had the jury be informed of this evidence, they could have understood that, rather than being a "grown man" who made "grown choices" (TT at 2542), Mr. Fields is a severely damaged individual who is sometimes subjected to compulsions and who makes his choices based on perceptual disorders, paranoid ideations, and grandiosity.

A more complete understanding of Mr. Fields' mental state would have contextualized evidence that the government introduced as aggravation.  For example, prosecution witness Officer Chris Eubank told the jury that as he stood in front of Mr. Fields' cell, Mr. Fields threatened to kill his wife and children and told him, "When I get up out of here, I'm going to hunt your fucking bitch ass down and cut your throat."  TT at 2155.  On cross-examination, trial counsel weakly pressed Mr. Eubanks by suggesting the Texas summer heat made for short tempers and, alternatively, that Mr. Fields was just "spouting off."  TT at 2156-57.  Trial counsel then questioned Mr. Eubanks about whether Mr. Fields was angry with him because Mr. Fields believed he was putting something in his food.  *Id.*  Mr. Eubanks denied hearing anything about that and the cross-examination ended with this exchange:

> Q:   Okay.  So you don't know why he was upset then?
>
> A:   Correct.  I do not know.
>
> Q:   He just did it then.  You say you don't have a reason why he might have done that?
>
> A:   No, sir.  I don't have a clue why he done it.
>
> Q:   Okay.  And you seem like a pretty easygoing guy.  You're not there aggravating people, are you?
>
> A:   No, sir.  I'm not.
>
> Q:   Okay.  But Mr. Fields seemed upset at the time, didn't he?
>
> A:   Yes, sir.  He did.

Q:       Okay.  All right.  Thank you.

TT at 2157-58.

Had trial counsel investigated Mr. Fields' long history of mental illness and consulted with a competent mental health expert, they could have demonstrated to the jury how Mr. Fields' mental health suffered in pretrial detention.  As discussed above, Mr. Fields wrote numerous grievances not complaining merely about the staff "putting something in his food" but rather explaining how the prison staff had formed a cabal, were holding KKK meetings, and were plotting to kill him by sneaking in his cell at night or poisoning his food.  In the weeks before the incident described by Mr. Eubanks, there were signs that Mr. Fields' Bipolar Disorder was manifesting itself.  On June 23, for example, Mr. Fields filed a grievance explaining that he was in fear for his life because the staff were plotting to murder him.  There is no indication that Mr. Fields was referred to a mental health professional based on the grievance.  Instead, the Sergeant merely replied, "No one is trying to sneak into your cell to do anything to you.  Your complaint is completely unfounded."  *See* Exh. 74.  On June 25, Mr. Fields again filed a grievance expressing concern about the staff plot to murder him, this time specifically naming Chris Eubanks:  "Officer Eubanks did try to poison me by putting an unknown substance in my food."  *See* Exh. 75.  The grievance officer again accepted the complaint at face value and rejected it as unfounded "without further proof or evidence."  *See* Exh. 75.  On July 2, the very day of the incident Mr. Eubanks reported, Mr. Fields filed a grievance stating that Mr. Eubanks threatened his life and that he was fearful.  *See* Exh. 77.  The jury never heard this evidence.

Many of Mr. Fields' other disciplinary infractions are indicative of his long-standing mental illness.  It is not surprising, given Mr. Fields' paranoid ideation and belief that he was unsafe in lockup where even the staff was attempting to murder him, that he would possess a shank.  Dr. Woods explained that Bipolar Disorder often affects African-Americans

differently than Caucasians, frequently with psychotic features, paranoid ideation and auditory hallucinations. *Woods Declaration II* ¶ 42. In light of these symptoms, it is hardly surprising that his delusional fear could cause him to possess some means of perceived self-defense.

This paranoid ideation and fear was not confined solely to times when Mr. Fields was incarcerated. Had mental health evidence been discovered and introduced, the jury could have understood how Mr. Fields' delusions and paranoia, coupled with his grandfather's insistence on isolated self-reliance and the importance of being armed, might have led to his illegal possession of firearms. With such evidence, there is a reasonable probability the jury would have the prosecution's simplistic insistence that these actions were purely a matter of rational choice. TT at 2539 ("[H]e could control himself when he wanted to. 380-caliber handgun found with Sherman Fields. This was not some act of chance. He chose to do this. The 9-millimeter handgun, this was not some random act of chance. He chose to do this").

Other disciplinary infractions stem from the multiple instances of indecent exposure and masturbation. At trial, the prosecution estimated at least 20 such infractions (TT at 2256), and it was often mentioned in testimony (TT at 2122-26, 2233, 2250-51, 2255-56, 2303, 2347, 2349, 2360). The prosecution even discussed it in closing argument as an example of a "choice" Mr. Fields made. TT at 2540. Had trial counsel investigated and presented the existing evidence of Mr. Fields' Bipolar Disorder, the jury could have better understood this evidence. Hypersexuality is an extremely common feature of Bipolar Disorder. In fact, it is so common that a Google search reveals many websites for laypersons discussing the problem of hypersexuality with Bipolar Disorder. *See*, *e.g.*, http://www.identifybipolardisorder.com/hypersexuality/ (last visited Aug. 23, 2010) ("With bipolar disorder, hypersexuality is marked by an excessive desire for sex and a lack of satisfaction after the act, leading to increased need for gratification . . . This doesn't just affect "liberals" with loose morals, but very conservative

individuals as well.  Hypersexuality is a medical problem and affects bipolars irregardless [sic] of one's moral code . . . If your spouse or partner cheats on you while hypomanic, they are responsible for their actions, but keep in mind that this is a strong impulse and requires a lot of self control").

Many other statements presented as aggravation are indicative of Mr. Fields' mental illness and could have been understood in their proper context had trial counsel conducted a complete and thorough investigation.  For example, Mr. Fields' grandiosity is displayed in comments like "the Waco PD was afraid of him and that's why they didn't stop him anywhere else and they waited for him to get to the house."  TT at 2173.

Had trial counsel properly investigated Mr. Fields' mental illness, counsel could have better cross-examined the prosecution's expert, Dr. Coons, and, perhaps more importantly, prevented their expert, Dr. Price, from giving extremely damaging testimony.  Although the prosecution did not use the term Antisocial Personality Disorder during questioning of Dr. Coons, Dr. Coons, based on a hypothetical, informed the jury that Mr. Fields was essentially what is colloquially called a psychopath:

> I look at the personality, the long-term personality and behavior patterns, long-standing rejection of authority, and that goes back to childhood.   The pattern of criminal behavior going back to childhood.  Escapes from various institutions, attempted escapes. This – his line of work basically is crime.  It's not working and being a member of society.  It's basically crime when – which usually involves violence in the crime.  He just simply hasn't accepted the rules and regulations of society.  I look then at the issue of conscience and that – that history basically says this person doesn't evidence conscience.  The – we know that he doesn't have a conscience which prevents him from property crimes, taking other people's – threats of violence, violence itself, murder, and no apparent remorse about any of that.  It's just a way of life.  That's a longstanding pattern.

TT at 2351.

On cross-examination of defense expert, Dr. Price, the Government directly questioned him about the possibility of Mr. Fields having Antisocial Personality Disorder (ASPD).   After explaining to the jury what ASPD was, Dr. Price admitted that previous psychologists suggested that Mr. Fields had ASPD.  He also told the jury that there were very few ways of treating ASPD, that he had seen where previous psychologists believed treatment was useless with Mr. Fields, and that Mr. Fields' own mother had described him as having a "Dr. Jekyll and Mr. Hyde" personality.  TT at 2482-84.  The testimony of these experts was extremely damaging to Mr. Fields' case and trial counsel's further questioning was ineffectual.

Had trial counsel properly investigated the history of Mr. Fields' mental illness and learned some of the basic information about Mr. Fields' particular disorders, they could have educated the jury as to why this testimony was inaccurate.   The DSM-IV-TR, like its predecessors, explicitly notes that an Antisocial Personality Disorder diagnosis cannot be made "during the course of schizophrenia or a manic episode."   In other words, symptoms, or diagnosis, of Bipolar Disorder, an Axis I diagnosis, are a rule out for an Antisocial Personality Disorder diagnosis, an Axis II diagnosis.  As Dr. Woods noted:

> Personality disorders . . . are often mistaken for Bipolar Disorder due to the affective instability in each.  Yet, personality disorders should not be diagnosed until the Axis I diagnoses, in this case Bipolar Disorder, and PTSD, have been controlled.   Often symptoms of Axis I disorders will mimic personality disorders.

*Woods Declaration II* ¶ 92.

Had trial counsel investigated and learned about Mr. Fields' Bipolar Disorder and PTSD diagnoses at age 15 and presented that information to Dr. Price, he would have been prepared to educate the jury about the complexities of Mr. Fields' mental illness and why ASPD could not be a proper diagnosis.  Likewise, had trial counsel competently investigated and

learned this information, they could have effectively cross-examined the government's expert and highlighted the fallacies underlying his hypothetical.

