**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**WACO DIVISION**

| | | |
|---|---|---|
| **SHERMAN LAMONT FIELDS,** | § | |
| **Movant,** | § | |
| | § | **CIVIL NO. W-09-CV-009** |
| **v.** | § | |
| | § | **CRIMINAL NO. W-01-CR-164 (1)** |
| **UNITED STATES OF AMERICA,** | § | |
| **Respondent.** | § | |

## O R D E R

Among other convictions and sentences, Movant Sherman Lamont Fields was convicted of capital murder and sentenced to death. He challenges the constitutionality of his convictions and sentences under 28 U.S.C. § 2255. (*See* Docs. 297, 298, 300, and 318). Pursuant to Federal Rule of Criminal Procedure, Movant also has filed a Motion for New Trial. (*See* Docs. 300 and 318). Having reviewed the motions, files and record, the Court is persuaded that Movant's § 2255 motion as amended and Motion for New Trial as amended are without merit and should be denied.

## I.      BACKGROUND

### A.      PROCEDURAL HISTORY

In a second superseding indictment, the Government charged Movant with the following seven counts: (1) conspiracy to escape from federal custody (Count 1); (2) escape from federal custody (Count 2); (3) using and carrying a firearm during and

in relation to escape, resulting in the intentional murder of Suncerey Coleman (Count 3); (4) car jacking (Count 4); (5) using and carrying a firearm during and in relation to car jacking (Count 5); (6) possession of a firearm as a convicted felon (Count 6); and (7) using and carrying a Ruger .22 caliber firearm during and in relation to his escape.  (Doc. 57).  The Government elected to seek the death penalty against Movant with respect to Count 3 of the indictment.

Following a jury trial, Movant was found guilty on all counts.  (Doc. 182).  After a separate trial on the penalty phase of the criminal proceeding, the jury unanimously recommended that Movant be sentenced to death as a result of his Count 3 conviction.  (Doc. 207).  In reaching this conclusion, the jury first determined through special findings that the Government had established the existence of the element of intent in the death of Suncerey Coleman beyond a reasonable doubt.  (Doc. 319, App. BB at 2-3).  Specifically, in its answers to the special findings on punishment as to Count 3, the jury unanimously answered "Yes" to all four intent questions.  (*Id.* at 2).

The jury unanimously answered "Yes" to the following statutory aggravating factors identified by the Government: (1) the death, or the injury resulting in death, of the victim, Suncerey Coleman, occurred during the commission or attempted commission of the crime of escape; and (2) Movant has previously been convicted of a federal or state offense punishable by a term of imprisonment of more than one

2

year involving the use or attempted use of a firearm against another person.  (*Id.* at

4).  The jury further found as aggravating factors:

> (1)    "[Movant] caused injury, harm, and loss to Suncerey Coleman, her family and children, and her friends as demonstrated by the victim's personal characteristics as an individual, including the fact that she was a new mother to a prematurely born infant, and the impact of her death upon her family, children, and friends";
>
> (2)    "Prior to the murder of Suncerey Coleman, [Movant] participated in attempted murders and other serious acts of violence"; and
>
> (3)    "[Movant] is likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others, including, but not limited to, inmates and correctional officers in an institutional correctional settings [sic] . . . ."

(*Id.* at 6-7).

The jury proceeded to make the following special findings as to the mitigating

factors present in Movant's case:

> (1)    No jurors found that Movant's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge."
>
> (2)    Two jurors found that Movant "was under unusual and substantial duress, regardless of whether the duress was of such degree as to constitute a defense to the charge."
>
> (3)    Eleven jurors found that "[t]he imposition of a death sentence would cause emotional injury, harm and loss to [Movant's] mother, children and other family members."
>
> (4)    Twelve jurors found that Movant "has lived most of his life without having a significant father figure."

(5)     Twelve jurors found that Movant "has spent a large portion of his life incarcerated."

(6)     Twelve jurors found that Movant's "periods of incarceration have included significant time in solitary confinement."

(7)     Eleven jurors found that "as [Movant] ages, his behavioral problems may decrease."

(8)     Twelve jurors found that Movant "suffered from physical abuse during his formative years."

(9)     Twelve jurors found that Movant "suffered from emotional abuse during his formative years."

(10)    Twelve jurors found that Movant "suffered from parental neglect during his formative years."

(11)    No jurors found that Movant "has talents, capabilities or qualities which are of some value to society."

(12)    Seven jurors found that Movant "grew up in an atmosphere of violence and fear, which misshaped his perception as to the acceptability or necessity of violent conduct."

(13)    No jurors found that Movant "can be controlled in a prison setting."

(14)    Nine jurors found that Movant "can be of some productive value in a prison setting."

(15)    Two jurors found that Movant "has the love and support of other members of his family."

(16)    Twelve jurors found that Movant "is the product of an impoverished background which impaired or hampered his integration into the social and economic mainstream of society."

(17)    One juror found that Movant "has recently responded well to a structured environment and would likely adapt to prison life if he

> were sentenced to life imprisonment without the possibility of release."
>
> (18)  Twelve jurors found that Movant's "mother has a history of criminal behavior and incarceration."
>
> (19)  Twelve jurors found that Movant "was exposed to the violent deaths of family members, loved ones, and friends during his formative years."

(*Id.* at 8-10).  The jury ultimately determined that the aggravating factors identified outweighed any mitigating factors and recommended by unanimous vote to sentence Movant to death as a result of his conviction in Count 3.  (*Id.* at 15).

Following the jury's recommendation, the Court sentenced Movant to death on the Count 3 conviction.  (Doc. 230).  The Court further sentenced Movant to 715 months of imprisonment as to the non-capital counts.  (*Id.*).  Thereafter, the Fifth Circuit Court of Appeals affirmed Movant's sentences and convictions.  *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), *cert. denied*, 552 U.S. 1144 (2008).

## B.    FACTUAL BACKGROUND

The Fifth Circuit Court of Appeals summarized the relevant background facts as follows:

> [Movant] was arrested on federal firearms charges in September 2001. He was held in federal custody at the McClennan [sic] County Detention Center in Waco, Texas.  In November 2001, [Movant] bribed a correctional officer—paying him $5000 in exchange for a key to the detention center's fire escape door.  Using the key, [Movant] escaped.
>
> After fleeing federal custody, [Movant] met up with a friend.  Through this friend, [Movant] obtained a car and a .32 caliber revolver.  That evening, [Movant] visited his ex-girlfriend, Suncerey Coleman, at

Hillcrest Hospital in Waco, where she was attending to her newborn baby. [Movant] was angry with Coleman for seeing other men. After [Movant] and Coleman conversed for some time, [Movant] convinced her to leave the hospital with him. They drove to Downsville, Texas, a small town just outside of Waco. The two had sexual intercourse,[FN2] and then [Movant] shot Coleman twice in the head. After that, he dragged her dead body from the road into some underbrush to hide it.

> FN2.  It is unclear whether the sex was consensual.

Several days later, [Movant] approached a Hillcrest Hospital employee, Tammy Edwards, while Edwards was exiting her car. Brandishing a handgun and grabbing her by the throat, [Movant] demanded that Edwards get back in the car. Although Edwards was able to struggle free, [Movant] managed to wrestle away her car keys. [Movant] drove away in Edwards's car.

Coleman's body was found on November 21, more than two weeks after her death. Three days later, police rearrested [Movant].

*Fields*, 483 F.3d at 323-24.

## II.    GROUNDS FOR RELIEF

In the instant § 2255 motion, Movant asserts that his convictions and sentences should be set aside for various constitutional violations. He has raised the following forty-nine grounds for relief in his § 2255 motion as amended:

(1)    Movant was incompetent to waive his right to counsel, in violation of the Fifth, Sixth, and Eighth Amendments (Ground One);

(2)    Movant was denied his right to counsel and due process when the trial court conducted an inadequate hearing in response to Movant's competency to waive counsel (Ground Two);

(3)    Movant received ineffective assistance of counsel and was denied his right to a reliable sentence because counsel failed to conduct a sufficient investigation into Movant's competency (Ground Three);

(4)     after the trial court approved Movant's request to waive counsel and represent himself, Movant's right to self-representation was violated in several material respects (Ground Four);

(5)     Movant's rights to self-representation were violated when he was not permitted to participate in bench and chambers conferences (Ground Five);

(6)     Movant's right to be present at trial was violated when he was not permitted to participate in bench and chamber conferences (Ground Six);

(7)     Movant received ineffective assistance of counsel when appellate counsel failed to raise on direct appeal the constitutional claims based on Movant's exclusion from bench and chambers conferences (Ground Seven);

(8)     Movant's rights were violated when standby counsel failed to use a peremptory challenge against a juror Movant sought to strike (Ground Eight);

(9)     Movant's rights to a fair and impartial jury were violated when one of his peremptory challenges was not exercised (Ground Nine);

(10)    Movant's rights to be present at all critical stages of the trial were violated when he was excluded from the chamber conference to discuss the trial court's response to the jury note (Ground Ten);

(11)    Movant received ineffective assistance of counsel because counsel failed to object to his exclusion from the chamber conference to discuss the trial court's response to the jury note (Ground Eleven);

(12)    Movant's rights under the Fifth, Sixth, and Eighth Amendment were violated when he was required to reveal his trial strategy by doing his cross-examination of a critical Government witness without requiring reciprocal disclosure of the prosecution's trial strategy (Ground Twelve);

(13)    Movant received ineffective assistance of appellate counsel because counsel failed to raise on appeal the issue of Movant being required to reveal his trial strategy pertaining to his cross-examination of a critical Government witness without requiring reciprocal disclosure of the prosecution's trial strategy  (Ground Thirteen);

(14)    Movant's rights were violated when the Court failed to inquire as to whether Movant knowingly and voluntarily waived his right to testify (Ground Fourteen);

(15)    Movant's convictions and death sentence violated his constitutional rights because he is innocent (Ground Fifteen);

(16)    Movant's rights were violated when the Government presented evidence and testimony that it knew or should have known was false (Ground Sixteen);

(17)    Movant's rights were violated because counsel failed to conduct a competent investigation into the facts of the charged homicide (Ground Seventeen);

(18)    the Government failed to disclose exculpatory evidence in violation of Movant's constitutional rights (Ground Eighteen);

(19)    the Government failed to correct a material misrepresentation of fact by a key witness in violation of Movant's constitutional rights (Ground Nineteen);

(20)    Movant's rights were violated because a jailhouse informant acted as a Government agent following Movant's indictment (Ground Twenty);

(21)    Movant received ineffective assistance of counsel because counsel failed to conduct a competent penalty phase investigation (Ground Twenty-One);

(22)    Movant received ineffective assistance of counsel because counsel failed to competently prepare for and cross-examine the Government expert, Dr. Coons, at the penalty-phase of the trial (Ground Twenty-Two);

(23)    Movant received ineffective assistance of counsel when counsel failed to investigate and present expert evidence regarding Movant's risk of future violence (Ground Twenty-Three);

(24)    Movant received ineffective assistance of counsel when his counsel failed to investigate and present expert evidence of the ability of the federal prison system to control Movant's behavior (Ground Twenty-Four);

(25)    Movant received ineffective assistance of counsel when his counsel failed to investigate and present testimony of Movant's minimal risk of escape from a federal prison (Ground Twenty-Five);

(26)    the Government committed prosecutorial conduct by misrepresenting the conditions of Movant's confinement and potential for future dangerousness (Ground Twenty-Six);

(27)    Movant received ineffective assistance of counsel when his counsel failed to respond to the prosecutor's misleading evidence and arguments concerning his risk for future dangerousness (Ground Twenty-Seven);

(28)    Movant received ineffective assistance of counsel when his counsel failed to object to the prosecution's misleading evidence and arguments concerning his risk for future dangerousness and present readily available evidence contradicting the prosecution's case (Ground Twenty-Eight);

(29)    Movant's rights to a jury trial and reliable determination of punishment were violated when the trial court instructed the jury to continue deliberations after the jury informed the Court that they could not come to a unanimous decision (Ground Twenty-Nine);

(30)    Movant's rights to due process and a reliable determination of punishment were violated when the trial court required Movant to wear a stun belt during trial (Ground Thirty);

(31)    Movant's rights to counsel and a reliable determination of punishment were violated when the trial court failed to warn

9

Movant of the disadvantages of wearing a stun belt (Ground Thirty-One);

(32) Movant's right to be present at trial was violated by requiring him to wear a stun belt during the entire trial (Ground Thirty-Two);

(33) Movant received ineffective assistance of counsel because counsel failed to demand a hearing requiring the requirement that Movant wear a stun belt (Ground Thirty-Three);

(34) Movant's right to counsel during the penalty phase of the trial was violated by requiring Movant to wear stun belt (Ground Thirty-Four);

(35) Movant's right to a reliable sentence determination was violated by the requirement that Movant wear a stun belt (Ground Thirty-Five);

(36) Movant's right to self-representation was violated by the condition of his confinement during the course of his trial (Ground Thirty-Six);

(37) Movant's rights were violated by the increased security measures that were apparent to the jurors (Ground Thirty-Seven);

(38) Movant received ineffective assistance of counsel when counsel failed to explain to the jurors how the increased security measures, including the presence of the stun belt, altered Movant's demeanor (Ground Thirty-Eight);

(39) Movant's right to a reliable determination of punishment was violated when the United States Marshals increased security after the jury returned a guilty verdict (Ground Thirty-Nine);

(40) Movant's rights to a jury trial and a reliable determination of punishment were violated when the United States Marshals informed the jurors that they would escort them to their vehicles during the penalty phase (Ground Forty);

(41)   Movant's rights to be present and a reliable determination of punishment were violated when the trial court told the jurors to report any threats to the Court (Ground Forty-One);

(42)   the Federal Death Penalty Act ("FDPA") is unconstitutional because it fails to require comparative proportionality review (Ground Forty-Two);

(43)   Movant received ineffective assistance of appellate counsel when his appellate counsel failed to raise the issue on direct appeal that the FDPA is unconstitutional (Ground Forty-Three);

(44)   if the Constitution mandates comparative proportionality, Movant's death sentence must therefore be overturned as disproportionate (Ground Forty-Four);

(45)   Movant received ineffective assistance of appellate counsel when appellate counsel failed to raise the claim that the Constitution mandates comparative proportionality (Ground Forty-Five);

(46)   the cumulative effect of the errors in this case constitutes a violation of Movant's due process right and his right to be free of cruel and unusual punishment (Ground Forty-Six);

(47)   Movant re-asserts all issues raised on direct appeal (Ground Forty-Seven);

(48)   appellate counsel rendered ineffective assistance in multiple respects (Ground Forty-Eight); and

(49)   Movant is entitled to an evidentiary hearing (Ground Forty-Nine).

(Docs. 318 at 30-287).

## III.   DISCUSSION

### A.   Movant's Preliminary Motions

#### 1.   Sealed Motions

Movant has submitted the following sealed motions: (1) Sealed Motion to Authorize Funds for Psychologist (Doc. 287); (2) Sealed Motion for Ruling on Proposed Budget/Motions for Funds (Doc. 288); (3) Sealed Motion to Authorize Funds for Psychiatrist (Doc. 289); and (4) Sealed Motion for Authorization of Funds for Expert Assistance (Doc. 329). By Order entered on December 5, 2008, the Court addressed Movant's first three sealed motions when it considered whether Movant was entitled to the appointment of certain experts, limited the fees and expenses for such experts, and directed that Movant could appoint either a psychiatrist or psychologist, but not both. (Doc. 296). The Clerk, therefore, is directed to remove Movant's sealed motions (Docs. 287, 288, and 289) as pending matters in this case.

Movant now seeks the authorization of funds necessary to secure the services of a trauma expert. (Doc. 329). An indigent defendant like Movant is entitled to appointment of experts in order to prepare and substantiate claims under § 2255 only when there is some indication that such appointment is reasonably necessary. *See* 18 U.S.C. § 3599(f). The Court, however, has already authorized the appointment of either a psychologist or a psychiatrist but not both. (Doc. 296 at 1). The record reflect that Movant has submitted a detailed affidavit from Dr. George W. Woods, a licensed physician specializing in psychiatry and neuropsychiatry, who

examined Movant following his conviction in a federal prison. (Doc. 319, Ex. B). Dr. Woods provided extensive statements in his affidavit as to Movant's mental condition and his developmental background, including the potential impact of trauma on Movant's behavior. (*Id.*). The Court finds, therefore, that the appointment and authorization of funds for a separate trauma expert is not reasonably necessary. Movant's motion (Doc. 329), therefore, is denied.

### 2.    Motions for Extension of Time

Movant has filed two motions for extension of time in order to file a reply brief. (Docs. 321 and 322). Movant ultimately sought through August 23, 2010, to file his reply to the government's answer. (Doc. 322 at 1). Movant's unopposed motions (Docs. 321 and 322) are granted, *nunc pro tunc*, and his reply brief is deemed timely filed on August 23, 2010. (Doc. 331).

### 3.    Motion for Protective Order

Movant has filed a Motion for Protective Order to Preserve Evidence (Doc. 323). Specifically, Movant asks the Court to preserve all of the physical evidence seized in this case for possible forensic examination and DNA testing. (*Id.* at 1). The Government does not oppose this motion, but rather states that it "will retain all physical evidence that is in the Government's custody pursuant to office policy as it would in any criminal case when the appeal process is still ongoing." (Doc. 326 at 1). Even though a protective order appears to be unnecessary, the Court

nevertheless will grant Movant's Motion for Protective Order (Doc. 323) out of an abundance of caution in order to preserve all of the physical evidence in this case.

### 4.    Motions for Discovery

Movant has filed two motions related to discovery: (1) Motion for Discovery and Production of Scientific Examination and Possible DNA Testing (Doc. 327); and (2) Motion for Discovery (Doc. 330).  Movant is not entitled to discovery as a matter of ordinary course.  *See Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  In general, courts considering motion to vacate under § 2255 permit discovery only if "good cause" is shown. 28 U.S.C. foll. § 2255 Rule 6(a).[1]  A § 2255 movant seeking habeas relief demonstrates "good cause" for discovery under Rule 6(a) "where specific allegations before the curt show reason to believe that the [movant] may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908-09.

Movant seeks discovery with respect to the following matters pertaining to many of his grounds for relief: (1) his mental competency (Grounds One, Two, and Three); (2) the bench and chambers conferences conducted without Movant (Grounds Four, Five, Six, and Ten); (3) his preview of trial strategy (Ground Twelve); (4) his claim of actual innocence (Ground 15); (5) any exculpatory evidence

---

[1] Rule 6(a) of the Rules Governing § 2255 Cases provides that "[a] party shall be entitled to invoke the processes of discovery available . . . to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."

regarding  government witness Outley (Grounds Eighteen and Nineteen); (6) whether government witness DeLeon acted as a government agent (Ground Twenty); (7) counsel's failure to conduct a competent mitigation investigation (Ground Twenty-One); (8) counsel's failure to conduct a competent "future dangerousness" investigations (Ground Twenty-Two); (9) the stun belt and courtroom security (Grounds Thirty through Forty-One); and (10) the unconstitutionality of the Federal Death Penalty Act (Ground Forty-Two).  (Doc. 330 at 2-8).  Movant further seeks discovery in the form of complete access related to the body of the victim, Ms. Coleman, so that a retained expert can examine it for the presence of any biological or foreign materials that might be useful in identifying her killer.  (Doc. 327 at 3-8).

As discussed below, Movant is not entitled to § 2255 relief with respect to any of his claims for relief.  The Court finds that Movant has failed to provide sufficient specific allegations to demonstrate that any of his discovery requests will yield evidence to support any of his grounds for relief.   Furthermore, his requests for discovery are either too general, speculative, or overbroad to provide a sufficient basis to invoke the discovery process.   Many of Movant's discovery requests constitute nothing more than a fishing expedition based on conclusory and speculative allegations.   Rule 6, however, does not authorize such fishing expeditions.  *See Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994).  *See also Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003) (quoting *Stanford v. Parker*, 266

F.3d 442, 460 (6th Cir. 2001) (recognizing that [e]ven in a death penalty case, 'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring" a response to discovery). Accordingly, Movant's requests for discovery (Docs. 327 and 330) are denied.

Pursuant to 18 U.S.C. § 3600, Movant further moves for DNA testing following his expert's examination of any of the physical evidence seized from the crime scene in the event they uncover any biological or foreign materials. (Doc. 327 at 2, 8-10). Section 3600 sets forth ten elements that must be proven before a district court may order DNA testing. *See* 18 U.S.C. § 3600. Some of these required elements are as follows: (1) the case did not involve previous DNA testing or that there is newer, more effective DNA testing available (18 U.S.C.§ 3600(a)(3)); (2) "the specific evidence to be tested is in the possession of the Government and has been subject to a chain of custody and retained under conditions sufficient to ensure that such evidence has not been substituted, contaminated, tampered with, replaced, or altered in an any respect material to the proposed DNA testing" (18 U.S.C. § 3600(a)(4)); (3) the defendant must show that the evidence would establish a theory of the defense that is not inconsistent with an affirmative defense and would establish actual innocence of the defendant (18 U.S.C. § 3600(a)(6)); and (4) the DNA testing would raise a reasonable possibility that the defendant is actually innocent of the crime (18 U.S.C. § 3600(a)(8)).

Given the compelling evidence of guilt presented at trial, the Court does not conclude that any DNA testing would raise a reasonable probability of Movant's actual innocence with regard to the murder of Ms. Coleman.  Indeed, there is no requirement that Movant be linked to the murder through a positive DNA test on Ms. Coleman's body and the items seized at the crime scene.  Furthermore, even assuming that the outcome of any DNA test would be favorable to Movant, he has not established that such outcome would raise a reasonable probability of his actual innocence.  Movant's motion for DNA testing (Doc. 327), therefore, is without merit.

### B.    Applicable Legal Standards for a § 2255 Motion

After a defendant has been convicted and exhausted or waived any right to appeal, a court is normally "entitled to presume that the defendant stands fairly and finally convicted."  *United States v. Frady,* 456 U.S. 152, 164 (1982).  Accordingly, "[r]elief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice."  *United States v. Gaudet,* 81 F.3d 585, 589 (5th Cir.1996) (quoting *United States v. Segler,* 37 F.3d 1131, 1133 (5th Cir.1994)).  Typically, before a court will grant relief pursuant to § 2255, the movant must establish that "(1) his sentence was imposed in violation of the Constitution or laws of the United States, (2) the sentencing court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum

authorized by law, or (4) the sentence is otherwise subject to collateral attack."

*United States v. Seyfert,* 67 F.3d 544, 546 (5th Cir.1995) (internal citations omitted).

