EXHIBIT A

## DECLARATION OF DR. KATHLEEN WAYLAND, Ph.D.

I, Dr. Kathleen Wayland, declare as follows:

1.  I am a clinical psychologist licensed to practice in the states of North Carolina and California.  For the past twenty years, I have worked as a Mitigation Specialist to assist court appointed counsel in capital cases in identifying, developing, and presenting mental health and mitigation evidence.  From 2008 to 2012, I have been working as a Mitigation Specialist in private practice.  From 2002 to 2008 I was employed as a Mitigation Specialist at the Habeas Corpus Resource Center (HCRC), an agency funded by the State of California to provide post-conviction representation to indigent defendants who have been sentenced to death.  In this capacity, I provided training to attorneys, investigators, mitigation specialists, and paralegals on a variety of mental health and mitigation issues relevant to capital cases, and routinely consulted with legal teams about clients' social histories and the development of mitigation and mental health evidence.  From 1993 to 2002, I served as a Mitigation Specialist at the California Appellate Project (CAP), where I assisted counsel in developing and presenting mental health and mitigation evidence, and in reviewing prior mental health evaluations for professional competence and reliability.  In my work as a Mitigation Specialist since 1993, I have routinely consulted with investigators, mitigation specialists, lawyers, and mental health professionals who are retained to assist counsel in death penalty cases.

2.  For a two decades, I have regularly attended seminars and conferences related to the defense of capital cases.  These conferences are organized and attended by attorneys specializing in capital work defense all over the country.

3.  I have served as a faculty member in numerous CLE-approved training seminars for capital litigation sponsored by state bar associations, state and federal capital defenders, professional associations, or colleges of law in numerous states and death penalty jurisdictions, including: Arizona, Alabama, California, Colorado, Connecticut, the District of Columbia, Florida, Georgia, Idaho, Illinois, Kansas, Louisiana, Maryland, Missouri, Ohio, Nevada, New Mexico, New York, North Carolina, Oregon, Pennsylvania, and Texas.

4.  I have lectured at multiple national conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conferences), the National Association of Sentencing Advocates, the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of

1

Criminal Defense Lawyers ("Making the Case for Life"). I have served on the planning committees for numerous national conferences, and have been a planning committee member for the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA) for approximately 17 years.

5.    I received a B.A. degree from the State University of New York at Binghamton in 1977 and an M.A. in clinical psychology from Duke University in 1986. In 1989, I was awarded a Ph.D. in clinical psychology, also from Duke University. In 1989 and 1990, I completed a post-doctoral fellowship at Duke University Medical Center.

6.    From 1990 to 1995, I was an Associate with the Department of Psychiatry, Divisions of Child and Adolescent Psychiatry and Medical Psychology at Duke University Medical Center. In 1993, I took a two-year leave of absence from Duke Medical Center to serve as a consultant and Mitigation Specialist with CAP. In 1995, I became a full time staff member at CAP.

7.    I have extensive research and clinical experience in the field of psychology and have published several articles in professional journals, including the Journal of Traumatic Stress and the Journal of Abnormal Child Psychology. At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases (36 HOFSTRA L. REV. 1067 (Spring 2008)), titled The Importance of Recognizing Trauma Throughout Capital Mitigation Investigations and Presentations. I co-wrote a manual for capital practitioners on mental health and mitigation issues, titled A Practitioner's Guide to Defending Capital Clients Who Have Mental Disorders and Impairments. I have served as a consultant and expert witness in legal actions concerning family, juvenile and criminal matters, generally as an expert on the long-term effects of child abuse and trauma or as an expert on the development of mental health and mitigation evidence in capital cases.

8.    I have extensive clinical experience conducting mental health evaluations and providing counseling and intensive therapy for both adults and children. I have lectured and consulted nationally about the biological and psychosocial factors affecting human development, including physical and sexual abuse and traumatic stress syndromes, and have trained professionals in the social service, mental health, legal, and law enforcement fields.

2

9.    I was asked by counsel for Mr. Fields to review the declaration of Dr. George Woods to determine whether a trauma expert could provide new and/or additional information regarding the impact of trauma on Mr. Fields.

10.    I agree that Dr. Woods provided "extensive statements" in his affidavit as to Mr. Fields' "mental condition and his developmental background," including the potential impact of trauma on Mr. Fields' behavior. Nevertheless, it is my opinion that a trauma expert could add important information that would assist the Court in deciding this case.