### 9. Counsel unreasonably failed to investigate potential brain damage and dysfunction

There were a number of "red flags" that should have alerted trial counsel to the need for an investigation into Mr. Fields' potential brain damage and dysfunction given what counsel knew and reasonably could have discovered in preparation for Mr. Fields' capital trial. Indeed, Jane Bye, the social worker who assisted counsel, specifically advised counsel regarding the need for Mr. Fields to undergo a neuropsychological evaluation. *Affidavit of Jane Bye.* As Ms. Bye noted in her remarks to counsel, and as had been widely reported by the media at the time of Mr. Fields' trial, chronic exposure to violence and trauma has documented neurobiological effects on the brain, and a growing body of research specifically indicated that such exposure can negatively impair or affect children's brain development. *Declaration of Russell Stetler* ¶ 36. In light of Mr. Fields' extraordinary exposure to trauma growing up, as recounted above, counsel should have pursued a neuropsychological evaluation for their client. *See supra* at 28-34; *see also* Exh. 117 (Fields: A Witness to Extreme Violence).

Additionally, readily available records should have alerted counsel to the risk of brain injury to which Mr. Fields was exposed as a result of his prior suicide attempts involving hanging. *See Sears*, 130 S. Ct. at 3262-63 (recognizing counsel's required duty to investigate and present mitigation evidence pertaining to possible brain damage and its effects on defendant's decision making). On one such occasion, Mr. Fields was found with a pulse, but no spontaneous respiration. These facts indicate that Mr. Fields was at risk from anoxic brain injury – that is, injury caused as the result of a lack of oxygen flowing to the brain, since brain cells will start to die within a few minutes if they are deprived of oxygen. Moreover, Mr. Fields' TYC

records documented a butterfly-shaped pigmented area over his nose, which is consistent with lupus erythematosus, a condition that can cause vasculitis in the brain – that is, an inflammation of the blood vessels in the brain, which can adversely affect neurological processes and functions.

In light of all these potential indicators of brain damage and dysfunction, counsel should have pursued a thorough neurological assessment of Mr. Fields.  Trial counsel, however, only had Mr. Fields evaluated by a psychologist for the narrow purpose of determining his I.Q.  Such testing, though, was not a substitute for a proper neuropsychological assessment.  Indeed, there is a critical distinction between intellectual functioning, measured by I.Q. scores, and neuropsychological integrity, which implicate the executive functions of the brain.[18]  An I.Q. score in the average or above-average range does not preclude the possibility of neuropsychological problems, as deficits in executive functioning, for example, can coexist with average or even high intellectual functioning.  However, because counsel never retained an expert to conduct a neuropsychological assessment, these issues were never explored, and consequently, potential evidence regarding brain damage and dysfunction was never investigated and developed.  There is no evidence in the extant record to suggest that this failure to retain an expert to conduct a neuropsychological assessment was the result of any tactical consideration.  To the contrary, numerous "red flags" were present in Mr. Fields' psycho-social history, which if discovered, would have indicated that neuropsychological testing was part of a competent mitigation investigation.  *See Sears*, 130 S. Ct. at 3262-63.  Once again, trial counsel's failure to conduct a competent background investigation led to their concomitant failure to seek a neuropsychological evaluation.

---

[18]  "Executive functions" refers to a collection of brain processes, most commonly linked to the frontal cortex, which are responsible for planning, decision-making, cognitive flexibility, abstract thinking, rule acquisition, initiating appropriate actions, problem solving, and selecting relevant sensory information.

**10.  Counsel Unreasonably Failed to Obtain All Documents and Interview Readily Available Witnesses About Mr. Fields' History of Incarceration**

As was obvious to trial counsel at the outset of Mr. Fields' capital prosecution, one of the key arguments that the Government would pursue in the penalty phase proceedings was that Mr. Fields' "future dangerousness" justified a sentence of death.  Given that by the time of trial, Mr. Fields had spent over a third of his life behind bars, it was incumbent on counsel to conduct a thorough investigation regarding Mr. Fields' history of incarceration, as evidence of Mr. Fields' prior conduct and adjustment to prison life would be probative on this issue.  Yet despite this seemingly obvious line of investigation, counsel inexplicably failed to interview *anyone* who had contact with Mr. Fields in the juvenile facilities where he was placed, or during his eight years in the Texas Department of Criminal Justice, or in the early months of his incarceration for the capital offense.  Compounding this failure, counsel failed to obtain and understand how Mr. Fields' incarceration records were compelling proof of his mental illness. Instead, counsel only obtained a few records, reviewed them in a cursory manner without the benefit of an accurate understanding of Mr. Fields' multigenerational family history of mental illness, and interviewed a few correctional officers who had only known Mr. Fields for about a year prior to his capital trial, while he was incarcerated at the Federal Medical Center in Fort Worth.  While these witnesses could testify that Mr. Fields was not currently causing any problems as an inmate in what amounted to solitary confinement in the special housing unit, these witnesses knew little or nothing of his prior incarcerations or problems as an inmate.

Trial counsel failed to interview anyone who was familiar with Mr. Fields' time in juvenile placements or in the Texas prison system.  Such an investigation was necessary to understand the context of Mr. Fields' behavior during his prior periods of incarceration, the

quality of any care he received when he was having mental and emotional problems, and the effectiveness of the institutions in achieving correctional objectives.

Trial counsel's failure to thoroughly review records and conduct interviews with witnesses regarding Mr. Fields' prior incarcerations was unreasonable, as it left counsel unprepared to adequately rebut the anticipated evidence in aggravation at the penalty phase regarding Mr. Fields' alleged future dangerousness.  As the Supreme Court has made clear, defense counsel has a duty to make all reasonable efforts to anticipate, investigate and rebut the details of the aggravating evidence that the prosecution will likely emphasize in capital sentencing proceedings.  *See Rompilla*, 545 U.S. at 385-90 (counsel held ineffective for failing to investigate petitioner's prior convictions where counsel knew that prosecution intended to seek death penalty by proving petitioner had significant history of felony convictions indicating the use or threat of violence).

**B.      The Jury's Findings And Deadlocked Deliberations Demonstrate That Trial Counsel's Ineffective Mitigation Presentation Prejudiced Fields**

In an effort to rescue the woefully inadequate mitigation presentation trial counsel provided Fields' jury, the Government argues that the "jury's findings show that defense counsel was very successful in presenting mitigation evidence."  GR at 48.  However, the jury's behavior indecision and findings on the Special Verdict Form demonstrate just the opposite.  Mr. Fields' jury clearly understood the mitigating import of the evidence detailed above, which should have been but was not presented to the jury.  Fields' jury, based on the paltry evidence Mr. Fields' lawyers discovered and presented, unanimously found that Mr. Fields lived most of his life without a significant father figure, suffered from physical and emotional abuse and neglect during his formative years, is the "product of an impoverished background which impaired and hampered his integration into the social and economic mainstream," and was exposed to the

violent deaths of loved ones and friends.  *See* Amended Petition, App. BB (Special Verdict Form).  Seven jurors additionally found that Mr. Fields "grew up in an atmosphere of violence and fear, which misshaped his perception as to the acceptability or necessity of violent conduct." *Id*.  These findings demonstrate that Mr. Fields' jurors were willing to give full consideration and effect to this type of mitigating evidence.  Rather than demonstrating that trial counsel's deficient mitigation presentation was successful, these findings demonstrate that had trial counsel conducted a constitutionally competent investigation and presented the overwhelmingly rich evidence described above – evidence they could and should have discovered – there is a reasonable probability that one juror would have voted against imposing a death sentence.

The fact that the jurors sent multiple notes to this Court indicating they were deadlocked further confirms the impact the omitted evidence described above would have had on the jury.  After lengthy deliberations, the jury sent this Court a note reading, "If we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the Court have for punishment."  TT at 2546-47.  The jury subsequently sent this Court another note, succinctly stating, "We cannot come to a unanimous agreement."  TT at 2547.  The length of the jury's deliberations and the notes regarding deadlock demonstrate *Strickland* prejudice in Mr. Fields' case:

> In light of the quantity and quality of the mitigating evidence [Petitioner] failed to present at trial, the duration of the jury's deliberations, and the jury's communication to the trial judge, we are not confident that, with the additional evidence presented at the evidentiary hearing, a unanimous jury would still have returned a sentence of death.

*Mayfield v. Woodford*, 270 F.3d 915, 932 (9th Cir. 2001).  Likewise here, trial counsel's constitutionally ineffective mitigation investigation and presentation to Fields' jury when viewed in light of the massive amount of additional evidence presented above and the jury's deadlock in

deliberations undermine the jury's sentence of death.   As such, Mr. Fields is entitled to discovery, an evidentiary hearing and a new trial.

CLAIM 22:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL AND A FAIR DETERMINATION OF PUNISHMENT BASED ON COUNSEL'S FAILURE TO COMPETENTLY PREPARE FOR AND CROSS EXAMINE THE GOVERNMENT-EXPERT, DR. COONS

CLAIM 23:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS BASED ON COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EXPERT TESTIMONY BOTH TO ESTABLISH THE RELATIVELY SMALL RISK THAT FIELDS WOULD ENGAGE IN FUTURE ACTS OF VIOLENCE AND TO CHALLENGE THE GOVERNMENT'S ASSERTION THAT FIELDS WOULD BE A FUTURE DANGER IF NOT EXECUTED.

CLAIM 24:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF THE ABILITY OF THE FEDERAL PRISON SYSTEM TO CONTROL FIELDS' BEHAVIOR.