Furthermore, a collateral challenge to a conviction or sentence should not serve as a substitute for a direct appeal. *Frady,* 456 U.S. at 165; *United States v. Shaid,* 937 F.2d 228, 231 (5th Cir.1991). When raising issues of jurisdictional or constitutional magnitude after the petitioner has "defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Bousley v. United States,* 523 U.S. 614, 622 (1998) (citing *Murray v. Carrier,* 477 U.S. 478, 479 (1986); *Smith v. Murray,* 477 U.S. 527, 537 (1986)).[2] However, this procedural bar does not apply when the petitioner is seeking relief because of the alleged ineffective assistance of his counsel. *Massaro v. United States*, 538 U.S. 500, 504 (2003). Rather than require such claims to be made first on direct appeal, the "better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255." *Id.*

To prevail on an ineffective assistance of counsel claim, a petitioner must show that his counsel's performance was deficient and that the deficiency prejudiced

---

[2] This cause and actual prejudice test applies when the movant alleges a fundamental constitutional error, and when the default was the result of inadvertent attorney errors as well as deliberate tactical decisions. *Id.* The only exception is when a constitutional violation "has probably resulted in the conviction of one who is actually innocent." *Dugger v. Adams*, 489 U.S. 401, 412 n. 6 (1989) (quoting *Murray*, 477 U.S. at 496).

the defense.  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).   A movant must satisfy both prongs of the *Strickland* test.  *Id.*  Thus, when reviewing an ineffective-assistance-of-counsel claim, the court is not required to address both elements if the defendant does not make a sufficient showing on one.  *Id.* at 697.

Counsel's performance is deficient if it falls below an objective standard of reasonableness.  *Id.*  A court's review of counsel's performance must be highly deferential, with a strong presumption that the performance was reasonable.  *Id.* at 689; *Little v. Johnson,* 162 F.3d 855, 860 (5th Cir.1998).   A court will not find ineffective assistance of counsel merely because it disagrees with counsel's trial strategy.  *Crane v. Johnson,* 178 F.3d 309, 312 (5th Cir.1999).   Moreover, "[a] fair assessment of attorney performance requires every effort to be made to eliminate the distorting effects of hindsight."  *Strickland,* 466 U.S. at 689.

To demonstrate the prejudice prong, a petitioner must show "a reasonable probability that the result of the proceedings would have been different but for counsel's unprofessional errors."  *Crane,* 178 F.3d at 312.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland,* 466 U.S. at 694.  "However, the mere possibility of a different outcome is not sufficient to prevail on the prejudice prong. Rather, the defendant must demonstrate that the prejudice rendered sentencing 'fundamentally unfair or unreliable.'"  *Crane,* 178 F.3d at 312–313 (quoting *Ransom v. Johnson,* 126 F.3d 716, 721 (5th Cir.1997)).

C.     Analysis of Movant's Grounds for § 2255 Relief

        1.     Grounds One, Two, and Three

Movant claims in three related grounds that: Movant was incompetent to waive his right to counsel, in violation of the Fifth, Sixth, and Eighth Amendments (Ground One); Movant was denied his right to counsel and due process when the trial court conducted an inadequate hearing in response to Movant's competency to waive counsel (Ground Two); and Movant received ineffective assistance of counsel and was denied his right to a reliable sentence because counsel failed to conduct a sufficient investigation into Movant's competency (Ground Three).  Each of these claims is without merit as discussed below.

It is well-established that "due process prohibits the conviction of a person who is mentally incompetent."  *Bouchillon v. Collins*, 907 F.2d 589, 592 (5th Cir. 1990) (citing *Bishop v. United States*, 350 U.S. 961 (1956)).  "A criminal defendant may not be tried unless he is competent, and he may not waive his right to counsel or plead guilty unless he does so 'competently and intelligently.'"  *Godinez v. Moran*, 509 U.S. 389, 396 (1993) (citations omitted); *see also Carroll v. Beto*, 421 F.2d 1065, 1067 (5th Cir. 1970) (recognizing that a person who is mentally incompetent cannot waive this constitutional right by guilty plea or otherwise).

The test for incompetency is "whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of

20

the proceedings against him."  *Bouchillon*, 907 F.2d at 592 (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)).  This same standard applies when determining whether a defendant in a criminal case is competent to waive his right to counsel. *Indiana v. Edwards*, 554 U.S. 164, 172-73 (2008)*; Godinez*, 509 U.S. at 396-98.[3]

The Supreme Court in *Godinez* explained that "[t]he focus of a competency inquiry is the defendant's mental capacity" and that "the question is whether he has the ability to understand the proceedings."  *Godinez*, 509 U.S. at 401 n.12.  "As in any criminal case, a competency determination is necessary only when a court has reason to doubt the defendant's competence."  *Id.* at 402 n.13.  "There are 'no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed,' and the question of mental incompetence "is a difficult one in which a wide range of manifestations and subtle nuances are implicated.'"  *United States v. Flores-Martinez*, 677 F.3d 699, 706 (5th Cir. 2012) (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).  "Whether "a reasonable cause' exists to put the court on notice that the defendant might be mentally incompetent is left to the sound discretion of the district court."  *United States v. Davis*, 61 F.3d 291, 304 (5th Cir. 1995) (citation omitted).

---

[3] While the Supreme Court's decisions in *Godinez* and *Edwards* involved state court proceedings, these cases are equally applicable to federal criminal proceedings '[b]ecause both state and federal courts are bound to uphold the right to a fair trial."  *United States v. Berry*, 565 F.3d 385, 392 (7th Cir. 2009).

Movant has failed to establish a constitutional violation with respect to Movant's competency to waive counsel. On January 9, 2004, the Court conducted an extensive inquiry before the commencement of the trial to determine whether Movant's waiver of his right to counsel was made voluntarily and intelligently. (Trial Transcript ("TT"), Vol. 1 at 13-26). The Court explained in detail to Movant the consequences of proceeding *pro se* in the criminal trial. (*Id.* at 15). During the course of the Court's inquiry, Movant expressed his understanding regarding the charges in his case, including the fact he was charged with capital murder in Count 3. (*Id.* at 16). The Court further explained to Movant:

> I think I've told you before that in my opinion the old adage that a person who represents himself has a fool for a client, which simply means that it is virtually always the case that a person is better off having a trained lawyer, or in your case, lawyers, represent them, that in trying to represent themselves it's just generally unwise to try to do that and particularly when you're not trained in the law . . . . You're not familiar with the Rules of Evidence or the Rules of Procedure . . . . I think you're making a terrible mistake and I urge not to do that for your own benefit.
>
> On the other hand, you have the right to represent yourself if you wish. One other thing that is that if you proceed to represent yourself, then if after the trial starts you change your mind and realize you've created a very bad situation and you want to have your lawyers jump in and start representing you after all, then that's not a matter of right anymore. There's some pretty strict limitations on your being able to do that once a trial starts . . . . So my point is, if you decide at this point you're going to represent yourself and if you change your mind later on, you might or might not have your lawyers come back in and represent you, but if that happened, that would be the last time you'd have a chance to change your mind.

(*Id.* at 20-21). Movant expressed his understanding and informed the Court that he still wished to represent himself and that he was not coerced into doing so. (*Id.* at 21-24).

The record before the Court demonstrates that Movant waived his right to counsel intelligently and voluntarily. Movant's demeanor before the Court at the pretrial hearing and in previous hearings reflects that he had the ability to consult with his lawyer and the Court with a reasonable degree of rational understanding and that he had a rational understanding of the criminal proceedings against him. *See Edwards*, 554 U.S. at 172-73; *Godinez*, 509 U.S. at 396-98; *Bouchillon*, 907 F.2d at 592). *Pro se* court filings submitted by Movant during the course of the criminal proceedings also show that Movant rationally understood the criminal proceedings as he moved the Court to represent himself with access to a law library and for a change of venue. (Doc. 317, Exs. 1, 2, and 3). Based on Movant's observed demeanor during the Court proceedings and the filing of coherent pleadings with the Court, Movant was mentally competent to waive his right to counsel. Thus, there is no substantive due process violation with respect to his voluntary and intelligent waiver.

Movant vigorously argues that his procedural due process rights were violated because the Court failed to conduct an adequate hearing to determine whether Movant was in fact competent to waive counsel. (Doc. 318 at 35-36). "In determining whether the court should order a mental competency hearing, the court

must consider three factors: (1) the existence of a history of irrational behavior; (2) the defendant's demeanor at trial; and (3) prior medical opinion on competency." *United States v. Ruston*, 565 F.3d 892, 902 (5th Cir. 2009). "While all three factors are relevant to the determination, one standing alone may be sufficient to require a hearing." *Haden v. United States*, No. 3:09-CV-258-P, 2009 WL 4060982, at *2 (N.D. Tex. Nov. 24, 2009) (citing *Ruston*, 565 F.3d at 902).

At the pre-trial hearing following the Court's interview with Movant regarding waiving counsel, prosecutor Steven Lloyd Snyder expressed his concern that Movant had not been seen by a psychiatrist. (TT, Vol. 1 at 24). Mr. Snyder sought such an examination in anticipation of the defense's possible argument Movant had such diminished capacity that would have affected his ability to appreciate the wrongfulness of his conduct or make "a rational, intelligent decision." (*Id.* at 24-25). Robert T. Swanton, one of Movant's attorneys at the time of the pretrial hearing, expressed to the Court that he did not believe his client to be insane. (*Id.* at 26). Mr. Swanton communicated that Movant had been examined by a psychologist, Dr. Randy Price, who reported that Movant was not mentally retarded and, in fact, fairly bright. (*Id.* at 27). Mr. Swanton further stated that Movant had never given any indication "that he was incompetent in the sense that he doesn't understand what's going on." (*Id.*).

In light of the parties' arguments at the pretrial hearing, the Court ordered Movant to be examined by psychiatrist Dr. Stephen A. Mark. (*Id.* at 27-31). The

Court explained the situation to Movant regarding Mr. Mark's involvement and its

impact on the ultimate decision to determine whether Movant was mentally

incompetent to waive counsel:

> [Movant], I want you to understand that the lawyers and I have been talking about up here is their concern that while neither of them has any feeling or doubts whatsoever concerning your intelligence and your competence and your ability to make a decision voluntarily, that the record would be better if a psychiatrist had visited with you and could assure the Court he sees no evidence of any organic problems or any psychiatric difficulties whatsoever.

(*Id.* at 31).  Dr. Mark subsequently visited with Movant for thirty minutes and reported

to the Court as follows:

> I was able to visit with [Movant] this morning.  He asked that at least one of his current attorneys be present.  Mr. Swanton was present. [Movant] went through a standard interview for competency and current mental status.  He has had some history of depression in the past and maybe some now with his current situation, but it does not interfere with his competency.  He is not psychotic.  He is not organic.  He appeared able to think through questions and not distract.  He appeared able to make decisions adequately for himself.
>
> In terms of the specific question can he make the decision to represent himself and be competent, the answer is yes.  He is competent to do so.

(TT, Vol. 2 at 60-61).  The Court ultimately determined that Movant "voluntarily and

intelligently" chose to waive counsel and represent himself at trial.  (*Id.* at 67).  The

Court further appointed Mr. Swanton and J. Scott Peterson to act as standby

counsel.  (*Id.* at 69).

25

Based on a review of the record, the Court finds no procedural due process violation. As noted above, Movant's demeanor before the Court at the pretrial hearing and in previous hearings reflects that he had the ability to consult with his lawyers and the Court with a reasonable degree of rational understanding and that he had a rational understanding of the criminal proceedings against him. No evidence was presented before the Court to establish that Movant had a long history of psychotic behavior. Movant's own attorneys at the time of the pretrial hearing expressed no concern about Movant's competence to waive counsel and indicated that Movant had an understanding of the criminal proceedings. The Court further had the benefit of Dr. Price's examination, revealing Movant to be bright and having no mental disorder that precluded his competency to represent himself. (*See* Doc. 319, Ex. F). The Court, therefore, finds no sufficient doubt about Movant's competency existed to even require a pretrial hearing on competence.

Despite having no reasonable cause to question Movant's mental competence, the Court nevertheless ordered Movant to be examined by a psychiatrist. Mr. Swanton, who had interacted with Movant substantially in preparation for trial, opined that he would have been "very surprised if Dr. Mark came back with anything that would cause the Court concern." (TT, Vol. 1 at 28). Nevertheless, Movant contends that Dr. Mark's psychiatric examination was too cursory or short for the purposes of rendering an opinion as to Movant's mental competency. (Doc. 318 at 37-38).

Unlike a more complex inquiry into whether a defendant lacks the appropriate mental state at the time of the commission of the offense, the determination of mental competence to either stand trial or waive counsel "focuses on a limited aspect of a defendant's present mental condition." *See United States v. Taylor*, 437 F.2d 371, 378 (4th Cir. 1971). The Court finds that Dr. Marks's thirty-minute examination of Movant on the limited issue of competence – when coupled with Movant's observed demeanor at trial, his attorney's observation after extensive interactions with Movant, and Dr. Price's evaluation focusing on Movant's intelligence -- did not deprive Movant of his procedural due process rights as to the adequacy of the Court's inquiry into the competence issue. *Cf. McCollum v. Bush*, 344 F.2d 672, 673 (5th Cir. 1965) (concluding that a forty-minute interview by a psychologist performed during a lunch recess was inadequate with regard to determining whether the defendant was sane, especially in light of the fact the defendant was kept a mental hospital for treatment and observation for 89 days).

Movant further argues that the Court's inquiry into Movant's competence was unreliable and speculative in that it failed to consider evidence of Movant's prior medical diagnosis of mental disorders, psychiatric evaluations, incarcerations, and a long "record of an abuse-filled, traumatic life, or [Movant's] multigenerational family history of mental illness." (Doc. 318 at 38). Movant relies heavily on a declaration prepared by Dr. George W. Woods, a licensed physician specializing in psychiatry

27

and neuropsychiatry, who examined Movant following his conviction in a federal prison.  (Doc. 319, Ex. B).

After interviewing Movant and reviewing the trial transcripts and an extensive medical records, Dr. Woods concluded that Movant "suffers from significant mental dysfunction."  (*Id.* at 1).  Specifically, Dr. Woods opined that Movant suffered a variety of mental illnesses including Post-Traumatic Stress Disorder ("PTSD"), Bipolar Disorder as well as being "severely and chronically paranoid and grandiose."  (*Id.* at 1-2).  According to Dr. Woods, Movant's "paranoid ideation and impaired judgment, coupled with the rumination and hyperreactivity of his PTSD (and exacerbated by his conditions of confinement) fueled his decision to waive counsel which was the direct product of his co-morbid psychiatric illness compounding and creating poor decision making."  (*Id.* at 24).

Movant has submitted several of his inmate grievance forms prepared during his pretrial detention which he contends "clearly evidence paranoid ideation and delusional thinking" as well as hypersexuality.  (Doc. 318 at 42, Exs. 72, 74, 75, 76, 77, 78. 79, 80, 81, 82).  Additional prison records from Movant's stay in detention document Movant's hypersexuality and irritability.  (*Id.*, Exs. 105, 106, 107, 109, 111, 113, 114, 115).  Movant also argues that there were "numerous records available at the time indicating a long multigenerational history of mental illness in [Movant's] family."  (Doc. 318 at 47).  According to Movant, these records of Movant's genetic history "underscore the high probability of" that mental illness would become

manifest in Movant.  (See *eg. id.*, Exs. B, O, 37, 58-61, 98).  Finally, Movant documents for the Court his long history of trauma as supporting Dr. Woods' diagnosis of PTSD.  (Doc. 318 at 50, Exs. 14, 18, 19, 67, 69, 71, 83, 84, 85, 87, 88, 89, 90, 92, 94, 95, 96).

After careful review of the record, the Court has no doubt that Movant has a history of trauma in his life and suffered to some degree from mental illness before, during, and after his criminal proceeding.  However, the fact that Movant may be mentally ill in some capacity does not demonstrate incompetence to waive counsel. *See Rever v. Acevedo*, 590 F.3d 533, 538 (7th Cir. 2010).

As noted above, the question of mental competence to stand trial or waive counsel  "focuses on a limited aspect of a defendant's present mental condition." *Taylor*, 437 F.2d at 378.  At the time of trial, Movant was competent to waive counsel as he demonstrated a rational understanding of the proceedings and was able to converse with his counsel and the Court regarding his defense.  The Court had before it compelling evidence from Drs. Price and Mark that Movant was mentally competent to waive counsel.  While Movant has provided this Court with additional records detailing Movant's medical, genetic, and past traumatic history, he has failed to convince the Court that Movant's constitutional rights were violated in connection with his voluntary and intelligent decision to waive counsel.[4]

---

[4]   Despite presenting detailed arguments to the contrary, even Movant acknowledges at one point in his brief that he "appeared to have a rational and factual understanding of the [criminal] proceedings."  (Doc. 318 at 65).

Movant further claims that he received ineffective assistance of counsel and was denied his right to a reliable sentence because counsel failed to conduct a thorough investigation into Movant's competency. Movant argues that his counsel at the pretrial hearing failed to insist on a proper competency hearing. The Court, however, finds that his counsel's representation at this hearing was neither deficient nor prejudicial. Given counsel's extensive interaction with Movant and the opinions rendered by Drs. Price and Mark regarding Movant's intelligence and competence to waive counsel, the Court finds counsel's conduct to be reasonable as to the issue of competence. Moreover, in light of the Court's findings and conclusion discussed above, the Court finds that Movant was not prejudiced by counsel's failure to investigate further into Movant's mental competency.

In connection with his grounds challenging competency, Movant lastly argues that the Court failed to consider in a proper manner whether Movant was competent to represent himself at trial. (Doc. 318 at 57). Movant asserts that a more stringent standard applies when determining this competence issue as compared to determining whether Movant was mentally competent to waive counsel. (*Id.* at 57-61). Movant contends that he simply was not mentally competent to the extent that he was unable to carry out the basic tasks necessary to present his own case *pro se*. (*Id.* at 62-65).

"Even if a court is satisfied that a defendant is competent to stand trial and waive his right to counsel, it may nevertheless consider whether he possesses the

mental competency to represent himself." *Haden*, 2009 WL 4060982, at *4 (citing

*Edwards*, 554 U.S. at 171-73). As explained in *Edwards*, the competency issue

involving self-representation is a higher standard to the "minimal constitutional

requirement that measures a defendant's ability to stand trial" and waive his right to

counsel. *Id.* at 172. The higher standard explained in *Edwards* proceeds to

measure "the defendant's ability to conduct trial proceedings." *Id.* at 173.

On the issue of mental competency for self-representation, the *Edwards* Court

ultimately concluded:

> the Constitution permits judges to take realistic account of the particular
> defendant's mental capacities by asking whether a defendant who
> seeks to conduct his own defense at trial is mentally incompetent to do
> so. That is to say, the Constitution permits States to insist upon
> representation by counsel for those competent enough to stand trial
> under *Dusky* but who still suffer from severe mental illness to the point
> where they are not competent to conduct trial proceedings by
> themselves.

*Id.* at 177-78. Thus, while providing the trial court with discretionary authority to

consider the competency issue, *Edwards* did not require the trial court to *"sua sponte*

determine whether a defendant is competent to conduct trial proceedings on his

own." *Haden*, 2009 WL 4060982, at *5.

In sum, neither Movant's right to counsel nor his due process rights were

violated in connection with the trial court's determination at trial on the issue of

Movant's competency to waive counsel and represent himself. The Court further

concludes that no Eighth Amendment violation exists with respect to its competency

31

determination.  Accordingly, Movant is not entitled to § 2255 relief with respect to his claims in Grounds One, Two, and Three.

### 2. Grounds Four, Five, and Six

In three related grounds, Movant claims that: after the trial court approved Movant's request to waive counsel and represent himself, Movant's right to self-representation was violated in several material respects (Ground Four); Movant's rights to self-representation were violated when he was not permitted to participate in bench and chambers conferences (Ground Five); and Movant's right to be present at trial was violated when he was not permitted to participate in bench and chamber conferences (Ground Six).  Each of these claims is without merit as discussed below.

A defendant has a Sixth Amendment right to self-representation.  *Faretta v. California*, 422 U.S. 806, 836 (1975).  A trial court, nevertheless, may appoint "standby counsel" to assist the *pro se* defendant at trial.  *See Lefevre v. Cain*, 586 F.3d 349, 353 (5th Cir. 2009) (citing *McKaskle v. Wiggins*, 465 U.S. 168, 170 (1984)). The role of standby counsel is subject to certain limitations.  "Standby counsel may not interfere with a criminal defendant's right to represent himself, which encompasses the defendant's right 'to have his voice heard.'" *Shelton v. Thaler*, No. H-09-0500, 2009 WL 3735435, at *9 (S.D. Tex. Nov. 4, 2009) (quoting *McKaskle*, 465 U.S. at 174).  "The *pro se* defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to

participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial." *McKaskle*, 465 U.S. at 174.

In determining whether standby counsel's participation at trial interfered with the defendant's Sixth Amendment right to self-representation, the "primary focus must be on whether the defendant had a fair chance to present his case in his own way." *Id.* at 177.  To preserve a defendant's *Faretta* right, the Supreme Court has articulated the following two limitations on the extent of standby counsel's participation:

> First, the *pro se* defendant is entitled to preserve actual control over the case he chooses to present to the jury.  This is the core of the *Faretta* right.  if standby counsel's participation over the defendant's objection effectively allows counsel to make or substantially interfere with any significant tactical decision, or to control the questioning of witnesses, or to speak *instead* of the defendant on any matter of importance, the *Faretta* right is eroded.

> Second, participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself.

*Id.* at 178 (emphasis in original).  "A defendant's *Faretta* rights are not infringed when standby counsel assists the defendant in routine issues of procedure or courtroom protocol because doing so does not interfere with the defendant's actual control of the case." *Lefevre*, 586 F.3d at 354 (citing *McKaskle*, 465 U.S. at 183).

"When a defendant's right to represent himself has been violated, he is entitled to a reversal even if he cannot show prejudice." *United States v. Mills*, 895 F.2d 897, 902 (2d Cir. 1990) (citing *Flanagan v. United States*, 465 U.S. 259, 268

(1984)). "Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to 'harmless error' analysis. The right is either respected or denied; its deprivation cannot be harmless." *McKaskle*, 465 U.S. at 177 n.8.

Movant essentially asserts in Grounds Four, Five, and Six that he was unconstitutionally excluded from all bench and chambers conferences during the course of the trial after he invoked his right to representing himself. (Doc. 318 at 69). His claims focus primarily on the violation of his Sixth Amendment right to self-representation. (*Id.* at 72-92). The Court first will analyze two circuit court cases that Movant cites in support of his claims, *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) and *United States v. McDermott*, 64 F.3d 1448 (10th Cir. 1995).

In *Frantz*, the habeas petitioner, Karl Adolph Frantz, waived his right to counsel and chose to represent himself." *Frantz*, 533 F.3d at 728. The trial court appointed attorney Paul Bates to act as "advisory counsel." *Id.* Subsequently, attorney Raymond Lamb replaced Bates as advisory counsel. *Id.* "At trial, Frantz was limited to questioning witnesses from behind the defense table" and "was required to wear a leg brace." *Id.* The Ninth Circuit recites that Lamb and the prosecutor attended a chambers conference during jury deliberations while Frantz was in custody at some other location. *Id.* at 731.

The Ninth Circuit concluded that "Lamb's solo participation in the chambers conference was not constitutional simply because the record contains no objection

by Frantz." *Id.* at 744. As articulated by the Ninth Circuit, "[w]hen standby counsel is appointed only to advise, the initial invocation of the right to self-representation is generally sufficient to establish that any participation by standby counsel other than for routine matters mentioned in *McKaskle* is 'over the defendant's objection." *Id.* (citations omitted). The Ninth Circuit further acknowledged that Frantz had no opportunity to object to Lamb's solo participation as he was elsewhere during the chambers conference, so implied consent to Lamb's actions cannot likely be inferred. *Id.* This circuit court held, therefore, that Frantz's exclusion from the chambers conference was unconstitutional. *Id.*

In *McDermott*, the federal district court granted David Bruce McDermott's request to represent himself and appointed Stuart Southerland as standby counsel. *McDermott*, 64 F.3d at 1451. "[A]fter the government objected to Mr. McDermott's full participation, the court ruled that he would not be allowed to participate in bench conferences, the jury instruction conference, or 'the purely legal matters' of the case." *Id.* at 1451-52. The district court provided no other reason for excluding McDermott from bench conferences, "including such matters as security considerations or any suggestion that Mr. McDermott would not abide by the necessary procedures or protocol of the court." *Id.* at 1452. McDermott objected on the record to the district court's ruling as to participation in the bench conferences. *Id.* at 1451. During the course of a six-day trial, McDermott was barred from participating in thirty bench conferences. *Id.* at 1452.