11.    To begin, assessing the role of trauma is (or should be) an essential component of any competent mitigation investigation and any competent assessment of mental health issues in a capital case. Mental health experts who specialize in understanding trauma can draw from the enormous body of literature from multiple fields—epidemiology, psychology, psychiatry, developmental psychopathology neuroscience—that clarifies the process by which exposure to psychological trauma leads to a host of devastating psychological conditions.

12.    A trauma expert can help insure that a competent and thorough investigation is conducted in order to discover information that is relevant, but often hidden, overlooked, or misunderstood. In my opinion, a competent mitigation investigation must thoroughly explore *all* of an individual defendant's trauma exposures. It is likely that he will have suffered multiple and possibly repeated traumatic experiences, very possibly in numerous contexts. An individual defendant may have been exposed to physical abuse, sexual abuse, community violence, institutional violence, combat, a natural disaster, and one or more motor vehicle accidents. A competent social history investigation requires close examination of each event (or series of events), including the circumstances of each trauma, the sequelae, the interaction or overlap with other disorders and disabilities, and the factors that shaped the client's response and recovery (or disability).

13.    Investigation of traumatic events and other highly sensitive life experiences requires highly specialized knowledge and skills. By virtue of the mandate to investigate and present the "diverse frailties of humankind," life history investigation in capital cases can often lead into areas which are potentially experienced as invasive and intrusive. It requires skilled interviewing of clients, family members, and others on a variety of subjects that are highly sensitive, may be cognitively or emotionally difficult to recall, and the telling or retelling of which may be accompanied by overwhelming affect.

3

14.    An expert in the field of trauma could also explain how people like Mr. Fields, with a prior history of trauma exposure, are at increased risk for subsequent exposure as well as profound emotional and behavioral disturbances.  The trauma literature clearly shows a "dose response" relationship between traumatic events and outcomes, that is, the greater the number of exposures to traumatic events, the greater the probability of negative physical and psychological health outcomes.

15.    A trauma expert can explain the numerous impairments from trauma including:

- Problems with the regulation of emotion (e.g. increased anxiety and depression, difficulties with aggression and anger);
- Problems with the regulation of behavior (e.g. self-destructive and impulsive behaviors);
- Problems with attention or consciousness, avoidant responses (e.g. dissociative symptoms, depersonalization);
- Problems with relationships (e.g. inability to trust, fearfulness, and suspiciousness of others, idealizing or bonding with one's abuser);
- Problems with a coherent sense of oneself (e.g. identity disturbances, low self esteem, feeling damaged or ineffective);
- Problems interpreting one's environment and the intent and actions of others;
- Problems maintaining a system of meaning (e.g. believing the future holds no promise or hope, profound feelings of despair, helplessness, and hopelessness).

16.    Absent a specialized understanding of the effects of trauma (and detailed information about Mr. Fields' life history), an evaluator might decide that behaviors signify "irritability and aggressiveness" (a symptom of ASPD) and miss the fact that the behaviors in question are a consequence of the hyperarousal component of PTSD.  Similarly, an evaluator might decide that behaviors signify "lack of remorse" (a symptom of ASPD), and miss the fact that the behaviors in question are a consequence of the psychic numbing component of PTSD.  Finally, an evaluator might decide that behaviors signify "reckless disregard for safety of self or others" (a symptom of ASPD) and miss the fact that the behaviors in question reflect symptoms of complex psychological trauma, sometimes referred to as DESNOS [disorders of extreme stress, not otherwise specified], as well as associated features of PTSD noted in the DSM-IV of dysregulated affect and behavior.

4

17.    The potential for misdiagnoses of ASPD is particularly great when the trauma history has not been sufficiently investigated.  A trauma expert can effectively explain behaviors that are often misunderstood and misinterpreted.

18.    Mitigation investigation related to psychological trauma must be informed by the trauma literature, including an understanding of the factors that increase risk, knowledge of trauma and its effects, and an understanding of the dynamics of interpersonal violence. This base of knowledge informs investigation and interviewing strategies with clients and family members, and provides a framework for presenting the psychological significance of this information to fact-finders.

19.    In sum, it is my opinion that the opinion of a mental health expert with expertise in trauma could add significant information both in terms of discovering and understanding the impact of trauma on Mr. Fields.

I declare under the penalty of perjury of the laws of the State of New Mexico and the United States that the above is true and correct.

10/22/12  Albuquerque, N. M.
Date and Place

_Kathleen Wayland, Ph.D_
Kathleen Wayland, Ph.D.

5