CLAIM 25:    MR. FIELDS WAS DENIED HIS SIXTH AND EIGHTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE AND PRESENT TESTIMONY OF FIELDS' INCREDIBLY MINIMAL RISK OF ESCAPE FROM A FEDERAL PRISON.

Mr. Fields established in his Petition that he was denied his Sixth and Eighth Amendment rights to effective assistance of counsel when his counsel failed competently prepare for and cross-examine the Government's expert witness, Dr. Coons and when it failed to investigate and present testimony on Mr. Fields' low risk of future dangerousness, the ability of the prison system to control Mr. Fields and the minimal risk of future escape from the federal prison system, and that Mr. Fields was prejudiced thereby when the jury "found Mr. Fields was likely to commit serious acts of violence in future which would be a continuing and serious threat to the lives and safety of others."  Petition at 166-94; Amended Petition at 229-56.  The Government does not deny that counsel failed to investigate and present independent testimony with regard to Mr. Fields' low risk of future dangerousness, the ability of the prison system to control Mr. Fields and the minimal risk of future escape from the federal prison system.  Indeed,

the Government does not challenge or refute any of the facts and opinions set forth in the Declaration of Dr. Mark Cunningham, or that Dr. Coons' analysis and testimony was subject to "grave errors."  *See Declaration of Dr. Mark Cunningham* ¶ 110.  Instead, predictably, the Government claims that Mr. Fields' counsel conducted a "vigorous challenge" to Dr. Coons' testimony.  *See* GR at 49-52.  As demonstrated below and in the Petition, the Government's defense is disingenuous and contrary to the facts, which are that the performance of Mr. Fields' counsel fell far below the objective standard of reasonableness that is required by *Strickland*.

The Government concedes that *Strickland* requires counsel's assistance to not "fall below an objective standard of reasonableness" in such a way that prejudices the defendant GR at 49, 51.  The Government also concedes that the jury's unanimous finding of the non-statutory aggravating factor that Mr. Fields "was likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others" "occurred because of Government testimony offered by Dr. Coons."  *See* Petition at 167; Amended Petition at 230 & App. S; GR at 49.  Accordingly, the Government concedes that had Mr. Fields' counsel adequately and effectively challenged Dr. Coons' testimony and put on readily available evidence that Mr. Fields was not a future danger and could be controlled by the federal prison system, it is likely that the jury would not have sentenced Mr. Fields to death.

The only disputed question is whether Mr. Fields' counsel's performance with regard to Dr. Coons was deficient.  The Government points to the fact that Mr. Fields' counsel conducted a *Daubert* challenge.  What the Government fails to note is that Mr. Fields' counsel was – by his own admission – woefully unprepared for such a challenge.  *See Affidavit of Robert Swanton, Esq.* ¶ 12.  Indeed, counsel did not even take the elementary step of filing a *Daubert* motion, something the Court took him to task for in open court.  TT at 2316:11-12, 2332:23-2333:6.  Counsel's failure to adequately prepare for such a motion, rendered, as the Court

recognized, any questioning inadequate.  *See* TT 2332:23-2333:2 ("Mr. Swanton, he was not prepared to do this.  You sprang this on everybody 15 minutes ago.  You didn't file a motion – a *Daubert* motion.  He couldn't possibly be prepared to answer that kind of question").

The Government also points to several instances of supposedly incisive questions counsel posed to Dr. Coons during his brief questioning.  GR at 49-50.  But the Government's examples are rife with mischaracterizations.  For example, the Government suggests that "[c]ounsel made the witness admit before the jury the American Psychiatric Association has indicated predicting future dangerousness is a very inexact science."  GR at 50.  In fact, Dr. Coons testified that "I'm not sure what their – exactly their position is," before allowing that "some members . . . have difficulty with the issue."  TT at 2356:16-19.  That some physicians have "difficulty" is a far cry from "admit[ting]" his methodology was disapproved by his discipline's premier professional body.  Similarly, the Government's assertion that counsel "questioned the witness to admit there was the chance the defendant had made a substantial change in his behavior for the better" omits the fact that the witness refused to do so.  GR at 50; TT at 2358-59.  That the Government resorts to such questionable "victories" only serves to illustrate counsel's failure to mount any effective cross-examination.

Moreover, counsel's constitutionally deficient cross-examination would not have been necessary had he performed under the objectively reasonable standards of legal representation.  He was simply unprepared – by his own admission – to challenge the admissibility of Dr. Coons' opinion.  At the outset, he stated that "I'm not exactly sure what the government intends to elicit from Mr. Coons.  I have some general idea, but if they intend to get into the issue of future dangerousness, I'd like to talk to him outside the presence of the jury and do a *Daubert* challenge to that particular kind of information."  TT at 2315:25-2316:5.  He then proceeded to question Dr. Coons for a short while – as he speculated in beginning, "I probably

won't have him for more than 15 or 20 minutes." TT at 2316:15-16. These are not the statements of counsel who has arrived at court prepared for a rigorous examination on a complex scientific topic, but one who was "not sure the Fifth Circuit has addressed that issue with respect to future dangerousness." TT at 2316:10-12. Counsel was caught off-guard, and unprepared. As set forth more fully in the Petition, *see* Petition at 188-92; Amended Petition at 251-54, if counsel had been prepared, he would have retained an expert to testify to the following (none of which was presented at Mr. Fields' trial): (1) the use of the term "future dangerousness" was an improper conflation of the language of the actual non-statutory aggravator (*see Declaration of Dr. Mark Cunningham* ¶ 63); (2) the methodology employed by Dr. Coons to evaluate Mr. Fields was spurious, unethical, and had been discredited by numerous scientific studies (*see id.* ¶¶ 66-67); (3) the improper reliance by Dr. Coons on "the incident offense" as a predictor of future dangerousness (*see id.* ¶¶ 69-73); (4) the lack of data supporting several instances of Dr. Coons' testimony; (5) the failure of Dr. Coons to acknowledge alternative conditions of confinement, such as those at ADX Florence, as well as the failure to recognize the role that the conditions at McLennan County Jail played in Mr. Fields' erratic behavior (*see id.* ¶¶ 85-96); (6) the fundamental errors in violence risk assessment at capital sentencing demonstrated in the methodology and related testimony of Dr. Coons (*see id.* ¶¶ 97-100); (7) the fact that Dr. Coons and David Sweeney of Federal Medical Center in Fort Worth relied on the improper factors of age and incarceration tenure as bearing on "future dangerousness" (*see id.* ¶¶ 101-03); (8) evidence that prisoners like Mr. Fields who have attained a GED or high school diploma have less of a chance of committing prison assaults (*see id.* ¶ 104); (9) evidence that readily available actuarial models in making risk assessments, which are proven to be more reliable than clinical judgment, would have shown far lower rates of risk of assault than presented by Dr. Coons (*see id.* ¶¶ 105-06); (10) the application of the base rate of violence among prisoners like Mr. Fields

would present a low risk of violence of prison (*see id.* ¶ 107); and (11) evidence that Mr. Fields' pattern of behavior while confined did not progress to serious violence and was only "predictive of continuing management problems" (*see id.*¶ 108).

The Government admits that Dr. Coons was the primary reason the jury determined an aggravating factor which led to Mr. Fields' death sentence. GR at 49. By his own admission, counsel was unprepared to examine Dr. Coons, or challenge the admissibility of his unfounded opinions, nor, as the Government concedes, did he present any independent expert testimony refuting the Government's case for "future dangerousness." For these reasons, Mr. Fields was represented ineffectively by counsel, leading to his death verdict – and this demands a new sentencing, or, at the very least, discovery and an evidentiary hearing.

CLAIM 26:   THE GOVERNMENT COMMITTED PROSECUTORIAL MISCONDUCT BY MISREPRESENTING THE CONDITIONS OF FIELDS' CONFINEMENT UPON CONVICTION AND POTENTIAL FOR FUTURE DANGEROUSNESS IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENT.

Mr. Fields established in his Petition that the Government mislead the jury during the penalty phase of Mr. Fields' trial by creating and perpetuating the false impression that Mr. Fields' "escapes" from low-security juvenile facilities and a county jail were reliable indicators of Mr. Fields' future dangerousness as a prisoner in federal detention facilities. Petition at 194-203; Amended Petition at 256-64. The Government does not deny that it created and perpetuated the impression that Mr. Fields' escapes from low-security juvenile facilities and county jail were reliable indicators of Mr. Fields' future dangerousness, but instead argues that the Government did not make any false or misleading statements, and the Government's statements did not have a substantial effect on the right to a fair trial. GR at 52-54. The Government is wrong.

By eliciting testimony from a non-qualified witness regarding the security capabilities of the federal prisons, failing to correct the record in distinguishing the conditions of

confinement in Mr. Fields' prior detention centers and potential federal penitentiaries, the Government mislead the jury with respect to the Federal Bureau of Prisons' ability to confine and control Mr. Fields. The Government further emphasized this false impression to the jury in describing Mr. Fields' past escape as the "very essence of future danger" (TT at 2541:16), yet not once even pointed to the types of facilities in which Mr. Fields would likely be housed upon conviction. As demonstrated more fully in the Petition, based on his low risk of future violence, Mr. Fields would have almost certainly be placed in a High Security U.S. Penitentiary, which unlike the facilities Mr. Fields escaped from, are:

> high-security prisons in BOP, characterized by double-perimeter fencing with razor wire, perimeter detection devices, gun-towers, concentric layers of security, controlled inmate movement, and intensive staffing. The architecture, staffing, and security procedures assume that all inmates at this level of security are motivated to escape and would attempt to do so if given the opportunity.