On appeal to the Tenth Circuit, McDermott contended that the district court violated his *Faretta* right to self-representation by barring his participation in the various bench conferences. *Id.* at 1452. Despite the district court's ruling as to the bench conferences, the Tenth Circuit recognized that the concept of preserving the jury's perception of the defendant was representing himself "was not violated in the context of McDermott's whole trial." *Id.* at 1454. Nevertheless, the Tenth Circuit concluded "we cannot say that McDermott's exclusion, over his objection, from thirty bench conferences during a six-day trial was an insignificant incursion on his *Faretta* right." *Id.* The circuit court, therefore, granted McDermott a new trial, explaining that a "harmless error analysis does not apply to the Sixth Amendment right in question." *Id.*

The Fifth Circuit in *Lefevre* analyzed both *Frantz* and *McDermott* when considering a case raising similar Sixth Amendment issues relating to the right to self representation. *Lefevre*, 586 F.3d at 354-58. Both Movant and the government cite *Lefevre* in support of their respective arguments. (Doc. 317 at 16-20; Doc. 318 at 76-79).

In *Lefevre*, the state court allowed David Lefevre to represent himself at trial, appointing attorney John E. Benz to act as standby counsel. *Lefevre*, 586 F.3d at 350. The state judge denied Lefevre's motion to remove his leg shackles during the course of the trial in which he was ultimately convicted on all charges. *Id.* In his federal habeas petition, Lefevre claimed that "the shackles prevented him from

participating in bench conferences because he could not approach the bench without exposing them to the jury, and he did not think he would be able to step up to the platform on which the bench was located with his ankles restrained." *Id.* at 352. The district court agreed with Lefevre on this claim, finding that the shackles violated his right to self-representation in that they prevented him from attending bench conferences and moving freely about the courtroom during trial. *Id.* at 350, 352.

On appeal, the Fifth Circuit analyzed the circuit court decisions in *Frantz* and *McDermott* when considering whether "his shackling prevented his attendance at bench conferences during his trial" and, therefore, violated his *Faretta* right to represent himself." *Id.* at 354-58. In distinguishing *Frantz*, the Fifth Circuit explained that the petitioner in that case "had no opportunity to object and may not have had a choice in whether to attend" the chambers conference at issue." *Id.* at 355. Conversely, according to the Fifth Circuit, Lefevre's absence from the bench conferences at issue was not involuntary because he "was present at the time the bench conferences took place, . . . knew that the bench conferences were occurring without his participation," and had "the opportunity to object to Benz's participation in the conferences in his stead." *Id.* The Fifth Circuit indicated that *McDermott* was distinguishable because "the defendant's involuntary exclusion from the [thirty bench] conferences was because the court had ruled, *over the defendant's objection*, that the defendant would not be permitted to be present at bench

conferences." *Id.* at 356 (emphasis in original).  The Fifth Circuit summarized its

conclusions on this issue as follows:

> Lefevre was in a different position.  While Lefevre objected to his shackling and had a right to be tried without visible restraints, Lefevre never objected to Benz's participation in the bench conferences on his behalf, moved to approach the bench himself, or requested to have the jury removed to argue an objection.  Unlike the trial court in *McDermott*, Lefevre's trial court never ruled that Lefevre could not participate in the bench conferences.  Also, unlike the defendant in *Frantz*, Lefevre was present in the courtroom during the bench conferences and had an opportunity to object to his absence from the conferences, either at the time of the conference or after the jury was removed from the courtroom.  Had Lefevre objected, the court might have accommodated his request to participate in the bench conferences by removing the jury from the courtroom and then allowing Lefevre to argue his objections.
>
> In the absence of an objection, the trial court had no way of knowing that Lefevre was unhappy with Benz's participation in the bench conferences on his behalf.  After the first bench conference, outside the presence of the jury, the judge asked Lefevre if he wanted to reconsider representing himself.  Lefevre replied that he did not want to give up his right to speak totally, and he inquired whether Benz could "play a bigger role."  While Lefevre did not waive his right to self-representation during this conversation, he also did not indicate that he was unhappy with Benz's participation on his behalf, and in fact suggested that he would like Benz to play a larger role.

*Id.* at 356-57.  The Fifth Circuit held, therefore, that "Lefevre acquiesced to Benz's

participation in the bench conferences and thus waived his right to self-

representation at the conferences."  *Id.* at 357.  The Fifth Circuit further held that

Lefevre's shackling did not violate his right to self-representation by destroying or

undermining the jury's perception of him as his own lawyer.  *Id.* at 357-58.

In the instant case, Movant contends that he was prevented from participating in numerous bench conferences (most of which were conducted in the presence of the jury) during the course of the six days of testimony in the guilt phase portion of the trial. (Doc. 318 at 74). At the beginning of the trial, the Court appointed Mr. Peterson and Mr. Swanton as standby counsel after Movant was allowed to waive counsel and represent himself at trial. (TT, Vol. 2 at 67-69). The Court stated as follows:

> Absolutely you're appointed as standby counsel. The question becomes what the jury is told about that situation. Standby counsel to me it seems by definition includes counsel who are standing by in case the defendant elects to be represented by attorneys at a later stage of the trial, and I intend to tell them that. I intend to tell them that until that happens. Then your role is to advise [Movant] on any legal matters he questions you about, that you are in essence his legal reference material since he's not a lawyer and doesn't have a library there at his disposal at counsel table. On the other hand, that it's not your job to represent himself through him, that you're allowed to sit there at the counsel table so you're readily available to answer any questions he has. Obviously anything he says to you or you to him is completely confidential. So no one is going to know to what extent these normal procedures are being followed, but what I think is important is that the appearance before the jury is that [Movant] is representing himself. He will have to make any statements made to the Court. He will have to question any witnesses that are made.

(TT, Vol. II at 70). During voir dire, the Court reiterated the importance that the jury must be left with the impression Movant is representing himself. (TT, Vol. V at 638). Specifically, the Court expressed its concern about a hybrid representation situation. (*Id.* at 639). The Court proceeded to authorize standby counsel to argue motions and take up matters outside the presence of the jury as long as the record was

"absolutely clear" that Movant chose to have stand by counsel do so and that counsel proceeded in a manner approved by Movant. (*Id.* at 644).

After voir dire and before opening statements, the Court considered matters involving security measures and the role of the parties in bench conferences. (TT, Vol. 9 at 1164-66). With regard to security concerns about Movant moving around the court room, the Court ruled that the parties would give their opening and closing arguments while standing, that both Movant and the prosecutors would question witnesses from the tables where they sit, and that the law clerk would assist in connection with the presentation of evidence. (*Id.* at 1165). The Court further ruled:

> Any of the bench conferences in which [Movant] has to be involved will have to be done outside the presence of the jury and [the Court] will certainly insist that to the extent possible that be done before the jury comes in the morning or in the afternoon or after a recess or after the jury's left in any of those instances. And if there must be a bench conference that would interfere and require [the Court] to excuse the jury, I would certainly hope that [Movant] would authorize his attorneys to speak for him in whatever manner – whatever manner needs to be discussed, and after we have the bench conference, the attorneys could go back and report to him what just took place and come back again if that was not satisfactory, if additional matters needed to be talked about or additional arguments made.

(*Id.* at 1166).

 The various bench conferences referenced by Movant are summarized as follows:

(1)   Mr. Swanton asked to approach the bench to discuss the issue of invoking the rule of sequestration with respect to certain witnesses. The Court addressed this matter outside of the presence of the jury. (TT, Vol. 11 at 1552-53).

(2)    Movant objected to a question by the prosecutor regarding a purported statement made by Movant.  The Court conducted a bench conference in the jury's presence, at which the objection was sustained.  (TT, Vol. 11 at 1560-61).

(3)    Mr. Snyder sought a bench conference to discuss a matter involving a motion under Federal Rule of Evidence 404(b).  A bench conference ensued in the presence of the jury.  The record reflects that Mr. Peterson participated in the conference at Movant's request and then, following the bench conference, conferred with Movant before the prosecutor continued his examination.  (TT, Vol. 11 at 1583-85).

(4)    Mr. Snyder objected to the form of one of Movant's questions.  A bench conference ensued in the jury's presence, at which Mr. Peterson argued on Movant's behalf.  The Court instructed Mr. Peterson how Movant could ask his particular question.  Movant then asked the witness whether she had worked at a particular club.  Mr. Snyder again objected.  Another bench conference was held at which Movant's standby counsel participated.  Mr. Swanton lodged an objection during the second bench conference regarding the manner in which the prosecutor had been objecting to Movant's questions.  (TT, Vol. 11 at 1614-16).

(5)    Mr. Snyder objected to Movant's questions on the grounds of hearsay.  The Court sustained the questions and asked for a bench conference in the jury's presence.  The Court instructed Mr. Swanton to explain to Movant that hearsay is not admissible except under limited circumstances.  The record reflects that Mr. Swanton conferred with Movant.  (TT, Vol. 11 at 1648-49).

(6)    Mr. Snyder challenged Movant's cross-examination of government witness Edward Outley as being undertaken in bad faith.  The Court conducted a bench conference in the jury's presence, at which standby counsel participated.  The Court ruled that Movant's particular question to Mr. Outley was improper and instructed standby counsel to discuss this ruling with Movant.  The record reflects that Mr. Peterson conferred with Movant.  (TT, Vol. 12 at 1850-52).

(7)     in the presence of the jury, Movant asked if his "advisory counsel [could] approach the bench."  The Court conducted a bench conference in the jury's presence regarding the fact that several of Movant's witnesses were not available to testify at that moment. Mr. Swanton informed the Court that Movant had not indicated an intent to testify on his own behalf.  The Court instructed that all of Movant's witnesses should be present by 9:00 a.m. the next morning.  (TT, Vol. 12 at 1913-16).

(8)     the Court cautioned Movant that it would cut short his cross examination because Movant's questions were improper.  After Movant conferred with Mr. Swanton, the Court conducted a bench conference in the presence of the jury.  The Court expressed its displeasure at Movant's "five-second sighs."  The record reflects that Mr. Swanton conferred with Movant following this bench conference.  (TT, Vol. 11 at 1652-53).

(9)     Mr. Peterson asked the Court if advisory counsel could approach the bench.  The Court conducted a bench conference in the jury's presence, at which Mr. Peterson complained about Mr. Snyder making repeated objections, making side-bar comments, and asking improper questions during direct examination.  The record reflects that Mr. Swanton conferred with Movant following this bench conference.  (TT, Vol. 12 at 1855-56).

In addition, Movant complains about his exclusion from all chambers conferences, citing two particular such conferences which were held off the record. (Doc. 318 at 79).  The first chambers conference pertained to addressing Movant's ability to move around the courtroom.  (TT, Vol. 9 at 1164).  The second chambers conference addressed the perception of hybrid representation to the jury and how to determine the proper role of standby counsel.  (TT, Vol. 11 at 1636).  During the course of the trial and out of the jury's presence, the Court referred to this chamber conference when it remarked that "[t]he perception of hybrid representation in this

case is getting completely out of hand." (*Id.*).  Despite the Court's plea for Movant

to proceed with counsel, Movant continued to represent himself.  (*Id.* at 1638).

Upon careful review of the record and the relevant case law, the Court

concludes that Movant's Sixth Amendment right to self-representation was not

violated in connection with standby counsel's participation in bench and chambers

conferences.  At the outset, it is important to note that "[t]rial courts must make

difficult 'judgment calls' when trying to reconcile the role of standby counsel with a

defendant's desire to represent himself." *Fields*, 483 F.3d at 361 (citing *McKaskle*,

465 U.S. at 177 n.8).  The Tenth Circuit in *McDermott* additionally noted that "the

cases become fact specific" when considering issues related to a defendant's

*Faretta* rights.  *See McDermott*, 64 F.3d at 1454.

The Court finds that the factual scenario presented in the instant case is more

analogous to the fact pattern discussed in *Lefevre* as opposed to the fact patterns

analyzed in *Frantz* and *McDermott*.  Contrary to *Frantz*, Movant was present at all

times during the conferences at issue.  In a manner similar to the defendant in

*Lefevre*, Movant never objected to either the Court's instructions relating to his

participation in bench conferences or standby counsel's participatory role in the

various bench and chambers conferences.  Indeed, assuming the Court expressly

43

excluded Movant from participating in any bench or chambers conference, the Court finds no evidence that he objected in open court to such exclusion.[5]

The record reflects that Movant never objected at any point to standby counsel's participation in the cited bench and chamber's conferences. Movant was present at all times, and the Court certainly would have entertained any objection lodged by Movant on this issue regarding Movant's lack of participation in the bench conferences. In distinguishing this case from the fact pattern in *McDermott*, Movant faced potential exclusion from bench and chambers conferences not because of his lack of legal training, but rather because of the need for security measures and the Court's attempt to avoid skewing the jury's perspective.

The Court overall finds nothing in connection with the bench and chambers conferences that would have destroyed the jury's perception that Movant was in charge of his representation. With respect to the bench conference involving the 404(b) motion, the record reflects that Mr. Peterson participated in the conference at Movant's request and then, following the bench conference, conferred with Movant before the prosecutor continued his examination. (TT, Vol. 11 at 1584). In another instance, Movant expressly advised standby counsel to approach the bench to discuss the issue pertaining to the availability of several of Movant's witnesses.

---

[5] Contrary to Movant's arguments, the Court finds no instance in the trial transcript where it expressly forbade Movant from participating in bench conferences. Rather, the Court expressed its "hope that [Movant] would authorize his attorneys to speak for him in whatever manner." (*See* TT, Vol. 9 at 1166).

(TT, Vol. 12 at 1913-16). The record reflects that standby counsel and Movant often conferred following many of the cited bench conferences. At no point did Movant expressly object to any aspect of standby counsel's role in the bench and chambers conferences.

Furthermore, with respect to other important aspects of the trial, the record reflects that Movant was in charge of his representation and did not give up control to standby counsel. Movant conducted voir dire questions, argued against the empaneling of certain jurors, presented opening and closing arguments, questioned witnesses both directly and in cross-examination, and voiced objections at various points during witness testimony.

Following the Fifth Circuit's reasoning in *Lefevre*, the Court similarly finds that Movant acquiesced to standby counsel's participation in the various bench and chambers conferences identified. In light of Movant's overall control of his defense, the Court finds that standby counsel's participation in the bench and chambers conferences falls well short of eroding Movant's Sixth Amendment right to self-representation. *See Lefevre*, 586 F.3d at 356-57. *See also Mills*, 895 F.2d at 904-95 (finding no violation of defendant's Sixth Amendment right to self-representation in the context of the trial as a whole when the defendant was excluded from sidebar conferences at which standby counsel participated).

The Court finds no constitutional violation with respect to Movant and standby counsel's respective roles in the bench and chambers conferences. Before trial,

reasonable concerns were expressed regarding Movant's ability to move freely around the courtroom. (TT, Vol. 9 at 1164-65). The Court's legitimate security concerns regarding Movant and its subsequent restrictions on his movement around the courtroom did not violate the constitutional rights attached to his interest in representing himself. *See Martinez v. Court of Appeal of California*, 528 U.S. 152, 162 (2000) (explaining that "the government's interest in ensuring the integrity and efficiency of trial at times outweighs the defendant's interest in acting as his own lawyer"). Movant has failed to demonstrate a violation of either his right to self-representation or a fair trial in connection with his claims in Grounds Four, Five, and Six. Accordingly, Movant is not entitled to § 2255 relief as to these claims.

### 3.    Ground Seven

Movant asserts in Ground Seven that he received ineffective assistance of appellate counsel when appellate counsel failed to raise on direct appeal the Sixth Amendment claim based on Movant's exclusion from bench and chambers conferences. The Constitution guarantees a criminal defendant the effective assistance of counsel on appeal. *Evitts v. Lucey,* 469 U.S. 387, 396 (1985). Whether appellate counsel has been ineffective is also determined by using the standard enunciated in *Strickland*. Under *Strickland,* petitioner must show a reasonable probability that but for his counsel's deficient representation, he would have prevailed on his appeal. *Briseno v. Cockrell,* 274 F.3d 204, 207 (5th Cir.2001).

46

To render effective assistance of counsel, appellate counsel need not raise every non-frivolous issue on appeal. *United States v. Williamson,* 183 F.3d 458, 462 (5th Cir.1999).  "Instead, to be deficient, the decision not to raise an issue must fall 'below an objective standard of reasonableness.'" *United States v. Phillips,* 210 F.3d 345, 348 (5th Cir.2000) (quoting *Strickland,* 466 U.S. at 688).  "[A] reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful.  Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *Williamson,* 183 F.3d at 462–63 (footnote and citations omitted). To determine whether appellate counsel was deficient, courts must consider whether the challenge "would have been sufficiently meritorious such that [counsel] should have raised it on appeal." *Phillips,* 210 F.3d at 348.

On appeal, Movant's counsel raised numerous issues that did not include any challenge to Movant's right to self-representation.  As discussed above, the Court has rejected on the merits Movant's constitutional claims based on his exclusion from various bench and chambers conferences.  Petitioner has failed to show that appellate counsel's conduct on appeal was deficient or prejudicial in that he had no obligation to raise meritless claims on appeal.  *See United States v. Reinhart*, 357 F.3d 521, 530 (5th Cir. 2004); *Phillips*, 210 F.3d at 348-50.  Accordingly, Movant is not entitled to relief with respect to his claim in Ground Seven.

47

### 4.    Grounds Eight and Nine

In two related grounds, Movant claims that: his constitutional rights were violated when standby counsel failed to use a peremptory challenge against a juror Movant sought to strike (Ground Eight); and his rights to a fair and impartial jury were violated when one of his peremptory challenges were not exercised (Ground Nine).  Each of these claims is without merit.

As discussed above, a defendant has a Sixth Amendment right to self-representation. *Faretta*, 422 U.S. at 836.  While standby counsel may be appointed to assist the *pro se* defendant, such counsel may not interfere with the defendant's *Faretta* right. *McKaskle*, 465 U.S. at 174; *Lefevre*, 586 F.3d at 353.  In determining whether standby counsel's participation at trial interfered with the defendant's Sixth Amendment right to self-representation, the "primary focus must be on whether the defendant had a fair chance to present his case in his own way." *McKaskle*, 465 U.S. at 177.  Violations of a Sixth Amendment right to self-representation are *per se* prejudicial.  *McKaskle*, 465 U.S. at 177 n.8.

Furthermore, the Supreme Court recognizes that voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment rights to an impartial jury will be honored." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).  The right to exercise peremptory challenges is "one of the most important rights secured to the accused." *Swain v. Alabama*, 380 U.S. 202, 219 (1965) (internal quotations and citation omitted), *overruled on other grounds Batson v.*

*Kentucky*, 476 U.S. 79 (1986).  "[T]he denial or impairment of the right to exercise peremptory challenges is reversible without a showing of prejudice."  *Knox v. Collins*, 928 F.2d 657, 661 (5th Cir. 1991) (citing *Swain*, 380 U.S. at 219).

Movant's asserts that his Sixth Amendment right to self-representation was violated based on standby counsel's misuse of a peremptory challenge against juror Jimmy D. Ansay.  (Doc. 318 at 96-98).  Movant contends that his standby counsel rejected his specific request to exercise a strike against Mr. Ansay and, therefore, effectively took control over an important tactical decision regarding jury selection. (*Id.* at 95-100).  Mr. Ansay ultimately served on the jury and voted to convict Movant and recommend sentencing him to death.

Upon careful review of the record, the Court concludes that Movant's Sixth Amendment right to self-representation was not violated in connection with his use of peremptory challenges. The record reflects that the Court conducted an individual voir dire examination of Mr. Ansay.  (TT, Vol. 3 at 242-50).  At the conclusion of the Court's examination, neither the prosecutor not Movant indicated any objection or filed a motion with respect to Mr. Ansay.  Movant later signed a document entitled "Defendant's Peremptory Challenges." (Doc. 317, Ex. 6).  The list does not include Mr. Ansay as one of Movant's peremptory strikes.  (*Id.*).

The record reflects that Movant never objected in Court to the impaneling of Mr. Ansay onto the jury.  While Movant and standby counsel may have disagreed about whether to use a peremptory strike against Mr. Ansay, Movant's signature on

49

the peremptory challenges list is compelling evidence that Movant acted as the final decision maker in not striking Mr. Ansay. The fact Movant may have followed standby counsel's advice not to strike Mr. Ansay does not mean that Movant gave up tactical control on this particular issue. Moreover, even if standby counsel effectively controlled the decision not to strike Mr. Ansay, the Court concludes that Movant acquiesced to standby counsel's participation and, therefore, waived his Sixth Amendment right to self-representation on this issue. *Lefevre*, 586 F.3d at 357.[6]

The Court finds no constitutional violation with respect to Movant and standby counsel's respective roles in the ultimate decision not to use a peremptory challenge against Mr. Ansay. Movant cannot claim that Mr. Ansay was wrongfully impaneled on the jury, especially since Movant himself signed the peremptory challenges list. Movant has failed to establish that he was deprived of a fair trial by a panel of impartial jurors or that his right to exercise peremptory challenges was unconstitutionally denied or otherwise impaired. *See Knox*, 928 F.2d at 661. *See also United States v. Webster*, 162 F.3d 308, 342 n.36 (5th Cir. 1998) (recognizing that challenges to the exercise of peremptory challenges rises to a constitutional violation only where an incompetent juror is forced upon the defendant).

---

[6] Movant allowed standby counsel to make *Batson* challenges. (TT, Vol 9 at 1152-53). The record as a whole reflects Movant's acquiescence to standby counsel's participation in certain aspects of the jury selection process. Movant never objected to standby counsel's participation, and any claimed violation of his right to self-representation is waived.

Accordingly, Movant is not entitled to § 2255 relief as to his claims in Grounds Eight and Nine.

### 5.    Grounds Ten and Eleven

In two related grounds, Movant claims that: his rights to be present at all critical stages of the trial were violated when he was excluded from the chamber conference to discuss the trial court's response to a jury note (Ground Ten); and he received ineffective assistance of counsel because counsel failed to object to his exclusion from the chamber conference to discuss the trial court's response to the jury note (Ground Eleven).  Each of these claims is without merit.

A defendant in a criminal proceeding is entitled "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta,* 422 U.S. at 819–20 n. 15 (1975).  *See also Rushen v. Spain,* 464 U.S. 114, 117–18 (1983) (explaining that he right to personal presence at all critical stages of the trial is a "fundamental right[ ] of each criminal defendant").  This right is rooted in both the Sixth Amendment Confrontation Clause and the Due Process Clause. *United States v. Gagnon,* 470 U.S. 522, 526 (1985).  *See also Illinois v. Allen,* 397 U.S. 337, 338 (1970) (recognizing that "[o]ne of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial"); *Snyder v. Massachusetts,* 291 U.S. 97, 107–08 (concluding that "the presence of a defendant is a condition of due process to the extent that a fair

and just hearing would be thwarted by his absence"), *overruled in part on other grounds by Malloy v. Hogan,* 378 U.S. 1 (1964).