*Declaration of Dr. Mark Cunningham* ¶ 52. Indeed, if Mr. Fields did pose a high risk of future violence (which he does not), he could be placed in ADX Florence, which was designed exclusively to control prisoners with histories of prison violence or escape behavior. *Id.* ¶ 23. The capabilities to control prisoners in ADX Florence include:

- Single cells with both barred and steel doors.

- Cell windows facing inner recreation area.

- Poured reinforced concrete fixtures.

- Twenty-three-hour a day lockdown.

- Prisoner meals in cell.

- Prisoner movement accompanied by double escort with baton, while the prisoner is cuffed behind the back with his feet shackled.

- Limited communication with the outside. Prisoners are only allowed one or two, fifteen minute, monitored phone calls per month.

- No contact visits – all prisoner visits are monitored.

- All prisoner mail subjected to x-ray, opening and review by staff.

*Id.* at Appx. B7. Because of the extraordinary control capabilities of ADX Florence, even though the facility houses the worst and most uncontrollable prisoners in the country, there were only 14 minor assaults on staff members and 3 attempted or threatened assaults between December, 1994 and June, 2001. *Declaration of Dr. Mark Cunningham* ¶ 41. The design is overwhelmingly effective – there has never been an escape from ADX Florence. *Id.* ¶ 24. Ignoring these facts, the Government elicited testimony form Jimmy Stone, a deputy sheriff with the McLennan County Sheriff's Department who had "never been in a federal prison" (TT at 23:13:7-8), and who told the jury that there are no "escape-proof" prisons (TT at 23010:12-14, 2312:4-5).

The Government does not deny that it elicited testimony from unqualified witnesses, omitted critical information about the conditions of Mr. Fields' future confinement and that it made inflammatory statements about Mr. Fields prior "escapes" from juvenile facilities and county jail, but still claims that it did not mislead the jury. Such a claim is insincere at best. The Government does not dispute the core component of Mr. Fields' claim: the risk of escape from a federal penitentiary is fundamentally and qualitatively lower than the risk of escape from juvenile detention camps and a county jail with a corrupt guard on staff. For the Government to present these drastically different risks of escapes as equal, or worse, to suggest that Mr. Fields' risk of escape from a federal penitentiary was likely based on testimony the Government knew or should have known was to be deficient, can only be characterized as an attempt to improperly inflame the passions and prejudice of the jury. Creating such an impression constitutes prosecutorial misconduct because "it is decidedly improper for the

government to propound inferences it knows to be false, or has very strong reason to doubt. . . ." *United States v. Blueford*, 312 F.3d 962, 968 (2002).

The Government also claims that any misconduct had no prejudicial effect.  GR at 53-54.  As demonstrated in the Petition, however, the crux of the Government's penalty phase presentation was Mr. Fields supposed future dangerousness.  *See* Petition at 166-94; Amended Petition at 229-56.  The jury's findings that Mr. Fields posed a future and continuing risk and an escape risk demonstrate that the Government's statements, omissions and witnesses had a substantial affect on the sentencing phase of the trial.  Moreover, the allegation that the "strength of the guilt" needs to be taken into account is specious.  The Prosecution's misrepresentations regarding the Mr. Fields' likely conditions of confinement as a federal prisoner and future dangerousness and reliance on such false and misleading impressions constituted a violation of Mr. Fields' Fifth and Eighth Amendment Rights and, as such, Mr. Fields is entitled to a new sentencing or, alternatively, a new trial.   At the very least, Mr. Fields is entitled to discovery and an evidentiary hearing.

CLAIM 27:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO RESPOND TO THE PROSECUTION'S MISLEADING EVIDENCE AND ARGUMENTS CONCERNING HIS RISK OF FUTURE DANGEROUSNESS.

CLAIM 28:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN A CAPITAL CASE WERE VIOLATED WHEN COUNSEL FAILED TO OBJECT TO THE PROSECUTION'S MISLEADING EVIDENCE AND ARGUMENTS CONCERNING HIS RISK OF FUTURE DANGEROUSNESS AND PRESENT READILY AVAILABLE EVIDENCE CONTRADICTING THE PROSECUTION.

Mr. Fields established in his Petition that he is entitled to a new sentencing hearing because his Sixth and Eighth Amendment rights to effective assistance of counsel were violated when his counsel failed to object to the Government's plainly misleading evidence regarding Mr. Fields' future dangerousness.  Petition at 203-04; Amended Petition at 264-65.

The Government conceded that the *Strickland* standard applies but attempts to justify counsel's plainly defective representation of Mr. Fields by inappropriately characterizing counsel's failures as within the purview of counsel's strategy.  GR at 55.

Under any objective standard of reasonableness, counsel's total failure to address the Government's evidence and arguments pertaining to Mr. Fields' future dangerousness does not meet constitutional muster.  The Government presented a wide variety of evidence and arguments which were misleading.  *See* Petition at 194-99; Amended Petition at 256-60. Counsel's inexcusable inaction can not fall within the purview of counsel's tactics or strategy, particularly since Mr. Fields' future dangerousness was the central issue in the penalty phase.  It is plainly deficient for counsel not to present contradictory evidence when such evidence is readily available after even a cursory investigation.

Further, counsel's failure to present evidence on future dangerousness plainly prejudiced Mr. Fields' defense.  Had counsel properly investigated and presented a defense on the issue of Mr. Fields' future dangerousness, the outcome of the penalty phase would likely have been different.  *See supra* at 137-41; Petition at 168-94; Amended Petition at 231-56.  The Government's restatement of prosecutorial evidence at trial (GR at 55-56) merely strengthens Mr. Fields' position that evidence to refute such evidence, including evidence pertaining to his future dangerousness, should have been presented.  Accordingly, Mr. Fields is entitled to a new trial because his right to effective assistance of counsel under the Sixth and Eighth Amendments was violated.

CLAIM 29:    MR. FIELDS' RIGHT TO A JURY TRIAL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE COURT INSTRUCTED JURORS TO REACH A UNANIMOUS PENALTY PHASE VERDICT AFTER THEY DECLARED THAT THEY WERE NOT UNANIMOUS AND WHERE THAT INSTRUCTION HAD A COERCIVE EFFECT.

Mr. Fields' Petition established that the Court's supplemental charge to the jury to "continue your deliberations," was sufficiently coercive to deprive Mr. Fields of his constitutional rights. Petition at 204-05; Amended Petition at 265-66. In response the Government make two arguments. First, it contends that because Mr. Fields challenged this jury instruction on direct appeal, his claim is barred. *See* GR at 6-7, 56. Second, the Government claims, without addressing the context of the challenged supplemental charge, simply that the supplemental charge was not improper. GR at 57. The Government is wrong on both counts.

First, Mr. Fields' claim is not barred because his claim is based on evidence unavailable at the time of Mr. Fields' direct appeal and a hearing should be held on this issue. The appellate court could not and did not consider the new evidence of juror coercion set forth in the Petition and corroborated by the jury's action on the trial record. Accordingly, the issue of whether the supplemental charge was coercive was never fully and finally litigated on direct appeal and is not barred here. Moreover, this Court has discretion to hear claims litigated on direct appeal, particularly when "countervailing equitable considerations" exist, or where "the ends of justice" would be disserved by dismissing the issue on collateral review. *See Valdez v. United States*, 494 F. Supp. 2d 505, 509 (W.D. Tex. 2007) (*citing Moore v. United States*, 598 F.2d 439, 441 (5th Cir. 1979)); *United States v. Porter*, No. CRIMA 01-282, 2007 WL 4348953, at *2 (E.D. La. Dec. 7, 2007). The jury charge to "[p]lease continue your deliberations" resulted in a previously deadlocked jury returning, in less than an hour, a death sentence. As such, discovery and an evidentiary hearing on the issue of whether the supplemental jury charge was coercive to the jury is critical to the service of the "ends of justice."

Second, the Government's conclusory argument that the phrase "please continue your deliberations" was not coercive ignores the fact that the law requires the reviewing court to look at the supplemental charge given by the judge "'in its context and under all the

circumstances.'"  *Lowenfield v. Phelps*, 484 U.S. 231, 237, 241 (1988) (citation omitted) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body").   In the Fifth Circuit an *Allen* charge "both deserves and receives a healthy disrespect."   *United States v. Amaya*, 509 F.2d 8, 12-13 (5th Cir. 1975) (a court must find improper any charge that "may be plausibly read as more coercive than the standard charge"); *see also United States v. Scruggs*, 583 F.2d 238, 242 (5th Cir. 1978) ("the *Allen* charge in all its forms is inherently coercive") (Coleman, J., concurring).