The right to be present is not absolute and is triggered only when the defendant's "presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder,* 291 U.S. at 105–06. In analyzing a criminal defendant's right to be present, the Supreme Court has emphasized that the right "is guaranteed ... if [the defendant's] presence would contribute to the fairness of the procedure," but that the right "is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *Kentucky v. Stincer,* 482 U.S. 730, 745 (1987) (quoting *Snyder,* 291 U.S. at 106–07).

A defendant's exclusion from any aspect of the trial "should be considered in light of the whole record." *Gagnon,* 470 U.S. at 526–27 (citing *Snyder,* 291 U.S. at 115). Where nothing in the record indicates that the defendant's absence compromised the fundamental fairness of the trial proceedings, no violation of the right to be present has occurred. *See Stincer,* 482 U.S. at 36–47 (rejecting challenge to defendant's exclusion, over objection, from witness competency hearing); *Gagnon,* 470 U.S. at 527 (rejecting challenge to defendant's exclusion, without objection, from *in camera* discussion between trial judge and juror); *Snyder,* 291 U.S. at 106–22 (rejecting challenge to defendant's exclusion, over objection, from jury inspection of crime scene).

After the jury found Movant guilty on all counts in the guilt phase of the trial, Movant expressly and unequivocally waived his right to self-representation and elected to have Mr. Swanton and Mr. Peterson represent him in the penalty phase of the trial.   (TT, Vol. 14 at 2048-49).   During their deliberation as to Movant's punishment, the jury sent the Court a note indicating that they were deadlocked on whether Movant should be sentenced to death.  (TT, Vol. 18 at 2547).  The Court expressed its initial opinion that there was nothing the Court could do other than to accept the jury's statement but that it would be "happy to entertain any argument to the contrary."  (*Id.*).  Mr. Snyder reminded the Court that the jury had only been deliberating for six hours.  (*Id.* at 2548).  The Court then conducted and off-the record chambers conference with Movant's counsel and the government's counsel. (*Id.*).  Movant was not present at the conference.  The trial transcript does not reflect any objection by Movant or his counsel to his exclusion from the chambers conference.  (*Id.*).  After the chambers conference, the Court directed the jury to continue its deliberations and overrule Movant's objections to the instruction.  (*Id.* at 2548-50).

Movant contends that his exclusion from the chambers conference violated his Fifth and Sixth Amendment rights to be present at this critical stage in the proceeding. (Doc. 318 at 107-08). The Court disagrees. The only matter discussed in the conference involved the Court's response as to whether the jury was in fact deadlocked in its penalty deliberations.   Movant's presence in the chambers

conference would not have contributed to his defense in connection with the resolution of this purely legal matter.  Movant also presents no argument to suggest that the Court's instruction to continue its deliberations was somehow improper.[7] The Court finds, therefore, that Movant's absence from the chambers conference neither compromised nor otherwise frustrated the fundamental fairness of the trial proceedings.  *See Kentucky,* 482 U.S. at 745; *Snyder,* 291 U.S. at 106–07.

Furthermore, Movant cannot establish that his counsel rendered ineffective assistance under the *Strickland* standard in failing to object to Movant's exclusion from the chambers conference at issue.  Counsel did not render deficient performance on this issue as it is clear Movant's participation in the chambers conference would not have contributed to the purely legal matter being discussed. Movant also fails to show how his inclusion in the chambers conference would have led to a different outcome in the jury's deliberation.  Because Movant cannot establish an underlying constitutional violation or ineffective assistance of counsel, Movant is not entitled to § 2255 relief as to his claims in Grounds Ten and Eleven.

---

[7] Any issue surrounding the Court's specific charge to continue deliberations was resolved on direct appeal by the Fifth Circuit.  Movant argued on direct appeal that this instruction to the jury "impermissibly coerced a verdict of death." *Fields*, 483 F.3d at 338.  The Fifth Circuit ruled that the Court's *Allen* charge was not unfairly prejudicial or coercive and that the Court, therefore, did not abuse its discretion in issuing such a charge to the jury.  *Id.* at 338-40.

### 6.    Grounds Twelve and Thirteen

In two related grounds, Movant claims that: his rights under the Fifth, Sixth, and Eighth Amendment were violated when he was required to reveal his trial strategy by doing his cross-examination of a critical government witness without requiring reciprocal disclosure of the prosecution's trial strategy (Ground Twelve); and he received ineffective assistance of appellate counsel because appellate counsel failed to raise on appeal the issue of Movant being required to reveal his trial strategy pertaining to his cross-examination of a critical government witness without requiring reciprocal disclosure of the prosecution's trial strategy (Ground Thirteen). Each of these claims is without merit.

The Confrontation Clause of the Sixth Amendment guarantees a defendant's right to cross-examine his accusers. *United States v. Jimenez,* 464 F.3d, 555, 559 (5th Cir. 2006). This right, however, is not unlimited. *Id. See also United States v. Friedman*, 658 F.3d 342, 356 (3d Cir. 2011) (explaining that "the Confrontation Clause does not grant unfettered rights to cross-examine witnesses"). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (citation and internal quotations omitted) (emphasis in original).

The district court has discretion to place reasonable limits on "a criminal defendant's right to cross-examine a witness based on concerns about, among other

55

things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *United States v. Hitt*, 473 F.3d 146, 156 (5th Cir. 2006) (citations and internal quotations omitted). Indeed, pursuant to Federal Rule of Evidence 611(a):

> The Court shall exercise reasonable control over the mode and order of interrogation witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth; (2) avoid needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment.

In this case, the government called Shalaykea Scroggins to the witness stand. (TT, Vol. 11 at 1576). Ms. Scroggins testified, *inter alia*, that: (1) she was Movant's girlfriend; (2) she knew that the murder victim, Ms. Coleman, was Movant's other girlfriend; (3) she was aware that Movant had implicated her as the murderer; (4) she had never threatened Ms. Coleman with bodily injury; and (5) Movant admitted to Ms. Scroggins that he had murdered Ms. Coleman by luring her away from the hospital, driving her to Downsville, and then shooting her twice in the head. (*Id.* at 1577-79, 1599-1600, 1605).

After her direct examination, Movant proceeded to cross-examine Ms. Scroggins. (*Id.* at 1611). At the outset, the Court sustained the prosecutor's objection based on Movant's inability to ask a question without prefacing it with commentary. (*Id.*). Movant, who lacked legal training, did not fare any better as his cross-examination continued. The record reflects that the Court repeatedly sustained objections to Movant's questions, based on form and content and

56

relevancy.  (*Id.* at 1611-1665).  On several occasions, Movant sought to read from

a document not in evidence.  (*Id.* at 618, 1629, 1655, 1660).  Movant often argued

with Ms. Scroggins, asked repetitive questions, and sought to elicit inadmissible

hearsay testimony from her.  (*Id.* at 1627-28, 1630, 1632, 1634-36, 1643-44, 1646-

50, 1654, 1663-65).  The Court finally opted to suspend Movant's cross-examination

and allowed the government to return to its direct examination of Ms. Scroggins.  (*Id.*

at 1665-66).

At the conclusion of the day's proceedings, the Court issued the following

instructions outside the presence of the jury and with Ms. Scroggins remaining on

the witness stand:

> What we're going to do, [Movant], you have a list of all the questions
> you want to ask this witness and you indicated you have a lot more.  So
> we're going to go ahead and go through that list.  You read each
> question you want to.  We'll stay here till midnight if we need to.  If the
> government feels the need to object, the government will object.  If I
> sustain the objection, then, [Movant] you put an "X" by that question.
> If the government doesn't object or I overrule it, you put a checkmark
> by it and then in the morning when the jury's here, you can go into the
> matters with the checkmarks on them.

(*Id.* at 1669).  Thus, in connection with this hearing out of the jury's presence, the

Court provided Movant with a "dry run" of his remaining cross-examination of Ms.

Scroggins to determine which questions were permissible to ask.  When Movant

expressed his misunderstanding as to purpose of the hearing, the Court explained:

> There's no point in having the jury sit here for an interminable length of
> time listening to questions that are objected to and the objection is
> sustained when they're merely an attempt by you to get things into the

record improperly, [Movant]. That's not fair because that's not the way the system works. It's – it's giving you the benefit that nobody else would ever have. It's not fair to the government. It's not fair to the jury to have to sit there and listen to something that they can't use to make a decision. It's all wasted time, and if time's going to be wasted, the jury's not going to have to put up with it. The rest of us are, but the jury's not . . . . You're not going to be able to waste the jury's time tomorrow any more than I can help it.

(*Id.* at 1676-78). As the hearing progressed, the Court determined which questions proposed by Movant were proper as leading to admissible evidence and which questions were not. (*Id.* at 1689-1720). The next day, Movant completed his cross examination of Ms. Scroggins. (TT, Vol. 12 at 1723-31).

The Court finds that the procedure utilized in the hearing at issue did not violate Movant's Sixth Amendment right to confrontation. Before the hearing commenced, the record reflects that Movant had asked Ms. Scroggins numerous improper questions. Movant's questions were argumentative and revealed his attempt to improper arguments and evidence into the record. The progress of the trial had been greatly hindered because it was necessary for the Court to address the prosecutor's appropriate objections and admonish Movant. The Court's use of the procedures in the hearing was necessary in order to filter out Movant's improper and repetitious questions to avoid the needless consumption of time. *See Hitt*, 473 F.3d at 156; Fed. R. Evid. 611(a). Rather than deny Movant the right of cross-examination, the Court's procedures utilized at the hearing served as an attempt to

aid Movant in effectively cross-examining Ms. Scroggins with proper questions.  The Court's limitations, therefore, do not amount to a Sixth Amendment violation.

Movant argues that the Court violated Movant's due process and Eighth Amendment right to a reliable verdict by "[c]ompelling Movant to preview his theory of the case and elicit testimonial evidence from a key witness outside the presence of the jury."  (Doc. 318 at 114).  Movant further argues that Ms. Scroggins's testimony during the "dry-run" hearing constitutes discovery material and that due process required reciprocal disclosure of the prosecutor's examination questions along with Ms. Scoggins's answers thereto.  (*Id.*).  According to Movant, the Court's unorthodox hearing undermined the reliability of the verdict by requiring Movant to "expose his defense theories, strategy, and confrontation tactics to the prosecution and its star witness."  (*Id.*).

Movant relies on the Supreme Court's decision in *Wardius v. Oregon,* 412 U.S. 470 (1973), in support of his contentions.  In *Wardius*, the Supreme Court considered Oregon's criminal pre-trial discovery procedures, which required a criminal defendant to provide the prosecution with: (1) notice of any alibi upon which the defendant intended to rely; and (2) the names of any and all witnesses who would testify in support of such an alibi.  *Id.* at 471-72 n.3; (citing Ore. Rev. Stat. s 135.875).  The Oregon discovery scheme, however, contained no reciprocal provision requiring the State to divulge the identity of witnesses it planned to call to refute a proposed alibi.  *Wardius*, 412 U.S. at 412.  The *Wardius* Court reversed the

defendant's conviction, concluding that it was a due process violation to compel a defendant to reveal the particulars of his alibi defense without giving him an equal opportunity to discover the State's rebuttal witnesses. *Id.* at 479.

The *Wardius* case is distinguishable from the present case as it pertained to due process considerations in enforcing a specific pre-trial discovery procedure related to alibi defenses. The instant case does not involve consideration of a statutory pre-trial discovery procedure. Rather, due to Movant's own ineptitude as revealed by his numerous improper cross-examination questions, the Court was compelled to fashion a procedure by which it could reasonably control Movant and focus his questions in a more appropriate and time-efficient manner. Because the prosecutor had already conducted his direct examination of Ms. Scroggins without incident and effectively disclosed his trial strategy as to this witness, it was unnecessary to require reciprocal disclosure.

Movant argues that the preview of his cross-examination unfairly revealed his theories and strategies related to: (1) Ms. Scroggins purported drug use; (2) the existence of exculpatory and DNA evidence; (3) the impeachment of Ms. Scroggins's credibility regarding Movant's confession; and (4) inconsistencies between her testimony and prior sworn testimony. (Doc. 318 at 111-12, 114-15). The Court finds, however, that Movant's main strategy of implicating Ms. Scroggins as the murderer was readily apparent in his opening remarks and cross-examination before the onset of the hearing at issue. (TT, Vol. 10 at 1201-02; TT, Vol. 11 at 1620, 1626,

1635, 1651).  Further, Movant revealed many of his tactics and strategies through his attempt at cross-examination before the hearing.  (TT, Vol. 11 at 1611-65).  The fact that MS. Scroggins was present at the hearing does not implicate any constitutional concerns.  She was under an obligation to tell the truth before the jury, and there is nothing before the Court to suggest that her testimony before the jury on the day following the hearing was untruthful or otherwise unreliable.

A review of the relevant trial transcript reveals that Movant essentially had gained an unfair advantage through his improper questioning of Ms. Scroggins and the argumentative manner in which he sought to introduce inadmissible evidence. The procedure utilized by the Court in its hearing was a reasonable attempt to have Movant comport with the rules of procedure, decorum, and evidence.  This hearing further provided Movant with an opportunity to pose the right questions and possibly learn the proper rules for posing them.  Any limitations on Movant's cross-examination stemmed from his lack of training as a *pro se* litigant along with his own decision to abandon particular questions at trial the next day following the hearing.

In sum, the Court concludes that the procedure utilized at the hearing did not impose any unconstitutional limitations on Movant's right to cross-examine Ms. Scroggins in an effective manner.  Given the Court's important interest in maintaining an orderly trial coupled with Movant's conduct during the course of his cross-examination, Movant also has failed to demonstrate either a due process or

61

Eighth Amendment violation.  Accordingly, Movant is not entitled to § 2255 relief with respect to any of his claims in Ground Twelve.

Because the Court has rejected on the merits Movant's constitutional claims in Ground Twelve, Movant cannot show that appellate counsel's conduct on appeal was deficient or prejudicial in that he had no obligation to raise such meritless claims on appeal.   *See  Reinhart*, 357 F.3d at 530; *Phillips*, 210 F.3d at 348-50. Accordingly, Movant is not entitled to relief with respect to his claim in Ground Thirteen.

### 7.    Ground Fourteen

Movant claims in Ground Fourteen that his constitutional rights were violated when the Court failed to inquire as to whether Movant knowingly and voluntarily waived his right to testify.  As discussed below, this claim is without merit.

"The right to testify on one own's behalf at a criminal trial . . . is one of the rights that are 'essential to due process of law in a fair adversary process.'"  *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (quoting *Faretta*, 422 U.S. at 819 n.15).  The right to testify is secured by both the Fifth and Sixth Amendments.  *Rock*, 483 U.S. at 51.  "Only the defendant may waive this right . . ., and it must be knowing and voluntary."  *United States v. Mullins*, 315 F.3d 449, 452 (5th Cir. 2002).

The Fifth Circuit has never held that it was the trial court's duty to inform a *pro se* defendant of the right to testify or that a defendant must state that he is aware of such a right.  In addressing this issue in the context of a 28 U.S.C. § 2254 petition,

the Fifth Circuit opined that there should not be a rule mandating an affirmative declaration of the acknowledgment of the right to testify. *See Jordan v. Hargett*, 34 F.3d 310, 314-15 (5th Cir. 1994). The *Jordan* court further explained:

> [S]ilence may itself be evidence of voluntary waiver of the right to testify. In the absence of evidence in the state court of the defendant's wish to testify, we think it appropriate for the habeas court to presume that the defendant acquiesced in his counsel's advice or defendant made a voluntary choice not to testify.

*Id.* at 315. Thus, "[t]he Fifth Circuit's only restriction on the presumption raised by silence was that it was not irrebuttable." *Hunt v. East*, No. 194CV205DD, 1995 WL 1945469, at *1 (N.D. Miss. Sep. 18, 1995).

Other circuits addressing the issue hold that the trial court has no duty to inform the defendant of his right to testify. *See e.g.*, *United States v. Brimberry*, 961 F.2d 1286, 1290 (7th Cir. 1992) (holding that "courts have no affirmative duty to determine whether a defendant's silence is the result of a knowing and voluntary decision not to testify"); *United States v. McMeans*, 927 F.2d 162, 163 (4th Cir. 1991) (recognizing that the trial court has no affirmative duty to inform a defendant of his right to testify); *United States v. Martinez*, 883 F.2d 750, 760 (9th Cir. 1989), *vacated on other grounds*, 928 F.2d 1470 (9th Cir. 1991) (recognizing that "courts have no affirmative duty sua sponte to address a silent defendant and inquire whether he knowingly and intelligently waives the right to testify"). The First Circuit also holds that the defendant's failure to affirmatively claim the right to testify will constitute waiver of such right. *See Siciliano v. Vose*, 834 F.2d 29, 30 (1st Cir. 1987).

In this case, the record does not reflect that Movant ever asserted his right to testify or voiced any objection to the Court when he did not testify.  During the voir dire portion of the trial in which Movant was present, the Court explained to the jury that Movant has "the right to remain silent" that a defendant does not have to testify, and that the jury cannot use defendant's decision not to testify against that defendant." (TT, Vol. 2 at 108-09).  Movant's standby counsel. Mr. Swanton, later informed the Court during the guilt phase of the trial that Movant had not indicated an intent to testify on his own behalf.  (TT, Vol. 12 at 1914).  At no point in the trial did Movant ever express his wish to testify under oath or object when he did not testify.  Movant, as his own counsel during the guilt phase portion of the trial, had the power to decide for himself whether or not he wished to testify.

Movant argues that his desire to testify was apparent through his conduct by being argumentative and providing improper testimony through his cross-examinations. (Doc. 318 at 122).  The Court, however, finds that Movant's conduct is more suggestive that he did not want to testify under oath and sought instead to place his story in front of the jury through his examination of witnesses.

In sum, Movant has presented nothing to rebut the presumption that he waived the right to testify through his silence.  *See Jordan*, 34 F.3d at 314-15; *Hunt*, 1995 WL 1945469, at *1.  *See also United States v. Martinez*, 974 F.2d 589, 590 (5th Cir. 1992) (stating that "[a] defendant may not remain mute during a trial and later complain of errors which might have been corrected by the trial court").  Because the

64

trial court had no duty to inform Movant of his right to testify and Movant effectively

waived that right, Movant is not entitled to § 2255 relief as to Ground Fourteen.

### 8.    Ground Fifteen

Movant claims in Ground Fifteen that his convictions and death sentence

violated his constitutional rights because he is innocent.  Movant states that his claim

is based on both a lack of proper forensic testing as well as a close examination of

"the many contradictions and inconsistencies in the testimony presented by the

Government."  (Doc. 318 at 124-25).  Specifically, Movant contends that: (1) the

forensic evidence establishes his innocence; (2) Ms. Scroggins and Mr. Outley

provided false testimony; (3) jail-house informants also gave false testimony; and (4)

the government should have been aware of other false accusations made against

Movant.  (*Id.* at 125-32).

Movant does not assert his actual innocence claim in Ground Fifteen as a

"gateway" to obtain review of an otherwise barred claim. *See Herrera v. Collins,* 506

U.S. 390, 404 (1993) (recognizing that a claim of actual innocence is "a gateway

through which a habeas petitioner must pass to have his otherwise [procedurally]

barred constitutional claim considered on the merits"); *Dowthitt v. Johnson,* 230 F.3d

733, 741 (5th Cir. 2000) (same).  A petitioner seeking to surmount a procedural

default through a showing of "actual innocence" must support his allegations with

new, reliable evidence that was not presented at trial and must show that it was

more likely than not that, in light of the new evidence, no juror, acting reasonably,

would have voted to find the petitioner guilty beyond a reasonable doubt. *Schlup v. Delo,* 513 U.S. 298, 326–27 (1995).

Thus, the question becomes whether a stand-alone claim of actual innocence is cognizable in a federal habeas petition. In *Herrera,* the Supreme Court explained:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Herrera*, 506 U.S. at 417. The Fifth Circuit has read *Herrera* as not allowing any freestanding claims of actual innocence. *Dowthitt*, 230 F.3d at 741-42.

In revisiting the issue of actual innocence, the Supreme Court specifically declined to resolve the question of whether freestanding actual innocence claims are to be recognized in federal habeas proceedings. *House v. Bell,* 547 U.S. 518, 554-55 (2006). The Fifth Circuit, in the wake of *House*, has reaffirmed its refusal to recognize a freestanding actual innocence claim in federal habeas proceedings. *See Foster v. Thaler*, 369 Fed. Appx. 598, 601 n.3 (5th Cir. 2010); *Moore v. Quarterman*, 534 F.3d 454, 465 n.19 (5th Cir. 2008); *Foster v. Quarterman,* 466 F.3d 359, 367–68 (5th Cir. 2006).

The Court finds that Movant's freestanding actual innocence claim in Ground Fifteen fails because it is not cognizable. Even assuming that such a claim could be cognizable, Movant fails to meet the more stringent standard of proof needed to establish it under *Herrera.* As discussed above, the Supreme Court has described the threshold for any "hypothetical freestanding innocence claim" as "extraordinarily high." *House,* 547 U.S. at 555; *Herrera*, 506 U.S. at 417. Such a showing would require "more convincing proof of innocence" than the gateway standard for overcoming a procedural bar found in *Schlup. House,* 547 U.S. at 555 (comparing the *Schlup* and *Herrera* standards).

Movant has failed to establish the extraordinarily high standard of proof for any possible actual innocence claim. Indeed, he fails to support his actual evidence claim with any new reliable evidence. Movant fails to show how any new DNA or forensic evidence testing would constitute direct evidence of his innocence. Movant further provides no corroborating evidence to support his allegations that various government witnesses gave false testimony at trial. Movant, therefore, falls short of satisfying the threshold discussed in *Herrera* and *House*. Accordingly, Movant is not entitled to § 2255 relief with respect to his actual innocence claim in Ground Fifteen.

### 9. Ground Sixteen

Movant claims in Ground Sixteen that his rights were violated when the Government presented evidence and testimony that it knew or should have known was false. Movant contends that "the prosecutions' case against [Movant] relied

67

almost exclusively on the testimony of individuals with motives to lie and manipulate their testimony in any manner to protect their self-interests."  (Doc. 318 at 136). Furthermore, according to Movant, "much of the testimony against [Movant] was unsubstantiated, inconsistent with the facts alleged, inconsistent with the testimony of other witnesses, and often inconsistent with the statements of the witnesses themselves."  (*Id.*).

The Supreme Court has long acknowledged that convictions obtained by the knowing use of perjured testimony are fundamentally unfair. *See United States v. Agurs,* 427 U.S. 97, 103 (1976); *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (holding that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"). Because such cases "involve a corruption of the truth-seeking function of the trial process," the Court has repeatedly held that defendants' convictions "must be set aside if there is *any reasonable likelihood* that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103–04. "To establish a due process violation based on the government's use of false or misleading testimony, [a movant] must show that (1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *United States v. Webster*, 392 F.3d 787, 801 (5th Cir. 2004).