Here, several factors suggest actual coercion.  The brief time period between the supplemental charge and the jury's verdict supports Mr. Fields' claim that the supplemental charge coerced the jury.  Courts, including the Supreme Court, have recognized that coercion is suggested where a jury returns a verdict "soon after receiving the supplemental instruction." *Lowenfield*, 484 U.S. at 240; *United States v. Fossler*, 597 F.2d 478, 485 (5th Cir. 1979) (reversing conviction where an *Allen* charge was delivered over two separate objections after the jury indicated it could not reach a verdict when a guilty verdict was returned after "[o]nly one hour" of further deliberation).   *Hooks v. Workman*, 606 F.3d 715 (10th Cir. 2010) is also instructive.  In *Hooks*, after five hours of deliberation, the jury exchanged notes with the court regarding its inability to reach unanimity.  *Id.* at 735.  The court then provided a supplemental instruction including the instruction to "continue with your deliberations."  *Id.*  Following a dinner break and a final instruction regarding preparations for the evening's deliberations, the jury returned a unanimous death sentence in forty minutes.  *Id.* at 736.  In overturning the conviction, the Tenth Circuit stated that "the only reasonable conclusion is that the short time period between the [*Allen* charge] and the return of the death sentences strongly indicates the death sentences in this case were coerced."  *Id.* at 751.

In Mr. Fields' case, the coercion indicated in interviews with jurors is corroborated on the record. Following approximately five hours of deliberation, the jury questioned the Court on the consequences of a failure to reach unanimity, and the Court directed the jury to page 16 of the Punishment Phase Charge of the Court which states "if you are unable to unanimously agree on either punishment option, the court will impose punishment, which cannot be a sentence of death.'" TT at 2547:7-9. The jury then informed the Court that "[w]e cannot come to a unanimous agreement." TT at 2548:13-14. The Court responded not with a constitutionally appropriate *Allen* charge, but with the instruction to "continue your deliberations." TT at 2548:15-16. In turn, the jury returned a guilty verdict in approximately one hour. *See* Petition at 204; Amended Petition at 266. The Court's insistence on continued deliberation was clearly coercive given the jury's message that it was unable to reach unanimity and further evidenced by jury's verdict "soon after receiving the supplemental instruction." *See Lowenfield*, 484 U.S. at 240; *Hooks*, 606 F.3d at 732; *Fossler*, 597 F.2d at 483.

Coercion may also be evidenced by the effect of the instruction on a lone hold-out juror. *Tucker v. Catoe*, 221 F.3d 600, 612 (4th Cir. 2000) (finding an *Allen* charge coercive where one juror opposed to a death sentence had held out for five hours, but changed his mind within an hour-and-a-half of the *Allen* charge). In Mr. Fields' case, given the circumstances surrounding the supplemental *Allen* charge, at least one "hold out" juror refused to agree to the death sentence for over five hours, and following the supplemental charge changed her views in *under* one hour. Petition at 204; Amended Petition at 266.

Finally, supplemental instructions also have long been accepted only where accompanied by an admonition that the jurors not abandon their conscientious convictions. *See Scruggs*, 583 F.2d at 241; *Green v. United States*, 309 F.2d 852, 855-56 (5th Cir. 1962). In this case, two supplemental charges were given relating to the jury's inability to reach a unanimous

sentencing verdict.   *See* Petition at 204; Amended Petition at 266.   Neither *Allen* charge

conformed to approved *Allen* charge language, nor accompanied by an admonition that the jurors

not abandon their conscientious convictions.

The insistence on continued deliberation is especially inappropriate in penalty-

phase proceedings since the need for unanimity is reduced because a deadlocked jury will not

result in a mistrial.   *Hooks*, 600 F.3d at 732.   Here, a deadlocked jury would not have required a

new trial and would have only resulted in a life sentence.   The Court's insistence on further

deliberations served no purpose other than to coerce the jury into a unanimous verdict of death.

Accordingly, the Court's supplemental jury charge was inherently coercive and a new trial or

hearing should be granted on this issue.

CLAIM 30:     MR. FIELDS' FIFTH AMENDMENT RIGHT TO DUE PROCESS; HIS SIXTH
AMENDMENT RIGHT TO SELF-REPRESENTATION AND A FAIR TRIAL; AND HIS
EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT
WERE ALL DENIED WHEN HE WAS FORCED TO WEAR A STUN BELT DURING
TRIAL; WHERE THE STUN BELT SIGNIFICANTLY AFFECTED HIS ABILITY TO
CONDUCT HIS OWN DEFENSE, AS WELL AS HIS DEMEANOR IN COURT; AND
WHERE THE TRIAL COURT FAILED TO CONSIDER LESS RESTRICTIVE
ALTERNATIVES.

CLAIM 31:     MR. FIELDS' SIXTH AMENDMENT RIGHT TO COUNSEL AND EIGHTH
AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE
VIOLATED WHEN THE TRIAL COURT FAILED TO WARN HIM OF THE
DISADVANTAGES OF BEING FORCED TO WEAR A STUN BELT AT THE TIME THE
COURT ENGAGED IN A COLLOQUY WITH FIELDS ABOUT HIS REQUEST TO
PROCEED PRO SE.

CLAIM 32:     MR. FIELDS' RIGHT TO BE PRESENT AT TRIAL WAS VIOLATED BY
REQUIRING THAT HE WEAR A STUN BELT DURING THE ENTIRE TRIAL,
VIOLATING THE GUARANTEES OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.

CLAIM 33:     MR. FIELDS' RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS
VIOLATED WHEN TRIAL COUNSEL FAILED TO DEMAND A HEARING AND
PRESENT EVIDENCE IN RESPONSE TO THE DIRECTIVE THAT FIELDS WEAR A
STUN BELT DURING TRIAL, DEPRIVING HIM OF RIGHTS GUARANTEED BY THE
FIFTH, SIXTH AND EIGHTH AMENDMENTS.

CLAIM 34:    DEPRIVING HIM OF RIGHTS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS, MR. FIELDS' RIGHT TO COUNSEL (DURING PENALTY PHASE) WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE DEVICE INTERFERED WITH HIS ABILITY TO CONSULT WITH COUNSEL.

CLAIM 35:    MR. FIELDS' SIXTH AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE SENTENCING DETERMINATION WAS VIOLATED BY REQUIRING FIELDS TO WEAR A STUN BELT, WHERE THE STUN BELT NEGATIVELY AFFECTED FIELDS' DEMEANOR IN COURT.

CLAIM 36:    MR. FIELDS' RIGHT TO SELF-REPRESENTATION WAS VIOLATED BY HIS CONDITIONS OF CONFINEMENT, INCLUDING BEING HOUSED IN A CELL WHERE THE LIGHTS WERE NEVER TURNED OFF OR DIMMED, WHERE THE NOISE SUBSTANTIALLY INTERFERED WITH FIELDS' ABILITY TO SLEEP, AND WHERE HE WAS DEPRIVED OF THE TOOLS WITH WHICH TO PREPARE FOR THE NEXT DAY'S EXAMINATIONS. THESE CONDITIONS SIGNIFICANTLY IMPAIRED FIELDS' ABILITY TO CONDUCT HIS OWN DEFENSE AND VIOLATED HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.

In his Petition, Mr. Fields established that his constitutional rights were violated when he was subjected to certain security measures including, *inter alia*, being required to wear a stun belt during trial.  As set forth in the Petition, the stun belt and other unwarranted security measures imposed by the Court had wide ranging adverse psychological effects that, among other things, seriously hampered Mr. Fields' ability to represent himself at trial, negatively affected his demeanor in the courtroom, and violated Mr. Fields' constitutional rights.  Petition at 205-13; Amended Petition at 266-74.  The Government's brief entirely misconstrues the nature of the constitutional infractions alleged by Claims 30-36 of the Amended Petition.  *See* GR at 57-59.  As a result, the Government effectively fails to respond to those claims.

The Government's response contends only that the stun belt could not have influenced the jury's perception of Mr. Fields' potential dangerousness, stating, "It cannot be concluded that the jury was prejudiced when there is no evidence when the belt is not activated and the belt is not visible to the jury."  GR at 59.  The Government's argument not only largely fails to respond to Claims 30-36, it assumes that no jurors saw the outline of the stun belt.  Mr.

Fields denies this factual assertion.  In a separate discovery motion (filed simultaneously with this reply), Mr. Fields seeks a deposition of all of the jurors on their awareness of any security measures undertaken during Mr. Fields' trial.

Misconstruing Mr. Fields' claim and starting from the assumption that no juror saw the stun belt, the Government then contrasts this case with *Deck v. Missouri*, 544 U.S. 622 (2005), a case concerning the influence of shackles on a jury's perception of a defendant as dangerous.  However, even assuming *arguendo* that no juror saw the stun belt, Mr. Fields was prejudiced in several ways that the Government's response fails to address.

As caselaw has recognized, while "stun belts plainly pose many of the same constitutional concerns as do other physical restraints," there also exists the "possibility that a stun belt could disrupt a different set of a defendant's constitutionally guaranteed rights" entirely. *United States v. Durham*, 287 F.3d 1297, 1305-06 (11th Cir. 2002).  It is that latter set of constitutionally guaranteed rights to which Claims 30-36 refer, and to which the Government offers no rebuttal.