Movant's claim in Ground Sixteen appears predicated on the following purported false testimony of various witnesses:

(1)    Ms. Scroggins testified regarding her whereabouts on the night of the murder, the circumstances regarding how Movant told her about the crime, her knowledge on November 7 that the murder victim was missing, whether Movant possessed a .32 pistol, and whether Movant in fact called her on November 15 to detail the murder.

(2)    Edward Outley testified with respect to a .32 gun, his own activities on the night of the murder, and the circumstances regarding Movant's confession as to the murder.[8]

(3)    Inmate witness Jerry Reed testified regarding the circumstances surrounding Movant's confession to murder.

(4)    Christian Walker testified regarding the circumstances surrounding Movant's confession.

(5)    Dominique Tubbs and Christopher Quigley, friends who shared the same jail cell with Movant, testified regarding the circumstances surrounding Movant's threats to kill Ms. Coleman.

(6)    Homero DeLeon made false claims in a letter dated February 12, 2003, and changed his story substantially at trial in testifying against Movant.

(7)    Ms. Edwards testified as to whether Movant attempted to kidnap her at gunpoint in the hospital park, whether Movant had shot at her, and whether Movant had choked her.

(8)    Ex-U.S. Marshal McNamara testified that Movant had disclosed the location of a .22 gun at the time of Movant's arrest.

(Doc. 318 at 127-33).  While pointing out inconsistencies in the testimonies of many

of these government witnesses, Movant has failed to establish that the testimony in

---

[8]  Movant also contends that Mr. Outley falsely testified regarding whether he had been given immunity from any charge for his testimony. (Doc.318 at 129).  The Court will address all issues surrounding this contention in connection with its discussion of Grounds Eighteen and Nineteen.

69

question was actually false. Furthermore, even if any of the witnesses cited above had provided false or misleading testimony, Movant provides nothing to convince the Court that the Government knowingly used any such false or perjured testimony to obtain a guilty verdict on any of the charges brought against Movant.

The record reflects that Movant had ample opportunity to cross-examine all of the witnesses in order to discredit their respective testimony.  It is within the province of the jury to decide the relative credibility of each witnesses' testimony. *Davis v. Alaska*, 415 U.S. 308, 317 (1974).  The Court concludes, based on a careful review of the trial testimony, that Movant's due process rights were not violated based on the testimony of the various Government witnesses.  Accordingly, Movant is not entitled to § 2255 relief with respect to his claim in Ground Sixteen.

### 10.    Ground Seventeen

Movant claims in Ground Seventeen that his rights were violated because counsel failed to conduct a competent and reasonable investigation into the facts of the charged homicide.  Movant contends that, during the two years before trial, appointed counsel failed to interview several key witnesses and that counsel only interviewed fewer than 7% of the government witnesses. (Doc. 318 at 137). Movant further contends that counsel failed to make any formal discovery requests and otherwise did not conduct an adequate investigation into the 120 witnesses identified against Movant.  (*Id.*).

70

The failure to investigate the relevant facts and law can support a finding of ineffective assistance of counsel. *See Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The court must assume that counsel satisfied that duty and that any investigation complied with the prevailing professional norms. *See id.* at 689, 691. To overcome such a strong presumption, the defendant must allege what a reasonable investigation would have uncovered and how it would have altered the outcome. *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989); *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir. 1994). Without a "specific affirmative showing of what the missing evidence or testimony would have been," assessing counsel's performance is difficult and determining whether the defendant was prejudiced is near impossible. *See Anderson*, 18 F.3d at 1221 (quoting *United States ex rel. Partee v. Lane*, 926 F.2d 694, 701 (7th Cir. 1991)).

Movant asserts that his counsel before trial failed to interview the following witnesses critical to Movant's defense: (1) Renee "Na-Na" Alberta Hampton, who purportedly was an eyewitness to the crime; (2) Mr. Outley, a key government witness who testified against Movant; and (3) Debra Alexander, "a witness that the Government identified as one who could corroborate [Movant's] defense that Ms. Scroggins was the actual killer." (Doc. 318 at 138-39). Movant further claims that counsel failed to interview numerous other government witnesses. (*Id.* at 138).

71

Movant has failed to convince the Court that his ineffective-assistance-of-counsel claims in Ground Seventeen have merit. "Complaints of uncalled [and uninterviewed] witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified to are largely speculative." *See Sayre v. Anderson*, 238 F.3d 631, 635–36 (5th Cir. 2001). In *Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008), the defendant, who had been convicted of capital murder, asserted that his attorney had failed to interview eyewitnesses and that, if he had, he would have found evidence that the defendant acted in self-defense or out of sudden passion. *See id.* at 467. In holding that the defendant's claims were too speculative to show ineffective assistance, the Fifth Circuit explained that neither the Court nor the defendant knew for sure to what the witnesses would have testified. *Id.* at 468. Indeed, complaints about uninterviewed witnesses based on more than speculation and conjecture are insufficient. *See id.*; *Sayre*, 238 F.3d at 635.

In this case, Movant advances conclusory allegations that Ms. Hampton would have provided favorable testimony at trial. While stating that Ms. Hampton was a potential eyewitness to the murder, Movant does not mention any specific facts to which she would testify. It is undisputed that Movant's counsel reviewed Ms. Hampton's statements to law enforcement and that she refused to speak with defense counsel's investigator. The Court finds, therefore, that counsel was not ineffective for failing to interview her.

Likewise, with respect to Ms. Alexander, Movant does not indicate the specific facts regarding her potential testimony that Ms. Scroggins was the actual killer. Movant further fails to suggest how the outcome of the trial would have been changed by interviewing either Ms. Alexander or Mr. Outley, Compelling testimony, including testimony from Mr. Outley, was presented at trial implicating Movant as the perpetrator of the charged crimes. The record reflects that defense counsel interviewed several key witnesses before trial (including Ms. Scroggins), moved for discovery production, and thoroughly reviewed the discovery file provided by the government. Even assuming that defense counsel failed to interview many other government witnesses who ultimately testified at trial, Movant has failed to establish how any of these interviews would have uncovered favorable testimony for Movant or otherwise altered the outcome of the case. Movant's allegations are largely speculative.

The Court also finds it important that Movant ultimately chose to represent himself at trial and, therefore, had control as to who to call to the stand as a witness. The record reflects, however, that Movant never sought a continuance with the Court in order to interview and possibly subpoena witnesses who could offer favorable testimony to his case. *See Faretta*, 422 U.S. at 834 n.46 (explaining that "a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounts to a denial of 'effective assistance of counsel'").

In sum, Movant has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689. Movant also has failed to establish the requisite prejudice with respect to counsel's investigation of the case before trial. *See Anderson*, 18 F.3d at 1221. Accordingly, Movant is not entitled to § 2255 relief with respect to Ground Seventeen.

### 11.   Ground Eighteen

Movant claims in Ground Eighteen that the Government failed to disclose exculpatory evidence in violation of Movant's constitutional rights. Specifically, Movant contends that the Government withheld exculpatory evidence by failing to: (1) reveal that Edward Outley had complete immunity for any charges in exchange for his testimony against Movant; and (2) provide ten or eleven pages of notes written by jail-house informant Homero DeLeon. (Doc. 318 at 147-48).

The Supreme Court has held that suppression by the prosecution of evidence favorable to an accused after request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To prevail on a *Brady* claim, a movant must prove that (1) the evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence was suppressed by the government either willfully or inadvertently; and (3) prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The materiality standard necessary for

*Brady* purposes is met when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The Court first will address whether there is a *Brady* violation pertaining to the disclosure of Mr. Outley's immunity. Before trial, a letter dated January 2, 2004, was sent to Mr. Outley's attorney outlining the agreement between the Government and his client. (Doc. 317, Ex. 12). The agreement is set forth as follows:

> This letter is written concerning the cooperation furnished by your client, Edward Outley, in connection with the investigation and trial being conducted by the United States into the murder of Suncerey Coleman and related crimes. This is to certify that your client is considered a witness in the case and not a target or subject of the investigation.
>
> [A]ny statement or testimony, or evidence derived directly or indirectly from the statements or testimony which your client provides regarding this matter or any matter into which he may be inquired by any agent or attorney associated with this case or any testimony furnished to a grand or petit jury will not be used against him in this or any further criminal proceeding, either federal or state, except a prosecution for perjury or otherwise making a false statement.
>
> This grant of immunity is completely conditional upon Mr. Outley's truthful, candid cooperation and is voidable by the United States in the event it can demonstrate to a court that Mr. Outley has made a material misrepresentation of fact to the Court or ceases to cooperate in this case.

(*Id.*). The parties do not dispute that this letter was disclosed to Fields.

Mr. Outley testified at trial on direct examination that he had no involvement in the murder of Ms. Coleman other than providing Movant with the murder weapon

and that Movant had confessed to Mr. Outley about murdering Ms. Coleman. (TT, Vol. 12 at 1826, 1229-30). On cross-examination, Movant asked Mr. Outley if the government had made him any promises, to which Mr. Outley responded "No." (*Id.* at 1847).[9]

Movant fails to meet his burden necessary to prevail on his *Brady* claim pertaining to Mr. Outley. The record reflects that the government disclosed to Movant its agreement with Mr. Outley regarding immunity for testifying truthfully against Movant. Movant contends, however, that the actual grant of immunity was "apparently" greater than immunity described in the January 2, 2004, letter, and that this "broad and undisclosed grant of immunity is unquestionably *Brady* material." (Doc. 318 at 147, 151). Mr. Outley has submitted an affidavit, dated December 5, 2008, in which he states that he only testified "because the Government gave me complete immunity for any charges" and that he could not be prosecuted for any crimes. (Doc. 319, Ex. J). Other than through Mr. Outley's vague and conclusory statements, Movant has not provided any evidence of such a broad and undisclosed immunity agreement. Rather, the January 2, 2004, letter detailing the actual immunity agreement is attached to Mr. Outley's affidavit. The Court finds that the government fulfilled its obligations by disclosing this letter to Movant.

---

[9] The Court will address Movant's specific claims regarding Mr. Outley's testimony regarding promises in connection with its discussion of Ground Nineteen.

Even if a broader grant of immunity existed and the Government failed to disclose it, the Court finds that is unlikely that any prejudice ensued to Movant. Movant advanced no questions regarding the January 2, 2004, letter to Mr. Outley despite the fact that it clearly disclosed certain promises to him in exchange for his truthful testimony.  There is no indication that Movant would have pursued any such questions even if a more broad immunity agreement had existed providing Mr. Outley with complete immunity.  Furthermore, several other witnesses provided compelling testimony that supported Movant's convictions on the charged crimes. Accordingly, Movant has failed to satisfy the materiality standard  because there is no reasonable probability that, had such a broad immunity agreement between the government and Mr. Outley been disclosed, the result of the proceeding would have been different.  *Kyles*, 514 U.S. at 434.

The Court now turns to consider whether there is a *Brady* violation pertaining to the purported non-disclosure of missing notes written by jail-house informant Homero DeLeon.  Movant asserts that DeLeon's missing notes would have provided "powerful impeachment" evidence as attacking DeLeon's credibility for telling the truth.  (Doc. 318 at 148).

Before trial, Assistant United States Attorney Gregory Gloff and Special Agent Douglas J. Kunze interviewed Mr. DeLeon on November 13, 2003.  (Doc. 317, Ex. 10).  Mr. DeLeon stated in his interview that:

(1)    he originally was Movant's cellmate in November 2001;

(2)    Mr. DeLeon later met up with Movant in November, 2002, at a federal prison in Fort Worth, Texas;

(3)    Movant described to Mr. DeLeon how he had escaped from jail by digging "through a vent in the ceiling with a light switch plate and metal part from a shower"; and

(4)    Movant confessed to Mr. DeLeon that he had shot Ms. Coleman around a tree.

(*Id.*).  Mr. DeLeon later testified at trial that:

(1)    he was a cell-mate of Movant in 2001 at the McLennan County Jail and that he met with Movant again at the Federal Medical Prison in Fort Worth, Texas;

(2)    Mr. DeLeon asked Movant what he was doing in the Fort Worth prison, to which Movant responded that he had tried to escape from the McLennan County Jail;

(3)    Movant confessed to Mr. DeLeon about murdering Ms. Coleman by shooting her and dragging her under a tree; and

(4)    Movant informed Mr. DeLeon that he would try to drag others "into the murder scene."

(TT, Vol.10 at 1420-28).

Rick Ojeda, a former FBI agent and police officer attested in an affidavit that he interviewed Mr. DeLeon on December 19, 2008, that Mr. DeLeon prepared ten or eleven pages of notes which he then mailed to Assistant United States Attorney Gregory Gloff without retaining a copy, that the notes described Movant's description of his escape from jail by crawling through a vent, his participation in a car jacking, and murder of Ms. Coleman by shooting her.  (Doc. 319, Ex. K).  According to Movant, these missing notes constitute *Brady* material as they state facts

78

inconsistent withe DeLeon's testimony at trial.  (Doc. 318 at 148).  Movant contends that these notes could have been used to successfully impeach Mr. DeLeon's credibility at trial.  (*Id.* at 152).

Movant fails to meet his burden necessary to prevail on his *Brady* claim pertaining to Mr. DeLeon.  With respect to whether the missing notes constitute favorable evidence to Movant, the Court disagrees and finds that they would largely corroborate Mr. DeLeon's compelling testimony at trial as to Movant's confession to murdering Ms. Coleman.  To the extent that the missing notes could be used to show inconsistencies in Mr. DeLeon's testimony regarding Movant's escape from jail, the Court finds that is unlikely that any prejudice ensued to Movant.  As noted above, several other witnesses provided compelling testimony that supported Movant's convictions on the charged crimes.  Movant has failed to satisfy the materiality standard  because there is no reasonable probability that, had the missing notes of Mr. DeLeon been disclosed, the result of the proceeding would have been different. *Kyles*, 514 U.S. at 434.

In sum, Movant has failed to establish a *Brady* violation with regard to either the disclosure of a broad immunity deal for Mr. Outley or the purported missing notes prepared by Mr. Outley.  Movant, therefore, is not entitled to § 2255 relief as to these claims.

### 12.   Ground Nineteen

Movant claims in Ground Nineteen that the Government failed to correct a material misrepresentation of fact by Mr. Outley in violation of Movant's constitutional rights.  This claims directly pertains to Movant's cross-examination of Mr. Outley when he asked whether the Government had made any promises to Mr. Outley and he responded "No."  (TT, Vol. 12 at 1847).

As discussed above, Movant can establish a "due process violation based on the government's use of false or misleading testimony" by establishing "that (1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *Webster*, 392 F.3d at 801.  An analysis of two Supreme Court decisions is instructive in considering Movant's claim in Ground Nineteen.

In *Napue*, the Supreme Court considered whether "the failure of the prosecutor to correct the testimony of the witness which he knew to be false denied petitioner due process." *Napue*, 360 U.S. at 265.  The principal state witness at the defendant's murder trial, George Hamer, testified falsely that he had received no promises in exchange for his testimony.  *Napue*, 360 U.S. at 265-68.  In fact, the prosecutor had promised the witness a recommendation for a reduced sentence. *Id.* at 266-67.  Hamer's false testimony first occurred on cross-examination.  *Id.* at 267-68 n. 2.  Rather than correct the Hamer's perjured testimony, the prosecutor elicited the same false answer in his redirect examination.  *Id.* at 267 n.2, 270-71.

The Supreme Court held that the false testimony used by the State in securing the conviction may have had an effect on the outcome of the trial, and accordingly, reversed the defendant's conviction. *Id*. at 272.

Likewise, in *Giglio v. United States*, 405 U.S. 150 (1972), the Government's only witness linking the defendant with the crime falsely testified on cross-examination that he had received no promise of immunity from prosecution. *Id.* at 151-52. The prosecutor failed to correct his perjury and repeated the witness' falsehood in his summation. *Id.* The Supreme Court reversed the defendant's conviction because there was reasonable likelihood that the prosecutor's knowing use of perjury on an issue so relevant to the witness' credibility affected the judgment of the jury. *Id.* at 154-55.

When reviewing the particular facts of the instant case, the Court does not find a due process violation with respect to Mr. Outley's testimony. In contrast to *Napue* and *Giglio*, Movant never asked the specific question whether Mr. Outley had received any promises in exchange for his testimony against Movant. Rather, Movant's vague question regarding promises appears to relate to whether or not Mr. Outley would be charged with murder. (TT, Vol. 12 at 1847-52). It is unclear whether Mr. Outley understood the general question posed to him, and Movant did not follow up with his questions regarding the letter detailing Mr. Outley's immunity agreement.

81

Furthermore, Movant cites nothing in the record to suggest that the prosecutor either directly elicited any false testimony as to whether Mr. Outley received immunity in exchange for his testimony or falsely informed the jury during closing remarks that Mr. Outley received nothing in exchange for his testimony. Even if Movant could establish that Mr. Outley's challenged testimony was false and the prosecutor knew it was false, the Court does not find the testimony to be material in light of compelling testimony provided by other witnesses supporting Movant's convictions on the charged crimes. In contrast to *Napue* and *Giglio*, Mr. Outley was neither the sole nor even the primary witness testifying against Movant. Accordingly, Movant is not entitled to § 2255 relief with respect to his claim in Ground Nineteen.

### 13.    Ground Twenty

Movant claims in Ground Twenty that his rights were violated when a jailhouse informant purportedly acted as a government agent following Movant's indictment. Movant specifically contends that Homero DeLeon deliberately elicited self-incriminating evidence from Movant, in violation of Movant's Sixth Amendment rights. (Doc. 318 at 154-61).

The Sixth Amendment right to counsel "means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him." *Maine v. Moulton*, 474 U.S. 159, 170 (1985) (internal quotation and citation omitted). The Sixth Amendment is implicated whenever government agents deliberately elicit incriminating statements from the accused after

indictment and in the absence of counsel. *Massiah v. United States,* 377 U.S. 201, 206 (1964). The Sixth Amendment applies to indirect and surreptitious interrogation, as well as interviews in the jailhouse. *Id.* at 206. In addition, the Government post-indictment "may not direct a jailhouse informant to deliberately elicit information about the crime from the defendant." *United States v. Bell*, 290 Fed. Appx. 178, 183 (10th Cir. 2008) (citing *United States v. Henry,* 447 U.S. 264, 270 (1980)).

"To allege a *Massiah* violation, a criminal defendant must establish that a Sixth Amendment right to counsel attached; an individual seeking the information was a government agent acting without the defendant's counsel being present, and, that the agent deliberately elicited incriminating evidence from the defendant." *United States v. Cutno*, 431 Fed. Appx. 275, 279 (5th Cir. 2011) (citing *Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006)). The Sixth Amendment, however, is not violated whenever by luck or happenstance the Government obtains incriminating statements from the accused after the right to counsel has attached. *Maine*, 447 U.S. at 176. Nevertheless, the knowing exploitation by the Government of an opportunity to confront the accused without counsel being present is as much a breach of the government's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. *Id.; Henry,* 447 U.S. at 270.

As discussed above in connection with the Court's discussion of Ground Eighteen, Mr. DeLeon testified he was housed with Movant at the Federal Medical

Center in Fort Worth, Texas, that he engaged in conversations with Movant while they were incarcerated together, and that Movant confessed to murdering Ms. Coleman. (TT, Vol.10 at 1420-28). On the witness stand, Mr. DeLeon indicated that he had previously provided testimony for the Government in another case in order to receive a lesser sentence on his charged federal crime. (*Id.* at 1419, 1425). Movant ultimately received a reduced sentence for the information provided against Movant. (*Id.* at 1420).

While providing cooperation in the past, the Court finds no evidence demonstrating that the Government directed or otherwise knowingly exploited Mr. DeLeon to act as a Government agent in eliciting information from Movant. Rather, a review of the record indicates that Mr. DeLeon acted unilaterally with the hope of gaining favorable treatment from the Government for the information gleaned in his conversations with Movant. Movant approached government authorities after his meetings with Movant to communicate his desire to testify against Movant. (Doc. 319, Ex. K (Mr. DeLeon's letter)).[10]

Movant fails to meet his burden necessary to prevail on his Sixth Amendment claim pertaining to Mr. DeLeon's interaction with Movant and testimony at trial. Movant has failed to show that Mr. DeLeon, or any other jailhouse informant involved

---

[10] Former FBI agent Ojeda states in his affidavit that Mr. DeLeon may have approached government officials during the course of his communications with Movant at the Fort Worth prison. (Doc. 319, Ex. K). It appears, however, that Mr. DeLeon clarified that his encounters with Movant all occurred before his first meeting with AUSA Gloff. (*Id.*).

in this case, deliberately elicited information from Movant as a government agent. *Massiah,* 377 U.S. at 206; *Cutno*, 431 Fed. Appx. at 279.  Accordingly, Movant is not entitled to § 2255 relief with respect to his claim in Ground Twenty.

### 14.    Ground Twenty-One

Movant claims in Ground Twenty-One that he received ineffective assistance of counsel because counsel failed to conduct a competent penalty phase investigation.   As discussed above, ineffective assistance of counsel may be established by demonstrating that "(1) counsel's performance fell below the objective professional standard of reasonableness; *and* (2) such deficient performance prejudiced the defense." *Vasquez v. Thaler*, 389 Fed. Appx. 419, 425 (5th Cir. 2010) (citing *Strickland*, 466 U.S. at 687-88).

"Trial counsel's failure to present mitigating evidence during the penalty phase is not per se ineffective assistance." *Smith v. Quarterman*, 515 F.3d 392, 405 (5th Cir. 2008).  However, "in a capital case, counsel's performance may be deficient if it does not include an adequate investigation into mitigating evidence, including research into a capital defendants '[medical . . ., educational . . .,] *family and social history.*'" *Vasquez*, 389 Fed. Appx. at 425 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)).  The Supreme Court  further explains:

> Strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 690-91).

With regard to the prejudice prong of the *Strickland* standard*,* Movant "must demonstrate that, but for counsel's failures to investigate and present evidence of his family life and social history, there is a 'reasonable probability' that a jury would not have sentenced him to death.'" *Vasquez*, 389 Fed. Appx. at 425 (quoting *Strickland*, 466 U.S. at 694.   "[A]n evaluation of *Strickland* prejudice include consideration of both the quantity and quality of the additional mitigating evidence." *Hood v. Dretke,* 93 Fed. Appx. 665, 669 (5th Cir.2004).

Nevertheless, "[t]he Fifth Circuit has consistently refused to find prejudice when trial counsel presented similar mitigating evidence, even if only in outline form, at trial."  *United States v. Bourgeois*, No. C-02-CR-216, 2011 WL 1930684, at * 57 (S.D. Tex. May 19, 2011) (citing *Coble v. Quarterman,* 496 F.3d 430, 437 (5th Cir.2007); *Rodriguez v. Quarterman,* 204 Fed. Appx. 489, 501 (5th Cir.2006); *Alexander v. Quarterman,* 198 Fed. Appx. 354, 359–60 (5th Cir. 2006); *Parr v. Quarterman,* 472 F.3d 245, 257–58 (5th Cir.2006)).  Courts "must be particularly wary of 'arguments that essentially come down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second guessing.'" *Dowthitt*, 230 F.3d at 743 (quoting *Kichens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)).