The Government's argument then turns to two cases in which a Circuit Court "upheld the use of a stun belt."  GR at 59.  However, neither case considers the various types of prejudice pled by Mr. Fields in his Petition.  In *United States v. Brooks*, 125 F.3d 484 (7th Cir. 1997), the defendant did not object to being forced to wear the stun belt and assaulted his attorney during trial, despite the fact that he was wearing the device.  *Id.* at 502.  The other case cited by the Government is Mr. Fields' appeal of the result of his original trial, *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), *cert. denied*, 552 U.S. 1144 (2008), in which no attention is given to the requirement that a court consider whether a stun belt is the least restrictive method of restraint appropriate for the situation.  *Id.* at 356-57; *see Illinois v. Allen*, 397 U.S. 337, 344 (1970) (noting that a particular form of restraint should only be used as a "last resort").

The Government concludes by criticizing the citation of two cases in Mr. Fields' Petition that explain the serious constitutional concerns inherent in the use of a stun belt: *Durham*, 287 F.3d 1297; *Gonzalez v. Pliler*, 341 F.3d 897 (9th Cir. 2003).   GR at 59.   The Government's criticism seems to be that no court has absolutely prohibited the use of a stun belt under any set of circumstances.   Mr. Fields does not disagree.   However, the Government's argument ignores the fact that a stun belt can be used only as a last resort and only after considering a number of factors, including its psychological effect on the defendant, especially one representing himself.

Few infringements on constitutional rights are *absolutely* prohibited.   Even racial classification – now considered one of the most constitutionally impermissible exercises of government power – is not *absolutely* prohibited.   *See Grutter v. Bollinger*, 539 U.S. 306, 340-41 (2003) (finding a racial classification constitutional if it satisfies strict scrutiny standard of "compelling state interest" and "narrow tailoring").   Just as the Supreme Court has set a high bar in order to justify a racial classification, *Durham* and *Gonzalez* describe the constitutional impairments of this "extraordinary security measure," 287 F.3d at 1305-07; 341 F.3d at 900-01, and set a high bar to justify its use.

Perhaps because the Government spends its time criticizing Mr. Fields' failure to prove an absolute prohibition against stun belts, it offers no justification for the use of the stun belt in this case.   The *Durham* court noted some of the procedural steps necessary in order to permit the use of a stun belt – steps that were not taken during Mr. Fields' trial.   In addition to factual findings regarding the functioning of the belt and the possibility of accidental discharge, the Eleventh Circuit pointed out that a "court will also need to assess whether an essential state interest is served by compelling a particular defendant to wear such a device, and must consider less restrictive methods of restraint."   287 F.3d at 1306-07.   Additionally, a "court's rationale

must be placed on the record to enable [an appeals court] to determine if the use of the stun belt was an abuse of the court's discretion." *Id.* at 1307 (*citing United States v. Theriault*, 531 F.2d 281, 285 (5th Cir. 1976)).  The transcript from Mr. Fields' original trial reflects little of the court's rationale, and no consideration of less restrictive methods of restraint.[19]  At the very least, if the Court felt increased security to be necessary, and if all parties were required to remain seated, a leg brace, as described in *Deck*, 544 U.S. at 624, or shackles not visible to the jury, would serve the same security purposes as the stun belt without oppressive effects on Mr. Fields' psychological wherewithal to conduct his own defense, his ability to consult with counsel, and his demeanor in front of the jury.  Open discussion of these less restrictive methods of restraint would have made clear that the use of a stun belt provided no additional benefit to the safety of the proceedings, while at the same time it infringed impermissibly on Mr. Fields' constitutional rights.  Putting such a discussion on the record, as required by the Fifth Circuit, would have made that same conclusion apparent on appeal.  Thus, the decisions cited in the Petition not only lay out the overarching constitutional concerns associated with stun belt use, but also set a high bar for its justification – a bar not even approached during Mr. Fields' original trial.

However, the other and perhaps more significant point missed by the Government in its Response is that Mr. Fields' claims here are based on new facts that were not presented nor considered by this Court during Mr. Fields' trial.  As a result, these facts were not part of the record on appeal.

In his Petition, Mr. Fields presents the following new facts:

---

[19]    The conversation over the use of a stun belt proceeded as follows:  First, the Court requests that a member of the Marshal's office summarize the security to be used during trial; the Marshal then describes his reasons for using the stun belt on Mr. Fields; the Court inquires whether it is still the rule that Mr. Fields must be shown a video about the stun belt; the Marshal says that it isn't, and then quickly describes the details and purpose of the belt.  Finally, the Court says "Okay" and moves on to the matter of security personnel.  TT at 52-53.

Requiring Mr. Fields to wear a stun belt during trial interfered with his ability to represent himself.   Certainly, Mr. Fields is not claiming that he was rendered continuously and completely unable to think by virtue of having to wear the stun belt.   However, whenever Fields encountered difficulty in cross-examination (which happened frequently), the stun belt made it nearly impossible for him to concentrate and think through the issue. In addition, the extreme sleep deprivation that Mr. Fields had to endure as a result of his conditions of confinement only served to acerbate the problem.   As a result, there are a number of examinations where Fields simply gave up – where he would not have done so but for the security conditions.  In short, Mr. Fields' ability to represent himself was burdened and prejudiced by the use of the stun belt.

During penalty phase, when Mr. Fields was represented by counsel, Mr. Fields was reluctant to discuss matters with counsel for fear of being electrocuted.  For example, Mr. Fields most wanted to speak to his attorneys about matters of trial strategy during breaks.  However, that was also when the marshals sought to take Fields back to the holding cell.  As a result, Mr. Fields would often simply not try to speak with counsel for fear that his efforts would be misinterpreted as a refusal to follow orders, resulting in activation of the device.  There were several instances where Fields decided not to consult with counsel as a result of the stun belt.

*       *       *

Requiring Mr. Fields to wear a stun belt made him appear to be cold and emotionless, the strategy he reasonably adopted in order to lessen the chance of being shocked.

Petition at 210-11; Amended Petition at 272-73.  The Government utterly ignores this new evidence, warranting an evidentiary hearing, showing how Mr. Fields was prejudiced, even if jurors did not notice he was wearing a stun belt.

In addition, the Government ignores and fails to respond to Mr. Fields' new evidence of the actual psychological effects of the stun belt on Mr. Fields, an individual who suffers from profound PTSD symptoms.  Mr. Fields' reaction to the stun belt – his intense fear of being shocked, his distrust of the marshals, and his altered demeanor – was influenced by years

of trauma.  In short, Mr. Fields' psychological condition, especially his paranoia, heightened the legally recognized problems generally associated with the device.  *See Woods Declaration II* ¶ 6 ("Even unrestrained, Mr. Fields is highly anxious and paranoid. These symptoms would be dramatically increased by requiring him to wear a stun belt controlled by a marshal").

As a result, the Government's answer is essentially non-responsive to most of Mr. Fields' factual assertions and legal claims regarding this Court's decision requiring Mr. Fields to wear a stun belt during trial.

Mr. Fields has made a sufficient showing that he was denied several constitutional rights as a result of the unreasonable decision to require him to wear stun belt during trial.  He is entitled to discovery in support of this claim; an evidentiary hearing; and a new trial as a result.

CLAIM 37:    MR. FIELDS' FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS WERE VIOLATED BY INCREASED SECURITY MEASURES AT TRIAL WHICH WERE APPARENT TO JURORS, INCLUDING THE VISIBLE OUTLINE OF THE STUN BELT, THE PRESENCE OF ADDITIONAL SECURITY PERSONNEL WHO WERE SEATED CLOSE TO FIELDS AND WHO, ON OCCASION INTERACTED WITH HIM WHILE JURORS WERE PRESENT IN THE COURTROOM, AND BY INCREASED SECURITY MEASURES EMPLOYED AFTER THE GUILTY VERDICT.

CLAIM 38:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND HIS EIGHTH AMENDMENT PROTECTION AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN, GIVEN THAT THE STUN BELT AND OTHER SECURITY MEASURES WERE APPARENT TO JURORS, COUNSEL FAILED TO EXPLAIN TO JURORS HOW THESE MEASURES NEGATIVELY ALTERED FIELDS' DEMEANOR.

CLAIM 39:    MR. FIELDS' FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE UNITED STATES MARSHALS INCREASED SECURITY AFTER JURORS RETURNED A GUILTY VERDICT, THEREBY IMPLYING THAT MR. FIELDS WAS DANGEROUS, AND WHERE THE COURT TOLD JURORS (OUTSIDE THE PRESENCE OF THE PARTIES) TO COMMUNICATE ANY ALLEGED THREATS TO THE COURT.

CLAIM 40:    MR. FIELDS' SIXTH AMENDMENT RIGHT TO A JURY TRIAL AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN, AFTER CONVICTION, THE MARSHALS INFORMED

JURORS THAT THEY WOULD ESCORT JURORS TO THEIR VEHICLES DURING PENALTY PHASE.

CLAIM 41:   MR. FIELDS' RIGHT TO BE PRESENT AND EIGHTH AMENDMENT RIGHT TO A RELIABLE DETERMINATION OF PUNISHMENT WERE VIOLATED WHEN THE COURT TOLD JURORS TO REPORT ANY THREATS TO THE COURT WHEN NEITHER FIELDS NOR COUNSEL WERE GIVEN NOTICE, AN OPPORTUNITY TO OBJECT, OR THE RIGHT TO BE PRESENT.