At the outset, the Court will address Movant's contention that counsel's representation fell short of the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* ("Guidelines"). (Doc. 318 at 161-62). Recent Supreme Court precedent has relied on the Guidelines as a useful measure of what activities a reasonable attorney should engage in when representing a capital defendant. See *Rompilla v. Beard,* 545 U.S. 374, 387 (2005); *Wiggins,* 539 U.S. at 524. *See also Strickland,* 466 U.S. at 688-89 (explaining that "[p]revailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable"). The Supreme Court in *Strickland* stated that:

> [n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract from the overriding mission of vigorous advocacy of the defendant's cause.

*Strickland,* 466 U.S. at 688–89. The Supreme Court has not explicitly held that the Guidelines are a checklist to effective representation. Rather, the Guidelines established by professional organizations inform, but do not supplant, *Strickland'*s penetrating performance and prejudice inquiry. *See Wiggins,* 539 U.S. at 521; *Roe v. Flores–Ortega,* 528 U.S. 470, 477 (2000).

Movant contends that "critical mitigation evidence which was readily available at the time of trial was never presented to the jury which sentenced [Movant] to death." (Doc. 318 at 165). According to Movant, "[t]he failure to present this evidence was not the result of any strategic or tactical considerations by counsel, but rather was the result of counsel's failure to conduct an adequate investigation into [Movant's] cultural, familial, social and mental health history." (*Id.*). Specifically, Movant faults defense counsel for failing to:

(1)    obtain all of the relevant multigenerational social history records of [Movant's] family members and caretakers;

(2)    interview historical witnesses and collect and review historical documents;

(3)    interview available family-member mitigation evidence;

(4)    investigate and present evidence of the abject poverty of [Movant's] family;

(5)    investigate and present evidence of the neglect of [Movant's] family and caretakers;

(6)    investigate and present evidence of the extent of abuse experienced by [Movant] in his formative years;

(7)    investigate and document trauma in [Movant's] life history;

(8)    investigate [Movant's] mental illness and multigenerational history of mental illness in [Movant's] family;

(9)    investigate potential brain damage and dysfunction; and

(10)    obtain all documents and interview readily available witnesses about [Movant's] history of incarceration.

(Doc. 318 at 168-210).

Before considering Movant's claims, the Court will review defense counsel's investigation and evidence presented at trial with respect to mitigation. The penalty-phase investigation team for Movant consisted of Movant's counsel (Mr. Peterson and Mr. Swanton), an investigator (Dan Youngblood), a mitigation specialist (Jane Bye, formerly known as Jane McHan),[11] and a psychiatrist (Dr. Price). (Doc. 319, Ex. E). Mr. Swanton asked Dr. Price: (1) to assess Movant's intelligence and to offer any opinions regarding Movant after his interview with Movant; and (2) to assess the relationship between Movant's intelligence and his ability to adapt to prison if sentenced to life. (*Id.*). While not asking Dr. Price to conduct any neuropsychological testing on Movant, Mr. Swanton indicated that he "would have relied on [Dr. Price's] opinion if he felt any such testing was warranted after his interviews with [Movant]." (*Id.*).

In his opening statement, Mr. Peterson informed the jury that "we will attempt to show that [Movant] had a very disruptive, a very violent childhood." (TT, Vol. 16 at 2371). He further alluded to the fact that Movant had suffered through several traumatic events in his life at a young age. (*Id.* at 2372). Furthermore, according to Mr. Peterson by way of background, Movant ended up in prison for long periods of time. (*Id.* at 2374). Mr. Peterson concluded his opening remarks by stating that the

---

[11] "At the time of [Movant's] trial, [Ms. Bye] had over 20 years' experience in the social work field, primarily with people with developmental disabilities, health issues, and mental retardation." (Doc. 319, Ex. G).

evidence will show that the murder of Ms. Coleman was not the result of deliberate planning and that Movant has successfully conformed to prison life.  (*Id.* at 2375).

Following the opening argument, defense counsel brought several witnesses to the stand to testify on a variety of mitigation topics.   Their testimony is summarized as follows:

(1) Jack Jaacks (Correctional Counselor at the Federal Medical Center in Fort Worth) - Mr. Jaacks testified that initial problems with Movant subsided as he learned to treat the prison staff with respect (TT, Vol.  16 at 2377-78).

(2) Frederick Waggoner (a Federal Bureau of Prison employee) - Mr. Waggoner testified that he never had a problem with Movant during the one year he knew Movant while Movant was in prison (TT, Vol. 16 at 2381).

(3) Greg Watts (a correctional officer at the Fort Worth medical center) - Mr. Watts testified that Movant was never disrespectful to him and was a good prisoner who seemed like a normal person.  (TT, Vol. 16 at 2386-87).

(4) Ms. Bye - Ms. Bye testified that she was hired by defense counsel to work as a mitigation specialist, concerned with looking into Movant's environment and the factors that affected his development.  (TT, Vol. 16 at 2390).  She further testified that: (a) Movant's mother, Alice Swinnie, became pregnant with Movant at age fifteen; (b) Ms. Swinnie became involved with an abusive boyfriend who abused Movant and other members of the family; (c) Ms. Swinnie eventually shot the abusive boyfriend and was incarcerated for the crime; (d) Movant's grandfather, Shelby Mitchell, paid a lot of attention to Movant, encouraged Movant, and was considered the one stabilizing influence in Movant's life; (e) shortly after Ms. Swinnie's incarceration, Movant began committing crimes around the age of eleven or twelve; (f) around this time, Movant's family moved into the projects where Movant was exposed to "drug dealers, guns, drugs, [and] different kinds of crimes"; (g) during the time Movant lived in the projects, he

received probation for a theft violation; (h) after being apprehended on another theft charge, movant and a friend attempted to hang themselves; (I) Movant survived while his friend died from the suicide attempt; (j) in 1989, three of Movant's friends all died in a violent fashion; (k) in 1990, Movant witnessed a drunk driver killing his grandfather; (l) while under the control of the Texas Youth Commission Authorities, Movant received psychiatric and psychological treatment; (m) Movant tried to commit suicide on two occasions during the course of his time in the Texas Youth Commission; (n) Ms. Swinnie ultimately received social security benefits based on a diagnosis of mental retardation; (o) from 1990 until 1997, Movant was labeled a disabled person and received social security benefits; (p) there was no indication that Movant was ever diagnosed as mentally retarded; (q) in the early 1990's, Movant began a period of incarceration with the TDCJ; (r) Movant's childhood was fairly described as chaotic, disruptive and violent; (s) Movant acted with respect during the course of his interviews with Ms. Bye and was evaluated as having the intellectual capacity to better himself in a very structured environment of a federal penitentiary; and (t) Movant's suicide attempts are largely indicative of impulsive behavior.  (TT, Vol. 16 at 2389-2410, 2431).

(5)     Vincent Green (Movant's uncle and son of Mr. Mitchell) - Mr. Green testified that: (a) Movant was hard-working at the age of eleven; (b) Movant was "hurt real bad" after the death of his grandfather; (c) the place in the projects where Movant lived was unsafe with drugs and gang activity; and (d) Mr. Green and Ms. Swinnie would be hurt if Movant received the death sentence. (TT, Vol 16 at 2432-40).

(6)     Reverend Edward Green (Mr. Mitchell's step-son) - Reverend Green testified that: (a) Movant was fourteen or fifteen years old at the time his grandfather was killed by a drunk driver; (b) the projects where Movant lived following the death of his grandfather was a rough neighborhood and quite a change from his prior environment; (c) Movant's behavior changed to the extent he "hung out" in traumatic places in the neighborhood; and (d) if Movant were sentenced to death, it would have a traumatic impact on Reverend Green.  (TT. Vol. 16 at 2443-50).

(7)     Adrian Dow (a previous girlfriend of Movant) - Ms. Dow testified that: (a) she and Movant had a relationship leading to the birth of one child; (b) Ms. Dow maintained a relationship with Movant after he was sent to prison and the birth of their daughter; (c) Movant was a positive influence to their daughter after leaving prison; and (d) Movant treated Ms. Dow at all times with respect.

(8)     Alice Swinnie (Movant's mother) - Ms Swinnie testified that: (a) she is currently receiving benefits for mental retardation; (b) Movant had four brothers; (c) Ms. Swinnie's boyfriend, William Bradford, lived in the household and regularly get drunk and beat Ms. Swinnie and her children; (d) Movant often cried when Mr. Bradford was beating on his mother; (e) the projects where she and the boys lived was "just so bad" as there were shootings and drug dealings; (f) Ms. Swinnie ultimately shot Mr. Bradford and one of his girlfriends; (g) she was found guilty on two counts of aggravated assault and sentenced to fifty days in jail; (h) Movant lived on and off with her and his grandfather until he was killed by a drunk driver; (I) Ms. Swinnie was shot in the head by another man; (j) she was aware that Movant had spent most of his adult life in prison; (k) if given a chance to live, Ms. Swinnie believes that Movant can do some good things with his life; and (l) if sentenced to die on the other hand, Ms. Swinnie would "hurt a lot." (TT, Vol. 16 at 2456-70).

(9)     Dr. Jack Price (a clinical and forensic psychologist - Dr. Price testified on direct examination that: (a) Movant's overall IQ is 113, which falls in the high average classification; (b) based on his IQ score, Movant could further his education if given the opportunity; (c) Movant's inability to so well in school was "most likely related to a chaotic life, to emotional disturbance and acting out in terms of conduct problems"; (d) despite prior behavioral issues, Movant did not exhibit any such problems while incarcerated in Fort Worth before the trial; and (e) Movant's "intelligence is the ability to adapt" to a federal prison environment and a long-term prison life. (TT, Vol. 16 at 2473-81). On cross-examination, Dr. Price acknowledged that Movant had been diagnosed as having an antisocial adolescent behavior disorder and that Movant showed no remorse or guilt. (*Id.* at 2483). On redirect examination, Dr. Price clarified that a

> psychiatrist's diagnosis may not necessarily be the correct one.
> (*Id.* at 2486).

Movant complains that counsel's performance regarding the presentation of mitigation evidence was inadequate in that additional evidence should have been presented to paint a clearer picture of Movant's "chaotic, abusive, violent, impoverished, neglectful, and dysfunctional home in which [Movant] grew up." (Doc. 318 at 173). Many of Movant's claims, therefore, focus on defense counsel's purported failures to collect all of the relevant multigenerational social history records, to interview historical witnesses and all available family members, to investigate Movant's abject poverty, and investigate and present evidence of neglect, abuse, and trauma experienced by Movant.

After careful review of the record, the Court finds that Movant's claims in Ground Twenty-One are without merit as he cannot establish that counsel's performance was deficient and/or prejudicial. The record reflects that defense counsel employed a mitigation specialist, Ms. Bye, to investigate and report extensively about Movant's background and social history. She provided compelling testimony about Movant's often violent and disruptive childhood. Ms. Bye's testimony further outlines that Movant often suffered abuse as a child, that he witnessed acts of violence against family and friends, that he spent much time living in the projects, and that he lost the only positive influence in his life, his grandfather, at an early age.

Several of Movant's closest relatives provided testimony that echoed Movant's violent, chaotic, and disruptive childhood.  Movant's mother, Ms. Swinnie, testified how one of her boyfriends regularly get drunk and beat Ms. Swinnie and her children and how Movant often cried when the boyfriend was beating on his mother.  Ms. Swinnie further described life in the projects where she and the boys lived as "just so bad" in light of the shootings and drug dealings.  Other relatives of Movant testified about Movant's violent and chaotic background, reiterating that Movant spent much time in the violent projects.

Movant argues that his counsel should have sought out records to independently corroborate the testimony of Ms. Swinnie, investigated additional sources of information, interviewed additional family members, and interviewed additional teachers, caseworkers, and mental health professionals to provide insight into Movant's life in the developmental years.  The Court finds, however, that much of this additional evidence cited would have duplicated or otherwise substantiated the mitigation evidence submitted at trial on the issues of poverty, neglect, abuse, violence, and overall chaotic environment.  *See Cullen v. Pinholster*, 131 S.Ct 1388, 1409-10 (2011) (recognizing that the "'new' evidence largely duplicated the mitigation evidence at trial" and likely would not have changed the jury's verdict).  Indeed, the testimony of additional relatives close to Movant would, for the most part, have substantiated the testimonies of both Ms. Bye and those relatives who testified at trial.

It is important to note the Special Findings of the jury, which reflects defense counsel's success in proving the types of information Movant complains about in this ground. The pertinent special findings on mitigation evidence are summarized as follows: (a) twelve jurors found that Movant "has lived most of his life without having a significant father figure"; (b) twelve jurors found that Movant "suffered from physical abuse during his formative years"; (c) twelve jurors found that Movant "suffered from emotional abuse during his formative years"; (d) twelve jurors found that Movant "suffered from parental neglect during his formative years"; (e) seven jurors found that Movant "grew up in an atmosphere of violence and fear, which misshaped his perception as to the acceptability or necessity of violent conduct"; (f) twelve jurors found that Movant "is the product of an impoverished background which impaired or hampered his integration into the social and economic mainstream of society"; (g) twelve jurors found that Movant's "mother has a history of criminal behavior and incarceration"; and (h) twelve jurors found that Movant "was exposed to the violent deaths of family members, loved ones, and friends during his formative years." (Doc. 319, App. BB at 8-10). The jury's special findings demonstrate that counsel in fact successfully investigated and presented in outline form mitigation evidence pertaining to poverty, neglect, abuse, violence, and overall chaotic environment. *See Bourgeois*, 2011 WL 1930684, at * 57. The Court finds, therefore, that counsel did not render deficient performance or otherwise prejudice Movant with respect to

his claims focusing on his violent and chaotic environment during his early childhood and developmental years.

Movant further claims that defense counsel failed to obtain all documents and interview readily available witnesses about [Movant's] history of incarceration. Significant evidence of Movant's history of incarceration was presented to the jury. Ms. Bye testified at trial regarding Movant's criminal record beginning as a youth and continuing into adulthood. The Special Findings of the jury again reflect that defense counsel was successful in conveying to all members of the jury that Movant had spent a large portion of his life incarcerated and that Movant's "periods of incarceration have included significant time in solitary confinement." (Doc. 319, App. BB at 8-10). The Court finds, therefore, that counsel did not render deficient performance or otherwise prejudice Movant with respect to his claim focused on his history of his incarceration.

Movant argues that counsel was ineffective for failing to investigate: (1) Movant's history of mental illness related to any diagnosis of PTSD or Bipolar Disorder; 2) Movant's potential for brain damage and dysfunction; and (3) the multigenerational history of mental illness in his family. According to Movant, defense counsel failed to retain a mental health professional specializing in trauma as there existed a multigenerational history of mental illness in Movant's family tree and Movant was genetically predisposed to mental illness. (Doc. 318 at 205-06).

Dr. George W. Woods, a licensed physician specializing in psychiatry and neuropsychiatry as noted above, specifically attested in his affidavit:

> The sheer number of close relatives in [Movant's] family] who suffer from serious mental illness is extraordinary and contributed to a high probability that he, also, would suffer from mental disease. Mood disorders have an incidence in the United States of approximately 8 percent of the population meaning that, at any one time, 8 percent of persons in the United States suffer from various forms of depression or Bipolar Disorder. When there is a genetic loading of mood disorders in a family, the incidence increases exponentially. This genetic loading for mental illness makes the potential for [Movant] to suffer from Bipolar Disorder very high. The co-morbidity of [Movant's] own genetically-based potential for developing a mental illness and the traumatic stress manifested by the circumstances of his upbringing, including the extreme poverty in which his family lived, his caretakers' substance abuse, and neglect and abuse that he and his siblings suffered in their childhood, created greater and more severe symptomatology than either disorder alone may present.

(Doc. 319, Ex. B at 10).

It is possible that further information regarding any mental illness suffered by Movant or the genetic predisposition to mental illness based on his family history could have been mitigating if true. *See Porter v. McCollum*, 130 S.Ct. 447, 454 (2009) (determining that evidence of poor mental health, in addition to other mitigating evidence, could influence a jury's appraisal of defendant's moral culpability). However, evidence of mental impairment functions as a "two-edged sword" as it can be both mitigating and aggravating. *Bourgeois*, 2011 WL 1930684, at *55 (citing *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)).

97

Evidence of mental illness on one hand "might well have helped the jury understand [the defendant], and his horrendous acts," but on the other "might not have made [him] any more likable to the jury[.]"  *Sears v. Upton,* 130 S.Ct. 3259, 3264 (2010).  It is also true that the "double-edged" nature of such evidence may have militated in favor of finding that Movant was a future danger to society.  *Woods v. Thaler,* 399 Fed. Appx. 884, 896-97 (5th Cir. 2010); *Vasquez,* 389 Fed. App. at 429; *Martinez v. Quarterman,* 481 F.3d 249, 254 (5th Cir.2007).

In support of Movant's § 2255 motion, Ms. Bye attested in her affidavit that she felt Movant should have undergone a full mental health evaluation and that she did "not recall any conversations about the subject of retaining an expert to conduct neurophysiological training."  (Doc. 319, Ex. G).  The Court agrees that there is a relative paucity of evidence regarding Movant's history of mental illness and his family's history of mental illness.  The record, however, is not totally devoid of evidence regarding issues of mental illness and brain dysfunction.

Ms. Bye testified that Movant's mother suffered from mental retardation.  She further testified that Movant received psychiatric and psychological treatment while under the control of the Texas Youth Commission Authorities.  Furthermore, while testifying that Movant had an above-average IQ, Dr. Price acknowledged that Movant previously had been diagnosed as having an antisocial adolescent behavior disorder and that Movant showed no remorse or guilt.  In countering the impression that Movant was antisocial, Dr. Price clarified that one psychiatrist's diagnosis may

not necessarily be the correct one.  While not asking Dr. Price to conduct any neuropsychological testing on Movant, Mr. Swanton indicated that he "would have relied on [Dr. Price's] opinion if he felt any such testing was warranted after his interviews with [Movant]."  (Doc. 319, Ex. E).

The Court does not find counsel's performance to be deficient based on counsel's failure to investigate and present additional evidence as to mental illness or the possibility that Movant suffered from brain damage.  On the issue of possible brain damage or dysfunction, Dr. Price stated that he "did not conduct any neuropsychological testing on [Movant] as [he] did not find any suggestion of congenital or acquired brain damage."  (Doc. 319, Ex. F).  The Court finds that defense counsel reasonably relied on this evaluation regarding whether Movant suffered from any type of brain damage or dysfunction as to not investigate any further.

Ms. Bye indicates in her affidavit that she was aware "of several prior evaluations and diagnosis of [Movant] . . . which made [Movant] look dangerous." (Doc. 319, Ex. G).  Rather than focus on mental illness, such as the possible presence of PTSD or Bipolar Disorder, defense counsel sought to elicit testimony from various witnesses that Movant's behavioral issues had improved while in prison.  Eleven jurors found in their special findings that "as [Movant] ages, his behavioral problems may decrease."  (Doc. 319, App. BB at 8-10).  Additional evidence regarding mental illness or brain dysfunction, however, could have

99

influenced the jury to feel that Movant remained a dangerous threat to society. Thus, counsel had a reasoned basis for not making any further inquiries as to Movant's mental illness or family history of mental illness, as such evidence may have militated in favor of finding that Movant was a future danger to society. *See Vasquez,* 389 Fed. App. at 429. *See also Bourgeois*, 2011 WL 1930684, at *55 (stating that "[t]rial counsel's decisions must be weighed with the recognition that the evidence [the movant] faults them for not adducing was not exclusively mitigating" and "[c]ourts [should] defer to counsel's strategic decisions, and especially so when the withholding of beneficial information staves off disclosure of harmful information").

Even assuming counsel rendered deficient assistance in failing to adduce additional evidence regarding mental illness and possible brain damage, the Court does not find that such deficiency prejudiced Movant's defense. As noted above, additional evidence of Movant's specific mental illnesses could possibly have been utilized as evidence that Movant was a future danger to society. The record reflects that the government had presented compelling aggravating evidence regarding Movant's future dangerousness. Given this evidence and the fact that evidence of mental illness or brain dysfunction evidence could act as a two-edged sword, Movant has not established a reasonable probability that a jury would not have sentenced him to death based on counsel's purported deficiencies. *See Woods,* 399 Fed. Appx. at 895-97; *Vasquez*, 389 Fed. Appx. at 425*.*

In sum, Movant has failed to show with respect to any of his claims in Ground Twenty-One that counsel's performance in investigating and presenting mitigating evidence was deficient and/or prejudicial. Because Movant cannot demonstrate a Sixth Amendment *Strickland* violation, he is not entitled to § 2255 relief as to this ground.

### 15.    Grounds Twenty-Two through Twenty-Five

Movant claims in four related grounds that counsel rendered ineffective assistance at the penalty phase by failing to: competently prepare for and cross-examine the Government expert, Dr. Coons, at the penalty-phase portion of the trial (Ground Twenty-Two); investigate and present expert evidence regarding Movant's risk of future violence (Ground Twenty-Three); investigate and present expert evidence of the ability of the federal prison system to control Movant's behavior (Ground Twenty-Four); to investigate and present testimony of Movant's minimal risk of escape from a federal prison (Ground Twenty-Five). Movant's claims in these grounds also are governed by the two-prong standard set forth in *Strickland*.

The Government called Dr. Richard Coons, a psychiatrist, to testify during the penalty-phase of the trial regarding the non-statutory aggravating factor of future dangerousness. (TT, Vol. 16 at 2340). Pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993),[12] Movant's counsel moved to examine Dr.

---

[12]  Under the Federal Rules of Evidence, expert evidence is admissible if it "is the product of reliable principles and methods" that are applied "reliably to the facts of the case." Fed. R. Evid. 702.  "Under *Daubert*, the district court conducts a

Coons outside of the presence of the jury before he gave his testimony. (*Id.* at 2316). The Court granted counsel's motion to examine Dr. Coons with regard to the reliability of predicting Movant's future dangerousness. (*Id.* at 2316-17).

During the *Daubert* hearing which was held outside of the presence of the jury, Mr. Swanton challenged Dr. Coons by stating as a fact that "the American Psychiatric Association has essentially taken the position that the area of future dangerousness is not one that can be predicted with any sort of regularity or scientific regularity." (*Id.* at 2318). Dr. Swanton further questioned Dr. Coons: (1) on the specific empirical date he relied upon in making his assessment on Movant's future dangerousness; and (2) whether he was aware of the studies suggesting that the prediction of future dangerousness is not reliable. (*Id.* at 2319-22). Next, Dr. Swanton confronted Dr. Coons on the lack of peer review performed with regard to predicting future dangerousness and the fact that his technique and theory cannot be scientifically studied. (*Id.* at 2324-25). During the *Daubert* hearing, Dr. Coons admitted that he did not perform a formal follow-up study in connection with any of the individuals previously declared by him to be future dangers. (*Id.* at 2328).

At the close of the *Daubert* hearing, Mr. Swanton argued that Dr. Coons's testimony with respect to future dangerousness does not meet the *Daubert* test

---

'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts in issue.'" *United States v. Norris*, 217 F.3d 262, 269 (5th Cir. 2000) (quoting *Daubert*, 509 U.S. 592-93).

because: (1) his theory or technique has not been tested; (2) his theory is subjective; (3) his theory has not been subjected to peer review; and (4) his technique is not accepted by the American Psychiatric Association. (*Id.* at 2337). Mr. Swanton further objected to Dr. Coons's testimony on constitutional grounds and that it would be prejudicial to Movant. (*Id.* at 2338). The Court ultimately overruled counsel's objections and allowed the government to call Dr. Coons to testify on the issue of future dangerousness. (*Id.* at 2340).[13] Dr. Coons's testimony on direct examination is summarized as follows:

(1)   Dr. Coons has "done a number of evaluations for issues like future dangerousness" in connection with capital murder cases.