In his Petition, Mr. Fields established that he was prejudiced when the jurors experienced the heightened security measures, such as a stun belt, the presence of additional security personnel, and certain measures taken by the Court after the guilty verdict, outside the presence of the parties, that implied that Mr. Fields was dangerous. Petition at 213-17; Amended Petition at 274-79. The Government does not challenge any of the facts set forth in the Petition, but instead claims that the Supreme Court cases *Illinois v. Allen*, 397 U.S. 337 (1970), and *Holbrook v. Flynn*, 475 U.S. 560 (1986), bar such a claim  GR at 60-61. The Government's claim is based on a gross misreading of *Allen* and *Holbrook*. Indeed, as demonstrated below, those cases support Mr. Fields' claim.

First, the Government cites *Allen* for the proposition that under certain circumstances, the Constitution permits special measures to be taken in a courtroom that would infringe on otherwise guaranteed constitutional rights. 397 U.S. at 343-44. The Government's reliance on *Allen* is a tacit admission that Mr. Fields' constitutional rights were violated by the security measures raised in Mr. Fields' Petition. In *Allen*, the majority concluded that a defendant forfeited his constitutional right to be present at trial when he "insist[ed] on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial [could not] be carried on with him in the courtroom." *Id.* at 343. The extreme situation that justified the departure from Sixth Amendment protections in *Allen* is exactly opposite to that presented in the trial of Mr. Fields, whom a marshal described as "a model prisoner here at the

courthouse."  TT at 53:1-2.  The Government's failure to offer a shred of evidence showing unruly courtroom behavior renders *Allen* inapplicable here.  Accordingly, the violation of Mr. Fields' Fifth, Sixth, and Eighth Amendment rights deserves no validation under *Allen*, which in fact insisted that "courts must indulge every reasonable presumption *against* the loss of constitutional rights."  397 U.S. at 343.

Next, the Government cites *Holbrook v. Flynn*, 475 U.S. 560 (1986), for the proposition that additional security personnel in the courtroom during a trial do not impermissibly prejudice a jury.  *Id.* at 572.  Again, the Government cites a case that supports, rather than counters, Mr. Fields' claim.  The Government wrongly claims that the issue in *Holbrook* is whether "additional security" or "additional guards" prejudice a defendant's constitutional rights.  In fact, the issue in *Holbrook* is whether, when the marshal's office did not have enough personnel to cover the trial, calling four state troopers in to bring security up to its *normal* level of two security personnel for each defendant, was prejudicial to the defendant. Taking into account that the level of security utilized in the trial was at a normal level, the Supreme Court found no prejudice "in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section."  *Id.* at 571.  Furthermore, "[f]our troopers are unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings."  *Id.*

Whereas the risk of prejudice was not apparent in *Holbrook* under what were normal security measures (save for four state troopers instead of four marshals), Mr. Fields' trial was subjected to obvious enhanced security measures from beginning to end, raising the potential for jury perception and prejudice to heights neither confronted nor considered in *Holbrook*.  Rather than sitting quietly in the spectator section of the courtroom, at least one marshal would approach Mr. Fields as the jury was being led out for recess.  While prosecutors

were permitted to approach the bench, Mr. Fields was conspicuously unable to do the same.  And in addition to the fear instilled in Mr. Fields by the stun belt he was forced to wear, its outline was visible through his clothes, indicating to the jury yet another method of restraint.

On top of the increased measures during the trial phase that prejudiced the jury against Mr. Fields, the actions of the Court and the marshals after the guilty verdict further vilified the defendant during the penalty phase.  Following the verdict, the marshals informed jurors that they would be escorted to their vehicles, and at least one juror reports that the Court advised the jury at some point to report any threats made to them.  Far from the minor variation on security exhibited in *Holbrook*, the display of security at the trial of Mr. Fields is more aptly described as *enhanced* – more than "a normal official concern for the safety and order of the proceedings" – thereby increasing the risk of prejudice to a jury that was so divided during the sentencing phase that they originally came back deadlocked and unwilling to recommend the death penalty.  Mr. Fields is entitled to an evidentiary hearing on the issue of whether he was prejudiced by the enhanced security measures at his trial.

Next, the Government concludes that counsels' failure to object does not "fall below the objective standard of reasonableness" that is required by *Strickland* to support a claim of ineffective assistance of counsel.  GR at 61.  The Government is wrong.  Counsel possesses the affirmative duties to "advocate the defendant's cause," and to "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."  *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Keeping these affirmative duties in mind, it is not enough that Mr. Fields' trial counsel simply did not think to raise the issue of the stun belt's effect on his client's demeanor – counsel must have made that decision as a "result of reasonable professional judgment."  Not revealing the stun belt's effect upon Mr. Fields' demeanor during the sentencing phase can only be considered reasonable if there is a reason for it, and no

reasonable attorney could find that there was.  At the very least, Mr. Fields is entitled to an evidentiary hearing into the reasonableness of his counsels' failure to object or even comment on the enhanced security.[20]

Finally, the Government asserts, without citing a single case, that the constitutional protections that apply during the trial phase need not apply during the sentencing phase.  GR at 61.  The Government is simply wrong on the law.  *Strickland* is directly on point: "A capital sentencing proceeding like the one involved in this case, however, is sufficiently like a trial in its adversarial format and in the existence of standards for decision, that counsel's role in the proceeding is comparable to counsel's role at trial – to ensure that the adversarial testing process works to produce a just result under the standards governing decision."  *Id.* at 686-87.  Therefore, for the purposes of constitutional rights of the accused, a "capital sentencing proceeding need not be distinguished from an ordinary trial."  *Id.* at 687.  Further, "[a]lthough the jury is no longer deciding between guilt and innocence, it is deciding between life and death.  That decision, given the "'severity"' and "'finality"' of the sanction, is no less important than the decision about guilt."  *Deck v. Missouri*, 544 U.S. 622, 632 (2005) (citations omitted).  Due to the prejudice Mr. Fields was subjected to as a result of the enhanced security measures, he is entitled to a new sentencing hearing, or alternatively, an evidentiary hearing.

## VI.    CLAIMS RELATED TO THE DISPROPORTIONALITY OF MR. FIELDS' DEATH SENTENCE

CLAIM 42:    THE FEDERAL DEATH PENALTY STATUTE IS UNCONSTITUTIONAL AND VIOLATES THE EIGHTH AMENDMENT BECAUSE IT FAILS TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW THE EIGHTH AMENDMENT.

---

[20]    The Government does not claim that Mr. Fields can't meet the prejudice prong of *Strickland*.  This is because there is more than enough evidence demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.  See, for example, the discussion of the Government's reliance on future dangerousness, set forth at pages 138-41.

Mr. Fields established in his Petition that the Federal Death Penalty Act ("FDPA") is unconstitutional because it does not provide for comparative proportionality review and its sentencing procedure does not provide any meaningful mechanisms to prevent arbitrary and capricious sentences.  Petition at 218-19; Amended Petition at 279-81.  The Government does not refute that the FDPA does not provide for comparative proportionality review and its sentencing procedure does not provide any meaningful mechanisms to prevent arbitrary and capricious sentences and, instead simply dismisses Mr. Fields' claim.  GR at 62.  It is clear that the Government does not understand the nature of Mr. Fields' claim.  Mr. Fields does not contend, as the Government seems to suggest, that the death penalty is *per se* unconstitutional.  Instead, Mr. Fields claims that the FDPA suffers from significant constitutional infirmities *because* the sentencing *procedures* in the FDPA provide no meaningful mechanism to prevent arbitrary and capricious sentences.  Petition at 218-19; Amended Petition at 279-81.  As the Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), held, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Id.* at 189.  Mr. Fields acknowledges that a proportionality review is *but one way* to ensure that arbitrary and capricious sentences are not meted out, however, the Eighth Amendment requires that statutory procedures exist that "adequately channel the sentencer's discretion."  *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987).  There are no such procedures exist in the FDPA, and the Government does not claim otherwise.  Accordingly, Mr. Fields is entitled to a new trial, or, in the alternative, discovery and an evidentiary hearing.

<u>CLAIM 43:</u>   MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO RAISE A CLAIM THAT THE FEDERAL DEATH PENALTY STATUTE IS UNCONSTITUTIONAL BECAUSE IT FAILS TO REQUIRE COMPARATIVE PROPORTIONALITY REVIEW AS AN ISSUE ON DIRECT APPEAL.

Mr. Fields demonstrated in his Petition that appellate counsel's failure to identify and litigate on direct appeal his claims regarding the unconstitutionality of the FDPA was inexcusable and violated Mr. Fields' Sixth Amendment rights to effective assistance of counsel. Petition at 219-90; Amended Petition at 281; *see also Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). Without having addressed the merits of Mr. Fields' Claim 42, the Government claims that the failure of Mr. Fields' appellate counsel to raise such a "meritless or weak issue[] does not constitute ineffective assistance of counsel." GR at 62 (*citing Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). As set forth in the Petition and above, Mr. Fields claims are neither weak nor meritless.