(2)   In evaluating future dangerousness, Dr. Coons looks at the defendant's history of violence, his area of conscience, and how particular death penalty defendants are on their good behavior while hoping to get their sentenced modified or reversed.

(3)   The Government provided Dr. Coons with numerous records which Dr. Coons felt was sufficient to reach an opinion as to Movant's future dangerousness.

(4)   in answering a hypothetical in which the prosecutor outlined a person having a similar history and characteristics to Movant and committing similar crimes to those perpetrated by Movant, Dr. Coons stated that such person would have a "probability of future violence."

---

[13] On direct appeal, Movant advanced several challenges to the Court's admission of Dr. Coon's testimony. *Fields*, 483 F.3d at 341-45. The Fifth Circuit rejected all of Movant's contentions, concluding that: (1) no court has ever applied *Daubert* to sentencing; (2) a quasi-*Daubert* hearing is not required to satisfy the FDPA; (3) Dr. Coons's testimony was not so unreliable that the district court abused its discretion by admitting it into evidence; and (4) the admission of such testimony did not violate the Fifth and Eighth Amendments. *Id.*

(5)     Dr. Coons based his opinion by looking at a variety of factors, including the persons history of violence and criminal conduct, the incidents leading to his current convictions, the issue of conscience, and the issue of where that person will reside under either a life or death sentence.

(6)     Dr. Coons found that it was significant the person's "inability to stabilize in a correctional facility for an extended period of time."

(7)     Dr. Coons summarized his opinion that "it's significantly more likely than not that he will be of a danger to other people, other inmates and correctional officers and medical personnel and so forth."

(TT, Vol. 16 at 2341-53).

Mr. Swanton conducted a vigorous cross-examination of Dr. Coons. (*Id.* at 2353-60). Dr. Coons acknowledged that he had reached a conclusion regarding Movant's future dangerousness based on Movant's records alone and before answering the prosecutor's questions regarding the hypothetical. (*Id.* at 2353-54). Dr. Coons recognized that there is a "considerable subjective element" with regard to his conclusions and that it would be difficult to scientifically arrive at the conclusions he reached. (*Id.* at 2354-55). Dr. Coons further testified on cross-examination that: (1) his theory on predicting future dangerousness has not been subjected to appropriate peer review; (2) he could not quote any specific study that validated such a subjective opinion on the issue of future dangerousness; and (3) some members of the American Psychiatric Association "have difficulty with the issue" of predicting future dangerousness. (*Id.* at 2355-56).

104

Dr. Swanton's cross-examination elicited from Dr. Coons that it was possible that Movant would not be violent in the future. (*Id.* at 2356-57). Dr. Coons conceded that records did not reflect Movant "actually physically injuring a guard" while in prison and that he was unsure about whether Movant's model behavior in prison was solely due to the fact his case was nearing trial. (*Id.* at 2359). Finally, Dr. Coons acknowledged on cross-examination that studies have been performed showing that as prisoners get older their behavior slows down and they are less likely to act violently. (*Id.* at 2360). In its Special Findings, however, the jury unanimously found that "[Movant] is likely to commit serious acts of violence in the future which would be a continuing and serious threat to the lives and safety of others, including, but not limited to, inmates and correctional officers in an institutional correctional settings [sic] . . . ." (Doc. 319, App. BB at 7).

In related Grounds Twenty-Two through Twenty-Five, Movant essentially argues that: (1) "the jury's finding was based on a misleading presentation by . . . Dr. Richard Coons"; (2) Movant's counsel "failed to introduce readily available evidence to counter Dr. Coons' risk assessment" in order to "demonstrate that, in fact, [Movant] presented a very low risk of future danger"; (3) Movant's counsel failed to cross-examine Dr. Coons in an effective manner; and (4) Movant's counsel "failed to hire a defense expert who could have countered Dr. Coons' testimony and pointed out flaws . . . in his approach and conclusion." (Doc. 318 at 230-31). In support of his ineffective-assistance-of-counsel claims, Movant has submitted declarations from

Dr. Mark Cunningham (a clinical and forensic psychologist) and former Bureau of Prison's ("BOP") Warden Mark A. Bezy.  (Doc. 319 at 231, Exs. C and D).   Both Dr. Cunningham and Mr. Bezy attest that, at the time of Movant's trial, "the BOP was in a position to virtually negate the risk of violence or escape of prisoners with a far more aggravated history than [Movant]." (*Id.* at 231).  In addition, Movant contends that "defense counsel's failure to retain an expert who could have presented testimony rebutting nearly all of the Government's case for 'future dangerousness.'" (*Id.* at 251).

After careful review of the record, the Court finds that Movant's claims in Grounds Twenty-Two through Twenty-Five are without merit as he cannot establish that counsel's performance was deficient and/or prejudicial.  Mr. Swanton states that he was familiar with Dr. Coons's approach, having tried previous cases involving Dr. Coons.  (Doc. 319. Ex. E).  The record reflects that Movant's counsel conducted a vigorous challenge to Dr. Coons's testimony on the issue of future dangerousness. Defense counsel first sought to exclude Dr. Coons's testimony altogether through a *Daubert* hearing in which he attacked the methodology and reliability of Dr. Coons's theory.

Movant complains that defense counsel failed to rebut Dr. Coons's testimony with readily available studies "that unequivocally rejected the notion that future dangerousness risk prediction can be assessed without empirical evaluation." (Doc. 318 at 240).  Despite not presenting any specific studies on the matter, the Court

106

nevertheless finds Mr. Swanton effectively attacked Dr. Coons through cross-examination on matters relating to the reliability and scientific nature of his theory and technique. Specifically, counsel elicited the following important concessions from Dr. Coons regarding his assessment of future dangerousness: (1) his conclusion regarding Movant's future dangerousness was based on Movant's records alone; (2) there is a "considerable subjective element" with regard to his conclusions and that it would be difficult to scientifically arrive at same; (3) his theory on predicting future dangerousness has not been subjected to appropriate peer review; (4) he could not quote any specific study that validated such a subjective opinion on the issue of future dangerousness; (5) some members of the American Psychiatric Association "have difficulty with the issue" of predicting future dangerousness. (TT, Vol.16 at 2353-56). Overall, the Court finds that counsel reasonably and competently attacked Dr. Coons's methodology.

Movant contends that defense counsel failed to discover and present readily available evidence about BOP's ability to prevent Movant from future violence by housing him at a secure prison facility. (Doc. 319 at 246-47). Dr. Cunningham states that a super-maximum facility located in Florence, Colorado ("ADX") is an ultra-secure facility for inmates with prison assault and escape histories. (Doc. 319, Ex. C at 10). Mr. Bezy indicated in his declaration that the BOP had the capacity before Movant's trial in 2004 to house him in a highly secure prison environment such as the USP-Marion. (*Id.*, Ex. D at 4). On the issue of future dangerousness,

however, Movant does not cite and this Court has not found any cases holding that counsel rendered ineffective assistance of counsel for failing to submit evidence of the ability to house an inmate in a super-maximum facility like the ADX.

Rather than present evidence on the existence of such super-secure facilities, defense counsel reasonably focused on establishing that Movant's violent tendencies would decrease with age and as a direct result of his high intellectual ability.  Several prison employees called to the stand by Movant's counsel testified that Movant's behavior had improved during the months before his trial.  (TT, Vol. 16 at 2377-78, 2381, 2386-87).  More importantly, defense witness Dr. Price agreed with studies showing behavioral problems as decreasing with age.  (*Id.* at 2479).  According to Dr. Price, "[a]ge is one of the most correlated factors to criminal behavior and also to institutional maladjustment that the older someone gets, the less likely they are to be involved in crime and the less likely they are to cause behavior problems in prison." (*Id.*).  In symmetry with Dr. Price's testimony, Movant's counsel evoked testimony from Dr. Coons suggesting that Movant's behavior would improve with age.  (TT, Vol. 16 at 2359).

On the issue of Movant's intellect, Dr. Price testified that Movant did not exhibit any behavioral problems while incarcerated in Fort Worth before the trial and that Movant's "intelligence is the ability to adapt" to a federal prison environment and a long-term prison life.  (TT, Vol. 16 at 2477-81).  The Court finds that defense counsel provided reasonable and competent assistance by attempting to establish before the

jury that Movant's capacity for violence was decreasing and would continue to do so as he aged. Movant's attack based on counsel's failure to present evidence on facilities like the ADX amounts to improper second guessing of counsel's performance with regard to the issue of future dangerousness. *Strickland*, 466 U.S. at 689.

The Court further finds that counsel did not render ineffective assistance by failing "to retain an expert who could have presented testimony rebutting nearly all of the Government's case for 'future dangerousness.'" (Doc. 318 at 251-55). As noted above, defense counsel vigorously attacked Dr. Coons's methodology through cross-examination and provided testimony from other witnesses, including a psychiatrist, which attenuated Dr. Coons's conclusion about Movant's likelihood for being a future danger. An expert witness summoned by defense counsel would have been subjected to intense cross-examination by the prosecution. Likewise, the qualifications of defense counsel's expert and the methodologies relied on by him would have been subjected to scrutiny before the jury. The Court is required to be highly deferential to defense counsel's performance, and Movant's challenge based on counsel's failure to call an expert witness is another attempt at second guessing counsel's reasonable performance. *Strickland*, 466 U.S. at 689.

Assuming counsel's performance was somehow deficient in connection with the issue of future dangerousness, Movant has failed to demonstrate the requisite prejudice. The Court is not convinced that the outcome of the jury's death penalty

109

deliberations would have changed if counsel had presented evidence from its own expert further discrediting the theories of Dr. Coons and had identified for the jury super-maximum facilities for Movant's life-time incarceration. The mention of such ultra-secure prisons may have reinforced to the jury the idea that Movant would always remain a future danger and would, therefore, require the utmost security measures to counter his natural and unwavering violent proclivities.

The Court further notes that the issue of future dangerousness was not the only aggravating factor found by the jury in its deliberation on whether to recommend the death penalty. Indeed, the jury unanimously answered "Yes" to the following statutory and non-statutory aggravating factors:

(1)    the death, or the injury resulting in death of Ms. Coleman occurred during the commission or attempted commission of the crime of escape.

(2)    Movant has previously been convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or attempted use of a firearm against another person.

(3)    "[Movant] caused injury, harm, and loss to [Ms.] Coleman, her family and children, and her friends as demonstrated by the victim's personal characteristics as an individual, including the fact that she was a new mother to a prematurely born infant, and the impact of her death upon her family, children, and friends."

(4)    "Prior to the murder of [Ms.] Coleman, [Movant] participated in attempted murders and other serious acts of violence."

(Doc. 319, App. BB at 4-7). Thus, even if counsel had performed as Movant urges and at least one member of the jury would have voted against a finding of future

dangerousness, the Court does not find a reasonable probability that the ultimate sentence would have changed in light of the additional and serious aggravating factors present in this case. The unique aggravating factors in this case include that Movant murdered Ms. Coleman during his escape from prison, that he had committed several prior criminal acts, and that the victim was a new mother at the time of the murder.

In sum, Movant has failed to show with respect to any of his claims in Grounds Twenty-Two, Twenty-Three, Twenty-Four, and Twenty-Five that counsel's performance pertaining to Dr. Coons's testimony and the issue of future dangerousness was deficient and/or prejudicial. Because Movant cannot demonstrate a Sixth Amendment *Strickland* violation, he is not entitled to § 2255 relief as to these grounds.

### 16.    Ground Twenty-Six

Movant claims in Ground Twenty-Six that the government committed prosecutorial misconduct by misrepresenting the conditions of Movant's confinement and potential for future dangerousness. Movant attacks in this ground the government's penalty-phase presentation to the jury that no prison facility is capable of controlling Movant and that Movant, therefore, would constitute a future danger unless executed. (Doc. 318 at 256).

As discussed above, Movant can establish a "due process violation based on the government's use of false or misleading testimony" by establishing "that (1) the

111

testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *Webster*, 392 F.3d at 801. "The materiality requirement implicitly recognizes that the misconduct's effect on the trial, not the blameworthiness of the prosecutor, is the crucial inquiry for due process purposes." *Smith v. Phillips,* 455 U.S. 209, 220 n.10 (1982).

When the claim attacks whether a particular argument of the prosecutor, a court must first decide whether or not the prosecutor made an improper argument or remark. *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999). Even if an improper argument or remark has been made, "it is not enough that the prosecutor's remarks were undesirable of universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotations and citation omitted). Instead, courts must inquire as to whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* In other words, the prosecutors acts of misconduct must be of such quality to necessarily prevent a fair trial to the defendant. *Nichols v. Scott*, 69 F.3d 1255, 1278 (5th Cir. 1995).

"Moreover, the burden is on the habeas petitioner to also show a reasonable probability that but for these remarks the result would have been different." *Id.* (internal quotations and citation omitted). *See also Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (recognizing that a petitioner is entitled to habeas relief only if he can show that the error "has substantial and injurious effect or influence in

112

determining the jury's verdict"). In evaluating the prejudicial effect of a prosecutor's particular comment or argument, the Court "must consider the magnitude of the prejudicial effect, the efficacy of cautionary instructions, and the strength of the defendant's guilt." *Harrison v. United States*, No. 1:08-CV-552, 2011 WL 1769101, at *3 (E.D. Tex. Mar. 31, 2011) (citing *United States v. Raney*, 633 F.3d 385, 394 (5th Cir. 2011)).

During the penalty-phase portion of the trial, the Government called Jimmy Stone (deputy sheriff of the McLennan County Sheriff's Department) to the witness stand. (TT, Vol. 16 at 2296). Deputy Stone testified on direct examination that there is no escape-proof prison and no prison facility where inmates cannot do damage or injury to another inmate or officer. (*Id.* at 2310). On cross-examination, however, Deputy Stone acknowledged that he had never been in a federal prison and that he had no knowledge as to whether a "high level federal prison is more secure than the McLennan County Detention Facility." (*Id.* at 2313). The prosecutor remarked in pertinent part at closing that:

> Mr. Swanton, said to you, he reiterated what the Judge said, the only way he's going to get out is in a pine box, unless of course he escapes. Unless of course, there is another Benny Garrett.
>
> When you're thinking about whether or not [Movant] is a future danger, think about the pattern of conduct. Think about – I mean isn't the very essence of future danger, isn't the very definition of being a future danger that you escape from jail and kill someone? Isn't that what happened. That's what happened in this case.

(*Id.,* Vol. 17 at 2541).[14]

Movant complains about the Government's conduct in connection with Mr. Stone's testimony and closing argument because it failed to disclose that executing Movant was not the only adequate means of limiting his risk for future dangerousness. (Doc. 318 at 257). Movant again relies on the declarations of Dr. Cunningham and Mr. Bezy, in which they state that maximum-security prison facilities such as the ADX and USP-Marion were available to house Movant and virtually negate his ability either to escape prison or commit violence. (Doc. 319, Exs. C and D). Thus, Movant, contends that the Government's improper reliance on inaccurate testimony concerning the likely and available conditions of Movant's post-conviction confinement misled the jury and violated Movant's constitutional right to a fair trial. (Doc. 318 at 260).

When reviewing the particular facts of the instant case, the Court does not find a constitutional violation with respect to Mr. Stone's testimony and the prosecutor's ensuing remarks at closing. Mr. Stone's testimony reflected his sincerely-held belief that no prison facility either was escape proof or capable of eliminating all prisoner violence. Even assuming that Mr. Stone's testimony misled the jury in some fashion as to whether more secured prisons were available for Movant's incarceration, Movant has failed to establish that Mr. Stone's testimony was material to the ultimate

---

[14] Evidence presented at the guilt-innocence phase of the trial established that Mr. Garrett, a correctional officer, aided Movant's escape from the McLennan County Detention Center in exchange for $5,000. (TT, Vol. 11 at 1567-68).

death sentence. The record reflects that other witnesses provided compelling testimony as to the issue of future dangerousness and the other aggravating factors found by the jury to exist in this case.

Furthermore, the Court also does not find the prosecutor's closing remarks at issue to be improper. Movant fails to show that the prosecutor made a false or misleading statement as he reasonably remarked that a man who has escaped from prison and murdered someone may constitute a future danger if given the opportunity to do so again. Even assuming that the prosecutor's remarks could be considered improper as failing to disclose the existence of a maximum-secured federal facility, the Court does not find that this isolated comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181*.*

The record reflects that the prosecutor made several additional closing remarks regarding the various statutory and non-statutory aggravating factors that may have led to the jury's ultimate conclusion of imposing the death penalty. Specifically, the prosecutor argued that: (1) Movant deliberately planned the murder; (2) Movant committed the murder while in the commission of an escape; (3) Movant had an extensive arrest record; and (4) the evidence shows harm to the victim's family and friends as demonstrated by the victim's personal characteristics (including the fact she was a new mother with a prematurely-born infant). (TT, Vol. 17 at 2507-10). Movant, therefore, cannot show that any statements or omissions regarding the

capability of the federal prison system to contain Movant prejudiced Movant to the extent that it would not have returned a death penalty verdict.  *See Brecht*, 507 U.S. at 623; *Raney*, 633 F.3d at 394.

In sum, Movant has failed to demonstrate a constitutional violation with respect to Mr. Stone's testimony and the related comment from the prosecutor at closing as to Movant's conditions of confinement and the potential for future dangerousness.   Accordingly, Movant is not entitled to § 2255 relied as to Ground 26.

### 17.    Grounds Twenty-Seven and Twenty-Eight

Movant claims in two related grounds that counsel rendered ineffective assistance at the penalty phase by failing to: respond to the prosecutor's misleading evidence and arguments concerning his risk for future dangerousness (Ground Twenty-Seven); and object to the prosecutions's misleading evidence and arguments concerning his risk for future dangerousness and present readily available evidence contradicting the prosecution (Ground Twenty-Eight).   Movant contends that "there was an abundance of readily available evidence that could have been used to refute the Government's argument concerning [Movant's] risk of escape and prison violence while housed in a high security U.S. Penitentiary." (Doc. 318 at 265).

The substance of Movant's claims in Grounds Twenty-Seven and Twenty-Eight has already been addressed and rejected in connection with the Court's

discussion of Grounds Twenty-Two through Twenty-Five, *supra*.    Counsel's performance on the issue of future dangerousness was reasonable and not subject to the second-guessing now undertaken by Movant.    *Strickland*, 466 U.S. at 689. Furthermore, Movant has failed to show a reasonable probability that the jury's death penalty deliberations would have changed if counsel had presented additional evidence further discrediting the theories of Dr. Coons and had identified for the jury super-maximum facilities for Movant's life-time incarceration.    As discussed above, the jury unanimously found the presence of several aggravating factors other than its findings on future dangerousness that contributed heavily to its recommendation of a death sentence.

In sum, Movant has failed to show with respect to any of his claims in Grounds Twenty-Seven and Twenty-Eight that counsel's performance was deficient and/or prejudicial.    Because Movant cannot demonstrate a Sixth Amendment *Strickland* violation, he is not entitled to § 2255 relief as to these grounds.

### 18.    Ground Twenty-Nine

Movant claims in Ground Twenty-Nine that his rights to a jury trial and reliable determination of punishment were violated when the trial court instructed the jury to continue deliberations after the jury informed the court that they could not come to a unanimous decision.    Movant's ground is based on his contention that the jury instruction was coercive and that one juror changed her vote from life to death as a result of the instruction.    (Doc. 318 at 265-66).

117

As noted above, however, any issue surrounding the Court's specific charge to continue deliberations was resolved on direct appeal by the Fifth Circuit. Movant argued on direct appeal that this instruction to the jury "impermissibly coerced a verdict of death." *Fields*, 483 F.3d at 338. The Fifth Circuit ruled that the Court's *Allen* charge was not unfairly prejudicial or coercive and that the Court, therefore, did not abuse its discretion in issuing such a charge to the jury. *Id.* at 338-40. Movant, therefore, cannot relitigate this issue in this § 2255 motion to vacate. *See United States v. Rocha*, 109 F.3d 225, 230 (5th Cir. 1997); *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986). *See also Moore v. United States*, 598 F.2d 439, 441 (5th Cir. 1979) (explaining that "[t]he appellate process does not permit reruns"). Accordingly, Movant is not entitled to § 2255 relief with respect to his claim in Ground Twenty-Nine.

### 19.    Grounds Thirty through Thirty-Five

Movant claims in several related grounds that: Movant's rights to due process and a reliable determination of punishment were violated when the trial court required Movant to wear a stun belt during trial (Ground Thirty); Movant's rights to counsel and a reliable determination of punishment were violated when the trial court failed to warn Movant of the disadvantages of wearing a stun belt (Ground Thirty-One); Movant's right to be present at trial was violated by requiring him to wear a stun belt during the entire trial (Ground Thirty-Two); Movant received ineffective assistance of counsel because counsel failed to demand a hearing requiring the

requirement that Movant wear a stun belt (Ground Thirty-Three); Movant's right to counsel during the penalty phase of the trial was violated by requiring Movant to wear a stun belt (Ground Thirty-Four); and Movant's right to a reliable sentence determination was violated by the requirement that Movant wear a stun belt (Ground Thirty-Five).

The Supreme Court has held that "[v]isible shackling undermines the presumption of innocence and the related fairness of the factfinding process." *Deck v. Missouri,* 544 U.S. 622, 630 (2005) (holding that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding"). Visible physical restraints also may interfere with a defendant's Sixth Amendment right to counsel, because "they can interfere with a defendant's ability to participate in his own defense, say, by freely choosing whether to take the witness stand on his own behalf" or by limiting a defendant's ability to communicate with his lawyer. *Id.* at 631. The *Deck* Court explained that shackling a defendant is inherently prejudicial because it implicates three fundamental principles: (1) the presumption of innocence; (2) the right to counsel, including the right to participate in one's defense and the right to testify; and (3) judicial responsibility for the dignity and decorum that preserves the judicial process. *Id.* at 630–31.

The defendant's right to be free of restraints in the courtroom is not absolute, but instead is based on balancing the defendant's right not to be viewed in a

prejudicial light by the jury against the court's need for security.  *Id.* at 633 (noting

that although "courts cannot routinely place defendants in shackles or other physical

restraints visible to the jury during the penalty phase of a capital proceeding," this

constitutional requirement "is not absolute" and so a judge may take account of

"special circumstances ... that may call for shackling").  A trial court, therefore, may

not impose a visible physical restraint upon a criminal defendant without making an

individualized finding of dangerousness or risk of escape.  *Id.* at 626; *See also*

*Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986) (explaining that the shackling of a

defendant is "inherently prejudicial" and is only "justified by an essential

[governmental] interest specific to each trial"); *Illinois*, 397 U.S. at 343-44

(recognizing that "no person should be tried while shackled and gagged except as

a last resort").