<u>CLAIM 44:</u>   IF THIS COURT CONCLUDES THAT COMPARATIVE PROPORTIONALITY REVIEW IS CONSTITUTIONALLY MANDATED AND CAN BE REQUIRED WITHOUT DOING VIOLENCE TO THE STATUTE, MR. FIELDS' DEATH SENTENCE MUST BE OVERTURNED AS DISPROPORTIONATE AND IN VIOLATION OF THE EIGHTH AMENDMENT.

Mr. Fields demonstrated in his Petition that because the facts surrounding his case are a significant departure from the typical case in which the death penalty is applied, this death sentence is disproportionate to all other federal death sentences and is, therefore, arbitrary and capricious in violation of the Eighth Amendment. Petition at 220-21; Amended Petition at 281-84. The Government declares that because the Supreme Court has held the death penalty is, as a general matter, a proportionate punishment for deliberate murder, Mr. Fields' claims related to the disproportionality of *his* sentence must fail. GR at 63. The Government misconstrues Mr. Fields' claims. Mr. Fields' does not assert that the death penalty is a *per se* disproportionate sentence for deliberate murder; instead Mr. Fields asserts here that *his particular sentence* for *the*

*particular crime* for which Mr. Fields was (wrongly) convicted, was disproportionate.  As Mr.

Fields demonstrates in his petition, even assuming that Mr. Fields committed the crime for which

he was convicted (which Mr. Fields denies) a comparison of his case with other cases in which

the federal death penalty was given (as well as when the federal death penalty not given or not

sought) demonstrates that his death sentence is disproportionate and, therefore, his punishment is

one that is arbitrary and capricious in violation of the Eighth Amendment.  *See, e.g., McCleskey*

*v. Kemp*, 481 U.S. 279, 306 (1987).  The application of the death sentence in this case was

disproportionate even if Mr. Fields was not innocent and therefore unconstitutional and, as such,

Mr. Fields is entitled to a new sentencing hearing or, alternatively, discovery and an evidentiary

hearing on the disproportionality of his sentence.

<u>CLAIM 45:</u>   MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO
EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL FAILED TO
RAISE A CLAIM THAT THAT COMPARATIVE PROPORTIONALITY REVIEW IS
CONSTITUTIONALLY MANDATED AND CAN BE REQUIRED WITHOUT DOING
VIOLENCE TO THE STATUTE AND THAT MR. FIELDS' DEATH SENTENCE MUST BE
OVERTURNED AS DISPROPORTIONATE UNDER SUCH A REVIEW.

Mr. Fields demonstrated in his Petition that appellate counsel's failure to identify

and litigate on direct appeal his claims regarding the disproportionality of Mr. Fields' sentence

was inexcusable and violated Mr. Fields' Sixth Amendment rights to effective assistance of

counsel.  Petition at 221-22; Amended Petition at 284-85; *see also Yarborough v. Gentry*, 540

U.S. 1, 5 (2003).  Without having addressed the merits of Mr. Fields' Claim 44, the Government

claims that the failure of Mr. Fields' appellate counsel to raise such a "meritless or weak issue[]

does not constitute ineffective assistance of counsel."  GR at 62 (*citing Jones v. Barnes*, 463 U.S.

745, 751-52 (1983)).  As set forth in the Petition and above, Mr. Fields claims are neither weak

nor meritless.

# VII.  **OTHER CLAIMS**

CLAIM 46:    THE CUMULATIVE ERRORS IN THIS CASE CONSTITUTE A VIOLATION OF MR. FIELDS' RIGHTS TO DUE PROCESS, TO A FAIR TRIAL, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.

Mr. Fields demonstrated in his Petition that the combination of errors in his case deprived Mr. Fields of his due process rights.  Petition at 222-23; Amended Petition at 285-86 The Government responds with the conclusory statement that because no error existed in the guilt phase or sentencing phase of the trial, there can be no cumulative error.  GR at 64.  As Mr. Fields' Petition demonstrates, both the guilt and sentencing phases of the trial were replete with errors that fatally infected his trial and violated Mr. Fields' constitutional right to due process. Mr. Fields is entitled to a new trial as a result of such cumulative errors.

"'A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'"  *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (citation omitted).  As demonstrated herein, the Government fails to persuasively respond to any of Mr. Fields' assertions of constitutional error, any one of which justify granting the relief sought in Mr. Fields' Petition.  Even if this Court finds certain of the errors harmless individually, when considered together in the aggregate, the cumulative effect of these multiple errors arises to constitutional error which deprived Mr. Fields of his due process rights.  *See Chambers v. Mississippi*, 410 U.S. 284, 289-90 (1973); *Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003) (holding that the "combined prejudice of multiple errors committed in the case" established "a separate and independent basis for granting" 28 U.S.C. § 2255 petition). Accordingly, Mr. Fields respectfully asserts that the cumulative effect of errors throughout the guilt and sentencing phases of his trial were a violation of his constitutional right to due process and warrant an independent grounds for granting his Petition.

<u>CLAIM 47</u>:      ISSUES RAISED ON DIRECT APPEAL.

Mr. Fields' Petition realleges and preserves all issues asserted on direct appeal. Petition at 223; Amended Petition at 286.  In response, the Government asserts that Mr. Fields may not reallege and preserve claims raised on direct appeal absent newly discovered evidence. GR at 64.  The Government ignores the fact that Mr. Fields presented newly discovered evidence in his Petition and that he has sought and continues to seek discovery from the Government and this Court that, to date, has not been granted.  Moreover, courts have recognized that when the immediate disposal of issues considered on direct appeal would do a disservice to the ends of justice or when countervailing equitable considerations are present, the Court may in its discretion consider in a motion pursuant to 28 U.S.C. § 2255 issues which were previously brought on direct appeal.  *See Valdez v. United States*, 494 F. Supp. 2d 505, 509 (W.D. Tex. 2007) (recognizing that "countervailing equitable considerations" may allow a federal district court to consider issues previously rejected on direct review); *United States v. Porter*, No. CRIMA 01-282, 2007 WL 4348953, at *2 (E.D. La. Dec. 7, 2007) (stating that although claims considered on direct appeal may be dismissed without reconsideration of the merits in a collateral attack, "unless immediate disposal of the issue would be a disservice to the ends of justice") (*citing United States v. Vaughn*, 955 F.2d 367, 368 (5th Cir. 1992)).  Here, "countervailing equitable considerations" exist and a failure to consider issues brought on direct appeal would be a disservice to the ends of justice.

<u>CLAIM 48</u>:      MR. FIELDS WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE APPELLATE COUNSEL WAS INEFFECTIVE IN MULTIPLE RESPECTS.

As established in Mr. Fields' Petition and as set forth above, to the extent that Appellate counsel could have raised the claims set forth therein and failed to do so, Mr. Fields'

Sixth Amendment right to effective assistance of counsel has been violated.  *See* Petition at 223-24; Amended Petition at 286-87.

CLAIM 49:     MR. FIELDS IS ENTITLED TO AN EVIDENTIARY HEARING.

As set forth above, and in the Petition and the Amended Petition, Mr. Fields is entitled to an evidentiary hearing.  *See* Petition at 224; Amended Petition at 287.

## CONCLUSION

Mr. Fields' convictions and death sentence are unreliable and unconstitutional.  Mr. Fields has presented numerous new facts which put this case in a very different light.  Mr. Fields now seeks an opportunity to prove what he has alleged.

The underlying purpose of the right to habeas relief is to correct errors of law, including those errors revealed for the first time by the discovery of new facts.  A habeas proceeding permits a second look at the facts presented and the law applied at the first trial.

In this way, justice is achieved, not frustrated as the Government implies.  "Those whom we would banish from society or from the human community itself often speak in too faint a voice to be heard above society's demand for punishment.  It is the particular role of courts to hear these voices, for the Constitution declares that the majoritarian chorus may not alone dictate the conditions of social life.  The Court thus fulfills, rather than disrupts, the scheme of separation of powers by closely scrutinizing the imposition of the death penalty, for no decision of a society is more deserving of 'sober second thought.'"  *McCleskey v. Kemp*, 481 U.S. 279, 343 (1987) (Brennan, J., dissenting) (*quoting* Harlan F. Stone, *The Common Law in the United States*, 50 Harv. L. Rev. 4, 25 (1936)).

The supporting statements submitted by Mr. Fields disclose genuine issues of material fact and sharp factual disputes that must be explored further. Once discovery has been completed and an evidentiary hearing held, Mr. Fields will be entitled to a new trial.

DATED this 23rd day of August, 2010.

Respectfully Submitted:

/s/ Jeffrey E. Ellis

Jeffrey E. Ellis
Law Offices of Alsept & Ellis, LLC
621 SW Morrison St., Ste 1025
Portland, OR
206/218-7076 (ph)
206/262-0335 (fax)
JeffreyErwinEllis@gmail.com

Peter J. Isajiw
*Pro Hac Vice* Admission Pending
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
Phone:  212-504-6000
Fax:  212-504-6666
peter.isajiw@cwt.com

## <u>CERTIFICATE OF SERVICE</u>

I, Jeffrey E. Ellis, hereby certify that on August 23, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following attorneys of record in the above-entitled case:

Gregory S. Gloff
Assistant United States Attorney
800 Franklin
Suite 280
Waco, TX 76701
Email: Greg.Gloff@usdoj.gov

<u>/s/ Jeffrey E. Ellis</u>
Jeffrey E. Ellis
*Attorney at Law*