In contrast to visible shackling, the Supreme Court has not yet considered

whether and how a trial court may order, without violating any constitutional rights,

a defendant to wear a stun belt as a security device at trial.  Several circuit courts

have weighed in on this matter.  The Ninth and Eleventh Circuits have concluded

that stun belts amount to physical restraints and that such restraint can

psychologically impact a defendant by chilling his consultation with counsel due to

the danger of accidental activation of an electrical charge.  *See Gonzalez v. Pliler*,

341 F.3d 897, 900-01 (9th Cir. 2003); *United States v. Durham*, 287 F.3d 1297, 1305-

06 (11th Cir. 2002).  These circuit courts as well as the Tenth Circuit hold that the use

120

of stun belts must be subject to the same close judicial scrutiny required for the imposition of other physical restraints and that the trial court must, therefore, make individualized findings on the record to justify the stun belt's use. *United States v. Wardell*, 591 F.3d 1279, 1294-96 (10th Cir. 2009); *Gonzalez*, 341 F.3d at 901-02; *Durham*, 287 F.3d at 1306-07.

The Sixth Circuit, however, has reached the opposite conclusion as to whether it was necessary for a trial to make an individualized determination as to the necessity of wearing a stun belt that was not visible to the jury. *See Earhart v. Konteh*, 589 F.3d 337, 348-49 (6th Cir. 2009); *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008). The Sixth Circuit determined that "*Deck's* facts and holdings . . . concerned *only visible* restraints at trial," which is a limitation stressed throughout the Supreme Court's opinion in *Deck*. *Mendoza*, 544 F.3d at 654. Thus, according to the Sixth Circuit, "requiring the petitioner to wear a stun belt while acting as his own counsel, without any individualized determination of necessity by the trial court, did not violate his due process rights where the stun belt was not visible to the jury." *Slater v. Conway*, No. 11-CV-0047 (MAT), 2012 WL 777481, at *14 (W.D. N.Y. Mar. 7, 2012) (citing *Earhart*, 589 F.3d at 348-49).

The Court will now turn to the relevant facts of Movant's trial before analyzing Movant's claims attacking the use of the stun belt. At the beginning of the trial, the Court considered security matters involving Movant. (TT, Vol. 1 at 51). Dan Phillips of the United States Marshal's Service informed the Court as follows:

> Marshal's Service has evaluated the security needs and we're taking everything into factor, specifically [Movant's] criminal history, violent criminal history, his history of escape and escape attempts since he's been back in custody. We have determined that it will be necessary to use an electronic restraint belt during the trial. This is something that has been used throughout the Marshal's Service regularly since 1996. The Marshal's Service has used it 174 times since 1996. This device has been used over 63,000 times since 1993 in courtrooms across America. Attached to my memo is case law supporting the use of this in the courtroom and containing the security needs.
>
> Basically, [Movant] has presented continual problems while he has been is custody . . . . [I]ts the Marshal's Service opinion that the electronic stun belt is necessary to make sure that he complies here in the courtroom and maintain the safety in the courtroom.

(*Id.* at 52-53). Marshal Phillips further informed the Court that "this belt can be worn under clothing, [and] isn't visible to the jury in any fashion." (*Id.* at 56). Further, he clarified that the stun belt's purpose was to eliminate any kind of physical restraint, was "easily concealed beneath a sport coat," and did not restrict Movant's movement." (*Id.* at 57). The Court required Movant to wear a stun belt during both the guilt and penalty phases of the trial.

On direct appeal, Movant claimed that the Court abused its discretion by directing him to wear a stun belt. *Fields*, 483 F.3d at 356. Specifically, Movant contended: "(1) that the trial court failed to find explicitly that the stun belt was necessary or to exercise its discretion independently from the recommendation of the Marshals Service and (2) that the decision to use a stun belt was substantively unjustified in light of his good behavior during previous court appearances and due to the heightened prejudice restraints may cause a *pro se* litigant." *Id.* at 356-57.

122

The Fifth Circuit rejected each of Movant's contentions. The appellate court first determined that a trial court may rely on the advice of the United States Marshals and that the Court's "reasons for restraining [Movant] are readily apparent" based on Marshal Phillips's testimony. *Id.* at 357. The Fifth Circuit further concluded that the use of the stun belt was justified in light of Movant's prior escape attempts and history of violence. *Id.* Finally, the Fifth Circuit recognized the Court's conciliatory measures in making sure the stun belt was not visible to the jury and providing that both sides remain seated before the jury. *Id.*

Contrary to Movant's arguments, the Court finds no constitutional violations with respect to the use of the stun belt at his trial. To the extent that Movant seeks to raise before this Court issues similar to those brought before the Fifth Circuit, they are barred from reconsideration in this § 2255 motion to vacate. *See Rocha*, 109 F.3d at 230*; Kalish*, 780 F.3d at 508. Conversely, to the extent Movant raises issues not specifically considered by the Fifth Circuit, they are without merit as discussed below.

Movant has not cited and this Court has not found any controlling Fifth Circuit opinion which requires a trial court to make an individualized determination as to the necessity of a stun belt. The Court agrees with the Sixth Circuit's conclusion that *Deck's* holding is limited to visible restraints such as shackling. Furthermore, rather than mandate an individualized determination as to the necessity of a non-visible stun belt, Fifth Circuit case law suggests that a trial court may rely heavily on the

123

advice of the United States Marshal. *Fields*, 483 F.3d at 357. In this case, Marshal Phillips informed the Court that Movant had presented a serious security risk based on his history of violence, successful escapes, and attempts to escape. Thus, the Court was well justified in deploying a stun belt on Movant during the course of the entire trial. *See Holbrook*, 475 U.S. at 568-69; *United States v. Joseph*, 333 F.3d 587, 590-91 (5th Cir. 2003). The Court, therefore, rejects each of Movant's constitutional claims based on the lack of making an individualized determination on the record as to the necessity of a stun belt.

Even assuming that the Court was constitutionally required to make proper individualized findings on the record as to the necessity for a stun belt, any such error was harmless as it had no substantial or injurious effect or influence in determining the jury's verdicts in either the guilt of penalty phases of the trial. *Deck*, 544 U.S. at 635; *Brecht*, 507 U.S. at 637–38. Prejudice can never be presumed from the use of a stun belt, where there is no evidence that any juror actually observed it. *United States v. McKissick*, 204 F.3d 1282, 1299 (10th Cir.2000). *See also Stevens v. McBride*, 489 F.3d 883, 899 (7th Cir. 2007) (citing *United States v. Brooks*, 125 F.3d 484, 502 (7th Cir.1997)) (explaining that the use of a stun belt in order to restrain a defendant at trial served to minimize the risk of prejudice where the stun belt is hidden beneath a defendant's clothing). Movant fails to establish any prejudice as the stun belt was concealed from the jury's view and never activated during any part of the trial. *McKissick*, 204 F.3d at 1299; *Stevens*, 489 F.3d at 899.

Furthermore, the deployment of the non-visible stun belt did not unfairly implicate or interfere with Movant's presumption of innocence, his right to participate effectively in his own defense, and the Court's responsibility for the dignity and decorum that preserves the judicial process. *Id.* at 630–31. Reasonable steps were taken to ensure that the jury would not see the stun belt and for Movant to be treated equally with the prosecutors during the guilt phase of the trial when Movant represented himself. While now complaining about the stun belt's physical and psychological restrictions, Movant never expressed to the Court that the stun belt interfered with his ability to represent himself or inhibited his ability to consult and otherwise communicate effectively with counsel during the penalty phase.

In addition, compelling evidence was presented before the Court to warrant guilty verdicts on all charges and the imposition of the death penalty. Thus, even if the Court committed a *Deck* error in failing to make individualized determinations on the record, such error is harmless as Movant cannot show that the use of the stun belt had a substantial or injurious effect or influence in determining the jury's verdicts. *See Deck,* 544 U.S. at 635; *Brecht*, 507 U.S. at 637–38.

In sum, the Court concludes that no constitutional violations occurred as a result of the use of the stun belt. In light of the above discussion, the Court does not find that counsel's performance was either deficient or prejudicial in failing to object to the use of the stun belt either before the time Movant waived his right to counsel or during the penalty phase of the trial. Movant's rights to counsel and a reliable

125

sentence also were not violated.  Accordingly, Movant is not entitled to relief with respect to any of his claims in Grounds Thirty through Thirty-Five.

### 20.    Ground Thirty-Six

Movant claims in Ground Thirty-Six that his right to self-representation was violated by the conditions of his confinement during the course of his trial (Ground Thirty-Six).  Movant contends that the conditions of his confinement in detention interfered with his ability both to prepare for the next day's examination and to sleep which, in turn, impaired his ability to conduct his own defense.  (Doc. 318 at 267, 272).

Movant has cited no authority to support his claim in Ground Thirty-Six.  He otherwise has presented no credible evidence to suggest that the nature of his detention adversely impacted his ability to represent himself at trial.  Movant's challenge to his conditions of confinement is separate from any challenge to his underlying convictions and sentence, and he cannot demonstrate that such conditions violated his *Faretta* right to self-representation.  Accordingly, he is not entitled to relief with respect to Ground Thirty-Six.

### 21.    Grounds Thirty-Seven through Forty-One

Movant claims in several related grounds that: Movant's rights were violated by the increased security measures that were apparent to the jurors (Ground Thirty-Seven); Movant received ineffective assistance of counsel when counsel failed to explain to the jurors how the increased security measures, including the presence

of the stun belt, altered Movant's demeanor (Ground Thirty-Eight); Movant's right to a reliable determination of punishment was violated when the United States Marshals increased security after the jury returned a guilty verdict (Ground Thirty-Nine); Movant's rights to a jury trial and a reliable determination of punishment were violated when the United States Marshals informed the jurors that they would escort them to their vehicles during the penalty phase (Ground Forty); and Movant's rights to be present and a reliable determination of punishment were violated when the trial court told the jurors to report any threats to the court (Ground Forty-One).

While the accused at a trial is entitled to certain rights and the presumption of innocence, these interests "must be balanced against the court's obligation to protect the court and its processes, and to attend to the safety and security of those in the courtroom." *United States v. Nicholson*, 846 F.2d 277, 279 (5th Cir. 1988) (citing *Holbrook,* 475 U.S. 560 and *Illinois*, 397 U.S. 337). The Fifth Circuit recognizes that "[t]his balancing of competing interests is *entrusted* to the sound discretion of the trial court." *Nicholson*, 846 F.2d at 279 (emphasis supplied). Security measures only violate a criminal defendant's right to a fair trial if they are either inherently prejudicial or cause actual prejudice. *See Holbrook*, 475 U.S. at 572.

The Court finds no constitutional violations with respect to Grounds Thirty-Seven and Thirty-Nine grounds, in which Movant challenges the presence of additional security measures provided during the course of Movant's trial. The open deployment of security guards in a courtroom is not an inherently prejudicial practice.

*See Holbrook*, 475 U.S. at 568-69.  In this case, the balancing of interests tipped in favor of additional security measures as it had been established that Movant was an escape risk with a history of violent behavior.  After a guilty verdict was returned against Movant, the decision to deploy additional United Marshals was also a reasonable exercise of the Court's discretion.  Movant has failed to establish that he was prejudiced by the Court's actions on these security matters or otherwise denied a fair trial at both the guilt and punishment phases.

As discussed above, the Court has rejected Movant's constitutional claims with respect to the Movant's wearing of the stun belt.  Movant now complains in Ground Thirty-Eight that counsel rendered ineffective assistance by failing to explain to the jury how the wearing of the stun belt adversely impacted on Movant's demeanor.  The Court, however, does not agree that counsel's performance fell below an objective standard of reasonableness.  No evidence has been presented to show that the stun belt was visible to the jury.  Common sense suggests that counsel wanted to avoid bringing unwarranted attention to a security device that was out of the jury's view.  In addition to failing to establish deficient performance on this claim, Movant also has failed to demonstrate a reasonable probability that the outcome of either the guilt or punishment phases would have changed.

Movant next asserts in Ground Forty that his constitutional rights were violated when, after the guilty verdict on all counts of conviction, the United States Marshals informed jurors that they would escort them to their vehicles.  In a criminal case, any

contact or communication with a juror during a trial about the matter pending before the jury is presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 229 (1954). In this case, the presumption of prejudice is inapplicable as the United States Marshal's contact with the jurors regarding being escorted to their vehicles did not involve a matter pending before the jury. No evidence has been presented that any United States Marshal discussed matters pending before the jury during the course of the jury escorts. *See United States v. Brooks*, 161 F.3d 1240, 1246-47 (10th Cir. 1998) (finding no *Remmer* presumption of prejudice where there was no evidence that the juror discussed any matter with the security officers about the matter pending before the jury).

In addition, the Court finds that the action of escorting jurors to their vehicle did not actually prejudice Movant. Indeed, jury escorts are subject to a number of inferences. *See Brown v. Cain*, No. 09-924-D-M2, 2011 WL 7096615, at *24 (M.D. La. Nov.22, 2011) (citing *Holbrook*, 475 U.S. at 572). After the guilty verdict was returned against Movant, the decision to use jury escorts constituted a reasonable security measure. Movant has failed to establish that he was prejudiced in such a way that this security measure would lead each juror to believe the death penalty should be imposed over any other possible penalty.

Lastly, in Grounds Thirty-Nine and Forty-One, Movant asserts that his constitutional rights were violated when the trial court told the jurors to report any threats to the court. Movant fails to indicate when the Court issued this advisement

to the jury.  Nevertheless, the balancing of interests in this case tipped in favor of the Court taking additional security precautions.  Movant has failed to establish that he was prejudiced by the Court's action on this security matter or otherwise denied a fair trial at both the guilt and punishment phases.

The Court overall finds no constitutional violation with regard to any of Movant's claims in Grounds Thirty-Seven, Thirty-Eight, Thirty-Nine, Forty, and Forty-One.  Accordingly, Movant is not entitled to § 2255 relief with respect to these grounds.

### 22.   Grounds Forty-Two through Forty-Five

Movant claims in several related grounds that: the FDPA is unconstitutional because it fails to require comparative proportionality review (Ground Forty-Two); Movant received ineffective assistance of appellate counsel when his appellate counsel failed to raise the issue on direct appeal that the FDPA is unconstitutional (Ground Forty-Three); if the Constitution mandates comparative proportionality, Movant's death sentence must therefore be overturned as disproportionate (Ground Forty-Four); and Movant received ineffective assistance of appellate counsel when appellate counsel failed to raise the claim that the Constitution mandates comparative proportionality (Ground Forty-Five).

The Supreme Court recognizes that comparative proportionality review "presumes that the death sentence is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless

unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime." *Pulley v. Harris,* 465 U.S. 37, 43 (1984). While upholding capital sentencing schemes requiring proportionality review, the Supreme Court has never constitutionally mandated such review. *See Gregg v. Georgia,* 428 U.S. 153, 204-05 (1976) (plurality opinion) (noting the benefits of proportionality review as a means of preventing arbitrary death sentences, but not mandating such review). Rather than require comparative proportionality review in every capital case, the Constitution compels only that the death penalty not be imposed arbitrarily or capriciously. *See Pulley,* 465 U.S. at 49-50.

The FDPA "is not so lacking in other checks on arbitrariness that it fails to pass constitutional muster for lack of proportionality review." *United States v. Jones*, 132 F.3d 232, 240 (5th Cir. 1998). Specifically, the Fifth Circuit in *Jones* explained:

> The FDPA bifurcates the penalty phase from guilt determination. During the penalty phase, the jury must first determine whether the defendant intentionally killed the victim, or intentionally committed or participated in an act that resulted in the death of the victim. 18 U.S.C. § 3591(a). Then the jury must make a finding, beyond a reasonable doubt, of the existence of any aggravating factor or factors enumerated in § 3592(c). After finding the existence of at least one statutory aggravating factor, the jury may consider the existence of nonstatutory aggravating factors for which notice has been given by the government. *See* 18 U.S.C. § 3593(d). Individual jurors must then consider evidence of any mitigating factor that he or she has found to exist by a preponderance of the evidence. Prior to imposing a sentence of death, the jurors must conclude that evidence of the aggravating factors unanimously found to exist beyond a reasonable doubt, both statutory and nonstatutory, outweighs the mitigating factors any individual juror

has found to exist by a preponderance of the evidence. Additionally, the statute provides for appellate review to determine whether the death sentence was imposed under the influence of passion, prejudice or any other arbitrary factor. 18 U.S.C. § 3595.

*Id.*

Movant's constitutional challenge to the FDPA is without merit as the Constitution does not require comparative proportionality review in this case. *See Pulley,* 465 U.S. at 49-50. Furthermore, in accordance with *Jones*, its is clear that "the FDPA provides sufficient safeguards to prevent the arbitrary imposition of the death penalty." *Jones*, 132 F.3d at 241. The record in this case establishes that the death penalty was not imposed on Movant in an arbitrary or capricious fashion, and it follows that the death sentence was not unconstitutionally disproportionate with respect to the crime committed. *See Gregg*, 428 U.S. at 187 (explaining that imposition of the death penalty is not a punishment disproportionate to the crime of deliberate murder). Accordingly, Movant is not entitled to § 2255 relief with respect to his claims in Grounds Forty-Two and Forty-Four.

Because the Court has rejected on the merits Movant's constitutional claims in Grounds Forty-Two and Forty-Four, Movant cannot show that appellate counsel's conduct on appeal was deficient or prejudicial in that he had no obligation to raise such meritless claims on appeal. *See Reinhart*, 357 F.3d at 530; *Phillips*, 210 F.3d at 348-50. Accordingly, Movant is not entitled to relief with respect to his claims in Grounds Forty-Three and Forty-Five.

### 23.   Ground Forty-Six

Movant claims in Ground Forty-Six that the cumulative effect of the errors in this case constitutes a violation of Movant's due process right and his right to be free of cruel and unusual punishment.  He contends that the "cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."  (Doc. 318 at 285).

"Under the cumulative error doctrine, relief may be obtained only when constitutional errors so fatally infect the trial that they violate the trial's fundamental fairness."  *United States v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009) (internal quotations and citation omitted).  Where the trial court commits no error, it follows that there can be no cumulative error.  *Id.*  As discussed above, Movant's grounds for relief are all without merit and, therefore, had no cumulative effect.  No error was committed during both the guilt phase or the punishment phase of the trial.  Accordingly,  Movant is not entitled to relief with respect to his claim in Ground Forty-Six.

### 24.   Ground Forty-Seven

In Ground Forty-Seven, Movant re-asserts all issues raised on direct appeal.  The Fifth Circuit denied each of Movant's claims raised in his direct appeal.  *Fields*, 483 F.3d at 324-62.  Movant, therefore, cannot relitigate these issues in this § 2255 motion to vacate.  *See Rocha*, 109 F.3d at 230; *Kalish*, 780 F.3d at 508*; Moore*, 598

F.2d at 441.  Accordingly, Movant is not entitled to § 2255 relief with respect to his claim in Ground Forty-Seven.

### 25. Ground Forty-Eight

Movant claims in Ground Forty-Eight that appellate counsel rendered ineffective assistance in multiple respects.  As discussed above, Movant has failed to demonstrate that any of his claims entitle him to relief or that appellate counsel otherwise rendered deficient or prejudicial assistance on appeal.  Accordingly, Movant is not entitled to § 2255 relief with respect to his claim in Ground Forty-Eight.

### 26. Ground Forty-Nine

Movant claims in Ground Forty-Nine that he is entitled to an evidentiary hearing.  No evidentiary hearing is warranted in a § 2255 proceeding where the written submission of the parties and the district court's existing record provide sufficient information to dispose of the motion without a hearing.  *Franklin v. United States,* 589 F.2d 192, 193 (5th Cir.1979); *see United States v. Plewniak,* 947 F.2d 1284, 1290 (5th Cir.1991).  In this case, the Court finds that the extensive record and written submissions to be sufficient to dispose of each ground for relief.  Accordingly, Movant is not entitled to an evidentiary hearing.

### D. Motion for New Trial

Pursuant to Federal Rule of Criminal Procedure 33, Movant has filed a Motion for New Trial as amended.  (Docs. 300 and 318).  "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so

requires."   Fed.R.Crim.P. 33(a).  At the time Movant filed the motion for new trial, Federal Rule of Criminal Procedure 33(b)(2) provided that a motion for new trial based on any ground other newly discovered evidence must be filed within seven days of the guilty verdict."  Thus, to the extent that Movant's motion a new trial is based on matters other than newly discovered evidence, it is untimely.[15] Furthermore, a motion for new trial cannot be based on "newly discovered evidence" that trial counsel was ineffective. *United States v. Medina,* 118 F.3d 371, 372 (5th Cir.1997); *United States v. Ugalde,* 861 F.2d 802, 807–809 (5th Cir.1988).

A Rule 33 motion for new trial properly based on newly discovered evidence must be filed within three years after the verdict or finding of guilt.  Fed.R.Crim.P. 33(b)(1).  Such a motion, however, is "disfavored and reviewed with great caution." *United States v. Wall*, 389 F.3d 457, 467 (2004).  A movant must satisfy the following five prerequisites to justify a new trial based on newly discovered evidence: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if produced at a new trial would probably produce an acquittal." *Id.*

---

[15]  Rule 33(b)(2) currently provides that "[a]ny motion for a new trial grounded on any reasons other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilt."  Fed.R.Crim.P. 33(b)(2).

The record reflects that Movant filed the instant motion for a new trial well after three years following the jury's finding of guilt and recommendation to impose the death penalty in early 2004. The Court, therefore, is without jurisdiction to consider Movant's Rule 33 motion. *See Herrera*, 506 U.S. at 409; *Robinson v. United States*, No. 4:05-CV-756-Y, 2008 WL 4906272, at *24 (N.D. Tex. Nov. 7, 2008). *See also United States v. Ristovski*, 312 F.3d 206, 209-10 (6th Cir. 2002) (recognizing that a district court lacks jurisdiction to consider the merits of an untimely motion for a new trial). Even if the motion were timely filed, the Court finds that Movant has failed to satisfy each of the necessary prerequisites to justify a new trial. Accordingly, Movant's motion for a new trial as amended (Docs. 300 and 318) is denied.

## IV.   CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Movant Sherman Lamont Fields's Motion to Motion to Vacate, Set Aside, or Correct Sentence, as amended (*See* Docs. 297, 298, 300, and 318), is **DENIED** and this action is **DISMISSED**. Additionally, having considered the findings and conclusions set forth above and the requirements of 28 U.S.C. § 2253, the Court finds, *sua sponte*, that a certificate of appealability should not issue, as Movant has failed to make a substantial showing of the denial of a constitutional right. It is further

**ORDERED** that Movant's Motion for New Trial as amended (Docs. 300 and 318) is **DENIED**. It is further

**ORDERED** that the Clerk of the Court is directed to **REMOVE** Movant's sealed motions (Docs. 287, 288, and 289) as pending matters in this case. It is further

**ORDERED** that Movant's motions for extension of time in order to file a reply brief (Docs. 321 and 322) are **GRANTED**, *nunc pro tunc*, and that his reply brief (Doc. 331) is deemed timely filed on August 23, 2010. It is further

**ORDERED** that Movant's Motion for Authorization of Funds for Expert Assistance (Doc. 329) is **DENIED**. It is further

**ORDERED** that Movant's Motion for Protective Order (Doc. 323) is **GRANTED** and that the Government and its agents are **DIRECTED** to preserve all of the physical evidence seized in this case and take all reasonable steps to prevent against the contamination and/or spoilage of that evidence. It is further

**ORDERED** that Movant's Motion for Discovery and Production of Scientific Examination and Possible DNA Testing (Doc. 327) and Motion for Discovery (Doc. 330) are **DENIED**.

**SIGNED** on this 25th day of September, 2012.

_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE